## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DEX ONE CORPORATION, et al.,[1] | ) | Case No. 13-10533 ([___]) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## APPLICATION OF DEX ONE CORPORATION, ET AL. FOR ENTRY OF AN ORDER APPROVING THE RETENTION AND EMPLOYMENT OF EPIQ BANKRUPTCY SOLUTIONS, LLC AS THE ADMINISTRATIVE ADVISOR FOR THE DEBTORS, EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE

The above-captioned debtors (collectively, the "Debtors" or "Dex One") file this application (the "Application") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Order"), approving the services agreement (the "Services Agreement") between the Debtors and Epiq Bankruptcy Solutions, LLC ("Epiq") and the Debtors' retention and employment of Epiq as administrative advisor (the "Administrative Advisor") for the Debtors in connection with these chapter 11 cases and for related relief, effective nunc pro tunc to March 18, 2013 (the "Petition Date"). In support of this Application, the Debtors rely on the declaration of Jennifer M. Meyerowitz, Esq. (the "Meyerowitz Declaration") attached hereto as Exhibit B and incorporated herein by reference. In further support of the Application, the Debtors respectfully state as follows:

---

[1] The Debtors, together with the last four digits of each of the Debtors' federal tax identification number, are: Dex One Corporation (0040); Dex Media, Inc. (9762); Dex Media East, Inc. (5763); Dex Media West, Inc. (7004); Dex Media Service LLC (9647); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley Inc. (7635); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); Newdex, Inc. (1335); and Spruce Acquisition Sub, Inc. (4006). For the purpose of these chapter 11 cases, the service address for the Debtors is: 1001 Winstead Drive, Cary, North Carolina 27513.

## Jurisdiction

1.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory bases for the relief requested herein are sections 327(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Relief Requested

4.        The Debtors seek entry of the Order approving the Services Agreement and the Debtors' retention of Epiq as the Administrative Advisor for the Debtors in these chapter 11 cases pursuant to the Services Agreement, which is attached hereto as Exhibit C and incorporated herein by reference, effective *nunc pro tunc* to the Petition Date.

5.        This Application supplements the Debtors' application under 28 U.S.C. § 156(c) (the "Section 156(c) Application") filed contemporaneously herewith to retain Epiq to serve as the claims and noticing agent in these cases, and seeks approval for Epiq to perform duties outside of the scope of 28 U.S.C. § 156(c).

## Business Overview

6.      Dex One, headquartered in Cary, North Carolina and employing about 2,200 people across the United States, is a leading provider of marketing solutions that help local businesses and consumers connect with each other.  The company's marketing consultants provide essential services, advice, and value to local businesses to help them thrive in an increasingly fragmented marketing landscape.  Specifically, Dex One's portfolio of marketing solutions includes:  print directories, search engine optimization, website and mobile site design, individualized directory placement, online reputation management, custom-created digital display advertising, and in-depth reports on customers' marketing programs.

7.      In recent years, Dex One has experienced growth in its digital product and service revenues.  These revenues, in aggregate, increased from $146 million to $229 million, or by 57%, for fiscal year 2012 over fiscal year 2011.  While digital revenues are anticipated to continue to grow over time, such revenues currently represent only about 18% of Dex One's total revenues.  Moreover, consumers' shift away from traditional print media and macroeconomic factors have negatively impacted Dex One's overall operating performance.  Dex One's adjusted EBITDA decreased from $634 million to $561 million, or by 12%, for fiscal year 2012 over fiscal year 2011.  Also, as of the Petition Date, the book value of Dex One's assets totaled approximately $2.7 billion and its liabilities totaled approximately $2.7 billion.[2]  Dex One must restructure its balance sheet and reduce operating costs to maintain long-term operations.

## The Restructuring

8.      Prior to the Petition Date, Dex One engaged in significant negotiations with both SuperMedia, Inc. (together with its subsidiaries, "SuperMedia") and Dex One's senior secured

---

[2]      For more information regarding Dex One's history, operations, and financial performance, see the *Declaration of Mark W. Hianik in Support of First Day Motions*, filed concurrently with this motion.

lenders under its three separate secured credit facilities. Specifically, Dex One engaged in nine months of discussions with SuperMedia that ultimately resulted in Dex One and SuperMedia signing a merger agreement on August 20, 2012 (the "Merger Agreement"). The Merger Agreement provides for a stock-for-stock merger (the "Merger") to improve the companies' operating cash position. Dex One estimates that the Merger will generate between $150 million and $175 million of annual run rate cost synergies by 2015. Additionally, Dex One expects its current and future tax attributes, estimated at approximately $1.0 billion, to inure to the benefit of the combined company over time.

