# EXHIBIT A

**Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DEX ONE CORPORATION, et al.,[1] | ) | Case No. 13-10533 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN**

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    james.sprayregen@kirkland.com
    marc.kieselstein@kirkland.com
    christopher.marcus@kirkland.com

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
    pkeane@pszjlaw.com

Proposed Attorneys for the
Debtors and Debtors in Possession

Dated: February 8, 2013

---

[1]    The Debtors, together with the last four digits of each of the Debtors' federal tax identification number (if applicable), are:  Dex One Corporation (0040); Dex Media, Inc. (9762); Dex Media East, Inc. (5763); Dex Media West, Inc. (7004); Dex Media Service LLC (9647); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley Inc. (7635); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); Newdex, Inc. (1335); and Spruce Acquisition Sub, Inc. (4006).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is:  1001 Winstead Drive, Cary, North Carolina 27513.

**DISCLAIMER**

This Disclosure Statement[2] contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All holders of Claims entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, the Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in the Disclosure Statement and the terms and provisions of the Plan or the other documents and financial information incorporated in the Disclosure Statement by reference, the Plan or the other documents and financial information, as the case may be, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court. The statements and financial information contained in this Disclosure Statement have been made as of the date of the Disclosure Statement unless otherwise specified. Holders of Claims reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in the Disclosure Statement since the date of the Disclosure Statement. Each holder of a Claim entitled to vote on the Plan should carefully review the Plan and this Disclosure Statement in their entirety before casting a ballot. No holder of a Claim should rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. The Disclosure Statement does not constitute legal, business, financial, or tax advice. Any entities desiring any such advice should consult with their own advisors.

The securities described in this Disclosure Statement to be issued under the Plan will be issued in compliance with the registration requirements of the Securities Act or exempt from the registration requirements of section 5 therein pursuant to section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), nor has the commission commented upon the accuracy or adequacy of the statements contained in this Disclosure Statement. Likewise, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The financial projections, attached hereto as Exhibit B and described in this Disclosure Statement, have been prepared by the Debtors' management in consultation with their advisors. The financial projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts to not be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' and SuperMedia's businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to the ultimate performance of

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Debtors' Joint Prepackaged Chapter 11 Plan (the "Plan"), attached hereto as Exhibit A, Dex One's most recent Annual Report in Form 10-K and Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2012, June 30, 2012, and September 30, 2012, the entirety of which are publicly available at (a) the Debtors' investor relations website, located at http://ir.dexone.com and (b) the Securities and Exchange Commission's Electronic Data Gathering, Analysis, and Retrieval system, located at http://www.sec.gov/edgar/searchedgar/webusers.htm.

Newdex compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the financial projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to holders of Claims against or Interests in, the Debtors or any other party in interest. Please refer to <u>ARTICLE VIII</u> of this Disclosure Statement, entitled "Certain Factors to be Considered" for a discussion of certain risk factors that a creditor voting on the Plan should consider.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................................1

**ARTICLE I PLAN OVERVIEW** ..........................................................................................................2
    1.1       Plan Structure Overview ...................................................................................................2
    1.2       Restructuring Transactions ...............................................................................................2
    1.3       Amended and Restated Credit Agreements ......................................................................3
    1.4       Shared Services Agreement ...............................................................................................8
    1.5       Tax Sharing Agreements ...................................................................................................8
    1.6       Dex One Support Agreement ............................................................................................9
    1.7       Unclassified Claims .........................................................................................................12
    1.8       Classified Claims and Interests ......................................................................................13
    1.9       Liquidation Analysis .......................................................................................................20
    1.10      Valuation Analysis ..........................................................................................................20

**ARTICLE II VOTING PROCEDURES AND REQUIREMENTS** .................................................21
    2.1       Classes Entitled to Vote on the Plan ..............................................................................21
    2.2       Votes Required for Acceptance by a Class ......................................................................21
    2.3       Certain Factors to be Considered Prior to Voting ..........................................................21
    2.4       Classes Not Entitled to Vote on the Plan ........................................................................22
    2.5       Solicitation Procedures ....................................................................................................22
    2.6       Voting Procedures ...........................................................................................................23

**ARTICLE III CONFIRMATION** .......................................................................................................24

**ARTICLE IV FINANCIAL INFORMATION AND PROJECTIONS** ............................................24

**ARTICLE V BUSINESS DESCRIPTIONS** .......................................................................................25
    5.1       Corporate History and Organizational Structure ...........................................................25
    5.2       Employees ........................................................................................................................27
    5.3       Directors and Officers .....................................................................................................28
    5.4       Prepetition Capital Structure ...........................................................................................32

**ARTICLE VI EVENTS LEADING TO THE CHAPTER 11 CASES** ...........................................35
    6.1       Challenging Industry Conditions ....................................................................................35
    6.2       Insufficient Votes to Effect the Merger, and Financing Amendments, Out of Court.....36

**ARTICLE VII OTHER KEY ASPECTS OF THE PLAN** .............................................................37
    7.1       Distributions .....................................................................................................................37
    7.2       Treatment of Executory Contracts and Unexpired Leases ..............................................38
    7.3       Release, Injunction, and Related Provisions ...................................................................40
    7.4       Protection Against Discriminatory Treatment .................................................................42
    7.5       Indemnification ................................................................................................................42
    7.6       Recoupment .....................................................................................................................43
    7.7       Release of Liens ...............................................................................................................43
    7.8       Reimbursement or Contribution ......................................................................................43
    7.9       Newdex Common Stock ...................................................................................................43
    7.10      Incentive Plans and Employee and Retiree Benefits .......................................................43
    7.11      Subordination ...................................................................................................................43
    7.12      Vesting of Assets in the Reorganized Debtors ................................................................44
    7.13      Modification of Plan ........................................................................................................44
    7.14      Revocation or Withdrawal of Plan ..................................................................................44
    7.15      Reservation of Rights .......................................................................................................44
    7.16      Plan Supplement Exhibits ................................................................................................44
    7.17      Conditions Precedent to the Effective Date .....................................................................45

**ARTICLE VIII CERTAIN FACTORS TO BE CONSIDERED** .......................................................................**45**
 8.1  General ................................................................................................................. 46
 8.2  Risks Related to the Plan and Other Bankruptcy Law Considerations ............................ 46
 8.3  Business-Specific Risk Factors ........................................................................................ 51
 8.4  Disclosure Statement Disclaimer ..................................................................................... 59

**ARTICLE IX IMPORTANT SECURITIES LAW DISCLOSURE** .......................................................**61**

**ARTICLE X REGULATORY APPROVALS REQUIRED FOR THE TRANSACTION** ................................**62**

**ARTICLE XI CONFIRMATION PROCEDURES** ...........................................................................**63**
 11.1  The Confirmation Hearing .............................................................................................. 63
 11.2  Confirmation Standards .................................................................................................. 63
 11.3  Best Interests Test/Liquidation Analysis ......................................................................... 64
 11.4  Feasibility ........................................................................................................................ 64
 11.5  Confirmation Without Acceptance by All Impaired Classes ............................................ 64

**ARTICLE XII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ...........**65**

**ARTICLE XIII CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** ......................................**66**
 13.1  Introduction .................................................................................................................... 66
 13.2  Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ................... 67
 13.3  Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed
    Claims ............................................................................................................................. 69
 13.4  Withholding and Reporting ............................................................................................. 71

**ARTICLE XIV CONCLUSION AND RECOMMENDATION** ..........................................................**72**

**APPENDIX: RULES OF INTERPRETATION, COMPUTATION OF TIME,  GOVERNING LAW,
 AND OTHER REFERENCES** ...............................................................................................**74**
 14.1  Rules of Interpretation .................................................................................................... 74
 14.2  Computation of Time ...................................................................................................... 74
 14.3  Governing Law ............................................................................................................... 74
 14.4  Reference to Monetary Figures ....................................................................................... 74
 14.5  Reference to the Debtors or the Reorganized Debtors ..................................................... 74

**EXHIBITS**

Exhibit A        Debtors' Joint Prepackaged Chapter 11 Plan

Exhibit B        Financial Projections

Exhibit C        SuperMedia Plan

Exhibit D        Dex One Support Agreement

Exhibit E        Merger Agreement

Exhibit F        Unaudited Pro Forma Condensed Combined Financial Statements

Exhibit G        SuperMedia Tax Sharing Agreement

Exhibit H        Unaudited Liquidation Analysis of the Debtors

Exhibit I        Unaudited Valuation Analysis of Newdex

Exhibit J        Corporate Structure Charts

Exhibit K        Newdex Certificate of Incorporation

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

# INTRODUCTION

Dex One is one of the largest print and online directory publishers in the United States, as measured by revenue, and a leading provider of local search advertising products and services. The Debtors' portfolio of products and services includes print and online directory publications, search engine marketing and optimization, individualized directory placement, website and mobile site design, custom-created digital display advertising, and in-depth reports on customer marketing programs.

The Debtors' operations have been impacted by a highly competitive industry in the United States. The Debtors compete with many different media, including newspapers, radio, television, the internet, billboards, direct mail, telemarketing and other yellow pages directory publishers. Declining use of print yellow page directories also has adversely affected the Debtors' businesses. The Debtors have continually evaluated their financial and strategic options in response to the challenging industry environment.

On August 20, 2012, Dex One and certain of its subsidiaries entered into the Merger Agreement with SuperMedia, which was amended and restated on December 5, 2012. The Merger Agreement provides for certain amendments to the Credit Agreements and the SuperMedia Secured Credit Agreement (as defined in Section 5.4(b) below) (such agreements, as in effect immediately prior to such amendments, collectively, the "Prepetition Credit Agreements"). To be consummated outside of a Chapter 11 process, certain of these amendments would require unanimous consent of the relevant lenders, while other amendments would require the consent of a simple majority of the lenders.

Accordingly, Dex One and SuperMedia entered into negotiations with a steering committee composed of an unaffiliated group of lenders under the Prepetition Credit Agreements (the "Steering Committee"), including the administrative agents under the Prepetition Credit Agreements. On December 5, 2012, the Debtors, the administrative agents under the Credit Agreements, and the members of the Steering Committee who were lenders under the Credit Agreements entered into the Dex One Support Agreement, in which the parties agreed to support, subject to the terms and conditions of the Dex One Support Agreement, the consummation of the Amended and Restated Credit Agreements and the Merger either out of court or under a chapter 11 plan. Contemporaneously, SuperMedia, the administrative agent under the SuperMedia Secured Credit Agreement, and the members of the Steering Committee who were lenders under the SuperMedia Secured Credit Agreement entered into the SuperMedia Support Agreement, in which the parties agreed to support, subject to the terms and conditions of the SuperMedia Support Agreement, the consummation of amendments to the SuperMedia Secured Credit Agreement and the Merger either out of court or under a chapter 11 plan.

On December 6, 2012, Dex One requested that the lenders to the Credit Agreements (other than the members of the Steering Committee) become parties to the Dex One Support Agreement. At the same time, SuperMedia made similar requests of the lenders to the SuperMedia Secured Credit Agreement (other than the members of the Steering Committee) with respect to the SuperMedia Support Agreement.

On December 21, 2012, Dex One and SuperMedia announced that lenders holding more than half in number and at least two-thirds in amount of (but not all) Claims under each of the Prepetition Credit Agreements have entered into the Dex One Support Agreement and SuperMedia Support Agreement, as applicable. For additional discussion of the Dex One Support Agreement, please see section 1.6 herein.

On February 8, 2013, the SEC declared the combined registration statement and joint proxy statement of Dex One and SuperMedia effective. Thereafter, and contemporaneously with this solicitation, Dex One commenced solicitation of its shareholders to approve the Merger on an out-of-court basis, and, in accordance with sections 1125 and 1126 of the Bankruptcy Code, to accept the Plan, which provides for consummation of the Merger and the Amended and Restated Credit Agreements through a chapter 11 process. Dex One also simultaneously is soliciting lender consents to the amendments on an out-of-court basis. By this Disclosure Statement and the accompanying materials, the Debtors are soliciting the votes of the lenders under the Credit Agreements on the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code. SuperMedia, in parallel, has commenced the above-described solicitation processes with respect to its senior secured lenders and shareholders.

The Debtors are seeking consent of all senior secured lenders for the Amended and Restated Credit Agreements and the approval of a majority of Dex One common stockholders with respect to the Merger.  If the Debtors do not obtain sufficient lender consents or stockholder votes to consummate the Merger and the Amended and Restated Credit Agreements on an out of court basis under applicable law, the Debtors may file voluntary petitions for relief under chapter 11 of the Bankruptcy Code and the Plan on the Petition Date, as described in this Disclosure Statement.  The Debtors, in substantial part, would do so to effect the Merger and the Amended and Restated Credit Agreements.  In addition, if SuperMedia does not obtain sufficient senior secured lender consents or shareholder votes to consummate the amendments to its senior secured credit agreement and the Merger on an out of court basis under applicable law, SuperMedia and certain of its subsidiaries may file voluntary petitions for relief under chapter 11 of the Bankruptcy Code and the SuperMedia Plan, attached hereto as <u>Exhibit C</u>, on the Petition Date.

This Disclosure Statement provides information regarding the Plan, a copy of which is attached hereto as <u>Exhibit A</u>.  The only impaired Classes of Claims entitled to vote on the Plan, namely Classes 5, 6, and 7, are the classes of claims held by lenders under the Credit Agreements.  And as noted above, lenders holding more than half in number and at least two-thirds in amount of (but not all) Claims under each of the Prepetition Credit Agreements have entered into the Dex One Support Agreement and SuperMedia Support Agreement, as applicable.  The Dex One Support Agreement is attached as <u>Exhibit D</u> hereto.  The Debtors believe that the Plan is in the best interests of all holders of Claims and Interests.  Accordingly, the Debtors urge all such holders entitled to vote on the Plan to vote in favor of the Plan.

**ARTICLE I**
**PLAN OVERVIEW**

## 1.1    <u>Plan Structure Overview</u>

The Plan effects the transactions contemplated by the Merger Agreement, including the amendment and restatement of the Credit Agreements.  Additionally, the Plan provides for the discharge of Claims and Interests, primarily, through the: (a) issuance of shares of Newdex Common Stock; (b) the reinstatement of certain Claims and Interests; (c) entry into the Amended and Restated Credit Agreements; and (d) payment of Cash.  Specifically, as more fully described below, Allowed Senior Subordinated Notes Claims will be reinstated and rendered Unimpaired.  Holders of Allowed Dex East Secured Credit Facility Claims, Allowed Dex West Secured Credit Facility Claims, and Allowed RHDI Secured Credit Facility Claims will receive a portion of the loans under the Amended and Restated Dex East Secured Credit Agreement, the Amended and Restated Dex West Secured Credit Agreement, and the Amended and Restated RHDI Secured Credit Agreement, respectively, as well as of certain Cash payments in accordance with the terms of the Credit Agreements.  Holders of Allowed General Unsecured Claims will be paid in full in Cash on the later of the Effective Date or in the ordinary course of business.  Holders of Allowed Dex One Interests will receive shares of Newdex Common Stock, and Dex One Interests will be extinguished on the Effective Date.  Intercompany Interests will be left unaltered and rendered Unimpaired.  Holders of Allowed Administrative Claims, Allowed Secured Tax Claims, Allowed Other Secured Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Professional Claims will be paid in full in Cash from Cash on hand and from the Debtors' existing assets or reinstated, as applicable.  The Plan constitutes a separate Plan proposed by each Debtor.

## 1.2    <u>Restructuring Transactions</u>

On August 20, 2012, the Dex One board of directors and the SuperMedia board of directors each approved the Merger Agreement, which was amended and restated on December 5, 2012, a copy of which is attached hereto as <u>Exhibit E</u>.  The Merger is a stock-for-stock merger between the Debtors and SuperMedia.

(a)    <u>**The Restructuring Transactions**</u>

On the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may take such actions, in their sole discretion, including as set forth below, as are necessary or appropriate to effect the Merger in accordance with the terms of the Merger Agreement and the Plan.  Such actions shall include:

- Dex One merging with and into Newdex, with Newdex surviving the merger;

- immediately thereafter, Spruce Acquisition Sub, Inc. merging with and into SuperMedia, with SuperMedia surviving the merger as a wholly owned subsidiary of Newdex;

- immediately thereafter, only if the option set forth in Section 1.2(b) is exercised, the distribution of stock in accordance with Section 1.2(b); and

- immediately thereafter, the entry into, delivery of and effectiveness of the Amended and Restated Credit Agreements and the other Amended and Restated Credit Documents contemplated to be effective or delivered on the Effective Date.

As a result of the Transaction, SuperMedia will be a direct wholly-owned subsidiary of Newdex, which will change its name from Newdex, Inc. to Dex Media, Inc. and will be a publicly traded corporation.

(b)      **Option to Distribute Newdex Common Stock**

Notwithstanding anything to the contrary in the Merger Agreement or the Plan, the Debtors, with the consent of the SuperMedia Debtors, shall have the option on the Effective Date to issue and distribute Newdex Common Stock to the Distribution Agent for the benefit of the Designated Employee Benefit Plans in an amount necessary to give rise to an ownership change as defined in 26 U.S.C. § 382(g) (but in no event to exceed 10 % of the Newdex Common Stock issued on the Effective Date).

## 1.3      Amended and Restated Credit Agreements[3]

On the Effective Date, the Debtors will close the Amended and Restated Credit Agreements, amending and restating the Credit Agreements in accordance with the Merger Agreement, each of which will mature on December 31, 2016.  The Amended and Restated Credit Agreements will require quarterly amortization payments of principal as follows:

(a)      **Amended and Restated RHDI Secured Credit Agreement:**

(1)      $10,000,000 for each fiscal quarter in fiscal 2013 and fiscal 2014;

(2)      $7,500,000 for each fiscal quarter in fiscal 2015; and

(3)      $6,250,000 for each fiscal quarter in fiscal 2016, with all remaining outstanding amounts due at maturity.

(b)      **Amended and Restated Dex East Secured Credit Agreement:**

(1)      $16,250,000 for each fiscal quarter in fiscal 2013;

(2)      $13,750,000 for each fiscal quarter in fiscal 2014; and

(3)      $11,250,000 for each fiscal quarter in fiscal 2015 and 2016, with all remaining outstanding amounts due at maturity.

---

[3]   This summary of the terms of the Newdex Credit Agreements (as defined in Section 1.3(g) herein) is not a complete summary and is qualified in its entirety by reference to the Amended and Restated Credit Agreements (attached as Exhibit A, Exhibit B, and Exhibit C to the Plan, attached hereto as Exhibit A) and the Amended and Restated SuperMedia Secured Credit Agreement (as defined in Section 1.3(g) herein) (attached as Exhibit B to the SuperMedia Plan, attached hereto as Exhibit C), as applicable.

(c)      **Amended and Restated Dex West Secured Credit Agreement:**

(1)      $11,250,000 for each fiscal quarter in fiscal 2013 through fiscal 2016, with all remaining outstanding amounts due at maturity on December 31, 2016.

Interest will be paid (1) with respect to any base rate loan, quarterly, and (2) with respect to any Eurodollar loan, on the last day of the interest period applicable to such borrowing, at each respective borrower's option as follows:

(d)      **Amended and Restated RHDI Secured Credit Agreement:**

(1)      the highest (subject to a floor of 4.00%) of (1) the prime rate, (2) the federal funds effective rate plus 0.50%, and (3) one month Adjusted LIBO Rate[4] plus 1.00%, in each case as in effect on such day plus an interest rate margin for base rate loans. The interest rate margin for base rate loans will be 5.75% per annum; or

(2)      the higher of (1) Adjusted LIBO Rate and (2) 3.00%, in each case plus an interest rate margin for Eurodollar loans. The interest rate margin for Eurodollar loans will be 6.75% per annum. RHDI may elect interest periods of one, two, three, or six months for Eurodollar borrowings.

(e)      **Amended and Restated Dex East Secured Credit Agreement:**

(1)      the highest (subject to a floor of 4.00%) of (1) the prime rate, (2) the federal funds effective rate plus 0.50%, and (3) one month Adjusted LIBO Rate plus 1.00%, in each case as in effect on such day plus an interest rate margin for base rate loans. The interest rate margin for base rate loans will be 2.00% per annum; or

(2)      the higher of (1) Adjusted LIBO Rate and (2) 3.00%, in each case plus an interest rate margin for Eurodollar loans. The interest rate margin for Eurodollar loans will be 3.00% per annum. Dex East will be able to elect interest periods of one, two, three, or six months for Eurodollar borrowings.

(f)      **Amended and Restated Dex West Secured Credit Agreement:**

(1)      the highest (subject to a floor of 4.00%) of (1) the prime rate, (2) the federal funds effective rate plus 0.50%, and (3) one month Adjusted LIBO Rate plus 1.00%, in each case as in effect on such day plus an interest rate margin for base rate loans. The interest rate margin for base rate loans will be 4.00% per annum; or

(2)      the higher of (1) Adjusted LIBO Rate and (2) 3.00%, in each case plus an interest rate margin for Eurodollar loans. The interest rate margin for Eurodollar loans will be 5.00% per annum. Dex West may elect interest periods of one, two, three, or six months for Eurodollar borrowings.

(g)      **Amended and Restated SuperMedia Secured Credit Agreement**

Additionally, on or before the Effective Date, SuperMedia will amend and restate the SuperMedia Secured Credit Agreement (the "Amended and Restated SuperMedia Secured Credit Agreement" and, together with the Amended and Restated Credit Agreements, the "Newdex Credit Agreements") in accordance with the Merger Agreement.  The Amended and Restated SuperMedia Secured Credit Agreement will require (1) with respect to any

---

[4]      "Adjusted LIBO Rate" is a defined term in each of the Newdex Credit Agreements.

base rate loan, quarterly interest payments, and (2) with respect to any Eurodollar loan, interest payments on the last day of the interest period applicable to such borrowing, at SuperMedia's option at either:

(1)     with respect to base rate loans, the highest of (1) the prime rate, (2) the federal funds effective rate plus 0.50%, and (3) one month LIBO Rate[5] (subject to a floor of 3.00%) plus 1.00%, in each case as in effect on such day plus an interest rate margin of 7.60%; or

(2)     with respect to Eurodollar loans, the higher of (1) Adjusted LIBO Rate in effect for the applicable interest period and (2) 3.00%, in each case plus an interest rate margin of 8.60%. SuperMedia may elect interest periods of one, two or three months for Eurodollar borrowings.

(h)     **Newdex Credit Agreements Generally**

On the Effective Date, each of the Newdex Credit Agreements will contain provisions for prepayment from net proceeds of asset dispositions, equity issuances, and debt issuances subject to certain exceptions. Each of the Amended and Restated Credit Agreements will contain provisions for prepayment (i) from a ratable portion of the net proceeds received by the applicable subsidiary of Newdex from asset dispositions, subject to certain exceptions, after the first $2,500,000 of net proceeds received by the borrower and its subsidiaries during the term of the Amended and Restated Credit Agreements, (ii) from certain issuances of equity or debt, and (iii) from a portion of excess cash flow calculated and required to be applied as a prepayment on a quarterly basis. The Amended and Restated SuperMedia Secured Credit Agreement will contain a provision for prepayment of net proceeds received by the borrower and its subsidiaries (i) from asset dispositions, subject to certain exceptions, after the first $5,000,000 of net proceeds received by the borrower and its subsidiaries in each fiscal year (ii) from certain issuances of equity or debt, and (iii) from a portion of available cash (not to exceed 67.5% of the amount of any increase in such available cash during the applicable fiscal quarter) calculated and required to be applied as a prepayment on a quarterly basis. Each of the Newdex Credit Agreements will allow voluntary prepayments in whole or in part, subject to certain minimum prepayment requirements.

Each of the Newdex Credit Agreements will contain certain covenants that, among other things and subject to, in each case, certain exceptions, materiality thresholds, and baskets as more specifically set forth in each credit agreement, limit or restrict each borrower and its subsidiaries' incurrence of liens, investments (including acquisitions) and loans, sales of assets, indebtedness and equity issuances, payment of dividends, distributions and payments of certain indebtedness, sale and leaseback transactions, swap transactions, affiliate transactions, negative pledge clauses, changes in fiscal year, changes in business, amendments to material documents, capital expenditures and mergers, liquidations, and consolidations. In addition, each of the Amended and Restated Credit Agreements will contain covenants that, among other things and subject to exceptions, limit or restrict activities and obligations of each of Newdex, Dex One Service, Inc., Dex Media Service LLC, and certain bankruptcy remote entities to be established. The Amended and Restated SuperMedia Secured Credit Agreement will contain covenants that, among other things and subject to exceptions, limit or restrict activities and obligations of each of Newdex, Dex One Service, Inc., and certain bankruptcy remote entities to be established. Each of the borrowers under the Newdex Credit Agreements will be required to maintain compliance with a consolidated leverage ratio covenant of no greater than as of the end of each fiscal quarter as set forth in the summary table below (reference to each of the Newdex Credit Agreements should be made for actual computation of the applicable leverage ratio):

| Credit Agreement | Leverage Ratio | |
|---|---|---|
| | Fiscal Quarter | Leverage Ratio |
| Amended and Restated Dex East Secured Credit Agreement | 1Q 2013 | 5.00x |
| | 2Q 2013 | 5.00x |
| | 3Q 2013 | 5.00x |
| | 4Q 2013 | 5.00x |
| | 1Q 2014 | 4.9375x |

---

[5]     "LIBO Rate" is a defined term in the Amended and Restated SuperMedia Secured Credit Agreement.

|  | 2Q 2014 | 4.875x |
|  | 3Q 2014 | 4.8125x |
|  | 4Q 2014 | 4.75x |
|  | 1Q 2015 | 4.6875x |
|  | 2Q 2015 | 4.625x |
|  | 3Q 2015 | 4.5625x |
|  | 4Q 2015 | 4.50x |
|  | 1Q 2016 | 4.375x |
|  | 2Q 2016 | 4.25x |
|  | 3Q 2016 | 4.125x |
|  | 4Q 2016 | 4.00x |

Amended and Restated Dex West Secured Credit Agreement

| Fiscal Quarter | Leverage Ratio |
|---|---|
| 1Q 2013 | 3.50x |
| 2Q 2013 | 3.50x |
| 3Q 2013 | 3.50x |
| 4Q 2013 | 3.50x |
| 1Q 2014 | 3.50x |
| 2Q 2014 | 3.42x |
| 3Q 2014 | 3.34x |
| 4Q 2014 | 3.25x |
| 1Q 2015 | 3.1875x |
| 2Q 2015 | 3.125x |
| 3Q 2015 | 3.0625x |
| 4Q 2015 | 3.00x |
| 1Q 2016 | 2.875x |
| 2Q 2016 | 2.75x |
| 3Q 2016 | 2.625x |
| 4Q 2016 | 2.5x |

Amended and Restated RHDI Secured Credit Agreement

| Fiscal Quarter | Leverage Ratio |
|---|---|
| 1Q 2013 | 5.50x |
| 2Q 2013 | 5.50x |
| 3Q 2013 | 5.50x |
| 4Q 2013 | 5.50x |
| 1Q 2014 | 5.4625x |
| 2Q 2014 | 5.425x |
| 3Q 2014 | 5.3875x |
| 4Q 2014 | 5.35x |
| 1Q 2015 | 5.3125x |
| 2Q 2015 | 5.275x |
| 3Q 2015 | 5.2375x |
| 4Q 2015 | 5.20x |
| 1Q 2016 | 5.15x |
| 2Q 2016 | 5.10x |
| 3Q 2016 | 5.05x |
| 4Q 2016 | 5.0x |

Amended and Restated SuperMedia Secured Credit Agreement

| Fiscal Quarter | Leverage Ratio |
|---|---|
| 1Q 2013 | 4.75x |
| 2Q 2013 | 4.75x |
| 3Q 2013 | 4.75x |
| 4Q 2013 | 4.75x |
| 1Q 2014 | 4.6875x |

| | |
|---|---|
| 2Q 2014 | 4.625x |
| 3Q 2014 | 4.5625x |
| 4Q 2014 | 4.50x |
| 1Q 2015 | 4.50x |
| 2Q 2015 | 4.50x |
| 3Q 2015 | 4.50x |
| 4Q 2015 | 4.50x |
| 1Q 2016 | 4.4375x |
| 2Q 2016 | 4.375x |
| 3Q 2016 | 4.3125x |
| 4Q 2016 | 4.25x |

The borrowers under each of the Amended and Restated Credit Agreements will also be required to maintain compliance with a consolidated (with respect to it and its subsidiaries) interest coverage ratio covenant as of the last day of each fiscal quarter of at least: (a) 2.0x under the Amended and Restated Dex West Secured Credit Agreement; (b) 1.10x under the Amended and Restated RHDI Secured Credit Agreement; and (c) 1.10x under the Amended and Restated Dex East Secured Credit Agreement. SuperMedia will be required to maintain a consolidated (with respect to it and its subsidiaries) interest coverage ratio covenant of 1.10x as of the last day of each fiscal quarter. Based on the information provided in the unaudited pro forma condensed combined statements of the Debtors and SuperMedia, copies of which are attached hereto as <u>Exhibit F</u>, each of the borrowers under the Newdex Credit Agreements would be in pro forma compliance with the various covenants contained in the Newdex Credit Agreements.

The obligations under each of the Amended and Restated Credit Agreements will be guaranteed by each of the respective borrower's subsidiaries, if any, and will be secured by a lien on substantially all of such borrower's and such subsidiaries' tangible and intangible assets, including a pledge of the stock of their respective subsidiaries, as well as a mortgage on certain real property, if any, in each case, subject to certain exceptions. In addition, each of the borrowers under the Newdex Credit Agreements will enter into a subordinated guarantee pursuant to which each borrower will guarantee the obligations of the other borrowers under their respective Newdex Credit Agreements. Such subordinated guarantee (a) will be subordinated to the obligations of the borrower providing the guarantee in respect of its amended and restated credit agreement and (b) will include sharing provisions pursuant to which the beneficiaries of such guarantees will share the benefits of such guarantees in accordance with the percentage used as of the closing of the Newdex Credit Agreements to allocate costs under the Shared Services Agreement[6] between SuperMedia, on the one hand, and Dex East, Dex West and RHDI, on the other hand.

The obligations under the Amended and Restated SuperMedia Secured Credit Agreement will be guaranteed by certain of SuperMedia's subsidiaries and will be secured by a lien on substantially all of SuperMedia and the SuperMedia guarantors' tangible and intangible assets, including a pledge of the stock of their respective subsidiaries, as well as a mortgage on certain real property, subject in each case, to certain exceptions.

Pursuant to a shared guaranty and collateral agreement and subject to an intercreditor agreement among the administrative agents under each of the Amended and Restated Credit Agreements, Newdex, and, subject to exceptions, certain of its subsidiaries (but in any event, excluding all SuperMedia Entities and their subsidiaries and Spruce Acquisition Sub, Inc.), will guaranty the obligations under each of the Amended and Restated Credit Agreements and the obligations under each of the Amended and Restated Credit Agreements will be secured by a lien on substantially all of such shared guarantor's tangible and intangible assets (except that with respect to Newdex's subsidiaries, Dex One Digital, Inc. and R.H. Donnelley Corporation, such guarantee will only be secured by a pledge of stock held by such subsidiaries, if any), including a pledge of the stock of their respective subsidiaries (excluding SuperMedia and its subsidiaries and Spruce Acquisition Sub, Inc.), as well as a mortgage on certain real property, if any, subject in each case, to certain exceptions. In addition, Newdex will also guarantee the obligations under the Amended and Restated SuperMedia Secured Credit Agreement on an unsecured basis. Furthermore, Dex

---

[6]    The "Shared Services Agreement" is Exhibit J to the Merger Agreement, attached hereto as <u>Exhibit E</u>.

One Service, Inc. and Dex Media, Inc. will guarantee on a secured basis the obligations under each of the Newdex Credit Agreements.

SuperMedia, RHDI, Dex East, Dex West, and certain other subsidiaries of Newdex (the "BRE Transferors") will transfer the trademarks owned by such BRE Transferor (together with the associated goodwill) to a bankruptcy remote subsidiary (each, a "BRE") of such BRE Transferor.  Each such BRE will grant a perpetual, non-exclusive license, with the right to sublicense, to the trademarks that are transferred to it back to the applicable BRE Transferor.  None of the BREs will be permitted to license such trademarks to any third party except to Newdex or a subsidiary of Newdex (or as otherwise permitted under the Newdex Credit Agreements) or to assign such trademarks.  Newdex and each of its subsidiaries will also grant to each other a perpetual, non-exclusive license under all intellectual property (other than trademarks and domain names) owned by such entity (as of the closing of the Merger and thereafter).  In addition, SuperMedia, RHDI, Dex East, Dex West, and certain other subsidiaries of Newdex will deliver to each other current or contingent possession of, or access to, certain software source code (and various related tangible materials) that is currently used by such entity in its respective business.

**1.4     Shared Services Agreement**

Concurrently with the completion of the Transaction, the Debtors and SuperMedia and its subsidiaries will enter into the Shared Services Agreement.  Pursuant to the terms of the Shared Services Agreement, Dex One Service LLC, a wholly owned subsidiary of Dex One, and SuperMedia LLC, a wholly owned subsidiary of SuperMedia, will provide certain specified services (e.g., Human Resources, Legal, Billing, Information Technology), or pay for certain services provided by other entities, to Newdex and all of its direct and indirect subsidiaries.  Entities receiving such services will be charged as follows:  (1) to the extent the cost of providing such service can be directly attributed to a particular entity, such entity will be charged that amount and (2) to the extent the service provider provides a service that benefits multiple entities and the cost of such service cannot be directly attributable to a particular entity (e.g., overhead), each entity benefiting from such service will be charged a share of such cost approximately equal to the quotient of such entity's net revenue for the preceding calendar year divided by the total net revenue for such calendar year of all the entities benefiting from such service.  To the extent SuperMedia LLC both provides and receives services to the other parties to the Shared Services Agreement, it will be credited the amounts it has paid to provide such services, which will be netted against its charges for services received.  Costs associated with the Shared Services Agreement will be captured and billed for each month.  It is expected that once the integration of SuperMedia and the Debtors is complete, SuperMedia LLC will no longer be a provider of services to Newdex and its subsidiaries.

**1.5     Tax Sharing Agreements**

Dex One files a U.S. federal income tax return that includes the results of Dex One's wholly owned corporate subsidiaries.  Dex One and its corporate subsidiaries are parties to a tax sharing agreement (the "Dex Tax Sharing Agreement") that governs the respective rights, responsibilities and obligations of Dex One and its subsidiaries with respect to tax liabilities and benefits, tax attributes, tax contests and other tax matters regarding income taxes, other taxes and related tax returns.  The Dex Tax Sharing Agreement provides, among other things, that Dex One and its corporate subsidiaries are required to make payments to Dex One Service LLC (as agent of Dex One) in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return.  In general, if any taxable income (excluding any income as a result of cancellation of indebtedness income) of Dex One or its subsidiaries for U.S. federal income tax purposes is offset or reduced as a result of utilization of a tax asset (such as a net operating loss) of Dex One's other corporate subsidiaries, such party is required to pay the Dex One subsidiary (through Dex One Service LLC) that generated the tax asset in an amount equal to 50% of the tax benefit received by such party.

On the day following the Transaction, SuperMedia and its subsidiaries will become members of Newdex's U.S. federal consolidated tax group.  Concurrently with the completion of the Transaction, Dex One Service LLC and SuperMedia and its subsidiaries will enter into a tax sharing agreement (the "SuperMedia Tax Sharing Agreement"), attached hereto as Exhibit G, that will govern the respective rights, responsibilities and obligations of SuperMedia and its subsidiaries after the Transaction with respect to tax liabilities and benefits, tax attributes, tax contests and other tax matters regarding income taxes, other taxes and related tax returns.  The SuperMedia Tax Sharing Agreement will provide, among other things, that SuperMedia and its subsidiaries are required to make

payments to Dex One Service LLC (as agent of Newdex) in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return. In general, if any taxable income (including any income as a result of cancellation of indebtedness income, whether taxable or not) of SuperMedia and/or its subsidiaries for U.S. federal income tax purposes is offset or reduced as a result of utilization of a tax asset (such as a net operating loss) of Newdex's other subsidiaries, such party is required to pay the Newdex subsidiary (through Dex One Service LLC) that generated the tax asset in an amount equal to 75% of the tax benefit received by such party. Concurrently with the completion of the Transaction, Newdex and its subsidiaries will enter into an amended and restated tax sharing agreement (the "Dex A&R Tax Sharing Agreement")[7] to provide, among other things, that if any taxable income (excluding any income as a result of cancellation of indebtedness income) of Newdex or its subsidiaries (other than SuperMedia and/or its subsidiaries) for U.S. federal income tax purposes is offset or reduced as a result of utilization of a tax asset (such as a net operating loss) of SuperMedia and/or its subsidiaries, such party is required to pay, as applicable, SuperMedia and/or the SuperMedia subsidiary (through Dex One Service LLC) that generated the tax asset in an amount equal to 50% of the tax benefit received by such party.

## 1.6     Dex One Support Agreement[8]

Negotiations between the Debtors, SuperMedia, and the Steering Committee primarily took place between November 12, 2012, and December 5, 2012. On December 5, 2012, the Debtors entered into the Dex One Support Agreement with certain lenders under the Credit Agreements. Also on December 5, 2012, SuperMedia and certain subsidiaries entered into the SuperMedia Support Agreement, which is attached to the Dex One Support Agreement as Exhibit B. Lenders holding more than half in number and at least two-thirds in amount of (but not all) Claims under each of the Prepetition Credit Agreements have entered into the Dex One Support Agreement and SuperMedia Support Agreement, as applicable. As a result, the number and amount of Claims held by lenders contractually obligated to support the Plan and the SuperMedia Plan, respectively, and in each case subject to the terms of the Dex One Support Agreement and the SuperMedia Support Agreement, respectively, exceed the thresholds required for approval of such plans with respect to Classes 5, 6, and 7 under the Plan and Class 5 under the SuperMedia Plan in accordance with applicable bankruptcy law. Additional lenders may join the Dex One Support Agreement or the SuperMedia Support Agreement in the future.

Under the Dex One Support Agreement, the Debtors agree to take reasonable and appropriate action consistent with their obligations under the Merger Agreement and the Dex One Support Agreement in furtherance of the Transaction, and, if applicable, Confirmation and Consummation of the Plan, (a) to obtain signature pages to the Amended and Restated Credit Agreements, (b) to provide this Disclosure Statement to the lenders under the Credit Agreements and solicit their votes to accept the Plan, and (c) if the Debtors elect to effectuate the Transaction through the Chapter 11 Cases, to file voluntary petitions under chapter 11 and seek approval of certain relief from the Bankruptcy Court and Confirmation of the Plan.

The lender parties to the Dex One Support Agreement agree to (a) support and take any reasonable action in furtherance of the Amended and Restated Credit Agreements and the effectiveness of the Dex One Support Agreement, (b) timely vote their Claims to accept the Plan and not change or withdraw such vote unless such Plan is modified in a manner materially inconsistent with the Dex One Support Agreement or materially adverse to the rights of the lenders party to the Dex One Support Agreement, and (c) in the event the Debtors elect to effectuate the Transaction through a chapter 11 process, (i) support approval of this Disclosure Statement and Confirmation of the Plan, unless the Plan is modified in a manner materially inconsistent with the Dex One Support Agreement or that materially adversely affects the rights of the lender parties to the Dex One Support Agreement, (ii) support certain relief to be requested by the Debtors from the Bankruptcy Court, (iii) refrain from taking any action inconsistent with the Confirmation or Consummation of the Plan, and (iv) not propose, support, solicit or participate in the formulation of any plan other than the Plan.

---

[7]     The Dex A&R Tax Sharing Agreement is attached as Exhibit I to the Merger Agreement, attached hereto as Exhibit E.

[8]     This summary of the terms of the Dex One Support Agreement is not a complete summary and is qualified in its entirety by reference to the Dex One Support Agreement, attached hereto as Exhibit D.

Upon execution of the Dex One Support Agreement by a majority of lenders under each of the Credit Agreements, certain waivers under and amendments to the Credit Agreements by the Credit Agreement Agents, Dex One Parties and lenders party to the Dex One Support Agreement, as applicable, became effective as set forth below:[9]

- (x) waiver of any Default or Event of Default arising under Article VII(j)(vi) of each of the Credit Agreements solely to the extent that such Default or Event of Default may result from taking any action for the purpose of effecting the Transaction through the commencement of the Chapter 11 Cases, which waiver shall survive termination of the Dex One Support Agreement; and (y) Article VII(j) of each of the Credit Agreements is amended as of the Support Agreement Effective Date by deleting clause (vi) thereof and replacing it with: "take any action for the purpose of effecting any of the foregoing; provided, however, that, for the avoidance of doubt, none of the Ultimate Parent's, any Material Ultimate Parent Subsidiary's, the Parent's, the Borrower's or any Material Subsidiary's execution of, performance of the obligations contemplated by or consistent with, and the taking of any action under (I) the Support and Limited Waiver Agreement dated as of December 5, 2012 by and among the Ultimate Parent, its Subsidiaries, the Agent, the other administrative agent referenced therein and the lenders from time to time party thereto (as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof) and (II) the Merger Agreement (as defined in the Support and Limited Waiver Agreement referred to in clause (I) above) shall constitute a Default or an Event of Default under this clause (vi).";

- with respect to all Loan Parties, waiver of any Default or Event of Default under Article VII(f) of each of the Credit Agreements arising from the Borrower's failure to comply with section 5.01(a) solely as a result of the failure to deliver an audit without a 'going concern' or like qualification, exception or explanatory paragraph with respect to the fiscal year ending December 31, 2012 (which 'going concern' or like qualification, exception or explanatory paragraph relates (i) to the anticipated or potential commencement of the Chapter 11 Cases pursuant to the Dex One Support Agreement and (ii) does not expressly provide that it results from (x) a limitation of scope or (y) the financial statements not presenting fairly in all material respects the financial position, results of operations or cash flows of the Dex Parties in conformity with GAAP resulting in a qualified or adverse audit opinion), which waiver shall survive termination of the Dex One Support Agreement;

- agreement that section 5.01 of each Credit Agreement is amended to incorporate the covenants in the second sentence of the first paragraph (including all bullet points thereunder) under the heading "Affirmative Covenants" in, as applicable, the Amendment Term Sheets, and the applicable Dex Parties agree to comply therewith upon the effectiveness of section 8.7(b)(3) of the Dex One Support Agreement; and

- agreement that for so long as the Dex One Support Agreement is in effect, notwithstanding anything in the Credit Agreements to the contrary, the Dex Parties shall not make any Discounted Voluntary Prepayments.

Similar waivers and amendments to the SuperMedia Secured Credit Agreement became effective under the SuperMedia Support Agreement upon execution of that agreement by a sufficient number of lenders under the SuperMedia Secured Credit Agreement.

The Dex One Support Agreement provides that it shall terminate automatically upon certain events, including, without limitation, the following:

---

[9]    For purposes of this paragraph, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Dex One Support Agreement.

- If Dex One has provided notice that it will effectuate the Transaction outside of court and (a) if SuperMedia has not filed the SuperMedia Chapter 11 Cases, if the Amended and Restated Credit Agreements have not been consummated by 130 days after the Dex One Support Agreement effective date, or (b) if SuperMedia has filed the SuperMedia Chapter 11 Cases, if the Amended and Restated Credit Agreements have not been consummated by 190 days after the Dex One Support Agreement effective date.

- If lender parties to the Dex One Support Agreement hold less than 100% of the loans under the Credit Agreements and the Debtors have not commenced solicitation of lender votes on the Plan by 100 days after the Dex One Support Agreement effective date.

- The termination of the SuperMedia Support Agreement.

- If, after the Debtors have commenced the Chapter 11 Cases, (a) the Chapter 11 Cases are dismissed, converted to chapter 7 cases, or an examiner is appointed, (b) an order is entered terminating any Debtor's exclusive right to file a plan of reorganization, or (c) any Debtor's consensual use of cash collateral is terminated in accordance with an interim or final cash collateral order entered by the Bankruptcy Court.

- The termination of the Merger Agreement pursuant to its terms.

- If the Debtors elect to terminate the Dex One Support Agreement in accordance with the exercise of their fiduciary duties, or the lender parties to the Dex One Support Agreement elect to terminate the Dex One Support Agreement upon notice that the Debtors are reasonably likely to breach the Dex One Support Agreement in accordance with the exercise of their fiduciary duties.

The Dex One Support Agreement also shall terminate ten Business Days after (a) either the Debtors or lender parties to the Dex One Support Agreement holding at least 2/3 of the aggregate outstanding principal amount of loans under each of the Credit Agreements held by all lender parties to the Dex One Support Agreement give written notice of a material breach of the Dex One Support Agreement and such breach is not cured or waived, or (b) the Debtors and the Credit Agreement Agents have received executed signature pages to the Dex One Support Agreement from lenders (i) holding no less than 2/3 of the outstanding principal amount of the loans under each of the Credit Agreements, and (ii) representing more than 50% of all lenders under each of the Credit Agreements (the "Dex One Bankruptcy Threshold"), and notice is subsequently given by either the Credit Agreement Agents or the Debtors that the Dex One Bankruptcy Threshold is no longer satisfied, unless the threshold is again satisfied by the end of the ten Business Day cure period.

In addition, the Dex One Support Agreement shall terminate ten Business Days after the occurrence of any of the following specified events, if such event has not been cured by the Debtors or waived by the Credit Agreement Agents and by lender parties to the Dex One Support Agreement holding at least 2/3 of the aggregate outstanding principal amount of loans under each of the Credit Agreements held by all lender parties to the Dex One Support Agreement:

- Ten days after the solicitation of the lenders under the Credit Agreements is commenced unless definitive bankruptcy documentation (other than the Plan and this Disclosure Statement) has been made available to the lender parties to the Dex One Support Agreement.

- Five Business Days after the end of the lender solicitation period unless the Debtors have commenced the Chapter 11 Cases or Dex One has provided written notice to the Credit Agreement Agents that it has received the necessary consents from the lenders under the Credit Agreements and the Dex One stockholders to effectuate the Transaction without filing the Chapter 11 Cases.

- If the Debtors do not file the Plan and this Disclosure Statement on the Petition Date.

- If the Bankruptcy Court has not entered interim and final orders authorizing the Debtors to use cash collateral, granting adequate protection to the lenders under the Credit Agreements, and approving cash management systems within certain specified periods.

- Fifty days after the Petition Date unless the Bankruptcy Court has entered the Confirmation Order.

- If, after filing the Chapter 11 Cases, the Debtors (a) withdraw the Plan, (b) publicly announce an intention not to proceed with the Plan, or (c) file any motion, pleading, plan of reorganization and/or disclosure statement that is materially inconsistent with the Plan, or materially adversely affects the rights of the lenders party to the Dex One Support Agreement.

- The Bankruptcy Court grants relief that is materially inconsistent with the Dex One Support Agreement or materially adversely affects the rights of the lender parties to the Dex One Support Agreement.

- If any change or event occurs that has or would reasonably be expected to have a material adverse effect on the Debtors or the validity or enforceability of the Dex One Support Agreement, Merger Agreement, or Credit Agreements.

- The occurrence of an event of default under the Credit Agreements, with certain exceptions set forth in the Dex One Support Agreement.

- The amendment or modification of the Plan or this Disclosure Statement which is materially inconsistent with the Plan or materially adversely affects the rights of the lender parties to the Dex One Support Agreement.

- The amendment or modification of (a) the SuperMedia Plan or SuperMedia lender disclosure statement which, in the reasonable judgment of the Debtors or the Credit Agreement Agents, as applicable, is materially inconsistent with the Transaction or the Dex One Support Agreement, or materially adversely affects the rights of the Debtors or lender parties to the Dex One Support Agreement, as applicable, or (b) the SuperMedia Support Agreement or the waiver of any terms thereof, except in accordance with the Dex One Support Agreement.

Upon the termination date of the Dex One Support Agreement, all ballots to accept the Plan and signature pages to the Amended and Restated Credit Agreements submitted by a lender party to the Dex One Support Agreement will be withdrawn and deemed null and void for all purposes, provided that a lender party to the Dex One Support Agreement may provide written notice to the Debtors and the Credit Agreement Agents within five Business Days that such lender's vote shall continue to be effective.

Any modification, amendment, or supplement to the Dex One Support Agreement (including any exhibits, annexes, or schedules thereto) is subject to the terms of section 8.12(a) of the Dex One Support Agreement.

## 1.7    Unclassified Claims

(a)    **Unclassified Claims Summary**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.  The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims and Professional Claims | Paid in full in Cash | 100% |
| Priority Tax Claims | Paid in full in Cash | 100% |

(b)     **Unclassified Claims Detail**

(1)     **Administrative Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date, or as soon as practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the holders of such Allowed Administrative Claims.

(2)     **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Court Allows.  From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(3)     **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive on the Effective Date, or as soon as practicable thereafter, from the respective Debtor liable for such Allowed Priority Tax Claim, payment in Cash in an amount equal to the amount of such Allowed Priority Tax Claim.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

**1.8**     **Classified Claims and Interests**

(a)     **Classified Claims and Interests Summary**

The Plan establishes a comprehensive classification of Claims and Interests.  The table below summarizes the classification, treatment, voting rights, and estimated recoveries, estimated as of September 30, 2012,[10] of the Claims and Interests, by Class, under the Plan.  Amounts assumed in the liquidation recovery analysis

---

[10]     The liquidation recovery analysis is based on Dex One's most recent publicly filed consolidated financial statements (unaudited) contained in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2012, the entirety of which is publicly available at (a) the Debtors' investor relations website, located at

are estimates only.  The projected liquidation recoveries are based on certain assumptions described herein. Accordingly, recoveries received by holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed below.

| Class | Claim or Interest | Voting Rights | Treatment | Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Secured Tax Claims[11] | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash | 100% | 100% |
| 2 | Other Secured Claims[11] | Not Entitled to Vote / Presumed to Accept | Reinstated or receive collateral | 100% | 100% |
| 3 | Other Priority Claims[11] | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash | 100% | 100% |
| 4 | Senior Subordinated Notes Claims | Not Entitled to Vote / Presumed to Accept | Reinstated | 100% | 0% |
| 5 | Dex East Secured Credit Facility Claims | Entitled to Vote | Pro Rata share of Amended and Restated Dex East Secured Credit Agreement and Pro Rata Cash payment | 100% | 13-16% |
| 6 | Dex West Secured Credit Facility Claims | Entitled to Vote | Pro Rata share of Amended and Restated Dex West Secured Credit Agreement and Pro Rata Cash payment | 100% | 14-18% |
| 7 | RHDI Secured Credit Facility Claims | Entitled to Vote | Pro Rata share of Amended and Restated RHDI Secured Credit Agreement and Pro Rata Cash payment | 100% | 12-16% |
| 8 | General Unsecured Claims | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash | 100% | 0% |
| 9 | Dex One Interests | Entitled to Vote | 0.2 shares of Newdex Common Stock for each Allowed Class 9 Interest | 100% | 0% |

http://ir.dexone.com and (b) the SEC's Electronic Data Gathering, Analysis, and Retrieval system, located at http://www.sec.gov/edgar/searchedgar/webusers.htm.

[11]  As of September 30, 2012, the Debtors are not aware of any Secured Tax Claims, Other Secured Claims, or Other Priority Claims.  However, should such Claims be identified, they would receive a 100% recovery based on the priority of proceeds in a liquidation.

| Class | Claim or Interest | Voting Rights | Treatment | Plan Recovery | Liquidation Recovery |
|-------|-------------------|---------------|-----------|---------------|----------------------|
| 10 | Intercompany Interests | Not Entitled to Vote / Presumed to Accept | Unaltered | 100% | 0% |
| 11 | Section 510(b) Claims | Not Entitled to Vote / Deemed to Reject | Paid in full in Cash or treated like holders of Allowed Class 9 Interests | 100% | 0% |

      (b)    <u>**Classified Claims and Interests Details**</u>

Except to the extent that a holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such holder shall receive under the Plan the treatment described in the Plan, as set forth below, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest. Unless otherwise indicated in the Plan, the holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as practicable thereafter.

      (1)    **Class 1 — Secured Tax Claims**

      A.    *Classification*: Class 1 consists of any Secured Tax Claims against any Debtor.

      B.    *Treatment*: Each holder of an Allowed Class 1 Claim shall receive, as applicable:

      i.    if the Allowed Class 1 Claim is due and payable on or before the Effective Date, Cash in an amount equal to such Allowed Class 1 Claim; or

      ii.    if the Allowed Class 1 Claim is not due and payable on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

      C.    *Voting*: Class 1 is Unimpaired. Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

      (2)    **Class 2 — Other Secured Claims**

      A.    *Classification*: Class 2 consists of any Other Secured Claims against any Debtor.

      B.    *Treatment*: Each holder of an Allowed Class 2 Claim shall, at the sole option of the Debtors or the Reorganized Debtors, as applicable:

      i.    have its Allowed Class 2 Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code; or

          ii.     receive the collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

C.     *Voting*:   Class 2 is Unimpaired.   Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

(3)     **Class 3 — Other Priority Claims**

A.     *Classification*:   Class 3 consists of any Other Priority Claims against any Debtor.

B.     *Treatment*:  Each holder of an Allowed Class 3 Claim shall be paid in full in Cash.

C.     *Voting*:   Class 3 is Unimpaired. Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

(4)     **Class 4 — Senior Subordinated Notes Claims**

A.     *Classification*:  Class 4 consists of any Senior Subordinated Notes Claims.

B.     *Allowance*:  On the Effective Date, Class 4 Claims shall be Allowed in the aggregate principal amount of $219,707,502, plus any accrued but unpaid interest thereon payable at the non-default interest rate in accordance with the Senior Subordinated Notes Indenture.

C.     *Treatment*:  Each holder of an Allowed Class 4 Claim shall have its Allowed Class 4 Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

D.     *Voting*:   Class 4 is Unimpaired.   Holders of Allowed Class 4 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 4 Claims are not entitled to vote to accept or reject the Plan.

(5)     **Class 5 — Dex East Secured Credit Facility Claims**

A.     *Classification*:  Class 5 consists of all Dex East Secured Credit Facility Claims.

B.     *Allowance:*  On the Effective Date, Class 5 Claims shall be Allowed, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset, in the aggregate principal amount of $540,875,487, plus (A) any accrued but unpaid interest payable at the non-default interest rate in accordance with the Dex East Secured Credit Agreement, (B) any unpaid fees, expenses or other amounts that constitute Obligations (other than principal) under and as defined in the Dex East Secured Credit Agreement, (C) any unpaid adequate protection payments required to be paid pursuant to the terms of the Dex East Cash Collateral Order and (D) to the extent applicable, any unpaid amounts required to be paid pursuant to a Dex East Specified Swap Agreement or a Dex East Cash Management Arrangement, <u>less</u> any amortization or other

16

payments of principal paid by the Debtors after December 31, 2012, or during the pendency of the Chapter 11 Cases pursuant to the terms of the Dex East Secured Credit Agreement or the Dex East Cash Collateral Order.

C.    *Treatment*:  On the Effective Date, each holder of an Allowed Class 5 Claim shall receive:

      i.    in satisfaction of such holder's Allowed Class 5 Claim (other than the portion of the Allowed Class 5 Claim which directly arises under, is derived from or is based upon a Dex East Specified Swap Agreement or a Dex East Cash Management Arrangement) (a) its Pro Rata share of the loans under the Amended and Restated Dex East Secured Credit Agreement and (b) Cash in an amount equal to such holder's Pro Rata share of any outstanding amounts described in clauses (A), (B) or (C) of the immediately foregoing paragraph 1.8(b)(5)B, to the extent such amounts are owed to a lender under the Dex East Secured Credit Agreement or the Dex East Cash Collateral Order; and

      ii.    in satisfaction of the portion (if any) of such holder's Allowed Class 5 Claim that directly arises under, is derived from or is based upon a Dex East Specified Swap Agreement or a Dex East Cash Management Arrangement, Cash in an amount equal to such partial Claim amount.

D.    *Voting*:  Class 5 is Impaired.  Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

(6)    **Class 6 — Dex West Secured Credit Facility Claims**

A.    *Classification*:  Class 6 consists of all Dex West Secured Credit Facility Claims.

B.    *Allowance:*  On the Effective Date, Class 6 Claims shall be Allowed, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset, in the aggregate principal amount of $503,232,404, plus (A) any accrued but unpaid interest payable at the non-default interest rate in accordance with the Dex West Secured Credit Agreement, (B) any unpaid fees, expenses or other amounts that constitute Obligations (other than principal) under and as defined in the Dex West Secured Credit Agreement, (C) any unpaid adequate protection payments required to be paid pursuant to the terms of the Dex West Cash Collateral Order and (D) to the extent applicable, any unpaid amounts required to be paid pursuant to a Dex West Specified Swap Agreement or a Dex West Cash Management Arrangement, <u>less</u> any amortization or other payments of principal paid by the Debtors after December 31, 2012, or during the pendency of the Chapter 11 Cases pursuant to the terms of the Dex West Secured Credit Agreement or the Dex West Cash Collateral Order.

C.    *Treatment*:  On the Effective Date, each holder of an Allowed Class 6 Claim shall receive:

      i.    in satisfaction of such holder's Allowed Class 6 Claim (other than the portion of the Allowed Class 6 Claim which directly arises under, is derived from or is based upon a Dex West

17

Specified Swap Agreement or a Dex West Cash Management Arrangement) (a) its Pro Rata share of the loans under the Amended and Restated Dex West Secured Credit Agreement and (b) Cash in an amount equal to such holder's Pro Rata share of any outstanding amounts described in clauses (A), (B) or (C) of the immediately foregoing paragraph 1.8(b)(6)B, to the extent such amounts are owed to a lender under the Dex West Secured Credit Agreement or the Dex West Cash Collateral Order; and

ii.      in satisfaction of the portion (if any) of such holder's Allowed Class 6 Claim that directly arises under, is derived from or is based upon a Dex West Specified Swap Agreement or a Dex West Cash Management Arrangement, Cash in an amount equal to such partial Claim amount.

D.      *Voting*:  Class 6 is Impaired.  Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.

(7)      **Class 7 — RHDI Secured Credit Facility Claims**

A.      *Classification*:  Class 7 consists of all RHDI Secured Credit Facility Claims.

B.      *Allowance:*  On the Effective Date, Class 7 Claims shall be Allowed, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset,  in the aggregate principal amount of $782,499,573, plus (A) any accrued but unpaid interest payable at the non-default interest rate in accordance with the RHDI Secured Credit Agreement, (B) any unpaid fees, expenses or other amounts that constitute Obligations (other than principal) under and as defined in the RHDI Secured Credit Agreement, (C) any unpaid adequate protection payments required to be paid pursuant to the terms of the RHDI Cash Collateral Order and (D) to the extent applicable, any unpaid amounts required to be paid pursuant to an RHDI Specified Swap Agreement or an RHDI Cash Management Arrangement, less any amortization or other payments of principal paid by the Debtors after December 31, 2012, or during the pendency of the Chapter 11 Cases pursuant to the terms of the RHDI Secured Credit Agreement or the RHDI Cash Collateral Order.

C.      *Treatment*:  On the Effective Date, each holder of an Allowed Class 7 Claim shall receive:

i.       in satisfaction of such holder's Allowed Class 7 Claim (other than the portion of the Allowed Class 7 Claim which directly arises under, is derived from or is based upon an RHDI Specified Swap Agreement or an RHDI Cash Management Arrangement) (a) its Pro Rata share of the loans under the Amended and Restated RHDI Secured Credit Agreement and (b) Cash in an amount equal to such holder's Pro Rata share of any outstanding amounts described in clauses (A), (B) or (C) of the immediately foregoing paragraph 1.8(b)(7)B, to the extent such amounts are owed to a lender under the RHDI Secured Credit Agreement or the RHDI Cash Collateral Order; and

ii.      in satisfaction of the portion (if any) of such holder's Allowed Class 7 Claim that directly arises under, is derived from or is

18

> based upon an RHDI Specified Swap Agreement or an RHDI Cash Management Arrangement, Cash in an amount equal to such partial Claim amount.

    D.    *Voting*:  Class 7 is Impaired.  Holders of Allowed Class 7 Claims are entitled to vote to accept or reject the Plan.

(8)    **Class 8 — General Unsecured Claims**

    A.    *Classification*:  Class 8 consists of any General Unsecured Claims against any Debtor.

    B.    *Treatment*:  Each holder of an Allowed Class 8 Claim shall receive Cash in an amount equal to such Allowed Class 8 Claim on the later of the Effective Date or in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 8 Claim.

    C.    *Voting*:  Class 8 is Unimpaired.  Holders of Allowed Class 8 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

(9)    **Class 9 — Dex One Interests**

    A.    *Classification*:  Class 9 consists of any Dex One Interests.

    B.    *Treatment*:  Upon consummation of the Merger, each holder of an Allowed Class 9 Interest shall receive 0.2 shares of Newdex Common Stock for each of its Allowed Class 9 Interests.

    C.    *Voting*:  Class 9 is Impaired.[12]  Holders of Allowed Class 9 Interests are entitled to vote to accept or reject the Plan.

(10)    **Class 10 — Intercompany Interests**

    A.    *Classification*:  Class 10 consists of any Intercompany Interests.

    B.    *Treatment*:  Each holder of an Allowed Class 10 Interest shall have its Allowed Class 10 Interest left unaltered and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

    C.    *Voting*:  Class 10 is Unimpaired.  Holders of Allowed Class 10 Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 10 Interests are not entitled to vote to accept or reject the Plan.

---

[12]    Bankruptcy courts treat any alteration of legal, equitable, and contractual rights pursuant to a chapter 11 plan as "impairment."  Under the Plan, holders of Allowed Dex One Interests are receiving new, different equity instruments—i.e., Newdex Common Stock—in exchange for their Allowed Dex One Interests.  Accordingly, even though the Debtors submit that the transactions contemplated by the Plan are in all stakeholders' best interests and that the value of Newdex Common Stock to be received by holders of Allowed Dex One Interests is not lower than the value of such Dex One Interests, the Plan's treatment of Allowed Dex One Interests would nevertheless constitute "impairment" as defined under the Bankruptcy Code and applicable caselaw.

(11)    **Class 11 — Section 510(b) Claims**

    A.    *Classification*:  Class 11 consists of any Section 510(b) Claims against any Debtor.

    B.    *Allowance:*  Notwithstanding anything in the Plan to the contrary, a Class 11 Claim, if existing, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any asserted Class 11 Claim and believe that no Class 11 Claim exists.

    C.    *Treatment*:  A holder of an Allowed Class 11 Claim shall, in the Reorganized Debtors' sole discretion, (A) receive Cash in the full amount of its Allowed Class 11 Claim or (B) be treated as if such holder held a number of Allowed Class 9 Interests instead of its Allowed Class 11 Claim equal in value to the amount of its Allowed Class 11 Claim.

    D.    *Voting*:  Class 11 is Impaired.  Holders (if any) of Allowed Class 11 Claims are conclusively presumed to have rejected the Plan.  Holders (if any) of Allowed Class 11 Claims are not entitled to vote to accept or reject the Plan.

(c)    **Special Provision Governing Unimpaired Claims**

    Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## 1.9    Liquidation Analysis

    The Debtors believe that the Plan provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including:  (a) the Debtors' primary assets are publishing contracts that would have a substantially reduced value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case; (c) the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation; and (d) the negative impact on the market for the Debtors' assets caused by attempting to sell a large number of assets in a short time frame, each of which likely would also diminish the value of the Debtors' assets available for distributions.

    The Debtors, with the assistance of Houlihan Lokey, have prepared an unaudited liquidation analysis, attached hereto as <u>Exhibit H</u>, to assist holders of Claims and Interests in evaluating the Plan.  The liquidation analysis compares the projected creditor recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan.  The liquidation analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the liquidation analysis.

## 1.10    Valuation Analysis

    The Plan and the SuperMedia Plan provide for the distribution of Newdex Common Stock to the stockholders of Dex One and SuperMedia upon consummation of the transactions contemplated by the Plan and the SuperMedia Plan, including consummation of the transactions contemplated by the Merger Agreement.  Accordingly, Houlihan Lokey, in consultation with the Debtors and SuperMedia, has performed an analysis of the estimated implied value of Newdex on a going-concern basis as of December 31, 2012, attached hereto as <u>Exhibit I</u>.  The valuation analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with <u>ARTICLE VIII</u> of this Disclosure

Statement, entitled "Certain Factors to be Considered." The valuation analysis is dated December 5, 2012, and is based on data and information as of that date. Houlihan Lokey makes no representations as to changes to such data and information that may have occurred since December 5, 2012.

## ARTICLE II
## VOTING PROCEDURES AND REQUIREMENTS

### 2.1    Classes Entitled to Vote on the Plan

The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 5 | Dex East Secured Credit Facility Claims | Impaired |
| 6 | Dex West Secured Credit Facility Claims | Impaired |
| 7 | RHDI Secured Credit Facility Claims | Impaired |
| 9 | Dex One Interests | Impaired |

If your Claim is not included in any of these Classes, you are not entitled to vote and you will not receive a solicitation package, including a ballot setting forth detailed voting instructions. If your Claim is included in one of these Classes, you should read your ballot and carefully follow the instructions included in the ballot. Please use only the ballot that accompanies this Disclosure Statement or the ballot that the Debtors, including the Claims and Solicitation Agent, otherwise provide to you.

### 2.2    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims or Interests is determined by calculating the amount and, if a Class of Claims, the number of Claims voting to accept, as a percentage of the Allowed Claims or Interests, as applicable, that have voted. Acceptance by a Class of Claims requires an affirmative vote of more than one-half in number of total Allowed Claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total Allowed Claims that have voted. Acceptance by a Class of Interests requires an affirmative vote of at least two-thirds in amount of the total Allowed Interests that have voted.

### 2.3    Certain Factors to be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Impaired

Classes entitled to vote to accept or reject the Plan (the "Voting Classes") or necessarily require a re-solicitation of the votes of holders of Claims and Interests in such Voting Classes.

For a further discussion of risk factors, please refer to ARTICLE VIII of this Disclosure Statement ("Certain Factors to be Considered").

**2.4    Classes Not Entitled to Vote on the Plan**

Under the Bankruptcy Code, holders of Claims and Interests are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no property under the Plan.  Accordingly, the following Classes are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 4 | Senior Subordinated Notes Claims | Unimpaired | Presumed to Accept |
| 8 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 10 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |

**2.5    Solicitation Procedures**

(a)    **Claims and Solicitation Agent**

The Debtors retained Epiq Bankruptcy Solutions, LLC, to act, among other things, as the Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

(b)    **Solicitation of Interest Holders**

The Debtors seek to consummate the Merger and the financing amendments through an out-of-court process and, only in the alternative, in accordance with the Plan through the Chapter 11 Cases.  In accordance with applicable securities laws, the votes of Dex One Interest holders on the Merger on an out-of-court basis will be solicited using solicitation materials, which include the information in the Shareholder Disclosure Statement, that the SEC has previously approved.  Dex One Interest holders' votes on the Plan will be solicited through the same process and using the same materials as used to solicit such holders' votes on the Merger on an out-of-court basis.  Thus, Dex One Interest holders will not receive this Disclosure Statement as part of their solicitation package.  The solicitation process and the solicitation package for Dex One Interest holders is explained more fully in Debtors' Form S-4 filed with the SEC, which may be obtained from the Claims and Solicitation Agent, or from the SEC's Electronic Data Gathering, Analysis, and Retrieval system, located at http://www.sec.gov/edgar/searchedgar/webusers.htm.

(c)    **Claim Holder Solicitation Package**

The following materials will constitute the solicitation package (the "Solicitation Package") distributed to holders of Claims entitled to vote to accept or reject the Plan:

- the appropriate ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement, including the Plan with all exhibits.

(d)        **Distribution of the Solicitation Package and Plan Supplement**

The Debtors, by way of the Claims and Solicitation Agent, intend to distribute the Solicitation Packages to holders of Claims on or before February 11, 2013, which is a date 30 days before the voting deadline at 1:30 p.m. Eastern Time on March 13, 2013 (the "Voting Deadline").

The Solicitation Package (except the ballots) may also be obtained from the Claims and Solicitation Agent by: (1) calling the Debtors' restructuring hotline at (866) 734-9393 within the U.S. or Canada or, outside of the U.S. or Canada, by calling (646) 282-2500, and/or (2) writing to Dex One Corporation Ballot Processing Center, c/o Epiq Systems, FDR Station, P.O. Box 5014, New York, New York 10150-5014.  If the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, www.epiq11.com/dexone, or for a fee via PACER at http://www.deb.uscourts.gov.

Prior to the Confirmation Hearing, the Debtors intend to file the Plan Supplement.  As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Solicitation Agent by:  (1) calling the Debtors' restructuring hotline at one of the telephone numbers set forth above; (2) visiting the Debtors' restructuring website, www.epiq11.com/dexone; and/or (3) writing to Dex One Corporation, c/o Epiq Systems, FDR Station, P.O. Box 5014, New York, New York 10150-5014.

## 2.6    Voting Procedures

January 25, 2013, the voting record date, will be the date for determining which holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, this voting record date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

In order for the holder of a Claim in the Voting Classes to have such holder's ballot counted as a vote to accept or reject the Plan, such holder's ballot must be properly completed, executed, and delivered by using the return envelope provided by: (a) first class mail by using the return envelope provided addressed to Dex One Corporation Ballot Processing Center, c/o Epiq Systems, FDR Station, P.O. Box 5014, New York, New York 10150-5014; or (b) via courier or personal delivery to Dex One Corporation Ballot Processing Center c/o Epiq Systems, 757 Third Avenue, 3rd Floor, New York, New York 10017, so that such holder's ballot or the master ballot incorporating the vote cast by such ballot, as applicable, is **actually received** by the Claims and Solicitation Agent **on or before the Voting Deadline**.

If a holder of a Claim in Class 5, 6, or 7 that is party to the Dex One Support Agreement transfers all of such Claim to one or more parties on or after the voting record date and before the holder has cast its vote on the Plan, the holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the holder's Claim in Class 5, 6, or 7, and such purchaser(s) shall be deemed to be the holder(s) thereof as of the voting record date for purposes of voting on the Plan, provided that the transfer complies with the applicable requirements under the Dex One Support Agreement.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE

BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

## ARTICLE III
## CONFIRMATION

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. If the Debtors file the Chapter 11 Cases, they will file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time approximately 30 days after the Petition Date for the Confirmation Hearing in the Bankruptcy Court. In this case, the Debtors will also request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing. The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code and the Dex One Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections. All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections.

## ARTICLE IV
## FINANCIAL INFORMATION AND PROJECTIONS

In connection with the planning and development of the Plan, the Debtors prepared projections for the calendar years 2012 through 2016 to present the anticipated impact of the Plan. The projections assume that the Plan will be implemented in accordance with its stated terms. The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the projections due to a material change in the Debtors' prospects.

The projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in this Disclosure Statement. Accordingly, the estimates and assumptions underlying the projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties. Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the historical consolidated financial statements (including the notes and schedules thereto), and other financial information set forth in the Debtors' publicly filed quarterly and annual reports, as applicable, and any other recent report to the SEC. These filings are available by visiting the SEC's website at http://www.sec.gov or the Debtors' website at http://www.dexone.com.

The Debtors' financial projections for the calendar years 2012 through 2016, including management's assumptions and initiatives related thereto, are attached hereto as <u>Exhibit B</u>. For purposes of the financial

projections, the Debtors have assumed an Effective Date of March 31, 2013. The unaudited pro forma condensed combined statements of the Debtors and SuperMedia, copies of which are attached hereto as <u>Exhibit F</u>, also provide financial information with respect to the combined companies.

### ARTICLE V
### BUSINESS DESCRIPTIONS

**5.1**    <u>Corporate History and Organizational Structure</u>

R. H. Donnelley Company was founded in 1886 and was first incorporated in 1917. In 1961, Dun & Bradstreet Corporation and R. H. Donnelley Company merged, with R. H. Donnelley Company becoming a wholly-owned subsidiary of Dun & Bradstreet Corporation and, in 1973, a Delaware corporation. In November 1996, Dun & Bradstreet Corporation split into companies including three separate public companies: The Dun & Bradstreet Corporation, ACNielsen Corporation, and Cognizant Corporation. In June 1998, the Dun & Bradstreet Corporation separated into two separate public companies: R.H. Donnelley Corporation (formerly the Dun & Bradstreet Corporation) and a new company that changed its name to the Dun & Bradstreet Corporation. In early 2010, R.H. Donnelley Corporation emerged from chapter 11 bankruptcy as Dex One Corporation.

Today, the Debtors, headquartered in Cary, North Carolina and employing approximately 2,300 people across the United States, sell products and services for local businesses to acquire and convert consumer leads and manage their marketing programs. The Debtors comprise one of the largest print and online directory publishers in the United States by revenue and are a leading provider of local search advertising products and services. Specifically, the Debtors' products and services include: print and online directory publications, search engine marketing and optimization, individualized directory placement, website and mobile site design, custom-created digital display advertising, and in-depth reports on customer marketing programs.

The following table describes the Debtors' print and digital advertising products and services.

| Product/Service | Description |
| --- | --- |
| Yellow Pages | Dex One's yellow pages are a comprehensive directory of local area businesses published under the "Dex" brand and generally co-branded with CenturyLink and AT&T. A business's name, address, and telephone number are included in the relevant yellow pages directory for free, under the appropriate business category, with a range of paid advertising options available to customers. For example, businesses can enhance their complimentary listing by highlighting their business name or setting it in a bolder typeface. They may also purchase various advertisements in the yellow pages directory, ranging from in-column advertising, which increases the space in the column in which the listing appears, to a display advertisement, which includes a wide range of information, illustrations, photographs and logos. Dex One publishes yellow pages in 577 core directories, 80 community directories and 149 "Plus" companion directories, which are distributed in 32 states in the United States. |
| White Pages | Dex One publishes 717 white pages directories listing the names, addresses, and telephone numbers of residential and business subscribers in a local market with the majority co-bound with the Yellow Pages directories noted above, in 28 states in the United States pursuant to publishing agreements with affiliates of CenturyLink and AT&T. Advertising in white pages directories is available and includes options similar to those available in yellow pages directories: bold and highlighted names, extra lines, and in-column and display advertisements. |
| Specialty/Awareness | As part of the advertising options available to Dex One's customers, Dex One provides limited inventory Awareness/Specialty items for businesses that want to create greater brand awareness. Many of these high profile advertising spaces are integrated into the directory design providing a business the opportunity to be featured on the inside or the outside of the directory cover. Other Awareness/Specialty advertising options are |

25

| Product/Service | Description |
| --- | --- |
| | produced separately and placed in or on the directory, such as removable cover magnets or heavier stock tabs inserted in the directory. Dex One sold 809 Awareness/ Specialty products in 2012, including: magnets, paper tip-ons, gatefold covers, inkjet, blow-ins, and tabs. |
| QR Codes | In addition to regular advertisements in the yellow and white pages, Dex One offers QR codes that allow businesses to link their print advertisements to their DexKnows.com digital profiles.  A QR code functions similarly to a barcode.  Consumers scan the code with their smart phones and are immediately linked to the corresponding business's website (if supplied by the customer) or online profile for more information.  The QR codes enable Dex One's customers to: (a) provide their most current business profile; (b) offer fresh content, such as coupons, new products, and up-to-date business hours; (c) supply more information than in print alone; and (d) be where consumers are looking, on their mobile phones. |
| DexKnows.com | Dex One places customers' advertisement content, including basic listings and business profiles, from its print directories onto its DexKnows.com platform.  The DexKnows.com platform includes both a traditional website, accessed by consumers using desktop and laptop computers, and a mobile-optimized site, accessed by consumers using smartphone and tablet devices.  Also, Dex One enhances the DexKnows.com listings through the purchase of information from national databases to enhance its in-region listings and to supply out-of-region listings.  And Dex One includes its customers' advertising information on its extended partner networks including: Yahoo! Local, YouTube, Superpages, and YP.com.  The DexKnows.com database includes approximately 13.2 million businesses and more than 250 million residential listings from across the United States. |
| DexPages.com | Dex One offers another way for its advertising customers to reach consumers online through the DexPages.com platform.  Through this platform, Dex One offers an easy-to-use site and provides consumers with a familiar way to find advertisers' information.  DexPages.com is identical in look and feel to a print directory and contains the same local business listings, white pages listings, and community information, in addition to extra features available on a digital platform.  DexPages.com features include: name look-up; reverse phone number search; search by business name, business heading, and keyword; links to websites; email addresses; and links to related search results. |
| Dex CityCentral | Dex CityCentral is an application developed by Dex One for the iPad.  Consumers can install the Dex CityCentral application and use it to find content, activities, and local businesses in a specific city. |
| Dex Net | Dex Net focuses exclusively on the delivery of local advertisements across multiple local search directories and major search engines such as Google, Yahoo!, Bing, DexKnows.com, and YP.com. Dex Net provides these services through four major product and service elements.  The first element is the business profile, which is designed to establish an easy-to-read, but content rich, Internet presence for advertisers.  The second is the distribution capabilities that provide the advertiser's business information to multiple local search platforms, including major search engines.  The third element is paid search, which is the development, deployment, and management of effective search marketing campaigns across multiple major search platforms on behalf of the advertiser.  Finally, the network provides reporting capabilities that provide advertisers with transparent, real-time results, such as click and call activity that occurs on the advertiser's website or profile. |
| Search Engine | Dex One offers Search Engine Optimization ("SEO") solutions for its customers. SEO |

| Product/Service | Description |
| --- | --- |
| Optimization | solutions help small businesses enhance their website and online presences to help search engines find and list them in consumers' searches. With Dex One's SEO solution, its customers' websites rank more often and higher in the local maps and free sections of Google, Yahoo!, and Bing. SEO services help to increase customers' visibility and capture more consumers when they search. |
| Websites | Dex One offers website solutions to its advertising customers, where Dex One, supported by its website solution partners, produces and hosts websites on behalf of its advertisers. These websites include both standardized websites, based on templates with limited customization, custom websites built according to an advertiser's specific preferences., and mobile websites, optimized for when a consumer is viewing the website from a mobile device such as a smartphone or a tablet |
| Video | Dex One, supported by its video production partners, offers video production and distribution solutions to its advertising customers. Using these solutions, customers can produce customized videos or slideshows depicting their business.  Dex One then distributes these videos across a variety of online distribution channels, including proprietary properties such as DexOne.com and third party video sites such as YouTube.com. |
| Reputation Management | Dex One offers reputation management solutions to its advertising customers.  These solutions allow customers to monitor the commentary, reviews, and ratings posted by consumers about their business across a wide variety of online sites and reply when appropriate. |
| Display Advertising | Dex One offers Display Advertising solutions to its advertising customers. Dex One, supported by its display advertising partners, produces display advertisements, small graphical advertisements including both pictures and text, which are then distributed across a network of third party online sites.  When consumers click on one of these display advertisements, they are generally taken to either the advertiser's page on DexKnows.com or directly to the advertiser's own website. |

A chart illustrating the Debtors' and SuperMedia's current and reorganized organizational structures is attached hereto as Exhibit J.  Additional information about the Debtors, including a full description of the condition and performance of the Debtors' business, is included in Dex One's most recent Annual Report in Form 10-K and Quarterly Reports in Form 10-Q for the quarterly periods ended March 31, 2012, June 30, 2012 and September 30, 2012, the entirety of which are publicly available at (a) the Debtors' investor relations website, located at http://ir.dexone.com and (b) the SEC's Electronic Data Gathering, Analysis, and Retrieval system, located at http://www.sec.gov/edgar/searchedgar/webusers.htm.  Also, information about the Debtors may be found on the Debtors' corporate internet website located at www.DexOne.com.

## 5.2    Employees

The Debtors employ approximately 2,300 individuals, including approximately 650 hourly, and 1,650 salaried, employees and approximately 30 temporary, contract employees.  Also, the International Brotherhood of Electrical Workers of America and the Communication Workers of America represent approximately 300 and 400 of the employees, respectively.  Dex One Service, Inc. employs the majority of the Debtors' employees.  The Debtors' employees and contract workers perform a variety of critical functions, including sales, customer service, purchasing, publishing and a variety of administrative, accounting, legal, finance, management, technology, supervisory, and other related tasks.

**5.3**    <u>**Directors and Officers**</u>

The Debtors' current directors and officers are listed in the tables below.  On the Effective Date, the Newdex Board will comprise 10 members including:  (a) five current Dex One non-employee directors designated by Dex One, including Alan F. Schultz as Chairman of the Newdex Board; (b) four current SuperMedia non-employee directors designated by SuperMedia; and (c) Peter McDonald, the current Chief Executive Officer and President of SuperMedia, as President and Chief Executive Officer of Newdex.  On the Effective Date, the terms of the current members of the board of directors and the appointment of the officers of Dex One shall terminate, and the terms of the current members of the board of directors of Newdex and the appointment of the current President and Chief Executive Officer of Newdex shall terminate. Otherwise, on the Effective Date, the existing officers and directors of the Debtors, including Newdex, shall serve in their current capacities in the Reorganized Debtors.  From and after the Effective Date, each director or officer of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other constituent documents, and applicable state corporation law.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the Newdex Board and any Person proposed to serve as an officer of Newdex shall have been disclosed at or before the Confirmation Hearing.

[*The remainder of this page is intentionally left blank.*]

| Director | Title | Dex One Corporation | Other Debtors[13] | Merger Entities[14] |
|---|---|---|---|---|
| Bulkeley, Jonathan | Director | X | | |
| Freiberg, Gregory | Director | | X | X |
| Hianik, Mark | Director | | X | X |
| Kuersteiner, Richard | Director | X | X | |
| Liddell, W. Kirk | Director | X | | |
| McEachen, Mark | Director | X | | |
| Mockett, Alfred | Director | X | X | X |
| Schultz, Alan | Director | X | | |

---

13  This group of Debtors includes:  Dex Media, Inc.; Dex Media East, Inc.; Dex Media West, Inc.; Dex Media Service LLC; Dex One Digital, Inc.; Dex One Service, Inc.; R.H. Donnelley Inc.; R.H. Donnelley APIL, Inc.; and R.H. Donnelley Corporation.

14  This group of Debtors includes:  Newdex, Inc. and Spruce Acquisition Sub, Inc.

| Officer[15] | Title | Dex One Corporation | Dex Media, Inc.; Dex Media East, Inc.; Dex Media West, Inc.; Dex One Service, Inc.; R.H. Donnelley Inc. | Dex Media Service LLC; R.H. Donnelley APIL, Inc.; R.H. Donnelley Corporation | Dex One Digital, Inc. | Merger Entities |
|---|---|---|---|---|---|---|
| Althaus, Lisa | Regional VP, National Sales | | X | | X | |
| Dishrow, Bruce | Regional VP, Midwest Region | | X | | X | |
| Freiberg, Gregory | Executive VP and Chief Financial Officer | X | X | X | X | X |
| Gibbons, Stephen | VP, Marketing | | X | | X | |
| Gronbach, Tyler | Senior VP, Communications | X | X | | X | |
| Hager, Robin | Regional VP, Northwest Region | | X | | X | |
| Hanna, Richard | Executive VP, Sales and Marketing | X | X | | X | |
| Hianik, Mark | Senior VP, General Counsel, Chief Administrative Officer, and Corp. Secretary | X | X | X | X | X |
| Hurley, Terry | VP, Legal and Assistant General Counsel | X | X | | X | |
| Johnson, Sylvester | VP, Controller, and Chief Accounting Officer | X | X | X | X | |
| Kovnatsky, Eugene | VP, Consumer Platforms Engineering | X | X | | | |
| Lail, Brent | Dean of the Sales Academy | | X | | X | |
| Lassy, Carter | VP Product Development for Business Services | X | X | | | |

30

15   For purposes of this table, "Officer" means an employee holding the position of Vice President ("VP") or higher.

| Officer[15] | Title | Dex One Corporation | Dex Media, Inc.; Dex Media East, Inc.; Dex Media West, Inc.; Dex One Service, Inc.; R.H. Donnelley Inc. | Dex Media Service LLC; R.H. Donnelley APIL, Inc.; R.H. Donnelley Corporation | Dex One Digital, Inc. | Merger Entities |
|---|---|---|---|---|---|---|
| Leeloy, Todd | VP, Digital Product Strategy and Management | X | X | | X | X |
| Mockett, Alfred | President and Chief Executive Officer | X | X | X | X | X |
| Moore, David | Regional VP, Southwest Region | | X | | X | |
| Murgo, Steven | VP, Sales Operations and Planning | | X | | X | |
| Provost, Gary | VP, Infrastructure Services | X | X | | X | |
| Rock, Cynthia | VP, Sales – Call Centers and Support | | X | | X | |
| Sharman, David | Senior VP, Chief Strategy Officer | X | X | X | X | |
| Shetty, Satish | VP, Information Technology Strategy and Enterprise Architecture | X | X | | X | |
| Towles, Donna | Senior VP, Operations | X | X | | X | |
| Wagner, Bruce | VP, National Sales Partner Channels | | X | | X | |
| Walker, Buff | Regional VP, East Region | | X | | X | |
| Wells, Matt | VP, Enterprise Applications | X | X | | X | |

31

**5.4**    **Prepetition Capital Structure**

(a)    **The Debtors' Credit Agreements**

In connection with Dex One and certain of its subsidiaries' emergence from bankruptcy, on January 29, 2010, three of Dex One's wholly-owned subsidiaries, RHDI, Dex East, and Dex West, amended and restated their credit agreements. Each of these agreements consists of term loans and each matures on October 24, 2014. The Credit Agreements require quarterly amortization payments of principal as follows: (1) $10,833,247, with remaining amounts due at maturity for the RHDI Secured Credit Agreement; (2) $29,119,073, with remaining outstanding amounts due at maturity for the Dex East Secured Credit Agreement; and (3) $4,647,054, with remaining outstanding amounts due at maturity for the Dex West Secured Credit Agreement. Interest is paid (1) with respect to any base rate loan, quarterly, and (2) with respect to any Eurodollar loan, on the last day of the interest period applicable to such borrowing, at each respective borrower's option as follows:

(1)    **RHDI Secured Credit Agreement:**

A.    the highest (subject to a floor of 4.00%) of (1) the prime rate, (2) the federal funds effective rate plus 0.50%, and (3) one month Adjusted LIBO Rate plus 1.00%, in each case as in effect on such day plus an interest rate margin for base rate loans. The interest rate margin for base rate loans is (a) 5.25% per annum if the leverage ratio is greater than or equal to 4.25x or (b) 5.00% per annum if the leverage ratio is less than 4.25x; or

B.    the higher of (1) Adjusted LIBO Rate, and (2) 3.00%, in each case plus an interest rate margin for Eurodollar loans. The interest rate margin for Eurodollar loans is (a) 6.25% per annum if the leverage ratio is greater than or equal to 4.25x or (b) 6.00% per annum if the leverage ratio is less than 4.25x. RHDI may elect interest periods of one, two, three, or six months for Eurodollar borrowings.

(2)    **Dex East Secured Credit Agreement:**

A.    the highest of (1) the prime rate, (2) the federal funds effective rate plus 0.50%, and (3) one month Adjusted LIBO Rate plus 1.00%, in each case as in effect on such day plus an interest rate margin for base rate loans. The interest rate margin for base rate loans is (a) 1.50% per annum if the leverage ratio is greater than or equal to 2.75x, (b) 1.25% per annum if the leverage ratio is greater than or equal to 2.50x but less than 2.75x and, (c) 1.00% per annum if the leverage ratio is less than 2.50x; or

B.    Adjusted LIBO Rate plus an interest rate margin for Eurodollar loans. The interest rate margin for Eurodollar loans is (a) 2.50% per annum if the leverage ratio is greater than or equal to 2.75x, (b) 2.25% per annum if the leverage ratio is greater than or equal to 2.50x but less than 2.75x, and (c) 2.00% per annum if the leverage ratio is less than 2.50x. Dex East may elect interest periods of one, two, three, or six months for Eurodollar borrowings.

(3)    **Dex West Secured Credit Agreement:**

A.    the highest (subject to a floor of 4.00%) of (1) the prime rate, (2) the federal funds effective rate plus 0.50%, and (3) one month Adjusted LIBO Rate plus 1.00%, in each case as in effect on such day plus an interest rate margin for base rate loans. The interest rate margin for base rate loans is (a) 3.50% per annum if the leverage ratio is greater than or equal to 2.75x, (b) 3.25% per annum if the leverage ratio is greater than or equal to 2.50x but less than 2.75x, and (c) 3.00% per annum if the leverage ratio is less than 2.50x; or

B.      the higher of (1) Adjusted LIBO Rate, and (2) 3.00%, in each case plus an interest rate margin for Eurodollar loans. The interest rate margin for Eurodollar loans is (a) 4.50% per annum if the leverage ratio is greater than or equal to 2.75x, (b) 4.25% per annum if the leverage ratio is greater than or equal to 2.50x but less than 2.75x, and (c) 4.00% per annum if the leverage ratio is less than 2.50x. Dex West may elect interest periods of one, two, three, or six months for Eurodollar borrowings.

As of December 31, 2012, there was $782.5 million, $540.9 million and $503.2 million of principal outstanding with weighted average interest rates of 9.0%, 2.8%, and 7.0% under the term loans under the RHDI Secured Credit Agreement, Dex East Secured Credit Agreement, and Dex West Secured Credit Agreement, respectively.

(b)      **The SuperMedia Secured Credit Agreement**

In connection with its emergence from chapter 11, on December 31, 2009, SuperMedia entered into a term loan agreement (the "SuperMedia Secured Credit Agreement") with certain financial institutions and JPMorgan Chase Bank, N.A. as administrative agent and collateral agent for an aggregate principal amount of approximately $2.8 billion. The SuperMedia Secured Credit Agreement was used to repay a portion of the amounts outstanding under SuperMedia's prepetition senior secured credit facilities. The SuperMedia Secured Credit Agreement matures on December 31, 2015.

The SuperMedia Secured Credit Agreement requires (1) with respect to any base rate loan, quarterly interest payments and (2) with respect to any Eurodollar loan, interest payments on the last day of the interest period applicable to such borrowing, at SuperMedia's option at either:

(1)      with respect to base rate loans, the highest of (1) the prime rate, (2) the federal funds effective rate plus 0.50%, and (3) one month LIBO Rate (subject to a floor of 3.00%) plus 1.00%, in each case as in effect on such day plus an interest rate margin of 7.00%; or

(2)      with respect to Eurodollar loans, the higher of (1) Adjusted LIBO Rate in effect for the applicable interest period and (2) 3.00%, in each case plus an interest rate margin of 8.00%. SuperMedia may elect interest periods of one, two or three months for Eurodollar borrowings.

As of December 31, 2012, there was a balance of $1.4 billion in principal outstanding with a weighted average interest rate of 11.0% under the SuperMedia Secured Credit Agreement.

(c)      **The Prepetition Credit Agreements Generally**

Each of the Prepetition Credit Agreements contains provisions for prepayment from net proceeds of asset dispositions, equity issuances, and debt issuances subject to certain exceptions. Each of the Credit Agreements contains provisions for prepayment (i) from a ratable portion of the net proceeds received by the applicable subsidiary of Dex One from asset dispositions, subject to certain exceptions, after the first $7,500,000 of net proceeds received by Dex West in each fiscal year and after the first $5,000,000 of net proceeds received by RHDI or Dex East in each fiscal year, (ii) from certain issuances of equity or debt, and (iii) from a portion of excess cash flow. The SuperMedia Secured Credit Agreement contains a provision for prepayment of net proceeds received by the borrower and its subsidiaries (i) from asset dispositions, subject to certain exceptions, after the first $5,000,000 of net proceeds received by the borrower and its subsidiaries in each fiscal year, (ii) from certain issuances of equity or debt, and (iii) from a portion of available cash (not to exceed 67.5% of the amount of any increase in such available cash during the applicable fiscal quarter) calculated and required to be applied as a prepayment on a quarterly basis. Each of the Prepetition Credit Agreements allows voluntary prepayments in whole or in part, subject to certain minimum prepayment requirements.

Each of the Prepetition Credit Agreements contains certain covenants that, subject to exceptions, limit or restrict each borrower and its subsidiaries' incurrence of liens, investments (including acquisitions) and loans, sales

33

of assets, indebtedness, payment of dividends, distributions and payments of certain indebtedness, sale and leaseback transactions, swap transactions, affiliate transactions, negative pledge clauses, changes in fiscal year, amendments to material documents, capital expenditures and mergers, liquidations, and consolidations. In addition, each of the Credit Agreements also contains covenants that, subject to exceptions, limit or restrict activities and obligations of each of Dex One, Dex One Service, Inc., and Dex Media Service LLC. Each of the borrowers under the Credit Agreements is required to maintain compliance with a consolidated (with respect to it and its subsidiaries) leverage ratio covenant of no more than as of the end of each fiscal quarter: (a) 5.00x under the Dex East Secured Credit Agreement; (b) 5.25x under the Dex West Secured Credit Agreement; and (c) 4.75x as of September 30, 2012, stepping down to 4.5x as of March 31, 2013, stepping down to 4.25x as of September 30, 2013, and further stepping down to 4.00x on March 31, 2014 under the RHDI Secured Credit Agreement.  The borrowers under the Dex West Secured Credit Agreement and the RHDI Secured Credit Agreement are also required to maintain compliance with a consolidated (with respect to it and its subsidiaries) interest coverage ratio covenant as of the last day of each fiscal quarter of at least (a) 1.35x under the Dex West Secured Credit Agreement, and (b) 1.75x as of September 30, 2012, stepping up to 1.90x as of March 31, 2013 and further stepping up to 2.00x as of March 31, 2014 under the RHDI Secured Credit Agreement.  There is no interest coverage ratio under the Dex East Secured Credit Agreement.  In addition, the borrower under the Dex West Secured Credit Agreement is required to maintain a consolidated (with respect to it and its subsidiaries) senior secured leverage ratio of no more than 3.00x. SuperMedia is required to maintain compliance with a consolidated (with respect to it and its subsidiaries) leverage ratio covenant of 7.50x at any time during any fiscal quarter and a consolidated (with respect to it and its subsidiaries) interest coverage ratio covenant of 1.10x as of the last day of each fiscal quarter.

The obligations under each of the Credit Agreements are guaranteed by each of the respective borrower's subsidiaries, if any, and are secured by a lien on substantially all of such borrower's and such subsidiaries' tangible and intangible assets, including a pledge of the stock of their respective subsidiaries, as well as a mortgage on certain real property, if any, in each case, subject to certain exceptions.

The obligations under the SuperMedia Secured Credit Agreement are guaranteed by certain of SuperMedia's subsidiaries and are secured by a lien on substantially all of SuperMedia and the SuperMedia guarantors' tangible and intangible assets, including a pledge of the stock of their respective subsidiaries, as well as a mortgage on certain real property, subject in each case, to certain exceptions.

Pursuant to a shared guaranty and collateral agreement and subject to an intercreditor agreement among the administrative agents under each of the Credit Agreements, Dex One and, subject to exceptions, certain of its subsidiaries (but excluding the borrowers under the Credit Agreements), guaranty the obligations under each of the Credit Agreements and the obligations under each of the Credit Agreements are secured by a lien on substantially all of such shared guarantor's tangible and intangible assets (except that with respect to Dex One's subsidiaries, Dex One Digital, Inc. and R.H. Donnelley Corporation, such guarantee is only secured by a pledge of stock held by such subsidiaries, if any), including a pledge of the stock of their respective subsidiaries, as well as a mortgage on certain real property, if any, subject in each case, to certain exceptions.

(d)    **Senior Subordinated Notes**

On January 29, 2010, Dex One issued $300.0 million aggregate principal amount of 12%/14% Senior Subordinated Notes due 2017 in exchange for the Dex West 8.5% senior notes due 2010 and 5.875% senior notes due 2011.   As of December 31, 2012, there was $219.7 million aggregate principal amount of the Senior Subordinated Notes outstanding.  Interest on the Senior Subordinated Notes is payable semi-annually on March 31 and September 30 of each year, commencing on March 31, 2010 through January 29, 2017.   The Senior Subordinated Notes accrue interest at an annual rate of 12% for Cash interest payments and 14% if Dex One elects paid-in-kind interest payments.  Dex One may elect, no later than two Business Days prior to the beginning of any such semi-annual interest period, whether to make each interest payment on the Senior Subordinated Notes (1) entirely in Cash or (2) 50% in Cash and 50% in paid-in-kind interest, which is capitalized as incremental or additional Senior Subordinated Notes.  In the absence of such an election for any subsequent semi-annual interest period, interest on the Senior Subordinated Notes will be payable in the form of the interest payment for the semi-annual interest period immediately preceding such subsequent semi-annual interest period.  During the year ended December 31, 2011, Dex One made interest payments entirely in Cash.  Dex One elected to pay interest amounts on the Senior Subordinated Notes 50% in Cash and 50% in paid-in-kind interest in lieu of making interest payments

entirely in Cash for the semi-annual interest periods ending March 31, 2012, and September 30, 2012, as permitted by the Senior Subordinated Notes Indenture.  After Consummation of the Plan, Newdex will continue to pay interest amounts on the Senior Subordinated Notes 50% in Cash and 50% paid-in-kind.  The interest rate on the Senior Subordinated Notes may be subject to adjustment in the event Dex One incurs certain specified debt with a higher effective yield to maturity than the yield to maturity of the Senior Subordinated Notes.  The Senior Subordinated Notes are, and after Confirmation of the Plan will remain, unsecured obligations of Dex One, effectively subordinated in right of payment to all of Dex One's existing and future secured debt, including contractually and structurally subordinated to all outstanding amounts under each of the Amended and Restated Credit Agreements and are structurally subordinated to the Amended and Restated SuperMedia Secured Credit Agreement and any existing or future liabilities (including trade payables and the subordinated guarantees to be issued by certain of Newdex's subsidiaries for the benefit of the lenders under the Newdex Credit Agreements) of its direct and indirect subsidiaries.

The Senior Subordinated Notes Indenture contains certain covenants that, subject to certain exceptions, among other things, limit or restrict Dex One's (and, in certain cases, Dex One's restricted subsidiaries') incurrence of indebtedness, making of certain restricted payments, incurrence of liens, entry into transactions with affiliates, conduct of its business and the merger, consolidation or sale of all or substantially all of its property.  The Senior Subordinated Notes Indenture also requires Dex One to offer to repurchase the Senior Subordinated Notes at par after certain changes of control involving Dex One or the sale of substantially all of its assets.  The Merger does not constitute a change of control under the Senior Subordinated Notes Indenture and the Transaction does not otherwise require the consent of the holders of the Senior Subordinated Notes.  Holders of the Senior Subordinated Notes also may cause Dex One to repurchase the Senior Subordinated Notes at a price of 101% of the principal amount upon the incurrence by Dex One of certain acquisition indebtedness.

(1)     **Supplemental Indenture**

Contemporaneously with the Consummation of the Plan, Dex One, Newdex, and The Bank of New York Mellon will enter into a first supplemental indenture to the indenture governing the Senior Subordinated Notes.  Newdex will, pursuant to the terms of the supplemental indenture, expressly assume Dex One's obligations under the related indenture, including Dex One's payment and other performance obligations.  Furthermore, the supplemental indenture will amend the "Non-Recourse Debt" definition in the Senior Subordinated Notes Indenture, to cure any ambiguity, omission, defect, mistake or inconsistency therein in accordance with section 8.01(a)(1) thereof.  The Senior Subordinated Notes Claims will be reinstated under the Plan and left Unimpaired.

## ARTICLE VI
## EVENTS LEADING TO THE CHAPTER 11 CASES

### 6.1     Challenging Industry Conditions

In recent years, the Debtors have experienced: (a) declines in advertising sales due to the economic recession, dislocation of credit markets, and declining consumer usage of print directory products and (b) significant competition and saturation in advertising markets, which placed significant strain on the Debtors' liquidity.  Although the Debtors have implemented various cost-cutting and operational restructuring initiatives, these initiatives have, to date, been insufficient to offset declining revenues.

### (a)     Economic Recession, Dislocation of Credit Markets, and Declining Consumer Usage

The economic recession that began in 2008 and the accompanying dislocation of credit markets triggered a decline in the Debtors' print advertising sales—the principal source of the Debtors' revenue.  The recession significantly reduced business spending among small and medium-sized businesses ("SMBs"), which constitute a substantial majority of the Debtors' advertising clients.  Recent economic conditions have also resulted in higher collection costs and bad debt expense due to increased difficulty in collecting accounts receivable from advertising clients in financial difficulty.  Additionally, revenue weaknesses are a result of declining consumer usage of print directories in the United States.  This decline is attributable to a number of factors, including increased usage of internet local search and internet-based directory products (particularly in business-to-business and retail categories).  The decline in the Debtors' print revenue has not been offset by an increase in revenue from the

35

Debtors' digital offerings, and other non-print products and services. Net revenue for the three and twelve-month periods ended September 30, 2012 were approximately $320 million and $1,351 million, respectively, representing a decrease in total revenue of approximately 11% and 13%, respectively, from the same periods for the previous year.

    (b)    **Competition**

The Debtors' industry is highly competitive. In each of the Debtors' print advertising markets, the Debtors compete with one or more Yellow Pages directory publishers, which are predominantly independent publishers. The Debtors also compete with other incumbent publishers in overlapping and adjacent markets, which affects the Debtors' ability to attract and retain advertisers and to increase advertising rates. Additionally, the Debtors' core print advertising business has come under increasing competition from internet-based directories and internet-based local search companies, as well as local advertising sales in traditional media such as newspapers, magazines, radio, direct mail, telemarketing, billboards, and television. Specifically, the Debtors' digital offerings compete with those of other incumbent directory publishers (such as SuperPages.com) and of independent directory publishers (such as Yellowbook.com). The Debtors also compete with search engines and portals, such as Google, Yahoo, and Bing and with other internet sites that provide local business information, such as Citysearch.com, Yelp.com, Local.com, and Zagat.com. Although the Debtors have entered into affiliate agreements with many of these companies, such agreements are not exclusive in most instances. Thus, these companies compete directly with the Debtors and have entered into similar agreements with other major directory publishers and providers of local marketing services. The Debtors also compete with certain providers of search engine marketing services, website development services, search engine marketing services, and other emerging digital marketing services provided by technology companies, such as Yodle, ReachLocal, Local.com, and Web.com.

In light of these circumstances, the Debtors believe that consummation of the Merger, the Amended and Restated Credit Agreements, and related transactions are in the best interest of their stakeholders. Combining Dex One and SuperMedia will produce a company that is better positioned as a national provider of social, local, and mobile marketing solutions and allow the combined company to achieve economies of scale with reduced costs and enhanced cash flow and liquidity.

The Plan provides the Debtors and their stakeholders an alternative to consummate the Merger, the Amended and Restated Credit Agreements, and related transactions in the event that the requisite consents from the lenders under the Credit Agreements and holders of Dex One Interests are not achieved in an out-of-court solicitation. In the event that the Debtors are unable to obtain unanimous lender approval or the approval of a majority of Dex One's stockholders, but receive acceptances of the Plan from a majority (counting only those voting on the Plan) of the lenders under each of the Credit Agreements, including the holders of at least 2/3 of the aggregate principal amount (counting only those voting on the Plan) of each of the Credit Agreements, the Debtors may file the Chapter 11 Cases and seek Confirmation and Consummation of the Plan. The Debtors have not taken any action approving a bankruptcy filing at this time, and, if the transaction is consummated outside of court, the Debtors will not commence the Chapter 11 Cases to Consummate the Plan.

**6.2**    **Insufficient Votes to Effect the Merger, and Financing Amendments, Out of Court**

The Debtors anticipate that effecting the Merger, and amending and restating their Credit Agreements, will position the combined company to increase sales of profitable products and services and phase out unprofitable products and services. Accordingly, as described earlier, the Debtors are soliciting senior secured lender consents and stockholder votes to approve the Merger and the financing amendments, as applicable, on an out-of-court basis. Concurrently and in accordance with sections 1125 and 1126 of the Bankruptcy Code, the Debtors are soliciting senior secured lender and stockholder votes on the Plan, which contemplates the Merger and the Amended and Restated Credit Agreements. If the Debtors do not obtain the necessary lender consents and stockholder votes to satisfy corporate law requirements for approval of the Merger and the Amended and Restated Credit Agreements outside of bankruptcy, the Debtors may effect the Merger and the Amended and Restated Credit Agreements in chapter 11 through the Plan.

# ARTICLE VII
## OTHER KEY ASPECTS OF THE PLAN

**7.1**     **Distributions**

One of the key concepts under the Bankruptcy Code is that only Claims and Interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines that the Claim or Interest, and the amount thereof, is in fact a valid obligation of or interest in the Debtors. Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, on the Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Allowed Claims and Interests, including those that become Allowed after the Distribution Record Date, subject to the Reorganized Debtors' right to object to Claims and Interests.

(a)     **Disputed Claims Process**

Except as otherwise provided in the Plan, if a party files a proof of claim and the Debtors or Reorganized Debtors, as applicable, do not determine in their sole discretion, and without the need for notice to or action, order or approval of the Bankruptcy Court, that the Claim subject to such proof of claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in the Plan. Except as otherwise provided in the Plan, all proofs of claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

(b)     **Prosecution of Objections to Claims and Interests**

Except insofar as a Claim or Interest is Allowed under the Plan, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to the Claim or Interest. Any objections to Claims and Interests shall be served and filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Section 4.15 of the Plan.

(c)     **No Interest**

Unless otherwise specifically provided for in the Plan or by order of the Bankruptcy Court (including pursuant to the Dex East Cash Collateral Order, the Dex West Cash Collateral Order or the RHDI Cash Collateral Order), postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

(d)     **Disallowance of Claims and Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**7.2**    **Treatment of Executory Contracts and Unexpired Leases**

    (a)    **Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless any such Executory Contract or Unexpired Lease:  (a) is listed on the Rejection Schedule; (b) has been previously assumed or rejected by the Debtors by Final Order or has been assumed or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; or (c) is the subject of a motion to assume or reject pending as of the Effective Date.  The assumption of Executory Contracts and Unexpired Leases under the Plan may include the assignment of certain of such contracts to Affiliates or to the SuperMedia Debtors.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

Except as otherwise provided in the Plan or agreed to by the Debtors with the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

    (b)    **Cure of Defaults and Objections to Cure and Assumption**

The Debtors or Reorganized Debtors, as applicable, shall pay Cures on the Effective Date or as soon as practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors must be filed with the Claims and Solicitation Agent on or before 30 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided, however, that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is a dispute regarding Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     **Pre-existing Payment and Other Obligations**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide: (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

(d)     **Rejection Damages Claims and Objections to Rejections**

Pursuant to section 502(g) of the Bankruptcy Code, counterparties to Executory Contracts or Unexpired Leases that are rejected shall have the right to assert Claims, if any, on account of the rejection of such contracts and leases. Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of Executory Contracts and Unexpired Leases pursuant to the Plan must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Confirmation Date or the effective date of rejection. Any such Proofs of Claim that are not timely filed shall be disallowed without the need for any further notice to or action, order, or approval of the Bankruptcy Court. Such Proofs of Claim shall be forever barred, estopped, and enjoined from assertion. Moreover, such Proofs of Claim shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged notwithstanding anything in a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as Class 8 - General Unsecured Claims against the applicable Debtor counterparty thereto.

(e)     **Contracts, Intercompany Contracts, and Leases Entered into After the Petition Date**

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

(f)     **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**7.3**       **Release, Injunction, and Related Provisions**

(a)       **Discharge of Claims and Termination of Interests**

Except as otherwise provided for in the Plan and effective as of the Effective Date:  (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

(b)       **Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided for in the Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, and liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative Claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, the Estates, or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Affiliates, the Chapter 11 Cases, the Transaction, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, prepetition contracts and agreements with one or more Debtors (including the Credit Agreements and other agreements reflecting long-term indebtedness), the Dex One Support Agreement, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the Plan and Disclosure Statement or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date, other than Claims or liabilities arising out of or related to any contractual or fixed monetary obligation owed to the Debtors or the Reorganized Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.2 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by Section 8.2 of the Plan; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any Claim or Cause of Action released by Section 8.2 of the Plan.

(c)       **Releases by Holders of Claims and Interests**

As of the Effective Date, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts,

reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Transaction, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, prepetition contracts and agreements with one or more Debtors (including the Credit Agreements and other agreements reflecting long-term indebtedness), the Dex One Support Agreement, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date of the Plan.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.3 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (a) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates, and the Released Parties; (b) a good faith settlement and compromise of the Claims released by Section 8.3 of the Plan; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under Section 8.3 of the Plan from asserting any Claim or Cause of Action released by Section 8.3 of the Plan.

(d)    **Exculpation**

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan.  The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(e)    **Preservation of Rights of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and**

**all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

(f)    **Injunction**

**Except as otherwise provided in the Plan or for obligations issued pursuant to the Plan, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 8.2 of the Plan or Section 8.3 of the Plan, discharged pursuant to Section 8.1 of the Plan, or are subject to exculpation pursuant to Section 8.4 of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.**

**7.4    Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**7.5    Indemnification**

On and from the Effective Date, and except as prohibited by applicable law, the Reorganized Debtors shall assume or reinstate, as applicable, all indemnification obligations in place as of the Effective Date (whether in by-laws, certificates of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates.

**7.6**     **Recoupment**

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**7.7**     **Release of Liens**

Except (a) with respect to the Liens securing the Dex East Secured Credit Facility Claims, Dex West Secured Credit Facility Claims or the RHDI Secured Credit Facility Claims, (b) with respect to the Liens securing the Secured Tax Claims or Other Secured Claims (depending on the treatment of such Claims), or (c) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**7.8**     **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**7.9**     **Newdex Common Stock**

The authorized shares of Newdex—Newdex Common Stock—will have a par value of $0.001 per share.

**7.10**     **Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order, the Reorganized Debtors shall:  (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.   Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**7.11**     **Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided in the Plan, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**7.12    Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan, including in connection with the Merger, or in any agreement, instrument, or other document incorporated in the Plan (including the Amended and Restated Credit Documents), on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**7.13    Modification of Plan**

Effective as of the date of the Plan:  (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order, subject to the limitations set forth in the Plan and, if effective, the Dex One Support Agreement; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject to the limitations set forth in the Plan and, if effective, the Dex One Support Agreement.

**7.14    Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**7.15    Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**7.16    Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Solicitation Agent by:  (1) calling the Debtors' restructuring hotline at one of the telephone numbers set forth earlier in this Disclosure Statement; (2) visiting the Debtors' restructuring website, www.epiq11.com/dexone; and/or (3) writing to Dex One Corporation Ballot Processing Center, c/o Epiq Systems, FDR Station, P.O. Box 5014, New York, New York 10150-5014. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**7.17**    **Conditions Precedent to the Effective Date**

The following conditions shall have been satisfied or waived, pursuant to Section 9.2 of the Plan, as a condition to the Effective Date:

(a)      the Confirmation Order shall have been entered, and such order shall not have been stayed, modified, or vacated on appeal;

(b)      if the SuperMedia Chapter 11 Cases have been filed, the SuperMedia Confirmation Order shall have been entered by the Bankruptcy Court, and such order shall not have been stayed, modified, or vacated on appeal;

(c)      the Merger shall have been consummated, and all conditions set forth in Article VII of the Merger Agreement shall have been satisfied (and not waived);

(d)      all respective conditions precedent to the consummation of each of the Amended and Restated Dex East Secured Credit Agreement, the Amended and Restated Dex West Secured Credit Agreement, and the Amended and Restated RHDI Secured Credit Agreement shall have been waived or satisfied in accordance with the respective terms thereof;

(e)      if the SuperMedia Chapter 11 Cases have been filed, the effective date of the SuperMedia Plan shall have occurred in accordance with the terms thereof concurrently with the occurrence of the Effective Date;

(f)      all fees and expenses of the Credit Agreement Agents, including the fees and expenses of counsel and the financial advisors to the Credit Agreement Agents, shall have been paid in full in cash; and

(g)      all documents and agreements necessary to implement the Plan shall have:  (1) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (2) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (3) been effected or executed.

The Debtors, with the prior written consent of each Credit Agreement Agent, which may not be unreasonably withheld, may waive any of the conditions to the Effective Date set forth in the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or this Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE VIII**
**CERTAIN FACTORS TO BE CONSIDERED**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

45

**8.1**     **General**

 The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. For additional risk factors, please refer to Dex One's most recent Annual Report in Form 10-K and Quarterly Reports in Form 10-Q for the quarters ended March 31, 2012, June 30, 2012, and September 30, 2012, which are incorporated by reference into this Disclosure Statement and are publicly available in their entirety at (a) the Debtors' investor relations website, located at http://ir.dexone.com and (b) the SEC's Electronic Data Gathering, Analysis, and Retrieval system, located at http://www.sec.gov/edgar/searchedgar/webusers.htm. In considering whether to object to Confirmation, holders of Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**8.2**     **Risks Related to the Plan and Other Bankruptcy Law Considerations**

 (a) **A Claim or Interest Holder May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests**

 Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created eleven Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. However, a Claim or Interest holder could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court concludes that either or both of the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

 (b) **The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan**

 If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation. If the Plan does not receive the required support from Classes 5, 6, 7, and 9, the Debtors may elect to amend the Plan, seek Confirmation regardless of the rejection, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

 (c) **The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan**

 The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Plan.

 If the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

Moreover, the Bankruptcy Court could fail to approve this Disclosure Statement or the Shareholder Disclosure Statement and determine that the votes in favor of the Plan should be disregarded. The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statements. Typically, this process involves a 60- to 90-day period and includes a court hearing for the required approval of disclosure statement(s), followed (after bankruptcy court approval) by another solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the bankruptcy court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests and the Debtors' liquidation analysis are set forth under the unaudited liquidation analysis, attached hereto as Exhibit H. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors than those provided for in the Plan because of:

- the likelihood that the Debtors' assets would need to be sold or otherwise disposed of in a less orderly fashion over a short period of time;

- additional administrative expenses involved in the appointment of a trustee; and

- additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

(d)     **The Debtors May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(e)     **Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.

(f)     **Contingencies May Affect Distributions to Holders of Allowed Claims and Interests**

The distributions available to holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions under the Plan.

(g)     **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

With regard to solicitation of votes prior to the commencement of a bankruptcy case, if the Bankruptcy Court concludes that the requirements of Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, whereupon the Plan could not be confirmed without a resolicitation of votes to accept or reject the Plan. While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

      (h)      **The SEC, the United States Trustee, or Other Parties May Object to the Plan on Account of the Third-Party Release Provisions**

Any party in interest, including the SEC and the United States Trustee, could object to the Plan on the grounds that the third-party releases are not given consensually or in a permissible non-consensual manner. In response to such an objection, the Bankruptcy Court could determine that the third-party releases are not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to remove the third-party release provisions. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

      (i)      **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtors reserve the right, prior to the Confirmation of the Plan or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law and the Dex One Support Agreement, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

      (j)      **The Plan May Have a Material Adverse Effects on the Debtors' Operations**

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective customers, employees, partners, and others. There is a risk, due to uncertainty about the Debtors' future, that, among other things:

- the Debtors' customers' confidence in the abilities of the Debtors to produce and deliver their products and services could erode, resulting in a significant decline in the Debtors' revenues, profitability, and cash flow;

- it may become more difficult to retain, attract, or replace key employees;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- the Debtors' suppliers, vendors, and service providers could terminate their relationships with the Debtors or require financial assurances or enhanced performance, subject to the Debtors' assertions in the Bankruptcy Court of certain protections under the Bankruptcy Code.

(k)     **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately 30 to 60 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

While the Debtors expect that the Chapter 11 Cases filed solely for the purpose of implementing the Plan would be of short duration and would not be unduly disruptive to the Debtors' businesses, the Debtors cannot be certain that this necessarily would be the case. Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan would be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' futures, that, among other things:

- customers could move to the Debtors' competitors, including competitors that have comparatively greater financial resources and that are in comparatively less financial distress;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses, as well as create concerns for employees, suppliers and customers.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

(l)     **Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization that May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from filing. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing holders of Dex One Interests and may seek to exclude these holders from retaining any equity under their plan. Alternative plans of reorganization also may treat less favorably the Claims of a number of other constituencies, including the creditors under the Credit Agreements, the Debtors' employees, and the Debtors' trading partners and customers. The Debtors consider maintaining relationships with their senior secured creditors, common stockholders, employees, and trading partners and customers as critical to maintaining the value of Newdex following the Effective Date, and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share

49

the Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive. If this were to occur, or if the Debtors' employees or other constituencies important to the Debtors' business reacted adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing Section 8.2(j) also could occur.

(m)      **The Debtors' Business May Be Negatively Affected if the Debtors Are Unable to Assume Their Executory Contracts**

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases, unless designated on a schedule of rejected contracts. The Debtors intend to preserve as much of the benefit of their existing contracts and leases as possible. However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

(n)      **Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers**

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the date of filing of the bankruptcy petition or one year before the date of filing of the petition, if the creditor, at the time of such transfer was an insider. If any transfer was challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, a bankruptcy court could order the recovery of all amounts received by the recipient of the transfer.

(o)      **The Debtors May Be Unsuccessful in Obtaining First Day Orders to Permit Them to Pay Their Key Suppliers and Their Employees, or to Continue to Perform Customer Programs, in the Ordinary Course of Business**

The Debtors have tried to address potential concerns of their key customers, vendors, employees, and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

(p)      **The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral**

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the lenders under the Credit Agreements, which requests will be in accordance with the terms of the Dex One Support Agreement. Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

(q)     **The Plan May Be Confirmed over the Objection of the Holders of Dex One Interests**

Under the "cram down" provisions of the Bankruptcy Code, the Plan may be confirmed even if the holders of Dex One Interests do not vote to accept the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly, and is fair and equitable, regarding each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  If the requisite votes of the senior secured lenders of the Debtors to accept the Plan are obtained but the requisite votes of the holders of Dex One Interests to accept the Plan are not, the Debtors may seek to have the Plan confirmed under the cram down provisions of the Bankruptcy Code.

## 8.3     Business-Specific Risk Factors

### Risk Factors Relating to the Merger

(a)     **The Exchange Ratios Are Fixed and Will Not Be Adjusted in the Event of Any Change in Either Dex One's or SuperMedia's Stock Price**

Upon the Effective Date, each Allowed Dex One Interest will be converted into 0.2 shares of Newdex Common Stock and each share of SuperMedia common stock will be converted into the right to receive 0.4386 shares of Newdex Common Stock.  These exchange ratios will not be adjusted for changes in the market price of either Dex One Interests or SuperMedia common stock between the signing of the Merger Agreement and the Effective Date.  Changes in the prices of Dex One Interests and SuperMedia common stock will affect the value of the Newdex Common Stock that holders of Dex One Interests and SuperMedia stockholders, respectively, will receive in the Merger.

(b)     **Holders of Dex One Interests and SuperMedia Stockholders Cannot Be Sure of the Market Value of the Shares of Newdex Common Stock to Be Issued Upon the Effective Date**

Holders of Dex One Interests and SuperMedia stockholders will each receive a fixed number of shares of Newdex Common Stock in the Merger.  The market values of Dex One Interests and SuperMedia common stock on the Effective Date may vary significantly from their prices on the date the Merger Agreement was executed, the date of this Disclosure Statement, and the date on which holders of Dex One Interests and SuperMedia stockholders vote on the Merger.  Because the respective Merger consideration exchange ratios will not be adjusted to reflect any changes in the market prices of Dex One Interests or SuperMedia common stock, the market value of the Newdex Common Stock issued in the Merger and the Dex One Interests and SuperMedia common stock surrendered in the Merger may be higher or lower than the values of these shares on earlier dates.  One hundred percent of the consideration under the Plan to be received by both holders of Dex One Interests and SuperMedia stockholders will be Newdex Common Stock.

Changes in the market prices of Dex One Interests and SuperMedia common stock may result from a variety of factors that are beyond the control of Dex One or SuperMedia, including changes in their businesses, operations and prospects, regulatory considerations, governmental actions, and legal proceedings and developments.  Market assessments of the benefits of the Merger, the likelihood that the Merger will be completed, and general and industry-specific market and economic conditions may also have an effect on the market price of Dex One Interests and SuperMedia common stock.  Changes in market prices of SuperMedia common stock and Dex One Interests may also be caused by fluctuations and developments affecting domestic and global securities markets.  Neither Dex One nor SuperMedia is permitted to terminate the Merger Agreement solely because of changes in the market price of either party's respective common stock.

In addition, the Effective Date may not occur until a significant period of time has passed after the Voting Deadline.  As a result, the market values of Dex One Interests or SuperMedia common stock may vary significantly from the date of the Voting Deadline to the Effective Date.  There can be no assurance that the Merger will be completed, that there will not be a delay in the completion of the Merger, or that all or any of the anticipated benefits of the Merger will be obtained.

(c)   **Failure to Successfully Combine the Businesses of the Debtors and SuperMedia or Failure to Do so in the Expected Time Frame May Adversely Affect Newdex's Future Results**

The success of the Merger and the Plan will depend, in part, on Newdex's ability to realize the anticipated benefits from combining the businesses of the Debtors and SuperMedia.  To realize these anticipated benefits, the businesses of the Debtors and SuperMedia must be successfully combined.  Historically, the Debtors and SuperMedia have been independent companies, and they will continue to be operated as such until the Effective Date. The management of Newdex may face significant challenges in consolidating the functions of SuperMedia and the Debtors, integrating the technologies, organizations, procedures, policies, and operations of the two companies, as well as addressing the different business cultures at the two companies and retaining key personnel. If the Debtors and SuperMedia do not successfully integrate their business operations, the anticipated benefits of the Plan may not be realized fully or at all or may take longer to realize than expected. The integration may also be complex and time consuming and require substantial resources and effort. The integration process and other disruptions resulting from the Plan may also disrupt each company's ongoing businesses and/or adversely affect each company's relationships with employees, regulators, and others with whom they have business or other dealings.  There can be no assurance that Newdex will be able to accomplish this integration process smoothly or successfully. In addition, the integration of certain operations following the Effective Date will require the dedication of significant management resources, which will compete for management's attention with its efforts to manage the day-to-day business of Newdex.  Even if the Debtors and SuperMedia are able to integrate their business operations successfully, there can be no assurance that this integration will result in the realization of the full benefits of synergies, cost savings, growth, and operational efficiencies that may be possible from this integration, or that these benefits will be achieved within a reasonable period of time.  Any inability to realize the full extent of, or any of, the anticipated cost savings and financial benefits of the Plan, as well as any delays encountered in the integration process, could have an adverse effect on the business and results of operations of Newdex, which may affect the market price of Newdex Common Stock.

(d)   **The Debtors and SuperMedia Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Effective Date**

Uncertainty about the effects of the Plan and the SuperMedia Plan, if filed, on employees and customers may have an adverse effect on the Debtors or SuperMedia and consequently on Newdex. These uncertainties may impair the Debtors' or SuperMedia's ability to retain and motivate key personnel and could cause customers and others that deal with the Debtors or SuperMedia to defer entering into contracts with the Debtors or SuperMedia or making other decisions concerning the Debtors or SuperMedia or seek to change existing business relationships with the Debtors or SuperMedia. In addition, if key employees depart because of uncertainty about their future roles and the potential complexities of the Merger, SuperMedia's and the Debtors' businesses could be harmed. In addition, the Merger Agreement restricts the Debtors and SuperMedia from making certain acquisitions and taking other specified actions until the Merger occurs without the consent of the other party. These restrictions may prevent the Debtors and SuperMedia from pursuing attractive business opportunities that may arise prior to the Effective Date.

(e)   **Holders of Dex One Interests and SuperMedia Stockholders Will Have a Reduced Ownership and Voting Interest After the Effective Date and Will Exercise Less Influence over Management**

Upon the Effective Date, holders of Dex One Interests and SuperMedia stockholders will own a smaller percentage of Newdex than they currently own of Dex One and SuperMedia, respectively. Upon Consummation of the Plan, it is anticipated that holders of Dex One Interests and SuperMedia stockholders will hold approximately 60% and 40%, respectively, of the shares of common stock of Newdex issued and outstanding immediately after the Consummation of the Plan. Consequently, holders of Dex One Interests, as a group, and SuperMedia stockholders, as a group, will each have reduced ownership and voting power in Newdex compared to their current ownership and voting power in Dex One and SuperMedia, respectively.  In particular, SuperMedia stockholders, as a group, will have less than a majority of the ownership and voting power of Newdex and, therefore, will be able to exercise less collective influence over the management and policies of Newdex than they currently exercise over the management and policies of SuperMedia.

(f)     **Members of Both the Debtors' and SuperMedia's Management and Certain Directors Have Interests in the Plan that Are Different from, or in Addition to, Stockholders' Interests**

Executive officers of Dex One and SuperMedia negotiated the terms of the Merger Agreement, and the Dex One and SuperMedia boards approved the Merger and recommended that their respective stockholders vote to approve and adopt the Merger Agreement and related transactions or, in the alternative, the Plan or the SuperMedia Plan, as applicable. In considering these facts and the other information contained in this Disclosure Statement, you should be aware that some members of both Dex One's and SuperMedia's management and certain members of their boards have economic interests in the Transaction that are different from, or in addition to, the interests of holders of Dex One Interests and SuperMedia stockholders generally. These interests include, among others, continued service as a director or an executive officer of Newdex, ownership interests in Newdex, and the accelerated vesting of certain equity awards and/or certain severance benefits, in connection with the Plan. These interests, among others, may influence the directors and executive officers of Dex One and SuperMedia to support or approve the Plan.  In addition, some directors of each of Dex One and SuperMedia are associated with stockholders who are also debtholders of each of Dex One and SuperMedia, and therefore may have interests relating to the debt that are different from those relating to the stockholders.

(g)     **The Merger Agreement Limits the Debtors' and SuperMedia's Ability to Pursue Alternatives to the Merger**

Each of Dex One and SuperMedia has agreed that it will not, among other things, solicit, initiate, encourage or facilitate, or engage in discussions, negotiations or agreements regarding, proposals to acquire 10% or more of the stock or assets of Dex One or SuperMedia, subject to limited exceptions, including that a party may take certain actions in the event it receives an unsolicited acquisition proposal that constitutes a superior proposal or is reasonably expected to lead to a superior proposal, and the party's board of directors determines in good faith, after consultation with its outside legal counsel and financial advisor, that a failure to take action with respect to such takeover proposal would be inconsistent with its duties under applicable law. Each party has also agreed that its board of directors will not change its recommendation to its stockholders or approve any alternative agreement, subject to limited exceptions, including that, at any time prior to the applicable stockholder approval, the applicable board of directors may make a change in recommendation of the Merger if such board concludes in good faith, after consultation with its outside legal counsel and financial advisor, that (1) the failure to take such action would be inconsistent with its duties under applicable laws, (2) if requested by the other party, its representatives shall have negotiated in good faith with the other party for three Business Days, and (3) if such change in recommendation is related to an alternative acquisition proposal, that such proposal constitutes a superior proposal.

(h)     **The Support of Certain Secured Creditors of the Debtors and SuperMedia for the Necessary Amendments to the Applicable Credit Agreements Is Subject to the Terms of Support Agreements Between the Debtors and Certain of Their Secured Creditors and SuperMedia and Certain of Its Secured Creditors, Which Are Subject to Termination**

The Debtors and SuperMedia and certain of its Affiliates have entered into the Dex One Support Agreement and the SuperMedia Support Agreement, respectively, with certain of their respective senior secured creditors. These support agreements provide, among other things, that the creditor parties will support the amendments to the Prepetition Credit Agreements and the Plan or SuperMedia Plan, as applicable, and will support the waiver of certain credit rights under the Prepetition Credit Agreements. The execution of the support agreements by those secured creditors is not a guarantee that the Newdex Credit Agreements will become effective.  As of the date of this Disclosure Statement, an insufficient number of creditors are party to the Dex One Support Agreement and the SuperMedia Support Agreement to cause the Amended and Restated Credit Agreements and the Amended and Restated SuperMedia Secured Credit Agreement to be effective in an out-of-court process, and there is no assurance that either Dex One or SuperMedia will ever obtain the support of the requisite numbers of creditors to do so.  In addition, these support agreements are subject to certain automatic termination upon the occurrence of certain events and to termination upon 10 Business Days' notice (subject to cure), upon the occurrence of certain other events, including the failure to deliver definitive loan documents within a certain timeframe and the failure of the Shareholder Disclosure Statement to be declared effective within a specified timeframe.  If either the Dex One Support Agreement or the SuperMedia Support Agreement is terminated, the senior secured lenders of the Debtors or SuperMedia will have no obligation to support the amendments to and restatements of the Prepetition Credit

Agreements, either through an out-of-court transaction or through a chapter 11 process. The Plan will not be consummated if the amendments to and restatements of the Prepetition Credit Agreements are not approved.

(i)    **The Debtors, SuperMedia, and Newdex Will Incur Significant Transaction and Transaction-Related Transition Costs in Connection with the Plan and the Merger**

The Debtors and SuperMedia expect that they and Newdex will incur significant, non-recurring costs in connection with consummating the Plan and the Merger and integrating the operations of the two companies. The Debtors and SuperMedia may incur additional costs to maintain employee morale and to retain key employees. The Debtors and SuperMedia will also incur significant fees and expenses relating to amending the Prepetition Credit Agreements and legal, accounting, and other transaction fees and other costs associated with consummating the Plan and the Merger.  Some of these costs are payable regardless of whether the Plan is confirmed.   Upon termination of the Merger Agreement under specified circumstances, the Debtors or the SuperMedia Debtors may be required to pay the other party an expense reimbursement of up to a maximum amount of $7.5 million.

(j)    **Unaudited Pro Forma Financial Information Included in This Disclosure Statement May Not Be Indicative of Newdex's Actual Financial Position or Results of Operations**

The unaudited pro forma financial information in this Disclosure Statement is presented for illustrative purposes only and is not necessarily indicative of what Newdex's actual financial position or results of operations would have been had the Effective Date occurred on the date indicated. The unaudited pro forma financial information reflects adjustments, which are based upon preliminary estimates, to allocate the purchase price to SuperMedia's net assets. The purchase price allocation reflected in this Disclosure Statement is preliminary, and final allocation of the purchase price will be based upon the actual purchase price and the fair value of the assets and liabilities of SuperMedia as of the Effective Date. In addition, subsequent to the Effective Date, there may be further refinements of the purchase price allocation as additional information becomes available.  Accordingly, the final purchase accounting adjustments may differ materially from the pro forma adjustments reflected in this Disclosure Statement. See the unaudited pro forma condensed combined statements, attached hereto as Exhibit F, for more information.

(k)    **The Debtors, SuperMedia, and, Subsequently, Newdex Must Continue to Retain, Motivate, and Recruit Executives and Other Key Employees, Which May Be Difficult in Light of Uncertainty Regarding the Plan, and Failure to Do so Could Negatively Affect Newdex**

For the Merger to be successful, during the period before the Effective Date, both the Debtors and SuperMedia must continue to retain, motivate, and recruit executives and other key employees. Moreover, Newdex must be successful at retaining and motivating key employees following the Effective Date.  Experienced employees in the industries in which both the Debtors and SuperMedia operate are in high demand and competition for their talents can be intense.  Employees of both the Debtors and SuperMedia may experience uncertainty about their future roles with Newdex until, or even after, strategies with regard to Newdex are announced or executed.  The potential distractions of the Merger may adversely affect the ability of the Debtors, SuperMedia or, following the Effective Date, Newdex, to retain, motivate, and recruit executives and other key employees and keep them focused on applicable strategies and goals. A failure by the Debtors, SuperMedia or, following the Effective Date, Newdex, to attract, retain, and motivate executives and other key employees during the period prior to or after the Effective Date could have a negative impact on the businesses of the Debtors, SuperMedia, or Newdex.

(l)    **Upon the Effective Date, the Newdex Certificate of Incorporation Will Include Transfer Restrictions on Newdex Common Stock as Well as Restrictions Prohibiting the Issuance of Non-Voting Equity Securities**

The Merger Agreement provides that, upon the consummation of the Merger, the Newdex certificate of incorporation, attached hereto as Exhibit K, will include specific transfer restrictions on Newdex Common Stock to reduce the possibility of certain ownership changes occurring before or after the merger of Spruce Acquisition Sub, Inc. with and into SuperMedia.  These restrictions could impair the ability of certain stockholders to freely transfer shares of Newdex Common Stock after the Effective Date.  In addition, if the Merger is consummated through the

Plan, the Newdex certificate of incorporation will also include a provision prohibiting the issuance of non-voting equity securities to the extent necessary to satisfy the requirements of the Bankruptcy Code.

     (m)    **Failure to Confirm and Consummate the Plan Could Negatively Impact the Debtors and SuperMedia**

       If the Plan is not confirmed and consummated, the ongoing businesses of the Debtors and SuperMedia may be adversely affected and there may be various consequences, including:

- the adverse impact to the business of each party caused by the failure to pursue other beneficial opportunities due to the focus on the Merger, without realizing any of the anticipated benefits of the Merger;

- the incurrence of substantial costs by the Debtors and SuperMedia in connection with the Merger, without realizing any of the anticipated benefits of the Merger;

- if the Merger Agreement is terminated, under certain circumstances, the payment by one party to the other party of an expense reimbursement of up to $7.5 million;

- a negative impact on the market price of the common stock of Dex One and/or SuperMedia;

- the possibility, for each of the Debtors and SuperMedia, of being unable to repay indebtedness when due and payable; and

- the Debtors and/or SuperMedia pursuing chapter 11 or chapter 7 proceedings resulting in recoveries for creditors and stockholders that are less than contemplated under the Plan or SuperMedia Plan, as applicable, or resulting in no recovery for certain creditors and stockholders.

     (n)    **Satisfying the Conditions to, and Completion of, the Merger May Take Longer Than, and Could Cost More Than, the Debtors and SuperMedia Expect.  Any Delay in Completing, or Any Additional Conditions Imposed in Order to Complete, the Merger May Materially and Adversely Affect the Synergies and Other Benefits that the Debtors and SuperMedia Expect to Achieve from the Merger and the Integration of Their Respective Businesses**

       The Merger is subject to a number of conditions beyond the Debtors' and SuperMedia's control that may prevent, delay, or otherwise materially adversely affect its completion.  The Debtors cannot predict when or whether these conditions will be satisfied.  Furthermore, the requirements for obtaining any required regulatory clearances and approvals could delay the completion of the Merger for a significant period of time or prevent it from occurring altogether.  Any delay in completing the Merger could cause Newdex not to realize some or all of the synergies that the Debtors expect to achieve if the Merger is successfully completed in the expected time frame.

**Risk Factors Relating to Newdex Following the Effective Date**

     (o)    **The Failure to Successfully Integrate the Businesses of the Debtors and SuperMedia in the Expected Timeframe Would Adversely Affect Newdex's Future Results Following the Effective Date**

       The Plan involves the integration of two companies that have previously operated independently. The success of the Plan will depend, in large part, on the ability of Newdex following the Effective Date to realize the anticipated benefits, including synergies, cost savings, innovation, and operational efficiencies, from combining the businesses of the Debtors and SuperMedia. To realize these anticipated benefits, the businesses of the Debtors and SuperMedia must be successfully integrated. This integration will be complex and time-consuming. The failure to integrate successfully and to manage successfully the challenges presented by the integration process may result in Newdex not achieving the anticipated benefits of the Plan.

Potential difficulties that may be encountered in the integration process include the following:

- the inability to successfully integrate the businesses of the Debtors and SuperMedia in a manner that permits Newdex to achieve the full revenue and cost savings anticipated to result from the Merger;

- complexities associated with managing the larger, more complex, combined business;

- integrating personnel from the two companies while maintaining focus on providing consistent, high-quality products and services;

- potential unknown liabilities and unforeseen expenses, delays or regulatory conditions associated with the Merger;

- performance shortfalls at one or both of the companies as a result of the diversion of management's attention caused by completing the Merger and integrating the companies' operations; and

- the disruption of, or the loss of momentum in, each company's ongoing business or inconsistencies in standards, controls, procedures and policies.

Any of these difficulties in successfully integrating the businesses of the Debtors and SuperMedia, or any delays in the integration process, could adversely affect Newdex's ability to achieve the anticipated benefits of the Plan and could adversely affect Newdex's business, financial results, financial condition, and stock price. Even if Newdex is able to integrate the business operations of the Debtors and SuperMedia successfully, there can be no assurance that this integration will result in the realization of the full benefits of synergies, cost savings, innovation, and operational efficiencies that the Debtors and SuperMedia currently expect from this integration or that these benefits will be achieved within the anticipated time frame.

(p)    **The Future Results of Newdex Will Suffer if Newdex Does Not Effectively Manage Its Expanded Operations Following the Effective Date**

Following the Effective Date, the size of Newdex's business will increase significantly beyond the current size of either the Debtors' or SuperMedia's business. Newdex's future success depends, in part, upon its ability to manage this expanded business, which will pose substantial challenges for management, including challenges related to the management and monitoring of new operations and associated increased costs and complexity. There can be no assurances that Newdex will be successful or that it will realize the expected operating efficiencies, cost savings, revenue enhancements and other benefits currently anticipated from the Plan.

(q)    **Newdex Is Expected to Incur Substantial Expenses Related to the Plan and the Integration of the Debtors and SuperMedia**

Newdex is expected to incur substantial expenses in connection with the Plan and the integration of the Debtors and SuperMedia.   There are a large number of processes, policies, procedures, operations, technologies, and systems that must be integrated, including information technology purchasing, accounting and finance, sales, billing, payroll, pricing, revenue management, marketing, and benefits.   While the Debtors and SuperMedia have assumed that a certain level of expenses would be incurred, there are many factors beyond their control that could affect the total amount or the timing of the integration expenses.   Moreover, many of the expenses that will be incurred are, by their nature, difficult to estimate accurately.   These expenses could, particularly in the near term, exceed the savings that Newdex expects to achieve from the elimination of duplicative expenses and the realization of economies of scale and cost savings.   These integration expenses likely will result in Newdex taking significant charges against earnings following the Effective Date, and the amount and timing of such charges are uncertain at present.

(r)    **Uncertainty About the Plan and Diversion of Management Could Harm Newdex Following the Effective Date**

The Plan could result in current and prospective employees experiencing uncertainty about their future with Newdex following the Plan.  These uncertainties may impair the ability of Newdex to retain, recruit, or motivate key personnel. In addition, Confirmation of the Plan and integrating the companies' operations will require a significant amount of time and attention from management of the two companies. The diversion of management's attention away from ongoing operations could adversely affect business relationships of Newdex following the Effective Date.

(s)    **Newdex Will Have Substantial Indebtedness Following the Effective Date  that Could Adversely Affect Its Business, Prospects, Financial Condition, Results of Operations and Cash Flow**

Newdex will have a significant amount of indebtedness following the Effective Date.  Newdex's substantial level of indebtedness increases the risk that it may be unable to generate cash sufficient to pay amounts due in respect of its indebtedness.  Newdex's substantial indebtedness could have other important consequences to you and significant effects on Newdex's business and prospects.  For example, it could:

- increase Newdex's vulnerability to adverse changes in general economic, industry, and competitive conditions;

- require Newdex to dedicate a substantial portion of its cash flow from operations to make payments on its indebtedness, thereby reducing the availability of its cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit Newdex's flexibility in planning for, or reacting to, changes in its business and the industry in which it operates;

- restrict Newdex from exploiting business opportunities;

- make it more difficult to satisfy Newdex's financial obligations, including payments on its indebtedness;

- place Newdex at a disadvantage compared to its competitors that have less debt; and

- limit Newdex's ability to borrow additional funds for working capital, capital expenditures, acquisitions, debt service requirements, execution of its business strategy or other general corporate purposes.

In addition, the Newdex Credit Agreements, the Senior Subordinated Notes, and the agreements evidencing or governing other future indebtedness may contain restrictive covenants that will limit Newdex's ability to engage in activities that may be in its long-term best interests.  Newdex's failure to comply with those covenants could result in an event of default which, if not cured or waived, could result in the acceleration of all of its indebtedness.

(t)    **The Newdex Credit Agreements and the Senior Subordinated Notes will restrict Newdex's Future Operations, Particularly Its Ability to Respond to Changes or to Take Certain Actions, After the Effective Date**

The Newdex Credit Agreements will impose significant operating and financial restrictions and will limit Newdex and its subsidiaries' ability to, among other things:

- incur liens or other encumbrances;

- make acquisitions, loans and investments;

- sell or otherwise dispose of assets;

- incur additional indebtedness;

- pay dividends, make distributions and pay certain indebtedness;

- enter into sale and leaseback tractions; and

- enter into swap transactions and certain affiliate transactions.

In addition, under the Newdex Credit Agreements, Newdex will be required to maintain specified financial ratios and satisfy other financial condition tests. The terms of any future indebtedness Newdex may incur could include more restrictive covenants. There can be no assurance that Newdex will be able to maintain compliance with these covenants in the future and, if it fails to do so, that Newdex will be able to obtain waivers from its senior secured creditors and/or amend the covenants.

A failure by Newdex to comply with the covenants or to maintain the required financial ratios contained in the agreements governing its indebtedness could result in an event of default under such indebtedness, which could adversely affect Newdex's ability to respond to changes in its business and manage its operations. Additionally, a default by Newdex under one agreement covering Newdex's indebtedness may trigger cross-defaults under other agreements covering its indebtedness. Upon the occurrence of an event of default or cross-default under any of the agreements governing Newdex's indebtedness, the lenders could elect to declare all amounts outstanding to be due and payable and exercise other remedies as set forth in the agreements. If any of Newdex's indebtedness was to be accelerated, there can be no assurance that its assets would be sufficient to repay this indebtedness in full, which could have a material adverse effect on Newdex's ability to continue to operate as a going concern.

(u)    **To Service Its Indebtedness, Newdex Will Require a Significant Amount of Cash**

Newdex's ability to generate cash depends on many factors beyond its control, and any failure to meet its debt service obligations could harm its business, financial condition, and results of operations. Newdex's ability to make payments on and to refinance its indebtedness and to fund working capital needs and planned capital expenditures will depend on Newdex's ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive, business, legislative, regulatory, and other factors that are beyond its control.

If Newdex's business does not generate sufficient cash flow from operations or if future borrowings are not available to it in an amount sufficient to enable Newdex to pay its indebtedness or to fund Newdex's other liquidity needs, Newdex may need to refinance all or a portion of its indebtedness on or before the maturity thereof, sell assets, reduce or delay capital investments or seek to raise additional capital, any of which could have a material adverse effect on its operations. In addition, Newdex may not be able to affect any of these actions, if necessary, on commercially reasonable terms or at all. Newdex's ability to restructure or refinance its indebtedness will depend on the condition of the capital markets and Newdex's financial condition at such time. Any refinancing of Newdex's debt could be at higher interest rates and may require it to comply with more onerous covenants, which could further restrict Newdex's business operations. The terms of existing or future debt instruments may limit or prevent Newdex from taking any of these actions. In addition, any failure to make scheduled payments of interest and principal on Newdex's outstanding indebtedness would likely result in a reduction of its credit rating, which could harm Newdex's ability to incur additional indebtedness on commercially reasonable terms or at all. Newdex's inability to generate sufficient cash flow to satisfy its debt service obligations, or to refinance or restructure its obligations on commercially reasonable terms or at all, would have an adverse effect, which could be material, on Newdex's business, financial condition and results of operations, as well as on its ability to satisfy its obligations in respect of the Newdex Credit Agreements and the Senior Subordinated Notes.

(v)    **Newdex's Ability to Use the Debtors' Net Operating Loss Carryforwards to Offset Future Taxable Income May Become Limited as a Result of the Plan**

As of September 30, 2012, the Debtors had net operating loss carryforwards for U.S. federal income tax purposes of approximately $1.0 billion. Under sections 382 and 383 of the Internal Revenue Code of 1986, as amended (the "IRC"), if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income and taxes may be limited. In general, an "ownership change" occurs if there is a cumulative change in ownership by "5-percent shareholders" (within the meaning of section 382 of the IRC) that exceeds 50 percentage points over a rolling three-year period. If a corporation has a "net unrealized built-in gain" (a "NUBIG"), generally meaning that, immediately before an ownership change, the fair market value of its assets

exceeds the aggregate tax basis of its assets, then the limitation described above is generally increased for the first five years after the change date by the amount of recognized built-in gain during a post-change year (but not cumulatively to exceed the NUBIG). The merger of SuperMedia and Spruce Acquisition Sub, Inc. pursuant to the Plan may cause an ownership change with respect to Newdex on the Effective Date.  As a result, section 382 of the IRC may apply to limit Newdex's use of any remaining net operating losses and other pre-change tax attributes after the Effective Date. In the event Newdex experiences an ownership change as a result of the merger of SuperMedia and Spruce Acquisition Sub, Inc., although there can be no assurance in this regard, the Debtors expect that the resulting limitation on Newdex's ability to utilize its net operating losses and other pre-change tax attributes should be significantly increased as a result of Newdex's NUBIG, permitting Newdex to use more of its net operating losses than it would otherwise.  Newdex's net operating losses and other pre-change tax attributes after the Effective Date may be adversely affected if an ownership change within the meaning of section 382 of the IRC were to occur after the effectiveness of the merger of SuperMedia and Spruce Acquisition Sub, Inc. In order to prevent an ownership change after the effectiveness of the merger of SuperMedia and Spruce Acquisition Sub, Inc., Newdex Common Stock will generally be subject to transfer restrictions. No such transfer restrictions currently exist with respect to Dex One's common stock. However, there can be no assurances that these restrictions will prevent an ownership change from occurring in the future.

(w)     **Amendments to the Prepetition Credit Agreements May Increase the Tax Liability or Reduce the Tax Assets of Newdex**

The Effective Date is contingent upon, among other things, amendments to the Prepetition Credit Agreements.  To the extent that loans issued under such credit agreements trade at a discount at the time of such an amendment, the Debtors, SuperMedia, or Newdex, as the case may be, may realize cancellation of debt income ("COD Income") for U.S. federal income tax purposes without a corresponding receipt of Cash.  If such amendment occurs outside of court, some or all of such COD Income may be included in taxable income.  If such amendment occurs as part of a chapter 11 bankruptcy process, no such COD Income will be included in taxable income.  In either event, tax attributes that might otherwise be available to offset income or tax of the Debtors, SuperMedia, or Newdex, as the case may be, would be reduced to the extent of any COD Income that is not included in taxable income.  However, the Debtors expect that the amount of COD Income realized will result in a corresponding amount of original issue discount that will be deductible for U.S. federal income tax purposes by the Debtors, SuperMedia, or Newdex, as the case may be, over the term of the applicable Newdex Credit Agreements.

(x)     **The Continuing Declining Use of Print Yellow Pages Directories Will Adversely Affect Newdex's Business**

Overall references to print yellow pages directories in the United States have declined from 14.5 billion in 2005 to 7.5 billion in 2011 according to a Local Search Association (formerly known as the Yellow Pages Association) Industry Usage Study. This decline is primarily attributable to increased use of internet search providers, as well as the proliferation of very large retail stores for which consumers and businesses may not reference the yellow pages. The decline will negatively affect the advertising sales associated with traditional print business. Use of Newdex's print directories may continue to decline. A significant decline in usage of Newdex's print directories could impair its ability to maintain or increase advertising prices and cause businesses to reduce or discontinue purchasing advertising in its yellow pages directories.  Either or both of these factors would adversely affect Newdex's revenue and have a material adverse effect on Newdex's business, prospects, financial condition, results of operations, and cash flow.

**8.4     Disclosure Statement Disclaimer**

(a)     **Information Contained Herein is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

(b)        **Disclosure Statement Was Not Approved by the SEC**

Although a copy of this Disclosure Statement will be served on the SEC, and the combined registration statement and joint proxy statement of Dex One and SuperMedia in connection with the Merger, which includes information in this Disclosure Statement, was approved by the SEC, this Disclosure Statement was not filed with the SEC.  The SEC, like any other party in interest, will be given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approves it.   Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the Exhibits or the statements contained herein, and any representation to the contrary is unlawful.

(c)        **Disclosure Statement May Contain Forward Looking Statements**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or pendency of the Chapter 11 Cases;

- growth opportunities for existing products and services;

- financing plans;

- results of litigation;

- competitive position;

- disruption of operations;

- business strategy;

- contractual obligations;

- budgets;

- projected general market conditions;

- projected cost reductions;

- plans and objectives of management for future operations; and

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation;

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows.

Statements concerning these and other matters are not guarantees of the Debtors' future performance.  The reader is cautioned that all forward-looking statements are necessarily speculative.  The valuation analysis, the liquidation analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted.  Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made.  There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

(d)        **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(e)    **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties-in-interest.

(f)    **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

(g)    **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim or Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

(h)    **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(i)    **Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(j)    **No Representations Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement in connection with the combined registration statement and joint proxy statement of Dex One and SuperMedia and associated documents. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## ARTICLE IX
## IMPORTANT SECURITIES LAW DISCLOSURE

Under the Plan, Newdex will issue, on the Effective Date, shares of Newdex Common Stock for the benefit of holders of Allowed Interests in Class 9. All such shares will be duly authorized, validly issued, fully paid, and non-assessable.

The offering, issuance, and distribution of any Securities, including the Newdex Common Stock pursuant to the Plan will be in compliance with the registration requirements of the Securities Act or exempt from the

registration requirements of section 5 therein pursuant to section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.  Section 1145 of the Bankruptcy Code exempts from registration the sale of a debtor's Securities under a chapter 11 plan if such Securities are offered or sold in exchange for a claim against, or equity interests in, or a claim for an administrative expense in a case concerning, such debtor.  Under this exemption, Newdex Common Stock generally will be exempt from the registration requirements of the Securities Act.  Accordingly, recipients will be able to resell the Newdex Common Stock without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such Securities, within the meaning of section 1145(b)(1) of the Bankruptcy Code or similar federal, state, local, or foreign laws.  In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued under the Plan will be freely transferable under the Securities Act by the recipients thereof, subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act, and in compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) any other applicable regulatory approval.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:  (1) purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor, if that purchase is with a view to distributing any Security received in exchange for such a claim or interest; (2) offers to sell Securities offered under a plan of reorganization for the holders of those Securities; (3) offers to buy those Securities from the holders of the Securities, if the offer to buy is (a) with a view to distributing those Securities and (b) under an agreement made in connection with the plan of reorganization, or with the offer or sale of Securities under the plan of reorganization; or (4) is an "issuer" with respect to the Securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent that Entities who receive Newdex Common Stock are deemed to be "underwriters," resales by such Entities may not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those Entities may, however, be permitted to sell Newdex Common Stock without registration, subject to the provisions of Rule 144 under the Securities Act, which permit the public sale of securities received pursuant to a plan of reorganization by "underwriters," subject to the availability to the public of current information regarding the issuer, volume limitations and certain other conditions.  Whether or not any Entity would be deemed to be an "underwriter" with respect to any Security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Entity.  Accordingly, the Debtors express no view as to whether any Entity would be an "underwriter" with respect to any Security to be issued pursuant to the Plan.  **YOU SHOULD CONFER WITH YOUR OWN LEGAL ADVISORS TO HELP DETERMINE WHETHER OR NOT YOU ARE AN "UNDERWRITER".**

## ARTICLE X
## REGULATORY APPROVALS REQUIRED FOR THE TRANSACTION

Although currently no filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") is believed to be necessary for the transaction to be completed, the Antitrust Division of the United States Department of Justice (the "Antitrust Division") and the United States Federal Trade Commission (the "FTC") frequently scrutinize the legality under the antitrust laws of transactions such as the combination of the Debtors and SuperMedia.  Moreover, depending upon fluctuations in the fair market value of SuperMedia's common stock, it may be necessary for the parties to make the requisite filings and wait the requisite waiting periods under the HSR Act. In addition, at any time before or after the Transaction, the Antitrust Division, the FTC, one or more state attorneys general or a foreign competition authority could take such action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the transaction or seeking divestiture of substantial businesses or assets of Dex One, SuperMedia or their subsidiaries and affiliates. Private parties may also bring legal actions under the antitrust laws under certain circumstances.

There can be no assurance that a challenge to the transaction on antitrust grounds will not be made or, if a challenge is made, as to the result of such challenge.  Similarly, there can be no assurance that the Debtors and SuperMedia will obtain the regulatory approvals necessary to consummate the Transaction or that the granting of these approvals will not involve the imposition of conditions or changes to the terms of the Transaction. These

conditions or changes could result in the conditions to the Transaction not being satisfied prior to June 30, 2013, or at all.  Each of the Debtors and SuperMedia has agreed to use its reasonable best efforts to obtain all regulatory approvals required to complete the transactions contemplated by the Merger Agreement. Neither the Debtors nor SuperMedia is required to take any action or agree to any condition or restriction in connection with obtaining regulatory approvals that would be reasonably expected to have a material adverse effect, measured on a scale relative to Dex One, SuperMedia or, following the Transaction, Newdex.

# ARTICLE XI
# CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

## 11.1    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

## 11.2    Confirmation Standards

Among the requirements for the Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.  The Plan fully complies with the statutory requirements for Confirmation listed below.

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors (or any other proponent of the Plan) have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, officer, or voting trustee of Newdex, the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies.

- The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by Newdex or the Reorganized Debtors and the nature of any compensation for such Insider.

- With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective

Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of Newdex, the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

**11.3    Best Interests Test/Liquidation Analysis**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Based on the Debtors' liquidation analysis, the Debtors believe that the value of any distributions if the Debtors' Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan. As a result, the Debtors believe holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation as they would recover through a hypothetical chapter 7 liquidation.

**11.4    Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections, which, together with the assumptions on which they are based, are attached hereto as Exhibit B. Based on such projections, the Debtors believe that they will be able to make all payments required under the Plan. Therefore, Confirmation is not likely to be followed by liquidation or the need for further reorganization.

**11.5    Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

(a)        **No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair". The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of

Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

      (b)      **Fair and Equitable Test**

This test applies to Classes of different priority and status (u.g., secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class. As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests of the Debtor in such Class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Secured Creditors: Each holder of a secured claim either (1) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim, (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (3) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Creditors: Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan.

- Equity Interests: Either (1) each holder of an interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 11 (Section 510(b) Claims) is deemed to reject the Plan, because, as to such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims in such Class.

## ARTICLE XII
## ALTERNATIVES TO
## CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan cannot be confirmed, the Debtors may seek to (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (3) liquidate the Debtors under chapter 7 of the Bankruptcy Code. If the Debtors were to pursue a liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors is described in the unaudited liquidation analysis, attached hereto as Exhibit H.

# ARTICLE XIII
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

**13.1**    **Introduction**

The following is a general discussion of the material U.S. federal income tax consequences of the Plan to the Debtors and to certain holders of Claims.  The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote to accept or reject the Plan.  This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "<u>IRS</u>") and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This summary does not apply to holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders in light of their individual circumstances.  This discussion does not address tax issues with respect to holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, holders of Claims who are themselves in bankruptcy, persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, and regulated investment companies, entities treated as partnerships for U.S. federal income tax purposes (and partners therein) and those holding, or who will hold, Claims under the Amended and Restated Dex East Secured Credit Agreement, the Amended and Restated Dex West Secured Credit Agreement or the Amended and Restated RHDI Secured Credit Agreement as part of a hedge, straddle, conversion or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  Further, this discussion assumes that the transaction will be completed in accordance with the Merger Agreement and as further described in this document.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

<u>**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**</u>:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE PLAN OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**13.2**     **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

(a)        **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Pursuant to the Plan, allowed Class 5, 6 and 7 Claims will be exchanged for a pro rata share of the loans under the Amended and Restated Dex East Secured Credit Agreement, the Amended and Restated Dex West Secured Credit Agreement, and the Amended and Restated RHDI Secured Credit Agreement, respectively (see discussion of "Consequences to Holders of Class 5, 6 and 7 Claims" below). Consequently, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the "issue price" of the Amended and Restated Credit Agreements exchanged therefor (see discussion of "Issue Price" below). As this price cannot be known with certainty until after the Effective Date, the amount of COD Income the Debtors may incur is thus uncertain.

Following this reduction, the Debtors expect that, subject to the limitations discussed herein, there will be material reductions in NOLs, NOL carryforwards and other tax attributes, including the Reorganized Debtors' tax basis in their assets. However, the Debtors expect that the amount of COD Income attributable to the exchange of Class 5, 6 and 7 Claims for the Amended and Restated Credit Agreements will result in a corresponding amount of original issue discount that will be deductible for U.S. federal income tax purposes by the Reorganized Debtors over the term of the Amended and Restated Credit Agreements.

(b)        **Limitation of NOL Carryforwards and Other Tax Attributes**

The Debtors anticipate that the Reorganized Debtors will have significant NOLs and other tax attributes at emergence. The amount of such tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available tax attributes include:  (a) the amount of taxable income incurred by the Debtors in 2012; and (b) the issue price of the Amended and Restated Credit Agreements.  Following consummation of the Plan, the Debtors anticipate that their NOLs and other tax attributes may be subject to limitation under section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation.  The merger of Spruce Acquisition Sub, Inc. with and into SuperMedia pursuant to the Plan (the "SuperMedia Plan Merger") may result in an "ownership change" of the Reorganized Debtors for these purposes, and the Debtors' use of their Pre-Change Losses may be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

(1)    **General Section 382 Annual Limitation**

This discussion refers to the limitation determined under section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation." In general, a corporation's annual Section 382 Limitation on the use of its Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, approximately 3%). If the Debtors have a NUBIG, generally meaning that, immediately before an ownership change, the fair market value of its assets exceeds the aggregate tax basis of its assets, then the limitation described above is generally increased for the first five years after the change date by the amount of recognized built-in gain during a post-change year (but not cumulatively to exceed the NUBIG). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The SuperMedia Plan Merger may cause an ownership change with respect to the Debtors on the Effective Date. As a result, unless an exception applies, section 382 of the IRC may apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date. In the event the Debtors experience an ownership change as a result of the SuperMedia Plan Merger, although there can be no assurance in this regard, the Debtors expect that the resulting limitation on the Reorganized Debtors' ability to utilize its NOLs should be significantly increased as a result of its NUBIG, permitting the Reorganized Debtors to use more of its NOLs than it would otherwise. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income. The Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date. With respect to any ownership change after the Effective Date, NOLs and other tax attributes attributable to the period prior to the Effective Date are treated as Pre-Change Losses for the latter ownership change as well, with the result that such NOLs would be subject to the smaller of the earlier annual limitation and any later annual limitations. In order to prevent a post-Effective Date "ownership change" of the Reorganized Debtors, Newdex Common Stock will be subject to transfer restrictions. No such transfer restrictions currently exist with respect to the Debtors' stock. However, there can be no assurances that these restrictions will prevent an ownership change from occurring in the future.

(2)    **Special Bankruptcy Exceptions**

An exception to the foregoing annual limitation rules generally applies when a debtor company's existing shareholders and/or so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions attributable to "qualified creditors" claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner

described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors have not yet determined whether to utilize the 382(l)(5) Exception. In the event that there is an ownership change with respect to the Debtors as a result of the SuperMedia Plan Merger and the Debtors do not use the 382(l)(5) Exception, the Debtors expect that their use of any Pre-Change Losses after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.

**13.3    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims**

(a)    **Consequences to Holders of Class 5, 6 and 7 Claims**

Pursuant to the Plan and in full and final satisfaction of their Claims, holders of Allowed Class 5, 6 and 7 Claims will be exchanged for their portion of the loans under the Amended and Restated Credit Agreements. The U.s. federal income tax consequences of the Plan to such holders of Claims depends, in part, on whether the exchange of such Claims for the Amended and Restated Credit Agreements should be treated as a "significant modification" for U.S. federal income tax purposes. Under the applicable Treasury Regulations, a "significant modification" is treated as a "deemed" exchange of an old debt instrument for a new debt instrument on which taxable gain or loss may be realized. In general, the Treasury Regulations consider a modification a "significant modification" if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant.  The Treasury Regulations also provide certain specific guidance as to what may be considered a "significant modification." The Debtors expect that the exchange of the Class 5, 6 and 7 Claims for their portion of the Amended and Restated Credit Agreements will constitute, and thus intend to treat the exchange as constituting, a "significant modification" resulting in a deemed exchange of the Class 5, 6 and 7 Claims, and, as a result, holders of Allowed Class 5, 6 and 7 Claims will realize gain or loss for U.S. federal income tax purposes upon the exchange.  The treatment of the gain or loss realized upon the exchange will depend, in part, on whether the exchange qualifies as a recapitalization (which depends on whether the debt instruments underlying each of the Allowed Class 5, 6 and 7 Claims and the Amended and Restated Credit Agreements constitute "securities" for U.S. federal income tax purposes).

(1)    **Treatment of a Debt Instrument as a "Security"**

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but several authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument may be a security for U.S. federal income tax purposes.  Some authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.  Each holder of an allowed Class 5, 6 and 7 Claim should consult with its own tax advisor to determine whether or not the debt instruments underlying each of the Claims and the Amended and Restated Credit Agreements constitute "securities" for U.S. federal income tax purposes.

(2)    **Treatment of a Holder of an Allowed Claim if the Exchange of its Claim is not Treated as a Recapitalization**

If the exchange of the Allowed Class 5, 6 or 7 Claims is not treated as a recapitalization for U.S. federal income tax purposes (e.g., because the debt instruments underlying either of the Claims or the Amended and Restated Credit Agreements are not treated as securities for U.S. federal income tax purposes), a holder of such Claim should be treated as exchanging its allowed Claim for its portion of the Amended and Restated Credit Agreements in a fully taxable exchange.  A holder of an allowed Claim who is subject to this treatment would recognize gain or loss equal to the difference between (i) the issue price (as described below) of the Amended and Restated Secured Credit Agreements that is not allocable to accrued but untaxed interest, and (ii) the holder's adjusted tax basis in the obligation constituting the surrendered allowed Claim.  The character of such gain or loss as

69

capital gain or loss or as ordinary income or loss would be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of accrued interest and market discount below. A holder's tax basis in its portion of the Amended and Restated Credit Agreements received on the Effective Date would equal its issue price.  A holder's holding period for its portion of the Amended and Restated Credit Agreements received on the Effective Date would begin on the day following the Effective Date.

(3)      **Treatment of a Holder of an Allowed Claim if the Exchange of its Claim is Treated as a Recapitalization**

If the exchange of the Allowed Class 5, 6 or 7 Claims is treated as a recapitalization for U.S. federal income tax purposes (e.g., because the debt instruments underlying each of the Claims and the Amended and Restated Credit Agreements are treated as securities for U.S. federal income tax purposes), a holder would not recognize loss with respect to the exchange and would not recognize gain except to the extent that the shares of the Amended and Restated Credit Agreements received are allocable to accrued but untaxed interest on the allowed Claim surrendered therefor (see discussion below, "Accrued Interest").  Such holder's tax basis in its portion of the Amended and Restated Credit Agreements would be equal to the tax basis of the obligation constituting the allowed Claim surrendered therefor, and a holder's holding period for its portion of the Amended and Restated Credit Agreements would include the holding period for the obligation constituting the surrendered allowed Senior Secured Claim; <u>provided</u> that the tax basis of any portion of the Amended and Restated Credit Agreements treated as received in satisfaction of accrued but untaxed interest would equal the amount of such accrued but untaxed interest, and the holding period for any such portion of the Amended and Restated Credit Agreements would not include the holding period of the debt instrument constituting the surrendered allowed Claim.

**The tax consequences of the Plan and to the holders of allowed Class 5, 6 and 7 Claims are highly uncertain.  Holders of allowed Class 5, 6 and 7 Claims should consult their tax advisors regarding whether the debt instruments underlying each of the Claims and the Amended and Restated Credit Agreements could be treated as "securities" for U.S. federal income tax purposes.**

(4)      **Issue Price of a Debt Instrument**

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a holder of the allowed Claims surrendered under the Plan are traded on an "established securities market" for U.S. federal income tax purposes.  The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). Although not free from doubt, the Debtors believe and intend to take the position that the debt instruments underlying the allowed Class 5, 6 and 7 Claims are traded on an established market and expect that the debt instruments underlying the Amended and Restated Credit Agreements will be traded on an established market. These rules are complex and you should consult your tax advisor regarding the determination of the issue price of the Amended and Restated Credit Agreements.

(5)      **Accrued Interest**

To the extent that any amount received by a holder of a surrendered allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the holder's gross income for U.S. federal income tax purposes, such amount would be taxable to the holder as ordinary interest income.  Conversely, a holder of a surrendered allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously so included in the holder's gross income but was not paid in full by the Debtors.

The extent to which the consideration received by a holder of a surrendered allowed Claim will be attributable to accrued interest on the debt underlying the surrendered allowed Claim is unclear.  Certain legislative

history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. Pursuant to the Plan, distributions in respect of allowed claims shall be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on either the IRS or a court with respect to the appropriate tax treatment for creditors.

(6)    **Market Discount**

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a holder exchanging the debt instruments constituting its allowed claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable disposition (determined as described above) of debts that it acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here if the exchange is treated as a recapitalization), any market discount that accrued on such debts but was not recognized by the holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

(b)    **Consequences to Holders of Class 9 Interests**

Pursuant to the Plan and upon consummation of the Merger, each holder of Allowed Class 9 Interests shall receive 0.2 shares of Newdex Common Stock for each of its Allowed Class 9 Interests.

The Debtors expect and intend to treat the merger of Dex One with and into its direct, wholly owned subsidiary, Newdex, as a "reorganization" within the meaning of section 368(a) of the IRC. Therefore, a holder of Class 9 Interests generally will not recognize any gain or loss for U.S. federal income tax purposes upon the exchange of shares of Dex One Interests for Newdex Common Stock pursuant to the Merger. Additionally, a holder of Class 9 Interests will not recognize any gain or loss for U.S. federal income tax purposes on account of the implied reverse stock split of shares of Dex One common stock when they are exchanged for shares of Newdex Common Stock pursuant to the Merger. Such holder's tax basis in its portion of the Newdex Common Stock should be equal to the tax basis of the Dex One common stock constituting the allowed Interests surrendered therefor, and a holder's holding period for its portion of the Newdex Common Stock will include the holding period for the Dex One common stock constituting the allowed Interests surrendered therefor.

## 13.4    **Withholding and Reporting**

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of an allowed Claim. Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments if a holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against

such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XIV
## CONCLUSION AND RECOMMENDATION

The Plan effects the Merger and the financing amendments required for the Debtors to implement their long-term business plan.  Absent these transactions, the Debtors may not be able to sustain going concern operations.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than proposed under the Plan.  The Debtors urge all holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots and master ballots so they will be received by the Claims and Solicitation Agent no later than 1:30 p.m. prevailing Eastern Time on March 13, 2013.

Dated: February 8, 2013

Respectfully submitted,

DEX ONE CORPORATION
on behalf of itself and all other Debtors

By: _____
Name:    Mark W. Hianik
Title:    Senior Vice President, General Counsel and Chief
         Administrative Officer

Prepared by:

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        james.sprayregen@kirkland.com
              marc.kieselstein@kirkland.com
              christopher.marcus@kirkland.com

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              pkeane@pszjlaw.com

Proposed Attorneys for the
Debtors and Debtors in Possession

**APPENDIX:**
**RULES OF INTERPRETATION, COMPUTATION OF TIME,**
**GOVERNING LAW, AND OTHER REFERENCES**

**14.1    Rules of Interpretation**

For purposes of the Disclosure Statement:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to any particular portion of the Disclosure Statement; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**14.2    Computation of Time**

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

**14.3    Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

**14.4    Reference to Monetary Figures**

All references in the Disclosure Statement to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**14.5    Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Disclosure Statement to the contrary, references in the Disclosure Statement to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**<u>EXHIBIT A TO THE DISCLOSURE STATEMENT</u>**

<u>DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN</u>

[THIS PAGE INTENTIONALLY LEFT BLANK]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DEX ONE CORPORATION, et al.,[1] | ) Case No. 13-10533 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

---

**DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN**

---

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE, 11 U.S.C. §§ 1125, 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                christopher.marcus@kirkland.com

Proposed Attorneys for the
Debtors and Debtors in Possession

Dated:  February 8, 2013

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                pkeane@pszjlaw.com

---

[1]    The Debtors, together with the last four digits of each of the Debtors' federal tax identification number (if applicable), are:  Dex One Corporation (0040); Dex Media, Inc. (9762); Dex Media East, Inc. (5763); Dex Media West, Inc. (7004); Dex Media Service LLC (9647); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley Inc. (7635); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); Newdex, Inc. (1335); and Spruce Acquisition Sub, Inc. (4006).  For the purpose of these chapter 11 cases, the service address for the Debtors is:  1001 Winstead Drive, Cary, North Carolina 27513.

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** ........................................................................................................................ 1

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW, AND OTHER REFERENCES** ................................................................ 1
    1.1    Defined Terms ..................................................................................... 1
    1.2    Rules of Interpretation ......................................................................... 11
    1.3    Computation of Time ............................................................................ 11
    1.4    Governing Law .................................................................................... 11
    1.5    Reference to Monetary Figures ............................................................ 11
    1.6    Reference to the Debtors or the Reorganized Debtors .......................... 11

**ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS** ............................................... 11
    2.1    Administrative Claims .......................................................................... 11
    2.2    Professional Claims .............................................................................. 12
    2.3    Priority Tax Claims ............................................................................... 12

**ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS** ........... 12
    3.1    Classification of Claims and Interests .................................................. 12
    3.2    Treatment of Classes of Claims and Interests ...................................... 13
    3.3    Special Provision Governing Unimpaired Claims ................................ 17

**ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN** ............................ 17
    4.1    General Settlement of Claims ................................................................ 17
    4.2    Newdex Common Stock ........................................................................ 17
    4.3    Amended and Restated Credit Documents ............................................ 18
    4.4    Offering and Issuance of Newdex Common Stock ................................ 18
    4.5    Subordination ....................................................................................... 18
    4.6    Vesting of Assets in the Reorganized Debtors ...................................... 19
    4.7    Cancellation of Notes, Instruments, Certificates, and Other Documents ...... 19
    4.8    Issuance of New Securities; Execution of Plan Documents ................... 19
    4.9    Corporate Action .................................................................................. 19
    4.10    Charter and Bylaws ............................................................................. 19
    4.11    Effectuating Documents; Further Transactions .................................. 20
    4.12    Section 1146(a) Exemption ................................................................. 20
    4.13    Directors and Officers ......................................................................... 20
    4.14    Incentive Plans and Employee and Retiree Benefits .......................... 20
    4.15    Preservation of Rights of Action ........................................................ 20
    4.16    Restructuring Transactions .................................................................. 21

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........ 22
    5.1    Assumption of Executory Contracts and Unexpired Leases ................ 22
    5.2    Cure of Defaults and Objections to Cure and Assumption .................. 22
    5.3    Pre-existing Payment and Other Obligations ...................................... 23
    5.4    Rejection Damages Claims and Objections to Rejections .................... 23
    5.5    Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date .... 24
    5.6    Reservation of Rights ........................................................................... 24

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** ........................................ 24
    6.1    Distributions on Account of Claims and Interests Allowed as of the Effective Date ..... 24

6.2     Special Rules for Distributions to Holders of Disputed Claims and Interests.................................24
6.3     Delivery of Distributions ........................................................................................................24
6.4     Claims Paid or Payable by Third Parties................................................................................27
6.5     Setoffs ....................................................................................................................................27
6.6     Allocation Between Principal and Accrued Interest ...............................................................28

**ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS.......................28**
7.1     Disputed Claims Process.........................................................................................................28
7.2     Prosecution of Objections to Claims and Interests.................................................................28
7.3     No Interest...............................................................................................................................28
7.4     Disallowance of Claims and Interests ....................................................................................28

**ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN ..........................................................29**
8.1     Discharge of Claims and Termination of Interests.................................................................29
8.2     Releases by the Debtors..........................................................................................................29
8.3     Releases by Holders of Claims and Interests .........................................................................30
8.4     Exculpation ............................................................................................................................30
8.5     Injunction ...............................................................................................................................30
8.6     Protection Against Discriminatory Treatment .......................................................................31
8.7     Indemnification .......................................................................................................................31
8.8     Recoupment ...........................................................................................................................31
8.9     Release of Liens .....................................................................................................................31
8.10    Reimbursement or Contribution.............................................................................................31

**ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.......................................32**
9.1     Conditions Precedent to the Effective Date.  It shall be a condition to the Effective Date
       that the following conditions shall have been satisfied or waived pursuant to Section 9.2:............32
9.2     Waiver of Conditions Precedent ............................................................................................32
9.3     Effect of Non-Occurrence of Conditions to Consummation ...................................................32

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN...............................33**
10.1    Modification of Plan ..............................................................................................................33
10.2    Revocation or Withdrawal of Plan ........................................................................................33
10.3    Confirmation of the Plan ........................................................................................................33

**ARTICLE XI RETENTION OF JURISDICTION ........................................................................33**

**ARTICLE XII MISCELLANEOUS PROVISIONS ......................................................................35**
12.1    Additional Documents ...........................................................................................................35
12.2    Payment of Statutory Fees .....................................................................................................35
12.3    Reservation of Rights.............................................................................................................35
12.4    Successors and Assigns..........................................................................................................35
12.5    Service of Documents ............................................................................................................35
12.6    Term of Injunctions or Stays..................................................................................................36
12.7    Entire Agreement ...................................................................................................................36
12.8    Plan Supplement Exhibits ......................................................................................................36
12.9    Non-Severability ....................................................................................................................37

**LIST OF EXHIBITS**

Exhibit A        Amended and Restated Dex East Secured Credit Agreement

Exhibit B        Amended and Restated Dex West Secured Credit Agreement

Exhibit C        Amended and Restated RHDI Secured Credit Agreement

Exhibit D        Merger Agreement

## INTRODUCTION

Dex One and its Debtor subsidiaries in the above-captioned chapter 11 cases jointly propose this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding claims against and interests in each Debtor pursuant to the Bankruptcy Code. The Debtors and the SuperMedia Debtors seek to consummate the Merger on the Effective Date of the Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of claims and interests set forth in ARTICLE III shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan contemplates no substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, the Merger and certain related matters.

## ARTICLE I

### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

**1.1**    **Defined Terms**

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

3.    "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, as applicable, or by a Final Order.

4.    "*Amended and Restated Credit Agreements*" means, collectively, the Amended and Restated Dex East Secured Credit Agreement, the Amended and Restated Dex West Secured Credit Agreement and the Amended and Restated RHDI Secured Credit Agreement.

5.    "*Amended and Restated Credit Documents*" means, collectively, the Amended and Restated Dex East Secured Credit Documents, the Amended and Restated Dex West Secured Credit Documents and the Amended and Restated RHDI Secured Credit Documents.

6.    "*Amended and Restated Dex East Secured Credit Agreement*" means the Amended and Restated Credit Agreement by and among Dex East, as borrower thereunder, Dex Media, Inc., Dex One, and Dex Media Service LLC, as guarantors thereunder, the financial institutions from time to time party thereto, and JPMorgan Chase Bank, N.A., in its capacities as administrative agent and collateral agent thereunder, to be effective on the Effective Date, in form and substance reasonably satisfactory to the Credit Agreement Agents and the Majority Documentation Lenders and in substantially the form attached to the Plan as Exhibit A.

7.    "*Amended and Restated Dex East Secured Credit Documents*" means, collectively, the Amended and Restated Dex East Secured Credit Agreement, each of the other Loan Documents (as defined in the Amended and Restated Dex East Secured Credit Agreement) and all other agreements, documents and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents).

8.    "*Amended and Restated Dex West Secured Credit Agreement*" means the Amended and Restated Credit Agreement by and among Dex West, as borrower thereunder, Dex Media, Inc., Dex One, and Dex Media Service LLC, as guarantors thereunder, the certain financial institutions from time to time party thereto, and

JPMorgan Chase Bank, N.A., in its capacities as administrative agent and collateral agent thereunder, to be effective on the Effective Date, in form and substance reasonably satisfactory to the Credit Agreement Agents and the Majority Documentation Lenders and in substantially the form attached to the Plan as Exhibit B.

9. "*Amended and Restated Dex West Secured Credit Documents*" means, collectively, the Amended and Restated Dex West Secured Credit Agreement, each of the other Loan Documents (as defined in the Amended and Restated Dex West Secured Credit Agreement) and all other agreements, documents and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents).

10. "*Amended and Restated RHDI Secured Credit Agreement*" means the Amended and Restated Credit Agreement by and among RHDI, as borrower thereunder, Dex One and RH Donnelley APIL, Inc., as guarantors thereunder, the financial institutions from time to time party thereto, and Deutsche Bank Trust Company Americas, in its capacities as administrative agent and collateral agent thereunder, to be effective on the Effective Date, in form and substance reasonably satisfactory to the Credit Agreement Agents and the Majority Documentation Lenders and in substantially the form attached to the Plan as Exhibit C.

11. "*Amended and Restated RHDI Secured Credit Documents*" means, collectively, the Amended and Restated RHDI Secured Credit Agreement, each of the other Loan Documents (as defined in the Amended and Restated RHDI Secured Credit Agreement) and all other agreements, documents and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents).

12. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

13. "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

14. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

15. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

16. "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

17. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

18. "*Causes of Action*" means any and all claims, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and any avoidance, recovery, subordination, or other actions against Insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of any of the Debtors, the debtors in possession, and/or the Estates (including those actions set forth in the Plan Supplement), whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced by the Reorganized Debtors after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

19.     "*Certificate*" means any instrument evidencing a Claim or an Interest, <u>provided</u>, "Certificate" includes no instrument issued pursuant to, or evidencing a Claim under, any Credit Agreement.

20.     "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

21.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

22.     "*Claims and Solicitation Agent*" means the claims and solicitation agent the Debtors may retain in the Chapter 11 Cases pursuant to order of the Bankruptcy Court.

23.     "*Claims Register*" means the official register of Claims against or Interests in the Debtors maintained by the Claims and Solicitation Agent.

24.     "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

25.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

26.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

27.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

28.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Lender Disclosure Statement and the Shareholder Disclosure Statement, which order shall be in form and substance reasonably satisfactory to the Credit Agreement Agents.

29.     "*Consummation*" means the occurrence of the Effective Date.

30.     "*Credit Agreements*" means, collectively, the Dex East Secured Credit Agreement, the Dex West Secured Credit Agreement, or the RHDI Secured Credit Agreement.

31.     "*Credit Agreement Agent*" means, as applicable, the Dex East Administrative Agent, the Dex West Administrative Agent, or the RHDI Administrative Agent.

32.     "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

33.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default which is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

34.     "*Debtors*" means, collectively, each of the following:  Dex One; Dex Media, Inc.; Dex Media East, Inc.; Dex Media West, Inc.; Dex Media Service LLC; Dex One Digital, Inc.; Dex One Service, Inc.; R.H. Donnelley Inc.; R.H. Donnelley APIL, Inc.; R.H. Donnelley Corporation; Newdex, Inc.; and Spruce Acquisition Sub, Inc.

35.     "*Designated Employee Benefit Plans*" means the employee benefit plans designated by the Debtors, with the consent of the SuperMedia Debtors, on or before the Effective Date.

36.     "*Dex East*" means Dex Media East, Inc.

37.    "*Dex East Administrative Agent*" means JPMorgan Chase Bank, N.A. or its successor, in its capacities as administrative agent and collateral agent under the Dex East Secured Credit Facility Documents.

38.    "*Dex East Cash Collateral Order*" means, collectively, the interim order and, if applicable, the Final Order entered by the Bankruptcy Court authorizing Dex East and certain of the other Debtors to use the Dex East Secured Lenders' collateral (including cash collateral) and granting adequate protection to the Dex East Secured Lenders, which orders shall be in form and substance reasonably satisfactory to the Credit Agreement Agents.

39.    "*Dex East Cash Management Arrangement*" means any "Specified Cash Management Arrangement", as defined in the Dex East Guarantee and Collateral Agreement.

40.    "*Dex East Guarantee and Collateral Agreement*" means the Guarantee and Collateral Agreement, dated as of October 24, 2007 and as amended and restated on January 29, 2010, among Dex East, the other Debtors party thereto and the Dex East Administrative Agent.

41.    "*Dex East Secured Credit Agreement*" means the credit agreement, dated as of October 24, 2007, and as amended and restated on January 29, 2010 and further amended thereafter, by and among Dex East, as borrower thereunder, Dex One, Dex West, Dex Media, Inc., the Dex East Secured Lenders party thereto from time to time, the Dex East Administrative Agent and the other agents and arrangers party thereto.

42.    "*Dex East Secured Credit Facility Claim*" means any Claim arising under, derived from, or based upon the Dex East Secured Credit Facility Documents.

43.    "*Dex East Secured Credit Facility Documents*" means, collectively, (a) the Dex East Secured Credit Agreement, (b) all other agreements, documents and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents), (c) any Dex East Specified Cash Management Arrangement and (d) any Dex East Specified Swap Agreement.

44.    "*Dex East Secured Lenders*" means the "Secured Parties", as defined in the Dex East Secured Credit Agreement.

45.    "*Dex East Specified Swap Agreement*" means any "Specified Swap Agreement", as defined in the Dex East Guarantee and Collateral Agreement.

46.    "*Dex One*" means Dex One Corporation.

47.    "*Dex One Interest*" means any Interest in Dex One.

48.    "*Dex One Support Agreement*" means the Support and Limited Waiver Agreement, dated as of December 5, 2012, by and among the Debtors, each of the Credit Agreement Agents and the Dex East Secured Lenders, Dex West Secured Lenders, and RHDI Secured Lenders party thereto from time to time.

49.    "*Dex Secured Credit Facility Documents*" means, collectively, (a) the Dex East Secured Credit Facility Documents, (b) the Dex West Secured Credit Facility Documents and (c) the RHDI Secured Credit Facility Documents.

50.    "*Dex West*" means Dex Media West, Inc.

51.    "*Dex West Administrative Agent*" means JPMorgan Chase Bank, N.A. or its successor, in its capacities as administrative agent and collateral agent under the Dex West Secured Credit Facility Documents.

52.    "*Dex West Cash Collateral Order*" means, collectively, the interim order and, if applicable, the Final Order entered by the Bankruptcy Court authorizing Dex West and certain of the other Debtors to use the Dex

West Secured Lenders' collateral (including cash collateral) and granting adequate protection to the Dex West Secured Lenders, which orders shall be in form and substance reasonably satisfactory to the Credit Agreement Agents.

53.     "*Dex West Cash Management Arrangement*" means any "Specified Cash Management Arrangement", as defined in the Dex West Guarantee and Collateral Agreement.

54.     "*Dex West Guarantee and Collateral Agreement*" means the Guarantee and Collateral Agreement, dated as of June 6, 2008 and as amended and restated on January 29, 2010, among Dex West, the other Debtors party thereto and the Dex West Administrative Agent.

55.     "*Dex West Secured Credit Agreement*" means the credit agreement, dated as of June 6, 2008, and as amended and restated on January 29, 2010 and further amended thereafter, by and among Dex West, as borrower thereunder, Dex One, Dex Media Inc., the Dex West Secured Lenders party thereto from time to time, the Dex West Administrative Agent and the other agents and arrangers party thereto.

56.     "*Dex West Secured Credit Facility Claim*" means any Claim arising under, derived from, or based upon the Dex West Secured Credit Facility Documents.

57.     "*Dex West Secured Credit Facility Documents*" means, collectively, (a) the Dex West Secured Credit Agreement, (b) all other agreements, documents and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents), (c) any Dex West Cash Management Arrangement and (d) any Dex West Specified Swap Agreement.

58.     "*Dex West Secured Lenders*" means the "Secured Parties", as defined in the Dex West Secured Credit Agreement.

59.     "*Dex West Specified Swap Agreement*" means any "Specified Swap Agreement", as defined in the Dex West Guarantee and Collateral Agreement.

60.     "*Disclosure Statement*" means either the Lender Disclosure Statement or the Shareholder Disclosure Statement, as applicable.

61.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, as applicable, or a Final Order; or (c) with respect to which a party in interest has filed a proof of claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

62.     "*Distribution Agent*" means Newdex or any Entity Newdex selects to make or to facilitate distributions in accordance with the Plan.

63.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or Newdex, in their sole discretion, on or after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan; provided that Distribution Dates shall occur no less frequently than every 30 days after the Effective Date, as necessary.

64.     "*Distribution Record Date*" means the date that is three Business Days after entry of the Confirmation Order.

65.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 have been satisfied or waived in accordance with Section 9.2.

66.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

67.    "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code.

68.    "*Estate*" means the bankruptcy estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

69.    "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in court or out-of-court efforts to implement the Transaction, the Chapter 11 Cases, the Dex One Support Agreement, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Lender Disclosure Statement, the Shareholder Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Dex One Support Agreement, the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan.

70.    "*Exculpated Party*" means each of the following in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the SuperMedia Debtors; (d) the RHDI Secured Lenders and the RHDI Administrative Agent; (e) the Dex East Secured Lenders and the Dex East Administrative Agent; (f) the Dex West Secured Lenders and the Dex West Administrative Agent; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), such Entity's successors and assigns and current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals.

71.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

72.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

73.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

74.    "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Professional Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a RHDI Secured Credit Facility Claim, a Dex West Secured Credit Facility Claim, a Dex East Secured Credit Facility Claim, a Senior Subordinated Notes Claim, and a Section 510(b) Claim.

75.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

76.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

77.    "*Indenture Trustee*" means the indenture trustee of the Senior Subordinated Notes.

78.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

79.    "*Intercompany Contract*" means a contract between or among two or more Debtors or a contract between or among one or more Affiliates and one or more Debtors.

80.    "*Intercompany Interest*" means an Interest held by a Debtor or an Affiliate.

81.     "*Interest*" means any Equity Security of a Debtor existing immediately prior to the Effective Date.

82.     "*Lender Disclosure Statement*" means the disclosure statement for the Plan provided to the Dex East Secured Lenders, Dex West Secured Lenders, and RHDI Secured Lenders as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

83.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

84.     "*Majority Documentation Lenders*" means, if the Dex One Support Agreement has not been terminated, as of any date of determination, the majority by number of the Consenting Lenders (as defined in the Dex One Support Agreement) set forth on Schedule 2 to the Dex One Support Agreement excluding the Credit Agreement Agents (and, for the avoidance of doubt, not such Consenting Lenders' successors or assigns and not any Consenting Lender that is no longer bound by the Dex One Support Agreement pursuant to the terms thereof) that exercise their consent or approval rights as of such date of determination in accordance with the terms of the Dex One Support Agreement.

85.     "*Merger*" means the merger of Dex One and its subsidiaries with SuperMedia and its subsidiaries in accordance with the Merger Agreement and the Plan.

86.     "*Merger Agreement*" means the amended and restated agreement and plan of merger, dated December 5, 2012, by and among Dex One, SuperMedia, Newdex, Inc., and Spruce Acquisition Sub, Inc., as may be amended from time to time, attached hereto as <u>Exhibit D</u>.

87.     "*Newdex*" means the Reorganized Debtors' ultimate parent company upon consummation of the Merger.

88.     "*Newdex Board*" means Newdex's initial board of directors.

89.     "*Newdex Bylaws*" means Newdex's bylaws, substantially in the form contained in the Merger Agreement.

90.     "*Newdex Charter*" means Newdex's amended and restated certificate of incorporation, substantially in the form contained in the Merger Agreement.

91.     "*Newdex Common Stock*" means Newdex's authorized shares of common stock on the Effective Date, par value $0.001 per share.

92.     "*Option"* has the meaning set forth in Section 4.16(b) herein.

93.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

94.     "*Other Secured Claim*" means any Secured Claim other than the following:  (a) a RHDI Secured Credit Facility Claim; (b) a Dex West Secured Credit Facility Claim; (c) a Dex East Secured Credit Facility Claim; or (d) a Secured Tax Claim.  For the avoidance of doubt, "Other Secured Claims" includes any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

95.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

96.     "*Petition Date*" means the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

97.    "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time, including the Plan Supplement and all exhibits, supplements, appendices, and schedules.

98.    "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors no later than 10 Business Days after the Petition Date or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

99.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

100.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

101.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

102.    "*Professional Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

103.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

104.    "*Rejection Schedule*" means the schedule of Executory Contracts and Unexpired Leases in the Plan Supplement, as may be amended from time to time, setting forth certain Executory Contracts and Unexpired Leases for rejection as of the Effective Date under section 365 of the Bankruptcy Code.

105.    "*Released Party*" means each of the following in its capacity as such:  (a) the Debtors; (b) the RHDI Secured Lenders and the RHDI Administrative Agent; (c) the Dex East Secured Lenders and the Dex East Administrative Agent; (d) the Dex West Secured Lenders and the Dex West Administrative Agent; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entity's successors and assigns, and current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals.

106.    "*Releasing Parties*" means each of the following in its capacity as such:  (a) the RHDI Secured Lenders and the RHDI Administrative Agent; (b) the Dex East Secured Lenders and the Dex East Administrative Agent; (c) the Dex West Secured Lenders and the Dex West Administrative Agent; and (d) without limiting the foregoing clauses (a), (b), and (c), each holder of a Claim or an Interest other than a holder of a Claim or an Interest that has voted to reject the Plan or is a member of a Class that is deemed to reject the Plan.

107.    "*Reorganized Debtor*" means a Debtor, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

108.    "*Restructuring Transactions*" means the transactions, including the Merger, described in Section 4.16.

109.    "*RHDI*" means R.H. Donnelley Inc.

110.    "*RHDI Administrative Agent*" means Deutsche Bank Trust Company Americas or its successor, in its capacities as administrative agent and collateral agent under the RHDI Secured Credit Facility Documents.

111.    "*RHDI Cash Management Arrangement*" means any "Specified Cash Management Arrangement", as defined in the RHDI Guarantee and Collateral Agreement.

112.    "*RHDI Guarantee and Collateral Agreement*" means the Third Amended Guarantee and Collateral Agreement, dated as of January 29, 2010, among RHDI, the other Debtors party thereto and the RHDI Administrative Agent.

113.    "*RHDI Cash Collateral Order*" means, collectively, the interim order and, if applicable, the Final Order entered by the Bankruptcy Court authorizing RHDI and certain of the other Debtors to use the RHDI Secured Lenders' collateral (including cash collateral) and granting adequate protection to the RHDI Secured Lenders, which orders shall be in form and substance reasonably satisfactory to the Credit Agreement Agents.

114.    "*RHDI Secured Credit Agreement*" means the third amended and restated credit agreement, dated January 29, 2010 and further amended thereafter, by and among RHDI, as borrower thereunder, Dex One,  the RHDI Secured Lenders party thereto from time to time, the RHDI Administrative Agent and the other agents and arrangers party thereto.

115.    "*RHDI Secured Credit Facility Claim*" means any Claim arising under, derived from, or based upon the RHDI Secured Credit Facility Documents.

116.    "*RHDI Secured Credit Facility Documents*" means, collectively, (a) the RHDI Secured Credit Agreement, (b) all other agreements, documents and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents), (c) any RHDI Cash Management Arrangement and (d) any RHDI Specific Swap Agreement.

117.    "*RHDI Secured Lenders*" means the "Secured Parties" (as defined in the RHDI Secured Credit Agreement).

118.    "*RHDI Specified Swap Agreement*" means any "Specified Swap Agreement" (as defined in the RHDI Guarantee and Collateral Agreement).

119.    "*Section 510(b) Claim*" means any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

120.    "*Secured Claim*" means a Claim:  (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

121.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

122.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

123.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act. For the avoidance of doubt, no Credit Agreement or Amended and Restated Credit Agreement, or any loan or Claim thereunder, or any note or other instrument issued in connection therewith, is, or shall be deemed to be, a Security.

124.    "*Senior Subordinated Notes*" means the Dex One 12%/14% senior subordinated notes due 2017, issued on January 29, 2010.

125.     "*Senior Subordinated Notes Claim*" means any Claim arising under, derived from, or based upon the Senior Subordinated Notes.

126.     "*Senior Subordinated Noteholders*" means holders of the Senior Subordinated Notes.

127.     "*Senior Subordinated Notes Indenture*" means the Indenture, dated January 29, 2010, among The Bank of New York Mellon, as trustee, and Dex One as the issuer, which Indenture governs the Senior Subordinated Notes.

128.     "*Servicer*" means an indenture trustee, agent, or other authorized representative of holders of Claims or Interests.

129.     "*Shareholder Disclosure Statement*" means the combined Form S-4 regarding the Merger filed with the United States Securities and Exchange Commission and disclosure statement for the Plan, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

130.     "*SuperMedia*" means SuperMedia Inc.

131.     "*SuperMedia Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases, if any, filed by the SuperMedia Debtors in the Bankruptcy Court in accordance with the SuperMedia Support Agreement and the Merger Agreement.

132.     "*SuperMedia Confirmation Order*" means the order of the Bankruptcy Court confirming the SuperMedia Plan under section 1129 of the Bankruptcy Code and approving the SuperMedia Disclosure Statement in the SuperMedia Chapter 11 Cases, if filed.

133.     "*SuperMedia Debtors*" means, collectively, each of the following:  SuperMedia Inc.; SuperMedia LLC; SuperMedia Services Inc.; and SuperMedia Sales Inc.

134.     "*SuperMedia Plan*" means the chapter 11 plan filed in the SuperMedia Chapter 11 Cases in accordance with the SuperMedia Support Agreement and Merger Agreement.

135.     "*SuperMedia Support Agreement*" means the Support and Limited Waiver Agreement, dated as of December 5, 2012, by and among the SuperMedia Debtors, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent under the SuperMedia senior secured credit agreement, and the lenders under the credit agreement from time to time party to such Support and Limited Waiver Agreement.

136.     "*Transaction*" means the Merger and the transactions related thereto including the entry into and delivery and effectiveness of the Amended and Restated Credit Agreements and other Amended and Restated Credit Documents.

137.     "*Unclaimed Distribution*"  means any distribution under the Plan on account of an Allowed Claim or Interest to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

138.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

139.     "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

## 1.2    Rules of Interpretation

For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## 1.3    Computation of Time

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

## 1.4    Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## 1.5    Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## 1.6    Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

### ARTICLE II

### ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III.

## 2.1    Administrative Claims

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date, or as soon as practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the

date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the holders of such Allowed Administrative Claims.

## 2.2    Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Court Allows.  From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## 2.3    Priority Tax Claims

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive on the Effective Date, or as soon as practicable thereafter, from the respective Debtor liable for such Allowed Priority Tax Claim, payment in Cash in an amount equal to the amount of such Allowed Priority Tax Claim.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

## 3.1    Classification of Claims and Interests

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in ARTICLE II, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 4 | Senior Subordinated Notes Claims | Unimpaired | Presumed to Accept |
| 5 | Dex East Secured Credit Facility Claims | Impaired | Entitled to Vote |
| 6 | Dex West Secured Credit Facility Claims | Impaired | Entitled to Vote |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 7 | RHDI Secured Credit Facility Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 9 | Dex One Interests | Impaired | Entitled to Vote |
| 10 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |

### 3.2    Treatment of Classes of Claims and Interests

Except to the extent that a holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest. Unless otherwise indicated, the holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as practicable thereafter.

(a)    **Class 1 — Secured Tax Claims**

    (1)    *Classification*:  Class 1 consists of any Secured Tax Claims against any Debtor.

    (2)    *Treatment*:  Each holder of an Allowed Class 1 Claim shall receive, as applicable:

        A.    If the Allowed Class 1 Claim is due and payable on or before the Effective Date, Cash in an amount equal to such Allowed Class 1 Claim; or

        B.    If the Allowed Class 1 Claim is not due and payable on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

    (3)    *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

(b)    **Class 2 — Other Secured Claims**

    (1)    *Classification*:  Class 2 consists of any Other Secured Claims against any Debtor.

    (2)    *Treatment*:  Each holder of an Allowed Class 2 Claim shall, at the sole option of the Debtors or the Reorganized Debtors, as applicable:

        A.    have its Allowed Class 2 Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code; or

        B.    receive the collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

    (3)    *Voting*:  Class 2 is Unimpaired.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

(c)     **Class 3 — Other Priority Claims**

    (1)    *Classification*:  Class 3 consists of any Other Priority Claims against any Debtor.

    (2)    *Treatment*:  Each holder of an Allowed Class 3 Claim shall be paid in full in Cash.

    (3)    *Voting*:   Class 3 is Unimpaired. Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

(d)     **Class 4 — Senior Subordinated Notes Claims**

    (1)    *Classification*:  Class 4 consists of any Senior Subordinated Notes Claims.

    (2)    *Allowance*:  On the Effective Date, Class 4 Claims shall be Allowed in the aggregate principal amount of $219,707,502, plus any accrued but unpaid interest thereon payable at the non-default interest rate in accordance with the Senior Subordinated Notes Indenture.

    (3)    *Treatment*:  Each holder of an Allowed Class 4 Claim shall have its Allowed Class 4 Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

    (4)    *Voting*:  Class 4 is Unimpaired.  Holders of Allowed Class 4 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 4 Claims are not entitled to vote to accept or reject the Plan.

(e)     **Class 5 — Dex East Secured Credit Facility Claims**

    (1)    *Classification*:  Class 5 consists of all Dex East Secured Credit Facility Claims.

    (2)    *Allowance:*  On the Effective Date, Class 5 Claims shall be Allowed, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset, in the aggregate principal amount of $540,875,487, plus (A) any accrued but unpaid interest payable at the non-default interest rate in accordance with the Dex East Secured Credit Agreement, (B) any unpaid fees, expenses or other amounts that constitute Obligations (other than principal) under and as defined in the Dex East Secured Credit Agreement, (C) any unpaid adequate protection payments required to be paid pursuant to the terms of the Dex East Cash Collateral Order and (D) to the extent applicable, any unpaid amounts required to be paid pursuant to a Dex East Specified Swap Agreement or a Dex East Cash Management Arrangement, <u>less</u> any amortization or other payments of principal paid by the Debtors after December 31, 2012, or during the pendency of the Chapter 11 Cases pursuant to the terms of the Dex East Secured Credit Agreement or the Dex East Cash Collateral Order.

    (3)    *Treatment*:  On the Effective Date, each holder of an Allowed Class 5 Claim shall receive:

        A.    in satisfaction of such holder's Allowed Class 5 Claim (other than the portion of the Allowed Class 5 Claim which directly arises under, is derived from or is based upon a Dex East Specified Swap Agreement or a Dex East Cash Management Arrangement) (a) its Pro Rata share of the loans under the Amended and Restated Dex East Secured Credit Agreement and (b) Cash in an amount equal to such holder's Pro Rata share of any outstanding amounts described in clauses (A), (B) or (C) of the immediately foregoing paragraph

(e)(2), to the extent such amounts are owed to a lender under the Dex East Secured Credit Agreement or the Dex East Cash Collateral Order; and

B.       in satisfaction of the portion (if any) of such holder's Allowed Class 5 Claim that directly arises under, is derived from or is based upon a Dex East Specified Swap Agreement or a Dex East Cash Management Arrangement, Cash in an amount equal to such partial Claim amount.

(4)      *Voting*:  Class 5 is Impaired.  Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

(f)      **Class 6 — Dex West Secured Credit Facility Claims**

(1)      *Classification*:  Class 6 consists of all Dex West Secured Credit Facility Claims.

(2)      *Allowance:*   On the Effective Date, Class 6 Claims shall be Allowed, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset, in the aggregate principal amount of $503,232,404, plus (A) any accrued but unpaid interest payable at the non-default interest rate in accordance with the Dex West Secured Credit Agreement, (B) any unpaid fees, expenses or other amounts that constitute Obligations (other than principal) under and as defined in the Dex West Secured Credit Agreement, (C) any unpaid adequate protection payments required to be paid pursuant to the terms of the Dex West Cash Collateral Order and (D) to the extent applicable, any unpaid amounts required to be paid pursuant to a Dex West Specified Swap Agreement or a Dex West Cash Management Arrangement, less any amortization or other payments of principal paid by the Debtors after December 31, 2012, or during the pendency of the Chapter 11 Cases pursuant to the terms of the Dex West Secured Credit Agreement or the Dex West Cash Collateral Order.

(3)      *Treatment*:   On the Effective Date, each holder of an Allowed Class 6 Claim shall receive:

A.       in satisfaction of such holder's Allowed Class 6 Claim (other than the portion of the Allowed Class 6 Claim which directly arises under, is derived from or is based upon a Dex West Specified Swap Agreement or a Dex West Cash Management Arrangement) (a) its Pro Rata share of the loans under the Amended and Restated Dex West Secured Credit Agreement and (b) Cash in an amount equal to such holder's Pro Rata share of any outstanding amounts described in clauses (A), (B) or (C) of the immediately foregoing paragraph (f)(2), to the extent such amounts are owed to a lender under the Dex West Secured Credit Agreement or the Dex West Cash Collateral Order; and

B.       in satisfaction of the portion (if any) of such holder's Allowed Class 6 Claim that directly arises under, is derived from or is based upon a Dex West Specified Swap Agreement or a Dex West Cash Management Arrangement, Cash in an amount equal to such partial Claim amount.

(4)      *Voting*:  Class 6 is Impaired.  Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.

(g)      **Class 7 — RHDI Secured Credit Facility Claims**

(1)      *Classification*:  Class 7 consists of all RHDI Secured Credit Facility Claims.

(2)     *Allowance:*  On the Effective Date, Class 7 Claims shall be Allowed, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset,  in the aggregate principal amount of $782,499,573, plus (A) any accrued but unpaid interest payable at the non-default interest rate in accordance with the RHDI Secured Credit Agreement, (B) any unpaid fees, expenses or other amounts that constitute Obligations (other than principal) under and as defined in the RHDI Secured Credit Agreement, (C) any unpaid adequate protection payments required to be paid pursuant to the terms of the RHDI Cash Collateral Order and (D) to the extent applicable, any unpaid amounts required to be paid pursuant to an RHDI Specified Swap Agreement or an RHDI Cash Management Arrangement, <u>less</u> any amortization or other payments of principal paid by the Debtors after December 31, 2012, or during the pendency of the Chapter 11 Cases pursuant to the terms of the RHDI Secured Credit Agreement or the RHDI Cash Collateral Order.

(3)     *Treatment*:  On the Effective Date, each holder of an Allowed Class 7 Claim shall receive:

A.     in satisfaction of such holder's Allowed Class 7 Claim (other than the portion of the Allowed Class 7 Claim which directly arises under, is derived from or is based upon an RHDI Specified Swap Agreement or an RHDI Cash Management Arrangement) (a) its Pro Rata share of the loans under the Amended and Restated RHDI Secured Credit Agreement and (b) Cash in an amount equal to such holder's Pro Rata share of any outstanding amounts described in clauses (A), (B) or (C) of the immediately foregoing paragraph (g)(2), to the extent such amounts are owed to a lender under the RHDI Secured Credit Agreement or the RHDI Cash Collateral Order; and

B.     in satisfaction of the portion (if any) of such holder's Allowed Class 7 Claim that directly arises under, is derived from or is based upon an RHDI Specified Swap Agreement or an RHDI Cash Management Arrangement, Cash in an amount equal to such partial Claim amount.

(4)     *Voting*:  Class 7 is Impaired.  Holders of Allowed Class 7 Claims are entitled to vote to accept or reject the Plan.

(h)     **Class 8 — General Unsecured Claims**

(1)     *Classification*:  Class 8 consists of any General Unsecured Claims against any Debtor.

(2)     *Treatment*:  Each holder of an Allowed Class 8 Claim shall receive Cash in an amount equal to such Allowed Class 8 Claim on the later of the Effective Date or in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 8 Claim.

(3)     *Voting*:  Class 8 is Unimpaired.  Holders of Allowed Class 8 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

(i)     **Class 9 — Dex One Interests**

(1)     *Classification*:  Class 9 consists of any Dex One Interests.

(2)     *Treatment*:  Upon consummation of the Merger, each holder of an Allowed Class 9 Interest shall receive 0.2 shares of Newdex Common Stock for each of its Allowed Class 9 Interests.

(3)     *Voting*:  Class 9 is Impaired.  Holders of Allowed Class 9 Interests are entitled to vote to accept or reject the Plan.

(j)     **Class 10 — Intercompany Interests**

(1)     *Classification*:  Class 10 consists of any Intercompany Interests.

(2)     *Treatment*:  Each holder of an Allowed Class 10 Interest shall have its Allowed Class 10 Interest left unaltered and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

(3)     *Voting*:  Class 10 is Unimpaired.  Holders of Allowed Class 10 Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 10 Interests are not entitled to vote to accept or reject the Plan.

(k)     **Class 11 — Section 510(b) Claims**

(1)     *Classification*:  Class 11 consists of any Section 510(b) Claims against any Debtor.

(2)     *Allowance:*  Notwithstanding anything in the Plan to the contrary, a Class 11 Claim, if existing, may only become Allowed by Final Order of the Bankruptcy Court.   The Debtors are not aware of any asserted Class 11 Claim and believe that no Class 11 Claim exists.

(3)     *Treatment*:  A holder of an Allowed Class 11 Claim shall, in the Reorganized Debtors' sole discretion, (A) receive Cash in the full amount of its Allowed Class 11 Claim or (B) be treated as if such holder held a number of Allowed Class 9 Interests instead of its Allowed Class 11 Claim equal in value to the amount of its Allowed Class 11 Claim.

(4)     *Voting*:   Class 11 is Impaired.   Holders (if any) of Allowed Class 11 Claims are conclusively presumed to have rejected the Plan.  Holders (if any) of Allowed Class 11 Claims are not entitled to vote to accept or reject the Plan.

**3.3     Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**ARTICLE IV**

**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

**4.1     General Settlement of Claims**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

**4.2     Newdex Common Stock**

The issuance of Newdex Common Stock, including any options for the purchase thereof and equity awards associated therewith, is authorized without the need for any further corporate action or without any further action by the Debtors or Newdex, as applicable.  The Newdex Charter shall authorize the issuance and distribution on the

Effective Date of shares of Newdex Common Stock to the Distribution Agent for the benefit of holders of Allowed Interests in Class 9, subject to the Debtors' exercise of the Option described in Section 4.16(b).  All of the shares of Newdex Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Newdex shall use its commercially reasonable efforts to obtain approval of the Newdex Common Stock for listing on the New York Stock Exchange or the NASDAQ Stock Market on, or as soon as reasonably practicable after, the Effective Date.

**4.3**    **Amended and Restated Credit Documents.**On the Effective Date, each of the Reorganized Debtors shall execute and deliver (1) each of the Amended and Restated Credit Agreements to which such Reorganized Debtor is contemplated to be a party and (2) all other Amended and Restated Credit Documents to which such Reorganized Debtor is contemplated to be a party on the Effective Date.  The Amended and Restated Credit Agreements and all such other Amended and Restated Credit Documents that are contemplated to become effective on the Effective Date shall become so effective in accordance with their terms and the Plan.  On the Effective Date, (1) each holder of a Dex East Secured Credit Facility Claim shall automatically be deemed a party to the Amended and Restated Dex East Secured Credit Agreement, (2) each holder of a Dex West Secured Credit Facility Claim shall automatically be deemed a party to the Amended and Restated Dex West Secured Credit Agreement, and (3) each holder of an RHDI Secured Credit Facility Claim shall automatically be deemed a party to the Amended and Restated RHDI Secured Credit Agreement.

(b)    Holders of Dex East Secured Credit Facility Claims, Dex West Secured Credit Facility Claims and RHDI Secured Credit Facility Claims have, pursuant to the Dex Secured Credit Facility Documents, and shall have valid, binding and enforceable Liens on the collateral specified in the Dex Secured Credit Facility Documents and the Amended and Restated Dex East Secured Credit Documents, the Amended and Restated Dex West Secured Credit Documents and the Amended and Restated RHDI Secured Credit Documents, respectively.  The guarantees, mortgages, pledges, liens and other security interests previously granted pursuant to the Dex Secured Credit Facility Documents and, if applicable, granted pursuant to each of the Amended and Restated Credit Documents have been and are granted in good faith as an inducement to the holders of the Dex East Secured Credit Facility Claims, the Dex West Secured Credit Facility Claims and the RHDI Secured Credit Facility Claims to agree to the treatment contemplated by the Plan and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the respective Dex Secured Credit Facility Documents and the respective Amended and Restated Credit Documents (and the claims and obligations arising under the Senior Subordinated Notes shall continue to be subordinate to the claims and obligations arising under each of the Amended and Restated Credit Documents, as applicable, and subject to the terms of the Amended and Restated Credit Documents, and any subordination agreement, if any, in effect prior to the Effective Date with respect to such subordination shall continue in full force and effect).

**4.4**    **Offering and Issuance of Newdex Common Stock**

The offering, issuance, and distribution of any Securities, including the Newdex Common Stock, pursuant to the Plan will be in compliance with the registration requirements of the Securities Act or exempt from the registration requirements of section 5 therein pursuant to section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.  In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued under the Plan will be freely transferable under the Securities Act by the recipients thereof, subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) any other applicable regulatory approval.

**4.5**    **Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan

shall recognize and implement any such rights. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**4.6**      **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein, including in connection with the Merger, or in any agreement, instrument, or other document incorporated in the Plan (including the Amended and Restated Credit Documents), on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**4.7**      **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except to the extent otherwise provided herein (including as otherwise provided with respect to the Senior Subordinated Notes Indenture, the Amended and Restated Credit Agreements and any contracts evidencing transactions described in Section 3.2(h)(2)), all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors or Reorganized Debtors and the non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; provided, however, that notwithstanding Confirmation or the occurrence of the Effective Date, any indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions under the Plan and (b) allowing and preserving the rights of the Dex East Administrative Agent, the Dex West Administrative Agent, the RHDI Administrative Agent, and any Servicer, as applicable, to make distributions on account of Claims and Interests as provided in ARTICLE VI.

**4.8**      **Issuance of New Securities; Execution of Plan Documents**

Except as otherwise provided herein, on the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall issue all Securities, notes, instruments, Certificates, and other documents required to be issued under the Plan.

**4.9**      **Corporate Action**

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, including the Merger, shall be authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable. Such actions may include: (a) the adoption and filing of the Newdex Charter and Newdex Bylaws; (b) the appointment of the Newdex Board; and (c) the authorization, issuance, and distribution of Newdex Common Stock and other Securities to be authorized, issued, and distributed pursuant to the Plan.

**4.10**      **Charter and Bylaws**

The Debtors' respective certificates of incorporation and bylaws (and other formation documents relating to limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the Amended and Restated Credit Documents and the Bankruptcy Code. Newdex's certificate of incorporation shall be amended to, among other things: (a) authorize the issuance of the shares of Newdex Common Stock and (b) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other constituent documents as permitted by the laws of its respective jurisdiction of formation and its respective charter and bylaws.

**4.11**      **Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Merger, the Amended and Restated Credit Documents and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**4.12**      **Section 1146(a) Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**4.13**      **Directors and Officers**

On the Effective Date, the Newdex Board will comprise 10 members including:  (a) five current Dex One non-employee directors designated by Dex One, including Alan F. Schultz as Chairman of the Newdex Board; (b) four current SuperMedia non-employee directors designated by SuperMedia; and (c) Peter McDonald, the current Chief Executive Officer and President of SuperMedia, as President and Chief Executive Officer of Newdex. On the Effective Date, the terms of the current members of the board of directors and the appointment of the officers of Dex One shall terminate, and the terms of the current members of the board of directors of Newdex and the appointment of the current President and Chief Executive Officer of Newdex shall terminate. Otherwise, on the Effective Date, the existing officers and directors of the Debtors, including Newdex, shall serve in their current capacities in the Reorganized Debtors.  From and after the Effective Date, each director or officer of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other constituent documents, and applicable state corporation law.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the Newdex Board and any Person proposed to serve as an officer of Newdex shall have been disclosed at or before the Confirmation Hearing.

**4.14**      **Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order, the Reorganized Debtors shall:  (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**4.15**      **Preservation of Rights of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan

Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**4.16    Restructuring Transactions**

    (a)    **The Restructuring Transactions**

On the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may take such actions, in their sole discretion, including as set forth below, as are necessary or appropriate to effect the Merger in accordance with the terms of the Merger Agreement and the Plan. Such actions shall include:

        (1)    Dex One merging with and into Newdex, with Newdex surviving the merger;

        (2)    immediately thereafter, Spruce Acquisition Sub, Inc. merging with and into SuperMedia, with SuperMedia surviving the merger as a wholly owned subsidiary of Newdex;

        (3)    immediately thereafter, only if the Option set forth in Section 4.16(b) is exercised, the distribution of stock in accordance with Section 4.16(b); and

        (4)    immediately thereafter, the entry into, delivery of and effectiveness of the Amended and Restated Credit Agreements and the other Amended and Restated Credit Documents contemplated to be effective or delivered on the Effective Date.

    (b)    **Option to Distribute Newdex Common Stock**

Notwithstanding anything to the contrary in the Merger Agreement or this Plan, the Debtors, with the consent of the SuperMedia Debtors, shall have the option on the Effective Date to issue and distribute Newdex Common Stock to the Distribution Agent for the benefit of the Designated Employee Benefit Plans in an amount necessary to give rise to an ownership change as defined in 26 U.S.C. § 382(g) (but in no event to exceed 10% of the Newdex Common Stock issued on the Effective Date) (the "Option").

    (c)    **Additional Restructuring Transactions and Actions**

Without limiting the foregoing, on the Effective Date, the Debtors or the Reorganized Debtors may enter into the following transactions and take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the

Reorganized Debtors, as and to the extent provided therein.  The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors or the Reorganized Debtors, as applicable, to be necessary or appropriate.  The actions to effect the Restructuring Transactions may include:   (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Amended and Restated Credit Documents; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Amended and Restated Credit Documents and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state law; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1**    **Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless any such Executory Contract or Unexpired Lease: (a) is listed on the Rejection Schedule; (b) has been previously assumed or rejected by the Debtors by Final Order or has been assumed or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; or (c) is the subject of a motion to assume or reject pending as of the Effective Date.   The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates or to the SuperMedia Debtors.   The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

Except as otherwise provided herein or agreed to by the Debtors with the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**5.2**    **Cure of Defaults and Objections to Cure and Assumption**

The Debtors or Reorganized Debtors, as applicable, shall pay Cures on the Effective Date or as soon as practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors must be filed with the Claims and Solicitation Agent on or before 30 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is a dispute regarding Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.3    Pre-existing Payment and Other Obligations

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide:  (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

### 5.4    Rejection Damages Claims and Objections to Rejections

Pursuant to section 502(g) of the Bankruptcy Code, counterparties to Executory Contracts or Unexpired Leases that are rejected shall have the right to assert Claims, if any, on account of the rejection of such contracts and leases.  Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of Executory Contracts and Unexpired Leases pursuant to the Plan must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Confirmation Date or the effective date of rejection. Any such Proofs of Claim that are not timely filed shall be disallowed without the need for any further notice to or action, order, or approval of the Bankruptcy Court.  Such Proofs of Claim shall be forever barred, estopped, and enjoined from assertion.  Moreover, such Proofs of Claim shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged notwithstanding anything in a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as Class 8 - General Unsecured Claims against the applicable Debtor counterparty thereto.

**5.5**     **Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date**

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**5.6**     **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

**6.1**     **Distributions on Account of Claims and Interests Allowed as of the Effective Date**

(a)     **Delivery of Distributions in General**

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors (as the case may be) and the holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims and Interests; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (2) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in accordance with Sections 2.3 and 3.2(a)(2), respectively. To the extent any Allowed Priority Tax Claim or Allowed Secured Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Distribution Dates shall occur no less frequently than every 30 days, as necessary in the Reorganized Debtors' sole discretion, after the Effective Date.

**6.2**     **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order and (2) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to holders of Allowed Claims or Interests, as applicable, in a Class and paid to such holders under the Plan shall be paid also, in the applicable amounts, to any holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims or Interests in such Class.

**6.3**     **Delivery of Distributions**

(a)     **Record Date for Distributions**

On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders, if any, listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate, is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)        **Distribution Process**

The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims or Interests administered by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims and Interests, including Claims and Interests that become Allowed after the Distribution Record Date, shall be made to holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate:  (1) to the address of such holder as set forth in the books and records of the applicable Debtor (or if the Debtors have been notified in writing, on or before the date that is 14 days before the Effective Date, of a change of address, to the changed address); (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtors books and records, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is 14 days before the Effective Date; or (3) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  Notwithstanding anything to the contrary in the Plan, including this Section 6.3(b), distributions under the Plan to holders of Dex East Secured Credit Facility Claims, Dex West Secured Credit Facility Claims and RHDI Secured Credit Facility Claims shall be made to, or to Entities at the direction of, the Dex East Administrative Agent, Dex West Administrative Agent and the RHDI Administrative Agent, respectively, in accordance with the terms of the Plan and the Dex East Secured Credit Agreement, Dex West Secured Credit Agreement and the RHDI Secured Credit Agreement, respectively.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)        **Accrual of Dividends and Other Rights**

For purposes of determining the accrual of dividends or other rights after the Effective Date, Newdex Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; provided, however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of Newdex Common Stock actually take place.

(d)        **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

(e)        **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using

the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

    (f)    **Fractional, Undeliverable, and Unclaimed Distributions**

        (1)    *Fractional Distributions.*  The Distribution Agent shall make distributions of fractions of shares of Newdex Common Stock, as applicable.  The Distribution Agent shall not make distributions or payments of fractions of dollars.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

        (2)    *Undeliverable Distributions.*  If any distribution to a holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder on the next Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to <u>Section 6.3(f)(3)</u>, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

        (3)    *Reversion.*  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is Newdex Common Stock, shall be deemed cancelled.  Upon such revesting, the Claim or Interest of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

    (g)    **Surrender of Cancelled Instruments or Securities**

On the Effective Date or as soon as practicable thereafter, each holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer).  Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.  No distribution of property pursuant to the Plan shall be made to or on behalf of any such holder unless and until such Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer pursuant to the provisions of <u>Section 6.3(h)</u>.  Any holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date shall have its Claim or Interest discharged with no further action, be forever barred from asserting any such Claim or Interest against the relevant Reorganized Debtor or its property, be deemed to have forfeited all rights, and Claims and Interests with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary.  Notwithstanding the foregoing paragraph, this <u>Section 6.3(g)</u> shall not apply to any Claims and Interests reinstated pursuant to the terms of the Plan.

    (h)    **Lost, Stolen, Mutilated, or Destroyed Securities**

Any holder of Allowed Claims or Interests evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such holder as a holder of an Allowed Claim or Interest.  Upon compliance with this procedure by a holder of an Allowed Claim or Interest evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

**6.4**    **Claims Paid or Payable by Third Parties**

(a)    **Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)    **Claims Payable by Insurance Carriers**

Other than with respect to the Dex East Secured Credit Facility Claims, the Dex West Secured Credit Facility Claims or the RHDI Secured Credit Facility Claims, no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  Other than with respect to the Dex East Secured Credit Facility Claims, the Dex West Secured Credit Facility Claims or the RHDI Secured Credit Facility Claims, to the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Policies**

Except as otherwise provided herein, distributions to holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.5**    **Setoffs**

Except as otherwise expressly provided for herein (including with respect to any Dex East Secured Credit Facility Claims, Dex West Secured Credit Facility Claims, RHDI Secured Credit Facility Claims or Claims with respect to letters of credit as provided in the definition of Other Secured Claims), each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the

allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder.  In no event shall any holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**6.6**      **Allocation Between Principal and Accrued Interest**

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

### ARTICLE VII

### PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**7.1**      **Disputed Claims Process** Except as otherwise provided herein, if a party files a proof of claim and the Debtors or Reorganized Debtors, as applicable, do not determine in their sole discretion, and without the need for notice to or action, order or approval of the Bankruptcy Court, that the Claim subject to such proof of claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this ARTICLE VII.  Except as otherwise provided herein, all proofs of claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

**7.2**      **Prosecution of Objections to Claims and Interests**

Except insofar as a Claim or Interest is Allowed under the Plan, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to the Claim or Interest.  Any objections to Claims and Interests shall be served and filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Section 4.15.

**7.3**      **No Interest**

Unless otherwise specifically provided for in the Plan or by order of the Bankruptcy Court (including pursuant to the Dex East Cash Collateral Order, the Dex West Cash Collateral Order or the RHDI Cash Collateral Order), postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**7.4**      **Disallowance of Claims and Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn

over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII

## EFFECT OF CONFIRMATION OF THE PLAN

**8.1**     <u>Discharge of Claims and Termination of Interests</u>

**Except as otherwise provided for herein and effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.**

**8.2**     <u>Releases by the Debtors</u>

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided for herein, for good and valuable consideration, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, and liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative Claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, the Estates, or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Affiliates, the Chapter 11 Cases, the Transaction, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, prepetition contracts and agreements with one or more Debtors (including the Credit Agreements and other agreements reflecting long-term indebtedness), the Dex One Support Agreement, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, solicitation or preparation of the Plan and Disclosure Statement or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date, other than Claims or liabilities arising out of or related to any contractual or fixed monetary obligation owed to the Debtors or the Reorganized Debtors.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this <u>Section 8.2</u>, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by this <u>Section 8.2</u>; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any Claim or Cause of Action released by this <u>Section 8.2</u>.**

**8.3**     **Releases by Holders of Claims and Interests**

As of the Effective Date, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Transaction, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, prepetition contracts and agreements with one or more Debtors (including the Credit Agreements and other agreements reflecting long-term indebtedness), the Dex One Support Agreement, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, solicitation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date of the Plan.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this **Section 8.3**, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is:  (a) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates, and the Released Parties; (b) a good faith settlement and compromise of the Claims released by this **Section 8.3**; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under this **Section 8.3** from asserting any Claim or Cause of Action released by this **Section 8.3**.

**8.4**     **Exculpation**

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; **provided**, **however**, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; **provided**, **further**, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan.  The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**8.5**     **Injunction**

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to **Section 8.2** or **Section 8.3**,

**discharged pursuant to Section 8.1, or are subject to exculpation pursuant to Section 8.4 are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.**

**8.6    Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**8.7    Indemnification**

On and from the Effective Date, and except as prohibited by applicable law, the Reorganized Debtors shall assume or reinstate, as applicable, all indemnification obligations in place as of the Effective Date (whether in by-laws, certificates of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates.

**8.8    Recoupment**

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**8.9    Release of Liens**

Except (a) with respect to the Liens securing the Dex East Secured Credit Facility Claims, Dex West Secured Credit Facility Claims or the RHDI Secured Credit Facility Claims, (b) with respect to the Liens securing the Secured Tax Claims or Other Secured Claims (depending on the treatment of such Claims), or (c) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**8.10    Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective

Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**ARTICLE IX**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**9.1**    **Conditions Precedent to the Effective Date**.  It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2:

(a)    the Confirmation Order shall have been entered, and such order shall not have been stayed, modified, or vacated on appeal;

(b)    if the SuperMedia Chapter 11 Cases have been filed, the SuperMedia Confirmation Order shall have been entered by the Bankruptcy Court, and such order shall not have been stayed, modified, or vacated on appeal;

(c)    the Merger shall have been consummated, and all conditions set forth in Article VII of the Merger Agreement shall have been satisfied (and not waived);

(d)    all respective conditions precedent to the consummation of each of the Amended and Restated Dex East Secured Credit Agreement, the Amended and Restated Dex West Secured Credit Agreement, and the Amended and Restated RHDI Secured Credit Agreement shall have been waived or satisfied in accordance with the respective terms thereof;

(e)    if the SuperMedia Chapter 11 Cases have been filed, the effective date of the SuperMedia Plan shall have occurred in accordance with the terms thereof concurrently with the occurrence of the Effective Date;

(f)    all fees and expenses of the Credit Agreement Agents, including the fees and expenses of counsel and the financial advisors to the Credit Agreement Agents, shall have been paid in full in cash; and

(g)    all documents and agreements necessary to implement the Plan shall have:  (1) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (2) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (3) been effected or executed.

**9.2**    **Waiver of Conditions Precedent**

The Debtors, with the prior written consent of each Credit Agreement Agent, which may not be unreasonably withheld, may waive any of the conditions to the Effective Date set forth in Section 9.1 at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

**9.3**    **Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE X

# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**10.1**     **Modification of Plan**

Effective as of the date hereof:  (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order, subject to the limitations set forth herein and, if effective, the Dex One Support Agreement; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject to the limitations set forth herein and, if effective, the Dex One Support Agreement.

**10.2**     **Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**10.3**     **Confirmation of the Plan**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE XI

# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amendment, modification, or supplement, after the Effective Date, pursuant to ARTICLE V, of the list of

Executory Contracts and Unexpired Leases to be rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

      4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

      5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

      6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan or the Confirmation Order, including contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

      7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

      8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

      9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

      10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to <u>Section 6.4(a)</u>; (b) with respect to the releases, injunctions, and other provisions contained in <u>ARTICLE VIII</u>, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any Entity's obligations incurred in connection with the Plan or the Confirmation Order, including those arising under agreements, documents, or instruments executed in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

      11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

      12.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

      13.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

      14.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

      15.      enforce all orders previously entered by the Bankruptcy Court; and

      16.      hear any other matter not inconsistent with the Bankruptcy Code.

After the Effective Date, notwithstanding anything in this ARTICLE XI to the contrary, any disputes arising under the Amended and Restated Credit Documents will be governed by the jurisdictional provisions therein.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**12.1     Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**12.2     Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**12.3     Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**12.4     Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**12.5     Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| **Reorganized Debtors** | **Dex Media Inc.**<br>1001 Winstead Drive<br>Cary, North Carolina 27513<br>Attn.:    Mark W. Hianik |
| **Counsel to Debtors** | **Pachulski Stang Ziehl & Jones LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705 (Courier 19801)<br>Attn.:    Laura Davis Jones<br>         Peter J. Keane |
| | **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022-4611<br>Attn.:    Marc Kieselstein, P.C.<br>         Christopher J. Marcus |

| | |
|---|---|
| **Counsel to the Credit Agreement Agents** | **Richards, Layton & Finger, P.A.**<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn:    Mark Collins, Esq.<br><br>**Simpson Thacher & Bartlett LLP**<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn:    Steve Fuhrman, Esq.<br>            Sandy Qusba, Esq. |
| **Counsel to SuperMedia** | **Young Conaway Stargatt &**<br>**Taylor, LLP**<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Attn:    Pauline K. Morgan<br><br>**Cleary Gottlieb Steen &**<br>**Hamilton LLP**<br>One Liberty Plaza<br>New York, New York 10006<br>Attn:    Sean A. O'Neal |
| **United States Trustee** | **Office of the United States Trustee**<br>**for the District of Delaware**<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801<br>Attn.:    [___] |

## 12.6    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 12.7    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## 12.8    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from www.epiq11.com/dexone or the Bankruptcy Court's website at www.deb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in

the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**12.9**    **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.    Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:    (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

*[The remainder of this page is intentionally left blank.]*

Dated:  February 8, 2013

DEX ONE CORPORATION
on behalf of itself and all other Debtors

Alfred T. Mockett
Chief Executive Officer
1001 Winstead Drive
Cary, North Ccarolia 27513

**EXHIBIT A TO THE PLAN**

AMENDED AND RESTATED DEX EAST SECURED CREDIT AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

CREDIT AGREEMENT

dated as of

October 24, 2007,
as amended and restated as of January 29, 2010, and
as further amended and restated as of [          ], 2013,

among

NEWDEX, INC.,

DEX MEDIA, INC.,

DEX MEDIA EAST, INC.,
as Borrower,

The Lenders Party Hereto

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and Collateral Agent

_____

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Syndication Agent

_____

J.P. MORGAN SECURITIES LLC and

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 2 |
| Section 1.02 | Classification of Loans and Borrowings | 34 |
| Section 1.03 | Terms Generally | 34 |
| Section 1.04 | Accounting Terms; GAAP | 34 |

## ARTICLE II

### THE CREDITS

| | | |
|---|---|---|
| Section 2.01 | Loans | 34 |
| Section 2.02 | Borrowings | 35 |
| Section 2.03 | Interest Elections | 35 |
| Section 2.04 | Repayment of Loans; Evidence of Debt | 36 |
| Section 2.05 | Amortization of Loans | 36 |
| Section 2.06 | Prepayment of Loans | 37 |
| Section 2.07 | Fees | 39 |
| Section 2.08 | Interest | 40 |
| Section 2.09 | Alternate Rate of Interest | 40 |
| Section 2.10 | Increased Costs; Illegality | 41 |
| Section 2.11 | Break Funding Payments | 42 |
| Section 2.12 | Taxes. | 42 |
| Section 2.13 | Payments Generally; Pro Rata Treatment; Sharing of Setoffs. | 45 |
| Section 2.14 | Mitigation Obligations; Replacement of Lenders | 46 |
| Section 2.15 | Voluntary Prepayments Below Par | 47 |

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 3.01 | Organization; Powers. | 49 |
| Section 3.02 | Authorization; Enforceability. | 49 |
| Section 3.03 | Governmental Approvals; No Conflicts. | 49 |
| Section 3.04 | Financial Condition | 50 |
| Section 3.05 | Properties | 50 |
| Section 3.06 | Litigation and Environmental Matters | 50 |
| Section 3.07 | Compliance with Laws and Agreements | 50 |
| Section 3.08 | Investment Company Status | 51 |
| Section 3.09 | Taxes | 51 |
| Section 3.10 | ERISA | 51 |
| Section 3.11 | Margin Regulations. | 51 |
| Section 3.12 | Disclosure | 51 |
| Section 3.13 | Subsidiaries | 51 |
| Section 3.14 | Insurance | 52 |
| Section 3.15 | Labor Matters. | 52 |

Section 3.16    Senior Debt. ......................................................................................... 52
Section 3.17    Security Documents. ............................................................................. 52
Section 3.18    Liens. ................................................................................................... 53
Section 3.19    [Bankruptcy Court Orders. ................................................................. 53

## ARTICLE IV

## CONDITIONS

Section 4.01    Effectiveness of Agreement. ................................................................ 53

## ARTICLE V

## AFFIRMATIVE COVENANTS

Section 5.01    Financial Statements and Other Information. ..................................... 57
Section 5.02    Notices of Material Events. ................................................................. 61
Section 5.03    Information Regarding Collateral. ....................................................... 62
Section 5.04    Existence; Conduct of Business. ......................................................... 62
Section 5.05    Payment of Obligations. ...................................................................... 62
Section 5.06    Maintenance of Properties. .................................................................. 62
Section 5.07    Insurance. ............................................................................................. 63
Section 5.08    Casualty and Condemnation. ............................................................... 63
Section 5.09    Books and Records; Inspection and Audit Rights. .............................. 63
Section 5.10    Compliance with Laws. ....................................................................... 63
Section 5.11    Additional Subsidiaries. ...................................................................... 63
Section 5.12    Further Assurances. ............................................................................. 63
Section 5.13    Credit Ratings ...................................................................................... 64
Section 5.14    Intellectual Property ............................................................................ 64
Section 5.15    Independent Director ........................................................................... 65

## ARTICLE VI

## NEGATIVE COVENANTS

Section 6.01    Indebtedness; Certain Equity Securities. ............................................ 65
Section 6.02    Liens. ................................................................................................... 66
Section 6.03    Fundamental Changes. ......................................................................... 67
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions. ........... 67
Section 6.05    Asset Sales. .......................................................................................... 69
Section 6.06    Sale and Leaseback Transactions. ....................................................... 70
Section 6.07    Swap Agreements. ............................................................................... 70
Section 6.08    Restricted Payments; Certain Payments of Indebtedness. .................. 70
Section 6.09    Transactions with Affiliates. ............................................................... 72
Section 6.10    Restrictive Agreements ....................................................................... 72
Section 6.11    Change in Business. ............................................................................. 73
Section 6.12    Fiscal Year. .......................................................................................... 73
Section 6.13    Amendment of Material Documents. ................................................... 73
Section 6.14    Leverage Ratio and Interest Coverage Ratio. ..................................... 73
Section 6.15    Capital Expenditures ........................................................................... 74

Section 6.16    Parent Covenants. ........................................................................................................... 74
Section 6.17    Ultimate Parent Covenants ................................................................................................ 75
Section 6.18    Service Company Covenants.............................................................................................. 76
Section 6.19    Dex Media Service Covenant ............................................................................................ 78
Section 6.20    Limitation on Activities of the License Subsidiaries......................................................... 78

ARTICLE VII

EVENTS OF DEFAULT

ARTICLE VIII

THE AGENT

ARTICLE IX

MISCELLANEOUS

Section 9.01    Notices. ............................................................................................................................. 84
Section 9.02    Waivers; Amendments ...................................................................................................... 84
Section 9.03    Expenses; Indemnity; Damage Waiver ............................................................................ 86
Section 9.04    Successors and Assigns. .................................................................................................... 87
Section 9.05    Survival ............................................................................................................................. 89
Section 9.06    Counterparts; Integration; Effectiveness .......................................................................... 90
Section 9.07    Severability........................................................................................................................ 90
Section 9.08    Right of Setoff. .................................................................................................................. 90
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process. ...................................... 90
Section 9.10    WAIVER OF JURY TRIAL .............................................................................................. 91
Section 9.11    Headings ............................................................................................................................ 91
Section 9.12    Confidentiality. .................................................................................................................. 91
Section 9.13    Interest Rate Limitation. .................................................................................................... 92
Section 9.14    Termination or Release....................................................................................................... 92
Section 9.15    USA Patriot Act. ................................................................................................................ 93
Section 9.16    Intercreditor Agreement. ................................................................................................... 93
Section 9.17    Amendment and Restatement ............................................................................................ 93

<u>SCHEDULES</u>:

| | | |
|---|---|---|
| Schedule 1.01A | -- | Directory Consolidation Project |
| Schedule 1.01B | -- | Mortgaged Property |
| Schedule 3.05 | -- | Properties |
| Schedule 3.09 | -- | Taxes |
| Schedule 3.13 | -- | Subsidiaries |
| Schedule 3.14 | -- | Insurance |
| Schedule 3.17 | -- | UCC Filing Jurisdictions |
| Schedule 6.01 | -- | Existing Indebtedness |
| Schedule 6.02 | -- | Existing Liens |
| Schedule 6.04 | -- | Existing Investments |
| Schedule 6.10 | -- | Existing Restrictions |

<u>EXHIBITS</u>:

| | | |
|---|---|---|
| Exhibit A | -- | Form of Assignment and Assumption |
| Exhibit B | -- | Form of Acknowledgment and Confirmation |
| Exhibit C | -- | Form of Amended and Restated Shared Guarantee and Collateral Agreement |
| Exhibit D | -- | Form of Amended and Restated Intercreditor and Collateral Agency Agreement |
| Exhibit E | -- | Form of Amended and Restated Shared Services Agreement |
| Exhibit F | -- | Form of Newco Subordinated Guarantee |
| Exhibit G | -- | Form of Subordinated Guarantee Agreement |
| Exhibit H | -- | Form of License Agreement |
| Exhibit I | -- | Form of Master IP License Agreement |
| Exhibit J | -- | Form of Election Notice |
| Exhibit K | -- | Form of Dex Tax Sharing Agreement |
| Exhibit L | -- | Form of SuperMedia Tax Sharing Agreement |
| Exhibit M | -- | Form of Tax Certificates |

CREDIT AGREEMENT, dated as of October 24, 2007, as amended and restated as of January 29, 2010 and as further amended and restated as of [          ] (this "<u>Agreement</u>"), among NEWDEX, INC., a Delaware corporation, DEX MEDIA, INC., a Delaware corporation, DEX MEDIA EAST, INC., a Delaware corporation, the several banks and other financial institutions or entities from time to time party hereto (the "<u>Lenders</u>"), and JPMORGAN CHASE BANK, N.A., as administrative agent and collateral agent for such lenders.

<u>Recitals</u>

WHEREAS, the Ultimate Parent, the Parent and the Borrower (as each term is defined below) are parties to the Credit Agreement (as amended, supplemented or otherwise modified prior to the Closing Date (as defined below), the "<u>Existing Credit Agreement</u>"), dated as of October 24, 2007 and amended and restated as of January 29, 2010 (the "<u>Original Restatement Date</u>"), among the Ultimate Parent, the Parent, the Borrower, the Lenders and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent;

[WHEREAS, on [_____, 2013] (the "<u>Petition Date</u>"), the Ultimate Parent (as defined below) and its Subsidiaries (as defined below) each commenced bankruptcy cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions under chapter 11 of the Bankruptcy Code (as defined below) in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

WHEREAS, on the Petition Date, the Ultimate Parent and its Subsidiaries filed with the Bankruptcy Court the Reorganization Plan (as defined below) and the Disclosure Statement (as defined below);

WHEREAS, on [_____, 2013], the Bankruptcy Court entered the Confirmation Order (as defined below) confirming the Reorganization Plan;

WHEREAS, pursuant to the Reorganization Plan, the Ultimate Parent and its Subsidiaries have implemented (or substantially simultaneously with the Closing Date will implement) the Amendments (as defined below);][1]

WHEREAS, the Ultimate Parent and SuperMedia Inc. ("<u>SuperMedia</u>") have entered into a Merger Agreement, dated as of August 20, 2012, as amended and restated as of December 5, 2012 (the "<u>Merger Agreement</u>"), by and among Dex One, NewDex, Inc. ("<u>Newdex</u>"), Spruce Acquisition Sub, Inc. ("<u>Merger Sub</u>") and SuperMedia, pursuant to which Dex One merged with Newdex, with Newdex as the surviving corporation (the "<u>Dex Merger</u>"), and SuperMedia merged with Merger Sub, with SuperMedia as the surviving corporation (the "<u>SuperMedia Merger</u>" and together with the Dex Merger, the "<u>Mergers</u>");

WHEREAS, after giving effect to the Mergers, SuperMedia has become a direct wholly owned subsidiary of Newdex and Newdex has become the Ultimate Parent;

WHEREAS, the Ultimate Parent, the Parent and the Borrower have requested that the Lenders amend and restate the Existing Credit Agreement as provided in this Agreement; and

WHEREAS, the Lenders are willing to so amend and restate the Existing Credit Agreement on the terms and conditions set forth herein.

---

[1] To be included if applicable

Now, therefore, the parties hereto agree that the Existing Credit Agreement shall be amended and restated in its entirety as of the Closing Date to read as follows:

ARTICLE I

DEFINITIONS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"Acknowledgment and Confirmation" means an Acknowledgment and Confirmation substantially in the form of Exhibit B hereto, dated the date hereof, executed by each Dex East Loan Party.

"Additional Notes" means notes issued by the Ultimate Parent after the date hereof (a) that are not secured by any assets of the Ultimate Parent or any of its Subsidiaries, (b) that bear interest at a prevailing market rate at the time of the issuance thereof, (c) the proceeds of which are used to refinance the Restructuring Notes or any Additional Notes, (d) that do not mature, and are not mandatorily redeemable, in whole or in part, or required to be repurchased or reacquired, in whole or in part, prior to the date that is six months after the Maturity Date (other than pursuant to asset sale or change in control provisions customary in offerings of similar notes), (e) that have no financial maintenance covenants and no restrictive covenants that apply to any Subsidiary of the Ultimate Parent or that impose limitations on the Ultimate Parent's ability to guarantee or pledge assets to secure the Obligations and otherwise have covenants, representations and warranties and events of default that are no more restrictive than those existing in the prevailing market at the time of issuance for companies with the same or similar credit ratings of the Ultimate Parent at such time issuing similar securities, (f) are not guaranteed by any Subsidiary of the Ultimate Parent and are subordinated to the Obligations on terms that are no less favorable to the Lenders than the subordination terms set forth in the Restructuring Notes Indenture and that are otherwise reasonably satisfactory to the Administrative Agent and (g) are not convertible or exchangeable except into (i) other Indebtedness of the Ultimate Parent meeting the qualifications set forth in this definition or (ii) common equity of the Ultimate Parent, provided that any such exchange or conversion, if effected, would not result in a Change in Control or a Default.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Lenders hereunder and its Affiliates and permitted successors acting in such capacity.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Advance Amortization Payment</u>" has the meaning assigned to such term in Section 2.06(a).

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agent</u>" means JPMorgan Chase Bank, N.A., in its capacities as Administrative Agent and/or Collateral Agent, and each of its Affiliates and successors acting in any such capacity.  The Administrative Agent may act on behalf of or in place of any Person included in the "Agent".

"<u>Agreement</u>" has the meaning assigned in the preamble hereto.

"<u>Allocable Net Proceeds</u>" means, with respect to any Equity Issuance by the Ultimate Parent, 13% of the Net Proceeds of such Equity Issuance; <u>provided</u>, that to the extent the Indebtedness outstanding under (a) the RHDI Credit Agreement has been repaid in full, Allocable Net Proceeds shall mean 16% of the Net Proceeds of such Equity Issuance, (b) the Dex West Credit Agreement has been repaid in full, the Allocable Net Proceeds shall mean 15% of the Net Proceeds of such Equity Issuance, (c) the RHDI Credit Agreement and the Dex West Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 20% of the Net Proceeds of such Equity Issuance, (d) the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 28% of the Net Proceeds of such Equity Issuance, (e) the RHDI Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 46% of the Net Proceeds of such Equity Issuance, (f) the Dex West Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 41% of the Net Proceeds of such Equity Issuance and (g) the Dex West Credit Agreement, RHDI Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 100% of the Net Proceeds of such Equity Issuance.

"<u>Alternate Base Rate</u>" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> ½ of 1%, (c) the Adjusted LIBO Rate for a Eurodollar Loan with an Interest Period of one month commencing on such day plus 1% and (d) 4.00%, <u>provided</u> that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on Reuters Screen LIBOR 01 Page (or on any successor or substitute of such page) at approximately 11:00 a.m., London time, on such day.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"<u>Amendments</u>" means, collectively, the amendment and restatement of the RHDI Existing Credit Agreement, the Dex West Existing Credit Agreement and the SuperMedia Existing Credit Agreement, pursuant to the RHDI Credit Agreement, the Dex West Credit Agreement and the SuperMedia Credit Agreement, respectively (in each case referred to in clause (a) in the definition thereof)[, which amendments were consummated pursuant to the Reorganization Plan][2].

"<u>Applicable Payment Percentage</u>" has the meaning assigned to such term in Section 2.15(c).

"<u>Applicable Rate</u>" means, for any day, with respect to any Loan, 2.00% per annum, in the case of an ABR Loan, and 3.00% per annum, in the case of a Eurodollar Loan.

_____
[2] To be included if applicable

"Approved Fund" has the meaning assigned to such term in Section 9.04.

"Arrangers" means, collectively, J.P. Morgan Securities LLC and Deutsche Bank Securities Inc., in their capacities as Joint Lead Arrangers and Joint Bookrunners.

"Asset Disposition" means (a) any sale, lease, assignment, conveyance, transfer or other disposition (including pursuant to a sale and leaseback or securitization transaction) of any property or asset of the Borrower or any Subsidiary other than (i) dispositions described in clauses (a), (b), (c), (d), (f), (g) and (h) of Section 6.05 and (ii) dispositions described in Section 6.05(e) resulting in aggregate Net Proceeds not exceeding $2,500,000 during the term of this Agreement and (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary, but only to the extent that the Net Proceeds therefrom have not been applied to repair, restore or replace such property or asset within 365 days after such event.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Attributable Debt" means, on any date, in respect of any lease of the Borrower or any Subsidiary entered into as part of a sale and leaseback transaction subject to Section 6.06, (a) if such lease is a Capital Lease Obligation, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP and (b) if such lease is not a Capital Lease Obligation, the capitalized amount of the remaining lease payments under such lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease Obligation.

["Bankruptcy Code" means title 11 of the United States Code (11 U.S.C. §101 et seq.), as amended from time to time, and any successor statute.][3]

["Bankruptcy Court" has the meaning assigned to such term in the recitals to this Agreement.][4]

"Billing and Collection Agreement" means the Agreement for the Provision of Billing and Collection Services for Directory Publishing Services dated as of November 1, 2004, between Qwest Corp. and the Parent.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Dex Media East, Inc., a Delaware corporation.

"Borrower Receivables" means the receivables of the Borrower or its Subsidiaries subject to purchase by Qwest Corp. pursuant to the Billing and Collection Agreement.

---

[3] To be included if applicable

[4] To be included if applicable

"Borrower's Discounted Prepayment Portion of Excess Cash Flow" means an amount determined following the end of each fiscal quarter of the Borrower (and certified by a Financial Officer of the Borrower pursuant to Section 5.01(d)), commencing with the first such fiscal quarter ending after the Closing Date, equal to (i) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the Borrower's Percentage, minus (ii) (a) any Discounted Voluntary Prepayment made during the applicable ECF Period as to which the Borrower has delivered an Election Notice to the Administrative Agent that such Discounted Voluntary Prepayment shall constitute a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow within the applicable 180-day period described in Section 2.06(e) and (b) all (x) Advance Amortization Payments, (y) prepayments made pursuant to Section 2.06(a) (other than Advance Amortization Payments) and (z) other prepayments made pursuant to Section 2.06(d), in each case to the extent the Borrower has delivered an Election Notice to the Administrative Agent that such payment shall constitute a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow, provided that, for purposes of Section 2.06(e), the Borrower's Discounted Prepayment Portion of Excess Cash Flow shall be calculated as to each individual fiscal quarter and shall not be reduced or affected by any subsequent calculation of the Borrower's Discounted Prepayment Portion of Excess Cash Flow at the end of any subsequent fiscal quarter.

"Borrower's Discretionary Portion of Excess Cash Flow" means an amount determined following the end of each fiscal quarter of the Borrower (and certified by a Financial Officer of the Borrower pursuant to Section 5.01(d)), commencing with the first such fiscal quarter ending after the Closing Date, equal to (i) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the Borrower's Percentage, minus (ii) all Discounted Voluntary Prepayments made during the applicable ECF Period as to which the Borrower has delivered an Election Notice to the Administrative Agent that such Discounted Voluntary Prepayment shall constitute a utilization of the Borrower's Discretionary Portion of Excess Cash Flow.

"Borrower's Percentage" means (a) with respect to any fiscal quarter of the Borrower in the fiscal years ending December 31, 2013 and December 31, 2014, 15%, and (b) with respect to any fiscal quarter of the Borrower in the fiscal years ending December 31, 2015 and December 31, 2016, 20%.

"Borrower's Portion of Excess Cash Flow" means, collectively, the Borrower's Discounted Prepayment Portion of Excess Cash Flow and the Borrower's Discretionary Portion of Excess Cash Flow.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided, that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, without duplication, (i) the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Subsidiaries for such period, determined in accordance with GAAP and (ii) the portion of the additions to property, plant and equipment and other capital expenditures of the Service Company for such period allocated to, and funded by, the Borrower and its consolidated Subsidiaries pursuant to the Shared Services Agreement.

"Capital Lease Obligations" of any Person means (i) the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP and (ii) in the case of the Borrower and its Subsidiaries, the portion of the obligations of the Service Company described in the foregoing clause (i) allocated to, and funded by, the Borrower and its Subsidiaries pursuant to the Shared Services Agreement.

["Cash Collateral Order" means the Final Order Under 11 U.S.C. §§ 105, 361, 362, 363, 552  and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to the Prepetition Secured Parties, entered by the Bankruptcy Court on [____], 2013.][5]

"Change in Control" means, subject to the proviso below:

(a)  the ownership, beneficially or of record, by any Person other than the Parent of any Equity Interest in the Borrower;

(b)  the ownership, beneficially or of record, by any Person other than the Ultimate Parent of any Equity Interest in the Parent;

(c)  for so long as the Shared Services Agreement is in existence, the ownership, beneficially or of record, by any Person other than the Ultimate Parent of any Equity Interests in the Service Company;

(d)  the ownership, beneficially or of record, by any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of more than 35% of the outstanding Equity Interests in the Ultimate Parent;

(e)  occupation of a majority of the seats (other than vacant seats) on the Governing Board of the Ultimate Parent or the Parent by Persons who were not (i) members of such Governing Board as of the Closing Date [(after giving effect to the Reorganization Plan)][6], (ii) nominated by, or whose nomination for election was approved or ratified by a majority of the directors or members of, the Governing Board of the Ultimate Parent or the Parent, as applicable, or (iii) appointed by Persons described in the foregoing clauses (i) and (ii); or

(f) the occurrence of a "Change of Control" (or similar term) as defined in the Restructuring Notes Indenture or any indenture, agreement or other instrument governing the Additional Notes;

provided, that the consummation of the Mergers pursuant to the SuperMedia Merger Agreement shall not constitute a Change in Control.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for

---

[5] To be included if applicable

[6] To be included if applicable

purposes of Section 2.10(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

["Chapter 11 Cases" has the meaning assigned to such term in the recitals to this Agreement.][7]

"Charges" has the meaning assigned to such term in Section 9.13.

"Closing Date" means the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied (or waived) and the notice contemplated in the last sentence of Section 4.01 shall have been delivered, which date is [_____, 2013].[8]

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document or Shared Collateral Security Document.

"Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Secured Parties and its Affiliates and permitted successors acting in such capacity.

"Collateral Agreements" means the collective reference to the Guarantee and Collateral Agreement and the Shared Guarantee and Collateral Agreement.

"Collateral and Guarantee Requirement" means the requirement that:

(a)     the Collateral Agent shall have received from each Dex East Loan Party either (i) a counterpart of the Guarantee and Collateral Agreement duly executed and delivered on behalf of such Dex East Loan Party or (ii) in the case of any Subsidiary that becomes a Subsidiary Loan Party after the Closing Date, a supplement to the Guarantee and Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Subsidiary;

(b)     the Shared Collateral Agent shall have received from each Shared Collateral Loan Party (other than the Newco Subordinated Guarantors) either (i) a counterpart of the Shared Guarantee and Collateral Agreement duly executed and delivered on behalf of such Shared Collateral Loan Party or (ii) in the case of any Newco that becomes a Shared Collateral Loan Party after the Closing Date, a supplement to the Shared Guarantee and Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Newco;

(c)     all outstanding Equity Interests of the Borrower and each other Subsidiary Loan Party shall have been pledged pursuant to the Guarantee and Collateral Agreement (except that the Borrower and each other Subsidiary Loan Party shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and the Collateral

---

[7] To be included if applicable

[8] If the Closing Date occurs prior to March 31, 2013, the initial delivery of annual financial statements will be adjusted and the Excess Cash Flow prepayment provisions will be adjusted to require payment of the Excess Cash Flow prepayment under the Existing Credit Agreement for the period ending December 31, 2012.

Agent shall have received all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(d)      all outstanding Equity Interests of the Parent, Dex Media Service, Dex Digital, RHDC, the Service Company and each other Subsidiary owned by or on behalf of any Shared Collateral Loan Party shall have been pledged pursuant to the Shared Guarantee and Collateral Agreement (except that the Shared Collateral Loan Parties shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and, subject to the terms of the Intercreditor Agreement, the Shared Collateral Agent shall have received all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(e)      the Shared Collateral Agent shall have received from each Newco Subordinated Guarantor a subordinated guarantee substantially in the form of Exhibit F (or such other form as shall be reasonably acceptable to the Agent and the Shared Collateral Agent), which shall (i) to the extent permitted by the terms of any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor (without giving effect to any restriction effected by any amendment thereto entered into in contemplation of such assumption) and any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor, be secured by a pledge of the Equity Interests of such Newco Subordinated Guarantor's Subsidiaries and any joint venture interest owned by such Newco Subordinated Guarantor (subject to any restrictions in the applicable joint venture agreement applicable to all partners of such joint venture; it being understood and agreed that in the event any such restriction exists, the Administrative Agent and such Newco Subordinated Guarantor shall agree upon alternative structures, if available, to effect the economic equivalent of a pledge of the applicable joint venture interest) and (ii) to the extent required by the terms of any such Indebtedness (without giving effect to any restriction effected by any amendment, waiver, modification or refinancing thereto entered into in contemplation of such assumption) be subordinated to any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor and any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor; provided, that (i) to the extent that any restriction shall exist which shall not permit such Guarantee or which requires the subordination thereof as described above, the Borrower shall deliver, or cause to be delivered, true and complete copies of all relevant agreements received by the Borrower in respect of such Indebtedness, certified by a Financial Officer, to the Agent at least ten Business Days prior to the completion of the acquisition of the applicable Newco Subordinated Guarantor (or, in the case of any such agreement received by the Borrower after such tenth Business Day, promptly following the Borrower's receipt of such agreement) and (ii) notwithstanding the foregoing, no Newco Subordinated Guarantor shall be required to guarantee the Obligations to the extent such Guarantee is prohibited by the terms of any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor (without giving effect to any restriction effected by any amendment, waiver, modification or refinancing thereto entered into in contemplation of such assumption) or any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor if no alternative financing (on terms not materially less favorable taken as a whole to the applicable borrower or issuer) is available that would permit such Guarantee or is otherwise prohibited under applicable law; provided, further, that (x) the Ultimate Parent shall use its commercially reasonable efforts to amend any such assumed Indebtedness that is otherwise being amended in connection with such acquisition to permit such Guarantee and (y) if any Newco Subordinated Guarantor is unable to Guarantee the Obligations due to circumstances described in the first proviso hereof, then (A) the Ultimate Parent may only effect the acquisition of such Newco Subordinated Guarantor to the extent it

provides evidence reasonably satisfactory to the Administrative Agent, and certification by a Financial Officer, that the Ultimate Parent was unable to obtain amendments (after use of commercially reasonable efforts) and/or alternative financing (on terms not materially less favorable taken as a whole to the applicable borrower or issuer) was not available, as the case may be, permitting such Guarantee or such Guarantee was otherwise prohibited by applicable law (and providing a description of such applicable law) and (B) to the extent permitted by applicable law, a holding company shall be formed to hold 100% of the shares of the applicable Newco Subordinated Guarantor, which holding company shall Guarantee the Obligations and pledge the stock of such Newco Subordinated Guarantor to secure such Guarantee (any Guarantee provided by this clause (e), a "Newco Subordinated Guarantee");

(f)      all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent or the Shared Collateral Agent, as applicable, to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and the Shared Collateral Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Collateral Agreements, shall have been filed, registered or recorded or, subject to the Intercreditor Agreement, delivered to the Agent or the Shared Collateral Agent, as applicable, for filing, registration or recording;

(g)      (1) the Collateral Agent shall have received with respect to each Mortgaged Property existing on the Closing Date (i) a Mortgage Amendment, together with (i) evidence that counterparts of said Mortgage Amendments have been delivered to the Title Company (defined below), (ii) a datedown endorsement to the existing title policy insuring the Lien of each such Mortgage (or a reissued title insurance policy) (the "Mortgage Endorsements"), issued by Stewart Title Guaranty Company (the "Title Company"), insuring the Lien of such Mortgage (as amended by the applicable Mortgage Amendment) as a valid Lien on the Mortgaged Property described therein, free of any Liens except those permitted under Section 6.02, (iii) the opinions, addressed to the Collateral Agent and the Lenders of (A) outside counsel or in-house counsel, as to the due authorization, execution and delivery of the Mortgage Amendments by the Borrower or any Loan Party, as applicable, and (B) local counsel in each jurisdiction where Mortgaged Property is located regarding the Mortgage Amendments, (iv) with respect to each Mortgaged Amendment, such affidavits, certificates, instruments of indemnification and other items (including a so-called "gap" indemnification) as shall be reasonably required to induce the Title Company to issue the Mortgage Endorsements contemplated above, (v) evidence reasonably acceptable to the Collateral Agent of payment by the Borrower of all Mortgage Endorsement premiums, search and examination charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgage Amendments, fixture filings and issuance of the Mortgage Endorsements referred to above, in each case, in form and substance reasonably satisfactory to the Collateral Agent,  and (2) with respect to each Mortgaged Property acquired after the date hereof (i) execute and deliver a first priority Mortgage in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such real property, subject to any Liens permitted by Section 6.02, (ii) if requested by the Collateral Agent, the Collateral Agent shall have received, and the Title Company shall have received, maps or plats of an as-built survey of the sites of such Mortgaged Property prepared by an independent professional licensed land surveyor reasonably satisfactory to the Collateral Agent and the Title Company (and certified by such surveyor to the Collateral Agent and the Title Company), which maps or plats and the surveys on which they are based shall be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the American Congress on Surveying and Mapping in 1992,  (iii) the Collateral Agent shall have received in respect of such Mortgaged Property a mortgagee's title insurance policy (or policies) or marked up unconditional binder for such insurance, and each such policy shall (A) be in an

amount reasonably satisfactory to the Collateral Agent; (B) be issued at ordinary rates; (C) insure that the Mortgage insured thereby creates a valid first Lien on such Mortgaged Property free and clear of all defects and encumbrances, except as disclosed therein; (D) name the Collateral Agent for the benefit of the Secured Parties as the insured thereunder; (E) be in the form of ALTA Loan Policy - 2006 (or equivalent policies); (F) contain such endorsements and affirmative coverage as the Collateral Agent may reasonably request, and the Collateral Agent shall have received evidence satisfactory to it that all premiums in respect of each such policy, all charges for mortgage recording tax, and all related expenses, if any, have been paid; (iv) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; (v) if requested by the Collateral Agent, deliver to the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Collateral Agent, and (vi) deliver to the Collateral Agent a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to such Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Collateral Agent; and

(h)        each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents and Shared Collateral Security Documents (or supplements thereto) to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens thereunder.

"Collateral Trademarks" has the meaning assigned to such term in Section 4.01(e).

"Companies" means collectively, the Borrower, Dex West, RHDI and SuperMedia, and each, individually, a "Company".

["Confirmation Order" means that certain order approving the Disclosure Statement and confirming the Reorganization Plan pursuant to Section 1129 of the Bankruptcy Code entered by the Bankruptcy Court on [        ], 2013.][9]

"Consolidated Cash Interest Expense" means, for any period, the excess of (a) sum of (i) total cash interest expense (including that attributable to Capital Lease Obligations) of the Borrower and its Subsidiaries for such period with respect to all outstanding Indebtedness of the Borrower and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptance financing and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP) plus (ii) the amount of dividends paid by the Borrower during such period pursuant to Section 6.08(a)(iv) minus (b) total cash interest income of the Borrower and its Subsidiaries for such period.

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) consolidated interest expense for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any extraordinary charges or non-cash charges for such period (provided, however, that any cash payment or expenditure made with respect to any such non-cash charge shall be subtracted in computing

---

[9] To be included if applicable

Consolidated EBITDA during the period in which such cash payment or expenditure is made), (v) non-recurring charges consisting of (A) severance costs associated with a restructuring recorded during the fiscal years ended December 31, 2015 and December 31, 2016, not to exceed $3,500,000 in any such fiscal year, (B) payments of customary investment and commercial banking fees and expenses and (C) cash premiums, penalties or other payments payable in connection with the early extinguishment or repurchase of Indebtedness, and (vi) Specified Charges for such period, provided that such charges are recorded during the period starting on October 1, 2012 and ending on December 31, 2013 and the aggregate amount of charges added back pursuant to this clause (vi) for all periods shall not exceed $11,700,000 (it being understood that such charges may be added back in any four-fiscal-quarter period which includes the fiscal quarter in which such charges are recorded), and minus (b) without duplication and to the extent included in determining such Consolidated Net Income, (i) consolidated interest income for such period and (ii) any extraordinary gains and non-cash gains (including, without limitation, any gain arising from the retirement of Indebtedness) for such period, all determined on a consolidated basis in accordance with GAAP.  For purposes of calculating the Leverage Ratio or the Interest Coverage Ratio as of any date, if the Borrower or any consolidated Subsidiary has made any Permitted Acquisition or sale, transfer, lease or other disposition outside of the ordinary course of business of a Subsidiary or of assets constituting a business unit, in each case as permitted by Section 6.05, during the period of four consecutive fiscal quarters (a "Reference Period") most recently ended on or prior to such date, Consolidated EBITDA for the such Reference Period shall be calculated after giving pro forma effect thereto, as if such Permitted Acquisition or sale, transfer, lease or other disposition (and any related incurrence, repayment or assumption of Indebtedness with any new Indebtedness being deemed to be amortized over the applicable testing period in accordance with its terms) had occurred on the first day of such Reference Period.  The calculation of Consolidated EBITDA shall exclude (i) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase method of accounting for the transactions contemplated by any acquisition, in accordance with GAAP [and (ii) any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan][10].

"Consolidated Net Income" means, for any period, the net income or loss, before the effect of the payment of any dividends or other distributions in respect of preferred stock, of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP (adjusted to reflect any charge, tax or expense incurred or accrued by the Parent during such period as though such charge, tax or expense had been incurred by the Borrower, to the extent that the Borrower has made or would be entitled under the Loan Documents to make and intends to make any payment or dividend or other distribution to or for the account of the Parent in respect thereof (but without duplication of any such charge, tax or expense in respect of which Dex West has made or intends to make a payment or dividend or other distribution to or for the account of the Parent) and adjusted to eliminate (i) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase method of accounting for the transactions contemplated by any acquisition, in accordance with GAAP [and (ii) any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan][11]; provided, that there shall be excluded (a) the income of any Person (other than the Borrower or a Subsidiary Loan Party) in which any other Person (other than the Borrower or any Subsidiary Loan Party or any director holding qualifying shares in compliance with applicable law) owns an Equity Interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or any of the Subsidiary Loan Parties during such

_____

[10] To be included if applicable

[11] To be included if applicable

period, and (b) except as otherwise contemplated by the definition of "Consolidated EBITDA", the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Debt Issuance" means the incurrence by the Borrower or any Subsidiary of any Indebtedness, other than Indebtedness permitted by Section 6.01(a).

"Default" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender, as reasonably determined by the Administrative Agent, that has (a) notified the Borrower, the Administrative Agent or any other Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under agreements in which it commits to extend credit generally, (b) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (c) (i) been (or has a parent company that has been) adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, unless in the case of any Lender referred to in this clause (c) the Borrower and the Administrative Agent shall be satisfied that such Lender intends, and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder.  For the avoidance of doubt, a Lender shall not be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in such Lender or its parent by a Governmental Authority.

"Dex" means Qwest Dex, Inc., a Colorado corporation.

"Dex Digital" means Dex One Digital, Inc., a Delaware corporation.

"Dex East Loan Parties" means the Borrower and the Subsidiary Loan Parties.

"Dex East Obligations" has the meaning assigned to such term in the Intercreditor Agreement.

"Dex Media Service" means Dex Media Service LLC, a Delaware limited liability company.

"Dex Merger" has the meaning assigned to such term in the recitals to this Agreement.

"Dex One" means Dex One Corporation, a Delaware corporation.

"Dex Support Agreement" means the Support and Limited Waiver Agreement, dated as of December 5, 2013, among the Ultimate Parent, the Parent, the Borrower, Dex West, RHDI and their respective Subsidiaries party thereto, the Agent, the administrative agent and collateral agent under the Dex West Credit Agreement, the administrative agent under the RHDI Credit Agreement and each of the lenders party thereto.

"Dex Tax Sharing Agreement" means the Amended and Restated Tax Sharing Agreement in the form of Exhibit K hereto, dated the date hereof, among Newdex, Dex One, Parent, the Borrower, the Service Company, RHDC, Dex West, RHDI, R.H. Donnelley Apil, Inc. and Dex Digital.

"Dex West" means Dex Media West Inc., a Delaware corporation.

"Dex West Existing Credit Agreement" means the Credit Agreement, dated as of June 6, 2008, as amended and restated as of January 29, 2010, among the Ultimate Parent, the Parent, Dex West, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, as amended, supplemented or otherwise modified prior to the effectiveness of the Dex West Credit Agreement.

"Dex West Credit Agreement" means (a) the Credit Agreement, dated as of June 6, 2008 (as amended and restated as of January 29, 2010, as further amended and restated as of the Closing Date, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Ultimate Parent, the Parent, Dex West, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the Dex West Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"Dex West Loan Documents" means the "Loan Documents" as defined in the Dex West Credit Agreement.

"Directory Consolidation Project" means the initiative described in Schedule 1.01A.[12]

["Disclosed Matters" means the matters, proceedings, transactions and other information disclosed in the [Disclosure Statement][Registration Statement on Form S-4] (other than any risk factor disclosures contained under the heading "Risk Factors", any disclosures of risks in the "Forward-Looking Statements" disclaimer or any other similar forward-looking statements in the Disclosure Statement).][13]

["Disclosure Statement" means the Disclosure Statement for the Reorganization Plan, the adequacy of which was approved by the Bankruptcy Court pursuant to the Confirmation Order.][14]

---

[12] Summary from the Term Sheet to be listed on the schedule.

[13] To be included if applicable

[14] To be included if applicable

"Discounted Voluntary Prepayment" has the meaning assigned to such term in Section 2.15(a).

"Discounted Voluntary Prepayment Amount" has the meaning assigned to such term in Section 2.15(b).

"Discounted Voluntary Prepayment Notice" has the meaning assigned to such term in Section 2.15(b).

"Dollars" or "$" refers to lawful money of the United States of America.

"East Acquisition" means the acquisition by the Borrower pursuant to the East Acquisition Agreement of all of the Equity Interests of SGN LLC, a Delaware limited liability company, and the other transactions contemplated by the East Acquisition Agreement and the documents related thereto. Immediately after such acquisition of SGN LLC, the Borrower was merged with and into SGN LLC, which changed its name to "Dex Media East LLC" and on February 1, 2010, Dex Media East LLC merged with and into Dex Media East, Inc., with Dex Media East, Inc. being the surviving entity.

"East Acquisition Agreement" means the Purchase Agreement dated as of August 19, 2002, among Dex, Qwest Services, Qwest and Dex Holdings LLC.

"ECF Period" means the period beginning on January 1, 2013 and ending at the end of the applicable fiscal quarter thereafter.

"ECF Sweep Percentage" means (a) with respect to any fiscal quarter in the fiscal years ending December 31, 2013 and December 31, 2014, 70% and (b) with respect to any fiscal quarter in the fiscal years ending December 31, 2015 and December 31, 2016, 60%.

"Election Notice" means a written notice from the Borrower to the Administrative Agent in the form of Exhibit J hereto.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" means any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in

a Person of whatever nature, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"Equity Issuance" means the issuance by the Ultimate Parent, the Borrower or any Subsidiary of any Equity Interests, or the receipt by the Ultimate Parent, the Borrower or any Subsidiary of any capital contribution, other than (i) any issuance of Equity Interests or receipt of capital contributions to the extent as a result of (x) a non-cash exchange of Restructuring Notes or Additional Notes or (y) the issuance of Equity Interests that are issued on a non-cash basis as consideration for a Permitted Acquisition or other Investment permitted hereunder or (ii) any issuance of Equity Interests to, or receipt of any capital contribution from, the Ultimate Parent, the Parent or any Dex East Loan Party.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standards (within the meaning of Sections 412 and 430 of the Code or Section 302 of ERISA) applicable to such Plan, including, for Plan years ending prior to January 1, 2008, any "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure by any Loan Party or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; (d) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Plan; (e) a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA; (f) the receipt by any Loan Party or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (h) the receipt by any Loan Party or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"Escrow Materials" means copies of (i) all software source code and all documentation and training manuals relating thereto and (ii) all other tangible or written embodiments of material technology, websites and databases (but excluding any print directories or other publicly distributed print materials), in each case to the extent (1) owned (or licensed, if such license grants the licensee (x) possession of same and the right to allow the foregoing entities (and any escrow agent, as applicable) to access same and (y) the right to sublicense such right of possession and access without (I) the licensor's consent, unless consent can be obtained with no additional fees or other consideration (unless the sublicensee fully reimburses the sublicensor for such additional fees or other consideration) or additional

obligations upon sublicensor or any loss of rights of sublicensor, (II) loss of any rights of sublicensor, (III) additional obligations upon sublicensor or (IV) any additional fees or consideration (unless the sublicensee fully reimburses the sublicensor for such fees or other consideration required to obtain such right of possession and access) and (2) currently used by SuperMedia, Borrower, Dex West, RHDI, the Service Company or any of such Shared Collateral Loan Parties, as applicable, in their respective businesses.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excess Cash Flow" means, as of the end of each fiscal quarter ending after the Closing Date, for the period starting on January 1, 2013 and ending on the last day of such fiscal quarter, the result (without duplication) of:

(a) net cash provided by operating activities of the Borrower and its Subsidiaries for such period as reflected in the statement of cash flows on the consolidated financial statements of the Borrower for each applicable quarter during such period , that (i) to the extent the Borrower makes any Discounted Voluntary Prepayments and the  gain arising from the retirement of Indebtedness in connection with such Discounted Voluntary Prepayments results in any additional cash taxes, the payment of such additional cash taxes shall not be deducted in the calculation of Excess Cash Flow and (ii) for the avoidance of doubt, income related to the retirement of Indebtedness shall not be included in the calculation of Excess Cash Flow; plus

(b)  cash payments received during such period to enter into or settle Swap Agreements to the extent not already recognized in net cash provided by operating activities; plus

(c)  to the extent deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries for such period, the Specified Charges for such period; minus

 (d)  the amount of Capital Expenditures for such period (except to the extent attributable to the incurrence of Capital Lease Obligations or otherwise financed by incurring Long Term Indebtedness and except to the extent made with Net Proceeds in respect of Prepayment Events); minus

(e)  the aggregate principal amount of Long Term Indebtedness repaid or prepaid (for the avoidance of doubt, including any Advance Amortization Payment) by the Borrower and its consolidated Subsidiaries during such period to the extent permitted by Section 6.08(b), excluding (i) any prepayment of Loans and (ii) repayments or prepayments of Long Term Indebtedness financed by incurring other Long Term Indebtedness; minus

(f)  the aggregate amount of cash dividends or other distributions paid by the Borrower to the Parent during such period pursuant to Section 6.08(a)(iv) (other than in reliance on clause (B) thereof); minus

(g)  cash payments made during such period to enter into or settle Swap Agreements to the extent not already included in net cash provided by operating activities.

"Exchange Act" has the meaning assigned to such term in the definition of "Change in Control".

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) any taxes imposed on or measured, in whole or in part, by revenue or net income and franchise taxes imposed in lieu thereof by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located, has a present or former connection (other than in connection with the Loan Documents) or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction described in clause (a) above and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.14(b)), any U.S. withholding tax that (i) is in effect and would apply to amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to any withholding tax pursuant to Section 2.12(a), or (ii) is attributable to such Foreign Lender's failure (other than as a result of any Change in Law) to comply with Section 2.12(e) and (d) any U.S. Federal withholding taxes imposed under FATCA.

"Existing Credit Agreement" has the meaning assigned to such term in the recitals to this Agreement.

"Existing Loans" means the Loans (as defined in the Existing Credit Agreement) outstanding under the Existing Credit Agreement prior to the Closing Date.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower or the Ultimate Parent, as applicable.

"First Amendment" means the First Amendment to this Agreement, dated as of March 9, 2012.

"First Amendment Effective Date" means the date on which the conditions precedent set forth in Section 3 of the First Amendment shall have been satisfied, which for the avoidance of doubt is March 9, 2012.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located or, with respect to any Borrower that is a "Untied States person" within the meaning of Section 7701(a)(30) of the Code, that is not a "United States person"

within the meaning of such Section.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means (i) a Subsidiary organized under the laws of a jurisdiction located outside the United States of America or (ii) a Subsidiary of any Person described in the foregoing clause (i).

"GAAP" means generally accepted accounting principles in the United States of America.

"Governing Board" means (a) the managing member or members or any controlling committee of members of any Person, if such Person is a limited liability company, (b) the board of directors of any Person, if such Person is a corporation or (c) any similar governing body of any Person.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantee and Collateral Agreement" means the Guarantee and Collateral Agreement, dated as of the Original Restatement Date, among each Dex East Loan Party and the Agent.

"Guarantors" means the Ultimate Parent, Dex Digital, RHDC, the Service Company, the Parent, the Subsidiary Loan Parties, each Newco Senior Guarantor and each Newco Subordinated Guarantor.

"Hazardous Materials" means (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances; or (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for

which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Independent Financial Advisor" means an accounting, appraisal or investment banking firm of national standing or any third party appraiser or recognized expert with experience in appraising the terms and conditions of the type of transaction or series of related transactions for which an opinion is required; provided, that such firm or appraiser is not an Affiliate of the Borrower.

"Information" has the meaning assigned to such term in Section 9.12.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement" means the Amended and Restated Intercreditor and Collateral Agency Agreement, substantially in the form of Exhibit D, entered into among the Agent on behalf of the Secured Parties, the Shared Collateral Agent on behalf of the Shared Collateral Secured Parties, the administrative agent and collateral agent under the Dex West Credit Agreement, the administrative agent and collateral agent under the RHDI Credit Agreement and the administrative agent and collateral agent under the SuperMedia Credit Agreement.

"Interest Coverage Ratio" means, with respect to the Borrower and for any period of four consecutive fiscal quarters ending on any date of determination, the ratio of (a) Consolidated EBITDA for such period to (b) Consolidated Cash Interest Expense for such period.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.03.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means purchasing, holding or acquiring (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interest, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or making or permitting to exist any loans or advances (other than commercially reasonable extensions of trade credit) to, guaranteeing any obligations of, or making or permitting to exist any investment in, any other Person, or purchasing or otherwise acquiring (in one transaction or a series of transactions) any assets of any Person constituting a business unit.  The amount, as of any date of determination, of any Investment shall be the original cost of such Investment (including any Indebtedness of a Person existing at the time such Person becomes a Subsidiary in connection with any Investment and any Indebtedness assumed in connection with any acquisition of assets), plus the cost of all additions, as of such date, thereto and minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash or property as a repayment of principal or a return of capital (including pursuant to any sale or disposition of such Investment), as the case may be, but without any other adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.  In determining the amount of any Investment or repayment involving a transfer of any property other than cash, such property shall be valued at its fair market value at the time of such transfer.

"Lenders" has the meaning assigned to such term in the preamble to this Agreement.

"Leverage Ratio" means, on any date, the ratio of (a) Total Indebtedness as of such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters of the Borrower ended on such date.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) the rate per annum determined on the basis of the rate for deposits in dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR 01 Page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period (or in the event that such rate does not appear on Reuters Screen LIBOR 01 Page (or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 10:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein and (b) 3.00%.

"<u>License Agreement</u>" means an agreement, substantially in the form of Exhibit H hereto, pursuant to which each License Subsidiary shall grant a license to use trademarks to the Ultimate Parent and each Subsidiary of the Ultimate Parent.

"<u>License Subsidiary</u>" has the meaning assigned to such term in Section 4.01(e).

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Loan Documents</u>" means this Agreement, the Intercreditor Agreement, the Subordinated Guarantee Agreement, the Security Documents and the Shared Collateral Security Documents.

"<u>Loan Parties</u>" means the Borrower and the Guarantors.

"<u>Loan</u>" has the meaning assigned to such term in Section 2.01(a).

"<u>Long Term Indebtedness</u>" means any Indebtedness that, in accordance with GAAP, constitutes (or, when incurred, constituted) a long-term liability.  For purposes of determining the Long Term Indebtedness of the Borrower and the Subsidiaries, Indebtedness of the Borrower or any Subsidiary owed to the Borrower or a Subsidiary shall be excluded.

"<u>Margin Stock</u>" shall have the meaning assigned to such term in Regulation U of the Board.

"<u>Master IP License Agreement</u>" means an agreement substantially in the form of Exhibit I hereto.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, property, material agreements, liabilities, financial condition or results of operations of the Borrower and the Subsidiaries, taken as a whole, or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights and remedies of the Agent or the Lenders under any of the Loan Documents.

"<u>Material Indebtedness</u>" means Indebtedness (other than the Loans and the Subordinated Guarantee but including, for the avoidance of doubt, Guarantees (other than the Subordinated Guarantee)), or obligations in respect of one or more Swap Agreements, of any one or more of the Ultimate Parent and its Subsidiaries (other than RHDI, Dex West, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, the Parent, the Borrower and its Subsidiaries), in an aggregate principal amount exceeding $25,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Ultimate Parent or any of its Subsidiaries in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Ultimate Parent or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"<u>Material Subsidiary</u>" means any Subsidiary which meets any of the following conditions:  (a) the Borrower's and the other Subsidiaries' investments in and advances to such

Subsidiary exceed 5% of the consolidated total assets of the Borrower and the Subsidiaries as of the end of the most recently completed fiscal quarter, (b) the consolidated assets of such Subsidiary exceed 5% of the consolidated total assets of the Borrower and the Subsidiaries as of the end of the most recently completed fiscal quarter or (c) the consolidated pre-tax income from continuing operations of such Subsidiary for the most recently ended period of four consecutive fiscal quarters exceeds 5% of the consolidated pre-tax income from continuing operations of the Borrower and the Subsidiaries for such period.

"Material Ultimate Parent Subsidiary" means (i) any License Subsidiary and (ii) any Subsidiary of the Ultimate Parent (other than RHDI, Dex West, SuperMedia and their respective Subsidiaries) which meets any of the following conditions:  (a) the Ultimate Parent's and its other Subsidiaries' aggregate investments in and advances to such Subsidiary exceed $10,000,000 as of the end of the most recently completed fiscal quarter, (b) the consolidated assets of such Subsidiary exceed $10,000,000 as of the end of the most recently completed fiscal quarter or (c) the consolidated pre-tax income from continuing operations of such Subsidiary for the most recently ended period of four consecutive fiscal quarters exceeds $5,000,000.

"Maturity Date" means December 31, 2016, or, if such day is not a Business Day, the next preceding Business Day.

"Maximum Rate" has the meaning assigned to such term in Section 9.13.

"Merger Agreement" has the meaning assigned to such term in the recitals to this Agreement.

"Merger Sub" has the meaning assigned to such term in the recitals to this Agreement.

"Mergers" has the meaning assigned to such term in the recitals to this Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means any mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any real property and improvements thereto to secure the Obligations delivered after the Closing Date pursuant to Section 5.12.  Each Mortgage shall be satisfactory in form and substance to the Collateral Agent.

"Mortgage Amendment" has the meaning assigned to such term in Section 4.01(a).

"Mortgage Endorsement" has the meaning assigned to such term in clause (g) of the definition of "Collateral and Guarantee Requirement".

"Mortgaged Property" means each parcel of real property and improvements thereto listed on Schedule 1.01B and each other parcel of real property and improvements thereto owned by a Dex East Loan Party with respect to which a Mortgage is granted pursuant to Section 5.12.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds, including cash received in respect of any debt instrument or equity security received as non-cash proceeds, but only as and when

received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses (including underwriting discounts and commissions and collection expenses) paid or payable by the Loan Parties or any Subsidiary thereof to third parties (including Affiliates, if permitted by Section 6.09) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made by the Loan Parties or any Subsidiary thereof as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, including, for the avoidance of doubt, in the case of an Ultimate Parent Asset Disposition, payments required to be made by the Loan Parties or any Subsidiary thereof pursuant to the Subordinated Guarantee Agreement (it being understood that this clause shall not apply to customary asset sale provisions in offerings of debt securities) and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Loan Parties or any Subsidiary thereof (provided that such amounts withheld or estimated for the payment of taxes shall, to the extent not utilized for the payment of taxes, be deemed to be Net Proceeds received when such nonutilization is determined), and the amount of any reserves established by the Loan Parties or any Subsidiary thereof to fund contingent liabilities reasonably estimated to be payable, in each case that are directly attributable to such event (provided that such reserves and escrowed amounts shall be disclosed to the Administrative Agent promptly upon being taken or made and any reversal of any such reserves will be deemed to be Net Proceeds received at the time and in the amount of such reversal), in each case as determined reasonably and in good faith by the chief financial officer of the Borrower; provided that for the purposes of calculating the Net Proceeds of an Ultimate Parent Asset Disposition, payments made (or reasonably estimated to be payable) under the Tax Sharing Agreements shall be deducted in the same manner as taxes paid (or reasonably estimated to be payable) under clause (b)(iii) above.

"Newco" means any Subsidiary (direct or indirect) of the Ultimate Parent (other than SuperMedia and its Subsidiaries) acquired or formed by the Ultimate Parent after the Closing Date other than a Subsidiary of the Borrower, Dex West, RHDI or SuperMedia.

"Newco Senior Guarantor" means any Newco the acquisition or formation of which is accomplished, directly or indirectly, using cash or other credit support (including debt service) provided by the Borrower, any Subsidiary or any other Newco Senior Guarantor or in which any Investment is made by the Borrower, any Subsidiary or any other Newco Senior Guarantor.

"Newco Subordinated Guarantee" has the meaning assigned to such term in clause (e) of the definition of "Collateral and Guarantee Requirement".

"Newco Subordinated Guarantor" means any Newco other than a Newco Senior Guarantor.

"Newdex" has the meaning assigned to such term in the recitals to this Agreement.

"Obligations" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Optional Repurchase" means, with respect to any outstanding Indebtedness, any optional or voluntary repurchase, redemption or prepayment made in cash of such Indebtedness, the related payment in cash of accrued interest to the date of such repurchase, redemption or prepayment on the principal amount of such Indebtedness repurchased, redeemed or prepaid, the payment in cash of associated premiums (whether voluntary or mandatory) on such principal amount and the cash payment of other fees and expenses incurred in connection with such repurchase, redemption or prepayment.

"Original Restatement Date" has the meaning assigned to such term in the recitals to this Agreement.

"Other Taxes" means any and all present or future recording, stamp, documentary, excise, transfer, sales, property or similar Taxes, charges or levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Parent" means Dex Media, Inc., a Delaware corporation.

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(iii).

"Payment Percentage" has the meaning assigned to such term in Section 2.15(b).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisitions" means any acquisition (by merger, consolidation or otherwise) by the Borrower or a Subsidiary Loan Party of all or substantially all the assets of, or all the Equity Interests in, a Person or division or line of business of a Person, if (a) both before and immediately after giving effect thereto, no Default or Event of Default has occurred and is continuing or would result therefrom, (b) such acquired Person is organized under the laws of the United States of America or any State thereof or the District of Columbia and substantially all the business of such acquired Person or business consists of one or more Permitted Businesses and not less than 80% of the consolidated gross operating revenues of such acquired Person or business for the most recently ended period of twelve months is derived from domestic operations in the United States of America, (c) each Subsidiary resulting from such acquisition (and which survives such acquisition) other than any Foreign Subsidiary, shall be a Subsidiary Loan Party and at least 80% of the Equity Interests of each such Subsidiary shall be owned directly by the Borrower and/or Subsidiary Loan Parties and shall have been (or within ten Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) pledged pursuant to the Guarantee and Collateral Agreement (subject to the limitations of the pledge of Equity Interests of Foreign Subsidiaries set forth in the definition of "Collateral and Guarantee Requirement"), (d) the Collateral and Guarantee Requirement shall have been (or within ten Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) satisfied with respect to each such Subsidiary, (e) the Borrower and the Subsidiaries are in Pro Forma Compliance after giving effect to such acquisition and (f) the Borrower has delivered to the Agent an officer's certificate to the effect set forth in clauses (a), (b), (c), (d) and (e) above, together with all relevant financial information for the Person or assets acquired and reasonably detailed calculations demonstrating satisfaction of the requirement set forth in clause (e) above.

"Permitted Business" means the telephone and internet directory services businesses and businesses reasonably related, incidental or ancillary thereto.

"Permitted Encumbrances" means:

(a) Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.05;

(b)  carriers', warehousemen's, mechanics', materialmen's, landlord's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.05;

(c)  pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)  deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)  judgment Liens in respect of judgments or attachments that do not constitute a Default or an Event of Default under clause (k) of Article VII; provided that any such Lien is released within 30 days following the creation thereof;

(f)  easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that are not substantial in amount and do not, or could not reasonably be expected to, materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary or, for purposes of (i) Section 6.16, the Parent, (ii) Section 6.17, the Ultimate Parent or (iii) Section 6.18, the Service Company;

(g)  Liens arising solely by virtue of any statutory or common law provisions relating to bankers' Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depositary institution;

(h)  any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary of the Borrower or, for purposes of (i) Section 6.16, the Parent, (ii) Section 6.17, the Ultimate Parent or (iii) Section 6.18, the Service Company, in the ordinary course of its business and covering only the assets so leased;

(i)  the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, or could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(j)  any provision for the retention of title to any property by the vendor or transferor of such property, which property is acquired by the Borrower or a Subsidiary of the Borrower or, for purposes of (i) Section 6.16, the Parent, (ii) Section 6.17, the Ultimate Parent or (iii) Section 6.18, the Service Company, in a transaction entered into in the ordinary course of business of the Borrower or such Subsidiary of the Borrower, or, for purposes of (A) Section 6.16, the Parent, (B) Section 6.17, the Ultimate Parent or (C) Section 6.18, the Service Company, and for which kind of transaction it is normal market practice for such retention of title provision to be included;

provided, that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a)  direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the

extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing or allowing for liquidation at the original par value at the option of the holder within one year from the date of acquisition thereof;

(b)  investments in commercial paper (other than commercial paper issued by the Ultimate Parent, the Parent, the Borrower or any of their Affiliates) maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)  investments in certificates of deposit, banker's acceptances, time deposits or overnight bank deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000, and having a debt rating of "A-1" or better from S&P or "P-1" or better from Moody's;

(d)  fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)  money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Permitted Subordinated Indebtedness" means (a) the Subordinated Guarantee and (b) Indebtedness of the Borrower which (i) does not mature, and is not subject to mandatory repurchase, redemption or amortization (other than pursuant to customary asset sale or change in control provisions requiring redemption or repurchase only if and to the extent then permitted by this Agreement), in each case, prior to the date that is six months after the Maturity Date, (ii) is not secured by any assets of the Borrower or any Subsidiary, (iii) is not exchangeable or convertible into Indebtedness of the Borrower or any Subsidiary or any preferred stock or other Equity Interest (other than common equity of the Ultimate Parent, provided that any such exchange or conversion, if effected, would not result in a Change in Control or Default) and (iv) is, together with any Guarantee thereof by any Subsidiary, subordinated to the Obligations pursuant to a written instrument delivered to the Administrative Agent and having subordination terms that are no less favorable to the Lenders than the subordination terms set forth in the Restructuring Notes Indenture and that are otherwise reasonably satisfactory to the Administrative Agent.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

["Petition Date" has the meaning assigned to such term in the recitals to this Agreement.][15]

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

---

[15] To be included if applicable

"Prepayment Event" means any (a) Asset Disposition, (b) Equity Issuance or (c) Debt Issuance.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Pro Forma Compliance" means, with respect to any event, that the Borrower is in pro forma compliance with Section 6.14 recomputed as if the event with respect to which Pro Forma Compliance is being tested had occurred on the first day of the four fiscal quarter period most recently ended on or prior to such date for which financial statements have been delivered pursuant to Section 5.01.

"Qualifying Loans" has the meaning assigned to such term in Section 2.15(c).

"Qwest" means Qwest Communications International Inc., a Delaware corporation.

"Qwest Corp." means Qwest Corporation, a Colorado corporation.

"Qwest Services" means Qwest Services Corporation, a Colorado corporation.

"Range" has the meaning assigned to such term in Section 2.15(b).

"Refinanced Debt" has the meaning assigned to such term in the definition of "Refinancing Indebtedness".

"Refinancing Indebtedness" means Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to extend, renew or refinance existing Indebtedness ("Refinanced Debt"); provided, that (a) such extending, renewing or refinancing Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of, and unpaid interest on, the Refinanced Debt plus the amount of any premiums paid thereon and fees and expenses associated therewith, (b) such Indebtedness has a later maturity and a longer weighted average life than the Refinanced Debt, (c) such Indebtedness bears a market interest rate (as reasonably determined in good faith by the board of directors of the Borrower) as of the time of its issuance or incurrence, (d) if the Refinanced Debt or any Guarantees thereof are subordinated to the Obligations, such Indebtedness and Guarantees thereof are subordinated to the Obligations on terms no less favorable to the holders of the Obligations than the subordination terms of such Refinanced Debt or Guarantees thereof (and no Loan Party that has not guaranteed such Refinanced Debt guarantees such Indebtedness), (e) such Indebtedness contains covenants and events of default and is benefited by Guarantees (if any) which, taken as a whole, are reasonably determined in good faith by the board of directors of the Borrower not to be materially less favorable to the Lenders than the covenants and events of default of or Guarantees (if any) in respect of such Refinanced Debt, (f) if such Refinanced Debt or any Guarantees thereof are secured, such Indebtedness and any Guarantees thereof are either unsecured or secured only by such assets as secured the Refinanced Debt and Guarantees thereof, (g) if such Refinanced Debt and any Guarantees thereof are unsecured, such Indebtedness and Guarantees thereof are also unsecured, (h) such Indebtedness is issued only by the issuer of such Refinanced Indebtedness and (i) the proceeds of such Indebtedness are applied promptly (and in any event within 45 days) after receipt thereof to the repayment of such Refinanced Debt.

"Register" has the meaning assigned to such term in Section 9.04.

"<u>Registration Statement on Form S-4</u>" means the Registration Statement on Form S-4 filed by the Ultimate Parent with the Securities and Exchange Commission on [      ].

"<u>Reinvestment</u>" has the meaning assigned to such term in Section 2.06(b).

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, Controlling Persons and advisors of such Person and of each of such Person's Affiliates.

"<u>Release</u>" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

["<u>Reorganization Plan</u>" means the Debtors' Joint Prepackaged Chapter 11 Plan for the Ultimate Parent and its Subsidiaries, including any exhibits, supplements, appendices and schedules thereto, dated [      ], 2013, as amended, supplemented or otherwise modified from time to time in accordance with the Dex Support Agreement and as confirmed by the Bankruptcy Court pursuant to the Confirmation Order.][16]

"<u>Required Lenders</u>" means, at any time, Lenders having Loans representing more than 50% of the sum of the total outstanding Loans at such time.

"<u>Required Percentage</u>" means (a) in the case of an Ultimate Parent Asset Disposition, an Asset Disposition, a Debt Issuance or an Equity Issuance by the Borrower or any Subsidiary, 100%, provided that, in the case of an Ultimate Parent Asset Disposition, to the extent that no amount is deducted in the calculation of the Net Proceeds of such Ultimate Parent Asset Disposition because no amount is paid to and distributed by the Subordinated Guarantee Agent pursuant to the Subordinated Guarantee Agreement, "Required Percentage" shall mean the percentage that the Dex East Credit Parties (as defined in the Subordinated Guarantee Agreement) would have received pursuant to the Subordinated Guarantee Agreement if the Net Proceeds had been paid to and distributed by the Subordinated Guarantee Agent pursuant to the Subordinated Guarantee Agreement, and (b) in the case of an Equity Issuance by the Ultimate Parent, 50%.

"<u>Restricted Payment</u>" means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, termination or amendment of any Equity Interests in such Person or of any option, warrant or other right to acquire any such Equity Interests in such Person.

"<u>Restructuring Notes</u>" means the 12%/14% Senior Subordinated Notes due 2017 of the Ultimate Parent issued pursuant to the Restructuring Notes Indenture in an aggregate principal of $300,000,000 on the Original Restatement Date.

"<u>Restructuring Notes Indenture</u>" means the Indenture, dated the date hereof, between the Ultimate Parent and The Bank of New York Mellon, as trustee.

"<u>RHDC</u>" means R.H. Donnelley Corporation, a Delaware corporation.

---

[16] To be included if applicable

"RHDI" means R.H. Donnelley Inc., a Delaware corporation.

"RHDI Credit Agreement" means (a) the Fourth Amended and Restated Credit Agreement, dated as of the Closing Date (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Ultimate Parent, RHDI, the several banks and other financial institutions or entities from time to time party thereto and Deutsche Bank Trust Company Americas, as administrative agent, and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the RHDI Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"RHDI Existing Credit Agreement" means the Third Amended and Restated Credit Agreement, dated as of January 29, 2010, among the Ultimate Parent, RHDI, as borrower, the several lenders from time to time party thereto and Deutsche Bank Trust Company Americas, as administrative agent, as amended, supplemented or otherwise modified prior to the effectiveness of the RHDI Credit Agreement.

"RHDI Loan Documents" means the "Loan Documents" as defined in the RHDI Credit Agreement.

"S&P" means Standard & Poor's Financial Services LLC.

"Secured Parties" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Security Documents" means the Guarantee and Collateral Agreement, the Mortgages and each other security agreement or other instrument or document executed and delivered by any Dex East Loan Party pursuant to Section 5.11 or 5.12 or pursuant to the Guarantee and Collateral Agreement to secure any of the Obligations.

"Service Company" means Dex One Service, Inc., a Delaware corporation.

"Shared Assets" means any asset (including intellectual property rights) owned by the Service Company or any License Subsidiary.

"Shared Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Shared Collateral Secured Parties, pursuant to the terms of the Intercreditor Agreement.

"Shared Collateral Loan Parties" means the Ultimate Parent, the Parent, Dex Digital, RHDC, the Service Company, and each Newco that is a party to the Shared Collateral Security Documents.

"Shared Collateral Secured Parties" has the meaning as set forth in the Intercreditor Agreement.

"Shared Collateral Security Documents" means the Shared Guarantee and Collateral Agreement, the Newco Subordinated Guarantees, any mortgage and each other security agreement or

other instruments or documents executed and delivered by any Shared Collateral Loan Party pursuant to Section 5.12 or pursuant to the Shared Guarantee and Collateral Agreement to secure any of the Dex East Obligations.

"Shared Guarantee and Collateral Agreement" means the Amended and Restated Guarantee and Collateral Agreement among each Shared Collateral Loan Party (other than the Newco Subordinated Guarantors) and the Shared Collateral Agent, substantially in the form of Exhibit C.

"Shared Services" means the centralized, shared or pooled services, undertakings and arrangements which are provided by the Service Company or any of its Subsidiaries to or for the benefit of the Ultimate Parent and its Subsidiaries pursuant to the Shared Services Agreement, including, without limitation, the acquisition and ownership of assets by the Service Company or any of its Subsidiaries used in the provision of the foregoing and centralized payroll, benefits and account payable operations.

"Shared Services Agreement" means the Amended and Restated Shared Services Agreement, dated as of the date hereof, among the Ultimate Parent, the Service Company, the Borrower and the other Subsidiaries of the Ultimate Parent party thereto, in substantially the form attached as Exhibit E hereto.

"Shared Services Transactions" means, collectively, (a) the engagement of the Service Company for the provision of Shared Services pursuant to the Shared Services Agreement, (b) sales, transfers and other dispositions of assets to the Service Company or any of its Subsidiaries pursuant to the Shared Services Agreement for use in the provision of Shared Services, (c) the transfer of employees of the Loan Parties to the Service Company or any of its Subsidiaries for the provision of Shared Services pursuant to the Shared Services Agreement and (d) payments, distributions and other settlement of payment obligations by the recipient of Shared Services to, or for ultimate payment to, the provider of such Shared Services pursuant to the Shared Services Agreement in respect of the provision of such Shared Services (including, without limitation, the prefunding in accordance with the Shared Services Agreement of certain such payment obligations in connection with the establishment of the payment and settlement arrangements under the Shared Services Agreement); provided, that all such payments, distributions and settlements shall reflect a fair and reasonable allocation of the costs of such Shared Services in accordance with the terms of the Shared Services Agreement (it being understood and agreed that payments in respect of tax liabilities or tax attributes pursuant to the Tax Sharing Agreements shall not constitute Shared Services Transactions; provided, further, that the foregoing shall not restrict the ability of the Borrower to make Restricted Payments (i) pursuant to Section 6.08(a)(iii) to the Service Company in respect of tax liabilities incurred by the Service Company in connection with the performance of its obligations under the Shared Services Agreement).

"Specified Charges" means (a) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with the Mergers, this Agreement (including, for the avoidance of doubt, costs, fees, and expenses incurred in connection with satisfying the conditions precedent in Sections 4.01(e) and 4.01(f)), and the transactions contemplated by the Dex Support Agreement[, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases][17] and (b) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Administrative Agent and the steering committee Lenders and reimbursed by the Borrower (without, including without limitation, the fees and expenses of the Administrative Agent and the steering committee Lenders) incurred in connection with this Agreement (including, for the avoidance of doubt,

---

[17] To be included if applicable

costs, fees, and expenses incurred in connection with satisfying the conditions precedent in Sections 4.01(e) and 4.01(f)), and the transactions contemplated by the Dex Support Agreement[, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases][18].

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Guarantee" means the Guarantee made by the Borrower pursuant to the Subordinated Guarantee Agreement.

"Subordinated Guarantee Agent" has the meaning assigned to such term in the Subordinated Guarantee Agreement.

"Subordinated Guarantee Agreement" means the Subordinated Guarantee Agreement, dated the date hereof, attached hereto as Exhibit G, among the Borrower, Dex West, RHDI and SuperMedia.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more Subsidiaries of the parent or by the parent and one or more Subsidiaries of the parent. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Loan Party" means any Subsidiary of the Borrower that is not a Foreign Subsidiary.

"SuperMedia" has the meaning assigned to such term in the recitals of this Agreement.

"SuperMedia Credit Agreement" means (a) the Amended and Restated Loan Agreement, dated as of December 31, 2009, as amended and restated as of the date hereof (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among SuperMedia, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or

---

[18] To be included if applicable

governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the SuperMedia Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"SuperMedia Existing Credit Agreement" means the Amended and Restated Loan Agreement, dated as of December 31, 2009, (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among SuperMedia, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent, as amended, supplemented or otherwise modified prior to the effectiveness of the SuperMedia Credit Agreement.

"SuperMedia Loan Documents" means the "Loan Documents" as defined in the SuperMedia Credit Agreement.

"SuperMedia Merger" has the meaning assigned to such term in the recitals of this Agreement.

"SuperMedia Tax Sharing Agreement" means the Tax Sharing Agreement in the form of Exhibit L hereto, dated the date hereof, among SuperMedia, SuperMedia Sales Inc., SuperMedia Services Inc., Newdex, Dex One and the Service Company.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Syndication Agent" means Deutsche Bank Trust Company Americas, in its capacity as syndication agent.

"Tax Payments" means payments for (i) the net amounts payable by the Borrower pursuant to the Tax Sharing Agreements for the current tax period and (ii) to the extent not duplicative with (i), taxes which are not determined by reference to income, but which are imposed on a direct or indirect owner of the Borrower as a result of such owner's ownership of the equity of the Borrower.

"Tax Sharing Agreements" means, collectively, the Dex Tax Sharing Agreement and the SuperMedia Tax Sharing Agreement (each, individually, a "Tax Sharing Agreement").

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Title Company" has the meaning assigned to such term in clause (g) of the definition of "Collateral and Guarantee Requirement".

"Total Indebtedness" means, as of any date, an amount equal to (a) the aggregate principal amount of Indebtedness of the Borrower and the Subsidiaries outstanding as of such date, other

than the Subordinated Guarantee, determined on a consolidated basis in accordance with GAAP minus, solely for purposes of Section 6.14, (b) the lesser of (i) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents or otherwise subject to a Permitted Encumbrance shall be deemed to be unencumbered for purposes of this definition) maintained by the Borrower and the Subsidiaries as of such date and (ii) $25,000,000; provided, that the amount of such Indebtedness shall be (A) without regard to the effects of purchase method of accounting requiring that the amount of such Indebtedness be valued at its fair market value instead of its outstanding principal amount and (B) determined exclusive of (x) any reimbursement obligations and intercompany non-cash obligations constituting intercompany Indebtedness or Attributable Debt owing to the Service Company incurred pursuant to the Shared Services Transactions and (y) any letters of credit to the extent cash collateralized in reliance on Section 6.02(a)(vi).

"Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, (b) [the effectiveness and consummation of the Reorganization Plan pursuant to the Confirmation Order  (including, without limitation, the consummation of the Mergers) and][19] and (c) the payment of fees and expenses in connection with [clause (b) hereof and][20] the Amendments and the Loan Documents.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"Ultimate Parent" means (i) prior to the Mergers, Dex One, and (ii) after the Mergers, Newdex.

"Ultimate Parent Annual Cash Interest Amount" means, for any fiscal year (or full fiscal year equivalent), an amount equal to 27% of $36,000,000.

"Ultimate Parent Asset Disposition" means any sale, transfer or other disposition (including pursuant to a public offering or spin-off transaction) by the Ultimate Parent or any Subsidiary thereof of all or a portion of the Equity Interests of the Borrower, Dex West, RHDI, SuperMedia, Dex Digital, RHDC or any Newco (or substantially all of the assets constituting a business unit, division or line of business thereof).

"Ultimate Parent PIK Election" means the election by the Ultimate Parent to make paid-in-kind interest payments on the Restructuring Notes as permitted by the Restructuring Notes Indenture.

"U.S. Person" means "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.12(e)(ii)(B)(3).

"West Territories" means Arizona, Idaho, Montana, Oregon, Utah, Washington and Wyoming.

---

[19] To be included if applicable

[20] To be included if applicable

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

Section 1.02    Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Eurodollar Loan").  Borrowings also may be classified and referred to by Type (e.g., a "Eurodollar Borrowing").

Section 1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Any reference made in this Agreement or any other Loan Document to any consolidated financial statement or statements of the Ultimate Parent, the Parent, the Borrower and the Subsidiaries means such financial statement or statements prepared on a combined basis for the Ultimate Parent, the Parent, the Borrower and the Subsidiaries pursuant to GAAP, not utilizing the equity method.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Parent, the Borrower or any of their respective Subsidiaries at "fair value", as defined therein.

ARTICLE II

THE CREDITS

Section 2.01    Loans.  (a)  Subject to the terms and conditions set forth herein, each Existing Loan shall continue to be outstanding and, on and as of the Closing Date, constitute term loans hereunder (the "Loans").

(b)  Amounts repaid in respect of Loans may not be reborrowed.

Section 2.02    Borrowings.  (a)  Subject to Section 2.09, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.

(b)  At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $5,000,000.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 15 Eurodollar Borrowings outstanding.

(c)  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03    Interest Elections.  (a)  The Borrower may elect to convert each Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)  To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone (i) in the case of an election to continue or convert to a Eurodollar Borrowing, by not later than 2:00 p.m., New York City time, three Business Days before the date of the proposed continuation or conversion or (ii) in the case of an election to convert to an ABR Borrowing, by not later than 2:00 p.m., New York City time, one Business Day before the date of the proposed conversion.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(c)  Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)      the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred after the Closing Date and is continuing then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.04    Repayment of Loans; Evidence of Debt.  (a)  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.05.

(b)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)  The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)  The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)  Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form reasonably satisfactory to the Administrative Agent.  Such promissory note shall state that it is subject to the provisions of this Agreement.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.05    Amortization of Loans.  (a)  Subject to adjustment pursuant to paragraph (c) of this Section 2.05 and except for Advance Amortization Payments, the Borrower shall repay the Borrowings on each date set forth below in the amount set forth opposite such date; provided, that, to the extent the Borrower makes a Discounted Voluntary Prepayment, the repayments due to any Lender participating in such Discounted Voluntary Prepayment shall be reduced ratably by the principal amount of Loans so prepaid (it being understood and agreed that such Discounted Voluntary Prepayment shall not in any manner affect the scheduled repayments due to the Lenders not participating in such Discounted Voluntary Prepayment):

| Date | Principal Amount to be Repaid |
|------|-------------------------------|
| March 31, 2013 | $16,250,000 |
| June 30, 2013[21] | $16,250,000 |
| September 30, 2013 | $16,250,000 |
| December 31, 2013 | $16,250,000 |
| March 31, 2014 | $13,750,000 |
| June 30, 2014 | $13,750,000 |
| September 30, 2014 | $13,750,000 |
| December 31, 2014 | $13,750,000 |
| March 31, 2015 | $11,250,000 |
| June 30, 2015 | $11,250,000 |
| September 30, 2015 | $11,250,000 |
| December 31, 2015 | $11,250,000 |
| March 31, 2016 | $11,250,000 |
| June 30, 2016 | $11,250,000 |
| September 30, 2016 | $11,250,000 |
| Maturity Date | Remaining Outstanding Amounts |

(b)  To the extent not previously paid all Loans shall be due and payable on the Maturity Date.

(c)  Any mandatory prepayment of a Borrowing or optional prepayment that is not a Discounted Voluntary Prepayment shall be applied to reduce the subsequent scheduled repayments of the Borrowings to be made pursuant to this Section ratably.

(d)  Prior to any repayment of any Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be repaid and shall notify the Administrative Agent by telephone (confirmed by telecopy) of such selection not later than 11:00 a.m., New York City time, three Business Days before the scheduled date of such repayment.  Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

Section 2.06    Prepayment of Loans.  (a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (but subject to Section 2.11), in an aggregate principal amount that (except as otherwise provided in Section 2.15) is an integral multiple of $1,000,000 and not less than $1,000,000 or, if less, the amount outstanding, subject to the requirements of this Section.  The Borrower shall have the right to elect by notice to the Administrative Agent that an optional prepayment that is not a Discounted Voluntary Prepayment and that is not subject to the notice contemplated in Section 2.06(d)(iii) is to be applied to a specific scheduled repayment to be made pursuant to Section 2.05 (any such payment, an "Advance Amortization Payment"); provided that (i) each such Advance Amortization Payment shall (x) be made in an amount equal to such scheduled repayment and (y) be applied to the next such scheduled repayment

---

[21] The scheduled repayments immediately following the Closing Date will be reduced (in direct order) by an amount equal to the difference between the scheduled repayment due on March 31, 2013 (so long as such payment has been made) under the Existing Credit Agreement and the scheduled repayment due on March 31, 2013 described above.

that has not been prepaid by an Advance Amortization Payment and (ii) for the avoidance of doubt, no Advance Amortization Payment shall be deemed to constitute a prepayment for the purposes of Section 2.06(d).

(b)  In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate amount equal to the Required Percentage of such Net Proceeds or, in the case of an Equity Issuance by the Ultimate Parent, the Required Percentage of the Allocable Net Proceeds of such Prepayment Event; provided that, solely in the case of any Asset Disposition, if the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer of the Borrower to the effect that the Borrower or a Subsidiary intends to apply the Net Proceeds from such Asset Disposition (or a portion thereof specified in such certificate), within 365 days after receipt of such Net Proceeds, to acquire real property, equipment or other assets to be used in the business of the Borrower or such Subsidiaries or to fund a Permitted Acquisition in accordance with the terms of Section 6.04, in each case as specified in such certificate (any such event, a "Reinvestment"), and certifying that no Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds in respect of such Asset Disposition (or the portion of such Net Proceeds specified in such certificate, if applicable) except to the extent of any such Net Proceeds therefrom (i) that the Borrower or the applicable Subsidiary shall have determined not to, or shall have otherwise ceased to, or is not able to, by operation of contract or law or otherwise, apply toward such Reinvestment or (ii) that have not been so applied, or contractually committed to be so applied, by the end of such 365-day period, in each case at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been, or have been determined not to be, so applied (it being understood that if any portion of such proceeds are not so used within such 365-day period but within such 365-day period are contractually committed to be used, then upon the earlier to occur of (A) the termination of such contract and (B) the expiration of a 180-day period following such 365-day period, such remaining portion shall constitute Net Proceeds as of the date of such termination or expiry without giving effect to this proviso); provided, further, that the Net Proceeds applied toward Reinvestments or contractually committed to be so applied pursuant to the foregoing proviso shall not exceed $10,000,000 in the aggregate during any fiscal year.

(c)  In the event and on each occasion that any Net Proceeds are received by or on behalf of the Ultimate Parent or any of its Subsidiaries in respect of any Ultimate Parent Asset Disposition, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate amount equal to the Required Percentage of the Net Proceeds of such Ultimate Parent Asset Disposition.

(d)  Following the end of each fiscal quarter of the Borrower, commencing with the first fiscal quarter ending after the Closing Date, the Borrower will prepay Borrowings in an aggregate amount equal to (i) (A) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the applicable ECF Sweep Percentage in effect at such time, minus (B) all prepayments made during the applicable ECF Period pursuant to this Section 2.06(d)(i) as of the end of such fiscal quarter (including any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e)), less (ii) any voluntary prepayments of Loans made pursuant to Section 2.06(a) during such fiscal quarter (other than  any Advance Amortization Payments and any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e) and except as provided in Section 2.15(f)), provided that any prepayment applied pursuant to clause (iii) of this Section 2.06(d) to reduce a prepayment made pursuant to this Section 2.06(d) shall not be applied in the subsequent quarter pursuant to this clause (ii) to reduce a prepayment made pursuant to this Section 2.06(d), less (iii) any voluntary prepayments of the Loans (other than an Advance Amortization Payment, any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e), and except as provided in Section 2.15(f)) made since the end

of such fiscal quarter to the extent the Borrower has, on or prior to the date any mandatory prepayment is due under this paragraph (d) with respect to such fiscal quarter, specified in an Election Notice delivered to the Administrative Agent that such voluntary prepayments shall be applied to reduce the amount of such mandatory prepayment.  Each prepayment pursuant to this paragraph shall be made on or before the date on which financial statements are delivered pursuant to Section 5.01 with respect to the fiscal quarter at the end of which Excess Cash Flow is being calculated (and in any event within (x) 55 days after the end of such fiscal quarter or (y) if such fiscal quarter is the last fiscal quarter in a fiscal year of the Borrower, 100 days after the end of such fiscal quarter), provided that if the Closing Date occurs after the date on which such prepayment would otherwise have been due hereunder for the period ended March 31, 2013, then the mandatory quarterly prepayment pursuant to this paragraph for such period shall be due and payable on the Closing Date.

(e)  Subject to the immediately following sentence, the Borrower shall on one or more occasions use the Borrower's Discounted Prepayment Portion of Excess Cash Flow, as determined following the end of a fiscal quarter, to effect Discounted Voluntary Prepayments within 180 days after the date on which financial statements are delivered pursuant to Section 5.01 with respect to such quarter, with such Discounted Voluntary Prepayments to be designated as having been made to satisfy the Borrower's obligations under this Section 2.06(e) pursuant to an Election Notice delivered to the Administrative Agent. If the Borrower does not make such Discounted Voluntary Prepayments within such 180-day period equal to the Borrower's Discounted Prepayment Portion of Excess Cash Flow for the applicable fiscal quarter (as designated in the applicable Election Notice), the Borrower shall (i) make an optional prepayment pursuant to Section 2.06(a) at the end of the fiscal quarter during which such 180-day period (as designated in an Election Notice to such effect) expires, with such prepayment to be applied to scheduled prepayments under Section 2.05, as directed by the Borrower, or (ii) make a prepayment as described in Section 2.06(d)(iii) (and as designated in an Election Notice to such effect).  The Borrower may retain the Borrower's Discretionary Portion of Excess Cash Flow and may utilize such Borrower's Discretionary Portion of Excess Cash Flow for purposes otherwise permitted hereunder, including, but not limited to, at the Borrower's option and in the Borrower's sole discretion, (i) to effect Discounted Voluntary Prepayments or (ii) for optional prepayments pursuant to Section 2.06(a).

(f)  Prior to any optional or, subject to Sections 2.06(b), (c) and (d), mandatory prepayment of Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (g) of this Section.

(g)  The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 2:00 p.m., New York City time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment or to prepay such Borrowing in full.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest and other amounts to the extent required by Sections 2.08 and 2.11.

Section 2.07     Fees.  (a)  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(b)  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent.  Fees paid shall not be refundable under any circumstances.

Section 2.08    Interest.  (a)  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)  Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(d)  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.09    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)  the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)  the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any  Borrowing as, a Eurodollar Borrowing shall be ineffective; provided, however, that, in the case of a notice received pursuant to clause (b) above, if the Administrative Agent is able prior to the commencement of such Interest Period to ascertain, after using reasonable efforts to poll the Lenders giving such notice, that a rate other than the Alternate Base Rate would adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, the Administrative Agent shall notify the Borrower of such alternate rate and the Borrower may agree by

written notice to the Agent prior to the commencement of such Interest Period to increase the Applicable Rate for the Loans included in such Borrowing for such Interest Period to result in an interest rate equal to such alternate rate, in which case such increased Applicable Rate shall apply to all the Eurodollar Loans included in the relevant Borrowing.

Section 2.10    Increased Costs; Illegality.  (a) If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)    subject the Administrative Agent or any Lender to any Taxes (other than Indemnified Taxes, Excluded Taxes and Other Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time after submission by such Lender to the Borrower of a written request therefor, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth in reasonable detail the matters giving rise to a claim under this Section 2.10 and the calculation of such claim by such Lender or its holding company, as the case may be, shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)  Notwithstanding any other provision herein, if any Change in Law shall make it unlawful for any Lender to maintain Eurodollar Loans as contemplated by this Agreement, (i) the commitment of such Lender hereunder to continue Eurodollar Loans as such and convert ABR Loans to Eurodollar Loans shall forthwith be canceled and (ii) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by applicable law.  If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.11.

(f)  For the avoidance of doubt, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued or implemented.

Section 2.11    <u>Break Funding Payments</u>.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.06(g) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.14 or 9.02(c), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall consist of an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (without giving effect to clause (b) of the definition of LIBO Rate), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.12    <u>Taxes</u>.  (a)  Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of, and without deduction for, any Taxes; <u>provided</u> that if the applicable withholding agent shall be required to deduct any Taxes from such payments, then (i) if such Taxes are Indemnified Taxes or Other Taxes, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or, at the option of the Administrative Agent timely reimburse it for the payment thereof.

(c)    The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such Administrative Agent or Lender (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto.  A certificate as to the amount of such payment or liability and a written statement setting forth in reasonable detail the basis and calculation of such amounts prepared in good faith and delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.12, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    (i) Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate, provided that (i) such Foreign Lender has received written notice from the Borrower advising it of the availability of such exemption or reduction and supplying all applicable documentation and (ii) such Foreign Lender is legally entitled to complete, execute, and deliver such documentation.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of,

U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

     (2)      executed originals of IRS Form W-8ECI;

     (3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit M-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed originals of IRS Form W-8BEN; or

     (4)      to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-2 or Exhibit M-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-4 on behalf of each such direct and indirect partner;

     (C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

     (D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for

purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)   If the Administrative Agent or a Lender determines, in its sole judgment exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower within a reasonable period of time (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g)   Each Lender shall indemnify the Administrative Agent within ten days after written demand therefor, for the full amount of (i) any Taxes attributable to such Lender and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h)   The agreements in this Section 2.12 shall survive the termination of this agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.13    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.  (a)  The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.10, 2.11 or 2.12, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices at 270 Park Avenue, New York, New York, except that payments pursuant to Sections 2.10, 2.11, 2.12 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day (except as otherwise provided in the definition of "Interest Period"), the date for payment shall be extended to the next

succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the relative aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.13(d) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.14    Mitigation Obligations; Replacement of Lenders.  (a)  If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its

Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or 2.12, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, provided that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.10 or 2.12.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)  If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12, or if any Lender is not able to maintain Eurodollar Loans for reasons described in Section 2.10(e), or if any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04, provided that the Borrower or assignee must pay any applicable processing or recordation fee), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, further, that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld and (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and such Lender shall be released from all obligations hereunder.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.15    Voluntary Prepayments Below Par.  (a)  The Borrower may elect to notify the Administrative Agent and the Lenders that it wishes to make below par voluntary prepayments of the Loans (each such payment a "Discounted Voluntary Prepayment") pursuant to the procedures set forth in this Section 2.15; provided that (i) the Borrower shall specify in an Election Notice to the Administrative Agent whether such Discounted Voluntary Prepayment will be a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow or the Borrower's Discretionary Portion of Excess Cash Flow and Discounted Voluntary Prepayments shall only be permitted to be made in amounts not exceeding the Borrower's Discounted Prepayment Portion of Excess Cash Flow or the Borrower's Discretionary Portion of Excess Cash Flow (as applicable) at the time such Discounted Voluntary Prepayment is made and (ii) no Discounted Voluntary Prepayment shall be made after December 31, 2016.  At the time of any Discounted Voluntary Prepayment, the Borrower shall certify, with reasonable supporting detail (as reasonably determined by the Administrative Agent), (i) compliance with the requirements of this Section 2.15, which certification shall include a schedule setting forth the computation (of any utilization by the Borrower) of Borrower's Discounted Prepayment Portion of Excess Cash Flow or Borrower's Discretionary Portion of Excess Cash Flow (as applicable), (ii) that no Event of Default pursuant to Section 6.14 could reasonably be expected to occur during the immediately succeeding four calendar quarters if such Discounted Voluntary Prepayment is not made, (iii) that such Discounted Voluntary Prepayment shall have been approved by the Borrower's Board of Directors and (iv) that immediately prior to and after giving effect to any Discounted Voluntary Prepayment, (x) no Default or Event of Default shall have occurred and be continuing, (y) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents, the Dex West Loan Documents or the RHDI Loan Documents shall be deemed to be unencumbered for purposes of this clause (y)) maintained by the Borrower, Dex West, RHDI and their Subsidiaries on a consolidated basis shall be at least $40,000,000

and (z) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents shall be deemed to be unencumbered for purposes of this clause (z)) maintained by the Borrower and its Subsidiaries shall be at least $10,000,000.

(b)  In connection with any Discounted Voluntary Prepayment, the Borrower shall notify the Lenders (the "Discounted Voluntary Prepayment Notice") that the Borrower desires to prepay Loans with cash proceeds in an aggregate amount (each, a "Discounted Voluntary Prepayment Amount") specified by the Borrower (which amount shall be not less than $5,000,000) at a price within a range (the "Range") to be specified by the Borrower equal to a percentage of par (not to exceed 100%) (the "Payment Percentage") of the principal amount of the Loans to be prepaid; provided that only one Discounted Voluntary Prepayment Notice may be in effect at any time.  The Discounted Voluntary Prepayment Notice shall further specify the date by which Lenders are required to indicate their election to participate in such proposed Discounted Voluntary Prepayment, which shall be at least five Business Days following the date of the Discounted Voluntary Prepayment Notice (the "Acceptance Date").  No proposed Discounted Voluntary Prepayment shall be made if the amount of cash expended to make Discounted Voluntary Prepayments would exceed an amount equal to the Borrower's Portion of Excess Cash Flow at such time.

(c)  On or prior to the Acceptance Date, each Lender may specify by written notice to the Administrative Agent a minimum Payment Percentage (the "Acceptable Payment Percentage") within the Range for a maximum principal amount (subject to rounding requirements specified by the Administrative Agent) of Loans at which such Lender is willing to permit such Discounted Voluntary Prepayment.  Based on the Acceptable Payment Percentages and principal amounts of Loans specified by Lenders, the applicable Payment Percentage (the "Applicable Payment Percentage") for the Discounted Voluntary Prepayment shall be the lowest Acceptable Payment Percentage at which the Borrower can complete the Discounted Voluntary Prepayment for the applicable Discounted Voluntary Prepayment Amount that is within the applicable Range; provided that if the offers received from Lenders are insufficient to allow the Borrower to complete the Discounted Voluntary Prepayment for the applicable Discounted Voluntary Prepayment Amount, then the Applicable Payment Percentage shall instead be the highest Acceptable Payment Percentage that is within the applicable Range.  The Borrower shall prepay Loans (or the respective portions thereof) offered by Lenders at the Acceptable Payment Percentages specified by each such Lender that are equal to or less than the Applicable Payment Percentage ("Qualifying Loans") by remitting an amount to the Administrative Agent (for distribution to each respective Lender to be prepaid) equal to the product of the face amount, or par, of the Loan being prepaid multiplied by the Applicable Payment Percentage; provided that if the aggregate cash proceeds required to prepay Qualifying Loans (disregarding any interest payable under Section 2.15(d)) would exceed the applicable Discounted Voluntary Prepayment Amount for such Discounted Voluntary Prepayment, the Borrower shall prepay such Qualifying Loans at the Applicable Payment Percentage ratably based on the respective principal amounts of such Qualifying Loans (subject to rounding requirements specified by the Administrative Agent).

(d)  All Loans prepaid by the Borrower pursuant to this Section 2.15 shall be accompanied by payment of accrued and unpaid interest on the par principal amount so prepaid to, but not including, the date of prepayment.

(e)  Each Discounted Voluntary Prepayment shall be consummated pursuant to procedures (including as to rounding and minimum amounts, Type and Interest Periods of accepted Loans, irrevocability of Discounted Voluntary Prepayment Notice and other notices by the Borrower and Lenders and determination of Applicable Payment Percentage) reasonably established by the Administrative Agent in consultation with the Borrower and not inconsistent with the terms hereof.

(f)  Each Discounted Voluntary Prepayment shall constitute an optional prepayment of Loans for all purposes under this Agreement, but excluding for purposes of Section 2.06(d).

(g)  Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 2.06 and 2.13), the Lenders hereby consent to the transactions described in this Section 2.15 and further acknowledge that in connection with any Discounted Voluntary Prepayment, principal and interest payments may be made on a non-pro rata basis, as determined by the Administrative Agent, to the applicable Lenders.

(h)  This Section 2.15 shall not require the Borrower to undertake or any Lender to participate in any Discounted Voluntary Prepayment.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Borrower and, solely for purposes of Sections 3.01, 3.02, 3.03, 3.08, 3.09, 3.12, 3.13 and 3.19, the Ultimate Parent (with respect to itself and the Service Company) and the Parent represents and warrants to the Lenders that:

Section 3.01    Organization; Powers.  Each of the Ultimate Parent, the Parent, the Service Company, the Borrower and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02    Authorization; Enforceability.  The Transactions entered into and to be entered into by each of the Ultimate Parent, the Parent, the Service Company and the Dex East Loan Parties are within such Person's corporate or limited liability company powers and have been duly authorized by all necessary corporate or limited liability company and, if required, stockholder or member action.  This Agreement has been duly executed and delivered by each of the Ultimate Parent, the Parent and the Dex East Loan Parties and constitutes, and each other Loan Document to which any of the Ultimate Parent, the Parent, the Service Company and the Dex East Loan Parties is to be a party, when executed and delivered by such Person, will constitute, a legal, valid and binding obligation of such Person, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    Governmental Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate any applicable law or regulation or the charter, limited liability company agreement, by-laws or other organizational documents of the Ultimate Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Ultimate Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries or any of their assets, or give rise to a right thereunder to require any payment to be made by the Ultimate Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Ultimate

Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries, except Liens permitted under Section 6.02.

Section 3.04    Financial Condition.  The unaudited consolidated balance sheet of the Borrower as of [_____], 201[_] and the related unaudited consolidated statements of operations and of cash flows for the [____]-month period ended on such date present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower as of such date and for such period in accordance with GAAP, subject to normal year-end audit adjustments.

Section 3.05    Properties.  (a)  The Borrower and each of its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business (including its Mortgaged Properties), except for minor defects in title that do not, or could not reasonably be expected to, interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

(b)  The Borrower and each of its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower and its Subsidiaries does not infringe upon the rights of any other Person, except, in each case, for any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect [(other than the Disclosed Matters)][22].

(c)  Schedule 3.05 sets forth the address of each real property that is owned or leased by the Borrower or any of its Subsidiaries as of the Closing Date.

Section 3.06    Litigation and Environmental Matters.  (a)  There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower, any of its Subsidiaries or any of their respective executive officers or directors (i) which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect [(other than the Disclosed Matters)][23] or (ii) that involve any of the Loan Documents or the Transactions.

(b)  Except for [either the Disclosed Matters or][24] any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any facts or circumstances which are reasonably likely to form the basis for any Environmental Liability.

Section 3.07    Compliance with Laws and Agreements.  The Borrower and each of its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

---

[22] To be included if applicable

[23] To be included if applicable

[24] To be included if applicable

Section 3.08    Investment Company Status.  None of the Ultimate Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries is required to be registered as an "investment company" as defined in the Investment Company Act of 1940.

Section 3.09    Taxes.  Each of the Ultimate Parent, the Parent, the Service Company, the Borrower and its Subsidiaries has timely filed or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except any Taxes that are being contested in good faith by appropriate proceedings and for which the Ultimate Parent, the Parent, the Service Company, the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.  Except as set forth in Schedule 3.09, no material tax Liens have been filed.

Section 3.10    ERISA.  During the five year period prior to the date on which this representation is made or deemed to be made with respect to any Plan or Multiemployer Plan, no ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability has occurred during such five year period or for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount that would reasonably be expected to have a Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that would reasonably be expected to have a Material Adverse Effect.

Section 3.11    Margin Regulations.  Neither the Borrower nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

Section 3.12    Disclosure.  None of the written reports, financial statements, certificates or other written information (including, without limitation, the Registration Statement on Form S-4 [and the Disclosure Statement (as supplemented in writing through the Closing Date))][25] taken as a whole, furnished by or on behalf of the Ultimate Parent, the Parent, the Service Company or any Dex East Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as of the date thereof and as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made taken as a whole, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable (i) at the time such projected financial information was prepared and (ii) as of the date hereof.  [The Bankruptcy Court entered an order on or about [_____], 2013 approving the adequacy of the Disclosure Statement.][26]

Section 3.13    Subsidiaries.  Schedule 3.13 sets forth the name of, and the ownership interest of the Ultimate Parent, the Parent, the Service Company and the Borrower in, each Subsidiary of

---

[25] To be included if applicable

[26] To be included if applicable

the Ultimate Parent, the Parent, the Service Company and the Borrower and identifies each such Subsidiary that is a Loan Party, in each case as of the Closing Date.  As of the Closing Date, none of the Ultimate Parent, the Parent, the Service Company and the Borrower has any Subsidiaries other than those set forth on Schedule 3.13.

Section 3.14    Insurance.  Schedule 3.14 sets forth a description of all insurance maintained by or on behalf of the Borrower and its Subsidiaries as of the Closing Date.  As of the Closing Date, all premiums due and payable in respect of such insurance have been paid.  The Borrower believes that the insurance maintained by or on behalf of the Borrower and its Subsidiaries is adequate.

Section 3.15    Labor Matters.  As of the Closing Date[, other than the Disclosed Matters][27], there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened.  Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:  (a) the hours worked by and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters; (b) all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary; and (c) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

Section 3.16    Senior Debt.  For so long as the Restructuring Notes or Additional Notes are outstanding, the Obligations shall constitute "Senior Debt" under and as defined in the Restructuring Notes Indenture or, if applicable, under the indenture, note purchase agreement or other applicable agreement or instrument under which any such Additional Notes are issued.

Section 3.17    Security Documents.  (a)  The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the Pledged Stock and Pledged Notes (as defined in the Guarantee and Collateral Agreement) described in the Guarantee and Collateral Agreement, when stock certificates representing such Pledged Stock and Pledged Notes are delivered to the Collateral Agent, and in the case of the other Collateral described in the Guarantee and Collateral Agreement (other than the Intellectual Property, as defined in the Guarantee and Collateral Agreement), when financing statements and other filings are filed in the offices specified on Schedule 3.17 (as updated by the Borrower from time to time in accordance with Section 5.03), the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Dex East Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, or in the case of Pledged Stock and Pledged Notes, by possession or control, in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Stock and Pledged Notes, Liens permitted by Section 6.02(a)).

(b)  When the Guarantee and Collateral Agreement or a summary thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Guarantee and Collateral Agreement and such financing statements shall constitute a fully perfected Lien on, and security interest in, all right, title and

_____

[27] To be included if applicable

interest of the grantors thereunder in the Intellectual Property (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the date hereof).

(c)   The Mortgages, if any, entered into on or prior to the Closing Date (when amended by the mortgage amendment referred to in clause (g)(1) of the Collateral and Guarantee Requirement (the "Mortgage Amendments")), or after the Closing Date pursuant to Section 5.12, are or when entered shall be effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Dex East Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed in the proper real estate filing offices, such Mortgages shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Dex East Loan Parties in such Mortgaged Property and the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to the rights of Person pursuant to Liens expressly permitted by Section 6.02(a).

Section 3.18     Liens.  There are no Liens of any nature whatsoever on any properties of the Borrower or any of its Subsidiaries other than Permitted Encumbrances and Liens permitted by Section 6.02.

Section 3.19     [Bankruptcy Court Orders.  The Confirmation Order has been entered by the Bankruptcy Court, and such order has not been stayed, reversed, modified or vacated on appeal.][28]

ARTICLE IV

CONDITIONS

Section 4.01     Effectiveness of Agreement.  The effectiveness of this Agreement is subject to the satisfaction or waiver of the following conditions precedent (and the delivery of the notice contemplated in the last sentence of this Section 4.01), provided that nothing herein shall limit the consent rights set forth in the Dex Support Agreement:

(a)  Loan Documents.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Ultimate Parent, the Parent, the Borrower, the Administrative Agent and[, to the extent requested by the Administrative Agent,][29] the Lenders, (ii) an executed Acknowledgment and Confirmation substantially in the form of Exhibit B hereto from each Dex East Loan Party, (iii) the Shared Guarantee and Collateral Agreement executed and delivered by each Shared Collateral Loan Party, (iv) the Subordinated Guarantee Agreement, executed and delivered by the Borrower, Dex West, RHDI and SuperMedia and (v) the Intercreditor Agreement, executed and delivered by the Ultimate Parent, the Parent, Dex Media Service, Dex Digital, RHDC, the Borrower, Dex West, RHDI, the Agent, the Shared Collateral Agent, the administrative agent and collateral agent under the Dex West Credit Agreement, the administrative agent under the RHDI Credit Agreement and the administrative agent under the SuperMedia Credit Agreement.

(b)  [Confirmation of the Reorganization Plan.  The Reorganization Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order.  The Confirmation Order shall not

---

[28] To be included if applicable

[29] To be included if applicable.

have been stayed, modified, or vacated on appeal.  All conditions precedent to the effectiveness of the Reorganization Plan shall have been satisfied (or waived) or shall be concurrently with the effective date of the Reorganization Plan satisfied (or waived) in accordance with the terms of the Reorganization Plan.][30]

   (c)  <u>Amendments</u>.  The Administrative Agent shall have received satisfactory evidence of the completion of the Amendments (including, for the avoidance of doubt, evidence that (i) the RHDI Loan Documents and the Dex West Loan Documents have been entered into, and become effective, substantially simultaneously with this Agreement and (ii) the SuperMedia Loan Documents have been entered into and, become effective, prior to the consummation of the Mergers)[; <u>provided</u>, that it is acknowledged and agreed that the filing by the Ultimate Parent, on behalf of itself and its Subsidiaries, with the Bankruptcy Court of written notice of the occurrence of the "Effective Date" under (and as defined in) the Reorganization Plan shall satisfy this condition.][31]

   (d)  <u>Mergers</u>.  The Mergers shall have been consummated by the filing of the Certificates of Merger (as defined in the Merger Agreement) with the Secretary of State of the State of Delaware.

   (e)  <u>Trademarks</u>.  The trademarks owned by the Borrower, Dex West, RHDI, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) ("<u>Collateral Trademarks</u>") shall have been transferred (together with the associated goodwill) to and owned by a bankruptcy remote Subsidiary of each such Person, respectively, and in each case, (i) the organizational documents of such bankruptcy remote Subsidiaries (each, a "<u>License Subsidiary</u>") shall provide for, and require that there at all times be, two special independent directors or members whose consent would be required for such License Subsidiary to file a petition for bankruptcy or for the transfer of any equity interests therein (other than the sale of such equity interests in a transaction permitted under the Loan Documents) and shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent and the Administrative Agent shall have received and shall be reasonably satisfied with (A) a certificate of an authorized officer of the Ultimate Parent including the certificate of incorporation or formation, as applicable, for the License Subsidiaries, certified by the relevant authority of the jurisdiction of organization of such License Subsidiary, (B) a complete copy of resolutions adopted by the Governing Board of such License Subsidiary authorizing the execution, delivery and performance in accordance with their respective terms of the agreements described in clause (ii) below and (C) a long form good standing certificate of such License Subsidiary, as applicable, from its jurisdiction of organization, (ii) the License Subsidiaries shall have entered into License Agreements and (iii) except as permitted by a License Agreement, anything incidental to the ownership of the Collateral Trademarks (including filing or registering any application for or registration of all current or future Collateral Trademarks and the prosecution, maintenance, renewal or enforcement of same) shall be done solely by the Licensee Subsidiaries (or their respective selected designees).

   (f)  <u>Other Intellectual Property Arrangements</u>.  (i) Each of the Borrower, Dex West, RHDI, SuperMedia, the Service Company and each other Shared Collateral Loan Party shall have entered into Master IP License Agreements substantially in the form of Exhibit I hereto and (ii) each of the Borrower, Dex West, RHDI, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) shall have delivered to each other above-referenced party and its Subsidiaries (other than License Subsidiaries) as of the Closing Date current or contingent (*e.g.*, through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of, or access to, all Escrow Materials in existence as of the Closing Date, to the extent the applicable owner or licensee of any Escrow Materials is not permitted by the Agent to make delivery of same to any of such other parties promptly after

---

[30] To be included if applicable

[31] To be included if applicable

the Closing Date.  Notwithstanding anything to the contrary contained in this Section 4.01(f), neither Borrower, Dex West, RHDI, SuperMedia, the Service Company nor any other Shared Collateral Loan Party shall be deemed to have failed to satisfy this Section 4.01(f) for any inadvertent failure to deliver or place into escrow any Escrow Materials because such party was unaware of the existence of any such item, provided that (x) delivery or escrow of any such item is made promptly after identification or discovery of such item (and that such item has not been delivered or escrowed) by such party and (y) none of such other parties are materially damaged or prejudiced, and do not lose any material rights, due to such failure.

(g)  Existing Credit Agreement.  The Borrower shall have timely paid current scheduled amortization and interest (at the non-default rate) on the Loans (as defined in the Existing Credit Agreement) in accordance with the Existing Credit Agreement [and, to the extent applicable, the Cash Collateral Order,][32] and shall have paid all other fees and expenses then due and payable with respect to the Existing Credit Agreement.

(h)  Fees.  The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which reasonably detailed invoices have been presented, on or before the Closing Date.

(i)  No Actions.  There shall be no action, suit, investigation or proceeding pending or, to the knowledge of the Borrower, threatened in any court or before any arbitrator or Governmental Authority that could reasonably be expected to (x) have a material adverse effect on the business, assets, properties, liabilities (actual and contingent), operations or condition (financial or otherwise) of the Ultimate Parent and the other Loan Parties and their respective Subsidiaries, taken as a whole, (y) adversely affect the ability of the Ultimate Parent or any other Loan Party to perform its obligations under the Loan Documents or (z) adversely affect the rights and remedies of the Agent or the Lenders under the Loan Documents.

(j)  Shared Services Agreement.  The Administrative Agent shall have received the Shared Services Agreement, duly executed and delivered by the Ultimate Parent, the Service Company, the Borrower and each other party thereto, in substantially the form attached as Exhibit E hereto.

(k)  Tax Sharing Agreements.  The Administrative Agent shall have received the Tax Sharing Agreements, duly executed and delivered by the parties thereto.

(l)  Financial Statements.  The Lenders shall have received the unaudited interim consolidated financial statements described in Section 3.04.

(m)  Closing Certificate.  The Administrative Agent shall have received and shall be satisfied with (x) a certificate of an authorized officer of each Loan Party (other than any Newco Subordinated Guarantor), dated the Closing Date, with appropriate insertions and attachments including (i) the certificate of incorporation or formation, as applicable, of such Person, as applicable, certified by the relevant authority of the jurisdiction of organization of such Person, as applicable, (ii) a complete copy of resolutions adopted by the Governing Board of such Person authorizing the execution, delivery and performance in accordance with their respective terms of the Loan Documents to which such Person is a party and any other documents required or contemplated hereunder (in the case of the Ultimate Parent, a copy of the Confirmation Order in lieu of such resolutions; provided that a copy of the resolutions adopted by the new Governing Board of the Ultimate Parent ratifying the execution, delivery and performance in accordance with their respective terms of the Loan Documents to which the Ultimate Parent is a party shall be delivered to the Administrative Agent on the Closing Date) and (iii) a long form good standing certificate of such Person, as applicable, from its jurisdiction of organization and (y) a certificate signed by the president, a vice president or a

_____

[32] To be included if applicable

Financial Officer of the Borrower, the Ultimate Parent and the Parent, confirming that the conditions in Sections 4.01(q) and 4.01(t) have been satisfied, as applicable.

(n)  <u>Legal Opinions</u>.  The Administrative Agent shall have received the following executed opinions, in each case in form and substance satisfactory to the Administrative Agent: (i) the legal opinion of Kirkland & Ellis LLP, counsel to the Ultimate Parent and its Subsidiaries, (ii) the legal opinion of Mark W. Hianik, the general counsel of the Ultimate Parent and its Subsidiaries, and (iii) the legal opinion of Fulbright & Jaworski LLP, counsel to SuperMedia and its Subsidiaries.

(o)  <u>Pledged Stock; Stock Powers; Pledged Notes</u>.  To the extent not previously delivered, (i) the Agent shall have received (x) the certificates or other instruments representing all outstanding Equity Interests of each Subsidiary owned by or on behalf of any Loan Party pledged pursuant to the Guarantee and Collateral Agreement, together with stock powers or other instruments of transfer with respect thereto endorsed in blank and (y) each promissory note pledged and required to be delivered to the Agent pursuant to the Guarantee and Collateral Agreement, together with note powers or other instruments of transfer with respect thereto endorsed in blank, and (ii) the Shared Collateral Agent shall have received, subject to the Intercreditor Agreement, (x) the certificates or other instruments representing all outstanding Equity Interests of each Subsidiary owned by or on behalf of any Shared Collateral Loan Party pledged pursuant to the Shared Guarantee and Collateral Agreement, together with stock powers or other instruments of transfer with respect thereto endorsed in blank and (y) each promissory note pledged and required to be delivered to the Shared Collateral Agent pursuant to the Shared Guarantee and Collateral Agreement, together with note powers or other instruments of transfer with respect thereto endorsed in blank.

(p)  <u>Filings, Registrations and Recordings</u>.  All documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent or the Shared Collateral Agent, as applicable, to be filed, registered or recorded to create the Liens intended to be created by the Collateral Agreements and perfect such Liens to the extent required by, and with the priority required by, the Collateral Agreements, shall have been executed and be in proper form for filing, subject only to exceptions satisfactory to the Agent or the Shared Collateral Agent, as applicable, and the Collateral and Guarantee Requirement shall have otherwise been satisfied.

(q)  <u>Representations and Warranties</u>.  The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (except to the extent already qualified as to materiality in which case such representations and warranties shall be true in all respects) on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects (except to the extent already qualified as to materiality in which case such representations and warranties shall be true in all respects) on and as of such earlier date).

(r)  <u>Mortgages</u>.  The Collateral and Guarantee Requirement shall have been satisfied with respect to the Mortgaged Properties listed on Schedule 1.01B.

(s)  <u>Control Agreements</u>.  To the extent not previously delivered, (i) the Agent shall have received control agreements executed by all parties thereto with respect to each "deposit account" (as defined in the Guarantee and Collateral Agreement) and "securities account" (as defined in the Guarantee and Collateral Agreement) with respect to which a control agreement is required to be delivered by any Loan Party to the Agent pursuant to the Guarantee and Collateral Agreement, in each case in form and substance reasonably satisfactory to the Agent and (ii) the Shared Collateral Agent shall have received control agreements executed by all parties thereto with respect to each "deposit account" (as defined in the Shared Guarantee and Collateral Agreement) and "securities account" (as defined in the Shared Guarantee and Collateral Agreement) with respect to which a control agreement is required to be delivered by any Shared

Collateral Loan Party to the Shared Collateral Agent pursuant to the Shared Guarantee and Collateral Agreement, in each case in form and substance reasonably satisfactory to the Shared Collateral Agent.

(t)  No Default.  After giving effect to Section 9.17, no Default shall have occurred and be continuing as of the Closing Date.

(u)  Other Transaction Documents.  The Administrative Agent shall have received copies of the Dex West Credit Agreement, the RHDI Credit Agreement and the SuperMedia Credit Agreement, in each case certified by an authorized officer of the Ultimate Parent.

(v)  Interest under Existing Credit Agreement.  The accrued and unpaid interest on the Loans (as defined in the Existing Credit Agreement) to the Closing Date (at the applicable non-default rate) shall have been paid in full in cash by the Borrower.[33]

(w)  Flood Hazards.  The Administrative Agent shall have received a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto), if any, and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Administrative Agent.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

ARTICLE V

AFFIRMATIVE COVENANTS

Until the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each of the Borrower and, solely for purposes of (i) Sections 5.01(a), (b) and (l), 5.12(c), 5.13 and 5.15, the Ultimate Parent and (ii) Section 5.12(c), the Parent covenants and agrees with the Lenders that:

Section 5.01    Financial Statements and Other Information.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)  no later than the earlier of (i) 10 days after the date that the Borrower is required to file a report on Form 10-K with the Securities and Exchange Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether or not the Borrower is so subject to such reporting requirements), and (ii) 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2013, (A) (x) the Ultimate Parent's audited consolidated  balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such year and (y) the Ultimate Parent's audited consolidating balance sheet and related consolidating statements of operations, stockholders' equity and cash flows as of the end of and for such year (with each such consolidating financial statement showing the standalone financial information for each of the Borrower and its consolidated Subsidiaries, Dex West and its consolidated Subsidiaries, RHDI and its consolidated Subsidiaries and SuperMedia and its consolidated Subsidiaries and otherwise

_____

[33] Potential for breakage or other costs to be discussed.

being in form substantially similar in all material respects to the consolidating financial statements of the Ultimate Parent most recently delivered to the Administrative Agent prior to the Closing Date or such other form as may be reasonably acceptable to the Administrative Agent), setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by KPMG LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification, exception or explanatory paragraph and without any qualification or exception as to the scope of such audit or other material qualification or exception; provided, that if the Ultimate Parent switches from one independent public accounting firm to another, the audit report of any such new accounting firm may contain a qualification or exception as to the scope of such consolidated or consolidating financial statements that relates to any fiscal year prior to its retention which, for the avoidance of doubt, shall have been the subject of an audit report of the previous accounting firm meeting the criteria set forth above) to the effect that such consolidated and consolidating financial statements present fairly in all material respects the financial condition and results of operations of the Ultimate Parent and its consolidated Subsidiaries on a consolidated or consolidating basis, as the case may be, in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to each Subsidiary of the Ultimate Parent's income tax provision prepared on a consolidated basis and (B) the Borrower's unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to the Borrower, and its Subsidiaries of the Ultimate Parent's income tax provision prepared on a consolidated basis[; provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in (x) Management's Discussion and Analysis or Liquidity and Capital Resources, in the case of the financial statements delivered pursuant to clause (A), and (y) Borrower's Management's Narrative Analysis and Results of Operations, in the case of the financial statements delivered pursuant to clause (B)][34];

(b)    no later than the earlier of (i) 10 days after the date that the Borrower is required to file a report on Form 10-Q with the Securities and Exchange Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether or not the Borrower is so subject to such reporting requirements), and (ii) 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, commencing with the fiscal quarter ending March 31, 2013, (A) (x) the Ultimate Parent's unaudited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year and (y) the Ultimate Parent's unaudited consolidating balance sheet and related consolidating statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year (with each such consolidating financial statement showing the standalone financial information for each of the Borrower and its consolidated Subsidiaries, Dex West and its consolidated Subsidiaries, RHDI and its consolidated Subsidiaries and SuperMedia and its consolidated Subsidiaries and otherwise being in form substantially similar in all material respects to the consolidating financial statements of the Ultimate Parent most recently delivered to the Administrative Agent prior to the Closing Date or such other form as may be reasonably

---

[34] To be included if applicable

acceptable to the Administrative Agent), setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Ultimate Parent as presenting fairly in all material respects the financial condition and results of operations of the Ultimate Parent and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to each Subsidiary of the Ultimate Parent's income tax provision prepared on a consolidated basis, subject to normal year-end audit adjustments and the absence of footnotes and (B) the Borrower's unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to the Borrower and its Subsidiaries of the Ultimate Parent's income tax provision prepared on a consolidated basis, subject to normal year-end audit adjustments and the absence of footnotes[;provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in (x) Management's Discussion and Analysis or Liquidity and Capital Resources, in the case of the financial statements delivered pursuant to clause (A), and (y) Borrower's Management's Narrative Analysis and Results of Operations, in the case of the financial statements delivered pursuant to clause (B)][35];

(c)  concurrently with any delivery of financial statements under clause (a)(B) or (b)(B) above, the corresponding financial statements with respect to Dex West, RHDI and SuperMedia that are required to be delivered by Dex West, RHDI and SuperMedia under the Dex West Credit Agreement, the RHDI Credit Agreement and the SuperMedia Credit Agreement, respectively;

(d)  concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.14 (commencing with the fiscal quarter ending March 31, 2013), (iii) stating whether any change in GAAP or in the application thereof has occurred since the Closing Date that has had an effect on the financial statements accompanying such certificate and specifying any such change and the related effect, (iv) identifying any Subsidiary of the Dex East Loan Parties formed or acquired since the end of the previous fiscal quarter, (v) identifying any parcels of real property or improvements thereto with a value exceeding $10,000,000 that have been acquired by the Dex East Loan Parties since the end of the previous fiscal quarter, (vi) identifying any changes of the type described in Section 5.03(a) that have not been previously reported by the Borrower, (vii) identifying any Permitted Acquisition or other acquisitions of going concerns that have been consummated since the end of the previous fiscal quarter, including the date on which each such acquisition or Investment was consummated and the consideration therefor, (viii) identifying any material Intellectual Property (as defined in the Guarantee and Collateral Agreement) with respect to which a notice is required to be delivered

---

[35] To be included if applicable

under the Guarantee and Collateral Agreement and has not been previously delivered, (ix) identifying any Prepayment Events or Ultimate Parent Asset Dispositions that have occurred since the end of the previous fiscal quarter and setting forth a reasonably detailed calculation of the Net Proceeds received from any such Prepayment Events or Ultimate Parent Asset Dispositions, (x) identifying any change in the locations at which equipment and inventory, in each case with a value in excess of $10,000,000, are located, if not owned by the Dex East Loan Parties, (xi) identifying any Services Assets (as defined in the Shared Services Agreement) (but with respect to Services Assets that constitute Intellectual Property, solely Intellectual Property that has been registered or patented or the registration of which has been applied for) contributed by the Borrower and its Subsidiaries to the Service Company during the immediately preceding fiscal quarter, and a reasonably detailed description of such Services Assets and the value thereof, (xii) attaching a schedule setting forth a computation (and any utilization by the Borrower) of Excess Cash Flow, Borrower's Discounted Prepayment Portion of Excess Cash Flow and Borrower's Discretionary Portion of Excess Cash Flow as of the end of the period covered by such financial statements and (xiii) setting forth (A) a reporting sales metric (which will serve as leading indicator of reported print and digital revenues), for such fiscal quarter or fiscal year, as applicable, (B) print and digital revenue and a gross margin amount for each of such reported revenue amounts for such fiscal quarter or fiscal year, as applicable, and (C) statements of cash flow from operations (with a reconciliation of net income to operating cash flow from operations and financing activities (including capital expenditures)) for such fiscal quarter or fiscal year, as applicable;

(e)   concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default or Event of Default in respect of Section 6.14 (which certificate may be limited to the extent required by accounting rules, guidelines or practice);

(f)   within 30 days after the commencement of each fiscal year of the Borrower, a detailed consolidated budget for such fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of and for such fiscal year and setting forth the assumptions used for purposes of preparing such budget, in form reasonably satisfactory to the Administrative Agent), promptly when available, any material significant revisions of such budget;

(g)   promptly after the same become publicly available, and no later than five Business Days after the same are sent, copies of all periodic and other reports, proxy statements and other materials filed by the Dex East Loan Parties with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by the Ultimate Parent or the Parent to its shareholders generally;

(h)   promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Dex East Loan Parties, or compliance with the terms of any Loan Document, as the Administrative Agent (including on behalf of any Lender) may reasonably request;

(i)   concurrently with any delivery of financial statements and related information by any Loan Party to any debtholder of Dex Digital, RHDC or of any Newco not otherwise required to be delivered hereunder, copies of such financial statements and related information;

(j)   promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that any Loan Party or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the Loan Parties or any of their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Administrative Agent, the Loan Parties and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent (on behalf of each requesting Lender) promptly after receipt thereof; provided, further, that the rights granted to the Administrative Agent in this section shall be exercised not more than once during a 12-month period;

(k)   if the Borrower is not then a reporting company under the Securities Exchange Act of 1934, as amended, within 45 days after the end of each fiscal quarter of the Borrower or 90 days in the case of the last fiscal quarter of each fiscal year, a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the comparable periods of the previous year, in substantially the form delivered to the Administrative Agent prior to the Closing Date;

(l)   no later than five Business Days prior to the effectiveness thereof, copies of substantially final drafts of any proposed material amendment, supplement, waiver or other modification with respect to the Dex West Credit Agreement, the RHDI Credit Agreement, the SuperMedia Credit Agreement, the Shared Services Agreement, the Tax Sharing Agreements, the Subordinated Guarantee, any Master IP License Agreement, any License Agreement, any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement, the Restructuring Notes or any Additional Notes; and

(m) (i) promptly following receipt thereof, any notice of changes of allocation percentages that any Dex East Loan Party shall receive pursuant to the Shared Services Agreement and (ii) concurrently with any delivery of financial statements under clause (a) or (b) above, a statement of changes in the intercompany balances of the Loan Parties with the Service Company in substantially the form delivered to the Administrative Agent prior to the Closing Date.

Section 5.02    Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender written notice of the following promptly after any Financial Officer or executive officer of the Borrower or any Subsidiary obtains knowledge thereof:

(a)   the occurrence of any Default;

(b)   the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Ultimate Parent, the Parent, the Borrower or any Affiliate thereof that involves (i) a reasonable possibility of an adverse determination and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) which relates to the Loan Documents;

(c)   the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; and

(d)  any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03    Information Regarding Collateral.  (a)  The Borrower will furnish to the Administrative Agent prompt written notice of any change (i) in the legal name of any of the Dex East Loan Parties, as reflected in its organization documents, (ii) in jurisdiction of organization or corporate structure of any of the Dex East Loan Parties and (iii) in the identity, Federal Taxpayer Identification Number or organization number of any of the Dex East Loan Parties, if any, assigned by the jurisdiction of its organization.  The Borrower agrees not to effect or permit any change referred to in clauses (i) through (iii) of the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral of the Dex East Loan Parties for the benefit of the Secured Parties.  The Borrower also agrees promptly to notify the Administrative Agent if any damage to or destruction of Collateral of the Dex East Loan Parties that is uninsured and has a fair market value exceeding $10,000,000 occurs.

(b)  Each year, at the time of delivery of annual financial statements with respect to the preceding fiscal year pursuant to clause (a) of Section 5.01, the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer and the chief legal officer of the Borrower certifying that all Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral and required pursuant to the Loan Documents to be filed, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction necessary to protect and perfect the security interests under the Guarantee and Collateral Agreement for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period).

Section 5.04    Existence; Conduct of Business.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, contracts, licenses, permits, privileges and franchises material to the conduct of its business; provided, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any sale of assets permitted under Section 6.05.

Section 5.05    Payment of Obligations.  The Borrower will, and will cause each of its Subsidiaries to, pay its material Indebtedness and other material obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.06    Maintenance of Properties.  The Borrower will, and will cause each of its Subsidiaries to, keep and maintain all property (other than Intellectual Property) material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.  The Borrower will, and will cause each of its Subsidiaries to, subject to its and their reasonable business judgment, take all actions to maintain all registrations and applications with respect to material Intellectual Property owned by any of them.

Section 5.07    Insurance.  The Borrower will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies (a) insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required to be maintained pursuant to the Security Documents.  The Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

Section 5.08    Casualty and Condemnation.  The Borrower (a) will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any Collateral of the Dex East Loan Parties fairly valued at more than $10,000,000 or the commencement of any action or proceeding for the taking of any Collateral of the Dex East Loan Parties or any material part thereof or material interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of the Security Documents and this Agreement.

Section 5.09    Books and Records; Inspection and Audit Rights.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers, employees and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 5.10    Compliance with Laws.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations, including Environmental Laws, and orders of any Governmental Authority applicable to it, its operations or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.11    Additional Subsidiaries.  If any additional Subsidiary of the Dex East Loan Parties is formed or acquired after the Closing Date, the Borrower will, within three Business Days after such Subsidiary is formed or acquired, notify the Administrative Agent and the Lenders thereof and, within 15 Business Days (or such longer period as the Administrative Agent shall agree) after such Subsidiary is formed or acquired, cause any applicable provisions of the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of the Dex East Loan Parties.

Section 5.12    Further Assurances.  (a) The Borrower will, and will cause each Subsidiary Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents), that may be required under any applicable law, or that the Administrative Agent or the Required Lenders may reasonably request, to cause all provisions of the Collateral and Guarantee Requirement applicable to the Dex East Loan Parties to be and remain satisfied, all at the expense of the Dex East Loan Parties; provided, that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Dex East Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the Dex East Loan Parties as a lessee under a lease.  The Borrower also agrees to provide to the Administrative Agent, from time to time upon request, evidence

reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)  If any material asset (including any real property or improvements thereto or any interest therein) that has an individual fair market value of more than $10,000,000 is acquired by the Dex East Loan Parties after the Closing Date or owned by an entity at the time it becomes a Subsidiary Loan Party (in each case other than assets constituting Collateral under the Guarantee and Collateral Agreement that become subject to the Lien of the Guarantee and Collateral Agreement upon acquisition thereof), the Borrower will notify the Administrative Agent and the Lenders thereof, and, if requested by the Administrative Agent or the Required Lenders, the Borrower will cause such asset to be subjected to a Lien securing the Obligations and will take, and cause the Dex East Loan Parties to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the Dex East Loan Parties; provided, that the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Dex East Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000, (ii) any real property held by any of the Dex East Loan Parties as a lessee under a lease and (iii) other assets with respect to which the Agent determines that the cost or impracticability of including such assets as Collateral would be excessive in relation to the benefits to the Secured Parties.

(c)  Subject to the Intercreditor Agreement, each of the Ultimate Parent and the Parent shall cause all provisions of the Collateral and Guarantee Requirement applicable to the Shared Collateral Loan Parties to be satisfied, including by causing, as applicable, (i) each Newco Subordinated Guarantor to execute a Newco Subordinated Guarantee as described in clause (e) of the definition of "Collateral and Guarantee Requirement" and (ii) each Newco Senior Guarantor to execute a supplement to the Shared Guarantee and Collateral Agreement as required thereunder;  provided, that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Shared Collateral Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the Shared Collateral Loan Parties as a lessee under a lease.

Section 5.13    Credit Ratings.  Each of the Ultimate Parent and the Borrower will use its commercially reasonable efforts to maintain at all times monitored public ratings of the Loans by Moody's and S&P and a corporate family rating for each of the Ultimate Parent and the Borrower from Moody's and a corporate issuer rating for each of the Ultimate Parent and the Borrower from S&P.

Section 5.14    Intellectual Property.  Each of the Borrower, Dex West, RHDI, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) shall deliver to each other, following the Closing Date, current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of, or access to, all future Escrow Materials that were not Escrow Materials as of the Closing Date and material updates on an ongoing basis to Escrow Materials in existence as of the Closing Date, in each case within a reasonable period of time following such Escrow Materials becoming owned, licensed or updated, as applicable, by Borrower, Dex West, RHDI, SuperMedia, the Service Company or another Shared Collateral Loan Party (other than the Ultimate Parent), as applicable.  Notwithstanding anything to the contrary contained in this Section 5.14, neither Borrower, Dex West, RHDI, SuperMedia, the Service Company nor any other Shared Collateral Loan Party shall be deemed to have failed to satisfy this Section 5.14 for any inadvertent failure to deliver or place into escrow any Escrow Materials because such party was unaware of the existence of any such item, provided that (x) delivery or escrow of any such item is made within a reasonable period of time after identification or discovery of such item (and that such item has not been

delivered or escrowed) by such party and (y) none of such other parties are materially damaged or prejudiced, and do not lose any material rights, due to such failure.

Section 5.15    Independent Director.  Each of the Ultimate Parent and the Borrower shall cause the board of directors, board of managers, or other equivalent governing body of each License Subsidiary to include at least two special, independent directors or members (or equivalent thereof), pursuant to documentation reasonably satisfactory to the Administrative Agent, whose consent shall be required for (i) any filing of a petition for bankruptcy by the relevant License Subsidiary, (ii) the transfer of any membership or other equity interests therein (other than the sale or other transfer of such membership or equity interests in a transaction permitted under the Loan Documents) and (iii) encumbering any asset owned by such License Subsidiary with a real property mortgage or deed of trust, as applicable, or a security agreement, pledge agreement or any similar agreement creating a Lien in respect thereof, except as permitted under the Loan Documents (including as a result of any consent, amendment, waiver or other modification obtained in accordance with the terms of the Loan Documents).

ARTICLE VI

NEGATIVE COVENANTS

Until the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each of the Borrower, and solely for purposes of (i) Sections 6.13(b) and 6.16, the Parent, and (ii) Sections 6.13(b), 6.17, 6.18, 6.19 and 6.20, the Ultimate Parent, covenants and agrees with the Lenders that:

Section 6.01    Indebtedness; Certain Equity Securities.  (a)  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness or any Attributable Debt, except:

(i)    Indebtedness created under the Loan Documents and any Permitted Subordinated Indebtedness of the Borrower or its Subsidiaries to the extent the Net Proceeds thereof are used to refinance Indebtedness created under the Loan Documents;

(ii)    Indebtedness existing on the Closing Date and set forth in Schedule 6.01 and Refinancing Indebtedness in respect thereof;

(iii)    Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary; provided, that no Subsidiary that is not a Loan Party shall have any Indebtedness to the Borrower or any Subsidiary Loan Party;

(iv)    Guarantees by the Borrower of Indebtedness of any Subsidiary Loan Party and by any Subsidiary of Indebtedness of the Borrower or any Subsidiary Loan Party;

(v)    Indebtedness and Attributable Debt of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than by an amount not greater than fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof; provided that (1) such Indebtedness or Attributable Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction

or improvement and (2) the aggregate principal amount of Indebtedness and Attributable Debt permitted by this clause (v), together with the aggregate principal amount of Indebtedness and Attributable Debt of the Service Company described in Section 6.18(d)(i) allocated to the Borrower and its Subsidiaries pursuant to the Shared Services Agreement, shall not exceed $15,000,000 at any time outstanding;

(vi)     Indebtedness of any Person that becomes a Subsidiary after the Closing Date and Refinancing Indebtedness in respect thereof; provided that (A) such Indebtedness (other than Refinancing Indebtedness) exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such entity becoming a Subsidiary) and (B) the aggregate principal amount of Indebtedness permitted by this clause (vi) shall not exceed $10,000,000 at any time outstanding;

(vii)     Indebtedness of the Borrower or any Subsidiary in respect of letters of credit in an aggregate face amount not exceeding $5,000,000 at any time outstanding;

(viii)     unsecured Indebtedness and Attributable Debt owing to the Service Company incurred pursuant to the Shared Services Transactions; and

(ix)     other unsecured Indebtedness (other than Indebtedness of the Borrower to any Affiliate of the Borrower) in an aggregate principal amount not exceeding $20,000,000 at any time outstanding.

(b)  The Borrower will not, nor will it permit any Subsidiary to, issue any preferred stock or other preferred Equity Interests.

Section 6.02     Liens.  (a)  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i)     Liens created under the Loan Documents;

(ii)     Permitted Encumbrances;

(iii)     any Lien existing on the Closing Date and set forth in Schedule 6.02 on any property or asset of the Borrower or any Subsidiary; provided that (A) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary (other than proceeds) and (B) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof;

(iv)     any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Closing Date prior to the time such Person becomes a Subsidiary; provided that (A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (B) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds) and (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be and extensions, renewals,

refinancings and replacements thereof that do not increase the outstanding principal amount thereof (other than by an amount not in excess of fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof;

(v)    Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (A) such Liens secure Indebtedness permitted by clause (v) of Section 6.01(a), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds);

(vi)    Liens on cash collateral securing letters of credit permitted by Section 6.01(a)(vii) in an aggregate amount not to exceed the lesser of (x) $5,250,000 and (y) 105% of the face amount thereof;

(vii)    Liens in the nature of non-exclusive licenses of Intellectual Property granted to or in favor of another Company pursuant to the Directory Consolidation Project; and

(viii)    Liens not otherwise permitted by this Section 6.02 securing obligations other than Indebtedness and involuntary Liens not otherwise permitted by this Section 6.02 securing Indebtedness, which obligations and Indebtedness are in an aggregate amount not in excess of $5,000,000 at any time outstanding.

Section 6.03    Fundamental Changes.  (a)  The Borrower will not, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, wind up or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving entity, (ii) subject to Section 6.20, any Subsidiary may merge into any Subsidiary in a transaction in which the surviving entity is a wholly-owned Subsidiary and, if any party to such merger is a Subsidiary Loan Party, a Subsidiary Loan Party, (iii) any Subsidiary may merge or consolidate with any other Person in order to effect a Permitted Acquisition and (iv) any Subsidiary (other than the Borrower) may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; provided that (x) any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04 and (y) any such liquidation or dissolution involving a License Subsidiary of the Borrower shall not be permitted unless such License Subsidiary conveys, leases, sells, transfers or otherwise disposes of, in one transaction or series of transactions, all or substantially all of its business or property, whether now or hereafter acquired, to a License Subsidiary.

(b)  The Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than a Permitted Business.

(c)  Notwithstanding anything to the contrary contained herein, this Section 6.03 shall not prohibit the [Mergers]["Restructuring Transactions" under (and as defined in) the Reorganization Plan.][36]

Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.  The Borrower will not, and will not permit any of its Subsidiaries to, make, purchase, hold or acquire

---

[36] To be included if applicable

(including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Investment, except:

(a)  Permitted Investments;

(b)  Investments existing on the date hereof and set forth on Schedule 6.04;

(c)  Investments by the Borrower and its Subsidiaries in Equity Interests in Subsidiaries that are Subsidiary Loan Parties immediately prior to the time of such Investments;

(d)  loans or advances made by the Borrower to any Subsidiary Loan Party and made by any Subsidiary to the Borrower or any Subsidiary Loan Party;

(e)  Guarantees constituting Indebtedness permitted by Section 6.01;

(f)  investments (including debt obligations and equity securities) received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(g)  extensions of trade credit in the ordinary course of business;

(h)  Investments consisting of non-cash consideration received in respect of sales, transfers or other dispositions of assets to the extent permitted by Section 6.05;

(i)  Swap Agreements entered into in compliance with Section 6.07;

(j)  loans and advances by the Borrower and any of its Subsidiaries to their employees in the ordinary course of business and for bona fide business purposes in an aggregate amount at any time outstanding not in excess of $2,500,000;

(k)  Investments in connection with the Shared Services Transactions;

(l)  Permitted Acquisitions (other than Permitted Acquisitions involving the purchase of assets from Affiliates that are not Subsidiaries of the Borrower) in an aggregate amount not to exceed $5,000,000 during the term of this Agreement;

(m) provided that (i) no Event of Default is continuing or would result therefrom, (ii) no portion of the proceeds of any such Investment is used, directly or indirectly, to purchase or repurchase, or finance the purchase or repurchase, of any Restructuring Notes, Additional Notes or any other Indebtedness of any Affiliate (and the terms of any Investment shall not permit any such purchase or repurchase by the Person in which such Investment is made while such Investment is outstanding) and (iii) no such Investment is made in any Person that is an Affiliate of the Borrower (other than the Borrower and its Subsidiaries) other than Investments that result in a purchase of assets (x) by a Newco Senior Guarantor or the Service Company in connection with equivalent Investments by each of Dex West, RHDI and SuperMedia or (y) by the Borrower or a Subsidiary in Dex Digital in connection with equivalent Investments by each of Dex West and RHDI, Investments in any other Person in an aggregate amount not to exceed $5,000,000 during the term of this Agreement; and

(n)  advances or payments made by the Borrower or any Subsidiary to (x) the License Subsidiaries of the Borrower or (y) any other Person for the purpose of (i) filing, prosecuting,

registering, renewing, enforcing or maintaining any Intellectual Property applications or registrations owned by such License Subsidiaries and (ii) satisfying all other liabilities related to, in connection with or incidental to (x) the maintenance of the existence of such License Subsidiaries and (y) activities of such License Subsidiaries permitted under this Agreement (including, without limitation, reimbursement for directors and officers fees and compensation) and under the organizational documents of such License Subsidiaries.

Section 6.05    Asset Sales.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it and any sale of assets in connection with a securitization, nor will the Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary, except:

(a)  sales of (x) inventory, (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments in the ordinary course of business;

(b)  sales, transfers and dispositions to the Borrower or a Subsidiary; provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)  sales of receivables on substantially the same terms that the receivables are purchased by Qwest Corp. pursuant to the Billing and Collection Agreement as in effect on November 1, 2004, including sales of receivables pursuant to and in accordance with the Billing and Collection Agreement;

(d)  sale and leaseback transactions permitted by Section 6.06;

(e)  sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary) to bona fide third parties that are not Affiliates of the Borrower and that are not permitted by any other clause of this Section; provided, that the aggregate cumulative fair market value of all assets sold, transferred or otherwise disposed of after the Closing Date in reliance upon this clause (e) shall not exceed $20,000,000;

(f)  sales, transfers and other dispositions pursuant to the Shared Services Transactions;

(g)  the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(h)  the sales, transfers or other dispositions in connection with the Directory Consolidation Project[37];

provided, that (x) all sales, transfers, leases and other dispositions permitted hereby (other than pursuant to clauses (a)(y), (b), (f) and (f) above) shall be made for at least 80% cash consideration or, in the case of Permitted Investments, sales of receivables or sale and leaseback transactions, 100% cash consideration,

---

[37] Schedule 1.01A to provide that the profits of the consolidated directories will be shared among the contributing companies in a manner reasonably acceptable to the admin agent taking into account the respective revenues of the directories that are combined, the costs of achieving the combination and the ongoing operating costs of the combination

and (y) all sales, transfers, leases and other dispositions permitted by clauses (a)(x), (e) and (g) above shall be made for fair value.

Section 6.06    Sale and Leaseback Transactions.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except (a) pursuant to the Shared Services Transactions or (b) any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 90 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset, to the extent all Capital Lease Obligations, Attributable Debt and Liens associated with such sale and leaseback transaction are permitted by Sections 6.01(a)(v) and 6.02(a)(v) (treating the property subject thereto as being subject to a Lien securing the related Attributable Debt, in the case of a sale and leaseback not accounted for as a Capital Lease Obligation).

Section 6.07    Swap Agreements.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries) in the conduct of its business or the management of its liabilities and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

Section 6.08    Restricted Payments; Certain Payments of Indebtedness.  (a)  The Borrower will not, nor will it permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) Subsidiaries of the Borrower may declare and pay dividends or distributions ratably with respect to their Equity Interests, (ii) provided no Default or Event of Default is continuing or would result therefrom, the Borrower may make Restricted Payments to the Parent, provided that (A) the proceeds of such Restricted Payments are used to repurchase, redeem, or otherwise acquire or retire for value Equity Interests in the Ultimate Parent held by any future, present or former directors, officers, members of management, employees or consultants of the Ultimate Parent or the Service Company or their respective estates, heirs, family members, spouses or former spouses pursuant to the terms of any employee equity subscription agreement, stock option agreement or similar agreement, (B) (x) any Restricted Payments used to effect such repurchases, redemptions, acquisitions or retirements are made not earlier than ten Business Days prior to the date when such Equity Interests are repurchased, redeemed, acquired or retired, if such repurchase, redemption, acquisition or retirement is made and (y) if such Restricted Payments are not used for such repurchase, redemption, acquisition or retirement, the proceeds therefrom shall be returned to the Borrower as a capital contribution within ten Business Days from the date such Restricted Payment was made, (C) the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests in any fiscal year pursuant to this clause (ii) (other than (1) any such Equity Interests repurchased, redeemed, acquired or retired in compensation for any taxes due or payable by the holder thereof, and (2) any such Equity Interests that are deemed repurchased, redeemed, acquired or retired by the Ultimate Parent in connection with the exercise of stock options or warrants by the holder thereof in connection with the payment of all or a portion of the exercise price of such options or warrant) will not exceed $1,000,000 per year and (D) such Equity Interests shall only be repurchased, redeemed, acquired or retired in connection with the death, resignation or retirement of, or settlement of a dispute with, any such Person, (iii) Restricted Payments in amounts as shall be necessary to make Tax Payments; provided that all Restricted Payments made pursuant to this clause (iii) are used by the recipient for the

purpose specified in this clause (iii) within 30 days of receipt thereof, (iv) provided no Default or Event of Default is continuing or would result therefrom, the Borrower may from time to time pay cash dividends or distributions to the Parent in an amount not in excess of the lesser of (x) the Ultimate Parent Annual Cash Interest Amount and (y) the regularly scheduled cash interest payable (taking into account the Ultimate Parent PIK Election made pursuant to Section 6.17(j)) on the Restructuring Notes (or any Additional Notes incurred to refinance such Restructuring Notes) during the next period of ten Business Days, provided, however, that (A) any such dividends or distributions relating to any such cash interest payment must be paid not earlier than ten Business Days prior to the date when such cash interest is required to be paid by the Ultimate Parent and the proceeds must (except to the extent prohibited by applicable subordination provisions) be applied by the Ultimate Parent, to the payment of such interest when due, (B) the Borrower and its Subsidiaries shall be in Pro Forma Compliance after giving effect to the payment of any such dividends or distributions pursuant to this clause (iv) and (C) in no event may the amount of any such dividend or distribution made pursuant to this clause (iv) relating to any such cash interest payment exceed 27% of the amount of such cash interest paid by the Ultimate Parent when due, (v) the Borrower may make Restricted Payments as part of the Shared Services Transactions and (vi) the Borrower may make Restricted Payments to the Parent in an aggregate amount not to exceed $2,000,000 during any fiscal year of the Borrower, provided that (A) no Default or Event of Default is continuing or would result therefrom, (B) the aggregate amount of Restricted Payments made pursuant to this clause (vi) shall not exceed $5,000,000 over the term of this Agreement, (C) the Ultimate Parent shall apply such Restricted Payments within 30 days of receipt thereof and only to fund general corporate expenses permitted hereunder and (D) no Restricted Payments made pursuant to this clause (vi) shall be used to (x) effect the repurchase, or the making of any payments in respect, of Restructuring Notes or Additional Notes or (y) make any payment to or Investment in any Affiliate other than the Borrower or a Subsidiary of the Borrower (or any director, officer or employee of any such Affiliate).

(b)  The Borrower will not, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)      payment of Indebtedness created under the Loan Documents;

(ii)     payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness, other than payments in respect of subordinated Indebtedness to the extent prohibited by the subordination provisions thereof;

(iii)    refinancings of Indebtedness to the extent permitted by Section 6.01;

(iv)    payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(v)     prepayment of Capital Lease Obligations in an aggregate cumulative amount from and after the Closing Date not exceeding $5,000,000;

(vi)    payment of any Indebtedness owing to the Service Company arising pursuant to the Shared Services Transactions; and

(vii)   payment of any Indebtedness owing to the Borrower or any Subsidiary Loan Party.

(c)  The Borrower will not, and will not permit any Subsidiary to, furnish any funds to, make any Investment in, or provide other consideration to any other Person for purposes of enabling such Person to, or otherwise permit any such Person to, make any Restricted Payment or other payment or distribution restricted by this Section that could not be made directly by the Borrower in accordance with the provisions of this Section.

(d)  Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, the Loan Parties shall be permitted to make all distributions required to be made by the Loan Parties on or after the Closing Date [(pursuant to the Reorganization Plan and the Confirmation Order][38].

Section 6.09    Transactions with Affiliates.  The Borrower will not, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable, considered as a whole, to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and the Subsidiary Loan Parties not involving any other Affiliate, (c) any payment permitted by Section 6.08 or any Investment permitted by Section 6.04 specifically contemplated by Section 6.04 to be made among Affiliates, (d) the sale of receivables on substantially the same terms that the Borrower Receivables are purchased by Qwest Corp. pursuant to the Billing and Collection Agreement as in effect on November 1, 2004, (e) any Restricted Payment permitted by Section 6.08(a)(ii), (f)  subject to Section 6.13(b), the existence of, or performance by the Borrower or any of its Subsidiaries of its obligations under the terms of, the Tax Sharing Agreements, (g) Shared Services Transactions, (h) arrangements pursuant to which payments by Qwest for advertising in directories that were committed to be made in connection with the East Acquisition and the acquisition by Dex West of Qwest's directories services business in the West Territories are allocated approximately 42% to the Borrower and approximately 58% to Dex West (without regard to the directories in which such advertising is actually placed), (i) the issuance by the Borrower or any Subsidiary of Equity Interests to, or the receipt of any capital contribution from, the Parent, the Borrower or a Subsidiary, (j) the transactions in connection with the Directory Consolidation Project, (k) the License Agreements, the Master IP License Agreements and the provision of the Escrow Materials and [(l) the "Restructuring Transactions" under (and as defined in) the Reorganization Plan][39].  Additionally, without limiting the foregoing, transactions between the Borrower and its Subsidiaries, on the one hand, and Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries, on the other hand, that are not part of Shared Services or other similar ordinary course transactions, must satisfy the following requirements:  (i) the terms of any such transaction must not be less favorable in any material respect than the terms the Borrower or such Subsidiary of the Borrower would receive in an arms-length transaction with a third party (and, in the case of any such transaction involving consideration in excess of $50,000,000, the terms of such transaction must be confirmed as arms-length by a reputable financial institution or advisor); (ii) no such transaction shall involve the transfer of ownership of any operating assets (including intellectual property rights) or personnel to Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries; and (iii) all such transactions shall result in the receipt of reasonably equivalent value by the Borrower and its Subsidiaries and no such transaction shall result in the transfer of any revenues that would otherwise be recognized by the Borrower or any of its Subsidiaries to Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries.

Section 6.10    Restrictive Agreements.  The Borrower will not, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other

_____

[38] To be included if applicable

[39] To be included if applicable

arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to the Secured Parties securing the Obligations, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided, that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and the proceeds thereof, (v) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to any Indebtedness incurred by a Subsidiary prior to the date on which such Subsidiary was acquired by the Borrower (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (vii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to the refinancing of Indebtedness, provided that the terms of any such restrictions or conditions are not materially less favorable to the Lenders than the restrictions or conditions contained in the predecessor agreements and (viii) the foregoing shall not apply to customary provisions in joint venture agreements.

Section 6.11    Change in Business.  The Borrower will not, and will not permit any Subsidiary to, engage at any time in any business or business activity other than a Permitted Business.

Section 6.12    Fiscal Year.  The Borrower shall not change its fiscal year for accounting and financial reporting purposes to end on any date other than December 31.

Section 6.13    Amendment of Material Documents.  (a)  The Borrower will not, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents if, taken as a whole, such amendment, modification or waiver is adverse in any material respect to the interests of the Lenders.

(b)  None of the Ultimate Parent, the Parent or the Borrower will, nor will they permit the Service Company or any Subsidiary to amend, modify, waive or terminate any of its rights under the Shared Services Agreement, the Tax Sharing Agreements, the Subordinated Guarantee Agreement, any License Agreement, any Master IP License Agreement, any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement or the organizational documents of any License Subsidiary to the extent that such amendment, modification, waiver or termination is adverse in any material respect to the interests of the Lenders.

Section 6.14    Leverage Ratio and Interest Coverage Ratio.  (a) The Borrower will not permit the Leverage Ratio as of the last day of a fiscal quarter set forth below to exceed the ratio set forth opposite such date:

| Fiscal Quarter Ended | Ratio |
| --- | --- |
| March 31, 2013 | 5.00 to 1.00 |
| June 30, 2013 | 5.00 to 1.00 |
| September 30, 2013 | 5.00 to 1.00 |

| Fiscal Quarter Ended | Ratio |
| --- | --- |
| December 31, 2013 | 5.00 to 1.00 |
| March 31, 2014 | 4.9375 to 1.00 |
| June 30, 2014 | 4.875 to 1.00 |
| September 30, 2014 | 4.8125 to 1.00 |
| December 31, 2014 | 4.75 to 1.00 |
| March 31, 2015 | 4.6875 to 1.00 |
| June 30, 2015 | 4.625 to 1.00 |
| September 30, 2015 | 4.5625 to 1.00 |
| December 31, 2015 | 4.50 to 1.00 |
| March 31, 2016 | 4.375 to 1.00 |
| June 30, 2016 | 4.25 to 1.00 |
| September 30, 2016 | 4.125 to 1.00 |
| December 31, 2016 | 4.00 to 1.00 |

(b)  The Borrower will not permit the Interest Coverage Ratio as of the last day of a fiscal quarter to be less than 1.10 to 1.00.

Section 6.15    Capital Expenditures.  The Borrower will not, and will not permit any Subsidiary to, make or commit to make any Capital Expenditure, except Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business not exceeding $10,000,000 in the aggregate in each of the fiscal years ending December 31, 2013 and December 31, 2014 and $9,000,000 in the aggregate in each of the fiscal years ending December 31, 2015 and December 31, 2016; provided, that Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business, in the aggregate when combined with the Capital Expenditures of Dex West, RHDI, SuperMedia and their respective Subsidiaries, shall not exceed (i) $57,500,000 during the fiscal year ending December 31, 2013 and (ii) $50,000,000 during the fiscal years ending December 31, 2014, December 31, 2015 and December 31, 2016; provided, further, that, (x) in each case (i) up to 75% of such stated amounts referred to above, if not so expended in the fiscal year for which it is permitted, may be carried over for expenditure in the next succeeding fiscal year and (ii) Capital Expenditures made pursuant to this (b) during any fiscal year shall be deemed made, first, in respect of amounts permitted for such fiscal year as provided above and, second, in respect of amounts carried over from the prior fiscal year and (y) Capital Expenditures of a Company hereunder shall either (i) relate to assets directly owned or acquired by such Company and shall be allocated to (and paid by) such Company or (ii) relate to the acquisition or development of Shared Assets and shall be allocated to (and paid by) the Companies in accordance with their Allocated Share (as defined in the Shared Services Agreement) at the time any such payment is made.

Section 6.16    Parent Covenants.  (a)The Parent will not engage in any business or activity other than the ownership of outstanding Equity Interests of the Borrower and Dex West and their respective Subsidiaries, the issuance and sale of its Equity Interests and, in each case, activities incidental thereto.

(b)  The Parent will not own or acquire any assets (other than Equity Interests of the Borrower, Dex West and Dex Media Service, other Investments in the Borrower, Dex West and their respective Subsidiaries and Dex Media Service, cash and Permitted Investments) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and liabilities under the Loan Documents, the Dex West Loan Documents and the RHDI Loan Documents, subject to the Intercreditor Agreement, liabilities imposed by law, including Tax liabilities, liabilities under the Shared Services Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)  The Parent will not create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than (i) Permitted Encumbrances and (ii) Liens securing the Dex East Obligations, the obligations under the Dex West Loan Documents and the obligations under the RHDI Loan Documents, subject to the Intercreditor Agreement.

(d)  The Parent shall not in any event incur or permit to exist any Indebtedness for borrowed money other than a Guarantee of the Dex East Obligations, the obligations under the Dex West Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement.

Section 6.17    <u>Ultimate Parent Covenants</u>.  (a) The Ultimate Parent will not engage in any business or activity other than the ownership of outstanding Equity Interests of its Subsidiaries and other assets permitted under Section 6.17(b), the issuance and sale of its Equity Interests, the performance of its obligations under the Shared Services Agreement and, in each case, activities incidental thereto.

(b)  The Ultimate Parent will not own or acquire any assets (other than Equity Interests of its existing Subsidiaries or any Newcos, other Investments in its existing Subsidiaries and any Newcos, assets owned or acquired in connection with its obligations under the Shared Services Agreement, cash, Permitted Investments, joint ventures or minority investments permitted under Section 6.17(e) and the Equity Interests of SuperMedia) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and liabilities under the Loan Documents, the Dex West Loan Documents, the RHDI Loan Documents and the SuperMedia Loan Documents, liabilities imposed by law, including Tax liabilities, Indebtedness permitted under Section 6.17(d), liabilities under the Shared Services Agreement, liabilities under the SuperMedia Merger Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)  The Ultimate Parent will not create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than (i) Permitted Encumbrances and (ii) Liens securing the Dex East Obligations, the obligations under the Dex West Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement.

(d)  The Ultimate Parent shall not in any event incur or permit to exist any Indebtedness for borrowed money other than (i) the Restructuring Notes, (ii) any Additional Notes and (iii) subject to the Intercreditor Agreement, a Guarantee of the Dex East Obligations, the obligations under the Dex West Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents.

(e)  The Ultimate Parent may only make Investments in, or acquisitions of, any Newco so long as (i) no Default or Event of Default has occurred and is continuing, (ii) any Newco that is acquired or created as a result of such Investment or acquisition shall become a Guarantor as and to the extent required by the Collateral and Guarantee Requirement, (iii) all transactions related thereto are consummated in accordance with applicable laws in all material respects and (iv) in case of an acquisition of assets, such assets (other than assets to be retired or disposed of) are to be used, and in the case of an acquisition of any Equity Interests, the Person so acquired is engaged, in the same line of business as that of the Ultimate Parent or a line of business reasonably related thereto.  The Ultimate Parent may make Investments (not consisting of contribution of assets of any of its Subsidiaries) in joint ventures and other minority investments, <u>provided</u> that such Investment shall be pledged as Collateral to the Shared Collateral Agent for the benefit of the Shared Collateral Secured Parties pursuant to the Shared Collateral and Guarantee Agreement.

(f)  The Ultimate Parent shall not (i) make any dividends or other Restricted Payments to the holders of its Equity Interests or (ii) optionally redeem or repurchase any Restructuring Notes or Additional Notes (other than any non-cash exchange therefor for common stock of the Ultimate Parent).

(g)  The Ultimate Parent may not make any Ultimate Parent Asset Disposition unless the Net Proceeds are applied to prepay the Loans pursuant to Section 2.06(c).

(h)  The Ultimate Parent shall not permit the Restructuring Notes or the Restructuring Indenture to be amended in any way that is, taken as a whole, materially adverse to the interests of the Lenders and shall not (i) permit the Restructuring Notes or any Additional Notes to be secured by any assets of the Ultimate Parent or any of its Subsidiaries, (ii) permit the proceeds of any Additional Notes to be used to finance anything other than refinancing of the Restructuring Notes or any other Additional Notes, (iii) alter the maturity of the Restructuring Notes or any Additional Notes to a date, or make the Restructuring Notes or any Additional Notes mandatorily redeemable, in whole or in part, or required to be repurchased or reacquired, in whole or in part, prior to the date that is six months after the Maturity Date (other than pursuant to customary asset sale or change in control provisions), (iv) allow the Restructuring Notes or any Additional Notes to (A) have financial maintenance covenants, (B) have restrictive covenants that apply to the Parent, the Borrower or any Subsidiary (other than, solely in the case of the Restructuring Notes, the restrictive covenants set forth in the Restructuring Notes Indenture as of the Closing Date) or that impose limitations on the Ultimate Parent's ability to guarantee or pledge assets to secure the Dex East Obligations or (C) otherwise have covenants, representations and warranties and events of default that are more restrictive than those existing in the prevailing market at the time of issuance thereof for companies with the same or similar credit ratings of the Ultimate Parent at such time issuing similar securities, (v) permit the Restructuring Notes or any Additional Notes to be guaranteed by any Subsidiary of the Ultimate Parent or not be subordinated to the Dex East Obligations on terms at least as favorable to the Lenders as the subordination terms set forth in the Restructuring Notes Indenture on the Closing Date and that are otherwise reasonably satisfactory to the Administrative Agent or (vi) permit the Restructuring Notes or any Additional Notes to be convertible or exchangeable into other Indebtedness, except other Indebtedness of the Ultimate Parent meeting the qualifications set forth in the definition of "Additional Notes".

(i)  The Ultimate Parent shall not at any time hold an aggregate amount of cash and Permitted Investments in excess of an amount equal to (a) $5,000,000 plus (b) any amounts received to fund regularly scheduled cash interest payments on the Restructuring Notes (or any Additional Notes incurred to refinance such Restructuring Notes) pursuant to Section 6.08(a)(iv) pending use by the Ultimate Parent within 10 Business Days of receipt of such amounts (in accordance with Section 6.08(a)(iv)).

(j)  The Ultimate Parent shall continue to make the Ultimate Parent PIK Election during the term of this Agreement.

Section 6.18    Service Company Covenants. (a) The Ultimate Parent will not permit the Service Company to engage in any business or activity other than the issuance and sale of its Equity Interests, ownership of the outstanding Equity Interests of its Subsidiaries and other assets permitted under Section 6.18(b) and the provision of Shared Services and, in each case, activities incidental thereto.

(b)  Subject to the Intercreditor Agreement, the Ultimate Parent will not permit the Service Company to own or acquire any assets (other than the outstanding Equity Interests of its Subsidiaries, assets owned or acquired in connection with the Shared Services, cash and Permitted Investments) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and other liabilities incurred in the ordinary course in connection with the provision of Shared Services by the Service Company or any Subsidiary of the Service Company pursuant to the terms of the Shared Service Agreement, liabilities under

the Loan Documents, the Dex West Loan Documents, the RHDI Loan Documents and the SuperMedia Loan Documents, liabilities imposed by law, including Tax liabilities, liabilities under the Shared Services Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)  Subject to the Intercreditor Agreement, the Ultimate Parent will not permit the Service Company to create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than:

(i)        Permitted Encumbrances;

(ii)        Liens securing the Dex East Obligations, the obligations under the Dex West Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement; and

(iii)        Liens on fixed or capital assets acquired, constructed or improved by the Service Company; provided that (A) such Liens secure Indebtedness permitted by Section 6.18(d), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of such Service Company.

(d)  The Ultimate Parent shall not permit the Service Company to in any event incur or permit to exist any Indebtedness for borrowed money other than:

(i)        Indebtedness and Attributable Debt of the Service Company incurred to finance the acquisition, construction or improvement of any fixed or capital assets in connection with the provision of Shared Services, including Capital Lease Obligations and extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than by an amount not greater than fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof; provided that such Indebtedness or Attributable Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement; and

(ii)        a Guarantee of the Dex East Obligations, the obligations under the Dex West Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement.

(e)  The Ultimate Parent will not permit the Service Company to sell, transfer, lease or otherwise dispose of any asset, other than:

(i)        sales of assets, the proceeds of which are reinvested within 90 days of such sale in assets of the Service Company related to the provision of Shared Services;

(ii)        sales of (x) inventory, (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments, in each case in the ordinary course of business;

(iii)        sales, transfers and other dispositions pursuant to the Shared Services Transactions;

        (iv)      the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Ultimate Parent and its Subsidiaries; and

        (v)      other dispositions of assets (other than Equity Interests in a Subsidiary) not otherwise permitted by this Section 6.18(e); provided, that the aggregate cumulative fair market value of all assets sold, transferred or otherwise disposed of after the Closing Date in reliance upon this clause (v) shall not exceed $1,000,000.

        Section 6.19      <u>Dex Media Service Covenant</u>.  The Ultimate Parent will not permit Dex Media Service to engage in any business or activity, or to own or acquire any assets or to incur or permit to exist any Indebtedness or Liens on its property or assets, in each case other than those incidental to pension liabilities arising pursuant to the Dex Media, Inc. Pension Plan.

        Section 6.20      <u>Limitation on Activities of the License Subsidiaries</u>.  The Ultimate Parent shall not, directly or indirectly, permit any License Subsidiary to (a) (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than ownership of Collateral Trademarks and anything incidental thereto (including filing or registering any application for or registration of Collateral Trademarks and the prosecution, maintenance, renewal or enforcement of Collateral Trademarks) or (ii) take any action, or conduct its affairs in a manner, that could reasonably be expected to result in the separate existence of such License Subsidiary being ignored, or the assets and liabilities of such License Subsidiary being substantively consolidated with those of the Ultimate Parent or any Subsidiary thereof in a bankruptcy, reorganization or other insolvency proceeding, (b) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (i) Indebtedness evidenced by the Loan Documents, (ii) Indebtedness owed to another Loan Party so long as such Indebtedness is subordinated to the Obligations (or a guarantee thereof), (iii) nonconsensual obligations imposed by operation of law, (iv) obligations with respect to its equity interests, (v) obligations (other than Indebtedness) in the ordinary course of business in the operation of its assets and (vi) the statutory liability of any general partner for the liabilities of the limited partnership in which it is a general partner, (c) breach any provision of, or default in the performance of its obligations under, any License Agreement to which it is a party, (d) without the consent of the two special independent directors or members required by Section 5.15 (but without prejudice to clause (j) of Article VII), (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (i) of Article VII, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing (it being understood and agreed that the consent of such special independent directors or members to any of the actions described in this clause (d) shall not in any manner limit the provisions of Article VII), (e) assign any right, title or interest in or to any current or future Collateral Trademarks to any Person except as otherwise permitted under this Agreement or license any right, title or interest in or to any of the Collateral Trademarks to any Person except to the Ultimate Parent, a Subsidiary of the Ultimate Parent or as otherwise permitted under this Agreement or (f) without the prior written consent of the Administrative Agent, not to be unreasonably withheld, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, wind up or dissolve.  The Ultimate Parent shall not (x) consent to or vote in favor of (and shall not permit any Subsidiary to consent to or vote in favor of) the incurrence of any Indebtedness by any License Subsidiary (other than Indebtedness permitted pursuant to

clause (b)(i) above) or (y) permit the organizational documents of any License Subsidiary, or any License Agreement to which any License Subsidiary is a party, to be amended, supplemented, waived, terminated or otherwise modified in any material respect without the prior written consent of the Administrative Agent, not to be unreasonably withheld.

ARTICLE VII

EVENTS OF DEFAULT

If any of the following events ("Events of Default") shall occur:

(a)  the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)  the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days;

(c)  any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)  the Ultimate Parent, the Parent or the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02 or 5.04 (with respect to the existence of the Borrower) or in Article VI;

(e)  (i) any Shared Collateral Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section [6.4 or 6.5][40] of the Shared Guarantee and Collateral Agreement or (ii) any Shared Collateral Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section [6.1, 6.2 or 6.3][41] of the Shared Guarantee and Collateral Agreement, and such failure shall continue unremedied for a period of 30 days after the earlier of (A) knowledge thereof by the Ultimate Parent or any Subsidiary thereof and (B) notice thereof from the Administrative Agent to the Borrower (which notice will be promptly given at the request of any Lender);

(f)  any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b), (d) or (e) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will promptly be given at the request of any Lender);

---

[40] Section references to be updated as appropriate based on final Shared Guarantee and Collateral Agreement.

[41] Section references to be updated as appropriate based on final Shared Guarantee and Collateral Agreement.

(g)  the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex West, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, any Newcos, the Parent, the Borrower and the Subsidiaries) shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period specified in the agreement or instrument governing such Indebtedness);

(h)  any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided, that this clause (h) (i) shall not apply to (A) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (B) Optional Repurchases permitted hereunder, (C) refinancings of Indebtedness to the extent permitted by Section 6.01 and (D) Guarantees by the Ultimate Parent and its Subsidiaries of the obligations under the Dex West Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents unless (x) any payment shall have been demanded to be made by, or any other remedy shall have been exercised against, the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex West, SuperMedia and their respective Subsidiaries) or their respective assets in respect of such Guarantees and (y) the obligations under the Dex West Loan Documents, the RHDI Loan Documents or the SuperMedia Loan Documents, as the case may be, shall have been accelerated and (ii) shall give effect to any notice required or grace period provided in the agreement or instrument governing such relevant Material Indebtedness, but shall not give effect to any waiver granted by the holders of such relevant Material Indebtedness after the giving of such notice or during such applicable grace period;

(i)  an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Parent, the Borrower or any Material Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Parent, the Borrower or any Material Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)  the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Parent, the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (i) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Parent, the Borrower or any Material Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make

a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(k)  one or more judgments for the payment of money in an aggregate amount in excess of $25,000,000 (net of amounts covered by insurance) shall be rendered against the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex West, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, the Parent, the Borrower and the Subsidiaries) or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex West, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, the Parent, the Borrower and the Subsidiaries) to enforce any such judgment;

(l)  (i) an ERISA Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan(s), (iii) the PBGC shall institute proceedings to terminate any Plan, or (iv) any Loan Party or ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability in a timely and appropriate manner; and in each cases (i) through (iv) above, such event or condition, in the opinion of the Required Lenders, when taken together with all other such events or conditions, if any, could reasonably be expected to result in a Material Adverse Effect;

(m)  any Lien purported to be created under any Security Document or Shared Collateral Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral having, in the aggregate, a value in excess of $10,000,000, with the priority required by the applicable Security Document or Shared Collateral Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (ii) as a result of the Agent's or the Shared Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Agreements;

(n)  a Change in Control shall occur;

(o)  any guarantee under the Collateral Agreements for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall assert in writing that the Collateral Agreements or any guarantee thereunder has ceased to be or is not enforceable;

(p)  the Intercreditor Agreement or any material portion thereof for any reason shall cease to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

(q)  the Subordinated Guarantee Agreement or any material portion thereof for any reason shall cease to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

(r)  the commencement of enforcement actions under the Shared Guarantee and Collateral Agreement with respect to any Shared Collateral Loan Party party thereto;

(s)   the commencement of enforcement actions under the Shared Services Agreement or the occurrence of an event that permits the Service Company to terminate the Shared Services Agreement with respect to any Client Company (as defined in the Shared Services Agreement) and such event continues unremedied for a period of three days;

(t)   the failure of the Borrower to receive any payment under either Tax Sharing Agreement when due and such failure continues unremedied for a period of three days;

(u)   any License Agreement, Master IP License Agreement or any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement shall be terminated (other than upon the expiration of any of the respective terms thereof), cease to be effective or cease to be the legally valid, binding and enforceable obligation in any material respect of any party thereto; or

(v)   either Tax Sharing Agreement shall be terminated (other than upon expiration of the term thereof), cease to be effective or cease to be the legally valid, binding and enforceable obligation in any material respect of any party thereto.

then, and in every such event (other than an event with respect to the Borrower described in clause (i) or (j) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may with the consent of the Required Lenders, and at the request of the Required Lenders shall, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (i) or (j) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

ARTICLE VIII

THE AGENT

Each of the Lenders hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or

percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Ultimate Parent, the Parent, the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Agent or any of its Affiliates in any capacity (other than as Agent).  The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

   The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

   The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

   Subject to the appointment and acceptance of a successor to the Agent as provided in this paragraph, the Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed and such consent not to be required if an Event of Default under clause (a), (b), (i) or (j) of Article VII has occurred and is continuing), to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Agent and Collateral Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

The Arrangers and Syndication Agent shall be entitled to the benefits of this Article VIII.

ARTICLE IX

MISCELLANEOUS

Section 9.01    Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)        if to the Ultimate Parent, the Parent or the Borrower, to it at Dex Media East, Inc., 1001 Winstead Drive, Cary, North Carolina, 27513, Attention of General Counsel (Telecopy No. (919) 297-1518);

(ii)        if to the Agent, to JPMorgan Chase Bank, N.A., Global Loan Operations, 500 Stanton Christiana Road, Ops 2, Floor 3, Newark, Delaware 19713, Attention of John Getchius (Telecopy No. (9302) 634-3301, with a copy to JPMorgan Chase Bank, N.A., 383 Madison Avenue, New York, New York 10179, Attention of Neil Boylan (Telecopy No. (212) 622-4560); and

(iii)        if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided, that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)  Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 9.02    Waivers; Amendments.  (a) No failure or delay by the Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that

they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)  Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Ultimate Parent, the Parent, the Borrower and the Required Lenders, (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent or the Shared Collateral Agent, as applicable, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, or (z) in the case of this Agreement or any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Loan Party or Loan Parties subject to such Loan Document, the Agent and, as applicable, the Shared Collateral Agent, to cure any ambiguity, omission, defect or inconsistency; provided that any such agreement to waive, amend or modify this Agreement or any other Loan Document or any provision hereof or thereof pursuant to the foregoing clause (z) shall also be made to the Dex West Credit Agreement or the Dex West Loan Documents, the RHDI Credit Agreement or the RHDI Loan Documents, or the SuperMedia Credit Agreement or SuperMedia Loan Documents, as applicable; provided, further, that no such agreement shall (i) reduce the principal amount of any Loan held by any Lender or reduce the rate of interest thereon, or reduce any fees payable to any Lender hereunder, without the written consent of such Lender, (ii) postpone the maturity of any Lender's Loan, or any scheduled date of payment of the principal amount of any Lender's Loan under Section 2.05, or any date for the payment of any interest or fees payable to any Lender hereunder, or reduce the amount of, waive or excuse any such payment, without the written consent of such Lender, (iii) change Section 2.13(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (iv) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (v) except as provided by Section 9.14, release any Guarantor from its Guarantee under a Collateral Agreement, Newco Subordinated Guarantee or other applicable Security Document or Shared Collateral Security Document (except as expressly provided in the applicable Collateral Agreement, Newco Subordinated Guarantee or other Security Document or Shared Collateral Security Document), or limit its liability in respect of such Guarantee, without the written consent of each Lender, (vi) release all or substantially all of the Collateral from the Liens of the Security Documents and Shared Collateral Security Documents, without the written consent of each Lender; provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent without the prior written consent of the Agent. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Ultimate Parent, the Parent, the Borrower, the Required Lenders and the Agent if at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

(c)  If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i) through (vi), inclusive, of the second proviso to Section 9.02(b), the consent of Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding Loans at such time is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clause (i) or (ii) below, to either (i) replace each such non-consenting Lender or Lenders with one or more assignees pursuant

to, and with the effect of an assignment under, Section 2.14 so long as at the time of such replacement, each such assignee consents to the proposed change, waiver, discharge or termination or (ii) repay the outstanding Loans of such Lender that gave rise to the need to obtain such Lender's consent; provided (A) that, unless the Loans that are repaid pursuant to the preceding clause (ii) are immediately replaced in full at such time through the addition of new Lenders or the increase of the outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to the preceding clause (ii), Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding Loans at such time (determined after giving effect to the proposed action) shall specifically consent thereto and (B) any such replacement or termination transaction described above shall be effective on the date notice is given of the relevant transaction and shall have a settlement date no earlier than five Business Days and no later than 90 days after the relevant transaction.

Section 9.03    Expenses; Indemnity; Damage Waiver.  (a)  The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Agent, the Arrangers and their Affiliates, including the reasonable fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent and the Arrangers and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers, in connection with the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all out-of-pocket expenses incurred by the Agent, the Arrangers or any Lender, (including the fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent, the Arrangers and any Lender and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers) in connection with documentary taxes or the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans and (iii) all other reasonable out-of-pocket expenses as may be separately agreed with the Administrative Agent.

(b)  The Borrower shall indemnify the Agent, the Arrangers and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of (a) a single transaction and documentation counsel for any Indemnitee and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)  To the extent that the Borrower fails to pay any amount required to be paid by it to the Agent under paragraph (a) or (b) of this Section, but without affecting the Borrower's obligations thereunder, each Lender severally agrees to pay to the Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount;

provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans at the time.

(d)  To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions or any Loan or the use of the proceeds thereof.

(e)  All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

Section 9.04    Successors and Assigns.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than the Borrower or its Affiliates or Subsidiaries) all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A) the Borrower, provided that no consent of the Borrower shall be required (x) for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund (as defined below) or, (y) if an Event of Default has occurred and is continuing, any other assignee; and

(B) the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of Loans to an assignee that is a Lender immediately prior to giving effect to such assignment, an Affiliate of a Lender or an Approved Fund.

(ii)        Assignments shall be subject to the following conditions:

(A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loan, the amount of the Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, in each case unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (it being understood that only a single processing and recordation fee of $3,500 will be payable with respect to any multiple assignments to or by a Lender, an Affiliate of a Lender or an Approved Fund pursuant to clause (ii)(A) above, each of which is individually less than $1,000,000, that are simultaneously consummated); and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For purposes of this Section 9.04, the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) any entity or an Affiliate of an entity that administers, advises or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 2.12 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time, which register shall indicate that each lender is entitled to interest paid with respect to such Loans (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i)Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans

owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the second proviso to Section 9.02(b) that affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 2.12 (subject to the requirements and limitations therein, including the requirements under Section 2.12(e) (it being understood that the documentation required under Section 2.12(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13(c) as though it were a Lender.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.10 or 2.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05     Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.  The provisions of Sections 2.10, 2.11, 2.12 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent and the Arrangers constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when the conditions set forth in Section 4.01 hereof shall have been satisfied, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or email transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.  (a)  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)  Each of the Ultimate Parent, the Parent and the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Ultimate Parent, the Parent, the Borrower or its properties in the courts of any jurisdiction.

(c)  Each of the Ultimate Parent, the Parent and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  [After the Closing Date, the Bankruptcy Court's retention of jurisdiction shall not govern the interpretation or enforcement of the Loan Documents or any rights or remedies related thereto.][42]

(e)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    Confidentiality.  Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, partners, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any pledgee referred to in Section 9.04(d), (iii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations or (iv) any credit insurance provider relating to the Borrower and its Obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Agent or any Lender on a nonconfidential basis from a source other than the Ultimate Parent or any Subsidiary thereof.  For the purposes of this Section, "Information" means all information received from the Ultimate Parent or any Subsidiary thereof relating to the Ultimate Parent or any Subsidiary thereof or its business, other than any such information that is available to the Agent or any Lender on a nonconfidential basis prior to disclosure by the Ultimate Parent or any Subsidiary thereof; provided, that, in the case of information received from the Ultimate Parent or any Subsidiary thereof after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with

---

[42] To be included if applicable

its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to confidential information of its other customers.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or its Affiliates or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.13    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.14    Termination or Release.  (a)  At such time as the Loans, all accrued interest and fees under this Agreement, and all other obligations of the Dex East Loan Parties under the Loan Documents (other than obligations under Sections 2.10, 2.11, 2.12 and 9.03 that are not then due and payable) shall have been paid in full in cash, (i) the Collateral shall be released from the Liens created by the Security Documents and with respect to the Dex East Obligations, the Shared Collateral Security Documents and (ii) the obligations (other than those expressly stated to survive termination) of the Agent and each Loan Party under the Security Documents and, with respect to the Dex East Obligations, the Shared Collateral Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(b)  A Subsidiary Loan Party shall automatically be released from its obligations under the Guarantee and Collateral Agreement and the security interests in the Collateral of such Subsidiary Loan Party shall be automatically released upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary of the Borrower.

(c)  Upon any sale or other transfer by any Dex East Loan Party of any Collateral that is permitted under this Agreement to any Person that is not a Dex East Loan Party, or upon the effectiveness of any written consent to the release of the security interest granted by the Guarantee and Collateral Agreement or any other Loan Document in any Collateral of the Dex East Loan Parties pursuant to Section 9.02 of this

Agreement, the security interest in such Collateral granted by the Guarantee and Collateral Agreement and the other Loan Documents shall be automatically released (it being understood that, in the case of a sale or other transfer to a Shared Collateral Loan Party, such Collateral shall become subject to a security interest in favor of the Shared Collateral Agent as to the extent set forth in the Shared Collateral Security Documents upon the consummation of such sale or other transfer).

(d)  In connection with any termination or release pursuant to paragraph (a), (b) or (c) of this Section 9.14, the Collateral Agent shall execute and deliver to any Loan Party at such Loan Party's expense all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section 9.14 shall be without recourse to or warranty by the Collateral Agent or any Lender.

Section 9.15    USA Patriot Act.  Each Lender hereby notifies the Ultimate Parent, the Parent and the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "USA Patriot Act"), it is required to obtain, verify and record information that identifies the Ultimate Parent, the Parent and the Borrower, which information includes the name and address of the Ultimate Parent, the Parent and the Borrower and other information that will allow such Lender to identify the Ultimate Parent, the Parent and the Borrower in accordance with the USA Patriot Act.

Section 9.16    Intercreditor Agreement.  Each Lender agrees that it will be bound by, and shall take no actions contrary to, the provisions of the Intercreditor Agreement or any intercreditor agreement entered into in connection with any Newco Subordinated Guarantee and authorizes the Agent to enter into the Intercreditor Agreement and any intercreditor agreement to be entered into in connection with any Newco Subordinated Guarantee (which shall be in form and substance reasonably satisfactory to the Agent) on its behalf.

Section 9.17    Amendment and Restatement.  On the Closing Date, the Existing Credit Agreement will be automatically amended and restated in its entirety to read in full as set forth herein, and all of the provisions of this Agreement which were previously not effective or enforceable shall become effective and enforceable.  Notwithstanding anything to the contrary herein, subject to the satisfaction (or waiver) of the conditions set forth in Section 4.01, the Lenders hereby waive, and shall be deemed to have waived, each Default and Event of Default under (and as defined in) the Existing Credit Agreement in existence as of the Closing Date to the extent (i) arising out of the commencement of the Chapter 11 Cases or (ii) such Default or Event of Default otherwise shall have occurred and be continuing based on facts known to the Administrative Agent and the Lenders as of the Closing Date.

[*remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

NEWDEX, INC.

By:_____
   Name:
   Title:

DEX MEDIA, INC.

By:_____
   Name:
   Title:

DEX MEDIA EAST, INC.

By:_____
   Name:
   Title:

JPMORGAN CHASE BANK, N.A., as
Administrative Agent and Collateral Agent,
and as a Lender


By:_____
    Name:
    Title:

**EXHIBIT B TO THE PLAN**

AMENDED AND RESTATED DEX WEST SECURED CREDIT AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

CREDIT AGREEMENT

dated as of

June 6, 2008,
as amended and restated as of January 29, 2010, and
as further amended and restated as of [        ], 2013,

among

NEWDEX, INC.,

DEX MEDIA, INC.,

DEX MEDIA WEST, INC.,
as Borrower,

The Lenders Party Hereto

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and Collateral Agent

_____

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Syndication Agent

_____

J.P. MORGAN SECURITIES LLC and

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 2 |
| Section 1.02 | Classification of Loans and Borrowings | 34 |
| Section 1.03 | Terms Generally | 34 |
| Section 1.04 | Accounting Terms; GAAP | 34 |

## ARTICLE II

### THE CREDITS

| | | |
|---|---|---|
| Section 2.01 | Loans | 34 |
| Section 2.02 | Borrowings | 35 |
| Section 2.03 | Interest Elections | 35 |
| Section 2.04 | Repayment of Loans; Evidence of Debt | 36 |
| Section 2.05 | Amortization of Loans | 36 |
| Section 2.06 | Prepayment of Loans | 37 |
| Section 2.07 | Fees | 39 |
| Section 2.08 | Interest | 40 |
| Section 2.09 | Alternate Rate of Interest | 40 |
| Section 2.10 | Increased Costs; Illegality | 41 |
| Section 2.11 | Break Funding Payments | 42 |
| Section 2.12 | Taxes. | 42 |
| Section 2.13 | Payments Generally; Pro Rata Treatment; Sharing of Setoffs. | 45 |
| Section 2.14 | Mitigation Obligations; Replacement of Lenders | 46 |
| Section 2.15 | Voluntary Prepayments Below Par | 47 |

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 3.01 | Organization; Powers. | 49 |
| Section 3.02 | Authorization; Enforceability. | 49 |
| Section 3.03 | Governmental Approvals; No Conflicts. | 49 |
| Section 3.04 | Financial Condition | 50 |
| Section 3.05 | Properties | 50 |
| Section 3.06 | Litigation and Environmental Matters | 50 |
| Section 3.07 | Compliance with Laws and Agreements | 50 |
| Section 3.08 | Investment Company Status | 51 |
| Section 3.09 | Taxes | 51 |
| Section 3.10 | ERISA | 51 |
| Section 3.11 | Margin Regulations. | 51 |
| Section 3.12 | Disclosure | 51 |
| Section 3.13 | Subsidiaries | 51 |
| Section 3.14 | Insurance | 52 |
| Section 3.15 | Labor Matters. | 52 |

Section 3.16    Senior Debt. ................................................................................................ 52
Section 3.17    Security Documents. ..................................................................................... 52
Section 3.18    Liens. ............................................................................................................ 53
Section 3.19    [Bankruptcy Court Orders. ........................................................................... 53

## ARTICLE IV

## CONDITIONS

Section 4.01    Effectiveness of Agreement. ......................................................................... 53

## ARTICLE V

## AFFIRMATIVE COVENANTS

Section 5.01    Financial Statements and Other Information. ................................................. 57
Section 5.02    Notices of Material Events. ........................................................................... 61
Section 5.03    Information Regarding Collateral. .................................................................. 62
Section 5.04    Existence; Conduct of Business. .................................................................... 62
Section 5.05    Payment of Obligations. ................................................................................ 62
Section 5.06    Maintenance of Properties. ............................................................................ 62
Section 5.07    Insurance. ...................................................................................................... 63
Section 5.08    Casualty and Condemnation. .......................................................................... 63
Section 5.09    Books and Records; Inspection and Audit Rights. ........................................... 63
Section 5.10    Compliance with Laws. .................................................................................. 63
Section 5.11    Additional Subsidiaries. ................................................................................. 63
Section 5.12    Further Assurances. ....................................................................................... 63
Section 5.13    Credit Ratings. ............................................................................................... 64
Section 5.14    Intellectual Property ...................................................................................... 64
Section 5.15    Independent Director ...................................................................................... 65

## ARTICLE VI

## NEGATIVE COVENANTS

Section 6.01    Indebtedness; Certain Equity Securities. ........................................................ 65
Section 6.02    Liens. ............................................................................................................ 66
Section 6.03    Fundamental Changes. .................................................................................... 67
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions. ........................ 67
Section 6.05    Asset Sales. .................................................................................................... 68
Section 6.06    Sale and Leaseback Transactions. .................................................................. 70
Section 6.07    Swap Agreements. ......................................................................................... 70
Section 6.08    Restricted Payments; Certain Payments of Indebtedness. ............................... 70
Section 6.09    Transactions with Affiliates. .......................................................................... 72
Section 6.10    Restrictive Agreements .................................................................................. 72
Section 6.11    Change in Business. ....................................................................................... 73
Section 6.12    Fiscal Year. .................................................................................................... 73
Section 6.13    Amendment of Material Documents. .............................................................. 73
Section 6.14    Leverage Ratio and Interest Coverage Ratio. ................................................. 73
Section 6.15    Capital Expenditures ...................................................................................... 74

Section 6.16    Parent Covenants. ........................................................................................ 74
Section 6.17    Ultimate Parent Covenants ........................................................................ 75
Section 6.18    Service Company Covenants. ..................................................................... 76
Section 6.19    Dex Media Service Covenant ..................................................................... 78
Section 6.20    Limitation on Activities of the License Subsidiaries................................... 78

ARTICLE VII

EVENTS OF DEFAULT

ARTICLE VIII

THE AGENT

ARTICLE IX

MISCELLANEOUS

Section 9.01    Notices. ....................................................................................................... 84
Section 9.02    Waivers; Amendments ............................................................................... 84
Section 9.03    Expenses; Indemnity; Damage Waiver ....................................................... 86
Section 9.04    Successors and Assigns. .............................................................................. 87
Section 9.05    Survival ...................................................................................................... 89
Section 9.06    Counterparts; Integration; Effectiveness ................................................... 90
Section 9.07    Severability.................................................................................................. 90
Section 9.08    Right of Setoff. ........................................................................................... 90
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process. ..................... 90
Section 9.10    WAIVER OF JURY TRIAL ....................................................................... 91
Section 9.11    Headings ...................................................................................................... 91
Section 9.12    Confidentiality.............................................................................................. 91
Section 9.13    Interest Rate Limitation. ............................................................................. 92
Section 9.14    Termination or Release................................................................................. 92
Section 9.15    USA Patriot Act. ......................................................................................... 93
Section 9.16    Intercreditor Agreement. ............................................................................ 93
Section 9.17    Amendment and Restatement ...................................................................... 93

SCHEDULES:

Schedule 1.01A --    Directory Consolidation Project
Schedule 1.01B --    Mortgaged Property
Schedule 3.05   --    Properties
Schedule 3.09   --    Taxes
Schedule 3.13   --    Subsidiaries
Schedule 3.14   --    Insurance
Schedule 3.17   --    UCC Filing Jurisdictions
Schedule 6.01   --    Existing Indebtedness
Schedule 6.02   --    Existing Liens
Schedule 6.04   --    Existing Investments
Schedule 6.10   --    Existing Restrictions

EXHIBITS:

Exhibit A    --    Form of Assignment and Assumption
Exhibit B    --    Form of Acknowledgment and Confirmation
Exhibit C    --    Form of Amended and Restated Shared Guarantee and Collateral Agreement
Exhibit D    --    Form of Amended and Restated Intercreditor and Collateral Agency Agreement
Exhibit E    --    Form of Amended and Restated Shared Services Agreement
Exhibit F    --    Form of Newco Subordinated Guarantee
Exhibit G    --    Form of Subordinated Guarantee Agreement
Exhibit H    --    Form of License Agreement
Exhibit I    --    Form of Master IP License Agreement
Exhibit J    --    Form of Election Notice
Exhibit K    --    Form of Dex Tax Sharing Agreement
Exhibit L    --    Form of SuperMedia Tax Sharing Agreement
Exhibit M    --    Form of Tax Certificates

CREDIT AGREEMENT, dated as of June 6, 2008, as amended and restated as of January 29, 2010 and as further amended and restated as of [          ] (this "Agreement"), among NEWDEX, INC., a Delaware corporation, DEX MEDIA, INC., a Delaware corporation, DEX MEDIA WEST, INC., a Delaware corporation, the several banks and other financial institutions or entities from time to time party hereto (the "Lenders"), and JPMORGAN CHASE BANK, N.A., as administrative agent and collateral agent for such lenders.

Recitals

WHEREAS, the Ultimate Parent, the Parent and the Borrower (as each term is defined below) are parties to the Credit Agreement (as amended, supplemented or otherwise modified prior to the Closing Date (as defined below), the "Existing Credit Agreement"), dated as of June 6, 2008 and amended and restated as of January 29, 2010 (the "Original Restatement Date"), among the Ultimate Parent, the Parent, the Borrower, the Lenders and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent;

[WHEREAS, on [_____, 2013] (the "Petition Date"), the Ultimate Parent (as defined below) and its Subsidiaries (as defined below) each commenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of the Bankruptcy Code (as defined below) in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on the Petition Date, the Ultimate Parent and its Subsidiaries filed with the Bankruptcy Court the Reorganization Plan (as defined below) and the Disclosure Statement (as defined below);

WHEREAS, on [_____, 2013], the Bankruptcy Court entered the Confirmation Order (as defined below) confirming the Reorganization Plan;

WHEREAS, pursuant to the Reorganization Plan, the Ultimate Parent and its Subsidiaries have implemented (or substantially simultaneously with the Closing Date will implement) the Amendments (as defined below);][1]

WHEREAS, the Ultimate Parent and SuperMedia Inc. ("SuperMedia") have entered into a Merger Agreement, dated as of August 20, 2012, as amended and restated as of December 5, 2012 (the "Merger Agreement"), by and among Dex One, NewDex, Inc. ("Newdex"), Spruce Acquisition Sub, Inc. ("Merger Sub") and SuperMedia, pursuant to which Dex One merged with Newdex, with Newdex as the surviving corporation (the "Dex Merger"), and SuperMedia merged with Merger Sub, with SuperMedia as the surviving corporation (the "SuperMedia Merger" and together with the Dex Merger, the "Mergers");

WHEREAS, after giving effect to the Mergers, SuperMedia has become a direct wholly owned subsidiary of Newdex and Newdex has become the Ultimate Parent;

WHEREAS, the Ultimate Parent, the Parent and the Borrower have requested that the Lenders amend and restate the Existing Credit Agreement as provided in this Agreement; and

WHEREAS, the Lenders are willing to so amend and restate the Existing Credit Agreement on the terms and conditions set forth herein.

---

[1] To be included if applicable

Now, therefore, the parties hereto agree that the Existing Credit Agreement shall be amended and restated in its entirety as of the Closing Date to read as follows:

ARTICLE I

DEFINITIONS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"Acknowledgment and Confirmation" means an Acknowledgment and Confirmation substantially in the form of Exhibit B hereto, dated the date hereof, executed by each Dex East Loan Party.

"Additional Notes" means notes issued by the Ultimate Parent after the date hereof (a) that are not secured by any assets of the Ultimate Parent or any of its Subsidiaries, (b) that bear interest at a prevailing market rate at the time of the issuance thereof, (c) the proceeds of which are used to refinance the Restructuring Notes or any Additional Notes, (d) that do not mature, and are not mandatorily redeemable, in whole or in part, or required to be repurchased or reacquired, in whole or in part, prior to the date that is six months after the Maturity Date (other than pursuant to asset sale or change in control provisions customary in offerings of similar notes), (e) that have no financial maintenance covenants and no restrictive covenants that apply to any Subsidiary of the Ultimate Parent or that impose limitations on the Ultimate Parent's ability to guarantee or pledge assets to secure the Obligations and otherwise have covenants, representations and warranties and events of default that are no more restrictive than those existing in the prevailing market at the time of issuance for companies with the same or similar credit ratings of the Ultimate Parent at such time issuing similar securities, (f) are not guaranteed by any Subsidiary of the Ultimate Parent and are subordinated to the Obligations on terms that are no less favorable to the Lenders than the subordination terms set forth in the Restructuring Notes Indenture and that are otherwise reasonably satisfactory to the Administrative Agent and (g) are not convertible or exchangeable except into (i) other Indebtedness of the Ultimate Parent meeting the qualifications set forth in this definition or (ii) common equity of the Ultimate Parent, provided that any such exchange or conversion, if effected, would not result in a Change in Control or a Default.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Lenders hereunder and its Affiliates and permitted successors acting in such capacity.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Advance Amortization Payment" has the meaning assigned to such term in Section 2.06(a).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means JPMorgan Chase Bank, N.A., in its capacities as Administrative Agent and/or Collateral Agent, and each of its Affiliates and successors acting in any such capacity.  The Administrative Agent may act on behalf of or in place of any Person included in the "Agent".

"Agreement" has the meaning assigned in the preamble hereto.

"Allocable Net Proceeds" means, with respect to any Equity Issuance by the Ultimate Parent, 15% of the Net Proceeds of such Equity Issuance; provided, that to the extent the Indebtedness outstanding under (a) the RHDI Credit Agreement has been repaid in full, Allocable Net Proceeds shall mean 19% of the Net Proceeds of such Equity Issuance, (b) the Dex East Credit Agreement has been repaid in full, the Allocable Net Proceeds shall mean 17% of the Net Proceeds of such Equity Issuance, (c) the RHDI Credit Agreement and the Dex East Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 22% of the Net Proceeds of such Equity Issuance, (d) the SuperMedia Credit Agreement has been repaid in full, Allocable Net Proceeds shall mean 32% of the Net Proceeds of such Equity Issuance, (e) the RHDI Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 54% of the Net Proceeds of such Equity Issuance, (f) the Dex East Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 44% of the Net Proceeds of such Equity Issuance and (g) the Dex East Credit Agreement, the RHDI Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 100% of the Net Proceeds of such Equity Issuance.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%, (c) the Adjusted LIBO Rate for a Eurodollar Loan with an Interest Period of one month commencing on such day plus 1% and (d) 4.00%, provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on Reuters Screen LIBOR 01 Page (or on any successor or substitute of such page) at approximately 11:00 a.m., London time, on such day.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"Amendments" means, collectively, the amendment and restatement of the RHDI Existing Credit Agreement, the Dex East Existing Credit Agreement and the SuperMedia Existing Credit Agreement, pursuant to the RHDI Credit Agreement, the Dex East Credit Agreement and the SuperMedia Credit Agreement, respectively (in each case referred to in clause (a) in the definition thereof)[, which amendments were consummated pursuant to the Reorganization Plan][2].

"Applicable Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"Applicable Rate" means, for any day, with respect to any Loan, 4.00% per annum, in the case of an ABR Loan, and 5.00% per annum, in the case of a Eurodollar Loan.

---

[2] To be included if applicable

"Approved Fund" has the meaning assigned to such term in Section 9.04.

"Arrangers" means, collectively, J.P. Morgan Securities LLC and Deutsche Bank Securities Inc., in their capacities as Joint Lead Arrangers and Joint Bookrunners.

"Asset Disposition" means (a) any sale, lease, assignment, conveyance, transfer or other disposition (including pursuant to a sale and leaseback or securitization transaction) of any property or asset of the Borrower or any Subsidiary other than (i) dispositions described in clauses (a), (b), (c), (d), (f), (g) and (h) of Section 6.04(n) and (ii) dispositions described in Section 6.05(e) resulting in aggregate Net Proceeds not exceeding $2,500,000 during the term of this Agreement and (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary, but only to the extent that the Net Proceeds therefrom have not been applied to repair, restore or replace such property or asset within 365 days after such event.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Attributable Debt" means, on any date, in respect of any lease of the Borrower or any Subsidiary entered into as part of a sale and leaseback transaction subject to Section 6.06, (a) if such lease is a Capital Lease Obligation, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP and (b) if such lease is not a Capital Lease Obligation, the capitalized amount of the remaining lease payments under such lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease Obligation.

["Bankruptcy Code" means title 11 of the United States Code (11 U.S.C. §101 et seq.), as amended from time to time, and any successor statute.][3]

["Bankruptcy Court" has the meaning assigned to such term in the recitals to this Agreement.][4]

"Billing and Collection Agreement" means the Agreement for the Provision of Billing and Collection Services for Directory Publishing Services dated as of November 1, 2004, between Qwest Corp. and the Parent.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means Dex Media West, Inc., a Delaware corporation.

"Borrower Receivables" means the receivables of the Borrower or its Subsidiaries subject to purchase by Qwest Corp. pursuant to the Billing and Collection Agreement.

"Borrower's Discounted Prepayment Percentage" means 30%.

---

[3] To be included if applicable

[4] To be included if applicable

"Borrower's Discounted Prepayment Portion of Excess Cash Flow" means an amount determined following the end of each fiscal quarter of the Borrower (and certified by a Financial Officer of the Borrower pursuant to Section 5.01(d)), commencing with the first such fiscal quarter ending after the Closing Date, equal to (i) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the Borrower's Discounted Prepayment  Percentage, minus (ii) (a) any Discounted Voluntary Prepayment made during the applicable ECF Period as to which the Borrower has delivered an Election Notice to the Administrative Agent that such Discounted Voluntary Prepayment shall constitute a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow within the applicable 180-day period described in Section 2.06(e) and (b) all (x) Advance Amortization Payments, (y) prepayments made pursuant to Section 2.06(a) (other than Advance Amortization Payments) and (z) other prepayments made pursuant to Section 2.06(d), in each case to the extent the Borrower has delivered an Election Notice to the Administrative Agent that such payment shall constitute a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow, provided that, for purposes of Section 2.06(e), the Borrower's Discounted Prepayment Portion of Excess Cash Flow shall be calculated as to each individual fiscal quarter and shall not be reduced or affected by any subsequent calculation of the Borrower's Discounted Prepayment Portion of Excess Cash Flow at the end of any subsequent fiscal quarter.

"Borrower's Discretionary Percentage" means 20%.

"Borrower's Discretionary Portion of Excess Cash Flow" means an amount determined following the end of each fiscal quarter of the Borrower (and certified by a Financial Officer of the Borrower pursuant to Section 5.01(d)), commencing with the first such fiscal quarter ending after the Closing Date, equal to (i) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the Borrower's Discretionary Percentage, minus (ii) all Discounted Voluntary Prepayments made during the applicable ECF Period as to which the Borrower has delivered an Election Notice to the Administrative Agent that such Discounted Voluntary Prepayment shall constitute a utilization of the Borrower's Discretionary Portion of Excess Cash Flow.

"Borrower's Portion of Excess Cash Flow" means, collectively, the Borrower's Discounted Prepayment Portion of Excess Cash Flow and the Borrower's Discretionary Portion of Excess Cash Flow.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided, that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, without duplication, (i) the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Subsidiaries for such period, determined in accordance with GAAP and (ii) the portion of the additions to property, plant and equipment and other capital expenditures of the Service Company for such period allocated to, and funded by, the Borrower and its consolidated Subsidiaries pursuant to the Shared Services Agreement.

"Capital Lease Obligations" of any Person means (i) the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations

shall be the capitalized amount thereof determined in accordance with GAAP and (ii) in the case of the Borrower and its Subsidiaries, the portion of the obligations of the Service Company described in the foregoing clause (i) allocated to, and funded by, the Borrower and its Subsidiaries pursuant to the Shared Services Agreement.

["Cash Collateral Order" means the Final Order Under 11 U.S.C. §§ 105, 361, 362, 363, 552 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to the Prepetition Secured Parties, entered by the Bankruptcy Court on [____], 2013.][5]

"Change in Control" means, subject to the proviso below:

(a)  the ownership, beneficially or of record, by any Person other than the Parent of any Equity Interest in the Borrower;

(b)  the ownership, beneficially or of record, by any Person other than the Ultimate Parent of any Equity Interest in the Parent;

(c)  for so long as the Shared Services Agreement is in existence, the ownership, beneficially or of record, by any Person other than the Ultimate Parent of any Equity Interests in the Service Company;

(d)  the ownership, beneficially or of record, by any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of more than 35% of the outstanding Equity Interests in the Ultimate Parent;

(e)  occupation of a majority of the seats (other than vacant seats) on the Governing Board of the Ultimate Parent or the Parent by Persons who were not (i) members of such Governing Board as of the Closing Date [(after giving effect to the Reorganization Plan)][6], (ii) nominated by, or whose nomination for election was approved or ratified by a majority of the directors or members of, the Governing Board of the Ultimate Parent or the Parent, as applicable, or (iii) appointed by Persons described in the foregoing clauses (i) and (ii); or

(f) the occurrence of a "Change of Control" (or similar term) as defined in the Restructuring Notes Indenture or any indenture, agreement or other instrument governing the Additional Notes;

provided, that the consummation of the Mergers pursuant to the SuperMedia Merger Agreement shall not constitute a Change in Control.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.10(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

---

[5] To be included if applicable

[6] To be included if applicable

["Chapter 11 Cases" has the meaning assigned to such term in the recitals to this Agreement.][7]

"Charges" has the meaning assigned to such term in Section 9.13.

"Closing Date" means the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied (or waived) and the notice contemplated in the last sentence of Section 4.01 shall have been delivered, which date is [_____, 2013].[8]

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document or Shared Collateral Security Document.

"Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Secured Parties and its Affiliates and permitted successors acting in such capacity.

"Collateral Agreements" means the collective reference to the Guarantee and Collateral Agreement and the Shared Guarantee and Collateral Agreement.

"Collateral and Guarantee Requirement" means the requirement that:

(a)      the Collateral Agent shall have received from each Dex West Loan Party either (i) a counterpart of the Guarantee and Collateral Agreement duly executed and delivered on behalf of such Dex West Loan Party or (ii) in the case of any Subsidiary that becomes a Subsidiary Loan Party after the Closing Date, a supplement to the Guarantee and Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Subsidiary;

(b)      the Shared Collateral Agent shall have received from each Shared Collateral Loan Party (other than the Newco Subordinated Guarantors) either (i) a counterpart of the Shared Guarantee and Collateral Agreement duly executed and delivered on behalf of such Shared Collateral Loan Party or (ii) in the case of any Newco that becomes a Shared Collateral Loan Party after the Closing Date, a supplement to the Shared Guarantee and Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Newco;

(c)      all outstanding Equity Interests of the Borrower and each other Subsidiary Loan Party shall have been pledged pursuant to the Guarantee and Collateral Agreement (except that the Borrower and each other Subsidiary Loan Party shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and the Collateral Agent shall have received all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

---

[7] To be included if applicable

[8] If the Closing Date occurs prior to March 31, 2013, the initial delivery of annual financial statements will be adjusted and the Excess Cash Flow prepayment provisions will be adjusted to require payment of the Excess Cash Flow prepayment under the Existing Credit Agreement for the period ending December 31, 2012.

(d)      all outstanding Equity Interests of the Parent, Dex Media Service, Dex Digital, RHDC, the Service Company and each other Subsidiary owned by or on behalf of any Shared Collateral Loan Party shall have been pledged pursuant to the Shared Guarantee and Collateral Agreement (except that the Shared Collateral Loan Parties shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and, subject to the terms of the Intercreditor Agreement, the Shared Collateral Agent shall have received all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(e)      the Shared Collateral Agent shall have received from each Newco Subordinated Guarantor a subordinated guarantee substantially in the form of Exhibit F (or such other form as shall be reasonably acceptable to the Agent and the Shared Collateral Agent), which shall (i) to the extent permitted by the terms of any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor (without giving effect to any restriction effected by any amendment thereto entered into in contemplation of such assumption) and any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor, be secured by a pledge of the Equity Interests of such Newco Subordinated Guarantor's Subsidiaries and any joint venture interest owned by such Newco Subordinated Guarantor (subject to any restrictions in the applicable joint venture agreement applicable to all partners of such joint venture; it being understood and agreed that in the event any such restriction exists, the Administrative Agent and such Newco Subordinated Guarantor shall agree upon alternative structures, if available, to effect the economic equivalent of a pledge of the applicable joint venture interest) and (ii) to the extent required by the terms of any such Indebtedness (without giving effect to any restriction effected by any amendment, waiver, modification or refinancing thereto entered into in contemplation of such assumption) be subordinated to any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor and any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor; provided, that (i) to the extent that any restriction shall exist which shall not permit such Guarantee or which requires the subordination thereof as described above, the Borrower shall deliver, or cause to be delivered, true and complete copies of all relevant agreements received by the Borrower in respect of such Indebtedness, certified by a Financial Officer, to the Agent at least ten Business Days prior to the completion of the acquisition of the applicable Newco Subordinated Guarantor (or, in the case of any such agreement received by the Borrower after such tenth Business Day, promptly following the Borrower's receipt of such agreement) and (ii) notwithstanding the foregoing, no Newco Subordinated Guarantor shall be required to guarantee the Obligations to the extent such Guarantee is prohibited by the terms of any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor (without giving effect to any restriction effected by any amendment, waiver, modification or refinancing thereto entered into in contemplation of such assumption) or any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor if no alternative financing (on terms not materially less favorable taken as a whole to the applicable borrower or issuer) is available that would permit such Guarantee or is otherwise prohibited under applicable law; provided, further, that (x) the Ultimate Parent shall use its commercially reasonable efforts to amend any such assumed Indebtedness that is otherwise being amended in connection with such acquisition to permit such Guarantee and (y) if any Newco Subordinated Guarantor is unable to Guarantee the Obligations due to circumstances described in the first proviso hereof, then (A) the Ultimate Parent may only effect the acquisition of such Newco Subordinated Guarantor to the extent it provides evidence reasonably satisfactory to the Administrative Agent, and certification by a Financial Officer, that the Ultimate Parent was unable to obtain amendments (after use of commercially reasonable efforts) and/or alternative financing (on terms not materially less

favorable taken as a whole to the applicable borrower or issuer) was not available, as the case may be, permitting such Guarantee or such Guarantee was otherwise prohibited by applicable law (and providing a description of such applicable law) and (B) to the extent permitted by applicable law, a holding company shall be formed to hold 100% of the shares of the applicable Newco Subordinated Guarantor, which holding company shall Guarantee the Obligations and pledge the stock of such Newco Subordinated Guarantor to secure such Guarantee (any Guarantee provided by this clause (e), a "Newco Subordinated Guarantee");

(f)     all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent or the Shared Collateral Agent, as applicable, to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and the Shared Collateral Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Collateral Agreements, shall have been filed, registered or recorded or, subject to the Intercreditor Agreement, delivered to the Agent or the Shared Collateral Agent, as applicable, for filing, registration or recording;

(g)     (1) the Collateral Agent shall have received with respect to each Mortgaged Property existing on the Closing Date (i) a Mortgage Amendment, together with (i) evidence that counterparts of said Mortgage Amendments have been delivered to the Title Company (defined below), (ii) a datedown endorsement to the existing title policy insuring the Lien of each such Mortgage (or a reissued title insurance policy) (the "Mortgage Endorsements"), issued by Stewart Title Guaranty Company (the "Title Company"), insuring the Lien of such Mortgage (as amended by the applicable Mortgage Amendment) as a valid Lien on the Mortgaged Property described therein, free of any Liens except those permitted under Section 6.02, (iii) the opinions, addressed to the Collateral Agent and the Lenders of (A) outside counsel or in-house counsel, as to the due authorization, execution and delivery of the Mortgage Amendments by the Borrower or any Loan Party, as applicable, and (B) local counsel in each jurisdiction where Mortgaged Property is located regarding the Mortgage Amendments, (iv) with respect to each Mortgaged Amendment, such affidavits, certificates, instruments of indemnification and other items (including a so-called "gap" indemnification) as shall be reasonably required to induce the Title Company to issue the Mortgage Endorsements contemplated above, (v) evidence reasonably acceptable to the Collateral Agent of payment by the Borrower of all Mortgage Endorsement premiums, search and examination charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgage Amendments, fixture filings and issuance of the Mortgage Endorsements referred to above, in each case, in form and substance reasonably satisfactory to the Collateral Agent,  and (2) with respect to each Mortgaged Property acquired after the date hereof (i) execute and deliver a first priority Mortgage in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such real property, subject to any Liens permitted by Section 6.02, (ii) if requested by the Collateral Agent, the Collateral Agent shall have received, and the Title Company shall have received, maps or plats of an as-built survey of the sites of such Mortgaged Property prepared by an independent professional licensed land surveyor reasonably satisfactory to the Collateral Agent and the Title Company (and certified by such surveyor to the Collateral Agent and the Title Company), which maps or plats and the surveys on which they are based shall be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the American Congress on Surveying and Mapping in 1992,  (iii) the Collateral Agent shall have received in respect of such Mortgaged Property a mortgagee's title insurance policy (or policies) or marked up unconditional binder for such insurance, and each such policy shall (A) be in an amount reasonably satisfactory to the Collateral Agent; (B) be issued at ordinary rates; (C) insure that the Mortgage insured thereby creates a valid first Lien on such Mortgaged Property free and clear of all defects and encumbrances, except as disclosed therein; (D) name the Collateral Agent

for the benefit of the Secured Parties as the insured thereunder; (E) be in the form of ALTA Loan Policy - 2006 (or equivalent policies); (F) contain such endorsements and affirmative coverage as the Collateral Agent may reasonably request, and the Collateral Agent shall have received evidence satisfactory to it that all premiums in respect of each such policy, all charges for mortgage recording tax, and all related expenses, if any, have been paid; (iv) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; (v) if requested by the Collateral Agent, deliver to the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Collateral Agent, and (vi) deliver  to the Collateral Agent a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to such  Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Collateral Agent; and

   (h)  each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents and Shared Collateral Security Documents (or supplements thereto) to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens thereunder.

   "Collateral Trademarks" has the meaning assigned to such term in Section 4.01(e).

   "Companies" means collectively, the Borrower, Dex East, RHDI and SuperMedia, and each, individually, a "Company".

   ["Confirmation Order" means that certain order approving the Disclosure Statement and confirming the Reorganization Plan pursuant to Section 1129 of the Bankruptcy Code entered by the Bankruptcy Court on [  ], 2013.][9]

   "Consolidated Cash Interest Expense" means, for any period, the excess of (a) sum of (i) total cash interest expense (including that attributable to Capital Lease Obligations) of the Borrower and its Subsidiaries for such period with respect to all outstanding Indebtedness of the Borrower and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptance financing and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP) plus (ii) the amount of dividends paid by the Borrower during such period pursuant to Section 6.08(a)(iv) minus (b) total cash interest income of the Borrower and its Subsidiaries for such period.

   "Consolidated EBITDA" means, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) consolidated interest expense for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any extraordinary charges or non-cash charges for such period (provided, however, that any cash payment or expenditure made with respect to any such non-cash charge shall be subtracted in computing Consolidated EBITDA during the period in which such cash payment or expenditure is made), (v) non-recurring charges consisting of (A) severance costs associated with a restructuring recorded during the fiscal years ended December 31, 2015 and December 31, 2016, not to exceed $3,500,000 in any such

---

[9] To be included if applicable

fiscal year, (B) payments of customary investment and commercial banking fees and expenses and (C) cash premiums, penalties or other payments payable in connection with the early extinguishment or repurchase of Indebtedness, and (vi) Specified Charges for such period, provided that such charges are recorded during the period starting on October 1, 2012 and ending on December 31, 2013 and the aggregate amount of charges added back pursuant to this clause (vi) for all periods shall not exceed $13,700,000 (it being understood that such charges may be added back in any four-fiscal-quarter period which includes the fiscal quarter in which such charges are recorded), and minus (b) without duplication and to the extent included in determining such Consolidated Net Income, (i) consolidated interest income for such period and (ii) any extraordinary gains and non-cash gains (including, without limitation, any gain arising from the retirement of Indebtedness) for such period, all determined on a consolidated basis in accordance with GAAP.  For purposes of calculating the Leverage Ratio or the Interest Coverage Ratio as of any date, if the Borrower or any consolidated Subsidiary has made any Permitted Acquisition or sale, transfer, lease or other disposition outside of the ordinary course of business of a Subsidiary or of assets constituting a business unit, in each case as permitted by Section 6.04(n), during the period of four consecutive fiscal quarters (a "Reference Period") most recently ended on or prior to such date, Consolidated EBITDA for the such Reference Period shall be calculated after giving pro forma effect thereto, as if such Permitted Acquisition or sale, transfer, lease or other disposition (and any related incurrence, repayment or assumption of Indebtedness with any new Indebtedness being deemed to be amortized over the applicable testing period in accordance with its terms) had occurred on the first day of such Reference Period.  The calculation of Consolidated EBITDA shall exclude (i) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase method of accounting for the transactions contemplated by any acquisition, in accordance with GAAP [and (ii) any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan][10].

"Consolidated Net Income" means, for any period, the net income or loss, before the effect of the payment of any dividends or other distributions in respect of preferred stock, of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP (adjusted to reflect any charge, tax or expense incurred or accrued by the Parent during such period as though such charge, tax or expense had been incurred by the Borrower, to the extent that the Borrower has made or would be entitled under the Loan Documents to make and intends to make any payment or dividend or other distribution to or for the account of the Parent in respect thereof (but without duplication of any such charge, tax or expense in respect of which Dex East has made or intends to make a payment or dividend or other distribution to or for the account of the Parent) and adjusted to eliminate (i) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase method of accounting for the transactions contemplated by any acquisition, in accordance with GAAP [and (ii) any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan][11]; provided, that there shall be excluded (a) the income of any Person (other than the Borrower or a Subsidiary Loan Party) in which any other Person (other than the Borrower or any Subsidiary Loan Party or any director holding qualifying shares in compliance with applicable law) owns an Equity Interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or any of the Subsidiary Loan Parties during such period, and (b) except as otherwise contemplated by the definition of "Consolidated EBITDA", the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or

---

[10] To be included if applicable

[11] To be included if applicable

consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Debt Issuance" means the incurrence by the Borrower or any Subsidiary of any Indebtedness, other than Indebtedness permitted by Section 6.01(a).

"Default" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender, as reasonably determined by the Administrative Agent, that has (a) notified the Borrower, the Administrative Agent or any other Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under agreements in which it commits to extend credit generally, (b) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (c) (i) been (or has a parent company that has been) adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, unless in the case of any Lender referred to in this clause (c) the Borrower and the Administrative Agent shall be satisfied that such Lender intends, and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder.  For the avoidance of doubt, a Lender shall not be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in such Lender or its parent by a Governmental Authority.

"Dex" means Qwest Dex, Inc., a Colorado corporation.

"Dex Digital" means Dex One Digital, Inc., a Delaware corporation.

"Dex East" means Dex Media East Inc., a Delaware corporation.

"Dex East Existing Credit Agreement" means the Credit Agreement, dated as of October 24, 2007, as amended and restated as of January 29, 2010, among the Ultimate Parent, the Parent, Dex East, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, as amended, supplemented or otherwise modified prior to the effectiveness of the Dex East Credit Agreement.

"Dex East Credit Agreement" means (a) the Credit Agreement, dated as of October 24, 2007 (as amended and restated as of January 29, 2010, as further amended and restated as of the Closing Date, and as further amended, restated, amended and restated, supplemented or otherwise modified from

time to time), among the Ultimate Parent, the Parent, Dex East, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the Dex East Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"Dex East Loan Documents" means the "Loan Documents" as defined in the Dex East Credit Agreement.

"Dex Media Service" means Dex Media Service LLC, a Delaware limited liability company.

"Dex Merger" has the meaning assigned to such term in the recitals to this Agreement.

"Dex One" means Dex One Corporation, a Delaware corporation.

"Dex Support Agreement" means the Support and Limited Waiver Agreement, dated as of December 5, 2013, among the Ultimate Parent, the Parent, the Borrower, Dex East, RHDI and their respective Subsidiaries party thereto, the Agent, the administrative agent and collateral agent under the Dex East Credit Agreement, the administrative agent under the RHDI Credit Agreement and each of the lenders party thereto.

"Dex Tax Sharing Agreement" means the Amended and Restated Tax Sharing Agreement in the form of Exhibit K hereto, dated the date hereof, among Newdex, Dex One, Parent, the Borrower, the Service Company, RHDC, Dex East, RHDI, R.H. Donnelley Apil, Inc. and Dex Digital.

"Dex West Loan Parties" means the Borrower and the Subsidiary Loan Parties.

"Dex West Obligations" has the meaning assigned to such term in the Intercreditor Agreement.

"Directory Consolidation Project" means the initiative described in Schedule 1.01A.[12]

["Disclosed Matters" means the matters, proceedings, transactions and other information disclosed in the [Disclosure Statement][Registration Statement on Form S-4] (other than any risk factor disclosures contained under the heading "Risk Factors", any disclosures of risks in the "Forward-Looking Statements" disclaimer or any other similar forward-looking statements in the Disclosure Statement).][13]

["Disclosure Statement" means the Disclosure Statement for the Reorganization Plan, the adequacy of which was approved by the Bankruptcy Court pursuant to the Confirmation Order.][14]

---

[12] Summary from the Term Sheet to be listed on the schedule.

[13] To be included if applicable

[14] To be included if applicable

"Discounted Voluntary Prepayment" has the meaning assigned to such term in Section 2.15(a).

"Discounted Voluntary Prepayment Amount" has the meaning assigned to such term in Section 2.15(b).

"Discounted Voluntary Prepayment Notice" has the meaning assigned to such term in Section 2.15(b).

"Dollars" or "$" refers to lawful money of the United States of America.

"East Territories" means the states of Colorado, Iowa, Minnesota, Nebraska, New Mexico, North Dakota and South Dakota and the metropolitan statistical area of El Paso, Texas.

"ECF Period" means the period beginning on January 1, 2013 and ending at the end of the applicable fiscal quarter thereafter.

"ECF Sweep Percentage" means 50%.

"Election Notice" means a written notice from the Borrower to the Administrative Agent in the form of Exhibit J hereto.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" means any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person of whatever nature, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"Equity Issuance" means the issuance by the Ultimate Parent, the Borrower or any Subsidiary of any Equity Interests, or the receipt by the Ultimate Parent, the Borrower or any Subsidiary of any capital contribution, other than (i) any issuance of Equity Interests or receipt of capital contributions to the extent as a result of (x) a non-cash exchange of Restructuring Notes or Additional Notes or (y) the issuance of Equity Interests that are issued on a non-cash basis as consideration for a Permitted Acquisition or other Investment permitted hereunder or (ii) any issuance of Equity Interests to, or receipt of any capital contribution from, the Ultimate Parent, the Parent or any Dex West Loan Party.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standards (within the meaning of Sections 412 and 430 of the Code or Section 302 of ERISA) applicable to such Plan, including, for Plan years ending prior to January 1, 2008, any "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure by any Loan Party or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; (d) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Plan; (e) a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA; (f) the receipt by any Loan Party or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (h) the receipt by any Loan Party or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"Escrow Materials" means copies of (i) all software source code and all documentation and training manuals relating thereto and (ii) all other tangible or written embodiments of material technology, websites and databases (but excluding any print directories or other publicly distributed print materials), in each case to the extent (1) owned (or licensed, if such license grants the licensee (x) possession of same and the right to allow the foregoing entities (and any escrow agent, as applicable) to access same and (y) the right to sublicense such right of possession and access without (I) the licensor's consent, unless consent can be obtained with no additional fees or other consideration (unless the sublicensee fully reimburses the sublicensor for such additional fees or other consideration) or additional obligations upon sublicensor or any loss of rights of sublicensor, (II) loss of any rights of sublicensor, (III) additional obligations upon sublicensor or (IV) any additional fees or consideration (unless the sublicensee fully reimburses the sublicensor for such fees or other consideration required to obtain such right of possession and access) and (2) currently used by SuperMedia, Borrower, Dex East, RHDI, the Service Company or any of such Shared Collateral Loan Parties, as applicable, in their respective businesses.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excess Cash Flow" means, as of the end of each fiscal quarter ending after the Closing Date, for the period starting on January 1, 2013 and ending on the last day of such fiscal quarter, the result (without duplication) of:

(a) net cash provided by operating activities of the Borrower and its Subsidiaries for such period as reflected in the statement of cash flows on the consolidated financial statements of the Borrower for each applicable quarter during such period , that (i) to the extent the Borrower makes any Discounted Voluntary Prepayments and the  gain arising from the retirement of Indebtedness in connection with such Discounted Voluntary Prepayments results in any additional cash taxes, the payment of such additional cash taxes shall not be deducted in the calculation of Excess Cash Flow and (ii) for the avoidance of doubt, income related to the retirement of Indebtedness shall not be included in the calculation of Excess Cash Flow; plus

(b)  cash payments received during such period to enter into or settle Swap Agreements to the extent not already recognized in net cash provided by operating activities; plus

(c)  to the extent deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries for such period, the Specified Charges for such period; minus

(d)  the amount of Capital Expenditures for such period (except to the extent attributable to the incurrence of Capital Lease Obligations or otherwise financed by incurring Long Term Indebtedness and except to the extent made with Net Proceeds in respect of Prepayment Events); minus

(e)  the aggregate principal amount of Long Term Indebtedness repaid or prepaid (for the avoidance of doubt, including any Advance Amortization Payment) by the Borrower and its consolidated Subsidiaries during such period to the extent permitted by Section 6.08(b), excluding (i) any prepayment of Loans and (ii) repayments or prepayments of Long Term Indebtedness financed by incurring other Long Term Indebtedness; minus

(f)  the aggregate amount of cash dividends or other distributions paid by the Borrower to the Parent during such period pursuant to Section 6.08(a)(iv) (other than in reliance on clause (B) thereof); minus

(g)  cash payments made during such period to enter into or settle Swap Agreements to the extent not already included in net cash provided by operating activities.

"Exchange Act" has the meaning assigned to such term in the definition of "Change in Control".

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) any taxes imposed on or measured, in whole or in part, by revenue or net income and franchise taxes imposed in lieu thereof by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located, has a present or former connection (other than in connection with the Loan Documents) or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction described in clause (a) above and (c) in the case of a Foreign

Lender (other than an assignee pursuant to a request by the Borrower under Section 2.14(b)), any U.S. withholding tax that (i) is in effect and would apply to amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to any withholding tax pursuant to Section 2.12(a), or (ii) is attributable to such Foreign Lender's failure (other than as a result of any Change in Law) to comply with Section 2.12(e) and (d) any U.S. Federal withholding taxes imposed under FATCA.

"Existing Credit Agreement" has the meaning assigned to such term in the recitals to this Agreement.

"Existing Loans" means the Loans (as defined in the Existing Credit Agreement) outstanding under the Existing Credit Agreement prior to the Closing Date.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower or the Ultimate Parent, as applicable.

"First Amendment" means the First Amendment to this Agreement, dated as of March 9, 2012.

"First Amendment Effective Date" means the date on which the conditions precedent set forth in Section 3 of the First Amendment shall have been satisfied, which for the avoidance of doubt is March 9, 2012.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located or, with respect to any Borrower that is a "Untied States person" within the meaning of Section 7701(a)(30) of the Code, that is not a "United States person" within the meaning of such Section. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means (i) a Subsidiary organized under the laws of a jurisdiction located outside the United States of America or (ii) a Subsidiary of any Person described in the foregoing clause (i).

"GAAP" means generally accepted accounting principles in the United States of America.

"Governing Board" means (a) the managing member or members or any controlling committee of members of any Person, if such Person is a limited liability company, (b) the board of directors of any Person, if such Person is a corporation or (c) any similar governing body of any Person.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantee and Collateral Agreement" means the Guarantee and Collateral Agreement, dated as of the Original Restatement Date, among each Dex West Loan Party and the Agent.

"Guarantors" means the Ultimate Parent, Dex Digital, RHDC, the Service Company, the Parent, the Subsidiary Loan Parties, each Newco Senior Guarantor and each Newco Subordinated Guarantor.

"Hazardous Materials" means (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances; or (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Independent Financial Advisor" means an accounting, appraisal or investment banking firm of national standing or any third party appraiser or recognized expert with experience in appraising the terms and conditions of the type of transaction or series of related transactions for which an opinion is required; provided, that such firm or appraiser is not an Affiliate of the Borrower.

"Information" has the meaning assigned to such term in Section 9.12.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement" means the Amended and Restated Intercreditor and Collateral Agency Agreement, substantially in the form of Exhibit D, entered into among the Agent on behalf of the Secured Parties, the Shared Collateral Agent on behalf of the Shared Collateral Secured Parties, the administrative agent and collateral agent under the Dex East Credit Agreement, the administrative agent and collateral agent under the RHDI Credit Agreement and the administrative agent and collateral agent under the SuperMedia Credit Agreement.

"Interest Coverage Ratio" means, with respect to the Borrower and for any period of four consecutive fiscal quarters ending on any date of determination, the ratio of (a) Consolidated EBITDA for such period to (b) Consolidated Cash Interest Expense for such period.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.03.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the

date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means purchasing, holding or acquiring (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interest, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or making or permitting to exist any loans or advances (other than commercially reasonable extensions of trade credit) to, guaranteeing any obligations of, or making or permitting to exist any investment in, any other Person, or purchasing or otherwise acquiring (in one transaction or a series of transactions) any assets of any Person constituting a business unit.  The amount, as of any date of determination, of any Investment shall be the original cost of such Investment (including any Indebtedness of a Person existing at the time such Person becomes a Subsidiary in connection with any Investment and any Indebtedness assumed in connection with any acquisition of assets), plus the cost of all additions, as of such date, thereto and minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash or property as a repayment of principal or a return of capital (including pursuant to any sale or disposition of such Investment), as the case may be, but without any other adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.  In determining the amount of any Investment or repayment involving a transfer of any property other than cash, such property shall be valued at its fair market value at the time of such transfer.

"Lenders" has the meaning assigned to such term in the preamble to this Agreement.

"Leverage Ratio" means, on any date, the ratio of (a) Total Indebtedness as of such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters of the Borrower ended on such date.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) the rate per annum determined on the basis of the rate for deposits in dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR 01 Page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period (or in the event that such rate does not appear on Reuters Screen LIBOR 01 Page (or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 10:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein and (b) 3.00%.

"License Agreement" means an agreement, substantially in the form of Exhibit H hereto, pursuant to which each License Subsidiary shall grant a license to use trademarks to the Ultimate Parent and each Subsidiary of the Ultimate Parent.

"License Subsidiary" has the meaning assigned to such term in Section 4.01(e).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such

asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, the Intercreditor Agreement, the Subordinated Guarantee Agreement, the Security Documents and the Shared Collateral Security Documents.

"Loan Parties" means the Borrower and the Guarantors.

"Loan" has the meaning assigned to such term in Section 2.01(a).

"Long Term Indebtedness" means any Indebtedness that, in accordance with GAAP, constitutes (or, when incurred, constituted) a long-term liability.  For purposes of determining the Long Term Indebtedness of the Borrower and the Subsidiaries, Indebtedness of the Borrower or any Subsidiary owed to the Borrower or a Subsidiary shall be excluded.

"Margin Stock" shall have the meaning assigned to such term in Regulation U of the Board.

"Master IP License Agreement" means an agreement substantially in the form of Exhibit I hereto.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, property, material agreements, liabilities, financial condition or results of operations of the Borrower and the Subsidiaries, taken as a whole, or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights and remedies of the Agent or the Lenders under any of the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans and the Subordinated Guarantee but including, for the avoidance of doubt, Guarantees (other than the Subordinated Guarantee)), or obligations in respect of one or more Swap Agreements, of any one or more of the Ultimate Parent and its Subsidiaries (other than RHDI, Dex East, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, the Parent, the Borrower and its Subsidiaries), in an aggregate principal amount exceeding $25,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Ultimate Parent or any of its Subsidiaries in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Ultimate Parent or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Subsidiary" means any Subsidiary which meets any of the following conditions:  (a) the Borrower's and the other Subsidiaries' investments in and advances to such Subsidiary exceed 5% of the consolidated total assets of the Borrower and the Subsidiaries as of the end of the most recently completed fiscal quarter, (b) the consolidated assets of such Subsidiary exceed 5% of the consolidated total assets of the Borrower and the Subsidiaries as of the end of the most recently completed fiscal quarter or (c) the consolidated pre-tax income from continuing operations of such Subsidiary for the most recently ended period of four consecutive fiscal quarters exceeds 5% of the consolidated pre-tax income from continuing operations of the Borrower and the Subsidiaries for such period.

"Material Ultimate Parent Subsidiary" means (i) any License Subsidiary and (ii) any Subsidiary of the Ultimate Parent (other than RHDI, Dex East, SuperMedia and their respective

Subsidiaries) which meets any of the following conditions:  (a) the Ultimate Parent's and its other Subsidiaries' aggregate investments in and advances to such Subsidiary exceed $10,000,000 as of the end of the most recently completed fiscal quarter, (b) the consolidated assets of such Subsidiary exceed $10,000,000 as of the end of the most recently completed fiscal quarter or (c) the consolidated pre-tax income from continuing operations of such Subsidiary for the most recently ended period of four consecutive fiscal quarters exceeds $5,000,000.

"Maturity Date" means December 31, 2016, or, if such day is not a Business Day, the next preceding Business Day.

"Maximum Rate" has the meaning assigned to such term in Section 9.13.

"Merger Agreement" has the meaning assigned to such term in the recitals to this Agreement.

"Merger Sub" has the meaning assigned to such term in the recitals to this Agreement.

"Mergers" has the meaning assigned to such term in the recitals to this Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means any mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any real property and improvements thereto to secure the Obligations delivered after the Closing Date pursuant to Section 5.12.  Each Mortgage shall be satisfactory in form and substance to the Collateral Agent.

"Mortgage Amendment" has the meaning assigned to such term in Section 4.01(a).

"Mortgage Endorsement" has the meaning assigned to such term in clause (g) of the definition of "Collateral and Guarantee Requirement".

"Mortgaged Property" means each parcel of real property and improvements thereto listed on Schedule 1.01B and each other parcel of real property and improvements thereto owned by a Dex West Loan Party with respect to which a Mortgage is granted pursuant to Section 5.12.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds, including cash received in respect of any debt instrument or equity security received as non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses (including underwriting discounts and commissions and collection expenses) paid or payable by the Loan Parties or any Subsidiary thereof to third parties (including Affiliates, if permitted by Section 6.09) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made by the Loan Parties or any Subsidiary thereof as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, including, for the avoidance of doubt, in the case of an Ultimate Parent Asset Disposition, payments required to be made by the Loan

Parties or any Subsidiary thereof pursuant to the Subordinated Guarantee Agreement (it being understood that this clause shall not apply to customary asset sale provisions in offerings of debt securities) and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Loan Parties or any Subsidiary thereof (provided that such amounts withheld or estimated for the payment of taxes shall, to the extent not utilized for the payment of taxes, be deemed to be Net Proceeds received when such nonutilization is determined), and the amount of any reserves established by the Loan Parties or any Subsidiary thereof to fund contingent liabilities reasonably estimated to be payable, in each case that are directly attributable to such event (provided that such reserves and escrowed amounts shall be disclosed to the Administrative Agent promptly upon being taken or made and any reversal of any such reserves will be deemed to be Net Proceeds received at the time and in the amount of such reversal), in each case as determined reasonably and in good faith by the chief financial officer of the Borrower; provided that for the purposes of calculating the Net Proceeds of an Ultimate Parent Asset Disposition, payments made (or reasonably estimated to be payable) under the Tax Sharing Agreements shall be deducted in the same manner as taxes paid (or reasonably estimated to be payable) under clause (b)(iii) above.

"Newco" means any Subsidiary (direct or indirect) of the Ultimate Parent (other than SuperMedia and its Subsidiaries) acquired or formed by the Ultimate Parent after the Closing Date other than a Subsidiary of the Borrower, Dex East, RHDI or SuperMedia.

"Newco Senior Guarantor" means any Newco the acquisition or formation of which is accomplished, directly or indirectly, using cash or other credit support (including debt service) provided by the Borrower, any Subsidiary or any other Newco Senior Guarantor or in which any Investment is made by the Borrower, any Subsidiary or any other Newco Senior Guarantor.

"Newco Subordinated Guarantee" has the meaning assigned to such term in clause (e) of the definition of "Collateral and Guarantee Requirement".

"Newco Subordinated Guarantor" means any Newco other than a Newco Senior Guarantor.

"Newdex" has the meaning assigned to such term in the recitals to this Agreement.

"Obligations" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Optional Repurchase" means, with respect to any outstanding Indebtedness, any optional or voluntary repurchase, redemption or prepayment made in cash of such Indebtedness, the related payment in cash of accrued interest to the date of such repurchase, redemption or prepayment on the principal amount of such Indebtedness repurchased, redeemed or prepaid, the payment in cash of associated premiums (whether voluntary or mandatory) on such principal amount and the cash payment of other fees and expenses incurred in connection with such repurchase, redemption or prepayment.

"Original Restatement Date" has the meaning assigned to such term in the recitals to this Agreement.

"Other Taxes" means any and all present or future recording, stamp, documentary, excise, transfer, sales, property or similar Taxes, charges or levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Parent" means Dex Media, Inc., a Delaware corporation.

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(iii).

"Payment Percentage" has the meaning assigned to such term in Section 2.15(b).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisitions" means any acquisition (by merger, consolidation or otherwise) by the Borrower or a Subsidiary Loan Party of all or substantially all the assets of, or all the Equity Interests in, a Person or division or line of business of a Person, if (a) both before and immediately after giving effect thereto, no Default or Event of Default has occurred and is continuing or would result therefrom, (b) such acquired Person is organized under the laws of the United States of America or any State thereof or the District of Columbia and substantially all the business of such acquired Person or business consists of one or more Permitted Businesses and not less than 80% of the consolidated gross operating revenues of such acquired Person or business for the most recently ended period of twelve months is derived from domestic operations in the United States of America, (c) each Subsidiary resulting from such acquisition (and which survives such acquisition) other than any Foreign Subsidiary, shall be a Subsidiary Loan Party and at least 80% of the Equity Interests of each such Subsidiary shall be owned directly by the Borrower and/or Subsidiary Loan Parties and shall have been (or within ten Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) pledged pursuant to the Guarantee and Collateral Agreement (subject to the limitations of the pledge of Equity Interests of Foreign Subsidiaries set forth in the definition of "Collateral and Guarantee Requirement"), (d) the Collateral and Guarantee Requirement shall have been (or within ten Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) satisfied with respect to each such Subsidiary, (e) the Borrower and the Subsidiaries are in Pro Forma Compliance after giving effect to such acquisition and (f) the Borrower has delivered to the Agent an officer's certificate to the effect set forth in clauses (a), (b), (c), (d) and (e) above, together with all relevant financial information for the Person or assets acquired and reasonably detailed calculations demonstrating satisfaction of the requirement set forth in clause (e) above.

"Permitted Business" means the telephone and internet directory services businesses and businesses reasonably related, incidental or ancillary thereto.

"Permitted Encumbrances" means:

(a)  Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.05;

(b)  carriers', warehousemen's, mechanics', materialmen's, landlord's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.05;

(c)  pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)  deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)  judgment Liens in respect of judgments or attachments that do not constitute a Default or an Event of Default under clause (k) of Article VII; provided that any such Lien is released within 30 days following the creation thereof;

(f)  easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that are not substantial in amount and do not, or could not reasonably be expected to, materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary or, for purposes of (i) Section 6.16, the Parent, (ii) Section 6.17, the Ultimate Parent or (iii) Section 6.18, the Service Company;

(g)  Liens arising solely by virtue of any statutory or common law provisions relating to bankers' Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depositary institution;

(h)  any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary of the Borrower or, for purposes of (i) Section 6.16, the Parent, (ii) Section 6.17, the Ultimate Parent or (iii) Section 6.18, the Service Company, in the ordinary course of its business and covering only the assets so leased;

(i)  the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, or could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(j)  any provision for the retention of title to any property by the vendor or transferor of such property, which property is acquired by the Borrower or a Subsidiary of the Borrower or, for purposes of (i) Section 6.16, the Parent, (ii) Section 6.17, the Ultimate Parent or (iii) Section 6.18, the Service Company, in a transaction entered into in the ordinary course of business of the Borrower or such Subsidiary of the Borrower, or, for purposes of (A) Section 6.16, the Parent, (B) Section 6.17, the Ultimate Parent or (C) Section 6.18, the Service Company, and for which kind of transaction it is normal market practice for such retention of title provision to be included;

provided, that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a)  direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing or allowing for liquidation at the original par value at the option of the holder within one year from the date of acquisition thereof;

(b)  investments in commercial paper (other than commercial paper issued by the Ultimate Parent, the Parent, the Borrower or any of their Affiliates) maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)  investments in certificates of deposit, banker's acceptances, time deposits or overnight bank deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office

of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000, and having a debt rating of "A-1" or better from S&P or "P-1" or better from Moody's;

(d)  fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)  money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Permitted Subordinated Indebtedness" means (a) the Subordinated Guarantee and (b) Indebtedness of the Borrower which (i) does not mature, and is not subject to mandatory repurchase, redemption or amortization (other than pursuant to customary asset sale or change in control provisions requiring redemption or repurchase only if and to the extent then permitted by this Agreement), in each case, prior to the date that is six months after the Maturity Date, (ii) is not secured by any assets of the Borrower or any Subsidiary, (iii) is not exchangeable or convertible into Indebtedness of the Borrower or any Subsidiary or any preferred stock or other Equity Interest (other than common equity of the Ultimate Parent, provided that any such exchange or conversion, if effected, would not result in a Change in Control or Default) and (iv) is, together with any Guarantee thereof by any Subsidiary, subordinated to the Obligations pursuant to a written instrument delivered to the Administrative Agent and having subordination terms that are no less favorable to the Lenders than the subordination terms set forth in the Restructuring Notes Indenture and that are otherwise reasonably satisfactory to the Administrative Agent.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

["Petition Date" has the meaning assigned to such term in the recitals to this Agreement.][15]

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepayment Event" means any (a) Asset Disposition, (b) Equity Issuance or (c) Debt Issuance.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Pro Forma Compliance" means, with respect to any event, that the Borrower is in pro forma compliance with Section 6.14 recomputed as if the event with respect to which Pro Forma Compliance is being tested had occurred on the first day of the four fiscal quarter period most recently

---

[15] To be included if applicable

ended on or prior to such date for which financial statements have been delivered pursuant to Section 5.01.

"Qualifying Loans" has the meaning assigned to such term in Section 2.15(c).

"Qwest" means Qwest Communications International Inc., a Delaware corporation.

"Qwest Corp." means Qwest Corporation, a Colorado corporation.

"Qwest Services" means Qwest Services Corporation, a Colorado corporation.

"Range" has the meaning assigned to such term in Section 2.15(b).

"Refinanced Debt" has the meaning assigned to such term in the definition of "Refinancing Indebtedness".

"Refinancing Indebtedness" means Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to extend, renew or refinance existing Indebtedness ("Refinanced Debt"); provided, that (a) such extending, renewing or refinancing Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of, and unpaid interest on, the Refinanced Debt plus the amount of any premiums paid thereon and fees and expenses associated therewith, (b) such Indebtedness has a later maturity and a longer weighted average life than the Refinanced Debt, (c) such Indebtedness bears a market interest rate (as reasonably determined in good faith by the board of directors of the Borrower) as of the time of its issuance or incurrence, (d) if the Refinanced Debt or any Guarantees thereof are subordinated to the Obligations, such Indebtedness and Guarantees thereof are subordinated to the Obligations on terms no less favorable to the holders of the Obligations than the subordination terms of such Refinanced Debt or Guarantees thereof (and no Loan Party that has not guaranteed such Refinanced Debt guarantees such Indebtedness), (e) such Indebtedness contains covenants and events of default and is benefited by Guarantees (if any) which, taken as a whole, are reasonably determined in good faith by the board of directors of the Borrower not to be materially less favorable to the Lenders than the covenants and events of default of or Guarantees (if any) in respect of such Refinanced Debt, (f) if such Refinanced Debt or any Guarantees thereof are secured, such Indebtedness and any Guarantees thereof are either unsecured or secured only by such assets as secured the Refinanced Debt and Guarantees thereof, (g) if such Refinanced Debt and any Guarantees thereof are unsecured, such Indebtedness and Guarantees thereof are also unsecured, (h) such Indebtedness is issued only by the issuer of such Refinanced Indebtedness and (i) the proceeds of such Indebtedness are applied promptly (and in any event within 45 days) after receipt thereof to the repayment of such Refinanced Debt.

"Register" has the meaning assigned to such term in Section 9.04.

"Registration Statement on Form S-4" means the Registration Statement on Form S-4 filed by the Ultimate Parent with the Securities and Exchange Commission on [        ].

"Reinvestment" has the meaning assigned to such term in Section 2.06(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, Controlling Persons and advisors of such Person and of each of such Person's Affiliates.

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

["Reorganization Plan" means the Debtors' Joint Prepackaged Chapter 11 Plan for the Ultimate Parent and its Subsidiaries, including any exhibits, supplements, appendices and schedules thereto, dated [        ], 2013, as amended, supplemented or otherwise modified from time to time in accordance with the Dex Support Agreement and as confirmed by the Bankruptcy Court pursuant to the Confirmation Order.][16]

"Required Lenders" means, at any time, Lenders having Loans representing more than 50% of the sum of the total outstanding Loans at such time.

"Required Percentage" means (a) in the case of an Ultimate Parent Asset Disposition, an Asset Disposition, a Debt Issuance or an Equity Issuance by the Borrower or any Subsidiary, 100%, provided that, in the case of an Ultimate Parent Asset Disposition, to the extent that no amount is deducted in the calculation of the Net Proceeds of such Ultimate Parent Asset Disposition because no amount is paid to and distributed by the Subordinated Guarantee Agent pursuant to the Subordinated Guarantee Agreement, "Required Percentage" shall mean the percentage that the Dex West Credit Parties (as defined in the Subordinated Guarantee Agreement) would have received pursuant to the Subordinated Guarantee Agreement if the Net Proceeds had been paid to and distributed by the Subordinated Guarantee Agent pursuant to the Subordinated Guarantee Agreement, and (b) in the case of an Equity Issuance by the Ultimate Parent, 50%.

"Restricted Payment" means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, termination or amendment of any Equity Interests in such Person or of any option, warrant or other right to acquire any such Equity Interests in such Person.

"Restructuring Notes" means the 12%/14% Senior Subordinated Notes due 2017 of the Ultimate Parent issued pursuant to the Restructuring Notes Indenture in an aggregate principal of $300,000,000 on the Original Restatement Date.

"Restructuring Notes Indenture" means the Indenture, dated the date hereof, between the Ultimate Parent and The Bank of New York Mellon, as trustee.

"RHDC" means R.H. Donnelley Corporation, a Delaware corporation.

"RHDI" means R.H. Donnelley Inc., a Delaware corporation.

"RHDI Credit Agreement" means (a) the Fourth Amended and Restated Credit Agreement, dated as of the Closing Date (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Ultimate Parent, RHDI, the several banks and other financial institutions or entities from time to time party thereto and Deutsche Bank Trust Company Americas, as administrative agent, and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether

---

[16] To be included if applicable

by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the RHDI Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"RHDI Existing Credit Agreement" means the Third Amended and Restated Credit Agreement, dated as of January 29, 2010, among the Ultimate Parent, RHDI, as borrower, the several lenders from time to time party thereto and Deutsche Bank Trust Company Americas, as administrative agent, as amended, supplemented or otherwise modified prior to the effectiveness of the RHDI Credit Agreement.

"RHDI Loan Documents" means the "Loan Documents" as defined in the RHDI Credit Agreement.

"S&P" means Standard & Poor's Financial Services LLC.

"Secured Parties" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Security Documents" means the Guarantee and Collateral Agreement, the Mortgages and each other security agreement or other instrument or document executed and delivered by any Dex East Loan Party pursuant to Section 5.11 or 5.12 or pursuant to the Guarantee and Collateral Agreement to secure any of the Obligations.

"Service Company" means Dex One Service, Inc., a Delaware corporation.

"Shared Assets" means any asset (including intellectual property rights) owned by the Service Company or any License Subsidiary.

"Shared Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Shared Collateral Secured Parties, pursuant to the terms of the Intercreditor Agreement.

"Shared Collateral Loan Parties" means the Ultimate Parent, the Parent, Dex Digital, RHDC, the Service Company, and each Newco that is a party to the Shared Collateral Security Documents.

"Shared Collateral Secured Parties" has the meaning as set forth in the Intercreditor Agreement.

"Shared Collateral Security Documents" means the Shared Guarantee and Collateral Agreement, the Newco Subordinated Guarantees, any mortgage and each other security agreement or other instruments or documents executed and delivered by any Shared Collateral Loan Party pursuant to Section 5.12 or pursuant to the Shared Guarantee and Collateral Agreement to secure any of the Dex West Obligations.

"Shared Guarantee and Collateral Agreement" means the Amended and Restated Guarantee and Collateral Agreement among each Shared Collateral Loan Party (other than the Newco Subordinated Guarantors) and the Shared Collateral Agent, substantially in the form of Exhibit C.

"Shared Services" means the centralized, shared or pooled services, undertakings and arrangements which are provided by the Service Company or any of its Subsidiaries to or for the benefit of the Ultimate Parent and its Subsidiaries pursuant to the Shared Services Agreement, including, without limitation, the acquisition and ownership of assets by the Service Company or any of its Subsidiaries used in the provision of the foregoing and centralized payroll, benefits and account payable operations.

"Shared Services Agreement" means the Amended and Restated Shared Services Agreement, dated as of the date hereof, among the Ultimate Parent, the Service Company, the Borrower and the other Subsidiaries of the Ultimate Parent party thereto, in substantially the form attached as Exhibit E hereto.

"Shared Services Transactions" means, collectively, (a) the engagement of the Service Company for the provision of Shared Services pursuant to the Shared Services Agreement, (b) sales, transfers and other dispositions of assets to the Service Company or any of its Subsidiaries pursuant to the Shared Services Agreement for use in the provision of Shared Services, (c) the transfer of employees of the Loan Parties to the Service Company or any of its Subsidiaries for the provision of Shared Services pursuant to the Shared Services Agreement and (d) payments, distributions and other settlement of payment obligations by the recipient of Shared Services to, or for ultimate payment to, the provider of such Shared Services pursuant to the Shared Services Agreement in respect of the provision of such Shared Services (including, without limitation, the prefunding in accordance with the Shared Services Agreement of certain such payment obligations in connection with the establishment of the payment and settlement arrangements under the Shared Services Agreement); provided, that all such payments, distributions and settlements shall reflect a fair and reasonable allocation of the costs of such Shared Services in accordance with the terms of the Shared Services Agreement (it being understood and agreed that payments in respect of tax liabilities or tax attributes pursuant to the Tax Sharing Agreements shall not constitute Shared Services Transactions; provided, further, that the foregoing shall not restrict the ability of the Borrower to make Restricted Payments (i) pursuant to Section 6.08(a)(iii) to the Service Company in respect of tax liabilities incurred by the Service Company in connection with the performance of its obligations under the Shared Services Agreement).

"Specified Charges" means (a) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with the Mergers, this Agreement (including, for the avoidance of doubt, costs, fees, and expenses incurred in connection with satisfying the conditions precedent in Sections 4.01(e) and 4.01(f)), and the transactions contemplated by the Dex Support Agreement[, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases][17] and (b) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Administrative Agent and the steering committee Lenders and reimbursed by the Borrower (without, including without limitation, the fees and expenses of the Administrative Agent and the steering committee Lenders) incurred in connection with this Agreement (including, for the avoidance of doubt, costs, fees, and expenses incurred in connection with satisfying the conditions precedent in Sections 4.01(e) and 4.01(f)), and the transactions contemplated by the Dex Support Agreement[, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases][18].

---

[17] To be included if applicable

[18] To be included if applicable

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Guarantee" means the Guarantee made by the Borrower pursuant to the Subordinated Guarantee Agreement.

"Subordinated Guarantee Agent" has the meaning assigned to such term in the Subordinated Guarantee Agreement.

"Subordinated Guarantee Agreement" means the Subordinated Guarantee Agreement, dated the date hereof, attached hereto as Exhibit G, among the Borrower, Dex East, RHDI and SuperMedia.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more Subsidiaries of the parent or by the parent and one or more Subsidiaries of the parent. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Loan Party" means any Subsidiary of the Borrower that is not a Foreign Subsidiary.

"SuperMedia" has the meaning assigned to such term in the recitals of this Agreement.

"SuperMedia Credit Agreement" means (a) the Amended and Restated Loan Agreement, dated as of December 31, 2009, as amended and restated as of the date hereof (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among SuperMedia, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the SuperMedia Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"SuperMedia Existing Credit Agreement" means the Amended and Restated Loan Agreement, dated as of December 31, 2009, (as further amended, restated, amended and restated,

supplemented or otherwise modified from time to time), among SuperMedia, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent, as amended, supplemented or otherwise modified prior to the effectiveness of the SuperMedia Credit Agreement.

"SuperMedia Loan Documents" means the "Loan Documents" as defined in the SuperMedia Credit Agreement.

"SuperMedia Merger" has the meaning assigned to such term in the recitals of this Agreement.

"SuperMedia Tax Sharing Agreement" means the Tax Sharing Agreement in the form of Exhibit L hereto, dated the date hereof, among SuperMedia, SuperMedia Sales Inc., SuperMedia Services Inc., Newdex, Dex One and the Service Company.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Syndication Agent" means Deutsche Bank Trust Company Americas, in its capacity as syndication agent.

"Tax Payments" means payments for (i) the net amounts payable by the Borrower pursuant to the Tax Sharing Agreements for the current tax period and (ii) to the extent not duplicative with (i), taxes which are not determined by reference to income, but which are imposed on a direct or indirect owner of the Borrower as a result of such owner's ownership of the equity of the Borrower.

"Tax Sharing Agreements" means, collectively, the Dex Tax Sharing Agreement and the SuperMedia Tax Sharing Agreement (each, individually, a "Tax Sharing Agreement").

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Title Company" has the meaning assigned to such term in clause (g) of the definition of "Collateral and Guarantee Requirement".

"Total Indebtedness" means, as of any date, an amount equal to (a) the aggregate principal amount of Indebtedness of the Borrower and the Subsidiaries outstanding as of such date, other than the Subordinated Guarantee, determined on a consolidated basis in accordance with GAAP minus, solely for purposes of Section 6.14, (b) the lesser of (i) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents or otherwise subject to a Permitted Encumbrance shall be deemed to be unencumbered for purposes of this definition) maintained by the Borrower and the Subsidiaries as of such date and (ii) $25,000,000; provided, that the amount of such Indebtedness shall be (A) without regard to the effects of purchase method of accounting requiring that the amount of such Indebtedness be valued at its fair market value instead of its outstanding principal amount and (B) determined exclusive of

(x) any reimbursement obligations and intercompany non-cash obligations constituting intercompany Indebtedness or Attributable Debt owing to the Service Company incurred pursuant to the Shared Services Transactions and (y) any letters of credit to the extent cash collateralized in reliance on Section 6.02(a)(vi).

"Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, (b) [the effectiveness and consummation of the Reorganization Plan pursuant to the Confirmation Order (including, without limitation, the consummation of the Mergers) and][19] and (c) the payment of fees and expenses in connection with [clause (b) hereof and][20] the Amendments and the Loan Documents.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"Ultimate Parent" means (i) prior to the Mergers, Dex One, and (ii) after the Mergers, Newdex.

"Ultimate Parent Annual Cash Interest Amount" means, for any fiscal year (or full fiscal year equivalent), an amount equal to 36% of $36,000,000.

"Ultimate Parent Asset Disposition" means any sale, transfer or other disposition (including pursuant to a public offering or spin-off transaction) by the Ultimate Parent or any Subsidiary thereof of all or a portion of the Equity Interests of the Borrower, Dex East, RHDI, SuperMedia, Dex Digital, RHDC or any Newco (or substantially all of the assets constituting a business unit, division or line of business thereof).

"Ultimate Parent PIK Election" means the election by the Ultimate Parent to make paid-in-kind interest payments on the Restructuring Notes as permitted by the Restructuring Notes Indenture.

"U.S. Person" means "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.12(e)(ii)(B)(3).

"West Acquisition" means the acquisition by the Borrower pursuant to the West Acquisition Agreement of all of the Equity Interests of GPP LLC, a Delaware limited liability company, and the other transactions contemplated by the West Acquisition Agreement and the documents related thereto.  Immediately after such acquisition of GPP LLC, the Borrower was merged with and into GPP LLC, which changed its name to "Dex Media West LLC" and on February 1, 2010, Dex Media West LLC merged with and into Dex Media West, Inc., with Dex Media West, Inc. being the surviving entity.

"West Acquisition Agreement" means the Purchase Agreement dated as of August 19, 2002, among Dex, Qwest Services, Qwest and Dex Holdings LLC, as amended by an amendment dated as of September 9, 2003.

---

[19] To be included if applicable

[20] To be included if applicable

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

Section 1.02    Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Eurodollar Loan").  Borrowings also may be classified and referred to by Type (e.g., a "Eurodollar Borrowing").

Section 1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Any reference made in this Agreement or any other Loan Document to any consolidated financial statement or statements of the Ultimate Parent, the Parent, the Borrower and the Subsidiaries means such financial statement or statements prepared on a combined basis for the Ultimate Parent, the Parent, the Borrower and the Subsidiaries pursuant to GAAP, not utilizing the equity method.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Parent, the Borrower or any of their respective Subsidiaries at "fair value", as defined therein.

ARTICLE II

THE CREDITS

Section 2.01    Loans.  (a)  Subject to the terms and conditions set forth herein, each Existing Loan shall continue to be outstanding and, on and as of the Closing Date, constitute term loans hereunder (the "Loans").

(b)  Amounts repaid in respect of Loans may not be reborrowed.

Section 2.02    Borrowings.  (a)  Subject to Section 2.09, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.

(b)  At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $5,000,000.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 15 Eurodollar Borrowings outstanding.

(c)  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03    Interest Elections.  (a)  The Borrower may elect to convert each Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)  To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone (i) in the case of an election to continue or convert to a Eurodollar Borrowing, by not later than 2:00 p.m., New York City time, three Business Days before the date of the proposed continuation or conversion or (ii) in the case of an election to convert to an ABR Borrowing, by not later than 2:00 p.m., New York City time, one Business Day before the date of the proposed conversion.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(c)  Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred after the Closing Date and is continuing then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.04    Repayment of Loans; Evidence of Debt.  (a)  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.05.

(b)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)  The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)  The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)  Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form reasonably satisfactory to the Administrative Agent.  Such promissory note shall state that it is subject to the provisions of this Agreement.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.05    Amortization of Loans.  (a)  Subject to adjustment pursuant to paragraph (c) of this Section 2.05 and except for Advance Amortization Payments, the Borrower shall repay the Borrowings on each date set forth below in the amount set forth opposite such date; provided, that, to the extent the Borrower makes a Discounted Voluntary Prepayment, the repayments due to any Lender participating in such Discounted Voluntary Prepayment shall be reduced ratably by the principal amount of Loans so prepaid (it being understood and agreed that such Discounted Voluntary Prepayment shall not in any manner affect the scheduled repayments due to the Lenders not participating in such Discounted Voluntary Prepayment):

| Date | Principal Amount to be Repaid |
|------|-------------------------------|
| March 31, 2013 | $11,250,000 |
| June 30, 2013[21] | $11,250,000 |
| September 30, 2013 | $11,250,000 |
| December 31, 2013 | $11,250,000 |
| March 31, 2014 | $11,250,000 |
| June 30, 2014 | $11,250,000 |
| September 30, 2014 | $11,250,000 |
| December 31, 2014 | $11,250,000 |
| March 31, 2015 | $11,250,000 |
| June 30, 2015 | $11,250,000 |
| September 30, 2015 | $11,250,000 |
| December 31, 2015 | $11,250,000 |
| March 31, 2016 | $11,250,000 |
| June 30, 2016 | $11,250,000 |
| September 30, 2016 | $11,250,000 |
| Maturity Date | Remaining Outstanding Amounts |

(b)  To the extent not previously paid all Loans shall be due and payable on the Maturity Date.

(c)  Any mandatory prepayment of a Borrowing or optional prepayment that is not a Discounted Voluntary Prepayment shall be applied to reduce the subsequent scheduled repayments of the Borrowings to be made pursuant to this Section ratably.

(d)  Prior to any repayment of any Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be repaid and shall notify the Administrative Agent by telephone (confirmed by telecopy) of such selection not later than 11:00 a.m., New York City time, three Business Days before the scheduled date of such repayment.  Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

Section 2.06    Prepayment of Loans.  (a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (but subject to Section 2.11), in an aggregate principal amount that (except as otherwise provided in Section 2.15) is an integral multiple of $1,000,000 and not less than $1,000,000 or, if less, the amount outstanding, subject to the requirements of this Section.  The Borrower shall have the right to elect by notice to the Administrative Agent that an optional prepayment that is not a Discounted Voluntary Prepayment and that is not subject to the notice contemplated in Section 2.06(d)(iii) is to be applied to a specific scheduled repayment to be made pursuant to Section 2.05 (any such payment, an "Advance Amortization Payment"); provided that (i) each such Advance Amortization Payment shall (x) be made in an amount equal to such scheduled repayment and (y) be applied to the next such scheduled repayment

---

[21] The scheduled repayments immediately following the Closing Date will be increased (in direct order) by an amount equal to the difference between the scheduled repayment due on March 31, 2013 described above and the scheduled repayment due on March 31, 2013 (so long as such payment has been made) under the Existing Credit Agreement.

that has not been prepaid by an Advance Amortization Payment and (ii) for the avoidance of doubt, no Advance Amortization Payment shall be deemed to constitute a prepayment for the purposes of Section 2.06(d).

(b)  In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate amount equal to the Required Percentage of such Net Proceeds or, in the case of an Equity Issuance by the Ultimate Parent, the Required Percentage of the Allocable Net Proceeds of such Prepayment Event; provided that, solely in the case of any Asset Disposition, if the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer of the Borrower to the effect that the Borrower or a Subsidiary intends to apply the Net Proceeds from such Asset Disposition (or a portion thereof specified in such certificate), within 365 days after receipt of such Net Proceeds, to acquire real property, equipment or other assets to be used in the business of the Borrower or such Subsidiaries or to fund a Permitted Acquisition in accordance with the terms of Section 6.04, in each case as specified in such certificate (any such event, a "Reinvestment"), and certifying that no Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds in respect of such Asset Disposition (or the portion of such Net Proceeds specified in such certificate, if applicable) except to the extent of any such Net Proceeds therefrom (i) that the Borrower or the applicable Subsidiary shall have determined not to, or shall have otherwise ceased to, or is not able to, by operation of contract or law or otherwise, apply toward such Reinvestment or (ii) that have not been so applied, or contractually committed to be so applied, by the end of such 365-day period, in each case at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been, or have been determined not to be, so applied (it being understood that if any portion of such proceeds are not so used within such 365-day period but within such 365-day period are contractually committed to be used, then upon the earlier to occur of (A) the termination of such contract and (B) the expiration of a 180-day period following such 365-day period, such remaining portion shall constitute Net Proceeds as of the date of such termination or expiry without giving effect to this proviso); provided, further, that the Net Proceeds applied toward Reinvestments or contractually committed to be so applied pursuant to the foregoing proviso shall not exceed $10,000,000 in the aggregate during any fiscal year.

(c)  In the event and on each occasion that any Net Proceeds are received by or on behalf of the Ultimate Parent or any of its Subsidiaries in respect of any Ultimate Parent Asset Disposition, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate amount equal to the Required Percentage of the Net Proceeds of such Ultimate Parent Asset Disposition.

(d)  Following the end of each fiscal quarter of the Borrower, commencing with the first fiscal quarter ending after the Closing Date, the Borrower will prepay Borrowings in an aggregate amount equal to (i) (A) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the applicable ECF Sweep Percentage in effect at such time, minus (B) all prepayments made during the applicable ECF Period pursuant to this Section 2.06(d)(i) as of the end of such fiscal quarter (including any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e)), less (ii) any voluntary prepayments of Loans made pursuant to Section 2.06(a) during such fiscal quarter (other than  any Advance Amortization Payments and any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e) and except as provided in Section 2.15(f)), provided that any prepayment applied pursuant to clause (iii) of this Section 2.06(d) to reduce a prepayment made pursuant to this Section 2.06(d) shall not be applied in the subsequent quarter pursuant to this clause (ii) to reduce a prepayment made pursuant to this Section 2.06(d), less (iii) any voluntary prepayments of the Loans (other than an Advance Amortization Payment, any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e), and except as provided in Section 2.15(f)) made since the end

of such fiscal quarter to the extent the Borrower has, on or prior to the date any mandatory prepayment is due under this paragraph (d) with respect to such fiscal quarter, specified in an Election Notice delivered to the Administrative Agent that such voluntary prepayments shall be applied to reduce the amount of such mandatory prepayment.  Each prepayment pursuant to this paragraph shall be made on or before the date on which financial statements are delivered pursuant to Section 5.01 with respect to the fiscal quarter at the end of which Excess Cash Flow is being calculated (and in any event within (x) 55 days after the end of such fiscal quarter or (y) if such fiscal quarter is the last fiscal quarter in a fiscal year of the Borrower, 100 days after the end of such fiscal quarter), provided that if the Closing Date occurs after the date on which such prepayment would otherwise have been due hereunder for the period ended March 31, 2013, then the mandatory quarterly prepayment pursuant to this paragraph for such period shall be due and payable on the Closing Date.

(e)   Subject to the immediately following sentence, the Borrower shall on one or more occasions use the Borrower's Discounted Prepayment Portion of Excess Cash Flow, as determined following the end of a fiscal quarter, to effect Discounted Voluntary Prepayments within 180 days after the date on which financial statements are delivered pursuant to Section 5.01 with respect to such quarter, with such Discounted Voluntary Prepayments to be designated as having been made to satisfy the Borrower's obligations under this Section 2.06(e) pursuant to an Election Notice delivered to the Administrative Agent. If the Borrower does not make such Discounted Voluntary Prepayments within such 180-day period equal to the Borrower's Discounted Prepayment Portion of Excess Cash Flow for the applicable fiscal quarter (as designated in the applicable Election Notice), the Borrower shall (i) make an optional prepayment pursuant to Section 2.06(a) at the end of the fiscal quarter during which such 180-day period (as designated in an Election Notice to such effect) expires, with such prepayment to be applied to scheduled prepayments under Section 2.05, as directed by the Borrower, or (ii) make a prepayment as described in Section 2.06(d)(iii) (and as designated in an Election Notice to such effect).  The Borrower may retain the Borrower's Discretionary Portion of Excess Cash Flow and may utilize such Borrower's Discretionary Portion of Excess Cash Flow for purposes otherwise permitted hereunder, including, but not limited to, at the Borrower's option and in the Borrower's sole discretion, (i) to effect Discounted Voluntary Prepayments or (ii) for optional prepayments pursuant to Section 2.06(a).

(f)   Prior to any optional or, subject to Sections 2.06(b), (c) and (d), mandatory prepayment of Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (g) of this Section.

(g)   The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 2:00 p.m., New York City time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment or to prepay such Borrowing in full.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest and other amounts to the extent required by Sections 2.08 and 2.11.

Section 2.07    Fees.  (a)  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(b)  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent.  Fees paid shall not be refundable under any circumstances.

Section 2.08    Interest.  (a)  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)  Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(d)  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.09    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)  the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)  the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any  Borrowing as, a Eurodollar Borrowing shall be ineffective; provided, however, that, in the case of a notice received pursuant to clause (b) above, if the Administrative Agent is able prior to the commencement of such Interest Period to ascertain, after using reasonable efforts to poll the Lenders giving such notice, that a rate other than the Alternate Base Rate would adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, the Administrative Agent shall notify the Borrower of such alternate rate and the Borrower may agree by

written notice to the Agent prior to the commencement of such Interest Period to increase the Applicable Rate for the Loans included in such Borrowing for such Interest Period to result in an interest rate equal to such alternate rate, in which case such increased Applicable Rate shall apply to all the Eurodollar Loans included in the relevant Borrowing.

Section 2.10    Increased Costs; Illegality.  (a) If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)    subject the Administrative Agent or any Lender to any Taxes (other than Indemnified Taxes, Excluded Taxes and Other Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)  If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time after submission by such Lender to the Borrower of a written request therefor, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)  A certificate of a Lender setting forth in reasonable detail the matters giving rise to a claim under this Section 2.10 and the calculation of such claim by such Lender or its holding company, as the case may be, shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)  Notwithstanding any other provision herein, if any Change in Law shall make it unlawful for any Lender to maintain Eurodollar Loans as contemplated by this Agreement, (i) the commitment of such Lender hereunder to continue Eurodollar Loans as such and convert ABR Loans to Eurodollar Loans shall forthwith be canceled and (ii) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by applicable law.  If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.11.

(f)  For the avoidance of doubt, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued or implemented.

Section 2.11    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.06(g) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.14 or 9.02(c), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall consist of an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (without giving effect to clause (b) of the definition of LIBO Rate), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.12    Taxes.  (a)  Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of, and without deduction for, any Taxes; provided that if the applicable withholding agent shall be required to deduct any Taxes from such payments, then (i) if such Taxes are Indemnified Taxes or Other Taxes, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)  In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or, at the option of the Administrative Agent timely reimburse it for the payment thereof.

(c)  The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such Administrative Agent or Lender (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto.  A certificate as to the amount of such payment or liability and a written statement setting forth in reasonable detail the basis and calculation of such amounts prepared in good faith and delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.12, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)  (i) Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate, provided that (i) such Foreign Lender has received written notice from the Borrower advising it of the availability of such exemption or reduction and supplying all applicable documentation and (ii) such Foreign Lender is legally entitled to complete, execute, and deliver such documentation.

(ii)  Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)  in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of,

U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)        executed originals of IRS Form W-8ECI;

(3)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit M-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(4)        to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-2 or Exhibit M-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for

purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)   If the Administrative Agent or a Lender determines, in its sole judgment exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower within a reasonable period of time (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g)   Each Lender shall indemnify the Administrative Agent within ten days after written demand therefor, for the full amount of (i) any Taxes attributable to such Lender and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h)   The agreements in this Section 2.12 shall survive the termination of this agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.13      Payments Generally; Pro Rata Treatment; Sharing of Setoffs. (a)  The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.10, 2.11 or 2.12, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices at 270 Park Avenue, New York, New York, except that payments pursuant to Sections 2.10, 2.11, 2.12 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day (except as otherwise provided in the definition of "Interest Period"), the date for payment shall be extended to the next

succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the relative aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.13(d) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.14    Mitigation Obligations; Replacement of Lenders.  (a)  If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its

Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or 2.12, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, provided that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.10 or 2.12.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)  If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12, or if any Lender is not able to maintain Eurodollar Loans for reasons described in Section 2.10(e), or if any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04, provided that the Borrower or assignee must pay any applicable processing or recordation fee), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, further, that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld and (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and such Lender shall be released from all obligations hereunder.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.15    Voluntary Prepayments Below Par.  (a)  The Borrower may elect to notify the Administrative Agent and the Lenders that it wishes to make below par voluntary prepayments of the Loans (each such payment a "Discounted Voluntary Prepayment") pursuant to the procedures set forth in this Section 2.15; provided that (i) the Borrower shall specify in an Election Notice to the Administrative Agent whether such Discounted Voluntary Prepayment will be a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow or the Borrower's Discretionary Portion of Excess Cash Flow and Discounted Voluntary Prepayments shall only be permitted to be made in amounts not exceeding the Borrower's Discounted Prepayment Portion of Excess Cash Flow or the Borrower's Discretionary Portion of Excess Cash Flow (as applicable) at the time such Discounted Voluntary Prepayment is made and (ii) no Discounted Voluntary Prepayment shall be made after December 31, 2016.  At the time of any Discounted Voluntary Prepayment, the Borrower shall certify, with reasonable supporting detail (as reasonably determined by the Administrative Agent), (i) compliance with the requirements of this Section 2.15, which certification shall include a schedule setting forth the computation (of any utilization by the Borrower) of Borrower's Discounted Prepayment Portion of Excess Cash Flow or Borrower's Discretionary Portion of Excess Cash Flow (as applicable), (ii) that no Event of Default pursuant to Section 6.14 could reasonably be expected to occur during the immediately succeeding four calendar quarters if such Discounted Voluntary Prepayment is not made, (iii) that such Discounted Voluntary Prepayment shall have been approved by the Borrower's Board of Directors and (iv) that immediately prior to and after giving effect to any Discounted Voluntary Prepayment, (x) no Default or Event of Default shall have occurred and be continuing, (y) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents, the Dex East Loan Documents or the RHDI Loan Documents shall be deemed to be unencumbered for purposes of this clause (y)) maintained by the Borrower, Dex East, RHDI and their Subsidiaries on a consolidated basis shall be at least $40,000,000

and (z) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents shall be deemed to be unencumbered for purposes of this clause (z)) maintained by the Borrower and its Subsidiaries shall be at least $10,000,000.

(b)  In connection with any Discounted Voluntary Prepayment, the Borrower shall notify the Lenders (the "Discounted Voluntary Prepayment Notice") that the Borrower desires to prepay Loans with cash proceeds in an aggregate amount (each, a "Discounted Voluntary Prepayment Amount") specified by the Borrower (which amount shall be not less than $5,000,000) at a price within a range (the "Range") to be specified by the Borrower equal to a percentage of par (not to exceed 100%) (the "Payment Percentage") of the principal amount of the Loans to be prepaid; provided that only one Discounted Voluntary Prepayment Notice may be in effect at any time.  The Discounted Voluntary Prepayment Notice shall further specify the date by which Lenders are required to indicate their election to participate in such proposed Discounted Voluntary Prepayment, which shall be at least five Business Days following the date of the Discounted Voluntary Prepayment Notice (the "Acceptance Date").  No proposed Discounted Voluntary Prepayment shall be made if the amount of cash expended to make Discounted Voluntary Prepayments would exceed an amount equal to the Borrower's Portion of Excess Cash Flow at such time.

(c)  On or prior to the Acceptance Date, each Lender may specify by written notice to the Administrative Agent a minimum Payment Percentage (the "Acceptable Payment Percentage") within the Range for a maximum principal amount (subject to rounding requirements specified by the Administrative Agent) of Loans at which such Lender is willing to permit such Discounted Voluntary Prepayment.  Based on the Acceptable Payment Percentages and principal amounts of Loans specified by Lenders, the applicable Payment Percentage (the "Applicable Payment Percentage") for the Discounted Voluntary Prepayment shall be the lowest Acceptable Payment Percentage at which the Borrower can complete the Discounted Voluntary Prepayment for the applicable Discounted Voluntary Prepayment Amount that is within the applicable Range; provided that if the offers received from Lenders are insufficient to allow the Borrower to complete the Discounted Voluntary Prepayment for the applicable Discounted Voluntary Prepayment Amount, then the Applicable Payment Percentage shall instead be the highest Acceptable Payment Percentage that is within the applicable Range.  The Borrower shall prepay Loans (or the respective portions thereof) offered by Lenders at the Acceptable Payment Percentages specified by each such Lender that are equal to or less than the Applicable Payment Percentage ("Qualifying Loans") by remitting an amount to the Administrative Agent (for distribution to each respective Lender to be prepaid) equal to the product of the face amount, or par, of the Loan being prepaid multiplied by the Applicable Payment Percentage; provided that if the aggregate cash proceeds required to prepay Qualifying Loans (disregarding any interest payable under Section 2.15(d)) would exceed the applicable Discounted Voluntary Prepayment Amount for such Discounted Voluntary Prepayment, the Borrower shall prepay such Qualifying Loans at the Applicable Payment Percentage ratably based on the respective principal amounts of such Qualifying Loans (subject to rounding requirements specified by the Administrative Agent).

(d)  All Loans prepaid by the Borrower pursuant to this Section 2.15 shall be accompanied by payment of accrued and unpaid interest on the par principal amount so prepaid to, but not including, the date of prepayment.

(e)  Each Discounted Voluntary Prepayment shall be consummated pursuant to procedures (including as to rounding and minimum amounts, Type and Interest Periods of accepted Loans, irrevocability of Discounted Voluntary Prepayment Notice and other notices by the Borrower and Lenders and determination of Applicable Payment Percentage) reasonably established by the Administrative Agent in consultation with the Borrower and not inconsistent with the terms hereof.

(f)  Each Discounted Voluntary Prepayment shall constitute an optional prepayment of Loans for all purposes under this Agreement, but excluding for purposes of Section 2.06(d).

(g)  Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 2.06 and 2.13), the Lenders hereby consent to the transactions described in this Section 2.15 and further acknowledge that in connection with any Discounted Voluntary Prepayment, principal and interest payments may be made on a non-pro rata basis, as determined by the Administrative Agent, to the applicable Lenders.

(h)  This Section 2.15 shall not require the Borrower to undertake or any Lender to participate in any Discounted Voluntary Prepayment.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Borrower and, solely for purposes of Sections 3.01, 3.02, 3.03, 3.08, 3.09, 3.12, 3.13 and 3.19, the Ultimate Parent (with respect to itself and the Service Company) and the Parent represents and warrants to the Lenders that:

Section 3.01    Organization; Powers.  Each of the Ultimate Parent, the Parent, the Service Company, the Borrower and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02    Authorization; Enforceability.  The Transactions entered into and to be entered into by each of the Ultimate Parent, the Parent, the Service Company and the Dex West Loan Parties are within such Person's corporate or limited liability company powers and have been duly authorized by all necessary corporate or limited liability company and, if required, stockholder or member action.  This Agreement has been duly executed and delivered by each of the Ultimate Parent, the Parent and the Dex West Loan Parties and constitutes, and each other Loan Document to which any of the Ultimate Parent, the Parent, the Service Company and the Dex West Loan Parties is to be a party, when executed and delivered by such Person, will constitute, a legal, valid and binding obligation of such Person, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    Governmental Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate any applicable law or regulation or the charter, limited liability company agreement, by-laws or other organizational documents of the Ultimate Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Ultimate Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries or any of their assets, or give rise to a right thereunder to require any payment to be made by the Ultimate Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Ultimate

Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries, except Liens permitted under Section 6.02.

Section 3.04    Financial Condition.  The unaudited consolidated balance sheet of the Borrower as of [_____], 201[_] and the related unaudited consolidated statements of operations and of cash flows for the [___]-month period ended on such date present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower as of such date and for such period in accordance with GAAP, subject to normal year-end audit adjustments.

Section 3.05    Properties.  (a)  The Borrower and each of its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business (including its Mortgaged Properties), except for minor defects in title that do not, or could not reasonably be expected to, interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

(b)  The Borrower and each of its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower and its Subsidiaries does not infringe upon the rights of any other Person, except, in each case, for any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect [(other than the Disclosed Matters)][22].

(c)  Schedule 3.05 sets forth the address of each real property that is owned or leased by the Borrower or any of its Subsidiaries as of the Closing Date.

Section 3.06    Litigation and Environmental Matters.  (a)  There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower, any of its Subsidiaries or any of their respective executive officers or directors (i) which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect [(other than the Disclosed Matters)][23] or (ii) that involve any of the Loan Documents or the Transactions.

(b)  Except for [either the Disclosed Matters or][24] any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any facts or circumstances which are reasonably likely to form the basis for any Environmental Liability.

Section 3.07    Compliance with Laws and Agreements.  The Borrower and each of its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

---

[22] To be included if applicable

[23] To be included if applicable

[24] To be included if applicable

Section 3.08    Investment Company Status.  None of the Ultimate Parent, the Parent, the Service Company, the Borrower or any of its Subsidiaries is required to be registered as an "investment company" as defined in the Investment Company Act of 1940.

Section 3.09    Taxes.  Each of the Ultimate Parent, the Parent, the Service Company, the Borrower and its Subsidiaries has timely filed or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except any Taxes that are being contested in good faith by appropriate proceedings and for which the Ultimate Parent, the Parent, the Service Company, the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.  Except as set forth in Schedule 3.09, no material tax Liens have been filed.

Section 3.10    ERISA.  During the five year period prior to the date on which this representation is made or deemed to be made with respect to any Plan or Multiemployer Plan, no ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability has occurred during such five year period or for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount that would reasonably be expected to have a Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that would reasonably be expected to have a Material Adverse Effect.

Section 3.11    Margin Regulations.  Neither the Borrower nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

Section 3.12    Disclosure.  None of the written reports, financial statements, certificates or other written information (including, without limitation, the Registration Statement on Form S-4 [and the Disclosure Statement (as supplemented in writing through the Closing Date))][25] taken as a whole, furnished by or on behalf of the Ultimate Parent, the Parent, the Service Company or any Dex West Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as of the date thereof and as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made taken as a whole, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable (i) at the time such projected financial information was prepared and (ii) as of the date hereof.  [The Bankruptcy Court entered an order on or about [_____], 2013 approving the adequacy of the Disclosure Statement.][26]

Section 3.13    Subsidiaries.  Schedule 3.13 sets forth the name of, and the ownership interest of the Ultimate Parent, the Parent, the Service Company and the Borrower in, each Subsidiary of

---

[25] To be included if applicable

[26] To be included if applicable

the Ultimate Parent, the Parent, the Service Company and the Borrower and identifies each such Subsidiary that is a Loan Party, in each case as of the Closing Date.  As of the Closing Date, none of the Ultimate Parent, the Parent, the Service Company and the Borrower has any Subsidiaries other than those set forth on Schedule 3.13.

Section 3.14    Insurance.  Schedule 3.14 sets forth a description of all insurance maintained by or on behalf of the Borrower and its Subsidiaries as of the Closing Date.  As of the Closing Date, all premiums due and payable in respect of such insurance have been paid.  The Borrower believes that the insurance maintained by or on behalf of the Borrower and its Subsidiaries is adequate.

Section 3.15    Labor Matters.  As of the Closing Date[, other than the Disclosed Matters][27], there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened.  Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:  (a) the hours worked by and payments made to employees of the Borrower and the Subsidiaries has not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters; (b) all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary; and (c) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

Section 3.16    Senior Debt.  For so long as the Restructuring Notes or Additional Notes are outstanding, the Obligations shall constitute "Senior Debt" under and as defined in the Restructuring Notes Indenture or, if applicable, under the indenture, note purchase agreement or other applicable agreement or instrument under which any such Additional Notes are issued.

Section 3.17    Security Documents.  (a)  The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the Pledged Stock and Pledged Notes (as defined in the Guarantee and Collateral Agreement) described in the Guarantee and Collateral Agreement, when stock certificates representing such Pledged Stock and Pledged Notes are delivered to the Collateral Agent, and in the case of the other Collateral described in the Guarantee and Collateral Agreement (other than the Intellectual Property, as defined in the Guarantee and Collateral Agreement), when financing statements and other filings are filed in the offices specified on Schedule 3.17 (as updated by the Borrower from time to time in accordance with Section 5.03), the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Dex West Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, or in the case of Pledged Stock and Pledged Notes, by possession or control, in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Stock and Pledged Notes, Liens permitted by Section 6.02(a)).

(b)  When the Guarantee and Collateral Agreement or a summary thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Guarantee and Collateral Agreement and such financing statements shall constitute a fully perfected Lien on, and security interest in, all right, title and

---

[27] To be included if applicable

interest of the grantors thereunder in the Intellectual Property (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the date hereof).

(c)  The Mortgages, if any, entered into on or prior to the Closing Date (when amended by the mortgage amendment referred to in clause (g)(1) of the Collateral and Guarantee Requirement (the "Mortgage Amendments")), or after the Closing Date pursuant to Section 5.12, are or when entered shall be effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Dex West Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed in the proper real estate filing offices, such Mortgages shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Dex West Loan Parties in such Mortgaged Property and the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to the rights of Person pursuant to Liens expressly permitted by Section 6.02(a).

Section 3.18    Liens.  There are no Liens of any nature whatsoever on any properties of the Borrower or any of its Subsidiaries other than Permitted Encumbrances and Liens permitted by Section 6.02.

Section 3.19    [Bankruptcy Court Orders.  The Confirmation Order has been entered by the Bankruptcy Court, and such order has not been stayed, reversed, modified or vacated on appeal.][28]

ARTICLE IV

CONDITIONS

Section 4.01    Effectiveness of Agreement.  The effectiveness of this Agreement is subject to the satisfaction or waiver of the following conditions precedent (and the delivery of the notice contemplated in the last sentence of this Section 4.01), provided that nothing herein shall limit the consent rights set forth in the Dex Support Agreement:

(a)  Loan Documents.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Ultimate Parent, the Parent, the Borrower, the Administrative Agent and[, to the extent requested by the Administrative Agent,][29] the Lenders, (ii) an executed Acknowledgment and Confirmation substantially in the form of Exhibit B hereto from each Dex West Loan Party, (iii) the Shared Guarantee and Collateral Agreement executed and delivered by each Shared Collateral Loan Party, (iv) the Subordinated Guarantee Agreement, executed and delivered by the Borrower, Dex East, RHDI and SuperMedia and (v) the Intercreditor Agreement, executed and delivered by the Ultimate Parent, the Parent, Dex Media Service, Dex Digital, RHDC, the Borrower, Dex East, RHDI, the Agent, the Shared Collateral Agent, the administrative agent and collateral agent under the Dex East Credit Agreement, the administrative agent under the RHDI Credit Agreement and the administrative agent under the SuperMedia Credit Agreement.

(b)  [Confirmation of the Reorganization Plan.  The Reorganization Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order.  The Confirmation Order shall not

_____

[28] To be included if applicable

[29] To be included if applicable

have been stayed, modified, or vacated on appeal.  All conditions precedent to the effectiveness of the Reorganization Plan shall have been satisfied (or waived) or shall be concurrently with the effective date of the Reorganization Plan satisfied (or waived) in accordance with the terms of the Reorganization Plan.][30]

(c)  <u>Amendments</u>.  The Administrative Agent shall have received satisfactory evidence of the completion of the Amendments (including, for the avoidance of doubt, evidence that (i) the RHDI Loan Documents and the Dex East Loan Documents have been entered into, and become effective, substantially simultaneously with this Agreement and (ii) the SuperMedia Loan Documents have been entered into and, become effective, prior to the consummation of the Mergers)[; <u>provided</u>, that it is acknowledged and agreed that the filing by the Ultimate Parent, on behalf of itself and its Subsidiaries, with the Bankruptcy Court of written notice of the occurrence of the "Effective Date" under (and as defined in) the Reorganization Plan shall satisfy this condition.][31]

(d)  <u>Mergers</u>.  The Mergers shall have been consummated by the filing of the Certificates of Merger (as defined in the Merger Agreement) with the Secretary of State of the State of Delaware.

(e)  <u>Trademarks</u>.  The trademarks owned by the Borrower, Dex East, RHDI, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) ("<u>Collateral Trademarks</u>") shall have been transferred (together with the associated goodwill) to and owned by a bankruptcy remote Subsidiary of each such Person, respectively, and in each case, (i) the organizational documents of such bankruptcy remote Subsidiaries (each, a "<u>License Subsidiary</u>") shall provide for, and require that there at all times be, two special independent directors or members whose consent would be required for such License Subsidiary to file a petition for bankruptcy or for the transfer of any equity interests therein (other than the sale of such equity interests in a transaction permitted under the Loan Documents) and shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent and the Administrative Agent shall have received and shall be reasonably satisfied with (A) a certificate of an authorized officer of the Ultimate Parent including the certificate of incorporation or formation, as applicable, for the License Subsidiaries, certified by the relevant authority of the jurisdiction of organization of such License Subsidiary, (B) a complete copy of resolutions adopted by the Governing Board of such License Subsidiary authorizing the execution, delivery and performance in accordance with their respective terms of the agreements described in clause (ii) below and (C) a long form good standing certificate of such License Subsidiary, as applicable, from its jurisdiction of organization, (ii) the License Subsidiaries shall have entered into License Agreements and (iii) except as permitted by a License Agreement, anything incidental to the ownership of the Collateral Trademarks (including filing or registering any application for or registration of all current or future Collateral Trademarks and the prosecution, maintenance, renewal or enforcement of same) shall be done solely by the Licensee Subsidiaries (or their respective selected designees).

(f)  <u>Other Intellectual Property Arrangements</u>.  (i) Each of the Borrower, Dex East, RHDI, SuperMedia, the Service Company and each other Shared Collateral Loan Party shall have entered into Master IP License Agreements substantially in the form of Exhibit I hereto and (ii) each of the Borrower, Dex East, RHDI, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) shall have delivered to each other above-referenced party and its Subsidiaries (other than License Subsidiaries) as of the Closing Date current or contingent (*e.g.*, through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of, or access to, all Escrow Materials in existence as of the Closing Date, to the extent the applicable owner or licensee of any Escrow Materials is not permitted by the Agent to make delivery of same to any of such other parties promptly after

---

[30] To be included if applicable

[31] To be included if applicable

the Closing Date.  Notwithstanding anything to the contrary contained in this Section 4.01(f), neither Borrower, Dex East, RHDI, SuperMedia, the Service Company nor any other Shared Collateral Loan Party shall be deemed to have failed to satisfy this Section 4.01(f) for any inadvertent failure to deliver or place into escrow any Escrow Materials because such party was unaware of the existence of any such item, provided that (x) delivery or escrow of any such item is made promptly after identification or discovery of such item (and that such item has not been delivered or escrowed) by such party and (y) none of such other parties are materially damaged or prejudiced, and do not lose any material rights, due to such failure.

(g)  Existing Credit Agreement.  The Borrower shall have timely paid current scheduled amortization and interest (at the non-default rate) on the Loans (as defined in the Existing Credit Agreement) in accordance with the Existing Credit Agreement [and, to the extent applicable, the Cash Collateral Order,][32] and shall have paid all other fees and expenses then due and payable with respect to the Existing Credit Agreement.

(h)  Fees.  The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which reasonably detailed invoices have been presented, on or before the Closing Date.

(i)  No Actions.  There shall be no action, suit, investigation or proceeding pending or, to the knowledge of the Borrower, threatened in any court or before any arbitrator or Governmental Authority that could reasonably be expected to (x) have a material adverse effect on the business, assets, properties, liabilities (actual and contingent), operations or condition (financial or otherwise) of the Ultimate Parent and the other Loan Parties and their respective Subsidiaries, taken as a whole, (y) adversely affect the ability of the Ultimate Parent or any other Loan Party to perform its obligations under the Loan Documents or (z) adversely affect the rights and remedies of the Agent or the Lenders under the Loan Documents.

(j)  Shared Services Agreement.  The Administrative Agent shall have received the Shared Services Agreement, duly executed and delivered by the Ultimate Parent, the Service Company, the Borrower and each other party thereto, in substantially the form attached as Exhibit E hereto.

(k)  Tax Sharing Agreements.  The Administrative Agent shall have received the Tax Sharing Agreements, duly executed and delivered by the parties thereto.

(l)  Financial Statements.  The Lenders shall have received the unaudited interim consolidated financial statements described in Section 3.04.

(m)  Closing Certificate.  The Administrative Agent shall have received and shall be satisfied with (x) a certificate of an authorized officer of each Loan Party (other than any Newco Subordinated Guarantor), dated the Closing Date, with appropriate insertions and attachments including (i) the certificate of incorporation or formation, as applicable, of such Person, as applicable, certified by the relevant authority of the jurisdiction of organization of such Person, as applicable, (ii) a complete copy of resolutions adopted by the Governing Board of such Person authorizing the execution, delivery and performance in accordance with their respective terms of the Loan Documents to which such Person is a party and any other documents required or contemplated hereunder (in the case of the Ultimate Parent, a copy of the Confirmation Order in lieu of such resolutions; provided that a copy of the resolutions adopted by the new Governing Board of the Ultimate Parent ratifying the execution, delivery and performance in accordance with their respective terms of the Loan Documents to which the Ultimate Parent is a party shall be delivered to the Administrative Agent on the Closing Date) and (iii) a long form good standing certificate of such Person, as applicable, from its jurisdiction of organization and (y) a certificate signed by the president, a vice president or a

---

[32] To be included if applicable

Financial Officer of the Borrower, the Ultimate Parent and the Parent, confirming that the conditions in Sections 4.01(q) and 4.01(t) have been satisfied, as applicable.

(n) <u>Legal Opinions</u>.  The Administrative Agent shall have received the following executed opinions, in each case in form and substance satisfactory to the Administrative Agent: (i) the legal opinion of Kirkland & Ellis LLP, counsel to the Ultimate Parent and its Subsidiaries, (ii) the legal opinion of Mark W. Hianik, the general counsel of the Ultimate Parent and its Subsidiaries, and (iii) the legal opinion of Fulbright & Jaworski LLP, counsel to SuperMedia and its Subsidiaries.

(o) <u>Pledged Stock; Stock Powers; Pledged Notes</u>.  To the extent not previously delivered, (i) the Agent shall have received (x) the certificates or other instruments representing all outstanding Equity Interests of each Subsidiary owned by or on behalf of any Loan Party pledged pursuant to the Guarantee and Collateral Agreement, together with stock powers or other instruments of transfer with respect thereto endorsed in blank and (y) each promissory note pledged and required to be delivered to the Agent pursuant to the Guarantee and Collateral Agreement, together with note powers or other instruments of transfer with respect thereto endorsed in blank, and (ii) the Shared Collateral Agent shall have received, subject to the Intercreditor Agreement, (x) the certificates or other instruments representing all outstanding Equity Interests of each Subsidiary owned by or on behalf of any Shared Collateral Loan Party pledged pursuant to the Shared Guarantee and Collateral Agreement, together with stock powers or other instruments of transfer with respect thereto endorsed in blank and (y) each promissory note pledged and required to be delivered to the Shared Collateral Agent pursuant to the Shared Guarantee and Collateral Agreement, together with note powers or other instruments of transfer with respect thereto endorsed in blank.

(p) <u>Filings, Registrations and Recordings</u>.  All documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent or the Shared Collateral Agent, as applicable, to be filed, registered or recorded to create the Liens intended to be created by the Collateral Agreements and perfect such Liens to the extent required by, and with the priority required by, the Collateral Agreements, shall have been executed and be in proper form for filing, subject only to exceptions satisfactory to the Agent or the Shared Collateral Agent, as applicable, and the Collateral and Guarantee Requirement shall have otherwise been satisfied.

(q) <u>Representations and Warranties</u>.  The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (except to the extent already qualified as to materiality in which case such representations and warranties shall be true in all respects) on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects (except to the extent already qualified as to materiality in which case such representations and warranties shall be true in all respects) on and as of such earlier date).

(r) <u>Mortgages</u>.  The Collateral and Guarantee Requirement shall have been satisfied with respect to the Mortgaged Properties listed on Schedule 1.01B.

(s) <u>Control Agreements</u>.  To the extent not previously delivered, (i) the Agent shall have received control agreements executed by all parties thereto with respect to each "deposit account" (as defined in the Guarantee and Collateral Agreement) and "securities account" (as defined in the Guarantee and Collateral Agreement) with respect to which a control agreement is required to be delivered by any Loan Party to the Agent pursuant to the Guarantee and Collateral Agreement, in each case in form and substance reasonably satisfactory to the Agent and (ii) the Shared Collateral Agent shall have received control agreements executed by all parties thereto with respect to each "deposit account" (as defined in the Shared Guarantee and Collateral Agreement) and "securities account" (as defined in the Shared Guarantee and Collateral Agreement) with respect to which a control agreement is required to be delivered by any Shared

Collateral Loan Party to the Shared Collateral Agent pursuant to the Shared Guarantee and Collateral Agreement, in each case in form and substance reasonably satisfactory to the Shared Collateral Agent.

(t)  <u>No Default</u>.  After giving effect to Section 9.17, no Default shall have occurred and be continuing as of the Closing Date.

(u)  <u>Other Transaction Documents</u>.  The Administrative Agent shall have received copies of the Dex East Credit Agreement, the RHDI Credit Agreement and the SuperMedia Credit Agreement, in each case certified by an authorized officer of the Ultimate Parent.

(v)  <u>Interest under Existing Credit Agreement</u>.  The accrued and unpaid interest on the Loans (as defined in the Existing Credit Agreement) to the Closing Date (at the applicable non-default rate) shall have been paid in full in cash by the Borrower.[33]

(w)  <u>Flood Hazards</u>.  The Administrative Agent shall have received a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto), if any, and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Administrative Agent.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

ARTICLE V

AFFIRMATIVE COVENANTS

Until the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each of the Borrower and, solely for purposes of (i) Sections 5.01(a), (b) and (l), 5.12(c), 5.13 and 5.15, the Ultimate Parent and (ii) Section 5.12(c), the Parent covenants and agrees with the Lenders that:

Section 5.01    <u>Financial Statements and Other Information</u>.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)  no later than the earlier of (i) 10 days after the date that the Borrower is required to file a report on Form 10-K with the Securities and Exchange Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether or not the Borrower is so subject to such reporting requirements), and (ii) 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2013, (A) (x) the Ultimate Parent's audited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such year and (y) the Ultimate Parent's audited consolidating balance sheet and related consolidating statements of operations, stockholders' equity and cash flows as of the end of and for such year (with each such consolidating financial statement showing the standalone financial information for each of the Borrower and its consolidated Subsidiaries, Dex East and its consolidated Subsidiaries, RHDI and its consolidated Subsidiaries and SuperMedia and its consolidated Subsidiaries and otherwise

---

[33] Potential for breakage or other costs to be discussed.

being in form substantially similar in all material respects to the consolidating financial statements of the Ultimate Parent most recently delivered to the Administrative Agent prior to the Closing Date or such other form as may be reasonably acceptable to the Administrative Agent), setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by KPMG LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification, exception or explanatory paragraph and without any qualification or exception as to the scope of such audit or other material qualification or exception; provided, that if the Ultimate Parent switches from one independent public accounting firm to another, the audit report of any such new accounting firm may contain a qualification or exception as to the scope of such consolidated or consolidating financial statements that relates to any fiscal year prior to its retention which, for the avoidance of doubt, shall have been the subject of an audit report of the previous accounting firm meeting the criteria set forth above) to the effect that such consolidated and consolidating financial statements present fairly in all material respects the financial condition and results of operations of the Ultimate Parent and its consolidated Subsidiaries on a consolidated or consolidating basis, as the case may be, in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to each Subsidiary of the Ultimate Parent's income tax provision prepared on a consolidated basis and (B) the Borrower's unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to the Borrower, and its Subsidiaries of the Ultimate Parent's income tax provision prepared on a consolidated basis[; provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in (x) Management's Discussion and Analysis or Liquidity and Capital Resources, in the case of the financial statements delivered pursuant to clause (A), and (y) Borrower's Management's Narrative Analysis and Results of Operations, in the case of the financial statements delivered pursuant to clause (B)][34];

(b)     no later than the earlier of (i) 10 days after the date that the Borrower is required to file a report on Form 10-Q with the Securities and Exchange Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether or not the Borrower is so subject to such reporting requirements), and (ii) 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, commencing with the fiscal quarter ending March 31, 2013, (A) (x) the Ultimate Parent's unaudited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year and (y) the Ultimate Parent's unaudited consolidating balance sheet and related consolidating statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year (with each such consolidating financial statement showing the standalone financial information for each of the Borrower and its consolidated Subsidiaries, Dex East and its consolidated Subsidiaries, RHDI and its consolidated Subsidiaries and SuperMedia and its consolidated Subsidiaries and otherwise being in form substantially similar in all material respects to the consolidating financial statements of the Ultimate Parent most recently delivered to the Administrative Agent prior to the Closing Date or such other form as may be reasonably

---

[34] To be included if applicable

acceptable to the Administrative Agent), setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Ultimate Parent as presenting fairly in all material respects the financial condition and results of operations of the Ultimate Parent and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to each Subsidiary of the Ultimate Parent's income tax provision prepared on a consolidated basis, subject to normal year-end audit adjustments and the absence of footnotes and (B) the Borrower's unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to the Borrower and its Subsidiaries of the Ultimate Parent's income tax provision prepared on a consolidated basis, subject to normal year-end audit adjustments and the absence of footnotes[; provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in (x) Management's Discussion and Analysis or Liquidity and Capital Resources, in the case of the financial statements delivered pursuant to clause (A), and (y) Borrower's Management's Narrative Analysis and Results of Operations, in the case of the financial statements delivered pursuant to clause (B)][35];

(c)   concurrently with any delivery of financial statements under clause (a)(B) or (b)(B) above, the corresponding financial statements with respect to Dex East, RHDI and SuperMedia that are required to be delivered by Dex East, RHDI and SuperMedia under the Dex East Credit Agreement, the RHDI Credit Agreement and the SuperMedia Credit Agreement, respectively;

(d)   concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.14 (commencing with the fiscal quarter ending March 31, 2013), (iii) stating whether any change in GAAP or in the application thereof has occurred since the Closing Date that has had an effect on the financial statements accompanying such certificate and specifying any such change and the related effect, (iv) identifying any Subsidiary of the Dex West Loan Parties formed or acquired since the end of the previous fiscal quarter, (v) identifying any parcels of real property or improvements thereto with a value exceeding $10,000,000 that have been acquired by the Dex West Loan Parties since the end of the previous fiscal quarter, (vi) identifying any changes of the type described in Section 5.03(a) that have not been previously reported by the Borrower, (vii) identifying any Permitted Acquisition or other acquisitions of going concerns that have been consummated since the end of the previous fiscal quarter, including the date on which each such acquisition or Investment was consummated and the consideration therefor, (viii) identifying any material Intellectual Property (as defined in the Guarantee and Collateral Agreement) with respect to which a notice is required to be delivered under the Guarantee and Collateral Agreement and has not been previously delivered,

---

[35] To be included if applicable

(ix) identifying any Prepayment Events or Ultimate Parent Asset Dispositions that have occurred since the end of the previous fiscal quarter and setting forth a reasonably detailed calculation of the Net Proceeds received from any such Prepayment Events or Ultimate Parent Asset Dispositions, (x) identifying any change in the locations at which equipment and inventory, in each case with a value in excess of $10,000,000, are located, if not owned by the Dex West Loan Parties, (xi) identifying any Services Assets (as defined in the Shared Services Agreement) (but with respect to Services Assets that constitute Intellectual Property, solely Intellectual Property that has been registered or patented or the registration of which has been applied for) contributed by the Borrower and its Subsidiaries to the Service Company during the immediately preceding fiscal quarter, and a reasonably detailed description of such Services Assets and the value thereof, (xii) attaching a schedule setting forth a computation (and any utilization by the Borrower) of Excess Cash Flow, Borrower's Discounted Prepayment Portion of Excess Cash Flow and Borrower's Discretionary Portion of Excess Cash Flow as of the end of the period covered by such financial statements and (xiii) setting forth (A) a reporting sales metric (which will serve as leading indicator of reported print and digital revenues), for such fiscal quarter or fiscal year, as applicable, (B) print and digital revenue and a gross margin amount for each of such reported revenue amounts for such fiscal quarter or fiscal year, as applicable, and (C) statements of cash flow from operations (with a reconciliation of net income to operating cash flow from operations and financing activities (including capital expenditures)) for such fiscal quarter or fiscal year, as applicable;

(e)  concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default or Event of Default in respect of Section 6.14 (which certificate may be limited to the extent required by accounting rules, guidelines or practice);

(f)  within 30 days after the commencement of each fiscal year of the Borrower, a detailed consolidated budget for such fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of and for such fiscal year and setting forth the assumptions used for purposes of preparing such budget, in form reasonably satisfactory to the Administrative Agent), promptly when available, any material significant revisions of such budget;

(g)  promptly after the same become publicly available, and no later than five Business Days after the same are sent, copies of all periodic and other reports, proxy statements and other materials filed by the Dex West Loan Parties with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by the Ultimate Parent or the Parent to its shareholders generally;

(h)  promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Dex West Loan Parties, or compliance with the terms of any Loan Document, as the Administrative Agent (including on behalf of any Lender) may reasonably request;

(i)  concurrently with any delivery of financial statements and related information by any Loan Party to any debtholder of Dex Digital, RHDC or of any Newco not otherwise required to be delivered hereunder, copies of such financial statements and related information;

(j)   promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that any Loan Party or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the Loan Parties or any of their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Administrative Agent, the Loan Parties and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent (on behalf of each requesting Lender) promptly after receipt thereof; provided, further, that the rights granted to the Administrative Agent in this section shall be exercised not more than once during a 12-month period;

(k)   if the Borrower is not then a reporting company under the Securities Exchange Act of 1934, as amended, within 45 days after the end of each fiscal quarter of the Borrower or 90 days in the case of the last fiscal quarter of each fiscal year, a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the comparable periods of the previous year, in substantially the form delivered to the Administrative Agent prior to the Closing Date;

(l)   no later than five Business Days prior to the effectiveness thereof, copies of substantially final drafts of any proposed material amendment, supplement, waiver or other modification with respect to the Dex East Credit Agreement, the RHDI Credit Agreement, the SuperMedia Credit Agreement, the Shared Services Agreement, the Tax Sharing Agreements, the Subordinated Guarantee, any Master IP License Agreement, any License Agreement, any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement, the Restructuring Notes or any Additional Notes; and

(m) (i) promptly following receipt thereof, any notice of changes of allocation percentages that any Dex West Loan Party shall receive pursuant to the Shared Services Agreement and (ii) concurrently with any delivery of financial statements under clause (a) or (b) above, a statement of changes in the intercompany balances of the Loan Parties with the Service Company in substantially the form delivered to the Administrative Agent prior to the Closing Date.

Section 5.02    Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender written notice of the following promptly after any Financial Officer or executive officer of the Borrower or any Subsidiary obtains knowledge thereof:

(a)   the occurrence of any Default;

(b)   the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Ultimate Parent, the Parent, the Borrower or any Affiliate thereof that involves (i) a reasonable possibility of an adverse determination and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) which relates to the Loan Documents;

(c)   the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; and

(d)  any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03    Information Regarding Collateral.  (a)  The Borrower will furnish to the Administrative Agent prompt written notice of any change (i) in the legal name of any of the Dex West Loan Parties, as reflected in its organization documents, (ii) in jurisdiction of organization or corporate structure of any of the Dex West Loan Parties and (iii) in the identity, Federal Taxpayer Identification Number or organization number of any of the Dex West Loan Parties, if any, assigned by the jurisdiction of its organization.  The Borrower agrees not to effect or permit any change referred to in clauses (i) through (iii) of the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral of the Dex West Loan Parties for the benefit of the Secured Parties.  The Borrower also agrees promptly to notify the Administrative Agent if any damage to or destruction of Collateral of the Dex West Loan Parties that is uninsured and has a fair market value exceeding $10,000,000 occurs.

(b)  Each year, at the time of delivery of annual financial statements with respect to the preceding fiscal year pursuant to clause (a) of Section 5.01, the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer and the chief legal officer of the Borrower certifying that all Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral and required pursuant to the Loan Documents to be filed, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction necessary to protect and perfect the security interests under the Guarantee and Collateral Agreement for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period).

Section 5.04    Existence; Conduct of Business.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, contracts, licenses, permits, privileges and franchises material to the conduct of its business; provided, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any sale of assets permitted under Section 6.04(n).

Section 5.05    Payment of Obligations.  The Borrower will, and will cause each of its Subsidiaries to, pay its material Indebtedness and other material obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.06    Maintenance of Properties.  The Borrower will, and will cause each of its Subsidiaries to, keep and maintain all property (other than Intellectual Property) material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.  The Borrower will, and will cause each of its Subsidiaries to, subject to its and their reasonable business judgment, take all actions to maintain all registrations and applications with respect to material Intellectual Property owned by any of them.

Section 5.07    Insurance.  The Borrower will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies (a) insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required to be maintained pursuant to the Security Documents.  The Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

Section 5.08    Casualty and Condemnation.  The Borrower (a) will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any Collateral of the Dex West Loan Parties fairly valued at more than $10,000,000 or the commencement of any action or proceeding for the taking of any Collateral of the Dex West Loan Parties or any material part thereof or material interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of the Security Documents and this Agreement.

Section 5.09    Books and Records; Inspection and Audit Rights.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers, employees and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 5.10    Compliance with Laws.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations, including Environmental Laws, and orders of any Governmental Authority applicable to it, its operations or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.11    Additional Subsidiaries.  If any additional Subsidiary of the Dex West Loan Parties is formed or acquired after the Closing Date, the Borrower will, within three Business Days after such Subsidiary is formed or acquired, notify the Administrative Agent and the Lenders thereof and, within 15 Business Days (or such longer period as the Administrative Agent shall agree) after such Subsidiary is formed or acquired, cause any applicable provisions of the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of the Dex West Loan Parties.

Section 5.12    Further Assurances.  (a) The Borrower will, and will cause each Subsidiary Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents), that may be required under any applicable law, or that the Administrative Agent or the Required Lenders may reasonably request, to cause all provisions of the Collateral and Guarantee Requirement applicable to the Dex West Loan Parties to be and remain satisfied, all at the expense of the Dex West Loan Parties; provided, that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Dex West Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the Dex West Loan Parties as a lessee under a lease.  The Borrower also agrees to provide to the Administrative Agent, from time to time upon request, evidence

reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)  If any material asset (including any real property or improvements thereto or any interest therein) that has an individual fair market value of more than $10,000,000 is acquired by the Dex West Loan Parties after the Closing Date or owned by an entity at the time it becomes a Subsidiary Loan Party (in each case other than assets constituting Collateral under the Guarantee and Collateral Agreement that become subject to the Lien of the Guarantee and Collateral Agreement upon acquisition thereof), the Borrower will notify the Administrative Agent and the Lenders thereof, and, if requested by the Administrative Agent or the Required Lenders, the Borrower will cause such asset to be subjected to a Lien securing the Obligations and will take, and cause the Dex West Loan Parties to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the Dex West Loan Parties; provided, that the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Dex West Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000, (ii) any real property held by any of the Dex West Loan Parties as a lessee under a lease and (iii) other assets with respect to which the Agent determines that the cost or impracticability of including such assets as Collateral would be excessive in relation to the benefits to the Secured Parties.

(c)  Subject to the Intercreditor Agreement, each of the Ultimate Parent and the Parent shall cause all provisions of the Collateral and Guarantee Requirement applicable to the Shared Collateral Loan Parties to be satisfied, including by causing, as applicable, (i) each Newco Subordinated Guarantor to execute a Newco Subordinated Guarantee as described in clause (e) of the definition of "Collateral and Guarantee Requirement" and (ii) each Newco Senior Guarantor to execute a supplement to the Shared Guarantee and Collateral Agreement as required thereunder;  provided, that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Shared Collateral Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the Shared Collateral Loan Parties as a lessee under a lease.

Section 5.13    Credit Ratings.  Each of the Ultimate Parent and the Borrower will use its commercially reasonable efforts to maintain at all times monitored public ratings of the Loans by Moody's and S&P and a corporate family rating for each of the Ultimate Parent and the Borrower from Moody's and a corporate issuer rating for each of the Ultimate Parent and the Borrower from S&P.

Section 5.14    Intellectual Property.  Each of the Borrower, Dex East, RHDI, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) shall deliver to each other, following the Closing Date, current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of, or access to, all future Escrow Materials that were not Escrow Materials as of the Closing Date and material updates on an ongoing basis to Escrow Materials in existence as of the Closing Date, in each case within a reasonable period of time following such Escrow Materials becoming owned, licensed or updated, as applicable, by Borrower, Dex East, RHDI, SuperMedia, the Service Company or another Shared Collateral Loan Party (other than the Ultimate Parent), as applicable.  Notwithstanding anything to the contrary contained in this Section 5.14, neither Borrower, Dex East, RHDI, SuperMedia, the Service Company nor any other Shared Collateral Loan Party shall be deemed to have failed to satisfy this Section 5.14 for any inadvertent failure to deliver or place into escrow any Escrow Materials because such party was unaware of the existence of any such item, provided that (x) delivery or escrow of any such item is made within a reasonable period of time after identification or discovery of such item (and that such item has not been delivered or

escrowed) by such party and (y) none of such other parties are materially damaged or prejudiced, and do not lose any material rights, due to such failure.

Section 5.15    Independent Director.  Each of the Ultimate Parent and the Borrower shall cause the board of directors, board of managers, or other equivalent governing body of each License Subsidiary to include at least two special, independent directors or members (or equivalent thereof), pursuant to documentation reasonably satisfactory to the Administrative Agent, whose consent shall be required for (i) any filing of a petition for bankruptcy by the relevant License Subsidiary, (ii) the transfer of any membership or other equity interests therein (other than the sale or other transfer of such membership or equity interests in a transaction permitted under the Loan Documents) and (iii) encumbering any asset owned by such License Subsidiary with a real property mortgage or deed of trust, as applicable, or a security agreement, pledge agreement or any similar agreement creating a Lien in respect thereof, except as permitted under the Loan Documents (including as a result of any consent, amendment, waiver or other modification obtained in accordance with the terms of the Loan Documents).

## ARTICLE VI

## NEGATIVE COVENANTS

Until the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each of the Borrower, and solely for purposes of (i) Sections 6.13(b) and 6.16, the Parent, and (ii) Sections 6.13(b), 6.17, 6.18, 6.19 and 6.20, the Ultimate Parent, covenants and agrees with the Lenders that:

Section 6.01    Indebtedness; Certain Equity Securities.  (a)  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness or any Attributable Debt, except:

(i)    Indebtedness created under the Loan Documents and any Permitted Subordinated Indebtedness of the Borrower or its Subsidiaries to the extent the Net Proceeds thereof are used to refinance Indebtedness created under the Loan Documents;

(ii)    Indebtedness existing on the Closing Date and set forth in Schedule 6.01 and Refinancing Indebtedness in respect thereof;

(iii)    Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary; provided, that no Subsidiary that is not a Loan Party shall have any Indebtedness to the Borrower or any Subsidiary Loan Party;

(iv)    Guarantees by the Borrower of Indebtedness of any Subsidiary Loan Party and by any Subsidiary of Indebtedness of the Borrower or any Subsidiary Loan Party;

(v)    Indebtedness and Attributable Debt of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than by an amount not greater than fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof; provided that (1) such Indebtedness or Attributable Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction

or improvement and (2) the aggregate principal amount of Indebtedness and Attributable Debt permitted by this clause (v), together with the aggregate principal amount of Indebtedness and Attributable Debt of the Service Company described in Section 6.18(d)(i) allocated to the Borrower and its Subsidiaries pursuant to the Shared Services Agreement, shall not exceed $15,000,000 at any time outstanding;

(vi)     Indebtedness of any Person that becomes a Subsidiary after the Closing Date and Refinancing Indebtedness in respect thereof; provided that (A) such Indebtedness (other than Refinancing Indebtedness) exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such entity becoming a Subsidiary) and (B) the aggregate principal amount of Indebtedness permitted by this clause (vi) shall not exceed $10,000,000 at any time outstanding;

(vii)    Indebtedness of the Borrower or any Subsidiary in respect of letters of credit in an aggregate face amount not exceeding $5,000,000 at any time outstanding;

(viii)   unsecured Indebtedness and Attributable Debt owing to the Service Company incurred pursuant to the Shared Services Transactions; and

(ix)     other unsecured Indebtedness (other than Indebtedness of the Borrower to any Affiliate of the Borrower) in an aggregate principal amount not exceeding $20,000,000 at any time outstanding.

(b)  The Borrower will not, nor will it permit any Subsidiary to, issue any preferred stock or other preferred Equity Interests.

Section 6.02      Liens.  (a)  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i)      Liens created under the Loan Documents;

(ii)     Permitted Encumbrances;

(iii)    any Lien existing on the Closing Date and set forth in Schedule 6.02 on any property or asset of the Borrower or any Subsidiary; provided that (A) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary (other than proceeds) and (B) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof;

(iv)     any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Closing Date prior to the time such Person becomes a Subsidiary; provided that (A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (B) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds) and (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be and extensions, renewals,

refinancings and replacements thereof that do not increase the outstanding principal amount thereof (other than by an amount not in excess of fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof;

(v)    Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (A) such Liens secure Indebtedness permitted by clause (v) of Section 6.01(a), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds);

(vi)    Liens on cash collateral securing letters of credit permitted by Section 6.01(a)(vii) in an aggregate amount not to exceed the lesser of (x) $5,250,000 and (y) 105% of the face amount thereof;

(vii)    Liens in the nature of non-exclusive licenses of Intellectual Property granted to or in favor of another Company pursuant to the Directory Consolidation Project; and

(viii)    Liens not otherwise permitted by this Section 6.02 securing obligations other than Indebtedness and involuntary Liens not otherwise permitted by this Section 6.02 securing Indebtedness, which obligations and Indebtedness are in an aggregate amount not in excess of $5,000,000 at any time outstanding.

Section 6.03    Fundamental Changes.  (a)  The Borrower will not, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, wind up or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving entity, (ii) subject to Section 6.20, any Subsidiary may merge into any Subsidiary in a transaction in which the surviving entity is a wholly-owned Subsidiary and, if any party to such merger is a Subsidiary Loan Party, a Subsidiary Loan Party, (iii) any Subsidiary may merge or consolidate with any other Person in order to effect a Permitted Acquisition and (iv) any Subsidiary (other than the Borrower) may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; provided that (x) any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04 and (y) any such liquidation or dissolution involving a License Subsidiary of the Borrower shall not be permitted unless such License Subsidiary conveys, leases, sells, transfers or otherwise disposes of, in one transaction or series of transactions, all or substantially all of its business or property, whether now or hereafter acquired, to a License Subsidiary.

(b)  The Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than a Permitted Business.

(c)  Notwithstanding anything to the contrary contained herein, this Section 6.03 shall not prohibit the [Mergers]["Restructuring Transactions" under (and as defined in) the Reorganization Plan.][36]

Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.  The Borrower will not, and will not permit any of its Subsidiaries to, make, purchase, hold or acquire

---

[36] To be included if applicable

(including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Investment, except:

(a)  Permitted Investments;

(b)  Investments existing on the date hereof and set forth on Schedule 6.04;

(c)  Investments by the Borrower and its Subsidiaries in Equity Interests in Subsidiaries that are Subsidiary Loan Parties immediately prior to the time of such Investments;

(d)  loans or advances made by the Borrower to any Subsidiary Loan Party and made by any Subsidiary to the Borrower or any Subsidiary Loan Party;

(e)  Guarantees constituting Indebtedness permitted by Section 6.01;

(f)  investments (including debt obligations and equity securities) received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(g)  extensions of trade credit in the ordinary course of business;

(h)  Investments consisting of non-cash consideration received in respect of sales, transfers or other dispositions of assets to the extent permitted by Section 6.04(n);

(i)  Swap Agreements entered into in compliance with Section 6.07;

(j)  loans and advances by the Borrower and any of its Subsidiaries to their employees in the ordinary course of business and for bona fide business purposes in an aggregate amount at any time outstanding not in excess of $2,500,000;

(k)  Investments in connection with the Shared Services Transactions;

(l)  Permitted Acquisitions (other than Permitted Acquisitions involving the purchase of assets from Affiliates that are not Subsidiaries of the Borrower) in an aggregate amount not to exceed $5,000,000 during the term of this Agreement;

(m) provided that (i) no Event of Default is continuing or would result therefrom, (ii) no portion of the proceeds of any such Investment is used, directly or indirectly, to purchase or repurchase, or finance the purchase or repurchase, of any Restructuring Notes, Additional Notes or any other Indebtedness of any Affiliate (and the terms of any Investment shall not permit any such purchase or repurchase by the Person in which such Investment is made while such Investment is outstanding) and (iii) no such Investment is made in any Person that is an Affiliate of the Borrower (other than the Borrower and its Subsidiaries) other than Investments that result in a purchase of assets (x) by a Newco Senior Guarantor or the Service Company in connection with equivalent Investments by each of Dex East, RHDI and SuperMedia or (y) by the Borrower or a Subsidiary in Dex Digital in connection with equivalent Investments by each of Dex East and RHDI, Investments in any other Person in an aggregate amount not to exceed $5,000,000 during the term of this Agreement; and

(n)  advances or payments made by the Borrower or any Subsidiary to (x) the License Subsidiaries of the Borrower or (y) any other Person for the purpose of (i) filing, prosecuting,

registering, renewing, enforcing or maintaining any Intellectual Property applications or registrations owned by such License Subsidiaries and (ii) satisfying all other liabilities related to, in connection with or incidental to (x) the maintenance of the existence of such License Subsidiaries and (y) activities of such License Subsidiaries permitted under this Agreement (including, without limitation, reimbursement for directors and officers fees and compensation) and under the organizational documents of such License Subsidiaries.

Section 6.05    Asset Sales.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it and any sale of assets in connection with a securitization, nor will the Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary, except:

(a)  sales of (x) inventory, (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments in the ordinary course of business;

(b)  sales, transfers and dispositions to the Borrower or a Subsidiary; provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)  sales of receivables on substantially the same terms that the receivables are purchased by Qwest Corp. pursuant to the Billing and Collection Agreement as in effect on November 1, 2004, including sales of receivables pursuant to and in accordance with the Billing and Collection Agreement;

(d)  sale and leaseback transactions permitted by Section 6.06;

(e)  sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary) to bona fide third parties that are not Affiliates of the Borrower and that are not permitted by any other clause of this Section; provided, that the aggregate cumulative fair market value of all assets sold, transferred or otherwise disposed of after the Closing Date in reliance upon this clause (e) shall not exceed $20,000,000;

(f)  sales, transfers and other dispositions pursuant to the Shared Services Transactions;

(g)  the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(h)  the sales, transfers or other dispositions in connection with the Directory Consolidation Project[37];

provided, that (x) all sales, transfers, leases and other dispositions permitted hereby (other than pursuant to clauses (a)(y), (b), (f) and (f) above) shall be made for at least 80% cash consideration or, in the case of Permitted Investments, sales of receivables or sale and leaseback transactions, 100% cash consideration,

---

[37] Schedule 1.01A to provide that the profits of the consolidated directories will be shared among the contributing companies in a manner reasonably acceptable to the admin agent taking into account the respective revenues of the directories that are combined, the costs of achieving the combination and the ongoing operating costs of the combination

and (y) all sales, transfers, leases and other dispositions permitted by clauses (a)(x), (e) and (g) above shall be made for fair value.

Section 6.06    Sale and Leaseback Transactions.  The Borrower will not, and will not permit any of its Subsidiaries, to enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except (a) pursuant to the Shared Services Transactions or (b) any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 90 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset, to the extent all Capital Lease Obligations, Attributable Debt and Liens associated with such sale and leaseback transaction are permitted by Sections 6.01(a)(v) and 6.02(a)(v) (treating the property subject thereto as being subject to a Lien securing the related Attributable Debt, in the case of a sale and leaseback not accounted for as a Capital Lease Obligation).

Section 6.07    Swap Agreements.  The Borrower will not, and will not permit any of its Subsidiaries, to enter into any Swap Agreement, except (a) Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries) in the conduct of its business or the management of its liabilities and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

Section 6.08    Restricted Payments; Certain Payments of Indebtedness.  (a)  The Borrower will not, nor will it permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) Subsidiaries of the Borrower may declare and pay dividends or distributions ratably with respect to their Equity Interests, (ii) provided no Default or Event of Default is continuing or would result therefrom, the Borrower may make Restricted Payments to the Parent, provided that (A) the proceeds of such Restricted Payments are used to repurchase, redeem, or otherwise acquire or retire for value Equity Interests in the Ultimate Parent held by any future, present or former directors, officers, members of management, employees or consultants of the Ultimate Parent or the Service Company or their respective estates, heirs, family members, spouses or former spouses pursuant to the terms of any employee equity subscription agreement, stock option agreement or similar agreement, (B) (x) any Restricted Payments used to effect such repurchases, redemptions, acquisitions or retirements are made not earlier than ten Business Days prior to the date when such Equity Interests are repurchased, redeemed, acquired or retired, if such repurchase, redemption, acquisition or retirement is made and (y) if such Restricted Payments are not used for such repurchase, redemption, acquisition or retirement, the proceeds therefrom shall be returned to the Borrower as a capital contribution within ten Business Days from the date such Restricted Payment was made, (C) the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests in any fiscal year pursuant to this clause (ii) (other than (1) any such Equity Interests repurchased, redeemed, acquired or retired in compensation for any taxes due or payable by the holder thereof, and (2) any such Equity Interests that are deemed repurchased, redeemed, acquired or retired by the Ultimate Parent in connection with the exercise of stock options or warrants by the holder thereof in connection with the payment of all or a portion of the exercise price of such options or warrant) will not exceed $1,000,000 per year and (D) such Equity Interests shall only be repurchased, redeemed, acquired or retired in connection with the death, resignation or retirement of, or settlement of a dispute with, any such Person, (iii) Restricted Payments in amounts as shall be necessary to make Tax Payments; provided that all Restricted Payments made pursuant to this clause (iii) are used by the recipient for the

purpose specified in this clause (iii) within 30 days of receipt thereof, (iv) provided no Default or Event of Default is continuing or would result therefrom, the Borrower may from time to time pay cash dividends or distributions to the Parent in an amount not in excess of the lesser of (x) the Ultimate Parent Annual Cash Interest Amount and (y) the regularly scheduled cash interest payable (taking into account the Ultimate Parent PIK Election made pursuant to Section 6.17(j)) on the Restructuring Notes (or any Additional Notes incurred to refinance such Restructuring Notes) during the next period of ten Business Days, provided, however, that (A) any such dividends or distributions relating to any such cash interest payment must be paid not earlier than ten Business Days prior to the date when such cash interest is required to be paid by the Ultimate Parent and the proceeds must (except to the extent prohibited by applicable subordination provisions) be applied by the Ultimate Parent, to the payment of such interest when due, (B) the Borrower and its Subsidiaries shall be in Pro Forma Compliance after giving effect to the payment of any such dividends or distributions pursuant to this clause (iv) and (C) in no event may the amount of any such dividend or distribution made pursuant to this clause (iv) relating to any such cash interest payment exceed 36% of the amount of such cash interest paid by the Ultimate Parent when due, (v) the Borrower may make Restricted Payments as part of the Shared Services Transactions and (vi) the Borrower may make Restricted Payments to the Parent in an aggregate amount not to exceed $2,000,000 during any fiscal year of the Borrower, provided that (A) no Default or Event of Default is continuing or would result therefrom, (B) the aggregate amount of Restricted Payments made pursuant to this clause (vi) shall not exceed $5,000,000 over the term of this Agreement, (C) the Ultimate Parent shall apply such Restricted Payments within 30 days of receipt thereof and only to fund general corporate expenses permitted hereunder and (D) no Restricted Payments made pursuant to this clause (vi) shall be used to (x) effect the repurchase, or the making of any payments in respect, of Restructuring Notes or Additional Notes or (y) make any payment to or Investment in any Affiliate other than the Borrower or a Subsidiary of the Borrower (or any director, officer or employee of any such Affiliate).

(b)  The Borrower will not, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)  payment of Indebtedness created under the Loan Documents;

(ii)  payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness, other than payments in respect of subordinated Indebtedness to the extent prohibited by the subordination provisions thereof;

(iii)  refinancings of Indebtedness to the extent permitted by Section 6.01;

(iv)  payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(v)  prepayment of Capital Lease Obligations in an aggregate cumulative amount from and after the Closing Date not exceeding $5,000,000;

(vi)  payment of any Indebtedness owing to the Service Company arising pursuant to the Shared Services Transactions; and

(vii)  payment of any Indebtedness owing to the Borrower or any Subsidiary Loan Party.

(c)  The Borrower will not, and will not permit any Subsidiary to, furnish any funds to, make any Investment in, or provide other consideration to any other Person for purposes of enabling such Person to, or otherwise permit any such Person to, make any Restricted Payment or other payment or distribution restricted by this Section that could not be made directly by the Borrower in accordance with the provisions of this Section.

(d)  Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, the Loan Parties shall be permitted to make all distributions required to be made by the Loan Parties on or after the Closing Date [(pursuant to the Reorganization Plan and the Confirmation Order][38].

Section 6.09    Transactions with Affiliates.  The Borrower will not, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable, considered as a whole, to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and the Subsidiary Loan Parties not involving any other Affiliate, (c) any payment permitted by Section 6.08 or any Investment permitted by Section 6.04 specifically contemplated by Section 6.04 to be made among Affiliates, (d) the sale of receivables on substantially the same terms that the Borrower Receivables are purchased by Qwest Corp. pursuant to the Billing and Collection Agreement as in effect on November 1, 2004, (e) any Restricted Payment permitted by Section 6.08(a)(ii), (f) subject to Section 6.13(b), the existence of, or performance by the Borrower or any of its Subsidiaries of its obligations under the terms of, the Tax Sharing Agreements, (g) Shared Services Transactions, (h) arrangements pursuant to which payments by Qwest for advertising in directories that were committed to be made in connection with the West Acquisition and the acquisition by Dex East of Qwest's directories services business in the East Territories are allocated approximately 58% to the Borrower and approximately 42% to Dex East (without regard to the directories in which such advertising is actually placed), (i) the issuance by the Borrower or any Subsidiary of Equity Interests to, or the receipt of any capital contribution from, the Parent, the Borrower or a Subsidiary, (j) the transactions in connection with the Directory Consolidation Project, (k) the License Agreements, the Master IP License Agreements and the provision of the Escrow Materials and [(l) the "Restructuring Transactions" under (and as defined in) the Reorganization Plan][39].  Additionally, without limiting the foregoing, transactions between the Borrower and its Subsidiaries, on the one hand, and Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries, on the other hand, that are not part of Shared Services or other similar ordinary course transactions, must satisfy the following requirements:  (i) the terms of any such transaction must not be less favorable in any material respect than the terms the Borrower or such Subsidiary of the Borrower would receive in an arms-length transaction with a third party (and, in the case of any such transaction involving consideration in excess of $50,000,000, the terms of such transaction must be confirmed as arms-length by a reputable financial institution or advisor); (ii) no such transaction shall involve the transfer of ownership of any operating assets (including intellectual property rights) or personnel to Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries; and (iii) all such transactions shall result in the receipt of reasonably equivalent value by the Borrower and its Subsidiaries and no such transaction shall result in the transfer of any revenues that would otherwise be recognized by the Borrower or any of its Subsidiaries to Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries.

Section 6.10    Restrictive Agreements.  The Borrower will not, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other

---

[38] To be included if applicable

[39] To be included if applicable

arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to the Secured Parties securing the Obligations, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided, that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and the proceeds thereof, (v) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to any Indebtedness incurred by a Subsidiary prior to the date on which such Subsidiary was acquired by the Borrower (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (vii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to the refinancing of Indebtedness, provided that the terms of any such restrictions or conditions are not materially less favorable to the Lenders than the restrictions or conditions contained in the predecessor agreements and (viii) the foregoing shall not apply to customary provisions in joint venture agreements.

Section 6.11    Change in Business.  The Borrower will not, and will not permit any Subsidiary to, engage at any time in any business or business activity other than a Permitted Business.

Section 6.12    Fiscal Year.  The Borrower shall not change its fiscal year for accounting and financial reporting purposes to end on any date other than December 31.

Section 6.13    Amendment of Material Documents.  (a)  The Borrower will not, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents if, taken as a whole, such amendment, modification or waiver is adverse in any material respect to the interests of the Lenders.

(b)  None of the Ultimate Parent, the Parent or the Borrower will, nor will they permit the Service Company or any Subsidiary to amend, modify, waive or terminate any of its rights under the Shared Services Agreement, the Tax Sharing Agreements, the Subordinated Guarantee Agreement, any License Agreement, any Master IP License Agreement, any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement or the organizational documents of any License Subsidiary to the extent that such amendment, modification, waiver or termination is adverse in any material respect to the interests of the Lenders.

Section 6.14    Leverage Ratio and Interest Coverage Ratio.  (a) The Borrower will not permit the Leverage Ratio as of the last day of a fiscal quarter set forth below to exceed the ratio set forth opposite such date:

| Fiscal Quarter Ended | Ratio |
| --- | --- |
| March 31, 2013 | 3.50 to 1.00 |
| June 30, 2013 | 3.50 to 1.00 |
| September 30, 2013 | 3.50 to 1.00 |

| Fiscal Quarter Ended | Ratio |
|---|---|
| December 31, 2013 | 3.50 to 1.00 |
| March 31, 2014 | 3.50 to 1.00 |
| June 30, 2014 | 3.42 to 1.00 |
| September 30, 2014 | 3.34 to 1.00 |
| December 31, 2014 | 3.25 to 1.00 |
| March 31, 2015 | 3.1875 to 1.00 |
| June 30, 2015 | 3.125 to 1.00 |
| September 30, 2015 | 3.0625 to 1.00 |
| December 31, 2015 | 3.00 to 1.00 |
| March 31, 2016 | 2.875 to 1.00 |
| June 30, 2016 | 2.75 to 1.00 |
| September 30, 2016 | 2.625 to 1.00 |
| December 31, 2016 | 2.50 to 1.00 |

(b)  The Borrower will not permit the Interest Coverage Ratio as of the last day of a fiscal quarter to be less than 2.00 to 1.00.

Section 6.15    Capital Expenditures.  The Borrower will not, and will not permit any Subsidiary to, make or commit to make any Capital Expenditure, except Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business not exceeding $12,000,000 in the aggregate in the fiscal year ending December 31, 2013, $10,000,000 in the aggregate in the fiscal year ending December 31, 2014 and $9,000,000 in the aggregate in each of the fiscal years ending December 31, 2015 and December 31, 2016; provided, that Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business, in the aggregate when combined with the Capital Expenditures of Dex East, RHDI, SuperMedia and their respective Subsidiaries, shall not exceed (i) $57,500,000 during the fiscal year ending December 31, 2013 and (ii) $50,000,000 during the fiscal years ending December 31, 2014, December 31, 2015 and December 31, 2016; provided, further that, (x) in each case (i) up to 75% of such stated amounts referred to above, if not so expended in the fiscal year for which it is permitted, may be carried over for expenditure in the next succeeding fiscal year and (ii) Capital Expenditures made pursuant to this (b) during any fiscal year shall be deemed made, first, in respect of amounts permitted for such fiscal year as provided above and, second, in respect of amounts carried over from the prior fiscal year and (y) Capital Expenditures of a Company hereunder shall either (i) relate to assets directly owned or acquired by such Company and shall be allocated to (and paid by) such Company or (ii) relate to the acquisition or development of Shared Assets and shall be allocated to (and paid by) the Companies in accordance with their Allocated Share (as defined in the Shared Services Agreement) at the time any such payment is made.

Section 6.16    Parent Covenants.  (a)The Parent will not engage in any business or activity other than the ownership of outstanding Equity Interests of the Borrower and Dex East and their respective Subsidiaries, the issuance and sale of its Equity Interests and, in each case, activities incidental thereto.

(b)  The Parent will not own or acquire any assets (other than Equity Interests of the Borrower, Dex East and Dex Media Service, other Investments in the Borrower, Dex East and their respective Subsidiaries and Dex Media Service, cash and Permitted Investments) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and liabilities under the Loan Documents, the Dex East Loan Documents and the RHDI Loan Documents, subject to the Intercreditor Agreement, liabilities imposed by law, including Tax liabilities, liabilities under the Shared Services Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)  The Parent will not create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than (i) Permitted Encumbrances and (ii) Liens securing the Dex West Obligations, the obligations under the Dex East Loan Documents and the obligations under the RHDI Loan Documents, subject to the Intercreditor Agreement.

(d)  The Parent shall not in any event incur or permit to exist any Indebtedness for borrowed money other than a Guarantee of the Dex West Obligations, the obligations under the Dex East Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement.

Section 6.17    Ultimate Parent Covenants.  (a) The Ultimate Parent will not engage in any business or activity other than the ownership of outstanding Equity Interests of its Subsidiaries and other assets permitted under Section 6.17(b), the issuance and sale of its Equity Interests, the performance of its obligations under the Shared Services Agreement and, in each case, activities incidental thereto.

(b)  The Ultimate Parent will not own or acquire any assets (other than Equity Interests of its existing Subsidiaries or any Newcos, other Investments in its existing Subsidiaries and any Newcos, assets owned or acquired in connection with its obligations under the Shared Services Agreement, cash, Permitted Investments, joint ventures or minority investments permitted under Section 6.17(e) and the Equity Interests of SuperMedia) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and liabilities under the Loan Documents, the Dex East Loan Documents, the RHDI Loan Documents and the SuperMedia Loan Documents, liabilities imposed by law, including Tax liabilities, Indebtedness permitted under Section 6.17(d), liabilities under the Shared Services Agreement, liabilities under the SuperMedia Merger Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)  The Ultimate Parent will not create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than (i) Permitted Encumbrances and (ii) Liens securing the Dex West Obligations, the obligations under the Dex East Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement.

(d)  The Ultimate Parent shall not in any event incur or permit to exist any Indebtedness for borrowed money other than (i) the Restructuring Notes, (ii) any Additional Notes and (iii) subject to the Intercreditor Agreement, a Guarantee of the Dex West Obligations, the obligations under the Dex East Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents.

(e)  The Ultimate Parent may only make Investments in, or acquisitions of, any Newco so long as (i) no Default or Event of Default has occurred and is continuing, (ii) any Newco that is acquired or created as a result of such Investment or acquisition shall become a Guarantor as and to the extent required by the Collateral and Guarantee Requirement, (iii) all transactions related thereto are consummated in accordance with applicable laws in all material respects and (iv) in case of an acquisition of assets, such assets (other than assets to be retired or disposed of) are to be used, and in the case of an acquisition of any Equity Interests, the Person so acquired is engaged, in the same line of business as that of the Ultimate Parent or a line of business reasonably related thereto.  The Ultimate Parent may make Investments (not consisting of contribution of assets of any of its Subsidiaries) in joint ventures and other minority investments, provided that such Investment shall be pledged as Collateral to the Shared Collateral Agent for the benefit of the Shared Collateral Secured Parties pursuant to the Shared Collateral and Guarantee Agreement.

(f)  The Ultimate Parent shall not (i) make any dividends or other Restricted Payments to the holders of its Equity Interests or (ii) optionally redeem or repurchase any Restructuring Notes or Additional Notes (other than any non-cash exchange therefor for common stock of the Ultimate Parent).

(g)  The Ultimate Parent may not make any Ultimate Parent Asset Disposition unless the Net Proceeds are applied to prepay the Loans pursuant to Section 2.06(c).

(h)  The Ultimate Parent shall not permit the Restructuring Notes or the Restructuring Indenture to be amended in any way that is, taken as a whole, materially adverse to the interests of the Lenders and shall not (i) permit the Restructuring Notes or any Additional Notes to be secured by any assets of the Ultimate Parent or any of its Subsidiaries, (ii) permit the proceeds of any Additional Notes to be used to finance anything other than refinancing of the Restructuring Notes or any other Additional Notes, (iii) alter the maturity of the Restructuring Notes or any Additional Notes to a date, or make the Restructuring Notes or any Additional Notes mandatorily redeemable, in whole or in part, or required to be repurchased or reacquired, in whole or in part, prior to the date that is six months after the Maturity Date (other than pursuant to customary asset sale or change in control provisions), (iv) allow the Restructuring Notes or any Additional Notes to (A) have financial maintenance covenants, (B) have restrictive covenants that apply to the Parent, the Borrower or any Subsidiary (other than, solely in the case of the Restructuring Notes, the restrictive covenants set forth in the Restructuring Notes Indenture as of the Closing Date) or that impose limitations on the Ultimate Parent's ability to guarantee or pledge assets to secure the Dex West Obligations or (C) otherwise have covenants, representations and warranties and events of default that are more restrictive than those existing in the prevailing market at the time of issuance thereof for companies with the same or similar credit ratings of the Ultimate Parent at such time issuing similar securities, (v) permit the Restructuring Notes or any Additional Notes to be guaranteed by any Subsidiary of the Ultimate Parent or not be subordinated to the Dex West Obligations on terms at least as favorable to the Lenders as the subordination terms set forth in the Restructuring Notes Indenture on the Closing Date and that are otherwise reasonably satisfactory to the Administrative Agent or (vi) permit the Restructuring Notes or any Additional Notes to be convertible or exchangeable into other Indebtedness, except other Indebtedness of the Ultimate Parent meeting the qualifications set forth in the definition of "Additional Notes".

(i)  The Ultimate Parent shall not at any time hold an aggregate amount of cash and Permitted Investments in excess of an amount equal to (a) $5,000,000 plus (b) any amounts received to fund regularly scheduled cash interest payments on the Restructuring Notes (or any Additional Notes incurred to refinance such Restructuring Notes) pursuant to Section 6.08(a)(iv) pending use by the Ultimate Parent within 10 Business Days of receipt of such amounts (in accordance with Section 6.08(a)(iv)).

(j)  The Ultimate Parent shall continue to make the Ultimate Parent PIK Election during the term of this Agreement.

Section 6.18    Service Company Covenants. (a) The Ultimate Parent will not permit the Service Company to engage in any business or activity other than the issuance and sale of its Equity Interests, ownership of the outstanding Equity Interests of its Subsidiaries and other assets permitted under Section 6.18(b) and the provision of Shared Services and, in each case, activities incidental thereto.

(b)  Subject to the Intercreditor Agreement, the Ultimate Parent will not permit the Service Company to own or acquire any assets (other than the outstanding Equity Interests of its Subsidiaries, assets owned or acquired in connection with the Shared Services, cash and Permitted Investments) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and other liabilities incurred in the ordinary course in connection with the provision of Shared Services by the Service Company or any Subsidiary of the Service Company pursuant to the terms of the Shared Service Agreement, liabilities under

the Loan Documents, the Dex East Loan Documents, the RHDI Loan Documents and the SuperMedia Loan Documents, liabilities imposed by law, including Tax liabilities, liabilities under the Shared Services Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)  Subject to the Intercreditor Agreement, the Ultimate Parent will not permit the Service Company to create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than:

(i)      Permitted Encumbrances;

(ii)      Liens securing the Dex West Obligations, the obligations under the Dex East Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement; and

(iii)      Liens on fixed or capital assets acquired, constructed or improved by the Service Company; provided that (A) such Liens secure Indebtedness permitted by Section 6.18(d), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of such Service Company.

(d)  The Ultimate Parent shall not permit the Service Company to in any event incur or permit to exist any Indebtedness for borrowed money other than:

(i)      Indebtedness and Attributable Debt of the Service Company incurred to finance the acquisition, construction or improvement of any fixed or capital assets in connection with the provision of Shared Services, including Capital Lease Obligations and extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than by an amount not greater than fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof; provided that such Indebtedness or Attributable Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement; and

(ii)      a Guarantee of the Dex West Obligations, the obligations under the Dex East Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement.

(e)  The Ultimate Parent will not permit the Service Company to sell, transfer, lease or otherwise dispose of any asset, other than:

(i)      sales of assets, the proceeds of which are reinvested within 90 days of such sale in assets of the Service Company related to the provision of Shared Services;

(ii)      sales of (x) inventory, (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments, in each case in the ordinary course of business;

(iii)      sales, transfers and other dispositions pursuant to the Shared Services Transactions;

(iv)    the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Ultimate Parent and its Subsidiaries; and

(v)    other dispositions of assets (other than Equity Interests in a Subsidiary) not otherwise permitted by this Section 6.18(e); provided, that the aggregate cumulative fair market value of all assets sold, transferred or otherwise disposed of after the Closing Date in reliance upon this clause (v) shall not exceed $1,000,000.

Section 6.19    Dex Media Service Covenant.  The Ultimate Parent will not permit Dex Media Service to engage in any business or activity, or to own or acquire any assets or to incur or permit to exist any Indebtedness or Liens on its property or assets, in each case other than those incidental to pension liabilities arising pursuant to the Dex Media, Inc. Pension Plan.

Section 6.20    Limitation on Activities of the License Subsidiaries.  The Ultimate Parent shall not, directly or indirectly, permit any License Subsidiary to (a) (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than ownership of Collateral Trademarks and anything incidental thereto (including filing or registering any application for or registration of Collateral Trademarks and the prosecution, maintenance, renewal or enforcement of Collateral Trademarks) or (ii) take any action, or conduct its affairs in a manner, that could reasonably be expected to result in the separate existence of such License Subsidiary being ignored, or the assets and liabilities of such License Subsidiary being substantively consolidated with those of the Ultimate Parent or any Subsidiary thereof in a bankruptcy, reorganization or other insolvency proceeding, (b) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (i) Indebtedness evidenced by the Loan Documents, (ii) Indebtedness owed to another Loan Party so long as such Indebtedness is subordinated to the Obligations (or a guarantee thereof), (iii) nonconsensual obligations imposed by operation of law, (iv) obligations with respect to its equity interests, (v) obligations (other than Indebtedness) in the ordinary course of business in the operation of its assets and (vi) the statutory liability of any general partner for the liabilities of the limited partnership in which it is a general partner, (c) breach any provision of, or default in the performance of its obligations under, any License Agreement to which it is a party, (d) without the consent of the two special independent directors or members required by Section 5.15 (but without prejudice to clause (j) of Article VII), (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (i) of Article VII, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing (it being understood and agreed that the consent of such special independent directors or members to any of the actions described in this clause (d) shall not in any manner limit the provisions of Article VII), (e) assign any right, title or interest in or to any current or future Collateral Trademarks to any Person except as otherwise permitted under this Agreement or license any right, title or interest in or to any of the Collateral Trademarks to any Person except to the Ultimate Parent, a Subsidiary of the Ultimate Parent or as otherwise permitted under this Agreement or (f) without the prior written consent of the Administrative Agent, not to be unreasonably withheld, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, wind up or dissolve.  The Ultimate Parent shall not (x) consent to or vote in favor of (and shall not permit any Subsidiary to consent to or vote in favor of) the incurrence of any Indebtedness by any License Subsidiary (other than Indebtedness permitted pursuant to

clause (b)(i) above or (y) permit the organizational documents of any License Subsidiary, or any License Agreement to which any License Subsidiary is a party, to be amended, supplemented, waived, terminated or otherwise modified in any material respect without the prior written consent of the Administrative Agent, not to be unreasonably withheld.

ARTICLE VII

EVENTS OF DEFAULT

If any of the following events ("Events of Default") shall occur:

(a)  the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)  the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days;

(c)  any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)  the Ultimate Parent, the Parent or the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02 or 5.04 (with respect to the existence of the Borrower) or in Article VI;

(e)  (i) any Shared Collateral Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section [6.4 or 6.5][40] of the Shared Guarantee and Collateral Agreement or (ii) any Shared Collateral Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section [6.1, 6.2 or 6.3][41] of the Shared Guarantee and Collateral Agreement, and such failure shall continue unremedied for a period of 30 days after the earlier of (A) knowledge thereof by the Ultimate Parent or any Subsidiary thereof and (B) notice thereof from the Administrative Agent to the Borrower (which notice will be promptly given at the request of any Lender);

(f)  any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b), (d) or (e) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will promptly be given at the request of any Lender);

---

[40] Section references to be updated as appropriate based on final Shared Guarantee and Collateral Agreement.

[41] Section references to be updated as appropriate based on final Shared Guarantee and Collateral Agreement.

(g)  the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex East, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, any Newcos, the Parent, the Borrower and the Subsidiaries) shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period specified in the agreement or instrument governing such Indebtedness);

(h)  any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided, that this clause (h) (i) shall not apply to (A) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (B) Optional Repurchases permitted hereunder, (C) refinancings of Indebtedness to the extent permitted by Section 6.01 and (D) Guarantees by the Ultimate Parent and its Subsidiaries of the obligations under the Dex East Loan Documents, the obligations under the RHDI Loan Documents and the obligations under the SuperMedia Loan Documents unless (x) any payment shall have been demanded to be made by, or any other remedy shall have been exercised against, the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex East, SuperMedia and their respective Subsidiaries) or their respective assets in respect of such Guarantees and (y) the obligations under the Dex East Loan Documents, the RHDI Loan Documents or the SuperMedia Loan Documents, as the case may be, shall have been accelerated and (ii) shall give effect to any notice required or grace period provided in the agreement or instrument governing such relevant Material Indebtedness, but shall not give effect to any waiver granted by the holders of such relevant Material Indebtedness after the giving of such notice or during such applicable grace period;

(i)  an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Parent, the Borrower or any Material Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Parent, the Borrower or any Material Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)  the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Parent, the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (i) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Parent, the Borrower or any Material Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make

a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(k)  one or more judgments for the payment of money in an aggregate amount in excess of $25,000,000 (net of amounts covered by insurance) shall be rendered against the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex East, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, the Parent, the Borrower and the Subsidiaries) or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex East, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, the Parent, the Borrower and the Subsidiaries) to enforce any such judgment;

(l)  (i) an ERISA Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan(s), (iii) the PBGC shall institute proceedings to terminate any Plan, or (iv) any Loan Party or ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability in a timely and appropriate manner; and in each cases (i) through (iv) above, such event or condition, in the opinion of the Required Lenders, when taken together with all other such events or conditions, if any, could reasonably be expected to result in a Material Adverse Effect;

(m)  any Lien purported to be created under any Security Document or Shared Collateral Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral having, in the aggregate, a value in excess of $10,000,000, with the priority required by the applicable Security Document or Shared Collateral Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (ii) as a result of the Agent's or the Shared Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Agreements;

(n)  a Change in Control shall occur;

(o)  any guarantee under the Collateral Agreements for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall assert in writing that the Collateral Agreements or any guarantee thereunder has ceased to be or is not enforceable;

(p)  the Intercreditor Agreement or any material portion thereof for any reason shall cease to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

(q)  the Subordinated Guarantee Agreement or any material portion thereof for any reason shall cease to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

(r)  the commencement of enforcement actions under the Shared Guarantee and Collateral Agreement with respect to any Shared Collateral Loan Party party thereto;

(s)   the commencement of enforcement actions under the Shared Services Agreement or the occurrence of an event that permits the Service Company to terminate the Shared Services Agreement with respect to any Client Company (as defined in the Shared Services Agreement) and such event continues unremedied for a period of three days;

(t)   the failure of the Borrower to receive any payment under either Tax Sharing Agreement when due and such failure continues unremedied for a period of three days;

(u)   any License Agreement, Master IP License Agreement or any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement shall be terminated (other than upon the expiration of any of the respective terms thereof), cease to be effective or cease to be the legally valid, binding and enforceable obligation in any material respect of any party thereto; or

(v)   either Tax Sharing Agreement shall be terminated (other than upon expiration of the term thereof), cease to be effective or cease to be the legally valid, binding and enforceable obligation in any material respect of any party thereto.

then, and in every such event (other than an event with respect to the Borrower described in clause (i) or (j) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may with the consent of the Required Lenders, and at the request of the Required Lenders shall, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (i) or (j) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

ARTICLE VIII

THE AGENT

Each of the Lenders hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or

percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Ultimate Parent, the Parent, the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Agent or any of its Affiliates in any capacity (other than as Agent).  The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

        The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

        The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

        Subject to the appointment and acceptance of a successor to the Agent as provided in this paragraph, the Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed and such consent not to be required if an Event of Default under clause (a), (b), (i) or (j) of Article VII has occurred and is continuing), to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Agent and Collateral Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

The Arrangers and Syndication Agent shall be entitled to the benefits of this Article VIII.

ARTICLE IX

<u>MISCELLANEOUS</u>

Section 9.01    <u>Notices</u>.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)    if to the Ultimate Parent, the Parent or the Borrower, to it at Dex Media West, Inc., 1001 Winstead Drive, Cary, North Carolina, 27513, Attention of General Counsel (Telecopy No. (919) 297-1518);

(ii)    if to the Agent, to JPMorgan Chase Bank, N.A., Global Loan Operations, 500 Stanton Christiana Road, Ops 2, Floor 3, Newark, Delaware 19713, Attention of John Getchius (Telecopy No. (9302) 634-3301, with a copy to JPMorgan Chase Bank, N.A., 383 Madison Avenue, New York, New York 10179, Attention of Neil Boylan (Telecopy No. (212) 622-4560); and

(iii)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; <u>provided</u>, that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

(c)  Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 9.02    <u>Waivers; Amendments</u>.  (a)  No failure or delay by the Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that

they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)  Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Ultimate Parent, the Parent, the Borrower and the Required Lenders, (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent or the Shared Collateral Agent, as applicable, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, or (z) in the case of this Agreement or any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Loan Party or Loan Parties subject to such Loan Document, the Agent and, as applicable, the Shared Collateral Agent, to cure any ambiguity, omission, defect or inconsistency; provided that any such agreement to waive, amend or modify this Agreement or any other Loan Document or any provision hereof or thereof pursuant to the foregoing clause (z) shall also be made to the Dex East Credit Agreement or the Dex East Loan Documents, the RHDI Credit Agreement or the RHDI Loan Documents, or the SuperMedia Credit Agreement or SuperMedia Loan Documents, as applicable; provided, further, that no such agreement shall (i) reduce the principal amount of any Loan held by any Lender or reduce the rate of interest thereon, or reduce any fees payable to any Lender hereunder, without the written consent of such Lender, (ii) postpone the maturity of any Lender's Loan, or any scheduled date of payment of the principal amount of any Lender's Loan under Section 2.05, or any date for the payment of any interest or fees payable to any Lender hereunder, or reduce the amount of, waive or excuse any such payment, without the written consent of such Lender, (iii) change Section 2.13(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (iv) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (v) except as provided by Section 9.14, release any Guarantor from its Guarantee under a Collateral Agreement, Newco Subordinated Guarantee or other applicable Security Document or Shared Collateral Security Document (except as expressly provided in the applicable Collateral Agreement, Newco Subordinated Guarantee or other Security Document or Shared Collateral Security Document), or limit its liability in respect of such Guarantee, without the written consent of each Lender, (vi) release all or substantially all of the Collateral from the Liens of the Security Documents and Shared Collateral Security Documents, without the written consent of each Lender; provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent without the prior written consent of the Agent. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Ultimate Parent, the Parent, the Borrower, the Required Lenders and the Agent if at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

(c)  If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i) through (vi), inclusive, of the second proviso to Section 9.02(b), the consent of Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding Loans at such time is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clause (i) or (ii) below, to either (i) replace each such non-consenting Lender or Lenders with one or more assignees pursuant

to, and with the effect of an assignment under, Section 2.14 so long as at the time of such replacement, each such assignee consents to the proposed change, waiver, discharge or termination or (ii) repay the outstanding Loans of such Lender that gave rise to the need to obtain such Lender's consent; provided (A) that, unless the Loans that are repaid pursuant to the preceding clause (ii) are immediately replaced in full at such time through the addition of new Lenders or the increase of the outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to the preceding clause (ii), Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding Loans at such time (determined after giving effect to the proposed action) shall specifically consent thereto and (B) any such replacement or termination transaction described above shall be effective on the date notice is given of the relevant transaction and shall have a settlement date no earlier than five Business Days and no later than 90 days after the relevant transaction.

Section 9.03    Expenses; Indemnity; Damage Waiver.  (a)  The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Agent, the Arrangers and their Affiliates, including the reasonable fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent and the Arrangers and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers, in connection with the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all out-of-pocket expenses incurred by the Agent, the Arrangers or any Lender, (including the fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent, the Arrangers and any Lender and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers) in connection with documentary taxes or the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans and (iii) all other reasonable out-of-pocket expenses as may be separately agreed with the Administrative Agent.

(b)  The Borrower shall indemnify the Agent, the Arrangers and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of (a) a single transaction and documentation counsel for any Indemnitee and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)  To the extent that the Borrower fails to pay any amount required to be paid by it to the Agent under paragraph (a) or (b) of this Section, but without affecting the Borrower's obligations thereunder, each Lender severally agrees to pay to the Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount;

*provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans at the time.

(d)  To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions or any Loan or the use of the proceeds thereof.

(e)  All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

Section 9.04    Successors and Assigns.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than the Borrower or its Affiliates or Subsidiaries) all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A) the Borrower, *provided* that no consent of the Borrower shall be required (x) for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund (as defined below) or, (y) if an Event of Default has occurred and is continuing, any other assignee; and

(B) the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment of Loans to an assignee that is a Lender immediately prior to giving effect to such assignment, an Affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following conditions:

(A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loan, the amount of the Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, in each case unless each of the Borrower and the Administrative Agent otherwise consent, *provided* that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (it being understood that only a single processing and recordation fee of $3,500 will be payable with respect to any multiple assignments to or by a Lender, an Affiliate of a Lender or an Approved Fund pursuant to clause (ii)(A) above, each of which is individually less than $1,000,000, that are simultaneously consummated); and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For purposes of this Section 9.04, the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) any entity or an Affiliate of an entity that administers, advises or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 2.12 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time, which register shall indicate that each lender is entitled to interest paid with respect to such Loans (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i)Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans

owing to it); <u>provided</u>, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the second proviso to Section 9.02(b) that affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 2.12 (subject to the requirements and limitations therein, including the requirements under Section 2.12(e) (it being understood that the documentation required under Section 2.12(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, <u>provided</u> such Participant agrees to be subject to Section 2.13(c) as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.10 or 2.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "<u>Participant Register</u>").  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05    <u>Survival</u>.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.  The provisions of Sections 2.10, 2.11, 2.12 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent and the Arrangers constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when the conditions set forth in Section 4.01 hereof shall have been satisfied, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or email transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.  (a)  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)  Each of the Ultimate Parent, the Parent and the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Ultimate Parent, the Parent, the Borrower or its properties in the courts of any jurisdiction.

(c)  Each of the Ultimate Parent, the Parent and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  [After the Closing Date, the Bankruptcy Court's retention of jurisdiction shall not govern the interpretation or enforcement of the Loan Documents or any rights or remedies related thereto.][42]

(e)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    Confidentiality.  Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, partners, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any pledgee referred to in Section 9.04(d), (iii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations or (iv) any credit insurance provider relating to the Borrower and its Obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Agent or any Lender on a nonconfidential basis from a source other than the Ultimate Parent or any Subsidiary thereof.  For the purposes of this Section, "Information" means all information received from the Ultimate Parent or any Subsidiary thereof relating to the Ultimate Parent or any Subsidiary thereof or its business, other than any such information that is available to the Agent or any Lender on a nonconfidential basis prior to disclosure by the Ultimate Parent or any Subsidiary thereof; provided, that, in the case of information received from the Ultimate Parent or any Subsidiary thereof after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with

---

[42] To be included if applicable

its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to confidential information of its other customers.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or its Affiliates or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.13    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.14    Termination or Release.  (a)  At such time as the Loans, all accrued interest and fees under this Agreement, and all other obligations of the Dex West Loan Parties under the Loan Documents (other than obligations under Sections 2.10, 2.11, 2.12 and 9.03 that are not then due and payable) shall have been paid in full in cash, (i) the Collateral shall be released from the Liens created by the Security Documents and with respect to the Dex West Obligations, the Shared Collateral Security Documents and (ii) the obligations (other than those expressly stated to survive termination) of the Agent and each Loan Party under the Security Documents and, with respect to the Dex West Obligations, the Shared Collateral Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(b)  A Subsidiary Loan Party shall automatically be released from its obligations under the Guarantee and Collateral Agreement and the security interests in the Collateral of such Subsidiary Loan Party shall be automatically released upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary of the Borrower.

(c)  Upon any sale or other transfer by any Dex West Loan Party of any Collateral that is permitted under this Agreement to any Person that is not a Dex West Loan Party, or upon the effectiveness of any written consent to the release of the security interest granted by the Guarantee and Collateral Agreement or any other Loan Document in any Collateral of the Dex West Loan Parties pursuant to

Section 9.02 of this Agreement, the security interest in such Collateral granted by the Guarantee and Collateral Agreement and the other Loan Documents shall be automatically released (it being understood that, in the case of a sale or other transfer to a Shared Collateral Loan Party, such Collateral shall become subject to a security interest in favor of the Shared Collateral Agent as to the extent set forth in the Shared Collateral Security Documents upon the consummation of such sale or other transfer).

(d)  In connection with any termination or release pursuant to paragraph (a), (b) or (c) of this Section 9.14, the Collateral Agent shall execute and deliver to any Loan Party at such Loan Party's expense all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section 9.14 shall be without recourse to or warranty by the Collateral Agent or any Lender.

Section 9.15    USA Patriot Act.  Each Lender hereby notifies the Ultimate Parent, the Parent and the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "USA Patriot Act"), it is required to obtain, verify and record information that identifies the Ultimate Parent, the Parent and the Borrower, which information includes the name and address of the Ultimate Parent, the Parent and the Borrower and other information that will allow such Lender to identify the Ultimate Parent, the Parent and the Borrower in accordance with the USA Patriot Act.

Section 9.16    Intercreditor Agreement.  Each Lender agrees that it will be bound by, and shall take no actions contrary to, the provisions of the Intercreditor Agreement or any intercreditor agreement entered into in connection with any Newco Subordinated Guarantee and authorizes the Agent to enter into the Intercreditor Agreement and any intercreditor agreement to be entered into in connection with any Newco Subordinated Guarantee (which shall be in form and substance reasonably satisfactory to the Agent) on its behalf.

Section 9.17    Amendment and Restatement.  On the Closing Date, the Existing Credit Agreement will be automatically amended and restated in its entirety to read in full as set forth herein, and all of the provisions of this Agreement which were previously not effective or enforceable shall become effective and enforceable.  Notwithstanding anything to the contrary herein, subject to the satisfaction (or waiver) of the conditions set forth in Section 4.01, the Lenders hereby waive, and shall be deemed to have waived, each Default and Event of Default under (and as defined in) the Existing Credit Agreement in existence as of the Closing Date to the extent (i) arising out of the commencement of the Chapter 11 Cases or (ii) such Default or Event of Default otherwise shall have occurred and be continuing based on facts known to the Administrative Agent and the Lenders as of the Closing Date.

[*remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

NEWDEX, INC.

By:_____
    Name:
    Title:

DEX MEDIA, INC.

By:_____
    Name:
    Title:

DEX MEDIA WEST, INC.

By:_____
    Name:
    Title:

JPMORGAN CHASE BANK, N.A., as
Administrative Agent and Collateral Agent,
and as a Lender


By:_____
    Name:
    Title:

**EXHIBIT C TO THE PLAN**

AMENDED AND RESTATED RHDI SECURED CREDIT AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

FOURTH AMENDED AND RESTATED CREDIT AGREEMENT

dated as of

[        ], 2013,

among

NEWDEX, INC.,

R.H. DONNELLEY INC.,
as Borrower,

The Lenders Party Hereto

and

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent and Collateral Agent

JPMORGAN CHASE BANK, N.A.,
as Syndication Agent

_____

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Syndication Agent

_____

DEUTSCHE BANK SECURITIES INC. and

J.P. MORGAN SECURITIES LLC,
as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS

Section 1.01   Defined Terms .................................................................................................. 2
Section 1.02   Classification of Loans and Borrowings ......................................................... 33
Section 1.03   Terms Generally ............................................................................................. 33
Section 1.04   Accounting Terms; GAAP ............................................................................. 33

## ARTICLE II

### THE CREDITS

Section 2.01   Loans ............................................................................................................. 34
Section 2.02   Borrowings .................................................................................................... 34
Section 2.03   Interest Elections ........................................................................................... 34
Section 2.04   Repayment of Loans; Evidence of Debt ........................................................ 35
Section 2.05   Amortization of Loans ................................................................................... 36
Section 2.06   Prepayment of Loans ..................................................................................... 37
Section 2.07   Fees ............................................................................................................... 39
Section 2.08   Interest .......................................................................................................... 39
Section 2.09   Alternate Rate of Interest .............................................................................. 39
Section 2.10   Increased Costs; Illegality ............................................................................. 40
Section 2.11   Break Funding Payments ............................................................................... 41
Section 2.12   Taxes ............................................................................................................. 42
Section 2.13   Payments Generally; Pro Rata Treatment; Sharing of Setoffs ...................... 45
Section 2.14   Mitigation Obligations; Replacement of Lenders .......................................... 46
Section 2.15   Voluntary Prepayments Below Par ................................................................ 46

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

Section 3.01   Organization; Powers ..................................................................................... 48
Section 3.02   Authorization; Enforceability ........................................................................ 48
Section 3.03   Governmental Approvals; No Conflicts .......................................................... 49
Section 3.04   Financial Condition ....................................................................................... 49
Section 3.05   Properties ...................................................................................................... 49
Section 3.06   Litigation and Environmental Matters ........................................................... 49
Section 3.07   Compliance with Laws and Agreements ........................................................ 50
Section 3.08   Investment Company Status .......................................................................... 50
Section 3.09   Taxes ............................................................................................................. 50
Section 3.10   ERISA ........................................................................................................... 50
Section 3.11   Margin Regulations ....................................................................................... 50
Section 3.12   Disclosure ..................................................................................................... 50
Section 3.13   Subsidiaries ................................................................................................... 51
Section 3.14   Insurance ....................................................................................................... 51
Section 3.15   Labor Matters ................................................................................................ 51

Section 3.16     Senior Debt. .................................................................................................... 51
Section 3.17     Security Documents ........................................................................................ 51
Section 3.18     Liens. .............................................................................................................. 52
Section 3.19     [Bankruptcy Court Orders. ............................................................................ 52


## ARTICLE IV

## CONDITIONS

Section 4.01     Effectiveness of Agreement ............................................................................ 52


## ARTICLE V

## AFFIRMATIVE COVENANTS

Section 5.01     Financial Statements and Other Information. ................................................ 56
Section 5.02     Notices of Material Events. ............................................................................ 60
Section 5.03     Information Regarding Collateral. ................................................................. 61
Section 5.04     Existence; Conduct of Business. ................................................................... 61
Section 5.05     Payment of Obligations. ................................................................................ 61
Section 5.06     Maintenance of Properties. ............................................................................ 62
Section 5.07     Insurance. ....................................................................................................... 62
Section 5.08     Casualty and Condemnation. ......................................................................... 62
Section 5.09     Books and Records; Inspection and Audit Rights. ........................................ 62
Section 5.10     Compliance with Laws. ................................................................................. 62
Section 5.11     Additional Subsidiaries. ................................................................................ 62
Section 5.12     Further Assurances. ....................................................................................... 62
Section 5.13     Credit Ratings ................................................................................................ 63
Section 5.14     Intellectual Property ...................................................................................... 63
Section 5.15     Independent Director ..................................................................................... 64


## ARTICLE VI

## NEGATIVE COVENANTS

Section 6.01     Indebtedness; Certain Equity Securities. ...................................................... 64
Section 6.02     Liens. .............................................................................................................. 65
Section 6.03     Fundamental Changes. ................................................................................... 66
Section 6.04     Investments, Loans, Advances, Guarantees and Acquisitions. ..................... 67
Section 6.05     Asset Sales. ..................................................................................................... 68
Section 6.06     Sale and Leaseback Transactions. ................................................................. 69
Section 6.07     Swap Agreements. .......................................................................................... 69
Section 6.08     Restricted Payments; Certain Payments of Indebtedness. ............................. 69
Section 6.09     Transactions with Affiliates. ......................................................................... 71
Section 6.10     Restrictive Agreements ................................................................................. 71
Section 6.11     Change in Business. ....................................................................................... 72
Section 6.12     Fiscal Year. .................................................................................................... 72
Section 6.13     Amendment of Material Documents. ............................................................ 72
Section 6.14     Leverage Ratio and Interest Coverage Ratio. ............................................... 72
Section 6.15     Capital Expenditures ..................................................................................... 73

Section 6.16    [Intentionally Omitted]. ....................................................................................... 73
Section 6.17    Ultimate Parent Covenants .......................................................................................... 73
Section 6.18    Service Company Covenants ........................................................................................ 75
Section 6.19    Dex Media Service Covenant ...................................................................................... 76
Section 6.20    Limitation on Activities of the License Subsidiaries ................................................... 76

## ARTICLE VII

## EVENTS OF DEFAULT

## ARTICLE VIII

## THE AGENT

## ARTICLE IX

## MISCELLANEOUS

Section 9.01    Notices. ..................................................................................................................... 82
Section 9.02    Waivers; Amendments ................................................................................................ 83
Section 9.03    Expenses; Indemnity; Damage Waiver ....................................................................... 84
Section 9.04    Successors and Assigns. .............................................................................................. 85
Section 9.05    Survival ...................................................................................................................... 88
Section 9.06    Counterparts; Integration; Effectiveness ..................................................................... 88
Section 9.07    Severability .................................................................................................................. 88
Section 9.08    Right of Setoff. ........................................................................................................... 89
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process. ..................................... 89
Section 9.10    WAIVER OF JURY TRIAL ........................................................................................ 89
Section 9.11    Headings ...................................................................................................................... 90
Section 9.12    Confidentiality. ........................................................................................................... 90
Section 9.13    Interest Rate Limitation. ............................................................................................. 91
Section 9.14    Termination or Release. ............................................................................................... 91
Section 9.15    USA Patriot Act. ......................................................................................................... 91
Section 9.16    Intercreditor Agreement. ............................................................................................ 92
Section 9.17    Amendment and Restatement ...................................................................................... 92

<u>SCHEDULES</u>:

Schedule 1.01A --      Directory Consolidation Project
Schedule 1.01B--       Mortgaged Property
Schedule 3.05   --      Properties
Schedule 3.09   --      Taxes
Schedule 3.13   --      Subsidiaries
Schedule 3.14   --      Insurance
Schedule 3.17   --      UCC Filing Jurisdictions
Schedule 6.01   --      Existing Indebtedness
Schedule 6.02   --      Existing Liens
Schedule 6.04   --      Existing Investments
Schedule 6.10   --      Existing Restrictions

<u>EXHIBITS</u>:

Exhibit A    --   Form of Assignment and Assumption
Exhibit B    --   Form of Acknowledgment and Confirmation
Exhibit C    --   Form of Amended and Restated Shared Guarantee and Collateral Agreement
Exhibit D    --   Form of Amended and Restated Intercreditor and Collateral Agency Agreement
Exhibit E    --   Form of Amended and Restated Shared Services Agreement
Exhibit F    --   Form of Newco Subordinated Guarantee
Exhibit G    --   Form of Subordinated Guarantee Agreement
Exhibit H    --   Form of License Agreement
Exhibit I    --   Form of Master IP License Agreement
Exhibit J    --   Form of Election Notice
Exhibit K    --   Form of Dex Tax Sharing Agreement
Exhibit L    --   Form of SuperMedia Tax Sharing Agreement
Exhibit M    --   Form of Tax Certificates

FOURTH AMENDED AND RESTATED CREDIT AGREEMENT, dated as of [ ] (this "Agreement"), among NEWDEX, INC., a Delaware corporation, R.H. DONNELLEY INC., a Delaware corporation, the several banks and other financial institutions or entities from time to time party hereto (the "Lenders"), and DEUTSCHE BANK TRUST COMPANY AMERICAS, as administrative agent and collateral agent for such lenders.

<u>Recitals</u>

WHEREAS, the Ultimate Parent and the Borrower (as each term is defined below) are parties to the Third Amended and Restated Credit Agreement (as amended, supplemented or otherwise modified prior to the Closing Date (as defined below), the "Existing Credit Agreement"), dated as of January 29, 2010 (the "Original Restatement Date"), among the Ultimate Parent, the Borrower, the Lenders and Deutsche Bank Trust Company Americas, as administrative agent and collateral agent;

[WHEREAS, on [_____, 2013] (the "Petition Date"), the Ultimate Parent (as defined below) and its Subsidiaries (as defined below) each commenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of the Bankruptcy Code (as defined below) in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on the Petition Date, the Ultimate Parent and its Subsidiaries filed with the Bankruptcy Court the Reorganization Plan (as defined below) and the Disclosure Statement (as defined below);

WHEREAS, on [_____, 2013], the Bankruptcy Court entered the Confirmation Order (as defined below) confirming the Reorganization Plan;

WHEREAS, pursuant to the Reorganization Plan, the Ultimate Parent and its Subsidiaries have implemented (or substantially simultaneously with the Closing Date will implement) the Amendments (as defined below);][1]

WHEREAS, the Ultimate Parent and SuperMedia Inc. ("SuperMedia") have entered into a Merger Agreement, dated as of August 20, 2012, as amended and restated as of December 5, 2012 (the "Merger Agreement"), by and among Dex One, NewDex, Inc. ("Newdex"), Spruce Acquisition Sub, Inc. ("Merger Sub") and SuperMedia, pursuant to which Dex One merged with Newdex, with Newdex as the surviving corporation (the "Dex Merger"), and SuperMedia merged with Merger Sub, with SuperMedia as the surviving corporation (the "SuperMedia Merger" and together with the Dex Merger, the "Mergers");

WHEREAS, after giving effect to the Mergers, SuperMedia has become a direct wholly owned subsidiary of Newdex and Newdex has become the Ultimate Parent;

WHEREAS, the Ultimate Parent and the Borrower have requested that the Lenders amend and restate the Existing Credit Agreement as provided in this Agreement; and

WHEREAS, the Lenders are willing to so amend and restate the Existing Credit Agreement on the terms and conditions set forth herein.

Now, therefore, the parties hereto agree that the Existing Credit Agreement shall be amended and restated in its entirety as of the Closing Date to read as follows:

---

[1] To be included if applicable

# ARTICLE I

## DEFINITIONS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"Acknowledgment and Confirmation" means an Acknowledgment and Confirmation substantially in the form of Exhibit B hereto, dated the date hereof, executed by each Dex East Loan Party.

"Additional Notes" means notes issued by the Ultimate Parent after the date hereof (a) that are not secured by any assets of the Ultimate Parent or any of its Subsidiaries, (b) that bear interest at a prevailing market rate at the time of the issuance thereof, (c) the proceeds of which are used to refinance the Restructuring Notes or any Additional Notes, (d) that do not mature, and are not mandatorily redeemable, in whole or in part, or required to be repurchased or reacquired, in whole or in part, prior to the date that is six months after the Maturity Date (other than pursuant to asset sale or change in control provisions customary in offerings of similar notes), (e) that have no financial maintenance covenants and no restrictive covenants that apply to any Subsidiary of the Ultimate Parent or that impose limitations on the Ultimate Parent's ability to guarantee or pledge assets to secure the Obligations and otherwise have covenants, representations and warranties and events of default that are no more restrictive than those existing in the prevailing market at the time of issuance for companies with the same or similar credit ratings of the Ultimate Parent at such time issuing similar securities, (f) are not guaranteed by any Subsidiary of the Ultimate Parent and are subordinated to the Obligations on terms that are no less favorable to the Lenders than the subordination terms set forth in the Restructuring Notes Indenture and that are otherwise reasonably satisfactory to the Administrative Agent and (g) are not convertible or exchangeable except into (i) other Indebtedness of the Ultimate Parent meeting the qualifications set forth in this definition or (ii) common equity of the Ultimate Parent, provided that any such exchange or conversion, if effected, would not result in a Change in Control or a Default.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means Deutsche Bank Trust Company Americas, in its capacity as administrative agent for the Lenders hereunder and its Affiliates and permitted successors acting in such capacity.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Advance Amortization Payment" has the meaning assigned to such term in Section 2.06(a).

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agent</u>" means Deutsche Bank Trust Company Americas, in its capacities as Administrative Agent and/or Collateral Agent, and each of its Affiliates and successors acting in any such capacity.  The Administrative Agent may act on behalf of or in place of any Person included in the "Agent".

"<u>Agreement</u>" has the meaning assigned in the preamble hereto.

"<u>Allocable Net Proceeds</u>" means, with respect to any Equity Issuance by the Ultimate Parent, 19% of the Net Proceeds of such Equity Issuance; <u>provided</u>, that to the extent the Indebtedness outstanding under (a) the Dex East Credit Agreement has been repaid in full, Allocable Net Proceeds shall mean 22% of the Net Proceeds of such Equity Issuance, (b) the Dex West Credit Agreement has been repaid in full, the Allocable Net Proceeds shall mean 23% of  the Net Proceeds of such Equity Issuance, (c) the Dex East Credit Agreement and the Dex West Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 26% of the Net Proceeds of such Equity Issuance, (d) the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 40% of the Net Proceeds of such Equity Issuance, (e) the Dex East Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 56% of the Net Proceeds of such Equity Issuance, (f) the Dex West Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 59% of the Net Proceeds of such Equity Issuance and (g) the Dex East Credit Agreement, the Dex West Credit Agreement and the SuperMedia Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 100% of the Net Proceeds of such Equity Issuance.

"<u>Alternate Base Rate</u>" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> ½ of 1%, (c) the Adjusted LIBO Rate for a Eurodollar Loan with an Interest Period of one month commencing on such day plus 1% and (d) 4.00%, <u>provided</u> that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on Reuters Screen LIBOR 01 Page (or on any successor or substitute of such page) at approximately 11:00 a.m., London time, on such day.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"<u>Amendments</u>" means, collectively, the amendment and restatement of the Dex East Existing Credit Agreement, the Dex West Existing Credit Agreement and the SuperMedia Existing Credit Agreement, pursuant to the Dex East Credit Agreement, the Dex West Credit Agreement and the SuperMedia Credit Agreement, respectively (in each case referred to in clause (a) in the definition thereof)[, which amendments were consummated pursuant to the Reorganization Plan][2].

"<u>Applicable Payment Percentage</u>" has the meaning assigned to such term in Section 2.15(c).

"<u>Applicable Rate</u>" means, for any day, with respect to any Loan, 5.75% per annum, in the case of an ABR Loan, and 6.75% per annum, in the case of a Eurodollar Loan.

---

[2] To be included if applicable

"Approved Fund" has the meaning assigned to such term in Section 9.04.

"Arrangers" means, collectively, J.P. Morgan Securities LLC and Deutsche Bank Securities Inc., in their capacities as Joint Lead Arrangers and Joint Bookrunners.

"Asset Disposition" means (a) any sale, lease, assignment, conveyance, transfer or other disposition (including pursuant to a sale and leaseback or securitization transaction) of any property or asset of the Borrower or any Subsidiary other than (i) dispositions described in clauses (a), (b), (d), (f), (g) and (h) of Section 6.05 and (ii) dispositions described in Section 6.05(e) resulting in aggregate Net Proceeds not exceeding $2,500,000 during the term of this Agreement and (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary, but only to the extent that the Net Proceeds therefrom have not been applied to repair, restore or replace such property or asset within 365 days after such event.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Attributable Debt" means, on any date, in respect of any lease of the Borrower or any Subsidiary entered into as part of a sale and leaseback transaction subject to Section 6.06, (a) if such lease is a Capital Lease Obligation, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP and (b) if such lease is not a Capital Lease Obligation, the capitalized amount of the remaining lease payments under such lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease Obligation.

["Bankruptcy Code" means title 11 of the United States Code (11 U.S.C. §101 et seq.), as amended from time to time, and any successor statute.][3]

["Bankruptcy Court" has the meaning assigned to such term in the recitals to this Agreement.][4]

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means R.H. Donnelley Inc., a Delaware corporation.

"Borrower's Discounted Prepayment Percentage" means 20%.

"Borrower's Discounted Prepayment Portion of Excess Cash Flow" means an amount determined following the end of each fiscal quarter of the Borrower (and certified by a Financial Officer of the Borrower pursuant to Section 5.01(d)), commencing with the first such fiscal quarter ending after the Closing Date, equal to (i) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the Borrower's Discounted Prepayment Percentage, minus (ii) (a) any Discounted Voluntary Prepayment made during the applicable ECF Period as to which the Borrower has delivered an Election Notice to the

---

[3] To be included if applicable

[4] To be included if applicable

Administrative Agent that such Discounted Voluntary Prepayment shall constitute a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow within the applicable 180-day period described in Section 2.06(e) and (b) all (x) Advance Amortization Payments, (y) prepayments made pursuant to Section 2.06(a) (other than Advance Amortization Payments) and (z) other prepayments made pursuant to Section 2.06(d), in each case to the extent the Borrower has delivered an Election Notice to the Administrative Agent that such payment shall constitute a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow, provided that, for purposes of Section 2.06(e), the Borrower's Discounted Prepayment Portion of Excess Cash Flow shall be calculated as to each individual fiscal quarter and shall not be reduced or affected by any subsequent calculation of the Borrower's Discounted Prepayment Portion of Excess Cash Flow at the end of any subsequent fiscal quarter.

"Borrower's Discretionary Percentage" means 20%.

"Borrower's Discretionary Portion of Excess Cash Flow" means an amount determined following the end of each fiscal quarter of the Borrower (and certified by a Financial Officer of the Borrower pursuant to Section 5.01(d)), commencing with the first such fiscal quarter ending after the Closing Date, equal to (i) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the Borrower's Discretionary Percentage, minus (ii) all Discounted Voluntary Prepayments made during the applicable ECF Period as to which the Borrower has delivered an Election Notice to the Administrative Agent that such Discounted Voluntary Prepayment shall constitute a utilization of the Borrower's Discretionary Portion of Excess Cash Flow.

"Borrower's Portion of Excess Cash Flow" means, collectively, the Borrower's Discounted Prepayment Portion of Excess Cash Flow and the Borrower's Discretionary Portion of Excess Cash Flow.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided, that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, without duplication, (i) the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Subsidiaries for such period, determined in accordance with GAAP and (ii) the portion of the additions to property, plant and equipment and other capital expenditures of the Service Company for such period allocated to, and funded by, the Borrower and its consolidated Subsidiaries pursuant to the Shared Services Agreement.

"Capital Lease Obligations" of any Person means (i) the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP and (ii) in the case of the Borrower and its Subsidiaries, the portion of the obligations of the Service Company described in the foregoing clause (i) allocated to, and funded by, the Borrower and its Subsidiaries pursuant to the Shared Services Agreement.

["Cash Collateral Order" means the Final Order Under 11 U.S.C. §§ 105, 361, 362, 363, 552 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to the Prepetition Secured Parties, entered by the Bankruptcy Court on [_____], 2013.][5]

"Change in Control" means, subject to the proviso below:

(a) the ownership, beneficially or of record, by any Person other than the Ultimate Parent of any Equity Interest in the Borrower;

(b) for so long as the Shared Services Agreement is in existence, the ownership, beneficially or of record, by any Person other than the Ultimate Parent of any Equity Interests in the Service Company;

(c) the ownership, beneficially or of record, by any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of more than 35% of the outstanding Equity Interests in the Ultimate Parent;

(d) occupation of a majority of the seats (other than vacant seats) on the Governing Board of the Ultimate Parent by Persons who were not (i) members of such Governing Board as of the Closing Date [(after giving effect to the Reorganization Plan)][6], (ii) nominated by, or whose nomination for election was approved or ratified by a majority of the directors or members of, the Governing Board of the Ultimate Parent or (iii) appointed by Persons described in the foregoing clauses (i) and (ii); or

(e) the occurrence of a "Change of Control" (or similar term) as defined in the Restructuring Notes Indenture or any indenture, agreement or other instrument governing the Additional Notes;

provided, that the consummation of the Mergers pursuant to the SuperMedia Merger Agreement shall not constitute a Change in Control.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.10(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

["Chapter 11 Cases" has the meaning assigned to such term in the recitals to this Agreement.][7]

"Charges" has the meaning assigned to such term in Section 9.13.

---

[5] To be included if applicable

[6] To be included if applicable

[7] To be included if applicable

"Closing Date" means the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied (or waived) and the notice contemplated in the last sentence of Section 4.01 shall have been delivered , which date is [_____, 2013].[8]

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document or Shared Collateral Security Document.

"Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Secured Parties and its Affiliates and permitted successors acting in such capacity..

"Collateral Agreements" means the collective reference to the Guarantee and Collateral Agreement and the Shared Guarantee and Collateral Agreement.

"Collateral and Guarantee Requirement" means the requirement that:

(a)    the Collateral Agent shall have received from each RHDI Loan Party either (i) a counterpart of the Guarantee and Collateral Agreement duly executed and delivered on behalf of such RHDI Loan Party or (ii) in the case of any Subsidiary that becomes a Subsidiary Loan Party after the Closing Date, a supplement to the Guarantee and Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Subsidiary;

(b)    the Shared Collateral Agent shall have received from each Shared Collateral Loan Party (other than the Newco Subordinated Guarantors) either (i) a counterpart of the Shared Guarantee and Collateral Agreement duly executed and delivered on behalf of such Shared Collateral Loan Party or (ii) in the case of any Newco that becomes a Shared Collateral Loan Party after the Closing Date, a supplement to the Shared Guarantee and Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Newco;

(c)    all outstanding Equity Interests of the Borrower and each other Subsidiary Loan Party shall have been pledged pursuant to the Guarantee and Collateral Agreement (except that the Borrower and each other Subsidiary Loan Party shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and the Collateral Agent shall have received all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(d)    all outstanding Equity Interests of DMI, Dex Media Service, Dex Digital, RHDC, the Service Company and each other Subsidiary owned by or on behalf of any Shared Collateral Loan Party shall have been pledged pursuant to the Shared Guarantee and Collateral Agreement (except that the Shared Collateral Loan Parties shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and, subject to the terms of the Intercreditor Agreement, the Shared Collateral Agent shall have received all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

---

[8] If the Closing Date occurs prior to March 31, 2013, the initial delivery of annual financial statements will be adjusted and the Excess Cash Flow prepayment provisions will be adjusted to require payment of the Excess Cash Flow prepayment under the Existing Credit Agreement for the period ending December 31, 2012.

(e)    the Shared Collateral Agent shall have received from each Newco Subordinated Guarantor a subordinated guarantee substantially in the form of Exhibit F (or such other form as shall be reasonably acceptable to the Agent and the Shared Collateral Agent), which shall (i) to the extent permitted by the terms of any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor (without giving effect to any restriction effected by any amendment thereto entered into in contemplation of such assumption) and any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor, be secured by a pledge of the Equity Interests of such Newco Subordinated Guarantor's Subsidiaries and any joint venture interest owned by such Newco Subordinated Guarantor (subject to any restrictions in the applicable joint venture agreement applicable to all partners of such joint venture; it being understood and agreed that in the event any such restriction exists, the Administrative Agent and such Newco Subordinated Guarantor shall agree upon alternative structures, if available, to effect the economic equivalent of a pledge of the applicable joint venture interest) and (ii) to the extent required by the terms of any such Indebtedness (without giving effect to any restriction effected by any amendment, waiver, modification or refinancing thereto entered into in contemplation of such assumption) be subordinated to any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor and any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor; provided, that (i) to the extent that any restriction shall exist which shall not permit such Guarantee or which requires the subordination thereof as described above, the Borrower shall deliver, or cause to be delivered, true and complete copies of all relevant agreements received by the Borrower in respect of such Indebtedness, certified by a Financial Officer, to the Agent at least ten Business Days prior to the completion of the acquisition of the applicable Newco Subordinated Guarantor (or, in the case of any such agreement received by the Borrower after such tenth Business Day, promptly following the Borrower's receipt of such agreement) and (ii) notwithstanding the foregoing, no Newco Subordinated Guarantor shall be required to guarantee the Obligations to the extent such Guarantee is prohibited by the terms of any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor (without giving effect to any restriction effected by any amendment, waiver, modification or refinancing thereto entered into in contemplation of such assumption) or any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor if no alternative financing (on terms not materially less favorable taken as a whole to the applicable borrower or issuer) is available that would permit such Guarantee or is otherwise prohibited under applicable law; provided, further, that (x) the Ultimate Parent shall use its commercially reasonable efforts to amend any such assumed Indebtedness that is otherwise being amended in connection with such acquisition to permit such Guarantee and (y) if any Newco Subordinated Guarantor is unable to Guarantee the Obligations due to circumstances described in the first proviso hereof, then (A) the Ultimate Parent may only effect the acquisition of such Newco Subordinated Guarantor to the extent it provides evidence reasonably satisfactory to the Administrative Agent, and certification by a Financial Officer, that the Ultimate Parent was unable to obtain amendments (after use of commercially reasonable efforts) and/or alternative financing (on terms not materially less favorable taken as a whole to the applicable borrower or issuer) was not available, as the case may be, permitting such Guarantee or such Guarantee was otherwise prohibited by applicable law (and providing a description of such applicable law) and (B) to the extent permitted by applicable law, a holding company shall be formed to hold 100% of the shares of the applicable Newco Subordinated Guarantor, which holding company shall Guarantee the Obligations and pledge the stock of such Newco Subordinated Guarantor to secure such Guarantee (any Guarantee provided by this clause (e), a "Newco Subordinated Guarantee");

(f)        all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent or the Shared Collateral Agent, as applicable, to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and the Shared Collateral Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Collateral Agreements, shall have been filed, registered or recorded or, subject to the Intercreditor Agreement, delivered to the Agent or the Shared Collateral Agent, as applicable, for filing, registration or recording;

(g)        (1) the Collateral Agent shall have received with respect to each Mortgaged Property existing on the Closing Date (i) a Mortgage Amendment, together with (i) evidence that counterparts of said Mortgage Amendments have been delivered to the Title Company (defined below), (ii) a datedown endorsement to the existing title policy insuring the Lien of each such Mortgage (or a reissued title insurance policy) (the "Mortgage Endorsements"), issued by Stewart Title Guaranty Company (the "Title Company"), insuring the Lien of such Mortgage (as amended by the applicable Mortgage Amendment) as a valid Lien on the Mortgaged Property described therein, free of any Liens except those permitted under Section 6.02, (iii) the opinions, addressed to the Collateral Agent and the Lenders of (A) outside counsel or in-house counsel, as to the due authorization, execution and delivery of the Mortgage Amendments by the Borrower or any Loan Party, as applicable, and (B) local counsel in each jurisdiction where Mortgaged Property is located regarding the Mortgage Amendments, (iv) with respect to each Mortgaged Amendment, such affidavits, certificates, instruments of indemnification and other items (including a so-called "gap" indemnification) as shall be reasonably required to induce the Title Company to issue the Mortgage Endorsements contemplated above, (v) evidence reasonably acceptable to the Collateral Agent of payment by the Borrower of all Mortgage Endorsement premiums, search and examination charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgage Amendments, fixture filings and issuance of the Mortgage Endorsements referred to above, in each case, in form and substance reasonably satisfactory to the Collateral Agent,  and (2) with respect to each Mortgaged Property acquired after the date hereof (i) execute and deliver a first priority Mortgage in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such real property, subject to any Liens permitted by Section 6.02, (ii) if requested by the Collateral Agent, the Collateral Agent shall have received, and the Title Company shall have received, maps or plats of an as-built survey of the sites of such Mortgaged Property prepared by an independent professional licensed land surveyor reasonably satisfactory to the Collateral Agent and the Title Company (and certified by such surveyor to the Collateral Agent and the Title Company), which maps or plats and the surveys on which they are based shall be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the American Congress on Surveying and Mapping in 1992,  (iii) the Collateral Agent shall have received in respect of such Mortgaged Property a mortgagee's title insurance policy (or policies) or marked up unconditional binder for such insurance, and each such policy shall (A) be in an amount reasonably satisfactory to the Collateral Agent; (B) be issued at ordinary rates; (C) insure that the Mortgage insured thereby creates a valid first Lien on such Mortgaged Property free and clear of all defects and encumbrances, except as disclosed therein; (D) name the Collateral Agent for the benefit of the Secured Parties as the insured thereunder; (E) be in the form of ALTA Loan Policy - 2006 (or equivalent policies); (F) contain such endorsements and affirmative coverage as the Collateral Agent may reasonably request, and the Collateral Agent shall have received evidence satisfactory to it that all premiums in respect of each such policy, all charges for mortgage recording tax, and all related expenses, if any, have been paid; (iv) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; (v) if requested by the Collateral Agent, deliver to the Collateral Agent legal

opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Collateral Agent, and (vi) deliver to the Collateral Agent a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to such Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Collateral Agent; and

(h)    each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents and Shared Collateral Security Documents (or supplements thereto) to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens thereunder.

"Collateral Trademarks" has the meaning assigned to such term in Section 4.01(e).

"Companies" means collectively, the Borrower, Dex West, Dex East and SuperMedia, and each, individually, a "Company".

["Confirmation Order" means that certain order approving the Disclosure Statement and confirming the Reorganization Plan pursuant to Section 1129 of the Bankruptcy Code entered by the Bankruptcy Court on [        ], 2013.][9]

"Consolidated Cash Interest Expense" means, for any period, the excess of (a) sum of (i) total cash interest expense (including that attributable to Capital Lease Obligations) of the Borrower and its Subsidiaries for such period with respect to all outstanding Indebtedness of the Borrower and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptance financing and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP) plus (ii) the amount of dividends paid by the Borrower during such period pursuant to Section 6.08(a)(iv) minus (b) total cash interest income of the Borrower and its Subsidiaries for such period.

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) consolidated interest expense for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any extraordinary charges or non-cash charges for such period (provided, however, that any cash payment or expenditure made with respect to any such non-cash charge shall be subtracted in computing Consolidated EBITDA during the period in which such cash payment or expenditure is made), (v) non-recurring charges consisting of (A) severance costs associated with a restructuring recorded during the fiscal years ended December 31, 2015 and December 31, 2016, not to exceed $3,500,000 in any such fiscal year, (B) payments of customary investment and commercial banking fees and expenses and (C) cash premiums, penalties or other payments payable in connection with the early extinguishment or repurchase of Indebtedness, and (vi) Specified Charges for such period, provided that such charges are recorded during the period starting on October 1, 2012 and ending on December 31, 2013 and the aggregate amount of charges added back pursuant to this clause (vi) for all periods shall not exceed $14,700,000 (it being understood that such charges may be added back in any four-fiscal-quarter period which includes the fiscal quarter in which such charges are recorded), and minus (b) without duplication and to the extent included in determining such Consolidated Net Income, (i) consolidated interest income

---

[9] To be included if applicable

for such period and (ii) any extraordinary gains and non-cash gains (including, without limitation, any gain arising from the retirement of Indebtedness) for such period, all determined on a consolidated basis in accordance with GAAP.  For purposes of calculating the Leverage Ratio or the Interest Coverage Ratio as of any date, if the Borrower or any consolidated Subsidiary has made any Permitted Acquisition or sale, transfer, lease or other disposition outside of the ordinary course of business of a Subsidiary or of assets constituting a business unit, in each case as permitted by Section 6.05, during the period of four consecutive fiscal quarters (a "<u>Reference Period</u>") most recently ended on or prior to such date, Consolidated EBITDA for the such Reference Period shall be calculated after giving <u>pro forma</u> effect thereto, as if such Permitted Acquisition or sale, transfer, lease or other disposition (and any related incurrence, repayment or assumption of Indebtedness with any new Indebtedness being deemed to be amortized over the applicable testing period in accordance with its terms) had occurred on the first day of such Reference Period.  The calculation of Consolidated EBITDA shall exclude (i) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase method of accounting for the transactions contemplated by any acquisition, in accordance with GAAP [and (ii) any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan][10].

"<u>Consolidated Net Income</u>" means, for any period, the net income or loss, before the effect of the payment of any dividends or other distributions in respect of preferred stock, of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP and adjusted to eliminate (i) any non-cash impact attributable to the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase method of accounting for the transactions contemplated by any acquisition, in accordance with GAAP [and (ii) any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan][11]; <u>provided</u>, that there shall be excluded (a) the income of any Person (other than the Borrower or a Subsidiary Loan Party) in which any other Person (other than the Borrower or any Subsidiary Loan Party or any director holding qualifying shares in compliance with applicable law) owns an Equity Interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or any of the Subsidiary Loan Parties during such period, and (b) except as otherwise contemplated by the definition of "Consolidated EBITDA", the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Debt Issuance</u>" means the incurrence by the Borrower or any Subsidiary of any Indebtedness, other than Indebtedness permitted by Section 6.01(a).

"<u>Default</u>" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"<u>Defaulting Lender</u>" means any Lender, as reasonably determined by the Administrative Agent, that has (a) notified the Borrower, the Administrative Agent or any other Lender in writing that it

---

[10] To be included if applicable

[11] To be included if applicable

does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under agreements in which it commits to extend credit generally, (b) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (c) (i) been (or has a parent company that has been) adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, unless in the case of any Lender referred to in this clause (c) the Borrower and the Administrative Agent shall be satisfied that such Lender intends, and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder.  For the avoidance of doubt, a Lender shall not be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in such Lender or its parent by a Governmental Authority.

"Dex Digital" means Dex One Digital, Inc., a Delaware corporation.

"Dex East" means Dex Media East Inc., a Delaware corporation.

"Dex East Existing Credit Agreement" means the Credit Agreement, dated as of October 24, 2007, as amended and restated as of January 29, 2010, among the Ultimate Parent, DMI, Dex East, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, as amended, supplemented or otherwise modified prior to the effectiveness of the Dex East Credit Agreement.

"Dex East Credit Agreement" means (a) the Credit Agreement, dated as of October 24, 2007 (as amended and restated as of January 29, 2010, as further amended and restated as of the Closing Date, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Ultimate Parent, DMI, Dex East, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the Dex East Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"Dex East Loan Documents" means the "Loan Documents" as defined in the Dex East Credit Agreement.

"Dex Media Service" means Dex Media Service LLC, a Delaware limited liability company.

"Dex Merger" has the meaning assigned to such term in the recitals to this Agreement.

"Dex One" means Dex One Corporation, a Delaware corporation.

"Dex Support Agreement" means the Support and Limited Waiver Agreement, dated as of December 5, 2013, among the Ultimate Parent, DMI, the Borrower, Dex West, Dex East and their respective Subsidiaries party thereto, the Agent, the administrative agent and collateral agent under the Dex West Credit Agreement, the administrative agent under the Dex East Credit Agreement and each of the lenders party thereto.

"Dex Tax Sharing Agreement" means the Amended and Restated Tax Sharing Agreement in the form of Exhibit K hereto, dated the date hereof, among Newdex, Dex One, DMI, the Borrower, the Service Company, RHDC, Dex West, Dex East, R.H. Donnelley Apil, Inc. and Dex Digital.

"Dex West" means Dex Media West Inc., a Delaware corporation.

"Dex West Existing Credit Agreement" means the Credit Agreement, dated as of June 6, 2008, as amended and restated as of January 29, 2010, among the Ultimate Parent, DMI, Dex West, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, as amended, supplemented or otherwise modified prior to the effectiveness of the Dex West Credit Agreement.

"Dex West Credit Agreement" means (a) the Credit Agreement, dated as of June 6, 2008 (as amended and restated as of January 29, 2010, as further amended and restated as of the Closing Date, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Ultimate Parent, DMI, Dex West, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the Dex West Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"Directory Consolidation Project" means the initiative described in Schedule 1.01A.[12]

["Disclosed Matters" means the matters, proceedings, transactions and other information disclosed in the [Disclosure Statement][Registration Statement on Form S-4] (other than any risk factor disclosures contained under the heading "Risk Factors", any disclosures of risks in the "Forward-Looking Statements" disclaimer or any other similar forward-looking statements in the Disclosure Statement).][13]

["Disclosure Statement" means the Disclosure Statement for the Reorganization Plan, the adequacy of which was approved by the Bankruptcy Court pursuant to the Confirmation Order.][14]

---

[12] Summary from the Term Sheet to be listed on the schedule.

[13] To be included if applicable

[14] To be included if applicable

"<u>Discounted Voluntary Prepayment</u>" has the meaning assigned to such term in Section 2.15(a).

"<u>Discounted Voluntary Prepayment Amount</u>" has the meaning assigned to such term in Section 2.15(b).

"<u>Discounted Voluntary Prepayment Notice</u>" has the meaning assigned to such term in Section 2.15(b).

"<u>DMI</u>" means Dex Media, Inc., a Delaware corporation.

"<u>Dollars</u>" or "<u>$</u>" refers to lawful money of the United States of America.

"<u>ECF Period</u>" means the period beginning on January 1, 2013 and ending at the end of the applicable fiscal quarter thereafter.

"<u>ECF Sweep Percentage</u>" means 60%.

"<u>Election Notice</u>" means a written notice from the Borrower to the Administrative Agent in the form of Exhibit J hereto.

"<u>Environmental Laws</u>" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"<u>Environmental Liability</u>" means any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equity Interests</u>" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person of whatever nature, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"<u>Equity Issuance</u>" means the issuance by the Ultimate Parent, the Borrower or any Subsidiary of any Equity Interests, or the receipt by the Ultimate Parent, the Borrower or any Subsidiary of any capital contribution, other than (i) any issuance of Equity Interests or receipt of capital contributions to the extent as a result of (x) a non-cash exchange of Restructuring Notes or Additional Notes or (y) the issuance of Equity Interests that are issued on a non-cash basis as consideration for a Permitted Acquisition or other Investment permitted hereunder or (ii) any issuance of Equity Interests to, or receipt of any capital contribution from, the Ultimate Parent or any RHDI Loan Party.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standards (within the meaning of Sections 412 and 430 of the Code or Section 302 of ERISA) applicable to such Plan, including, for Plan years ending prior to January 1, 2008, any "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure by any Loan Party or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; (d) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Plan; (e) a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA; (f) the receipt by any Loan Party or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (h) the receipt by any Loan Party or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"Escrow Materials" means copies of (i) all software source code and all documentation and training manuals relating thereto and (ii) all other tangible or written embodiments of material technology, websites and databases (but excluding any print directories or other publicly distributed print materials), in each case to the extent (1) owned (or licensed, if such license grants the licensee (x) possession of same and the right to allow the foregoing entities (and any escrow agent, as applicable) to access same and (y) the right to sublicense such right of possession and access without (I) the licensor's consent, unless consent can be obtained with no additional fees or other consideration (unless the sublicensee fully reimburses the sublicensor for such additional fees or other consideration) or additional obligations upon sublicensor or any loss of rights of sublicensor, (II) loss of any rights of sublicensor, (III) additional obligations upon sublicensor or (IV) any additional fees or consideration (unless the sublicensee fully reimburses the sublicensor for such fees or other consideration required to obtain such right of possession and access) and (2) currently used by SuperMedia, Borrower, Dex East, Dex West, the Service Company or any of such Shared Collateral Loan Parties, as applicable, in their respective businesses.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excess Cash Flow" means, as of the end of each fiscal quarter ending after the Closing Date, for the period starting on January 1, 2013 and ending on the last day of such fiscal quarter, the result (without duplication) of:

(a) net cash provided by operating activities of the Borrower and its Subsidiaries for such period as reflected in the statement of cash flows on the consolidated financial statements of the Borrower for each applicable quarter during such period , that (i) to the extent the Borrower makes any Discounted Voluntary Prepayments and the gain arising from the retirement of Indebtedness in connection with such Discounted Voluntary Prepayments results in any additional cash taxes, the payment of such additional cash taxes shall not be deducted in the calculation of Excess Cash Flow and (ii) for the avoidance of doubt, income related to the retirement of Indebtedness shall not be included in the calculation of Excess Cash Flow; plus

(b) cash payments received during such period to enter into or settle Swap Agreements to the extent not already recognized in net cash provided by operating activities; plus

(c) to the extent deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries for such period, the Specified Charges for such period; minus

(d) the amount of Capital Expenditures for such period (except to the extent attributable to the incurrence of Capital Lease Obligations or otherwise financed by incurring Long Term Indebtedness and except to the extent made with Net Proceeds in respect of Prepayment Events); minus

(e) the aggregate principal amount of Long Term Indebtedness repaid or prepaid (for the avoidance of doubt, including any Advance Amortization Payment) by the Borrower and its consolidated Subsidiaries during such period to the extent permitted by Section 6.08(b), excluding (i) any prepayment of Loans and (ii) repayments or prepayments of Long Term Indebtedness financed by incurring other Long Term Indebtedness; minus

(f) the aggregate amount of cash dividends or other distributions paid by the Borrower to the Ultimate Parent during such period pursuant to Section 6.08(a)(iv) (other than in reliance on clause (B) thereof); minus

(g) cash payments made during such period to enter into or settle Swap Agreements to the extent not already included in net cash provided by operating activities.

"Exchange Act" has the meaning assigned to such term in the definition of "Change in Control".

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) any taxes imposed on or measured, in whole or in part, by revenue or net income and franchise taxes imposed in lieu thereof by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located, has a present or former connection (other than in connection with the Loan Documents) or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction described in clause (a) above and (c) in the case of a Foreign

Lender (other than an assignee pursuant to a request by the Borrower under Section 2.14(b)), any U.S. withholding tax that (i) is in effect and would apply to amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to any withholding tax pursuant to Section 2.12(a), or (ii) is attributable to such Foreign Lender's failure (other than as a result of any Change in Law) to comply with Section 2.12(e) and (d) any U.S. Federal withholding taxes imposed under FATCA.

"Existing Credit Agreement" has the meaning assigned to such term in the recitals to this Agreement.

"Existing Loans" means the Loans (as defined in the Existing Credit Agreement) outstanding under the Existing Credit Agreement prior to the Closing Date.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower or the Ultimate Parent, as applicable.

"First Amendment" means the First Amendment to this Agreement, dated as of March 9, 2012.

"First Amendment Effective Date" means the date on which the conditions precedent set forth in Section 3 of the First Amendment shall have been satisfied, which for the avoidance of doubt is March 9, 2012.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located or, with respect to any Borrower that is a "Untied States person" within the meaning of Section 7701(a)(30) of the Code, that is not a "United States person" within the meaning of such Section.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means (i) a Subsidiary organized under the laws of a jurisdiction located outside the United States of America or (ii) a Subsidiary of any Person described in the foregoing clause (i).

"GAAP" means generally accepted accounting principles in the United States of America.

"Governing Board" means (a) the managing member or members or any controlling committee of members of any Person, if such Person is a limited liability company, (b) the board of directors of any Person, if such Person is a corporation or (c) any similar governing body of any Person.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantee and Collateral Agreement" means the Guarantee and Collateral Agreement, dated as of the Original Restatement Date, among each RHDI Loan Party and the Agent.

"Guarantors" means the Ultimate Parent, Dex Digital, RHDC, the Service Company, DMI, the Subsidiary Loan Parties, each Newco Senior Guarantor and each Newco Subordinated Guarantor.

"Hazardous Materials" means (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances; or (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"<u>Indemnified Taxes</u>" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and Other Taxes.

"<u>Indemnitee</u>" has the meaning assigned to such term in Section 9.03(b).

"<u>Independent Financial Advisor</u>" means an accounting, appraisal or investment banking firm of national standing or any third party appraiser or recognized expert with experience in appraising the terms and conditions of the type of transaction or series of related transactions for which an opinion is required; <u>provided</u>, that such firm or appraiser is not an Affiliate of the Borrower.

"<u>Information</u>" has the meaning assigned to such term in Section 9.12.

"<u>Intellectual Property</u>" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"<u>Intercreditor Agreement</u>" means the Amended and Restated Intercreditor and Collateral Agency Agreement, substantially in the form of Exhibit D, entered into among the Agent on behalf of the Secured Parties, the Shared Collateral Agent on behalf of the Shared Collateral Secured Parties, the administrative agent and collateral agent under the Dex West Credit Agreement, the administrative agent and collateral agent under the Dex East Credit Agreement and the administrative agent and collateral agent under the SuperMedia Credit Agreement.

"<u>Interest Coverage Ratio</u>" means, with respect to the Borrower and for any period of four consecutive fiscal quarters ending on any date of determination, the ratio of (a) Consolidated EBITDA for such period to (b) Consolidated Cash Interest Expense for such period.

"<u>Interest Election Request</u>" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.03.

"<u>Interest Payment Date</u>" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"<u>Interest Period</u>" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower may elect; <u>provided</u>, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the

date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means purchasing, holding or acquiring (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interest, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or making or permitting to exist any loans or advances (other than commercially reasonable extensions of trade credit) to, guaranteeing any obligations of, or making or permitting to exist any investment in, any other Person, or purchasing or otherwise acquiring (in one transaction or a series of transactions) any assets of any Person constituting a business unit.  The amount, as of any date of determination, of any Investment shall be the original cost of such Investment (including any Indebtedness of a Person existing at the time such Person becomes a Subsidiary in connection with any Investment and any Indebtedness assumed in connection with any acquisition of assets), plus the cost of all additions, as of such date, thereto and minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash or property as a repayment of principal or a return of capital (including pursuant to any sale or disposition of such Investment), as the case may be, but without any other adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.  In determining the amount of any Investment or repayment involving a transfer of any property other than cash, such property shall be valued at its fair market value at the time of such transfer.

"Lenders" has the meaning assigned to such term in the preamble to this Agreement.

"Leverage Ratio" means, on any date, the ratio of (a) Total Indebtedness as of such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters of the Borrower ended on such date.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) the rate per annum determined on the basis of the rate for deposits in dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR 01 Page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period (or in the event that such rate does not appear on Reuters Screen LIBOR 01 Page (or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 10:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein and (b) 3.00%.

"License Agreement" means an agreement, substantially in the form of Exhibit H hereto, pursuant to which each License Subsidiary shall grant a license to use trademarks to the Ultimate Parent and each Subsidiary of the Ultimate Parent.

"License Subsidiary" has the meaning assigned to such term in Section 4.01(e).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such

asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, the Intercreditor Agreement, the Subordinated Guarantee Agreement, the Security Documents and the Shared Collateral Security Documents.

"Loan Parties" means the Borrower and the Guarantors.

"Loan" has the meaning assigned to such term in Section 2.01(a).

"Long Term Indebtedness" means any Indebtedness that, in accordance with GAAP, constitutes (or, when incurred, constituted) a long-term liability.  For purposes of determining the Long Term Indebtedness of the Borrower and the Subsidiaries, Indebtedness of the Borrower or any Subsidiary owed to the Borrower or a Subsidiary shall be excluded.

"Margin Stock" shall have the meaning assigned to such term in Regulation U of the Board.

"Master IP License Agreement" means an agreement substantially in the form of Exhibit I hereto.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, property, material agreements, liabilities, financial condition or results of operations of the Borrower and the Subsidiaries, taken as a whole, or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights and remedies of the Agent or the Lenders under any of the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans and the Subordinated Guarantee but including, for the avoidance of doubt, Guarantees (other than the Subordinated Guarantee)), or obligations in respect of one or more Swap Agreements, of any one or more of the Ultimate Parent and its Subsidiaries (other than Dex East, Dex West, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, DMI, the Borrower and its Subsidiaries), in an aggregate principal amount exceeding $25,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Ultimate Parent or any of its Subsidiaries in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Ultimate Parent or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Subsidiary" means any Subsidiary which meets any of the following conditions:  (a) the Borrower's and the other Subsidiaries' investments in and advances to such Subsidiary exceed 5% of the consolidated total assets of the Borrower and the Subsidiaries as of the end of the most recently completed fiscal quarter, (b) the consolidated assets of such Subsidiary exceed 5% of the consolidated total assets of the Borrower and the Subsidiaries as of the end of the most recently completed fiscal quarter or (c) the consolidated pre-tax income from continuing operations of such Subsidiary for the most recently ended period of four consecutive fiscal quarters exceeds 5% of the consolidated pre-tax income from continuing operations of the Borrower and the Subsidiaries for such period.

"Material Ultimate Parent Subsidiary" means (i) any License Subsidiary and (ii) any Subsidiary of the Ultimate Parent (other than Dex East, Dex West, SuperMedia and their respective

Subsidiaries) which meets any of the following conditions:  (a) the Ultimate Parent's and its other Subsidiaries' aggregate investments in and advances to such Subsidiary exceed $10,000,000 as of the end of the most recently completed fiscal quarter, (b) the consolidated assets of such Subsidiary exceed $10,000,000 as of the end of the most recently completed fiscal quarter or (c) the consolidated pre-tax income from continuing operations of such Subsidiary for the most recently ended period of four consecutive fiscal quarters exceeds $5,000,000.

"Maturity Date" means December 31, 2016, or, if such day is not a Business Day, the next preceding Business Day.

"Maximum Rate" has the meaning assigned to such term in Section 9.13.

"Merger Agreement" has the meaning assigned to such term in the recitals to this Agreement.

"Merger Sub" has the meaning assigned to such term in the recitals to this Agreement.

"Mergers" has the meaning assigned to such term in the recitals to this Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means any mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any real property and improvements thereto to secure the Obligations delivered after the Closing Date pursuant to Section 5.12.  Each Mortgage shall be satisfactory in form and substance to the Collateral Agent.

"Mortgage Amendment" has the meaning assigned to such term in Section 4.01(a).

"Mortgage Endorsement" has the meaning assigned to such term in clause (g) of the definition of "Collateral and Guarantee Requirement".

"Mortgaged Property" means each parcel of real property and improvements thereto listed on Schedule 1.01B and each other parcel of real property and improvements thereto owned by a RHDI Loan Party with respect to which a Mortgage is granted pursuant to Section 5.12.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds, including cash received in respect of any debt instrument or equity security received as non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses (including underwriting discounts and commissions and collection expenses) paid or payable by the Loan Parties or any Subsidiary thereof to third parties (including Affiliates, if permitted by Section 6.09) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made by the Loan Parties or any Subsidiary thereof as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, including, for the avoidance of doubt, in the case of an Ultimate Parent Asset Disposition, payments required to be made by the Loan

Parties or any Subsidiary thereof pursuant to the Subordinated Guarantee Agreement (it being understood that this clause shall not apply to customary asset sale provisions in offerings of debt securities) and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Loan Parties or any Subsidiary thereof (provided that such amounts withheld or estimated for the payment of taxes shall, to the extent not utilized for the payment of taxes, be deemed to be Net Proceeds received when such nonutilization is determined), and the amount of any reserves established by the Loan Parties or any Subsidiary thereof to fund contingent liabilities reasonably estimated to be payable, in each case that are directly attributable to such event (provided that such reserves and escrowed amounts shall be disclosed to the Administrative Agent promptly upon being taken or made and any reversal of any such reserves will be deemed to be Net Proceeds received at the time and in the amount of such reversal), in each case as determined reasonably and in good faith by the chief financial officer of the Borrower; provided that for the purposes of calculating the Net Proceeds of an Ultimate Parent Asset Disposition, payments made (or reasonably estimated to be payable) under the Tax Sharing Agreements shall be deducted in the same manner as taxes paid (or reasonably estimated to be payable) under clause (b)(iii) above.

"Newco" means any Subsidiary (direct or indirect) of the Ultimate Parent (other than SuperMedia and its Subsidiaries) acquired or formed by the Ultimate Parent after the Closing Date other than a Subsidiary of the Borrower, Dex West, Dex East or SuperMedia.

"Newco Senior Guarantor" means any Newco the acquisition or formation of which is accomplished, directly or indirectly, using cash or other credit support (including debt service) provided by the Borrower, any Subsidiary or any other Newco Senior Guarantor or in which any Investment is made by the Borrower, any Subsidiary or any other Newco Senior Guarantor.

"Newco Subordinated Guarantee" has the meaning assigned to such term in clause (e) of the definition of "Collateral and Guarantee Requirement".

"Newco Subordinated Guarantor" means any Newco other than a Newco Senior Guarantor.

"Newdex" has the meaning assigned to such term in the recitals to this Agreement.

"Obligations" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Optional Repurchase" means, with respect to any outstanding Indebtedness, any optional or voluntary repurchase, redemption or prepayment made in cash of such Indebtedness, the related payment in cash of accrued interest to the date of such repurchase, redemption or prepayment on the principal amount of such Indebtedness repurchased, redeemed or prepaid, the payment in cash of associated premiums (whether voluntary or mandatory) on such principal amount and the cash payment of other fees and expenses incurred in connection with such repurchase, redemption or prepayment.

"Original Restatement Date" has the meaning assigned to such term in the recitals to this Agreement.

"Other Taxes" means any and all present or future recording, stamp, documentary, excise, transfer, sales, property or similar Taxes, charges or levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(iii).

"Payment Percentage" has the meaning assigned to such term in Section 2.15(b).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisitions" means any acquisition (by merger, consolidation or otherwise) by the Borrower or a Subsidiary Loan Party of all or substantially all the assets of, or all the Equity Interests in, a Person or division or line of business of a Person, if (a) both before and immediately after giving effect thereto, no Default or Event of Default has occurred and is continuing or would result therefrom, (b) such acquired Person is organized under the laws of the United States of America or any State thereof or the District of Columbia and substantially all the business of such acquired Person or business consists of one or more Permitted Businesses and not less than 80% of the consolidated gross operating revenues of such acquired Person or business for the most recently ended period of twelve months is derived from domestic operations in the United States of America, (c) each Subsidiary resulting from such acquisition (and which survives such acquisition) other than any Foreign Subsidiary, shall be a Subsidiary Loan Party and at least 80% of the Equity Interests of each such Subsidiary shall be owned directly by the Borrower and/or Subsidiary Loan Parties and shall have been (or within ten Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) pledged pursuant to the Guarantee and Collateral Agreement (subject to the limitations of the pledge of Equity Interests of Foreign Subsidiaries set forth in the definition of "Collateral and Guarantee Requirement"), (d) the Collateral and Guarantee Requirement shall have been (or within ten Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) satisfied with respect to each such Subsidiary, (e) the Borrower and the Subsidiaries are in Pro Forma Compliance after giving effect to such acquisition and (f) the Borrower has delivered to the Agent an officer's certificate to the effect set forth in clauses (a), (b), (c), (d) and (e) above, together with all relevant financial information for the Person or assets acquired and reasonably detailed calculations demonstrating satisfaction of the requirement set forth in clause (e) above.

"Permitted Business" means the telephone and internet directory services businesses and businesses reasonably related, incidental or ancillary thereto.

"Permitted Encumbrances" means:

(a)  Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.05;

(b)  carriers', warehousemen's, mechanics', materialmen's, landlord's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.05;

(c)  pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)  deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)  judgment Liens in respect of judgments or attachments that do not constitute a Default or an Event of Default under clause (k) of Article VII; provided that any such Lien is released within 30 days following the creation thereof;

(f)  easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that are not substantial in amount and do not, or could not reasonably be expected to, materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary or, for purposes of (i) Section 6.17, the Ultimate Parent or (ii) Section 6.18, the Service Company;

(g)  Liens arising solely by virtue of any statutory or common law provisions relating to bankers' Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depositary institution;

(h)  any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary of the Borrower or, for purposes of (i) Section 6.17, the Ultimate Parent or (ii) Section 6.18, the Service Company, in the ordinary course of its business and covering only the assets so leased;

(i)  the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, or could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(j)  any provision for the retention of title to any property by the vendor or transferor of such property, which property is acquired by the Borrower or a Subsidiary of the Borrower or, for purposes of (i) Section 6.17, the Ultimate Parent or (ii) Section 6.18, the Service Company, in a transaction entered into in the ordinary course of business of the Borrower or such Subsidiary of the Borrower, or, for purposes of (A) Section 6.17, the Ultimate Parent or (B) Section 6.18, the Service Company, and for which kind of transaction it is normal market practice for such retention of title provision to be included;

provided, that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a)  direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing or allowing for liquidation at the original par value at the option of the holder within one year from the date of acquisition thereof;

(b)  investments in commercial paper (other than commercial paper issued by the Ultimate Parent, the Borrower or any of their Affiliates) maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c) investments in certificates of deposit, banker's acceptances, time deposits or overnight bank deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office

of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000, and having a debt rating of "A-1" or better from S&P or "P-1" or better from Moody's;

(d)  fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)  money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Permitted Subordinated Indebtedness" means (a) the Subordinated Guarantee and (b) Indebtedness of the Borrower which (i) does not mature, and is not subject to mandatory repurchase, redemption or amortization (other than pursuant to customary asset sale or change in control provisions requiring redemption or repurchase only if and to the extent then permitted by this Agreement), in each case, prior to the date that is six months after the Maturity Date, (ii) is not secured by any assets of the Borrower or any Subsidiary, (iii) is not exchangeable or convertible into Indebtedness of the Borrower or any Subsidiary or any preferred stock or other Equity Interest (other than common equity of the Ultimate Parent, provided that any such exchange or conversion, if effected, would not result in a Change in Control or Default) and (iv) is, together with any Guarantee thereof by any Subsidiary, subordinated to the Obligations pursuant to a written instrument delivered to the Administrative Agent and having subordination terms that are no less favorable to the Lenders than the subordination terms set forth in the Restructuring Notes Indenture and that are otherwise reasonably satisfactory to the Administrative Agent.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

["Petition Date" has the meaning assigned to such term in the recitals to this Agreement.][15]

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepayment Event" means any (a) Asset Disposition, (b) Equity Issuance or (c) Debt Issuance.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Deutsche Bank Trust Company Americas as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Pro Forma Compliance" means, with respect to any event, that the Borrower is in pro forma compliance with Section 6.14 recomputed as if the event with respect to which Pro Forma Compliance is being tested had occurred on the first day of the four fiscal quarter period most recently

---

[15] To be included if applicable.

ended on or prior to such date for which financial statements have been delivered pursuant to Section 5.01.

"Qualifying Loans" has the meaning assigned to such term in Section 2.15(c).

"Range" has the meaning assigned to such term in Section 2.15(b).

"Refinanced Debt" has the meaning assigned to such term in the definition of "Refinancing Indebtedness".

"Refinancing Indebtedness" means Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to extend, renew or refinance existing Indebtedness ("Refinanced Debt"); provided, that (a) such extending, renewing or refinancing Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of, and unpaid interest on, the Refinanced Debt plus the amount of any premiums paid thereon and fees and expenses associated therewith, (b) such Indebtedness has a later maturity and a longer weighted average life than the Refinanced Debt, (c) such Indebtedness bears a market interest rate (as reasonably determined in good faith by the board of directors of the Borrower) as of the time of its issuance or incurrence, (d) if the Refinanced Debt or any Guarantees thereof are subordinated to the Obligations, such Indebtedness and Guarantees thereof are subordinated to the Obligations on terms no less favorable to the holders of the Obligations than the subordination terms of such Refinanced Debt or Guarantees thereof (and no Loan Party that has not guaranteed such Refinanced Debt guarantees such Indebtedness), (e) such Indebtedness contains covenants and events of default and is benefited by Guarantees (if any) which, taken as a whole, are reasonably determined in good faith by the board of directors of the Borrower not to be materially less favorable to the Lenders than the covenants and events of default of or Guarantees (if any) in respect of such Refinanced Debt, (f) if such Refinanced Debt or any Guarantees thereof are secured, such Indebtedness and any Guarantees thereof are either unsecured or secured only by such assets as secured the Refinanced Debt and Guarantees thereof, (g) if such Refinanced Debt and any Guarantees thereof are unsecured, such Indebtedness and Guarantees thereof are also unsecured, (h) such Indebtedness is issued only by the issuer of such Refinanced Indebtedness and (i) the proceeds of such Indebtedness are applied promptly (and in any event within 45 days) after receipt thereof to the repayment of such Refinanced Debt.

"Register" has the meaning assigned to such term in Section 9.04.

"Registration Statement on Form S-4" means the Registration Statement on Form S-4 filed by the Ultimate Parent with the Securities and Exchange Commission on [      ].

"Reinvestment" has the meaning assigned to such term in Section 2.06(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, Controlling Persons and advisors of such Person and of each of such Person's Affiliates.

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

["Reorganization Plan" means the Debtors' Joint Prepackaged Chapter 11 Plan for the Ultimate Parent and its Subsidiaries, including any exhibits, supplements, appendices and schedules thereto, dated [      ], 2013, as amended, supplemented or otherwise modified from time to time in

accordance with the Dex Support Agreement and as confirmed by the Bankruptcy Court pursuant to the Confirmation Order.][16]

"Required Lenders" means, at any time, Lenders having Loans representing more than 50% of the sum of the total outstanding Loans at such time.

"Required Percentage" means (a) in the case of an Ultimate Parent Asset Disposition, an Asset Disposition, a Debt Issuance or an Equity Issuance by the Borrower or any Subsidiary, 100%, provided that, in the case of an Ultimate Parent Asset Disposition, to the extent that no amount is deducted in the calculation of the Net Proceeds of such Ultimate Parent Asset Disposition because no amount is paid to and distributed by the Subordinated Guarantee Agent pursuant to the Subordinated Guarantee Agreement, "Required Percentage" shall mean the percentage that the RHDI Credit Parties (as defined in the Subordinated Guarantee Agreement) would have received pursuant to the Subordinated Guarantee Agreement if the Net Proceeds had been paid to and distributed by the Subordinated Guarantee Agent pursuant to the Subordinated Guarantee Agreement, and (b) in the case of an Equity Issuance by the Ultimate Parent, 50%.

"Restricted Payment" means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, termination or amendment of any Equity Interests in such Person or of any option, warrant or other right to acquire any such Equity Interests in such Person.

"Restructuring Notes" means the 12%/14% Senior Subordinated Notes due 2017 of the Ultimate Parent issued pursuant to the Restructuring Notes Indenture in an aggregate principal of $300,000,000 on the Original Restatement Date.

"Restructuring Notes Indenture" means the Indenture, dated the date hereof, between the Ultimate Parent and The Bank of New York Mellon, as trustee.

"RHDI Loan Parties" means the Borrower and the Subsidiary Loan Parties.

"RHDI Obligations" has the meaning assigned to such term in the Intercreditor Agreement.

"RHDC" means R.H. Donnelley Corporation, a Delaware corporation.

"S&P" means Standard & Poor's Financial Services LLC.

"Secured Parties" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Security Documents" means the Guarantee and Collateral Agreement, the Mortgages and each other security agreement or other instrument or document executed and delivered by any RHDI Loan Party pursuant to Section 5.11 or 5.12 or pursuant to the Guarantee and Collateral Agreement to secure any of the Obligations.

"Service Company" means Dex One Service, Inc., a Delaware corporation.

---

[16] To be included if applicable

"Shared Assets" means any asset (including intellectual property rights) owned by the Service Company or any License Subsidiary.

"Shared Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Shared Collateral Secured Parties, pursuant to the terms of the Intercreditor Agreement.

"Shared Collateral Loan Parties" means the Ultimate Parent, DMI, Dex Digital, RHDC, the Service Company, and each Newco that is a party to the Shared Collateral Security Documents.

"Shared Collateral Secured Parties" has the meaning as set forth in the Intercreditor Agreement.

"Shared Collateral Security Documents" means the Shared Guarantee and Collateral Agreement, the Newco Subordinated Guarantees, any mortgage and each other security agreement or other instruments or documents executed and delivered by any Shared Collateral Loan Party pursuant to Section 5.12 or pursuant to the Shared Guarantee and Collateral Agreement to secure any of the RHDI Obligations.

"Shared Guarantee and Collateral Agreement" means the Amended and Restated Guarantee and Collateral Agreement among each Shared Collateral Loan Party (other than the Newco Subordinated Guarantors) and the Shared Collateral Agent, substantially in the form of Exhibit C.

"Shared Services" means the centralized, shared or pooled services, undertakings and arrangements which are provided by the Service Company or any of its Subsidiaries to or for the benefit of the Ultimate Parent and its Subsidiaries pursuant to the Shared Services Agreement, including, without limitation, the acquisition and ownership of assets by the Service Company or any of its Subsidiaries used in the provision of the foregoing and centralized payroll, benefits and account payable operations.

"Shared Services Agreement" means the Amended and Restated Shared Services Agreement, dated as of the date hereof, among the Ultimate Parent, the Service Company, the Borrower and the other Subsidiaries of the Ultimate Parent party thereto, in substantially the form attached as Exhibit E hereto.

"Shared Services Transactions" means, collectively, (a) the engagement of the Service Company for the provision of Shared Services pursuant to the Shared Services Agreement, (b) sales, transfers and other dispositions of assets to the Service Company or any of its Subsidiaries pursuant to the Shared Services Agreement for use in the provision of Shared Services, (c) the transfer of employees of the Loan Parties to the Service Company or any of its Subsidiaries for the provision of Shared Services pursuant to the Shared Services Agreement and (d) payments, distributions and other settlement of payment obligations by the recipient of Shared Services to, or for ultimate payment to, the provider of such Shared Services pursuant to the Shared Services Agreement in respect of the provision of such Shared Services (including, without limitation, the prefunding in accordance with the Shared Services Agreement of certain such payment obligations in connection with the establishment of the payment and settlement arrangements under the Shared Services Agreement); provided, that all such payments, distributions and settlements shall reflect a fair and reasonable allocation of the costs of such Shared Services in accordance with the terms of the Shared Services Agreement (it being understood and agreed that payments in respect of tax liabilities or tax attributes pursuant to the Tax Sharing Agreements shall not constitute Shared Services Transactions; provided, further, that the foregoing shall not restrict the ability of the Borrower to make Restricted Payments (i) pursuant to Section 6.08(a)(iii) to the Service

Company in respect of tax liabilities incurred by the Service Company in connection with the performance of its obligations under the Shared Services Agreement).

"Specified Charges" means (a) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with the Mergers, this Agreement (including, for the avoidance of doubt, costs, fees, and expenses incurred in connection with satisfying the conditions precedent in Sections 4.01(e) and 4.01(f)), and the transactions contemplated by the Dex Support Agreement[, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases][17] and (b) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Administrative Agent and the steering committee Lenders and reimbursed by the Borrower (without, including without limitation, the fees and expenses of the Administrative Agent and the steering committee Lenders) incurred in connection with this Agreement (including, for the avoidance of doubt, costs, fees, and expenses incurred in connection with satisfying the conditions precedent in Sections 4.01(e) and 4.01(f)), and the transactions contemplated by the Dex Support Agreement[, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases][18].

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Guarantee" means the Guarantee made by the Borrower pursuant to the Subordinated Guarantee Agreement.

"Subordinated Guarantee Agent" has the meaning assigned to such term in the Subordinated Guarantee Agreement.

"Subordinated Guarantee Agreement" means the Subordinated Guarantee Agreement, dated the date hereof, attached hereto as Exhibit G, among the Borrower, Dex West, Dex East and SuperMedia.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such

---

[17] To be included if applicable

[18] To be included if applicable

date, owned, Controlled or held by the parent or one or more Subsidiaries of the parent or by the parent and one or more Subsidiaries of the parent.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Loan Party" means any Subsidiary of the Borrower that is not a Foreign Subsidiary.

"SuperMedia" has the meaning assigned to such term in the recitals of this Agreement.

"SuperMedia Credit Agreement" means (a) the Amended and Restated Loan Agreement, dated as of December 31, 2009, as amended and restated as of the date hereof (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among SuperMedia, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the SuperMedia Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"SuperMedia Existing Credit Agreement" means the Amended and Restated Loan Agreement, dated as of December 31, 2009, (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among SuperMedia, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent, as amended, supplemented or otherwise modified prior to the effectiveness of the SuperMedia Credit Agreement.

"SuperMedia Loan Documents" means the "Loan Documents" as defined in the SuperMedia Credit Agreement.

"SuperMedia Merger" has the meaning assigned to such term in the recitals of this Agreement.

"SuperMedia Tax Sharing Agreement" means the Tax Sharing Agreement in the form of Exhibit L hereto, dated the date hereof, among SuperMedia, SuperMedia Sales Inc., SuperMedia Services Inc., Newdex, Dex One and the Service Company.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Syndication Agent" means JPMorgan Chase Bank, N.A., in its capacity as syndication agent.

"Tax Payments" means payments for (i) the net amounts payable by the Borrower pursuant to the Tax Sharing Agreements for the current tax period and (ii) to the extent not duplicative

with (i), taxes which are not determined by reference to income, but which are imposed on a direct or indirect owner of the Borrower as a result of such owner's ownership of the equity of the Borrower.

"Tax Sharing Agreements" means, collectively, the Dex Tax Sharing Agreement and the SuperMedia Tax Sharing Agreement (each, individually, a "Tax Sharing Agreement").

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Title Company" has the meaning assigned to such term in clause (g) of the definition of "Collateral and Guarantee Requirement".

"Total Indebtedness" means, as of any date, an amount equal to (a) the aggregate principal amount of Indebtedness of the Borrower and the Subsidiaries outstanding as of such date, other than the Subordinated Guarantee, determined on a consolidated basis in accordance with GAAP minus, solely for purposes of Section 6.14, (b) the lesser of (i) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents or otherwise subject to a Permitted Encumbrance shall be deemed to be unencumbered for purposes of this definition) maintained by the Borrower and the Subsidiaries as of such date and (ii) $25,000,000; provided, that the amount of such Indebtedness shall be (A) without regard to the effects of purchase method of accounting requiring that the amount of such Indebtedness be valued at its fair market value instead of its outstanding principal amount and (B) determined exclusive of (x) any reimbursement obligations and intercompany non-cash obligations constituting intercompany Indebtedness or Attributable Debt owing to the Service Company incurred pursuant to the Shared Services Transactions and (y) any letters of credit to the extent cash collateralized in reliance on Section 6.02(a)(vi).

"Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, (b) [the effectiveness and consummation of the Reorganization Plan pursuant to the Confirmation Order (including, without limitation, the consummation of the Mergers) and][19] and (c) the payment of fees and expenses in connection with [clause (b) hereof and][20] the Amendments and the Loan Documents.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"Ultimate Parent" means (i) prior to the Mergers, Dex One, and (ii) after the Mergers, Newdex.

"Ultimate Parent Annual Cash Interest Amount" means, for any fiscal year (or full fiscal year equivalent), an amount equal to 37% of $36,000,000.

"Ultimate Parent Asset Disposition" means any sale, transfer or other disposition (including pursuant to a public offering or spin-off transaction) by the Ultimate Parent or any Subsidiary thereof of all or a portion of the Equity Interests of the Borrower, Dex West, Dex East, SuperMedia, Dex

---

[19] To be included if applicable

[20] To be included if applicable

Digital, RHDC or any Newco (or substantially all of the assets constituting a business unit, division or line of business thereof).

"Ultimate Parent PIK Election" means the election by the Ultimate Parent to make paid-in-kind interest payments on the Restructuring Notes as permitted by the Restructuring Notes Indenture.

"U.S. Person" means "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.12(e)(ii)(B)(3).

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

Section 1.02    Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Eurodollar Loan").  Borrowings also may be classified and referred to by Type (e.g., a "Eurodollar Borrowing").

Section 1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Any reference made in this Agreement or any other Loan Document to any consolidated financial statement or statements of the Ultimate Parent, the Borrower and the Subsidiaries means such financial statement or statements prepared on a combined basis for the Ultimate Parent, the Borrower and the Subsidiaries pursuant to GAAP, not utilizing the equity method.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations

of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any of their respective Subsidiaries at "fair value", as defined therein.

ARTICLE II

THE CREDITS

Section 2.01    Loans. (a) Subject to the terms and conditions set forth herein, each Existing Loan shall continue to be outstanding and, on and as of the Closing Date, constitute term loans hereunder (the "Loans").

(b) Amounts repaid in respect of Loans may not be reborrowed.

Section 2.02    Borrowings. (a) Subject to Section 2.09, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.

(b) At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $5,000,000. Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 15 Eurodollar Borrowings outstanding.

(c) Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03    Interest Elections. (a) The Borrower may elect to convert each Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b) To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone (i) in the case of an election to continue or convert to a Eurodollar Borrowing, by not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed continuation or conversion or (ii) in the case of an election to convert to an ABR Borrowing, by not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed conversion. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(c) Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred after the Closing Date and is continuing then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.04    Repayment of Loans; Evidence of Debt.  (a)  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.05.

(b)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)  The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)  The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)  Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form reasonably satisfactory to the Administrative Agent.  Such promissory note shall state that it is subject to the provisions of this Agreement.  Thereafter, the Loans evidenced by such promissory note and interest

thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.05    Amortization of Loans.  (a)  Subject to adjustment pursuant to paragraph (c) of this Section 2.05 and except for Advance Amortization Payments, the Borrower shall repay the Borrowings on each date set forth below in the amount set forth opposite such date; provided, that, to the extent the Borrower makes a Discounted Voluntary Prepayment, the repayments due to any Lender participating in such Discounted Voluntary Prepayment shall be reduced ratably by the principal amount of Loans so prepaid (it being understood and agreed that such Discounted Voluntary Prepayment shall not in any manner affect the scheduled repayments due to the Lenders not participating in such Discounted Voluntary Prepayment):

| Date | Principal Amount to be Repaid |
|------|-------------------------------|
| March 31, 2013 | $10,000,000 |
| June 30, 2013[21] | $10,000,000 |
| September 30, 2013 | $10,000,000 |
| December 31, 2013 | $10,000,000 |
| March 31, 2014 | $10,000,000 |
| June 30, 2014 | $10,000,000 |
| September 30, 2014 | $10,000,000 |
| December 31, 2014 | $10,000,000 |
| March 31, 2015 | $7,500,000 |
| June 30, 2015 | $7,500,000 |
| September 30, 2015 | $7,500,000 |
| December 31, 2015 | $7,500,000 |
| March 31, 2016 | $6,250,000 |
| June 30, 2016 | $6,250,000 |
| September 30, 2016 | $6,250,000 |
| Maturity Date | Remaining Outstanding Amounts |

(b)  To the extent not previously paid all Loans shall be due and payable on the Maturity Date.

(c)  Any mandatory prepayment of a Borrowing or optional prepayment that is not a Discounted Voluntary Prepayment shall be applied to reduce the subsequent scheduled repayments of the Borrowings to be made pursuant to this Section ratably.

(d)  Prior to any repayment of any Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be repaid and shall notify the Administrative Agent by telephone (confirmed by telecopy) of such selection not later than 11:00 a.m., New York City time, three Business Days before the scheduled date of such repayment.  Each repayment of a Borrowing shall be applied ratably to the Loans

---

[21] The scheduled repayments immediately following the Closing Date will be reduced (in direct order) by an amount equal to the difference between the scheduled repayment due on March 31, 2013 (so long as such payment has been made) under the Existing Credit Agreement and the scheduled repayment due on March 31, 2013 described above.

included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

        Section 2.06     <u>Prepayment of Loans</u>.  (a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (but subject to Section 2.11), in an aggregate principal amount that (except as otherwise provided in Section 2.15) is an integral multiple of $1,000,000 and not less than $1,000,000 or, if less, the amount outstanding, subject to the requirements of this Section.  The Borrower shall have the right to elect by notice to the Administrative Agent that an optional prepayment that is not a Discounted Voluntary Prepayment and that is not subject to the notice contemplated in Section 2.06(d)(iii) is to be applied to a specific scheduled repayment to be made pursuant to Section 2.05 (any such payment, an "<u>Advance Amortization Payment</u>"); <u>provided</u> that (i) each such Advance Amortization Payment shall (x) be made in an amount equal to such scheduled repayment and (y) be applied to the next such scheduled repayment that has not been prepaid by an Advance Amortization Payment and (ii) for the avoidance of doubt, no Advance Amortization Payment shall be deemed to constitute a prepayment for the purposes of Section 2.06(d).

        (b)  In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate amount equal to the Required Percentage of such Net Proceeds or, in the case of an Equity Issuance by the Ultimate Parent, the Required Percentage of the Allocable Net Proceeds of such Prepayment Event; <u>provided</u> that, solely in the case of any Asset Disposition, if the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer of the Borrower to the effect that the Borrower or a Subsidiary intends to apply the Net Proceeds from such Asset Disposition (or a portion thereof specified in such certificate), within 365 days after receipt of such Net Proceeds, to acquire real property, equipment or other assets to be used in the business of the Borrower or such Subsidiaries or to fund a Permitted Acquisition in accordance with the terms of Section 6.04, in each case as specified in such certificate (any such event, a "<u>Reinvestment</u>"), and certifying that no Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds in respect of such Asset Disposition (or the portion of such Net Proceeds specified in such certificate, if applicable) except to the extent of any such Net Proceeds therefrom (i) that the Borrower or the applicable Subsidiary shall have determined not to, or shall have otherwise ceased to, or is not able to, by operation of contract or law or otherwise, apply toward such Reinvestment or (ii) that have not been so applied, or contractually committed to be so applied, by the end of such 365-day period, in each case at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been, or have been determined not to be, so applied (it being understood that if any portion of such proceeds are not so used within such 365-day period but within such 365-day period are contractually committed to be used, then upon the earlier to occur of (A) the termination of such contract and (B) the expiration of a 180-day period following such 365-day period, such remaining portion shall constitute Net Proceeds as of the date of such termination or expiry without giving effect to this proviso); <u>provided</u>, <u>further</u>, that the Net Proceeds applied toward Reinvestments or contractually committed to be so applied pursuant to the foregoing proviso shall not exceed $10,000,000 in the aggregate during any fiscal year.

        (c)  In the event and on each occasion that any Net Proceeds are received by or on behalf of the Ultimate Parent or any of its Subsidiaries in respect of any Ultimate Parent Asset Disposition, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate amount equal to the Required Percentage of the Net Proceeds of such Ultimate Parent Asset Disposition.

        (d)  Following the end of each fiscal quarter of the Borrower, commencing with the first fiscal quarter ending after the Closing Date, the Borrower will prepay Borrowings in an aggregate amount

equal to (i) (A) the Excess Cash Flow as of the end of such fiscal quarter multiplied by the applicable ECF Sweep Percentage in effect at such time, minus (B) all prepayments made during the applicable ECF Period pursuant to this Section 2.06(d)(i) as of the end of such fiscal quarter (including any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e)), less (ii) any voluntary prepayments of Loans made pursuant to Section 2.06(a) during such fiscal quarter (other than  any Advance Amortization Payments and any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e) and except as provided in Section 2.15(f)), provided that any prepayment applied pursuant to clause (iii) of this Section 2.06(d) to reduce a prepayment made pursuant to this Section 2.06(d) shall not be applied in the subsequent quarter pursuant to this clause (ii) to reduce a prepayment made pursuant to this Section 2.06(d), less (iii) any voluntary prepayments of the Loans (other than an Advance Amortization Payment, any prepayments that are applied to payments due under this Section 2.06(d)(i) pursuant to an Election Notice delivered pursuant to Section 2.06(e), and except as provided in Section 2.15(f)) made since the end of such fiscal quarter to the extent the Borrower has, on or prior to the date any mandatory prepayment is due under this paragraph (d) with respect to such fiscal quarter, specified in an Election Notice delivered to the Administrative Agent that such voluntary prepayments shall be applied to reduce the amount of such mandatory prepayment.  Each prepayment pursuant to this paragraph shall be made on or before the date on which financial statements are delivered pursuant to Section 5.01 with respect to the fiscal quarter at the end of which Excess Cash Flow is being calculated (and in any event within (x) 55 days after the end of such fiscal quarter or (y) if such fiscal quarter is the last fiscal quarter in a fiscal year of the Borrower, 100 days after the end of such fiscal quarter), provided that if the Closing Date occurs after the date on which such prepayment would otherwise have been due hereunder for the period ended March 31, 2013, then the mandatory quarterly prepayment pursuant to this paragraph for such period shall be due and payable on the Closing Date.

(e)  Subject to the immediately following sentence, the Borrower shall on one or more occasions use the Borrower's Discounted Prepayment Portion of Excess Cash Flow, as determined following the end of a fiscal quarter, to effect Discounted Voluntary Prepayments within 180 days after the date on which financial statements are delivered pursuant to Section 5.01 with respect to such quarter, with such Discounted Voluntary Prepayments to be designated as having been made to satisfy the Borrower's obligations under this Section 2.06(e) pursuant to an Election Notice delivered to the Administrative Agent. If the Borrower does not make such Discounted Voluntary Prepayments within such 180-day period equal to the Borrower's Discounted Prepayment Portion of Excess Cash Flow for the applicable fiscal quarter (as designated in the applicable Election Notice), the Borrower shall (i) make an optional prepayment pursuant to Section 2.06(a) at the end of the fiscal quarter during which such 180-day period (as designated in an Election Notice to such effect) expires, with such prepayment to be applied to scheduled prepayments under Section 2.05, as directed by the Borrower, or (ii) make a prepayment as described in Section 2.06(d)(iii) (and as designated in an Election Notice to such effect).  The Borrower may retain the Borrower's Discretionary Portion of Excess Cash Flow and may utilize such Borrower's Discretionary Portion of Excess Cash Flow for purposes otherwise permitted hereunder, including, but not limited to, at the Borrower's option and in the Borrower's sole discretion, (i) to effect Discounted Voluntary Prepayments or (ii) for optional prepayments pursuant to Section 2.06(a).

(f)  Prior to any optional or, subject to Sections 2.06(b), (c) and (d), mandatory prepayment of Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (g) of this Section.

(g)  The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 2:00 p.m., New York City time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of

prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment or to prepay such Borrowing in full.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest and other amounts to the extent required by Sections 2.08 and 2.11.

Section 2.07    Fees.  (a)  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(b)  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent.  Fees paid shall not be refundable under any circumstances.

Section 2.08    Interest.  (a)  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)  Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(d)  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.09    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)  the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)  the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any  Borrowing as, a Eurodollar Borrowing shall be ineffective; provided, however, that, in the case of a notice received pursuant to clause (b) above, if the Administrative Agent is able prior to the commencement of such Interest Period to ascertain, after using reasonable efforts to poll the Lenders giving such notice, that a rate other than the Alternate Base Rate would adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, the Administrative Agent shall notify the Borrower of such alternate rate and the Borrower may agree by written notice to the Agent prior to the commencement of such Interest Period to increase the Applicable Rate for the Loans included in such Borrowing for such Interest Period to result in an interest rate equal to such alternate rate, in which case such increased Applicable Rate shall apply to all the Eurodollar Loans included in the relevant Borrowing.

Section 2.10    Increased Costs; Illegality.  (a)  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)    subject the Administrative Agent or any Lender to any Taxes (other than Indemnified Taxes, Excluded Taxes and Other Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)  If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time after submission by such Lender to the Borrower of a written request therefor, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)  A certificate of a Lender setting forth in reasonable detail the matters giving rise to a claim under this Section 2.10 and the calculation of such claim by such Lender or its holding company, as the case may be, shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)  Notwithstanding any other provision herein, if any Change in Law shall make it unlawful for any Lender to maintain Eurodollar Loans as contemplated by this Agreement, (i) the commitment of such Lender hereunder to continue Eurodollar Loans as such and convert ABR Loans to Eurodollar Loans shall forthwith be canceled and (ii) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by applicable law.  If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.11.

(f)  For the avoidance of doubt, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued or implemented.

Section 2.11    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.06(g) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.14 or 9.02(c), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall consist of an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (without giving effect to clause (b) of the definition of LIBO Rate), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A certificate of any Lender setting forth any

amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.12    Taxes.  (a)  Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of, and without deduction for, any Taxes; provided that if the applicable withholding agent shall be required to deduct any Taxes from such payments, then (i) if such Taxes are Indemnified Taxes or Other Taxes, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)  In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or, at the option of the Administrative Agent timely reimburse it for the payment thereof.

(c)  The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such Administrative Agent or Lender (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto.  A certificate as to the amount of such payment or liability and a written statement setting forth in reasonable detail the basis and calculation of such amounts prepared in good faith and delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.12, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)  (i) Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate, provided that (i) such Foreign Lender has received written notice from the Borrower advising it of the availability of such exemption or reduction and supplying all applicable documentation and (ii) such Foreign Lender is legally entitled to complete, execute, and deliver such documentation.

(ii)  Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed originals of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit M-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-2 or Exhibit M-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly

completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)   If the Administrative Agent or a Lender determines, in its sole judgment exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower within a reasonable period of time (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g)   Each Lender shall indemnify the Administrative Agent within ten days after written demand therefor, for the full amount of (i) any Taxes attributable to such Lender and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h)   The agreements in this Section 2.12 shall survive the termination of this agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.13    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.  (a)  The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.10, 2.11 or 2.12, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices at 60 Wall Street, New York, New York, except that payments pursuant to Sections 2.10, 2.11, 2.12 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day (except as otherwise provided in the definition of "Interest Period"), the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the relative aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the

amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.13(d) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.14    Mitigation Obligations; Replacement of Lenders.  (a)  If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or 2.12, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, provided that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.10 or 2.12.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)  If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12, or if any Lender is not able to maintain Eurodollar Loans for reasons described in Section 2.10(e), or if any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04, provided that the Borrower or assignee must pay any applicable processing or recordation fee), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, further, that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld and (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and such Lender shall be released from all obligations hereunder.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.15    Voluntary Prepayments Below Par.  (a)  The Borrower may elect to notify the Administrative Agent and the Lenders that it wishes to make below par voluntary prepayments of the Loans (each such payment a "Discounted Voluntary Prepayment") pursuant to the procedures set forth in this Section 2.15; provided that (i) the Borrower shall specify in an Election Notice to the Administrative Agent whether such Discounted Voluntary Prepayment will be a utilization of the Borrower's Discounted Prepayment Portion of Excess Cash Flow or the Borrower's Discretionary Portion of Excess Cash Flow and Discounted Voluntary Prepayments shall only be permitted to be made in amounts not exceeding the Borrower's Discounted Prepayment Portion of Excess Flow or the Borrower's Discretionary Portion of Excess Cash Flow (as applicable) at the time such Discounted Voluntary

Prepayment is made and (ii) no Discounted Voluntary Prepayment shall be made after December 31, 2016.  At the time of any Discounted Voluntary Prepayment, the Borrower shall certify, with reasonable supporting detail (as reasonably determined by the Administrative Agent), (i) compliance with the requirements of this Section 2.15, which certification shall include a schedule setting forth the computation (of any utilization by the Borrower) of Borrower's Discounted Prepayment Portion of Excess Cash Flow or Borrower's Discretionary Portion of Excess Cash Flow (as applicable), (ii) that no Event of Default pursuant to Section 6.14 could reasonably be expected to occur during the immediately succeeding four calendar quarters if such Discounted Voluntary Prepayment is not made, (iii) that such Discounted Voluntary Prepayment shall have been approved by the Borrower's Board of Directors and (iv) that immediately prior to and after giving effect to any Discounted Voluntary Prepayment, (x) no Default or Event of Default shall have occurred and be continuing, (y) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents, the Dex West Loan Documents or the Dex East Loan Documents shall be deemed to be unencumbered for purposes of this clause (y)) maintained by the Borrower, Dex West, Dex East and their Subsidiaries on a consolidated basis shall be at least $40,000,000 and (z) the aggregate unencumbered cash and Permitted Investments (provided that any such cash and Permitted Investments to the extent subject to a Lien created under the Loan Documents shall be deemed to be unencumbered for purposes of this clause (z)) maintained by the Borrower and its Subsidiaries shall be at least $10,000,000.

(b)  In connection with any Discounted Voluntary Prepayment, the Borrower shall notify the Lenders (the "Discounted Voluntary Prepayment Notice") that the Borrower desires to prepay Loans with cash proceeds in an aggregate amount (each, a "Discounted Voluntary Prepayment Amount") specified by the Borrower (which amount shall be not less than $5,000,000) at a price within a range (the "Range") to be specified by the Borrower equal to a percentage of par (not to exceed 100%) (the "Payment Percentage") of the principal amount of the Loans to be prepaid; provided that only one Discounted Voluntary Prepayment Notice may be in effect at any time.  The Discounted Voluntary Prepayment Notice shall further specify the date by which Lenders are required to indicate their election to participate in such proposed Discounted Voluntary Prepayment, which shall be at least five Business Days following the date of the Discounted Voluntary Prepayment Notice (the "Acceptance Date").  No proposed Discounted Voluntary Prepayment shall be made if the amount of cash expended to make Discounted Voluntary Prepayments would exceed an amount equal to the Borrower's Portion of Excess Cash Flow at such time.

(c)  On or prior to the Acceptance Date, each Lender may specify by written notice to the Administrative Agent a minimum Payment Percentage (the "Acceptable Payment Percentage") within the Range for a maximum principal amount (subject to rounding requirements specified by the Administrative Agent) of Loans at which such Lender is willing to permit such Discounted Voluntary Prepayment.  Based on the Acceptable Payment Percentages and principal amounts of Loans specified by Lenders, the applicable Payment Percentage (the "Applicable Payment Percentage") for the Discounted Voluntary Prepayment shall be the lowest Acceptable Payment Percentage at which the Borrower can complete the Discounted Voluntary Prepayment for the applicable Discounted Voluntary Prepayment Amount that is within the applicable Range; provided that if the offers received from Lenders are insufficient to allow the Borrower to complete the Discounted Voluntary Prepayment for the applicable Discounted Voluntary Prepayment Amount, then the Applicable Payment Percentage shall instead be the highest Acceptable Payment Percentage that is within the applicable Range.  The Borrower shall prepay Loans (or the respective portions thereof) offered by Lenders at the Acceptable Payment Percentages specified by each such Lender that are equal to or less than the Applicable Payment Percentage ("Qualifying Loans") by remitting an amount to the Administrative Agent (for distribution to each respective Lender to be prepaid) equal to the product of the face amount, or par, of the Loan being prepaid multiplied by the Applicable Payment Percentage; provided that if the aggregate cash proceeds required to prepay Qualifying Loans (disregarding any interest payable under Section 2.15(d)) would exceed the applicable Discounted Voluntary Prepayment Amount for such

Discounted Voluntary Prepayment, the Borrower shall prepay such Qualifying Loans at the Applicable Payment Percentage ratably based on the respective principal amounts of such Qualifying Loans (subject to rounding requirements specified by the Administrative Agent).

(d)  All Loans prepaid by the Borrower pursuant to this Section 2.15 shall be accompanied by payment of accrued and unpaid interest on the par principal amount so prepaid to, but not including, the date of prepayment.

(e)  Each Discounted Voluntary Prepayment shall be consummated pursuant to procedures (including as to rounding and minimum amounts, Type and Interest Periods of accepted Loans, irrevocability of Discounted Voluntary Prepayment Notice and other notices by the Borrower and Lenders and determination of Applicable Payment Percentage) reasonably established by the Administrative Agent in consultation with the Borrower and not inconsistent with the terms hereof.

(f)  Each Discounted Voluntary Prepayment shall constitute an optional prepayment of Loans for all purposes under this Agreement, but excluding for purposes of Section 2.06(d).

(g)  Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 2.06 and 2.13), the Lenders hereby consent to the transactions described in this Section 2.15 and further acknowledge that in connection with any Discounted Voluntary Prepayment, principal and interest payments may be made on a non-pro rata basis, as determined by the Administrative Agent, to the applicable Lenders.

(h)  This Section 2.15 shall not require the Borrower to undertake or any Lender to participate in any Discounted Voluntary Prepayment.

ARTICLE III

<u>REPRESENTATIONS AND WARRANTIES</u>

The Borrower and, solely for purposes of Sections 3.01, 3.02, 3.03, 3.08, 3.09, 3.12, 3.13 and 3.19, the Ultimate Parent (with respect to itself and the Service Company) represents and warrants to the Lenders that:

Section 3.01    <u>Organization; Powers</u>.  Each of the Ultimate Parent, the Service Company, the Borrower and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02    <u>Authorization; Enforceability</u>.  The Transactions entered into and to be entered into by each of the Ultimate Parent, the Service Company and the RHDI Loan Parties are within such Person's corporate or limited liability company powers and have been duly authorized by all necessary corporate or limited liability company and, if required, stockholder or member action.  This Agreement has been duly executed and delivered by each of the Ultimate Parent and the RHDI Loan Parties and constitutes, and each other Loan Document to which any of the Ultimate Parent, the Service Company and the RHDI Loan Parties is to be a party, when executed and delivered by such Person, will constitute, a legal, valid and binding obligation of such Person, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting

creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    Governmental Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate any applicable law or regulation or the charter, limited liability company agreement, by-laws or other organizational documents of the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries or any of their assets, or give rise to a right thereunder to require any payment to be made by the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries, except Liens permitted under Section 6.02.

Section 3.04    Financial Condition.  The unaudited consolidated balance sheet of the Borrower as of [_____], 201[_] and the related unaudited consolidated statements of operations and of cash flows for the [___]-month period ended on such date present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower as of such date and for such period in accordance with GAAP, subject to normal year-end audit adjustments.

Section 3.05    Properties.  (a)  The Borrower and each of its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business (including its Mortgaged Properties), except for minor defects in title that do not, or could not reasonably be expected to, interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

(b)  The Borrower and each of its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower and its Subsidiaries does not infringe upon the rights of any other Person, except, in each case, for any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect [(other than the Disclosed Matters)][22].

(c)  Schedule 3.05 sets forth the address of each real property that is owned or leased by the Borrower or any of its Subsidiaries as of the Closing Date.

Section 3.06    Litigation and Environmental Matters.  (a)  There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower, any of its Subsidiaries or any of their respective executive officers or directors (i) which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect [(other than the Disclosed Matters)][23] or (ii) that involve any of the Loan Documents or the Transactions.

(b)  Except for [either the Disclosed Matters or][24] any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Borrower

---

[22] To be included if applicable

[23] To be included if applicable

[24] To be included if applicable

or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any facts or circumstances which are reasonably likely to form the basis for any Environmental Liability.

Section 3.07    Compliance with Laws and Agreements.  The Borrower and each of its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

Section 3.08    Investment Company Status.  None of the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries is required to be registered as an "investment company" as defined in the Investment Company Act of 1940.

Section 3.09    Taxes.  Each of the Ultimate Parent, the Service Company, the Borrower and its Subsidiaries has timely filed or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except any Taxes that are being contested in good faith by appropriate proceedings and for which the Ultimate Parent, the Service Company, the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.  Except as set forth in Schedule 3.09, no material tax Liens have been filed.

Section 3.10    ERISA.  During the five year period prior to the date on which this representation is made or deemed to be made with respect to any Plan or Multiemployer Plan, no ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability has occurred during such five year period or for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount that would reasonably be expected to have a Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that would reasonably be expected to have a Material Adverse Effect.

Section 3.11    Margin Regulations.  Neither the Borrower nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

Section 3.12    Disclosure.  None of the written reports, financial statements, certificates or other written information (including, without limitation, the Registration Statement on Form S-4 [and the Disclosure Statement (as supplemented in writing through the Closing Date))][25] taken as a whole, furnished by or on behalf of the Ultimate Parent, the Service Company or any RHDI Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as of the date thereof and as modified or

---

[25] To be included if applicable

supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made taken as a whole, not misleading; <u>provided</u> that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable (i) at the time such projected financial information was prepared and (ii) as of the date hereof. [The Bankruptcy Court entered an order on or about [_____], 2013 approving the adequacy of the Disclosure Statement.][26]

      Section 3.13    <u>Subsidiaries</u>.  Schedule 3.13 sets forth the name of, and the ownership interest of the Ultimate Parent, the Service Company and the Borrower in, each Subsidiary of the Ultimate Parent, the Service Company and the Borrower and identifies each such Subsidiary that is a Loan Party, in each case as of the Closing Date.  As of the Closing Date, none of the Ultimate Parent, the Service Company and the Borrower has any Subsidiaries other than those set forth on Schedule 3.13.

      Section 3.14    <u>Insurance</u>.  Schedule 3.14 sets forth a description of all insurance maintained by or on behalf of the Borrower and its Subsidiaries as of the Closing Date.  As of the Closing Date, all premiums due and payable in respect of such insurance have been paid.  The Borrower believes that the insurance maintained by or on behalf of the Borrower and its Subsidiaries is adequate.

      Section 3.15    <u>Labor Matters</u>.  As of the Closing Date[, other than the Disclosed Matters][27], there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened.  Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:  (a) the hours worked by and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters; (b) all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary; and (c) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

      Section 3.16    <u>Senior Debt</u>.  For so long as the Restructuring Notes or Additional Notes are outstanding, the Obligations shall constitute "Senior Debt" under and as defined in the Restructuring Notes Indenture or, if applicable, under the indenture, note purchase agreement or other applicable agreement or instrument under which any such Additional Notes are issued.

      Section 3.17    <u>Security Documents</u>.  (a)  The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the Pledged Stock and Pledged Notes (as defined in the Guarantee and Collateral Agreement) described in the Guarantee and Collateral Agreement, when stock certificates representing such Pledged Stock and Pledged Notes are delivered to the Collateral Agent, and in the case of the other Collateral described in the Guarantee and Collateral Agreement (other than the Intellectual Property, as defined in the Guarantee and Collateral Agreement), when financing statements and other filings are filed in the offices specified on Schedule 3.17 (as updated by the Borrower from time to time in accordance with Section 5.03), the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all

---

[26] To be included if applicable

[27] To be included if applicable

right, title and interest of the RHDI Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, or in the case of Pledged Stock and Pledged Notes, by possession or control, in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Stock and Pledged Notes, Liens permitted by Section 6.02(a)).

(b)  When the Guarantee and Collateral Agreement or a summary thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Guarantee and Collateral Agreement and such financing statements shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Intellectual Property (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the date hereof).

(c)  The Mortgages, if any, entered into on or prior to the Closing Date (when amended by the mortgage amendment referred to in clause (g)(1) of the Collateral and Guarantee Requirement (the "Mortgage Amendments")), or after the Closing Date pursuant to Section 5.12, are or when entered shall be effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the RHDI Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed in the proper real estate filing offices, such Mortgages shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the RHDI Loan Parties in such Mortgaged Property and the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to the rights of Person pursuant to Liens expressly permitted by Section 6.02(a).

Section 3.18    Liens.  There are no Liens of any nature whatsoever on any properties of the Borrower or any of its Subsidiaries other than Permitted Encumbrances and Liens permitted by Section 6.02.

Section 3.19    [Bankruptcy Court Orders.  The Confirmation Order has been entered by the Bankruptcy Court, and such order has not been stayed, reversed, modified or vacated on appeal.][28]

ARTICLE IV

CONDITIONS

Section 4.01    Effectiveness of Agreement.  The effectiveness of this Agreement is subject to the satisfaction or waiver of the following conditions precedent (and the delivery of the notice contemplated in the last sentence of this Section 4.01), provided that nothing herein shall limit the consent rights set forth in the Dex Support Agreement:

(a)  Loan Documents.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Ultimate Parent, the Borrower, the Administrative Agent and[, to the extent requested by the Administrative Agent,][29] the Lenders, (ii) an executed Acknowledgment and Confirmation

---

[28] To be included if applicable

[29] To be included if applicable

substantially in the form of Exhibit B hereto from each RHDI Loan Party, (iii) the Shared Guarantee and Collateral Agreement executed and delivered by each Shared Collateral Loan Party, (iv) the Subordinated Guarantee Agreement, executed and delivered by the Borrower, Dex West, Dex East and SuperMedia and (v) the Intercreditor Agreement, executed and delivered by the Ultimate Parent, DMI, Dex Media Service, Dex Digital, RHDC, the Borrower, Dex East, Dex West, the Agent, the Shared Collateral Agent, the administrative agent and collateral agent under the Dex West Credit Agreement, the administrative agent under the Dex East Credit Agreement and the administrative agent under the SuperMedia Credit Agreement.

(b)    [Confirmation of the Reorganization Plan.  The Reorganization Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order.  The Confirmation Order shall not have been stayed, modified, or vacated on appeal.  All conditions precedent to the effectiveness of the Reorganization Plan shall have been satisfied (or waived) or shall be concurrently with the effective date of the Reorganization Plan satisfied (or waived) in accordance with the terms of the Reorganization Plan.][30]

(c)    Amendments.  The Administrative Agent shall have received satisfactory evidence of the completion of the Amendments (including, for the avoidance of doubt, evidence that (i) the Dex East Loan Documents and the Dex West Loan Documents have been entered into, and become effective, substantially simultaneously with this Agreement and (ii) the SuperMedia Loan Documents have been entered into, and become effective, prior to the consummation of the Mergers)[; provided, that it is acknowledged and agreed that the filing by the Ultimate Parent, on behalf of itself and its Subsidiaries, with the Bankruptcy Court of written notice of the occurrence of the "Effective Date" under (and as defined in) the Reorganization Plan shall satisfy this condition.][31]

(d)    Mergers.  The Mergers shall have been consummated by the filing of the Certificates of Merger (as defined in the Merger Agreement) with the Secretary of State of the State of Delaware.

(e)    Trademarks.  The trademarks owned by the Borrower, Dex West, Dex East, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) ("Collateral Trademarks") shall have been transferred (together with the associated goodwill) to and owned by a bankruptcy remote Subsidiary of each such Person, respectively, and in each case, (i) the organizational documents of such bankruptcy remote Subsidiaries (each, a "License Subsidiary") shall provide for, and require that there at all times be, two special independent directors or members whose consent would be required for such License Subsidiary to file a petition for bankruptcy or for the transfer of any equity interests therein (other than the sale of such equity interests in a transaction permitted under the Loan Documents) and shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent and the Administrative Agent shall have received and shall be reasonably satisfied with (A) a certificate of an authorized officer of the Ultimate Parent including the certificate of incorporation or formation, as applicable, for the License Subsidiaries, certified by the relevant authority of the jurisdiction of organization of such License Subsidiary, (B) a complete copy of resolutions adopted by the Governing Board of such License Subsidiary authorizing the execution, delivery and performance in accordance with their respective terms of the agreements described in clause (ii) below and (C) a long form good standing certificate of such License Subsidiary, as applicable, from its jurisdiction of organization, (ii) the License Subsidiaries shall have entered into License Agreements and (iii) except as permitted by a License Agreement, anything incidental to the ownership of the Collateral Trademarks (including filing or registering any application for or registration of all current or future Collateral Trademarks and the prosecution, maintenance, renewal or enforcement of same) shall be done solely by the Licensee Subsidiaries (or their respective selected designees).

---

[30] To be included if applicable

[31] To be included if applicable

(f) <u>Other Intellectual Property Arrangements</u>. (i) Each of the Borrower, Dex East, Dex West, SuperMedia, the Service Company and each other Shared Collateral Loan Party shall have entered into Master IP License Agreements substantially in the form of Exhibit I hereto and (ii) each of the Borrower, Dex East, Dex West, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) shall have delivered to each other above-referenced party and its Subsidiaries (other than License Subsidiaries) as of the Closing Date current or contingent (*e.g.*, through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of, or access to, all Escrow Materials in existence as of the Closing Date, to the extent the applicable owner or licensee of any Escrow Materials is not permitted by the Agent to make delivery of same to any of such other parties promptly after the Closing Date. Notwithstanding anything to the contrary contained in this Section 4.01(f), neither Borrower, Dex East, Dex West, SuperMedia, the Service Company nor any other Shared Collateral Loan Party shall be deemed to have failed to satisfy this Section 4.01(f) for any inadvertent failure to deliver or place into escrow any Escrow Materials because such party was unaware of the existence of any such item, provided that (x) delivery or escrow of any such item is made promptly after identification or discovery of such item (and that such item has not been delivered or escrowed) by such party and (y) none of such other parties are materially damaged or prejudiced, and do not lose any material rights, due to such failure.

(g) <u>Existing Credit Agreement</u>. The Borrower shall have timely paid current scheduled amortization and interest (at the non-default rate) on the Loans (as defined in the Existing Credit Agreement) in accordance with the Existing Credit Agreement [and, to the extent applicable, the Cash Collateral Order,][32] and shall have paid all other fees and expenses then due and payable with respect to the Existing Credit Agreement.

(h) <u>Fees</u>. The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which reasonably detailed invoices have been presented, on or before the Closing Date.

(i) <u>No Actions</u>. There shall be no action, suit, investigation or proceeding pending or, to the knowledge of the Borrower, threatened in any court or before any arbitrator or Governmental Authority that could reasonably be expected to (x) have a material adverse effect on the business, assets, properties, liabilities (actual and contingent), operations or condition (financial or otherwise) of the Ultimate Parent and the other Loan Parties and their respective Subsidiaries, taken as a whole, (y) adversely affect the ability of the Ultimate Parent or any other Loan Party to perform its obligations under the Loan Documents or (z) adversely affect the rights and remedies of the Agent or the Lenders under the Loan Documents.

(j) <u>Shared Services Agreement</u>. The Administrative Agent shall have received the Shared Services Agreement, duly executed and delivered by the Ultimate Parent, the Service Company, the Borrower and each other party thereto, in substantially the form attached as Exhibit E hereto.

(k) <u>Tax Sharing Agreements</u>. The Administrative Agent shall have received the Tax Sharing Agreements, duly executed and delivered by the parties thereto.

(l) <u>Financial Statements</u>. The Lenders shall have received the unaudited interim consolidated financial statements described in Section 3.04.

(m) <u>Closing Certificate</u>. The Administrative Agent shall have received and shall be satisfied with (x) a certificate of an authorized officer of each Loan Party (other than any Newco Subordinated Guarantor), dated the Closing Date, with appropriate insertions and attachments including (i) the certificate

---

[32] To be included if applicable

of incorporation or formation, as applicable, of such Person, as applicable, certified by the relevant authority of the jurisdiction of organization of such Person, as applicable, (ii) a complete copy of resolutions adopted by the Governing Board of such Person authorizing the execution, delivery and performance in accordance with their respective terms of the Loan Documents to which such Person is a party and any other documents required or contemplated hereunder (in the case of the Ultimate Parent, a copy of the Confirmation Order in lieu of such resolutions; provided that a copy of the resolutions adopted by the new Governing Board of the Ultimate Parent ratifying the execution, delivery and performance in accordance with their respective terms of the Loan Documents to which the Ultimate Parent is a party shall be delivered to the Administrative Agent on the Closing Date) and (iii) a long form good standing certificate of such Person, as applicable, from its jurisdiction of organization and (y) a certificate signed by the president, a vice president or a Financial Officer of the Borrower and the Ultimate Parent confirming that the conditions in Sections 4.01(q) and 4.01(t) have been satisfied, as applicable.

(n) <u>Legal Opinions</u>.  The Administrative Agent shall have received the following executed opinions, in each case in form and substance satisfactory to the Administrative Agent: (i) the legal opinion of Kirkland & Ellis LLP, counsel to the Ultimate Parent and its Subsidiaries, (ii) the legal opinion of Mark W. Hianik, the general counsel of the Ultimate Parent and its Subsidiaries, (iii) the legal opinion of Fulbright & Jaworski LLP, counsel to SuperMedia and its Subsidiaries, and (iv) the legal opinion of [Sherrard & Roe, PLC], local counsel to the Loan Parties in Tennessee.

(o) <u>Pledged Stock; Stock Powers; Pledged Notes</u>.  To the extent not previously delivered, (i) the Agent shall have received (x) the certificates or other instruments representing all outstanding Equity Interests of each Subsidiary owned by or on behalf of any Loan Party pledged pursuant to the Guarantee and Collateral Agreement, together with stock powers or other instruments of transfer with respect thereto endorsed in blank and (y) each promissory note pledged and required to be delivered to the Agent pursuant to the Guarantee and Collateral Agreement, together with note powers or other instruments of transfer with respect thereto endorsed in blank, and (ii) the Shared Collateral Agent shall have received, subject to the Intercreditor Agreement, (x) the certificates or other instruments representing all outstanding Equity Interests of each Subsidiary owned by or on behalf of any Shared Collateral Loan Party pledged pursuant to the Shared Guarantee and Collateral Agreement, together with stock powers or other instruments of transfer with respect thereto endorsed in blank and (y) each promissory note pledged and required to be delivered to the Shared Collateral Agent pursuant to the Shared Guarantee and Collateral Agreement, together with note powers or other instruments of transfer with respect thereto endorsed in blank.

(p) <u>Filings, Registrations and Recordings</u>.  All documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent or the Shared Collateral Agent, as applicable, to be filed, registered or recorded to create the Liens intended to be created by the Collateral Agreements and perfect such Liens to the extent required by, and with the priority required by, the Collateral Agreements, shall have been executed and be in proper form for filing, subject only to exceptions satisfactory to the Agent or the Shared Collateral Agent, as applicable, and the Collateral and Guarantee Requirement shall have otherwise been satisfied.

(q) <u>Representations and Warranties</u>.  The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (except to the extent already qualified as to materiality in which case such representations and warranties shall be true in all respects) on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects (except to the extent already qualified as to materiality in which case such representations and warranties shall be true in all respects) on and as of such earlier date).

(r)  <u>Mortgages</u>.  The Collateral and Guarantee Requirement shall have been satisfied with respect to the Mortgaged Properties listed on Schedule 1.01B.

(s)  <u>Control Agreements</u>.  To the extent not previously delivered, (i) the Agent shall have received control agreements executed by all parties thereto with respect to each "deposit account" (as defined in the Guarantee and Collateral Agreement) and "securities account" (as defined in the Guarantee and Collateral Agreement) with respect to which a control agreement is required to be delivered by any Loan Party to the Agent pursuant to the Guarantee and Collateral Agreement, in each case in form and substance reasonably satisfactory to the Agent and (ii) the Shared Collateral Agent shall have received control agreements executed by all parties thereto with respect to each "deposit account" (as defined in the Shared Guarantee and Collateral Agreement) and "securities account" (as defined in the Shared Guarantee and Collateral Agreement) with respect to which a control agreement is required to be delivered by any Shared Collateral Loan Party to the Shared Collateral Agent pursuant to the Shared Guarantee and Collateral Agreement, in each case in form and substance reasonably satisfactory to the Shared Collateral Agent.

(t)  <u>No Default</u>.  After giving effect to Section 9.17, no Default shall have occurred and be continuing as of the Closing Date.

(u)  <u>Other Transaction Documents</u>.  The Administrative Agent shall have received copies of the Dex West Credit Agreement, the Dex East Credit Agreement and the SuperMedia Credit Agreement, in each case certified by an authorized officer of the Ultimate Parent.

(v)  <u>Interest under Existing Credit Agreement</u>.  The accrued and unpaid interest on the Loans (as defined in the Existing Credit Agreement) to the Closing Date (at the applicable non-default rate) shall have been paid in full in cash by the Borrower.[33]

(w)  <u>Flood Hazards</u>.  The Administrative Agent shall have received a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto), if any, and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Administrative Agent.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

ARTICLE V

AFFIRMATIVE COVENANTS

Until the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each of the Borrower and, solely for purposes of Sections 5.01(a), (b) and (l), 5.12(c), 5.13 and 5.15, the Ultimate Parent, covenants and agrees with the Lenders that:

Section 5.01    <u>Financial Statements and Other Information</u>.  The Borrower will furnish to the Administrative Agent and each Lender:

---

[33] Potential for breakage or other costs to be discussed.

(a)  no later than the earlier of (i) 10 days after the date that the Borrower is required to file a report on Form 10-K with the Securities and Exchange Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether or not the Borrower is so subject to such reporting requirements), and (ii) 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2013, (A) (x) the Ultimate Parent's audited consolidated  balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such year and (y) the Ultimate Parent's audited consolidating balance sheet and related consolidating statements of operations, stockholders' equity and cash flows as of the end of and for such year (with each such consolidating financial statement showing the standalone financial information for each of the Borrower and its consolidated Subsidiaries, Dex West and its consolidated Subsidiaries, Dex East and its consolidated Subsidiaries and SuperMedia and its consolidated Subsidiaries and otherwise being in form substantially similar in all material respects to the consolidating financial statements of the Ultimate Parent most recently delivered to the Administrative Agent prior to the Closing Date or such other form as may be reasonably acceptable to the Administrative Agent), setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by KPMG LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification, exception or explanatory paragraph and without any qualification or exception as to the scope of such audit or other material qualification or exception; provided, that if the Ultimate Parent switches from one independent public accounting firm to another, the audit report of any such new accounting firm may contain a qualification or exception as to the scope of such consolidated or consolidating financial statements that relates to any fiscal year prior to its retention which, for the avoidance of doubt, shall have been the subject of an audit report of the previous accounting firm meeting the criteria set forth above) to the effect that such consolidated and consolidating financial statements present fairly in all material respects the financial condition and results of operations of the Ultimate Parent and its consolidated Subsidiaries on a consolidated or consolidating basis, as the case may be, in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to each Subsidiary of the Ultimate Parent's income tax provision prepared on a consolidated basis and (B) the Borrower's unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to the Borrower, and its Subsidiaries of the Ultimate Parent's income tax provision prepared on a consolidated basis[; provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in (x) Management's Discussion and Analysis or Liquidity and Capital Resources, in the case of the financial statements delivered pursuant to clause (A), and (y) Borrower's Management's Narrative Analysis and Results of Operations, in the case of the financial statements delivered pursuant to clause (B)][34];

(b)  no later than the earlier of (i) 10 days after the date that the Borrower is required to file a report on Form 10-Q with the Securities and Exchange Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether or not the Borrower is so subject to such reporting requirements), and (ii) 45 days after the end of each of the first

---

[34] To be included if applicable

three fiscal quarters of each fiscal year of the Borrower, commencing with the fiscal quarter ending March 31, 2013, (A) (x) the Ultimate Parent's unaudited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year and (y) the Ultimate Parent's unaudited consolidating balance sheet and related consolidating statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year (with each such consolidating financial statement showing the standalone financial information for each of the Borrower and its consolidated Subsidiaries, Dex West and its consolidated Subsidiaries, Dex East and its consolidated Subsidiaries and SuperMedia and its consolidated Subsidiaries and otherwise being in form substantially similar in all material respects to the consolidating financial statements of the Ultimate Parent most recently delivered to the Administrative Agent prior to the Closing Date or such other form as may be reasonably acceptable to the Administrative Agent), setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Ultimate Parent as presenting fairly in all material respects the financial condition and results of operations of the Ultimate Parent and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to each Subsidiary of the Ultimate Parent's income tax provision prepared on a consolidated basis, subject to normal year-end audit adjustments and the absence of footnotes and (B) the Borrower's unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to the Borrower and its Subsidiaries of the Ultimate Parent's income tax provision prepared on a consolidated basis, subject to normal year-end audit adjustments and the absence of footnotes[; provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in (x) Management's Discussion and Analysis or Liquidity and Capital Resources, in the case of the financial statements delivered pursuant to clause (A), and (y) Borrower's Management's Narrative Analysis and Results of Operations, in the case of the financial statements delivered pursuant to clause (B)][35];

    (c)  concurrently with any delivery of financial statements under clause (a)(B) or (b)(B) above, the corresponding financial statements with respect to Dex West, RHDI and SuperMedia that are required to be delivered by Dex East, Dex West and SuperMedia under the Dex East Credit Agreement, Dex West Credit Agreement and the SuperMedia Credit Agreement, respectively;

    (d)  concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.14 (commencing with the fiscal quarter ending March

---

[35] To be included if applicable

31, 2013), (iii) stating whether any change in GAAP or in the application thereof has occurred since the Closing Date that has had an effect on the financial statements accompanying such certificate and specifying any such change and the related effect, (iv) identifying any Subsidiary of the RHDI Loan Parties formed or acquired since the end of the previous fiscal quarter, (v) identifying any parcels of real property or improvements thereto with a value exceeding $10,000,000 that have been acquired by the RHDI Loan Parties since the end of the previous fiscal quarter, (vi) identifying any changes of the type described in Section 5.03(a) that have not been previously reported by the Borrower, (vii) identifying any Permitted Acquisition or other acquisitions of going concerns that have been consummated since the end of the previous fiscal quarter, including the date on which each such acquisition or Investment was consummated and the consideration therefor, (viii) identifying any material Intellectual Property (as defined in the Guarantee and Collateral Agreement) with respect to which a notice is required to be delivered under the Guarantee and Collateral Agreement and has not been previously delivered, (ix) identifying any Prepayment Events or Ultimate Parent Asset Dispositions that have occurred since the end of the previous fiscal quarter and setting forth a reasonably detailed calculation of the Net Proceeds received from any such Prepayment Events or Ultimate Parent Asset Dispositions, (x) identifying any change in the locations at which equipment and inventory, in each case with a value in excess of $10,000,000, are located, if not owned by the RHDI Loan Parties, (xi) identifying any Services Assets (as defined in the Shared Services Agreement) (but with respect to Services Assets that constitute Intellectual Property, solely Intellectual Property that has been registered or patented or the registration of which has been applied for) contributed by the Borrower and its Subsidiaries to the Service Company during the immediately preceding fiscal quarter, and a reasonably detailed description of such Services Assets and the value thereof, (xii) attaching a schedule setting forth a computation (and any utilization by the Borrower) of Excess Cash Flow, Borrower's Discounted Prepayment Portion of Excess Cash Flow and Borrower's Discretionary Portion of Excess Cash Flow as of the end of the period covered by such financial statements and (xiii) setting forth (A) a reporting sales metric (which will serve as leading indicator of reported print and digital revenues), for such fiscal quarter or fiscal year, as applicable, (B) print and digital revenue and a gross margin amount for each of such reported revenue amounts for such fiscal quarter or fiscal year, as applicable, and (C) statements of cash flow from operations (with a reconciliation of net income to operating cash flow from operations and financing activities (including capital expenditures)) for such fiscal quarter or fiscal year, as applicable;

(e)  concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default or Event of Default in respect of Section 6.14 (which certificate may be limited to the extent required by accounting rules, guidelines or practice);

(f)  within 30 days after the commencement of each fiscal year of the Borrower, a detailed consolidated budget for such fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of and for such fiscal year and setting forth the assumptions used for purposes of preparing such budget, in form reasonably satisfactory to the Administrative Agent), promptly when available, any material significant revisions of such budget;

(g)  promptly after the same become publicly available, and no later than five Business Days after the same are sent, copies of all periodic and other reports, proxy statements and other materials filed by the RHDI Loan Parties with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with

any national securities exchange, or distributed by the Ultimate Parent to its shareholders generally;

(h)  promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the RHDI Loan Parties, or compliance with the terms of any Loan Document, as the Administrative Agent (including on behalf of any Lender) may reasonably request;

(i)  concurrently with any delivery of financial statements and related information by any Loan Party to any debtholder of Dex Digital, RHDC or of any Newco not otherwise required to be delivered hereunder, copies of such financial statements and related information;

(j)  promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that any Loan Party or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the Loan Parties or any of their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Administrative Agent, the Loan Parties and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent (on behalf of each requesting Lender) promptly after receipt thereof; provided, further, that the rights granted to the Administrative Agent in this section shall be exercised not more than once during a 12-month period;

(k)  if the Borrower is not then a reporting company under the Securities Exchange Act of 1934, as amended, within 45 days after the end of each fiscal quarter of the Borrower or 90 days in the case of the last fiscal quarter of each fiscal year, a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the comparable periods of the previous year, in substantially the form delivered to the Administrative Agent prior to the Closing Date;

(l)  no later than five Business Days prior to the effectiveness thereof, copies of substantially final drafts of any proposed material amendment, supplement, waiver or other modification with respect to the Dex West Credit Agreement, the Dex East Credit Agreement, the SuperMedia Credit Agreement, the Shared Services Agreement, the Tax Sharing Agreements, the Subordinated Guarantee, any Master IP License Agreement, any License Agreement, any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement, the Restructuring Notes or any Additional Notes; and

(m)  (i) promptly following receipt thereof, any notice of changes of allocation percentages that any RHDI Loan Party shall receive pursuant to the Shared Services Agreement and (ii) concurrently with any delivery of financial statements under clause (a) or (b) above, a statement of changes in the intercompany balances of the Loan Parties with the Service Company in substantially the form delivered to the Administrative Agent prior to the Closing Date.

Section 5.02    Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender written notice of the following promptly after any Financial Officer or executive officer of the Borrower or any Subsidiary obtains knowledge thereof:

(a)  the occurrence of any Default;

(b)  the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Ultimate Parent, the Borrower or any Affiliate thereof that involves (i) a reasonable possibility of an adverse determination and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (ii) which relates to the Loan Documents;

(c)  the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; and

(d)  any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03    Information Regarding Collateral.  (a)  The Borrower will furnish to the Administrative Agent prompt written notice of any change (i) in the legal name of any of the RHDI Loan Parties, as reflected in its organization documents, (ii) in jurisdiction of organization or corporate structure of any of the RHDI Loan Parties and (iii) in the identity, Federal Taxpayer Identification Number or organization number of any of the RHDI Loan Parties, if any, assigned by the jurisdiction of its organization.  The Borrower agrees not to effect or permit any change referred to in clauses (i) through (iii) of the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral of the RHDI Loan Parties for the benefit of the Secured Parties.  The Borrower also agrees promptly to notify the Administrative Agent if any damage to or destruction of Collateral of the RHDI Loan Parties that is uninsured and has a fair market value exceeding $10,000,000 occurs.

(b)  Each year, at the time of delivery of annual financial statements with respect to the preceding fiscal year pursuant to clause (a) of Section 5.01, the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer and the chief legal officer of the Borrower certifying that all Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral and required pursuant to the Loan Documents to be filed, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction necessary to protect and perfect the security interests under the Guarantee and Collateral Agreement for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period).

Section 5.04    Existence; Conduct of Business.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, contracts, licenses, permits, privileges and franchises material to the conduct of its business; provided, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any sale of assets permitted under Section 6.05.

Section 5.05    Payment of Obligations.  The Borrower will, and will cause each of its Subsidiaries to, pay its material Indebtedness and other material obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is

being contested in good faith by appropriate proceedings and (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.06    Maintenance of Properties.  The Borrower will, and will cause each of its Subsidiaries to, keep and maintain all property (other than Intellectual Property) material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.  The Borrower will, and will cause each of its Subsidiaries to, subject to its and their reasonable business judgment, take all actions to maintain all registrations and applications with respect to material Intellectual Property owned by any of them.

Section 5.07    Insurance.  The Borrower will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies (a) insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required to be maintained pursuant to the Security Documents.  The Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

Section 5.08    Casualty and Condemnation.  The Borrower (a) will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any Collateral of the RHDI Loan Parties fairly valued at more than $10,000,000 or the commencement of any action or proceeding for the taking of any Collateral of the RHDI Loan Parties or any material part thereof or material interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of the Security Documents and this Agreement.

Section 5.09    Books and Records; Inspection and Audit Rights.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers, employees and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 5.10    Compliance with Laws.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations, including Environmental Laws, and orders of any Governmental Authority applicable to it, its operations or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.11    Additional Subsidiaries.  If any additional Subsidiary of the RHDI Loan Parties is formed or acquired after the Closing Date, the Borrower will, within three Business Days after such Subsidiary is formed or acquired, notify the Administrative Agent and the Lenders thereof and, within 15 Business Days (or such longer period as the Administrative Agent shall agree) after such Subsidiary is formed or acquired, cause any applicable provisions of the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of the RHDI Loan Parties.

Section 5.12    Further Assurances.  (a) The Borrower will, and will cause each Subsidiary Loan Party to, execute any and all further documents, financing statements, agreements and

instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents), that may be required under any applicable law, or that the Administrative Agent or the Required Lenders may reasonably request, to cause all provisions of the Collateral and Guarantee Requirement applicable to the RHDI Loan Parties to be and remain satisfied, all at the expense of the RHDI Loan Parties; provided, that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the RHDI Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the RHDI Loan Parties as a lessee under a lease.  The Borrower also agrees to provide to the Administrative Agent, from time to time upon request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)  If any material asset (including any real property or improvements thereto or any interest therein) that has an individual fair market value of more than $10,000,000 is acquired by the RHDI Loan Parties after the Closing Date or owned by an entity at the time it becomes a Subsidiary Loan Party (in each case other than assets constituting Collateral under the Guarantee and Collateral Agreement that become subject to the Lien of the Guarantee and Collateral Agreement upon acquisition thereof), the Borrower will notify the Administrative Agent and the Lenders thereof, and, if requested by the Administrative Agent or the Required Lenders, the Borrower will cause such asset to be subjected to a Lien securing the Obligations and will take, and cause the RHDI Loan Parties to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the RHDI Loan Parties; provided, that the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the RHDI Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000, (ii) any real property held by any of the RHDI Loan Parties as a lessee under a lease and (iii) other assets with respect to which the Agent determines that the cost or impracticability of including such assets as Collateral would be excessive in relation to the benefits to the Secured Parties.

(c)  Subject to the Intercreditor Agreement, each of the Ultimate Parent shall cause all provisions of the Collateral and Guarantee Requirement applicable to the Shared Collateral Loan Parties to be satisfied, including by causing, as applicable, (i) each Newco Subordinated Guarantor to execute a Newco Subordinated Guarantee as described in clause (e) of the definition of "Collateral and Guarantee Requirement" and (ii) each Newco Senior Guarantor to execute a supplement to the Shared Guarantee and Collateral Agreement as required thereunder;  provided, that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Shared Collateral Loan Parties with an individual fair market value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the Shared Collateral Loan Parties as a lessee under a lease.

Section 5.13    Credit Ratings.  Each of the Ultimate Parent and the Borrower will use its commercially reasonable efforts to maintain at all times monitored public ratings of the Loans by Moody's and S&P and a corporate family rating for each of the Ultimate Parent and the Borrower from Moody's and a corporate issuer rating for each of the Ultimate Parent and the Borrower from S&P.

Section 5.14    Intellectual Property.  Each of the Borrower, Dex East, Dex West, SuperMedia, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) shall deliver to each other, following the Closing Date, current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of, or access to, all future Escrow Materials that were not Escrow Materials as of the Closing Date and material updates on an ongoing basis to Escrow Materials in existence as of the Closing Date, in each case within a reasonable period of time following such Escrow Materials becoming owned, licensed or updated, as applicable, by Borrower, Dex East, Dex West, SuperMedia, the Service Company or another Shared Collateral Loan

Party (other than the Ultimate Parent), as applicable.  Notwithstanding anything to the contrary contained in this Section 5.14, neither Borrower, Dex East, Dex West, SuperMedia, the Service Company nor any other Shared Collateral Loan Party shall be deemed to have failed to satisfy this Section 5.14 for any inadvertent failure to deliver or place into escrow any Escrow Materials because such party was unaware of the existence of any such item, provided that (x) delivery or escrow of any such item is made within a reasonable period of time after identification or discovery of such item (and that such item has not been delivered or escrowed) by such party and (y) none of such other parties are materially damaged or prejudiced, and do not lose any material rights, due to such failure.

Section 5.15      Independent Director.  Each of the Ultimate Parent and the Borrower shall cause the board of directors, board of managers, or other equivalent governing body of each License Subsidiary to include at least two special, independent directors or members (or equivalent thereof), pursuant to documentation reasonably satisfactory to the Administrative Agent, whose consent shall be required for (i) any filing of a petition for bankruptcy by the relevant License Subsidiary, (ii) the transfer of any membership or other equity interests therein (other than the sale or other transfer of such membership or equity interests in a transaction permitted under the Loan Documents) and (iii) encumbering any asset owned by such License Subsidiary with a real property mortgage or deed of trust, as applicable, or a security agreement, pledge agreement or any similar agreement creating a Lien in respect thereof, except as permitted under the Loan Documents (including as a result of any consent, amendment, waiver or other modification obtained in accordance with the terms of the Loan Documents).

## ARTICLE VI

## NEGATIVE COVENANTS

Until the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each of the Borrower, and solely for purposes of Sections 6.13(b), 6.17, 6.18, 6.19 and 6.20, the Ultimate Parent, covenants and agrees with the Lenders that:

Section 6.01      Indebtedness; Certain Equity Securities.  (a)  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness or any Attributable Debt, except:

(i)      Indebtedness created under the Loan Documents and any Permitted Subordinated Indebtedness of the Borrower or its Subsidiaries to the extent the Net Proceeds thereof are used to refinance Indebtedness created under the Loan Documents;

(ii)      Indebtedness existing on the Closing Date and set forth in Schedule 6.01 and Refinancing Indebtedness in respect thereof;

(iii)      Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary; provided, that no Subsidiary that is not a Loan Party shall have any Indebtedness to the Borrower or any Subsidiary Loan Party;

(iv)      Guarantees by the Borrower of Indebtedness of any Subsidiary Loan Party and by any Subsidiary of Indebtedness of the Borrower or any Subsidiary Loan Party;

(v)      Indebtedness and Attributable Debt of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and

extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than by an amount not greater than fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof; provided that (1) such Indebtedness or Attributable Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (2) the aggregate principal amount of Indebtedness and Attributable Debt permitted by this clause (v), together with the aggregate principal amount of Indebtedness and Attributable Debt of the Service Company described in Section 6.18(d)(i) allocated to the Borrower and its Subsidiaries pursuant to the Shared Services Agreement, shall not exceed $15,000,000 at any time outstanding;

(vi)     Indebtedness of any Person that becomes a Subsidiary after the Closing Date and Refinancing Indebtedness in respect thereof; provided that (A) such Indebtedness (other than Refinancing Indebtedness) exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such entity becoming a Subsidiary) and (B) the aggregate principal amount of Indebtedness permitted by this clause (vi) shall not exceed $10,000,000 at any time outstanding;

(vii)    Indebtedness of the Borrower or any Subsidiary in respect of letters of credit in an aggregate face amount not exceeding $5,000,000 at any time outstanding;

(viii)   unsecured Indebtedness and Attributable Debt owing to the Service Company incurred pursuant to the Shared Services Transactions; and

(ix)     other unsecured Indebtedness (other than Indebtedness of the Borrower to any Affiliate of the Borrower) in an aggregate principal amount not exceeding $20,000,000 at any time outstanding.

(b)  The Borrower will not, nor will it permit any Subsidiary to, issue any preferred stock or other preferred Equity Interests.

Section 6.02     Liens.  (a)  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i)      Liens created under the Loan Documents;

(ii)     Permitted Encumbrances;

(iii)    any Lien existing on the Closing Date and set forth in Schedule 6.02 on any property or asset of the Borrower or any Subsidiary; provided that (A) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary (other than proceeds) and (B) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof;

(iv)    any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Closing Date prior to the time such Person becomes a Subsidiary; provided

that (A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (B) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds) and (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof (other than by an amount not in excess of fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof;

(v)    Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (A) such Liens secure Indebtedness permitted by clause (v) of Section 6.01(a), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds);

(vi)    Liens on cash collateral securing letters of credit permitted by Section 6.01(a)(vii) in an aggregate amount not to exceed the lesser of (x) $5,250,000 and (y) 105% of the face amount thereof;

(vii)    Liens in the nature of non-exclusive licenses of Intellectual Property granted to or in favor of another Company pursuant to the Directory Consolidation Project; and

(viii)    Liens not otherwise permitted by this Section 6.02 securing obligations other than Indebtedness and involuntary Liens not otherwise permitted by this Section 6.02 securing Indebtedness, which obligations and Indebtedness are in an aggregate amount not in excess of $5,000,000 at any time outstanding.

Section 6.03    Fundamental Changes.  (a)  The Borrower will not, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, wind up or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving entity, (ii) subject to Section 6.20, any Subsidiary may merge into any Subsidiary in a transaction in which the surviving entity is a wholly-owned Subsidiary and, if any party to such merger is a Subsidiary Loan Party, a Subsidiary Loan Party, (iii) any Subsidiary may merge or consolidate with any other Person in order to effect a Permitted Acquisition and (iv) any Subsidiary (other than the Borrower) may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; provided that (x) any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04 and (y) any such liquidation or dissolution involving a License Subsidiary of the Borrower shall not be permitted unless such License Subsidiary conveys, leases, sells, transfers or otherwise disposes of, in one transaction or series of transactions, all or substantially all of its business or property, whether now or hereafter acquired, to a License Subsidiary.

(b)  The Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than a Permitted Business.

(c)  Notwithstanding anything to the contrary contained herein, this Section 6.03 shall not prohibit the [Mergers]["Restructuring Transactions" under (and as defined in) the Reorganization Plan.][36]

Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.  The Borrower will not, and will not permit any of its Subsidiaries to, make, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Investment, except:

(a)  Permitted Investments;

(b)  Investments existing on the date hereof and set forth on Schedule 6.04;

(c)  Investments by the Borrower and its Subsidiaries in Equity Interests in Subsidiaries that are Subsidiary Loan Parties immediately prior to the time of such Investments;

(d)  loans or advances made by the Borrower to any Subsidiary Loan Party and made by any Subsidiary to the Borrower or any Subsidiary Loan Party;

(e)  Guarantees constituting Indebtedness permitted by Section 6.01;

(f)  investments (including debt obligations and equity securities) received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(g)  extensions of trade credit in the ordinary course of business;

(h)  Investments consisting of non-cash consideration received in respect of sales, transfers or other dispositions of assets to the extent permitted by Section 6.05;

(i)  Swap Agreements entered into in compliance with Section 6.07;

(j)  loans and advances by the Borrower and any of its Subsidiaries to their employees in the ordinary course of business and for bona fide business purposes in an aggregate amount at any time outstanding not in excess of $2,500,000;

(k)  Investments in connection with the Shared Services Transactions;

(l)  Permitted Acquisitions (other than Permitted Acquisitions involving the purchase of assets from Affiliates that are not Subsidiaries of the Borrower) in an aggregate amount not to exceed $5,000,000 during the term of this Agreement;

(m) provided that (i) no Event of Default is continuing or would result therefrom, (ii) no portion of the proceeds of any such Investment is used, directly or indirectly, to purchase or repurchase, or finance the purchase or repurchase, of any Restructuring Notes, Additional Notes or any other Indebtedness of any Affiliate (and the terms of any Investment shall not permit any such purchase or repurchase by the Person in which such Investment is made while such Investment is outstanding) and (iii) no such Investment is made in any Person that is an Affiliate of the Borrower (other than the Borrower and its Subsidiaries) other than Investments that result in a purchase of assets (x) by a Newco Senior Guarantor or the Service Company in connection

---

[36] To be included if applicable

with equivalent Investments by each of Dex West, Dex East and SuperMedia or (y) by the Borrower or a Subsidiary in Dex Digital in connection with equivalent Investments by each of Dex West and Dex East, Investments in any other Person in an aggregate amount not to exceed $5,000,000 during the term of this Agreement; and

(n)  advances or payments made by the Borrower or any Subsidiary to (x) the License Subsidiaries of the Borrower or (y) any other Person for the purpose of (i) filing, prosecuting, registering, renewing, enforcing or maintaining any Intellectual Property applications or registrations owned by such License Subsidiaries and (ii) satisfying all other liabilities related to, in connection with or incidental to (x) the maintenance of the existence of such License Subsidiaries and (y) activities of such License Subsidiaries permitted under this Agreement (including, without limitation, reimbursement for directors and officers fees and compensation) and under the organizational documents of such License Subsidiaries.

Section 6.05    Asset Sales.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it and any sale of assets in connection with a securitization, nor will the Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary, except:

(a)  sales of (x) inventory, (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments in the ordinary course of business;

(b)  sales, transfers and dispositions to the Borrower or a Subsidiary; provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)  [Intentionally Omitted];

(d)  sale and leaseback transactions permitted by Section 6.06;

(e)  sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary) to bona fide third parties that are not Affiliates of the Borrower and that are not permitted by any other clause of this Section; provided, that the aggregate cumulative fair market value of all assets sold, transferred or otherwise disposed of after the Closing Date in reliance upon this clause (e) shall not exceed $20,000,000;

(f)  sales, transfers and other dispositions pursuant to the Shared Services Transactions;

(g)  the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries;

(h)  the sales, transfers or other dispositions in connection with the Directory Consolidation Project[37]; and

---

[37] Schedule 1.01A to provide that the profits of the consolidated directories will be shared among the contributing companies in a manner reasonably acceptable to the admin agent taking into account the respective revenues of the directories that are combined, the costs of achieving the combination and the ongoing operating costs of the combination

(i)   the disposition of the Borrower's facility at 1615 Bluff City Highway, Bristol, Tennessee;

provided, that (x) all sales, transfers, leases and other dispositions permitted hereby (other than pursuant to clauses (a)(y), (b), (f) and (f) above) shall be made for at least 80% cash consideration or, in the case of Permitted Investments, sales of receivables or sale and leaseback transactions, 100% cash consideration, and (y) all sales, transfers, leases and other dispositions permitted by clauses (a)(x), (e) and (g) above shall be made for fair value.

Section 6.06    Sale and Leaseback Transactions.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except (a) pursuant to the Shared Services Transactions or (b) any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 90 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset, to the extent all Capital Lease Obligations, Attributable Debt and Liens associated with such sale and leaseback transaction are permitted by Sections 6.01(a)(v) and 6.02(a)(v) (treating the property subject thereto as being subject to a Lien securing the related Attributable Debt, in the case of a sale and leaseback not accounted for as a Capital Lease Obligation).

Section 6.07    Swap Agreements.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries) in the conduct of its business or the management of its liabilities and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

Section 6.08    Restricted Payments; Certain Payments of Indebtedness.  (a)  The Borrower will not, nor will it permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) Subsidiaries of the Borrower may declare and pay dividends or distributions ratably with respect to their Equity Interests, (ii) provided no Default or Event of Default is continuing or would result therefrom, the Borrower may make Restricted Payments to the Ultimate Parent, provided that (A) the proceeds of such Restricted Payments are used to repurchase, redeem, or otherwise acquire or retire for value Equity Interests in the Ultimate Parent held by any future, present or former directors, officers, members of management, employees or consultants of the Ultimate Parent or the Service Company or their respective estates, heirs, family members, spouses or former spouses pursuant to the terms of any employee equity subscription agreement, stock option agreement or similar agreement, (B) (x) any Restricted Payments used to effect such repurchases, redemptions, acquisitions or retirements are made not earlier than ten Business Days prior to the date when such Equity Interests are repurchased, redeemed, acquired or retired, if such repurchase, redemption, acquisition or retirement is made and (y) if such Restricted Payments are not used for such repurchase, redemption, acquisition or retirement, the proceeds therefrom shall be returned to the Borrower as a capital contribution within ten Business Days from the date such Restricted Payment was made, (C) the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests in any fiscal year pursuant to this clause (ii) (other than (1) any such Equity Interests repurchased, redeemed, acquired or retired in compensation for any taxes due or payable by the holder thereof, and (2) any such Equity Interests that are deemed repurchased, redeemed, acquired

or retired by the Ultimate Parent in connection with the exercise of stock options or warrants by the holder thereof in connection with the payment of all or a portion of the exercise price of such options or warrant) will not exceed $1,000,000 per year and (D) such Equity Interests shall only be repurchased, redeemed, acquired or retired in connection with the death, resignation or retirement of, or settlement of a dispute with, any such Person, (iii) Restricted Payments in amounts as shall be necessary to make Tax Payments; provided that all Restricted Payments made pursuant to this clause (iii) are used by the recipient for the purpose specified in this clause (iii) within 30 days of receipt thereof, (iv) provided no Default or Event of Default is continuing or would result therefrom, the Borrower may from time to time pay cash dividends or distributions to the Ultimate Parent in an amount not in excess of the lesser of (x) the Ultimate Parent Annual Cash Interest Amount and (y) the regularly scheduled cash interest payable (taking into account the Ultimate Parent PIK Election made pursuant to Section 6.17(j)) on the Restructuring Notes (or any Additional Notes incurred to refinance such Restructuring Notes) during the next period of ten Business Days, provided, however, that (A) any such dividends or distributions relating to any such cash interest payment must be paid not earlier than ten Business Days prior to the date when such cash interest is required to be paid by the Ultimate Parent and the proceeds must (except to the extent prohibited by applicable subordination provisions) be applied by the Ultimate Parent, to the payment of such interest when due, (B) the Borrower and its Subsidiaries shall be in Pro Forma Compliance after giving effect to the payment of any such dividends or distributions pursuant to this clause (iv) and (C) in no event may the amount of any such dividend or distribution made pursuant to this clause (iv) relating to any such cash interest payment exceed 37% of the amount of such cash interest paid by the Ultimate Parent when due, (v) the Borrower may make Restricted Payments as part of the Shared Services Transactions and (vi) the Borrower may make Restricted Payments to the Ultimate Parent in an aggregate amount not to exceed $2,000,000 during any fiscal year of the Borrower, provided that (A) no Default or Event of Default is continuing or would result therefrom, (B) the aggregate amount of Restricted Payments made pursuant to this clause (vi) shall not exceed $5,000,000 over the term of this Agreement, (C) the Ultimate Parent shall apply such Restricted Payments within 30 days of receipt thereof and only to fund general corporate expenses permitted hereunder and (D) no Restricted Payments made pursuant to this clause (vi) shall be used to (x) effect the repurchase, or the making of any payments in respect, of Restructuring Notes or Additional Notes or (y) make any payment to or Investment in any Affiliate other than the Borrower or a Subsidiary of the Borrower (or any director, officer or employee of any such Affiliate).

(b)    The Borrower will not, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)    payment of Indebtedness created under the Loan Documents;

(ii)    payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness, other than payments in respect of subordinated Indebtedness to the extent prohibited by the subordination provisions thereof;

(iii)    refinancings of Indebtedness to the extent permitted by Section 6.01;

(iv)    payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(v)    prepayment of Capital Lease Obligations in an aggregate cumulative amount from and after the Closing Date not exceeding $5,000,000;

(vi)     payment of any Indebtedness owing to the Service Company arising pursuant to the Shared Services Transactions; and

(vii)     payment of any Indebtedness owing to the Borrower or any Subsidiary Loan Party.

(c)  The Borrower will not, and will not permit any Subsidiary to, furnish any funds to, make any Investment in, or provide other consideration to any other Person for purposes of enabling such Person to, or otherwise permit any such Person to, make any Restricted Payment or other payment or distribution restricted by this Section that could not be made directly by the Borrower in accordance with the provisions of this Section.

(d)  Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, the Loan Parties shall be permitted to make all distributions required to be made by the Loan Parties on or after the Closing Date [(pursuant to the Reorganization Plan and the Confirmation Order][38].

Section 6.09    Transactions with Affiliates.  The Borrower will not, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable, considered as a whole, to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and the Subsidiary Loan Parties not involving any other Affiliate, (c) any payment permitted by Section 6.08 or any Investment permitted by Section 6.04 specifically contemplated by Section 6.04 to be made among Affiliates, (d)  subject to Section 6.13(b), the existence of, or performance by the Borrower or any of its Subsidiaries of its obligations under the terms of, the Tax Sharing Agreements, (e) any Restricted Payment permitted by Section 6.08(a)(ii), (f) Shared Services Transactions, (g) the issuance by the Borrower or any Subsidiary of Equity Interests to, or the receipt of any capital contribution from, the Borrower or a Subsidiary, (h) the transactions in connection with the Directory Consolidation Project, (i) the License Agreements, the Master IP License Agreements and the provision of the Escrow Materials and [(j) the "Restructuring Transactions" under (and as defined in) the Reorganization Plan][39].  Additionally, without limiting the foregoing, transactions between the Borrower and its Subsidiaries, on the one hand, and Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries, on the other hand, that are not part of Shared Services or other similar ordinary course transactions, must satisfy the following requirements:  (i) the terms of any such transaction must not be less favorable in any material respect than the terms the Borrower or such Subsidiary of the Borrower would receive in an arms-length transaction with a third party (and, in the case of any such transaction involving consideration in excess of $50,000,000, the terms of such transaction must be confirmed as arms-length by a reputable financial institution or advisor); (ii) no such transaction shall involve the transfer of ownership of any operating assets (including intellectual property rights) or personnel to Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries; and (iii) all such transactions shall result in the receipt of reasonably equivalent value by the Borrower and its Subsidiaries and no such transaction shall result in the transfer of any revenues that would otherwise be recognized by the Borrower or any of its Subsidiaries to Dex Digital, RHDC and/or any Newcos or any of their respective Subsidiaries.

Section 6.10    Restrictive Agreements.  The Borrower will not, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other

---

[38] To be included if applicable

[39] To be included if applicable

arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to the Secured Parties securing the Obligations, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided, that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and the proceeds thereof, (v) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to any Indebtedness incurred by a Subsidiary prior to the date on which such Subsidiary was acquired by the Borrower (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (vii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to the refinancing of Indebtedness, provided that the terms of any such restrictions or conditions are not materially less favorable to the Lenders than the restrictions or conditions contained in the predecessor agreements and (viii) the foregoing shall not apply to customary provisions in joint venture agreements.

Section 6.11    Change in Business.  The Borrower will not, and will not permit any Subsidiary to, engage at any time in any business or business activity other than a Permitted Business.

Section 6.12    Fiscal Year.  The Borrower shall not change its fiscal year for accounting and financial reporting purposes to end on any date other than December 31.

Section 6.13    Amendment of Material Documents.  (a)  The Borrower will not, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents if, taken as a whole, such amendment, modification or waiver is adverse in any material respect to the interests of the Lenders.

(b)  Neither the Ultimate Parent nor the Borrower will, nor will they permit the Service Company or any Subsidiary to amend, modify, waive or terminate any of its rights under the Shared Services Agreement, the Tax Sharing Agreements, the Subordinated Guarantee Agreement, any License Agreement, any Master IP License Agreement, any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement or the organizational documents of any License Subsidiary to the extent that such amendment, modification, waiver or termination is adverse in any material respect to the interests of the Lenders.

Section 6.14    Leverage Ratio and Interest Coverage Ratio.  (a) The Borrower will not permit the Leverage Ratio as of the last day of a fiscal quarter set forth below to exceed the ratio set forth opposite such date:

| Fiscal Quarter Ended | Ratio |
| --- | --- |
| March 31, 2013 | 5.50 to 1.00 |
| June 30, 2013 | 5.50 to 1.00 |
| September 30, 2013 | 5.50 to 1.00 |

| Fiscal Quarter Ended | Ratio |
| --- | --- |
| December 31, 2013 | 5.50 to 1.00 |
| March 31, 2014 | 5.4625 to 1.00 |
| June 30, 2014 | 5.425 to 1.00 |
| September 30, 2014 | 5.3875 to 1.00 |
| December 31, 2014 | 5.35 to 1.00 |
| March 31, 2015 | 5.3125 to 1.00 |
| June 30, 2015 | 5.275 to 1.00 |
| September 30, 2015 | 5.2375 to 1.00 |
| December 31, 2015 | 5.20 to 1.00 |
| March 31, 2016 | 5.15 to 1.00 |
| June 30, 2016 | 5.10 to 1.00 |
| September 30, 2016 | 5.05 to 1.00 |
| December 31, 2016 | 5.00 to 1.00 |

(b)  The Borrower will not permit the Interest Coverage Ratio as of the last day of a fiscal quarter to be less than 1.10 to 1.00.

Section 6.15    Capital Expenditures.  The Borrower will not, and will not permit any Subsidiary to, make or commit to make any Capital Expenditure, except Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business not exceeding $15,000,000 in the aggregate in any fiscal year; provided, that Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business, in the aggregate when combined with the Capital Expenditures of Dex West, Dex East and SuperMedia and their respective Subsidiaries, shall not exceed (i) $57,500,000 during the fiscal year ending December 31, 2013 and (ii) $50,000,000 during the fiscal years ending December 31, 2014, December 31, 2015 and December 31, 2016; provided, further, that, (x) in each case (i) up to 75% of such stated amounts referred to above, if not so expended in the fiscal year for which it is permitted, may be carried over for expenditure in the next succeeding fiscal year and (ii) Capital Expenditures made pursuant to this (b) during any fiscal year shall be deemed made, first, in respect of amounts permitted for such fiscal year as provided above and, second, in respect of amounts carried over from the prior fiscal year and (y) Capital Expenditures of a Company hereunder shall either (i) relate to assets directly owned or acquired by such Company and shall be allocated to (and paid by) such Company or (ii) relate to the acquisition or development of Shared Assets and shall be allocated to (and paid by) the Companies in accordance with their Allocated Share (as defined in the Shared Services Agreement) at the time any such payment is made.

Section 6.16    [Intentionally Omitted].

Section 6.17    Ultimate Parent Covenants.  (a) The Ultimate Parent will not engage in any business or activity other than the ownership of outstanding Equity Interests of its Subsidiaries and other assets permitted under Section 6.17(b), the issuance and sale of its Equity Interests, the performance of its obligations under the Shared Services Agreement and, in each case, activities incidental thereto.

(b)  The Ultimate Parent will not own or acquire any assets (other than Equity Interests of its existing Subsidiaries or any Newcos, other Investments in its existing Subsidiaries and any Newcos, assets owned or acquired in connection with its obligations under the Shared Services Agreement, cash, Permitted Investments, joint ventures or minority investments permitted under Section 6.17(e) and the Equity Interests of SuperMedia) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and liabilities under the Loan Documents, the Dex West Loan Documents, the Dex East Loan Documents and the SuperMedia Loan Documents, liabilities imposed by law, including Tax liabilities, Indebtedness

permitted under Section 6.17(d), liabilities under the Shared Services Agreement, liabilities under the SuperMedia Merger Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)    The Ultimate Parent will not create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than (i) Permitted Encumbrances and (ii) Liens securing the RHDI Obligations, the obligations under the Dex West Loan Documents, the obligations under the Dex East Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement.

(d)    The Ultimate Parent shall not in any event incur or permit to exist any Indebtedness for borrowed money other than (i) the Restructuring Notes, (ii) any Additional Notes and (iii) subject to the Intercreditor Agreement, a Guarantee of the RHDI Obligations, the obligations under the Dex West Loan Documents, the obligations under the Dex East Loan Documents and the obligations under the SuperMedia Loan Documents.

(e)    The Ultimate Parent may only make Investments in, or acquisitions of, any Newco so long as (i) no Default or Event of Default has occurred and is continuing, (ii) any Newco that is acquired or created as a result of such Investment or acquisition shall become a Guarantor as and to the extent required by the Collateral and Guarantee Requirement, (iii) all transactions related thereto are consummated in accordance with applicable laws in all material respects and (iv) in case of an acquisition of assets, such assets (other than assets to be retired or disposed of) are to be used, and in the case of an acquisition of any Equity Interests, the Person so acquired is engaged, in the same line of business as that of the Ultimate Parent or a line of business reasonably related thereto.  The Ultimate Parent may make Investments (not consisting of contribution of assets of any of its Subsidiaries) in joint ventures and other minority investments, provided that such Investment shall be pledged as Collateral to the Shared Collateral Agent for the benefit of the Shared Collateral Secured Parties pursuant to the Shared Collateral and Guarantee Agreement.

(f)    The Ultimate Parent shall not (i) make any dividends or other Restricted Payments to the holders of its Equity Interests or (ii) optionally redeem or repurchase any Restructuring Notes or Additional Notes (other than any non-cash exchange therefor for common stock of the Ultimate Parent).

(g)    The Ultimate Parent may not make any Ultimate Parent Asset Disposition unless the Net Proceeds are applied to prepay the Loans pursuant to Section 2.06(c).

(h)    The Ultimate Parent shall not permit the Restructuring Notes or the Restructuring Indenture to be amended in any way that is, taken as a whole, materially adverse to the interests of the Lenders and shall not (i) permit the Restructuring Notes or any Additional Notes to be secured by any assets of the Ultimate Parent or any of its Subsidiaries, (ii) permit the proceeds of any Additional Notes to be used to finance anything other than refinancing of the Restructuring Notes or any other Additional Notes, (iii) alter the maturity of the Restructuring Notes or any Additional Notes to a date, or make the Restructuring Notes or any Additional Notes mandatorily redeemable, in whole or in part, or required to be repurchased or reacquired, in whole or in part, prior to the date that is six months after the Maturity Date (other than pursuant to customary asset sale or change in control provisions), (iv) allow the Restructuring Notes or any Additional Notes to (A) have financial maintenance covenants, (B) have restrictive covenants that apply to the Borrower or any Subsidiary (other than, solely in the case of the Restructuring Notes, the restrictive covenants set forth in the Restructuring Notes Indenture as of the Closing Date) or that impose limitations on the Ultimate Parent's ability to guarantee or pledge assets to secure the RHDI Obligations or (C) otherwise have covenants, representations and warranties and events of default that are more restrictive than those existing in the prevailing market at the time of issuance thereof for companies with the same or similar

credit ratings of the Ultimate Parent at such time issuing similar securities, (v) permit the Restructuring Notes or any Additional Notes to be guaranteed by any Subsidiary of the Ultimate Parent or not be subordinated to the RHDI Obligations on terms at least as favorable to the Lenders as the subordination terms set forth in the Restructuring Notes Indenture on the Closing Date and that are otherwise reasonably satisfactory to the Administrative Agent or (vi) permit the Restructuring Notes or any Additional Notes to be convertible or exchangeable into other Indebtedness, except other Indebtedness of the Ultimate Parent meeting the qualifications set forth in the definition of "Additional Notes".

(i)   The Ultimate Parent shall not at any time hold an aggregate amount of cash and Permitted Investments in excess of an amount equal to (a) $5,000,000 plus (b) any amounts received to fund regularly scheduled cash interest payments on the Restructuring Notes (or any Additional Notes incurred to refinance such Restructuring Notes) pursuant to Section 6.08(a)(iv) pending use by the Ultimate Parent within 10 Business Days of receipt of such amounts (in accordance with Section 6.08(a)(iv)).

(j)   The Ultimate Parent shall continue to make the Ultimate Parent PIK Election during the term of this Agreement.

Section 6.18    Service Company Covenants. (a) The Ultimate Parent will not permit the Service Company to engage in any business or activity other than the issuance and sale of its Equity Interests, ownership of the outstanding Equity Interests of its Subsidiaries and other assets permitted under Section 6.18(b) and the provision of Shared Services and, in each case, activities incidental thereto.

(b)   Subject to the Intercreditor Agreement, the Ultimate Parent will not permit the Service Company to own or acquire any assets (other than the outstanding Equity Interests of its Subsidiaries, assets owned or acquired in connection with the Shared Services, cash and Permitted Investments) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and other liabilities incurred in the ordinary course in connection with the provision of Shared Services by the Service Company or any Subsidiary of the Service Company pursuant to the terms of the Shared Service Agreement, liabilities under the Loan Documents, the Dex West Loan Documents, the Dex East Loan Documents and the SuperMedia Loan Documents liabilities imposed by law, including Tax liabilities, liabilities under the Shared Services Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)   Subject to the Intercreditor Agreement, the Ultimate Parent will not permit the Service Company to create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than:

(i)      Permitted Encumbrances;

(ii)     Liens securing the RHDI Obligations, the obligations under the Dex West Loan Documents, the obligations under the Dex East Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement; and

(iii)    Liens on fixed or capital assets acquired, constructed or improved by the Service Company; provided that (A) such Liens secure Indebtedness permitted by Section 6.18(d), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of such Service Company.

(d)  The Ultimate Parent shall not permit the Service Company to in any event incur or permit to exist any Indebtedness for borrowed money other than:

        (i)        Indebtedness and Attributable Debt of the Service Company incurred to finance the acquisition, construction or improvement of any fixed or capital assets in connection with the provision of Shared Services, including Capital Lease Obligations and extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than by an amount not greater than fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted life thereof; <u>provided</u> that such Indebtedness or Attributable Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement; and

        (ii)       a Guarantee of the RHDI Obligations, the obligations under the Dex West Loan Documents, the obligations under the Dex East Loan Documents and the obligations under the SuperMedia Loan Documents, subject to the Intercreditor Agreement.

(e)  The Ultimate Parent will not permit the Service Company to sell, transfer, lease or otherwise dispose of any asset, other than:

        (i)        sales of assets, the proceeds of which are reinvested within 90 days of such sale in assets of the Service Company related to the provision of Shared Services;

        (ii)       sales of (x) inventory, (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments, in each case in the ordinary course of business;

        (iii)      sales, transfers and other dispositions pursuant to the Shared Services Transactions;

        (iv)      the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Ultimate Parent and its Subsidiaries; and

        (v)       other dispositions of assets (other than Equity Interests in a Subsidiary) not otherwise permitted by this Section 6.18(e); <u>provided</u>, that the aggregate cumulative fair market value of all assets sold, transferred or otherwise disposed of after the Closing Date in reliance upon this clause (v) shall not exceed $1,000,000.

Section 6.19    <u>Dex Media Service Covenant</u>.  The Ultimate Parent will not permit Dex Media Service to engage in any business or activity, or to own or acquire any assets or to incur or permit to exist any Indebtedness or Liens on its property or assets, in each case other than those incidental to pension liabilities arising pursuant to the Dex Media, Inc. Pension Plan.

Section 6.20    <u>Limitation on Activities of the License Subsidiaries</u>.  The Ultimate Parent shall not, directly or indirectly, permit any License Subsidiary to (a) (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than ownership of Collateral Trademarks and anything incidental thereto (including filing or registering any application for or registration of Collateral Trademarks and the prosecution, maintenance, renewal or enforcement of Collateral Trademarks) or (ii) take any action, or conduct its affairs in a

manner, that could reasonably be expected to result in the separate existence of such License Subsidiary being ignored, or the assets and liabilities of such License Subsidiary being substantively consolidated with those of the Ultimate Parent or any Subsidiary thereof in a bankruptcy, reorganization or other insolvency proceeding, (b) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (i) Indebtedness evidenced by the Loan Documents, (ii) Indebtedness owed to another Loan Party so long as such Indebtedness is subordinated to the Obligations (or a guarantee thereof), (iii) nonconsensual obligations imposed by operation of law, (iv) obligations with respect to its equity interests, (v) obligations (other than Indebtedness) in the ordinary course of business in the operation of its assets and (vi) the statutory liability of any general partner for the liabilities of the limited partnership in which it is a general partner, (c) breach any provision of, or default in the performance of its obligations under, any License Agreement to which it is a party, (d) without the consent of the two special independent directors or members required by Section 5.15 (but without prejudice to clause (j) of Article VII), (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (i) of Article VII, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing (it being understood and agreed that the consent of such special independent directors or members to any of the actions described in this clause (d) shall not in any manner limit the provisions of Article VII), (e) assign any right, title or interest in or to any current or future Collateral Trademarks to any Person except as otherwise permitted under this Agreement or license any right, title or interest in or to any of the Collateral Trademarks to any Person except to the Ultimate Parent, a Subsidiary of the Ultimate Parent or as otherwise permitted under this Agreement or (f) without the prior written consent of the Administrative Agent, not to be unreasonably withheld, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, wind up or dissolve.  The Ultimate Parent shall not (x) consent to or vote in favor of (and shall not permit any Subsidiary to consent to or vote in favor of) the incurrence of any Indebtedness by any License Subsidiary (other than Indebtedness permitted pursuant to clause (b)(i) above) or (y) permit the organizational documents of any License Subsidiary, or any License Agreement to which any License Subsidiary is a party, to be amended, supplemented, waived, terminated or otherwise modified in any material respect without the prior written consent of the Administrative Agent, not to be unreasonably withheld.

## ARTICLE VII

## EVENTS OF DEFAULT

If any of the following events ("Events of Default") shall occur:

(a)  the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)  the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days;

(c)  any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)  the Ultimate Parent or the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02 or 5.04 (with respect to the existence of the Borrower) or in Article VI;

(e)  (i) any Shared Collateral Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section [6.4 or 6.5][40] of the Shared Guarantee and Collateral Agreement or (ii) any Shared Collateral Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section [6.1, 6.2 or 6.3][41] of the Shared Guarantee and Collateral Agreement, and such failure shall continue unremedied for a period of 30 days after the earlier of (A) knowledge thereof by the Ultimate Parent or any Subsidiary thereof and (B) notice thereof from the Administrative Agent to the Borrower (which notice will be promptly given at the request of any Lender);

(f)  any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b), (d) or (e) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will promptly be given at the request of any Lender);

(g)  the Ultimate Parent or any of its Subsidiaries (other than Dex East, Dex West, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, any Newcos, DMI, the Borrower and the Subsidiaries) shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period specified in the agreement or instrument governing such Indebtedness);

(h)  any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided, that this clause (h) (i) shall not apply to (A) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (B) Optional Repurchases permitted hereunder, (C) refinancings of Indebtedness to the extent permitted by Section 6.01 and (D) Guarantees by the Ultimate Parent and its Subsidiaries of the obligations under the Dex West Loan Documents, the obligations under the Dex East Loan Documents and the obligations under the SuperMedia Loan Documents unless (x) any payment

---

[40] Section references to be updated as appropriate based on final Shared Guarantee and Collateral Agreement.

[41] Section references to be updated as appropriate based on final Shared Guarantee and Collateral Agreement.

shall have been demanded to be made by, or any other remedy shall have been exercised against, the Ultimate Parent or any of its Subsidiaries (other than Dex East, Dex West, SuperMedia and their respective Subsidiaries) or their respective assets in respect of such Guarantees and (y) the obligations under the Dex West Loan Documents, the Dex East Loan Documents or the SuperMedia Loan Documents, as the case may be, shall have been accelerated and (ii) shall give effect to any notice required or grace period provided in the agreement or instrument governing such relevant Material Indebtedness, but shall not give effect to any waiver granted by the holders of such relevant Material Indebtedness after the giving of such notice or during such applicable grace period;

(i)  an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Borrower or any Material Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Borrower or any Material Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)  the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Borrower or any Material Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (i) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Ultimate Parent, any Material Ultimate Parent Subsidiary, the Service Company, the Borrower or any Material Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(k)  one or more judgments for the payment of money in an aggregate amount in excess of $25,000,000 (net of amounts covered by insurance) shall be rendered against the Ultimate Parent or any of its Subsidiaries (other than Dex East, Dex West, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, the Borrower and the Subsidiaries) or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Ultimate Parent or any of its Subsidiaries (other than Dex East, Dex West, SuperMedia and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, Dex Digital, RHDC, the Service Company, Dex Media Service, any Newcos, DMI, the Borrower and the Subsidiaries) to enforce any such judgment;

(l)  (i) an ERISA Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan(s), (iii) the PBGC shall institute proceedings to terminate any Plan, or (iv) any Loan Party or ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such

Withdrawal Liability in a timely and appropriate manner; and in each cases (i) through (iv) above, such event or condition, in the opinion of the Required Lenders, when taken together with all other such events or conditions, if any, could reasonably be expected to result in a Material Adverse Effect;

(m) any Lien purported to be created under any Security Document or Shared Collateral Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral having, in the aggregate, a value in excess of $10,000,000, with the priority required by the applicable Security Document or Shared Collateral Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (ii) as a result of the Agent's or the Shared Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Agreements;

(n) a Change in Control shall occur;

(o) any guarantee under the Collateral Agreements for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall assert in writing that the Collateral Agreements or any guarantee thereunder has ceased to be or is not enforceable;

(p) the Intercreditor Agreement or any material portion thereof for any reason shall cease to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

(q) the Subordinated Guarantee Agreement or any material portion thereof for any reason shall cease to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

(r) the commencement of enforcement actions under the Shared Guarantee and Collateral Agreement with respect to any Shared Collateral Loan Party party thereto;

(s) the commencement of enforcement actions under the Shared Services Agreement or the occurrence of an event that permits the Service Company to terminate the Shared Services Agreement with respect to any Client Company (as defined in the Shared Services Agreement) and such event continues unremedied for a period of three days;

(t) the failure of the Borrower to receive any payment under either Tax Sharing Agreement when due and such failure continues unremedied for a period of three days;

(u) any License Agreement, Master IP License Agreement or any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement shall be terminated (other than upon the expiration of any of the respective terms thereof), cease to be effective or cease to be the legally valid, binding and enforceable obligation in any material respect of any party thereto; or

(v) either Tax Sharing Agreement shall be terminated (other than upon expiration of the term thereof), cease to be effective or cease to be the legally valid, binding and enforceable obligation in any material respect of any party thereto.

then, and in every such event (other than an event with respect to the Borrower described in clause (i) or (j) of this Article), and at any time thereafter during the continuance of such event, the Administrative

Agent may with the consent of the Required Lenders, and at the request of the Required Lenders shall, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (i) or (j) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

ARTICLE VIII

THE AGENT

Each of the Lenders hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Ultimate Parent, the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Agent or any of its Affiliates in any capacity (other than as Agent).  The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to

be genuine and to have been signed or sent by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Subject to the appointment and acceptance of a successor to the Agent as provided in this paragraph, the Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed and such consent not to be required if an Event of Default under clause (a), (b), (i) or (j) of Article VII has occurred and is continuing), to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Agent and Collateral Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

The Arrangers and Syndication Agent shall be entitled to the benefits of this Article VIII.

ARTICLE IX

MISCELLANEOUS

Section 9.01    Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)        if to the Ultimate Parent or the Borrower, to it at R.H. Donnelley Inc., Inc., 1001 Winstead Drive, Cary, North Carolina, 27513, Attention of General Counsel (Telecopy No. (919) 297-1518);

(ii)        if to the Agent, to Deutsche Bank Trust Company Americas, Global Loan Operations, DB Services New Jersey Inc., 5022 Gate Parkway, Bldg. 200, Jacksonville, Florida 32256, Attention of Lee Schmerin (Telecopy No. (904) 520-5353), with a copy to Deutsche Bank Trust Company Americas, 60 Wall Street, New York, New York 10005, Attention of Benjamin Souh (Telecopy (646) 502-4257); and

(iii)        if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided, that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)  Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 9.02    Waivers; Amendments.  (a)  No failure or delay by the Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)  Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Ultimate Parent, the Borrower and the Required Lenders, (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent or the Shared Collateral Agent, as applicable, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, or (z) in the case of this Agreement or any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Loan Party or Loan Parties subject to such Loan Document, the Agent and, as applicable, the Shared Collateral Agent, to cure any ambiguity, omission, defect or inconsistency; provided that any such agreement to waive, amend or modify this Agreement or any other Loan Document or any provision hereof or thereof pursuant to the foregoing clause (z) shall also be made to the Dex East Credit Agreement or the Dex East Loan Documents, the Dex West Credit Agreement or the Dex West Loan Documents or the

SuperMedia Credit Agreement or SuperMedia Loan Documents, as applicable; provided, further, that no such agreement shall (i) reduce the principal amount of any Loan held by any Lender or reduce the rate of interest thereon, or reduce any fees payable to any Lender hereunder, without the written consent of such Lender, (ii) postpone the maturity of any Lender's Loan, or any scheduled date of payment of the principal amount of any Lender's Loan under Section 2.05, or any date for the payment of any interest or fees payable to any Lender hereunder, or reduce the amount of, waive or excuse any such payment, without the written consent of such Lender, (iii) change Section 2.13(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (iv) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (v) except as provided by Section 9.14, release any Guarantor from its Guarantee under a Collateral Agreement, Newco Subordinated Guarantee or other applicable Security Document or Shared Collateral Security Document (except as expressly provided in the applicable Collateral Agreement, Newco Subordinated Guarantee or other Security Document or Shared Collateral Security Document), or limit its liability in respect of such Guarantee, without the written consent of each Lender, (vi) release all or substantially all of the Collateral from the Liens of the Security Documents and Shared Collateral Security Documents, without the written consent of each Lender; provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent without the prior written consent of the Agent. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Ultimate Parent, the Borrower, the Required Lenders and the Agent if at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

(c)  If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i) through (vi), inclusive, of the second proviso to Section 9.02(b), the consent of Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding Loans at such time is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clause (i) or (ii) below, to either (i) replace each such non-consenting Lender or Lenders with one or more assignees pursuant to, and with the effect of an assignment under, Section 2.14 so long as at the time of such replacement, each such assignee consents to the proposed change, waiver, discharge or termination or (ii) repay the outstanding Loans of such Lender that gave rise to the need to obtain such Lender's consent; provided (A) that, unless the Loans that are repaid pursuant to the preceding clause (ii) are immediately replaced in full at such time through the addition of new Lenders or the increase of the outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to the preceding clause (ii), Lenders having Loans representing more than 66-2/3% of the sum of the total outstanding Loans at such time (determined after giving effect to the proposed action) shall specifically consent thereto and (B) any such replacement or termination transaction described above shall be effective on the date notice is given of the relevant transaction and shall have a settlement date no earlier than five Business Days and no later than 90 days after the relevant transaction.

Section 9.03    Expenses; Indemnity; Damage Waiver.  (a)  The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Agent, the Arrangers and their Affiliates, including the reasonable fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent and the Arrangers and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers, in connection with the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all

out-of-pocket expenses incurred by the Agent, the Arrangers or any Lender, (including the fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent, the Arrangers and any Lender and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers) in connection with documentary taxes or the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans and (iii) all other reasonable out-of-pocket expenses as may be separately agreed with the Administrative Agent.

(b)   The Borrower shall indemnify the Agent, the Arrangers and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of (a) a single transaction and documentation counsel for any Indemnitee and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and the Arrangers, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)   To the extent that the Borrower fails to pay any amount required to be paid by it to the Agent under paragraph (a) or (b) of this Section, but without affecting the Borrower's obligations thereunder, each Lender severally agrees to pay to the Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans at the time.

(d)   To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions or any Loan or the use of the proceeds thereof.

(e)   All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

Section 9.04    Successors and Assigns.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or

otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than the Borrower or its Affiliates or Subsidiaries) all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A) the Borrower, provided that no consent of the Borrower shall be required (x) for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund (as defined below) or, (y) if an Event of Default has occurred and is continuing, any other assignee; and

(B) the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of Loans to an assignee that is a Lender immediately prior to giving effect to such assignment, an Affiliate of a Lender or an Approved Fund.

(ii)      Assignments shall be subject to the following conditions:

(A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loan, the amount of the Loan of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, in each case unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (it being understood that only a single processing and recordation fee of $3,500 will be payable with respect to any multiple assignments to or by a Lender, an Affiliate of a Lender or an Approved Fund pursuant to clause (ii)(A) above, each of which is individually less than $1,000,000, that are simultaneously consummated); and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For purposes of this Section 9.04, the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) any entity or an Affiliate of an entity that administers, advises or manages a Lender.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 2.12 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time, which register shall indicate that each lender is entitled to interest paid with respect to such Loans (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)  (i)Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the second proviso to Section 9.02(b) that affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 2.12 (subject to the requirements and limitations therein, including the requirements under Section 2.12(e) (it being understood that the documentation required under Section 2.12(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13(c) as though it were a Lender.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.10 or 2.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(iii)     Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05     Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.  The provisions of Sections 2.10, 2.11, 2.12 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06     Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent and the Arrangers constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when the conditions set forth in Section 4.01 hereof shall have been satisfied, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or email transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07     Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08     Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 9.09     Governing Law; Jurisdiction; Consent to Service of Process.  (a)  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)  Each of the Ultimate Parent and the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Ultimate Parent, the Borrower or its properties in the courts of any jurisdiction.

(c)  Each of the Ultimate Parent and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  [After the Closing Date, the Bankruptcy Court's retention of jurisdiction shall not govern the interpretation or enforcement of the Loan Documents or any rights or remedies related thereto.][42]

(e)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10     WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES

---

[42] To be included if applicable

THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    Confidentiality.  Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, partners, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any pledgee referred to in Section 9.04(d), (iii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations or (iv) any credit insurance provider relating to the Borrower and its Obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Agent or any Lender on a nonconfidential basis from a source other than the Ultimate Parent or any Subsidiary thereof.  For the purposes of this Section, "Information" means all information received from the Ultimate Parent or any Subsidiary thereof relating to the Ultimate Parent or any Subsidiary thereof or its business, other than any such information that is available to the Agent or any Lender on a nonconfidential basis prior to disclosure by the Ultimate Parent or any Subsidiary thereof; provided, that, in the case of information received from the Ultimate Parent or any Subsidiary thereof after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to confidential information of its other customers.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or its Affiliates or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.13     Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.14     Termination or Release.  (a)  At such time as the Loans, all accrued interest and fees under this Agreement, and all other obligations of the RHDI Loan Parties under the Loan Documents (other than obligations under Sections 2.10, 2.11, 2.12 and 9.03 that are not then due and payable) shall have been paid in full in cash, (i) the Collateral shall be released from the Liens created by the Security Documents and with respect to the RHDI Obligations, the Shared Collateral Security Documents and (ii) the obligations (other than those expressly stated to survive termination) of the Agent and each Loan Party under the Security Documents and, with respect to the RHDI Obligations, the Shared Collateral Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(b)  A Subsidiary Loan Party shall automatically be released from its obligations under the Guarantee and Collateral Agreement and the security interests in the Collateral of such Subsidiary Loan Party shall be automatically released upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary of the Borrower.

(c)  Upon any sale or other transfer by any RHDI Loan Party of any Collateral that is permitted under this Agreement to any Person that is not a RHDI Loan Party, or upon the effectiveness of any written consent to the release of the security interest granted by the Guarantee and Collateral Agreement or any other Loan Document in any Collateral of the RHDI Loan Parties pursuant to Section 9.02 of this Agreement, the security interest in such Collateral granted by the Guarantee and Collateral Agreement and the other Loan Documents shall be automatically released (it being understood that, in the case of a sale or other transfer to a Shared Collateral Loan Party, such Collateral shall become subject to a security interest in favor of the Shared Collateral Agent as to the extent set forth in the Shared Collateral Security Documents upon the consummation of such sale or other transfer).

(d)  In connection with any termination or release pursuant to paragraph (a), (b) or (c) of this Section 9.14, the Collateral Agent shall execute and deliver to any Loan Party at such Loan Party's expense all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section 9.14 shall be without recourse to or warranty by the Collateral Agent or any Lender.

Section 9.15     USA Patriot Act.  Each Lender hereby notifies the Ultimate Parent and the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "USA Patriot Act"), it is required to obtain, verify and record information that identifies the Ultimate Parent and the Borrower, which information includes the name and address of the Ultimate Parent and the Borrower and other information that will allow such Lender to identify the Ultimate Parent and the Borrower in accordance with the USA Patriot Act.

Section 9.16    <u>Intercreditor Agreement</u>.  Each Lender agrees that it will be bound by, and shall take no actions contrary to, the provisions of the Intercreditor Agreement or any intercreditor agreement entered into in connection with any Newco Subordinated Guarantee and authorizes the Agent to enter into the Intercreditor Agreement and any intercreditor agreement to be entered into in connection with any Newco Subordinated Guarantee (which shall be in form and substance reasonably satisfactory to the Agent) on its behalf.

Section 9.17    <u>Amendment and Restatement</u>.  On the Closing Date, the Existing Credit Agreement will be automatically amended and restated in its entirety to read in full as set forth herein, and all of the provisions of this Agreement which were previously not effective or enforceable shall become effective and enforceable.  Notwithstanding anything to the contrary herein, subject to the satisfaction (or waiver) of the conditions set forth in Section 4.01, the Lenders hereby waive, and shall be deemed to have waived, each Default and Event of Default under (and as defined in) the Existing Credit Agreement in existence as of the Closing Date to the extent (i) arising out of the commencement of the Chapter 11 Cases or (ii) such Default or Event of Default otherwise shall have occurred and be continuing based on facts known to the Administrative Agent and the Lenders as of the Closing Date.

[*remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

NEWDEX, INC.

By:_____

    Name:
    Title:

R.H. DONNELLEY INC.

By:_____

    Name:
    Title:

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent and Collateral Agent,
and as a Lender


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

[THIS PAGE INTENTIONALLY LEFT BLANK]

## EXHIBIT D TO THE PLAN

<u>MERGER AGREEMENT</u>

See Exhibit E to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT B TO THE DISCLOSURE STATEMENT**

FINANCIAL PROJECTIONS

[THIS PAGE INTENTIONALLY LEFT BLANK]

### Financial projections

Below are the consolidated projected financial results ("Projections") for Newdex for the years ending 2012 through 2016 (the "Projection Period"). The Projections should be read in conjunction with the respective SEC filings of the Debtors and SuperMedia, the Plan, this Disclosure Statement, the Shareholder Disclosure Statement, the SuperMedia Plan and SuperMedia lender disclosure statement, in their entirety.

**Cautionary Statement Regarding Forward-Looking Statements**

This Disclosure Statement contains or incorporates by reference certain forward-looking statements, including statements about the financial condition, results of operations, earnings outlook and prospects of each of the Debtors and SuperMedia, whether and when the Effective Date will occur, and the benefits of combination of the Debtors and SuperMedia, which are subject to numerous assumptions, risks and uncertainties. These forward-looking statements are found at various places throughout this Disclosure Statement, including in this Exhibit B and in ARTICLE VIII, entitled "Certain Factors to be Considered." You can find many of these statements by looking for words such as "plan," "believe," "expect," "intend," "anticipate," "estimate," "project," "potential," "possible" or other similar expressions. Actual results could differ materially from those contained or implied by such statements for a variety of factors, including:

- the continuing decline in the use of print directories;

- increased competition, particularly from existing and emerging digital technologies;

- ongoing weak economic conditions and continued decline in advertising sales;

- the Debtors' and SuperMedia's abilities to collect trade receivables from customers to whom they extend credit;

- the Debtors' and SuperMedia's abilities to generate sufficient cash to service their debt;

- the Debtors' and SuperMedia's abilities to comply with the financial covenants contained in their debt agreements and the potential impact to operations and liquidity as a result of restrictive covenants in such debt agreements;

- the Debtors' and SuperMedia's abilities to refinance or restructure their debt on reasonable terms and conditions as might be necessary from time to time, including without limitation, obtaining approval of the Debtors' senior secured creditors and SuperMedia's senior secured creditors with respect to the Newdex Credit Agreements required under the Merger Agreement;

- increasing interest rates;

- changes in the companies' and the companies' subsidiaries' credit ratings;

- changes in accounting standards;

- regulatory changes and judicial rulings impacting the companies' businesses;

- adverse results from litigation, governmental investigations or tax related proceedings or audits;

- the effect of labor strikes, lock-outs and negotiations;

- successful realization of the expected benefits of acquisitions, divestitures and joint ventures;

- the Debtors' and SuperMedia's abilities to maintain agreements with major internet search and local media companies;

- the Debtors' and SuperMedia's reliance on third-party vendors for various services;

- other events beyond the Debtors' and SuperMedia's control that may result in unexpected adverse operating results;

- the ability of the Debtors and SuperMedia to effect the Merger on the terms set forth in the Merger Agreement;

- the risk that anticipated cost savings, growth opportunities, and other financial and operating benefits as a result of the Merger may not be realized or may take longer to realize than expected;

- the risk that benefits from the Merger may be significantly offset by costs incurred in integrating the companies;

- potential adverse impacts or delay in effecting the Merger as a result of obtaining consents from lenders to the Debtors or SuperMedia;

- failure to receive the approval of the stockholders of either Dex One or SuperMedia for the Merger;

- difficulties in connection with the process of integrating the Debtors and SuperMedia, including: coordinating geographically separate organizations; integrating business cultures, which could prove to be incompatible; difficulties and costs of integrating information technology systems; and the potential difficulty in retaining key officers and personnel;

- the ability of the Debtors and SuperMedia to effect the Merger on the terms set forth in the Plan or SuperMedia Plan, as applicable;

- the risks related to the impact of any chapter 11 cases and the Plan or SuperMedia Plan, as applicable, could have on the Debtors' and SuperMedia's, as applicable, business operations, financial condition, liquidity, or cash flow;

- the possibility that the Bankruptcy Court does not confirm the Plan or SuperMedia Plan, if filed, or requires a re-solicitation of the votes;

- the risks related to other parties objecting to the Plan or SuperMedia Plan, if filed, and the resulting cost and expenses of delays in any chapter 11 cases; and

- each of the Debtors and SuperMedia, if SuperMedia commences any chapter 11 cases, will incur significant, non-recurring costs in connection with the administration of their bankruptcy cases.

In light of these assumptions, risks and uncertainties, the results anticipated by the forward-looking statements contained in this Disclosure Statement or made by representatives of the Debtors or SuperMedia may not occur. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof or, in the case of statements incorporated by reference, on the date of the document incorporated by reference, or, in the case of statements made by representatives of the Debtors or SuperMedia, on the date those statements are made. All subsequent written and oral forward-looking statements concerning the Merger or Newdex or other matters addressed in this Disclosure Statement and attributable to the Debtors or SuperMedia or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section. All forward-looking statements included in this Disclosure Statement are based on information available at the time of the document. Except to the extent required by applicable law or regulation, neither the Debtors nor SuperMedia assumes any obligation to update any forward-looking statement.

For additional information about factors that could cause actual results to differ materially from those expressed or implied by the forward-looking statements, please see the reports that the Debtors and SuperMedia have filed with the SEC.

**Financial Forecasts**

The Debtors generally do not make public financial forecasts as to future performance, earnings or other results beyond the current fiscal year, and SuperMedia generally does not provide public financial forecasts. Each party is especially cautious of making financial forecasts for extended periods due to the unpredictability of the underlying assumptions and estimates. However, prior to entering into the Merger Agreement, each of the parties provided the other party and the parties' respective financial advisors with non-public internal forecasts that were prepared by management for planning purposes and not for public disclosure and that are subjective in many respects. The parties have included below a subset of these management forecasts to give holders of Claims access to certain non-public information that was furnished to and considered by the parties.

The summary of the management forecasts is not being included in this document to influence the decision of a holder of Claims as to whether to vote to accept the Plan, but is included because the management forecasts were provided by each of the parties to the other party and the parties' respective financial advisors. The management forecasts, while presented with numerical specificity, necessarily were based on numerous variables and assumptions that are inherently uncertain and may be beyond the control of the parties' management. Important factors that may affect actual results and cause the management forecasts to not be achieved include, but are not limited to, risks and uncertainties relating to each party's business (including its ability to achieve strategic goals, objectives and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions and other factors. The management forecasts also reflect assumptions as to certain business decisions that are subject to change. Further, events and circumstances occurring subsequent to the date on which the financial projections were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. As a result, actual results may differ materially from those contained in the management forecasts. Accordingly, there can be no assurance that the management forecasts will be realized.

The inclusion of the management forecasts in this Disclosure Statement should not be regarded as an indication that either party or any of their respective officers, directors, advisors or representatives considered or consider the management forecasts to be predictive of actual future events, and the management forecasts should not be relied upon as such. Neither party nor any of their respective officers, directors, advisors or representatives can give any assurance that actual results will not differ from the management forecasts, and none of them undertakes any obligation to update or otherwise revise or reconcile the management forecasts to reflect circumstances existing after the date the management forecasts were generated or to reflect the occurrence of future events even in the event that any or all of the assumptions underlying the management forecasts are shown to be in error. The parties do not intend to, and disclaim any obligation to, make publicly available any update or other revision to the management forecasts. Neither party nor any of their respective affiliates, advisors, officers, directors or representatives has made or makes any representation to any holder of Claims of the Debtors or SuperMedia or other person regarding the parties' ultimate performance compared to the information contained in the management forecasts or that forecasted results will be achieved. Neither party has made any representation in the Merger Agreement or otherwise, concerning the management forecasts.

In light of the foregoing factors and the uncertainties inherent in the management forecasts, holders of Claims are cautioned not to place undue, if any, reliance on the management forecasts.

The Projections have been prepared based on assumption that the Effective Date is March 31, 2013 and assume the successful implementation of the Debtors' and SuperMedia's business plans for the combined company. Although the Debtors and SuperMedia presently intend to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when, or if, the Effective Date will actually occur. The projections are based on, among other things, the following: (a) current and projected market conditions in each of the Debtors' and SuperMedia's respective markets; (b) the ability to maintain sufficient working capital to fund operations; and (c) consummation of the Merger under the Plan.

The Projections were not prepared with a view towards complying with the Guidelines for Prospective Financial Statements published by the American Institute of Certified Public Accountants. The Debtors' and SuperMedia's respective independent accountants have not reviewed the accompanying projections to determine the reasonableness thereof and, accordingly, have not expressed an opinion or any other form of assurance with respect thereto. In addition, the Debtors' and SuperMedia's financial advisors do not express an opinion or any other form of assurance with respect to the Projections, assumed no responsibility for the Projections, and disclaim any association with the Projections.

The Projections have been prepared in good faith based upon assumptions believed to be reasonable. The Projections include assumptions with respect to various financial accounts of the companies, which are based upon the managements' estimates and market conditions.

Business combination adjustments have not been reflected in the Projections. The debt balances in the Projections reflect debt outstanding and do not have any existing or pro forma fair market value adjustments factored into such debt balances.

EBITDA is measured as earnings (defined as total operating revenue less total operating expenses, as described below) before interest, taxes, depreciation and amortization. Adjusted EBITDA is determined by adjusting EBITDA for (1) gain on debt repurchases, (2) stock-based compensation expense and long-term incentive program, (3) impairment charges, (4) gain on sale of assets, net and (5) restructuring charges and other non-recurring items including transaction-related costs. EBITDA and Adjusted EBITDA are not measurements of operating performance computed in accordance with GAAP and should not be considered as a substitute for net income (loss) prepared in conformity with GAAP. In addition, EBITDA and Adjusted EBITDA may not be comparable to similarly titled measures of other companies. Management of SuperMedia and the Debtors believe that these non-GAAP financial measures are important indicators of the companies' respective operations because they exclude items that may not be indicative of, or related to, the companies' core operating results, and provide a better baseline for analyzing the companies' underlying business. EBITDA is a metric used by the companies' management and is frequently used by the financial community to provide insight into an organization's operating trends and to facilitate comparisons between peer companies, since interest, taxes, depreciation and amortization can differ greatly between organizations as a result of differing capital structures and tax strategies.

Leveraged free cash flow is not a measurement of operating performance computed in accordance with GAAP and should not be considered as a substitute for cash flow from operations prepared in conformity with GAAP. In addition, leveraged free cash flow may not be comparable to a similarly titled measure of other companies. Management believes that this cash flow measure provides investors and holders of Claims with a relevant measure of liquidity and a useful basis for assessing the Debtors' and SuperMedia's ability to fund their activities and obligations.

Management of SuperMedia and the Debtors prepared the Projections for SuperMedia and the Debtors, respectively, for the years ending December 31, 2012, 2013, 2014, 2015, and 2016. The Projections are based on a number of assumptions, and while SuperMedia and the Debtors have prepared the Projections in good faith and believe the assumptions to be reasonable, it is important to note that the companies' can provide no assurance that such assumptions will ultimately be realized. In deciding whether to vote to accept the Plan, holders of Claims must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections. The Projections should be read in conjunction with the assumptions, qualifications and notes contained herein, the risk factors described ARTICLE VIII of this Disclosure Statement, entitled "Certain Factors to be Considered," the section above entitled "Cautionary Statement about Forward Looking Statements," and the historical financial statements filed by the Debtors and SuperMedia.

The following summarizes the underlying key assumptions upon which the Projections were based.

### *Operating Revenue*

SuperMedia and the Debtors derive operating revenue primarily from the sale of advertising in their print directories ("Print Revenue") and from internet-based marketing solutions including online directories ("Digital Revenue").

Growth in operating revenue can be affected by several factors, including changes in the number of advertising customers, changes in the pricing of advertising, changes in the quantity of advertising purchased per customer, changes in the size of the sales force and the introduction of new products. In addition, growth in operating revenue can be affected by the ongoing advertiser and consumer shift toward internet-delivered advertisement and away from the print directory. The Projections reflect SuperMedia's and the Debtors' expectation for continued change in its overall operating revenue mix by forecasting a consistent decline in Print Revenue that is partially offset by growth in Digital Revenue.

The revenue projections were prepared jointly between SuperMedia and the Debtors. SuperMedia Digital Revenue excludes revenue from Idearc Inceptor, LLC, which was divested in August 2012. The Debtors' and SuperMedia's management made certain adjustments to the Projections based on their views of the industry and potential new business prospects as well as potential business delays and other risks and contingencies related to the potential bankruptcy filing.

| | The Debtors | | | | | | SuperMedia | | | | | | Pro Forma Combined | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2011A | 2012E | 2013E | 2014E | 2015E | 2016E | 2011PF | 2012E | 2013E | 2014E | 2015E | 2016E | 2011PF | 2012E | 2013E | 2014E | 2015E | 2016E |
| Print & Direct Mail | 1,320 | 1,068 | 841 | 690 | 566 | 466 | 1,406 | 1,145 | 919 | 754 | 618 | 507 | 2,726 | 2,213 | 1,761 | 1,444 | 1,184 | 975 |
| Digital[1] | 159 | 240 | 334 | 416 | 508 | 615 | 256 | 235 | 271 | 339 | 413 | 501 | 416 | 475 | 604 | 754 | 920 | 1,117 |
| Other | 17 | 11 | 7 | 7 | 7 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 11 | 7 | 7 | 7 | 7 |
| Allowances & Credits | (16) | (14) | (15) | (14) | (14) | (14) | (37) | (27) | (24) | (22) | (21) | (20) | (53) | (41) | (39) | (36) | (35) | (35) |
| Net Revenue[1] | 1,481 | 1,304 | 1,167 | 1,098 | 1,066 | 1,077 | 1,625 | 1,353 | 1,166 | 1,071 | 1,010 | 988 | 3,106 | 2,657 | 2,333 | 2,169 | 2,076 | 2,065 |
| **Year-over-Year Growth Rates** | | | | | | | | | | | | | | | | | | |
| Print & Direct Mail | | -19% | -21% | -18% | -18% | -18% | | -19% | -20% | -18% | -18% | -18% | | -19% | -20% | -18% | -18% | -18% |
| Digital | | 51% | 39% | 25% | 22% | 21% | | -8% | 15% | 25% | 22% | 22% | | 14% | 27% | 25% | 22% | 21% |
| Net Revenue | | -12% | -11% | -6% | -3% | 1% | | -17% | -14% | -8% | -6% | -2% | | -14% | -12% | -7% | -4% | -1% |

(1) SuperMedia Digital Revenue excludes revenue from Idearc Inceptor, LLC, which was divested in August 2012.

### *Operating Expenses*

Operating expense (excluding depreciation and amortization) includes the cost of sales, direct selling expense as well as general and administrative costs. Costs directly attributable to producing print directories as well as sales commissions are amortized over the average life of a directory or advertising service. All other costs are expensed as incurred.

SuperMedia and the Debtors expect expenses to increase as a percentage of revenue principally due to the inability to completely offset the decline in Print Revenue with incremental cost reductions. As Digital Revenue increases, expenses are expected to increase but the companies expect to recognize some economies of scale to partially offset the expenses.

Based on an in-depth review of the potential synergies by the management of both companies estimated that the combined companies could achieve $150 to $175 million of operating expense savings related to the mergers. These cost savings are expected to be realized across all categories of operating expenses. Associated with these savings are certain costs to incur those savings. SuperMedia and the Debtors have forecasted that these costs will largely offset the expense savings in the first year following the Merger but that the combined company should be able to recognize its full annual cost savings by 2015. The annual synergies and the associated costs assumed in the Projections are shown in the table below. These cost savings are included in the Projections as a reduction to the forecasted operating expenses.

| $ millions | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Gross Synergies | $ 60 | $ 125 | $ 175 | $ 175 |
| Cost to Achieve | (77) | (21) | 0 | 0 |
| Net Synergies | $ (17) | $ 104 | 175 | 175 |

### Taxes

The Projections assume that the RHDI NOL carryforward will partially be offset by cancellation of indebtedness income upon the amendment of the RHDI Secured Credit Agreement. It is assumed, however, that the NOL carryforward will still have a significant balance following the Merger that will offset the taxable income of the combined companies over the Projection Period. In addition, the Projections assume that the cancellation of indebtedness income incurred upon the consummation of the Merger will generate original issue discount deductions for U.S. federal income tax purposes at all four credit silos. It is anticipated that the amount of original issue discount will also partially offset Newdex's taxable income over the Projection Period. The Projections assume that certain tax sharing payments are made between and among the related entities in accordance with the tax sharing agreements.

### Post-Merger Debt

The Projections assume that the current capital structure of the combined companies will be substantially similar to their independent pre-Merger structures. As per the amended terms of these agreements, the debt is assumed to remain outstanding throughout the Projection Period. The Projections further assume that the Borrowers' Discounted Prepayment Portion of Excess Cash Flow and Voluntary Prepayments (as those terms are defined in the applicable amended and restated credit agreements) of debt are completed at par. The cash interest paid under each loan agreement is calculated London Interbank Offered Rate (assumed to be 3.0% throughout the Projection Period) plus the respective applicable margins. The applicable margins are 8.60% for SuperMedia, 6.75% for RHDI, 3.0% for Dex East and 5.0% for Dex West.

### Capital Expenditures

The capital expenditure requirements of the companies' business are modest and forecasted to represent between 1.5% and 2.0% of annual operating revenues.

[*The remainder of this page is intentionally left blank.*]

### Newdex (Consolidated Pro Forma Company)

$MM

| | Newdex | | | | |
|---|---|---|---|---|---|
| | 2012E | 2013E | 2014E | 2015E | 2016E |
| Revenue | $2,657 | $2,333 | $2,169 | $2,077 | $2,065 |
| Adj EBITDA—Pre Synergies | 1,094 | 882 | 732 | 607 | 544 |
| Synergies, net | — | (17) | 104 | 175 | 175 |
| Adj EBITDA | 1,094 | 865 | 836 | 782 | 719 |
| Bank Debt Interest | (316) | (292) | (259) | (216) | (176) |
| Bond Debt Interest | (22) | (16) | (17) | (19) | (20) |
| Taxes/Tax Sharing | (111) | (63) | (23) | (37) | (41) |
| Other | (67) | (141) | (63) | (72) | (71) |
| Leveraged Free Cash Flow | 578 | 352 | 474 | 439 | 412 |
| Debt, ending | 3,467 | 3,072 | 2,616 | 2,196 | 1,805 |
| Cash, ending | 249 | 190 | 191 | 192 | 192 |
| Net Debt, ending | 3,217 | 2,881 | 2,424 | 2,004 | 1,613 |
| *Net Debt/Adj EBITDA* | *2.9x* | *3.3x* | *2.9x* | *2.6x* | *2.2x* |

### Dex East

$MM

| | Dex East | | | | |
|---|---|---|---|---|---|
| | 2012E | 2013E | 2014E | 2015E | 2016E |
| Revenue | $348 | $308 | $292 | $285 | $288 |
| Adj EBITDA—Pre Synergies | 162 | 131 | 112 | 93 | 86 |
| Synergies, net | — | (2) | 15 | 26 | 26 |
| Adj EBITDA | 162 | 128 | 127 | 119 | 112 |
| Bank Interest | (24) | (31) | (30) | (25) | (20) |
| Rest. Payment—Bond Interest | (6) | (4) | (5) | (5) | (5) |
| Rest. Payment—General | (5) | — | — | — | — |
| Taxes/Tax Sharing | (6) | 7 | 8 | 0 | (0) |
| Other | 19 | (22) | (12) | (13) | (9) |
| Leveraged Free Cash Flow | 141 | 78 | 89 | 76 | 78 |
| Debt, ending | 538 | 453 | 364 | 288 | 210 |
| Cash, ending | 56 | 48 | 48 | 48 | 48 |
| Net Debt, ending | 482 | 405 | 316 | 240 | 162 |
| *Net Debt/Adj EBITDA* | *3.0x* | *3.2x* | *2.5x* | *2.0x* | *1.4x* |

### *Dex West*

$MM

| | Dex West | | | | |
|---|---|---|---|---|---|
| | 2012E | 2013E | 2014E | 2015E | 2016E |
| Revenue | $411 | $366 | $339 | $325 | $329 |
| Adj EBITDA—Pre Synergies | 184 | 150 | 126 | 104 | 97 |
| Synergies, net | — | (3) | 17 | 29 | 29 |
| Adj EBITDA | 184 | 148 | 143 | 133 | 126 |
| Bank Interest | (42) | (35) | (29) | (21) | (14) |
| Rest. Payment—Bond Interest | (8) | (6) | (6) | (7) | (7) |
| Rest. Payment—General | (5) | — | — | — | — |
| Taxes/Tax Sharing | (12) | (4) | (4) | (3) | (3) |
| Other | (7) | (24) | (13) | (14) | (13) |
| Leveraged Free Cash Flow | 110 | 78 | 91 | 88 | 89 |
| Debt, ending | 491 | 403 | 311 | 223 | 135 |
| Cash, ending | 45 | 35 | 35 | 35 | 35 |
| Net Debt, ending | 446 | 367 | 276 | 188 | 99 |
| *Net Debt/Adj EBITDA* | *2.4x* | *2.5x* | *1.9x* | *1.4x* | *0.8x* |

### *RHDI*

$MM

| | RHDI | | | | |
|---|---|---|---|---|---|
| | 2012E | 2013E | 2014E | 2015E | 2016E |
| Revenue | $541 | $479 | $449 | $437 | $441 |
| Adj EBITDA—Pre Synergies | 215 | 174 | 143 | 118 | 105 |
| Synergies, net | — | (3) | 20 | 33 | 32 |
| Adj EBITDA | 215 | 170 | 162 | 150 | 136 |
| Bank Interest | (77) | (68) | (60) | (49) | (40) |
| Rest. Payment—Bond Interest | (8) | (6) | (6) | (7) | (7) |
| Rest. Payment—General | (5) | — | — | — | — |
| Taxes/Tax Sharing | 5 | 6 | 27 | 17 | 9 |
| Other | (56) | (25) | (10) | (11) | (14) |
| Leveraged Free Cash Flow | 73 | 78 | 114 | 101 | 84 |
| Debt, ending | 757 | 668 | 554 | 454 | 370 |
| Cash, ending | 32 | 21 | 21 | 21 | 21 |
| Net Debt, ending | 725 | 647 | 533 | 432 | 348 |
| *Net Debt/Adj EBITDA* | *3.4x* | *3.8x* | *3.3x* | *2.9x* | *2.6x* |

*SuperMedia*

$MM

| | SuperMedia | | | | |
|---|---|---|---|---|---|
| | 2012E | 2013E | 2014E | 2015E | 2016E |
| Revenue | $1,353 | $1,166 | $1,071 | $1,010 | $988 |
| Adj EBITDA—Pre Synergies | 534 | 427 | 351 | 291 | 257 |
| Synergies, net | | (9) | 52 | 88 | 87 |
| Adj EBITDA | 534 | 419 | 403 | 379 | 344 |
| Bank Debt Interest | (174) | (158) | (141) | (121) | (101) |
| Taxes/Tax Sharing | (96) | (72) | (54) | (51) | (47) |
| Other | (8) | (71) | (28) | (33) | (35) |
| Leveraged Free Cash Flow | 256 | 118 | 180 | 173 | 161 |
| Debt, ending | 1,456 | 1,308 | 1,128 | 955 | 794 |
| Cash, ending | 110 | 80 | 80 | 80 | 80 |
| Net Debt, ending | 1,346 | 1,227 | 1,048 | 875 | 714 |
| *Net Debt/Adj EBITDA* | *2.5x* | *2.9x* | *2.6x* | *2.3x* | *2.1x* |

*Parent (unconsolidated)*[1]

$MM

| | Parent (unconsolidated) | | | | |
|---|---|---|---|---|---|
| | 2012E | 2013E | 2014E | 2015E | 2016E |
| Revenue | $    4 | $    14 | $    18 | $    19 | $    19 |
| Adj EBITDA—Pre Synergies | (2) | — | 1 | 1 | (0) |
| Synergies, net | — | — | — | — | — |
| Adj EBITDA | (2) | — | 1 | 1 | (0) |
| Bank Interest | — | — | — | — | — |
| Rest. Payment—Bond Interest | 22 | 16 | 17 | 19 | 20 |
| Rest. Payment—General | 15 | — | — | — | — |
| Taxes/Tax Sharing | (1) | — | — | — | — |
| Bond Interest | (22) | (16) | (17) | (19) | (20) |
| Other | (15) | — | — | — | — |
| Leveraged Free Cash Flow | (3) | — | 1 | 1 | (0) |
| Debt, ending | 224 | 240 | 257 | 276 | 296 |
| Cash, ending | 5 | 5 | 6 | 7 | 7 |
| Net Debt, ending | 219 | 235 | 251 | 269 | 289 |
| *Net Debt/Adj EBITDA* | *n/a* | *n/a* | *n/a* | *n/a* | *n/a* |

---

[1]    "Parent" refers to Newdex.

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

**EXHIBIT C TO THE DISCLOSURE STATEMENT**

SUPERMEDIA PLAN

[THIS PAGE INTENTIONALLY LEFT BLANK]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DEX ONE CORPORATION, et al.,[1] | ) | Case No. 13-10533 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE, 11 U.S.C. §§ 1125, 1126.  THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      james.sprayregen@kirkland.com
            marc.kieselstein@kirkland.com
            christopher.marcus@kirkland.com

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:      ljones@pszjlaw.com
            pkeane@pszjlaw.com

Proposed Attorneys for the
Debtors and Debtors in Possession

Dated:  February 8, 2013

---

[1]    The Debtors, together with the last four digits of each of the Debtors' federal tax identification number (if applicable), are:  Dex One Corporation (0040); Dex Media, Inc. (9762); Dex Media East, Inc. (5763); Dex Media West, Inc. (7004); Dex Media Service LLC (9647); Dex One Digital, Inc. (9750); Dex One Service, Inc. (0222); R.H. Donnelley Inc. (7635); R.H. Donnelley APIL, Inc. (6495); R.H. Donnelley Corporation (2490); Newdex, Inc. (1335); and Spruce Acquisition Sub, Inc. (4006).  For the purpose of these chapter 11 cases, the service address for the Debtors is:  1001 Winstead Drive, Cary, North Carolina 27513.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................................... 1

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
    GOVERNING LAW, AND OTHER REFERENCES ........................................................... 1
    1.1     Defined Terms ......................................................................................................... 1
    1.2     Rules of Interpretation ........................................................................................... 8
    1.3     Computation of Time ............................................................................................. 8
    1.4     Governing Law ....................................................................................................... 8
    1.5     Reference to Monetary Figures .............................................................................. 8
    1.6     Reference to the Debtors or the Reorganized Debtors ........................................... 9

ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS .......................................................... 9
    2.1     Administrative Claims ........................................................................................... 9
    2.2     Professional Claims ............................................................................................... 9
    2.3     Priority Tax Claims ................................................................................................ 9

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ................... 10
    3.1     Classification of Claims and Interests ................................................................. 10
    3.2     Treatment of Classes of Claims and Interests ..................................................... 10
    3.3     Special Provision Governing Unimpaired Claims ............................................... 13

ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN ...................................... 13
    4.1     General Settlement of Claims .............................................................................. 13
    4.2     Newdex Common Stock ....................................................................................... 13
    4.3     Amended and Restated Credit Documents ........................................................... 13
    4.4     Offering and Issuance of Newdex Common Stock .............................................. 14
    4.5     Subordination ....................................................................................................... 14
    4.6     Vesting of Assets in the Reorganized Debtors ..................................................... 14
    4.7     Cancellation of Notes, Instruments, Certificates, and Other Documents ............ 14
    4.8     Issuance of New Securities; Execution of Plan Documents ................................ 15
    4.9     Corporate Action .................................................................................................. 15
    4.10    Charter and Bylaws .............................................................................................. 15
    4.11    Effectuating Documents; Further Transactions .................................................... 15
    4.12    Section 1146(a) Exemption .................................................................................. 15
    4.13    Directors and Officers .......................................................................................... 15
    4.14    Incentive Plans and Employee and Retiree Benefits ........................................... 16
    4.15    Preservation of Rights of Action .......................................................................... 16
    4.16    Restructuring Transactions ................................................................................... 16

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 17
    5.1     Assumption of Executory Contracts and Unexpired Leases ............................... 17
    5.2     Cure of Defaults and Objections to Cure and Assumption .................................. 18
    5.3     Pre-existing Payment and Other Obligations ...................................................... 19
    5.4     Rejection Damages Claims and Objections to Rejections ................................... 19
    5.5     Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date ................... 19
    5.6     Reservation of Rights ........................................................................................... 19

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ..................................................... 19
    6.1     Distributions on Account of Claims and Interests Allowed as of the Effective Date .................. 19
    6.2     Special Rules for Distributions to Holders of Disputed Claims and Interests .................. 20
    6.3     Delivery of Distributions ...................................................................................... 20
    6.4     Claims Paid or Payable by Third Parties .............................................................. 22

6.5       Setoffs ........................................................................................................................23
6.6       Allocation Between Principal and Accrued Interest .........................................................23

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS ..............................23
7.1       Disputed Claims Process....................................................................................................23
7.2       Prosecution of Objections to Claims and Interests...........................................................24
7.3       No Interest..........................................................................................................................24
7.4       Disallowance of Claims and Interests ...............................................................................24

ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN ...........................................................24
8.1       Discharge of Claims and Termination of Interests............................................................24
8.2       Releases by the Debtors .....................................................................................................24
8.3       Releases by Holders of Claims and Interests ....................................................................25
8.4       Exculpation ........................................................................................................................26
8.5       Injunction ...........................................................................................................................26
8.6       Protection Against Discriminatory Treatment ...................................................................26
8.7       Indemnification ..................................................................................................................27
8.8       Recoupment .......................................................................................................................27
8.9       Release of Liens .................................................................................................................27
8.10      Reimbursement or Contribution.........................................................................................27

ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ................................................27
9.1       Conditions Precedent to the Effective Date.  It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2:............27
9.2       Waiver of Conditions Precedent .......................................................................................28
9.3       Effect of Non-Occurrence of Conditions to Consummation .............................................28

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...........................28
10.1      Modification of Plan ..........................................................................................................28
10.2      Revocation or Withdrawal of Plan ....................................................................................28
10.3      Confirmation of the Plan ....................................................................................................29

ARTICLE XI RETENTION OF JURISDICTION ...............................................................................29

ARTICLE XII MISCELLANEOUS PROVISIONS ..............................................................................30
12.1      Additional Documents .......................................................................................................30
12.2      Payment of Statutory Fees .................................................................................................30
12.3      Reservation of Rights.........................................................................................................30
12.4      Successors and Assigns......................................................................................................31
12.5      Service of Documents ........................................................................................................31
12.6      Term of Injunctions or Stays..............................................................................................32
12.7      Entire Agreement ...............................................................................................................32
12.8      Plan Supplement Exhibits ..................................................................................................32
12.9      Non-Severability ................................................................................................................32

LIST OF EXHIBITS

Exhibit A          Merger Agreement

Exhibit B          Amended and Restated SuperMedia Secured Credit Agreement

## INTRODUCTION

SuperMedia and its Debtor subsidiaries in the above-captioned chapter 11 cases jointly propose this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding claims against and interests in each Debtor pursuant to the Bankruptcy Code. The Debtors and Dex One and its subsidiaries seek to consummate the Merger on the Effective Date of the Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of claims and interests set forth in <u>ARTICLE III</u> shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan contemplates no substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, the Merger and certain related matters.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### 1.1    Defined Terms

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

3.    "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, as applicable, or by a Final Order.

4.    "*Amended and Restated SuperMedia Secured Credit Agreement*" means the Amended and Restated Loan Agreement by and among SuperMedia Inc., as borrower thereunder, certain lender financial institutions from time to time party thereto, and JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent thereunder, to be effective on the Effective Date, in form and substance reasonably satisfactory to the SuperMedia Administrative Agent and the Majority Documentation Lenders and in substantially the form attached to the Plan as <u>Exhibit B</u>.

5.    "*Amended and Restated SuperMedia Secured Credit Documents*" means, collectively, the Amended and Restated SuperMedia Secured Credit Agreement, each of the other Loan Documents (as defined in the Amended and Restated SuperMedia Secured Credit Agreement) and all other agreements, documents and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents).

6.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

7.    "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

8.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

9. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

10. "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

11. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

12. "*Causes of Action*" means any and all claims, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and any avoidance, recovery, subordination, or other actions against Insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of any of the Debtors, the debtors in possession, and/or the Estates (including those actions set forth in the Plan Supplement), whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced by the Reorganized Debtors after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

13. "*Certificate*" means any instrument evidencing a Claim or an Interest, provided, "Certificate" includes no instrument issued pursuant to, or evidencing a Claim under the SuperMedia Secured Credit Agreement.

14. "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

15. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

16. "*Claims and Solicitation Agent*" means the claims and solicitation agent the Debtors may retain in the Chapter 11 Cases pursuant to order of the Bankruptcy Court.

17. "*Claims Register*" means the official register of Claims against or Interests in the Debtors maintained by the Claims and Solicitation Agent.

18. "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

19. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

20. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

21. "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

22. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Lender Disclosure Statement and the Shareholder Disclosure Statement, which order shall be in form and substance reasonably satisfactory to the SuperMedia Administrative Agent.

23. "*Consummation*" means the occurrence of the Effective Date.

24. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

25.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default which is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

26.     "*Debtors*" means, collectively, each of the following: SuperMedia Inc., SuperMedia LLC, SuperMedia Services Inc. and SuperMedia Sales Inc.

27.     "*Designated Employee Benefit Plans*" means the employee benefit plans designated by the Dex One Debtors, with the consent of the Debtors, on or before the Effective Date.

28.     "*Dex One*" means Dex One Corporation.

29.     "*Dex One Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases, if any, filed by the Dex One Debtors in the Bankruptcy Court in accordance with the Dex One Support Agreement and Merger Agreement.

30.     "*Dex One Confirmation Order*" means the order of the Bankruptcy Court confirming the Dex One Plan under section 1129 of the Bankruptcy Code and approving the Dex One Disclosure Statement in the Dex One Chapter 11 Cases.

31.     "*Dex One Debtors*" means, collectively, if Dex One and certain of its subsidiaries file the Dex One Chapter 11 Cases, each of the following: Dex One; Dex Media, Inc.; Dex Media East, Inc.; Dex Media West, Inc.; Dex Media Service LLC; Dex One Digital, Inc.; Dex One Service, Inc.; R.H. Donnelley Inc.; R.H. Donnelley APIL, Inc.; R.H. Donnelley Corporation; Newdex, Inc.; and Spruce Acquisition Sub, Inc.

32.     "*Dex One Plan*" means the chapter 11 plan filed in the Dex One Chapter 11 Cases in accordance with the Dex One Support Agreement and Merger Agreement.

33.     "*Dex One Support Agreement*" means the Support and Limited Waiver Agreement, dated as of December 5, 2012, by and among the Dex One Debtors, Deutsche Bank Trust Company Americas and JPMorgan Chase Bank, N.A. in their respective capacities as administrative agents and collateral agents under certain senior secured credit agreements to which various of the Dex One Debtors are party and certain lenders under such credit agreements from time to time party to such Support Agreement and Limited Waiver Agreement.

34.     "*Disclosure Statement*" means either the Lender Disclosure Statement or the Shareholder Disclosure Statement, as applicable.

35.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, as applicable, or a Final Order; or (c) with respect to which a party in interest has filed a proof of claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order or approval of the Bankruptcy Court.

36.     "*Distribution Agent*" means Newdex or any Entity Newdex selects to make or to facilitate distributions in accordance with the Plan.

37.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or Newdex, in their sole discretion, on or after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan; provided that Distribution Dates shall occur no less frequently than every 30 days after the Effective Date, as necessary.

38.     "*Distribution Record Date*" means the date that is three Business Days after entry of the Confirmation Order.

39.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 have been satisfied or waived in accordance with Section 9.2.

40.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

41.    "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code.

42.    "*Estate*" means the bankruptcy estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

43.    "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in court or out-of-court efforts to implement the Transaction, the Chapter 11 Cases, the SuperMedia Support Agreement, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Lender Disclosure Statement, the Shareholder Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the SuperMedia Support Agreement, the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan.

44.    "*Exculpated Party*" means each of the following in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Dex One Debtors; (d) the SuperMedia Secured Lenders and SuperMedia Administrative Agent; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entity's successors and assigns and current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals.

45.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

46.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

47.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

48.    "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Professional Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a SuperMedia Secured Credit Agreement Claim, and a Section 510(b) Claim.

49.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

50.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

51.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

52.    "*Intercompany Contract*" means a contract between or among two or more Debtors or a contract between or among one or more Affiliates and one or more Debtors.

53.    "*Intercompany Interest*" means an Interest held by a Debtor or an Affiliate.

54.    "*Interest*" means any Equity Security of a Debtor existing immediately prior to the Effective Date.

55.    "*Lender Disclosure Statement*" means the disclosure statement for the Plan provided to the SuperMedia Secured Lenders as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

56.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

57.    "*Majority Documentation Lenders*" means, if the SuperMedia Support Agreement has not been terminated, as of any date of determination, the majority by number of the Consenting Lenders (as defined in the SuperMedia Support Agreement) set forth on Schedule 2 to the SuperMedia Support Agreement excluding the SuperMedia Administrative Agent  (and, for the avoidance of doubt, not such Consenting Lenders' successors or assigns and not any Consenting Lender that is no longer bound by the Support Agreement pursuant to the terms thereof ) that exercise their consent or approval rights as of such date of determination in accordance with the terms of the SuperMedia Support Agreement.

58.    "*Merger*" means the merger of Dex One and its subsidiaries with SuperMedia and its subsidiaries in accordance with the Merger Agreement and the Plan.

59.    "*Merger Agreement*" means the amended and restated agreement and plan of merger, dated December 5, 2012, by and among Dex One, SuperMedia, Newdex, Inc., and Spruce Acquisition Sub, Inc., as may be amended from time to time, attached hereto as Exhibit A.

60.    "*Newdex*" means the Reorganized Debtors' ultimate parent company upon consummation of the Merger.

61.    "*Newdex Board*" means Newdex's initial board of directors.

62.    "*Newdex Bylaws*" means Newdex's bylaws, substantially in the form contained in the Merger Agreement.

63.    "*Newdex Charter*" means Newdex's amended and restated certificate of incorporation, substantially in the form contained in the Merger Agreement.

64.    "*Newdex Common Stock*" means Newdex's authorized shares of common stock on the Effective Date, par value $0.001 per share.

65.    "*Option*" has the meaning set forth in Section 4.16(b) herein.

66.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

67.    "*Other Secured Claim*" means any Secured Claim other than a SuperMedia Secured Credit Agreement Claim or a Secured Tax Claim.  For the avoidance of doubt, "Other Secured Claims" includes any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

68.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

69.    "*Petition Date*" means the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

70.    "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time, including the Plan Supplement and all exhibits, supplements, appendices, and schedules.

71.    "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors no later than 10 Business Days after the Petition Date or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

72.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

73.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

74.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

75.    "*Professional Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

76.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

77.    "*Rejection Schedule*" means the schedule of Executory Contracts and Unexpired Leases in the Plan Supplement, as may be amended from time to time, setting forth certain Executory Contracts and Unexpired Leases for rejection as of the Effective Date under section 365 of the Bankruptcy Code.

78.    "*Released Party*" means each of the following in its capacity as such:  (a) the Debtors; (b) the SuperMedia Secured Lenders and SuperMedia Administrative Agent; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), such Entity's successors and assigns, and current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals.

79.    "*Releasing Parties*" means each of the following in its capacity as such:  (a) the SuperMedia Secured Lenders and the SuperMedia Administrative Agent; and (b) without limiting the foregoing clause (a), each holder of a Claim or an Interest other than a holder of a Claim or an Interest that has voted to reject the Plan or is a member of a Class that is deemed to reject the Plan.

80.    "*Reorganized Debtor*" means a Debtor, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

81.    "*Restructuring Transactions*" means the transactions, including the Merger, described in <u>Section 4.16</u>.

82.    "*Section 510(b) Claim*" means any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

83.    "*Secured Claim*" means a Claim:  (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

84.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

85.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

86.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act. For the avoidance of doubt, none of the following is, or shall be deemed to be, a Security: the SuperMedia Secured Credit Agreement, the Amended and Restated SuperMedia Secured Credit Agreement, any loan or Claim under the SuperMedia Secured Credit Agreement or the Amended and Restated SuperMedia Secured Credit Agreement, or any note or other instrument issued in connection therewith.

87.    "*Servicer*" means an indenture trustee, agent, or other authorized representative of holders of Claims or Interests.

88.    "*Shareholder Disclosure Statement*" means the combined Form S-4 regarding the Merger filed with the United States Securities and Exchange Commission and disclosure statement for the Plan, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

89.    "*SuperMedia*" means SuperMedia Inc.

90.    "*SuperMedia Administrative Agent*" means JPMorgan Chase Bank, N.A. or its successor, in its capacity as administrative agent and collateral agent under the SuperMedia Secured Credit Agreement Documents.

91.    "*SuperMedia Cash Collateral Order*" means, collectively, the interim order and, if applicable, the Final Order entered by the Bankruptcy Court authorizing SuperMedia and certain of the other Debtors to use the SuperMedia Secured Lenders' collateral (including cash collateral) and granting adequate protection to the SuperMedia Secured Lenders, which orders shall be in form and substance reasonably satisfactory to the SuperMedia Administrative Agent.

92.    "*SuperMedia Cash Management Arrangement*" means any "Cash Management Agreement", as defined in the SuperMedia Guarantee and Collateral Agreement, that is of a type described in clause (ii) of the definition of "Obligations" in the SuperMedia Guarantee and Collateral Agreement.

93.    "*SuperMedia Guarantee and Collateral Agreement*" means the Guarantee and Collateral Agreement, dated as of December 31, 2009, among SuperMedia, the other Debtors party thereto and the SuperMedia Administrative Agent.

94.    "*SuperMedia Interest*" means any Interest in SuperMedia.

95.    "*SuperMedia Secured Credit Agreement*" means the Loan Agreement, dated as of December 31, 2009, as amended on December 13, 2010 and November 8, 2011, by and among SuperMedia Inc. (formerly known as Idearc Inc.), as borrower thereunder, the SuperMedia Secured Lenders from time to time party thereto and the SuperMedia Administrative Agent.

96.    "*SuperMedia Secured Credit Agreement Claim*" means any Claim arising under, derived from or based upon the SuperMedia Secured Credit Agreement Documents.

97.    "*SuperMedia Secured Credit Agreement Documents*" means collectively, (a) the SuperMedia Secured Credit Agreement, (b) all other agreements, documents and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents) and (c) any SuperMedia Cash Management Arrangements.

98.     "*SuperMedia Secured Lenders*" means the "Secured Parties", as defined in the SuperMedia Secured Credit Agreement.

99.     "*SuperMedia Support Agreement*" means the Support and Limited Waiver Agreement, dated as of December 5, 2012, by and among the Debtors, the SuperMedia Administrative Agent and the SuperMedia Secured Lenders party thereto from time to time.

100.     "*Transaction*" means the Merger and the transactions related thereto including the entry into and delivery and effectiveness of the Amended and Restated Credit Agreements and other Amended and Restated Credit Documents.

101.     "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Interest to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

102.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

103.     "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

## 1.2     Rules of Interpretation

For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## 1.3     Computation of Time

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

## 1.4     Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## 1.5     Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**1.6**      **Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**ARTICLE II**

**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in <u>ARTICLE III</u>.

**2.1**      **Administrative Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date, or as soon as practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the holders of such Allowed Administrative Claims.

**2.2**      **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Court Allows.  From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**2.3**      **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive on the Effective Date, or as soon as practicable thereafter, from the respective Debtor liable for such Allowed Priority Tax Claim, payment in Cash in an amount equal to the amount of such Allowed Priority Tax Claim.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

**3.1**    **Classification of Claims and Interests**

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in ARTICLE II, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Below is a chart assigning each Class a number for purposes of identifying each separate Class.  The Classes have been numbered in a manner consistent with the Dex One Plan for convenience and ease of reading. There are no Classes 4, 6, or 7 under this Plan.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 5 | SuperMedia Secured Credit Agreement Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 9 | SuperMedia Interests | Impaired | Entitled to Vote |
| 10 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 11 | Section 510(b) Claims | Impaired | Presumed to Reject |

**3.2**    **Treatment of Classes of Claims and Interests**

Except to the extent that a holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest.  Unless otherwise indicated, the holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as practicable thereafter.

(a)    **Class 1 — Secured Tax Claims**

(1)    *Classification*:  Class 1 consists of any Secured Tax Claims against any Debtor.

(2)    *Treatment*:  Each holder of an Allowed Class 1 Claim shall receive, as applicable:

A.    If the Allowed Class 1 Claim is due and payable on or before the Effective Date, Cash in an amount equal to such Allowed Class 1 Claim; or

B.    If the Allowed Class 1 Claim is not due and payable on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be

due and payable under applicable non-bankruptcy law or in the ordinary course of business.

(3)  *Voting*:  Class 1 is Unimpaired.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

**(b)     Class 2 — Other Secured Claims**

(1)  *Classification*:  Class 2 consists of any Other Secured Claims against any Debtor.

(2)  *Treatment*:  Each holder of an Allowed Class 2 Claim shall, at the sole option of the Debtors or the Reorganized Debtors, as applicable:

   A.    have its Allowed Class 2 Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code; or

   B.    receive the collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

(3)  *Voting*:  Class 2 is Unimpaired.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

**(c)     Class 3 — Other Priority Claims**

(1)  *Classification*:  Class 3 consists of any Other Priority Claims against any Debtor.

(2)  *Treatment*:  Each holder of an Allowed Class 3 Claim shall be paid in full in Cash.

(3)  *Voting*:  Class 3 is Unimpaired. Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

**(d)     Class 5 — SuperMedia Secured Credit Agreement Claims**

(1)  *Classification*:  Class 5 consists of any SuperMedia Secured Credit Agreement Claims.

(2)  *Allowance:*  On the Effective Date, Class 5 Claims shall be Allowed, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset, in the aggregate principal amount of $1,441,990,818, plus (A) any accrued but unpaid interest payable at the non-default interest rate in accordance with the SuperMedia Secured Credit Agreement, (B) any unpaid fees, expenses or other amounts that constitute Obligations (other than principal) under and as defined in the SuperMedia Secured Credit Agreement, (C) any unpaid adequate protection payments required to be paid pursuant to the terms of the SuperMedia Cash Collateral Order and (D) to the extent applicable, any unpaid amounts required to be paid pursuant to a SuperMedia Cash Management Arrangement, <u>less</u> any other payments of principal paid by the Debtors after December 31, 2012, or during the pendency of the Chapter 11 Cases pursuant to the terms of the SuperMedia Secured Credit Agreement or the SuperMedia Cash Collateral Order.

(3)  *Treatment*:  (A) On the Effective Date, each holder of an Allowed Class 5 Claim shall receive, in satisfaction of such holder's Allowed Class 5 Claim (other than the portion of

the Allowed Class 5 Claim  which directly arises under, is derived from or is based upon a SuperMedia Cash Management Arrangement): (a) its Pro Rata share of the loans under the Amended and Restated SuperMedia Secured Credit Agreement and (b) Cash in an amount equal to such holder's Pro Rata share of any outstanding amounts described in clauses (A), (B) or (C) of the immediately foregoing paragraph (d)(2), to the extent such amounts are owed to a lender under the SuperMedia Secured Credit Agreement or SuperMedia Cash Collateral Order; and (B) in satisfaction of the portion (if any) of such holder's Allowed Class 5 Claim that directly arises under, is derived from or is based upon a SuperMedia Cash Management Arrangement, Cash in an amount equal to such partial Claim amount.

(4)    *Voting*:  Class 5 is Impaired.  Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

**(e)**    **Class 8 — General Unsecured Claims**

(1)    *Classification*:  Class 8 consists of any General Unsecured Claims against any Debtor.

(2)    *Treatment*:  Each holder of an Allowed Class 8 Claim shall receive Cash in an amount equal to such Allowed Class 8 Claim on the later of the Effective Date or in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 8 Claim.

(3)    *Voting*:  Class 8 is Unimpaired.  Holders of Allowed Class 8 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

**(f)**    **Class 9 — SuperMedia Interests**

(1)    *Classification*:  Class 9 consists of any SuperMedia Interests.

(2)    *Treatment*:  Upon consummation of the Merger, each holder of an Allowed Class 9 Interest shall receive 0.4386 shares of Newdex Common Stock for each of its Allowed Class 9 Interests.

(3)    *Voting*:  Class 9 is Impaired.  Holders of Allowed Class 9 Interests are entitled to vote to accept or reject the Plan.

**(g)**    **Class 10 — Intercompany Interests**

(1)    *Classification*:  Class 10 consists of any Intercompany Interests.

(2)    *Treatment*:  Each holder of an Allowed Class 10 Interest shall have its Allowed Class 10 Interest left unaltered and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

(3)    *Voting*:  Class 10 is Unimpaired.  Holders of Allowed Class 10 Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Class 10 Interests are not entitled to vote to accept or reject the Plan.

**(h)**    **Class 11 — Section 510(b) Claims**

(1)    *Classification*:  Class 11 consists of any Section 510(b) Claims against any Debtor.

(2)     *Allowance:*  Notwithstanding anything in the Plan to the contrary, a Class 11 Claim, if existing, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any asserted Class 11 Claim and believe that no Class 11 Claim exists.

(3)     *Treatment*:  A holder of an Allowed Class 11 Claim shall, in the Reorganized Debtors' sole discretion, (A) receive Cash in the full amount of its Allowed Class 11 Claim or (B) be treated as if such holder held a number of Allowed Class 9 Interests instead of its Allowed Class 11 Claim equal in value to the amount of its Allowed Class 11 Claim.

(4)     *Voting*:  Class 11 is Impaired.  Holders (if any) of Allowed Class 11 Claims are conclusively presumed to have rejected the Plan.  Holders (if any) of Allowed Class 11 Claims are not entitled to vote to accept or reject the Plan.

### 3.3     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## ARTICLE IV

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### 4.1     General Settlement of Claims

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

### 4.2     Newdex Common Stock

The issuance of Newdex Common Stock, including any options for the purchase thereof and equity awards associated therewith, is authorized without the need for any further corporate action or without any further action by the Debtors or Newdex, as applicable.  The Newdex Charter shall authorize the issuance and distribution on the Effective Date of shares of Newdex Common Stock to the Distribution Agent for the benefit of holders of Allowed Interests in Class 9, subject to the exercise of the Option described in Section 4.16(b).  All of the shares of Newdex Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Newdex shall use its commercially reasonable efforts to obtain approval of the Newdex Common Stock for listing on the New York Stock Exchange or the NASDAQ Stock Market on, or as soon as reasonably practicable after, the Effective Date.

### 4.3     Amended and Restated Credit Documents. On the Effective Date, SuperMedia, as a Reorganized Debtor, shall execute and deliver (1) the Amended and Restated SuperMedia Secured Credit Agreement and (2) all other Amended and Restated SuperMedia Secured Credit Documents.  The Amended and Restated SuperMedia Secured Credit Agreement and all such other Amended and Restated SuperMedia Secured Credit Documents that are contemplated to become effective on the Effective Date shall become so effective in accordance with their terms and the Plan.  On the Effective Date, each holder of a SuperMedia Secured Credit Agreement Claim shall automatically be deemed a party to the Amended and Restated SuperMedia Secured Credit Agreement.

(b)     Holders of SuperMedia Secured Credit Agreement Claims have, pursuant to the SuperMedia Secured Credit Agreement Documents, and shall have valid, binding and enforceable Liens on the collateral specified in the SuperMedia Secured Credit Agreement Documents and the Amended and Restated SuperMedia

Secured Credit Documents.  The guarantees, mortgages, pledges, liens and other security interests previously granted pursuant to the SuperMedia Secured Credit Agreement Documents and, if applicable, granted pursuant to the Amended and Restated SuperMedia Secured Credit Documents have been and are granted in good faith as an inducement to the holders of the SuperMedia Secured Credit Agreement Claims to agree to the treatment contemplated by the Plan and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the SuperMedia Secured Credit Agreement Documents and the Amended and Restated SuperMedia Secured Credit Documents.

**4.4      Offering and Issuance of Newdex Common Stock**

        The offering, issuance, and distribution of any Securities, including the Newdex Common Stock, pursuant to the Plan will be in compliance with the registration requirements of the Securities Act or exempt from the registration requirements of section 5 therein pursuant to section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.  In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued under the Plan will be freely transferable under the Securities Act by the recipients thereof, subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) any other applicable regulatory approval.

**4.5      Subordination**

        The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**4.6      Vesting of Assets in the Reorganized Debtors**

        Except as otherwise provided herein, including in connection with the Merger, or in any agreement, instrument, or other document incorporated in the Plan (including the Amended and Restated SuperMedia Secured Credit Documents), on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**4.7      Cancellation of Notes, Instruments, Certificates, and Other Documents**

        On the Effective Date, except to the extent otherwise provided herein (including as otherwise provided with respect to the Amended and Restated SuperMedia Secured Credit Agreement and any contracts evidencing transactions described in Section 3.2(e)(2)), all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors or Reorganized Debtors and the non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; provided, however, that notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions under the Plan and (b) allowing and preserving the rights of the SuperMedia Administrative Agent and any Servicer, as applicable, to make distributions on account of Claims and Interests as provided in ARTICLE VI.

**4.8**    **Issuance of New Securities; Execution of Plan Documents**

Except as otherwise provided herein, on the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall issue all Securities, notes, instruments, Certificates, and other documents required to be issued under the Plan.

**4.9**    **Corporate Action**

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, including the Merger, shall be authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable. Such actions may include: (a) the adoption and filing of the Newdex Charter and Newdex Bylaws; (b) the appointment of the Newdex Board; and (c) the authorization, issuance, and distribution of Newdex Common Stock and other Securities to be authorized, issued, and distributed pursuant to the Plan.

**4.10**    **Charter and Bylaws**

The Debtors' respective certificates of incorporation and bylaws (and other formation documents relating to limited liability companies) shall be amended as may be required to be consistent with the provisions of the Plan, the Amended and Restated SuperMedia Secured Credit Documents and the Bankruptcy Code. Newdex's certificate of incorporation shall be amended to, among other things: (a) authorize the issuance of the shares of Newdex Common Stock and (b) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other constituent documents as permitted by the laws of its respective jurisdiction of formation and its respective charter and bylaws.

**4.11**    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Merger, the Amended and Restated SuperMedia Secured Credit Documents and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**4.12**    **Section 1146(a) Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**4.13**    **Directors and Officers**

On the Effective Date, the Newdex Board will comprise 10 members including: (a) five current Dex One non-employee directors designated by Dex One, including Alan F. Schultz as Chairman of the Newdex Board; (b) four current SuperMedia non-employee directors designated by SuperMedia; and (c) Peter McDonald, the current Chief Executive Officer and President of SuperMedia, as President and Chief Executive Officer of Newdex. Also on the Effective Date, the existing officers and directors of the Debtors, shall serve in their current capacities in the Reorganized Debtors. From and after the Effective Date, each director or officer of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other constituent documents, and

applicable state corporation law.  Additionally, in accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the Newdex Board and any Person proposed to serve as an officer of Newdex shall have been disclosed at or before the Confirmation Hearing.

## 4.14    Incentive Plans and Employee and Retiree Benefits

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order, the Reorganized Debtors shall:  (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

## 4.15    Preservation of Rights of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## 4.16    Restructuring Transactions

### (a)        The Restructuring Transactions

On the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may take such actions, in their sole discretion, including as set forth below, as are necessary or appropriate to effect the Merger in accordance with the terms of the Merger Agreement and the Plan.  Such actions shall include:

(1)      the entry into, delivery of and effectiveness of the Amended and Restated SuperMedia Secured Credit Agreement and the other Amended and Restated SuperMedia Secured Credit Documents contemplated to be effective or delivered on the Effective Date;

(2)      immediately thereafter, Dex One merging with and into Newdex, with Newdex surviving the merger;

(3)      immediately thereafter, Spruce Acquisition Sub, Inc. merging with and into SuperMedia, with SuperMedia surviving the merger as a wholly owned subsidiary of Newdex; and

(4)      immediately thereafter, only if the Option set forth in Section 4.16(b) is exercised, the distribution of stock in accordance with Section 4.16(b).

**(b)**      **Option to Distribute Newdex Common Stock**

Notwithstanding anything to the contrary in the Merger Agreement or this Plan, the Dex One Debtors, with the consent of the Debtors, shall have the option on the Effective Date to issue and distribute Newdex Common Stock to the Distribution Agent for the benefit of the Designated Employee Benefit Plans in an amount necessary to give rise to an ownership change as defined in 26 U.S.C. § 382(g) (but in no event to exceed 10.0 % of the Newdex Common Stock issued on the Effective Date) (the "Option").

**(c)**      **Additional Restructuring Transactions and Actions**

Without limiting the foregoing, on the Effective Date, the Debtors or the Reorganized Debtors may enter into the following transactions and take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein. The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors or the Reorganized Debtors, as applicable, to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Amended and Restated SuperMedia Secured Credit Documents; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Amended and Restated SuperMedia Secured Credit Documents and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state law; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1**      **Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless any such Executory Contract or Unexpired Lease: (a) is listed on the Rejection Schedule; (b) has been previously assumed or rejected by the Debtors by Final Order or has been assumed or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; or (c) is the subject of a motion to assume or reject pending as of the

Effective Date.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates or to Dex One and its subsidiaries.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

Except as otherwise provided herein or agreed to by the Debtors with the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**5.2**    **Cure of Defaults and Objections to Cure and Assumption**

The Debtors or Reorganized Debtors, as applicable, shall pay Cures on the Effective Date or as soon as practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors must be filed with the Claims and Solicitation Agent on or before 30 days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is a dispute regarding Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

**5.3**     <u>Pre-existing Payment and Other Obligations</u>

        Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide: (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

**5.4**     <u>Rejection Damages Claims and Objections to Rejections</u>

        Pursuant to section 502(g) of the Bankruptcy Code, counterparties to Executory Contracts or Unexpired Leases that are rejected shall have the right to assert Claims, if any, on account of the rejection of such contracts and leases. Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of Executory Contracts and Unexpired Leases pursuant to the Plan must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Confirmation Date or the effective date of rejection. Any such Proofs of Claim that are not timely filed shall be disallowed without the need for any further notice to or action, order, or approval of the Bankruptcy Court. Such Proofs of Claim shall be forever barred, estopped, and enjoined from assertion. Moreover, such Proofs of Claim shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged notwithstanding anything in a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as Class 8 - General Unsecured Claims against the applicable Debtor counterparty thereto.

**5.5**     <u>Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date</u>

        Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**5.6**     <u>Reservation of Rights</u>

        Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE VI**

**PROVISIONS GOVERNING DISTRIBUTIONS**

**6.1**     <u>Distributions on Account of Claims and Interests Allowed as of the Effective Date</u>

        **(a)**     **Delivery of Distributions in General**

        Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors (as the case may be) and the holder of the applicable Claim or Interest, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims and Interests; <u>provided</u>, <u>however</u>, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the

ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (2) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in accordance with Sections 2.3 and 3.2(a)(2), respectively. To the extent any Allowed Priority Tax Claim or Allowed Secured Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  Distribution Dates shall occur no less frequently than every 30 days, as necessary in the Reorganized Debtors' sole discretion, after the Effective Date.

**6.2**     **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order and (2) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to holders of Allowed Claims or Interests, as applicable, in a Class and paid to such holders under the Plan shall be paid also, in the applicable amounts, to any holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims or Interests in such Class.

**6.3**     **Delivery of Distributions**

    **(a)**     **Record Date for Distributions**

On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders, if any, listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate, is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    **(b)**     **Distribution Process**

The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims or Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims and Interests, including Claims and Interests that become Allowed after the Distribution Record Date, shall be made to holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate:  (1) to the address of such holder as set forth in the books and records of the applicable Debtor (or if the Debtors have been notified in writing, on or before the date that is 14 days before the Effective Date, of a change of address, to the changed address); (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtors books and records, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is 14 days before the Effective Date; or (3) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  Notwithstanding anything to the contrary in the Plan, including this Section 6.3(b), distributions under the Plan to holders of the SuperMedia Secured Credit Agreement Claims shall be made to, or to Entities at the direction of the SuperMedia Administrative Agent in accordance with the terms of the Plan and the SuperMedia Secured Credit Agreement.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

(c)        **Accrual of Dividends and Other Rights**

For purposes of determining the accrual of dividends or other rights after the Effective Date, Newdex Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; provided, however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of Newdex Common Stock actually take place.

(d)        **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

(e)        **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

(f)        **Fractional, Undeliverable, and Unclaimed Distributions**

(1)        *Fractional Distributions*. The Distribution Agent shall make distributions of fractions of shares of Newdex Common Stock, as applicable. The Distribution Agent shall not make distributions or payments of fractions of dollars. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(2)        *Undeliverable Distributions*. If any distribution to a holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Section 6.3(f)(3), and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(3)        *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is Newdex Common Stock, shall be deemed cancelled. Upon such revesting, the Claim or Interest of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or

unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

**(g)      Surrender of Cancelled Instruments or Securities**

On the Effective Date or as soon as practicable thereafter, each holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer).  Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.  No distribution of property pursuant to the Plan shall be made to or on behalf of any such holder unless and until such Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer pursuant to the provisions of Section 6.3(h).  Any holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date shall have its Claim or Interest discharged with no further action, be forever barred from asserting any such Claim or Interest against the relevant Reorganized Debtor or its property, be deemed to have forfeited all rights, and Claims and Interests with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary.  Notwithstanding the foregoing paragraph, this Section 6.3(g) shall not apply to any Claims and Interests reinstated pursuant to the terms of the Plan.

**(h)      Lost, Stolen, Mutilated, or Destroyed Securities**

Any holder of Allowed Claims or Interests evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such holder as a holder of an Allowed Claim or Interest.  Upon compliance with this procedure by a holder of an Allowed Claim or Interest evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

**6.4      Claims Paid or Payable by Third Parties**

**(a)      Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

**(b)      Claims Payable by Insurance Carriers**

Other than with respect to the SuperMedia Secured Credit Facility Claims, no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  Other than with respect to the SuperMedia Secured Credit Facility Claims, to the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon

satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

       **(c)**       **Applicability of Insurance Policies**

Except as otherwise provided herein, distributions to holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**6.5**      **Setoffs**

Except as otherwise expressly provided for herein (including with respect to any SuperMedia Secured Credit Agreement Claims or Claims with respect to letters of credit as provided in the definition of Other Secured Claims), each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder. In no event shall any holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**6.6**      **Allocation Between Principal and Accrued Interest**

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

## ARTICLE VII

### PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**7.1**      **Disputed Claims Process**

Except as otherwise provided herein, if a party files a proof of claim and the Debtors or Reorganized Debtors, as applicable, do not determine in their sole discretion, and without the need for notice to or action, order or approval of the Bankruptcy Court, that the Claim subject to such proof of claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this ARTICLE VII. Except as otherwise provided herein, all proofs of claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

**7.2**     **Prosecution of Objections to Claims and Interests**

Except insofar as a Claim or Interest is Allowed under the Plan, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to the Claim or Interest. Any objections to Claims and Interests shall be served and filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to <u>Section 4.15</u>.

**7.3**     **No Interest**

Unless otherwise specifically provided for in the Plan or by order of the Bankruptcy Court (including pursuant to the SuperMedia Cash Collateral Order), postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**7.4**     **Disallowance of Claims and Interests**

All Claims and Interests of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.


**ARTICLE VIII**

**EFFECT OF CONFIRMATION OF THE PLAN**

**8.1**     **Discharge of Claims and Termination of Interests**

**Except as otherwise provided for herein and effective as of the Effective Date:  (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.**

**8.2**     **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided for herein, for good and valuable consideration, on and after the Effective Date, the Released Parties are**

deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, and liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative Claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, the Estates, or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Affiliates, the Chapter 11 Cases, the Transaction, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, prepetition contracts and agreements with one or more Debtors (including the SuperMedia Secured Credit Agreement and other agreements reflecting long-term indebtedness), the SuperMedia Support Agreement, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, solicitation or preparation of the Plan and Disclosure Statement or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date, other than Claims or liabilities arising out of or related to any contractual or fixed monetary obligation owed to the Debtors or the Reorganized Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this <u>Section 8.2</u>, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by this <u>Section 8.2</u>; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any Claim or Cause of Action released by this <u>Section 8.2</u>.

8.3    <u>Releases by Holders of Claims and Interests</u>

As of the Effective Date, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the Transaction, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, prepetition contracts and agreements with one or more Debtors (including the SuperMedia Secured Credit Agreement and other agreements reflecting long-term indebtedness), the SuperMedia Support Agreement, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, solicitation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date of the Plan.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this <u>Section 8.3</u>, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is:  (a) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates, and the Released Parties; b) a good faith settlement and compromise of the Claims released by this <u>Section 8.3</u>; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under this <u>Section 8.3</u> from asserting any Claim or Cause of Action released by this <u>Section 8.3</u>.

## 8.4    <u>Exculpation</u>

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; <u>provided</u>, <u>however</u>, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; <u>provided</u>, <u>further</u>, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan.  The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## 8.5    <u>Injunction</u>

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Section 8.2</u> or <u>Section 8.3</u>, discharged pursuant to <u>Section 8.1</u>, or are subject to exculpation pursuant to <u>Section 8.4</u> are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.

## 8.6    <u>Protection Against Discriminatory Treatment</u>

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**8.7**    **Indemnification**

On and from the Effective Date, and except as prohibited by applicable law, the Reorganized Debtors shall assume or reinstate, as applicable, all indemnification obligations in place as of the Effective Date (whether in by-laws, certificates of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates.

**8.8**    **Recoupment**

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**8.9**    **Release of Liens**

Except (a) with respect to the Liens securing the SuperMedia Secured Credit Agreement Claims, (b) with respect to the Liens securing the Secured Tax Claims or Other Secured Claims (depending on the treatment of such Claims), or (c) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**8.10**    **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**ARTICLE IX**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**9.1**    **Conditions Precedent to the Effective Date.**  It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2:

**(a)**    the Confirmation Order shall have been entered, and such order shall not have been stayed, modified, or vacated on appeal;

**(b)**    if the Dex One Chapter 11 Cases have been filed, the Dex One Confirmation Order shall have been entered by the Bankruptcy Court and such order shall not have been stayed, modified, or vacated on appeal;

**(c)**    the Merger shall have been consummated, and all conditions set forth in Article VII of the Merger Agreement shall have been satisfied (and not waived);

**(d)**    all respective conditions precedent to the consummation of the Amended and Restated SuperMedia Secured Credit Agreement shall have been waived or satisfied in accordance with the terms thereof;

**(e)**        if the Dex One Chapter 11 Cases have been filed, the effective date of the Dex One Plan shall have occurred in accordance with the terms thereof concurrently with the occurrence of the Effective Date;

**(f)**        all fees and expenses of the SuperMedia Administrative Agent, including the fees and expenses of counsel and the financial advisors to the SuperMedia Administrative Agent, shall have been paid in full in cash; and

**(g)**        all documents and agreements necessary to implement the Plan shall have:  (1) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (2) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (3) been effected or executed.

**9.2        Waiver of Conditions Precedent**

The Debtors, with the prior written consent of the SuperMedia Administrative Agent, which may not be unreasonably withheld, may waive any of the conditions to the Effective Date set forth in Section 9.1 at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

**9.3        Effect of Non-Occurrence of Conditions to Consummation**

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**10.1        Modification of Plan**

Effective as of the date hereof:  (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order, subject to the limitations set forth herein and, if effective, the SuperMedia Support Agreement; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject to the limitations set forth herein and, if effective, the SuperMedia Support Agreement.

**10.2        Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**10.3**     <u>Confirmation of the Plan</u>

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**ARTICLE XI**

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amendment, modification, or supplement, after the Effective Date, pursuant to <u>ARTICLE V</u>, of the list of Executory Contracts and Unexpired Leases to be rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan or the Confirmation Order, including contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.     enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

29

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Section 6.4(a); (b) with respect to the releases, injunctions, and other provisions contained in ARTICLE VIII, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any Entity's obligations incurred in connection with the Plan or the Confirmation Order, including those arising under agreements, documents, or instruments executed in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

13.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

15.     enforce all orders previously entered by the Bankruptcy Court; and

16.     hear any other matter not inconsistent with the Bankruptcy Code.

After the Effective Date, notwithstanding anything in this ARTICLE XI to the contrary, disputes arising under the Amended and Restated Credit Documents will be governed by the jurisdictional provisions therein.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### 12.1     Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 12.2     Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### 12.3     Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**12.4**    <u>Successors and Assigns</u>

      The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**12.5**    <u>Service of Documents</u>

      After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| | |
|---|---|
| **Reorganized Debtors** | **SuperMedia Inc.**<br>2200 West Airfield Driver<br>P.O. Box 619810<br>D/FW Airport<br>Texas, 75261<br>Attn: Chief Executive Officer<br>With a copy to: General Counsel |
| **Counsel to Debtors** | **Young Conaway Stargatt &<br>Taylor, LLP**<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Attn:  Pauline K. Morgan |
| | **Cleary Gottlieb Steen &<br>Hamilton LLP**<br>One Liberty Plaza<br>New York, New York 10006<br>Attn:  Sean A. O'Neal |
| **Counsel to the SuperMedia<br>Administrative Agent** | **Richards, Layton & Finger, P.A.**<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Attn:  Mark Collins, Esq. |
| | **Simpson Thacher & Bartlett LLP**<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn:  Steve Fuhrman, Esq.<br>     Sandy Qusba, Esq. |
| **Counsel to Dex One** | **Pachulski Stang Ziehl & Jones LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705<br>(Courier 19801)<br>Attn:  Laura Davis Jones<br>     Peter J. Keane |
| | **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022-4611<br>Attn:  Marc Kieselstein, P.C.<br>     Christopher J. Marcus |

**United States Trustee**                        **Office of the United States Trustee**
                                                       **for the District of Delaware**
                                                       844 King Street, Suite 2207
                                                     Wilmington, Delaware 19801
                                                     Attn:     [____]

## 12.6    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 12.7    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## 12.8    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from www.epiq11.com/SuperMedia or the Bankruptcy Court's website at www.deb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## 12.9    Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

*[The remainder of this page is intentionally left blank.]*

Dated:  [_____], 2013                              SUPERMEDIA INC.

_____

Name:  Samuel D. Jones
Title:    Executive Vice President, Chief Financial
             Officer and Treasurer




SUPERMEDIA LLC

_____

Name:  Samuel D. Jones
Title:    Executive Vice President, Chief Financial
             Officer and Treasurer




SUPERMEDIA SERVICES INC.

_____

Name:  Samuel D. Jones
Title:    Executive Vice President, Chief Financial
             Officer and Treasurer




SUPERMEDIA SALES INC.

_____

Name:  Samuel D. Jones
Title:    Executive Vice President, Chief Financial
             Officer and Treasurer

[THIS PAGE INTENTIONALLY LEFT BLANK]

**<u>EXHIBIT A TO THE SUPERMEDIA PLAN</u>**

<u>MERGER AGREEMENT</u>

See Exhibit E to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT B TO THE SUPERMEDIA PLAN**

AMENDED AND RESTATED SUPERMEDIA SECURED CREDIT AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

LOAN AGREEMENT


Dated as of December 31, 2009,
as amended and restated as of [      ], 2013

among


SUPERMEDIA INC.
(formerly known as IDEARC INC.),
as Borrower,

DEX ONE CORPORATION,

The Lenders from Time to Time Parties Hereto


and


JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and Collateral Agent

## Table of Contents

**Page**

ARTICLE I Definitions ............................................................................................2

    SECTION 1.01 Defined Terms............................................................................2

    SECTION 1.02 Type of Loans and Borrowings...............................................38

    SECTION 1.03 Terms Generally.......................................................................38

    SECTION 1.04 Accounting Terms; GAAP .....................................................38

    SECTION 1.05 Certain Terms ...........................................................................39

ARTICLE II The Credits .......................................................................................39

    SECTION 2.01 Loans Deemed Made on the Closing Date............................39

    SECTION 2.02 Loans and Borrowings ............................................................39

    SECTION 2.03 Conversion and Continuation Options ...................................39

    SECTION 2.04 Evidence of Debt......................................................................40

    SECTION 2.05 Repayment of Loans ...............................................................41

    SECTION 2.06 Prepayment of Loans...............................................................41

    SECTION 2.07 Fees ...........................................................................................43

    SECTION 2.08 Interest.......................................................................................43

    SECTION 2.09 Alternate Rate of Interest ........................................................44

    SECTION 2.10 Increased Costs ........................................................................44

    SECTION 2.11 Break Funding Payments ........................................................45

    SECTION 2.12 Taxes.........................................................................................46

    SECTION 2.13 Payments Generally; Pro Rata Treatment; Sharing of Setoffs...............48

    SECTION 2.14 Mitigation Obligations; Replacement of Lenders ..................50

    SECTION 2.15 Voluntary Prepayments ...........................................................50

ARTICLE III Representations and Warranties......................................................52

    SECTION 3.01 Organization; Powers..............................................................52

    SECTION 3.02 Authorization; Enforceability.................................................52

    SECTION 3.03 Governmental Approvals; No Conflicts.................................52

    SECTION 3.04 Financial Condition; No Material Adverse Change ...............53

    SECTION 3.05 Properties ..................................................................................53

    SECTION 3.06 Litigation and Environmental Matters ...................................53

    SECTION 3.07 Compliance with Laws and Agreements; Absence of Default...............54

    SECTION 3.08 Investment Company Status....................................................54

    SECTION 3.09 Taxes.........................................................................................54

SECTION 3.10 Employee Benefit Plans ........................................................................54

SECTION 3.11 Disclosure.............................................................................................55

SECTION 3.12 Subsidiaries ..........................................................................................55

SECTION 3.13 Insurance ...............................................................................................55

SECTION 3.14 Labor Matters........................................................................................55

SECTION 3.15 Margin Regulations ..............................................................................56

SECTION 3.16 Certain Agreements...............................................................................56

SECTION 3.17 Security Documents ..............................................................................56

SECTION 3.18 [Bankruptcy Court Orders ....................................................................57

ARTICLE IV Conditions ..................................................................................................57

SECTION 4.01 Effectiveness of Agreement .................................................................57

ARTICLE V Affirmative Covenants ................................................................................61

SECTION 5.01 Financial Statements and Other Information ........................................61

SECTION 5.02 Notices of Material Events....................................................................65

SECTION 5.03 Information Regarding Collateral .........................................................65

SECTION 5.04 Existence; Conduct of Business ...........................................................65

SECTION 5.05 Payment of Obligations........................................................................66

SECTION 5.06 Maintenance of Properties....................................................................66

SECTION 5.07 Insurance ...............................................................................................66

SECTION 5.08 Casualty and Condemnation ................................................................66

SECTION 5.09 Books and Records; Inspection and Audit Rights.................................66

SECTION 5.10 Compliance with Laws.........................................................................66

SECTION 5.11 Additional Subsidiaries ........................................................................67

SECTION 5.12 Further Assurances ...............................................................................67

SECTION 5.13 Account Control Agreements................................................................67

SECTION 5.14 Credit Ratings .......................................................................................68

SECTION 5.15 Intellectual Property .............................................................................68

SECTION 5.16 Independent Director.............................................................................68

ARTICLE VI Negative Covenants ...................................................................................68

SECTION 6.01 Indebtedness; Certain Equity Securities..............................................68

SECTION 6.02 Liens.....................................................................................................71

SECTION 6.03 Fundamental Changes ..........................................................................73

SECTION 6.04 Investments, Loans, Advances, Guarantees and Acquisitions ..............73

SECTION 6.05 Asset Sales ...........................................................................................76

SECTION 6.06 Sale and Leaseback Transactions.........................................................77

SECTION 6.07 Swap Agreements ................................................................................77

SECTION 6.08 Restricted Payments; Certain Payments of Indebtedness......................77

SECTION 6.09 Transactions with Affiliates .................................................................79

SECTION 6.10 Restrictive Agreements .......................................................................80

SECTION 6.11 Fiscal Year ..........................................................................................81

SECTION 6.12 Amendment of Material Documents ....................................................81

SECTION 6.13 Financial Covenants ...........................................................................81

SECTION 6.14 Capital Expenditures ..........................................................................82

SECTION 6.15 Ultimate Parent Covenants..................................................................82

SECTION 6.16 Service Company Covenants. ..............................................................84

SECTION 6.17 Limitation on Activities of the License Subsidiaries ...........................85

ARTICLE VII Events of Default..................................................................................86

ARTICLE VIII The Agent ...........................................................................................90

ARTICLE IX Miscellaneous .......................................................................................92

SECTION 9.01 Notices ...............................................................................................92

SECTION 9.02 Waivers; Amendments........................................................................92

SECTION 9.03 Expenses; Indemnity; Damage Waiver...............................................94

SECTION 9.04 Successors and Assigns.......................................................................95

SECTION 9.05 Survival ..............................................................................................98

SECTION 9.06 Counterparts; Integration; Effectiveness.............................................98

SECTION 9.07 Severability .........................................................................................98

SECTION 9.08 Right of Setoff.....................................................................................98

SECTION 9.09 Governing Law; Jurisdiction; Consent to Service of Process ...............98

SECTION 9.10 WAIVER OF JURY TRIAL ................................................................99

SECTION 9.11 Headings.............................................................................................99

SECTION 9.12 Confidentiality .................................................................................100

SECTION 9.13 U.S.A. PATRIOT Act .......................................................................100

SECTION 9.14 Termination or Release .....................................................................100

SECTION 9.15 No Fiduciary Relationship ................................................................101

SECTION 9.16 Intercreditor Agreement ...................................................................102

SECTION 9.17 Amendment and Restatement ...........................................................102

SECTION 9.18 [No Requirement of Lender Signatures .............................................102

Schedule 1.01A  --    Directory Consolidation Project
Schedule 1.01B  --    Post-Closing Items

Schedule 2.01      --      Loans Deemed Made on the Closing Date
Schedule 3.05      --      Properties
Schedule 3.06      --      Disclosed Matters
Schedule 3.12      --      Subsidiaries
Schedule 3.13      --      Insurance
Schedule 6.01      --      Existing Indebtedness
Schedule 6.02      --      Existing Liens
Schedule 6.02(u) --      Directory Consolidation Liens
Schedule 6.04      --      Existing Investments
Schedule 6.05(j)  --      Asset Sales
Schedule 6.05(m)--      Directory Consolidation Sales, Transfers and Other Dispositions
Schedule 6.09      --      Affiliate Transactions
Schedule 6.09(o) --      Directory Consolidation Transactions with Affiliates
Schedule 6.10      --      Existing Restrictions

EXHIBITS:

Exhibit A     --    Form of Assignment and Assumption
Exhibit B     --    Form of Perfection Certificate
Exhibit C     --    Form of U.S. Tax Compliance Certificates
Exhibit D     --    Form of Amended and Restated Intercreditor and Collateral Agency Agreement
Exhibit E     --    Form of Amended and Restated Shared Services Agreement
Exhibit F     --    Form of Subordinated Guarantee Agreement
Exhibit G     --    Form of Acknowledgment and Confirmation
Exhibit H     --    Form of Amended and Restated Shared Guarantee and Collateral Agreement
Exhibit I      --    Form of License Agreement
Exhibit J      --    Form of Master IP License Agreement
Exhibit K     --    Form of Election Notice
Exhibit L     --    Form of Tax Sharing Agreement
Exhibit M     --    Form of Newco Subordinated Guarantee

LOAN AGREEMENT dated as of December 31, 2009 (this "Agreement"), as amended and restated as of [      ], 2013, among SUPERMEDIA INC. (formerly known as Idearc Inc.), a Delaware corporation (the "Borrower"), which is a reorganized company pursuant to Reorganization Plan referred to below, DEX ONE CORPORATION, the several banks and other financial institutions or entities from time to time parties hereto (the "Lenders") and JPMORGAN CHASE BANK, N.A., as administrative agent and collateral agent for such Lenders.  Capitalized terms used but not defined in the succeeding recitals have the meanings set forth in Section 1.01 below.

[WHEREAS, on [_____, 2013] (the "Petition Date"), the Ultimate Parent and its Subsidiaries each commenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of the Bankruptcy Code  in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on the Petition Date, the Ultimate Parent and its Subsidiaries filed with the Bankruptcy Court the Reorganization Plan and the Disclosure Statement;

WHEREAS, on [_____, 2013], the Bankruptcy Court entered the Confirmation Order confirming the Reorganization Plan; and

WHEREAS, pursuant to the Reorganization Plan, the Ultimate Parent and its Subsidiaries will implement the Amendments on the Closing Date;][1]

WHEREAS, the Ultimate Parent and the Borrower have entered into a Merger Agreement, dated as of August 20, 2012, as amended and restated as of December 5, 2012 (the "Merger Agreement"), by and among Dex One Corporation, a Delaware  corporation ("Dex One"), NewDex, Inc., a Delaware corporation ("Newdex"), Spruce Acquisition Sub, Inc., a Delaware corporation ("Merger Sub") and the Borrower, pursuant to which Dex One will be merged with Newdex, with Newdex as the surviving corporation (the "Dex Merger"), and the Borrower will be merged with Merger Sub, with the Borrower as the surviving corporation (the "SuperMedia Merger" and together with the Dex Merger, the "Mergers");

WHEREAS, after giving effect to the Mergers, the Borrower will become a direct wholly owned subsidiary of Newdex and Newdex will become the Ultimate Parent;

WHEREAS, the Borrower has requested that the Lenders amend and restate the Existing Credit Agreement as provided in this Agreement; and

WHEREAS, the Lenders are willing to so amend and restate the Existing Credit Agreement on the terms and conditions set forth herein.

NOW, THEREFORE, the parties hereto agree that the Existing Credit Agreement shall be amended and restated in its entirety as of the Closing Date to read as follows:

---

[1] To be included if applicable.

## ARTICLE I

Definitions

SECTION 1.01  Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"Acknowledgment and Confirmation" means an Acknowledgment and Confirmation, substantially in the form of Exhibit G hereto, dated the date hereof, executed by each SuperMedia Loan Party.

"Additional Notes" means notes issued by the Ultimate Parent after the Closing Date (a) that are not secured by any assets of the Ultimate Parent or any of its Subsidiaries, (b) that bear interest at a prevailing market rate at the time of the issuance thereof, (c) the proceeds of which are used to refinance the Restructuring Notes or any Additional Notes, (d) that do not mature, and are not mandatorily redeemable, in whole or in part, or required to be repurchased or reacquired, in whole or in part, prior to the date that is six months after the Maturity Date (other than pursuant to asset sale or change in control provisions customary in offerings of similar notes), (e) that have no financial maintenance covenants and no restrictive covenants that apply to any Subsidiary of the Ultimate Parent or that impose limitations on the Ultimate Parent's ability to guarantee or pledge assets to secure the Obligations and otherwise have covenants, representations and warranties and events of default that are no more restrictive than those existing in the prevailing market at the time of issuance for companies with the same or similar credit ratings of the Ultimate Parent at such time issuing similar securities, (f) are not guaranteed by any Subsidiary of the Ultimate Parent and are subordinated to the Obligations on terms that are no less favorable to the Lenders than the subordination terms set forth in the Restructuring Notes Indenture and that are otherwise reasonably satisfactory to the Administrative Agent and (g) are not convertible or exchangeable except into (i) other Indebtedness of the Ultimate Parent meeting the qualifications set forth in this definition or (ii) common equity of the Ultimate Parent, provided that any such exchange or conversion, if effected, would not result in a Change in Control or a Default.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Lenders hereunder and its Affiliates and permitted successors acting in such capacity.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Advance Prepayment Certificate" means a certificate of a Responsible Officer furnished to the Administrative Agent with respect to a fiscal quarter certifying in reasonable detail the expected increase in Available Cash during such fiscal quarter.

"Advance Prepayments" has the meaning set forth in Section 2.06(c).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  Notwithstanding anything to the contrary in this definition, none of Verizon and its Affiliates will be deemed to be an Affiliate of the Borrower or any Subsidiary unless (x) any of such Persons is the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of shares representing 10% or more of the total voting power of the Equity Interests of the Borrower and (y) the first such Person would otherwise be such an Affiliate within the meaning of this definition.

"Agents" means the collective reference to the Administrative Agent and the Collateral Agent.

"Agreement" has the meaning set forth in the preamble hereto.

"Allocable Net Proceeds" means, with respect to any Ultimate Parent Equity Issuance, 53% of the Net Proceeds of such Ultimate Parent Equity Issuance; provided, that to the extent the Indebtedness outstanding under (a) the RHDI Credit Agreement has been repaid in full, Allocable Net Proceeds shall mean 65% of the Net Proceeds of such Ultimate Parent Equity Issuance, (b) the Dex East Credit Agreement has been repaid in full, Allocable Net Proceeds shall mean 61% of the Net Proceeds of such Ultimate Parent Equity Issuance, (c) the Dex West Credit Agreement has been repaid in full, the Allocable Net Proceeds shall mean 62% of  the Net Proceeds of such Ultimate Parent Equity Issuance, (d) the RHDI Credit Agreement and the Dex West Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 80% of the Net Proceeds of such Ultimate Parent Equity Issuance, (e) the RHDI Credit Agreement and the Dex East Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 78% of the Net Proceeds of such Ultimate Parent Equity Issuance, (f) the Dex West Credit Agreement and the Dex East Credit Agreement have been repaid in full, Allocable Net Proceeds shall mean 74% of the Net Proceeds of such Ultimate Parent Equity Issuance and (g) if the Dex Credit Agreements have been repaid in full, Allocable Net Proceeds shall mean 100% of the Net Proceeds of such Ultimate Parent Equity Issuance.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the LIBO Rate that would be calculated as of such day (or, if such day is not a Business Day, as of the next preceding Business Day) in respect of a proposed Eurodollar Loan with a one-month Interest Period plus 1%.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or such LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or such LIBO Rate, as the case may be.

"Amendments" means, collectively, the amendment and restatement of the RHDI Existing Credit Agreement, the Dex East Existing Credit Agreement and the Dex West Existing Credit Agreement, pursuant to the RHDI Credit Agreement, the Dex East Credit Agreement and the Dex West Credit Agreement, respectively (in each case referred to in clause (a) in the definition thereof)[, which amendments were consummated pursuant to the Reorganization Plan].[2]

---

[2] To be included if applicable.

"Applicable Margin" means (a) with respect to any ABR Loan, 7.60%, and (b) with respect to any Eurodollar Loan, 8.60%.

"Applicable Payment Percentage" has the meaning assigned to such term in Section 2.15(c).

"Approved Fund" has the meaning assigned to such term in Section 9.04(b).

"Asset Disposition" means (a) any sale, transfer or other disposition (including pursuant to a Sale and Leaseback Transaction) of any property or asset of the Borrower or any Subsidiary other than sales, transfers or other dispositions permitted under Section 6.05 (other than clauses (g), (i), (j) and (k)) and (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary, but, in the case of this clause (b), only to the extent that the Net Proceeds therefrom have not been applied to repair, restore or replace such property or asset within 180 days after such event.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, substantially in the form of Exhibit A or any other form approved by the Administrative Agent.

"Attributable Debt" means, on any date, in respect of any lease of the Borrower or any Subsidiary entered into as part of a Sale and Leaseback Transaction subject to Section 6.06 (a) if such lease is a Capital Lease Obligation, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP and (b) if such lease is not a Capital Lease Obligation, the capitalized amount of the remaining lease payments under such lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease Obligation.

"Available Cash" means, on any Determination Date, an amount (which may be a negative amount) calculated in accordance with Section 1.05 and equal to the sum (without duplication) of the following in respect of the Borrower and its Wholly Owned Subsidiaries on a consolidated basis for the period commencing on January 1, 2013 and ending on the last day of the most recent fiscal quarter for which a certificate shall have been delivered to the Administrative Agent pursuant to Section 5.01(d):

(a)  Consolidated Adjusted EBITDA for such period; plus

(b)  to the extent not included in calculating such Consolidated Adjusted EBITDA, any extraordinary or non-recurring cash gain during such period, other than any such gain resulting from any sale, transfer or other disposition of assets; plus

(c)  without duplication, decreases in Consolidated Working Capital for such period; minus

(d)  without duplication, increases in Consolidated Working Capital for such period; minus

(e)  without duplication and to the extent included in determining such Consolidated Adjusted EBITDA, the sum of (i) Consolidated Interest Expense for such period, (ii) all taxes of the Borrower and the Subsidiaries paid in cash during such period (other than Incremental COD Tax Payments), (iii) any extraordinary or nonrecurring loss, expense or charge paid in cash during

such period (other than Specified Charges) and (iv) the aggregate amount of Capital Expenditures made during such period, other than Capital Expenditures financed with (1) Net Proceeds from an Asset Disposition not otherwise required to be applied to prepay Loans pursuant to Section 2.06(b) or (2) the proceeds of Indebtedness permitted by Section 6.01 (other than proceeds of Indebtedness incurred in reliance on Section 6.01(a)(iii)); provided that amounts shall be included in this clause (e) for any period only to the extent not duplicative of any cost or expense which was (x) included in determining Consolidated Net Income for such period and (y) not added back to Consolidated Net Income in determining Consolidated Adjusted EBITDA for such period.

["Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time, and any successor statute.][3]

["Bankruptcy Court" has the meaning assigned to such term in the recitals to this Agreement.][4]

"Billing Services Agreement" means the Billing Services Agreement dated as of November 17, 2006, between Idearc Media LLC (formerly known as Idearc Media Corp.) and Verizon Services Corp.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preamble hereto.

"Borrower's Discounted Prepayment Portion of Available Cash" means an amount determined for each fiscal quarter of the Borrower, commencing with the fiscal quarter ending March 31, 2013, equal to the amount of any increase in Available Cash during such fiscal quarter multiplied by 12.5%.

"Borrower's Discretionary Portion of Available Cash" means (i) an amount determined for each fiscal quarter of the Borrower, commencing with the fiscal quarter ending March 31, 2013, equal to the amount of any increase in Available Cash during such fiscal quarter multiplied by 20% plus (ii) Existing Available Cash.

"Borrower's Portion of Available Cash" means, collectively, the Borrower's Discounted Prepayment Portion of Available Cash and the Borrower's Discretionary Portion of Available Cash.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Branding Agreement" means the Branding Agreement dated as of November 17, 2006, between Idearc Media LLC (formerly known as Idearc Media Corp.) and Verizon.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that,

---

[3] To be included if applicable.

[4] To be included if applicable.

when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditures" means, for any period, without duplication, (i) the additions to property, plant and equipment and other capital expenditures of the Borrower and its consolidated Subsidiaries for such period, determined in accordance with GAAP and (ii) the portion of the additions to property, plant and equipment and other capital expenditures of the Service Company for such period allocated to, and funded by, the Borrower and its consolidated Subsidiaries pursuant to the Shared Services Agreement.

"Capital Lease Obligations" of any Person means, without duplication, (i) the obligations of such Person to pay rent or other amounts under any Capitalized Lease, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP and (ii) in the case of the Borrower and its Subsidiaries, the portion of the obligations of the Service Company described in the foregoing clause (i) allocated to, and funded by, the Borrower and its Subsidiaries pursuant to the Shared Services Agreement.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

["Cash Collateral Order" means the Final Order Under 11 U.S.C. §§ 105, 361, 362, 363, 552 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to the Prepetition Secured Parties, entered by the Bankruptcy Court on [_____], 2013.][5]

"Cash Consideration" means the consideration received by the Borrower or any Subsidiary for any Asset Disposition that is in the form of cash, Permitted Investments or a combination of the foregoing. For purposes of this provision, each of the following will be deemed to be cash:

(a)    any liabilities (as shown on the Borrower's most recent consolidated balance sheet) of the Borrower or any Subsidiary that are assumed by the transferee of any such assets or Equity Interests pursuant to a written assignment and assumption agreement that releases the Borrower or applicable Subsidiary from further liability therefor; and

(b)    any securities, notes or other obligations received by the Borrower or any Subsidiary from such transferee that are converted by the Borrower or any Subsidiary into cash or Permitted Investments within 180 days of the receipt thereof.

"Change in Control" means:

(a)  the failure of the Borrower to own, directly or indirectly through one or more Wholly Owned Subsidiaries, 100% of the outstanding Equity Interests in Idearc Information Services LLC;

(b)  the failure of the Ultimate Parent to own, directly or indirectly through one or more of its Wholly Owned Subsidiaries, 100% of the outstanding Equity Interests in the Borrower free of Liens;

---

[5] To be included if applicable.

(c)  for so long as the Shared Services Agreement is in existence, the ownership, beneficially or of record, by any Person other than the Ultimate Parent of any Equity Interests in the Service Company;

(d)  the ownership, beneficially or of record, by any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act of more than 35% of the outstanding Equity Interests in the Ultimate Parent; or

(e)  the occupation of a majority of the seats (excluding, for purposes of this clause, vacant seats) on the Governing Board of the Ultimate Parent by Persons who were not (i) members of such Governing Board on the Closing Date [(after giving effect to the Reorganization Plan)],[6] (ii) nominated by, or whose nomination for election was approved or ratified by a majority of the directors or members of, the Governing Board of the Ultimate Parent or (iii) appointed by Persons referred to in clause (i) and (ii) above;

provided that that the consummation of the Mergers pursuant to the Merger Agreement shall not constitute a Change in Control.

"Change in Law" means (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.10(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.  For the avoidance of doubt, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued or implemented.

["Chapter 11 Cases" has the meaning assigned to such term in the recitals to this Agreement.][7]

"Chattel Paper" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Closing Date" means the date on which the conditions specified in Article IV are satisfied (or waived in accordance with Section 9.02) and the notice in the last sentence of Section 4.01 shall have been delivered, which date is [_____, 2013].[8]

---

[6] To be included if applicable.

[7] To be included if applicable.

[8] If the Closing Date occurs prior to March 31, 2013, the date for the commencement of delivery of, and the representation with respect to previously delivered, annual financial statements will be adjusted and the Available Cash prepayment provisions will be adjusted to require payment of the Available Cash prepayment under the Existing Credit Agreement for the period ending December 31, 2012.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all "Collateral", as defined in any applicable Security Document or Shared Collateral Security Document.

"Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Secured Parties and its Affiliates and permitted successors in such capacity.

"Collateral Agreements" means the collective reference to the Guarantee and Collateral Agreement and the Shared Guarantee and Collateral Agreement.

"Collateral and Guarantee Requirement" means the requirement that:

(a)  the Collateral Agent shall have received from each SuperMedia Loan Party either (i) a counterpart of the Guarantee and Collateral Agreement duly executed and delivered on behalf of such SuperMedia Loan Party or (ii) in the case of any Person that becomes a Subsidiary Loan Party after the Closing Date, a supplement to the Guarantee and Collateral Agreement, in substantially the form specified therein (or in such other form as the Borrower and the Collateral Agent may agree), duly executed and delivered on behalf of such Person (within the time frames required by Section 5.11);

(b)  the Shared Collateral Agent shall have received from each Shared Collateral Loan Party (other than the Newco Subordinated Guarantors) either (i) a counterpart of the Shared Guarantee and Collateral Agreement duly executed and delivered on behalf of such Shared Collateral Loan Party or (ii) in the case of any such Person that becomes a Shared Collateral Loan Party after the Closing Date, a supplement to the Shared Guarantee and Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Shared Collateral Loan Party;

(c)  all outstanding Equity Interests in each Subsidiary directly owned by any SuperMedia Loan Party shall have been pledged pursuant to the Guarantee and Collateral Agreement (except that the SuperMedia Loan Parties shall not be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and the Collateral Agent shall have received all certificates or other instruments representing such Equity Interests, if any, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(d)  all outstanding Equity Interests of each Subsidiary owned by or on behalf of the Service Company or any Newco that becomes a Shared Collateral Loan Party after the Closing Date shall have been pledged pursuant to the Shared Guarantee and Collateral Agreement (except that neither the Service Company nor any such Shared Collateral Loan Party shall be required to pledge more than 65% of the outstanding voting Equity Interests of any Foreign Subsidiary) and, subject to the terms of the Intercreditor Agreement, the Shared Collateral Agent shall have received all certificates or other instruments representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(e)  all Indebtedness of the Borrower and each Subsidiary that is owing to any SuperMedia Loan Party shall have been pledged pursuant to the Guarantee and Collateral Agreement and, if any such Indebtedness is evidenced by a promissory note (which may be a master note), the Collateral Agent shall have received all such promissory notes (other than promissory notes evidencing items of Indebtedness with a principal amount of $500,000 or less;

provided that the aggregate principal amount of all such items of Indebtedness shall not exceed $1,000,000), together with note powers or other instruments of transfer with respect thereto endorsed in blank;

(f)  the Shared Collateral Agent shall have received from each Newco Subordinated Guarantor, to the extent that such Newco Subordinated Guarantor becomes a Dex Guarantor, a subordinated guarantee substantially in the form of Exhibit M (or such other form as shall be reasonably acceptable to the Administrative Agent and the Shared Collateral Agent), which shall (i) to the extent permitted by the terms of any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor (without giving effect to any restriction effected by any amendment thereto entered into in contemplation of such assumption) and any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor, be secured by a pledge of the Equity Interests of such Newco Subordinated Guarantor's Subsidiaries and any joint venture interest owned by such Newco Subordinated Guarantor (subject to any restrictions in the applicable joint venture agreement applicable to all partners of such joint venture; it being understood and agreed that in the event any such restriction exists, the Administrative Agent and such Newco Subordinated Guarantor shall agree upon alternative structures, if available, to effect the economic equivalent of a pledge of the applicable joint venture interest) and (ii) to the extent required by the terms of any such Indebtedness (without giving effect to any restriction effected by any amendment, waiver, modification or refinancing thereto entered into in contemplation of such assumption), be subordinated to any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor and any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor; provided, that (i) to the extent that any restriction shall exist which shall not permit such Guarantee or which requires the subordination thereof as described above, the Borrower shall deliver, or cause to be delivered, true and complete copies of all relevant agreements received by the Borrower in respect of such Indebtedness, certified by a Financial Officer, to the Administrative Agent at least ten Business Days prior to the completion of the acquisition of the applicable Newco Subordinated Guarantor (or, in the case of any such agreement received by the Borrower after such tenth Business Day, promptly following the Borrower's receipt of such agreement) and (ii) notwithstanding the foregoing, no Newco Subordinated Guarantor shall be required to guarantee the Obligations to the extent such Guarantee is prohibited by the terms of any assumed Indebtedness of such Newco Subordinated Guarantor in existence prior to the acquisition of such Newco Subordinated Guarantor (without giving effect to any restriction effected by any amendment, waiver, modification or refinancing thereto entered into in contemplation of such assumption) or any Indebtedness incurred to finance the acquisition of such Newco Subordinated Guarantor if no alternative financing (on terms not materially less favorable taken as a whole to the applicable borrower or issuer) is available that would permit such Guarantee or is otherwise prohibited under applicable law; provided, further, that (x) the Ultimate Parent shall use its commercially reasonable efforts to amend any such assumed Indebtedness that is otherwise being amended in connection with such acquisition to permit such Guarantee and (y) if any Newco Subordinated Guarantor is unable to Guarantee the Obligations due to circumstances described in the first proviso hereof, then (A) the Ultimate Parent may only effect the acquisition of such Newco Subordinated Guarantor to the extent it provides evidence reasonably satisfactory to the Administrative Agent, and certification by a Financial Officer, that the Ultimate Parent was unable to obtain amendments (after use of commercially reasonable efforts) and/or alternative financing (on terms not materially less favorable taken as a whole to the applicable borrower or issuer) was not available, as the case may be, permitting such Guarantee or such Guarantee was otherwise prohibited by applicable law (and providing a description of such applicable law) and (B) to the extent permitted by applicable law, a holding company shall be formed to hold 100% of

the shares of the applicable Newco Subordinated Guarantor, which holding company shall Guarantee the Obligations and pledge the stock of such Newco Subordinated Guarantor to secure such Guarantee (any Guarantee provided by this clause (f), a "Newco Subordinated Guarantee");

(g)  all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Collateral Agent or the Shared Collateral Agent, as applicable, to be filed, registered or recorded to create the Liens intended to be created by the Security Documents (including any supplements thereto) and the Shared Collateral Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Collateral Agreements, shall have been filed, registered or recorded (or arrangements reasonably satisfactory to the Collateral Agent or the Shared Collateral Agent, as applicable, shall have been made to provide for the foregoing) or, subject to the Intercreditor Agreement, delivered to the Collateral Agent or the Shared Collateral Agent, as applicable, for filing, registration or recording;

(h)  (1) subject to Schedule 1.01B, the Collateral Agent shall have received with respect to each Mortgaged Property existing on the Closing Date (i) a Mortgage Amendment, together with (i) evidence that counterparts of said Mortgage Amendments have been delivered to the Title Company (defined below), (ii) a datedown endorsement to the existing title policy insuring the Lien of each such Mortgage (or a reissued title insurance policy) (the "Mortgage Endorsements"), issued by Stewart Title Guaranty Company (the "Title Company"), insuring the Lien of such Mortgage (as amended by the applicable Mortgage Amendment) as a valid Lien on the Mortgaged Property described therein, free of any Liens except those permitted under Section 6.02, (iii) the opinions, addressed to the Collateral Agent and the Lenders of (A) outside counsel or in-house counsel, as to the due authorization, execution and delivery of the Mortgage Amendments by the Borrower or any Loan Party, as applicable, and (B) local counsel in each jurisdiction where Mortgaged Property is located regarding the Mortgage Amendments, (iv) with respect to each Mortgaged Amendment, such affidavits, certificates, instruments of indemnification and other items (including a so-called "gap" indemnification) as shall be reasonably required to induce the Title Company to issue the Mortgage Endorsements contemplated above, (v) evidence reasonably acceptable to the Collateral Agent of payment by the Borrower of all Mortgage Endorsement premiums, search and examination charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgage Amendments, fixture filings and issuance of the Mortgage Endorsements referred to above, in each case, in form and substance reasonably satisfactory to the Collateral Agent,  and (2) with respect to each Mortgaged Property acquired after the Closing Date (i) execute and deliver a first priority Mortgage in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such real property, subject to any Liens permitted by Section 6.02, (ii) if requested by the Collateral Agent, the Collateral Agent shall have received, and the Title Company shall have received, maps or plats of an as-built survey of the sites of such Mortgaged Property prepared by an independent professional licensed land surveyor reasonably satisfactory to the Collateral Agent and the Title Company (and certified by such surveyor to the Collateral Agent and the Title Company), which maps or plats and the surveys on which they are based shall be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the American Congress on Surveying and Mapping in 1992,  (iii) the Collateral Agent shall have received in respect of such Mortgaged Property a mortgagee's title insurance policy (or policies) or marked up unconditional binder for such insurance, and each such policy shall (A) be in an amount reasonably satisfactory to the Collateral Agent; (B) be issued at ordinary rates; (C) insure that the Mortgage insured thereby creates a valid first Lien on such Mortgaged Property free and clear of all defects and encumbrances, except as disclosed therein; (D) name the Collateral Agent for the benefit of the

Secured Parties as the insured thereunder; (E) be in the form of ALTA Loan Policy - 2006 (or equivalent policies); (F) contain such endorsements and affirmative coverage as the Collateral Agent may reasonably request, and the Collateral Agent shall have received evidence satisfactory to it that all premiums in respect of each such policy, all charges for mortgage recording tax, and all related expenses, if any, have been paid; (iv) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; (v) if requested by the Collateral Agent, deliver to the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Collateral Agent, and (vi) deliver to the Collateral Agent a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to such Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Collateral Agent;

(i) each Loan Party shall have used commercially reasonable efforts to obtain all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents and Shared Collateral Security Documents (or supplements thereto) to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens thereunder, except in each case to the extent the failure to obtain such contents and approvals does not materially and adversely affect the interests of the Secured Parties; and

(j) each Loan Party shall have executed and delivered to the Administrative Agent account control agreements in accordance with Section 5.13.

"Collateral Trademarks" has the meaning assigned to such term in Section 4.01(e).

"Companies" means collectively, the Borrower, Dex East, Dex West and RHDI, and each, individually, a "Company".

["Confirmation Order" means that certain order approving the Disclosure Statement and confirming the Reorganization Plan pursuant to Section 1129 of the Bankruptcy Code entered by the Bankruptcy Court on [_____], 2013.][9]

"Consolidated Adjusted EBITDA" means, for any period, Consolidated Net Income for such period plus (or minus), without duplication:

(a) provision for taxes based on income or profits of the Borrower and the Subsidiaries for such period, to the extent deducted in computing Consolidated Net Income; plus

(b) Interest Expense of the Borrower and the Subsidiaries for such period, to the extent deducted in computing Consolidated Net Income; plus

(c) depreciation, amortization (including amortization of intangibles and amortization and write-off of financing costs) and impairment charges (solely with respect to goodwill or other intangibles) of the Borrower and the Subsidiaries for such period to the extent

---

[9] To be included if applicable.

that such depreciation, amortization and impairment charges were deducted in computing Consolidated Net Income; plus

(d)    any non-cash compensation charge arising from any grant of stock, stock options or other equity-based awards, to the extent deducted in computing Consolidated Net Income; plus

(e)    any extraordinary, unusual or non-recurring non-cash losses or non-cash charges, to the extent deducted in computing Consolidated Net Income; plus

(f)    to the extent deducted in computing Consolidated Net Income, the Specified Charges; provided that such charges are recorded during the period starting on October 1, 2012 and ending on December 31, 2013 and the aggregate amount of charges added back pursuant to this clause (f) for all periods shall not exceed $40,000,000 (it being understood that such charges may be added back in any four-fiscal-quarter period which includes the fiscal quarter in which such charges are recorded); plus

(g)    any non-recurring charges consisting of any severance charges incurred in connection with a restructuring recorded during the fiscal years ended December 31, 2015 and December 31, 2016, not to exceed $10,000,000 in any such fiscal year, to the extent deducted in computing Consolidated Net Income (it being understood that such amounts shall only be deducted in the determination of Available Cash in the period in which the payments are made); plus

(h)    any non-cash impact attributable to [(i)] the reduction in deferred revenue or reduction in deferred costs to balance sheet accounts as a result of the fair value exercise undertaken as required by purchase accounting for the transactions contemplated by any acquisition [or (ii) the adoption of fresh start accounting in connection with the transactions under the Reorganization Plan, all in accordance with GAAP];[10] plus

(i)    any non-cash Accounting Standards Codification 815 income (or loss) related to hedging activities, to the extent deducted in computing Consolidated Net Income; minus

(j)    extraordinary gains and non-recurring gains (for the avoidance of doubt, to the extent that any Voluntary Prepayment results in a gain that would be reflected in Consolidated Net Income in any period, such gain shall be subtracted in calculating Consolidated Adjusted EBITDA for such period pursuant to this clause (j)); minus

(k)    non-cash items increasing Consolidated Net Income for such period, other than (i) the accrual of revenue consistent with past practice and (ii) the reversal in such period of an accrual of, or cash reserve for, cash expenses in a prior period, but only to the extent such accrual or reserve was not added back to Consolidated Net Income in calculating Consolidated Adjusted EBITDA in a prior period; minus

(l)    any cash payments made during such period in respect of items described in clause (e) above subsequent to the fiscal quarter in which the relevant non-cash losses or charges were reflected as a charge in the statement of Consolidated Net Income;

in each case determined on a consolidated basis in accordance with GAAP.

---

[10] To be included if applicable.

For the purposes of calculating Consolidated Adjusted EBITDA for any period of four consecutive fiscal quarters (each, a "Reference Period"), (i) if at any time during such Reference Period (and after the Closing Date) the Borrower or any of its Subsidiaries shall have made any Material Disposition (as defined below), the Consolidated Adjusted EBITDA for such Reference Period shall be reduced by an amount equal to the Consolidated Adjusted EBITDA (if positive) attributable to the property that is the subject of such Material Disposition for such Reference Period or increased by an amount equal to the Consolidated Adjusted EBITDA (if negative) attributable thereto for such Reference Period and (ii) if during such Reference Period (and after the Closing Date) the Borrower or any of its Subsidiaries shall have made a Material Acquisition, Consolidated Adjusted EBITDA for such Reference Period shall be calculated after giving *pro forma* effect thereto in accordance with Regulation S-X or in such other manner acceptable to the Administrative Agent as if such Material Acquisition occurred on the first day of such Reference Period. As used in this definition, "Material Acquisition" means any acquisition of property or series of related acquisitions of property that (x) constitutes assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock of a Person and (y) involves the payment of consideration by the Borrower or any of its Subsidiaries in excess of $5,000,000; and "Material Disposition" means any disposition of property or series of related dispositions of property that (x) constitutes assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock of a Person and (y) yields gross proceeds to the Borrower or any of its Subsidiaries in excess of $5,000,000. In addition, Consolidated Adjusted EBITDA for any Reference Period including the first four full fiscal quarters following the Closing Date shall be subject to any [adjustment with respect to such quarters required to be made by the Borrower's independent certified public accountants as a result of "fresh start" accounting and set forth in reasonable detail in a certificate of a Responsible Officer delivered to the Administrative Agent] [, and, with respect to the Reference Period immediately prior to the Closing Date, Consolidated Adjusted EBITDA shall be so adjusted on a *pro forma* basis as though the Reorganization Plan had become effective on the first day of such Reference Period].[11]

"Consolidated Current Assets" means, at any date, all amounts (other than cash and Permitted Investments) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date.

"Consolidated Current Liabilities" means, at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date, but excluding the current portion of any Funded Debt of the Borrower and its Subsidiaries.

"Consolidated Fixed Charge Coverage Ratio" means, for any period, the ratio of (a) Consolidated Adjusted EBITDA for such period less the aggregate amount actually paid by the Borrower and its Subsidiaries during such period on account of (i) Capital Expenditures of the Borrower and its Subsidiaries (other than any such Capital Expenditures financed with (1) Net Proceeds from an Asset Disposition not otherwise required to be applied to prepay Loans pursuant to Section 2.06(b) or (2) the proceeds of Indebtedness permitted by Section 6.01 (other than proceeds of Indebtedness incurred in reliance on Section 6.01(a)(iii)) and (ii) Taxes to (b) Consolidated Fixed Charges for such period.

"Consolidated Fixed Charges" means, for any period, the sum (without duplication) of (a) Interest Expense for such period and (b) scheduled payments made during such period on account of principal of Indebtedness of the Borrower or any of its Subsidiaries.

---

[11] To be included if applicable.

"Consolidated Interest Coverage Ratio" means, for any period, the ratio of (a) Consolidated Adjusted EBITDA for such period to (b) Interest Expense for such period.

"Consolidated Interest Expense" means, for any period, the interest expense (including that attributable to Capitalized Leases) of the Borrower and the Subsidiaries, determined on a consolidated basis in accordance with GAAP.  For the avoidance of doubt, Consolidated Interest Expense shall not include any PIK Interest Amount.

"Consolidated Net Income" means, for any period, the net income (loss) of the Borrower and the Subsidiaries for such period, calculated in accordance with Section 1.05 and determined on a consolidated basis in accordance with GAAP and before any reduction in respect of Preferred Stock dividends; provided that (a) the net income of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or other distributions actually paid in cash to the Borrower or any Subsidiary during such period, (b) the net loss of any such Person will be included only to the extent such loss is funded in cash by the Borrower or a Subsidiary during such period and (c) the income or loss of any Person will be excluded to the extent such income or loss is accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary.

"Consolidated Working Capital" means, at any date, the excess of Consolidated Current Assets on such date over Consolidated Current Liabilities on such date.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Core Verizon Agreements" means the Publishing Agreement, the Non-Competition Agreement and the Branding Agreement.

"Credit Party" means any Agent or any Lender.

"Debt Issuance" means the incurrence by the Borrower or any Subsidiary of any Indebtedness in reliance on Section 6.01(a)(xx).

["Debtors" means the Borrower and its Domestic Subsidiaries in their capacities as debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code.][12]

"Default" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"Determination Date" means any date on which the amount of Available Cash is determined hereunder, which shall be each date on which a certificate shall have been delivered to the Administrative Agent pursuant to Section 5.01(d).

---

[12] To be included if applicable.

"<u>Dex Credit Agreements</u>" means the Dex East Credit Agreement, the Dex West Credit Agreement and the RHDI Credit Agreement.

"<u>Dex Digital</u>" means Dex One Digital, Inc., a Delaware corporation.

"<u>Dex East</u>" means Dex Media East LLC, a Delaware limited liability company.

"<u>Dex East Credit Agreement</u>" means (a) the Credit Agreement, dated as of October 24, 2007 (as amended and restated as of January 29, 2010, as further amended and restated as of the Closing Date, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Ultimate Parent, the Dex Parent, Dex East, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the Dex East Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"<u>Dex East Existing Credit Agreement</u>" means the Credit Agreement, dated as of October 24, 2007, as amended and restated as of January 29, 2010, among the Ultimate Parent, the Dex Parent, Dex West, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, as amended, supplemented or otherwise modified prior to the effectiveness of the Dex West Credit Agreement.

"<u>Dex East Loan Documents</u>" means the "Loan Documents" as defined in the Dex East Credit Agreement.

"<u>Dex Guarantors</u>" means the Ultimate Parent, Dex Digital, RHDC, the Service Company, the Dex Parent, each Newco Senior Guarantor and each Newco Subordinated Guarantor, and any Subsidiary of Dex East, Dex West or RHDI, as applicable, that is not a Foreign Subsidiary.

"<u>Dex Merger</u>" has the meaning assigned to such term in the recitals to this Agreement.

"<u>Dex One</u>" has the meaning assigned to such term in the recitals to this Agreement.

"<u>Dex Parent</u>" means Dex Media Inc., a Delaware corporation.

"<u>Dex West</u>" means Dex Media West Inc., a Delaware corporation.

"<u>Dex West Credit Agreement</u>" means (a) the Credit Agreement, dated as of June 6, 2008 (as amended and restated as of January 29, 2010, as further amended and restated as of the Closing Date, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Ultimate Parent, the Dex Parent, Dex West, the several banks and other financial institutions or entities from time to time party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the Dex West Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in

this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"Dex West Existing Credit Agreement" means the Credit Agreement, dated as of June 6, 2008, as amended and restated as of January 29, 2010, among the Ultimate Parent, the Dex Parent, Dex West, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, as amended, supplemented or otherwise modified prior to the effectiveness of the Dex West Credit Agreement.

"Dex West Loan Documents" means the "Loan Documents" as defined in the Dex West Credit Agreement.

"Directory Consolidation Project" means the initiative described in Schedule 1.01A.[13]

["Disclosed Matters" means the matters, proceedings, transactions and other information disclosed in the [Disclosure Statement][Registration Statement on Form S-4] (other than any risk factor disclosures contained under the heading "Risk Factors", any disclosures of risks in the "Forward-Looking Statements" disclaimer or any other similar forward-looking statements in the Disclosure Statement).][14]

["Disclosure Statement" means the Disclosure Statement for the Reorganization Plan, the adequacy of which was approved by the Bankruptcy Court pursuant to the Confirmation Order.][15]

"Disinterested Director" has the meaning assigned to such term in Section 6.09.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the Maturity Date; provided, however, that only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such dates shall be deemed to be Disqualified Stock; provided further that any such Equity Interests (including any options, warrants or other rights in respect thereof) issued or sold as compensation and held by future, present or former directors, officers, members of management, employees or consultants of the Borrower or any of its Subsidiaries or family members or relatives thereof, or trusts, partnerships or limited liability companies for the benefit of any of the foregoing, or any of their heirs, executors, successors and legal representatives shall not constitute Disqualified Stock.  Notwithstanding the preceding sentence, any Equity Interests that would constitute Disqualified Stock solely because the holders thereof have the right to require the Borrower or any of its Subsidiaries to repurchase such Equity Interests upon the occurrence of a change of control or a sale of all or substantially all its assets will not constitute Disqualified Stock if the terms of such Equity Interest provide that the Borrower or any Subsidiary may not repurchase or redeem any such Equity Interest pursuant to such provisions unless such repurchase or redemption complies with Section 6.08.  Subject to all of the preceding provisos in this definition, the term "Disqualified Stock" will also include any options, warrants or other rights that are convertible into

---

[13] Summary from the Term Sheet to be listed on the schedule.

[14] To be included if applicable.

[15] To be included if applicable.

Disqualified Stock or that are redeemable at the option of the holder, or required to be redeemed, prior to the date that is one year after the Maturity Date.

"Documents" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any State of the United States of America or the District of Columbia.

"dollars" or "$" refers to lawful money of the United States of America.

"Election Notice" means a written notice from the Borrower to the Administrative Agent in the form of Exhibit K hereto.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" means any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence or Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person of whatever nature, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing, but excluding any debt security that is convertible into, or exchangeable for, any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any Reportable Event; (b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, the failure to make by its due date a required installment under Section 430(j) of the

Code with respect to any Pension Plan or the failure by any Loan Party or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; (e) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (f) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Title IV of ERISA); (g) the receipt by any Loan Party or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (h) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (i) the receipt by any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent or in ERISA Reorganization or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"ERISA Reorganization" means, with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Escrow Materials" means copies of (i) all software source code and all documentation and training manuals relating thereto and (ii) all other tangible or written embodiments of material technology, websites and databases (but excluding any print directories or other publicly distributed print materials), in each case to the extent (1) owned (or licensed, if such license grants the licensee (x) possession of same and the right to allow the foregoing entities (and any escrow agent, as applicable) to access same and (y) the right to sublicense such right of possession and access without (I) the licensor's consent, unless consent can be obtained with no additional fees or other consideration (unless the sublicensee fully reimburses the sublicensor for such additional fees or other consideration) or additional obligations upon sublicensor or any loss of rights of sublicensor, (II) loss of any rights of sublicensor, (III) additional obligations upon sublicensor or (IV) any additional fees or consideration (unless the sublicensee fully reimburses the sublicensor for such fees or other consideration required to obtain such right of possession and access) and (2) currently used by the Borrower, Dex East, Dex West, RHDI, the Service Company or any of such Shared Collateral Loan Parties, as applicable, in their respective businesses.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Subsidiary" means (a) any Subsidiary that is prohibited by applicable law from guaranteeing the Obligations, (b) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary, (c) any Foreign Subsidiary, (d) any Domestic Subsidiary that is not a Wholly Owned Subsidiary, (e) any Insignificant Subsidiary and (f) any Subsidiary that is a License Subsidiary.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income taxes imposed on (or measured by) its net income or net profits and franchise taxes, capital taxes or net worth taxes imposed, in each case, in lieu of net income or net profits taxes by the United

States of America, by any State thereof or by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or by any jurisdiction by reason of any connection between such jurisdiction and the Administrative Agent, Lender or recipient (other than arising solely from the Loan Documents), (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction described in clause (a) above, (c) in the case of a Lender, (i) any U.S. withholding tax that is in effect at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to any withholding tax pursuant to Section 2.12(a) or such Lender is an assignee pursuant to a request by the Borrower under Section 2.14(b) or (ii) any tax that is attributable to such Lender's failure to comply with Section 2.12(f) and (d) any U.S. Federal withholding taxes imposed under FATCA.

"Existing Available Cash" means $[   ].[16]

"Existing Credit Agreement"  means the Loan Agreement, dated as of December 31, 2009, among the Borrower, the several lenders and agents parties thereto and JPMorgan Chase Bank, N.A., as administrative agent, as amended, supplemented or otherwise modified prior to the Closing Date.

"Existing Loans" means the Loans (as defined in the Existing Credit Agreement) outstanding under the Existing Credit Agreement prior to the Closing Date.

"Expanded Core Verizon Agreements" means the Publishing Agreement, the Non-Competition Agreement, the Branding Agreement, the Intellectual Property Agreement, the Listings License Agreement and the Billing Services Agreement.

"Fair Market Value" means a price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by a Financial Officer of the Borrower, whose determination will be conclusive if evidenced by an officer's certificate.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Covenants" means each of the covenants set forth in Section 6.13.

---

[16] To be the amount of Available Retained Cash as of December 31, 2012.

"Financial Officer" means the chief financial officer, the principal accounting officer, the treasurer or the controller of the Borrower or the Ultimate Parent, as applicable, or any assistant treasurer or assistant controller of the Borrower or the Ultimate Parent, as applicable, designated in writing by the chief financial officer, principal accounting officer, treasurer or controller of the Borrower or the Ultimate Parent, as applicable, for so long as such designation is effective in accordance with its terms.

"Foreign Benefit Arrangement" means each employee benefit arrangement mandated by non-US law that is maintained or contributed to by the Borrower or any ERISA Affiliate.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Plan" means each employee benefit plan (within the meaning of section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to US law and is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Funded Debt" means, as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation and, in the case of the Borrower, Indebtedness in respect of the Loans.

"GAAP" means generally accepted accounting principles in the United States of America.

"Governing Board" means (a) the managing member or members or any controlling committee of members of any Person, if such Person is a limited liability company, (b) the board of directors of any Person, if such Person is a corporation or (c) any similar governing body (or committee) of any Person.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of

credit or letter of guaranty issued to support such Indebtedness or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantee and Collateral Agreement" means the Guarantee and Collateral Agreement, dated as of December 31, 2009, among the Borrower, the Subsidiary Loan Parties and the Collateral Agent.

"Guarantors" means the Ultimate Parent, the Service Company, the Subsidiary Loan Parties, and each Person that becomes a Dex Guarantor after the Closing Date (other than Dex East and its Subsidiaries, Dex West and its Subsidiaries and RHDI and its Subsidiaries).

"Hazardous Materials" means (i) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos or asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances; or (ii) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law.

"Incremental COD Tax Payments" means the excess, if any, of (a) the taxes of the Borrower and the Subsidiaries paid in cash during such period, over (b) the taxes that the Borrower and the Subsidiaries would have paid in cash during such period calculated by excluding any cancellation of debt income resulting from Voluntary Prepayments made after November 8, 2011.

"Indebtedness" of any Person means, on any date, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale agreements relating to property acquired by such Person reflected as a liability on a balance sheet of such Person in accordance with GAAP (or, if no such balance sheet of such Person has been prepared as of such date, as would be reflected as a liability on such balance sheet in accordance with GAAP), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business and (ii) any earn-out obligation reflected as a liability on the balance sheet of such Person (or, if no such balance sheet of such Person has been prepared as of such date, as would be reflected as a liability on such balance sheet in accordance with GAAP)), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of other Persons, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (j) all obligations of such Person under Swap Agreements, after giving effect to applicable netting arrangements; provided, however, that "Indebtedness" shall not include any deferred payment obligation for Local Tax Claims. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of any obligation under any Swap Agreement on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the Fair Market Value of the property encumbered thereby.

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and Other Taxes.

"Insignificant Subsidiary" means a Subsidiary of the Borrower that (a) neither has total assets with a book value of $10,000 or more nor had revenues for the period of four fiscal quarters most recently completed of $10,000 or more, and (b) is designated by the Borrower as an "Insignificant Subsidiary" in a written notice to the Administrative Agent, provided, that the Borrower may designate at any one time no more than five then existing Subsidiaries as "Insignificant Subsidiaries."

"Insolvent" with respect to any Multiemployer Plan, means the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Instrument" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Intellectual Property" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Intellectual Property Agreement" means the Intellectual Property Agreement dated as of November 17, 2006, between Verizon and between Idearc Media LLC (formerly known as Idearc Media Corp.).

"Intercreditor Agreement" means the Amended and Restated Intercreditor and Collateral Agency Agreement, substantially in the form of Exhibit D, entered into among the Administrative Agent and Collateral Agent on behalf of the Secured Parties, the Shared Collateral Agent on behalf of the Shared Collateral Secured Parties, the administrative agent and collateral agent under the Dex East Credit Agreement, the administrative agent and collateral agent under the Dex West Credit Agreement and the administrative agent and collateral agent under the RHDI Credit Agreement.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.03.

"Interest Expense" means, with respect to any Person for any period, the sum, without duplication, of:

(a)    the consolidated interest expense of such Person and its subsidiaries for such period, whether paid or accrued, including, without limitation, original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Swap Agreements, but excluding the amortization or write-off of debt issuance costs; plus

(b)    the consolidated interest of such Person and its subsidiaries that was capitalized during such period; plus

(c) any interest expense on Indebtedness of another Person that is Guaranteed by such Person or one of its subsidiaries or secured by a Lien on assets of such Person or one of its subsidiaries, whether or not such Guarantee or Lien is called upon;

in each case determined on a consolidated basis in accordance with GAAP; provided, however, that "Interest Expense" shall exclude interest expense arising in connection with any deferred payment of Local Tax Claims.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two or three months thereafter, as the Borrower may elect; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing of Eurodollar Loans initially shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means purchasing, holding or acquiring (including pursuant to any merger with any Person that was not a Wholly Owned Subsidiary prior to such merger) any Equity Interest, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or making or permitting to exist any loans or advances (other than commercially reasonable extensions of trade credit) to, guaranteeing any obligations of, or making or permitting to exist any investment in, any other Person, or purchasing or otherwise acquiring (in one transaction or a series of transactions) any assets of any Person constituting a business unit. The amount, as of any date of determination, of any Investment shall be the original cost of such Investment minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash as a repayment of principal or a return of capital, as the case may be. In determining the amount of any Investment or repayment involving a transfer of any property other than cash, such property shall initially be valued at its Fair Market Value at the time of such transfer.

"Lender" has the meaning assigned to such term in the preamble hereto.

"Leverage Ratio" means, on any date, the ratio of (a) Total Indebtedness as of such date to (b) Consolidated Adjusted EBITDA for the most recently ended period of four consecutive fiscal quarters of the Borrower.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on the Reuters "LIBOR01" screen displaying British Bankers' Association Interest Settlement Rates (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period in an amount comparable to such Eurodollar Borrowing. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits and for a maturity comparable to such Interest Period in an amount comparable to such Eurodollar Borrowing are offered by the principal London office of the Administrative Agent in

immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.  Notwithstanding the foregoing, for the purposes of this Agreement, the LIBO Rate shall in no event be less than 3.00%.

"License Agreement" means an agreement, substantially in the form of Exhibit I hereto, pursuant to which each License Subsidiary shall grant a license to use trademarks to the Ultimate Parent and each Subsidiary of the Ultimate Parent.

"License Subsidiary" has the meaning assigned to such term in Section 4.01(e).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Listings License Agreement" means the Listings License Agreement dated as of November 17, 2006, between Idearc Media LLC (formerly known as Idearc Media Corp.) and certain subsidiaries of Verizon parties thereto.

 "Loan Documents" means this Agreement, the Intercreditor Agreement, the Subordinated Guarantee Agreement, the Security Documents and the Shared Collateral Security Documents.

"Loan Parties" means the Borrower and the Guarantors.

"Loans" has the meaning assigned to such term in Section 2.01 and shall include all PIK Interest Amounts added to the principal amount of the Loans pursuant to Section 2.08(d).

"Local Tax Claims" means state or local Tax claims accruing for operations of the Borrower or its Subsidiaries on or prior to the Petition Date, regardless of when asserted against the Borrower or its Subsidiaries."

"Margin Stock" shall have the meaning assigned to such term in Regulation U of the Board.

"Master IP License Agreement" means an agreement substantially in the form of Exhibit J hereto.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, assets, or financial condition of the Borrower and the Subsidiaries, taken as a whole, excluding any material adverse effect resulting directly from the taking of any action required by any Expanded Core Verizon Agreement or (b) the validity or enforceability of, or the rights and remedies, taken as a whole, of the Agents or the Lenders under the Loan Documents.

"Material Indebtedness" means Indebtedness (other than the Loans and the Subordinated Guarantee), including obligations in respect of one or more Swap Agreements, of any one or more of the Ultimate Parent and its Subsidiaries (other than RHDI, Dex East, Dex West and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, the Service Company, any Newcos, the Borrower and its Subsidiaries) in an aggregate principal amount exceeding $20,000,000.  For

purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Ultimate Parent or any of its Subsidiaries in respect of any Swap Agreement on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Material Ultimate Parent Subsidiary" means (i) any License Subsidiary and (ii) any Subsidiary of the Ultimate Parent (other than RHDI, Dex East, Dex West and their respective Subsidiaries) which meets any of the following conditions:  (a) the Ultimate Parent's and its other Subsidiaries' aggregate investments in and advances to such Subsidiary exceed $10,000,000 as of the end of the most recently completed fiscal quarter, (b) the consolidated assets of such Subsidiary exceed $10,000,000 as of the end of the most recently completed fiscal quarter or (c) the consolidated pre-tax income from continuing operations of such Subsidiary for the most recently ended period of four consecutive fiscal quarters exceeds $5,000,000.

"Maturity Date" means December 31, 2016, or, if such day is not a Business Day, the next preceding Business Day.

"Merger Agreement" has the meaning assigned to such term in the recitals to this Agreement.

"Merger Sub" has the meaning assigned to such term in the recitals to this Agreement.

"Mergers" has the meaning assigned to such term in the recitals to this Agreement.

"Moody's" means Moody's Investors Service, Inc. and any successors thereto.

"Mortgage" means any mortgage, deed of trust, assignment of leases and rents or other security document granting a Lien on any real property and improvements thereto to secure the Obligations.  Each Mortgage shall be reasonably satisfactory in form and substance to the Collateral Agent and the Borrower.

"Mortgaged Property" means, initially, each parcel of real property and the improvements thereto owned by a Loan Party and identified on Schedule 3.05, and includes each other parcel of real property and improvements thereto owned by a Loan Party with respect to which a Mortgage is granted pursuant to Section 5.12.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, (a) with respect to any Asset Disposition, the aggregate cash proceeds (including (x) payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not the interest component, thereof) and (y) any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Disposition) received by the Borrower or any of its Subsidiaries in respect of any Asset Disposition, net of (i) the direct costs relating to such Asset Disposition and the sale or other disposition of any such non-cash consideration, including legal, accounting, investment banking and brokerage fees and sales commissions and any relocation expenses incurred as a result thereof, (ii) Taxes paid or payable as a result thereof, in each case, after taking into account any available Tax credits or deductions and any Tax sharing arrangements (including, in respect of any proceeds received in connection with an Asset Disposition of any asset of any Foreign Subsidiary, deductions in respect of withholding taxes that are or would be payable in cash if such funds were repatriated to the United States), (iii) amounts required to be applied to the repayment of Indebtedness or other liabilities secured by a Lien on the asset or assets that were the subject of such Asset Disposition or

required to be paid as a result of such Asset Disposition, (iv) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, (v) in the case of any Asset Disposition by a Subsidiary of the Borrower, payments to holders of Equity Interests in such Subsidiary in such capacity (other than such Equity Interests held by the Borrower or any Subsidiary) to the extent that such payment is required to permit the distribution of such proceeds in respect of the Equity Interests in such Subsidiary held by the Borrower or such Subsidiary and (vi) appropriate amounts to be provided by the Borrower or its Subsidiaries as a reserve against liabilities associated with such Asset Disposition, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Disposition, all as determined in accordance with GAAP; provided that (a) any excess amounts set aside for payment of Taxes pursuant to clause (ii) above that are remaining after such Taxes have been paid in full or the statute of limitations therefor has expired and (b) the amount of any release or reversal of a reserve pursuant to clause (vi), will, in each case when no longer so held, become Net Proceeds; and

(b) with respect to any Debt Issuance by the Borrower or any Subsidiary, the aggregate cash proceeds received by the Borrower or any of its Subsidiaries in respect of any Debt Issuance, net of the direct costs relating to such Debt Issuance, including, without limitation, the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Subsidiary (or, in the case of Taxes, any member thereof) in connection with such incurrence or issuance and, in the case of Indebtedness of any Foreign Subsidiary, deductions in respect of withholding taxes that are or would otherwise be payable in cash if such funds were repatriated to the United States.

(c) with respect to any Ultimate Parent Equity Issuance or Ultimate Parent Asset Disposition (a) the cash proceeds received in respect of such Ultimate Parent Equity Issuance or Ultimate Parent Asset Disposition including (i) any cash received in respect of any non-cash proceeds, including cash received in respect of any debt instrument or equity security received as non cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out of pocket expenses (including underwriting discounts and commissions and collection expenses) paid or payable by the Loan Parties or any Subsidiary thereof to third parties (including Affiliates, if permitted by Section 6.09) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made by the Loan Parties or any Subsidiary thereof as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, including, for the avoidance of doubt, in the case of an Ultimate Parent Asset Disposition, payments required to be made by the Loan Parties or any Subsidiary thereof pursuant to the Subordinated Guarantee Agreement (it being understood that this clause shall not apply to customary asset sale provisions in offerings of debt securities) and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Loan Parties or any Subsidiary (provided that such amounts withheld or estimated for the payment of taxes shall, to the extent not utilized for the payment of taxes, be deemed to be Net Proceeds received when such nonutilization is determined), and the amount of any reserves established by the Loan Parties or any Subsidiary thereof to fund contingent liabilities reasonably estimated to be payable, in each case that are directly attributable to such event (provided that such reserves and escrowed amounts shall be disclosed to the Administrative Agent promptly upon being taken or made and any reversal of any such reserves will be deemed to be Net Proceeds received at the time and in the amount of such reversal), in each case as determined reasonably and in good faith by the chief financial officer of the Borrower; provided that for the purposes of calculating the Net Proceeds of an Ultimate Parent Asset Disposition, payments made (or reasonably estimated to be payable) under the Tax Sharing Agreements shall be

deducted in the same manner as taxes paid (or reasonably estimated to be payable) under clause (b)(iii) above.

"Newco" means any Subsidiary (direct or indirect) of the Ultimate Parent (other than the Borrower and its Subsidiaries) acquired or formed by the Ultimate Parent after the Closing Date other than a Subsidiary of the Borrower, Dex East, Dex West or RHDI.

"Newco Senior Guarantor" means any Newco, the acquisition or formation of which is accomplished, directly or indirectly, using cash or other credit support (including debt service) provided by the Borrower, any Subsidiary or any other Newco Senior Guarantor or in which any Investment is made by the Borrower, any Subsidiary or any other Newco Senior Guarantor.

"Newco Subordinated Guarantee" has the meaning assigned to such term in clause (f) of the definition of "Collateral and Guarantee Requirement".

"Newco Subordinated Guarantor" means any Newco other than a Newco Senior Guarantor.

"Newdex" has the meaning assigned to such term in the recitals to this Agreement.

"Non-Competition Agreement" means the Non-Competition Agreement dated as of November 17, 2006, between Idearc Media LLC (formerly known as Idearc Media Corp.) and Verizon.

"Non-Consenting Lender" means any Lender that withholds its consent to any proposed amendment, modification or waiver to a Loan Document consented to by the Required Lenders, if such proposed amendment, modification or waiver cannot become effective under Section 9.02 without the consent of such Lender.

"Obligations" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Other Taxes" means any and all present or future recording, stamp, documentary, excise, transfer, sales, property or similar Taxes, charges or levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, any Loan Document.

"Participant" has the meaning set forth in Section 9.04(c).

"Participant Register" has the meaning set forth in Section 9.04(c).

"Payment Percentage" has the meaning assigned to such term in Section 2.15(b).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pension Plan" means any Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA.

"Perfection Certificate" means a certificate in the form of Exhibit B or any other form approved by the Collateral Agent.

"Permitted Acquisitions" means any acquisition (by merger, consolidation or otherwise) by the Borrower or a Subsidiary Loan Party of all or substantially all the assets of, or all the Equity