9.    Also, Dex One negotiated for over 18 months with its secured lenders to agree to amended and restated senior secured credit facilities (collectively, the "Amendments").[3] Consummating the Amendments is a condition precedent to closing the Merger. The Amendments, among other things, will extend the maturity of Dex One's senior secured debt until the end of 2016 and will otherwise improve Dex One's ability to service and pay down its indebtedness. Dex One anticipates that these transactions will position and stabilize the combined company so that it may have the runway to increase sales of profitable products and services and phase out unprofitable products and services.

10.    On December 5, 2012, Dex One and a group of unaffiliated senior secured lenders comprising the steering committee executed a support agreement (the "Support Agreement") in furtherance of consummating the Merger and the Amendments either out-of-court or under a chapter 11 plan. On December 6, 2012, Dex One requested that senior secured lenders (other than the members of the steering committee) become parties to the Support Agreement. On December 20, 2012, Dex One announced that most of its senior secured lenders had become

---

[3]    Contemporaneously, SuperMedia negotiated with its senior secured lenders to amend and restate its senior secured credit facility.

parties to the Support Agreement.[4]  After obtaining the Securities and Exchange Commission's approval of its solicitation materials on February 8, 2013, Dex One commenced solicitation of its shareholders to approve the Merger, whether on an in-court or an out-of-court basis.  At the same time, Dex One began soliciting senior secured lenders to approve the Amendments, whether on an in-court or an out-of-court basis.  The solicitation of both the shareholders and the lenders was in accordance with sections 1125 and 1126 of the Bankruptcy Code and included a request for votes to accept a prepackaged chapter 11 plan (the "Plan"), which provides for consummation of the Merger and the Amendments if Dex One elected to pursue the restructuring through chapter 11 bankruptcy cases.  SuperMedia, in parallel, commenced a similar solicitation process with respect to its senior lenders and shareholders.

      11.    Dex One did not obtain the unanimous lender consent necessary to effect the Amendments outside of bankruptcy.  By contrast, the voting results were overwhelmingly in favor of the transactions and more than sufficient for Plan approval under the Bankruptcy Code. Dex One's senior secured lenders comprise its three impaired voting claims classes under the Plan.  Of the 400 senior secured lender votes received, *398 were cast in favor of the Plan*. Specifically, of those class 5 claim holders that voted on the Plan, 99.06% of holders, holding 97.23% of class 5 claims, voted to accept the Plan.  Of those class 6 claim holders that voted on the Plan, 100% of holders, holding 100% of class 6 claims, voted to accept the Plan.  And of those class 7 claim holders that voted on the Plan, 99.35% of holders, holding 99.59% of class 7

---

[4]    As of such date, lenders holding the following percentages of claims, by number and amount of the aggregate claims held, respectively, under each of the Debtors' credit facilities, were party to the Support Agreement: Dex Media East, Inc. credit facility — 71.6% / 81.4%; Dex Media West, Inc. credit facility — 87.5% / 94.8%; and R.H. Donnelley Inc. credit facility — 70.9% / 86.4%.

claims, voted to accept the Plan. Also, of those shareholders that voted on the Plan, holders of 99.90% in amount of Dex One Corporation interests voted to accept the Plan.[5]

12.     Thus, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and the Plan on the Petition Date.[6] Contemporaneously, SuperMedia filed for chapter 11 protection and a prepackaged chapter 11 plan providing for consummation of the transactions. On the effective date of the parties' respective chapter 11 plans, the Amendments and the Merger will close. Dex One Corporation's shareholders will own about 60% of the combined company's equity and SuperMedia's shareholders will own the remaining equity.

### Services to Be Provided

13.     The Debtors seek to retain Epiq to provide, among other things, the following bankruptcy administrative services (the "Administrative Services"), if and to the extent the Debtors request:

    a.    assisting with, among other things, solicitation, balloting, tabulation, and calculation of votes, as well as preparing any appropriate reports, as required in furtherance of confirmation of plan(s) of reorganization;[7]

    b.    generating an official ballot certification and testifying, if necessary, in support of the ballot tabulation results;

    c.    generating, providing and assisting with claims objections, exhibits, claims reconciliation, and related matters;

    d.    providing a confidential data room;

---

[5] Shareholders holding approximately 80% of Dex One Corporation issued and outstanding common stock voted to accept the Plan.

[6] The Debtors have filed a motion seeking joint administration of their chapter 11 cases under Bankruptcy Rule 1015(b). The Debtors are operating their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

[7] Given the prepackaged nature of the Debtors' chapter 11 cases, Epiq performed solicitation, balloting, tabulation, and calculation of votes prior to the Petition Date (the "Prepetition Services"). Although the Debtors do not foresee the need for these services after the Petition Date, they are included herein out of an abundance of caution and in the event there are additional follow-up services needed in the Debtors' cases.

e.    managing any distributions pursuant to a confirmed plan of reorganization; and

f.    providing such other claims processing, noticing, solicitation, balloting, and administrative services described in the Services Agreement, but not included in the Section 156(c) Application, as may be requested from time to time by the Debtors.

### Epiq's Qualifications

14.    Epiq is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. Epiq has substantial experience providing services, including administrative services, in matters comparable in size and complexity to this matter. See e.g., In re Satcon Tech. Corp., No. 12-12869 (KG) (Bankr. D. Del. Oct. 18, 2012); In re Prince Sports, Inc., No. 12-11439 (KJC) (Bankr. D. Del. May 2, 2012); In re Amicus Wind Down Corp. (f/k/a Friendly Ice Cream Corp.), No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011); In re SSI Grp. Holding Corp., No. 11-12917 (MFW) (Bankr. D. Del. Sept. 15, 2011); In re L.A. Dodgers LLC, No. 11-12010 (KG) (Bankr. D. Del. July 19, 2011); In re Anchor Blue Holding Corp., No. 11-10110 (PJW) (Bankr. D. Del. Jan. 12, 2011); In re Post-Sale Co. II, LLC (f/k/a Consol. Horticulture Grp. LLC, No. 10-13308 (CSS) (Bankr. D. Del. Oct. 14, 2010); In re Trico Marine Servs., Inc., No. 10-12653 (BLS) (Bankr. D. Del. Aug. 27, 2010); In re Leslie Controls, Inc., No. 10-12199 (CSS) (Bankr. D. Del. July 14, 2010); In re PCAA Parent, LLC, No. 10-10250 (MFW) (Bankr. D. Del. Jan. 29, 2010).[8]

15.    The Debtors chose Epiq to perform the Administrative Services because of Epiq's experience, reputation, and the competitiveness of its fees. The Debtors submit that using Epiq to perform the Prepetition Services was the most cost-effective and efficient way for the Debtors

---

[8]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Application. Copies of these orders are available upon request of the Debtors' proposed counsel.

to successfully file these prepackaged chapter 11 cases. Additionally, using Epiq to provide the other Administrative Services will provide the most cost-effective and efficient administration of these chapter 11 cases. Further, retaining Epiq to perform the Administrative Services has allowed, and will continue to allow, the Debtors and their professionals to focus on key aspects of the Debtors' restructuring efforts. Accordingly, the Debtors believe that Epiq is well qualified to provide the Administrative Services and that Epiq's retention in such capacity is in the best interests of the Debtors' estates and their creditors.

### Compensation and Representation of Disinterestedness

16.     The fees Epiq will charge in connection with its services to the Debtors are set forth in the Services Agreement. Epiq's rates are competitive and comparable to the rates Epiq's competitors charge for similar services and are reasonable given the quality of Epiq's services and Epiq's bankruptcy expertise. Additionally, Epiq will seek reimbursement from the Debtors for reasonable expenses in accordance with the terms of the Services Agreement.

17.     Prior to the Petition Date, the Debtors provided Epiq a retainer in the amount of $25,000. Epiq seeks to hold the retainer under the Services Agreement during the cases as security for the payment of fees and expenses incurred under the Services Agreement.

18.     Epiq intends to apply to the Court for allowance of compensation and reimbursement of out-of-pocket expenses incurred after the Petition Date in connection with the services it provides, pursuant to this Application, as the Administrative Advisor in these chapter 11 cases, subject to Court approval and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the United States Trustee for the District of Delaware, and further orders of the Court.

19.     The Meyerowitz Declaration represents that Epiq is not connected with the Debtors, their creditors, the United States Trustee, or any person employed by the Office of the United States Trustee, and that, to the best of Epiq's knowledge, after due inquiry, Epiq does not by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, or hold or represent any interest adverse to the Debtors, their estates, or any class of creditors or equity interest holders with respect to the matters upon which it is to be engaged.  Based upon the Meyerowitz Declaration, Epiq is a "disinterested person," as that term is defined in section 101(14) of the Bankruptcy Code.

### Basis for Relief

20.     Section 327(a) of the Bankruptcy Code provides that a debtor, subject to Court approval:

> [M]ay employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under this title.

11 U.S.C. § 327(a).

21.     Bankruptcy Rule 2014(a) requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, and proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014.

22.     Additionally, Local Rule 2014-1 requires an entity seeking approval of employment under section 327(a) to the Bankruptcy Code to file a motion, supporting affidavit,

and proposed order, all of which have been satisfied by this Application, the Meyerowitz Declaration attached hereto as <u>Exhibit B</u>, and the proposed Order attached hereto as <u>Exhibit A</u>. Further, in accordance with Local Rule 2014-1, Epiq acknowledges its continuing duty to supplement the Meyerowitz Declaration with additional material information relating to the employment of Epiq if necessary.

23.     To help manage administrative tasks with respect to the thousands of creditors, equity security holders, and other parties in interest that are expected to be involved in the Debtors' chapter 11 cases, and for reasons previously stated, the Debtors submit that Epiq's employment is necessary and in the best interests of the Debtors and their estates. Additionally, as described in the Meyerowitz Declaration, Epiq is disinterested. Accordingly, the Debtors submit that Court approval of Epiq as the Administrative Advisor in these chapter 11 cases pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1 is warranted.

<b><u>Nunc Pro Tunc Relief Is Appropriate</u></b>

24.     Pursuant to the Debtors' request, Epiq has acted as the Administrative Advisor since the Petition Date. Moreover, Epiq has performed the Prepetition Services with assurances that the Debtors would seek approval of its employment and retention effective <u>nunc</u> <u>pro</u> <u>tunc</u> to the Petition Date so that Epiq may be compensated for the Prepetition Services and the Administrative Services. The Debtors believe that no party in interest will be prejudiced by the granting of the <u>nunc</u> <u>pro</u> <u>tunc</u> employment of Epiq, because Epiq has provided and continues to provide valuable services to the Debtors' estates.

25.     Courts in this jurisdiction have routinely approved <u>nunc</u> <u>pro</u> <u>tunc</u> employment similar to that requested herein. <u>See e.g.</u>, <u>In re Satcon Tech. Corp.</u>, No. 12-12869 (KG) (Bankr.

D. Del. Oct. 17, 2012) (approving <u>nunc pro tunc</u> employment of Epiq to perform administrative services); <u>In re Amicus Wind Down Corp. (f/k/a Friendly Ice Cream Corp.)</u>, No. 11-13167 (KG) (Bankr. D. Del. Oct. 5, 2011) (same); <u>In re SSI Grp. Holding Corp.</u>, No. 11-12917 (MFW) (Bankr. D. Del. Sept. 15, 2011) (same); <u>In re L.A. Dodgers LLC</u>, No. 11-12010 (Bankr. D. Del. July 10, 2011) (same).

26.    Based on the foregoing, the Debtors submit that they have satisfied the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, the Debtors respectfully request entry of the Order pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1 approving the Debtors' Application to retain and employ Epiq to act as the Administrative Advisor, effective <u>nunc pro tunc</u> to the Petition Date.

### Notice

27.    The Debtors have provided notice of this Application to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) counsel to the administrative agents of the Debtors' prepetition secured credit facilities; (d) counsel to the indenture trustee for the Debtors' prepetition senior subordinated notes; (e) counsel to SuperMedia; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

28.    No prior application for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the Meyerowitz Declaration, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court deems appropriate.

DEX ONE CORPORATION
(for itself and on behalf of its Debtor subsidiaries)

Dated:  March 18, 2013
       Wilmington, Delaware

Mark W. Hianik
Senior Vice President, General Counsel and
Chief Administrative Officer
1001 Winstead Drive
Cary, North Carolina 27513