Interests in, a Person or division or line of business of a Person, if (a) immediately after giving effect thereto, no Default has occurred and is continuing or would result therefrom, (b) each Subsidiary resulting from such acquisition (and which survives such acquisition) shall be a Subsidiary Loan Party and the Equity Interests of each such Subsidiary shall be owned directly by the Borrower and/or Subsidiary Loan Parties and shall have been (or within 10 Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) pledged pursuant to the Guarantee and Collateral Agreement, (c) the Collateral and Guarantee Requirement shall have been (or within 10 Business Days (or such longer period as may be acceptable to the Agent) after such acquisition shall be) satisfied with respect to each such Subsidiary (whether or not it is an Excluded Subsidiary), (d) the aggregate amount of consideration for all Permitted Acquisitions shall not exceed $20,000,000 during the term of this Agreement, (e) the Borrower and the Subsidiaries are in Pro Forma Compliance, after giving effect to such acquisition and (f) in the case of any such acquisition for aggregate consideration in excess of $10,000,000, the Borrower has delivered to the Agent an officer's certificate to the effect set forth in clauses (a), (d) and (e) above, together with all relevant financial information for the Person or assets acquired and reasonably detailed calculations demonstrating satisfaction of the requirements set forth in clauses (d) and (e) above.

"Permitted Business" means any businesses or business activity conducted by the Borrower or any Subsidiary on the Closing Date and any business or business activity reasonably incidental or ancillary thereto, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"Permitted Encumbrances" means:

(a)  Liens imposed by law for Taxes, assessments or governmental charges  which are not delinquent for a period of more than 60 days or are being contested in compliance with Section 5.05;

(b)  carriers', warehousemen's, mechanics', materialmen's, landlord's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 5.05;

(c)  (i) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, (ii) Liens incurred in the ordinary course of business securing insurance premiums or reimbursement obligations under insurance policies and (iii) Liens securing obligations in respect of letters of credit or bank guarantees that have been posted by the Borrower or any of its Subsidiaries to support the payment of the items set forth in clauses (i) and (ii) of this clause (c);

(d)  (i) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business and (ii) Liens securing obligations in respect of letters of credit or bank guarantees that have been posted by a Borrower or any of its Subsidiaries to support the payment of items set forth in clause (i) of this clause (d);

(e)  judgment liens in respect of judgments or attachments that do not constitute an Event of Default under clause (j) of Article VII;

(f)  easements, zoning restrictions, rights-of-way, restrictive covenants, irregularities in title and similar encumbrances on real property imposed by law or arising in the ordinary course of business that are not substantial in amount and do not materially detract from the value of the

affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary or, for purposes of (i) Section 6.15, the Ultimate Parent or (ii) Section 6.16, the Service Company; and

(g)  the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, or could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries.

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means (a) securities issued or fully guaranteed or insured by the United States government or any agency or instrumentality thereof, (b) time deposits, certificates of deposit or bankers' acceptances of (i) any Lender or Affiliate thereof or (ii) any commercial bank having capital and surplus in excess of $500,000,000 and the commercial paper of the holding company of which is rated at least A-1 or the equivalent thereof by S&P or any successor rating agency or at least P-1 or the equivalent thereof by Moody's or any successor rating agency (or if at such time neither is issuing ratings, then a comparable rating of such other nationally recognized rating agency as shall be approved by the Administrative Agent in its reasonable judgment), (c) commercial paper rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's (or if at such time neither is issuing ratings, then a comparable rating of such other nationally recognized rating agency as shall be approved by the Administrative Agent in its reasonable judgment), (d) investments in money market funds complying with the risk limiting conditions of Rule 2a-7 or any successor rule of the Securities and Exchange Commission under the Investment Company Act, (e) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (b) above and (f) investments similar to any of the foregoing denominated in foreign currencies approved by the Governing Board of the Borrower, in each case provided in clauses (a), (b), (c) and (f) above only, maturing within twelve months after the date of acquisition.

"Permitted Subordinated Indebtedness" means (a) the Subordinated Guarantee and (b) Indebtedness of the Borrower which (i) does not mature, and is not subject to mandatory repurchase, redemption or amortization (other than pursuant to customary asset sale or change in control provisions requiring redemption or repurchase only if and to the extent then permitted by this Agreement), in each case, prior to the date that is one year after the Maturity Date, (ii) is not secured, directly or indirectly, by any assets of the Borrower or any Subsidiary, (iii) is not exchangeable or convertible into Indebtedness of the Borrower or any Subsidiary (other than Indebtedness which would qualify as "Permitted Subordinated Indebtedness" hereunder) or Disqualified Stock and (iv) is, together with any Guarantee thereof by any Subsidiary (a "Permitted Subordinated Guarantee"), subordinated to the Obligations pursuant to subordination provisions that are no less favorable to the Lenders than those applicable to offerings of "high yield" subordinated debt by similar issuers of similar debt at or about the same time or pursuant to other subordination provisions on terms reasonably satisfactory to the Administrative Agent.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

["Petition Date" has the meaning assigned to such term in the recitals to this Agreement.]¹⁷

---

¹⁷ To be included if applicable.

"PIK Interest Amount"  has the meaning set forth in Section 2.08(d).

"Plan"  means any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Preferred Stock" means, with respect to any Person, any Equity Interests in such Person that have preferential rights to any other Equity Interests in such Person with respect to dividends or redemptions upon liquidation.

"Prepayment Agent" means JPMorgan Chase Bank, N.A., in its capacity as prepayment agent in connection with any Voluntary Prepayment and its permitted successors in such capacity.

"Prepayment Amount" has the meaning assigned to such term in Section 2.15(b).

"Prepayment Notice" has the meaning assigned to such term in Section 2.15(b).

"Prime Rate" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A., as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Pro Forma Compliance" means, with respect to any event, that the Borrower is in *pro forma* compliance, calculated in accordance with Section 1.05, with each of the Financial Covenants recomputed as if the event with respect to which Pro Forma Compliance is being tested had occurred on the first day of each relevant period with respect to which current compliance with any Financial Covenant would be determined (for example, in the case of any Financial Covenant based on Consolidated Adjusted EBITDA, as if such event had occurred on the first day of the four fiscal quarter period ending on the last day of the most recent fiscal quarter in respect of which financial statements have been delivered pursuant to Section 5.01(a) or (b)).  *Pro forma* calculations made pursuant to this definition that require the calculation of Consolidated Adjusted EBITDA on a *pro forma* basis will be made in accordance with the last paragraph of the definition of such term, except that, when testing Pro Forma Compliance with respect to any acquisition or disposition, references to Material Acquisition and Material Disposition in such last paragraph will be deemed to include such acquisition and disposition.

"Prohibited Transaction" has the meaning assigned to such term in Section 406 of ERISA and Section 4975(f)(3) of the Code.

"Projections" has the meaning assigned to such term in Section 3.11.

"Publishing Agreement" means the Publishing Agreement dated as of November 17, 2006 between Idearc Media LLC (formerly known as Idearc Media Corp.) and Verizon.

"Qualifying Loans" has the meaning assigned to such term in Section 2.15(c).

"Range" has the meaning assigned to such term in Section 2.15(b).

"Refinancing Indebtedness" means Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to extend, renew, refinance, replace, defease or refund, or in exchange for existing Indebtedness ("Refinanced Debt"); provided that (i) such extending, renewing, refinancing, replacing, defeasing or refunding Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of, and unpaid interest (including post-petition interest) on, the Refinanced Debt plus the amount of any premiums paid thereon and fees and expenses associated therewith, (ii) such Indebtedness has an equal or later final maturity and an equal or longer Weighted Average Life than the Refinanced Debt, (iii) if the Refinanced Debt or any Guarantees thereof are subordinated to the Obligations, such Indebtedness and Guarantees thereof are subordinated to the Obligations on terms no less favorable in any material respect to the holders of the Obligations than the subordination terms of such Refinanced Debt or Guarantees thereof (and no Loan Party that has not guaranteed such Refinanced Debt Guarantees such Indebtedness), (iv) if such Refinanced Debt or any Guarantees thereof are secured, such Indebtedness and any Guarantees thereof are either unsecured or secured only by such assets as secured the Refinanced Debt and Guarantees thereof, (vii) if such Refinanced Debt and any Guarantees thereof are unsecured, such Indebtedness and Guarantees thereof are also unsecured, (v) such Indebtedness is issued only by the issuer of such Refinanced Debt and (vi) such Indebtedness is incurred not more than 30 days prior to and not more than 30 days after the date on which such Refinanced Debt is repaid, extended or renewed.

"Register" has the meaning set forth in Section 9.04(b).

"Registration Statement on Form S-4" means the Registration Statement on Form S-4 filed by the Ultimate Parent with the Securities and Exchange Commission on December 5, 2012.

"Regulation S-X" means Regulation S-X adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as in effect on the Closing Date.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, Controlling Persons and advisors of such Person and of each of such Person's Affiliates.

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

["Reorganization Plan" means the Debtors' Joint Prepackaged Chapter 11 Plan for the Borrower and its Subsidiaries, including any exhibits, supplements, appendices and schedules thereto, dated [          ], 2013, as amended, supplemented or otherwise modified from time to time in accordance with the SuperMedia Support Agreement and as confirmed by the Bankruptcy Court pursuant to the Confirmation Order.][18]

"Replacement Assets" means (a) non-current assets (including any such assets acquired by capital expenditures) that will be used or useful in a Permitted Business or (b) substantially all the assets of a Permitted Business or the voting stock of any Person engaged in a Permitted Business that will become on the date of acquisition thereof a Subsidiary Loan Party.

"Reportable Event" means any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Pension Plan.

---

[18] To be included if applicable.

"Required Lenders" means, at any time, Lenders having Loans representing more than 50% of the total outstanding principal amount of the Loans at such time.

"Responsible Officer" means (a) the chief executive officer and/or the president of the Borrower, (b) the chief operating officer of the Borrower, (c) any Financial Officer, (d) the general counsel of the Borrower and (e) any vice president of the Borrower who has been designated in writing as a Responsible Officer by the chief executive officer or the president of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, termination or amendment of any Equity Interests in the Borrower or any Subsidiary or of any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Subsidiary.

"Restructuring Notes" means the 12%/14% Senior Subordinated Notes due 2017 of the Ultimate Parent issued pursuant to the Restructuring Notes Indenture in an aggregate principal of $300,000,000 on January 29, 2010.

"Restructuring Notes Indenture" means the Indenture, dated as of January 29, 2010, between the Ultimate Parent and The Bank of New York Mellon, as trustee.

"RHDC" means R.H. Donnelley Corporation, a Delaware corporation.

"RHDI" means R.H. Donnelley Inc., a Delaware corporation.

"RHDI Credit Agreement" means (a) the Fourth Amended and Restated Credit Agreement, dated as of the Closing Date (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among the Ultimate Parent, RHDI, the several banks and other financial institutions or entities from time to time party thereto and Deutsche Bank Trust Company Americas, as administrative agent, and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different banks) in whole or in part (under one or more agreements) the Indebtedness and other obligations outstanding under the RHDI Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including, without limitation, adding or removing any Person as a borrower, guarantor or other obligor thereunder).

"RHDI Existing Credit Agreement" means the Third Amended and Restated Credit Agreement, dated as of January 29, 2010, among the Ultimate Parent, RHDI, as borrower, the several lenders from time to time party thereto and Deutsche Bank Trust Company Americas, as administrative agent, as amended, supplemented or otherwise modified prior to the effectiveness of the RHDI Credit Agreement.

"RHDI Loan Documents" means the "Loan Documents" as defined in the RHDI Credit Agreement.

"S&P" means Standard & Poor's Financial Services LLC and any successors thereto.

"Sale and Leaseback Transaction" has the meaning assigned to such term in Section 6.06.

"Sale and Leaseback Indebtedness" means, in respect of a Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at the interest rate implicit in the transaction) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction (including any period for which such lease has been extended), determined in accordance with GAAP; provided, that if such Sale and Leaseback Transaction results in a Capitalized Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capitalized Lease Obligations".

"SEC" means the U.S. Securities and Exchange Commission.

"Secured Parties" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Security Documents" means the Guarantee and Collateral Agreement, the Mortgages and each other security agreement or other instrument or document executed and delivered by any SuperMedia Loan Party pursuant to Section 5.11 or 5.12 or pursuant to the Guarantee and Collateral Agreement to secure any of the Obligations.

"Service Company" means Dex One Service, Inc., a Delaware corporation.

"Shared Assets" means any asset (including intellectual property rights) owned by the Service Company or any License Subsidiary.

"Shared Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as collateral agent for the Shared Collateral Secured Parties, pursuant to the terms of the Intercreditor Agreement.

"Shared Collateral Loan Parties" means the Ultimate Parent, the Dex Parent, Dex Digital, RHDC, the Service Company, and each Newco that is a party to the Shared Collateral Security Documents.

"Shared Collateral Secured Parties" has the meaning as set forth in the Intercreditor Agreement.

"Shared Collateral Security Documents" means the Shared Guarantee and Collateral Agreement, the Newco Subordinated Guarantees, any mortgage and each other security agreement or other instruments or documents executed and delivered by any Shared Collateral Loan Party pursuant to Section 5.12 or pursuant to the Shared Guarantee and Collateral Agreement to secure any of the SuperMedia Obligations.

"Shared Guarantee and Collateral Agreement" means the Amended and Restated Guarantee and Collateral Agreement in substantially the form of Exhibit H hereto, among each Shared Collateral Loan Party (other than the Newco Subordinated Guarantors) and the Shared Collateral Agent.

"Shared Services" means the centralized, shared or pooled services, undertakings and arrangements which are provided by the Service Company or any of its Subsidiaries to or for the benefit of the Ultimate Parent and its Subsidiaries pursuant to the Shared Services Agreement, including, without limitation, the acquisition and ownership of assets by the Service Company or any of its Subsidiaries used in the provision of the foregoing and centralized payroll, benefits and account payable operations.

"Shared Services Agreement" means the Amended and Restated Shared Services Agreement in substantially the form of Exhibit E hereto, dated as of the Closing Date, among the Ultimate Parent, the Service Company, the Borrower and the other Subsidiaries of the Ultimate Parent party thereto.

"Shared Services Transactions" means, collectively, (a) the engagement of the Service Company for the provision of Shared Services pursuant to the Shared Services Agreement, (b) sales, transfers and other dispositions of assets to the Service Company or any of its Subsidiaries pursuant to the Shared Services Agreement for use in the provision of Shared Services, (c) the transfer of employees of the Loan Parties to the Service Company or any of its Subsidiaries for the provision of Shared Services pursuant to the Shared Services Agreement and (d) payments, distributions and other settlement of payment obligations by the recipient of Shared Services to, or for ultimate payment to, the provider of such Shared Services pursuant to the Shared Services Agreement in respect of the provision of such Shared Services (including, without limitation, the prefunding in accordance with the Shared Services Agreement of certain such payment obligations in connection with the establishment of the payment and settlement arrangements under the Shared Services Agreement); provided, that all such payments, distributions and settlements shall reflect a fair and reasonable allocation of the costs of such Shared Services in accordance with the terms of the Shared Services Agreement (it being understood and agreed that payments in respect of tax liabilities or tax attributes pursuant to the Tax Sharing Agreement shall not constitute Shared Services Transactions; provided, further, that the foregoing shall not restrict the ability of the Borrower to make Restricted Payments (x) pursuant to Section 6.08(a)(vii) to the Service Company in respect of tax liabilities incurred by the Service Company in connection with the performance of its obligations under the Shared Services Agreement).

"Specified Asset" means owned real property and patents, trademarks, trade names, copyrights and other intellectual property.

"Specified Charges" means (a) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with the Mergers, this Agreement (including, for the avoidance of doubt, costs, fees, and expenses incurred in connection with satisfying the conditions precedent in Sections 4.01(e) and 4.01(f)) and the other Loan Documents, and the transactions contemplated by the SuperMedia Support Agreement[, including, those incurred in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases] and (b) out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Administrative Agent and the steering committee Lenders and reimbursed by the Borrower (without, including without limitation, the fees and expenses of the Administrative Agent and the steering committee Lenders) incurred in connection with this Agreement (including, for the avoidance of doubt, costs, fees, and expenses incurred in connection with satisfying the conditions precedent in Sections 4.01(e) and 4.01(f)) and the other Loan Documents, and the transactions contemplated by the SuperMedia Support Agreement[, including, those incurred in connection with the events leading up to, and throughout, the ongoing administration of the Chapter 11 Cases].[19]

"Statutory Reserve Rate" means a fraction (expressed as a decimal carried to the sixth decimal place), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those

---

[19] To be included if applicable.

imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Guarantee" means the Guarantee made by the Borrower pursuant to the Subordinated Guarantee Agreement.

"Subordinated Guarantee Agent" has the meaning assigned to such term in the Subordinated Guarantee Agreement.

"Subordinated Guarantee Agreement" means the Subordinated Guarantee Agreement, dated as of the Closing Date, attached hereto as Exhibit F, among the Borrower, Dex East, Dex West and RHDI.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more Subsidiaries of the parent or by the parent and one or more Subsidiaries of the parent.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Loan Party" means any Subsidiary (other than an Excluded Subsidiary) that is a party to the Guarantee and Collateral Agreement.

"SuperMedia Loan Parties" means the Borrower and the Subsidiary Loan Parties.

"SuperMedia Merger" has the meaning assigned to such term in the recitals of this Agreement.

"SuperMedia Obligations" has the meaning assigned to such term in the Intercreditor Agreement.

"SuperMedia Support Agreement" means the Support and Limited Waiver Agreement dated as of December 5, 2012 among the Borrower, certain Subsidiaries of the Borrower party thereto, the Administrative Agent and each of the lenders party thereto.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination values determined in accordance therewith, such termination values and (b) for any date prior to the date referenced in clause (a), the amounts determined as the mark-to-market values for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender).

"Tax Payments" means payments for (i) the net amounts payable by the Borrower pursuant to the Tax Sharing Agreement for the current tax period and (ii) to the extent not duplicative with (i), taxes which are not determined by reference to income, but which are imposed on a direct or indirect owner of the Borrower as a result of such owner's ownership of the equity of the Borrower.

"Tax Sharing Agreement" means the Tax Sharing Agreement in the form of Exhibit L hereto, dated the Closing Date, among the Borrower, SuperMedia Sales Inc., SuperMedia Services Inc., Newdex, Dex One and the Service Company.

"Taxes" means any and all present or future taxes (including documentary taxes), levies, imposts, duties, deductions, charges, fees, assessments or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Title Company" has the meaning assigned to such term in clause (h) of the definition of "Collateral and Guarantee Requirement".

"Total Indebtedness" means, as of any date, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding as of such date, other than the Subordinated Guarantee, determined on a consolidated basis in accordance with GAAP and which would be reflected as long-term debt or short-term debt on a consolidated balance sheet of the Borrower in accordance with GAAP if such balance sheet were prepared on such date, minus, solely for purposes of Section 6.13, the lesser of (i) the aggregate amount of Unrestricted Cash and (ii) $50,000,000; provided, that the amount of such Indebtedness shall be determined exclusive of any reimbursement obligations and intercompany non-cash obligations constituting intercompany Indebtedness or Attributable Debt owing to the Service Company incurred pursuant to the Shared Services Transactions.  Total Indebtedness shall in all cases be calculated without giving effect to Accounting Standards Codification 815.

"Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, (b) [the effectiveness and consummation of the Reorganization Plan pursuant to the Confirmation Order and][20] and (c) the payment of fees and expenses in connection with the Amendments and the Loan Documents.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"Ultimate Parent" means (i) prior to the Mergers, Dex One, and (ii) after the Mergers, Newdex.

---

[20] To be included if applicable.

"Ultimate Parent Asset Disposition" means any sale, transfer or other disposition (including pursuant to a public offering or spin-off transaction) by the Ultimate Parent or any Subsidiary thereof of all or a portion of the Equity Interests of the Borrower, Dex East, Dex West, RHDI, Dex Digital, RHDC or any Newco (or substantially all of the assets constituting a business unit, division or line of business thereof).

"Ultimate Parent Equity Issuance" means the issuance by the Ultimate Parent of any Equity Interests, or the receipt by the Ultimate Parent of any capital contribution, other than (i) any issuance of Equity Interests or receipt of capital contributions to the extent as a result of (x) a non-cash exchange of Restructuring Notes or Additional Notes for Equity Interests or (y) the issuance of Equity Interests that are issued on a non-cash basis as consideration for a Permitted Acquisition or other Investment permitted hereunder, (ii) any issuance of Equity Interests to, or receipt of any capital contribution from, the Ultimate Parent, the Dex Parent or any SuperMedia Loan Party or (iii) any issuance of Equity Interests made on the Closing Date in connection with the consummation of [the Mergers] [the "Restructuring Transactions" as defined in the Reorganization Plan][21] to the extent permitted under the Merger Agreement.

"Ultimate Parent PIK Election" means the election by the Ultimate Parent to make paid-in-kind interest payments on the Restructuring Notes as permitted by the Restructuring Notes Indenture.

"Unrestricted Cash" means the amount of cash and Permitted Investments of the Borrower and the other Loan Parties on such date, excluding cash and Permitted Investments that are (i) subject to any consensual Lien (other than Liens referred to in Section 6.02(a), Section 6.02(h) or Section 6.02(i)) or (ii) subject to any other contractual restriction specifically requiring the application thereof or of the proceeds thereof to a particular use.

"U.S. Person" means "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.12(f)(ii)(3).

"Verizon" means Verizon Communications Inc., a Delaware corporation.

"Voluntary Prepayment" has the meaning assigned to such term in Section 2.15.

"Weighted Average Life" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(a)  the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(b)  the then outstanding principal amount of such Indebtedness.

---

[21] To be included if applicable.

"Wholly Owned Subsidiary" means, as to any Person, any other Person all of the Equity Interests of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02  Type of Loans and Borrowings.  For purposes of this Agreement, Loans may be referred to by Type (e.g., a "Eurodollar Loan").  Borrowings also may be referred to by Type (e.g., a "Eurodollar Borrowing").

SECTION 1.03  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  When the performance of any covenant, duty or obligation under any Loan Document is required on a day that is not a Business Day, unless otherwise expressly provided therein, the date of such required performance shall be extended to the immediately succeeding Business Day.

SECTION 1.04  Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof (including any definition) to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until  such notice shall have been withdrawn or such provision  amended in accordance herewith.  Upon any such request for an amendment, the Borrower, the Required Lenders and the Administrative Agent agree to consider in good faith any such amendment in order to amend the provisions of this Agreement so as to reflect equitably such accounting changes so that the criteria for evaluating the Borrower's financial condition shall be the same after such accounting changes as if such accounting changes had not occurred.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Accounting Standards Codification having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein.

SECTION 1.05  Certain Terms.  "Available Cash", "Consolidated Fixed Charge Coverage Ratio", "Consolidated Net Income", "Pro Forma Compliance", "Total Indebtedness", the "Leverage Ratio" and the "Consolidated Interest Coverage Ratio" shall be calculated for the Borrower and its Subsidiaries on a stand-alone basis as if, after closing of the Mergers, (1) the Borrower were not a Subsidiary of the Ultimate Parent and (2) the preparation of financial statements and other calculations (including without limitation the Leverage Ratio, the Consolidated Interest Coverage Ratio and the Consolidated Fixed Charge Coverage Ratio) in accordance with GAAP did not require or give effect to intercompany eliminations for transactions between the Borrower and its Subsidiaries on the one hand and the Ultimate Parent and its other Subsidiaries on the other hand, and all transactions with the Ultimate Parent or its other Subsidiaries were transactions with a person not affiliated with the Borrower (provided that Section 6.09 shall continue to apply and give effect to the affiliate status of the Ultimate Parent and its other Subsidiaries).

ARTICLE II

The Credits

SECTION 2.01  Loans Deemed Made on the Closing Date.  Subject to the terms and conditions set forth herein, each Existing Loan shall continue to be outstanding and, on and as of the Closing Date, constitute a term loan hereunder (each, a "Loan" and, collectively, the "Loans").  Amounts repaid or prepaid in respect of Loans may not be reborrowed.

SECTION 2.02  Loans and Borrowings.  (a)  Each Loan shall be maintained ratably by the Lenders as part of a Borrowing consisting of Loans of the same Type.

(b)  The Loans deemed made pursuant to Section 2.01 shall be made without any actual funding and each Eurodollar Borrowing under and as defined in the Existing Credit Agreement shall be continued as a Eurodollar Borrowing hereunder, with an Interest Period ending on the same day it otherwise would have ended.  Subject to Section 2.09, after the Closing Date, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.

(c)  At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 10 Eurodollar Borrowings outstanding.

(d)  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to elect to convert or continue any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.03  Conversion and Continuation Options.  (a)  The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 a.m., New York City time, on the Business Day preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto.  The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 a.m., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor).

(b)  Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice (not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto) to the Administrative Agent of the length of the next Interest Period to be applicable to such Loans.

(c)  To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.  Each telephonic and written Interest Election Request shall specify the following information:

(i)        the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)       the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)      whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)      if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof.

(e)  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to a Eurodollar Borrowing with an Interest Period of one month's duration.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as such Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.04  Evidence of Debt.  (a)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan held by such Lender, including the amounts of principal and interest (including, without limitation, any PIK Interest Amount) payable and paid to such Lender from time to time hereunder.

(b)  The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan outstanding hereunder, the Type thereof and the Interest Period applicable thereto,

(ii) the amount of any principal or interest (including, without limitation, any PIK Interest Amount) due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(c)  The entries made in the accounts maintained pursuant to paragraph (a) or (b) of this Section shall be conclusive evidence of the existence and amounts of the obligations recorded therein, absent demonstrable error; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(d)  Any Lender may request that Loans held by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form reasonably satisfactory to the Administrative Agent and the Borrower; provided that, in order for any such promissory note to be delivered on the Closing Date, the request therefor shall be delivered no later than two Business Days prior to the Closing Date.  Such promissory note shall state that it is subject to the provisions of this Agreement.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form.

SECTION 2.05  Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender on the Maturity Date.

SECTION 2.06  Prepayment of Loans.  (a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (but subject to Section 2.11), in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $1,000,000 or, if less, the amount outstanding, subject to the requirements of this Section.

(b)  (i)  In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any Subsidiary in respect of any Asset Disposition, the Borrower shall, not later than the fifth Business Day after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate principal amount equal to such Net Proceeds; provided that if the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer to the effect that the Borrower or a Subsidiary intends to apply the Net Proceeds from such event (or a portion thereof specified in such certificate) within 365 days after receipt of such Net Proceeds to acquire Replacement Assets and certifying that no Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds from such event (or the portion of such Net Proceeds specified in such certificate, if applicable) except to the extent of any such Net Proceeds that have not been so applied by the end of such 365 day period, at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been so applied.  Notwithstanding the foregoing, in each fiscal year the Borrower may exclude up to $5,000,000 of Net Proceeds of Asset Dispositions from the requirements of this paragraph (b) (provided that the Net Proceeds of a single Asset Disposition may only be excluded pursuant to the foregoing sentence in the fiscal year during which such Asset Disposition was consummated).

(ii)    In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any Subsidiary in respect of any Debt Issuance, the Borrower shall, not later than the fifth Business Day after the date on which such Net Proceeds are received, prepay Borrowings in an aggregate principal amount equal to 100% of such Net Proceeds.

(iii)    In the event and on each occasion that any Net Proceeds are received by or on behalf of the Ultimate Parent or any of its Subsidiaries in respect of any Ultimate Parent Asset Disposition, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received by the Ultimate Parent or any of its Subsidiaries, prepay Borrowings in an aggregate amount equal to 100% of the Net Proceeds of such Ultimate Parent Asset Disposition; provided that, to the extent that no amount is deducted in the calculation of the Net Proceeds of such Ultimate Parent Asset Disposition because no amount is paid to and distributed by the Subordinated Guarantee Agent pursuant to the Subordinated Guarantee Agreement, the percentage of such Net Proceeds to be prepaid shall be the percentage that the SuperMedia Credit Parties (as defined in the Subordinated Guarantee Agreement) would have received pursuant to the Subordinated Guarantee Agreement if the Net Proceeds had been paid to and distributed by the Subordinated Guarantee Agent pursuant to the Subordinated Guarantee Agreement.

(iv)    In the event and on each occasion that any Net Proceeds are received by or on behalf of the Ultimate Parent or any of its Subsidiaries in respect of any Ultimate Parent Equity Issuance, the Borrower shall, not later than the Business Day next after the date on which such Net Proceeds are received by the Ultimate Parent or any of its Subsidiaries, prepay Borrowings in an aggregate amount equal to 50% of the Allocable Net Proceeds of such Ultimate Parent Equity Issuance.

(c)  Within five Business Days following the date on which financial statements are delivered by the Borrower pursuant to Section 5.01(a) or (b), the Borrower will prepay Borrowings in an aggregate amount equal to (i) 67.50% of the amount of any increase in Available Cash during such fiscal quarter less (ii) the aggregate principal amount of any prepayments of Loans pursuant to Section 2.06(a) or 2.06(d)(ii) made during the period from the last day of the fiscal period covered by such financial statements to the date the mandatory prepayment for such quarter is made pursuant to this paragraph (c) not to exceed the amount set forth in an Advance Prepayment Certificate for such fiscal quarter ("Advance Prepayments").

(d)  Subject to the immediately following sentence, the Borrower shall on one or more occasions use the aggregate Borrower's Discounted Prepayment Portion of Available Cash, as determined following the end of a fiscal quarter, to effect Voluntary Prepayments within 180 days after the date on which financial statements are delivered pursuant to Section 5.01(a) or (b) with respect to such quarter, with such Voluntary Prepayments to be designated as having been made to satisfy the Borrower's obligations under this Section 2.06(d) pursuant to an Election Notice delivered to the Administrative Agent.  If the Borrower does not make such Voluntary Prepayments within such 180-day period equal to such Borrower's Discounted Prepayment Portion of Available Cash for the applicable fiscal quarter (as designated in the applicable Election Notice), the Borrower shall (i) make an optional prepayment pursuant to Section 2.06(a) at the end of the fiscal quarter during which such 180-day period (as designated in an Election Notice to such effect) expires, or (ii) make an Advance Prepayment pursuant to Section 2.06(c) (as designated in an Election Notice to such effect).

(e)  The Borrower may retain the Borrower's Discretionary Portion of Available Cash and may utilize such Borrower's Discretionary Portion of Available Cash for purposes otherwise permitted hereunder, including, but not limited to, from time to time and at the Borrower's option and in the Borrower's sole discretion, (i) to effect Voluntary Prepayments or (ii) for optional prepayments pursuant to Section 2.06(a).

(f)  The aggregate amount required to be applied to prepayments pursuant to paragraph (b), (c) and (d) above will be applied on a *pro rata* basis, in accordance with the relative amounts of the then outstanding Borrowings first to the then outstanding ABR Borrowings and second to the then

outstanding Eurodollar Borrowings (and if more than one Interest Period is applicable to Eurodollar Borrowings, to the Eurodollar Borrowings with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowings with the most number of days remaining in the Interest Period applicable thereto in each case, subject to Section 2.11).

(g)  The Borrower shall notify the Administrative Agent by telephone (confirmed by email of a "pdf" copy or telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 2:00 p.m., New York City time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount thereof; provided that the Borrower may provide that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the consummation of an acquisition, sale or other similar transaction, the receipt of proceeds from the incurrence or issuance of Indebtedness or Equity Interests or the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest and other amounts to the extent required by Sections 2.08 and 2.11.

SECTION 2.07  Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

SECTION 2.08  Interest.  (a)  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin.

(b)  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)  Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2.00% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2.00% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(d)  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion, and (iv) a portion of the interest, not to exceed 2.50% per annum, accrued during and after the first fiscal quarter commencing after the first anniversary of the Closing Date for which the Consolidated Fixed Charge Coverage Ratio (determined on a trailing four-quarter basis ending with such quarter) is less than 1.25 to 1.00, may be paid at the Borrower's option (as notified to the Administrative Agent in writing at least

three Business Days prior to each relevant Interest Payment Date) through an increase in the principal amount of the Loans equal to the amount of such interest (the "PIK Interest Amount").

(e)   All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent demonstrable error.

SECTION 2.09  Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)  the Administrative Agent determines (which determination shall be conclusive absent demonstrable error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)  the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective; provided, however, that, in the case of a notice received pursuant to clause (b) above, if the Administrative Agent is able prior to the commencement of such Interest Period to ascertain, after using reasonable efforts to poll the Lenders giving such notice, that a rate other than the Alternate Base Rate would adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, the Administrative Agent shall notify the Borrower of such alternate rate and the Borrower may agree by written notice to the Agent prior to the commencement of such Interest Period to have the Loans included in such Borrowing bear interest for such Interest Period at an interest rate equal to such alternate rate, in which case such alternate interest rate shall apply to all the Eurodollar Loans included in the relevant Borrowing.

SECTION 2.10  Increased Costs.  (a)  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)      subject the Administrative Agent or any Lender to any Taxes (other than Indemnified Taxes, Excluded Taxes and Other Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans held by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of maintaining any Eurodollar Loan or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)  If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans held by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time after submission by such Lender to the Borrower of a written request therefor, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)  A certificate of a Lender setting forth in reasonable detail the matters giving rise to a claim under this Section 2.10 and the calculation of such claim by such Lender or its holding company, as the case may be, shall be delivered to the Borrower and shall be conclusive absent demonstrable error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 15 Business Days after receipt thereof.

(d)  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.11  Break Funding Payments.  In the event of (a) the payment by or on behalf of the Borrower of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure by the Borrower to convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.06(g) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.14, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall consist of an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but excluding the Applicable Margin), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to convert or continue, for the period that would have been the Interest Period for such Loan) over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered promptly to the Borrower and shall be conclusive absent demonstrable error.  The Borrower

shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt thereof.

SECTION 2.12  Taxes.  (a)  Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of, and without deduction for, any Taxes; provided that if the applicable withholding agent shall be required to deduct any Taxes from such payments, then (i) if such Taxes are Indemnified Taxes or Other Taxes, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)  In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or, at the option of the Administrative Agent timely reimburse it for the payment thereof.

(c)  The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within 30 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes payable or paid by the Administrative Agent or such Lender, as the case may be, directly or indirectly to a Governmental Authority on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such Administrative Agent or Lender (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A copy of a receipt or any other certificate documenting payment and reasonably acceptable to the Borrower as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)  As soon as reasonably practicable after any payment of Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)  Each Lender shall indemnify the Administrative Agent within ten days after written demand therefor, for the full amount of (i) any Taxes attributable to such Lender and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)  (i) Each Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), on or before the date that such Foreign Lender becomes a Lender hereunder or becomes entitled to any payments under any other Loan Document and at such times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without or at a reduced rate of withholding.  In addition, any Lender, at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Each Lender shall promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption of or reduction in withholding and deliver to the Borrower and the Administrative Agent further copies of any documentation on or before the date that any such documentation expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent documentation previously delivered.

(ii)  Without limiting the generality of the foregoing, in the event the Borrower is a U.S. Person,

(A)  any Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date that such Foreign Lender becomes a Lender hereunder or becomes entitled to any payments under any other Loan Document (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent or at such times prescribed by applicable law, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)  in the case of any Foreign Lender that is claiming the benefits of an income tax treaty to which the United States is a party, two duly completed copies of United States Internal Revenue Service Form W-8BEN (certifying that it is a resident of the applicable country within the meaning of the income tax treaty between the United States and that country) or successor applicable form;

(ii)  in the case of any Foreign Lender that is claiming an exemption from United States federal withholding tax because the payments made hereunder are effectively connected with a United States trade or business of such Foreign Lender, two duly completed copies of United States Internal Revenue Service Form W-8ECI, or successor applicable form;

(iii)  in the case of any Foreign Lender that is claiming the so-called "portfolio interest exemption", under Section 871(h) or 881(c) of the Code, (A) two duly completed certificates substantially in the form of Exhibit C (any such certificate, a "U.S. Tax Compliance Certificate") and (B) two duly completed copies of Internal Revenue Service Form W-8BEN, or successor applicable form, together with any information required to be provided with such form;

(iv)  in the case of any Foreign Lender that is an intermediary or flow-through entity for United States federal withholding tax purposes, two duly completed copies of Internal Revenue Service Form W-8IMY, or successor applicable form, together with any information required to be provided with such form;

(B)  two duly completed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(C)  if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(D)  any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of Internal Revenue Service Form W-9 certifying that such Lender is exempt from United States federal backup withholding tax.

(g)  If the Administrative Agent or a Lender determines, in its sole discretion and good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.12, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.12 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or Lender be required to pay any amount to the Borrower pursuant to this paragraph (g) the payment of which would place the Administrative Agent or Lender in a less favorable net after-Tax position than the Administrative Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

SECTION 2.13  Payments Generally; Pro Rata Treatment; Sharing of Setoffs.  (a)  The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.10, 2.11 or 2.12, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such

payment (or, if no such time is expressly required, prior to 3:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent to such account as the Administrative Agent shall from time to time specify in a notice delivered to the Borrower, except that payments pursuant to Sections 2.10, 2.11, 2.12 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars.

(b) If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder (after giving effect to all applicable grace periods and cure periods, if any), such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c) If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the relative aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d) Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of any Lender hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to such Lender the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.13(d) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.14  Mitigation Obligations; Replacement of Lenders.  (a)  If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender to Section 2.12, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or 2.12, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense that such Lender deems material and would not otherwise be, in the reasonable judgment of such Lender, materially disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)  If (i) any Lender requests compensation under Section 2.10, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12 or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and such Lender shall be released from all obligations hereunder and (iii) in the case of any such assignment resulting from the status of such Lender as a Non-Consenting Lender, such assignment, together with any assignments by other Non-Consenting Lenders, will enable the Borrower to obtain sufficient consents to cause the applicable amendment, modification or waiver to become effective.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 2.15  Voluntary Prepayments.  (a)  The Borrower may elect to notify the Administrative Agent and the Lenders that it may wish to make below par voluntary prepayments of the Loans (each such payment a "Voluntary Prepayment") pursuant to the procedures set forth in this Section 2.15; provided that (x) the Borrower shall specify in an Election Notice to the Administrative Agent whether such Voluntary Prepayment will be a utilization of the Borrower's Discounted Prepayment Portion of Available Cash or the Borrower's Discretionary Portion of Available Cash and (y) Voluntary Prepayments shall only be permitted to be made in amounts not exceeding aggregate unused amount of the Borrower's Discounted Prepayment Portion of Available Cash or the aggregate unused amount of the Borrower's Discretionary Portion of Available Cash (as applicable) at the time such Voluntary Prepayment is made.  At the time of any Voluntary Prepayment, the Borrower shall certify, with reasonable supporting detail (as determined by the Administrative Agent), (i) compliance with the requirements of this Section 2.15, which certification shall include a schedule setting forth the computation (and any utilization by the Borrower) of Available Cash, Borrower's Discounted Prepayment

Portion of Available Cash and Borrower's Discretionary Portion of Available Cash, (ii) that no Event of Default pursuant to Section 6.13 could reasonably be expected to occur during the succeeding four calendar quarters if such Voluntary Prepayment is not made, (iii) that such Voluntary Prepayment shall have been approved by at least 66 ⅔% of the Borrower's Governing Board and (iv) that immediately prior to and after giving effect to any Voluntary Prepayment, (x) no Default or Event of Default shall have occurred and be continuing and (y) the Loan Parties shall have Unrestricted Cash of at least $40,000,000.

(b)  In connection with any Voluntary Prepayment, the Borrower shall notify the Lenders (the "Prepayment Notice") that the Borrower desires to prepay Loans with cash proceeds in an aggregate amount (each, a "Prepayment Amount") specified by the Borrower (which amount shall be not less than $5,000,000) at a price within a range (the "Range") to be specified by the Borrower equal to a percentage of par (not to exceed 100%) (the "Payment Percentage") of the principal amount of the Loans to be prepaid.  No proposed Voluntary Prepayment shall be made if the amount expended to make such Voluntary Prepayment would exceed an amount equal to the aggregate unused amount of the Borrower's Portion of Available Cash at such time.  For the avoidance of doubt, Voluntary Prepayments may be made only from the Borrower's Portion of Available Cash.

(c)  In connection with any Voluntary Prepayment, the Borrower shall allow each Lender to specify a Payment Percentage (the "Acceptable Payment Percentage") for a principal amount (subject to rounding requirements specified by the Prepayment Agent) of Loans at which such Lender is willing to permit such Voluntary Prepayment.  Based on the Acceptable Payment Percentages and principal amounts of Loans specified by Lenders, the applicable Payment Percentage (the "Applicable Payment Percentage") for the Voluntary Prepayment shall be the lowest Acceptable Payment Percentage at which the Borrower can complete the Voluntary Prepayment for the applicable Prepayment Amount that is within the applicable Range; provided that if the offers received from Lenders are insufficient to allow the Borrower to complete the Voluntary Prepayment for the applicable Prepayment Amount, then the Applicable Payment Percentage shall instead be the highest Acceptable Payment Percentage that is within the applicable Range.  The Borrower shall prepay Loans (or the respective portions thereof) offered by Lenders at the Acceptable Payment Percentages specified by each such Lender that are equal to or less than the Applicable Payment Percentage ("Qualifying Loans") by remitting an amount to each Lender to be prepaid equal to the product of the face amount, or par, of the Loan being prepaid multiplied by the Applicable Payment Percentage; provided that if the aggregate cash proceeds required to prepay Qualifying Loans (disregarding any interest payable under Section 2.15(d)) would exceed the applicable Prepayment Amount for such Voluntary Prepayment, the Borrower shall prepay such Qualifying Loans at the Applicable Payment Percentage ratably based on the respective principal amounts of such Qualifying Loans (subject to rounding requirements specified by the Prepayment Agent).

(d)  All Loans prepaid by the Borrower pursuant to this Section 2.15 shall be accompanied by payment of accrued and unpaid interest on the par principal amount so prepaid to, but not including, the date of prepayment.

(e)  Each Voluntary Prepayment shall be consummated pursuant to procedures (including as to rounding and minimum amounts, Type and Interest Periods of accepted Loans, irrevocability of Prepayment Notice and other notices by the Borrower and Lenders and determination of Applicable Payment Percentage) reasonably established by the Prepayment Agent in consultation with the Borrower and not inconsistent with the terms hereof.

(f)  Each Voluntary Prepayment shall constitute an optional prepayment of Loans for all purposes under this Agreement, including for purposes of Section 2.06(a), but excluding for purposes of Section 2.06(c).

(g)  Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections  2.06 and 2.13), the Lenders hereby consent to the transactions described in this Section 2.15 and further acknowledge that in connection with any Voluntary Prepayment, principal and interest payments may be made on a non-pro rata basis, as determined by the Prepayment Agent, to the applicable Lenders.

(h)  This Section 2.15 shall not require the Borrower to undertake or any Lender to participate in any Voluntary Prepayment.

ARTICLE III

Representations and Warranties

The Borrower represents and warrants to the Lenders with respect to itself and its Subsidiaries and, commencing after the consummation of the Mergers and solely for purposes of Sections 3.01, 3.02, 3.03, 3.08, 3.09, 3.11, 3.12, 3.18, the Ultimate Parent (with respect to itself and the Service Company) represents and warrants to the Lenders that:

SECTION 3.01  Organization; Powers.  Each of the Ultimate Parent, the Service Company, the Borrower and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required by applicable law.

SECTION 3.02  Authorization; Enforceability.  The Transactions entered into and to be entered into by each of the Ultimate Parent, the Service Company and the SuperMedia Loan Parties are within such Person's corporate (or other organizational) powers and have been duly authorized by all necessary corporate (or other organizational) and, if required, stockholder or member action.  This Agreement has been duly executed and delivered by each of the Ultimate Parent and the Borrower and constitutes, and each other Loan Document to which any of the Ultimate Parent, the Service Company and the SuperMedia Loan Parties is to be a party, when executed and delivered by such Person, will constitute, a legal, valid and binding obligation of such Person, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03  Governmental Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) any applicable law or regulation, (ii) the charter, by-laws or other organizational documents of the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries or (iii) any order of any Governmental Authority applicable to the Ultimate Parent, the Service Company, the Borrower or such Subsidiary, (c) will not violate or result in a default under any material indenture, agreement or other instrument binding upon the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries or any of their assets, or give rise to a right thereunder to require any payment to be made by the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries and (d) will not result in the creation or imposition of any Lien on any asset of the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries, except Liens permitted under Section 6.02 and except with respect to clauses (a), (b)(i)

and (iii) and (c) to the extent any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04  Financial Condition; No Material Adverse Change.  (a)  The Borrower has heretofore furnished to the Lenders (i) the Borrower's audited consolidated balance sheet and related consolidated statements of income, shareowners' investment and cash flows as of and for the fiscal years ended December 31, 2012, December 31, 2011 and December 31, 2010, reported on by Ernst & Young LLP, independent registered public accounting firm, without qualification and (ii) its unaudited consolidated balance sheet and related unaudited consolidated statements of income and cash flows as of and for the fiscal quarter and the portion of the fiscal year ended [          ], 2013, certified by a Financial Officer.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)  The Borrower has heretofore furnished to the Lenders its *pro forma* consolidated balance sheet as of [          ] prepared giving effect to the Transactions as if such Transactions had occurred on such date.  Such *pro forma* consolidated balance sheet (i) accurately reflects all adjustments reasonably believed by the Borrower to be necessary to give effect to the Transactions and (ii) presents fairly, in all material respects, on a *pro forma* basis, the financial position of the Borrower and its consolidated Subsidiaries as of such date, as if the Transactions had occurred on such date.

(c)  Since December 31, 2012, except as set forth in the Disclosure Statement, there has been no change, development, event, effect, condition or occurrence that, individually or in the aggregate, has had a Material Adverse Effect.

SECTION 3.05  Properties.  (a)  Each of the Borrower and its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to their business (including its Mortgaged Properties), taken as a whole, except for Liens permitted by Section 6.02 and minor defects in title that do not interfere with its ability to conduct their business as currently conducted and except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)  Each of the Borrower and its Subsidiaries owns, or has the right to use, all trademarks, trade names, copyrights, patents and other intellectual property material to their business, taken as a whole, and, to the knowledge of the Borrower, the use thereof by the Borrower and its Subsidiaries does not infringe upon the rights of any other Person, except, in each case, for such failure to own or have the right to use or such infringement that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)  Schedule 3.05 sets forth the address of each real property that has an individual Fair Market Value (including fixtures and improvements) equal to or greater than $1,000,000 and is owned by the Borrower or any of its Subsidiaries as of the Closing Date and indicates each such property that is a Mortgaged Property as of the Closing Date.

SECTION 3.06  Litigation and Environmental Matters.  (a)  [Except for the Disclosed Matters,][22] there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the

---

[22] To be included if applicable.

Borrower or any of its Subsidiaries which would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect [(other than the Disclosed Matters)].

(b)  Except for [either the Disclosed Matters or][23] any other matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any Environmental Liability.

SECTION 3.07  Compliance with Laws and Agreements; Absence of Default.  Each of the Borrower and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority, in each case applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08  Investment Company Status.  None of the Ultimate Parent, the Service Company, the Borrower or any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09  Taxes.  Each of the Ultimate Parent, the Service Company, the Borrower and its Subsidiaries has timely filed (taking into account any extensions) or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except (a) any Taxes that are being contested in good faith by appropriate proceedings and for which the Ultimate Parent, the Service Company, the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so has not had and would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10  Employee Benefit Plans.  (a)  Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) each Loan Party and each of their respective ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Plans and the regulations and published interpretations thereunder; (ii) no ERISA Event has occurred or is reasonably expected to occur; and (iii) all amounts required by applicable law with respect to or by the terms of, any retiree welfare benefit arrangement maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate has an obligation to contribute have been accrued in accordance with Accounting Standards Codification 715. The Fair Market Value of the assets of each Plan was not materially less than the present value of either the accumulated benefit obligations or projected benefit obligations under such Plan (based on the assumptions used for purposes of the Accounting Standards Codification 715) as of the close of the most recent Plan year, as reported in the most recent financial statements reflecting such amounts, and if all of the Plans were terminated (disregarding any Plans with surpluses), the unfunded liabilities with respect to the Plans, individually and in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (i) all employer and employee contributions required by applicable law or by the terms of

---

[23] To be included if applicable.

any Foreign Benefit Arrangement or Foreign Plan have been made, or, if applicable, accrued in accordance with normal accounting practices; (ii) the accrued benefit obligations of each Foreign Plan (based on the assumptions used to fund such Foreign Plan) with respect to all current and former participants do not exceed the assets of such Foreign Plan; (iii) each Foreign Plan that is required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities; and (iv) each such Foreign Benefit Arrangement and Foreign Plan is in compliance (A) with all material provisions of applicable law and all material applicable regulations and published interpretations thereunder with respect to such Foreign Benefit Arrangement or Foreign Plan and (B) with the terms of such plan or arrangement.

SECTION 3.11  Disclosure.  None of the written reports, financial statements, certificates or other written information (other than projections, budgets or other estimates or forward-looking statements or information of a general economic or industry nature or reports or studies prepared by third parties that were not expressly commissioned by the Borrower or its Affiliates (collectively, the "Projections")) (including, without limitation, the Registration Statement on Form S-4 [and the Disclosure Statement (as supplemented in writing through the Closing Date)][24], taken as a whole, furnished by or on behalf of the Ultimate Parent, the Service Company or any SuperMedia Loan Party to the Administrative Agent, any Lender [or the Bankruptcy Court][25] prior to the Closing Date in connection with the transactions contemplated by this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished prior to the Closing Date) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to Projections, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time such Projections were prepared, it being understood that projections by their nature are uncertain and no assurance is given that the results reflected in such projections will be achieved.  [The Bankruptcy Court entered an order on or about [_____], 2013 approving the adequacy of the Disclosure Statement.][26]

SECTION 3.12  Subsidiaries.  Schedule 3.12 sets forth the name of, and the ownership interest of the Ultimate Parent, the Service Company and the Borrower in, each Subsidiary of the Ultimate Parent, the Service Company and the Borrower and identifies each Subsidiary that is a Subsidiary Loan Party, in each case as of the Closing Date.

SECTION 3.13  Insurance.  Schedule 3.13 sets forth a description of all insurance for risks associated with casualty, workers compensation claims, general liability, automobiles, excess liability, directors and officers risks, errors and omissions, fiduciary claims, EPLI, environmental matters, crime, property risks, business travel and accident claims and flood risks, maintained by or on behalf of the Borrower and its Subsidiaries as of the Closing Date.  As of the Closing Date, all premiums due and payable in respect of such insurance have been paid.

SECTION 3.14  Labor Matters.  As of the Closing Date, there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened.  As of the Closing Date, except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:  (a) the hours worked by and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards

---

[24] To be included if applicable.

[25] To be included if applicable.

[26] To be included if applicable.

Act or any other applicable Federal, state, local or foreign law dealing with such matters; (b) all payments due from the Borrower or any Subsidiary, or for which any claim may be made against the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Subsidiary; and (c) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

SECTION 3.15  Margin Regulations.  None of the Borrower or any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

SECTION 3.16  Certain Agreements.  As of the Closing Date, each of the Core Verizon Agreements has been duly authorized, executed and delivered by the Borrower, and to the knowledge of the Borrower, each of the other parties thereto and constitutes a legal, valid and binding obligation of the Borrower, and to the knowledge of the Borrower, each other party thereto, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  As of the Closing Date, a true, correct and complete copy (including any amendments and waivers) of each of the Core Verizon Agreements has been furnished to the Administrative Agent.

SECTION 3.17  Security Documents.  (a)  The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof to the extent described therein.  When (a) the actions specified in Section [4.02(b)][27] to the Guarantee and Collateral Agreement have been duly taken, (b) all applicable Instruments, Chattel Paper and Documents in which a security interest is perfected by possession have been delivered to, and/or are in the continued possession of, the Collateral Agent, (c) all deposit accounts, electronic chattel paper and Pledged Equity Interests (each, as defined in the Guarantee and Collateral Agreement), a security interest in which is required to be or is perfected by "control" (as described in the Uniform Commercial Code as in effect in the State of New York from time to time) are under the "control" of the Collateral Agent and (d) the Mortgages have been duly recorded, the security interests granted pursuant thereto shall constitute (to the extent described therein) a perfected security interest in, all right, title and interest of each pledgor or mortgagor (as applicable) party thereto in the Collateral described therein with respect to such pledgor or mortgagor (as applicable), subject, in each case to no other Lien other than Liens permitted under Section 6.02.

(b)  When the Guarantee and Collateral Agreement or a summary thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral composed of Intellectual Property in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Collateral Agent shall have, for the ratable benefit of the Secured Parties, a perfected security interest in, all right, title and interest of the SuperMedia Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case subject to no other Lien other than Liens permitted under Section 6.02, it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the Closing Date.

---

[27] Section reference to be updated as appropriate based on final Guarantee and Collateral Agreement.

(c)  The Mortgages entered into on the Closing Date, when amended by the mortgage amendment referred to in clause (h)(1) of the Collateral and Guarantee Requirement (the "Mortgage Amendments") and the Mortgages, if any, entered into after the Closing Date pursuant to Section 5.12, shall be effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the SuperMedia Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed in the proper real estate filing offices, such Mortgages shall constitute a perfected security interest in, all right, title and interest of the SuperMedia Loan Parties in such Mortgaged Property and the proceeds thereof, as security for the Obligations, in each case subject to no other Lien other than Liens permitted under Section 6.02.

SECTION 3.18  [Bankruptcy Court Orders.  The Confirmation Order has been entered by the Bankruptcy Court, and such order has not been stayed, reversed, modified or vacated on appeal.][28]

ARTICLE IV

Conditions

SECTION 4.01  Effectiveness of Agreement.  This Agreement shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02) (and the delivery of the notice contemplated in the last section of this Section 4.01); provided that nothing herein shall limit the consent rights set forth in the SuperMedia Support Agreement.

(a)    Loan Documents.  The Administrative Agent (or its counsel) shall have received:

(i)    a counterpart of this Agreement signed on behalf of the Borrower, the Ultimate Parent, the Administrative Agent and the Collateral Agent and[, to the extent requested by the Administrative Agent,][29] the Lenders;

(ii)    an Acknowledgment and Confirmation, executed and delivered by each SuperMedia Loan Party;

(iii)    the Shared Guarantee and Collateral Agreement, executed and delivered by each Shared Collateral Loan Party;

(iv)    the Subordinated Guarantee Agreement, executed and delivered by the Borrower, Dex East, Dex West and RHDI;

(v)    the Intercreditor Agreement, executed and delivered by the Ultimate Parent, the Dex Parent, Dex Media Service LLC, Dex Digital, RHDC, the Borrower, Dex East, Dex West, RHDI, the Agent, the Shared Collateral Agent, the administrative agent and collateral agent under the Dex East Credit Agreement, the administrative agent and collateral agent under the Dex West Credit Agreement and the administrative agent and collateral agent under the RHDI Credit Agreement;

(vi)    the Shared Services Agreement, duly executed and delivered by the Ultimate Parent, the Service Company, the Borrower and each other party thereto; and

---

[28] To be included if applicable.

[29] To be included if applicable.

(vii)    the Tax Sharing Agreement, duly executed and delivered by the Borrower and the other parties thereto.

Notwithstanding anything to the contrary, the deliverables described in clauses (vi) and (vii) of this Section 4.01(a) shall be held in escrow to become effective immediately after the effectiveness of this Agreement, and the deliverables described in clauses (iii), (iv) and (v) of this Section 4.01(a) shall be held in escrow to become effective immediately after the consummation of the Mergers.

(b)    [Confirmation of the Reorganization Plan.  The Reorganization Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order.  The Confirmation Order shall not have been stayed, modified or vacated on appeal.  All conditions precedent to the effectiveness of the Reorganization Plan shall have been satisfied (or waived) or shall be concurrently with the effective date of the Reorganization Plan satisfied (or waived) in accordance with the terms of the Reorganization Plan.][30]

(c)    Amendments.  The Administrative Agent shall have received satisfactory evidence that the conditions to effectiveness of each of the Amendments (other than the conditions that either of the Mergers have been consummated by the filing of either of the Certificates of Merger with the Secretary of State of the State of Delaware as such terms are defined in the Merger Agreement) have been satisfied[; provided, that it is acknowledged and agreed that the filing by the Ultimate Parent, on behalf of itself and its Subsidiaries, with the Bankruptcy Court of written notice of the occurrence of the "Effective Date" under (and as defined in) the Reorganization Plan shall satisfy this condition.][31]

(d)    Merger Agreement.  The Administrative Agent shall have received satisfactory evidence that the conditions to effectiveness of the Merger Agreement (other than the condition that this Agreement shall have become effective) have been satisfied.

(e)    Trademarks.  The trademarks owned by the Borrower, Dex East, Dex West, RHDI, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) ("Collateral Trademarks") shall have been transferred (together with the associated goodwill) to and owned by a bankruptcy remote Subsidiary of each such Person, respectively, and in each case, (i) the organizational documents of such bankruptcy remote Subsidiaries (each, a "License Subsidiary") shall provide for, and require that there at all times be, two special independent directors or members whose consent would be required for such License Subsidiary to file a petition for bankruptcy or for the transfer of any equity interests therein (other than the sale of such equity interests in a transaction permitted under the Loan Documents) and shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent and the Administrative Agent shall have received and shall be reasonably satisfied with (A) a certificate of an authorized officer of the Ultimate Parent including the certificate of incorporation or formation, as applicable, for the License Subsidiaries, certified by the relevant authority of the jurisdiction of organization of such License Subsidiary, (B) a complete copy of resolutions adopted by the Governing Board of such License Subsidiary authorizing the execution, delivery and performance in accordance with their respective terms of the agreements described in clause (ii) below and (C) a long form good standing certificate of such License Subsidiary, as applicable, from its jurisdiction of organization, (ii) the License

---

[30] To be included if applicable.

[31] To be included if applicable.

Subsidiaries shall have entered into License Agreements and (iii) except as permitted by a License Agreement, anything incidental to the ownership of the Collateral Trademarks (including filing or registering any application for or registration of all current or future Collateral Trademarks and the prosecution, maintenance, renewal or enforcement of same) shall be done solely by the Licensee Subsidiaries (or their respective selected designees).

(f)     Other Intellectual Property Arrangements.  (i) Each of the Borrower, Dex East, Dex West, RHDI, the Service Company and each other Shared Collateral Loan Party shall have entered into Master IP License Agreements substantially in the form of Exhibit J hereto and (ii) each of the Borrower, Dex East, Dex West, RHDI, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) shall have delivered to each other above-referenced party and its Subsidiaries (other than License Subsidiaries) as of the Closing Date current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of, or access to, all Escrow Materials in existence as of the Closing Date, to the extent the applicable owner or licensee of any Escrow Materials is not permitted by the Agent to make delivery of same to any of such other parties promptly after the Closing Date.  Notwithstanding anything to the contrary contained in this Section 4.01(f), neither the Borrower, Dex East, Dex West, RHDI, the Service Company nor any other Shared Collateral Loan Party shall be deemed to have failed to satisfy this Section 4.01(f) for any inadvertent failure to deliver or place into escrow any Escrow Materials because such party was unaware of the existence of any such item, provided that (x) delivery or escrow of any such item is made promptly after identification or discovery of such item (and that such item has not been delivered or escrowed) by such party and (y) none of such other parties are damaged or prejudiced, and do not lose any material rights, due to such failure.

(g)     Legal Opinions.  The Administrative Agent shall have received the following executed opinions, in each case in form and substance satisfactory to the Administrative Agent: (i) the legal opinion of Fulbright & Jaworski L.L.P., counsel for the Borrower, (ii) the legal opinion of Kirkland & Ellis LLP, counsel to the Ultimate Parent and its Subsidiaries, and (iii) the legal opinion of Mark W. Hianik, the general counsel of the Ultimate Parent and its Subsidiaries. The Borrower hereby requests each such counsel to deliver such opinions.

(h)     Closing Documents.  The Administrative Agent shall have received such customary documents and certificates for financing transactions of the type contemplated by this Agreement as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party and the Ultimate Parent, the authorization of the Transactions and any other legal matters relating to the Loan Parties, the Ultimate Parent, the Loan Documents, the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(i)     Representations and Warranties; No Default.  The Administrative Agent shall have received a certificate, dated the Closing Date and signed by the President, a Vice President or a Financial Officer of the Borrower and the Ultimate Parent, confirming that (i) the representations and warranties of each Loan Party set forth in the Loan Documents are true and correct in all material respects on and as of the Closing Date and (ii) at the time of and immediately after giving effect to the Transactions, no Default shall have occurred and be continuing.

(j)     Fees.  The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable invoiced fees, charges

and disbursements of counsel) required to be reimbursed or paid by any Loan Party hereunder, or under any other Loan Document [or the Reorganization Plan][32].

(k)  Collateral and Guarantee Requirement.  Except as set forth on Schedule 1.01B, the Collateral and Guarantee Requirement shall have been satisfied and the Administrative Agent shall have received a completed Perfection Certificate dated the Closing Date and signed by an executive officer or Financial Officer of the Borrower, together with all attachments contemplated thereby, including the results of a search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties in the jurisdictions contemplated by the Perfection Certificate and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are permitted by Section 6.02 or have been (or substantially simultaneously with the closing of the Transactions shall be) released; provided that the requirements of clauses (b), (d), (f), (g) and (i) (solely to the extent that clauses (g) and (i) relate to the Shared Collateral Agent or the Shared Collateral Security Documents) of the Collateral and Guarantee Requirement shall be deemed satisfied if all steps required to cause such requirements to be satisfied immediately upon the effectiveness of the Amendments have been taken.

(l)  Insurance.  The Administrative Agent shall have received evidence that the insurance required by Section 5.07 is (or substantially simultaneously with the closing of the Transactions shall be) in effect.

(m)  No Other Indebtedness.  After giving effect to the Transactions to be consummated on the Closing Date, the Borrower and the Subsidiaries shall have outstanding no Indebtedness or preferred Equity Interests other than (i) the Loans, (ii) the Subordinated Guarantee and (iii) the Indebtedness set forth in Schedule 6.01.

(n)  Consents and Approvals; No Actions.  All consents and approvals required to be obtained from any Governmental Authority or material third parties in connection with the Transactions shall have been obtained to the extent such consents or approvals are required under applicable laws or agreements or otherwise, and all applicable regulatory appeal periods shall have expired.  The Administrative Agent shall have received a certificate of a Financial Officer of the Borrower and the Ultimate Parent, certifying that there is no claim, action or proceeding pending or, to the knowledge of the Borrower or the Ultimate Parent, as applicable, threatened, by any Governmental Authority to enjoin, restrain or prohibit (or by any other Person that has a reasonable likelihood of enjoining, restraining or prohibiting) the Transactions that has a reasonable likelihood of enjoining, restraining or prohibiting the Transactions, or by any Person that has a reasonable likelihood of imposing burdensome conditions on the Transactions.

(o)  Flood Hazards.  The Administrative Agent shall have received a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto), and if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance in form and amount reasonably satisfactory to the Administrative Agent.

---

[32] To be included if applicable.

(p)      Existing Credit Agreement.  The Borrower shall have timely paid current scheduled interest (at the non-default rate) on the Loans (as defined in the Existing Credit Agreement) in accordance with the Existing Credit Agreement [and, to the extent applicable, the Cash Collateral Order,][33] and shall have paid all other fees and expenses then due and payable with respect to the Existing Credit Agreement.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

ARTICLE V

Affirmative Covenants

Until the principal of and interest on each Loan and all fees which are due and payable hereunder shall have been paid in full, each of the Borrower and, commencing after the consummation of the Mergers and solely for purposes of Sections 5.01(a), (b) and (k), 5.12(c), 5.14, 5.15 and 5.16, the Ultimate Parent covenants and agrees with the Lenders that:

SECTION 5.01  Financial Statements and Other Information.  The Borrower will furnish to the Administrative Agent for prompt distribution to each Lender:

(a)      no later than the earlier of (i) 10 days after the date that the Borrower is required to file a report on Form 10-K with the Securities and Exchange Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether or not the Borrower is so subject to such reporting requirements), and (ii) 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2013, (A) (x) the Ultimate Parent's audited consolidated  balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such year and (y) the Ultimate Parent's audited consolidating balance sheets and related consolidating statements of operations, stockholders' equity and cash flows as of the end of and for such year (with each such consolidating financial statement showing the standalone financial information for each of the Borrower and its consolidated Subsidiaries, Dex East and its consolidated Subsidiaries, Dex West and its consolidated Subsidiaries and RHDI and its consolidated Subsidiaries and otherwise being in form substantially similar in all material respects to the consolidating financial statements of the Ultimate Parent most recently delivered pursuant to the Dex Credit Agreements prior to the Closing Date or such other form as may be reasonably acceptable to the Administrative Agent), setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by KPMG LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification, exception or explanatory paragraph and without any qualification or exception as to the scope of such audit or other material qualification or exception; provided, that if the Ultimate Parent switches from one independent public accounting firm to another, the audit report of any such new accounting firm may contain a qualification or exception as to the scope of such consolidated or consolidating financial statements that relates to any fiscal year prior to its retention which, for the avoidance of doubt, shall have been the subject of an audit report of the previous accounting firm meeting the criteria set forth above) to the effect that such consolidated and consolidating financial statements present fairly in all material respects the financial condition and results of operations of the Ultimate Parent and its consolidated Subsidiaries on a consolidated or consolidating basis, as the case may be, in accordance with GAAP consistently applied, except for the income tax provision which reflects

---

[33] To be included if applicable.

an allocation to each Subsidiary of the Ultimate Parent's income tax provision prepared on a consolidated basis and (B) the Borrower's unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to the Borrower and its Subsidiaries of the Ultimate Parent's income tax provision prepared on a consolidated basis[; provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in (x) Management's Discussion and Analysis or Liquidity and Capital Resources, in the case of the financial statements delivered pursuant to clause (A), and (y) Borrower's Management's Narrative Analysis and Results of Operations, in the case of the financial statements delivered pursuant to clause (B)];[34]

(b)      no later than the earlier of (i) 10 days after the date that the Borrower is required to file a report on Form 10-Q with the Securities and Exchange Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Exchange Act (whether or not the Borrower is so subject to such reporting requirements), and (ii) 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, commencing with the fiscal quarter ending March 31, 2013, (A) (x) the Ultimate Parent's unaudited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year and (y) the Ultimate Parent's unaudited consolidating balance sheets and related consolidating statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year (with each such consolidating financial statement showing the standalone financial information for each of the Borrower and its consolidated Subsidiaries, Dex East and its consolidated Subsidiaries, Dex West and its consolidated Subsidiaries and RHDI and its consolidated Subsidiaries and otherwise being in form substantially similar in all material respects to the consolidating financial statements of the Ultimate Parent most recently delivered pursuant to the Dex Credit Agreements prior to the Closing Date or such other form as may be reasonably acceptable to the Administrative Agent), setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Ultimate Parent as presenting fairly in all material respects the financial condition and results of operations of the Ultimate Parent and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to each Subsidiary of the Ultimate Parent's income tax provision prepared on a consolidated basis, subject to normal year-end audit adjustments and the absence of footnotes and (B) the Borrower's unaudited consolidated balance sheet and related consolidated statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, except for the income tax provision which reflects an allocation to the Borrower and its

---

[34] To be included if applicable.

Subsidiaries of the Ultimate Parent's income tax provision prepared on a consolidated basis, subject to normal year-end audit adjustments and the absence of footnotes[;provided, that detailed income statement and balance sheet information reflecting the elimination of the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan shall be included in (x) Management's Discussion and Analysis or Liquidity and Capital Resources, in the case of the financial statements delivered pursuant to clause (A), and (y) Borrower's Management's Narrative Analysis and Results of Operations, in the case of the financial statements delivered pursuant to clause (B)];[35]

(c)      after consummation of the Mergers, concurrently with any delivery of financial statements under clause (a)(B) or (b)(B) above, the corresponding financial statements with respect to Dex East, Dex West and RHDI that are required to be delivered by Dex East, Dex West and RHDI under the Dex East Credit Agreement, the Dex West Credit Agreement, and the RHDI Credit Agreement, respectively;

(d)      [within 20 days after the end of each month, (i) consolidated and consolidating financial statements for the Debtors as of the end of the preceding month, and (ii) a monthly statement showing revenue pacings for the preceding month, with comparisons to those results from the preceding monthly statement delivered pursuant to this paragraph (d);][36]

(e)      concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with each of the Financial Covenants, (iii) identifying any Permitted Acquisition that has been consummated since the end of the immediately preceding fiscal quarter, (iv) identifying any prepayment events of the type set forth in  Section 2.06(b), Ultimate Parent Equity Issuances or Ultimate Parent Asset Dispositions that have occurred since the end of the previous fiscal quarter and setting forth a reasonably detailed calculation of the Net Proceeds received from any such prepayment events, Ultimate Parent Equity Issuances or Ultimate Parent Asset Dispositions, (v) identifying any Services Assets (as defined in the Shared Services Agreement) (but with respect to Services Assets that constitute Intellectual Property, solely Intellectual Property that has been registered or patented or the registration of which has been applied for) contributed by the Borrower and its Subsidiaries to the Service Company during the immediately preceding fiscal quarter, and a reasonably detailed description of such Services Assets and the value thereof, (vi) attaching a schedule setting forth a computation (and any utilization by the Borrower) of Available Cash, Borrower's Discounted Prepayment Portion of Available Cash and Borrower's Discretionary Portion of Available Cash as of the end of the period covered by such financial statements and (vii) setting forth (A) a reporting sales metric (which will serve as the leading indicator of reported print and digital revenues), (B) print and digital revenue and a gross margin amount for each of such reported revenue amounts and (C) statements of cash flow from operations (with a reconciliation of net income to operating cash flow from operations and financing activities (including capital expenditures)), in each case under this clause (vii) for such fiscal quarter or fiscal year, as applicable, ended as of the period to which such certificate relates;

---

[35] To be included if applicable.

[36] To be included if applicable.

(f)      within 90 days after the commencement of each fiscal year of the Borrower, a detailed consolidated budget for such fiscal year (including a projected consolidated balance sheet and related statements of projected income and cash flow as of the end of and for such fiscal year and setting forth the assumptions used for purposes of preparing such budget) and, promptly when available, any material significant revisions of such budget;

(g)      promptly after the same become publicly available, copies of all periodic reports, proxy statements and registration statements filed by the Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or any other materials distributed by the Ultimate Parent to its shareholders generally;

(h)      promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that any Loan Party or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the Loan Parties or any of their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan then, upon reasonable request of the Administrative Agent, the Loan Parties and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent (on behalf of each requesting Lender) promptly after receipt thereof; provided, further, that the rights granted to the Administrative Agent in this section shall not be exercised more than once during a 12-month period;

(i)      promptly following any written request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent (including on behalf of any Lender) may reasonably request;

(j)      concurrently with any delivery of financial statements and related information by any Loan Party to any debtholder of Dex Digital, RHDC or of any Newco not otherwise required to be delivered hereunder, copies of such financial statements and related information;

(k)      no later than five Business Days prior to the effectiveness thereof, copies of substantially final drafts of any proposed material amendment, supplement, waiver or other modification with respect to the Dex East Credit Agreement, Dex West Credit Agreement, the RHDI Credit Agreement, the Shared Services Agreement, the Tax Sharing Agreement, the Subordinated Guarantee Agreement, any Master IP License Agreement, any License Agreement, any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement, the Restructuring Notes or any Additional Notes; and

(l)      (i) promptly following receipt thereof, any notice of changes of allocation percentages that any SuperMedia Loan Party shall receive pursuant to the Shared Services Agreement and (ii) concurrently with any delivery of financial statements under clause (a) or (b) above, a statement of changes in the intercompany balances of the Loan Parties with the Service Company in substantially the form delivered pursuant to the Dex Credit Agreements prior to the Closing Date.

Any financial statement or other information required to be delivered pursuant to this Section 5.01 shall be deemed to have been delivered on the date on which such information is posted on the Ultimate Parent or the Borrower's website on the Internet or by the Administrative Agent on an IntraLinks or similar site to which Lenders have been granted access or shall be available on the SEC's

website on the Internet at www.sec.gov; provided that if the Ultimate Parent or the Borrower elect to post any financial statement or other information on its respective website, the Borrower shall concurrently deliver to the Administrative Agent paper copies of any such financial statement or other information. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of any certificate required by Section 5.01(b) or (e) to the Administrative Agent. If any financial statement or other information required to be delivered under this Agreement shall be required to be delivered on any date that is not a Business Day, such information may be delivered to the Administrative Agent on the next succeeding Business Day after such date.

SECTION 5.02  Notices of Material Events.  The Borrower will furnish to the Administrative Agent for prompt further distribution to each Lender written notice of the following promptly after any Responsible Officer obtains actual knowledge thereof:

(a) the occurrence of any Default;

(b) the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Ultimate Parent, the Borrower or any Affiliate thereof that would reasonably be expected to result in a Material Adverse Effect;

(c) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect;

(d) the occurrence, with respect to any Foreign Benefit Arrangement or Foreign Plan of an event that, alone or together with any other events with respect to any Foreign Benefit Arrangement or Foreign Plan that have occurred, would reasonably be expected to result in a Material Adverse Effect; and

(e) any other development that would be materially likely, in the reasonable judgment of the Borrower, to result in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03  Information Regarding Collateral.  The Borrower will furnish to the Administrative Agent prompt written notice of any change (a) in any SuperMedia Loan Party's legal name, as reflected in its organization documents, (b) in any SuperMedia Loan Party's jurisdiction of organization or form of organization and (c) in any SuperMedia Loan Party's identity, Federal Taxpayer Identification Number or organization number, if any, assigned by the jurisdiction of its organization. Not later than 30 Business Days after any change referred to in clauses (a) through (c) of the preceding sentence the Borrower shall confirm in writing to the Administrative Agent that (i) all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected security interest in any Collateral affected by such change for the benefit of the Secured Parties to the extent required by the Collateral Agreements or (ii) that the Borrower has provided to the Administrative Agent all information required for the Collateral Agent to make such filings.

SECTION 5.04  Existence; Conduct of Business.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, contracts, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except,

in the case of this clause (ii), where the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any sale of assets permitted under Section 6.05.

SECTION 5.05   Payment of Obligations.   The Borrower will, and will cause each of its Subsidiaries to, pay, discharge or otherwise satisfy its Taxes and other material governmental charges or levies imposed upon it or upon its income or profits or in respect of its property before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

SECTION 5.06   Maintenance of Properties.   Except as permitted by Section 6.05, the Borrower will, and will cause each of its Subsidiaries to, keep and maintain all property (other than Intellectual Property) necessary to the conduct of its business in good working order and condition, ordinary wear and tear, damage caused by casualty and condemnation excepted, except where the failure to take such actions would not reasonably be expected to have a Material Adverse Effect.  The Borrower will, and will cause each of its Subsidiaries to, subject to its and their reasonable business judgment, take all actions to maintain all registrations and applications with respect to material Intellectual Property owned by any of them.

SECTION 5.07   Insurance.   The Borrower will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies or with Verizon or any of its Affiliates, insurance in such amounts (after giving effect to any self-insurance) and against such risks as are, in the Borrower's good faith judgment, customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.

SECTION 5.08   Casualty and Condemnation.   The Borrower will furnish to the Administrative Agent prompt written notice of any casualty or other damage to any Collateral of the SuperMedia Loan Parties with a Fair Market Value of more than $5,000,000 or the commencement of any action or proceeding for the taking of any Collateral of the SuperMedia Loan Parties or any material part thereof or material interest therein under power of eminent domain or by condemnation or similar proceeding.

SECTION 5.09   Books and Records; Inspection and Audit Rights.   The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities to the extent necessary to permit the preparation of financial statements in accordance with GAAP.  The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon not fewer than five Business Days' prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its appropriate representatives and, with the opportunity for representatives of the Borrower to be present, independent accountants, all at such reasonable times and as often as reasonably requested, provided that (a) the Lenders will coordinate any visits through the Administrative Agent and (b) at times when no Default is continuing, the Borrower shall not be required to pay for more than two visits per year by the Administrative Agent or its representatives, or two visits per year by the Lenders or their respective representatives.

SECTION 5.10   Compliance with Laws.   The Borrower will, and will cause each of its Subsidiaries to, comply in all material respects with all laws, rules, regulations, including Environmental Laws, and orders of any Governmental Authority applicable to it, its operations or its property, except

where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.11  Additional Subsidiaries.  If any additional Subsidiary of the SuperMedia Loan Parties (other than an Excluded Subsidiary) is formed or acquired after the Closing Date, the Borrower will, within 10 Business Days (or such longer period as may be acceptable to the Collateral Agent) after such Subsidiary is formed or acquired, notify the Administrative Agent thereof and cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any SuperMedia Loan Party.

SECTION 5.12  Further Assurances.  (a)  The Borrower will, and will cause each Subsidiary Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents), that may be required under any applicable law, or that the Administrative Agent or the Required Lenders may reasonably request, to cause all provisions of the Collateral and Guarantee Requirement applicable to the SuperMedia Loan Parties to be and remain satisfied, all at the expense of the SuperMedia Loan Parties; provided that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Borrower or any Subsidiary Loan Party with an individual Fair Market Value (including fixtures and improvements) that is less than $1,000,000 and (ii) any real property held by the Borrower or any Subsidiary Loan Party as a lessee under a lease.  The Borrower also agrees to provide to the Administrative Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)  If any Specified Asset that has an individual Fair Market Value of more than $1,000,000 is acquired by the Borrower or any Subsidiary Loan Party after the Closing Date or owned by an entity at the time it becomes a Subsidiary Loan Party, the Borrower will notify the Administrative Agent thereof (and the Administrative Agent shall notify the Lenders thereof), and, if requested by the Administrative Agent or the Required Lenders, the Borrower will cause the Collateral and Guarantee Requirement to be satisfied with respect to such asset.

(c)  Subject to the Intercreditor Agreement, the Ultimate Parent shall cause all provisions of the Collateral and Guarantee Requirement applicable to the Shared Collateral Loan Parties to be satisfied, including by causing, as applicable, (i) each Newco Subordinated Guarantor to execute a Newco Subordinated Guarantee as described in clause (e) of the definition of "Collateral and Guarantee Requirement" and (ii) each Newco Senior Guarantor to execute a supplement to the Shared Guarantee and Collateral Agreement as required thereunder;  provided, that such provisions of the Collateral and Guarantee Requirement need not be satisfied with respect to (i) real properties owned by the Service Company or any Newco that becomes a Shared Collateral Loan Party after the Closing Date with an individual Fair Market Value (including fixtures and improvements) that is less than $10,000,000 and (ii) any real property held by the Service Company or any Newco that becomes a Shared Collateral Loan Party after the Closing Date as a lessee under a lease.

SECTION 5.13  Account Control Agreements.  As promptly as possible and in any event within 30 days following the Closing Date (or such later date as is satisfactory to the Administrative Agent in its sole discretion), each SuperMedia Loan Party shall execute and deliver to the Administrative Agent account control agreements with respect to deposit accounts of the SuperMedia Loan Parties containing at least 90% of the aggregate consolidated cash and Permitted Investments of the SuperMedia Loan Parties pursuant to which a first priority perfected security interest shall be created in favor of the

Administrative Agent in such deposit accounts and all amounts on deposit therein.  Thereafter, the SuperMedia Loan Parties shall cause at least 90% of the aggregate cash and Permitted Investments of the SuperMedia Loan Parties to be held in deposit accounts which are subject to such control agreements. Each such account control agreement shall be in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 5.14  Credit Ratings.  Each of the Ultimate Parent and the Borrower will use its commercially reasonable efforts to maintain at all times monitored public ratings of the Loans by Moody's and S&P and a corporate family rating for each of the Ultimate Parent and the Borrower from Moody's and a corporate issuer rating for each of the Ultimate Parent and the Borrower from S&P.

SECTION 5.15  Intellectual Property.  Each of the Borrower, Dex East, Dex West, RHDI, the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) shall deliver to each other, following the Closing Date, current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of, or access to, all future Escrow Materials that were not Escrow Materials as of the Closing Date and material updates on an ongoing basis to Escrow Materials in existence as of the Closing Date, in each case within a reasonable period of time following such Escrow Materials becoming owned, licensed or updated, as applicable, by Borrower, Dex East, Dex West, RHDI, the Service Company or another Shared Collateral Loan Party (other than the Ultimate Parent), as applicable.  Notwithstanding anything to the contrary contained in this Section 5.15, neither Borrower, Dex East, Dex West, RHDI, the Service Company nor any other Shared Collateral Loan Party shall be deemed to have failed to satisfy this Section 5.15 for any inadvertent failure to deliver or place into escrow any Escrow Materials because such party was unaware of the existence of any such item, provided that (x) delivery or escrow of any such item is made within a reasonable period of time after identification or discovery of such item (and that such item has not been delivered or escrowed) by such party and (y) none of such other parties are materially damaged or prejudiced, and do not lose any material rights, due to such failure.

SECTION 5.16  Independent Director.  Each of the Ultimate Parent and the Borrower shall cause the Governing Board of each License Subsidiary of the Shared Collateral Loan Parties to include at least two special, independent directors or members (or equivalent thereof), pursuant to documentation reasonably satisfactory to the Administrative Agent, whose consent shall be required for (i) any filing of a petition for bankruptcy by the relevant License Subsidiary, (ii) the transfer of any membership or other equity interests therein (other than the sale or other transfer of such membership or equity interests in a transaction permitted under the Loan Documents) and (iii) encumbering any asset owned by such License Subsidiary with a real property mortgage or deed of trust, as applicable, or a security agreement, pledge agreement or any similar agreement creating a Lien in respect thereof, except as permitted under the Loan Documents (including as a result of any consent, amendment, waiver or other modification obtained in accordance with the terms of the Loan Documents).

ARTICLE VI

Negative Covenants

Until the principal of and interest on each Loan and all fees which are due and payable hereunder have been paid in full, each of (x) the Borrower and (y) commencing after the consummation of the Mergers and solely for purposes of Sections 6.12(b), 6.15, 6.16 and 6.17, the Ultimate Parent, covenants and agrees with the Lenders that:

SECTION 6.01  Indebtedness; Certain Equity Securities.  (a)  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i)        Indebtedness created under the Loan Documents;

(ii)       Indebtedness existing on the Closing Date set forth in Schedule 6.01;

(iii)      Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary; provided that Indebtedness of any Subsidiary that is not a Loan Party to the Borrower or any Subsidiary Loan Party shall be subject to Section 6.04;

(iv)      Guarantees by the Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of the Borrower or any other Subsidiary; provided that Guarantees by the Borrower or any Subsidiary Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04;

(v)       Indebtedness incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof; provided that (1) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (2) the aggregate principal amount of Capital Lease Obligations and Indebtedness incurred pursuant to this clause (v), when added to the aggregate principal amount of Sale and Leaseback Indebtedness incurred pursuant to Section 6.06 and the aggregate principal amount of Indebtedness and Attributable Debt of the Service Company described in Section 6.16(d)(i) allocated to the Borrower and its Subsidiaries pursuant to the Shared Services Agreement, shall not exceed $15,000,000 at any time outstanding;

(vi)      Indebtedness of any Person that becomes a Subsidiary after the Closing Date; provided that (A) such Indebtedness exists at the time such Person becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary, (B) such Indebtedness does not prevent the Collateral and Guarantee Requirement from being fully satisfied with respect to any such Subsidiary that is required to become a Subsidiary Loan Party, (C) the Borrower is in Pro Forma Compliance after giving effect to the acquisition of such Subsidiary and (D) the aggregate principal amount of Indebtedness incurred pursuant to this clause (vi) shall not exceed $20,000,000 at any time outstanding;

(vii)     Indebtedness of the Borrower or any Subsidiary in respect of letters of credit obtained in the ordinary course of business so long as the aggregate amount of the reimbursement obligations (contingent or otherwise) in respect thereof is expressly limited to a face amount at any time outstanding not to exceed $15,000,000;

(viii)    Indebtedness of the Borrower or any Subsidiary in respect of performance bonds, bid bonds, appeal bonds, surety bonds, performance and completion guarantees and similar obligations (other than in respect of Indebtedness for borrowed money);

(ix)      Indebtedness in respect of Swap Agreements permitted by Section 6.07;

(x)       Indebtedness of the Borrower or any Subsidiary arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five Business Days of its incurrence;

(xi)      Indebtedness that constitutes an Investment permitted under Section 6.04;

(xii)    Indebtedness of Foreign Subsidiaries in an aggregate principal amount at any time outstanding not exceeding $5,000,000;

(xiii)    Indebtedness incurred by the Borrower or any Subsidiary representing deferred compensation to employees of the Borrower or any Subsidiary incurred in the ordinary course of business;

(xiv)    Indebtedness consisting of promissory notes issued by the Borrower or any Subsidiary to future, present or former directors, officers, members of management, employees or consultants of the Borrower or any of its Subsidiaries or their respective estates, heirs, family members, spouses or former spouses to finance the purchase or redemption of Equity Interests in the Borrower as permitted by Section 6.08(a)(iii);

(xv)    Indebtedness incurred by the Borrower or any Subsidiary in connection with any Permitted Acquisition consisting of obligations in respect of indemnification, the adjustment of the purchase price or similar adjustments;

(xvi)    Indebtedness consisting of obligations of the Borrower or any Subsidiary under deferred compensation or other similar arrangements incurred by such Person in connection with Permitted Acquisitions;

(xvii)    Indebtedness incurred by Borrower or any Subsidiary in respect of netting services, overdraft protections and similar arrangements, in each case in connection with cash management and deposit accounts;

(xviii)    Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations of the Borrower or any Subsidiary contained in supply arrangements, in each case, in the ordinary course of business;

(xix)    Refinancing Indebtedness of the Borrower or any Subsidiary incurred in exchange for, or the Net Proceeds of which are used to refund, refinance or replace Indebtedness (other than Indebtedness of the Borrower to any Subsidiary or of any Subsidiary to the Borrower or any other Subsidiary) that was permitted to be incurred under clause (ii), (v), (vi) or (xix) of this Section 6.01(a);

(xx)    Permitted Subordinated Indebtedness, without any limitation as to amount, so long as (other than with respect to the Subordinated Guarantee) the Borrower and the Subsidiaries are in Pro Forma Compliance;

(xxi)    other Indebtedness of the Borrower or any Subsidiary (other than Indebtedness of the Borrower or a Subsidiary to any Affiliate of the Borrower (other than a Subsidiary of the Borrower)), in an aggregate principal amount at any time outstanding pursuant to this clause (xxi) not in excess of $30,000,000;

(xxii)    unsecured Indebtedness and Attributable Debt owing to the Service Company incurred pursuant to the Shared Services Transactions; and

(xxiii)    all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described above.

(b)  The Borrower will not, nor will it permit any Subsidiary to, issue any Disqualified Stock.

SECTION 6.02  Liens.  The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)  Liens created under the Loan Documents;

(b)  Permitted Encumbrances;

(c)  any Lien existing on the Closing Date and set forth in Schedule 6.02 on any property or asset of the Borrower or any Subsidiary; provided that (A) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary (other than proceeds) and (B) such Lien shall secure only those obligations which it secures on the Closing Date and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof (other than by an amount not in excess of accrued interest thereon and fees and expenses, including premium and defeasance costs, associated therewith);

(d)  any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Closing Date prior to the time such Person becomes a Subsidiary; provided that (A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (B) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds), (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be, and extensions, renewals, refinancings and replacements thereof that do not increase the outstanding principal amount thereof (other than by an amount not in excess of accrued interest and fees and expenses, including premium and defeasance costs, associated therewith) and (D) the aggregate principal amount of the obligations secured pursuant to this clause (d) shall not exceed $20,000,000 at any time outstanding;

(e)  Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary (including any such assets made the subject of a Capital Lease Obligation); provided that (A) such Liens secure Indebtedness permitted by clause (v) of Section 6.01(a), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of the Borrower or any Subsidiary (other than proceeds);

(f)  Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary (or Guarantees of such Indebtedness), in each case to the extent permitted under Section 6.01(a);

(g)  Liens in favor of the Borrower or any Subsidiary Loan Party;

(h)  Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary to permit

satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Subsidiaries, (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business or (iv) arising under or pursuant to banking relationships;

(i)      Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(j)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods, in each case entered into in the ordinary course of business;

(k)      Liens securing Refinancing Indebtedness; <u>provided</u> that such Liens do not extend to any property or assets other than the property or assets (and proceeds thereof) that secure the Indebtedness being refinanced;

(l)      Liens (i) attaching to advances to a seller of any property to be acquired, (ii) consisting of an agreement to dispose of property and (iii) on cash earnest money deposits in connection with Investments permitted under Section 6.04;

(m)      Liens on insurance policies and the proceeds thereof granted in the ordinary course to secure the financing of insurance premiums with respect thereto;

(n)      any sale or assignment of accounts receivable permitted by Section 6.05(d);

(o)      licenses, sublicenses, leases or subleases granted to third Persons in the ordinary course of business of the Borrower or any of its Subsidiaries;

(p)      precautionary UCC financing statements in respect of operating leases permitted by this Agreement;

(q)      any interest or title of a licensor, lessor, sublicensor or sublessor under any license or lease permitted by this Agreement;

(r)      Liens arising under Environmental Laws which (i) are being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP or (ii) arise by operation of law (and not as a result of any grant or consent by the Borrower or any Subsidiary) to secure performance by the Borrower or its Subsidiaries of remediation activity, so long as the Borrower and its Subsidiaries are in compliance with all material requirements applicable to such remediation activity;

(s)      in the case of Equity Interests issued by a joint venture or a non-Wholly Owned Subsidiary, any call or similar right in the nature of a right of first offer or a first refusal right of a third party that is also an investor in such joint venture or Subsidiary and, in the case of Equity Interests issued by a joint venture or Subsidiary, any call or similar right on any nominee, trust or directors' qualifying shares or similar arrangements designed to satisfy requirements of applicable local laws

(t)      cash collateral securing reimbursement obligations in respect of letters of credit described in Section 6.01(a)(vii);

(u)    Liens in the nature of non-exclusive licenses of Intellectual Property granted to or in favor of another Company pursuant to the Directory Consolidation Project; and

(v)    Liens not otherwise permitted by this Section 6.02 securing obligations and Indebtedness in an aggregate amount not in excess of $10,000,000 at any time outstanding;

provided that notwithstanding the foregoing, no consensual Liens shall exist on Pledged Equity Interests that constitute Collateral other than pursuant to clauses (a) or (s) above.

SECTION 6.03  Fundamental Changes. (a)  The Borrower will not, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Person may merge into the Borrower in a transaction in which the Borrower is the surviving corporation, (ii) subject to Section 6.17, any Person may merge into any other Subsidiary in a transaction in which the surviving entity is (or upon consummation of such merger becomes a Subsidiary in accordance with the terms of this Agreement) a Subsidiary and, if any party to such merger is a Subsidiary Loan Party, a Subsidiary Loan Party, (iii) any Subsidiary may merge or consolidate with any other Person in order to effect a Permitted Acquisition and (iv) any Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; provided that (x) any such merger involving a Person that is not a Wholly Owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04 and (y) any such liquidation or dissolution involving a Subsidiary that is a License Subsidiary shall not be permitted unless such License Subsidiary conveys, leases, sells, transfers or otherwise disposes of, in one transaction or series of transactions, all or substantially all of its business or property, whether now or hereafter acquired, to a License Subsidiary.

(b)  The Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than a Permitted Business.

(c)  Notwithstanding anything to the contrary contained herein, this Section 6.03 shall not prohibit [the SuperMedia Merger] [the "Restructuring Transactions" as defined in the Reorganization Plan.][37]

SECTION 6.04  Investments, Loans, Advances, Guarantees and Acquisitions.  The Borrower will not, and will not permit any of its Subsidiaries to, make, purchase, hold or acquire (including pursuant to any merger with any Person that was not a Wholly Owned Subsidiary prior to such merger) any Investment, except:

(a)    Permitted Investments;

(b)    Investments existing on the Closing Date or made pursuant to binding commitments in effect on the Closing Date and, in each case, set forth on Schedule 6.04;

(c)    Investments by the Borrower in any Subsidiary and made by any Subsidiary in the Borrower or any Subsidiary; provided that the aggregate amount of Investments made after the Closing Date by SuperMedia Loan Parties in Subsidiaries that are not SuperMedia Loan Parties shall not exceed $10,000,000 during the term of this Agreement;

---

[37] To be included if applicable.

(d)    Guarantees constituting Indebtedness permitted by Section 6.01; provided that the aggregate principal amount of Indebtedness of Subsidiaries that are not SuperMedia Loan Parties that is Guaranteed by any SuperMedia Loan Party shall be subject to the limitation set forth in clause (c) above;

(e)    Guarantees made in the ordinary course of business by the Borrower or any Subsidiary of obligations other than Indebtedness of any Excluded Subsidiary, provided that the funding of any such guarantees by the Borrower or any Subsidiary Loan Party shall be deemed to constitute an Investment subject to Section 6.04(c) unless reimbursed by such Excluded Subsidiary;

(f)    Permitted Acquisitions (other than Permitted Acquisitions involving the purchase or other acquisition of assets from Affiliates that are not Subsidiaries of the Borrower), including any cash earnest money deposits required in connection therewith;

(g)    Investments (including debt obligations and equity securities) acquired (i) in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business or (ii) as a result of a foreclosure by the Borrower or any Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(h)    extensions of trade credit in the ordinary course of business;

(i)    Investments received in connection with the sale, transfer, lease or other disposition of any asset permitted by Section 6.05;

(j)    Swap Agreements entered into in compliance with Section 6.07;

(k)    loans and advances by the Borrower and any of its Subsidiaries to their employees, officers, members of management, consultants, agents, customers or suppliers (i) in connection with relocation expenses and (ii) for other purposes in an aggregate amount at any time outstanding not in excess of $2,500,000;

(l)    Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case in the ordinary course of business;

(m)    commission, payroll, travel and similar advances to officers and employees to cover matters that are expected at the time of such advances ultimately to be treated as expenses of the Borrower or any Subsidiary in accordance with GAAP;

(n)    Investments in the ordinary course of business consisting of the licensing or acquisition of, or investment in, intellectual property pursuant to joint marketing arrangements with other Persons;

(o)    Investments of any Person existing at the time such Person becomes a Subsidiary or consolidates or merges with the Borrower or any Subsidiary (including in connection with a Permitted Acquisition) so long as such Investments were not made in contemplation of such Person becoming a Subsidiary or of such consolidation or merger;

(p)    Investments resulting from pledges or deposits described in clause (c) or (d) of the definition of "Permitted Encumbrance";

(q)    Investments in the ordinary course consisting of endorsements of collection or deposit;

(r)    advances to customers or suppliers in the ordinary course of business that are, in conformity with GAAP, recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of the Borrower or any of its Subsidiaries and endorsements for collection or deposit arising in the ordinary course of business;

(s)    Investments arising from any transaction permitted by Section 6.08;

(t)    Investments arising or deemed to arise from the payment, repayment, prepayment, acquisition, purchase or repurchase of any part of the Loans pursuant to any provision of Article II of this Agreement;

(u)    so long as (i) no Event of Default has occurred and is continuing or would result therefrom, (ii) no portion of the proceeds of any such Investment is used, directly or indirectly, to purchase or repurchase, or finance the purchase or repurchase, of any Restructuring Notes, Additional Notes or any other Indebtedness of any Affiliate (and the terms of any Investment shall not permit any such purchase or repurchase by the Person in which such Investment is made while such Investment is outstanding) and (iii) no such Investment is made in any Person that is an Affiliate of the Borrower (other than the Borrower and its Subsidiaries) other than Investments that result in a purchase of assets by a Newco Senior Guarantor or the Service Company in connection with equivalent Investments by each of Dex East, Dex West and RHDI, additional Investments in any Person in an aggregate amount not to exceed $20,000,000, net of the aggregate amount of cash received by the Borrower or any Subsidiary from any such Investment as a repayment of principal or a return of capital; provided, that any Investment made pursuant to this clause (u) in any Person that is not a SuperMedia Loan Party at the time such Investment is made may, if such Person thereafter becomes a SuperMedia Loan Party, from and after such date, be deemed to have been made pursuant to clause (c) or (d) of this Section, as the case may be, and not pursuant to this clause (u);

(v)    Investments in connection with the Shared Services Transactions;

(w)    advances or payments made by the Borrower or any Subsidiary to (x) the License Subsidiaries of the Borrower or (y) any other Person for the purpose of (i) filing, prosecuting, registering, renewing, enforcing or maintaining any Intellectual Property applications or registrations owned by such License Subsidiaries and (ii) satisfying all other liabilities related to, in connection with or incidental to (x) the maintenance of the existence of such License Subsidiaries and (y) activities of such License Subsidiaries permitted under this Agreement (including, without limitation, reimbursement for directors and officers fees and compensation) and under the organizational documents of such License Subsidiaries;

(x)    the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(y)        the acquisitions or transfers in connection with the Directory Consolidation Project.

SECTION 6.05  Asset Sales.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary (other than issuing directors' qualifying shares and other than issuing Equity Interests to the Borrower or a Subsidiary), except:

(a)        sales, transfers, leases and other dispositions of (x) any property (including inventory), (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments, in each case in the ordinary course of business;

(b)        sales, transfers, leases and other dispositions to the Borrower or a Subsidiary; provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)        leases or subleases of property, and licenses or sublicenses of intellectual property, in each case entered into in the ordinary course of business and which do not, and would not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries taken as a whole;

(d)        dispositions or write-downs of accounts receivable in connection with the compromise, settlement or collection thereof in the ordinary course of business or bankruptcy or similar proceedings;

(e)        sales, transfers, leases and other dispositions permitted by Sections 6.03 and 6.08 and Liens permitted under Section 6.02;

(f)        sales, transfers, leases and other dispositions of property constituting Investments permitted under Section 6.04(g);

(g)        dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary;

(h)        voluntary terminations of Swap Agreements;

(i)        sales, leases, transfers, licenses or other dispositions identified on Schedule 6.05;

(j)        Sale and Leaseback Transactions permitted by Section 6.06;

(k)        sales, transfers, leases and other dispositions of assets that are not permitted by any other clause of this Section; provided that the aggregate Fair Market Value of all assets sold, transferred or otherwise disposed of in reliance on this clause (k) shall not exceed $50,000,000; provided, further, that such sale, transfer, lease or other disposition of assets is not made to an Affiliate of the Borrower (other than the Borrower or a Subsidiary);

(l)        sales, transfers and other dispositions pursuant to the Shared Services Transactions;

(m)    the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Borrower and its Subsidiaries; and

(n)    the sales, transfers or other dispositions in connection with the Directory Consolidation Project.[38]

provided that, notwithstanding the foregoing, (i) Equity Interests of any Wholly Owned Subsidiary may not be sold, transferred, leased or otherwise disposed of unless 100% of such Equity Interests are being sold, transferred, leased or otherwise disposed of pursuant to a transaction permitted by Section 6.03 or 6.05(k) and (ii) any sales, transfers, leases and other dispositions permitted by clause (i), (j), or (k) of this Section 6.05 shall be made (x) for Fair Market Value and (y) for at least 75% Cash Consideration.

SECTION 6.06    Sale and Leaseback Transactions.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (any such transaction, a "Sale and Leaseback Transaction"), except (a) pursuant to the Shared Services Transactions or (b) for Sale and Leaseback Transactions resulting in Sale and Leaseback Indebtedness in an aggregate principal amount, when added to the aggregate principal amount of Capital Lease Obligations and Indebtedness incurred pursuant to Section 6.01(a)(v), not to exceed $15,000,000 at any time outstanding; provided, however, that the Borrower applies the Net Proceeds of such Sale and Leaseback Transactions in compliance with Section 2.06(b).

SECTION 6.07    Swap Agreements.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries) in the conduct of its business or the management of its liabilities and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

SECTION 6.08    Restricted Payments; Certain Payments of Indebtedness.  (a)  The Borrower will not, nor will it permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except:

(i)    the Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests of the same class (other than Disqualified Stock);

(ii)    Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests;

---

[38] Schedule 1.01A to provide that the profits of the consolidated directories will be shared among the contributing companies in a manner reasonably acceptable to the admin agent taking into account the respective revenues of the directories that are combined, the costs of achieving the combination and the ongoing operating costs of the combination.

(iii)    the Borrower may make Restricted Payments to the Ultimate Parent, provided that (A) the proceeds of such Restricted Payments are used to repurchase, redeem or otherwise acquire or retire for value of any Equity Interests in the Ultimate Parent or any Subsidiary held by any future, present or former directors, officers, members of management, employees or consultants of the Borrower or any of its Subsidiaries or their respective estates, heirs, family members, spouses or former spouses pursuant to the terms of any employee equity subscription agreement, stock option agreement or similar agreement, (B) (x) any Restricted Payments used to effect such repurchases, redemptions, acquisitions or retirements are made not earlier than ten Business Days prior to the date when such Equity Interests are repurchased, redeemed, acquired or retired, if such repurchase, redemption, acquisition or retirement is made and (y) if such Restricted Payments are not used for such repurchase, redemption, acquisition or retirement, the proceeds therefrom shall be returned to the Borrower as a capital contribution within ten Business Days from the date such Restricted Payment was made, (C) the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests in any fiscal year pursuant to this clause (iii) (other than (1) any such Equity Interests repurchased, redeemed, acquired or retired in compensation for any taxes due or payable by the holder thereof, and (2) any such Equity Interests that are deemed repurchased, redeemed, acquired or retired by the Ultimate Parent in connection with the exercise of stock options or warrants by the holder thereof in connection with the payment of all or a portion of the exercise price of such options or warrant) will not exceed $5,000,000 per fiscal year and (D) such Equity Interests shall only be repurchased, redeemed, acquired or retired in connection with the death, resignation or retirement of, or settlement of a dispute with, any such Person;

(iv)    the making of any payment in exchange for, or out of the Net Proceeds of, a substantially concurrent sale (other than to a Subsidiary of the Borrower) of, common Equity Interests of the Borrower;

(v)    other Restricted Payments in an aggregate amount not exceeding $2,000,000 during any fiscal year of the Borrower, provided that (A) no Default or Event of Default is continuing or would result therefrom, (B) the aggregate amount of Restricted Payments made pursuant to this clause (v) shall not exceed $5,000,000 over the term of this Agreement, (C) the Ultimate Parent shall apply such Restricted Payments within 30 days of receipt thereof and only to fund general corporate expenses permitted hereunder and (D) no Restricted Payments made pursuant to this clause (v) shall be used to (x) effect the repurchase, or the making of any payments in respect, of Restructuring Notes or Additional Notes or (y) make any payment to or Investment in any Affiliate of the Borrower other than the Borrower or a Subsidiary of the Borrower (or any director, officer or employee of the Borrower or any such Affiliate);

(vi)    the Borrower may make Restricted Payments required by the Shared Services Transactions; and

(vii)    Restricted Payments in amounts as shall be necessary to make Tax Payments; provided that all Restricted Payments made pursuant to this clause (vii) are used by the Ultimate Parent for the purpose specified in this clause (vii) within 30 days of receipt thereof.

(b)    The Borrower will not, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Permitted Subordinated Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Permitted Subordinated Indebtedness, except:

(i)      payment of fees, expenses and regularly scheduled interest and principal payments as and when due in respect of such Indebtedness; and

(ii)      refinancings of such Indebtedness to the extent permitted by Section 6.01(a)(xix).

SECTION 6.09  <u>Transactions with Affiliates</u>.  The Borrower will not, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(a)      transactions that are at prices and on terms and conditions, taken as a whole, not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's length basis from unrelated third parties;

(b)      the indemnification of directors of the Borrower and the Subsidiaries in accordance with customary practice;

(c)      any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Governing Board of the Borrower;

(d)      Investments permitted under Section 6.04 specifically contemplated by Section 6.04 to be made among Affiliates;

(e)      transactions among the Borrower and any Subsidiary Loan Parties and transactions among Subsidiary Loan Parties otherwise permitted by this Agreement;

(f)      the payment of fees and indemnities to directors, officers and employees of the Borrower and the Subsidiaries in the ordinary course of business;

(g)      transactions pursuant to permitted agreements in existence on the Closing Date and set forth on <u>Schedule 6.09</u> or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect;

(h)      any employment agreements entered into by the Borrower or any of the Subsidiaries in the ordinary course of business;

(i)      Restricted Payments permitted under Section 6.08;

(j)      transactions with Subsidiaries for the purchase or sale of goods, products, parts and services and entered into in the ordinary course of business in a manner consistent with past practice;

(k)      transactions with joint ventures for the purchase or sale of equipment or services entered into in the ordinary course of business and in a manner consistent with past practice;

(l)      transactions with any one or more Lenders pursuant to the Loan Documents including, without limiting the generality of the foregoing, the repayment, prepayment, acquisition, purchase or repurchase of any part of the Loans pursuant to any provision of this Agreement;

(m)    subject to Section 6.12(b), the existence of, or performance by the Borrower or any Subsidiary of its respective obligations under the terms of, the Tax Sharing Agreements;

(n)    Shared Services Transactions;

(o)    the transactions in connection with the Directory Consolidation Project;

(p)    the issuance by the Borrower of Equity Interests to, or the receipt of any capital contribution from, the Ultimate Parent or any of its subsidiaries; and

(q)    [the "Restructuring Transactions" under (and as defined in) the Reorganization Plan][39]

For purposes of this Section 6.09, any transaction with any Affiliate involving an amount less than $5,000,000 shall be deemed to have satisfied the standard set forth in clause (a) above if such transaction is approved as being on an arm's length basis by a majority of the Disinterested Directors of the Governing Board of either the Borrower or such Subsidiary.  "Disinterested Director" shall mean, with respect to any Person and transaction, a member of the Governing Board of such Person who does not have any material direct or indirect financial interest in or with respect to such transaction.

SECTION 6.10  Restrictive Agreements.  The Borrower will not, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to the Secured Parties securing the Obligations or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to prohibitions, restrictions and conditions existing on the Closing Date identified on Schedule 6.10 and to any extension, renewal or modification thereof, other than to any extension or renewal of, or any amendment or modification to the extent expanding the scope of, any such restriction or condition, (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to prohibitions, restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and the proceeds thereof, (v)(A) clause (a) of the foregoing shall not apply to customary provisions in leases or other contracts restricting the assignment thereof and (B) clause (b) of the foregoing shall not apply to customary provisions in leases or other contracts restricting the assignment thereof to the extent such provisions restrict the distribution of such lease or other contract, (vi) the foregoing shall not apply to prohibitions, restrictions or conditions applicable to any Person or the property or assets of a Person acquired by the Borrower or any of its Subsidiaries (other than pursuant to a Permitted Acquisition) existing at the time of such acquisition and not incurred in connection with or in contemplation of such acquisition, which restriction or condition is not applicable to any Person or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired and any amendments, modifications, restatements, renewals, extensions, supplements, refundings, replacements or refinancings thereof, provided that the restrictions and conditions in any such amendments, modifications, restatements, renewals, extensions, supplements, refundings, replacement or refinancings are no more restrictive, taken as a whole, than those in effect on

_____

[39] To be included if applicable.

the date of the acquisition, (vii) the foregoing shall not apply to prohibitions, restrictions or conditions on cash or other deposits or net worth imposed by customers or required by insurance, surety or bonding companies, in each case, under contracts entered into in the ordinary course of business, (viii) the foregoing shall not apply to restrictions or conditions imposed by any agreement related to the refinancing of Indebtedness, provided that the terms of any such restrictions or conditions are not materially less favorable, taken as a whole, as determined by the Borrower in good faith, to the Lenders than the restrictions or conditions contained in the predecessor agreements and (ix) the foregoing shall not apply to customary provisions in joint venture agreements, limited liability company agreements of joint ventures and other similar agreements.

SECTION 6.11  Fiscal Year.  The Borrower shall not change its fiscal year for accounting and financial reporting purposes to end on any date other than December 31.

SECTION 6.12  Amendment of Material Documents.  (a)  The Borrower will not, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, if, taken as a whole, such amendment, modification or waiver is materially adverse to the interests of the Lenders.  The Borrower will not, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under any Core Verizon Agreement, if such amendment, modification or waiver would reasonably be expected to have a material adverse effect on the ability of the Borrower to perform its principal obligations under the Loan Documents.

(b)  Neither the Ultimate Parent nor the Borrower will, nor will they permit the Service Company or any Subsidiary, respectively, to, amend, modify, waive or terminate any of its rights under the Shared Services Agreement, the Tax Sharing Agreement, the Subordinated Guarantee Agreement, any License Agreement, any Master IP License Agreement, any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement or the organizational documents of any License Subsidiary to the extent that such amendment, modification, waiver or termination is adverse in any material respect to the interests of the Lenders.

SECTION 6.13  Financial Covenants.  (a) The Borrower will not permit the Leverage Ratio, at any time during any fiscal quarter ending during any period set forth below, to exceed the ratio set forth opposite such fiscal quarter:

| Fiscal Quarter Ended | Leverage Ratio |
| --- | --- |
| March 31, 2013 | 4.7500 to 1:00 |
| June 30,  2013 | 4.7500 to 1:00 |
| September 30, 2013 | 4.7500 to 1:00 |
| December 31, 2013 | 4.7500 to 1:00 |
| March 31, 2014 | 4.6875 to 1:00 |
| June 30, 2014 | 4.6250 to 1:00 |
| September 30, 2014 | 4.5625 to 1:00 |
| December 31, 2014 | 4.5000 to 1:00 |
| March 31, 2015 | 4.5000 to 1:00 |
| June 30, 2015 | 4.5000 to 1:00 |
| September 30, 2015 | 4.5000 to 1:00 |
| December 31, 2015 | 4.5000 to 1:00 |
| March 31, 2016 | 4.4375 to 1:00 |
| June 30, 2016 | 4.3750 to 1:00 |
| September 30, 2016 | 4.3125 to 1:00 |
| December 31, 2016 | 4.2500 to 1:00 |

(b)  The Borrower will not permit the Consolidated Interest Coverage Ratio, for any period of four consecutive fiscal quarters of the Borrower, to be less than 1.10 to 1.0.

(c)  The Leverage Ratio and the Consolidated Interest Coverage Ratio shall be calculated in accordance with Section 1.05.

SECTION 6.14  Capital Expenditures.  The Borrower will not, nor will it permit any Subsidiary to, make or commit to make any Capital Expenditure, except Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business not exceeding $30,000,000 in the aggregate in any fiscal year; provided that Capital Expenditures of the Borrower and its Subsidiaries in the ordinary course of business, in the aggregate when combined with the Capital Expenditures of Dex East, Dex West and RHDI and their respective Subsidiaries, shall not exceed (i) $57,500,000 during the fiscal year ending December 31, 2013 and (ii) $50,000,000 during the fiscal years ending December 31, 2014, December 31, 2015 and December 31, 2016; provided, further, that (x) in each case, (A) up to 75% of such stated amounts referred to above, if not so expended in the fiscal year for which it is permitted, may be carried over for expenditure in the next succeeding fiscal year and (B) Capital Expenditures made pursuant to this Section 6.14 during any fiscal year shall be deemed made, first, in respect of such stated amounts permitted for such fiscal year as provided above and, second, in respect of amounts carried over from the prior fiscal year pursuant to clause (A) above and (y) Capital Expenditures of a Company permitted hereunder shall (A) relate to assets directly owned or acquired by such Company and shall be allocated to (and paid by) such Company or (B) relate to the acquisition or development of Shared Assets and shall be allocated to (and paid by) the Companies in accordance with their Allocated Share (as defined in the Shared Services Agreement) at the time any such payment is made.

SECTION 6.15  Ultimate Parent Covenants.  (a)  The Ultimate Parent will not engage in any business or activity other than the ownership of outstanding Equity Interests of its Subsidiaries and other assets permitted under Section 6.15(b), the issuance and sale of its Equity Interests, the performance of its obligations under the Shared Services Agreement and, in each case, activities incidental thereto.

(b)  The Ultimate Parent will not own or acquire any assets (other than Equity Interests of its existing Subsidiaries or any Newcos, other Investments in its existing Subsidiaries and any Newcos, assets owned or acquired in connection with its obligations under the Shared Services Agreement, cash, Permitted Investments, joint ventures or minority investments permitted under Section 6.15(e) and the Equity Interests of the Borrower) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and liabilities under the Loan Documents, the Dex East Loan Documents, the Dex West Loan Documents and the RHDI Loan Documents, liabilities imposed by law, including Tax liabilities, Indebtedness permitted under Section 6.15(d), liabilities under the Shared Services Agreement, liabilities under the Merger Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)  The Ultimate Parent will not create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than (i) Permitted Encumbrances and (ii) Liens securing the SuperMedia Obligations, the obligations under the Dex East Loan Documents, the obligations under the Dex West Loan Documents and the obligations under the RHDI Loan Documents, subject to the Intercreditor Agreement.

(d)  The Ultimate Parent shall not in any event incur or permit to exist any Indebtedness for borrowed money other than (i) the Restructuring Notes, (ii) any Additional Notes and (iii) subject to the Intercreditor Agreement, a Guarantee of the SuperMedia Obligations, the obligations under the Dex East

Loan Documents, the obligations under the Dex West Loan Documents and the obligations under the RHDI Loan Documents.

(e)  The Ultimate Parent may only make Investments in, or acquisitions of, any Newco so long as (i) no Default or Event of Default has occurred and is continuing, (ii) any Newco that is acquired or created as a result of such Investment or acquisition shall become a Guarantor as and to the extent required by the Collateral and Guarantee Requirement, (iii) all transactions related thereto are consummated in accordance with applicable laws in all material respects and (iv) in case of an acquisition of assets, such assets (other than assets to be retired or disposed of) are to be used, and in the case of an acquisition of any Equity Interests, the Person so acquired is engaged, in the same line of business as that of the Ultimate Parent or a line of business reasonably related thereto.  The Ultimate Parent may make Investments (not consisting of contribution of assets of any of its Subsidiaries) in joint ventures and other minority investments, provided that such Investment shall be pledged as Collateral to the Shared Collateral Agent for the benefit of the Shared Collateral Secured Parties pursuant to the Shared Collateral and Guarantee Agreement.

(f)  The Ultimate Parent shall not (i) make any dividends or other Restricted Payments to the holders of its Equity Interests or (ii) optionally redeem or repurchase any Restructuring Notes or Additional Notes (other than any non-cash exchange therefor for common stock of the Ultimate Parent).

(g)  The Ultimate Parent may not make any Ultimate Parent Asset Disposition unless the Net Proceeds are applied to prepay the Loans to the extent required pursuant to Section 2.06(b).

(h)  The Ultimate Parent shall not permit the Restructuring Notes or the Restructuring Indenture to be amended in any way that is, taken as a whole, materially adverse to the interests of the Lenders and shall not (i) permit the Restructuring Notes or any Additional Notes to be secured by any assets of the Ultimate Parent or any of its Subsidiaries, (ii) permit the proceeds of any Additional Notes to be used to finance anything other than refinancing of the Restructuring Notes or any other Additional Notes, (iii) alter the maturity of the Restructuring Notes or any Additional Notes to a date, or make the Restructuring Notes or any Additional Notes mandatorily redeemable, in whole or in part, or required to be repurchased or reacquired, in whole or in part, prior to the date that is six months after the Maturity Date (other than pursuant to customary asset sale or change in control provisions), (iv) allow the Restructuring Notes or any Additional Notes to (A) have financial maintenance covenants, (B) have restrictive covenants that apply to the Dex Parent, the Borrower or any Subsidiary (other than, solely in the case of the Restructuring Notes, the restrictive covenants set forth in the Restructuring Notes Indenture as of the Closing Date) or that impose limitations on the Ultimate Parent's ability to guarantee or pledge assets to secure the SuperMedia Obligations or (C) otherwise have covenants, representations and warranties and events of default that are more restrictive than those existing in the prevailing market at the time of issuance thereof for companies with the same or similar credit ratings of the Ultimate Parent at such time issuing similar securities, (v) permit the Restructuring Notes or any Additional Notes to be guaranteed by any Subsidiary of the Ultimate Parent or not be subordinated to the SuperMedia Obligations on terms at least as favorable to the Lenders as the subordination terms set forth in the Restructuring Notes Indenture on the Closing Date and that are otherwise reasonably satisfactory to the Administrative Agent or (vi) permit the Restructuring Notes or any Additional Notes to be convertible or exchangeable into other Indebtedness, except other Indebtedness of the Ultimate Parent meeting the qualifications set forth in the definition of "Additional Notes".

(i)  The Ultimate Parent shall not at any time hold an aggregate amount of cash and Permitted Investments in excess of an amount equal to (a) $5,000,000 plus (b) any amounts received pursuant to Section 6.08(a)(iv) of the Dex Credit Agreements pending use by the Ultimate Parent within

10 Business Days of receipt of such amounts (in accordance with Section 6.08(a)(iv) of the Dex Credit Agreements.

(j)  The Ultimate Parent shall continue to make the Ultimate Parent PIK Election during the term of this Agreement.

SECTION 6.16  Service Company Covenants.  (a)  The Ultimate Parent will not permit the Service Company to engage in any business or activity other than the issuance and sale of its Equity Interests, ownership of the outstanding Equity Interests of its Subsidiaries and other assets permitted under Section 6.16(b) and the provision of Shared Services and, in each case, activities incidental thereto.

(b)  Subject to the Intercreditor Agreement, the Ultimate Parent will not permit the Service Company to own or acquire any assets (other than the outstanding Equity Interests of its Subsidiaries, assets owned or acquired in connection with the Shared Services, cash and Permitted Investments) or incur any liabilities (other than ordinary course trade payables, employee compensation liabilities (including, without limitation, loans and advances to employees in the ordinary course of business) and other liabilities incurred in the ordinary course in connection with the provision of Shared Services by the Service Company or any Subsidiary of the Service Company pursuant to the terms of the Shared Service Agreement, liabilities under the Loan Documents, the Dex East Loan Documents, the Dex West Loan Documents and the RHDI Loan Documents, liabilities imposed by law, including Tax liabilities, liabilities under the Shared Services Agreement and other liabilities incidental to the maintenance of its existence and permitted activities).

(c)  Subject to the Intercreditor Agreement, the Ultimate Parent will not permit the Service Company to create, incur, assume or permit to exist any Liens on any property or assets now owned or hereafter acquired by it other than:

(i)  Permitted Encumbrances;

(ii)  Liens securing the SuperMedia Obligations, the obligations under the Dex East Loan Documents, the obligations under the Dex West Loan Documents and the obligations under the RHDI Loan Documents, subject to the Intercreditor Agreement; and

(iii)  Liens on fixed or capital assets acquired, constructed or improved by the Service Company; provided that (A) such Liens secure Indebtedness permitted by Section 6.16(d), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of such Service Company.

(d)  The Ultimate Parent shall not permit the Service Company to in any event incur or permit to exist any Indebtedness for borrowed money other than:

(i)  Indebtedness and Attributable Debt of the Service Company incurred to finance the acquisition, construction or improvement of any fixed or capital assets in connection with the provision of Shared Services, including Capital Lease Obligations and extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than by an amount not greater than fees and expenses, including premium and defeasance costs, associated therewith) or result in a decreased average weighted

life thereof; <u>provided</u> that such Indebtedness or Attributable Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement; and

(ii)    a Guarantee of the SuperMedia Obligations, the obligations under the Dex East Loan Documents, the obligations under the Dex West Loan Documents and the obligations under the RHDI Loan Documents, subject to the Intercreditor Agreement.

(e)  The Ultimate Parent will not permit the Service Company to sell, transfer, lease or otherwise dispose of any asset, other than:

(i)    sales of assets, the proceeds of which are reinvested within 90 days of such sale in assets of the Service Company related to the provision of Shared Services;

(ii)    sales of (x) inventory, (y) used, surplus, obsolete or worn-out equipment and (z) Permitted Investments, in each case in the ordinary course of business;

(iii)    sales, transfers and other dispositions pursuant to the Shared Services Transactions;

(iv)    the licensing or sublicensing (other than exclusive licenses or sublicenses) of Intellectual Property in the ordinary course of business in a manner that does not, and could not reasonably be expected to, materially interfere with the business of the Ultimate Parent and its Subsidiaries; and

(v)    other dispositions of assets (other than Equity Interests in a Subsidiary) not otherwise permitted by this Section 6.16(e); provided, that the aggregate cumulative fair market value of all assets sold, transferred or otherwise disposed of after the Closing Date in reliance upon this clause (v) shall not exceed $1,000,000.

SECTION 6.17  Limitation on Activities of the License Subsidiaries.  The Ultimate Parent shall not, directly or indirectly, permit any License Subsidiary to (a) (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than ownership of Collateral Trademarks and anything incidental thereto (including filing or registering any application for or registration of Collateral Trademarks and the prosecution, maintenance, renewal or enforcement of Collateral Trademarks) or (ii) take any action, or conduct its affairs in a manner, that could reasonably be expected to result in the separate existence of such License Subsidiary being ignored, or the assets and liabilities of such License Subsidiary being substantively consolidated with those of the Ultimate Parent or any Subsidiary thereof in a bankruptcy, reorganization or other insolvency proceeding, (b) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (i) Indebtedness evidenced by the Loan Documents, (ii) Indebtedness owed to another Loan Party so long as such Indebtedness is subordinated to the Obligations (or a guarantee thereof), (iii) nonconsensual obligations imposed by operation of law, (iv) obligations with respect to its equity interests, (v) obligations (other than Indebtedness) in the ordinary course of business in the operation of its assets and (vi) the statutory liability of any general partner for the liabilities of the limited partnership in which it is a general partner, (c) breach any provision of, or default in the performance of its obligations under, any License Agreement to which it is a party, (d) without the consent of the two special independent directors or members required by Section 5.16 (but without prejudice to clause (j) of Article VII), (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition

described in clause (i) of Article VII, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing (it being understood and agreed that the consent of such special independent directors or members to any of the actions described in this clause (d) shall not in any manner limit the provisions of Article VII), (e) assign any right, title or interest in or to any current or future Collateral Trademarks to any Person except as otherwise permitted under this Agreement or license any right, title or interest in or to any of the Collateral Trademarks to any Person except to the Ultimate Parent, a Subsidiary of the Ultimate Parent or as otherwise permitted under this Agreement or (f) without the prior written consent of the Administrative Agent, not to be unreasonably withheld, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, wind up or dissolve.  The Ultimate Parent shall not (x) consent to or vote in favor of (and shall not permit any Subsidiary to consent to or vote in favor of) the incurrence of any Indebtedness by any License Subsidiary (other than Indebtedness permitted pursuant to clause (b)(i) above) or (y) permit the organizational documents of any License Subsidiary, or any License Agreement to which any License Subsidiary is a party, to be amended, supplemented, waived, terminated or otherwise modified in any material respect without the prior written consent of the Administrative Agent, not to be unreasonably withheld.

## ARTICLE VII

### Events of Default

Subject to the last sentence of this Article VII, if any of the following events ("Events of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    the Ultimate Parent or the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.04 (with respect to the existence of the Borrower), 5.11, 5.13 or in Article VI applicable to it;

(e)    (i) any Shared Collateral Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section [6.4 or 6.5][40] of the Shared Guarantee and

---

[40] Section references to be updated as appropriate based on final Shared Guarantee and Collateral Agreement.

Collateral Agreement or (ii) any Shared Collateral Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section [6.1, 6.2 or 6.3][41] of the Shared Guarantee and Collateral Agreement, and such failure shall continue unremedied for a period of 30 days after the earlier of (A) knowledge thereof by the Ultimate Parent or any Subsidiary thereof and (B) notice thereof from the Administrative Agent to the Borrower (which notice will be promptly given at the request of any Lender);

(f)     any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after written notice thereof from the Administrative Agent to the Borrower (which notice will promptly be given at the request of any Lender);

(g)     the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex East, Dex West, and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, the Service Company, any Newcos, the Borrower and its Subsidiaries) shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period specified in the agreement or instrument governing such Indebtedness);

(h)     any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity and any applicable grace period specified in the agreement or instrument evidencing such Indebtedness shall have expired; provided that this clause (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale, transfer or other disposition of the property or assets securing such Indebtedness, (ii) Indebtedness that by its terms becomes due or is required to be repurchased as a result of changes in tax laws, regulations or the interpretation or application thereof and (iii) Guarantees by the Ultimate Parent and its Subsidiaries of the obligations under the Dex East Loan Documents, the obligations under the Dex West Loan Documents and the obligations under the RHDI Loan Documents unless (x) any payment shall have been demanded to be made by, or any other remedy shall have been exercised against, the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex East, Dex West and their respective Subsidiaries) or their respective assets in respect of such Guarantees and (y) the obligations under the Dex East Loan Documents, the Dex West Loan Documents or the RHDI Loan Documents, as the case may be, shall have been accelerated;

(i)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower, any Subsidiary (other than a Foreign Subsidiary or an Insignificant Subsidiary), the Ultimate Parent, any Material Ultimate Parent Subsidiary or the Service Company or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower, any Subsidiary (other than a Foreign Subsidiary or an Insignificant Subsidiary) the Ultimate Parent, any Material Ultimate

---

[41] Section references to be updated as appropriate based on final Shared Guarantee and Collateral Agreement.

Parent Subsidiary or the Service Company or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)        the Borrower, any Subsidiary, the Ultimate Parent, any Material Ultimate Parent Subsidiary or the Service Company shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower, any Subsidiary, the Ultimate Parent, any Material Ultimate Parent Subsidiary or the Service Company or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding that would entitle the other party or parties to an order for relief, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(k)        one or more judgments for the payment of money in an aggregate amount in excess of $20,000,000 (net of amounts covered by insurance, provided that the insurance carriers have been notified of such judgment and have not contested liability therefor) shall be rendered against the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex East, Dex West and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, the Service Company, any Newcos, the Borrower and its Subsidiaries) or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Ultimate Parent or any of its Subsidiaries (other than RHDI, Dex East, Dex West and their respective Subsidiaries, but including, for the avoidance of doubt and without limitation, the Service Company, any Newcos, the Borrower and its Subsidiaries) to enforce any such judgment;

(l)        (i) an ERISA Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan, (iii) the PBGC shall institute proceedings to terminate any Pension Plan(s), (iv) any Loan Party or any of their respective ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner or (v) any other event or condition shall occur or exist with respect to a Plan, a Foreign Plan, or a Foreign Benefit Arrangement that, in each case, in the opinion of the Required Lenders, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect;

(m)        any Lien purported to be created under any Security Document or Shared Collateral Security Document shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and, except to the extent otherwise permitted under the applicable Collateral Agreement or any other relevant Security Document or Shared Collateral Security Document, perfected Lien on any Collateral having, in the aggregate, a value in excess of $20,000,000, with the priority required by the applicable Security Document or Shared Collateral Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (ii) as a result of the Collateral Agent's or Shared Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Agreements or to file Uniform Commercial Code continuation statements;

(n)    a Change in Control shall occur;

(o)    any Guarantee under the Collateral Agreements for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall assert in writing that the Collateral Agreements or any Guarantee thereunder has ceased to be or is not enforceable;

(p)    the material breach of or material loss of rights under any Core Verizon Agreement that has resulted in a material adverse effect on the business, operations, assets or financial condition of the Borrower and the Subsidiaries, taken as a whole;

(q)    the Intercreditor Agreement or any material portion thereof for any reason shall cease to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

(r)    the Subordinated Guarantee Agreement or any material portion thereof for any reason shall cease to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

(s)    the commencement of enforcement actions under the Shared Guarantee and Collateral Agreement with respect to any Shared Collateral Loan Party party thereto;

(t)     (i) the commencement of enforcement actions under the Shared Services Agreement or (ii) the occurrence of an event that permits the Service Company to terminate the Shared Services Agreement with respect to any Client Company (as defined in the Shared Services Agreement) and such event continues unremedied for a period of three days;

(u)    the failure of the Borrower to receive any payment under the Tax Sharing Agreement when due and such failure continues unremedied for a period of three days;

(v)    any License Agreement, Master IP License Agreement or any escrow arrangement with respect to the Escrow Materials entered into pursuant to this Agreement shall be terminated (other than upon the expiration of any of the respective terms thereof), cease to be effective or cease to be the legally valid, binding and enforceable obligation in any material respect of any party thereto;

(w)    the Tax Sharing Agreement shall be terminated (other than upon expiration of the term thereof), cease to be effective or cease to be the legally valid, binding and enforceable obligation in any material respect of any party thereto; or

(x)    the failure (i) to consummate the Mergers immediately following the effectiveness of this Agreement or (ii) to consummate the Amendments immediately following completion of the Mergers.

then, and in every such event (other than an event with respect to the Borrower described in clause (i) or (j) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may with the consent of the Required Lenders, and at the request of the Required Lenders shall, by notice to the Borrower, declare the Loans then outstanding to be due and payable in whole or in part, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are

hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (i) or (j) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

Notwithstanding anything herein to the contrary, the events described in the foregoing clauses (except for clause (x)) to the extent that they apply to any Person other than the Borrower or any Subsidiary shall not constitute an Event of Default unless they exist after the consummation of the Mergers.

ARTICLE VIII

The Agent

Each of the Lenders hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Ultimate Parent, the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Agent or any of its Affiliates in any capacity (other than as Agent).  The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct.  The Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Agent also may rely upon any

statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon other than as a result of its gross negligence or willful misconduct.  The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts other than as a result of its gross negligence or willful misconduct.

The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent in the exercise of its reasonable judgment. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

The Agent may resign as Agent at any time upon 15 days notice to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed and such consent not to be required if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing), to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 15 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, with the consent of the Borrower (such consent shall not be unreasonably withheld or delayed and such consent shall not be required if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing), on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Agent and Collateral Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  If no successor agent has accepted appointment as Agent by the date that is 5 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed in writing between the Borrower and such successor.  After any Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Pursuant to the Reorganization Plan, the Agent, on behalf of the Lenders, is empowered and authorized to execute and deliver to the Loan Parties the other Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents.  Any action taken by the Agent or the Required Lenders (or any other instructing group of Lenders specified by this Agreement) in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Agent or the Required Lenders (or any other instructing group of Lenders specified by this Agreement) of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges

that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

Neither the joint lead arrangers, the syndication agent nor the co-documentation agents listed on the cover page to this Agreement shall have any duties or responsibilities hereunder in their capacities as such.

ARTICLE IX

Miscellaneous

SECTION 9.01  Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)       if to the Borrower, to it at SuperMedia Inc., 2200 West Airfield Drive, DFW Airport, TX 75261, Attention of General Counsel (Telecopy No. (972) 453-6829);

(ii)      if to the Ultimate Parent, to it at NewDex, Inc., 1001 Winstead Drive, Cary, North Carolina, 27513, Attention of General Counsel (Telecopy No. (919) 297-1518)

(iii)     if to the Agents, to JPMorgan Chase Bank, N.A., Global Loan Operations, 500 Stanton Christiana Road, Ops 2, Floor 3, Newark, Delaware 19713, Attention of John Getchius (Telecopy No. (9302) 634-3301), with a copy to JPMorgan Chase Bank, N.A., 383 Madison Avenue, New York, New York 10179, Attention of Neil Boylan (Telecopy No. (212) 622-4560); and

(iv)     if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent and the Borrower; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)  Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02  Waivers; Amendments.  (a)  No failure or delay by the  Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Agent and the Lenders hereunder

and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making, deemed making or maintenance of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)  Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Ultimate Parent, the Borrower and the Required Lenders, (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent or the Shared Collateral Agent, as applicable, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders or (z) in the case of this Agreement or any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Loan Party or Loan Parties subject to such Loan Document, the Administrative Agent and, as applicable, the Shared Collateral Agent, to cure any ambiguity, omission, defect or inconsistency; provided that any such agreement to waive, amend or modify this Agreement or any other Loan Document or any provision hereof or thereof pursuant to the foregoing clause (z) shall also be made to the Dex East Credit Agreement or the Dex East Loan Documents , the Dex West Credit Agreement or the Dex West Loan Documents, or the RHDI Credit Agreement or the RHDI Loan Documents, as applicable; provided, further, that no such agreement shall (i) reduce the principal amount of any Loan held by any Lender or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of such Lender, (ii) postpone the maturity of any Lender's Loan, or any scheduled date of payment of the principal amount of any Lender's Loans under Section 2.05, or any date for the payment of any interest or fees payable to any Lender hereunder, or reduce the amount of, waive or excuse any such payment, without the written consent of such Lender (it being understood that the waiver of any mandatory prepayment of Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest), (iii) change Section 2.13(b) or (c) in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender adversely affected thereby (it being understood that an amendment with respect to Section 2.15, and definitions related thereto, shall not be deemed to be a change to Section 2.13(b) or (c)), (iv) change any of the provisions of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (v) except as provided by Section 9.14, release any Guarantor from its Guarantee under a Collateral Agreement, Newco Subordinated Guarantee or other applicable Security Document or Shared Collateral Security Document (except as expressly provided in the applicable Collateral Agreement, Newco Subordinated Guarantee or other Security Document or Shared Collateral Security Document), or limit its liability in respect of such Guarantee, without the written consent of each Lender or (vi) release all or substantially all the Collateral from the Liens of the Security Documents and Shared Collateral Security Documents, without the written consent of each Lender; provided, further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent without the prior written consent of the Agent.  Notwithstanding the other provisions of this paragraph, any provision of this Agreement may be amended by an agreement in writing entered into by the Ultimate Parent, the Borrower, the Required Lenders and the Agent if at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan held by it and all other amounts owing to it or accrued for its account under the Loan Documents. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have the right to approve or disapprove any waiver, amendment or other modification to any Loan Document, and any such

Defaulting Lender's Loans shall be disregarded for the purpose of calculating Required Lenders, except for waivers, amendments or other modifications that relate to any of the matters described in the first proviso to this Section 9.02(b).

SECTION 9.03  Expenses; Indemnity; Damage Waiver.  (a)  The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Agent, the joint lead arrangers listed on the cover page of this Agreement and their Affiliates, including the reasonable fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent, such joint arrangers and such Affiliates and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Agent and whose retention has been approved in writing by the Borrower, in connection with the structuring, arrangement and syndication of the credit facilities provided herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all documented out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of (a) a single transaction and documentation counsel for the Agent, the joint lead arrangers, and any Lender and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Administrative Agent and the joint lead arrangers) in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans and (iii) all other reasonable out-of-pocket expenses as may be separately agreed with the Administrative Agent.

(b)  The Borrower shall indemnify the Agent, each Lender, each joint lead arranger listed on the cover page of this Agreement and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of (a) a single transaction and documentation counsel for any Indemnitee and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Administrative Agent and the joint lead arrangers, incurred by or asserted against any Indemnitee (excluding Taxes, which are governed by Section 2.12) arising out of, in connection with, or as a result of (i) the structuring, arrangement, and syndication of the credit facilities provided for herein, (ii) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their obligations thereunder or the consummation the Transactions, (iii) any Loan or the use of the proceeds therefrom, (iv) any actual or alleged presence or Release of Hazardous Materials on or from any Mortgaged Property or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether such claim, litigation, investigation or proceeding is brought by a third party or the Borrower or any of its Affiliates and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of, or breach of its obligations under this Agreement or any other Loan Document by, such Indemnitee or any of its Related Parties.  For the avoidance of doubt, it is acknowledged hereby that nothing contained in this Agreement is or shall be deemed to constitute an indemnification by the Borrower or any Subsidiary of any Lender in its capacity as a holder of Equity Interests of the Borrower for any loss, cause, claim, expense, liability, cause or action or damage arising under or in connection with United States federal or state securities laws.

(c)  To the extent that the Borrower fails to pay any amount required to be paid by it to the Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Agent

such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such.  For purposes hereof, a Lender's "*pro rata* share" shall be determined based upon its share of the sum of the total outstanding Loans at the time.

(d)  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the wrongful use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent arising from the bad faith, gross negligence or willful misconduct of such Indemnitee or any of its Related Parties, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date).

(e)  All amounts due under this Section shall be payable not later than 15 Business Days after written demand therefor, together with an invoice setting forth in reasonable detail such amounts and the basis therefor.

SECTION 9.04  Successors and Assigns.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below and applicable law, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)  the Borrower, provided that no consent of the Borrower shall be required (x) for an assignment of Loans to a Lender, an Affiliate of a Lender or an Approved Fund (as defined below) or (y) if an Event of Default under clause (a), (b), (i) or (j) of Article VII has occurred and is continuing, to any assignee; and

(B)  the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of Loans to an assignee that is a Lender immediately prior to giving effect to such assignment, an Affiliate of a Lender or an Approved Fund.

(ii)  Assignments shall be subject to the following conditions:

(A)  except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, the amount of Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to

such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless each of the Borrower and the Administrative Agent expressly consent to the assignment of a lesser amount, provided that (i) no such consent of the Borrower shall be required if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing and (ii) the principal amount of concurrent assignments to related Approved Funds shall be aggregated for purposes of determining compliance with the foregoing minimum assignment amounts.

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For purposes of this Section 9.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than an natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) any entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 2.12 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders and the principal amount of the Loans owing to each Lender pursuant to the terms hereof from time to time, which register shall indicate that each Lender is entitled to interest paid with respect to such Loans (the "Register"). Absent demonstrable error, the entries in the Register shall be

conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)        Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)  (i)  Any Lender may, without the consent of, or notice to, the Borrower and the Administrative Agent sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 2.12 (subject to the requirements and limitations therein, including the requirements under Section 2.12(e) (it being understood that the documentation required under Section 2.12(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13(c) as though it were a Lender.

(ii)        A Participant shall not be entitled to receive any greater payment under Section 2.10 or 2.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(iii)        Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any

pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding.  The provisions of Sections 2.10, 2.11, 2.12 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

SECTION 9.06  Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Article IV, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by email or telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07  Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender (other than deposits held in a custodial, trust or fiduciary capacity), irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09  Governing Law; Jurisdiction; Consent to Service of Process.  (a) **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS**

**AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK**.

(b)  Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document will prevent any Lender or the Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established.

(c)  Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(e)  [After the Closing Date, the Bankruptcy Court's retention of jurisdiction shall not govern the interpretation or enforcement of the Loan Documents or any rights or remedies related thereto.][42]

SECTION 9.10  <u>WAIVER OF JURY TRIAL</u>.  **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN  ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

SECTION 9.11  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

---

[42] To be included if applicable.

SECTION 9.12  <u>Confidentiality</u>.  Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' trustees, directors, officers, employees and agents, including accountants, legal counsel and other advisors in connection with the Transactions (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement for the benefit of the Borrower containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any pledgee referred to in Section 9.04(d) or (iii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Agent or any Lender on a nonconfidential basis from a source other than the Borrower (other than a source actually known by such party to be bound by confidentiality obligations).  For the purposes of this Section, "<u>Information</u>" means all information received from the Borrower or its Related Parties relating to the Borrower, its Subsidiaries or its business, other than any such information that is available to the Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower (other than a source actually known by such party to be bound by confidentiality obligations).  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord other its own confidential information.

Each Lender acknowledges that Information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Related Parties or its or their securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with the procedures and applicable law, including Federal, State and foreign securities laws.

All Information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about the Borrower and the Subsidiaries and its and their Related Parties or securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal, State and foreign securities laws.

SECTION 9.13  <u>U.S.A. PATRIOT Act</u>.  The Administrative Agent and each Lender hereby notifies the Borrower, for itself and its Subsidiaries, that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow the Administrative Agent and such Lender to identify the Loan Parties in accordance with the Act.

SECTION 9.14  <u>Termination or Release</u>.  (a)  At such time as the Loans, all accrued interest and fees under this Agreement and all other obligations of the SuperMedia Loan Parties under the

Loan Documents then due and payable (other than obligations under Sections 2.10, 2.12 and 9.03 that are not then due and payable) shall have been paid in full in cash, (i) the Collateral shall be released from the Liens created by the Security Documents and, with respect to the SuperMedia Obligations, the Shared Collateral Security Documents and (ii) and the obligations (other than those expressly stated to survive termination) of the Administrative Agent and each Loan Party under the Security Documents and, with respect to the SuperMedia Obligations, the Shared Collateral Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(b)  A Subsidiary Loan Party shall automatically be released from its obligations under the Guarantee and Collateral Agreement and any other Loan Document and the security interests in the Collateral of such Subsidiary Loan Party shall be automatically released upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary of the Borrower.

(c)  Upon any sale or other transfer by any SuperMedia Loan Party of any Collateral that is permitted under this Agreement to any Person that is not a SuperMedia Loan Party, or upon the effectiveness of any written consent to the release of the security interest granted by the Guarantee and Collateral Agreement in any Collateral of the SuperMedia Loan Parties pursuant to Section 9.02 of this Agreement, the security interest in such Collateral shall be automatically released (it being understood that, in the case of a sale or other transfer to a Shared Collateral Loan Party, such Collateral shall become subject to a security interest in favor of the Shared Collateral Agent as to the extent set forth in the Shared Collateral Security Documents upon the consummation of such sale or other transfer).

(d)  In connection with any termination or release pursuant to paragraph (a), (b) or (c) of this Section 9.14, the Collateral Agent shall execute and deliver to any Loan Party at such Loan Party's expense all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section 9.14 shall be without recourse to or warranty by the Collateral Agent or any Lender.

SECTION 9.15  <u>No Fiduciary Relationship</u>.  Each of the Ultimate Parent and the Borrower hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Credit Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Credit Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Credit Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Credit Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Credit Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Credit Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Credit Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan Documents, (f) each Credit Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Credit Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or

in any other express writing executed and delivered by such Credit Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Credit Parties or among the Loan Parties and the Credit Parties.

SECTION 9.16  Intercreditor Agreement.  Each Lender agrees that it will be bound by, and shall take no actions contrary to, the provisions of the Intercreditor Agreement or any intercreditor agreement entered into in connection with any Newco Subordinated Guarantee and authorizes the Administrative Agent to enter into the Intercreditor Agreement and any intercreditor agreement to be entered into in connection with any Newco Subordinated Guarantee (which shall be in form and substance reasonably satisfactory to the Administrative Agent) on its behalf.

SECTION 9.17  Amendment and Restatement.  On the Closing Date, the Existing Credit Agreement will be automatically amended and restated in its entirety to read in full as set forth herein, and all of the provisions of this Agreement which were previously not effective or enforceable shall become effective and enforceable.  Notwithstanding anything to the contrary herein, subject to the satisfaction (or waiver) of the conditions set forth in Section 4.01, the Lenders hereby waive, and shall be deemed to have waived, each Default and Event of Default under (and as defined in) the Existing Credit Agreement in existence as of the Closing Date to the extent (i) arising out of the commencement of the Chapter 11 Cases or (ii) such Default or Event of Default otherwise shall have occurred and be continuing based on facts known to the Administrative Agent or any Lender as of the Closing Date.

SECTION 9.18  [No Requirement of Lender Signatures.  Each Lender listed on Schedule 2.01 shall be a party hereto in accordance with the Reorganization Plan and, pursuant to the Reorganization Plan, is bound hereby without the requirement of any such Lender to execute a signature page hereto.][43]

---

[43] To be included if applicable.

IN WITNESS WHEREOF, the Borrower and the Agents have caused this Agreement to be duly executed by their respective authorized officers or representatives as of the day and year first above written.

SUPERMEDIA INC.,

by_____
Name:
Title:


DEX ONE CORPORATION,

by_____
Name:
Title:


JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and Collateral Agent

by_____
Name:
Title:

**EXHIBIT D TO THE DISCLOSURE STATEMENT**

DEX ONE SUPPORT AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

*EXECUTION VERSION*

## SUPPORT AND LIMITED WAIVER AGREEMENT

This SUPPORT AND LIMITED WAIVER AGREEMENT (together with all Exhibits, Annexes and Schedules hereto, in each case as amended, supplemented or otherwise modified from time to time, this "Support Agreement") is dated as of December 5, 2012 by and among: (i) the Consenting Lenders (as defined below), (ii) Dex One Corporation ("Dex"), Dex Media, Inc. ("Dex Media"), R.H. Donnelley Inc. ("RHD"), Dex Media East, Inc. ("Dex East"), Dex Media West, Inc. ("Dex West") and certain other subsidiaries of Dex set forth on Schedule 1 attached hereto (collectively, the "Dex Parties"), (iii) JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent under the Dex East Credit Agreement and the Dex West Credit Agreement (each as defined below) and (iv) Deutsche Bank Trust Company Americas ("DBTCA"), as administrative agent under the RHD Credit Agreement (as defined below) (each of the parties set forth in clauses (i) through (iv) above, a "Party"; collectively, the "Parties").

**WHEREAS,** Dex and Dex Media, each as a guarantor, Dex East, as borrower, certain lenders (the "Dex East Lenders") and JPMorgan, as administrative agent and collateral agent (in such capacities, the "Dex East Agent") are parties to the Amended and Restated Credit Agreement, dated as of January 29, 2010 (as amended, supplemented or otherwise modified from time to time, the "Dex East Credit Agreement");

**WHEREAS,** Dex and Dex Media, each as a guarantor, Dex West, as borrower, certain lenders (the "Dex West Lenders") and JPMorgan, as administrative agent and collateral agent (the "Dex West Agent") are parties to the Amended and Restated Credit Agreement, dated as of January 29, 2010 (as amended, supplemented or otherwise modified from time to time, the "Dex West Credit Agreement");

**WHEREAS,** Dex, as a guarantor, RHD, as borrower, certain lenders (the "RHD Lenders"; together with the Dex East Lenders and the Dex West Lenders, the "Lenders") and DBTCA, as administrative agent and collateral agent (the "RHD Agent"; together with the Dex East Agent and the Dex West Agent, the "Administrative Agents"), are parties to the Third Amended and Restated Credit Agreement, dated as of January 29, 2010 (as amended, supplemented or otherwise modified from time to time, the "RHD Credit Agreement"; together with the Dex East Credit Agreement and the Dex West Credit Agreement, the "Credit Agreements");

**WHEREAS,** SuperMedia Inc. ("SuperMedia"), certain lenders (the "SuperMedia Lenders") and JPMorgan, as administrative agent and collateral agent, are parties to the Loan Agreement, dated as of December 31, 2009 (as amended, supplemented or otherwise modified from time to time, the "SuperMedia Credit Agreement");

**WHEREAS,** (i) each of Dex and Newdex, Inc., a direct wholly-owned subsidiary of Dex ("Newco"), desires to merge Dex with and into Newco, with Newco as the surviving entity (the "Dex Merger") and (ii) immediately following consummation of the Dex Merger, each of Newco, SuperMedia and Spruce Acquisition Sub, Inc., a direct wholly-owned subsidiary of Newco ("Merger Sub"), desire to merge Merger Sub with and into SuperMedia, with SuperMedia as the surviving entity (the "SuperMedia Merger" and together with the Dex Merger, the "Proposed Merger"), each in accordance with the Amended and Restated Agreement and Plan of Merger among Dex, Newco, SuperMedia and Merger Sub, dated as of December 5, 2012 (as amended, supplemented or otherwise modified from time to time, the "Merger Agreement");

**WHEREAS,** after giving effect to the Proposed Merger, SuperMedia will become a direct, wholly-owned subsidiary of Newco, and Newco will become the Ultimate Parent;

**WHEREAS**, to effectuate the Proposed Merger and the transactions related thereto, the Dex Parties have requested certain amendments to the Credit Agreements, all of which are conditions precedent to the consummation of the Proposed Merger (the "Amended and Restated Credit Agreements"; together with the Proposed Merger and the transactions related thereto, the "Transaction");

**WHEREAS**, the Dex Parties have requested that the Lenders execute and deliver this Support Agreement to evidence their support for the Transaction (including the Amended and Restated Credit Agreements), whether the Transaction is consummated out-of-court or pursuant to a prepackaged chapter 11 plan of reorganization of the Dex Parties under the Bankruptcy Code, as provided herein;

**WHEREAS**, the Consenting Lenders under their respective Credit Agreements are willing to enter into the Amended and Restated Credit Agreements as more particularly described in the term sheets annexed hereto as Exhibits D, E and F (collectively, the "Amendment Term Sheets"), subject to the terms and conditions set forth herein;

**WHEREAS**, to effectuate the Proposed Merger and the transactions related thereto, SuperMedia and certain of its subsidiaries (the "SuperMedia Parties") have requested certain amendments to the SuperMedia Credit Agreement, which are conditions precedent to the consummation of the Proposed Merger (the "SuperMedia Amendments");

**WHEREAS**, the SuperMedia Parties have requested that the SuperMedia Lenders execute and deliver a support and waiver agreement to evidence their support for the SuperMedia Amendments, the Proposed Merger and the transactions related thereto, whether consummated out-of-court or pursuant to a prepackaged chapter 11 plan of reorganization of the SuperMedia Parties under the Bankruptcy Code, as provided in the SuperMedia Support Agreement (as defined below);

**WHEREAS**, certain SuperMedia Lenders (the "Consenting SuperMedia Lenders") are willing to enter into the SuperMedia Amendments as more particularly described on Exhibit D to the Support and Limited Waiver Agreement among the SuperMedia Parties and the Consenting SuperMedia Lenders, dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "SuperMedia Support Agreement"), a copy of which is annexed hereto as Exhibit B, subject to the terms and conditions of the SuperMedia Support Agreement;

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

**Section 1.   Definitions.**

Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in each of the Credit Agreements, as applicable.  As used in this Support Agreement, the following terms have the meanings specified below:

"Adequate Protection" means customary adequate protection granted to secured parties in chapter 11 cases of the size and type of the Chapter 11 Cases if the Prepackaged Alternative is applicable, including current pay cash interest at the non-default rate specified in the applicable Credit Agreement for accrued and unpaid interest as of the Petition Date and for interest accruing after the Petition Date, scheduled amortization and other mandatory prepayments (other than as a result of the acceleration of the Loans upon the commencement of the Chapter 11 Cases) in the amounts and on the dates required under the applicable Credit Agreement, cash payments due under Swap Agreements in the ordinary course and

2

at the non-default rate set forth in the applicable Swap Agreement (to the extent such Swap Agreement has not been terminated in accordance with the Bankruptcy Code), adequate protection liens, superpriority administrative claims and current payment of ongoing professional fees and expenses (including legal counsel fees and financial advisor fees) of the Administrative Agents.

"Bankruptcy Code" means chapter 11 of title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local and chambers rules of the Bankruptcy Court.

"Bankruptcy Threshold" has the meaning set forth in Section 3.1(a)(4).

"Bankruptcy Threshold Date" means 5:00 p.m. (New York City time) on December 21, 2012; provided that Dex and the Administrative Agents may extend such date one or more times to a date no later than the 40th day after the Support Agreement Effective Date.

"Chapter 11 Cases" means reorganization cases filed by the Dex Parties in accordance with and subject to the terms of this Support Agreement.

"Claims" means, subject to and without limiting Section 8.7(c), with respect to each Consenting Lender, such Consenting Lender's claims (as defined in section 101(5) of the Bankruptcy Code) arising under the applicable Credit Agreement(s) against the applicable Dex Party(ies) set forth on such Consenting Lender's signature page hereto or Lender Joinder, as applicable, and as may be acquired after the date of such signature page or Lender Joinder, as applicable; provided that if there is any discrepancy in the principal amount of Loans set forth on a Consenting Lender's signature page hereto and the principal amount of Loans held by such Consenting Lender as reflected in the applicable Administrative Agent's Register, the principal amount set forth on such Register shall be conclusive for purposes of this Support Agreement absent manifest error.

"Confirmation Order" means an order of the Bankruptcy Court entered on the docket in the Chapter 11 Cases, in form and substance reasonably satisfactory to the Administrative Agents, approving the Disclosure Statement and confirming the Plan.

"Consenting Lenders" means the Lenders from time to time party to this Support Agreement (including by the execution and delivery of a Lender Joinder). "Consenting Lenders" shall not include any Lender who has become a party to this Support Agreement but thereafter materially breaches its obligations hereunder, which breach has not been waived or cured pursuant to the terms hereof.

"Definitive Bankruptcy Documentation" means, in the event the Parties effectuate the Transaction pursuant to the Prepackaged Alternative, the Plan, the Plan Supplement (as defined in the Plan), the Disclosure Statement, the Confirmation Order and the First Day Motions, including any amendments, modifications or supplements made from time to time thereto, which in each case are (x) materially consistent with this Support Agreement and the Plan in the form annexed hereto as Exhibit A and (y) except as otherwise provided herein, in form and substance reasonably satisfactory to the Dex Parties, the Administrative Agents and the Majority Documentation Lenders. All references herein to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order or the First Day Motions shall mean those documents in a form that constitutes Definitive Bankruptcy Documentation.

3

"Definitive Documentation" means, collectively, the Definitive Bankruptcy Documentation and the Definitive Loan Documentation.

"Definitive Loan Documentation" means the definitive agreements and documents, other than Definitive Bankruptcy Documentation, referenced in or contemplated by the Amendment Term Sheets, the Amended and Restated Credit Agreements, or as otherwise may be reasonably necessary to effectuate the Amended and Restated Credit Agreements, including guarantee and collateral agreements, a shared guarantee and collateral agreement, a subordinated guarantee agreement, an intercreditor and collateral agency agreement, a shared services agreement, amended tax sharing agreements, intellectual property escrow and license agreements, including any amendments, modifications or supplements made from time to time thereto, which definitive agreements and documents in each case are (x) materially consistent with the Amendment Term Sheets and (y) except as otherwise provided herein, in form and substance reasonably satisfactory to the Dex Parties, the Administrative Agents and the Majority Documentation Lenders.    All references herein to the Amendment Term Sheets, Amended and Restated Credit Agreements, or any of the other agreements referred to in this definition shall mean those agreements in a form that constitutes Definitive Loan Documentation.

"Disclosure Statement" means a disclosure statement to be provided to the Lenders relating to the Plan that complies with sections 1125 and 1126(b) of the Bankruptcy Code and is in form and substance reasonably satisfactory to the Administrative Agents.

"First Day Motions" means customary motions, applications and related proposed orders filed by chapter 11 debtors and debtors in possession in chapter 11 cases of the size and type of the Chapter 11 Cases if the Prepackaged Alternative is applicable, including motions seeking approval of (i) prepackaged plan scheduling procedures, (ii) consensual use of the Secured Parties' cash collateral and the provision of Adequate Protection to the Secured Parties and (iii) continued use of the Dex Parties' cash management system, which motions, applications and associated proposed orders shall be in form and substance reasonably satisfactory to the Administrative Agents.

"Joining Lender Party" means a (i) transferee of Claims that executes and delivers a Lender Joinder to the applicable Administrative Agent and the Dex Parties at least five (5) Business Days prior to the relevant Transfer or (ii) Lender that executes and delivers a Lender Joinder to the applicable Administrative Agent and the Dex Parties after the Bankruptcy Threshold Date.

"Lender Joinder" means a joinder to this Support Agreement, substantially in the form annexed hereto as Exhibit C.

"Majority Documentation Lenders" means, as of any date of determination, the majority by number of the Consenting Lenders set forth on Schedule 2 excluding the Administrative Agents (and, for the avoidance of doubt, not such Consenting Lenders' successors or assigns and not any Consenting Lender that is no longer bound by this Support Agreement pursuant to the terms hereof) that exercise their consent or approval rights as of such date of determination in accordance with the terms of this Support Agreement.

"Material Adverse Effect" means a material adverse effect, on (i) the business, property, material agreements, liabilities, financial condition or results of operation of (x) Dex East and the Subsidiaries (as defined in the Dex East Credit Agreement), taken as a whole, (y) Dex West and the Subsidiaries (as defined in the Dex West Credit Agreement), taken as a whole or (z) RHD and the Subsidiaries (as defined in the RHD Credit Agreement), taken as a whole, (ii) the validity or the enforceability of any of the Credit Agreements or any of the other Loan Documents or the rights and remedies of the Administrative Agents and the Lenders under any of the Loan Documents, (iii) the validity or the enforceability of this Support

Agreement or (iv) the validity or the enforceability of the Merger Agreement or the ability of the Dex Parties to consummate the Proposed Merger.

"Petition Date" means the date on which the Chapter 11 Cases are commenced.

"Person" means a "person" as defined in Section 101(41) of the Bankruptcy Code.

"Plan" means a joint, prepackaged chapter 11 plan of reorganization (including any Exhibits, Annexes and Schedules thereto) for the Dex Parties that effectuates the Transaction, substantially in the form annexed hereto as Exhibit A.

"Plan Effective Date" means the date that is the first Business Day after the date of satisfaction or, subject to the prior written consent of the Administrative Agents, which consent may not be unreasonably withheld, waiver, of the conditions to effectiveness of the Plan as set forth therein.

"Prepackaged Alternative" means Dex's election pursuant to Section 2.1(a)(ii) to effectuate the Transaction by commencing the Chapter 11 Cases and seeking confirmation by the Bankruptcy Court of the Plan.

"Qualified Marketmaker" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Dex Parties (including debt securities, the Loans or other debt) or enter with customers into long and short positions in claims against the Dex Parties (including debt securities, the Loans or other debt), in its capacity as a dealer or market maker in such claims against the Dex Parties and (ii) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"Required Consenting Lenders" means (i) Consenting Lenders holding greater than 66 2/3% of the aggregate outstanding principal amount of the Loans under the Dex East Credit Agreement that are held by Consenting Lenders, (ii) Consenting Lenders holding greater than 66 2/3% of the aggregate outstanding principal amount of the Loans under the Dex West Credit Agreement that are held by Consenting Lenders and (iii) Consenting Lenders holding greater than 66 2/3% of the aggregate outstanding principal amount of the Loans under the RHD Credit Agreement that are held by Consenting Lenders.

"SEC" means the Securities and Exchange Commission.

"SEC Documents" has the meaning set forth in Section 3.1(c)(1).

"Solicitation Commencement Date" means the date the Dex Parties' claims and solicitation agent first distributes the Disclosure Statement and ballots to the Lenders to solicit acceptances of the Plan from the Lenders.

"Solicitation End Date" means the 30th day after the Solicitation Commencement Date.

"Support Agreement Effective Date" means the date upon which all the conditions set forth in Section 4 are satisfied or waived by the Administrative Agents, except that the consent of the Dex Parties shall also be required to waive satisfaction of the condition set forth in Section 4(b) and (f).

"Termination Date" means (i) with respect to the Termination Events in Section 3.1(a), the date of the occurrence of such Termination Event and (ii) with respect to the Termination Events in Sections

3.1(b),(c) and (d), the date of expiration (without waiver) of the ten (10) Business Day cure period if the applicable Termination Event shall not have been cured.

"Termination Event" means any event set forth in Section 3.1.

"Transfer" means, with respect to any Claim, the sale, assignment or transfer thereof.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any reference herein to any Person shall be construed to include such Person's successors and assigns, (b) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Support Agreement in its entirety and not to any particular provision hereof and (c) all references herein to Articles, Sections, Exhibits, Annexes and Schedules shall be construed to refer to Articles and Sections of, and Exhibits, Annexes and Schedules to, this Support Agreement.


**Section 2.    Transaction, Plan and Definitive Documentation.**

**2.1    Support of Transaction, Plan and Definitive Documentation.**

(a)    Until the Termination Date, the Dex Parties, jointly and severally, agree to:

    (i)    take any and all reasonably necessary and appropriate actions (including obtaining requisite corporate approvals) consistent with their obligations under the Merger Agreement and this Support Agreement in furtherance of the Transaction and, if applicable, the confirmation and consummation of the Plan;

    (ii)    take any and all reasonably necessary and appropriate actions to obtain executed signature pages to the Amended and Restated Credit Agreements and this Support Agreement from Lenders holding 100% of the aggregate outstanding principal amount of Loans under each Credit Agreement; provided that Dex may, at its option, elect to effectuate the Transaction through the Prepackaged Alternative and the Plan and that, for the avoidance of doubt, if Dex has elected the Prepackaged Alternative, all of the Dex Parties shall be deemed to have elected the Prepackaged Alternative; and

    (iii)    take any and all reasonably necessary and appropriate actions (including obtaining requisite corporate approvals) to (A) in conjunction with the distribution of the Disclosure Statement, solicit votes from Lenders to accept the Plan and (B) in the event the Dex Parties elect to effectuate the Transaction pursuant to the Prepackaged Alternative (i) commence the Chapter 11 Cases by filing voluntary petitions under the Bankruptcy Code in the Bankruptcy Court, (ii) file and seek approval on an interim and final (to the extent applicable) basis of First Day Motions, and (iii) file the Plan and Disclosure Statement with the Bankruptcy Court on the Petition Date and seek approval of the Disclosure Statement and confirmation of the Plan. The Dex Parties shall, except where it is not reasonably practicable, provide draft copies of all motions or applications and other documents any of the Dex Parties intends to file with the Bankruptcy Court

6

after the Petition Date to counsel for the Administrative Agents at least three (3) Business Days prior to the date when the Dex Parties intend to file any such motion, application or document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(b)      Until the Termination Date, the Consenting Lenders, severally and not jointly, agree to:

(i)      support and take any and all reasonably necessary and appropriate actions in furtherance of consummation of the Amended and Restated Credit Agreements and the effectiveness of this Support Agreement;

(ii)     subject to receipt of the Disclosure Statement and solicitation in accordance with section 1126(b) of the Bankruptcy Code and subject to Section 7 hereof, (x) timely vote its Claims to accept the Plan (and to the extent any direction is requested with respect to voting of any claim held by a Consenting Lender for trades not settled (but which claims will be bound by the terms hereof upon the closing of such trade) to timely direct the vote of such claims to accept the Plan in accordance with market convention) and (y) not change or withdraw (or cause to be changed or withdrawn) such vote, unless the Plan is modified in a manner (A) materially inconsistent with the Plan in the form annexed hereto as Exhibit A and the Amendment Term Sheets or (B) that materially adversely affects the rights of the Consenting Lenders under this Support Agreement; and

(iii)    in the event the Dex Parties elect to effectuate the Transaction pursuant to the Prepackaged Alternative, (A) support approval of the Disclosure Statement and confirmation of the Plan (and not object to approval of the Disclosure Statement or confirmation of the Plan, or support the efforts of any other Person to oppose or object to, approval of the Disclosure Statement or confirmation of the Plan), unless the Plan is modified in a manner (x) materially inconsistent with the Plan in the form annexed hereto as Exhibit A and the Amendment Term Sheets or (y) that materially adversely affects the rights of the Consenting Lenders under this Support Agreement, (B) support (and not object to or support the efforts of any other Person to oppose or object to) the First Day Motions, (C) refrain from taking any action not required by law that is inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Plan or that is otherwise inconsistent with the express terms of this Support Agreement, the Plan in the form annexed hereto as Exhibit A and the Amendment Term Sheets, unless such action is taken in response to an action taken by a Dex Party that is inconsistent with the terms of this Support Agreement, and (D) not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any plan of reorganization or liquidation in the Chapter 11 Cases other than the Plan.

For the avoidance of doubt, and without limiting any of the Dex Parties' rights under the Merger Agreement, each of the Dex Parties also agrees, severally and not jointly, that, until the Termination Date, it will not take any action (or refrain from taking an action) that, directly or indirectly, would in any material respect interfere with, delay, impede, or postpone or take any other action that interferes with, the implementation of the Transaction and, if necessary, confirmation and consummation of the Plan.

**Section 3.    Termination.**

**3.1    Termination Events.**

(a)    *Automatic Termination.* This Support Agreement, and the obligations of all Parties hereunder, shall terminate automatically without any further action or notice:

(1) if Dex has provided the Administrative Agents with the notice contemplated in clause (ii) of Section 3.1(c)(9), and the Amended and Restated Credit Agreements are not consummated and effective pursuant to the terms of the Definitive Loan Documentation on or prior to (a) the 130th day after the Support Agreement Effective Date in the event that the SuperMedia Parties have not commenced Chapter 11 Cases (as defined in the SuperMedia Support Agreement), or (b) the 190th day after the Support Agreement Effective Date in the event that SuperMedia has commenced Chapter 11 Cases (as defined in the SuperMedia Support Agreement);

(2) on the 100th day after the Support Agreement Effective Date if (x) based on the Administrative Agents' Registers as of such date, the Consenting Lenders hold less than 100% of the aggregate outstanding principal amount of the Loans under one or more of the Credit Agreements and (y) prior thereto, the Solicitation Commencement Date has not occurred;

(3) on the date on which each of the Amended and Restated Credit Agreements has become effective in accordance with its terms (which, if the Transaction is effectuated pursuant to the Prepackaged Alternative, shall be the Plan Effective Date);

(4) on the Bankruptcy Threshold Date, unless the Administrative Agents and the Dex Parties have received executed signature pages to this Support Agreement from (i) more than 50% of the Lenders under each of the Credit Agreements and (ii) Lenders holding no less than 66 2/3% of the aggregate outstanding principal amount of the Loans under each of the Credit Agreements (the thresholds set forth in clauses (i) and (ii) above, collectively, the "Bankruptcy Threshold");

(5) upon the commencement of any of the Chapter 11 Cases prior to (x) the Solicitation Commencement Date or (y) the Solicitation End Date;

(6) on the date on which any court of competent jurisdiction or other competent governmental or regulatory authority issues a ruling or an order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Proposed Merger, the Amended and Restated Credit Agreements, the SuperMedia Amendments or any other aspect of the Transaction; provided that any such ruling or order remains in effect for a period of five (5) Business Days following its issuance or entry;

(7) upon the occurrence of the Termination Date under and as defined in the SuperMedia Support Agreement;

(8) if the Dex Parties have commenced the Chapter 11 Cases:

(i)    on the date on which any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of

8

the businesses of any of the Dex Parties (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or any of the Dex Parties shall file a motion or other request for any such relief;

(ii)     upon the entry of any order in the Chapter 11 Cases terminating any Dex Party's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code; or

(iii)    if any Dex Party's consensual use of cash collateral of the Secured Parties is terminated in accordance with an interim or final cash collateral order entered in the Chapter 11 Cases as required pursuant to Section 3.1(c)(11);

(9)  upon the termination of the Merger Agreement pursuant to its terms (after giving effect to any applicable grace or cure period specified therein); and

(10)    on the date the Dex Parties or the Consenting Lenders elect to terminate this Support Agreement in accordance with clause (y) of Section 8.13.

(b)     *Termination After Breach*.  Subject to the immediately succeeding sentence, this Support Agreement, and the obligations of all Parties hereunder shall terminate ten (10) Business Days after the Dex Parties or the Administrative Agents (on behalf of or upon the direction of the Required Consenting Lenders) give written notice of a material breach of any of the undertakings, representations, warranties or covenants of this Support Agreement by the Dex Parties (in the case of notice from the Administrative Agents) or any Consenting Lender (in the case of notice from the Dex Parties), and such breach shall not have been cured or waived by the Dex Parties or such Consenting Lender, as the case may be, in the ten (10) Business Day period after the receipt by the Administrative Agents or the Dex Parties, as the case may be, of such notice (it being understood that the Parties' obligations under Section 2.1 shall be deemed material in all events).  Other than as set forth in Section 3.1(d), if any Consenting Lender shall breach its obligations under this Support Agreement, the Termination Event arising as a result of such act or omission shall apply only to such Consenting Lender, and this Support Agreement shall otherwise remain in full force and effect with respect to the Dex Parties and all other Consenting Lenders.

(c)     *Termination After Specified Events*.  This Support Agreement, and the obligations of all Parties hereunder shall terminate, ten (10) Business Days after the occurrence of any of the following events if such event has not been cured by the Dex Parties or waived by the Administrative Agents and the Required Consenting Lenders in accordance with Section 8.12 within such ten (10) Business Day period:

(1) on the third (3rd) day after the Support Agreement Effective Date, unless prior thereto Dex shall have filed with the SEC its registration statement on Form S-4 including a proposed joint proxy statement/prospectus and disclosure statement (collectively, the "SEC Documents") with respect to the Proposed Merger and the Merger Agreement, each in form and substance reasonably satisfactory to the Administrative Agents;

9

(2) at 11:59 p.m. (New York City time) on December 16, 2012 (provided that Dex and the Administrative Agents may, by mutual agreement, extend such date one or more times to end no later than the 35th day after the Support Agreement Effective Date, unless prior thereto the proposed Amended and Restated Credit Agreements (excluding exhibits and schedules thereto) have been made available to the Lenders;

(3) on the 55th day after the Support Agreement Effective Date, unless prior thereto the Definitive Loan Documentation (other than the Amended and Restated Credit Agreements) has been made available to the Lenders;

(4) on the 75th day after Dex has filed the SEC Documents with the SEC, unless prior thereto the SEC has declared the registration statement effective for purposes of the proposed Dex Stockholder Approval (as defined in the Merger Agreement);

(5) on the fifth (5th) Business Day after the effective date of the registration statement, unless prior thereto the Dex Parties have commenced solicitation of the Dex Stockholder Approval (as defined in the Merger Agreement);

(6) if the Solicitation Commencement Date is not the same date as the date the Dex Parties have commenced solicitation of the Dex Stockholder Approval;

(7) on the Solicitation Commencement Date, unless on or prior thereto the Dex Parties have made available to the Lenders the proposed Plan, Disclosure Statement and other solicitation materials;

(8) on the 10th day after the Solicitation Commencement Date, unless prior thereto the proposed Definitive Bankruptcy Documentation (other than the Plan, the Disclosure Statement and the other solicitation materials) has been made available to the Lenders; provided that, for the avoidance of doubt, such proposed Definitive Bankruptcy Documentation (other than the Plan, the Disclosure Statement and the other solicitation materials) shall be subject to (i) continuing review and modification by Dex and its advisors and (ii) clauses (x) and (y) of the definition of "Definitive Bankruptcy Documentation");

(9) on the fifth (5th) Business Day after the Solicitation End Date, unless prior thereto (i) the Chapter 11 Cases have been commenced or (ii) Dex has provided written notice to the Administrative Agents that (x) Lenders holding 100% of the aggregate outstanding principal amount of Loans under each of the Credit Agreements have agreed to the Amended and Restated Credit Agreements and have executed and delivered this Support Agreement as of the date of such notice, (y) each of the Dex Stockholder Approval and the SuperMedia Stockholder Approval (each as defined in the Merger Agreement) has been obtained, and (z) the Dex Parties have elected to effectuate the Transaction out-of-court;

(10)    the Dex Parties' failure to file the Plan and the Disclosure Statement with the Bankruptcy Court on the Petition Date;

(11)    the failure of the Bankruptcy Court, subject to the Bankruptcy Court's schedule, to enter in the Chapter 11 Cases (A) within three (3) Business Days after the Petition Date, an interim order,  and (B) on or prior to the 40th day after the Petition Date (unless the Plan Effective Date has occurred), a final order, under Sections 105, 361, 362, 363

and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, and in form and substance reasonably satisfactory to the Administrative Agents, authorizing the Dex Parties to use the cash collateral of, and granting Adequate Protection to, the Secured Parties, and, in the case of the interim order, scheduling a final hearing pursuant to Bankruptcy Rule 4001(B);

(12)    the failure of the Bankruptcy Court, subject to the Bankruptcy Court's schedule, to enter in the Chapter 11 Cases (A) within three (3) Business Days after the Petition Date, an interim order, and (B) on or prior to the 40th day after the Petition Date (unless the Plan Effective Date has occurred), a final order, in form and substance reasonably satisfactory to the Administrative Agents, approving the Dex Parties' cash management systems;

(13)    the 50th day after the Petition Date, unless prior thereto the Bankruptcy Court has entered the Confirmation Order, subject to the Bankruptcy Court's schedule;

(14)    the 15th day after entry of the Confirmation Order approving the Plan, unless prior thereto the Plan Effective Date has occurred;

(15)    the Dex Parties take any of the following actions: (A) withdrawing the Plan, (B) publicly announcing their intention not to proceed with the Plan, or (C) filing any motion, pleading, plan of reorganization and/or disclosure statement that, in the reasonable judgment of the Administrative Agents (x) is materially inconsistent with the Plan in the form annexed hereto as Exhibit A or this Support Agreement (including the Amendment Term Sheets) or (y) materially adversely affects the rights of the Consenting Lenders under this Support Agreement;

(16)    the Bankruptcy Court grants relief that, in the reasonable judgment of the Administrative Agents (x) is materially inconsistent with this Support Agreement (including the Amendment Term Sheets) or (y) materially adversely affects the rights of the Consenting Lenders under this Support Agreement;

(17)    if any change, effect, event, occurrence, development, circumstance or state of facts occurs that has or would reasonably be expected to have a Material Adverse Effect;

(18)    the occurrence of an Event of Default under any of the Credit Agreements (other than as a result of the occurrence of an event specified in section 365(e)(1)(A) of the Bankruptcy Code, commencement of the Chapter 11 Cases or a cross-default arising therefrom);

(19)    either (1) a filing by any Dex Party of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, the Obligations (as defined in each of the Credit Agreements) or the liens securing the Obligations or asserting any other cause of action against and/or with respect to the Obligations, the prepetition liens securing the Obligations, the Administrative Agents or any of the Consenting Lenders (or if any Dex Party supports any such motion, application or adversary proceeding commenced by any third party or consents to the standing of any such third party), or (2) the entry of an order of the Bankruptcy Court granting relief with respect to any of the foregoing claims or causes of action;

11

(20)     the amendment or modification of, or the filing of a pleading by any of the Dex Parties that seeks to amend or modify, the Plan, the Disclosure Statement or any documents related to the Plan (excluding, however, an amendment or modification to Section 8.3 or Section 8.4 of the Plan, or to a defined term used therein, including under the Confirmation Order, if and to the extent directed by the Bankruptcy Court), which amendment, modification or filing, in the reasonable judgment of the Administrative Agents (x) is materially inconsistent with the Plan in the form annexed hereto as Exhibit A or this Support Agreement (including the Amendment Term Sheets) or (y) materially adversely affects the rights of the Consenting Lenders under this Support Agreement;

(21)     (A) the amendment or modification of, or the filing of a pleading by any of the SuperMedia Parties that seeks to amend or modify, the Plan (as defined in the SuperMedia Support Agreement), the Disclosure Statement (as defined in the SuperMedia Support Agreement), or any documents related to the Plan (as defined in the SuperMedia Support Agreement) (excluding, however, an amendment or modification to Section 8.3 or Section 8.4 of such Plan, or to a defined term used therein, including under the Confirmation Order, as defined in the SuperMedia Support Agreement, if and to the extent directed by the Bankruptcy Court), which amendment, modification or filing, in the reasonable judgment of the Dex Parties or the Administrative Agents, as applicable, (x) is materially inconsistent with the terms of the Transaction or this Support Agreement or (y) materially adversely affects the rights of the Dex Parties or the Consenting Lenders, as applicable, under this Support Agreement; or (B) the amendment, modification or supplement of the SuperMedia Support Agreement or the waiver of any terms thereof other than in accordance with Section 8.12; or

(22)     upon the occurrence of a "Termination Event" under and as defined in the SuperMedia Support Agreement (it being understood that, for the avoidance of doubt, a Termination Event occurring under Section 3.1(a) of the SuperMedia Support Agreement shall result in a Termination Date under this Support Agreement without any opportunity to cure or waive such Termination Event).

(d)     *Bankruptcy Threshold Termination.*  After the Bankruptcy Threshold Date, this Support Agreement, and the obligations of all Parties hereunder, shall terminate on the 10th Business Day after the receipt by the Administrative Agents from the Dex Parties, or the Dex Parties from the Administrative Agents, as the case may be, of notice that the Bankruptcy Threshold with respect to the Loans outstanding under any Credit Agreement is no longer satisfied; provided that this Support Agreement shall not terminate if, on the 10th Business Day after such notice is received, the Bankruptcy Threshold with respect to the Loans outstanding under each Credit Agreement is satisfied.

**3.2     Effect of Termination; Termination Event Procedures.**

(a)     Each of the Dex Parties hereby agrees that the automatic stay arising pursuant to section 362 of the Bankruptcy Code in the event the Chapter 11 Cases are commenced shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

(b)     Upon the Termination Date, any and all ballots with respect to the Plan and signature page(s) to the Amended and Restated Credit Agreements delivered by each Consenting Lender prior to such Termination Date shall be immediately withdrawn, and such ballots and signature pages, as the case may be, shall be deemed to be null and void for all

purposes (with respect to the ballots, as expressly set forth therein) and shall not be considered or otherwise used in any manner by the Parties; provided that within five (5) Business Days after the Termination Date any Consenting Lender, on behalf of itself and no other Consenting Lender, may advise the Dex Parties in writing (with a copy to the Administrative Agents) that such Consenting Lender's ballot, signature page(s) to the Amended and Restated Credit Agreements and signature page or Lender Joinder hereto continue to be effective and are not withdrawn.

**Section 4.  Conditions Precedent to Support Agreement.**

The obligations of the Parties and the effectiveness hereof (other than Section 8.7(b) hereof) are subject to satisfaction of each of the following conditions:

(a)   receipt by the Administrative Agents of an executed signature page to this Support Agreement by Dex on behalf of itself and all of the other Dex Parties;

(b)   receipt by the Administrative Agents and the Dex Parties of executed signature pages to this Support Agreement by the Lenders set forth on Schedule 2 attached hereto;

(c)   receipt by the Administrative Agents of resolutions from each Dex Party evidencing the corporate or similar organizational authority of such Dex Party to execute, deliver and perform its obligations under this Support Agreement;

(d)   receipt by the Administrative Agents of a certificate dated as of the Support Agreement Effective Date from an authorized officer of each Dex Party certifying the names and true signatures of the officers of such Dex Party authorized to sign this Support Agreement;

(e)   receipt by the Administrative Agents of a certificate dated as of the Support Agreement Effective Date from an authorized officer of each Dex Party certifying that the representations and warranties of such Dex Party set forth in this Support Agreement are true and correct;

(f)   the SuperMedia Support Agreement shall have become effective by its terms and shall be in full force and effect or shall become effective simultaneously with the occurrence of the Support Agreement Effective Date;

(g)   receipt by the Administrative Agents of a certificate dated as of the Support Agreement Effective Date from an authorized officer of each Dex Party that is a party to the Merger Agreement certifying that the Merger Agreement is in full force and effect and no party thereto has received notice of a breach of the terms, covenants, agreements, representations or warranties thereto; and

(h)   receipt by the Administrative Agents' counsel and financial advisors of all reasonable outstanding, invoiced fees and expenses through the Support Agreement Effective Date.

**Section 5.  Representations, Warranties and Covenants.**

**5.1   Power and Authority.**

Each Consenting Lender, severally and not jointly, and each of the Dex Parties, jointly and severally, represents, warrants and covenants that, as of the Support Agreement Effective Date (or, in the

13

case of Consenting Lenders executing and delivering signature pages hereto after the Support Agreement Effective Date but prior to the Bankruptcy Threshold Date, as of the date of its execution and delivery of its signature page hereto), (i) such Party has and shall maintain all requisite corporate, partnership, or limited liability company power and authority to enter into this Support Agreement and to perform under the Amended and Restated Credit Agreements and (ii) the execution and delivery of this Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**5.2    Enforceability.**

Each Consenting Lender, severally and not jointly, and each of the Dex Parties, jointly and severally, represents, warrants and covenants that this Support Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability.

**5.3    No Material Misstatement or Omission.**

The Dex Parties, jointly and severally, represent, warrant and covenant that the joint proxy statement / prospectus and disclosure statement constituting a part of the registration statement on Form S-4 filed with the SEC on or about December 6, 2012 will not with respect to the information contained therein relating to Dex, as of the date such registration statement is declared effective by the SEC, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances in which they are made, not materially misleading.   The projections and pro forma financial information contained in the joint proxy statement / prospectus and disclosure statement are based upon good faith estimates and assumptions believed by the Dex Parties to be reasonable at the time made in light of the circumstances under which such estimates and assumptions were made, it being recognized by the Administrative Agents and the Consenting Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein in a material amount.

**5.4    Governmental Consent; No Conflicts.**

Each of the Dex Parties, jointly and severally, represents, warrants and covenants that, as of the Support Agreement Effective Date, the execution, delivery, and performance by it of this Support Agreement (a) does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except (i) such filings as may be necessary and/or required for disclosure by the SEC and applicable state securities or "blue sky" laws and (ii) any filings in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (b) will not violate any applicable law or regulation or the charter, limited liability company agreement, by-laws or other organizational documents of any of the Dex Parties or any order of any governmental authority and (c) will not violate or result in a default under the Merger Agreement or that certain Indenture, dated as of January 29, 2010, between Dex and The Bank of New York Mellon, as trustee, as such Indenture may be amended, supplemented or otherwise modified from time to time.

**5.5    Ownership.**

Each Consenting Lender, severally, and not jointly, represents, warrants and covenants that:

14

(a)     such Consenting Lender is the owner of the Claims set forth on its signature page hereto or on the schedule attached to its Lender Joinder (as applicable), or has and shall maintain the power and authority to bind the legal and beneficial owner(s) of such Claims to the terms of this Support Agreement;

(b)     such Consenting Lender (i) has and shall maintain full power and authority to vote on its Claims and execute and deliver its signature page(s) to the Amended and Restated Credit Agreements and this Support Agreement or (ii) has received direction from the party having full power and authority to vote on its Claims and execute and deliver its signature page(s) to the Amended and Restated Credit Agreements and this Support Agreement;

(c)     other than as permitted under this Support Agreement, such Claims are and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's performance of its obligations under this Support Agreement at the time such obligations are required to be performed; and

(d)     such Consenting Lender has made no prior Transfer, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interest in any Claims held by such Consenting Lender as of the date hereof that are inconsistent with, or in violation of, the representations and warranties of such Consenting Lender herein, in violation of its obligations under this Support Agreement or that would adversely affect in any way such Consenting Lender's performance of its obligations under this Support Agreement at the time such obligations are required to be performed.

**5.6     Merger Agreement and Proposed Merger.**

(a)     Each of the Dex Parties jointly and severally represents, warrants and covenants that:

(1) as of the Support Agreement Effective Date, except in connection with the Merger Agreement and the Proposed Merger, such Dex Party (i) has not resolved to engage in any merger, consolidation, asset sale, or the purchase or acquisition of all or a substantial part of the assets of another Person and (ii) has not been a party to any agreement or engaged in any discussions or negotiations with any Person that is reasonably likely to lead to any merger, consolidation, asset sale, or the purchase or acquisition of all or a substantial part of the assets of another Person, in each case, which would be material to the Dex Parties.

(2) other than as a result of filing the Chapter 11 Cases to implement the Transaction, its obligations hereunder and under the Merger Agreement do not materially conflict with, or result in the breach of, or constitute a default under, or result in or permit the termination or acceleration of, any material contractual obligation of the Dex Parties.

(3) the representations and warranties made in the Merger Agreement by such Dex Party are true, correct and complete in all material respects as of the Support Agreement Effective Date except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true, correct and complete in all material respects on and as of such earlier date (except that any representation and warranty that is

15

qualified as to "materiality" or "Material Adverse Effect" shall be true, correct and complete in all respects as so qualified).

(b) The Dex Parties shall not materially amend or modify the Merger Agreement (as in effect on the Support Agreement Effective Date), including Article V of the Merger Agreement, without the consent of the Required Consenting Lenders; for the avoidance of doubt, termination of the Merger Agreement shall not limit the effect of the termination provisions set forth in this Support Agreement.  The Dex Parties shall not waive any material obligation, material right or material condition under the Merger Agreement without the consent of the Required Consenting Lenders.

(c) Prior to consummation of the Proposed Merger (whether consummated out-of-court or on the Plan Effective Date), the Dex Parties shall comply with each of their material obligations under the Merger Agreement (including Article V thereof).

(d) Dex shall give the Administrative Agents prompt written notice (and in any event, within one (1) Business Day) of Dex receiving or giving any notice of a material event pursuant to the terms of the Merger Agreement, including a notice of "Change in SuperMedia Recommendation" (as defined in the Merger Agreement) or a notice of termination of the Merger Agreement.

**5.7    Company Presentation.**

No later than January 31, 2013, Dex (in conjunction with SuperMedia) shall make a written and oral presentation to "private side" Lenders regarding potential cost reduction initiatives and the integration initiative to be implemented among Dex and SuperMedia in anticipation of and in connection with the Proposed Merger, including, among others things, with respect to synergies, additional potential cost reduction opportunities and digital products integration plans that may be implemented prior to or after with the Proposed Merger.

**5.8    Financial Statements**

From and after the Support Agreement Effective Date, and so long as this Support Agreement is in effect (x) Dex East hereby authorizes and directs the Dex East Agent to deliver the financial statements delivered pursuant to the Dex East Credit Agreement to the Dex West Agent, the RHD Agent and the Administrative Agent (as defined in the SuperMedia Support Agreement) for distribution by such Administrative Agents to their respective lending syndicates, (y) Dex West hereby authorizes and directs the Dex West Agent to deliver the financial statements delivered pursuant to the Dex West Credit Agreement to the Dex East Agent, the RHD Agent and the Administrative Agent (as defined in the SuperMedia Support Agreement) for distribution by such Administrative Agents to their respective lending syndicates and (z) RHD hereby authorizes and directs the RHD Agent to deliver the financial statements delivered pursuant to the RHD Agreement to the Dex East Agent, the Dex West Agent and the Administrative Agent (as defined in the SuperMedia Support Agreement) for distribution by such Administrative Agents to their respective lending syndicates.

**Section 6.   Remedies.**

The Parties agree that any breach of this Support Agreement by the Dex Parties, on the one hand, and the Consenting Lenders, on the other hand, would give rise to irreparable damage for which monetary damages would not be an adequate remedy.  Each Dex Party and each Consenting Lender accordingly agrees that the Consenting Lenders and the Dex Parties, as the case may be, will be entitled to enforce the

terms of this Support Agreement by decree of specific performance without the necessity of proving the inadequacy of monetary damages as a remedy and to obtain injunctive relief against any breach or threatened breach. The Consenting Lenders and the Dex Parties, as the case may be, agree that such relief will be their only remedy against the applicable other Party with respect to any such breach, and that in no event will any Party be liable for monetary damages.

**Section 7.    Acknowledgments.**

This Support Agreement is the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. The Dex Parties will not solicit acceptances of the Plan from any Consenting Lender until such Consenting Lender has been provided with a copy of the Disclosure Statement. Furthermore, no securities of any Dex Party are being offered or sold hereby and this Support Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of any Dex Party.

**Section 8.    Miscellaneous Terms.**

**8.1    Assignment; Transfer Restrictions.**

(a)    Each Consenting Lender hereby agrees, severally and not jointly, for so long as this Support Agreement shall remain in effect as to it, not to Transfer any of its Claims, or convey, grant, issue or sell any option or right to acquire any of its Claims or voting rights related thereto or any other interest in any Claim against the Dex Parties, except to (i) a party that is a Consenting Lender or (ii) a Joining Lender Party; provided that any such Claims shall automatically be deemed to be subject to the terms of this Support Agreement; provided further, that an entity or Person that purchases a participation interest from a Consenting Lender (pursuant to Section 9.04(c) of the Credit Agreements) shall not be required to execute and deliver a Lender Joinder. As a condition to the effectiveness of any such Transfer, each Joining Lender Party shall indicate, on the signature page to its Lender Joinder, the amount of Loans held by such Joining Lender Party. With respect to any Transfer effectuated in accordance with this Section 8.1(a), such Joining Lender Party shall be deemed to be a Consenting Lender for purposes of this Support Agreement. For the avoidance of doubt, any sale of participations (under Section 9.04(c) of the Credit Agreements) by a Consenting Lender of all or a portion of such Consenting Lender's rights or obligations under any of the Credit Agreements (including all or a portion of the Loans owing to such Consenting Lender) shall not relieve such Consenting Lender from its obligations under this Support Agreement, including with respect to any such participation (regardless of any instruction a transferee of such participation gives with respect to voting or any other rights and obligations of the Consenting Lender hereunder), to which such Consenting Lender shall remain bound subject to the terms hereof.

(b)    Any purported Transfer or transaction involving any Claim that does not comply with the procedures set forth in Section 8.1(a) shall be deemed void *ab initio*.

(c)    Any Consenting Lender that Transfers all of its Claims in accordance with Section 8.1(a) shall no longer be bound by this Support Agreement.

(d)     Notwithstanding the foregoing provisions of this Section 8.1, any Consenting Lender may, at any time and without notice to or consent from any other Party, pledge or grant a security interest in all or any portion of its Claims or rights (including rights to payment of interest and repayment of principal) under any of the Credit Agreements, as applicable, in order to secure obligations of such Consenting Lender to a Federal Reserve Bank or to secure obligations owed in connection with financing provided to such Consenting Lender; provided that no such pledge or grant of a security interest shall release such Consenting Lender from any of its obligations hereunder or substitute any such pledgee or grantee for such Consenting Lender as a Party hereto.

(e)     This Support Agreement shall not preclude any Consenting Lender from acquiring additional Loans; provided that any such Loans shall automatically be deemed to be "Claims" subject to the terms of this Support Agreement.

**8.2     No Third Party Beneficiaries.**

This Support Agreement shall be solely for the benefit of the Administrative Agents, the Dex Parties and each Consenting Lender.  No Person shall be a third party beneficiary of this Support Agreement.

**8.3     Entire Agreement.**

This Support Agreement, including Schedules, Exhibits, Annexes and the Definitive Documentation, constitutes the entire agreement of the Parties with respect to the subject matter of this Support Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Support Agreement.

**8.4     Counterparts.**

This Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed signature page of this Support Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

**8.5     Settlement Discussions.**

This Support Agreement (including the Amendment Term Sheets) is the product of negotiations among the Parties hereto and reflects various agreements and compromises to implement the Transaction. Nothing herein shall be deemed to be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Support Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Support Agreement.

**8.6     Continued Banking Practices.**

Notwithstanding anything herein to the contrary, each Consenting Lender, each Administrative Agent and their respective affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing (including debtor in possession financing), equity capital or other services (including financial advisory services) to any Dex Party or any affiliate of any Dex Party or any other Person, including, but not limited

to, any Person proposing or entering into a transaction related to or involving any Dex Party or any affiliate thereof.

**8.7     Reservation of Rights; Events of Default; Waivers; Amendments.**

(a)     Except as expressly provided in this Support Agreement, nothing herein is intended to, shall or shall be deemed in any manner to (i) waive, limit, impair, prejudice or restrict the ability of each Consenting Lender to protect and preserve its rights, remedies and interests, including, but not limited to, all of its rights and remedies, whether now existing or arising in the future, under any of the Credit Agreements, the other Loan Documents, any other instrument or agreement referred to herein or therein, the Bankruptcy Code or applicable law, including any such rights and remedies relating to Defaults or other events that may have occurred prior to the execution of this Support Agreement, any and all of its claims and causes of action against any of the Dex Parties, any liens or security interests it may have in any assets of any of the Dex Parties or any third parties, or its full participation in the Chapter 11 Cases, if commenced, (ii) constitute an amendment, modification or forbearance by the Lenders with respect to (x) any other term, provision, condition, Default or Event of Default of or under any of the Credit Agreements or any of the other Loan Documents, or (y) any other instrument or agreement referred to herein or therein and (iii) limit or impair the ability of any of the Consenting Lenders to consult with each other, the Dex Parties, the SuperMedia Parties and the SuperMedia Lenders.  If the Amended and Restated Credit Agreements are not consummated as provided herein or if a Termination Date occurs, the Administrative Agents, the Consenting Lenders and the Dex Parties each fully reserve any and all of their respective rights, remedies and interests under the Loan Documents and applicable law and in equity.

(b)     Without limiting subsection 8.7(a) in any way, from and after the date that this Support Agreement has been executed and delivered by Required Lenders under each of the Credit Agreements, and the conditions set forth in Section 4 have been satisfied or waived, the Consenting Lenders, the Administrative Agents and the Dex Parties, as applicable:

(1) (x) waive any Default or Event of Default arising under Article VII(j)(vi) of each of the Credit Agreements solely to the extent that such Default or Event of Default may result from taking any action for the purpose of effecting the Transaction through the commencement of the Chapter 11 Cases, which waiver shall survive termination of this Support Agreement; and (y) Article VII(j) of  each of the Credit Agreements is amended as of the Support Agreement Effective Date by deleting clause (vi) thereof and replacing it with: "take any action for the purpose of effecting any of the foregoing; provided, however, that, for the avoidance of doubt, none of the Ultimate Parent's, any Material Ultimate Parent Subsidiary's, the Parent's, the Borrower's or any Material Subsidiary's execution of, performance of the obligations contemplated by or consistent with, and the taking of any action under (I) the Support and Limited Waiver Agreement dated as of December 5, 2012 by and among the Ultimate Parent, its Subsidiaries, the Agent, the other administrative agent referenced therein and the lenders from time to time party thereto (as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof) and (II) the Merger Agreement (as defined in the Support and Limited Waiver Agreement referred to in clause (I) above) shall constitute a Default or an Event of Default under this clause (vi).";

19

(2)  with respect to all Loan Parties, waive any Default or Event of Default under Article VII(f) of each of the Credit Agreements arising from the Borrower's failure to comply with Section 5.01(a) solely as a result of the failure to deliver an audit without a 'going concern' or like qualification, exception or explanatory paragraph with respect to the fiscal year ending December 31, 2012 (which 'going concern' or like qualification, exception or explanatory paragraph relates (i) to the anticipated or potential commencement of the Chapter 11 Cases pursuant to this Support Agreement and (ii) does not expressly provide that it results from (x) a limitation of scope or (y) the financial statements not presenting fairly in all material respects the financial position, results of operations or cash flows of the Dex Parties in conformity with GAAP resulting in a qualified or adverse audit opinion), which waiver shall survive termination of this Support Agreement;

(3)  agree that Section 5.01 of each Credit Agreement is hereby amended to incorporate the covenants in the second sentence of the first paragraph (including all bullet points thereunder) under the heading "Affirmative Covenants" in, as applicable, the Amendment Term Sheets, and the applicable Dex Parties hereby agree to comply therewith upon the effectiveness of this Section 8.7(b)(3); and

(4)  agree that for so long as this Support Agreement is in effect, notwithstanding anything in the Credit Agreements to the contrary, the Dex Parties shall not make any Discounted Voluntary Prepayments.

(c)  Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of any Consenting Lender contained in this Support Agreement relates solely to such Consenting Lender's rights and obligations as a Consenting Lender under the applicable Credit Agreement, and does not bind such Consenting Lender or its affiliates with respect to any other indebtedness or other liability owed by Dex or any of its subsidiaries and affiliates to such Consenting Lender or any affiliate of such Consenting Lender. Notwithstanding anything herein to the contrary, in the event that a Consenting Lender (or affiliate thereof) has a contractual obligation with respect to any debt claims other than the Claims to vote such claims as directed by a third party, such Consenting Lender's (or affiliate's) compliance with such direction shall not be deemed a violation of any of the provisions of this Support Agreement.  For purposes of this Support Agreement, (x) claims of a Consenting Lender that are held by such Consenting Lender in a fiduciary or similar capacity and (y) claims held by a Consenting Lender in its capacity as a broker, dealer or Qualified Marketmaker of Loans under the applicable Credit Agreement or any other claim against or security of the Dex Parties (including any Loans or claims held in inventory with respect to such broker, dealer, or market-making activities, provided that the positions with respect to such Loans or claims are separately identified on the internal books and records of such Consenting Lender) shall not, in either case (x) or (y), be bound by or subject to this Support Agreement; provided further that the Claims identified on such Consenting Lender's signature page or Lender Joinder hereto, as applicable, shall not be subject to this sentence or be deemed to satisfy clause (x) or (y) above.

## 8.8    Relationship Among Parties.

It is understood and agreed that no Consenting Lender has any duty of trust or confidence in any form with any other Consenting Lender, and, except as provided in this Support Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting

Lender may trade in the Loans or other debt or equity securities of the Dex Parties without the consent of the Dex Parties, as the case may be, or any other Consenting Lender, subject to applicable securities laws, the terms of this Support Agreement and the applicable Credit Agreements; provided however that no Consenting Lender shall have any responsibility for any such trading by any other Person by virtue of this Support Agreement.  No prior history, pattern or practice of sharing confidences among or between the Consenting Lenders shall in any way affect or negate this understanding and agreement.

**8.9    Governing Law; Waiver of Jury Trial.**

      (a)      The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute under or arising out of or in connection with this Support Agreement, whether sounding in contract, tort or otherwise.

      (b)      This Support Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.  By its execution and delivery of this Support Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to Section 8.9(c), any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Support Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

      (c)      Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in Sections 8.9(a) or 8.9(b) shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of or in connection with this Support Agreement.

**8.10    Successors.**

This Support Agreement is intended to bind the Parties and inure to the benefit of the Administrative Agents, the Consenting Lenders and each of the Dex Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives.

**8.11    Acknowledgment Regarding Counsel.**

Each of the Parties acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Support Agreement and the transactions contemplated by this Support Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  No Party shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**8.12    Amendments, Modifications, Waivers.**

      (a)      Except as set forth in the last sentence of this Section 8.12(a), this Support Agreement may only be modified, amended or supplemented, and any of the terms hereof (including in Section 3.1 hereof) may only be waived, by an agreement in writing signed by each of

the Dex Parties and the Required Consenting Lenders; provided that (1) any such modification, amendment, supplement or waiver shall not be effective unless also agreed to in writing by each Consenting Lender (i) under a particular Credit Agreement whose treatment or rights is adversely affected by the modification, amendment, supplement or waiver in a manner different from the other Consenting Lenders under such Credit Agreement or (ii) whose consent would be required under the first proviso of Section 9.02(b) of the RHD Credit Agreement or under the second proviso of Section 9.02(b) of the Dex East Credit Agreement or the Dex West Credit Agreement, as applicable, if such modification, amendment, supplement or waiver to an Amendment Term Sheet (each as in the form attached hereto as Exhibit D, E and F on the Support Agreement Effective Date) were instead a modification, amendment, supplement or waiver to or under the applicable Credit Agreement, and (2) if the Dex Parties and the Required Consenting Lenders consent to any such modification, amendment, supplement or waiver, but a Consenting Lender whose consent is required under part (1) above does not so consent, the Dex Parties may terminate such non-consenting Consenting Lender as a Party to this Support Agreement and, as of the date of such termination, such Consenting Lender shall have no rights or obligations under this Support Agreement. For the avoidance of doubt, any modification, amendment, supplement, extension or waiver that is expressly permitted under this Support Agreement with the prior consent of the Administrative Agents and/or the Majority Documentation Lenders is not a modification, amendment, supplement, extension or waiver that is subject to this Section 8.12.

(b)     Except as set forth in the last sentence of this Section 8.12(b), the SuperMedia Support Agreement may only be modified, amended or supplemented, and any of the terms thereof (including in Section 3.1 thereof) may only be waived, by an agreement in writing signed by the Required Consenting Lenders hereunder. For the avoidance of doubt, any modification, amendment, supplement, extension or waiver that is expressly permitted under the SuperMedia Support Agreement with the prior consent of the Administrative Agent and/or the Majority Documentation Lenders (in each case, as defined in the SuperMedia Support Agreement) is not a modification, amendment, supplement, extension or waiver that is subject to this Section 8.12.

(c)     The definition of Required Consenting Lenders, and this Section 8.12, may not be modified, amended or supplemented, or any of its terms waived, as applicable, without the prior written consent of each Consenting Lender.

## 8.13    Fiduciary Duties.

Notwithstanding anything to the contrary herein, nothing in this Support Agreement shall require Dex, any of the other Dex Parties, or any of their respective directors or officers (in such Person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such Person's fiduciary obligations under applicable law; provided that (x) to the extent that taking such action or refraining from taking such action would be reasonably likely to result in a breach of this Support Agreement, Dex shall give the Administrative Agents not less than three (3) Business Days prior written notice of such anticipated action or anticipated refraining from taking such action and (y) if taking any such action or refraining from taking such action results in, or is reasonably likely to result in, a breach of this Support Agreement, then Dex (upon the expiration of the three (3) Business Day notice period set forth in (x) above) or the Consenting Lenders (upon receipt of the notice from Dex contemplated in (x) above), as the case may be, may terminate this Support Agreement as set forth in Section 3.1(a)(10) (it

being understood that the specific performance provisions of Section 6 shall not be applicable to the Parties with respect to their rights under this Section 8.13).

**8.14    Further Assurances; Rule of Construction.**

Subject to the other terms of this Support Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Amended and Restated Credit Agreements (including, if Dex has elected the Prepackaged Alternative and not withdrawn such election, the Plan).   For purposes of computing days under this Support Agreement, (i) the day of the event triggering the period shall be excluded; (ii) every day, including intermediate non-Business Days shall be included; and (iii) the last day of the period shall be included, underlined provided that, other than with respect to the date set forth in Section 3.1(c)(2), if the last day of the period is a non-Business Day, the period shall continue to run until the immediately succeeding Business Day from such last day of the period.

**8.15    Public Disclosure.**

(a)    The Parties acknowledge that this Support Agreement will be publicly disclosed on the earlier of (x) a Termination Date and (y) the date on which Dex has filed its SEC Documents with the SEC.   Any and all public disclosures of this Support Agreement shall include such redactions as may be reasonably requested by the Administrative Agents' counsel to maintain the confidentiality of the items identified in Section 8.15(b) hereof, subject to any applicable requirements under the federal securities laws, the Bankruptcy Code or the Bankruptcy Rules.

(b)    Except as required by law (as determined by outside counsel to the Dex Parties and with reasonable prior notice to the Administrative Agents), neither the Dex Parties nor the Administrative Agents shall (a) use the name of any Consenting Lender in any public manner without such Consenting Lender's prior written consent (except to the extent that the name of a Consenting Lender is otherwise set forth herein or the Plan, not including the signature pages or schedules hereto or to any Lender Joinder) or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Lender) other than the Administrative Agents, their advisors and the advisors to the Dex Parties and/or the SuperMedia Parties the amount or percentage of any Loans to the Dex Parties held by any Consenting Lender.   The Dex Parties may disclose the aggregate amount of outstanding Loans held by all Consenting Lenders under each Credit Agreement.

**8.16    Severability of Provisions.**

If any provision of this Support Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Support Agreement.

**8.17    Notices.**

All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier to the following address of the applicable other Party hereto; or (b) sent by fax to the following fax number of such other Party hereto with the confirmatory copy delivered by overnight courier to the address of such other Party listed below.

If to the Dex Parties, to:

Dex One Corporation
1001 Winstead Drive
Cary, NC 27513
Attn:    Mark W. Hianik
Telephone: (919) 297-1222
Facsimile: (919) 297-1518

with a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:    Marc Kieselstein, P.C.
          Christopher J. Marcus
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

If to any Consenting Lender, the address set forth on its signature page.

If to the Dex East Agent or the Dex West Agent, to:

JPMorgan Chase Bank, N.A.
383 Madison Avenue,
New York, New York 10179
Attn:    Neil Boylan
Telephone: (212) 270-1410
Facsimile: (212) 622-4560

with a copy to

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn:    Steve Fuhrman and Sandy Qusba
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

If to the RHD Agent, to:

Deutsche Bank
60 Wall Street, 43rd Floor
New York, New York 10005
Attn:    Mark Cohen and Benjamin Souh
Telephone: (212) 250-6596
Facsimile: (646) 502-4257

with a copy to

Simpson Thacher & Bartlett LLP

24

425 Lexington Avenue
New York, New York 10017
Attn: Steve Fuhrman and Sandy Qusba
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

[SIGNATURE PAGES FOLLOW]

In witness whereof, the Parties hereto have caused this Support Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Dex One Corporation
on behalf of itself and all of its direct and indirect subsidiaries

_____
By:
Name:
Title:

JPMorgan Chase Bank, N.A., in its capacity
as Dex East Agent and Dex West Agent


_____
By:
Name:
Title:

Deutsche Bank Trust Company Americas, in
its capacity as RHD Agent


_____
By:
Name:
Title:


_____
By:
Name:
Title:

[CONSENTING    LENDER    SIGNATURE
BLOCKS], as a Consenting Lender


_____
By:
Name:
Title:

Notice Address:


## CLAIMS UNDER DEX EAST CREDIT AGREEMENT

| Lender | Amount of Claim under Credit Agreement |
|---|---|
|  |  |
|  |  |
|  |  |

## CLAIMS UNDER DEX WEST CREDIT AGREEMENT

| Lender | Amount of Claim under Credit Agreement |
|---|---|
|  |  |
|  |  |
|  |  |

## CLAIMS UNDER RHD CREDIT AGREEMENT

| Lender | Amount of Claim under Credit Agreement |
|---|---|
|  |  |
|  |  |
|  |  |

**<u>SCHEDULE 1</u>**

<u>DEX PARTIES</u>

Dex One Corporation
Dex Media, Inc.
Dex One Digital, Inc.
Dex One Service, Inc.
R.H. Donnelly Inc.
R.H. Donnelley Corporation
Dex Media East, Inc.
Dex Media West, Inc.
Dex Media Service LLC
R.H. Donnelley APIL, Inc.
Newdex, Inc.
Spruce Acquisition Sub, Inc.

## **SCHEDULE 2**

## CONSENTING LENDERS[1] AS OF SUPPORT AGREEMENT EFFECTIVE DATE

JPMorgan Chase Bank, N.A.
Deutsche Bank Trust Company Americas
Paulson & Co. Inc.
Bain Capital LLC – Sankaty
Ares Management LLC
Highland Capital Management LP
General Electric Capital Corporation
Bennett Management Corporation

---

[1] Each entity listed below is either the legal and beneficial owner(s) of the Loans set forth on its respective signature pages to the Support Agreement or is or is an affiliate of a Person that has the power and authority to bind the legal and beneficial owner(s) with respect to such Loans.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT A TO THE DEX ONE SUPPORT AGREEMENT**

## PLAN

Substantially in the form attached hereto as Exhibit A to the Disclosure Statement

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

**<u>EXHIBIT B TO THE DEX ONE SUPPORT AGREEMENT</u>**

<u>SUPERMEDIA SUPPORT AGREEMENT</u>

[THIS PAGE INTENTIONALLY LEFT BLANK]

*EXECUTION VERSION*

## SUPPORT AND LIMITED WAIVER AGREEMENT

This SUPPORT AND LIMITED WAIVER AGREEMENT (together with all Exhibits, Annexes and Schedules hereto, in each case as amended, supplemented or otherwise modified from time to time, this "<u>Support Agreement</u>") is dated as of December 5, 2012 by and among: (i) the Consenting Lenders (as defined below), (ii) SuperMedia Inc. ("<u>SuperMedia</u>") and certain subsidiaries of SuperMedia set forth on <u>Schedule 1</u> attached hereto (collectively, the "<u>SuperMedia Parties</u>"), and (iii) JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>"), as administrative agent under the Credit Agreement (as defined below) (each of the parties set forth in clauses (i) through (iii) above, a "<u>Party</u>"; collectively, the "<u>Parties</u>").

**WHEREAS,** SuperMedia, as borrower, certain lenders (the "<u>Lenders</u>") and JPMorgan, as administrative agent and collateral agent (in such capacities, the "<u>Administrative Agent</u>"), are parties to the Loan Agreement, dated as of December 31, 2009 (as amended, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>");

**WHEREAS,** Dex One Corporation ("<u>Dex</u>") and Dex Media, Inc. ("<u>Dex Media</u>"), each as a guarantor, Dex Media East, Inc. ("<u>Dex East</u>"), as borrower, certain lenders (the "<u>Dex East Lenders</u>") and JPMorgan, as administrative agent and collateral agent, are parties to the Amended and Restated Credit Agreement, dated as of January 29, 2010 (as amended, supplemented or otherwise modified from time to time, the "<u>Dex East Credit Agreement</u>");

**WHEREAS,** Dex and Dex Media, each as a guarantor, Dex Media West, Inc. ("<u>Dex West</u>"), as borrower, certain lenders (the "<u>Dex West Lenders</u>") and JPMorgan, as administrative agent and collateral agent, are parties to the Amended and Restated Credit Agreement, dated as of January 29, 2010 (as amended, supplemented or otherwise modified from time to time, the "<u>Dex West Credit Agreement</u>");

**WHEREAS,** Dex, as a guarantor R.H. Donnelley Inc. ("<u>RHD</u>"), as borrower, certain lenders (the "<u>RHD Lenders</u>"; together with the Dex East Lenders and the Dex West Lenders, the "<u>Dex Lenders</u>") and Deutsche Bank Trust Company Americas, as administrative agent and collateral agent, are parties to the Third Amended and Restated Credit Agreement, dated as of January 29, 2010 (as amended, supplemented or otherwise modified from time to time, the "<u>RHD Credit Agreement</u>"; together with the Dex East Credit Agreement and the Dex West Credit Agreement, the "<u>Dex Credit Agreements</u>");

**WHEREAS**, (i) each of Dex and Newdex, Inc., a direct wholly-owned subsidiary of Dex ("<u>Newco</u>"), desires to merge Dex with and into Newco, with Newco as the surviving entity (the "<u>Dex Merger</u>") and (ii) immediately following consummation of the Dex Merger, each of Newco, SuperMedia and Spruce Acquisition Sub, Inc., a direct wholly-owned subsidiary of Newco ("<u>Merger Sub</u>"), desire to merge Merger Sub with and into SuperMedia, with SuperMedia as the surviving entity (the "<u>SuperMedia Merger</u>" and together with the Dex Merger, the "<u>Proposed Merger</u>"), each in accordance with the Amended and Restated Agreement and Plan of Merger among Dex, Newco, SuperMedia and Merger Sub, dated as of December 5, 2012 (as amended, supplemented or otherwise modified from time to time, the "<u>Merger Agreement</u>");

**WHEREAS**, after giving effect to the Proposed Merger, SuperMedia will become a direct wholly-owned subsidiary of Newco, and Newco will become the Ultimate Parent;

**WHEREAS**, to effectuate the Proposed Merger and the transactions related thereto, the SuperMedia Parties have requested certain amendments to the Credit Agreement, all of which are

conditions precedent to the consummation of the Proposed Merger (the "Amended and Restated Credit Agreement"; together with the Proposed Merger and the transactions related thereto, the "Transaction");

WHEREAS, the SuperMedia Parties have requested that the Lenders execute and deliver this Support Agreement to evidence their support for the Transaction (including the Amended and Restated Credit Agreement), whether the Transaction is consummated out-of-court or pursuant to a prepackaged chapter 11 plan of reorganization of the SuperMedia Parties under the Bankruptcy Code, as provided herein;

WHEREAS, the Consenting Lenders are willing to enter into the Amended and Restated Credit Agreement as more particularly described in the term sheet annexed hereto as Exhibit D (the "Amendment Term Sheet"), subject to the terms and conditions set forth herein;

WHEREAS, to effectuate the Proposed Merger and the transactions related thereto, Dex, Dex Media, Dex East, Dex West, RHD and certain of their subsidiaries (the "Dex Parties") have requested certain amendments to the Dex Credit Agreements, which are conditions precedent to the consummation of the Proposed Merger (the "Dex Amendments");

WHEREAS, the Dex Parties have requested that the Dex Lenders execute and deliver a support and waiver agreement to evidence their support for the Dex Amendments, the Proposed Merger and the transactions related thereto, whether consummated out-of-court or pursuant to a prepackaged chapter 11 plan of reorganization of the Dex Parties under the Bankruptcy Code, as provided in the Dex Support Agreement (as defined below);

WHEREAS, certain Dex Lenders (the "Consenting Dex Lenders") are willing to enter into the Dex Amendments as more particularly described on the term sheets annexed as Exhibits D, E and F, respectively, to the Support and Limited Waiver Agreement among the Dex Parties and the Consenting Dex Lenders, dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "Dex Support Agreement"), a copy of which is annexed hereto as Exhibit B, subject to the terms and conditions of the Dex Support Agreement;

NOW, THEREFORE, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

## Section 1.  Definitions.

Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Credit Agreement.  As used in this Support Agreement, the following terms have the meanings specified below:

"Adequate Protection" means customary adequate protection granted to secured parties in chapter 11 cases of the size and type of the Chapter 11 Cases if the Prepackaged Alternative is applicable, including current pay cash interest at the non-default rate specified in the Credit Agreement for accrued and unpaid interest as of the Petition Date and for interest accruing after the Petition Date, any mandatory prepayments (other than as a result of the acceleration of the Loans upon the commencement of the Chapter 11 Cases) in the amounts and on the dates required under the Credit Agreement, cash payments due under Swap Agreements in the ordinary course and at the non-default rate set forth in the applicable Swap Agreement (to the extent such

Swap Agreement has not been terminated in accordance with the Bankruptcy Code), adequate protection liens, superpriority administrative claims and current payment of ongoing professional fees and expenses (including legal counsel fees and financial advisor fees) of the Administrative Agent.

"Bankruptcy Code" means chapter 11 of title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local and chambers rules of the Bankruptcy Court.

"Bankruptcy Threshold" has the meaning set forth in Section 3.1(a)(4).

"Bankruptcy Threshold Date" means 5:00 p.m. (New York City time) on December 21, 2012; provided that SuperMedia and the Administrative Agent may extend such date one or more times to a date no later than the 40th day after the Support Agreement Effective Date.

"Chapter 11 Cases" means reorganization cases filed by the SuperMedia Parties in accordance with and subject to the terms of this Support Agreement.

"Claims" means, subject to and without limiting Section 8.7(c), with respect to each Consenting Lender, such Consenting Lender's claims (as defined in section 101(5) of the Bankruptcy Code) arising under the Credit Agreement, against SuperMedia set forth on such Consenting Lender's signature page hereto or Lender Joinder, as applicable and as may be acquired after the date of such signature page or Lender Joinder, as applicable; provided that if there is any discrepancy in the principal amount of Loans set forth on a Consenting Lender's signature page hereto and the principal amount of Loans held by such Consenting Lender as reflected in the Administrative Agent's Register, the principal amount set forth on such Register shall be conclusive for purposes of this Support Agreement absent manifest error.

"Confirmation Order" means an order of the Bankruptcy Court entered on the docket in the Chapter 11 Cases, in form and substance reasonably satisfactory to the Administrative Agent approving the Disclosure Statement and confirming the Plan.

"Consenting Lenders" means the Lenders from time to time party to this Support Agreement (including by the execution and delivery of a Lender Joinder). "Consenting Lenders" shall not include any Lender who has become a party to this Support Agreement but thereafter materially breaches its obligations hereunder, which breach has not been waived or cured pursuant to the terms hereof.

"Definitive Bankruptcy Documentation" means, in the event the Parties effectuate the Transaction pursuant to the Prepackaged Alternative, the Plan, the Plan Supplement (as defined in the Plan), the Disclosure Statement, the Confirmation Order and the First Day Motions, including any amendments, modifications or supplements made from time to time thereto, which in each case are (x) materially consistent with this Support Agreement and the Plan in the form annexed hereto as Exhibit A and (y) except as otherwise provided herein, in form and substance reasonably satisfactory to the SuperMedia Parties, the Administrative Agent and the Majority

3

Documentation Lenders.  All references herein to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order or the First Day Motions shall mean those documents in a form that constitutes Definitive Bankruptcy Documentation.

"Definitive Documentation" means, collectively, the Definitive Bankruptcy Documentation and the Definitive Loan Documentation.

"Definitive Loan Documentation" means the definitive agreements and documents, other than Definitive Bankruptcy Documentation, referenced in or contemplated by the Amendment Term Sheet, the Amended and Restated Credit Agreement, or as otherwise may be reasonably necessary to effectuate the Amended and Restated Credit Agreement, including guarantee and collateral agreements, a shared guarantee and collateral agreement, a subordinated guarantee agreement, an intercreditor and collateral agency agreement, a shared services agreement, amended tax sharing agreements, intellectual property escrow and license agreements, including any amendments, modifications or supplements made from time to time thereto, which definitive agreements and documents in each case are (x) materially consistent with the Amendment Term Sheet and (y) except as otherwise provided herein, in form and substance reasonably satisfactory to the SuperMedia Parties, the Administrative Agent and the Majority Documentation Lenders. All references herein to the Amendment Term Sheet, Amended and Restated Credit Agreement, or any of the other agreements referred to in this definition shall mean those agreements in a form that constitutes Definitive Loan Documentation.

"Disclosure Statement" means a disclosure statement to be provided to the Lenders relating to the Plan that complies with sections 1125 and 1126(b) of the Bankruptcy Code and is in form and substance reasonably satisfactory to the Administrative Agent.

"First Day Motions" means customary motions, applications and related proposed orders filed by chapter 11 debtors and debtors in possession in chapter 11 cases of the size and type of the Chapter 11 Cases if the Prepackaged Alternative is applicable, including, motions seeking approval of (i) prepackaged plan scheduling procedures, (ii) consensual use of the Secured Parties' cash collateral and the provision of Adequate Protection to the Secured Parties and (iii) continued use of the SuperMedia Parties' cash management system, which motions, applications and associated proposed orders shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Joining Lender Party" means a (i) transferee of Claims that executes and delivers a Lender Joinder to the Administrative Agent and the SuperMedia Parties at least five (5) Business Days prior to the relevant Transfer or (ii) Lender that  executes and delivers a Lender Joinder to the Administrative Agent and SuperMedia Parties after the Bankruptcy Threshold Date.

"Lender Joinder" means a joinder to this Support Agreement, substantially in the form annexed hereto as Exhibit C.

"Majority Documentation Lenders" means, as of any date of determination, the majority by number of the Consenting Lenders set forth on Schedule 2 excluding the Administrative Agent (and, for the avoidance of doubt, not such Consenting Lenders' successors or assigns and not any Consenting Lender that is no longer bound by this Support Agreement pursuant to the terms hereof) that exercise their consent or approval rights as of such date of determination in accordance with the terms of this Support Agreement.

4

"<u>Material Adverse Effect</u>" means a material adverse effect, on (i) the business, property, material agreements, liabilities, financial condition or results of operation of the SuperMedia Parties, taken as a whole, (ii) the validity or the enforceability of the Credit Agreement or any of the other Loan Documents or the rights and remedies of the Administrative Agent and the Lenders under any of the Loan Documents, (iii) the validity or the enforceability of this Support Agreement or (iv) the validity or the enforceability of the Merger Agreement or the ability of the SuperMedia Parties to consummate the Proposed Merger.

"<u>Petition Date</u>" means the date on which the Chapter 11 Cases are commenced.

"<u>Person</u>" means a "person" as defined in Section 101(41) of the Bankruptcy Code.

"<u>Plan</u>" means a joint, prepackaged chapter 11 plan of reorganization (including any Exhibits, Annexes and Schedules thereto) for the SuperMedia Parties that effectuates the Transaction, substantially in the form annexed hereto as <u>Exhibit A</u>.

"<u>Plan Effective Date</u>" means the date that is the first Business Day after the date of satisfaction or, subject to the prior written consent of the Administrative Agent, which consent may not be unreasonably withheld, waiver, of the conditions to effectiveness of the Plan as set forth therein.

"<u>Prepackaged Alternative</u>" means SuperMedia's election pursuant to Section 2.1(a)(ii) to effectuate the Transaction by commencing the Chapter 11 Cases and seeking confirmation by the Bankruptcy Court of the Plan.

"<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the SuperMedia Parties (including debt securities, the Loans or other debt) or enter with customers into long and short positions in claims against the SuperMedia Parties (including debt securities, the Loans or other debt), in its capacity as a dealer or market maker in such claims against the SuperMedia Parties and (ii) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"<u>Required Consenting Lenders</u>" means the consent of Consenting Lenders holding greater than 66 2/3% of the aggregate outstanding principal amount of the Loans that are held by Consenting Lenders.

"<u>SEC</u>" means the Securities and Exchange Commission.

"<u>SEC Documents</u>" has the meaning set forth in Section 3.1(c)(1).

"<u>Solicitation Commencement Date</u>" means the date the SuperMedia Parties' claims and solicitation agent first distributes the Disclosure Statement and ballots to the Lenders to solicit acceptances of the Plan from the Lenders.

"<u>Solicitation End Date</u>" means the 30th day after the Solicitation Commencement Date.

"<u>Support Agreement Effective Date</u>" means the date upon which all the conditions set forth in Section 4 are satisfied or waived by the Administrative Agent, except that the consent of the SuperMedia Parties shall also be required to waive satisfaction of the condition set forth in Section 4(b) and (f)

"<u>Termination Date</u>" means (i) with respect to the Termination Events in Section 3.1(a), the date of the occurrence of such Termination Event and (ii) with respect to the Termination Events in Sections 3.1(b), (c) and (d), the date of expiration (without waiver) of the ten (10) Business Day cure period if the applicable Termination Event shall not have been cured.

"<u>Termination Event</u>" means any event set forth in Section 3.1.

"<u>Transfer</u>" means, with respect to any Claim, the sale, assignment or transfer thereof.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any reference herein to any Person shall be construed to include such Person's successors and assigns, (b) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Support Agreement in its entirety and not to any particular provision hereof and (c) all references herein to Articles, Sections, Exhibits, Annexes and Schedules shall be construed to refer to Articles and Sections of, and Exhibits, Annexes and Schedules to, this Support Agreement.

## Section 2.   Transaction, Plan and Definitive Documentation.

**2.1    Support of Transaction, Plan and Definitive Documentation.**

(a)    Until the Termination Date, the SuperMedia Parties, jointly and severally, agree to:

(i)    take any and all reasonably necessary and appropriate actions (including obtaining requisite corporate approvals) consistent with their obligations under the Merger Agreement and this Support Agreement in furtherance of the Transaction and, if applicable, the confirmation and consummation of the Plan;

(ii)    take any and all reasonably necessary and appropriate actions to obtain executed signature pages to the Amended and Restated Credit Agreement and this Support Agreement from Lenders holding 100% of the aggregate outstanding principal amount of Loans under the Credit Agreement; <u>provided</u> that the SuperMedia Parties may, at their option, elect to effectuate the Transaction through the Prepackaged Alternative and the Plan; and

(iii)    take any and all reasonably necessary and appropriate actions (including obtaining requisite corporate approvals) to (A) in conjunction with the distribution of the Disclosure Statement, solicit votes from Lenders to accept the Plan and (B) in the event the SuperMedia Parties elect to effectuate the Transaction pursuant to the Prepackaged Alternative (i) commence the Chapter 11 Cases by filing voluntary petitions under the Bankruptcy Code in the Bankruptcy Court, (ii) file and seek approval on an interim and final (to the extent applicable) basis of First Day Motions,

6

and (iii) file the Plan and Disclosure Statement with the Bankruptcy Court on the Petition Date and seek approval of the Disclosure Statement and confirmation of the Plan.  The SuperMedia Parties shall, except where it is not reasonably practicable, provide draft copies of all motions or applications and other documents any of the SuperMedia Parties intends to file with the Bankruptcy Court after the Petition Date to counsel for the Administrative Agent at least three (3) Business Days prior to the date when the SuperMedia Parties intend to file any such motion, application or document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(b)    Until the Termination Date, the Consenting Lenders, severally and not jointly, agree to:

(i)    support and take any and all reasonably necessary and appropriate actions in furtherance of consummation of the Amended and Restated Credit Agreement and the effectiveness of this Support Agreement;

(ii)    subject to receipt of the Disclosure Statement and solicitation in accordance with section 1126(b) of the Bankruptcy Code and subject to Section 7 hereof, (x) timely vote its Claims to accept the Plan (and to the extent any direction is requested with respect to voting of any claim held by a Consenting Lender for trades not settled (but which claims will be bound by the terms hereof upon the closing of such trade) to timely direct the vote of such claims to accept the Plan in accordance with market convention) and (y) not change or withdraw (or cause to be changed or withdrawn) such vote, unless the Plan is modified in a manner (A) materially inconsistent with the Plan in the form annexed hereto as Exhibit A and the Amendment Term Sheet or (B) that materially adversely affects the rights of the Consenting Lenders under this Support Agreement; and

(iii)    in the event the SuperMedia Parties elect to effectuate the Transaction pursuant to the Prepackaged Alternative, (A) support approval of the Disclosure Statement and confirmation of the Plan (and not object to approval of the Disclosure Statement or confirmation of the Plan, or support the efforts of any other Person to oppose or object to, approval of the Disclosure Statement or confirmation of the Plan), unless the Plan is modified in a manner (x) materially inconsistent with the Plan in the form annexed hereto as Exhibit A and the Amendment Term Sheet or (y) that materially adversely affects the rights of the Consenting Lenders under this Support Agreement, (B) support (and not object to or support the efforts of any other Person to oppose or object to) the First Day Motions, (C) refrain from taking any action not required by law that is inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Plan or that is otherwise inconsistent with the express terms of this Support Agreement, the Plan in the form annexed hereto as Exhibit A and the Amendment Term Sheet, unless such action is taken in response to an action taken by a SuperMedia Party that is inconsistent with the terms of this Support

Agreement, and (D) not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any plan of reorganization or liquidation in the Chapter 11 Cases other than the Plan.

For the avoidance of doubt, and without limiting any of the SuperMedia Parties' rights under the Merger Agreement, each of the SuperMedia Parties also agrees, severally and not jointly, that, until the Termination Date, it will not take any action (or refrain from taking an action) that, directly or indirectly, would in any material respect interfere with, delay, impede, or postpone or take any other action that interferes with, the implementation of the Transaction and, if necessary, confirmation and consummation of the Plan.

**Section 3.    Termination.**

**3.1    Termination Events.**

(a)    *Automatic Termination*. This Support Agreement, and the obligations of all Parties hereunder, shall terminate automatically without any further action or notice:

(1) if SuperMedia has provided the Administrative Agent with the notice contemplated in clause (ii) of Section 3.1(c)(9), and the Amended and Restated Credit Agreement is not consummated and effective pursuant to the terms of the Definitive Loan Documentation on or prior to (a) the 130th day after the Support Agreement Effective Date in the event that the Dex Parties have not commenced Chapter 11 Cases (as defined in the Dex Support Agreement), or (b) the 190th day after the Support Agreement Effective Date in the event that the Dex Parties have commenced Chapter 11 Cases (as defined in the Dex Support Agreement);

(2) on the 100th day after the Support Agreement Effective Date if (x) based on the Administrative Agent's Register as of such date, the Consenting Lenders hold less than 100% of the aggregate outstanding principal amount of the Loans and (y) prior thereto, the Solicitation Commencement Date has not occurred;

(3) on the date on which the Amended and Restated Credit Agreement has become effective in accordance with its terms (which, if the Transaction is effectuated pursuant to the Prepackaged Alternative, shall be the Plan Effective Date);

(4) on the Bankruptcy Threshold Date, unless the Administrative Agent and the SuperMedia Parties have received executed signature pages to this Support Agreement from (i) more than 50% of the Lenders and (ii) Lenders holding no less than 66 2/3% of the aggregate outstanding principal amount of the Loans (the thresholds set forth in clauses (i) and (ii) above, collectively, the "Bankruptcy Threshold");

(5) upon the commencement of any of the Chapter 11 Cases prior to (x) the Solicitation Commencement Date or (y) the Solicitation End Date;

(6) on the date on which any court of competent jurisdiction or other competent governmental or regulatory authority issues a ruling or an order making illegal or otherwise restricting, preventing or prohibiting the consummation of the

Proposed Merger, the Amended and Restated Credit Agreement, the Dex Amendments or any other aspect of the Transaction; provided that any such ruling or order remains in effect for a period of five (5) Business Days following its issuance or entry;

(7)  upon the occurrence of the Termination Date under and as defined in the Dex Support Agreement;

(8)  if the SuperMedia Parties have commenced the Chapter 11 Cases:

    (i)  on the date on which any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of any of the SuperMedia Parties (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or any of the SuperMedia Parties shall file a motion or other request for any such relief;

    (ii)  upon the entry of any order in the Chapter 11 Cases terminating any SuperMedia Party's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code; or

    (iii)  if any SuperMedia Party's consensual use of cash collateral of the Secured Parties is terminated in accordance with an interim or final cash collateral order entered in the Chapter 11 Cases as required pursuant to Section 3.1(c)(11);

(9)  upon the termination of the Merger Agreement pursuant to its terms (after giving effect to any applicable grace or cure period specified therein); and

(10)  on the date the SuperMedia Parties or the Consenting Lenders elect to terminate this Support Agreement in accordance with clause (y) of Section 8.13.

(b)  *Termination After Breach*.  Subject to the immediately succeeding sentence, this Support Agreement, and the obligations of all Parties hereunder shall terminate ten (10) Business Days after the SuperMedia Parties or the Administrative Agent (on behalf of or upon the direction of the Required Consenting Lenders) give written notice of a material breach of any of the undertakings, representations, warranties or covenants of this Support Agreement by the SuperMedia Parties (in the case of notice from the Administrative Agent) or any Consenting Lender (in the case of notice from the SuperMedia Parties), and such breach shall not have been cured or waived by the SuperMedia Parties or such Consenting Lender, as the case may be, in the ten (10) Business Day period after the receipt by the Administrative Agent or the SuperMedia Parties, as the case may be, of such notice (it being understood that the Parties' obligations under Section 2.1 shall be deemed material in all events).  Other than as set forth in Section 3.1(d), if any Consenting Lender shall breach its obligations under this Support Agreement, the Termination Event arising as a result of such act or omission shall apply only to such Consenting Lender, and this Support Agreement shall otherwise remain in

9

full force and effect with respect to the SuperMedia Parties and all other Consenting Lenders.

(c)     *Termination After Specified Events.*    This Support Agreement, and the obligations of all Parties hereunder shall terminate, ten (10) Business Days after the occurrence of any of the following events if such event has not been cured by the SuperMedia Parties or waived by the Administrative Agent and the Required Consenting Lenders in accordance with Section 8.12 within such ten (10) Business Day period:

(1) on the third (3rd) day after the Support Agreement Effective Date, unless prior thereto Dex shall have filed with the SEC its registration statement on Form S-4 including a proposed joint proxy statement/prospectus and disclosure statement (collectively, the "<u>SEC Documents</u>") with respect to the Proposed Merger and the Merger Agreement, each in form and substance reasonably satisfactory to the Administrative Agents;

(2) at 11:59 p.m. (New York City time) on December 16, 2012 (provided that SuperMedia and the Administrative Agent may, by mutual agreement, extend such period to end no later than the 35th day after the Support Agreement Effective Date), unless prior thereto the proposed Amended and Restated Credit Agreement (excluding exhibits and schedules thereto) has been made available to the Lenders;

(3) on the 55th day after the Support Agreement Effective Date, unless prior thereto the Definitive Loan Documentation (other than the Amended and Restated Credit Agreement) has been made available to the Lenders;

(4) on the 75th day after the SEC Documents have been filed with the SEC, unless prior thereto the SEC has declared the registration statement effective for purposes of the proposed SuperMedia Stockholder Approval (as defined in the Merger Agreement);

(5) on the fifth (5th) Business Day after the effective date of the registration statement, unless prior thereto the SuperMedia Parties have commenced solicitation of the SuperMedia Stockholder Approval (as defined in the Merger Agreement);

(6) if the Solicitation Commencement Date is not the same date as the date the SuperMedia Parties have commenced solicitation of the SuperMedia Stockholder Approval;

(7) on the Solicitation Commencement Date, unless on or prior thereto the SuperMedia Parties have made available to the Lenders the proposed Plan, the Disclosure Statement and other solicitation materials;

(8) on the 10th day after the Solicitation Commencement Date, unless prior thereto the proposed Definitive Bankruptcy Documentation (other than the Plan, the Disclosure Statement and the other solicitation materials) has been made available to the Lenders); <u>provided</u> that, for the avoidance of doubt, such proposed Definitive Bankruptcy Documentation (other than the Plan, the

Disclosure Statement and the other solicitation materials) shall be subject to (i) continuing review and modification by SuperMedia and its advisors and (ii) clauses (x) and (y) of the definition of "Definitive Bankruptcy Documentation");

(9) on the fifth (5th) Business Day after the Solicitation End Date, unless prior thereto (i) the Chapter 11 Cases have been commenced or (ii) SuperMedia has provided written notice to the Administrative Agent that (x) Lenders holding 100% of the aggregate outstanding principal amount of Loans have agreed to the Amended and Restated Credit Agreement and have executed and delivered this Support Agreement as of the date of such notice, (y) each of the Dex Stockholder Approval and the SuperMedia Stockholder Approval (each as defined in the Merger Agreement) has been obtained, and (z) the SuperMedia Parties have elected to effectuate the Transaction out-of-court;

(10)    the SuperMedia Parties' failure to file the Plan and the Disclosure Statement with the Bankruptcy Court on the Petition Date;

(11)    the failure of the Bankruptcy Court, subject to the Bankruptcy Court's schedule, to enter in the Chapter 11 Cases (A) within three (3) Business Days after the Petition Date, an interim order, and (B) on or prior to the 40th day after the Petition Date (unless the Plan Effective Date has occurred), a final order, under Sections 105, 361, 362, 363 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, and in form and substance reasonably satisfactory to the Administrative Agent, authorizing the SuperMedia Parties to use the cash collateral of, and granting Adequate Protection to, the Secured Parties, and, in the case of the interim order, scheduling a final hearing pursuant to Bankruptcy Rule 4001(B);

(12)    the failure of the Bankruptcy Court, subject to the Bankruptcy Court's schedule, to enter in the Chapter 11 Cases (A) within three (3) Business Days after the Petition Date, an interim order, and (B) on or prior to the 40th day after the Petition Date (unless the Plan Effective Date has occurred), a final order, in form and substance reasonably satisfactory to the Administrative Agent, approving the SuperMedia Parties' cash management systems;

(13)    the 50th day after the Petition Date, unless prior thereto the Bankruptcy Court has entered the Confirmation Order, subject to the Bankruptcy Court's schedule;

(14)    the 15th day after entry of the Confirmation Order approving the Plan, unless prior thereto the Plan Effective Date has occurred;

(15)    the SuperMedia Parties take any of the following actions: (A) withdrawing the Plan, (B) publicly announcing their intention not to proceed with the Plan, or (C) filing any motion, pleading, plan of reorganization and/or disclosure statement that, in the reasonable judgment of the Administrative Agent (x) is materially inconsistent with the Plan in the form annexed hereto as Exhibit A or this Support Agreement (including the Amendment Term Sheet) or (y) materially adversely affects the rights of the Consenting Lenders under this Support Agreement;

11

(16)    the Bankruptcy Court grants relief that, in the reasonable judgment of the Administrative Agent (x) is materially inconsistent with this Support Agreement (including the Amendment Term Sheet) or (y) materially adversely affects the rights of the Consenting Lenders under this Support Agreement;

(17)    if any change, effect, event, occurrence, development, circumstance or state of facts occurs that has or would reasonably be expected to have a Material Adverse Effect;

(18)    the occurrence of an Event of Default under the Credit Agreement (other than as a result of the occurrence of an event specified in section 365(e)(1)(A) of the Bankruptcy Code, commencement of the Chapter 11 Cases or a cross-default arising therefrom);

(19)    either (1) a filing by any SuperMedia Party of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, the Obligations (as defined in the Credit Agreement) or the liens securing the Obligations or asserting any other cause of action against and/or with respect to the Obligations, the prepetition liens securing the Obligations, the Administrative Agent or any of the Consenting Lenders (or if any SuperMedia Party supports any such motion, application or adversary proceeding commenced by any third party or consents to the standing of any such third party), or (2) the entry of an order of the Bankruptcy Court granting relief with respect to any of the foregoing claims or causes of action;

(20)    the amendment or modification of, or the filing of a pleading by any of the SuperMedia Parties that seeks to amend or modify, the Plan, the Disclosure Statement or any documents related to the Plan (excluding, however, an amendment or modification to Section 8.3 or Section 8.4 of the Plan, or to a defined term used therein, including under the Confirmation Order, if and to the extent directed by the Bankruptcy Court), which amendment, modification or filing, in the reasonable judgment of the Administrative Agent (x) is materially inconsistent with the Plan in the form annexed hereto as Exhibit A or this Support Agreement (including the Amendment Term Sheet) or (y) materially adversely affects the rights of the Consenting Lenders under this Support Agreement;

(21)    (A) the amendment or modification of, or the filing of a pleading by any of the Dex Parties that seeks to amend or modify, the Plan (as defined in the Dex Support Agreement), the Disclosure Statement (as defined in the Dex Support Agreement), or any documents related to the Plan (as defined in the Dex Support Agreement) (excluding, however, an amendment or modification to Section 8.3 or Section 8.4 of such Plan, or to a defined term used therein, including under the Confirmation Order, as defined in the Dex Support Agreement, if and to the extent directed by the Bankruptcy Court), which amendment, modification or filing, in the reasonable judgment of the SuperMedia Parties or the Administrative Agent, as applicable, (x) is materially inconsistent with the terms of the Transaction or this Support Agreement or (y) materially adversely affects the rights of the SuperMedia Parties or the Consenting Lenders, as applicable, under this Support Agreement; or (B) the amendment, modification or

supplement of the Dex Support Agreement or the waiver of any terms thereof other than in accordance with Section 8.12; or

(22)    upon the occurrence of a "Termination Event" under and as defined in the Dex Support Agreement (it being understood that, for the avoidance of doubt, a Termination Event occurring under Section 3.1(a) of the Dex Support Agreement shall result in a Termination Date under this Support Agreement without any opportunity to cure or waive such Termination Event).

(d)    *Bankruptcy Threshold Termination.*  After the Bankruptcy Threshold Date, this Support Agreement, and the obligations of all Parties hereunder shall terminate on the 10th Business Day after the receipt by the Administrative Agent from the SuperMedia Parties, or the SuperMedia Parties from the Administrative Agent, as the case may be, of notice that the Bankruptcy Threshold with respect to the Loans outstanding is no longer satisfied; provided that this Support Agreement shall not terminate if, on the 10th Business Day after such notice is received, the Bankruptcy Threshold with respect to the Loans outstanding is satisfied.

**3.2    Effect of Termination; Termination Event Procedures.**

(a)    Each of the SuperMedia Parties hereby agrees that the automatic stay arising pursuant to section 362 of the Bankruptcy Code in the event the Chapter 11 Cases are commenced shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

(b)    Upon the Termination Date, any and all ballots with respect to the Plan and signature page(s) to the Amended and Restated Credit Agreement delivered by each Consenting Lender prior to such Termination Date shall be immediately withdrawn, and such ballots and signature pages, as the case may be, shall be deemed to be null and void for all purposes (with respect to the ballots, as expressly set forth therein) and shall not be considered or otherwise used in any manner by the Parties; provided that within five (5) Business Days after the Termination Date any Consenting Lender, on behalf of itself and no other Consenting Lender, may advise the SuperMedia Parties in writing (with a copy to the Administrative Agent) that such Consenting Lender's ballot, signature page to the Amended and Restated Credit Agreement and signature page or Lender Joinder hereto continue to be effective and are not withdrawn.

**Section 4.    Conditions Precedent to Support Agreement.**

The obligations of the Parties and the effectiveness hereof (other than Section 8.7(b) hereof) are subject to satisfaction of each of the following conditions:

(a)    receipt by the Administrative Agent of executed signature pages to this Support Agreement by the SuperMedia Parties;

(b)    receipt by the Administrative Agent and SuperMedia of executed signature pages to this Support Agreement by the Lenders set forth on Schedule 2 attached hereto;

(c)     receipt by the Administrative Agent of resolutions from each SuperMedia Party evidencing the corporate or similar organizational authority of such SuperMedia Party to execute, deliver and perform its obligations under this Support Agreement;

(d)     receipt by the Administrative Agent of a certificate dated as of the Support Agreement Effective Date from an authorized officer of each SuperMedia Party certifying the names and true signatures of the officers of such SuperMedia Party authorized to sign this Support Agreement;

(e)     receipt by the Administrative Agent of a certificate dated as of the Support Agreement Effective Date from an authorized officer of each SuperMedia Party certifying that the representations and warranties of such SuperMedia Party set forth in this Support Agreement are true and correct;

(f)     the Dex Support Agreement shall have become effective by its terms and shall be in full force and effect or shall become effective simultaneously with the occurrence of the Support Agreement Effective Date;

(g)     receipt by the Administrative Agent of a certificate dated as of the Support Agreement Effective Date from an authorized officer of each SuperMedia Party that is a party to the Merger Agreement certifying that the Merger Agreement is in full force and effect and no party thereto has received notice of a breach of the terms, covenants, agreements, representations or warranties thereto; and

(h)     receipt by the Administrative Agent's counsel and financial advisors of all reasonable outstanding, invoiced fees and expenses through the Support Agreement Effective Date.

**Section 5.   <u>Representations, Warranties and Covenants.</u>**

**5.1     Power and Authority.**

Each Consenting Lender, severally and not jointly, and each of the SuperMedia Parties, jointly and severally, represents, warrants and covenants that, as of the Support Agreement Effective Date (or, in the case of Consenting Lenders executing and delivering signature pages hereto after the Support Agreement Effective Date but prior to the Bankruptcy Threshold Date, as of the date of its execution and delivery of its signature page hereto), (i) such Party has and shall maintain all requisite corporate, partnership, or limited liability company power and authority to enter into this Support Agreement and to perform under the Amended and Restated Credit Agreement and (ii) the execution and delivery of this Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**5.2     Enforceability.**

Each Consenting Lender, severally and not jointly, and each of the SuperMedia Parties, jointly and severally, represents, warrants and covenants that this Support Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability.

14

**5.3**     **No Material Misstatement or Omission.**

The SuperMedia Parties, jointly and severally, represent, warrant and covenant that the joint proxy statement / prospectus and disclosure statement constituting a part of the registration statement on Form S-4 filed with the SEC on or about December 6, 2012 will not with respect to the information contained therein relating to SuperMedia, as of the date such registration statement is declared effective by the SEC, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances in which they are made, not materially misleading.  The projections and pro forma financial information contained in the joint proxy statement / prospectus and disclosure statement are based upon good faith estimates and assumptions believed by the SuperMedia Parties to be reasonable at the time made in light of the circumstances under which such estimates and assumptions were made, it being recognized by the Administrative Agent and the Consenting Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein in a material amount.

**5.4**     **Governmental Consent; No Conflicts.**

Each of the SuperMedia Parties, jointly and severally, represents, warrants and covenants that, as of the Support Agreement Effective Date, the execution, delivery, and performance by it of this Support Agreement (a) does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except (i) such filings as may be necessary and/or required for disclosure by the SEC and applicable state securities or "blue sky" laws and (ii) any filings in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (b) will not violate any applicable law or regulation or the charter, limited liability company agreement, by-laws or other organizational documents of any of the SuperMedia Parties or any order of any governmental authority and (c) will not violate or result in a default under the Merger Agreement.

**5.5**     **Ownership.**

Each Consenting Lender, severally and not jointly, represents, warrants and covenants that:

    (a)    such Consenting Lender is the owner of the Claims set forth on its signature page hereto or on the schedule attached to its Lender Joinder (as applicable), or has and shall maintain the power and authority to bind the legal and beneficial owner(s) of such Claims to the terms of this Support Agreement;

    (b)    such Consenting Lender (i) has and shall maintain full power and authority to vote on its Claims and execute and deliver its signature page(s) to the Amended and Restated Credit Agreement and this Support Agreement or (ii) has received direction from the party having full power and authority to vote on its Claims and execute and deliver its signature page(s) to the Amended and Restated Credit Agreement and this Support Agreement;

    (c)    other than as permitted under this Support Agreement, such Claims are and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation

15

on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's performance of its obligations under this Support Agreement at the time such obligations are required to be performed; and

(d)    such Consenting Lender has made no prior Transfer, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interest in any Claims held by such Consenting Lender as of the date hereof that are inconsistent with, or in violation of, the representations and warranties of such Consenting Lender herein, in violation of its obligations under this Support Agreement or that would adversely affect in any way such Consenting Lender's performance of its obligations under this Support Agreement at the time such obligations are required to be performed.

**5.6    Merger Agreement and Proposed Merger.**

(a)    Each of the SuperMedia Parties jointly and severally represents, warrants and covenants that:

(1) as of the Support Agreement Effective Date, except in connection with the Merger Agreement and the Proposed Merger, such SuperMedia Party (i) has not resolved to engage in any merger, consolidation, asset sale, or the purchase or acquisition of all or a substantial part of the assets of another Person and (ii) has not been a party to any agreement or engaged in any discussions or negotiations with any Person that is reasonably likely to lead to any merger, consolidation, asset sale, or the purchase or acquisition of all or a substantial part of the assets of another Person, in each case, which would be material to the SuperMedia Parties.

(2) other than as a result of filing the Chapter 11 Cases to implement the Transaction, its obligations hereunder and under the Merger Agreement do not materially conflict with, or result in the breach of, or constitute a default under, or result in or permit the termination or acceleration of, any material contractual obligation of the SuperMedia Parties.

(3) the representations and warranties made in the Merger Agreement by such SuperMedia Party are true, correct and complete in all material respects as of the Support Agreement Effective Date except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true, correct and complete in all material respects on and as of such earlier date (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true, correct and complete in all respects as so qualified).

(b)    The SuperMedia Parties shall not materially amend or modify the Merger Agreement (as in effect on the Support Agreement Effective Date), including Article V of the Merger Agreement, without the consent of the Required Consenting Lenders; for the avoidance of doubt, termination of the Merger Agreement shall not limit the effect of the termination provisions set forth in this Support Agreement.    The SuperMedia Parties shall not waive any material

16

obligation, material right or material condition under the Merger Agreement without the consent of the Required Consenting Lenders.

(c)     Prior to consummation of the Proposed Merger (whether consummated out-of-court or on the Plan Effective Date), the SuperMedia Parties shall comply with each of their material obligations under the Merger Agreement (including Article V thereof).

(d)     SuperMedia shall give the Administrative Agent prompt written notice (and in any event, within one (1) Business Day) of SuperMedia receiving or giving any notice of a material event pursuant to the terms of the Merger Agreement, including a notice of "Change in Dex Recommendation" (as defined in the Merger Agreement) or a notice of termination of the Merger Agreement.

**5.7     Company Presentation**

No later than January 31, 2013, SuperMedia (in conjunction with Dex) shall make a written and oral presentation to "private side" Lenders regarding potential cost reduction initiatives and the integration initiative to be implemented among Dex and SuperMedia in anticipation of and in connection with the Proposed Merger, including, among others things, with respect to synergies, additional potential cost reduction opportunities and digital products integration plans that may be implemented prior to or after with the Proposed Merger.

**5.8     Financial Statements**

From and after the Support Agreement Effective Date, and so long as this Support Agreement is in effect, SuperMedia hereby authorizes and directs the Administrative Agent to deliver the financial statements delivered pursuant to the Credit Agreement to each of the Administrative Agents (as defined in the Dex Support Agreement) for distribution by such Administrative Agents to their respective lending syndicates.

**Section 6.     <u>Remedies.</u>**

The Parties agree that any breach of this Support Agreement by the SuperMedia Parties, on the one hand, and the Consenting Lenders, on the other hand, would give rise to irreparable damage for which monetary damages would not be an adequate remedy.  Each SuperMedia Party and each Consenting Lender accordingly agrees that the Consenting Lenders and the SuperMedia Parties, as the case may be, will be entitled to enforce the terms of this Support Agreement by decree of specific performance without the necessity of proving the inadequacy of monetary damages as a remedy and to obtain injunctive relief against any breach or threatened breach.  The Consenting Lenders and the SuperMedia Parties, as the case may be, agree that such relief will be their only remedy against the applicable other Party with respect to any such breach, and that in no event will any Party be liable for monetary damages.

**Section 7.     <u>Acknowledgments.</u>**

This Support Agreement is the product of negotiations among the Parties, together with their respective representatives.  Notwithstanding anything herein to the contrary, this Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  The SuperMedia Parties will not solicit acceptances of the Plan from any

Consenting Lender until such Consenting Lender has been provided with a copy of the Disclosure Statement.  Furthermore, no securities of any SuperMedia Party are being offered or sold hereby and this Support Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of any SuperMedia Party.

**Section 8.    Miscellaneous Terms.**

**8.1    Assignment; Transfer Restrictions.**

(a)    Each Consenting Lender hereby agrees, severally and not jointly, for so long as this Support Agreement shall remain in effect as to it, not to Transfer any of its Claims, or convey, grant, issue or sell any option or right to acquire any of its Claims or voting rights related thereto or any other interest in any Claim against the SuperMedia Parties, except to (i) a party that is a Consenting Lender or (ii) a Joining Lender Party; provided that any such Claims shall automatically be deemed to be subject to the terms of this Support Agreement; provided further, that an entity or Person that purchases a participation interest from a Consenting Lender (pursuant to Section 9.04(c) of the Credit Agreement) shall not be required to execute and deliver a Lender Joinder.  As a condition to the effectiveness of any such Transfer, each Joining Lender Party shall indicate, on the signature page to its Lender Joinder, the amount of Loans held by such Joining Lender Party.  With respect to any Transfer effectuated in accordance with this Section 8.1(a), such Joining Lender Party shall be deemed to be a Consenting Lender for purposes of this Support Agreement.  For the avoidance of doubt, any sale of participations (under Section 9.04(c) of the Credit Agreement) by a Consenting Lender of all or a portion of such Consenting Lender's rights or obligations under the Credit Agreement (including all or a portion of the Loans owing to such Consenting Lender) shall not relieve such Consenting Lender from its obligations under this Support Agreement, including with respect to any such participation (regardless of any instruction a transferee of such participation gives with respect to voting or any other rights and obligations of the Consenting Lender hereunder), to which such Consenting Lender shall remain bound subject to the terms hereof.

(b)    Any purported Transfer or transaction involving any Claim that does not comply with the procedures set forth in Section 8.1(a) shall be deemed void *ab initio*.

(c)    Any Consenting Lender that Transfers all of its Claims in accordance with Section 8.1(a) shall no longer be bound by this Support Agreement.

(d)    Notwithstanding the foregoing provisions of this Section 8.1, any Consenting Lender may, at any time and without notice to or consent from any other Party, pledge or grant a security interest in all or any portion of its Claims or rights (including rights to payment of interest and repayment of principal) under the Credit Agreement, as applicable, in order to secure obligations of such Consenting Lender to a Federal Reserve Bank or to secure obligations owed in connection with financing provided to such Consenting Lender; provided that no such pledge or grant of a security interest shall release such Consenting Lender from any of its obligations hereunder or substitute any such pledgee or grantee for such Consenting Lender as a Party hereto.

(e)     This Support Agreement shall not preclude any Consenting Lender from acquiring additional Loans; <u>provided</u> that any such Loans shall automatically be deemed to be "Claims" subject to the terms of this Support Agreement.

**8.2     No Third Party Beneficiaries.**

This Support Agreement shall be solely for the benefit of the Administrative Agent, the SuperMedia Parties and each Consenting Lender.  No Person shall be a third party beneficiary of this Support Agreement.

**8.3     Entire Agreement.**

This Support Agreement, including Schedules, Exhibits, Annexes and the Definitive Documentation, constitutes the entire agreement of the Parties with respect to the subject matter of this Support Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Support Agreement.

**8.4     Counterparts.**

This Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed signature page of this Support Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

**8.5     Settlement Discussions.**

This Support Agreement (including the Amendment Term Sheet) is the product of negotiations among the Parties hereto and reflects various agreements and compromises to implement the Transaction.  Nothing herein shall be deemed to be an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Support Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Support Agreement.

**8.6     Continued Banking Practices.**

Notwithstanding anything herein to the contrary, each Consenting Lender, the Administrative Agent and their respective affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing (including debtor in possession financing), equity capital or other services (including financial advisory services) to any SuperMedia Party or any affiliate of any SuperMedia Party or any other Person, including, but not limited to, any Person proposing or entering into a transaction related to or involving any SuperMedia Party or any affiliate thereof.

**8.7     Reservation of Rights; Events of Default; Waivers; Amendments.**

(a)     Except as expressly provided in this Support Agreement, nothing herein is intended to, shall or shall be deemed in any manner to (i) waive, limit, impair, prejudice or restrict the ability of each Consenting Lender to protect and preserve its rights, remedies and interests, including, but not limited to, all of its rights and remedies, whether now existing or arising in the future, under the Credit

19

Agreement, the other Loan Documents, any other instrument or agreement referred to herein or therein, the Bankruptcy Code or applicable law, including any such rights and remedies relating to Defaults or other events that may have occurred prior to the execution of this Support Agreement, any and all of its claims and causes of action against any of the SuperMedia Parties, any liens or security interests it may have in any assets of any of the SuperMedia Parties or any third parties, or its full participation in the Chapter 11 Cases, if commenced, (ii) constitute an amendment, modification or forbearance by the Lenders with respect to (x) any other term, provision, condition, Default or Event of Default of or under the Credit Agreement or any of the other Loan Documents, or (y) any other instrument or agreement referred to herein or therein and (iii) limit or impair the ability of any of the Consenting Lenders to consult with each other, the SuperMedia Parties, the Dex Parties and the Dex Lenders.  If the Amended and Restated Credit Agreement is not consummated as provided herein or if a Termination Date occurs, the Administrative Agent, the Consenting Lenders and the SuperMedia Parties each fully reserve any and all of their respective rights, remedies and interests under the Loan Documents and applicable law and in equity.

(b)    Without limiting subsection 8.7(a) in any way, from and after the date that this Support Agreement has been executed and delivered by Required Lenders, and the conditions set forth in Section 4 have been satisfied or waived, the Consenting Lenders, the Administrative Agent and the SuperMedia Parties, as applicable:

(1) (x) waive any Default or Event of Default arising under Article VII(i)(vi) of the Credit Agreement solely to the extent that such Default or Event of Default may result from taking any action for the purpose of effecting the Transaction through the commencement of the Chapter 11 Cases, which waiver shall survive termination of this Support Agreement; and (y) Article VII(i) of the Credit Agreement is amended as of the Support Agreement Effective Date by deleting clause (vi) thereof and replacing it with: "take any action for the purpose of effecting any of the foregoing; provided, however, that, for the avoidance of doubt, the Borrower's and any Subsidiary's execution of, performance of the obligations contemplated by or consistent with, and the taking of any action under (I) the Support and Limited Waiver Agreement dated as of December 5, 2012 by and among the Borrower, its Subsidiaries, the Administrative Agent and the lenders from time to time party thereto (as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof) and (II) the Merger Agreement (as defined in the Support and Limited Waiver Agreement referred to in clause (x) above) shall not constitute a Default or an Event of Default under this clause (vi).";

(2) with respect to all Loan Parties, waive any Default or Event of Default under Article VII(e) of the Credit Agreement arising from the Borrower's failure to comply with Section 5.01(a) solely as a result of the failure to deliver an audit without a 'going concern' or like qualification, exception or explanatory paragraph with respect to the fiscal year ending December 31, 2012 (which 'going concern' or like qualification, exception or explanatory paragraph (i) relates to the anticipated or potential commencement of the Chapter 11 Cases pursuant to this Support Agreement and (ii) does not expressly provide that it

results from (x) a limitation of scope or (y) the financial statements not presenting fairly in all material respects the financial position, results of operations or cash flows of the SuperMedia Parties in conformity with GAAP resulting in a qualified or adverse audit opinion), which waiver shall survive termination of this Support Agreement;

(3) agree that Section 5.01 of the Credit Agreement is hereby amended to incorporate the covenants in the second paragraph (including all bullet points thereunder) under the heading "Affirmative Covenants" in the Amendment Term Sheet, and the applicable SuperMedia Parties hereby agree to comply therewith upon the effectiveness of this Section 8.7(b)(3); and

(4) agree that for so long as this Support Agreement is in effect, notwithstanding anything in the Credit Agreement to the contrary, the SuperMedia Parties shall not make any Voluntary Prepayments.

(c)     Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of any Consenting Lender contained in this Support Agreement relates solely to such Consenting Lender's rights and obligations as a Consenting Lender under the Credit Agreement, and does not bind such Consenting Lender or its affiliates with respect to any other indebtedness or other liability owed by SuperMedia or any of its subsidiaries and affiliates to such Consenting Lender or any affiliate of such Consenting Lender.  Notwithstanding anything herein to the contrary, in the event that a Consenting Lender (or affiliate thereof) has a contractual obligation with respect to any debt claims other than the Claims to vote such claims as directed by a third party, such Consenting Lender's (or affiliate's) compliance with such direction shall not be deemed a violation of any of the provisions of this Support Agreement.  For purposes of this Support Agreement, (x) claims of a Consenting Lender that are held by such Consenting Lender in a fiduciary or similar capacity and (y) claims held by a Consenting Lender in its capacity as a broker, dealer or Qualified Marketmaker of Loans under the Credit Agreement or any other claim against or security of the SuperMedia Parties (including any Loans or claims held in inventory with respect to such broker, dealer, or market-making activities, _provided_ that the positions with respect to such Loans or claims are separately identified on the internal books and records of such Consenting Lender) shall not, in either case (x) or (y), be bound by or subject to this Support Agreement; _provided_ _further_ that the Claims identified on such Consenting Lender's signature page or Lender Joinder hereto, as applicable, shall not be subject to this sentence or be deemed to satisfy clause (x) or (y) above.

**8.8     Relationship Among Parties.**

It is understood and agreed that no Consenting Lender has any duty of trust or confidence in any form with any other Consenting Lender, and, except as provided in this Support Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Lender may trade in the Loans or other debt or equity securities of the SuperMedia Parties without the consent of the SuperMedia Parties, as the case may be, or any other Consenting Lender, subject to applicable securities laws, the terms of this Support Agreement and the Credit Agreement; _provided_ _however_ that no Consenting Lender shall have any responsibility for any such trading by any other Person by virtue of this Support Agreement.

No prior history, pattern or practice of sharing confidences among or between the Consenting Lenders shall in any way affect or negate this understanding and agreement.

**8.9      Governing Law; Waiver of Jury Trial.**

(a)      The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute under or arising out of or in connection with this Support Agreement, whether sounding in contract, tort or otherwise.

(b)      This Support Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.  By its execution and delivery of this Support Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to Section 8.9(c), any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Support Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c)      Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in Sections 8.9(a) or 8.9(b) shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of or in connection with this Support Agreement.

**8.10    Successors.**

This Support Agreement is intended to bind the Parties and inure to the benefit of the Administrative Agent, the Consenting Lenders and each of the SuperMedia Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives.

**8.11    Acknowledgment Regarding Counsel.**

Each of the Parties acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Support Agreement and the transactions contemplated by this Support Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  No Party shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**8.12    Amendments, Modifications, Waivers.**

(a)      Except as set forth in the last sentence of this Section 8.12(a), this Support Agreement may only be modified, amended or supplemented, and any of the terms hereof (including in Section 3.1 hereof) may only be waived, by an agreement in writing signed by each of the SuperMedia Parties and the Required

Consenting Lenders; _provided_ that (1) any such modification, amendment, supplement or waiver shall not be effective unless also agreed to in writing by each Consenting Lender (i) whose treatment or rights are adversely affected by the modification, amendment, supplement or waiver in a manner different from the other Consenting Lenders or (ii) whose consent would be required under the first proviso of Section 9.02(b) of the Credit Agreement if such modification, amendment, supplement or waiver to the Amendment Term Sheet (as in the form attached hereto as <u>Exhibit D</u> on the Support Agreement Effective Date) were instead a modification, amendment, supplement or waiver to or under the Credit Agreement, and (2) if the SuperMedia Parties and the Required Consenting Lenders consent to any such modification, amendment, supplement or waiver, but a Consenting Lender whose consent is required under part (1) above does not so consent, the SuperMedia Parties may terminate such non-consenting Consenting Lender as a Party to this Support Agreement and, as of the date of such termination, such Consenting Lender shall have no rights or obligations under this Support Agreement.  For the avoidance of doubt, any modification, amendment, supplement, extension or waiver that is expressly permitted under this Support Agreement with the prior consent of the Administrative Agent and/or the Majority Documentation Lenders is not a modification, amendment, supplement, extension or waiver that is subject to this Section 8.12.

(b)     Except as set forth in the last sentence of this Section 8.12(b), the Dex Support Agreement may only be modified, amended or supplemented, and any of the terms thereof (including in Section 3.1 thereof) may only be waived, by an agreement in writing signed by the Required Consenting Lenders hereunder.  For the avoidance of doubt, any modification, amendment, supplement, extension or waiver that is expressly permitted under the Dex Support Agreement with the prior consent of the Administrative Agents and/or the Majority Documentation Lenders (in each case, as defined in the Dex Support Agreement) is not a modification, amendment, supplement, extension or waiver that is subject to this Section 8.12.

(c)     The definition of Required Consenting Lenders, and this Section 8.12, may not be modified, amended or supplemented, or any of its terms waived, as applicable, without the prior written consent of each Consenting Lender.

**8.13     Fiduciary Duties.**

Notwithstanding anything to the contrary herein, nothing in this Support Agreement shall require SuperMedia, any of the other SuperMedia Parties, or any of their respective directors or officers (in such Person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such Person's fiduciary obligations under applicable law; _provided_ that (x) to the extent that taking such action or refraining from taking such action would be reasonably likely to result in a breach of this Support Agreement, SuperMedia shall give the Administrative Agent not less than three (3) Business Days prior written notice of such anticipated action or anticipated refraining from taking such action and (y) if taking any such action or refraining from taking such action results in, or is reasonably likely to result in, a breach of this Support Agreement, then SuperMedia (upon the expiration of the three (3) Business Day notice period set forth in (x) above) or the Consenting Lenders (upon receipt of the notice from SuperMedia contemplated in (x) above), as the case may be, may terminate this Support

Agreement as set forth in Section 3.1(a)(10) (it being understood that the specific performance provisions of Section 6 shall not be applicable to the Parties with respect to their rights under this Section 8.13).

**8.14    Further Assurances; Rule of Construction.**

Subject to the other terms of this Support Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Amended and Restated Credit Agreement (including, if SuperMedia has elected the Prepackaged Alternative and not withdrawn such election, the Plan).  For purposes of computing days under this Support Agreement, (i) the day of the event triggering the period shall be excluded; (ii) every day, including intermediate non-Business Days shall be included; and (iii) the last day of the period shall be included, underlined provided that, other than with respect to the date set forth in Section 3.1(c)(2), if the last day of the period is a non-Business Day, the period shall continue to run until the immediately succeeding Business Day from such last day of the period.

**8.15    Public Disclosure.**

    (a)    The Parties acknowledge that this Support Agreement will be publicly disclosed on the earlier of (x) a Termination Date and (y) the date on which the SEC Documents have been filed with the SEC.  Any and all public disclosures of this Support Agreement, shall include such redactions as may be reasonably requested by the Administrative Agent's counsel to maintain the confidentiality of the items identified in Section 8.15(b) hereof, subject to any applicable requirements under the federal securities laws, the Bankruptcy Code or the Bankruptcy Rules.

    (b)    Except as required by law (as determined by outside counsel to the SuperMedia Parties and with reasonable prior notice to the Administrative Agent), neither the SuperMedia Parties nor the Administrative Agent shall (a) use the name of any Consenting Lender in any public manner without such Consenting Lender's prior written consent (except to the extent that the name of a Consenting Lender is otherwise set forth herein or the Plan, not including the signature pages or schedules hereto or to any Lender Joinder) or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Lender) other than the Administrative Agent, its advisors and the advisors to the Dex Parties and/or the SuperMedia Parties the amount or percentage of any Loans to SuperMedia held by any Consenting Lender.  The SuperMedia Parties may disclose the aggregate amount of outstanding Loans held by all Consenting Lenders.

**8.16    Severability of Provisions.**

If any provision of this Support Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Support Agreement.

**8.17    Notices.**

All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier to the following

address of the applicable other Party hereto; or (b) sent by fax to the following fax number of such other Party hereto with the confirmatory copy delivered by overnight courier to the address of such other Party listed below.

If to the SuperMedia Parties, to:

SuperMedia Inc.
2200 W. Airfield Drive, P.O. Box 619810
D/FW Airport, Texas 75261
Attention: Chief Executive Officer
Facsimile: (972)-453-6039

with a copy to:

SuperMedia Inc.
2200 W. Airfield Drive, P.O. Box 619810
D/FW Airport, Texas 75261
Attention: General Counsel
Facsimile: (972)-453-6039

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Attn: Sean A. O'Neal

If to any Consenting Lender, the address set forth on its signature page.

If to the Administrative Agent:

JPMorgan Chase Bank, N.A.
383 Madison Avenue,
New York, New York 10179
Attn: Neil Boylan
Telephone: (212) 270-1410
Facsimile: (212) 622-4560

with a copy to

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn: Steven Fuhrman and Sandy Qusba
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

[SIGNATURE PAGES FOLLOW]

In witness whereof, the Parties hereto have caused this Support Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SuperMedia Inc.

_____
By:
Name:
Title:


SuperMedia LLC

_____
By:
Name:
Title:


SuperMedia Sales Inc.

_____
By:
Name:
Title:


SuperMedia Services Inc.

_____
By:
Name:
Title:

JPMorgan Chase Bank, N.A., in its capacity as
Administrative Agent

_____
By:
Name:
Title:

[CONSENTING    LENDER    SIGNATURE
BLOCKS], as a Consenting Lender


_____
By:
Name:
Title:

Notice Address: _____


CLAIMS UNDER CREDIT AGREEMENT

| Lender | Amount of Claim under Credit Agreement |
|---|---|
|  |  |
|  |  |
|  |  |

## SCHEDULE 1

<u>SUPERMEDIA PARTIES</u>

SuperMedia Inc.
SuperMedia LLC
SuperMedia Sales Inc.
SuperMedia Services Inc.

## SCHEDULE 2

CONSENTING LENDERS[1] AS OF SUPPORT AGREEMENT EFFECTIVE DATE

JPMorgan Chase Bank, N.A.
Deutsche Bank Trust Company Americas
Paulson & Co. Inc.
Bain Capital LLC – Sankaty
Ares Management LLC
Highland Capital Management LP
General Electric Capital Corporation
Bennett Management Corporation

---

[1]    Each entity listed below is either the legal and beneficial owner(s) of the Loans set forth on its respective signature pages to the Support Agreement or is or is an affiliate of a Person that has the power and authority to bind the legal and beneficial owner(s) with respect to such Loans.

## EXHIBIT A TO THE SUPERMEDIA SUPPORT AGREEMENT

### SUPERMEDIA PLAN

Substantially in the form attached hereto as Exhibit C to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**<u>EXHIBIT B TO THE SUPERMEDIA SUPPORT AGREEMENT</u>**

<u>DEX ONE SUPPORT AGREEMENT</u>

Attached hereto as Exhibit D to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT C TO THE SUPERMEDIA SUPPORT AGREEMENT**

FORM OF LENDER JOINDER

Attached hereto as Exhibit C to the Dex One Support Agreement in Exhibit D to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT D TO THE SUPERMEDIA SUPPORT AGREEMENT**

TERM SHEET FOR THE AMENDED AND RESTATED CREDIT AGREEMENT

Attached hereto as Exhibit H to the Merger Agreement in Exhibit E to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT C TO THE DEX ONE SUPPORT AGREEMENT**


**FORM OF LENDER JOINDER**

        This Lender Joinder to the Support and Limited Waiver Agreement (as amended, supplemented or otherwise modified from time to time, the "Support Agreement"), dated as of December 5, 2012 by and among: (i) the lenders from time to time party thereto, (ii) Dex One Corporation, Dex Media, Inc., R.H. Donnelley Inc., Dex Media East, Inc., Dex Media West, Inc. and certain subsidiaries of Dex listed on Schedule 1(a) thereto (iii) JPMorgan Chase Bank, N.A., as administrative agent under the Dex East Credit Agreement and the Dex West Credit Agreement and (iv) Deutsche Bank Trust Company Americas, as administrative agent under the RHD Credit Agreement, a copy of which is attached to this Lender Joinder as Annex I, is executed and delivered by [_____] (the "Joining Lender Party") as of [_], 201[_].  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

        1.    Agreement to be Bound.  The Joining Lender Party hereby agrees to be bound by all of the terms of the Support Agreement.  The Joining Lender Party shall hereafter be deemed to be a "Consenting Lender" and a Party for all purposes under the Support Agreement.

        2.    [Representations and Warranties.    [With respect to the aggregate principal amount of Claims held by the Joining Lender Party upon consummation of the Transfer of such Claims to the Joining Lender Party, the Joining Lender Party hereby makes, as of the date hereof, the representations and warranties of the Consenting Lenders set forth in Section 5 of the Support Agreement to each of the other Parties to the Support Agreement.][1] [The Joining Lender Party hereby makes, as of the date hereof, the representations and warranties of the Consenting Lenders set forth in Section 5 of the Support Agreement to each of the other Parties to the Support Agreement.][2]

        3.    Governing Law.    This Lender Joinder shall be governed by and construed in accordance with the internal laws of the State of New York.


* * * * *


[THE REMAINDER OF THIS PAGE IS

INTENTIONALLY LEFT BLANK]

---

[1]        To be used if the Lender Joinder is being executed and delivered in connection with a Transfer.

[2]        To be used if the Lender Joinder is being executed and delivered by a Lender after the Bankruptcy Threshold Date.

IN WITNESS WHEREOF, the Joining Lender Party has caused this Lender Joinder to be executed as of the date first written above.

_____
Entity Name of Joining Lender Party


Authorized Signatory:

By:_____
     Name:
      Title:


Applicable Credit Agreement: _____

Amount of Claim under Credit Agreement

$ _____



Address: _____

**ANNEX I**

SUPPORT AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT D TO THE DEX ONE SUPPORT AGREEMENT**

TERM SHEET FOR
AMENDED AND RESTATED DEX EAST CREDIT AGREEMENT

Attached hereto as Exhibit G to the Merger Agreement in Exhibit E to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT E TO THE DEX ONE SUPPORT AGREEMENT**

TERM SHEET FOR
AMENDED AND RESTATED DEX WEST CREDIT AGREEMENT

Attached hereto as Exhibit G to the Merger Agreement in Exhibit E to the Disclosure Statement

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

**EXHIBIT F TO THE DEX ONE SUPPORT AGREEMENT**


TERM SHEET FOR
AMENDED AND RESTATED RHD CREDIT AGREEMENT


Attached hereto as Exhibit G to the Merger Agreement in Exhibit E to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT E TO THE DISCLOSURE STATEMENT**

MERGER AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

AMENDED AND RESTATED

AGREEMENT AND PLAN OF MERGER

by and among

DEX ONE CORPORATION,

NEWDEX, INC.,

SPRUCE ACQUISITION SUB, INC.

and

SUPERMEDIA INC.

_____

DATED AS OF DECEMBER 5, 2012

TABLE OF CONTENTS

ARTICLE I THE MERGERS ........................................................................................................ 2

1.1    The Dex Merger ............................................................................................... 2
1.2    The SuperMedia Merger .................................................................................. 2
1.3    Closing ............................................................................................................. 2
1.4    Effective Time .................................................................................................. 3
1.5    Effects of the Mergers ..................................................................................... 3
1.6    Certificate of Incorporation; Bylaws ............................................................... 3
1.7    Governance Arrangements ............................................................................... 3
1.8    Tax Consequences ............................................................................................ 4
1.9    No Dissenters Rights ........................................................................................ 4

ARTICLE II CONVERSION OF SECURITIES; EXCHANGE OF
       SHARES .............................................................................................................. 4

2.1    Conversion of Dex Common Stock .................................................................. 4
2.2    Conversion of SuperMedia Common Stock ..................................................... 5
2.3    Conversion of Merger Sub Stock ..................................................................... 5
2.4    Cancellation of Existing Newco Stock ............................................................ 5
2.5    Certain Adjustments ......................................................................................... 5
2.6    SuperMedia Equity and Equity-Based Awards ............................................... 6
2.7    Dex Equity and Equity-Based Awards ............................................................. 7
2.8    Exchange of Shares .......................................................................................... 8

ARTICLE III REPRESENTATIONS AND WARRANTIES OF
       SUPERMEDIA .................................................................................................. 11

3.1    Corporate Organization .................................................................................. 12
3.2    Capitalization ................................................................................................. 13
3.3    Authority; No Violation ................................................................................. 14
3.4    Consents and Approvals ................................................................................. 16
3.5    Reports ........................................................................................................... 16
3.6    Financial Statements ...................................................................................... 17
3.7    Broker's Fees ................................................................................................. 17
3.8    Absence of Certain Changes or Events .......................................................... 17
3.9    Legal Proceedings .......................................................................................... 18
3.10   Taxes and Tax Returns ................................................................................... 19
3.11   Employee Benefits ......................................................................................... 21
3.12   Compliance with Law; Permits ...................................................................... 24
3.13   Certain Contracts ........................................................................................... 25
3.14   Undisclosed Liabilities ................................................................................... 26
3.15   Environmental Liability .................................................................................. 26
3.16   Real Property .................................................................................................. 27
3.17   State Takeover Laws; Rights Agreement ....................................................... 27
3.18   Opinion .......................................................................................................... 28

i

3.19    Internal Controls ................................................................................................ 28
3.20    Insurance ............................................................................................................ 28
3.21    SuperMedia Information ...................................................................................... 28
3.22    Intellectual Property ............................................................................................ 29
3.23    Labor and Employment ........................................................................................ 31
3.24    Affiliate Transactions .......................................................................................... 32
3.25    SuperMedia Ownership of Dex Securities .......................................................... 32
3.26    No Other Representations; Disclaimer. ................................................................ 32

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF DEX
            AND MERGER SUBS ............................................................................. 33

4.1     Corporate Organization ........................................................................................ 34
4.2     Capitalization ...................................................................................................... 34
4.3     Authority; No Violation ........................................................................................ 36
4.4     Consents and Approvals ...................................................................................... 37
4.5     Reports ................................................................................................................ 38
4.6     Financial Statements ............................................................................................ 38
4.7     Broker's Fees ...................................................................................................... 39
4.8     Absence of Certain Changes or Events ................................................................ 39
4.9     Legal Proceedings ................................................................................................ 40
4.10    Taxes and Tax Returns ........................................................................................ 40
4.11    Employee Benefits .............................................................................................. 42
4.12    Compliance with Law; Permits ............................................................................ 45
4.13    Certain Contracts ................................................................................................ 45
4.14    Undisclosed Liabilities ........................................................................................ 46
4.15    Environmental Liability ........................................................................................ 46
4.16    Real Property ...................................................................................................... 47
4.17    State Takeover Laws; Rights Agreement ............................................................ 47
4.18    Reorganization .................................................................................................... 47
4.19    Opinion ................................................................................................................ 48
4.20    Internal Controls ................................................................................................ 48
4.21    Insurance ............................................................................................................ 48
4.22    Dex Information .................................................................................................. 48
4.23    Intellectual Property ............................................................................................ 49
4.24    Labor and Employment ........................................................................................ 50
4.25    Affiliate Transactions .......................................................................................... 51
4.26    Dex Ownership of SuperMedia Securities .......................................................... 51
4.27    No Other Representations; Disclaimer ................................................................ 51

ARTICLE V COVENANTS RELATING TO CONDUCT OF BUSINESS ............................ 52

5.1     Conduct of Businesses Prior to the Dex Effective Time .................................... 52
5.2     Forbearances ...................................................................................................... 53
5.3     No Control of the Other Party's Business .......................................................... 56

ARTICLE VI ADDITIONAL AGREEMENTS ........................................................................ 57

| | | |
|---|---|---|
| 6.1 | Proxy Statement/Registration Statement | 57 |
| 6.2 | Stockholder Meeting | 59 |
| 6.3 | Regulatory Matters | 60 |
| 6.4 | Transaction Litigation | 61 |
| 6.5 | Access to Information | 62 |
| 6.6 | Legal Conditions to Merger | 62 |
| 6.7 | Stock Exchange Listing | 63 |
| 6.8 | Indemnification and Insurance | 63 |
| 6.9 | Additional Agreements | 64 |
| 6.10 | Advice of Changes | 65 |
| 6.11 | Exemption from Liability Under Section 16(b) | 65 |
| 6.12 | No Solicitation | 65 |
| 6.13 | Takeover Statutes | 69 |
| 6.14 | Financing Amendments and Cooperation | 69 |
| 6.15 | De-listing and Deregistration | 70 |
| 6.16 | Assumption of Agreements | 71 |
| 6.17 | Chapter 11 Process and Solicitations | 71 |

ARTICLE VII CONDITIONS PRECEDENT ........................................................................... 71

| | | |
|---|---|---|
| 7.1 | Conditions to Each Party's Obligation to Effect the Mergers | 71 |
| 7.2 | Conditions to Obligations of Dex, Newco and Merger Sub | 73 |
| 7.3 | Conditions to Obligations of SuperMedia | 74 |

ARTICLE VIII TERMINATION AND AMENDMENT ......................................................... 75

| | | |
|---|---|---|
| 8.1 | Termination | 75 |
| 8.2 | Effect of Termination | 77 |
| 8.3 | Expense Reimbursement | 77 |
| 8.4 | Amendment | 79 |
| 8.5 | Extension; Waiver | 79 |

ARTICLE IX GENERAL PROVISIONS ............................................................................... 79

| | | |
|---|---|---|
| 9.1 | Nonsurvival of Representations, Warranties and Agreements | 79 |
| 9.2 | Expenses | 79 |
| 9.3 | Notices | 79 |
| 9.4 | Interpretation | 80 |
| 9.5 | Counterparts | 81 |
| 9.6 | Entire Agreement | 81 |
| 9.7 | Governing Law; Jurisdiction | 81 |
| 9.8 | Publicity | 82 |
| 9.9 | Assignment; Third Party Beneficiaries | 83 |
| 9.10 | Specific Performance | 83 |
| 9.11 | Severability | 83 |

Exhibit A – Form of Dex Surviving Company Certificate of Incorporation
Exhibit B – Form of Dex Surviving Company Bylaws
Exhibit C – Form of SuperMedia Surviving Company Certificate of Incorporation
Exhibit D – Form of SuperMedia Surviving Company Bylaws
Exhibit E – Knowledge of SuperMedia
Exhibit F – Knowledge of Dex
Exhibit G – Dex Financing Amendments
Exhibit H – SuperMedia Financing Amendments
Exhibit I – Form of Tax Sharing Agreement
Exhibit J – Form of Shared Services Agreement
Exhibit K – Form of SuperMedia Pre-Pack Plan
Exhibit L – Form of Dex Pre-Pack Plan

## INDEX OF DEFINED TERMS

|  | Section |
|---|---|
| Acquisition Proposal | 6.12(a) |
| Action | 3.9 |
| Affiliate | 3.24 |
| Aggregate Merger Consideration | 2.2(a) |
| Agreement | Preamble |
| Alternative Transaction | 6.12(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Certificated SuperMedia Shares | 2.8(a) |
| Certificates of Merger | 1.4 |
| Change in Dex Recommendation | 6.12(b) |
| Change in SuperMedia Recommendation | 6.12(b) |
| Chapter 11 Cases | Recitals |
| Closing | 1.3 |
| Closing Date | 1.3 |
| Code | Recitals |
| Confidentiality Agreement | 6.5(b) |
| Continuing Dex Directors | 1.7(a) |
| Continuing SuperMedia Directors | 1.7(a) |
| Contracts | 3.3(b) |
| Controlled Group Liability | 3.11 |
| Converted Dex Stock Option | 2.7(a) |
| Dex | Preamble |
| Dex 2011 10-K | 4.14 |
| Dex Benefit Plan | 4.11 |
| Dex Bylaws | 4.1(b) |
| Dex Certificate of Merger | 1.4 |
| Dex Charter | 4.1(b) |
| Dex Closing Price | 2.7(a) |
| Dex Common Stock | 2.1(a) |
| Dex Credit Facilities | 6.14 |
| Dex Creditors | 6.14 |
| Dex Creditor Financing Amendment Approval | 7.1(d) |
| Dex Creditor Plan Approval | 8.1(i) |
| Dex Disclosure Schedule | ARTICLE IV |
| Dex East Facility | 6.14 |
| Dex Effective Time | 1.4 |
| Dex Employment Agreement | 4.11 |
| Dex Exchange Ratio | 2.1(a) |
| Dex Financial Advisor | 4.19 |
| Dex Financing Amendments | 6.14 |
| Dex Instruments of Indebtedness | 4.13(a)(i) |
| Dex IP | 4.23(b) |
| Dex IP Contract | 4.23 |

| | |
|---|---|
| Dex IT Assets | 4.23 |
| Dex Leased Properties | 4.16(c) |
| Dex Leases | 4.16(b) |
| Dex Material Contracts | 4.13(a) |
| Dex Merger | Recitals |
| Dex Merger Consideration | 2.1(a) |
| Dex Owned Properties | 4.16(a) |
| Dex Permits | 4.12(b) |
| Dex Plan | 4.11 |
| Dex Pre-Pack Plan | 7.1(l) |
| Dex Preferred Stock | 4.2(a) |
| Dex Qualified Plans | 4.11(d) |
| Dex Recommendation | 4.3(a) |
| Dex Record Date | 6.2(b) |
| Dex Reports | 4.5 |
| Dex Restricted Shares | 2.7(b) |
| Dex SARs | 2.7(d) |
| Dex Stock Option | 2.7(a) |
| Dex Stock Plans | 2.7(a) |
| Dex Stock Units | 2.7(c) |
| Dex Stockholder Approval | 4.3(a) |
| Dex Stockholder Merger Approval | 4.3(a) |
| Dex Stockholder Plan Approval | 4.3(a) |
| Dex Stockholder Meeting | 6.2(a) |
| Dex Subsidiary | 3.1(d) |
| Dex Surviving Company | 1.1 |
| Dex West Facility | 6.14 |
| DGCL | 1.1 |
| Environmental Laws | 3.15 |
| ERISA | 3.11 |
| ERISA Affiliate | 3.11 |
| Exchange Act | 3.4 |
| Exchange Agent | 2.8(a) |
| Exchange Fund | 2.8(a) |
| Exchange Ratio | 2.2(a) |
| Expense Reimbursement | 8.3(a) |
| Form S-4 | 3.4 |
| GAAP | 3.1(d) |
| Governmental Entity | 3.4 |
| HSR Act | 3.4 |
| Indebtedness | 3.13(d) |
| Indemnification Agreement | 6.8(b) |
| Indemnified Parties | 6.8(b) |
| Intellectual Property | 3.22 |
| IRS | 3.11(b) |
| Joint Proxy Statement | 3.4 |
| Knowledge of Dex | 4.5 |

Knowledge of SuperMedia ................................................................ 3.5
Law or Laws ..................................................................................... 3.12(a)
Liens.................................................................................................. 3.2(b)
Material Adverse Effect..................................................................... 3.1(d)
Material Contract .............................................................................. 5.2(k)
Materially Burdensome Condition ................................................... 6.3(a)
Maximum Amount ............................................................................ 6.8(c)
Merger............................................................................................... Recitals
Merger Communication .................................................................... 9.8(d)
Merger Sub........................................................................................ Preamble
Merger Subs ...................................................................................... Preamble
Multiemployer Plan .......................................................................... 3.11
Multiple Employer Plan.................................................................... 3.11(f)
NASDAQ .......................................................................................... 3.4
Newco ............................................................................................... Preamble
Newco Common Stock ...................................................................... 2.1(a)
No-Shop Party ................................................................................... 6.12(a)
Notice Period .................................................................................... 6.12(c)(iii)
NYSE................................................................................................. 3.4
Orders................................................................................................ 3.9
Original Agreement .......................................................................... Recitals
Original Agreement Date .................................................................. Recitals
Other Party ........................................................................................ 6.12(a)
Outside Date ...................................................................................... 8.1(c)
Party or Parties.................................................................................. Preamble
PBGC ................................................................................................ 3.11(e)
Permits .............................................................................................. 3.12(b)
Permitted Liens ................................................................................. 3.22(g)
Person................................................................................................ 2.8(d)
Record Date ...................................................................................... 6.2(b)
Requisite Approvals.......................................................................... 7.1(c)(ii)
RHDI Facility.................................................................................... 6.14
Sarbanes-Oxley Act .......................................................................... 3.5
SEC .................................................................................................... 3.4
Securities Act .................................................................................... 3.4
Stockholder Meeting ........................................................................ 6.2
Subsidiary ......................................................................................... 3.1(d)
Superior Proposal.............................................................................. 6.12(a)
SuperMedia........................................................................................ Preamble
SuperMedia 2011 10-K..................................................................... 3.14
SuperMedia Benefit Plan .................................................................. 3.11
SuperMedia Bylaws .......................................................................... 3.1(b)
SuperMedia Certificate of Merger .................................................... 1.4
SuperMedia Certificates.................................................................... 2.2(b)
SuperMedia Charter .......................................................................... 3.1(b)
SuperMedia Common Stock .............................................................. 2.2(a)
SuperMedia Credit Facility .............................................................. 6.14

SuperMedia Creditors ................................................................................. 6.14
SuperMedia Creditor Financing Amendment Approval.............................. 7.1(e)
SuperMedia Creditor Plan Approval .......................................................... 8.1(ii)
SuperMedia Disclosure Schedule ............................................................... ARTICLE III
SuperMedia Effective Time......................................................................... 1.4
SuperMedia Employment Agreement.......................................................... 3.11
SuperMedia Exchange Ratio........................................................................ 2.2(a)
SuperMedia Financial Advisors................................................................... 3.7
SuperMedia Financing Amendments............................................................ 6.14
SuperMedia Instruments of Indebtedness..................................................... 3.13(a)
SuperMedia IP .............................................................................................. 3.22(b)
SuperMedia IP Contract ............................................................................... 3.22
SuperMedia IT Assets.................................................................................... 3.22
SuperMedia Leased Properties ...................................................................... 3.16(c)
SuperMedia Leases ........................................................................................ 3.16(b)
SuperMedia Material Contracts ..................................................................... 3.13(a)
SuperMedia Merger ....................................................................................... Recitals
SuperMedia Merger Consideration................................................................ 2.2(a)
SuperMedia Owned Properties ...................................................................... 3.16(a)
SuperMedia Permits....................................................................................... 3.12(b)
SuperMedia Plan............................................................................................ 3.11
SuperMedia Pre-Pack Plan ............................................................................ 7.1(l)
SuperMedia Qualified Plans .......................................................................... 3.11(d)
SuperMedia Recommendation........................................................................ 3.3(a)
SuperMedia Record Date ............................................................................... 6.2(b)
SuperMedia Reports........................................................................................ 3.5
SuperMedia Restricted Shares ....................................................................... 2.6(b)
SuperMedia Stock Option............................................................................... 2.6(a)
SuperMedia Stock Plans ................................................................................. 2.6(a)
SuperMedia Stock Units ................................................................................. 2.6(c)
SuperMedia Stockholder Approval................................................................. 3.3(a)
SuperMedia Stockholder Merger Approval.................................................... 3.3(a)
SuperMedia Stockholder Plan Approval ........................................................ 3.3(a)
SuperMedia Stockholder Meeting .................................................................. 6.2(a)
SuperMedia Subsidiary................................................................................... 3.1(d)
SuperMedia Surviving Company.................................................................... 1.2
Tax or Taxes .................................................................................................. 3.10(k)
Tax Return ..................................................................................................... 3.10(l)
Third Party ..................................................................................................... 9.8(d)
Trade Secrets.................................................................................................. 3.22
Transactions ................................................................................................... Recitals
Uncertificated Dex Shares ............................................................................. 2.8(c)
Uncertificated SuperMedia Shares ................................................................ 2.8(a)
Uncertificated Shares ..................................................................................... 2.8(e)
WARN Act....................................................................................................... 3.23(c)
Withdrawal Liability ....................................................................................... 3.11

AMENDED AND RESTATED
AGREEMENT AND PLAN OF MERGER

AMENDED AND RESTATED AGREEMENT AND PLAN OF MERGER, dated as of December 5, 2012 (this "Agreement"), by and among DEX ONE CORPORATION, a Delaware corporation ("Dex"), NEWDEX, INC., a Delaware corporation and a direct, wholly owned subsidiary of Dex ("Newco"), SPRUCE ACQUISITION SUB, INC., a Delaware corporation and a direct, wholly owned subsidiary of Newco ("Merger Sub" and together with Newco, "Merger Subs"), and SUPERMEDIA INC., a Delaware corporation ("SuperMedia"). Dex, Newco, Merger Sub and SuperMedia are sometimes referred to collectively as the "Parties" and individually as a "Party."

W I T N E S S E T H :

WHEREAS, the Parties have entered into that certain Agreement and Plan of Merger (the "Original Agreement"), dated as of August 20, 2012 (the "Original Agreement Date");

WHEREAS, the Parties now desire to amend and restate the Original Agreement by entering into this Agreement on the terms and conditions set forth herein;

WHEREAS, in anticipation of the Mergers, Dex has formed or caused to be formed (i) Merger Sub and (ii) Newco;

WHEREAS, (i) each of Dex and Newco desire, following the satisfaction or waiver of the conditions set forth in Article VII, to merge Dex with and into Newco, with Newco as the surviving entity (the "Dex Merger") and (ii) immediately following consummation of the Dex Merger, each of Newco, SuperMedia and Merger Sub desire, following the satisfaction or waiver of the conditions set forth in Article VII, to merge Merger Sub with and into SuperMedia, with SuperMedia as the surviving entity (the "SuperMedia Merger" and together with the Dex Merger, the "Mergers");

WHEREAS, the Boards of Directors of each of the applicable Parties have approved and declared fair and advisable the Dex Merger, the SuperMedia Merger and the other transactions contemplated by this Agreement (collectively, the "Transactions") upon the terms and subject to the conditions of this Agreement;

WHEREAS, the Boards of Directors of each of the applicable Parties have determined that the Transactions are in furtherance of, and consistent with, their respective business strategies and are in the best interest of their respective stockholders, and have approved and declared advisable or adopted this Agreement and the Transactions;

WHEREAS, for United States federal income tax purposes, it is intended that the each of the Mergers shall qualify as a "reorganization" within the meaning of Section 368(a) of the United States Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement is intended to be and is adopted as a "plan of reorganization" for purposes of Sections 354 and 361 of the Code;

1

WHEREAS, if either Dex or SuperMedia is unable to obtain the requisite consents to the Mergers and certain contemplated amendments to its financing arrangements from its stockholders and senior secured lenders in an out of court process, the Parties may attempt to effectuate the Mergers through voluntary, pre-packaged proceedings with respect to the Party or Parties unable to obtain such consents (and certain of such Party's subsidiaries) ("Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, the Parties desire to make certain representations, warranties and agreements in connection with the Mergers and also to prescribe certain conditions to the Mergers.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I

## THE MERGERS

1.1     The Dex Merger.  Subject to the terms and conditions of this Agreement, in accordance with the General Corporation Law of the State of Delaware (the "DGCL"), at the Dex Effective Time, Dex shall merge with and into Newco.  Newco shall be the surviving company in the Dex Merger ("Dex Surviving Company"), and shall continue its corporate existence under the Laws of the State of Delaware.  As of the Dex Effective Time, the separate corporate existence of Dex shall cease.

1.2     The SuperMedia Merger.  Subject to the terms and conditions of this Agreement, in accordance with the DGCL, at the SuperMedia Effective Time, Merger Sub shall merge with and into SuperMedia.  SuperMedia shall be the surviving company in the SuperMedia Merger ("SuperMedia Surviving Company"), and shall continue its corporate existence under the Laws of the State of Delaware.  As of the SuperMedia Effective Time, the separate corporate existence of Merger Sub shall cease.

1.3     Closing.  Subject to the terms and conditions of this Agreement, the closing of the Mergers (the "Closing") shall take place on a day that is a business day (i) at the offices of Kirkland & Ellis LLP, 300 N. LaSalle, Chicago, IL 60654 at 10:00 a.m., New York City time, no later than the fifth business day following the satisfaction of the conditions set forth in Article VII (other than (a) those conditions that are waived in accordance with the terms of this Agreement by the Party or Parties for whose benefit such conditions exist and (b) any such conditions, which by their terms, are not capable of being satisfied until the Closing, but subject to the satisfaction or waiver of those conditions at the Closing) or (ii) at such other place, time and/or date as the Parties may otherwise agree.  The date upon which the Closing actually occurs is referred to herein as the "Closing Date".

1.4     Effective Time.

(a)     The Dex Merger shall become effective at such time as set forth in a certificate of merger ("Dex Certificate of Merger") that shall be filed with the Secretary of State of the State of Delaware on the Closing Date in connection with the Mergers.  The term "Dex Effective Time" shall be the date and time when the Dex Merger becomes effective as set forth in the Certificate of Merger.

(b)     The SuperMedia Merger shall become effective at such time as set forth in the certificate of merger ("SuperMedia Certificate of Merger" and together with the Dex Certificate of Merger, the "Certificates of Merger") that shall be filed by SuperMedia with the Secretary of State of the State of Delaware on the Closing Date in connection with the SuperMedia Merger.  The term "SuperMedia Effective Time" shall be the date and time when the SuperMedia Merger becomes effective as set forth in the SuperMedia Certificate of Merger, which shall be immediately after the Dex Effective Time.

1.5     Effects of the Mergers.  At and after the Dex Effective Time and the SuperMedia Effective Time, the Dex Merger and SuperMedia Merger, respectively, shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL.  Without limiting the generality of the foregoing, (i) at the Dex Effective Time, except as otherwise provided herein, all the property, rights, privileges, powers and franchises of Dex and Newco shall vest in Dex Surviving Company, and all debts, liabilities and duties of Dex and Newco shall become the debts, liabilities and duties of Dex Surviving Company and (ii) at the SuperMedia Effective Time, except as otherwise provided herein, all the property, rights, privileges, powers and franchises of SuperMedia and Merger Sub shall vest in SuperMedia Surviving Company, and all debts, liabilities and duties of SuperMedia and Merger Sub shall become the debts, liabilities and duties of SuperMedia Surviving Company.

1.6     Certificate of Incorporation; Bylaws.

(a)     At the Dex Effective Time, the certificate of incorporation and bylaws of Dex Surviving Company shall be in the forms set forth in Exhibit A and Exhibit B, respectively.

(b)     At the SuperMedia Effective Time, the certificate of incorporation and bylaws of SuperMedia Surviving Company shall be in the forms set forth in Exhibit C and Exhibit D, respectively.

1.7     Governance Arrangements.

(a)     Dex Surviving Company Board of Directors.  On or prior to the SuperMedia Effective Time, Newco's Board of Directors shall cause the number of directors that will comprise the full Board of Directors of Dex Surviving Company to be ten (10) and shall approve and adopt resolutions effecting the composition contemplated by this Section 1.7.  The Board of Directors of Dex Surviving Company at the SuperMedia Effective Time shall consist of (i) the five (5) current non-employee Dex directors (collectively the "Continuing Dex Directors"), (ii) four (4) current non-employee SuperMedia directors designated by SuperMedia (collectively the "Continuing SuperMedia Directors"), and (iii) the Chief Executive Officer of Dex Surviving Company

3

as of the SuperMedia Effective Time as set forth in <u>Section 1.7(b)</u> below.  In the event that, prior to the SuperMedia Effective Time, any person selected to serve as a Continuing Dex Director or a Continuing SuperMedia Director, as applicable, after the SuperMedia Effective Time is unable or unwilling to serve in such position, the Board of Directors of either Dex or SuperMedia, as applicable, shall designate another person to serve in such person's stead.  The Chairman of the Board of Directors of Dex Surviving Company shall be Alan Schultz.

(b)    <u>President and Chief Executive Officer of Dex Surviving Company</u>.  At the SuperMedia Effective Time, Peter McDonald shall become President and Chief Executive Officer of Dex Surviving Company.

1.8    <u>Tax Consequences</u>.  It is intended that each of the Mergers shall qualify as a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement shall constitute, and is adopted as, a "plan of reorganization" for purposes of Sections 354 and 361 of the Code.

1.9    <u>No Dissenters Rights</u>.  In accordance with Section 262 of the DGCL, no appraisal rights shall be available to holders of SuperMedia Common Stock or Dex Common Stock in connection with the Mergers.

## ARTICLE II

## CONVERSION OF SECURITIES; EXCHANGE OF SHARES

2.1    <u>Conversion of Dex Common Stock</u>.  At the Dex Effective Time, by virtue of the Dex Merger and without any action on the part of Dex, Newco or the holder of any of the securities described in the following subsections:

(a)    Each share of the common stock, par value $0.001 per share, of Dex issued and outstanding immediately prior to the Dex Effective Time ("<u>Dex Common Stock</u>"), except for shares of Dex Common Stock owned by Dex, SuperMedia or any of their respective Subsidiaries (which shall be cancelled in accordance with <u>Section 2.1(c)</u>), shall be converted into 0.2 (the "<u>Dex Exchange Ratio</u>") fully paid and nonassessable shares of common stock, par value $0.001 per share ("<u>Newco Common Stock</u>"), of Newco (the "<u>Dex Merger Consideration</u>").

(b)    All of the shares of Dex Common Stock converted into the Dex Merger Consideration pursuant to this <u>Section 2.1</u> shall no longer be outstanding and shall automatically be cancelled and shall cease to exist as of the Dex Effective Time, and all evidence of shares in book-entry form previously representing any shares of Dex Common Stock shall thereafter represent only the right to receive the Dex Merger Consideration, as well as any dividends or distributions to which holders of Newco Common Stock are entitled in accordance with <u>Section 2.8(h)</u>.

(c)    Notwithstanding anything in this Agreement to the contrary, at the Dex Effective Time, all shares of Dex Common Stock that are owned by SuperMedia, Dex or any of

their respective Subsidiaries shall be cancelled and shall cease to exist and no Newco Common Stock or other consideration shall be delivered in exchange therefor.

2.2     Conversion of SuperMedia Common Stock.  At the SuperMedia Effective Time, by virtue of the SuperMedia Merger and without any action on the part of SuperMedia, Dex, Newco, Merger Sub or the holder of any of the securities described in the following subsections:

(a)     Each share of the common stock, par value $0.01 per share, of SuperMedia issued and outstanding immediately prior to the SuperMedia Effective Time ("SuperMedia Common Stock"), except for shares of SuperMedia Common Stock owned by Dex, Newco, SuperMedia or any of their respective Subsidiaries (which shall be cancelled in accordance with Section 2.2(c)), shall be converted into the right to receive 0.4386 (the "SuperMedia Exchange Ratio") fully paid and nonassessable shares of Newco Common Stock (the "SuperMedia Merger Consideration" and together with the Dex Merger Consideration, the "Aggregate Merger Consideration"). The quotient of the SuperMedia Exchange Ratio divided by the Dex Exchange Ratio is referred to herein as the "Exchange Ratio."

(b)     All of the shares of SuperMedia Common Stock converted into the right to receive the SuperMedia Merger Consideration pursuant to this Section 2.2 shall no longer be outstanding and shall automatically be cancelled and shall cease to exist as of the SuperMedia Effective Time, and each certificate or evidence of shares in book-entry form previously representing any such shares of SuperMedia Common Stock (such certificates and evidence of shares in book-entry form, collectively, "SuperMedia Certificates") shall thereafter represent only the right to receive the SuperMedia Merger Consideration, as well as any dividends or distributions to which holders of Newco Common Stock are entitled in accordance with Section 2.8(h).

(c)     Notwithstanding anything in this Agreement to the contrary, at the SuperMedia Effective Time, all shares of SuperMedia Common Stock that are owned by SuperMedia, Dex or any of their respective Subsidiaries shall be cancelled and shall cease to exist and no Dex Common Stock, stock of Merger Sub or other consideration shall be delivered in exchange therefor.

2.3     Conversion of Merger Sub Stock.  Each share of common stock, par value $.01 per share, of Merger Sub issued and outstanding immediately prior to the SuperMedia Effective Time shall be converted into and be exchanged for one newly and validly issued, fully paid and nonassessable share of common stock of SuperMedia Surviving Company.

2.4     Cancellation of Existing Newco Stock.  Each share of Newco Common Stock issued and outstanding immediately prior to the Dex Effective Time shall be cancelled and cease to exist. At the SuperMedia Effective Time, the only shares of Newco Common Stock outstanding shall be those shares of Newco Common Stock that constitute the Aggregate Merger Consideration.

2.5     Certain Adjustments.  If, from the Original Agreement Date until the Dex Effective Time or SuperMedia Effective Time, the outstanding shares of Dex Common Stock or

5

SuperMedia Common Stock shall have been changed into a different number of shares or a different class by reason of any reclassification, stock split (including a reverse stock split), recapitalization, split-up, combination, exchange of shares, readjustment, or other similar transaction, or a stock dividend or stock distribution thereon shall be declared with a record date within said period, the Dex Merger Consideration and the Dex Exchange Ratio or the SuperMedia Merger Consideration and the SuperMedia Exchange Ratio, and any other similarly dependent items, as the case may be, shall be equitably adjusted to provide the holders of Dex Common Stock and SuperMedia Common Stock the same economic effect as contemplated by this Agreement prior to such event.

2.6    <u>SuperMedia Equity and Equity-Based Awards</u>.

(a)    <u>SuperMedia Stock Options</u>.    Effective as of the SuperMedia Effective Time, each then outstanding and unexercised option to purchase shares of SuperMedia Common Stock (each a "<u>SuperMedia Stock Option</u>"), whether vested or unvested, issued by SuperMedia under any of the equity-based compensation plans identified on <u>Section 3.11(a)</u> of the SuperMedia Disclosure Schedule (the "<u>SuperMedia Stock Plans</u>") and the award agreements evidencing the grants thereunder shall be cancelled and each holder of a SuperMedia Stock Option shall be paid in cash the amount equal to (i) the excess, if any, of the closing sale price on the day before the Closing Date of a share of SuperMedia Common Stock subject to such SuperMedia Stock Option over the strike price for such SuperMedia Stock Option, multiplied by (ii) the number of shares of SuperMedia Common Stock subject to such SuperMedia Stock Option immediately prior to the SuperMedia Effective Time.

(b)    <u>SuperMedia Restricted Shares</u>.    Effective as of the SuperMedia Effective Time, each restricted share of SuperMedia Common Stock granted to any employee or director of SuperMedia, any SuperMedia Subsidiary or any of SuperMedia's predecessors under any SuperMedia Stock Plan that is outstanding immediately prior to the SuperMedia Effective Time (collectively, the "<u>SuperMedia Restricted Shares</u>") shall, by virtue of the SuperMedia Merger and without any action on the part of the holder thereof, be converted into the number of shares of Newco Common Stock equal to the product of (i) the number of SuperMedia Restricted Shares, multiplied by (ii) the SuperMedia Exchange Ratio.

(c)    <u>SuperMedia Restricted Stock Units</u>.    Prior to the SuperMedia Effective Time, each outstanding restricted stock unit denominated in shares of SuperMedia Common Stock granted to, or held in a deferral account for the benefit of, any current or former employee or director of SuperMedia or any SuperMedia Subsidiary under any SuperMedia Stock Plan that is unsettled immediately prior to the SuperMedia Effective Time (collectively, the "<u>SuperMedia Stock Units</u>") shall be settled in accordance with the terms of the applicable SuperMedia Stock Plans and award agreements.    To the extent such SuperMedia Stock Units are settled in SuperMedia Common Stock, such SuperMedia Common Stock shall be converted at the SuperMedia Effective Time in accordance with <u>Section 2.2</u>.

(d)    <u>Actions</u>.    Prior to the SuperMedia Effective Time, the Compensation Committee of the Board of Directors of SuperMedia shall make such adjustments and determinations and shall adopt any resolutions and take any corporate actions with respect to the SuperMedia Stock Options, SuperMedia Restricted Shares and SuperMedia Stock Units to

implement the foregoing provisions of this <u>Section 2.6</u>, including but not limited to designating the Transactions as a "Change in Control of the Company" for purposes of SuperMedia's 2009 Long-Term Incentive Plan, causing all SuperMedia Stock Options not exercised by immediately prior to the SuperMedia Effective Time to be cancelled and (C) causing all SuperMedia Stock Units to be vested and settled in SuperMedia Common Stock immediately prior to the SuperMedia Effective Time.  SuperMedia shall take all actions necessary to ensure that after the SuperMedia Effective Time, neither SuperMedia Surviving Company nor Dex Surviving Company will be required to deliver shares of SuperMedia Common Stock or other capital stock of SuperMedia to any person pursuant to or in settlement of SuperMedia Stock Options, SuperMedia Restricted Shares, SuperMedia Stock Units or any other stock-based award.

2.7    <u>Dex Equity and Equity-Based Awards</u>.

(a)    <u>Dex Stock Options</u>.  Effective as of the Dex Effective Time, each then outstanding and unexercised option to purchase shares of Dex Common Stock (each a "<u>Dex Stock Option</u>"), whether vested or unvested, issued by Dex under any of the equity-based compensation plans identified on <u>Section 4.11(a)</u> of the Dex Disclosure Schedule (the "<u>Dex Stock Plans</u>") and the award agreements evidencing the grants thereunder, granted to any current or former employee or director of, or consultant to, Dex or any Dex Subsidiary shall:

(i)    if the closing transaction price of a share of Dex Common Stock on the day before the Closing Date (the "<u>Dex Closing Price</u>") is less than or equals the strike price for such Dex Stock Option, be cancelled for no value; and

(ii)    if the Dex Closing Price exceeds the strike price for such Dex Stock Option, be converted into a fully vested option to purchase a number of shares of Newco Common Stock (a "<u>Converted Dex Stock Option</u>") equal to the product of (i) the number of shares of Dex Common Stock subject to such Dex Stock Option (or, if such Dex Stock Option is a price-vested stock option, the number of shares of Dex Common Stock that vest under the applicable award upon a Change in Control, as defined in such agreement) immediately prior to the Dex Effective Time multiplied by (ii) the Dex Exchange Ratio; and the per share exercise price for Newco Common Stock issuable upon the exercise of such Converted Dex Stock Option shall be equal to the quotient (rounded up to the nearest whole cent) of (i) the exercise price per share of Dex Common Stock at which such Dex Stock Option was exercisable immediately prior to the Dex Effective Time divided by (ii) the Dex Exchange Ratio; <u>provided</u>, <u>however</u>, that it is intended that such conversion be effected (i) with respect to any Dex Stock Option to which Section 421 of the Code applies by reason of its qualification under Section 422 of the Code, in a manner consistent with Section 424(a) of the Code and (ii) in all events, in a manner satisfying the requirements of Section 409A of the Code and the Treasury Regulations thereunder.  The Converted Dex Stock Options shall be subject to the same terms and conditions (including expiration date, <u>provided</u> that such options shall be fully vested) as were applicable to the

corresponding Dex Stock Options immediately prior to the Dex Effective Time.

(b)    <u>Dex Restricted Shares</u>.    Effective as of the Dex Effective Time, each restricted share of Dex Common Stock granted to any employee or director of Dex, any Dex Subsidiary or any of Dex's predecessors under any Dex Stock Plan that is outstanding immediately prior to the Dex Effective Time (collectively, the "<u>Dex Restricted Shares</u>") shall, by virtue of the Dex Merger and without any action on the part of the holder thereof, be converted into the number of shares of Newco Common Stock equal to the product of (i) the number of Dex Restricted Shares, multiplied by (ii) the Dex Exchange Ratio.

(c)    <u>Dex Restricted Stock Units</u>.    Effective as of the Dex Effective Time, each outstanding restricted stock unit denominated in shares of Dex Common Stock granted to, or held in a deferral account for the benefit of, any current or former employee or director of Dex or any Dex Subsidiary under any Dex Stock Plan that is unsettled immediately prior to the Dex Effective Time (collectively, the "<u>Dex Stock Units</u>"), shall, by virtue of the Dex Merger and without any action on the part of the holder thereof, become vested and converted into the right to receive a number of shares of Newco Common Stock equal to (i) the target number of Dex Stock Units (as specified on the applicable Dex Stock Unit award agreement) multiplied by (ii) the Dex Exchange Ratio.

(d)    <u>Dex Stock Appreciation Rights</u>.    Effective as of the Dex Effective Time, each outstanding stock appreciation right in respect of Dex Common Stock that is unsettled immediately prior to the Dex Effective Time (collectively, the "<u>Dex SARs</u>"), whether vested or unvested, shall be cancelled and shall only entitle the holder of a Dex SAR to receive a number of shares of Newco Common Stock equal to (i) the excess, if any, of the Dex Closing Price over the Base Price (as defined in the applicable Dex SAR agreement) of such Dex SAR, divided by (ii) the Dex Closing Price, multiplied by (iii) the number of shares of Dex Common Stock subject to such Dex SAR immediately prior to the Dex Effective Time, multiplied by (iv) the Dex Exchange Ratio.

(e)    <u>Actions</u>. Prior to the Dex Effective Time, the Compensation Committee of the Board of Directors and Board of Directors of Dex shall make such adjustments and determinations and shall adopt any resolutions and take any corporate actions with respect to the Dex Stock Options, Dex Restricted Shares, Dex Stock Units and Dex SARs to implement the foregoing provisions of this <u>Section 2.7</u>, including, but not limited to, designating the Mergers as a "Change in Control" under the Dex Stock Plans.

2.8    <u>Exchange of Shares</u>.

(a)    <u>Exchange Agent and Exchange Fund</u>.    Prior to the Dex Effective Time, Dex or Newco shall appoint an agent (the "<u>Exchange Agent</u>") reasonably acceptable to SuperMedia for the purpose of exchanging for the SuperMedia Merger Consideration (A) certificates representing shares of SuperMedia Common Stock ("<u>Certificated SuperMedia Shares</u>") and (B) uncertificated shares of SuperMedia Common Stock ("<u>Uncertificated SuperMedia Shares</u>"). At or prior to the SuperMedia Effective Time, Newco shall deposit with or otherwise make available to the Exchange Agent, in trust for the benefit of holders of shares of

8

SuperMedia Common Stock shares of Newco Common Stock in book-entry form sufficient to deliver the aggregate SuperMedia Merger Consideration (the "Exchange Fund"). Dex and Newco agree to make available to the Exchange Agent, from time to time after the Closing as needed, any dividends or distributions to which such holder is entitled pursuant to Section 2.8(h) of this Agreement.

(b)     Exchange Procedures for SuperMedia Common Stock.  Promptly after the SuperMedia Effective Time (but in no event later than five (5) business days following the SuperMedia Effective Time), Dex shall send, or shall cause the Exchange Agent to send, to each holder of record of shares of SuperMedia Common Stock at the SuperMedia Effective Time a letter of transmittal and instructions reasonably acceptable to SuperMedia (which shall specify that the delivery shall be effected, and risk of loss and title shall pass, only upon proper surrender of the Certificated SuperMedia Shares to the Exchange Agent and which shall otherwise be in customary form and shall include customary provisions with respect to delivery of an "agent's message" or other customary evidence, if any, regarding the transfer of Uncertificated SuperMedia Shares for use in such exchange).  Each holder of record of SuperMedia Common Stock whose shares have been converted into the right to receive the SuperMedia Merger Consideration pursuant to Section 2.2 shall be entitled to receive, upon (i) surrender to the Exchange Agent of one or more Certificated SuperMedia Shares, together with a properly completed letter of transmittal, or (ii) receipt of an "agent's message" by the Exchange Agent (or such other evidence, if any, of transfer as the Exchange Agent may reasonably request) in the case of a book-entry transfer of Uncertificated SuperMedia Shares, (x) shares (including fractions of a share) of Newco Common Stock to which such holder of SuperMedia Common Stock shall have become entitled pursuant to the provisions of Article II (after taking into account all shares of SuperMedia Common Stock then held by such holder) and (y) a check representing the amount of any dividends or distributions then payable pursuant to Section 2.8(h)(i), and the Certificated SuperMedia Shares and Uncertificated SuperMedia Shares so surrendered or transferred shall forthwith be cancelled.  The shares of Newco Common Stock constituting such SuperMedia Merger Consideration shall be in uncertificated book-entry form. No interest will be paid or accrued on any unpaid dividends and distributions payable to holders of Certificated SuperMedia Shares or Uncertificated SuperMedia Shares. Until so surrendered or transferred, as the case may be, each such Certificated SuperMedia Share or Uncertificated SuperMedia Share shall represent after the SuperMedia Effective Time for all purposes only the right to receive the SuperMedia Merger Consideration and the right to receive any dividends or other distributions pursuant to Section 2.8(h).

(c)     Exchange Procedures for Dex Common Stock.  At the Dex Effective Time, the Exchange Agent shall exchange by book entry transfer all uncertificated shares of Dex Common Stock (excluding any shares of Dex Common Stock to be cancelled pursuant to Section 2.1(c)) ("Uncertificated Dex Shares") for the shares of Newco Common Stock constituting the aggregate Dex Merger Consideration (including fractions of a share of Newco Common Stock).

(d)     Issuance or Payment to Persons Other Than the Registered Holder.  If any portion of the SuperMedia Merger Consideration is to be paid to a Person other than the Person in whose name the surrendered Certificated SuperMedia Share or the transferred Uncertificated SuperMedia Share is registered, it shall be a condition to such payment that (i) either such Certificated SuperMedia Share shall be properly endorsed or shall otherwise be in proper form

for transfer or such Uncertificated SuperMedia Share shall be properly transferred and (ii) the Person requesting such payment shall pay to the Exchange Agent any transfer or other taxes required as a result of such payment to a Person other than the registered holder of such Certificated SuperMedia Share or Uncertificated SuperMedia Share or establish to the satisfaction of the Exchange Agent that such tax has been paid or is not payable. For purposes of this Agreement, the term "Person" means any individual, corporation, limited liability company, partnership, association, joint venture, trust, unincorporated organization, other entity or group (as defined in the Exchange Act), including any Governmental Entity.

(e)    No Further Rights in Dex Common Stock or SuperMedia Common Stock. All Dex Merger Consideration and SuperMedia Merger Consideration paid in accordance with the terms hereof shall be deemed to have been issued in full satisfaction of all rights pertaining to such surrendered or transferred shares of Dex Common Stock or SuperMedia Common Stock, as applicable. From and after the Closing Date, the holders of Certificated SuperMedia Shares Uncertificated SuperMedia Shares and Uncertificated Dex Shares (together with the Uncertificated SuperMedia Shares, the "Uncertificated Shares") shall cease to have any rights with respect to such shares of SuperMedia Common Stock or Dex Common Stock, as applicable, except as otherwise provided herein or by applicable Law.

(f)    Termination of Exchange Fund. Any portion of the Exchange Fund deposited with or otherwise made available to the Exchange Agent pursuant to Section 2.8(a) that remains unclaimed by the holders of SuperMedia Common Stock twelve (12) months after the SuperMedia Effective Time shall be returned to Dex Surviving Company, upon demand, and any such holder who has not exchanged its shares of SuperMedia Common Stock for the SuperMedia Merger Consideration in accordance with this Section 2.8 prior to that time shall thereafter look only to Dex Surviving Company for, and Dex Surviving Company shall remain liable for, payment of the SuperMedia Merger Consideration, and any dividends and distributions with respect thereto pursuant to Section 2.8(h), in respect of such shares without any interest thereon. Notwithstanding the foregoing, Dex Surviving Company shall not be liable to any holder of SuperMedia Common Stock for any amounts properly paid to a public official pursuant to applicable abandoned property, escheat or similar laws. Any amounts remaining unclaimed by holders of SuperMedia Common Stock five (5) years after the SuperMedia Effective Time (or such earlier date, immediately prior to such time when the amounts would otherwise escheat to or become property of any Governmental Entity) shall become, to the extent permitted by applicable Law, the property of Dex Surviving Company, free and clear of any claims or interest of any Person previously entitled thereto.

(g)    Lost Certificates. If any Certificated SuperMedia Share shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificated SuperMedia Share to be lost, stolen or destroyed and, if required by Dex Surviving Company or Newco, the posting by such Person of a bond, in such reasonable and customary amount as Dex Surviving Company or Newco may direct, as indemnity against any claim that may be made against it with respect to such lost, stolen or destroyed Certificated SuperMedia Share and the payment of any ordinary and customary processing fees, the Exchange Agent will cause to be paid, in exchange for such lost, stolen or destroyed Certificated SuperMedia Share, the SuperMedia Merger Consideration and any dividends or distributions with respect thereto pursuant to Section 2.8(h), in accordance with this Section 2.8(g).

10

(h)     <u>Dividends and Distributions</u>.    No dividends or other distributions with respect to securities of Newco constituting part of the Aggregate Merger Consideration shall be paid to the holder of any Certificated SuperMedia Shares not surrendered or of any Uncertificated Shares not transferred until such Certificated SuperMedia Shares or Uncertificated Shares are surrendered or transferred, as the case may be, as provided in <u>Section 2.8(b)</u>. Following such surrender or transfer, there shall be paid, without interest, to the Person in whose name the securities of Newco have been registered, (i) the amount of dividends or other distributions with a record date after the SuperMedia Effective Time theretofore paid, without any interest thereon, with respect to the shares of Newco Common Stock represented by such Certificated SuperMedia Shares or Uncertificated Shares and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the SuperMedia Effective Time but prior to surrender and a payment date subsequent to surrender, with respect to shares of Newco Common Stock represented by such Certificated SuperMedia Shares or Uncertificated Shares.

(i)     <u>Withholding</u>.    Notwithstanding any provision contained herein to the contrary, each of the Exchange Agent, SuperMedia Surviving Company and Dex Surviving Company shall be entitled to deduct or withhold from the consideration otherwise payable to any Person pursuant to this <u>Section 2.8(i)</u> such amounts as it is required to deduct or withhold with respect to the making of such payment under any provision of federal, state, local or foreign tax law. SuperMedia Surviving Company shall, and shall cause its respective Affiliates to, assist Dex Surviving Company and/or Newco in making such deductions and withholding as reasonably requested by Dex Surviving Company and/or Newco. If the Exchange Agent, SuperMedia Surviving Company or Dex Surviving Company, as the case may be, so withholds amounts, such amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of SuperMedia Common Stock or Dex Common Stock in respect of which the Exchange Agent, SuperMedia Surviving Company or Dex Surviving Company, as the case may be, made such deduction and withholding.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SUPERMEDIA

Except (i) as disclosed in, and reasonably apparent from, any SuperMedia Report filed with, or furnished to, the SEC by SuperMedia and publicly available prior to the Original Agreement Date (excluding, in each case, any disclosures set forth in any risk factor section and in any section relating to forward-looking statements to the extent that they are cautionary, predictive or forward-looking in nature), or (ii) as disclosed in a correspondingly numbered section of the disclosure schedule (the "<u>SuperMedia Disclosure Schedule</u>") delivered by SuperMedia to Dex and Merger Subs prior to the execution of the Original Agreement (which schedule sets forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in this <u>Article III</u>, or to one or more of SuperMedia's covenants contained herein; <u>provided</u> that, notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such schedule shall not be deemed an admission that such item is required to be disclosed therein or represents a material

exception or material fact, event or circumstance or that such item has had or is reasonably likely to have a Material Adverse Effect on SuperMedia; provided, further, that the disclosure of any item in any section of the SuperMedia Disclosure Schedule shall be deemed disclosed with respect to any other section of the SuperMedia Disclosure Schedule to which such item is relevant, whether or not a specific cross reference appears, so long as the relevance is reasonably apparent from the face of such disclosure), SuperMedia hereby represents and warrants to Dex and Merger Subs as follows:

3.1     Corporate Organization.

(a)     SuperMedia is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  SuperMedia has the corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to have such power and authority or to be so licensed and qualified is not reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect on SuperMedia.

(b)     True and complete copies of the restated certificate of incorporation of SuperMedia (the "SuperMedia Charter") and the amended and restated bylaws of SuperMedia (the "SuperMedia Bylaws"), as in effect as of the Original Agreement Date, have previously been made available to Dex.

(c)     Each SuperMedia Subsidiary (i) is duly organized and validly existing under the Laws of its jurisdiction of organization, (ii) is duly qualified to do business and in good standing  (where such concept is recognized) in all jurisdictions (whether federal, state, local or foreign) where its ownership or leasing of property or the conduct of its business requires it to be so qualified and (iii) has all requisite corporate or similar power and authority to own or lease its properties and assets and to carry on its business as now conducted, except in each of (i) – (iii) as would not be reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect on SuperMedia.

(d)     As used in this Agreement, (i) the word "Subsidiary" when used with respect to any party, means any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, that is consolidated with such party for financial reporting purposes under U.S. generally accepted accounting principles ("GAAP"), and the terms "SuperMedia Subsidiary" and "Dex Subsidiary" shall mean any direct or indirect Subsidiary of SuperMedia or Dex, respectively, and (ii) the term "Material Adverse Effect" means, with respect to Dex, SuperMedia, Newco, Merger Sub, Dex Surviving Company or SuperMedia Surviving Company, as the case may be, a material adverse effect on (A) the business, assets, properties, results of operations or financial condition of such Party and its Subsidiaries taken as a whole (provided, however, that, with respect to this clause (A), Material Adverse Effect shall not be deemed to include effects to the extent resulting from (1) changes, after the Original Agreement Date, in GAAP (or any interpretation thereof) generally applicable to companies engaged in the industries in which SuperMedia and Dex operate, (2) changes, after the Original Agreement Date, in Laws of general applicability or interpretations or enforcement

thereof by Governmental Entities, (3) actions or omissions of Dex or Merger Subs, on the one hand, or SuperMedia, on the other hand, taken with the prior written consent of the other or expressly required hereunder, including the impact thereof on relationships (contractual or otherwise) with customers, suppliers, vendors, lenders, employees, labor unions, investors or venture partners, (4) changes, after the Original Agreement Date, in general economic or market conditions (including conditions of the securities and credit markets) generally affecting companies engaged in the industries in which Dex and SuperMedia operate, except to the extent that such changes have a disproportionate adverse effect on such Party relative to other participants in the same industries and to the Other Party, (5) changes, after the Original Agreement Date, generally affecting the marketing solutions industry, except to the extent that such changes have a disproportionate adverse effect on such Party relative to other participants in the same industry and to the Other Party, (6) the execution or public disclosure of this Agreement or the transactions contemplated hereby, including the directly attributable impact thereof on relationships (contractual or otherwise) with customers, suppliers, vendors, lenders, employees, labor unions, investors or venture partners and including any lawsuit, action or other proceeding with respect to the Mergers or other transactions contemplated hereby, (7) natural disasters, acts of war, armed hostilities or terrorism or any escalation or worsening thereof, except to the extent that such events have a disproportionate adverse effect on such Party relative to other participants in the industries in which Dex and SuperMedia operate and to the Other Party, (8) changes in the price or trading volume of the stock of Dex or SuperMedia, as applicable, in and of itself (provided that events, circumstances and conditions underlying any such change may nonetheless be considered in determining whether a Material Adverse Effect has occurred), or (9) any failure by Dex or SuperMedia, as applicable, to meet any projections or forecasts for any period ending (or for which revenues or earnings are released) on or after the Original Agreement Date (provided that events, circumstances and conditions underlying any such failure may nonetheless be considered in determining whether a Material Adverse Effect has occurred), or (B) the ability of such Party to timely consummate the transactions contemplated by this Agreement.

3.2    Capitalization.

(a)    The authorized capital stock of SuperMedia consists of 60,000,000 shares of SuperMedia Common Stock, of which, as of August 17, 2012, 15,666,518 shares were issued and outstanding and 5,000,000 shares of preferred stock, par value $0.01 per share, of which, as of the Original Agreement Date, no shares were issued and outstanding. As of August 17, 2012, no shares of SuperMedia Common Stock were held in SuperMedia's treasury. As of the Original Agreement Date, no shares of SuperMedia Common Stock were reserved for issuance except for 830,434 shares under the SuperMedia Stock Plans. As of August 17, 2012 (i) 330,540 SuperMedia Stock Options to acquire shares of SuperMedia Common Stock were outstanding pursuant to the SuperMedia Stock Plans or otherwise, (ii) 375,202 SuperMedia Restricted Shares were outstanding pursuant to the SuperMedia Stock Plans or otherwise, and (iii) 55,776 SuperMedia Stock Units were outstanding and unsettled pursuant to the SuperMedia Stock Plans or otherwise. All of the issued and outstanding shares of SuperMedia Common Stock have been, and all shares of SuperMedia Common Stock that may be issued upon the exercise of the SuperMedia Stock Options, the vesting of SuperMedia Restricted Shares or the settlement of SuperMedia Stock Units will be, when issued in accordance with the terms thereof, duly authorized and validly issued and are fully paid, nonassessable and not subject to, or issued in

13

violation of, any purchase option, redemption, call option, right of first refusal, preemptive right, subscription right or any similar right. Except pursuant to the SuperMedia Stock Plans, SuperMedia does not have and is not bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of SuperMedia Common Stock or any other equity securities of SuperMedia or any securities representing the right to purchase or otherwise receive any shares of SuperMedia Common Stock. SuperMedia has provided Dex with a true and complete list of all SuperMedia Stock Options, SuperMedia Restricted Shares, SuperMedia Stock Units, and other equity-based awards outstanding under the SuperMedia Stock Plans or otherwise as of August 17, 2012, the number of shares subject to each such award, the grant date of each such award, the vesting schedule of each such award and the exercise price for each such SuperMedia Stock Option. Since April 9, 2012 through the Original Agreement Date, SuperMedia has not issued or awarded, or authorized the issuance or award of, any capital stock, options, restricted stock or other equity-based awards or other securities convertible into or exchangeable for capital stock or other equity interests in SuperMedia under the SuperMedia Stock Plans or otherwise. There are no outstanding bonds, debentures, notes or other indebtedness having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matter on which SuperMedia's stockholders may vote.

(b)      All of the issued and outstanding shares of capital stock or other equity ownership interests of each Subsidiary of SuperMedia are owned by SuperMedia, directly or indirectly, free and clear of any liens, claims, mortgages, encumbrances, pledges, security interests, equities or charges of any kind ("Liens"), and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable and not subject to, or issued in violation of, any purchase option, redemption, call option, right of first refusal, preemptive right, subscription right or any similar right. No such Subsidiary has or is bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of such Subsidiary or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of such Subsidiary. No SuperMedia Subsidiary owns any SuperMedia Common Stock or other equity interest in SuperMedia. Except for the capital stock or other equity ownership interests of the SuperMedia Subsidiaries, neither SuperMedia nor any SuperMedia Subsidiary beneficially owns directly or indirectly any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person.

3.3      Authority; No Violation. (a) SuperMedia has full corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation by SuperMedia of the transactions contemplated hereby have been duly, validly and unanimously approved by the Board of Directors of SuperMedia. The Board of Directors of SuperMedia has determined that this Agreement and the transactions contemplated hereby are in the best interests of SuperMedia and its stockholders, has adopted, approved and declared advisable this Agreement and recommended that its stockholders vote (i) in favor of the adoption of this Agreement and (ii) to accept the SuperMedia Pre-Pack Plan (the "SuperMedia Recommendation") and, subject to Section 6.12(c) hereof, has directed that this Agreement and the transactions contemplated by this Agreement (including the consummation of

14

the transactions contemplated by this Agreement through Chapter 11 Cases) be submitted to SuperMedia's stockholders for approval and adoption at a duly held meeting of such stockholders or as otherwise required by applicable law. Except for the approval of this Agreement and the transactions contemplated by this Agreement by the affirmative vote of a majority of all the votes entitled to be cast by holders of outstanding SuperMedia Common Stock (the "SuperMedia Stockholder Merger Approval") or, if the Mergers are to be effected through Chapter 11 Cases with respect to SuperMedia, the acceptance of the SuperMedia Pre-Pack Plan by the affirmative vote of at least two-thirds of the votes cast by holders of outstanding SuperMedia Common Stock (the "SuperMedia Stockholder Plan Approval", and each of the SuperMedia Stockholder Merger Approval and the SuperMedia Stockholder Plan Approval, a "SuperMedia Stockholder Approval"), no vote of the stockholders and no other corporate proceedings on the part of SuperMedia or any of its Subsidiaries are necessary to approve this Agreement or to consummate the transactions contemplated hereby except for approval of the Board of Directors of SuperMedia and certain of its Subsidiaries authorizing the commencement of any Chapter 11 Cases.  This Agreement has been duly and validly executed and delivered by SuperMedia and (assuming due authorization, execution and delivery by Dex and Merger Sub) constitutes the valid and binding obligation of SuperMedia, enforceable against SuperMedia in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies).

(b)    Neither the execution and delivery of this Agreement by SuperMedia nor the consummation by SuperMedia of the transactions contemplated hereby, nor compliance by SuperMedia with any of the terms or provisions of this Agreement, will (i) assuming the SuperMedia Stockholder Merger Approval (or, if the Mergers are to be effected through Chapter 11 Cases with respect to SuperMedia, the SuperMedia Stockholder Plan Approval) is obtained, violate any provision of the SuperMedia Charter or the SuperMedia Bylaws or any equivalent organizational documents of any SuperMedia Subsidiary or (ii) assuming that the consents, approvals and filings referred to in Section 3.4 shall have been duly obtained and/or made prior to the SuperMedia Effective Time and any waiting period required thereunder shall have been terminated or expired prior to the SuperMedia Effective Time, (A) violate any Law or Order applicable to SuperMedia, any SuperMedia Subsidiary or any of their respective properties or assets or (B) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination, amendment or cancellation under, accelerate the performance required by, or result in the creation of any Lien upon any of the respective properties or assets of SuperMedia or any SuperMedia Subsidiary under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation (collectively, "Contracts") to which SuperMedia or any SuperMedia Subsidiary is a party, or by which they or any of their respective properties or assets may be bound or affected, except for such violations, conflicts, breaches or defaults with respect to clause (ii) that are not reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect on SuperMedia.

(c)    Notwithstanding anything in this Agreement to the contrary, to the extent the accuracy of SuperMedia's representations and warranties set forth in this Section 3.3 is based on the accuracy of Dex's representations and warranties in Section 4.26, SuperMedia's

representations and warranties in <u>Section 3.3</u> shall be limited to the extent affected by any inaccuracy in <u>Section 4.26</u>.

       3.4    <u>Consents and Approvals</u>.  Except for (i) the filing with the Securities and Exchange Commission (the "<u>SEC</u>") of a proxy statement in definitive form relating to the meetings of SuperMedia's stockholders and Dex's stockholders to be held in connection with this Agreement and the transactions contemplated by this Agreement (together with any amendments or supplements thereto, the "<u>Joint Proxy Statement</u>") and of a registration statement on Form S-4 (together with any amendments or supplements thereto, the "<u>Form S-4</u>") in which the Joint Proxy Statement will be included as a prospectus, and declaration of effectiveness of the Form S-4, and such reports under Sections 12, 13(a), 13(d), 13(g) and 16(a) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (collectively, the "<u>Exchange Act</u>") as may be required in connection with this Agreement, and the transactions contemplated hereby and thereby, and obtaining from the SEC such orders as may be required in connection therewith, (ii) the filing of the SuperMedia Certificate of Merger with the Secretary of State of the State of Delaware pursuant to the DGCL, (iii) any notices or filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>") and the termination or expiration of any applicable waiting period thereunder, and such other consents, approvals, filings or registrations as may be required under any foreign antitrust, merger control or competition Laws, (iv) such filings and approvals as are required to be made or obtained under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (collectively, the "<u>Securities Act</u>"), and the securities or "Blue Sky" Laws of various states in connection with the issuance of the shares of Newco Common Stock pursuant to this Agreement, and approval of the listing of such Newco Common Stock on the New York Stock Exchange ("<u>NYSE</u>") or the NASDAQ Stock Market (the "<u>NASDAQ</u>"), (v) such filings, consents and approvals of Governmental Entities as may be set forth on <u>Section 3.4</u> of the SuperMedia Disclosure Schedule, (vi) the SuperMedia Stockholder Merger Approval (or, if the Mergers are to be effected through Chapter 11 Cases with respect to SuperMedia, the SuperMedia Stockholder Plan Approval), (vii) such filings or notices required under the rules and regulations of the NYSE or the NASDAQ, (viii) if the Mergers are to be effected though Chapter 11 Cases with respect to SuperMedia, such filings (including a chapter 11 plan of reorganization and disclosure statement) and consents as are required under the Bankruptcy Code to cause the Chapter 11 Cases to be commenced and consummated, and (ix) such other consents, approvals, filings or registrations the failure of which to be made or obtained, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect on SuperMedia, no consents or approvals of or filings or registrations with any court, administrative agency or commission or other governmental agency, authority or instrumentality, domestic or foreign, or applicable self-regulatory organization (each a "<u>Governmental Entity</u>") are necessary in connection with (A) the execution and delivery by SuperMedia of this Agreement and (B) the consummation by SuperMedia of the Mergers and the other transactions contemplated by this Agreement.

       3.5    <u>Reports</u>.  Since January 1, 2010, SuperMedia has timely filed all forms, documents, statements and reports required to be filed by it with the SEC under the Securities Act or the Exchange Act prior to the Original Agreement Date (the forms, documents, statements and reports so filed with the SEC since January 1, 2010 and those filed with the SEC subsequent to the Original Agreement Date under the Securities Act or the Exchange Act, if any, including

any amendments thereto, the "SuperMedia Reports").   As of their respective dates, or, if amended or superseded by a subsequent filing, as of the date of the last such amendment or superseded filing prior to the Original Agreement Date, the SuperMedia Reports complied, and each of the SuperMedia Reports filed subsequent to the Original Agreement Date will comply, in all material respects with the requirements of the Securities Act, the Exchange Act  and the Sarbanes-Oxley Act of 2002 and rules and regulations promulgated thereunder (collectively, the "Sarbanes-Oxley Act"), as applicable.   No SuperMedia Subsidiary is subject to the periodic reporting requirements of the Exchange Act.   As of the time of filing with the SEC, none of the SuperMedia Reports so filed or that will be filed subsequent to the Original Agreement Date contained or will contain, as the case may be, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except to the extent that the information in such SuperMedia Report has been amended or superseded by a later SuperMedia Report filed prior to the Original Agreement Date. SuperMedia has made available to Dex correct and complete copies of all material correspondence with the SEC since January 1, 2010 and prior to the Original Agreement Date. To the Knowledge of SuperMedia, as of the Original Agreement Date, none of the SuperMedia Reports is the subject of any ongoing SEC review, outstanding SEC comment or outstanding SEC investigation.   For purposes of this Agreement, "Knowledge of SuperMedia" shall mean the actual knowledge of the Persons listed on Exhibit E.

3.6     Financial Statements.   Each of the consolidated financial statements of SuperMedia included in the SuperMedia Reports complied at the time it was filed as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, was prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented in all material respects the consolidated financial position of SuperMedia and the SuperMedia Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown (subject, in the case of unaudited statements, to normal year-end audit adjustments in amounts consistent with past practice in the case of unaudited financial statements, which adjustments, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect on SuperMedia).

3.7     Broker's Fees.   Neither SuperMedia nor any SuperMedia Subsidiary nor any of their respective officers or directors has employed any broker or finder or incurred any liability for any broker's fees, commissions or finder's fees in connection with the Mergers or related transactions contemplated by this Agreement, other than Morgan Stanley & Co. Incorporated and Chilmark Partners (the "SuperMedia Financial Advisors"), all of the fees and expenses of which shall be the sole responsibility of SuperMedia; and a true and complete copy of the agreements with respect to such engagements have previously been made available to Dex.

3.8     Absence of Certain Changes or Events.   Except for liabilities incurred in connection with this Agreement or as publicly disclosed in the Forms 10-K, 10-Q and 8-K and any registration statements, proxy statements or prospectuses comprising the SuperMedia Reports filed prior to the Original Agreement Date, (i) since December 31, 2011,

(A) SuperMedia and the SuperMedia Subsidiaries have conducted their respective businesses in all material respects in the ordinary course of business consistent with past practice, and (B) there has not been any Material Adverse Effect with respect to SuperMedia; and (ii) since December 31, 2011 through the Original Agreement Date, there has not been:

(a)    any issuance or awards of SuperMedia Stock Options, SuperMedia Restricted Shares, SuperMedia Stock Units or other equity-based awards in respect of SuperMedia Common Stock to any director, officer or employee of SuperMedia or any of the SuperMedia Subsidiaries, other than in the ordinary course of business consistent with past practice;

(b)    any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property) with respect to any of SuperMedia's capital stock;

(c)    except as required by the terms of any SuperMedia Benefit Plans set forth on Section 3.11(a) of the SuperMedia Disclosure Schedule or by applicable Law, (i) any granting by SuperMedia or any of the SuperMedia Subsidiaries to any current or former director, officer or employee of any increase in compensation, bonus or other benefits, except for any such increases to employees who are not current directors or executive officers of SuperMedia in the ordinary course of business consistent with past practice, (ii) any granting by SuperMedia or any of the SuperMedia Subsidiaries to any current or former director or executive officer of SuperMedia of any increase in severance or termination pay, (iii) any entry by SuperMedia or any of its Subsidiaries into, or any amendment of, any employment, deferred compensation, consulting, severance, termination or indemnification agreement with any current or former director or executive officer, (iv) any establishment, adoption, entry into, amendment or modification of any SuperMedia Benefit Plan or (v) any entry by SuperMedia or any of its Subsidiaries into, or any amendment or termination of, any collective bargaining agreement or collective bargaining relationship;

(d)    any change in any material respect in accounting methods, principles or practices by SuperMedia affecting its assets, liabilities or business, other than changes to the extent required by a change in GAAP or regulatory accounting principles;

(e)    any material Tax election or change in or revocation of any material Tax election, material amendment to any Tax Return, closing agreement with respect to a material amount of Taxes, or settlement or compromise of any material income Tax liability by SuperMedia or any of the SuperMedia Subsidiaries;

(f)    any material change in its investment or risk management or other similar policies; or

(g)    any agreement or commitment (contingent or otherwise) to do any of the foregoing.

3.9    Legal Proceedings.   There are no (i) actions, claims, suits, oppositions, cancellations, arbitrations, objections, investigations or proceedings (each, an "Action") pending (or, to the Knowledge of SuperMedia, threatened) against or affecting SuperMedia or any

SuperMedia Subsidiary, or any of their respective properties, at law or in equity, or (ii) orders, judgments, injunctions, awards, stipulations, decrees or writs handed down, adopted or imposed by (including any consent decree, settlement agreement or similar written agreement) any Governmental Entity (collectively, "Orders") against SuperMedia or any SuperMedia Subsidiary, in the case of each of clause (i) or (ii), which would, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on SuperMedia.  As of the Original Agreement Date, there is no Action pending against (or, to the Knowledge of SuperMedia, threatened against) SuperMedia that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Mergers.

        3.10   Taxes and Tax Returns.  Except for matters that, individually or in the aggregate, would not have a Material Adverse Effect on SuperMedia:

        (a)   All Tax Returns required to be filed by or with respect to SuperMedia or any SuperMedia Subsidiary for all taxable periods ending on or before the Original Agreement Date have been timely filed in accordance with applicable Law (taking into account any extension of time within which to file).  All such Tax Returns are true, correct, and complete in all material respects and were prepared in compliance with applicable Law.  No claim has ever been made by a Governmental Entity in a jurisdiction where SuperMedia or any SuperMedia Subsidiary does not file Tax Returns that SuperMedia or any SuperMedia Subsidiary is or may be subject to Taxes in such jurisdiction.

        (b)   All Taxes of SuperMedia and each SuperMedia Subsidiary due and payable have been timely paid, other than any amount which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established on SuperMedia's most recent consolidated financial statements.  The accruals and reserves for Taxes (without regard to deferred tax assets and deferred tax liabilities) of SuperMedia and each SuperMedia Subsidiary established in SuperMedia's most recent consolidated financial statements are complete and adequate to cover any liabilities for Taxes that are not yet due and payable.

        (c)   No deficiencies for Taxes have been proposed or assessed in writing against SuperMedia or any SuperMedia Subsidiary by any Governmental Entity, and neither SuperMedia nor any SuperMedia Subsidiary has received any written notice of any claim, proposal or assessment against SuperMedia or any SuperMedia Subsidiary for any such deficiency for Taxes.  As of the Original Agreement Date, there is no pending or, to the Knowledge of SuperMedia, threatened, audit, judicial proceeding or other examination against or with respect to SuperMedia or any SuperMedia Subsidiary with respect to any Taxes.  Neither SuperMedia nor any SuperMedia Subsidiary has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to the assessment or collection of any Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business).

        (d)   SuperMedia and each SuperMedia Subsidiary has duly and timely withheld and paid to the appropriate Governmental Entity all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(e)        There are no liens or other security interests upon any property or assets of SuperMedia or any SuperMedia Subsidiary for Taxes, except for liens for Taxes not yet due and payable.

(f)        Neither SuperMedia nor any SuperMedia Subsidiary has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for tax-free treatment under Section 355 of the Code in the past two (2) years.

(g)        Neither SuperMedia nor any SuperMedia Subsidiary (i) is or has ever been a member of an affiliated group (other than a group the common parent of which is SuperMedia) filing a consolidated federal income Tax Return, (ii) has any liability for Taxes of any person arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor, by contract, or otherwise, or (iii) is, or ever has been, a party to any agreement for the sharing, indemnification, or allocation of Taxes (other than agreements among SuperMedia and any SuperMedia Subsidiary and other than customary indemnifications for Taxes contained in credit or other commercial agreements the primary purposes of which do not relate to Taxes).

(h)        Neither SuperMedia nor any SuperMedia Subsidiary will be required to include any item of income in, or exclude any item of deduction from, taxable income for a taxable period ending after the Closing Date of as a result of any (i) adjustment pursuant to Section 481 of the Code (or any analogous provision of state, local or foreign Law) for a taxable period ending on or before the Closing Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any analogous provision of state, local or foreign Law) executed on or prior to the Closing Date, (iii) installment sale or open transaction disposition made on or prior to the Closing Date, (iv) prepaid amount received on or prior to the Closing Date, or (v) election by SuperMedia or any SuperMedia Subsidiary under Section 108(i) of the Code.

(i)        Neither SuperMedia nor any SuperMedia Subsidiary has engaged in any "listed transaction" within the meaning of Section 6011 of the Code (including the Treasury Regulations promulgated thereunder).

(j)        Neither SuperMedia nor any SuperMedia Subsidiary is a party to any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of (i) any "excess parachute payment" within the meaning of Section 280G of the Code in connection with the transactions contemplated by this Agreement or (ii) any amount that will not be fully deductible as a result of Section 162(m) of the Code.  There is no Contract to which SuperMedia or any SuperMedia Subsidiary is a party or by which SuperMedia or any SuperMedia Subsidiary is bound to compensate any employee, independent contractor or director of SuperMedia or any SuperMedia Subsidiary for excise taxes paid pursuant to Section 4999 of the Code.

(k)        As used in this Agreement, the term "Tax" or "Taxes" means all United States federal, state, local, and foreign income, excise, gross receipts, gross income, ad valorem, profits, gains, property, capital, sales, transfer, use, payroll, employment, severance, withholding, backup withholding, duties, intangibles, franchise, and other taxes, charges, fees, levies or like assessments, together with all penalties and additions to tax and interest thereon.

20

(l)      As used in this Agreement, the term "<u>Tax Return</u>" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, supplied or required to be supplied to a Governmental Entity.

3.11    <u>Employee Benefits</u>.  For purposes of this Agreement, the following terms shall have the following meaning:

"<u>Controlled Group Liability</u>" means, with respect to SuperMedia or Dex, any and all liabilities (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 and 4971 of the Code, and (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 <u>et</u> <u>seq</u>. of ERISA and Section 4980B of the Code other than such liabilities that arise solely out of, or relate solely to, the SuperMedia Benefit Plans or the Dex Benefit Plans, as applicable.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"<u>ERISA Affiliate</u>" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"<u>Multiemployer Plan</u>" means any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA.

"<u>SuperMedia Benefit Plan</u>" means any employee benefit plan, program, policy, practice, or other arrangement (other than any SuperMedia Employment Agreement) providing benefits to any current or former employee, officer or director of SuperMedia or any SuperMedia Subsidiary or any beneficiary or dependent thereof that is sponsored or maintained by SuperMedia or any SuperMedia Subsidiary or to which SuperMedia or any SuperMedia Subsidiary contributes or is obligated to contribute, or otherwise with respect to which SuperMedia or any SuperMedia Subsidiary has any liability or obligation, in each case whether or not written, including any employee welfare benefit plan within the meaning of Section 3(1) of ERISA, any employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) and any bonus, incentive, deferred compensation, vacation, stock purchase, stock option, severance, change of control or fringe benefit plan, program or policy.

"<u>SuperMedia Employment Agreement</u>" means a contract, offer letter or agreement of SuperMedia or any SuperMedia Subsidiary with or addressed to any individual who is rendering or has rendered services thereto as an employee or consultant pursuant to which SuperMedia or any SuperMedia Subsidiary has any actual or contingent liability or obligation to provide compensation and/or benefits in consideration for past, present or future services.

"SuperMedia Plan" means (i) each SuperMedia Benefit Plan that is not a Multiemployer Plan and (ii) each SuperMedia Employment Agreement.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as those terms are defined in Part I of Subtitle E of Title IV of ERISA.

(a)    Section 3.11(a) of the SuperMedia Disclosure Schedule includes a true and complete list of all material SuperMedia Benefit Plans and all material SuperMedia Employment Agreements.

(b)    With respect to each SuperMedia Plan, SuperMedia has delivered or made available to Dex a true, correct and complete copy of (as applicable):    (i) each writing constituting a part of such SuperMedia Plan, including the plan document currently in effect, material employee communications, benefit schedules, trust agreements, and insurance contracts and other funding vehicles; (ii) the most recent Annual Report (Form 5500 Series) and accompanying schedules; (iii) the current summary plan description and any material modifications thereto, if any (in each case, whether or not required to be furnished under ERISA); (iv) the most recent annual financial report, if any; (v) the most recent actuarial report, if any; (vi) any notices to or from the Internal Revenue Service or any office or representative of the Department of Labor or any similar Governmental Entity relating to any material compliance issues in respect of any such SuperMedia Plan; and (vii) the most recent determination letter from the Internal Revenue Service (the "IRS"), if any.    SuperMedia has delivered or made available to Dex a true, correct and complete copy of each material SuperMedia Employment Agreement.

(c)    Except as would not reasonably be expected to result in material liability to SuperMedia or Dex, all contributions required to be made to any SuperMedia Plan by applicable law or regulation or by any plan document or other contractual undertaking, and all premiums due or payable with respect to insurance policies funding any SuperMedia Plan, for any period through the Original Agreement Date have been timely made or paid in full or, to the extent not required to be made or paid on or before the Original Agreement Date, have been reflected on the financial statements to the extent required by GAAP.    Each SuperMedia Benefit Plan that is an employee welfare benefit plan under Section 3(1) of ERISA either (i) is funded through an insurance company contract and is not a "welfare benefit fund" within the meaning of Section 419 of the Code or (ii) is unfunded.

(d)    With respect to each SuperMedia Plan, SuperMedia and the SuperMedia Subsidiaries have complied, and are now in compliance, with all provisions of ERISA, the Code and all Laws applicable to such SuperMedia Plans, except for instances that would not have a Material Adverse Effect on SuperMedia.    Each SuperMedia Plan has been administered in all respects in accordance with its terms, except for instances that would not have a Material Adverse Effect on SuperMedia.    There is not now nor, to the Knowledge of SuperMedia, do any circumstances exist that would reasonably be expected to give rise to, any requirement for the posting of security with respect to a SuperMedia Plan or the imposition of any lien on the assets of SuperMedia or any SuperMedia Subsidiary under ERISA or the Code.    Section 3.11(d) of the SuperMedia Disclosure Schedule identifies each SuperMedia Plan that is intended to be a

"qualified plan" within the meaning of Section 401(a) of the Code ("SuperMedia Qualified Plans"). Each SuperMedia Qualified Plan (A)(i) has received a favorable determination letter from the IRS with respect to such qualification or (ii) is a prototype plan that is the subject of a favorable opinion letter from the IRS on which SuperMedia is entitled to rely, and (B) unless clause (A)(ii) applies, has been submitted to the IRS for a determination letter within the applicable remedial amendment period under Section 401(b) of the Code or has a remedial amendment period that has not yet expired, and to the Knowledge of SuperMedia, there are no existing circumstances and no events have occurred that would reasonably be expected to adversely affect the qualified status of any SuperMedia Qualified Plan or the tax-exempt status of its related Plan. Section 3.11(d) of the SuperMedia Disclosure Schedule identifies each trust funding any SuperMedia Plan which is intended to meet the requirements of Section 501(c)(9) of the Code, and each such trust meets such requirements and provides no disqualified benefits (as such term is defined in Code Section 4976(b)). None of SuperMedia and the SuperMedia Subsidiaries nor, to the Knowledge of SuperMedia, any other Person, including any fiduciary, has engaged in any "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA), which would reasonably be expected to subject any of the SuperMedia Plans or their related trusts, SuperMedia, any SuperMedia Subsidiary or, to the Knowledge of SuperMedia, any Person that SuperMedia or any SuperMedia Subsidiary has an obligation to indemnify, to any material Tax or penalty imposed under Section 4975 of the Code or Section 502 of ERISA.

(e)    With respect to each SuperMedia Plan that is subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code, (i) SuperMedia and each ERISA Affiliate have satisfied all minimum funding obligations under Section 412 of the Code or Section 302 of ERISA, and no waiver or variance of such obligations has been requested; (ii) no reportable event within the meaning of Section 4043(c) of ERISA for which the 30-day notice requirement has not been waived has occurred; (iii) all premiums to the Pension Benefit Guaranty Corporation (the "PBGC") have been timely paid in full; (iv) no liability (other than for premiums to the PBGC) under Title IV of ERISA has been or would reasonably be expected to be incurred by SuperMedia or any SuperMedia Subsidiary or any of their respective ERISA Affiliates; (v) the PBGC has not instituted proceedings to terminate any such SuperMedia Plan and, to the Knowledge of SuperMedia, no condition exists which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any such SuperMedia Plan; and (vi) there has been no determination that a SuperMedia Plan is or is expected to be in "at risk" status within the meaning of Section 303(i) of ERISA or Section 430(i) of the Code.

(f)    (i) No SuperMedia Benefit Plan is a Multiemployer Plan or a plan that has two or more contributing sponsors at least two of whom are not under common control, within the meaning of Section 4063 of ERISA (a "Multiple Employer Plan"); (ii) none of SuperMedia and the SuperMedia Subsidiaries nor any of their respective ERISA Affiliates has, at any time during the last six years, contributed to or been obligated to contribute to any Multiemployer Plan or Multiple Employer Plan; and (iii) none of SuperMedia and the SuperMedia Subsidiaries nor any of their respective ERISA Affiliates has incurred any Withdrawal Liability that has not been satisfied in full. There does not now exist, nor, to the Knowledge of SuperMedia, do any circumstances exist that would reasonably be expected to result in, any Controlled Group Liability that would be a liability of SuperMedia or any SuperMedia Subsidiary following the

SuperMedia Effective Time.    Without limiting the generality of the foregoing, none of SuperMedia, any SuperMedia Subsidiary, or any of their respective ERISA Affiliates has engaged in any transaction described in Section 4069 or Section 4204 or 4212 of ERISA.

(g)    SuperMedia and the SuperMedia Subsidiaries have no liability for life, health, medical or other welfare benefits to former employees or beneficiaries or dependents thereof, except for health continuation coverage as required by Section 4980B of the Code or Part 6 of Title I of ERISA and at no expense to SuperMedia and the SuperMedia Subsidiaries or as otherwise set forth on Section 3.11(g) of the SuperMedia Disclosure Schedule.

(h)    Neither the execution nor the delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in conjunction with any other event (whether contingent or otherwise), (i) result in any payment or benefit becoming due or payable, or required to be provided, to any director, employee or independent contractor of SuperMedia or any SuperMedia Subsidiary, (ii) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such director, employee or independent contractor, (iii) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation or (iv) result in any amount failing to be deductible by reason of Section 280G of the Code.

(i)    Each SuperMedia Benefit Plan and each SuperMedia Employment Agreement that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code and any award thereunder, in each case that is subject to Section 409A of the Code, has been established and maintained in all material respects in accordance with the requirements of Section 409A of the Code and the Treasury Regulations thereunder. Neither SuperMedia nor any SuperMedia Subsidiary has any obligation to provide any "gross up" or similar payment to any Person in the event that such SuperMedia Benefit Plan or SuperMedia Employment Agreement fails to comply with Section 409A of the Code.

3.12    Compliance with Law; Permits.    (a) SuperMedia and each SuperMedia Subsidiary is, and at all times since the later of January 1, 2010 or its respective date of formation or organization has been, in compliance with all applicable federal, state, local or foreign or provincial laws, statutes, ordinances, rules, regulations, requirements or Orders of or with any Governmental Entity, including common law (collectively, "Laws" and each, a "Law") and is not in default under or in violation of any applicable Laws, except where such noncompliance, default or violation would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect on SuperMedia.

(b)    SuperMedia and the SuperMedia Subsidiaries are in possession of all franchises, tariffs, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Entity (collectively, "Permits") necessary for SuperMedia and the SuperMedia Subsidiaries to own, lease and operate their properties and assets or to carry on their businesses as they are now being conducted (the "SuperMedia Permits") and no suspension or cancellation of any of the SuperMedia Permits is pending or, to the Knowledge of SuperMedia, threatened, except where the failure to have, or the suspension or cancellation of, any of the SuperMedia Permits would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SuperMedia.    All

SuperMedia Permits are in full force and effect, except where such failure to be in full force and effect would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect on SuperMedia. SuperMedia and the SuperMedia Subsidiaries are not, and since January 1, 2010 have not been, in violation or breach of, or default under, any SuperMedia Permit, except where such violation, breach or default would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect on SuperMedia.

(c)    This Section 3.12 does not relate to matters with respect to Taxes and Tax Returns (which are the subject of Section 3.10), Employee Benefits (which are the subject of Section 3.11) or Environmental Liabilities (which are the subject of Section 3.15).

3.13    Certain Contracts.

(a)    Except as set forth in the exhibit index to the SuperMedia 2011 10-K or as set forth on Section 3.13 of the SuperMedia Disclosure Schedule, as of the Original Agreement Date, neither SuperMedia nor any SuperMedia Subsidiary is a party to or bound by (i) any Contract relating to the incurrence or guarantee of Indebtedness by SuperMedia or any SuperMedia Subsidiary in an amount in excess in the aggregate of $10,000,000 (collectively, "SuperMedia Instruments of Indebtedness"), (ii) any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC), (iii) any non-competition Contract, or any other agreement or obligation which purports to limit or restrict in any material respect (A) the ability of SuperMedia or its Subsidiaries to solicit customers or (B) the manner in which, or the localities in which, all or any portion of the business of SuperMedia and the SuperMedia Subsidiaries or, following consummation of the transactions contemplated by this Agreement, Dex Surviving Company and its Subsidiaries, is or would be conducted, (iv) any Contract providing for any payments to an officer, director or Affiliate of SuperMedia or, in excess of $1,000,000, to any other Person that are conditioned, in whole or in part, on a change of control of SuperMedia or any SuperMedia Subsidiary, (v) any collective bargaining agreement or other agreement or arrangement with any labor organization, (vi) any joint venture or partnership agreement related to the formation, creation, operation or management or any joint venture or partnership that is material to SuperMedia and the SuperMedia Subsidiaries, taken as a whole, (vii) any Contract that grants any right of first refusal or right of first offer or similar right that limits or purports to limit the ability of SuperMedia or any SuperMedia Subsidiary to own, operate, sell, transfer, pledge or otherwise dispose of any material assets or business, (viii) any material Contract that contains a "most favored nation" or other term providing preferential pricing or treatment to a third party, and (ix) any Contract not made in the ordinary course of business which (A) is material to SuperMedia and the SuperMedia Subsidiaries taken as a whole or (B) which would reasonably be expected to materially delay the consummation of the Mergers or any other transaction contemplated by this Agreement (collectively, the "SuperMedia Material Contracts").

(b)    With such exceptions that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SuperMedia:

(i)    Each SuperMedia Material Contract is valid and binding on SuperMedia (or, to the extent a Subsidiary of SuperMedia is a party, such Subsidiary) and, to the Knowledge of SuperMedia, any other party thereto, and is in

full force and effect and enforceable against SuperMedia or a SuperMedia Subsidiary, as applicable (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies); and

(ii)    Neither SuperMedia nor any SuperMedia Subsidiary is, and, to the Knowledge of SuperMedia, no other party thereto is, in breach or default under any SuperMedia Material Contract.

(c)    Prior to the Original Agreement Date, SuperMedia has made available to Dex true and complete copies of all SuperMedia Material Contracts.

(d)    For purposes of this Agreement, "<u>Indebtedness</u>" of a Person means (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes and similar agreements, (iii) all leases of such Person capitalized pursuant to GAAP, and (iv) all obligations of such Person under sale-and-lease back transactions, agreements to repurchase securities sold and other similar financing transactions.

3.14    <u>Undisclosed Liabilities</u>.    Neither SuperMedia nor any SuperMedia Subsidiary has incurred any liability of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether due or to become due), except for (i) liabilities that are reflected or reserved against on the consolidated balance sheet of SuperMedia included in SuperMedia's Annual Report on Form 10-K filed for the fiscal year ended December 31, 2011 (the "<u>SuperMedia 2011 10-K</u>") (including any notes thereto), (ii) liabilities incurred in connection with this Agreement and the transactions contemplated hereby, and (iii) liabilities incurred in the ordinary course of business consistent with past practice since December 31, 2011 that have not had and are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on SuperMedia.

3.15    <u>Environmental Liability</u>.    Except for matters that, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect on SuperMedia, (i) there are no legal, administrative, arbitral or other proceedings, claims, actions, causes of action, private environmental investigations or remediation activities or governmental investigations of any nature seeking to impose, or that are reasonably likely to result in the imposition, on SuperMedia of any liability or obligation under Environmental Laws, or pending or, to the Knowledge of SuperMedia, threatened against SuperMedia; (ii) SuperMedia is not subject to any Order or party to any agreement, order, judgment, decree, letter or memorandum by or with any third party imposing any liability or obligation under any Environmental Laws; (iii) SuperMedia has complied and is in compliance with all applicable Environmental Laws, including obtaining and complying with all Permits required pursuant to applicable Environmental Laws; and (iv) SuperMedia has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or released, or exposed any person to any hazardous substance or waste, or owned or operated any property or facility contaminated by any hazardous substance or waste in a manner reasonably anticipated to give rise to any current or future liabilities under Environmental Laws.    For purposes of this Agreement, "<u>Environmental Laws</u>" means any common law or local, state, federal or foreign statute, regulation, ordinance or similar provision

having the force or effect of law, any judicial and administrative order or determination, or any contractual obligation concerning public health and safety, worker health and safety, or pollution or protection of the environment, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

3.16    <u>Real Property</u>.

(a)    Each of SuperMedia and the SuperMedia Subsidiaries has good title free and clear of all Liens to all real property owned by such entities (the "<u>SuperMedia Owned Properties</u>"), except for Liens that do not materially detract from the present use of such real property.

(b)    A true and complete copy of each agreement pursuant to which SuperMedia or any SuperMedia Subsidiary leases any material real property (such agreements, together with any amendments, modifications and other supplements thereto, collectively, the "<u>SuperMedia Leases</u>") has heretofore been made available to Dex.  Each SuperMedia Lease is valid, binding and enforceable against SuperMedia or an applicable SuperMedia Subsidiary in accordance with its terms and is in full force and effect (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies), except where the failure to be valid, binding, enforceable and in full force and effect, individually or in the aggregate, is not reasonably likely to have a Material Adverse Effect on SuperMedia.  There are no defaults by SuperMedia or any SuperMedia Subsidiary, as applicable, under any of the SuperMedia Leases which, individually or in the aggregate, would have a Material Adverse Effect on SuperMedia.  To the Knowledge of SuperMedia, no event has occurred that with or without notice or lapse of time or both would constitute a breach or default thereunder by any party thereto or would permit the termination, modification or acceleration of rent thereunder, except, in each case, for such breaches, defaults, terminations, modifications or accelerations that can not, individually or in aggregate, reasonably be expected to have a Material Adverse Effect on SuperMedia.

(c)    The SuperMedia Owned Properties and the properties leased pursuant to the SuperMedia Leases (the "<u>SuperMedia Leased Properties</u>") constitute all of the real estate on which SuperMedia and the SuperMedia Subsidiaries maintain their facilities or conduct their business as of the Original Agreement Date, except for locations the loss of which would not result in a Material Adverse Effect on SuperMedia.

3.17    <u>State Takeover Laws; Rights Agreement</u>.  SuperMedia has, or will have prior to the SuperMedia Effective Time, taken all necessary action so that, assuming compliance by Dex and Merger Sub with their respective obligations hereunder and the accuracy of the representations and warranties made by Dex and Merger Subs herein, no "business combination," "moratorium," "fair price," "control share acquisition" or other state anti-takeover statute or regulation, nor any takeover-related provision in the SuperMedia Charter or the SuperMedia Bylaws, would (i) prohibit or restrict SuperMedia's ability to perform its obligations under this Agreement, any related agreement, or the SuperMedia Certificate of Merger or its ability to consummate the transactions contemplated hereby and thereby, (ii) have the effect of invalidating or voiding this Agreement, or the SuperMedia Certificate of Merger, or any provision hereof or thereof, or (iii) subject Dex, Newco or Merger Sub to any impediment or

condition in connection with the exercise of any of its rights under this Agreement or the Certificates of Merger. SuperMedia does not have any stockholder rights plan in effect.

3.18    Opinion. Prior to the execution of this Agreement, the Board of Directors of SuperMedia has received an opinion from Morgan Stanley & Co. LLC to the effect that as of the date thereof and based upon and subject to the matters set forth therein, the Exchange Ratio is fair from a financial point of view to the holders of SuperMedia Common Stock except for shares of SuperMedia Common Stock owned by Dex, SuperMedia or any of their respective Subsidiaries. Such opinion has not been amended or rescinded.

3.19    Internal Controls. SuperMedia has established and maintains disclosure controls and procedures and internal controls over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act. SuperMedia's disclosure controls and procedures are designed to ensure that information required to be disclosed in SuperMedia's periodic reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the required time periods. SuperMedia and its Subsidiaries have implemented and maintain a system of internal controls over financial reporting that is sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP. SuperMedia is in compliance in all material respects with the applicable provisions of the Sarbanes-Oxley Act and the applicable listing and corporate governance rules and regulations of NASDAQ. Since December 31, 2011 through the Original Agreement Date, SuperMedia has not identified (i) any significant deficiency or material weakness in the design or operation of internal control over financial reporting which is reasonably likely to adversely affect SuperMedia's ability to record, process, summarize and report financial information or (ii) any fraud or allegation of fraud, whether or not material, that involves management or other employees who have a significant role in SuperMedia's internal control over financial reporting.

3.20    Insurance. SuperMedia and the SuperMedia Subsidiaries are insured with reputable insurers against such risks and in such amounts as its management reasonably has determined to be prudent in accordance with industry practices. To the Knowledge of SuperMedia, neither SuperMedia nor any SuperMedia Subsidiary is in material breach or material default of any insurance policies maintained by SuperMedia or any SuperMedia Subsidiary or has taken any action or failed to take any action that, with notice or the lapse of time, would constitute such a breach or default or permit termination (prior to the scheduled termination or expiration thereof) or modification of any such insurance policies. To the Knowledge of SuperMedia, neither SuperMedia nor any SuperMedia Subsidiary has received any notice of termination or cancellation (prior to the scheduled termination or expiration thereof) or denial of coverage with respect to any such insurance policy.

3.21    SuperMedia Information. The information relating to SuperMedia or any SuperMedia Subsidiary to be included or incorporated by reference in the Joint Proxy Statement and the Form S-4 will not, at the time the Form S-4 is declared effective, the time the Joint Proxy Statement is first mailed to stockholders of SuperMedia and Dex and the time of the SuperMedia Stockholders Meeting and the Dex Stockholders Meeting, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of

28

the circumstances in which they are made, not misleading. The information relating to SuperMedia or any SuperMedia Subsidiary that is provided or to be provided by SuperMedia or its representatives for inclusion in any document (other than the Form S-4) filed with any other Governmental Entity in connection with the transactions contemplated by this Agreement will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading. All documents that SuperMedia is responsible for filing with the SEC in connection with the Mergers or the other transactions contemplated hereby (including the Joint Proxy Statement) (except for such portions thereof that relate only to Dex, Merger Subs or any of their Subsidiaries) will comply as to form and substance in all material respects with the provisions of the Exchange Act.

3.22    Intellectual Property. For purposes of this Agreement, the following terms shall have the following respective meanings:

"Intellectual Property" means all intellectual property in any jurisdiction throughout the world including all (i) trademarks, service marks, brand names, Internet domain names, logos, symbols, trade dress, fictitious names, trade names, and other indicia of origin and all goodwill associated therewith and symbolized thereby; (ii) patents and inventions and discoveries, whether patentable or not, and improvements; (iii) confidential or proprietary information, trade secrets and know-how (including processes, schematics, business and other methods, formulae, drawings, specifications, prototypes, models, designs, plans, data, research and development, pricing and cost information, business and marketing plans and proposals, vendor, customer and supplier lists) (collectively, "Trade Secrets"); (iv) copyrights and works of authorship (including in any form or media) (whether or not copyrightable); (v) computer software programs (including source and object code), systems, data, databases and other compilations of information (and including all middleware, firmware, tools, applications and related documentation; (vi) disclosures, issuances, applications and registrations and any renewals thereof, and all extensions, modifications, reexaminations, renewals, divisions, continuations, continuations-in-part, reissues, restorations and reversions for or related to, as applicable, any of the foregoing; (vii) all other intellectual property and (viii) copies and tangible embodiments or descriptions of any of the foregoing (in whatever form or medium).

"SuperMedia IP Contract" means any material Contract concerning Intellectual Property to which SuperMedia or any SuperMedia Subsidiary is a party.

"SuperMedia IT Assets" means the computer software, firmware, middleware, servers, systems, networks, workstations, data communications lines, and all other information technology equipment, used by SuperMedia and the SuperMedia Subsidiaries.

(a)    Section 3.22(a) of the SuperMedia Disclosure Schedule sets forth a true and complete list of all the following that are owned by SuperMedia or any SuperMedia Subsidiary, indicating for each item if applicable, the registration or application number, the record owner and the applicable filing jurisdiction: (i) material patented or material registered Intellectual Property and (ii) material pending patent applications or applications for registration of material Intellectual Property.

(b)    To the Knowledge of SuperMedia, either SuperMedia or a SuperMedia Subsidiary owns all right, title and interest in and to, or is licensed or otherwise possesses adequate rights to use, all Intellectual Property material to their respective businesses as currently conducted (together with all Intellectual Property set forth in <u>Section 3.22(a)</u>, collectively the "<u>SuperMedia IP</u>") free and clear of any Liens other than Permitted Liens (and, for the avoidance of doubt, other than obligations to pay royalties or other amounts due under any licenses of Intellectual Property), and all such rights shall survive the consummation of the transactions contemplated in this Agreement on substantially similar terms as such rights existed prior to Closing.  There are no pending, and, to the Knowledge of SuperMedia, there have not been threatened within the past two years any, claims by any Person alleging infringement, misappropriation or other violation by SuperMedia or any SuperMedia Subsidiary of any other Person's Intellectual Property that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect on SuperMedia.  To the Knowledge of SuperMedia, the conduct of the business of SuperMedia and the SuperMedia Subsidiaries does not misappropriate, infringe or otherwise violate in any material respect any Intellectual Property of any other Person.  Neither SuperMedia nor any SuperMedia Subsidiary has filed any claim for misappropriation, infringement or other violation by another Person of its rights in or to any of the SuperMedia IP within the past twenty-four (24) months.  To the Knowledge of SuperMedia, no Person is misappropriating, infringing or otherwise violating any material SuperMedia IP.

(c)    With such exceptions that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SuperMedia, (i) each SuperMedia IP Contract is valid and binding on SuperMedia (or, to the extent a SuperMedia Subsidiary is a party, such Subsidiary) and, to the Knowledge of SuperMedia, any other party thereto, and is in full force and effect and enforceable against SuperMedia or a SuperMedia Subsidiary, as applicable (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies) and (ii) neither SuperMedia nor any SuperMedia Subsidiary, nor, to the Knowledge of SuperMedia, any other party thereto, is in breach or default under any SuperMedia IP Contract. Prior to the Original Agreement Date, SuperMedia has made available to Dex true and complete copies of all SuperMedia IP Contracts.

(d)    SuperMedia and the SuperMedia Subsidiaries (i) take reasonable actions to protect, maintain and preserve the (A) operation and security of the SuperMedia IT Assets, (B) confidentiality of data, information, and Trade Secrets owned, held or used by SuperMedia or the SuperMedia Subsidiaries, and (C) Intellectual Property material to their respective businesses (including by having and enforcing a policy that prior and current employees, consultants and agents execute non-disclosure (if such persons have or had access to Trade Secrets) and invention assignment agreements, in each case for the benefit of SuperMedia and/or the SuperMedia Subsidiaries), (ii) abide by all Laws regarding the collection, use, transfer and disclosure of personally identifiable and other confidential information, including customer and client information, and (iii) are not subject to any pending or, to the Knowledge of SuperMedia, threatened claim that alleges a material breach of any of the foregoing or inquiry by any Governmental Entity regarding the foregoing, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SuperMedia.

(e)    The SuperMedia IT Assets have not been interrupted or failed within the past two (2) years in a manner that materially impaired SuperMedia's or the SuperMedia Subsidiaries' ability to deliver SuperMedia's core products and services to their respective customers.

(f)    The SuperMedia IP is not subject to any material pending or outstanding Action or Order, and to the Knowledge of SuperMedia, there are no Actions or Orders threatened, that question or seek to cancel, limit, challenge or modify the ownership, validity, enforceability, registerability, patentability, use or right to use SuperMedia IP, or that would restrict, impair or otherwise materially adversely affect SuperMedia's or the SuperMedia Subsidiaries' use thereof or their rights thereto.

(g)    For purposes of this Agreement, the term "Permitted Liens" means (i) statutory liens securing payments not yet due, (ii) such imperfections or irregularities of title (other than with respect to Intellectual Property), easements, trackage rights, leases, licenses, special assessments, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not materially affect the use of the properties or assets subject thereto or affected thereby or otherwise materially impair business operations at such properties, (iii) mortgages, or deeds of trust, security interests or other encumbrances on title related to Indebtedness or other liabilities reflected on the consolidated financial statements contained in the SuperMedia Reports or the Dex Reports, as applicable, (iv) Liens for Taxes not yet due and payable or that are being contested in good faith and by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP, (v) mechanics', materialmen's or other Liens or security interests arising by operation of law that secure a liquidated amount that are being contested in good faith and by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP, and (vi) any other Liens that have not had or are not reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect on SuperMedia or Dex, as the case may be.

3.23    Labor and Employment.

(a)    As of the Original Agreement Date, Section 3.23 of the SuperMedia Disclosure Schedule sets forth a true and complete list of collective bargaining or other labor union contracts applicable to any employees of SuperMedia or any SuperMedia Subsidiary. As of the Original Agreement Date, there is no strike, work stoppage, lockout or other material labor dispute pending, or, to the Knowledge of SuperMedia, threatened, by or with respect to any employee of SuperMedia, and no such dispute has occurred within the past five (5) years. As of the Original Agreement Date, (i) neither SuperMedia nor any SuperMedia Subsidiary has breached or otherwise failed to comply with any provision of any collective bargaining or other labor union contract applicable to any employees of SuperMedia or any SuperMedia Subsidiary and (ii) there are no written grievances or written complaints outstanding or, to the Knowledge of SuperMedia, threatened against SuperMedia or any SuperMedia Subsidiary under any such contract except for any breaches, failures to comply, grievances or complaints that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SuperMedia. SuperMedia has made available to Dex true and complete copies of all contracts set forth in Section 3.23 of the SuperMedia Disclosure Schedule, including all amendments

applicable to such contracts. To the Knowledge of SuperMedia, with respect to any employees of SuperMedia, no union organizing or decertification activities are underway or threatened and no such activities have occurred within the past five (5) years.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SuperMedia, SuperMedia and each SuperMedia Subsidiary (i) is and has been in compliance with all applicable Laws regarding employment and employment practices, including without limitation those Laws relating to terms and conditions of employment, wages and hours, collective bargaining, equal employment, occupational safety and health and workers' compensation, and (ii) has no charges or complaints relating to unfair labor practices or unlawful employment practices pending or, to the knowledge of SuperMedia, threatened against it before any Governmental Entity.

(c)    With respect to the Mergers, any notice required under any law or collective bargaining agreement has been or prior to the Closing will be given, and all bargaining obligations with any employee representative have been or prior to the Closing will be satisfied. Within the past three (3) years, neither SuperMedia nor any SuperMedia Subsidiary has implemented any plant closing or layoff of employees that could implicate the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Law (collectively, the "WARN Act"), and no such action will be implemented without advance notification to Dex.

3.24    Affiliate Transactions.  To the Knowledge of SuperMedia, other than the SuperMedia Employment Agreements and any transaction under any SuperMedia Benefit Plan, there are no transactions, agreements, arrangements or understandings, or series of related transactions, agreements, arrangements or understandings, nor are there any currently proposed transactions, agreements, arrangements or understandings, or series or related transactions, agreements, arrangements or understandings, between SuperMedia and/or any SuperMedia Subsidiary, on the one hand, and any current or former stockholder (who beneficially owns or owned five percent or more of the SuperMedia Common Stock), director, executive officer or other Affiliate (other than any SuperMedia Subsidiary on the Original Agreement Date) of SuperMedia, whether or not required to be disclosed under Item 404 of Regulation S-K promulgated under the Exchange Act.  For purposes of this Agreement, "Affiliate" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by, or under common control with, such Person.  For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

3.25    SuperMedia Ownership of Dex Securities.  Neither SuperMedia nor any SuperMedia Subsidiary beneficially owns any shares of Dex Common Stock or any options, warrants or other rights to acquire Dex Common Stock.  SuperMedia is not and will not become prior to the Closing Date, an "interested stockholder" with respect to Dex or Newco within the meaning of Section 203 of the DGCL.

3.26    No Other Representations; Disclaimer.

(a)    Except for the representations and warranties made by SuperMedia in this Agreement, neither SuperMedia nor any other Person makes any express or implied representation or warranty with respect to SuperMedia or its Subsidiaries or their respective business, operations, assets, liabilities, condition (financial or otherwise) or prospects, and SuperMedia hereby disclaims any such other representations or warranties, including any representation or warranty regarding merchantability or fitness for a particular purpose.  In particular, without limiting the foregoing disclaimer, except for the representations and warranties made by SuperMedia in this Agreement, neither SuperMedia nor any other Person makes or has made any representation or warranty to Dex or any of its Affiliates or representatives with respect to (i) any financial projection, forecast, estimate, budget or prospect information relating to SuperMedia, any of its Subsidiaries or their respective businesses, or (ii) any oral or written information presented to Dex or any of its Affiliates or representatives in the course of their due diligence investigation of SuperMedia and its Subsidiaries, the negotiation of this Agreement or in the course of the transactions contemplated hereby.

(b)    Notwithstanding anything contained in this Agreement to the contrary, SuperMedia acknowledges and agrees that neither Dex nor any other Person has made or is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Dex and Merger Subs in this Agreement, including any implied representation or warranty as to the accuracy or completeness of any information regarding Dex or Merger Subs furnished or made available to SuperMedia, or any of its representatives or any representation or warranty regarding merchantability or fitness for a particular purpose.  Without limiting the generality of the foregoing, SuperMedia acknowledges that, except for the representations and warranties made by Dex and Merger Subs in this Agreement, no representation or warranties are made by Dex or any other Person with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to SuperMedia or any of its representatives.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF DEX AND MERGER SUBS

Except (i) as disclosed in, and reasonably apparent from, any Dex Report filed with, or furnished to, the SEC by Dex and publicly available prior to the Original Agreement Date (excluding, in each case, any disclosures set forth in any risk factor section and in any section relating to forward-looking statements to the extent that they are cautionary, predictive or forward-looking in nature), or (ii) as disclosed in a correspondingly numbered section of the disclosure schedule (the "Dex Disclosure Schedule") delivered by Dex and Merger Subs to SuperMedia prior to the execution of the Original Agreement (which schedule sets forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in this Article IV, or to one or more of Dex's, Newco's or Merger Sub's covenants contained herein; provided that, notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such schedule shall not be deemed an admission that such item is required to be disclosed therein or represents a material exception or material fact, event or circumstance or that such item has had or is reasonably likely to have a

Material Adverse Effect on Dex, Newco or Merger Sub; provided, further, that the disclosure of any item in any section of the Dex Disclosure Schedule shall be deemed disclosed with respect to any other section of the Dex Disclosure Schedule to which such item is relevant, whether or not a specific cross reference appears, so long as the relevance is reasonably apparent from the face of such disclosure), Dex and Merger Subs, jointly and severally, hereby represent and warrant to SuperMedia as follows:

4.1     Corporate Organization.

(a)     Dex is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Dex has the corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to have such power and authority or to be so licensed and qualified is not reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect on Dex.

(b)     True and complete copies of the certificate of incorporation (the "Dex Charter") and bylaws (the "Dex Bylaws") of Dex, as in effect as of the Original Agreement Date, have previously been made available to SuperMedia.

(c)     Each Dex Subsidiary (including Newco and Merger Sub) (i) is duly organized and validly existing under the Laws of its jurisdiction of organization, (ii) is duly qualified to do business and in good standing (where such concept is recognized) in all jurisdictions (whether federal, state, local or foreign) where its ownership or leasing of property or the conduct of its business requires it to be so qualified, and (iii) has all requisite corporate or similar power and authority to own or lease its properties and assets and to carry on its business as now conducted, except in each of (i) – (iii) as would not be reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect on Dex.  Each of Newco and Merger Sub (x) was formed solely for the purposes of engaging in the transactions contemplated by this Agreement, (y) since its date of formation, has not engaged in any activities or conducted its operation other than in connection with or as contemplated by this Agreement, and (z) is and will continue to be a wholly owned Subsidiary of Dex at all times through the Dex Effective Time. True and complete copies of the certificate of incorporation and bylaws of the Merger Subs, in effect as of the Original Agreement Date, have previously been made available to SuperMedia.

4.2     Capitalization.

(a)     The authorized capital stock of Dex consists of 300,000,000 shares of Dex Common Stock, of which, as of August 17, 2012, 51,363,963 shares were issued and outstanding, and 10,000,000 shares of preferred stock, par value $0.001 per share (the "Dex Preferred Stock"), of which, as of the Original Agreement Date, no shares were issued and outstanding.  As of August 17, 2012, no shares of Dex Common Stock were held in Dex's treasury.  As of the Original Agreement Date, no shares of Dex Common Stock or Dex Preferred Stock were reserved for issuance, except for 5,260,524 shares under the Dex Stock Plans.  As of August 17, 2012, (i) 2,542,170 Dex Stock Options were outstanding pursuant to

the Dex Stock Plans or otherwise, (ii) 552,288 Dex Restricted Shares were outstanding pursuant to the Dex Stock Plans or otherwise, (iii) 325,000 Dex Stock Units were outstanding and unsettled pursuant to the Dex Stock Plans or otherwise and (iv) 387,412 Dex SARs were outstanding and unsettled pursuant to the Dex Stock Plans or otherwise.  All of the issued and outstanding shares of Dex Common Stock have been, and all shares of Dex Common Stock that may be issued pursuant to the Dex Stock Plans or otherwise will be, when issued in accordance with the terms thereof, duly authorized and validly issued and are fully paid, nonassessable and not subject to, or issued in violation of, any purchase option, redemption, call option, right of first refusal, preemptive right, subscription right or any similar right.  Except pursuant to this Agreement, the Dex Stock Plans or as set forth on Section 4.11(a) of the Dex Disclosure Schedule, Dex does not have and is not bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of Dex Common Stock or any other equity securities of Dex or any securities representing the right to purchase or otherwise receive any shares of Dex Common Stock.  Dex has provided SuperMedia with a true and complete list of all Dex Stock Options, Dex Restricted Shares, Dex Stock Units, Dex SARs, and other equity-based awards outstanding under the Dex Stock Plans or otherwise as of June 30, 2012, the number of shares subject to each such award, the grant date of each such award, the vesting schedule of each such award and the exercise price for each such Dex Stock Option. Since June 30, 2012 through the Original Agreement Date, Dex has not issued or awarded, or authorized the issuance or award of, any capital stock, options, restricted stock or other equity-based awards or other securities convertible into or exchangeable for capital stock or other equity interests in Dex under the Dex Stock Plans or otherwise.   There are no outstanding bonds, debentures, notes or other indebtedness having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matter on which Dex's stockholders may vote.

(b)     The authorized capital stock of Newco consists of 100 shares of Newco Common Stock, of which 100 shares are issued and outstanding. All of the outstanding shares of Newco Common Stock are owned directly by Dex. The authorized capital stock of Merger Sub consists of 100 shares of common stock, $0.01 par value per share, all of which are owned directly by Newco.

(c)     All of the issued and outstanding shares of capital stock or other equity ownership interests of each Subsidiary of Dex (including Merger Subs) are owned by Dex, directly or indirectly, free and clear of any Liens, and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable and not subject to, or issued in violation of, any purchase option, redemption, call option, right of first refusal, preemptive right, subscription right or any similar right.  No such Subsidiary has or is bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of such Subsidiary or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of such Subsidiary.  No Dex Subsidiary owns any Dex Common Stock or other equity interest in Dex.  Except for the capital stock or other equity ownership interests of the Dex Subsidiaries, neither Dex nor any Dex Subsidiary beneficially owns directly or indirectly any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person. The shares of Dex Common Stock to be issued pursuant to the Mergers have been duly authorized and, when

issued and delivered in accordance with the terms of this Agreement, will have been validly issued, fully paid, nonassessable and not subject to, or issued in violation of, any purchase option, redemption, call option, right of first refusal, preemptive right, subscription right or any similar right.

    4.3    <u>Authority; No Violation</u>.

    (a)    Dex has full corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation by Dex of the transactions contemplated hereby have been duly, validly and unanimously approved by the Board of Directors of Dex.  The Board of Directors of Dex has determined that this Agreement and the transactions contemplated hereby are in the best interests of Dex and its stockholders, has adopted, approved and declared advisable this Agreement and recommended that its stockholders vote (i) in favor of the adoption of this Agreement and (ii) to accept the Dex Pre-Pack Plan (the "<u>Dex Recommendation</u>") and, subject to <u>Section 6.12(c)</u> hereof, has directed that this Agreement and the transactions contemplated by this Agreement (including the issuance of Newco Common Stock in connection with the SuperMedia Merger and the consummation of the transactions contemplated by this Agreement through Chapter 11 Cases) be submitted to Dex's stockholders for approval and adoption at a duly held meeting of such stockholders or as otherwise required by applicable law. Except for (i) the approval of this Agreement and the transactions contemplated by this Agreement by the affirmative vote of a majority of all the votes entitled to be cast by holders of outstanding Dex Common Stock (the "<u>Dex Stockholder Merger Approval</u>") or, if the Mergers are to be effected through Chapter 11 Cases with respect to Dex, the acceptance of the Dex Pre-Pack Plan by the affirmative vote of at least two-thirds of the votes cast by holders of outstanding Dex Common Stock (the "<u>Dex Stockholder Plan Approval</u>", and each of the Dex Stockholder Merger Approval and the Dex Stockholder Plan Approval, a "<u>Dex Stockholder Approval</u>") and (ii) the adoption of this Agreement and approval of the issuance of Newco Common Stock by Dex in its capacity as sole stockholder of Newco, which Dex shall effect promptly following the execution of this Agreement, no stockholder vote or other corporate proceedings on the part of Dex or any of its Subsidiaries are necessary to approve this Agreement or to consummate the transactions contemplated hereby except for approval of the Board of Directors of Dex and certain of its Subsidiaries authorizing the commencement of any Chapter 11 Cases.  This Agreement has been duly and validly executed and delivered by Dex and (assuming due authorization, execution and delivery by SuperMedia) constitutes the valid and binding obligation of Dex, enforceable against Dex in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies).

    (b)    Each of Newco and Merger Sub has full corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The Board of Directors of each of Newco and Merger Sub has determined that this Agreement and the transactions contemplated hereby are in the best interests of its respective company and its stockholders, has adopted, approved and declared advisable this Agreement and recommended that its stockholders vote in favor of the adoption of this Agreement. Except for the approval of this Agreement by Newco in its capacity as sole

stockholder of Merger Sub, which Newco shall effect promptly following the execution of this Agreement, no stockholder vote or other corporate proceedings on the part of the Merger Subs are necessary to authorize the execution and delivery of this Agreement by the Merger Subs and the consummation of the transactions contemplated hereby except for approval of the Board of Directors of each of the Merger Subs authorizing the commencement of any Chapter 11 Cases. This Agreement has been duly and validly executed and delivered by each of the Merger Subs and (assuming due authorization, execution and delivery by SuperMedia) constitutes the valid and binding obligation of each of the Merger Subs, enforceable against such Party in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies)

(c)     Neither the execution and delivery of this Agreement by Dex or the Merger Subs, nor the consummation by Dex or the Merger Subs of the transactions contemplated hereby, nor compliance by Dex or the Merger Subs with any of the terms or provisions of this Agreement, will (i) assuming the Dex Stockholder Merger Approval (or, if the Mergers are to be effected through Chapter 11 Cases with respect to Dex, the Dex Stockholder Plan Approval) is obtained, violate any provision of the Dex Charter or the Dex Bylaws or any equivalent organizational documents of any Dex Subsidiary (including the Merger Subs) or (ii) assuming that the consents, approvals and filings referred to in Section 4.4 shall have been duly obtained and/or made prior to the Dex Effective Time and any waiting period required thereunder shall have been terminated or expired prior to the Dex Effective Time, (A) violate any Law or Order applicable to Dex, any Dex Subsidiary or any of their respective properties or assets or (B) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination, amendment or cancellation under, accelerate the performance required by, or result in the creation of any Lien upon any of the respective properties or assets of Dex or any Dex Subsidiary under, any of the terms, conditions or provisions of any Contract to which Dex or any Dex Subsidiary is a party, or by which they or any of their respective properties or assets may be bound or affected, except for such violations, conflicts, breaches or defaults with respect to clause (ii) that are not reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect on Dex.

(d)     Notwithstanding anything in this Agreement to the contrary, to the extent the accuracy of the representations and warranties of Dex and the Merger Subs set forth in this Section 4.3 is based on the accuracy of SuperMedia's representations and warranties in Section 3.25, the representations and warranties of Dex and the Merger Subs in Section 4.3 shall be limited to the extent affected by any inaccuracy in Section 3.25.

4.4     Consents and Approvals.   Except for (i) the filing with the SEC of the Joint Proxy Statement and the filing and declaration of effectiveness of the Form S-4, and such reports under Sections 12, 13(a), 13(d), 13(g) and 16(a) of the Exchange Act as may be required in connection with this Agreement, and the transactions contemplated hereby and thereby, and obtaining from the SEC such orders as may be required in connection therewith, (ii) the filing of the Certificates of Merger with the Secretary of State of the State of Delaware pursuant to the DGCL, (iii) any notices or filings under the HSR Act and the termination or expiration of any applicable waiting period thereunder, and such other consents, approvals, filings or registrations

as may be required under any foreign antitrust, merger control or competition Laws, (iv) such filings and approvals as are required to be made or obtained under the Securities Act and the securities or "Blue Sky" Laws of various states in connection with the issuance of the shares of Newco Common Stock pursuant to this Agreement, and approval of the listing of such Newco Common Stock on the NYSE or the NASDAQ, (v) such filings, consents and approvals of Governmental Entities as may be set forth on Section 4.4 of the Dex Disclosure Schedule, (vi) the Dex Stockholder Merger Approval (or, if the Mergers are to be effected through Chapter 11 Cases with respect to Dex, the Dex Stockholder Plan Approval), (vii) such filings or notices required under the rules and regulations of the NYSE or the NASDAQ, (viii) if the Mergers are to be effected though Chapter 11 Cases with respect to Dex, such filings (including a chapter 11 plan of reorganization and disclosure statement) and consents as are required under the Bankruptcy Code to cause the Chapter 11 Cases to be commenced and consummated, and (ix) such other consents, approvals, filings or registrations the failure of which to be made or obtained, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect on Dex, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with (A) the execution and delivery by Dex and the Merger Subs of this Agreement and (B) the consummation by Dex and the Merger Subs of the Mergers and the other transactions contemplated by this Agreement.

4.5     Reports.     Since January 30, 2010, Dex has timely filed all forms, documents, statements and reports required to be filed by it with the SEC under the Securities Act or the Exchange Act prior to the Original Agreement Date (the forms, documents, statements and reports filed with the SEC since January 30, 2010 and those filed with the SEC subsequent to the Original Agreement Date under the Securities Act or the Exchange Act, if any, including any amendments thereto, the "Dex Reports").    As of their respective dates, or, if amended or superseded by a subsequent filing, as of the date of the last such amendment or superseded filing prior to the Original Agreement Date, the Dex Reports complied, and each of the Dex Reports filed subsequent to the Original Agreement Date will comply, in all material respects with the requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act, as the case may be.    No Dex Subsidiary is subject to the periodic reporting requirements of the Exchange Act.    As of the time of filing with the SEC, none of the Dex Reports so filed or that will be filed subsequent to the Original Agreement Date contained or will contain, as the case may be, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except to the extent that the information in such Dex Report has been amended or superseded by a later Dex Report filed prior to the Original Agreement Date.    Dex has made available to SuperMedia correct and complete copies of all material correspondence with the SEC since January 30, 2010 and prior to the Original Agreement Date. To the Knowledge of Dex, as of the Original Agreement Date, none of the Dex Reports is the subject of any ongoing SEC review, outstanding SEC comment or outstanding SEC investigation.    For purposes of this Agreement, "Knowledge of Dex" shall mean the actual knowledge of the Persons listed on Exhibit F.

4.6     Financial Statements.    Each of the consolidated financial statements of Dex included in the Dex Reports complied at the time it was filed as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, was prepared in accordance with GAAP (except, in the case of

unaudited statements, as permitted by Form 10-Q of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented in all material respects the consolidated financial position of Dex and the Dex Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown (subject, in the case of unaudited statements, to normal year-end audit adjustments in amounts consistent with past practice in the case of unaudited financial statements, which adjustments, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect on Dex).

4.7    <u>Broker's Fees</u>.    Neither Dex nor any Dex Subsidiary nor any of their respective officers or directors has employed any broker or finder or incurred any liability for any brokers fees, commissions or finder's fees in connection with the Mergers or related transactions contemplated by this Agreement, other than Houlihan Lokey Capital, Inc., all of the fees and expenses of which shall be the sole responsibility of Dex; and a true and complete copy of the agreement with respect to such engagement has previously been made available to SuperMedia.

4.8    <u>Absence of Certain Changes or Events</u>.    Except for liabilities incurred in connection with this Agreement or as publicly disclosed in the Forms 10-K, 10-Q and 8-K and any registration statements, proxy statements or prospectuses comprising the Dex Reports filed prior to the Original Agreement Date, (i) since December 31, 2011, (A) Dex and the Dex Subsidiaries have conducted their respective businesses in all material respects in the ordinary course of business consistent with past practice, and (B) there has not been any Material Adverse Effect with respect to Dex; and (ii) since December 31, 2011 through the Original Agreement Date, there has not been:

(a)    any issuance or awards of Dex Stock Options, Dex Restricted Shares, Dex Stock Units, Dex SARs or other equity-based awards in respect of Dex Common Stock to any director, officer or employee of Dex or any of the Dex Subsidiaries, other than in the ordinary course of business consistent with past practice;

(b)    any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property) with respect to any of Dex's capital stock;

(c)    except as required by the terms of any Dex Benefit Plans or by applicable Law, (i) any granting by Dex or any of the Dex Subsidiaries to any current or former director, officer or employee of any increase in compensation, bonus or other benefits, except for any such increases to employees who are not current directors or executive officers of Dex in the ordinary course of business consistent with past practice, (ii) any granting by Dex or any of the Dex Subsidiaries to any current or former director or executive officer of Dex of any increase in severance or termination pay, (iii) any entry by Dex or any of the Dex Subsidiaries into, or any amendment of, any employment, deferred compensation, consulting, severance, termination or indemnification agreement with any current or former director or executive officer, (iv) any establishment, adoption, entry into, amendment or modification of any Dex Benefit Plan or (v) any entry by Dex or any of its Subsidiaries into, or any amendment or termination of, any collective bargaining agreement or collective bargaining relationship;

(d)    any change in any material respect in accounting methods, principles or practices by Dex affecting its assets, liabilities or business, other than changes to the extent required by a change in GAAP or regulatory accounting principles;

(e)    any material Tax election or change in or revocation of any material Tax election, material amendment to any Tax Return, closing agreement with respect to a material amount of Taxes, or settlement or compromise of any material income Tax liability by Dex or any of the Dex Subsidiaries;

(f)    any material change in its investment or risk management or other similar policies; or

(g)    any agreement or commitment (contingent or otherwise) to do any of the foregoing.

4.9    <u>Legal Proceedings</u>.    (a) There are no (i) Actions pending (or, to the Knowledge of Dex, threatened) against or affecting Dex or any Dex Subsidiary, or any of their respective properties, at law or in equity, or (ii) Orders against Dex or any Dex Subsidiary, in the case of each of clause (i) or (ii), which would, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect on Dex.  As of the Original Agreement Date, there is no Action pending against (or, to the Knowledge of Dex, threatened against) Dex that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Mergers.

4.10    <u>Taxes and Tax Returns</u>.  Except for matters that, individually or in the aggregate, would not have a Material Adverse Effect on Dex:

(a)    All Tax Returns required to be filed by or with respect to Dex or any Dex Subsidiary for all taxable periods ending on or before the Original Agreement Date have been timely filed in accordance with applicable Law (taking into account any extension of time within which to file).  All such Tax Returns are true, correct, and complete in all material respects and were prepared in compliance with applicable Law.  No claim has ever been made by a Governmental Entity in a jurisdiction where Dex or any Dex Subsidiary does not file Tax Returns that Dex or any Dex Subsidiary is or may be subject to Taxes in such jurisdiction.

(b)    All Taxes of Dex and each Dex Subsidiary due and payable have been timely paid, other than any amount which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established on Dex's most recent consolidated financial statements.  The accruals and reserves for Taxes (without regard to deferred tax assets and deferred tax liabilities) of Dex and each Dex Subsidiary established in Dex's most recent consolidated financial statements are complete and adequate to cover any liabilities for Taxes that are not yet due and payable.

(c)    No deficiencies for Taxes have been proposed or assessed in writing against Dex or any Dex Subsidiary by any Governmental Entity, and neither Dex nor any Dex Subsidiary has received any written notice of any claim, proposal or assessment against Dex or any Dex Subsidiary for any such deficiency for Taxes.  As of the Original Agreement Date, there is no pending or, to the Knowledge of Dex, threatened, audit, judicial proceeding or other examination against or with respect to Dex or any Dex Subsidiary with respect to any Taxes.

Neither Dex nor any Dex Subsidiary has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to the assessment or collection of any Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business).

(d)    Dex and each Dex Subsidiary has duly and timely withheld and paid to the appropriate Governmental Entity all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(e)    There are no liens or other security interests upon any property or assets of Dex or any Dex Subsidiary for Taxes, except for liens for Taxes not yet due and payable.

(f)    Neither Dex nor any Dex Subsidiary has constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock qualifying for tax-free treatment under Section 355 of the Code in the past two (2) years.

(g)    Neither Dex nor any Dex Subsidiary (i) is or has ever been a member of an affiliated group (other than a group the common parent of which is Dex) filing a consolidated federal income Tax Return, (ii) has any liability for Taxes of any person arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor, by contract, or otherwise, or (iii) is, or ever has been, a party to any agreement for the sharing, indemnification, or allocation of Taxes (other than agreements among Dex and any Dex Subsidiary and other than customary indemnifications for Taxes contained in credit or other commercial agreements the primary purposes of which do not relate to Taxes).

(h)    Neither Dex nor any Dex Subsidiary will be required to include any item of income in, or exclude any item of deduction from, taxable income for a taxable period ending after the Closing Date of as a result of any (i) adjustment pursuant to Section 481 of the Code (or any analogous provision of state, local or foreign Law) for a taxable period ending on or before the Closing Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any analogous provision of state, local or foreign Law) executed on or prior to the Closing Date, (iii) installment sale or open transaction disposition made on or prior to the Closing Date, (iv) prepaid amount received on or prior to the Closing Date, or (v) election by Dex or any Dex Subsidiary under Section 108(i) of the Code.

(i)    Neither Dex nor any Dex Subsidiary has engaged in any "listed transaction" within the meaning of Section 6011 of the Code (including the Treasury Regulations promulgated thereunder).

(j)    Neither Dex nor any Dex Subsidiary is a party to any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of (i) any "excess parachute payment" within the meaning of Section 280G of the Code in connection with the transactions contemplated by this Agreement or (ii) any amount that will not be fully deductible as a result of Section 162(m) of the Code.  There is no Contract to which Dex or any Dex Subsidiary is a party or by which Dex or any Dex Subsidiary is bound to

41

compensate any employee, independent contractor or director of Dex or any Dex Subsidiary for excise taxes paid pursuant to Section 4999 of the Code.

(k)    To the Knowledge of Dex, as of December 31, 2011, Dex had (x) net operating loss carryforwards for purposes of Section 172 of the Code of approximately $1.1 billion and (y) alternative net operating loss carryforwards within the meaning of Section 56 of the Code of approximately $0.9 billion.

4.11    <u>Employee Benefits</u>.  For purposes hereof, the following terms shall have the following meaning:

"<u>Dex Benefit Plan</u>" means any employee benefit plan, program, policy, practice, or other arrangement (other than any Dex Employment Agreement) providing benefits to any current or former employee, officer or director of Dex or any Dex Subsidiary or any beneficiary or dependent thereof that is sponsored or maintained by Dex or any Dex Subsidiary or to which Dex or any Dex Subsidiary contributes or is obligated to contribute, or otherwise with respect to which Dex or any Dex Subsidiary has any liability or obligation, in each case whether or not written, including any employee welfare benefit plan within the meaning of Section 3(1) of ERISA, any employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) and any bonus, incentive, deferred compensation, vacation, stock purchase, stock option, severance, change of control or fringe benefit plan, program or policy.

"<u>Dex Employment Agreement</u>" means a contract, offer letter or agreement of Dex or any Dex Subsidiary with or addressed to any individual who is rendering or has rendered services thereto as an employee or consultant pursuant to which Dex or any Dex Subsidiary has any actual or contingent liability or obligation to provide compensation and/or benefits in consideration for past, present or future services.

"<u>Dex Plan</u>" means (i) each Dex Benefit Plan that is not a Multiemployer Plan and (ii) each Dex Employment Agreement.

(a)    <u>Section 4.11(a)</u> of the Dex Disclosure Schedule includes a true and complete list of all material Dex Benefit Plans and all material Dex Employment Agreements.

(b)    With respect to each Dex Plan, Dex has delivered or made available to SuperMedia a true, correct and complete copy of (as applicable): (i) each writing constituting a part of such Dex Plan, including the plan document currently in effect, material employee communications, benefit schedules, trust agreements, and insurance contracts and other funding vehicles; (ii) the most recent Annual Report (Form 5500 Series) and accompanying schedules; (iii) the current summary plan description and any material modifications thereto, if any (in each case, whether or not required to be furnished under ERISA); (iv) the most recent annual financial report, if any; (v) the most recent actuarial report, if any; (vi) any notices to or from the Internal Revenue Service or any office or representative of the Department of Labor or any similar Governmental Entity relating to any material compliance issues in respect of any such Dex Plan; and (vii) the most recent determination letter from the IRS, if any.  Dex has delivered or made

available to SuperMedia a true, correct and complete copy of each material Dex Employment Agreement.

(c)     Except as would not reasonably be expected to result in material liability to SuperMedia or Dex, all contributions required to be made to any Dex Plan by applicable law or regulation or by any plan document or other contractual undertaking, and all premiums due or payable with respect to insurance policies funding any Dex Plan, for any period through the Original Agreement Date have been timely made or paid in full or, to the extent not required to be made or paid on or before the Original Agreement Date, have been reflected on the financial statements to the extent required by GAAP.  Each Dex Benefit Plan that is an employee welfare benefit plan under Section 3(1) of ERISA either (i) is funded through an insurance company contract and is not a "welfare benefit fund" within the meaning of Section 419 of the Code or (ii) is unfunded.

(d)     With respect to each Dex Plan, Dex and the Dex Subsidiaries have complied, and are now in compliance, with all provisions of ERISA, the Code and all Laws applicable to such Dex Plans, except for instances that would not have a Material Adverse Effect on Dex.  Each Dex Plan has been administered in all respects in accordance with its terms, except for instances that would not have a Material Adverse Effect on Dex.  There is not now nor, to the Knowledge of Dex, do any circumstances exist that would reasonably be expected to give rise to, any requirement for the posting of security with respect to a Dex Plan or the imposition of any lien on the assets of Dex or any Dex Subsidiary under ERISA or the Code.  Section 4.11(d) of the Dex Disclosure Schedule identifies each Dex Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code ("Dex Qualified Plans").  Each Dex Qualified Plan (A)(i) has received a favorable determination letter from the IRS with respect to such qualification or (ii) is a prototype plan that is the subject of a favorable opinion letter from the IRS on which Dex is entitled to rely, and (B) unless clause (A)(ii) applies, has been submitted to the IRS for a determination letter within the applicable remedial amendment period under Section 401(b) of the Code or has a remedial amendment period that has not yet expired, and, to the Knowledge of Dex, there are no existing circumstances and no events have occurred that would reasonably be expected to adversely affect the qualified status of any Dex Qualified Plan or the tax-exempt status of its related trust.  Section 4.11(d) of the Dex Disclosure Schedule identifies each trust funding any Dex Plan which is intended to meet the requirements of Section 501(c)(9) of the Code, and each such trust meets such requirements and provides no disqualified benefits (as such term is defined in Code Section 4976(b)).  None of Dex and the Dex Subsidiaries nor, to the Knowledge of Dex, any other Person, including any fiduciary, has engaged in any "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA), which would reasonably be expected to subject any of the Dex Plans or their related trusts, Dex, any Dex Subsidiary or, to the Knowledge of Dex, any Person that Dex or any Dex Subsidiary has an obligation to indemnify, to any material Tax or penalty imposed under Section 4975 of the Code or Section 502 of ERISA.

(e)     With respect to each Dex Plan that is subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code, (i) Dex and each ERISA Affiliate have satisfied all minimum funding obligations under Section 412 of the Code or Section 302 of ERISA, and no waiver or variance of such obligations has been requested; (ii) no reportable event within the meaning of Section 4043(c) of ERISA for which the 30-day notice requirement has not been

waived has occurred; (iii) all premiums to the PBGC have been timely paid in full; (iv) no liability (other than for premiums to the PBGC) under Title IV of ERISA has been or would reasonably be expected to be incurred by Dex or any Dex Subsidiary or any of their respective ERISA Affiliates; (v) the PBGC has not instituted proceedings to terminate any such Dex Plan and, to the Knowledge of Dex, no condition exists which would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any such Dex Plan; and (vi) there has been no determination that a Dex Plan is or is expected to be in "at risk" status within the meaning of Section 303(i) of ERISA or Section 430(i) of the Code.

(f)        (i) No Dex Benefit Plan is a Multiemployer Plan or a Multiple Employer Plan; (ii) none of Dex and the Dex Subsidiaries nor any of their respective ERISA Affiliates has, at any time during the last six years, contributed to or been obligated to contribute to any Multiemployer Plan or Multiple Employer Plan; and (iii) none of Dex and the Dex Subsidiaries nor any of their respective ERISA Affiliates has incurred any Withdrawal Liability that has not been satisfied in full.   There does not now exist, nor, to the Knowledge of Dex, do any circumstances exist that would reasonably be expected to result in, any Controlled Group Liability that would be a liability of Dex or any Dex Subsidiary following the Dex Effective Time.  Without limiting the generality of the foregoing, none of Dex, any Dex Subsidiary or any of their respective ERISA Affiliates has engaged in any transaction described in Section 4069 or Section 4204 or 4212 of ERISA.

(g)        Dex and the Dex Subsidiaries have no liability for life, health, medical or other welfare benefits to former employees or beneficiaries or dependents thereof, except for health continuation coverage as required by Section 4980B of the Code or Part 6 of Title I of ERISA and at no expense to Dex and the Dex Subsidiaries or as otherwise set forth on Section 4.11(g) of the Dex Disclosure Schedule.

(h)        Neither the execution nor the delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in conjunction with any other event (whether contingent or otherwise), (i) result in any payment or benefit becoming due or payable, or required to be provided, to any director, employee or independent contractor of Dex or any Dex Subsidiary, (ii) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such director, employee or independent contractor, (iii) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation or (iv) result in any amount failing to be deductible by reason of Section 280G of the Code.

(i)        Each Dex Benefit Plan and each Dex Employment Agreement that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code and any award thereunder, in each case that is subject to Section 409A of the Code, has been established and maintained in all material respects in accordance with the requirements of Section 409A of the Code and the Treasury Regulations thereunder. Neither Dex nor any Dex Subsidiary has any obligation to provide any "gross up" or similar payment to any Person in the event that such Dex Benefit Plan or Dex Employment Agreement fails to comply with Section 409A of the Code.

4.12    Compliance with Law; Permits.

(a)    Dex and each Dex Subsidiary is, and at all times since the later of January 30, 2010 or its respective date of formation or organization has been, in compliance with all applicable Laws and is not in default under or in violation of any applicable Laws, except where such noncompliance, default, or violation would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect on Dex.

(b)    Dex and the Dex Subsidiaries are in possession of all Permits necessary for Dex and the Dex Subsidiaries to own, lease and operate their properties and assets or to carry on their businesses as they are now being conducted (the "Dex Permits") and no suspension or cancellation of any of the Dex Permits is pending or, to the Knowledge of Dex, threatened, except where the failure to have, or the suspension or cancellation of, any of the Dex Permits would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Dex. All Dex Permits are in full force and effect, except where the failure to be in full force and effect would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect on Dex.  Dex and the Dex Subsidiaries are not, and since January 30, 2010 have not been, in violation or breach of, or default under, any Dex Permit, except where such violation, breach or default would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect on Dex.

(c)    This Section 4.12 does not relate to matters with respect to Taxes and Tax Returns (which are the subject of Section 4.10), Employee Benefits (which are the subject of Section 4.11) or Environmental Liabilities (which are the subject of Section 4.15).

4.13    Certain Contracts.  (a) Except as set forth in the exhibit index to the Dex 2011 10-K or as set forth on Section 4.13 of the Dex Disclosure Schedule, as of the Original Agreement Date, neither Dex nor any Dex Subsidiary is a party to or bound by (i) any Contract relating to the incurrence or guarantee of Indebtedness by Dex or any Dex Subsidiary in an amount in excess in the aggregate of $10,000,000 (collectively, "Dex Instruments of Indebtedness"), (ii) any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC), (iii) any non-competition Contract, or any other agreement or obligation which purports to limit or restrict in any material respect (A) the ability of Dex or its Subsidiaries to solicit customers or (B) the manner in which, or the localities in which, all or any portion of the business of Dex and the Dex Subsidiaries, including, following consummation of the transactions contemplated by this Agreement, SuperMedia and the SuperMedia Subsidiaries, is or would be conducted, (iv)  any Contract providing for any payments to an officer, director or Affiliate of Dex or, in excess of $1,000,000, to any other Person that are conditioned, in whole or in part, on a change of control of Dex or any Dex Subsidiary, (v) any collective bargaining agreement or other agreement or arrangement with any labor organization, (vi) any joint venture or partnership agreement related to the formation, creation, operation or management or any joint venture or partnership that is material to Dex and the Dex Subsidiaries, taken as a whole, (vii) any Contract that grants any right of first refusal or right of first offer or similar right that limits or purports to limit the ability of Dex or any Dex Subsidiary to own, operate, sell, transfer, pledge or otherwise dispose of any material assets or business, (viii) any material Contract that contains a "most favored nation" or other term providing preferential pricing or treatment to a third party, and (ix) any Contract not made in the ordinary course of business which (A) is

45

material to Dex and the Dex Subsidiaries taken as a whole or (B) which would reasonably be expected to materially delay the consummation of the Mergers or any of the transactions contemplated by this Agreement (collectively, the "Dex Material Contracts").

(b)     With such exceptions that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Dex:

(i)     Each Dex Material Contract is valid and binding on Dex (or, to the extent a Subsidiary of Dex is a party, such Subsidiary) and, to the Knowledge of Dex, any other party thereto, and is in full force and effect and enforceable against Dex or a Dex Subsidiary, as applicable (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies); and

(ii)    Neither Dex nor any Dex Subsidiary is, and, to the Knowledge of Dex, no other party is, in breach or default under any Dex Material Contract.

(c)     Prior to the Original Agreement Date, Dex has made available to SuperMedia true and complete copies of all Dex Material Contracts.

4.14    Undisclosed Liabilities.  Neither Dex nor any Dex Subsidiary has incurred any liability of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether due or to become due), except for (i) liabilities that are reflected or reserved against on the consolidated balance sheet of Dex included in Dex's Annual Report on Form 10-K filed for the fiscal year ended December 31, 2011 (the "Dex 2011 10-K") (including any notes thereto), (ii) liabilities incurred in connection with this Agreement and the transactions contemplated hereby, and (iii) liabilities incurred in the ordinary course of business consistent with past practice since December 31, 2011 that have not had and are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on Dex. As of the Original Agreement Date, neither Newco nor Merger Sub has any liabilities other than the obligations incurred in connection with this Agreement and the transactions contemplated hereby.

4.15    Environmental Liability.  Except for matters that, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect on Dex, (i) there are no legal, administrative, arbitral or other proceedings, claims, actions, causes of action, private environmental investigations or remediation activities or governmental investigations of any nature seeking to impose, or that are reasonably likely to result in the imposition, on Dex of any liability or obligation under Environmental Laws, or pending or, to the Knowledge of Dex, threatened against Dex; (ii) Dex is not subject to any Order or party to any agreement, order, judgment, decree, letter or memorandum by or with any third party imposing any liability or obligation under any Environmental Laws; (iii) Dex has complied and is in compliance with all applicable Environmental Laws, including obtaining and complying with all Permits required pursuant to applicable Environmental Laws; and (iv) Dex has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or released, or exposed any person to any hazardous substance or waste, or owned or operated any property or facility

contaminated by any hazardous substance or waste in a manner reasonably anticipated to give rise to any current or future liabilities under Environmental Laws.

4.16    Real Property.

(a)    Each of Dex and the Dex Subsidiaries has good title free and clear of all Liens to all real property owned by such entities (the "Dex Owned Properties"), except for Liens that do not materially detract from the present use of such real property.

(b)    A true and complete copy of each agreement pursuant to which Dex or any Dex Subsidiary leases any material real property (such agreements, together with any amendments, modifications and other supplements thereto, collectively, the "Dex Leases") has heretofore been made available to SuperMedia.    Each Dex Lease is valid, binding and enforceable against Dex or an applicable Dex Subsidiary in accordance with its terms and is in full force and effect (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies), except where the failure to be valid, binding, enforceable and in full force and effect, individually or in the aggregate, is not reasonably likely to have a Material Adverse Effect on Dex.    There are no defaults by Dex or any Dex Subsidiary, as applicable, under any of the Dex Leases which, individually or in the aggregate, would have a Material Adverse Effect on Dex.    To the Knowledge of Dex, no event has occurred that with or without notice or lapse of time or both would constitute a breach or default thereunder by any party thereto or would permit the termination, modification or acceleration of rent thereunder, except, in each case, for such breaches, defaults, terminations, modifications or accelerations that can not, individually or in aggregate, reasonably be expected to have a Material Adverse Effect on Dex.

(c)    The Dex Owned Properties and the properties leased pursuant to the Dex Leases (the "Dex Leased Properties") constitute all of the real estate on which Dex and the Dex Subsidiaries maintain their facilities or conduct their business as of the Original Agreement Date, except for locations the loss of which would not result in a Material Adverse Effect on Dex.

4.17    State Takeover Laws; Rights Agreement.    Each of Dex and the Merger Subs has, or will have prior to the Dex Effective Time, taken all necessary action so that, assuming compliance by SuperMedia with its obligations hereunder and the accuracy of the representations and warranties made by SuperMedia herein, no "business combination," "moratorium," "fair price," "control share acquisition" or other state anti-takeover statute or regulation, nor any takeover-related provision in the Dex Charter or the Dex Bylaws, would (i) prohibit or restrict the ability of Dex and the Merger Subs to perform their respective obligations under this Agreement, any related agreement, or the Certificates of Merger or their ability to consummate the transactions contemplated hereby and thereby, (ii) have the effect of invalidating or voiding this Agreement, or the Certificates of Merger, or any provision hereof or thereof, or (iii) subject SuperMedia to any impediment or condition in connection with the exercise of any of its rights under this Agreement or the Certificates of Merger.    Dex does not have any stockholder rights plan in effect.

4.18    Reorganization.    As of the Original Agreement Date, Dex and the Merger Subs are not aware of any fact or circumstance that could reasonably be expected to prevent the

Dex Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code.

4.19    Opinion.  Prior to the execution of this Agreement, the Board of Directors of Dex has received an opinion from Houlihan Lokey Capital, Inc. (the "Dex Financial Advisor") to the effect that, as of the date of such opinion and based upon and subject to the matters set forth in such opinion, the Exchange Ratio is fair to the holders of Dex Common Stock from a financial point of view.  Such opinion has not been amended or rescinded.

4.20    Internal Controls.  Dex has established and maintains disclosure controls and procedures and internal controls over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act. Dex's disclosure controls and procedures are designed to ensure that information required to be disclosed in Dex's periodic reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the required time periods. Dex and its Subsidiaries have implemented and maintain a system of internal controls over financial reporting that is sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP. Dex is in compliance in all material respects with the applicable provisions of the Sarbanes-Oxley Act and the applicable listing and corporate governance rules and regulations of the NYSE. Since December 31, 2011 through the Original Agreement Date, Dex has not identified (i) any significant deficiency or material weakness in the design or operation of internal control over financial reporting which is reasonably likely to adversely affect Dex's ability to record, process, summarize and report financial information or (ii) any fraud or allegation of fraud, whether or not material, that involves management or other employees who have a significant role in Dex's internal control over financial reporting.

4.21    Insurance.  Dex and the Dex Subsidiaries are insured with reputable insurers against such risks and in such amounts as its management reasonably has determined to be prudent in accordance with industry practices.  To the Knowledge of Dex, neither Dex nor any Dex Subsidiary is in material breach or material default of any insurance policies maintained by Dex or any Dex Subsidiary or has taken any action or failed to take any action that, with notice or the lapse of time, would constitute such a breach or default or permit termination (prior to the scheduled termination or expiration thereof) or modification of any such insurance policies.  To the Knowledge of Dex, neither Dex nor any Dex Subsidiary has received any notice of termination or cancellation (prior to the scheduled termination or expiration thereof) or denial of coverage with respect to any such insurance policy.

4.22    Dex Information.  The information relating to Dex or any Dex Subsidiary to be included or incorporated by reference in the Joint Proxy Statement and the Form S-4 will not, at the time the Form S-4 is declared effective, the time the Joint Proxy Statement is first mailed to stockholders of SuperMedia and Dex and the time of the SuperMedia Stockholders Meeting and the Dex Stockholders Meeting, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading.  The information relating to Dex or any Dex Subsidiary that is provided or to be provided by Dex or its representatives for inclusion in any document (other than the Form S-4) filed with any other Governmental Entity in connection

with the transactions contemplated by this Agreement will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading.   All documents that Dex is responsible for filing with the SEC in connection with the Mergers or the other transactions contemplated hereby (including the Joint Proxy Statement and the Form S-4) (except for such portions thereof that relate only to SuperMedia or any of its Subsidiaries) will comply as to form and substance in all material respects with the provisions of the Securities Act and the Exchange Act.

4.23    Intellectual Property.  For purposes of this Agreement, the following terms shall have the following respective meanings:

"Dex IP Contract" means any material Contract concerning Intellectual Property to which Dex or any Dex Subsidiary is a party.

"Dex IT Assets" means the computer software, firmware, middleware, servers, systems, networks, workstations, data communications lines, and all other information technology equipment, used by Dex and the Dex Subsidiaries.

(a)    Section 4.23(a) of the Dex Disclosure Schedule sets forth a true and complete list of all the following that are owned by Dex or any Dex Subsidiary, indicating for each item if applicable, the registration or application number, the record owner and the applicable filing jurisdiction: (i) material patented or material registered Intellectual Property and (ii) material pending patent applications or applications for registration of material Intellectual Property.

(b)    To the Knowledge of Dex, Dex or a Dex Subsidiary owns all right, title and interest in and to, or is licensed or otherwise possesses adequate rights to use, all Intellectual Property material to their respective businesses as currently conducted (together with all Intellectual Property set forth in Section 4.23(a), collectively the "Dex IP") free and clear of any Liens other than Permitted Liens (and, for the avoidance of doubt, other than obligations to pay royalties or other amounts due under any licenses of Intellectual Property), and all such rights shall survive the consummation of the transactions contemplated in this Agreement on substantially similar terms as such rights existed prior to Closing.  There are no pending, and, to the Knowledge of Dex, there have not been threatened within the past two years any, claims by any Person alleging infringement, misappropriation or other violation by Dex or any Dex Subsidiary of any other Person's Intellectual Property that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect on Dex.  To the Knowledge of Dex, the conduct of the business of Dex and the Dex Subsidiaries does not misappropriate, infringe or otherwise violate in any material respect any Intellectual Property of any other Person.  Neither Dex nor any Dex Subsidiary has filed any claim for misappropriation, infringement or other violation by another Person of its rights in or to any of the Dex IP within the past twenty-four (24) months.  To the Knowledge of Dex, no Person is misappropriating, infringing or otherwise violating any material Dex IP.

(c)    With such exceptions that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Dex, (i) each Dex IP Contract is

49

valid and binding on Dex (or, to the extent a Dex Subsidiary is a party, such Subsidiary) and, to the Knowledge of Dex, any other party thereto, and is in full force and effect and enforceable against Dex or a Dex Subsidiary, as applicable (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies) and (ii) neither Dex nor any Dex Subsidiary, nor, to the Knowledge of Dex, any other party thereto, is in breach or default under any Dex IP Contract.  Prior to the Original Agreement Date, Dex has made available to SuperMedia true and complete copies of all Dex IP Contracts.

(d)     Dex and the Dex Subsidiaries (i) take reasonable actions to protect, maintain and preserve the (A) operation and security of the Dex IT Assets, (B) confidentiality of data, information, and Trade Secrets owned, held or used by Dex or the Dex Subsidiaries, and (C) Intellectual Property material to their respective businesses (including by having and enforcing a policy that prior and current employees, consultants and agents execute non-disclosure (if such persons have or had access to Trade Secrets) and invention assignment agreements, in each case for the benefit of Dex and/or the Dex Subsidiaries), (ii) abide by all Laws regarding the collection, use, transfer and disclosure of personally identifiable and other confidential information, including customer and client information, and (iii) are not subject to any pending or, to the Knowledge of Dex, threatened claim that alleges a material breach of any of the foregoing or inquiry by any Governmental Entity regarding the foregoing, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Dex.

(e)     The Dex IT Assets have not been interrupted or failed within the past two (2) years in a manner that materially impaired Dex or the Dex Subsidiaries' ability to deliver Dex's core products and services to their respective customers.

(f)     The Dex IP is not subject to any material pending or outstanding Action or Order, and to the Knowledge of Dex, there are no Actions or Orders threatened, that question or seek to cancel, limit, challenge or modify the ownership, validity, enforceability, registerability, patentability, use or right to use Dex IP, or that would restrict, impair or otherwise materially adversely affect Dex's or the Dex Subsidiaries' use thereof or their rights thereto.

4.24    Labor and Employment.

(a)     As of the Original Agreement Date, Section 4.24 of the Dex Disclosure Schedule sets forth a true and complete list of collective bargaining or other labor union contracts applicable to any employees of Dex or any Dex Subsidiary. As of the Original Agreement Date, there is no strike, work stoppage, lockout or other material labor dispute pending, or, to the Knowledge of Dex, threatened, by or with respect to any employee of Dex, and no such dispute has occurred within the past five (5) years. As of the Original Agreement Date, (i) neither Dex nor any Dex Subsidiary has breached or otherwise failed to comply with any provision of any collective bargaining or other labor union contract applicable to any employees of Dex or any Dex Subsidiary and (ii) there are no written grievances or written complaints outstanding or, to the Knowledge of Dex, threatened against Dex or any Dex Subsidiary under any such contract except for any breaches, failures to comply, grievances or complaints that would not, individually or in the aggregate, reasonably be expected to have a

Material Adverse Effect on Dex. Dex has made available to SuperMedia true and complete copies of all contracts set forth in <u>Section 4.24</u> of the Dex Disclosure Schedule, including all amendments applicable to such contracts. To the Knowledge of Dex, with respect to any employees of Dex, no union organizing or decertification activities are underway or threatened and no such activities have occurred within the past five (5) years.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Dex and each Dex Subsidiary (i) is and has been in compliance with all applicable Laws regarding employment and employment practices, including without limitation those Laws relating to terms and conditions of employment, wages and hours, collective bargaining, equal employment, occupational safety and health, and workers' compensation and (ii) has no charges or complaints relating to unfair labor practices or unlawful employment practices pending or, to the knowledge of Dex, threatened against it before any Governmental Entity.

(c)    With respect to the Mergers, any notice required under any law or collective bargaining agreement has been or prior to the Closing will be given, and all bargaining obligations with any employee representative have been or prior to the Closing will be satisfied. Within the past three (3) years, neither Dex nor any Dex Subsidiary has implemented any plant closing or layoff of employees that could implicate the WARN Act, and no such action will be implemented without advance notification to SuperMedia.

4.25    <u>Affiliate Transactions</u>.    To the Knowledge of Dex, other than the Dex Employment Agreements and any transaction under any Dex Benefit Plan, there are no transactions, agreements, arrangements or understandings, or series of related transactions, agreements, arrangements or understandings, nor are there any currently proposed transactions, agreements, arrangements or understandings, or series or related transactions, agreements, arrangements or understandings, between Dex and/or any Dex Subsidiary, on the one hand, and any current or former stockholder (who beneficially owns or owned five percent or more of the Dex Common Stock), director, executive officer or other Affiliate (other than any Subsidiary of Dex on the Original Agreement Date) of Dex, whether or not required to be disclosed under Item 404 of Regulation S-K promulgated under the Exchange Act.

4.26    <u>Dex Ownership of SuperMedia Securities</u>.    Neither Dex nor any Dex Subsidiary beneficially owns any shares of SuperMedia Common Stock or any options, warrants or other rights to acquire SuperMedia Common Stock.  None of Dex, Newco or Merger Sub is, and none will become prior to the Closing Date, an "interested stockholder" with respect to SuperMedia within the meaning of Section 203 of the DGCL.

4.27    <u>No Other Representations; Disclaimer</u>.

(a)    Except for the representations and warranties made by Dex and the Merger Subs in this Agreement, neither Dex nor any other Person makes any express or implied representation or warranty with respect to Dex or its Subsidiaries or their respective business, operations, assets, liabilities, condition (financial or otherwise) or prospects, and Dex and the Merger Subs hereby disclaim any such other representations or warranties, including any representation or warranty regarding merchantability or fitness for a particular purpose.  In

particular, without limiting the foregoing disclaimer, except for the representations and warranties made by Dex and the Merger Subs in this Agreement, neither Dex nor any other Person makes or has made any representation or warranty to SuperMedia or any of its Affiliates or representatives with respect to (i) any financial projection, forecast, estimate, budget or prospect information relating to Dex, any of its Subsidiaries or their respective businesses, or (ii) any oral or written information presented to SuperMedia or any of its Affiliates or representatives in the course of their due diligence investigation of Dex and its Subsidiaries, the negotiation of this Agreement or in the course of the transactions contemplated hereby.

(b)     Notwithstanding anything contained in this Agreement to the contrary, Dex and the Merger Subs acknowledge and agree that neither SuperMedia nor any other Person has made or is making any representations or warranties whatsoever, express or implied, beyond those expressly given by SuperMedia in this Agreement, including any implied representation or warranty as to the accuracy or completeness of any information regarding SuperMedia furnished or made available to Dex, Newco or Merger Sub or any of their representatives or any representation or warranty regarding merchantability or fitness for a particular purpose.  Without limiting the generality of the foregoing, Dex and the Merger Subs acknowledge that, except for the representations and warranties made by SuperMedia in this Agreement, no representations or warranties are made by SuperMedia or any other Person with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to Dex, the Merger Subs or any of their representatives.

## ARTICLE V

## COVENANTS RELATING TO CONDUCT OF BUSINESS

5.1     <u>Conduct of Businesses Prior to the Dex Effective Time</u>.  During the period from the Original Agreement Date to the Dex Effective Time, except as expressly contemplated or permitted by this Agreement (including commencement of Chapter 11 Cases with respect to either or both of Dex and SuperMedia and filing of the Dex Pre-Pack Plan or the SuperMedia Pre-Pack Plan and entrance into any agreements with Dex Creditors or SuperMedia Creditors in support of the Dex Financing Amendments and the Dex Pre-Pack Plan or the SuperMedia Financing Amendments and the SuperMedia Pre-Pack Plan, if necessary), as required by applicable Law, or as consented to in writing by Dex or SuperMedia, as applicable (which shall not be unreasonably withheld, conditioned or delayed), each of Dex and SuperMedia shall, and shall cause each of its respective Subsidiaries to, (i) conduct its business in the ordinary course in all material respects, (ii) use reasonable best efforts to maintain and preserve intact its business organization, employees and advantageous business relationships (including relationships with its customers and suppliers) and retain the services of its key officers and key employees and (iii) take no action that would reasonably be expected to prevent or materially impede or delay the obtaining of, or materially adversely affect the ability of the Parties to obtain, any necessary approvals of any Governmental Entity required for the transactions contemplated hereby or to perform their covenants and agreements under this Agreement or to consummate the transactions contemplated hereby or thereby.

5.2    Forbearances.    Without limiting the generality of Section 5.1 above, during the period from the Original Agreement Date to the Dex Effective Time, except as set forth in Section 5.2 of the SuperMedia Disclosure Schedule or the Dex Disclosure Schedule, as applicable, as required by applicable Law, or as expressly contemplated or permitted by this Agreement, neither SuperMedia nor Dex shall, and neither SuperMedia nor Dex shall permit any SuperMedia Subsidiary or Dex Subsidiary, as applicable, to, without the prior written consent of Dex or SuperMedia, as applicable, which shall not be unreasonably withheld, delayed or conditioned:

(a)    (i) other than dividends and distributions by a direct or indirect Subsidiary to such Party or to any direct or indirect wholly owned Subsidiary of such Party, declare, set aside or pay any dividends on, make any other distributions in respect of, or enter into any agreement with respect to the voting of, any of its capital stock, (ii) split, combine or reclassify any of its capital stock or any other of its securities, (iii) except as described in Section 2.6(d) or 2.7(e), accelerate the vesting of any options, warrants or other rights of any kind to acquire shares of capital stock or (iv) purchase, redeem or otherwise acquire any shares of its capital stock or other securities or any of its Subsidiaries, or any rights, warrants or options to acquire any such shares or other securities (other than the withholding of shares of common stock to satisfy the exercise price or Tax withholding upon the exercise of stock options, vesting of restricted shares or settlement of stock units or stock appreciation rights, in each case that are outstanding as of the Original Agreement Date in accordance with their terms and such Party's practices as of the Original Agreement Date);

(b)    issue, deliver, sell, pledge or otherwise encumber or subject to any Lien any shares of its capital stock, any other voting securities, including any restricted shares of its common stock, or any securities convertible into, or any rights, warrants or options to acquire, any such shares, voting securities or convertible securities, including any stock options and unit awards (other than the issuance of its common stock upon the exercise of stock options, vesting of restricted shares or settlement of stock units, in each case that are outstanding as of the Original Agreement Date in accordance with their terms, and other than the issuance of Newco Common Stock pursuant to the Option (as defined in the Dex Pre-Pack Plan));

(c)    amend its certificate of incorporation, bylaws or other comparable organizational documents or the organizational documents of any of its Subsidiaries;

(d)    acquire or agree to acquire by merging or consolidating with, or by purchasing any assets or any equity securities of, or by any other manner, any business or any Person, or otherwise acquire or agree to acquire any assets, except for acquisitions of inventory or other similar assets in the ordinary course of business consistent with past practice; provided, that the foregoing shall not prohibit internal reorganizations or consolidations;

(e)    sell, assign, transfer, lease, license, mortgage or otherwise encumber or subject to any Lien (other than Liens in connection with any Indebtedness permitted under Section 5.2(f)), or otherwise dispose of (i) any of its properties or assets (including capital stock in any of its Subsidiaries) or create any security interest in such assets or properties other than in the ordinary course of business consistent with past practice, or (ii) except as contemplated in the SuperMedia Financing Amendments or the Dex Financing Amendments, any SuperMedia IP

owned by SuperMedia or the SuperMedia Subsidiaries or any Dex IP owned by Dex or the Dex Subsidiaries, as applicable, except for non-exclusive licenses of Intellectual Property made in the ordinary course of business consistent with past practice;

(f)     except for borrowings under existing credit facilities (or renewals, extensions or replacements therefor that do not increase the aggregate amount available thereunder and that do not provide for any termination fees or penalties, prohibit pre-payments or provide for any pre-payment penalties, or contain any like provisions limiting or otherwise affecting the ability of such Party or its applicable Subsidiaries or successors from terminating or pre-paying such facilities, or contain financial terms less favorable, in the aggregate, than existing credit facilities, and as they may be so renewed, extended or replaced) that are incurred in the ordinary course of business consistent with past practice, or for borrowings or other lines of credit or refinancing of indebtedness outstanding on the Original Agreement Date in additional amounts not to exceed $5,000,000, or Indebtedness owed by any wholly owned Subsidiary to such Party or any other wholly owned Subsidiary of such Party, or as contemplated by Section 6.14, incur, redeem, prepay, defease, cancel, or modify the terms of, any Indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for the obligations of any Person (other than any of its wholly owned Subsidiaries), or make any loans or advances to any Person other than to its wholly owned Subsidiaries or as a result of ordinary advances and reimbursements to employees;

(g)     change in any material respect its accounting methods (or underlying assumptions), principles or practices affecting its assets, liabilities or business, including any reserving, renewal or residual method, practice or policy, in each case, in effect on the Original Agreement Date, except as required by changes in GAAP or regulatory accounting principles;

(h)     enter into any new line of business or change in any material respect the operating, asset liability, investment or risk management or other similar policies of it or any of its Subsidiaries;

(i)     make any investment in or loan to any Person in excess of $5,000,000 in the aggregate, whether by purchase of stock or securities, contributions to capital, property transfers, or entering into binding agreements with respect to any such investment, loan or acquisition;

(j)     make, change or revoke any material Tax election, change an annual Tax accounting period, adopt or change any material Tax accounting method, file any material amended Tax Return, enter into any closing agreement with respect to a material amount of Taxes, settle any material Tax claim or assessment or surrender any right to claim a refund of a material amount of Taxes;

(k)     except as expressly permitted by any other provision of this Section 5.2 or as set forth in the SuperMedia Disclosure Schedule or the Dex Disclosure Schedule, amend, terminate or waive any material provision of any SuperMedia Material Contract, SuperMedia IP Contract, Dex Material Contract or Dex IP Contract, as applicable (the "Material Contracts"), or enter into or renew any agreement or contract or other binding obligation that is or, if it were on

place as of the Original Agreement Date, would be a Material Contract (other than normal renewals of such Contracts without materially adverse changes, additions or deletions of terms);

(l)    make or incur, or enter into any Contract obligating such Party to incur, any capital or operating expenditures in excess of $5,000,000 in the aggregate, except for capital or operating expenditures contemplated in such party's existing plan for annual capital or operating expenditures for 2012, which plan has been made available to the Other Party prior to the Original Agreement Date;

(m)    except as required by agreements or instruments in effect on the Original Agreement Date, alter in any material respect, or enter into any commitment to alter in any material respect, any material interest in any corporation, association, joint venture, partnership or business entity in which such Party directly or indirectly holds any equity or ownership interest on the Original Agreement Date;

(n)    except as required by the terms of SuperMedia Benefit Plans or SuperMedia Employment Agreements, or the terms of Dex Benefit Plans or Dex Employment Agreements, as applicable, as in effect on the Original Agreement Date or as required by applicable Law or as provided by this Agreement, (i) grant or pay to any current or former director, officer, employee or consultant of Dex or any Dex Subsidiary or SuperMedia or any SuperMedia Subsidiary any increase in compensation, except for salary or wage increases in the ordinary course of business consistent with past practice, (ii) grant, pay, promise to pay, or enter into any SuperMedia Benefit Plan or SuperMedia Employment Agreement or Dex Benefit Plan or Dex Employment Agreement (as applicable) to pay, to any current or former director, officer, employee, consultant or service provider of SuperMedia or any SuperMedia Subsidiary or Dex or Dex Subsidiary (as applicable) any severance or termination pay or any increase in severance or termination pay, (iii) increase the compensation or benefits provided under any SuperMedia Benefit Plan, SuperMedia Employment Agreement, Dex Benefit Plan or Dex Employment Agreement, (iv) enter into or modify the terms of any equity-based award granted under any SuperMedia Stock Plan or Dex Stock Plan, (v) make any discretionary contributions or payments with respect to any SuperMedia Benefit Plan, SuperMedia Employment Agreement, Dex Benefit Plan, or Dex Employment Agreement to any trust or other funding vehicle, other than the issuance of Newco Common Stock pursuant to the Option (as defined in the Dex Pre-Pack Plan), (vi) accelerate the payment or vesting of any payment or benefit provided or to be provided to any director, officer, employee or consultant of SuperMedia or any SuperMedia Subsidiary or Dex or any Dex Subsidiary or otherwise pay any amounts not due such individual, (vii) enter into any new or amend or modify any existing SuperMedia Employment Agreement or Dex Employment Agreement (or agreement that would be a SuperMedia Employment Agreement or Dex Employment Agreement if in effect on the Original Agreement Date), other than employment agreements for new hires with total compensation not to exceed $300,000, (viii) establish any new or amend or modify any existing SuperMedia Benefit Plans or Dex Benefit Plan (or plans that would be a SuperMedia Benefit Plan or Dex Benefit Plan if in effect on the Original Agreement Date) or (ix) establish, adopt or enter into any collective bargaining agreement other than a renewal of or successor to an existing collective bargaining agreement on terms no less favorable to SuperMedia or Dex (as applicable);

(o)    except as set forth in the SuperMedia Disclosure Schedule or the Dex Disclosure Schedule, pay, discharge, settle or compromise any Action, other than any such payment, discharge, settlement or compromise (i) in the ordinary course of business consistent with past practice that involves solely money damages in an amount not in excess of $1,000,000 individually or $2,000,000 in the aggregate, and that does not create binding precedent for other pending or potential Actions, or (ii) pursuant to the terms of any Contract in effect on the Original Agreement Date (copies of which have been provided to the Other Party prior to the Original Agreement Date);

(p)    take any action, or knowingly fail to take any action within its control, which action or failure to act would be reasonably expected to prevent the Mergers from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code;

(q)    except in the reasonable business judgment of the holder of such Intellectual Property, let lapse, fail to maintain, abandon or cancel any applied for, patented or registered SuperMedia IP owned by SuperMedia or any SuperMedia Subsidiary or any registered Dex IP owned by Dex or any Dex Subsidiary;

(r)    adopt or enter into a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of such Party or any of its Subsidiaries, other than pursuant to Section 6.17;

(s)    fail to maintain in full force and effect the material insurance policies covering such Party and its Subsidiaries and their respective properties, assets and business in a form and amount consistent with past practices;

(t)    open any material new offices or facilities or relocate or close any material existing offices or facilities or implement any layoffs implicating the WARN Act, or file any application with any Governmental Entity to do any of the foregoing, except for openings, closings, relocations and layoffs in progress on the Original Agreement Date or planned on the Original Agreement Date and disclosed in Section 5.2(t) of the SuperMedia Disclosure Schedule or the Dex Disclosure Schedule, as applicable;

(u)    except as required by applicable Law, convene any regular or special meeting (or any adjournment thereof) of the stockholders of SuperMedia or Dex, as applicable, other than the SuperMedia Stockholder Meeting or the Dex Stockholder Meeting, or enter into any Contract, understanding or arrangement with respect to the voting of capital stock of SuperMedia or Dex;

(v)    take any action that is intended or is reasonably likely to result in any of the conditions to the Mergers set forth in Article VII not being satisfied or in a violation of any provision of this Agreement; or

(w)    commit or agree to take any of the actions contemplated by Sections 5.2(a) to (v) above.

5.3    No Control of the Other Party's Business. Nothing contained in this Agreement shall give Dex, directly or indirectly, the right to control or direct the operations of

SuperMedia or shall give SuperMedia, directly or indirectly, the right to control or direct the operations of Dex prior to the SuperMedia Effective Time.  Prior to the SuperMedia Effective Time, each of SuperMedia and Dex shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

6.1    Proxy Statement/Registration Statement.

(a)    Dex and Newco shall prepare drafts of the Joint Proxy Statement and Form S-4 and Dex, Newco and SuperMedia shall cooperate to cause the Joint Proxy Statement and Form S-4 to be filed with the SEC. SuperMedia shall have a reasonable opportunity to review and comment upon the Joint Proxy Statement and Form S-4 and any amendments thereto, none of which shall be filed until each of Dex, Newco and SuperMedia agree to such filing (which shall not be unreasonably withheld).  Each Party shall furnish all information reasonably necessary for the preparation of the Joint Proxy Statement and the Form S-4.  SuperMedia, Dex and Newco shall use their reasonable best efforts to cause the Form S-4 to become effective under the Securities Act as soon as practicable after the filing thereof and to keep the Form S-4 effective as long as is necessary to consummate the Mergers. Subject to and without limiting the rights of the Board of Directors of SuperMedia and Dex pursuant to Section 6.12(c), the Joint Proxy Statement shall include the SuperMedia Recommendation and the Dex Recommendation. The Joint Proxy Statement shall also include all material disclosure relating to the SuperMedia Financial Advisors and the Dex Financial Advisor (including, if requested, the amount of fees each of the SuperMedia Financial Advisors and the Dex Financial Advisor will receive upon consummation of the Mergers, and the conditions for the payment of such fees) and to the opinions referred to in Sections 3.18 and 4.19.  Each of SuperMedia, Newco and Dex shall use its reasonable best efforts to ensure that the Form S-4 and the Joint Proxy Statement comply as to form in all material respects with the rules and regulations promulgated by the SEC under the Securities Act and the Exchange Act, respectively.

(b)    SuperMedia, Newco and Dex shall make all necessary filings with respect to the Mergers and the transactions contemplated hereby under the Securities Act and the Exchange Act and applicable state "blue sky" laws and the rules and regulations thereunder.

(c)    SuperMedia, Newco and Dex shall use reasonable best efforts to respond as promptly as practicable to any comments made by the SEC with respect to the Joint Proxy Statement and the Form S-4 (and any documents or filings incorporated by reference therein). Each of SuperMedia, Newco and Dex shall provide the other Parties and their respective counsel with (i) any comments or other communications, whether written or oral, that such Party or its counsel may receive from time to time from the SEC or its staff with respect to the Joint Proxy Statement or the Form S-4, as applicable, promptly after receipt of those comments or other communications and (ii) a reasonable opportunity to participate in the response to those comments.  As promptly as practicable after the clearance (which shall include upon expiration

of the 10-day period after filing in the event the SEC does not review the Joint Proxy Statement) of the Joint Proxy Statement and Form S-4 by the SEC (in any event no more than five (5) business days after such clearance), each of SuperMedia and Dex shall mail the Joint Proxy Statement and all other proxy materials to the holders of shares of SuperMedia Common Stock and Dex Common Stock, respectively, and, if necessary in order to comply with applicable securities Laws, after the Joint Proxy Statement shall have been so mailed, promptly circulate amended, supplemental or supplemented proxy material, and, if required in connection therewith, re-solicit proxies.

(d)    Each of Dex, Newco and SuperMedia agrees, as to it and its Affiliates, directors, officers, employees, agents or representatives, that none of the information supplied or to be supplied by Dex, Newco or SuperMedia, as applicable, expressly for inclusion or incorporation by reference in the Joint Proxy Statement, Form S-4, or any other documents filed or to be filed with the SEC in connection with the transactions contemplated hereby, will, as of the time such documents (or any amendment thereof or supplement thereto) are mailed to the holders of shares of SuperMedia Common Stock and Dex Common Stock and at the time of the SuperMedia Stockholders Meeting and the Dex Stockholders Meeting, respectively, contain any untrue statement of a material fact, or omit to state any material fact required to be stated therein in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  Each of Dex, Newco and SuperMedia further agrees that all documents that such Party is responsible for filing with the SEC in connection with the Mergers will comply as to form and substance in all material respects with the applicable requirements of the Securities Act, the Exchange Act and any other applicable Laws and will not contain any untrue statement of a material fact, or omit to state any material fact required to be stated therein in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  If, at any time prior to the SuperMedia Effective Time, Dex, Newco or SuperMedia discovers any information relating to any Party, or any of their respective Affiliates, officers or directors, that should be set forth in an amendment or supplement to the Joint Proxy Statement or the Form S-4, so that none of those documents would include any misstatement of a material fact or omit to state any material fact necessary to make the statements in any such document, in light of the circumstances under which they were made, not misleading, the Party that discovers that information shall promptly notify the other parties and an appropriate amendment or supplement describing that information shall be promptly filed with the SEC and, to the extent required by law or regulation, disseminated to the stockholders of SuperMedia and Dex.

(e)    No amendment or supplement to the Joint Proxy Statement or the Form S-4 will be made by Dex, Newco or SuperMedia without the approval of the other Parties, which approval shall not be unreasonably withheld or delayed; provided, that with respect to documents filed by a Party which are incorporated by reference in the Form S-4 or Joint Proxy Statement, this right of approval shall apply only with respect to information relating to the other Party or its business, financial condition or results of operations; and provided, further, that SuperMedia, in connection with a Change in SuperMedia Recommendation, may amend or supplement the Joint Proxy Statement (including by incorporation by reference) pursuant to an amendment or supplement to the Joint Proxy Statement (including by incorporation by reference) to the extent it contains (i) a Change in SuperMedia Recommendation, (ii) a statement of the reasons of the Board of Directors of SuperMedia for making such a Change in SuperMedia Recommendation

and (iii) additional information reasonably related to the foregoing, and <u>provided</u>, <u>further</u>, that Dex, in connection with a Change in Dex Recommendation, may amend or supplement the Joint Proxy Statement (including by incorporation by reference) pursuant to an amendment or supplement to the Joint Proxy Statement (including by incorporation by reference) to the extent it contains (i) a Change in Dex Recommendation, (ii) a statement of the reasons of the Board of Directors of Dex for making such a Change in Dex Recommendation and (iii) additional information reasonably related to the foregoing. Each Party will advise the other Parties, promptly after it receives notice thereof, of the time when the Form S-4 has become effective or any supplement or amendment has been filed, the issuance of any stop order, the suspension of the qualification of Dex Common Stock issuable in connection with the Mergers for offering or sale in any jurisdiction, or any request by the SEC for amendment of the Joint Proxy Statement or the Form S-4.

6.2    <u>Stockholder Meeting</u>.

(a)    SuperMedia and Dex shall duly call, give notice of and hold a meeting of their respective stockholders (the "<u>SuperMedia Stockholder Meeting</u>" and the "<u>Dex Stockholder Meeting</u>," respectively and each a "<u>Stockholder Meeting</u>") as promptly as practicable following the date on which the Joint Proxy Statement is cleared by the SEC for the purpose of obtaining the SuperMedia Stockholder Merger Approval and the Dex Stockholder Merger Approval, respectively; <u>provided</u>, that without the prior written consent of Dex, (i) the SuperMedia Stockholder Meeting shall not be held later than forty-five (45) calendar days after the date on which the Joint Proxy Statement is mailed to SuperMedia's stockholders, and (ii) SuperMedia may not adjourn or postpone the SuperMedia Stockholder Meeting; <u>provided</u>, <u>further</u>, that without the prior written consent of SuperMedia, (i) the Dex Stockholder Meeting shall not be held later than forty-five (45) calendar days after the date on which the Joint Proxy Statement is mailed to Dex's stockholders, and (ii) Dex may not adjourn or postpone the Dex Stockholder Meeting; <u>provided</u>, <u>further</u>, that notwithstanding the foregoing, Dex may require SuperMedia to adjourn or postpone the SuperMedia Stockholder Meeting one (1) time and SuperMedia may require Dex to adjourn or postpone the Dex Stockholder Meeting one (1) time, in each case, for a period not to exceed 10 business days.  SuperMedia and Dex shall each use their reasonable best efforts to cause the SuperMedia Stockholder Meeting and the Dex Stockholder Meeting to be held on the same day.

(b)    SuperMedia and Dex shall each establish a record date for purposes of determining stockholders entitled to (i) notice of and vote at the SuperMedia Stockholder Meeting and the Dex Stockholder Meeting, respectively, and (ii) vote to accept or reject the SuperMedia Pre-Pack Plan and the Dex Pre-Pack Plan, respectively (the "<u>SuperMedia Record Date</u>" and the "<u>Dex Record Date</u>," respectively and each, a "<u>Record Date</u>") that is within ten days prior to the date on which the Joint Proxy Statement is mailed to SuperMedia's stockholders and Dex's stockholders, respectively.  Once such date is established, neither SuperMedia nor Dex shall change its respective Record Date without the prior written consent of Dex or SuperMedia, as applicable, unless required to do so by applicable Law.  In the event that the date of the SuperMedia Stockholder Meeting or Dex Stockholder Meeting as originally called is for any reason adjourned or postponed or otherwise delayed, SuperMedia and Dex each agrees that unless the Other Party shall have otherwise approved in writing, the adjournment or

postponement or other delay shall be implemented in such a way that SuperMedia or Dex, as applicable, does not establish a new Record Date, except as required by applicable Law.

(c)    Subject to <u>Section 6.12(c)</u>, (i) at the SuperMedia Stockholder Meeting, SuperMedia shall, through its Board of Directors, unless there has been a Change in SuperMedia Recommendation, make the SuperMedia Recommendation and SuperMedia shall (x) take all reasonable lawful action to solicit the SuperMedia Stockholder Merger Approval and the SuperMedia Stockholder Plan Approval, and (y) publicly reaffirm the SuperMedia Recommendation within two (2) business days after any request by Dex and (ii) at the Dex Stockholder Meeting, Dex shall, through its Board of Directors, unless there has been a Change in Dex Recommendation, make the Dex Recommendation and Dex shall (x) take all reasonable lawful action to solicit the Dex Stockholder Merger Approval and the Dex Stockholder Plan Approval, and (y) publicly reaffirm the Dex Recommendation within two (2) business days after any request by SuperMedia. Notwithstanding (A) any Change in SuperMedia Recommendation or Change in Dex Recommendation or (B) any Acquisition Proposal having been publicly proposed or announced or otherwise submitted to SuperMedia, Dex or any of their respective representatives, this Agreement and the Mergers shall be submitted to the stockholders of SuperMedia and Dex for the purpose of obtaining a SuperMedia Stockholder Approval and a Dex Stockholder Approval. SuperMedia and Dex each shall, upon reasonable request, advise the other party at least on a daily basis on each of the last ten (10) business days prior to the date of the SuperMedia Stockholder Meeting or the Dex Stockholder Meeting, as applicable, as to the aggregate tally of the proxies received by SuperMedia with respect to the SuperMedia Stockholder Merger Approval or by Dex with respect to the Dex Stockholder Merger Approval. Without the prior written consent of Dex, the adoption of this Agreement and the transactions contemplated hereby (including the Mergers) shall be the only matter (other than procedure matters) which SuperMedia shall propose to be acted on by the stockholders of SuperMedia at the SuperMedia Stockholder Meeting, and without the prior written consent of SuperMedia, the adoption of this Agreement and the transactions contemplated hereby (including the Mergers) shall be the only matter (other than procedure matters) which Dex shall propose to be acted on by stockholders of Dex at the Dex Stockholders Meeting, except in each case to the extent otherwise required by applicable Law.

6.3    <u>Regulatory Matters</u>.

(a)    The Parties shall cooperate with each other and use their respective reasonable best efforts to promptly prepare and file all necessary documentation (including Notification and Report Forms, if required, under the HSR Act (which, if required, shall be filed within ten business days of the date hereof) and any applicable Laws in foreign jurisdictions governing antitrust or merger control matters), to effect all applications, notices, petitions and filings, to obtain as promptly as practicable all Permits, consents, approvals, clearances and authorizations of all third parties and Governmental Entities that are necessary or advisable to consummate the transactions contemplated by this Agreement (including the Mergers), to use reasonable best efforts to cause the expiration or termination of any applicable waiting periods, or receipt of required authorizations, as applicable, under the HSR Act and any applicable Laws in foreign jurisdictions governing antitrust or merger control matters, to supply as promptly as practicable any additional information and documentary material that may be requested pursuant to the HSR Act or any applicable Laws in foreign jurisdictions governing antitrust or merger

control matters and to comply with the terms and conditions of all such Permits, consents, approvals, clearances and authorizations of all such Governmental Entities.  Each of SuperMedia and Dex shall have the right to review in advance, and, to the extent practicable, each will consult the other on, in each case subject to applicable Laws relating to the exchange of information, all the information relating to SuperMedia or Dex, as the case may be, and any of their respective Subsidiaries, which appear in any filing made with, or written materials submitted to, any third party or any Governmental Entity in connection with the transactions contemplated by this Agreement.  In exercising the foregoing right, each of the Parties shall act reasonably and as promptly as practicable.  Each of SuperMedia and Dex shall consult with each other with respect to the obtaining of all Permits, consents, approvals, clearances and authorizations of all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated by this Agreement and each will keep the other apprised of the status of matters relating to completion of the transactions contemplated by this Agreement, including promptly furnishing the Other Party with copies of notices or other communications received by SuperMedia or Dex, as the case may be, or any of their respective Subsidiaries, from any third party and/or any Governmental Entity with respect to such transactions.  Notwithstanding the foregoing, nothing in this Agreement shall be deemed to require Dex or SuperMedia to take any action, or commit to take any action, or agree to any condition or restriction, in connection with obtaining the foregoing Permits, consents, approvals, clearances and authorizations of third parties or Governmental Entities, that would reasonably be expected to have a material adverse effect on Newco, Dex, SuperMedia, Dex Surviving Company or SuperMedia Surviving Company (a "Materially Burdensome Condition").  In addition, SuperMedia and Dex agree to cooperate and use their reasonable best efforts to prepare and file such petitions and filings, and to obtain such permits, consents, approvals, clearances and authorizations of third parties and Governmental Entities, that may be necessary or advisable to effect any mergers and/or consolidations of the SuperMedia Subsidiaries and the Dex Subsidiaries following consummation of the Mergers.

(b)    Each of Dex and SuperMedia shall, upon request, furnish to the other all information concerning itself, its Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of Dex, SuperMedia or any of their respective Subsidiaries to any Governmental Entity in connection with the Mergers and the other transactions contemplated by this Agreement.

(c)    Each of Dex, the Merger Subs and SuperMedia shall promptly advise the others upon receiving any communication from any Governmental Entity the consent or approval of which is required for consummation of the transactions contemplated by this Agreement that causes such Party to believe that there is a reasonable likelihood that any Requisite Approval will not be obtained or that the receipt of any such approval may be materially delayed, and, to the extent permitted by applicable Law, shall promptly (and in any event within 24 hours) provide the Other Party with a copy of such communication.

6.4    Transaction Litigation.  Subject to the provisos contained in Section 6.3 expressly eliminating any obligation to take actions that would result in a Materially Burdensome Condition, if any administrative or judicial action or proceeding, including any proceeding by a private party, is instituted (or threatened to be instituted) challenging any

transaction contemplated by this Agreement, each of SuperMedia and Dex shall promptly notify the Other Party of such action or proceeding, shall cooperate in all respects with the other and shall use their respective reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement.  Each of Dex and SuperMedia shall give the Other Party the opportunity to participate in the defense or settlement of any stockholder litigation against such Party and its directors relating to the Mergers and the other transactions contemplated by this Agreement.   No Party shall compromise, settle, come to an arrangement regarding or agree to any of the foregoing regarding any such action or proceeding unless the other Parties have consented in writing. Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Section 6.4 shall limit a Party's right to terminate this Agreement pursuant to Section 8.1(b) or 8.1(c) so long as such Party has, prior to such termination, complied with its obligations under this Section 6.4.

6.5    Access to Information.    (a) Upon reasonable notice and subject to applicable Laws relating to the exchange of information, each of SuperMedia and Dex shall, and shall cause each of its Subsidiaries to, afford to the officers, employees, accountants, counsel and other representatives of the other reasonable access, during normal business hours during the period prior to the SuperMedia Effective Time, to all its properties, books, contracts, commitments and records, and, during such period, each of SuperMedia and Dex shall, and shall cause its Subsidiaries to, make available to the Other Party all other information concerning its business, properties and personnel as the other may reasonably request. Each of SuperMedia and Dex shall, and shall cause each of its Subsidiaries to, provide to the Other Party a copy of each report, schedule, registration statement and other document filed by it during such period pursuant to the requirements of federal securities Laws.  Neither SuperMedia nor Dex nor any of their Subsidiaries shall be required to provide access to or to disclose information where such Party determines in good faith, after consultation with legal counsel, that such access or disclosure would jeopardize the attorney-client privilege of such Party or its Subsidiaries or contravene any Law, Order or binding agreement entered into prior to the Original Agreement Date.  The Parties shall make appropriate substitute disclosure arrangements under circumstances in which the restrictions of the preceding sentence apply.

(b)     All information and materials provided pursuant to this Agreement shall be subject to the provisions of the Confidentiality Agreement entered into between SuperMedia and Dex as of May 13, 2010 (the "Confidentiality Agreement").

(c)     No investigation by any of the Parties or their respective representatives shall affect the representations and warranties of the other set forth in this Agreement.

6.6    Legal Conditions to Merger.  Subject to Section 6.3, each of Dex, Newco and SuperMedia shall, and shall cause its Subsidiaries to, use their reasonable best efforts (i) to take, or cause to be taken, all actions necessary, proper or advisable to comply promptly with all legal requirements that may be imposed on such Party or its Subsidiaries with respect to the Mergers, to cause the conditions set forth in Article VII to be satisfied  and to consummate the transactions contemplated by this Agreement in a reasonably expeditious manner and (ii) to

obtain (and to cooperate with the Other Party to obtain) any material consent, authorization, order or approval of, or any exemption by, any Governmental Entity and any other third party that is required to be obtained by SuperMedia, Newco or Dex or any of their respective Subsidiaries in connection with the Mergers and the other transactions contemplated by this Agreement.

6.7     Stock Exchange Listing.  Dex shall cause the shares of Newco Common Stock to be issued in the Mergers and such other shares of Newco Common Stock to be reserved for issuance in connection with the Mergers to be approved for listing on the NYSE or the NASDAQ, subject to official notice of issuance, prior to the Dex Effective Time.

6.8     Indemnification and Insurance.

(a)     For a period of at least six years following the SuperMedia Effective Time, the certificate of incorporation and bylaws of the SuperMedia Surviving Company shall contain provisions no less favorable with respect to exculpation and indemnification of the (as of or prior to the SuperMedia Effective Time) former directors, officers and employees of SuperMedia than are currently provided in the SuperMedia Charter and the SuperMedia Bylaws, as applicable, which provisions shall not be amended, repealed or otherwise modified in any manner that would adversely affect the rights thereunder of any such individuals until the expiration of the statutes of limitations applicable to such matters or unless such amendment, modification or repeal is required by applicable Law.

(b)     Without limiting the provisions of Section 6.8(a), in the event of any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal or administrative, including any such claim, action, suit, proceeding or investigation in which any individual who is now, or has been at any time prior to the Original Agreement Date, or who becomes prior to the SuperMedia Effective Time, a director or officer of SuperMedia or any SuperMedia Subsidiary or who is or was serving at the request of SuperMedia or any SuperMedia Subsidiary as a director or officer of another Person (the "Indemnified Parties"), is, or is threatened to be, made a party based in whole or in part on, or arising in whole or in part out of, or pertaining to (i) the fact that he is or was a director or officer of SuperMedia or any SuperMedia Subsidiary, or of another Person at the request of SuperMedia or any SuperMedia Subsidiary, or (ii) this Agreement or any of the transactions contemplated by this Agreement, whether asserted or arising before or after the SuperMedia Effective Time, the Parties shall cooperate and use their best efforts to defend against and respond thereto.  From and after the Effective Time, Dex Surviving Company shall indemnify and hold harmless, as and to the fullest extent permitted under applicable Law and any agreement set forth in Section 6.8 of the SuperMedia Disclosure Schedule (an "Indemnification Agreement"), each such Indemnified Party against any losses, claims, damages, liabilities, costs, expenses (including reimbursement for reasonable fees and expenses incurred in advance of the final disposition of any claim, suit, proceeding or investigation upon receipt of any undertaking required by applicable Law), judgments, fines and amounts paid in settlement in connection with any such threatened or actual claim, action, suit, proceeding or investigation.  In the event of any such proceeding, each Indemnified Party will be entitled to advancement of expenses incurred in the defense of the proceeding from Dex Surviving Company to the same extent such Persons have the right to advancement of expenses from SuperMedia as of the Original Agreement Date pursuant to the

SuperMedia Charter and SuperMedia Bylaws or such Person's Indemnification Agreement (provided that any Person to whom expenses are advanced shall have provided an undertaking to repay such advances if it is finally determined that such Person is not entitled to indemnification).

(c)    SuperMedia may purchase prior to the SuperMedia Effective Time a fully pre-paid six-year tail policy providing coverage and benefits that is substantially equivalent to the current directors' and officers' liability insurance policies maintained on the Original Agreement Date by SuperMedia (complete and accurate copies of which shall have been made available to Dex before such purchase).  If such policies have been obtained, Dex Surviving Company shall or shall cause SuperMedia Surviving Company to maintain such policies in full force and effect. If SuperMedia does not obtain a tail policy, Dex Surviving Company shall cause to be maintained for a period of six years after the Closing Date the current directors' and officers' liability insurance policies maintained by SuperMedia; provided, that Dex Surviving Company may substitute therefor policies of at least the same coverage containing terms and conditions that are not materially less favorable from an insurance carrier with the same or better credit rating as SuperMedia's current insurance carrier. Notwithstanding the foregoing, in no event shall Dex Surviving Company or SuperMedia Surviving Company be required to expend for such policies an annual premium greater than 300% of the existing annual premium on SuperMedia's current directors' and officers' liability insurance policies (the "Maximum Amount"); provided, that if SuperMedia Surviving Company is unable to maintain or obtain the insurance called for by this Section 6.8(c), Dex Surviving Company shall cause SuperMedia Surviving Company to obtain as much comparable insurance as available for the applicable Maximum Amount.

(d)    In the event that Dex Surviving Company or SuperMedia Surviving Company or any of their successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all of its properties and other assets to any Person, then, in each such case, Dex Surviving Company shall, and shall cause (as applicable) SuperMedia Surviving Company to, cause proper provision to be made so that the successors and assigns of Dex Surviving Company or SuperMedia Surviving Company, as applicable, shall expressly assume the obligations of such entity as set forth in this Section 6.8.

(e)    The provisions of this Section 6.8 shall survive the SuperMedia Effective Time and are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party and his or her heirs and representatives.

6.9    Additional Agreements.    In case at any time after the SuperMedia Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement (including any merger between a Subsidiary of Dex Surviving Company, on the one hand, and a SuperMedia Subsidiary, on the other) or to vest Dex Surviving Company or SuperMedia Surviving Company with full title to all properties, assets, rights, approvals, immunities and franchises of any party to the Mergers, the proper officers and directors of each Party and their respective Subsidiaries shall take all such necessary action as may be reasonably requested by, and at the sole expense of, Dex.

6.10    <u>Advice of Changes</u>.  Each of Dex, the Merger Subs and SuperMedia shall promptly advise the other Parties of any change or event (i) having or reasonably likely to have a Material Adverse Effect on it or (ii) that it believes would or would be reasonably likely to cause or constitute a breach of any of its representations, warranties or covenants contained in this Agreement; <u>provided</u>, <u>however</u>, that no such notification shall affect the representations, warranties, covenants or agreements of the Parties (or remedies with respect thereto) or the conditions to the obligations of the Parties under this Agreement; <u>provided</u>, <u>further</u>, that a failure to comply with this <u>Section 6.10</u> shall not constitute the failure of any condition set forth in <u>Article VII</u> to be satisfied unless the underlying Material Adverse Effect or breach would independently result in the failure of a condition set forth in <u>Article VII</u> to be satisfied.

6.11    <u>Exemption from Liability Under Section 16(b)</u>.  Prior to the Closing Date, Dex and SuperMedia shall take all such steps as may be required to cause the transactions contemplated by this Agreement, including any dispositions of SuperMedia Common Stock or Dex Common Stock (including derivative securities with respect to SuperMedia Common Stock or Dex Common Stock) or acquisitions of Newco Common Stock (including derivative securities with respect to Newco Common Stock), by each individual who is subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to SuperMedia or Dex or will become subject to such reporting requirements with respect to Newco, to be exempt under Rule 16b-3 promulgated under the Exchange Act.

6.12    <u>No Solicitation</u>.

(a)    Neither SuperMedia nor Dex (each, a "<u>No-Shop Party</u>", and with respect to each other, the "<u>Other Party</u>") shall, and each shall cause its respective Subsidiaries not to, and each shall direct its and its Subsidiaries' officers, directors, employees, agents and representatives (including any investment banker, financial advisor, attorney, accountant or other retained representative) not to, directly or indirectly (i) solicit, initiate, encourage or facilitate, directly or indirectly (including by way of furnishing information), or take any other action designed to facilitate, any inquiries or proposals regarding any merger (other than the Mergers), share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer), restructuring, recapitalization or similar transactions involving such No-Shop Party or any of its Subsidiaries that, if consummated, would constitute an Alternative Transaction (any of the foregoing inquiries or proposals being referred to herein as an "<u>Acquisition Proposal</u>"), (ii) participate in any discussions or negotiations regarding an Alternative Transaction, (iii) except as contemplated by <u>Section 6.13</u>, take any action to exempt any Person from the restrictions contained in any takeover or similar Law or otherwise cause such restrictions not to apply or (iv) enter into any merger agreement, letter of intent, agreement in principle, share purchase agreement or other agreement regarding any Alternative Transaction. Notwithstanding the foregoing, the Board of Directors of a No-Shop Party shall be permitted, prior to the meeting of stockholders of such No-Shop Party to be held pursuant to <u>Section 6.2</u>, and subject to compliance with the other terms of this <u>Section 6.12</u> and to first entering into a confidentiality agreement with the Person proposing such Acquisition Proposal on terms substantially similar to, and no less favorable to such No-Shop Party than, those contained in the Confidentiality Agreement, to furnish information concerning such No-Shop Party and its Subsidiaries to the Person making such Acquisition Proposal and to consider and participate in discussions and negotiations with respect to such Acquisition Proposal received by such No-

Shop Party, if and only to the extent that (A) such Acquisition Proposal is an unsolicited, bona fide written Acquisition Proposal, (B) such Acquisition Proposal did not result from a breach by such No-Shop Party of this <u>Section 6.12</u>, and (C) the Board of Directors of such No-Shop Party reasonably determines in good faith (after consultation with such No-Shop Party's outside legal counsel and independent financial advisors) that (x) such Acquisition Proposal constitutes or would reasonably be expected to lead to a Superior Proposal and (y) failure to do so would be inconsistent with its duties under applicable Laws.  Such No-Shop Party shall promptly provide or make available to the Other Party and its representatives any non-public information provided or made available to such other Person that was not previously provided or made available to the Other Party.

As used in this Agreement, "<u>Alternative Transaction</u>" means, in respect of either No-Shop Party, any of (i) a transaction pursuant to which any Person (or group of Persons) other than the Other Party or its Affiliates, directly or indirectly, acquires or would acquire more than 10 percent of the outstanding shares of SuperMedia Common Stock or Dex Common Stock, as applicable, or outstanding voting power or of any new series or new class of preferred stock that would be entitled to a class or series vote with respect to the Mergers, whether from such No-Shop Party, or pursuant to a tender offer or exchange offer or otherwise, (ii) any transaction pursuant to which any Person (or group of Persons) other than the Other Party or its Affiliates acquires or would acquire control of assets (including for this purpose the outstanding equity securities of any Subsidiaries of such No-Shop Party and securities of the entity surviving any merger or business combination, including any of its Subsidiaries) of such No-Shop Party or any of its Subsidiaries representing more than ten (10) percent of the fair market value of all the assets, net revenues or net income of such No-Shop Party and its Subsidiaries, taken as a whole, immediately prior to such transaction, or (iii) any other merger, consolidation, business combination, restructuring, recapitalization or similar transaction involving such No-Shop Party or any of its subsidiaries, other than the transactions contemplated by this Agreement, as a result of which the holders of shares of SuperMedia Common Stock or Dex Common Stock, as applicable, immediately prior to such transaction do not, in the aggregate, own at least 90 percent of each of the outstanding shares of common stock and the outstanding voting power of the surviving or resulting entity in such transaction immediately after the consummation thereof in substantially the same proportion as such holders held the shares of SuperMedia Common Stock or Dex Common Stock, as applicable, immediately prior to the consummation thereof.

As used in this Agreement, "<u>Superior Proposal</u>" means, with respect to a No-Shop Party, a bona fide written Acquisition Proposal (with the references to 10 percent included in the definition of Alternative Transaction changed to 50 percent and the reference to 90 percent in clause (iii) of such definition changed to 50 percent) for such No-Shop Party obtained not in violation of this <u>Section 6.12</u> which the Board of Directors of such No-Shop Party determines in good faith, after consultation with its financial advisors and outside legal counsel, and taking into account such facts as the Board of Directors considers to be appropriate (including conditions to and expected timing and risks of consummation, the ability of the Person making such proposal to obtain financing for such Acquisition Proposal, and any break-up fees or expense reimbursement provisions), (i) is reasonably likely to be consummated in accordance with its terms, and (ii) if consummated, would result in a transaction more favorable to the holders of common stock of such No-Shop Party than the Mergers.

(b)　　Other than in accordance with Section 6.12(c) below, the Board of Directors of a No-Shop Party shall not (i) withdraw (or not continue to make) or modify or qualify in a manner adverse to the Other Party, or publicly propose to withdraw (or not continue to make) or modify or qualify in a manner adverse to the Other Party, the SuperMedia Recommendation or the Dex Recommendation, as the case may be, (ii) approve, adopt or recommend, or publicly propose to approve, adopt or recommend, any Acquisition Proposal, (iii) fail to recommend against any Acquisition Proposal within two business days upon the request of the Other Party, or (iv) take any other action or make any other public statement that is inconsistent with the SuperMedia Recommendation or Dex Recommendation, as the case may be (any action described in clauses (i) through (iv), taken by the Board of Directors of either SuperMedia or Dex, a "Change in SuperMedia Recommendation" or a "Change in Dex Recommendation", respectively).

(c)　　Notwithstanding anything to the contrary in this Section 6.12, at any time prior to obtaining a SuperMedia Stockholder Approval or a Dex Stockholder Approval, as applicable, the Board of Directors of a No-Shop Party may (x) effect a Change in SuperMedia Recommendation or a Change in Dex Recommendation, as applicable, other than in respect of an Acquisition Proposal or (y) effect a Change in SuperMedia Recommendation or a Change in Dex Recommendation, as applicable, in respect of a Acquisition Proposal if the following conditions are met:

> (i)　　the No-Shop Party has complied in all material respects with its obligations under this Section 6.12 and the Board of Directors of the No-Shop Party has determined in good faith (after consultation with its financial advisors and outside legal counsel) that the failure to take such action would be inconsistent with its duties under applicable Laws;

> (ii)　　in the case of any action described in clause (x) above, (a) the No-Shop Party has provided prior written notice to the Other Party, at least three business days in advance, of its intention to effect a Change in SuperMedia Recommendation or a Change in Dex Recommendation, as applicable, which notice shall specify in reasonable detail the reasons therefor, (b) prior to effecting such Change in SuperMedia Recommendation or a Change in Dex Recommendation, as applicable, the No-Shop Party shall, and shall cause its legal and financial advisors to, during such three business day period, negotiate with the Other Party in good faith (to the extent the Other Party desires to negotiate) and (c) the Board of Directors of the No-Shop Party shall consider in good faith whether such modifications make a Change in SuperMedia Recommendation or a Change in Dex Recommendation, as applicable, unnecessary; and

> (iii)　　in the case of any action described in clause (y) above, (a) the Board of Directors of such No-Shop Party has concluded in good faith (after consultation with its financial advisors and outside legal counsel) that such Acquisition Proposal constitutes a Superior Proposal after giving effect to all of the adjustments which may be offered by the Other Party pursuant to

this clause (iii) (if applicable), (b) the No-Shop Party has provided prior written notice to the Other Party, at least three business days in advance (the "Notice Period"), of its intention to effect a Change in SuperMedia Recommendation or a Change in Dex Recommendation, as applicable, and/or to terminate the Agreement, which notice shall specify the material terms and conditions of any such Superior Proposal (including the identity of the party making such Superior Proposal), and contemporaneously with providing such notice shall have provided a copy of the relevant proposed transaction agreements with the party making such Superior Proposal and other material documents, and (c) prior to effecting such Change in SuperMedia Recommendation or Change in Dex Recommendation, as applicable, the No-Shop Party shall, and shall cause its legal and financial advisors to, during the Notice Period, negotiate with the Other Party in good faith (to the extent the Other Party desires to negotiate) to make such adjustments to the terms and conditions of this Agreement so that such Acquisition Proposal ceases to constitute a Superior Proposal.  In the event that during the Notice Period any revisions are made to the Superior Proposal and the Board of Directors of such No-Shop Party in its good faith judgment determines such revisions are material (it being agreed that any change in the purchase price in such Superior Proposal shall be deemed a material revision), the No-Shop Party shall be required to deliver a new written notice to the Other Party and to comply with the requirements of this Section 6.12(c) with respect to such new written notice.

(d)     Each No-Shop Party shall notify the Other Party promptly (but in no event later than 24 hours) after receipt of any Acquisition Proposal, or any material modification of or material amendment to any Acquisition Proposal, or any request for nonpublic information relating to such No-Shop Party or any of its Subsidiaries or for access to the properties, books or records of such No-Shop Party or any of its Subsidiaries by any Person or entity that informs the Board of Directors of such No-Shop Party or any Subsidiary of such No-Shop Party that it is considering making, or has made, an Acquisition Proposal.  Such notice to the Other Party shall be made orally and in writing, and shall indicate the identity of the Person making the Acquisition Proposal or intending to make or considering making an Acquisition Proposal or requesting non-public information or access to the books and records of such No-Shop Party or any of its Subsidiaries, and the material terms of any such Acquisition Proposal or modification or amendment to an Acquisition Proposal.  Each No-Shop Party shall keep the Other Party fully informed, on a current basis, of any material changes in the status and any material changes or modifications in the terms of any such Acquisition Proposal, indication or request, and at all times shall negotiate in good faith with the Other Party regarding possible modifications to the terms of this Agreement which may arise in connection with any Acquisition Proposal.  Each No-Shop Party shall also promptly, and in any event within 24 hours, notify the Other Party, orally and in writing, if it enters into discussions or negotiations concerning any Acquisition Proposal in accordance with this Section 6.12.

(e)     Nothing contained in this Section 6.12 shall prohibit a No-Shop Party or its Subsidiaries from taking and disclosing to its stockholders a position required by Rule 14e-2(a) or Rule 14d-9 promulgated under the Exchange Act.

(f)     Each No-Shop Party and its Subsidiaries shall immediately cease and cause to be terminated any existing discussions or negotiations with any Persons (other than the Other Party) conducted heretofore with respect to any of the foregoing, and shall use reasonable best efforts to cause all Persons other than the Other Party who have been furnished confidential information regarding such No-Shop Party in connection with the solicitation of or discussions regarding an Acquisition Proposal within the 12 months prior to the Original Agreement Date promptly to return or destroy such information.  Except as may be required by applicable Law, each No-Shop Party agrees not to, and to cause its Subsidiaries not to, release any third party from the confidentiality and standstill provisions of any agreement to which such No-Shop Party or its Subsidiaries is or may become a party, and shall immediately take all steps necessary to terminate any approval that may have been heretofore given under any such provisions authorizing any Person to make an Acquisition Proposal.

(g)     Each No-Shop Party shall ensure that the officers, directors and all employees, agents and representatives (including any investment bankers, financial advisors, attorneys, accountants or other retained representatives) of such No-Shop Party or its Subsidiaries are aware of the restrictions described in this Section 6.12 as reasonably necessary to avoid violations thereof.  It is understood that any violation of the restrictions set forth in this Section 6.12 by any officer, director, employee, agent or representative (including any investment banker, financial advisor, attorney, accountant or other retained representative) of a No-Shop Party or its Subsidiaries, at the direction or with the consent of such No-Shop Party or its Subsidiaries, shall be deemed to be a breach of this Section 6.12 by such No-Shop Party.

6.13     Takeover Statutes.  Each of Dex, the Merger Subs and SuperMedia shall use its reasonable best efforts (i) to take all actions necessary so that no "moratorium," "control share," "fair price," "anti-greenmail," "takeover," "interested stockholder" or similar Law is or becomes applicable to the Mergers, or any of the other transactions contemplated by this Agreement and (ii) if any such Law is or becomes applicable to the Mergers or any of the other transactions contemplated by this Agreement, to take all actions necessary so that the Mergers and the other transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise to minimize the effect of such Laws on the Mergers and the other transactions contemplated hereby.

6.14     Financing Amendments and Cooperation.  Each of Dex and SuperMedia shall, and shall cause its respective Subsidiaries to, use commercially reasonable efforts (and shall cause its and its respective Subsidiaries' officers, employees and advisors, including legal and financial advisors and accountants, to cooperate in such efforts) to (i) obtain the consent of the creditors (the "Dex Creditors") of Dex under (x) the Third Amended and Restated Credit Agreement, dated as of January 29, 2010, and further amended March 9, 2012, among Dex One Corporation, R.H. Donnelley Inc., the lenders party thereto, Deutsche Bank Trust Company Americas and JPMorgan Chase Bank, N.A. (the "RHDI Facility"), (y) the Credit Agreement, dated as of June 6, 2008, as amended and restated as of January 29, 2010, and further amended March 9, 2012, by and among Dex One Corporation, Dex Media, Inc., Dex Media West, Inc.,

Dex Media West LLC, the lenders parties thereto and JPMorgan Chase Bank, N.A. (the "Dex West Facility"), and (z) the Credit Agreement, dated as of October 24, 2007, as amended and restated as of January 29, 2010, and further amended March 9, 2012, by and among Dex Corporation, Dex Media, Inc., Dex Media East, Inc., Dex Media East LLC, the lenders parties thereto and JPMorgan Chase Bank, N.A. (the "Dex East Facility," and collectively, the "Dex Credit Facilities") to the amendments and extensions of the Dex Credit Facilities described on Exhibit G (the "Dex Financing Amendments") and to the consummation of the transactions contemplated by this Agreement, (ii) obtain the consent of the creditors (the "SuperMedia Creditors") of SuperMedia under the Loan Agreement, dated as of December 31, 2009 and amended December 14, 2010 and November 8, 2011, among SuperMedia, the lenders party thereto, and JPMorgan Chase Bank, N.A., (the "SuperMedia Credit Facility") to the amendments and extension of the SuperMedia Credit Facility described on Exhibit H (the "SuperMedia Financing Amendments") and to the consummation of the transactions contemplated by this Agreement, (iii) prepare, negotiate and enter into all required documentation with respect to the Dex Financing Amendments and the SuperMedia Financing Amendments on terms and conditions reasonably satisfactory to Dex and SuperMedia, and (iv) satisfy as promptly as reasonably practicable all conditions applicable to it for the completion of the Dex Financing Amendments immediately following the Closing and the SuperMedia Financing Amendments immediately prior to the Closing. Dex shall permit SuperMedia to participate in any meeting with the Dex Creditors, and SuperMedia shall permit Dex to participate in any meeting with the SuperMedia Creditors, to the extent permitted by such creditors. Dex and SuperMedia shall cooperate in the preparation of any materials to be provided to the Dex Creditors and the SuperMedia Creditors. Each Party will promptly provide the Other Party with copies of any communications received from the Dex Creditors or the SuperMedia Creditors, as applicable, and will keep the Other Party apprised of the status of discussions with the Dex Creditors and the SuperMedia Creditors, as applicable, including any request for information received from the Dex Creditors or the SuperMedia Creditors, as applicable, and any requested revisions to the amendments and extensions comprising the Dex Financing Amendments and the SuperMedia Financing Amendments. Subject to recipients of any such information entering into customary arrangements for confidentiality that are substantially similar to the provisions in the Confidentiality Agreement or reasonably acceptable to Dex or SuperMedia, as applicable, each of Dex and SuperMedia shall provide financial and other information regarding Dex and its Subsidiaries or SuperMedia and its Subsidiaries as may be reasonably requested by such creditors. The Parties shall otherwise cooperate in any manner reasonably requested in connection with the negotiation, arranging and consummation of the Dex Financing Amendments and the SuperMedia Financing Amendments.

6.15    De-listing and Deregistration.  Prior to the SuperMedia Effective Time, SuperMedia shall cooperate with Dex and use its reasonable best efforts to take, or cause to be taken, all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its part under Applicable Laws and rules and policies of the NASDAQ to enable the de-listing by SuperMedia Surviving Company of the SuperMedia Common Stock from the NASDAQ and the deregistration of the SuperMedia Common Stock and other securities of SuperMedia under the Exchange Act and the Securities Act as promptly as practicable after the SuperMedia Effective Time.

6.16    _Assumption of Agreements_.    Effective at the SuperMedia Effective Time, Dex Surviving Company shall, and shall cause the SuperMedia Surviving Company to, expressly assume all obligations of SuperMedia arising under (i) SuperMedia's Amended and Restated Executive Transition Plan, dated as of May 26, 2010, and (ii) any Award Agreement (as such term is defined in SuperMedia's 2009 Long-Term Incentive Plan) entered into pursuant to SuperMedia's 2009 Long-Term Incentive Plan.

6.17    _Chapter 11 Process and Solicitations_.

(a)    Unless there has been a Change in Dex Recommendation, Dex shall, and shall cause its Subsidiaries to, fulfill the obligations set forth for Dex and its Subsidiaries in Section 2.1(a) of that certain Support and Limited Waiver Agreement, dated as of December 5, 2012, by and among Dex, Dex Media, Inc., R.H. Donnelley Inc., Dex Media East, Inc., Dex Media West, Inc., certain other subsidiaries of Dex, JPMorgan Chase Bank, N.A., Deutsche Bank Trust Company Americas and other consenting lenders from time to time parties thereto. Dex shall, upon reasonable request, advise SuperMedia at least on a daily basis on each of the last ten (10) business days prior to the date of the voting deadline for obtaining the Dex Stockholder Plan Approval, as to the aggregate tally of the votes received by Dex with respect to the Dex Stockholder Plan Approval. Except where it is not reasonably practicable, Dex shall provide draft copies of all motions or applications and other documents it intends to file with the Bankruptcy Court to SuperMedia at least one (1) business day prior to the date when Dex intends to file any such motion, application or document and shall consult in good faith with SuperMedia regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(b)    Unless there has been a Change in SuperMedia Recommendation, SuperMedia shall, and shall cause its Subsidiaries to, fulfill the obligations set forth for SuperMedia and its Subsidiaries in Section 2.1(a) of that certain Support and Limited Waiver Agreement, dated as of December 5, 2012, by and among SuperMedia, JPMorgan Chase Bank, N.A and other consenting lenders from time to time parties thereto. SuperMedia shall, upon reasonable request, advise Dex at least on a daily basis on each of the last ten (10) business days prior to the date of the voting deadline for obtaining the SuperMedia Stockholder Plan Approval, as to the aggregate tally of the votes received by SuperMedia with respect to the SuperMedia Stockholder Plan Approval. Except where it is not reasonably practicable, SuperMedia shall provide draft copies of all motions or applications and other documents it intends to file with the Bankruptcy Court to Dex at least one (1) business day prior to the date when SuperMedia intends to file any such motion, application or document and shall consult in good faith with Dex regarding the form and substance of any such proposed filing with the Bankruptcy Court.

## ARTICLE VII

## CONDITIONS PRECEDENT

7.1    _Conditions to Each Party's Obligation to Effect the Mergers_.    The respective obligations of the Parties to effect the Mergers and the other transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Dex Effective Time of the following conditions:

(a)     Stockholder Approval.  Unless SuperMedia has commenced Chapter 11 Cases pursuant to Section 6.17, the SuperMedia Stockholder Merger Approval shall have been obtained, and, unless Dex has commenced Chapter 11 Cases pursuant to Section 6.17, the Dex Stockholder Merger Approval shall have been obtained.

(b)     Stock Exchange Listing.  The shares of Newco Common Stock to be issued to the holders of SuperMedia Common Stock and Dex Common Stock upon consummation of the Mergers and such other shares of Newco Common Stock to be reserved for issuance in connection with the Mergers shall have been authorized for listing on the NYSE or the NASDAQ, subject to official notice of issuance.

(c)     Required Approvals.  (i) Any applicable waiting period under the HSR Act shall have expired or been earlier terminated and (ii) any other approvals set forth in Sections 3.4 and 4.4 required to be obtained for the consummation, as of the Closing Date, of the Mergers and the other transactions contemplated by this Agreement, other than any approvals the failure to obtain which would not, individually or in the aggregate, have a Material Adverse Effect on SuperMedia or Dex, shall have been obtained (all such approvals and the expiration or termination of all such waiting periods being referred to as the "Requisite Approvals").

(d)     Dex Financing Amendments.  Unless Dex has commenced Chapter 11 Cases pursuant to Section 6.17, any necessary consents of the Dex Creditors to the consummation of the transactions contemplated by this Agreement shall have been obtained and each of the Dex Financing Amendments shall have been agreed and executed by 100% of the Dex Creditors holding applicable debt (collectively, the "Dex Creditor Financing Amendment Approval"), to become effective immediately following the Closing.  To the extent that the terms of any such Dex Financing Amendment shall differ from those described on Exhibit G, such differences shall be reasonably acceptable to each of Dex and SuperMedia.

(e)     SuperMedia Financing Amendment.  Unless SuperMedia has commenced Chapter 11 Cases pursuant to Section 6.17, any necessary consents of the SuperMedia Creditors to the consummation of the transactions contemplated by this Agreement shall have been obtained and the SuperMedia Financing Amendment shall have been agreed and executed by 100% of the SuperMedia Creditors holding applicable debt (collectively, the "SuperMedia Creditor Financing Amendment Approval"), to become effective prior to the Closing.  To the extent that the terms of any such SuperMedia Financing Amendment shall differ from those described on Exhibit H, such differences shall be reasonably acceptable to each of Dex and SuperMedia.

(f)     Form S-4.  The Form S-4 shall have become effective under the Securities Act and no stop order suspending the effectiveness of the Form S-4 shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC.

(g)     No Injunctions or Restraints; Illegality.  No Order (whether temporary, preliminary or permanent) issued by any court or agency of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Mergers or any of the other transactions contemplated by this Agreement shall be in effect.  No statute, rule, regulation or

Order shall have been enacted, entered, promulgated or enforced by any Governmental Entity that prohibits or makes illegal consummation of the Mergers.

(h)     No Materially Burdensome Condition.  None of the Requisite Approvals shall have resulted in the imposition of a Materially Burdensome Condition.

(i)     Tax Sharing Agreement.  Dex (and its Subsidiaries) and SuperMedia (and its Subsidiaries) shall have entered into a tax sharing agreement substantially in the form set forth in Exhibit I.

(j)     Shared Services Agreement.  Dex (and its Subsidiaries) and SuperMedia (and its Subsidiaries) shall have entered into a shared services agreement substantially in the form set forth in Exhibit J.

(k)     Dex Surviving Company Board Composition.  All steps shall have been taken (including obtaining any necessary resignations and approval of any necessary appointments) so that the Board of Directors of Dex Surviving Company shall, effective upon the SuperMedia Effective Time, be composed as described in Section 1.7.

(l)     Confirmation of Chapter 11 Plans.  If SuperMedia has commenced Chapter 11 Cases pursuant to Section 6.17, the Bankruptcy Court shall have issued orders confirming a pre-packaged chapter 11 plan of reorganization for SuperMedia and certain of its Subsidiaries substantially in the form set forth in Exhibit K (the "SuperMedia Pre-Pack Plan"), and, if Dex has commenced Chapter 11 Cases pursuant to Section 6.17, the Bankruptcy Court shall have issued orders confirming a pre-packaged chapter 11 plan of reorganization for Dex and certain of its Subsidiaries substantially in the form set forth in Exhibit L (the "Dex Pre-Pack Plan").

(m)     Dex Merger.  With respect to the obligation of the Parties to effect the SuperMedia Merger, the Dex Merger shall have been consummated.

7.2     Conditions to Obligations of Dex, Newco and Merger Sub.  The obligation of Dex, Newco and Merger Sub to effect the Mergers and the other transactions contemplated by this Agreement is also subject to the satisfaction, or waiver by Dex, Newco or Merger Sub, as the case may be, at or prior to the Closing Date, of the following conditions:

(a)     Representations and Warranties.  The representations and warranties of SuperMedia set forth in this Agreement shall be true and correct as of the Original Agreement Date and as of the Closing Date as though made on and as of the Closing Date (except that representations and warranties that by their terms speak specifically as of the Original Agreement Date or another date shall be true and correct only as of such date); provided, however, that no representation or warranty of SuperMedia shall be deemed untrue or incorrect as of the Closing Date for purposes hereunder if such breach is a consequence of the filing of any Chapter 11 Cases pursuant to Section 6.17; provided, further, that no representation or warranty of SuperMedia (other than representations or warranties contained in Sections 3.1(a) (first sentence only), 3.2, 3.3(a) and 3.7, which shall be true and correct in all material respects) shall be deemed untrue or incorrect for purposes hereunder as a consequence of the existence of any

fact, event or circumstance inconsistent with such representation or warranty, unless such fact, event or circumstance, individually or taken together with all other facts, events or circumstances inconsistent with any representation or warranty of SuperMedia  (other than representations or warranties contained in Sections 3.1(a) (first sentence only), 3.2, 3.3(a) and 3.7), has had or would reasonably be expected to result in a Material Adverse Effect on SuperMedia; provided, further, that for purposes of determining whether a representation or warranty is true and correct, any qualification or exception for, or reference to, materiality (including the terms "material," "materially," "in all material respects," "Material Adverse Effect" or similar terms or phrases) in any such representation or warranty shall be disregarded; and Dex shall have received a certificate signed on behalf of SuperMedia by the Chief Executive Officer or the Chief Financial Officer of SuperMedia to the foregoing effect.

(b)    Performance of Obligations of SuperMedia.    SuperMedia shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date; and Dex shall have received a certificate signed on behalf of SuperMedia by the Chief Executive Officer or the Chief Financial Officer of SuperMedia to such effect.

(c)    No Material Adverse Effect on SuperMedia.    Since the Original Agreement Date, there shall not have occurred any change, event, circumstance or development that has had, or is reasonably expected to have, a Material Adverse Effect on SuperMedia.

7.3    Conditions to Obligations of SuperMedia.  The obligation of SuperMedia to effect the SuperMedia Merger and the other transactions contemplated by this Agreement is also subject to the satisfaction or waiver by SuperMedia at or prior to the Closing Date of the following conditions:

(a)    Representations and Warranties.    The representations and warranties of Dex and Merger Subs set forth in this Agreement shall be true and correct as of the Original Agreement Date and as of the Closing Date as though made on and as of the Closing Date (except that representations and warranties that by their terms speak specifically as of the Original Agreement Date or another date shall be true and correct only as of such date); provided, however, that no representation or warranty of Dex or Merger Subs shall be deemed untrue or incorrect as of the Closing Date for purposes hereunder if such breach is a consequence of the filing of any Chapter 11 Cases pursuant to Section 6.17; provided, further, that no representation or warranty of Dex, Newco or Merger Sub (other than representations or warranties in Sections 4.1(a) (first sentence only), 4.1(c)(i) (as it relates to Merger Subs only), 4.2, 4.3(a) and 4.7, which shall be true and correct in all material respects) shall be deemed untrue or incorrect for purposes hereunder as a consequence of the existence of any fact, event or circumstance inconsistent with such representation or warranty, unless such fact, event or circumstance, individually or taken together with all other facts, events or circumstances inconsistent with any representation or warranty of Dex, Newco or Merger Sub (other than representations or warranties in Sections 4.1(a) (first sentence only), 4.1(c)(i) (as it relates to Merger Subs only), 4.2, 4.3(a) and 4.7), has had or would reasonably be expected to result in a Material Adverse Effect on Dex; provided, further, that for purposes of determining whether a representation or warranty is true and correct, any qualification or exception for, or reference to, materiality (including the terms "material," "materially," "in all material respects," "Material

Adverse Effect" or similar terms or phrases) in any such representation or warranty shall be disregarded; and SuperMedia shall have received a certificate signed on behalf of Dex by the Chief Executive Officer or the Chief Financial Officer of Dex to the foregoing effect.

(b)    Performance of Obligations of Dex and Merger Subs.    Each of Dex, Newco and Merger Sub shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and SuperMedia shall have received a certificate signed on behalf of Dex by the Chief Executive Officer or the Chief Financial Officer of Dex to such effect.

(c)    No Material Adverse Effect on Dex.    Since the Original Agreement Date, there shall not have occurred any change, event, circumstance or development that has had, or is reasonably expected to have, a Material Adverse Effect on Dex.

ARTICLE VIII

TERMINATION AND AMENDMENT

8.1    Termination.    This Agreement may be terminated at any time prior to the Dex Effective Time, whether before or after approval of the matters presented in connection with the Mergers by the stockholders of SuperMedia or Dex:

(a)    by mutual consent of SuperMedia and Dex in a written instrument, if the Board of Directors of each so determines by a vote of a majority of the members of its respective entire Board of Directors;

(b)    by either the Board of Directors of SuperMedia or the Board of Directors of Dex if any Governmental Entity that must grant a Requisite Approval has denied approval of the Mergers and such denial has become final and nonappealable or any Governmental Entity of competent jurisdiction shall have issued a final and nonappealable Order permanently enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, provided that the Party seeking to terminate this Agreement pursuant to this Section 8.1(b) shall have complied with its obligations pursuant to Section 6.4 with respect to such denial or Order;

(c)    by either the Board of Directors of SuperMedia or the Board of Directors of Dex if the Mergers shall not have been consummated on or before June 30, 2013 (the "Outside Date"); provided that a Party shall not be entitled to terminate under this clause (c) if the failure of the Closing to occur by such date shall be due to the failure of the Party seeking to terminate this Agreement to perform or observe the covenants and agreements of such Party set forth in this Agreement;

(d)    by either the Board of Directors of Dex or the Board of Directors of SuperMedia if there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of (i) SuperMedia, in the case of a termination by Dex, or (ii) Dex, Newco or Merger Sub, in the case of a termination by SuperMedia, which breach, either individually or in the aggregate, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 7.1, 7.2 or

7.3, as the case may be, and which is not cured within 30 days following written notice to the Party committing such breach or by its nature or timing cannot be cured within such time period; provided that the terminating Party shall not have the right to terminate this Agreement pursuant to this Section 8.1(d) if, at the time of such termination, there exists a breach or breaches of any representation, warranty, covenant or agreement of such terminating Party contained in this Agreement that, individually or in the aggregate, would result in the closing conditions set forth in Section 7.1 or 7.2, with respect to a termination by SuperMedia, or in Section 7.1 or 7.3, with respect to a termination by Dex, not to be satisfied;

(e)    by the Board of Directors of Dex if (x) SuperMedia has failed to make the SuperMedia Recommendation or to include the SuperMedia Recommendation in the Joint Proxy Statement, or has effected a Change in SuperMedia Recommendation or (y) a tender offer or exchange offer that would, if consummated, constitute an Acquisition Proposal shall have been commenced by a Person unaffiliated with Dex, and SuperMedia shall not have published, sent or given to its stockholders, pursuant to Rule 14e-2 under the Exchange Act, within 10 business days after such tender offer or exchange offer is first published, sent or given, a statement recommending that its stockholders reject such tender or exchange offer;

(f)    by the Board of Directors of SuperMedia if (x) Dex has failed to make the Dex Recommendation or to include the Dex Recommendation in the Joint Proxy Statement, or has effected a Change in Dex Recommendation or (y) a tender offer or exchange offer that would, if consummated, constitute an Acquisition Proposal shall have been commenced by a Person unaffiliated with SuperMedia, and Dex shall not have published, sent or given to its stockholders, pursuant to Rule 14e-2 under the Exchange Act, within 10 business days after such tender offer or exchange offer is first published, sent or given, a statement recommending that its stockholders reject such tender or exchange offer;

(g)    by either the Board of Directors of Dex or the Board of Directors of SuperMedia, if, as of the date of the SuperMedia Stockholder Meeting or the Dex Stockholder Meeting, whichever is later (and taking into account any postponement or adjournment in which a vote on SuperMedia Stockholder Merger Approval or the Dex Stockholder Merger Approval, as applicable, is taken), either (i) the necessary Dex Stockholder Approval has not been obtained because either (x) neither the Dex Stockholder Merger Approval nor the Dex Stockholder Plan Approval has been obtained or (y) the Dex Stockholder Merger Approval has been obtained, but neither the Dex Creditor Financing Amendment Approval nor the Dex Stockholder Plan Approval has been obtained, or (ii) the necessary SuperMedia Stockholder Approval has not been obtained because either (x) neither the SuperMedia Stockholder Merger Approval nor the SuperMedia Stockholder Plan Approval has been obtained or (y) the SuperMedia Stockholder Merger Approval has been obtained, but neither the SuperMedia Creditor Financing Amendment Approval nor the SuperMedia Stockholder Plan Approval has been obtained;

(h)    by the Board of Directors of Dex, if it determines in good faith (i) that the conditions set forth in either Section 7.1(d) or Section 7.1(e) will not be satisfied prior to the Outside Date and that the Dex Creditor Plan Approval (if the conditions in Section 7.1(d) will not be satisfied) or the SuperMedia Creditor Plan Approval (if the conditions in Section 7.1(e) will not be satisfied) will not be obtained prior to May 31, 2013; or (ii) if Chapter 11 Cases have

been filed with respect to SuperMedia or Dex, that the SuperMedia Pre-Pack Plan or the Dex Pre-Pack Plan, as applicable, will not become effective prior to the Outside Date; or

(i)    by the Board of Directors of SuperMedia, if it determines in good faith (i) that the conditions set forth in either Section 7.1(d) or Section 7.1(e) will not be satisfied prior to the Outside Date and that the Dex Creditor Plan Approval (if the conditions in Section 7.1(d) will not be satisfied) or the SuperMedia Creditor Plan Approval (if the conditions in Section 7.1(e) will not be satisfied) will not be obtained prior to May 31, 2013, or (ii) if Chapter 11 Cases have been filed with respect to SuperMedia or Dex, that the SuperMedia Pre-Pack Plan or the Dex Pre-Pack Plan, as applicable, will not become effective prior to the Outside Date.

Any Party desiring to terminate this Agreement pursuant to this Section 8.1 (other than any termination pursuant to Section 8.1(a)) shall give written notice of such termination to the other Parties specifying the provision or provisions of this Section 8.1 pursuant to which such termination is purportedly effected.

For purposes of this Agreement:

(i)    "Dex Creditor Plan Approval" means the acceptance by each of the following of the Dex Pre-Pack Plan: (1) Dex Creditors holding at least two-thirds in amount and more than one half in number of the allowed claims under the RHDI Facility; (2) Dex Creditors holding at least two-thirds in amount and more than one half in number of the allowed claims under the Dex East Facility; and (3) Dex Creditors holding at least two-thirds in amount and more than one half in number of the allowed claims under the Dex West Facility, in each case, of those creditors who vote on the Dex Pre-Pack Plan; and

(ii)    "SuperMedia Creditor Plan Approval" means acceptance of the SuperMedia Pre-Pack Plan by SuperMedia Creditors holding at least two-thirds in amount and more than one half in number of the allowed claims under the SuperMedia Credit Facility of those creditors who vote on the SuperMedia Pre-Pack Plan.

8.2    Effect of Termination.    In the event of termination of this Agreement by either SuperMedia or Dex as provided in Section 8.1, this Agreement shall forthwith become void and have no effect, and none of SuperMedia, Dex, any of their respective Subsidiaries or any of the officers or directors of any of them shall have any liability of any nature whatsoever under this Agreement, or in connection with the transactions contemplated by this Agreement, except that (i) Sections 6.5(b), 8.2, and 8.3, and Article IX (other than Section 9.8) shall survive any termination of this Agreement, and (ii) notwithstanding anything to the contrary contained in this Agreement, no Party shall be relieved or released from any liabilities or damages arising out of fraud or its willful breach of any provision of this Agreement.

8.3    Expense Reimbursement.    (a) In the event that (i) an Acquisition Proposal shall have been communicated to or otherwise made known to the stockholders of SuperMedia

or Dex, as applicable, or any Person shall have publicly announced an intention (whether or not conditional) to make an Acquisition Proposal involving SuperMedia or Dex, as applicable, in each case after the Original Agreement Date (the Party to which this clause (i) applies is referred to in this Section 8.3(a) as the "applicable party"), (ii) thereafter this Agreement is terminated (A) pursuant to Sections 8.1(c) or 8.1(g), in each case following the failure to receive the requisite approval of the applicable party's stockholders, (B) pursuant to Section 8.1(d) as a result of a breach by the applicable party or (C) pursuant to Sections 8.1(c), 8.1(h) or 8.1(i), in each case following the failure to receive the approval of the requisite Dex Creditors (if Dex is the applicable party) or SuperMedia Creditors (if SuperMedia is the applicable party) to the Mergers and the Dex Financing Amendments or the SuperMedia Financing Amendment or to the Dex Pre-Pack Plan or the SuperMedia Pre-Pack Plan, as applicable, and (iii) prior to the date that is twelve (12) months after the date of such termination the applicable party consummates an Alternative Transaction or enters into any definitive agreement related to an Alternative Transaction, then the applicable party shall on the date an Alternative Transaction is consummated or any such definitive agreement is entered into, pay the Other Party all of the documented, reasonable out-of-pocket expenses (including legal fees and expenses and advisor and consultant fees and expenses) incurred by such Other Party in connection with this Agreement and the transactions contemplated by this Agreement up to a maximum amount of $7.5 million (the "Expense Reimbursement") by wire transfer of same day funds; provided, that for the purposes of this Section 8.3, all percentages in the definition of Alternative Transaction shall be replaced with 50%.

(b)    In the event this Agreement is terminated by Dex pursuant to Section 8.1(e), then SuperMedia shall pay Dex the Expense Reimbursement by wire transfer of same day funds on the date of termination.    In the event this Agreement is terminated by SuperMedia pursuant to Section 8.1(f), then Dex shall pay SuperMedia the Expense Reimbursement by wire transfer of same day funds on the date of termination.  For purposes of this Section 8.3(b), if this Agreement is terminated pursuant to Section 8.1(g), 8.1(h), or 8.1(i) and at such time this Agreement could have terminated by Dex pursuant to Section 8.1(e) or by SuperMedia pursuant to Section 8.1(f), as applicable, the Expense Reimbursement shall be paid as if the Agreement had been terminated pursuant to Section 8.1(e) or Section 8.1(f), as applicable.

(c)    Each of Dex and SuperMedia acknowledges that the agreements contained in this Section 8.3 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the Other Party would not enter into this Agreement.  If any Party fails promptly to pay the amount due pursuant to this Section 8.3, and, in order to obtain such payment, the Other Party commences a suit which results in a judgment against such first Party for the amount set forth in this Section 8.3, the Other Party shall pay to such first Party its costs and expenses (including attorneys' fees and expenses) in connection with such suit, together with interest on any unpaid amount of the Expense Reimbursement at the rate on six-month U.S. Treasury obligations plus 300 basis points in effect on the date such payment was required to be made, calculated on a daily basis from the date the Expense Reimbursement was required to be paid until the date of the actual payment.

(d)    In no event shall any Party be required to pay the Expense Reimbursement on more than one occasion.

8.4    <u>Amendment</u>.  Subject to compliance with applicable Law, this Agreement may be amended by the Parties, by action taken or authorized by their respective Boards of Directors, at any time before or after approval of the matters presented in connection with the Mergers by the stockholders of SuperMedia or Dex; <u>provided</u>, <u>however</u>, that after any approval of the transactions contemplated by this Agreement by the stockholders of SuperMedia or Dex, there may not be, without further approval of such stockholders, any amendment of this Agreement that requires such further approval under applicable Law.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

8.5    <u>Extension; Waiver</u>.  At any time prior to the Dex Effective Time, the Parties, by action taken or authorized by their respective Board of Directors, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations or other acts of the other Parties, (ii) waive any inaccuracies in the representations and warranties contained in this Agreement and (iii) waive compliance with any of the agreements or conditions contained in this Agreement; <u>provided</u>, <u>however</u>, that after any approval of the transactions contemplated by this Agreement by the stockholders of SuperMedia and Dex, there may not be, without further approval of such stockholders any extension or waiver of this Agreement or any portion hereof that changes the amount or form of the consideration to be delivered to the holders of SuperMedia Common Stock or Dex Common Stock under this Agreement, other than as contemplated by this Agreement.  Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party, but such extension or waiver or failure to insist on strict compliance with an obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

ARTICLE IX

GENERAL PROVISIONS

9.1    <u>Nonsurvival of Representations, Warranties and Agreements</u>.  None of the representations, warranties, covenants and agreements set forth in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the SuperMedia Effective Time, except for <u>Articles I</u>, <u>II</u> and <u>IX</u> and <u>Sections 6.8</u> and <u>6.9</u>.

9.2    <u>Expenses</u>.  Except as provided in <u>Section 8.3</u>, all costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such expense; <u>provided</u>, <u>however</u>, that the costs and expenses of printing and mailing the Joint Proxy Statement, all filing and other fees paid to the SEC in connection with the Mergers and, if necessary, all HSR Act filing fees, shall be borne equally by SuperMedia and Dex.

9.3    <u>Notices</u>.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

(a)     if to SuperMedia, to:

>SuperMedia Inc.
>2200 W. Airfield Drive, P.O. Box 619810
>D/FW Airport, Texas 75261
>Attention:     Chief Executive Officer
>Facsimile:     (972) 453-6039

>with a copy to:

>Fulbright & Jaworski LLP
>2200 Ross Avenue, Suite 2800
>Dallas, Texas  75201-2784
>Attention:     Corporate Section Head
>Facsimile:     (214) 855-8200

>and to:

>Cleary Gottlieb Steen & Hamilton LLP
>One Liberty Plaza
>New York, NY  10006
>Attention:     William A. Groll, Esq.
>Facsimile:     (212) 225-3999

(b)     if to Dex, Newco or Merger Sub, to:

>Dex Corporation
>1001 Winstead Drive
>Cary, North Carolina 27513
>Attention:     Chief Executive Officer
>Facsimile:     (919) 297-1518

>with a copy to:

>Kirkland & Ellis LLP
>300 N. LaSalle
>Chicago, IL 60654
>Attention:     Richard W. Porter, P.C.
>                      R. Henry Kleeman, Esq.
>Facsimile:     (312) 862-2200

9.4     <u>Interpretation</u>.  When a reference is made in this Agreement to Articles, Sections, Exhibits or Schedules, such reference shall be to an Article or Section of or Exhibit or Schedule to this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or

"including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The SuperMedia Disclosure Schedule and the Dex Disclosure Schedule, as well as all other schedules and all exhibits hereto, shall be deemed part of this Agreement and included in any reference to this Agreement.  This Agreement shall not be interpreted or construed to require any Person to take any action, or fail to take any action, if to do so would violate any applicable Law.

9.5    Counterparts.    This Agreement may be executed in two or more counterparts (including by means of telecopied or electronically transmitted signature pages), all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other Parties, it being understood that each Party need not sign the same counterpart.

9.6    Entire Agreement.    This Agreement (including the documents and the instruments referred to in this Agreement), together with the Confidentiality Agreement, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter of this Agreement, other than the Confidentiality Agreement.

9.7    Governing Law; Jurisdiction.    This Agreement shall be governed and construed in accordance with the internal Laws of the State of Delaware applicable to contracts made and wholly performed within such state, without regard to any applicable conflicts of law principles which would require the application of any other State's laws.  The Parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any federal or state court located in the state of Delaware, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 9.4 shall be deemed effective service of process on such Party.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS

BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.7.

9.8    Publicity.

(a)    The initial press release regarding the Mergers shall be a joint press release by SuperMedia and Dex and thereafter SuperMedia and Dex each shall consult with the other prior to issuing any press releases or otherwise making public announcements (including conference calls with investors and analysts) with respect to the Mergers or any other transactions contemplated by this Agreement.  No Party shall issue any such press release or make any such public statement prior to such consultation, except to the extent the disclosing Party determines it is required to do so by applicable Law or any listing agreement with the NYSE or the NASDAQ, in which case such Party shall use all reasonable efforts to consult with the Other Party before issuing any such release or making any such public statement.

(b)    Upon the request of either Party, (i) SuperMedia and Dex shall promptly prepare a mutually acceptable joint written presentation to Institutional Shareholder Services and/or Glass Lewis recommending this Agreement and the transactions contemplated hereby, including the Mergers, and (ii) SuperMedia and Dex shall request a meeting with Institutional Shareholder Services and/or Glass Lewis for purposes of obtaining its recommendation of the adoption of this Agreement by SuperMedia's and Dex's stockholders.

(c)    Before any Merger Communication of SuperMedia or Dex or any of its respective "participants" (as defined in Item 4 of Schedule 14A of the Exchange Act) is (i) disseminated to any investor, analyst, member of the media, employee, client, customer or other Third Party or otherwise made accessible on the website of SuperMedia or Dex, as applicable or such participant (whether in written, video or oral form via webcast, hyperlink or otherwise), or (ii) utilized by any executive officer, key employee or advisor of SuperMedia or Dex, as applicable or any such participant, as a script in discussions or meetings with any such Third Parties, each of SuperMedia and Dex shall (or shall cause any such participant to) cooperate in good faith with respect to any such Merger Communication for purposes of, among other things, determining whether that communication constitutes "soliciting material" that is required to be filed by Rule 14a-6(b) or Rule 14a-12(b) of the Exchange Act. SuperMedia and Dex shall (or shall cause any such participant to) give reasonable and good faith consideration to any comments made by the Other Party and its counsel on any such Merger Communication.

(d)    For purposes of this Agreement, "Merger Communication" means any document or other written communication prepared by or on behalf of SuperMedia or Dex or any Subsidiary thereof, or any document or other material or information posted or made accessible on the website of SuperMedia or Dex (whether in written, video or oral form via webcast, hyperlink or otherwise), that is related to any of the transactions contemplated by this Agreement and, if reviewed by a stockholder of SuperMedia or Dex, as applicable, could reasonably be deemed to constitute a "solicitation" of "proxies" (in each case, as defined in Rule 14a-1 of the Exchange Act) with respect to the Mergers.  "Third Party" means any Person or group other than SuperMedia, the SuperMedia Subsidiaries, Dex or the Dex Subsidiaries.

9.9     <u>Assignment; Third Party Beneficiaries</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Parties.  Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by each of the parties and their respective successors and assigns.  Except as otherwise specifically provided in <u>Section 6.8</u>, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person other than the parties hereto any rights or remedies under this Agreement.  Notwithstanding the foregoing, after the Closing any holder of SuperMedia Common Stock or Dex Common Stock shall be entitled to enforce the provisions of <u>Article II</u> solely to the extent necessary to receive the SuperMedia Merger Consideration or Dex Merger Consideration, as the case may be, to which such holder is entitled thereunder.

9.10     <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in any federal or state court located in the state of Delaware in addition to any other remedy to which they are entitled at law or in equity.  Any requirements for the securing or posting of any bond with such remedy are hereby waived.

9.11     <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by virtue of any applicable Law, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so that the transactions contemplated hereby are fulfilled to the extent possible.

*Remainder of Page Intentionally Left Blank*

IN WITNESS WHEREOF, Dex, Newco, Merger Sub and SuperMedia have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

DEX ONE CORPORATION

By: /s/ Alfred T. Mockett
    Name: Alfred T. Mockett
    Title: President and Chief Executive Officer

NEWDEX, INC.

By: /s/ Alfred T. Mockett
    Name: Alfred T. Mockett
    Title: President and Chief Executive Officer

SPRUCE ACQUISITION SUB, INC.

By: /s/ Alfred T. Mockett
    Name: Alfred T. Mockett
    Title: President and Chief Executive Officer

SUPERMEDIA INC.


By: /s/ Peter McDonald
       Name: Peter McDonald
       Title: Chief Executive Officer and President

*Amended and Restated Agreement and Plan of Merger Signature Page*

## **EXHIBIT A TO THE MERGER AGREEMENT**

<u>FORM OF DEX SURVIVING COMPANY CERTIFICATE OF INCORPORATION</u>

Substantially in the form attached hereto as Exhibit K to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**<u>EXHIBIT B TO THE MERGER AGREEMENT</u>**

<u>FORM OF DEX SURVIVING COMPANY BYLAWS</u>

[THIS PAGE INTENTIONALLY LEFT BLANK]

# BYLAWS

## OF

## DEX MEDIA INC.

*A Delaware corporation*
(Adopted as of [●], 2013)

### ARTICLE I
### OFFICES

Section 1.    Offices.    Dex Media, Inc. (the "Corporation") may have an office or offices other than its registered office at such place or places, either within or outside the State of Delaware, as the Board of Directors of the Corporation (the "Board of Directors") may from time to time determine or the business of the Corporation may require.

### ARTICLE II
### MEETINGS OF STOCKHOLDERS

Section 1.    Place of Meetings.    The Board of Directors may designate a place, if any, either within or outside the State of Delaware, as the place of meeting for any annual meeting or for any special meeting.

Section 2.    Annual Meeting.    An annual meeting of the stockholders shall be held each year at such time as is specified by the Board of Directors.    At the annual meeting, stockholders shall elect directors to succeed those whose terms expire and transact such other business as properly may be brought before the annual meeting pursuant to Section 11 of Article II.

Section 3.    Special Meetings.

(a)    Special meetings of the stockholders for any purpose or purposes, except as otherwise prescribed by statute or by the Certificate of Incorporation, may be called (i) by a majority of the directors in office, the Chairman of the Board, the Chief Executive Officer or the President, (ii) pursuant to a resolution adopted by the Board of Directors, or (iii) by the Secretary at the request in writing of stockholders holding shares representing at least 25% of the voting power of shares of stock issued and outstanding and entitled to vote on the matter(s) and for the purposes stated in the written request of such stockholders.    A written request submitted by a stockholder to call a special meeting shall set forth the business to be transacted at such meeting and shall be signed and dated by the stockholder submitting such written request.    A written request submitted by a stockholder to call a special meeting shall also include all of the information that is required of a stockholder submitting notice of business under Article II, Section 11(a) of these Bylaws in connection with an annual meeting of stockholders.    The preceding sentence shall not apply to any stockholder that has provided a request in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Exchange Act (as defined herein) by way of a solicitation statement filed on Schedule 14A.    The Secretary shall

not accept, and shall consider ineffective, a written request from a stockholder to call a special meeting: (1) that relates to an item of business that is not a proper subject for stockholder action under applicable law; (2) if such written request to call a special meeting is delivered between the time beginning on the 61st day after the earliest date of signature on a written request to call a special meeting, that has been delivered to the Secretary, relating to an identical or substantially similar item (such item, a "Similar Item") and ending on the one-year anniversary of such earliest date; (3) if a Similar Item will be submitted for stockholder approval at any stockholder meeting to be held on or before the 90th day after the Secretary receives such written request to call a special meeting; or (4) if a Similar Item has been presented at the most recent annual meeting or at any special meeting held within one year prior to receipt by the Secretary of such written request to call a special meeting.  A stockholder may revoke a request to call a special meeting at any time before the special meeting by sending written notice of such revocation to the Secretary of the Corporation.  The Corporation shall not be required to hold a special meeting if, prior to such meeting, the number of unrevoked written requests constitutes less than 25% of the stockholders who were entitled to request the call of such special meeting.  The Board of Directors may fix a record date for purposes of determining the stockholders entitled to deliver requests to call a special meeting (whether or not a written request has been delivered by a stockholder prior to such record date).  Notwithstanding the foregoing, the Board of Directors may submit its own proposal or proposals for consideration at any special meeting.

(b)     Special meetings of the stockholders shall only be held at such time and at such place, within or without the State of Delaware, as shall be designated by the Board of Directors, the Chairman of the Board, the Chief Executive Officer or the President.  The Board of Directors may, in its sole discretion, determine that the special meeting shall not be held at any place, but shall be held solely by means of remote communication, subject to such guidelines and procedures as the Board of Directors may adopt, as permitted by applicable law.  The business transacted at a special meeting of the stockholders shall be limited to the purpose or purposes stated in the notice of the meeting.  Nominations of persons for election to the Board of Directors pursuant to Section 11(c) of this Article II may be made at a special meeting of stockholders called by stockholders at which directors are to be elected; provided that, notwithstanding anything in these Bylaws to the contrary, if a stockholder delivered a written request to call such meeting, the information required by Section 11(c) of Article II regarding such stockholder and his or her nominees must be delivered at the time the stockholder requests a special meeting (which information shall be updated as of the record date to determine the stockholders entitled to vote at the meeting not later than 10 days after such record date).  The record date for determining the stockholders entitled to notice of, and to vote at, a special meeting shall be fixed in the manner set forth in Section 12 of this Article II.

Section 4.     Notice of Meetings.  Notice of the place, if any, date, and time of all meetings of the stockholders, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, shall be given, not less than 10 nor more than 60 days before the date on which the meeting is to be held, to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting, except as otherwise provided herein or required by law (meaning, here and hereinafter, as required from time to time by the General

Corporation Law of the State of Delaware (the "DGCL") or the Corporation's certificate of incorporation as then in effect (the "Certificate of Incorporation")).

(a)    Form of Notice.  All such notices shall be delivered in writing or by a form of electronic transmission if receipt thereof has been consented to by the stockholder to whom the notice is given.  If mailed, such notice shall be deemed given when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation.  If given by facsimile telecommunication, such notice shall be deemed given when directed to a number at which the stockholder has consented to receive notice by facsimile.  Subject to the limitations of Section 4(c) of this Article II, if given by electronic transmission, such notice shall be deemed to be delivered:  (i) by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (ii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice; and (iii) if by any other form of electronic transmission, when directed to the stockholder.  An affidavit of the secretary or an assistant secretary of the Corporation, the transfer agent of the Corporation or any other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

(b)    Waiver of Notice.  Whenever notice is required to be given under any provisions of the DGCL, the Certificate of Incorporation or these Bylaws, a written waiver thereof, signed by the stockholder entitled to notice, or a waiver by electronic transmission by the person or entity entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Neither the business to be transacted at, nor the purpose of, any meeting of the stockholders of the Corporation need be specified in any waiver of notice of such meeting.  Attendance of a stockholder of the Corporation at a meeting of such stockholders shall constitute a waiver of notice of such meeting, except when the stockholder attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

(c)    Notice by Electronic Delivery.  Without limiting the manner by which notice otherwise may be given effectively to stockholders of the Corporation pursuant to the DGCL, the Certificate of Incorporation or these Bylaws, any notice to stockholders of the Corporation given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder of the Corporation to whom the notice is given.  Any such consent shall be deemed revoked if:  (i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices given by the Corporation in accordance with such consent; and (ii) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent or other person responsible for the giving of notice.  However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.  For purposes of these Bylaws, except as otherwise limited by applicable law, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such recipient through an automated process.

Section 5.    List of Stockholders.    The officer who has charge of the stock ledger of the Corporation shall prepare and make available, at least 10 days before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting; provided, however, that if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each such stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least 10 days prior to the meeting:  (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (b) during ordinary business hours, at the principal place of business of the Corporation.  In the event the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  The list shall also be produced and kept at the time and place, if any, of the meeting during the whole time thereof and may be inspected by any stockholder who is present.

Section 6.    Quorum.    The holders of a majority of the outstanding voting power of all shares of capital stock entitled to vote, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for all purposes, unless or except to the extent that the presence of a larger number may be required by the DGCL, the Certificate of Incorporation or the rules of any stock exchange upon which the Corporation's securities are listed.  If a quorum is not present, the chairman of the meeting or the holders of a majority of the voting power present in person or represented by proxy at the meeting and entitled to vote at the meeting may adjourn the meeting to another time and/or place.  When a specified item of business requires a separate vote by a class or series (if the Corporation shall then have outstanding shares of more than one class or series) voting as a class or series, the holders of a majority of the voting power of such class or series shall constitute a quorum (as to such class or series) for the transaction of such item of business.

Section 7.    Adjourned Meetings.    Any meeting of the stockholders may be adjourned by the chairman of the meeting, from time to time, whether or not there is a quorum.  When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time and place, if any, thereof and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken; provided, however, that if the adjournment is for more than 30 days, a notice of the place, if any, date and time of the adjourned meeting and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and, except as otherwise required by law, shall not be more than 60 days nor less than 10 days before the date of such adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.  At the

-4-

adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting.

Section 8.    Vote Required.  When a quorum is present, the affirmative vote of the majority of voting power of capital stock present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless a different vote is provided by express provisions of an applicable law, the rules of any stock exchange upon which the Corporation's securities are listed, the Certificate of Incorporation or these Bylaws, in which case such express provision shall govern and control the decision of such question.

Section 9.    Voting Rights.  Except as otherwise required by the DGCL, the Certificate of Incorporation (including the certificate of designation relating to any outstanding class or series of preferred stock), every stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of capital stock held by such stockholder.

Section 10.    Proxies.

(a)    Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for him or her by proxy, but no such proxy shall be voted or acted upon after one year from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.

(b)    Without limiting the manner in which a stockholder may authorize another person to act for such stockholder as proxy, the following shall constitute a valid means by which a stockholder may grant such authority: (1) execution of a proxy may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature; and (2) a stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.

(c)    Any copy, facsimile or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 11.    Advance Notice of Stockholder Business and Director Nominations.

(a)    Business at Annual Meetings of Stockholders.

-5-

(i)       Only such business (other than nominations of persons for election to the Board of Directors, which must be made in compliance with and are governed exclusively by Section 11(b) of ARTICLE II) shall be conducted at an annual meeting of the stockholders as shall have been brought before the meeting (A) as specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors, (B) by or at the direction of the Board of Directors, or (C) by any stockholder of the Corporation who (1) was a stockholder of record at the time of giving of notice provided for in Section 11(a) of ARTICLE II and at the time of the meeting, (2) is entitled to vote at the meeting and (3) complies with the notice procedures set forth in Section 11(a) of ARTICLE II. For the avoidance of doubt, the foregoing clause (C) of this Section 11(a)(i) of ARTICLE II shall be the exclusive means for a stockholder to propose such business (other than business included in the Corporation's annual meeting proxy materials pursuant to Rule 14a-8 under the Exchange Act) before an annual meeting of stockholders.

(ii)       For any business (other than nominations of persons for election to the Board of Directors, which must be made in compliance with and are governed exclusively by Section 11(b) of ARTICLE II) to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in proper written form as described in Section 11(a)(iii) of ARTICLE II to the Secretary and any such proposed business must be a proper matter for stockholder action. To be timely, a stockholder's notice for such business must be received by the Secretary at the principal executive offices of the Corporation in proper written form not less than ninety (90) days and not more than one hundred twenty (120) days prior to the first anniversary of the preceding year's annual meeting of stockholders; provided, however, that if and only if the annual meeting is not scheduled to be held within a period that commences thirty (30) days before such anniversary date and ends thirty (30) days after such anniversary date, or if no annual meeting was held in the preceding year, such stockholder's notice must be delivered by the later of (A) the tenth day following the day of the Public Announcement of the date of the annual meeting is first made or (B) the date which is ninety (90) days prior to the date of the annual meeting. For purposes of determining timely notice for the first annual meeting of stockholders held after the shares of Common Stock of the Corporation first become listed on a national securities exchange, the date of the preceding year's annual meeting shall be deemed to be _____. In no event shall any adjournment, deferral or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described above. Notices delivered pursuant to Section 11(a) of ARTICLE II will be deemed received on any given day if received prior to the close of business on such day. "Public Announcement" means disclosure in a press release reported by the Dow Jones News Service, Associated Press, Business Wire, PR Newswire or comparable news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

(iii)       To be in proper written form, a stockholder's notice to the Secretary must set forth as to each matter the stockholder proposes to bring before the annual meeting (A) a description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting and the complete text of

any resolutions to be presented at the meeting; (B) the name and address of the stockholder, as it appears on the Corporation's books, and of the beneficial owner, if any, on whose behalf the business is being brought; (C) a representation that the stockholder is a holder of the Corporation's voting stock and the class or series and number of shares of stock of the Corporation which are owned beneficially or of record by the stockholder or beneficial owner; (D) any material interest of the stockholder or beneficial owner in such business; and (E) whether and the extent to which any hedging or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of shares) has been made, the effect or intent of which is to mitigate loss to or manage risk or benefit of share price changes for, or to increase or decrease the voting power of, such stockholder or beneficial owner with respect to any share of stock of the Corporation (which information shall be updated by such stockholder and beneficial owner, if any, as of the record date to determine the stockholders entitled to vote at the meeting not later than 10 days after such record date).  Notwithstanding anything in these Bylaws to the contrary, no business (other than nominations of persons for election to the Board of Directors, which must be made in compliance with and are governed exclusively by Section 11(b) of ARTICLE II) shall be conducted at an annual meeting except in accordance with the procedures set forth in Section 11(a) of ARTICLE II.

(b)    Nominations at Annual Meetings of Stockholders.

(i)    Only persons who are nominated in accordance and compliance with the procedures set forth in Section 11(b) of ARTICLE II shall be eligible for election to the Board of Directors at an annual meeting of stockholders.

(ii)    Nominations of persons for election to the Board of Directors of the Corporation may be made at an annual meeting of stockholders only (A) by or at the direction of the Board of Directors or (B) by any stockholder of the Corporation who (1) was a stockholder of record at the time of giving of notice provided for in Section 11(b) of ARTICLE II and at the time of the meeting, (2) is entitled to vote at the meeting and (3) complies with the notice procedures set forth in Section 11(b) of ARTICLE II. For the avoidance of doubt, clause (B) of this Section 11(b)(ii) of ARTICLE II shall be the exclusive means for a stockholder to make nominations of persons for election to the Board of Directors at an annual meeting of stockholders. For nominations to be properly brought by a stockholder at an annual meeting of stockholders, the stockholder must have given timely notice thereof in proper written form as described in Section 11(b)(iii) of ARTICLE II to the Secretary. To be timely, a stockholder's notice for the nomination of persons for election to the Board of Directors must be delivered to the Secretary at the principal executive offices of the Corporation in proper written form not less than ninety (90) days and not more than one hundred twenty (120) days prior to the first anniversary of the preceding year's annual meeting of stockholders; provided, however, that if and only if the annual meeting is not scheduled to be held within a period that commences thirty (30) days before such anniversary date and ends thirty (30) days after such anniversary date, or if no annual meeting was held in the preceding year, such stockholder's notice must be delivered by the later of the tenth day following the day the Public Announcement of the date of the annual meeting is first made and the date which

is ninety (90) days prior to the date of the annual meeting. For purposes of determining timely notice for the first annual meeting of stockholders held after the shares of Common Stock of the Corporation first become listed on a national securities exchange, the date of the preceding year's annual meeting shall be deemed to be _____. In no event shall any adjournment, deferral or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described above. Notices delivered pursuant to Section 11(b) of ARTICLE II will be deemed received on any given day if received prior to the close of business on such day.

(iii)    To be in proper written form, a stockholder's notice to the Secretary shall set forth: (1) as to the nominee or nominees for director election (A) the name, age, business address and residence address of the nominee(s); (B) the principal occupation or employment of the nominee(s); (C) the class or series and number of shares of stock of the Corporation which are owned beneficially or of record by the nominee(s); (D) a description of all arrangements or understandings among the stockholder or such beneficial owner and the nominee(s), pursuant to which the nomination(s) are to be made by the stockholder or beneficial owner; (E) a representation that such stockholder intends to appear in person or by proxy at the meeting to nominate the nominee; and (F) any other information relating to the nominee(s) that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder; and (2) as to the stockholder submitting such notice: (A) the name and address of the stockholder, as it appears on the Corporation's books, and of the beneficial owner, if any, on whose behalf the nomination or nominations are being brought; (B) a representation that the stockholder is a holder of the Corporation's voting stock and the class or series and number of shares of stock of the Corporation which are owned beneficially or of record by the stockholder or beneficial owner; (C) any material interest of the stockholder or beneficial owner in such business; and (D) whether and the extent to which any hedging or other transaction or series of transactions has been entered into by or on behalf of, or any other agreement, arrangement or understanding (including any short position or any borrowing or lending of shares) has been made, the effect or intent of which is to mitigate loss to or manage risk or benefit of share price changes for, or to increase or decrease the voting power of, such stockholder or beneficial owner with respect to any share of stock of the Corporation (which information shall be updated by such stockholder and beneficial owner, if any, as of the record date to determine the stockholders entitled to vote at the meeting not later than 10 days after such record date). All notices of intent to make a nomination for election as a director shall be accompanied by the written consent of each nominee to serve as director of the Corporation if so elected.

(iv)    Notwithstanding anything in Section 11(b)(ii) of ARTICLE II to the contrary, if the number of directors to be elected to the Board of Directors is increased and there is no Public Announcement naming all of the nominees for director or specifying the size of the increased Board of Directors made by the Corporation at least 10 days prior to the last day a stockholder may deliver a notice of nomination in accordance with Section 11(b)(ii), a stockholder's notice required by Section 11(b)(ii) of

-8-

ARTICLE II shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the tenth day following the day on which such Public Announcement is first made by the Corporation.

(c)     Special Meetings of Stockholders. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the notice of meeting. Only persons who are nominated in accordance and compliance with the procedures set forth in this Section 11(c) of ARTICLE II shall be eligible for election to the Board of Directors at a special meeting of stockholders at which directors are to be elected. Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the notice of meeting only (i) by or at the direction of the Board of Directors or (ii) provided that the Board of Directors has determined that directors are to be elected at such special meeting, by any stockholder of the Corporation who (A) was a stockholder of record at the time of giving of notice provided for in this Section 11(c) of ARTICLE II and at the time of the special meeting, (B) is entitled to vote at the meeting and (C) complies with the notice procedures provided for in this Section 11(c) of ARTICLE II. For the avoidance of doubt, the foregoing clause (ii) of this Section 11(c) of ARTICLE II shall be the exclusive means for a stockholder to propose nominations of persons for election to the Board of Directors at a special meeting of stockholders at which directors are to be elected. For nominations to be properly brought by a stockholder at a special meeting of stockholders, the stockholder must have given timely notice thereof in proper written form as described in this Section 11(c) of ARTICLE II to the Secretary (including that such notice shall set forth all of the information required by Section 11(b)(iii) of this Article II and such information shall be updated as of the record date to determine the stockholders entitled to vote at the meeting not later than 10 days after such record date) ).  To be timely, a stockholder's notice for the nomination of persons for election to the Board of Directors must be received by the Secretary at the principal executive offices of the Corporation not earlier than the 120th day prior to such special meeting and not later than the close of business on the later of the 90th day prior to such special meeting or the tenth day following the day on which a Public Announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting. In no event shall any adjournment, deferral or postponement of a special meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described above. Notices delivered pursuant to Section 11(c) of ARTICLE II will be deemed received on any given day if received prior to the close of business on such day. To be in proper written form, such stockholder's notice shall set forth all of the information required by, and otherwise be in compliance with, Section 11(b)(iii) of ARTICLE II.

(d)     Remote Communication.  If authorized by the Board of Directors in accordance with these Bylaws and applicable law, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication, (1) participate in a meeting of stockholders and (2) be deemed present in person and entitled to vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote

communication is a stockholder or proxyholder, (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

(e)    <u>Authority of Chairman of Meeting</u>. Except as otherwise provided by applicable law, the Certificate of Incorporation, the certificate of designation relating to any outstanding class or series of preferred stock or these Bylaws, the chairman of the meeting shall have the power and duty to determine whether any nomination or other business proposed to be brought before the meeting was made or brought in accordance with the procedures set forth in these Bylaws and, if any nomination or other business is not made or brought in compliance with these Bylaws, to declare that such nomination or proposal of other business be disregarded and not acted upon.

(f)    <u>Compliance with Exchange Act</u>. Notwithstanding the foregoing provisions of this Section 11 of this Article II, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations promulgated thereunder with respect to the matters set forth in this Section 11 of this Article II; provided, however, that any references in these Bylaws to the Exchange Act or the rules and regulations promulgated thereunder are not intended to and shall not limit the requirements applicable to any nomination or other business to be considered pursuant to this Section 11 of this Article II.

(g)    <u>Effect on Other Rights</u>. Nothing in these Bylaws shall be deemed to (A) affect any rights of the stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act, (B) confer upon any stockholder a right to have a nominee or any proposed business included in the Corporation's proxy statement, or (C) affect any rights of the holders of any series of preferred stock to elect directors pursuant to any applicable provisions of the Certificate of Incorporation.

Section 12.    <u>Fixing a Record Date for Stockholder Meetings</u>.    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may fix, except as otherwise required by law, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 days nor less than 10 days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be the close of business on the day next preceding the day on which notice is first given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of

Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting; and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 11 of this ARTICLE II at the adjourned meeting.

Section 13.    <u>Conduct of Meetings</u>.

(a)    <u>Generally</u>.    Meetings of stockholders shall be presided over by the Chairman of the Board of Directors, or in the Chairman's absence or disability by the Chief Executive Officer, or in the Chief Executive Officer's absence or disability, by the President, or in the President's absence or disability, by the Chief Financial Officer. The Secretary shall act as secretary of the meeting, but in the Secretary's absence or disability the chairman of the meeting may appoint any person to act as secretary of the meeting.

(b)    <u>Rules, Regulations and Procedures</u>.    The Board of Directors may adopt by resolution such rules, regulations and procedures for the conduct of any meeting of stockholders of the Corporation as it shall deem appropriate, including, without limitation, such guidelines and procedures as it may deem appropriate regarding the participation by means of remote communication of stockholders and proxyholders not physically present at a meeting. Except to the extent inconsistent with such rules, regulations and procedures as adopted by the Board of Directors, the chairman of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as shall be determined; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board of Directors or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure. The chairman of the meeting shall announce at the meeting when the polls for each matter to be voted upon at the meeting will be opened and closed. After the polls close, no ballots, proxies or votes or any revocations or changes thereto may be accepted.  The chairman shall have the power to adjourn the meeting to another place, if any, date and time.

(c)    <u>Inspectors of Elections</u>.    The Corporation may, and to the extent required by law shall, in advance of any meeting of stockholders, appoint one or more inspectors of election to act at the meeting and make a written report thereof. One or more other persons may be designated as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Unless otherwise required by law, inspectors may be officers, employees or agents of the Corporation. Each inspector, before entering upon the discharge of such inspector's duties, shall take and sign an oath faithfully to execute the duties of

inspector with strict impartiality and according to the best of such inspector's ability. The inspector shall have the duties prescribed by law and shall take charge of the polls and, when the vote is completed, shall make a certificate of the result of the vote taken and of such other facts as may be required by law.

Section 14.    Voting by Fiduciaries, Pledgors and Joint Owners.  Persons holding voting stock in a fiduciary capacity shall be entitled to vote the shares so held, and persons whose stock is pledged shall be entitled to vote such shares, unless in the transfer by the pledgor on the books of the Corporation such pledgor has expressly empowered the pledgee to vote such shares, in which case only the pledgee or such pledgee's proxy may represent said stock and vote thereon. If voting stock is held of record in the names of two or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants-in-common, tenants by the entirety or otherwise, or if two or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (a) if only one votes, such act binds all; (b) if more than one votes, the act of the majority so voting binds all; (c) if more than one votes, but the vote is evenly split on any particular matter, each faction may vote such stock proportionally, or any person voting the shares, or a beneficiary, if any, may apply to the Court of Chancery or such other court as may have jurisdiction to appoint an additional person to act with the persons so voting the stock, which shall then be voted as determined by a majority of such persons and the person appointed by such court.  If the instrument so filed shows that any such tenancy is held in unequal interest, a majority or even-split for the purpose of this paragraph shall be a majority or even-split in interest.

Section 15.    Method of Voting.  The vote at any election or upon any question at any meeting of stockholders need not be by written ballot, except as required by law.

ARTICLE III
DIRECTORS

Section 1.    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  In addition to such powers as are herein and in the Certificate of Incorporation expressly conferred upon it, the Board of Directors shall have and may exercise all the powers of the Corporation, subject to the provisions of the laws of the State of Delaware, the Certificate of Incorporation and these Bylaws.

Section 2.    Number and Election.

(a)    Subject to Section 14 of this Article III, the number of directors constituting the entire Board of Directors, which shall be not less than three directors, shall be fixed from time to time solely by a resolution passed by a majority of the entire Board of Directors. Subject to the terms of any Preferred Stock of the Corporation then outstanding, directors shall be elected at each annual meeting of stockholders.  Subject to Section 14 of this Article III and subject to the terms of any Preferred Stock of the Corporation then outstanding, newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation, removal from office or

-12-

other cause may, unless otherwise required by law or by resolution of the Board of Directors, be filled by a majority vote of the directors then in office, though less than a quorum. Each director elected shall hold office until such director's successor is elected and qualified or until such director's earlier death, resignation or removal.

(b)    Each director shall be elected by the vote of the majority of the votes cast with respect to the director at an annual meeting of stockholders at which a quorum is present; provided that if, as of the tenth day before the Corporation first mails its notice of meeting for the meeting to elect directors, the number of nominees exceeds the number of directors to be elected, the directors shall be elected by the votes of the plurality of the shares represented in person or by proxy at such annual meeting and entitled to vote on the election of directors. A majority of the votes cast in an election of a director shall mean that the number of votes cast "for" a director's election must exceed the number of votes cast "against" that director's election and, shares not present, "broker nonvotes" and shares voting "abstain" or "abstentions" shall not be counted as a vote cast either "for" or "against" a director's election for purposes of determining whether a nominee for director has received a majority of the votes cast. Elections of directors need not be by written ballot.

(c)    If a nominee for director who is an incumbent director is not elected, the director shall promptly tender such director's resignation to the Board of Directors. The Corporate Governance Committee will make a recommendation to the Board of Directors as to whether to accept or reject the resignation of such incumbent director, or whether other action should be taken. The Board of Directors will act on the Corporate Governance Committee's recommendation and publicly disclose (by a press release, a filing with the Securities and Exchange Commission or other broadly disseminated means of communication) its decision regarding the tendered resignation and the rationale behind the decision within 90 days from the date of the certification of the election results. The director who tenders his or her resignation will not participate in the Corporate Governance Committee's recommendation or the Board of Director's decision with respect to his or her resignation. In addition, if there are not at least two members of the Corporate Governance Committee who were elected at the annual meeting, then each of the independent members of the Board of Directors who were elected at the meeting shall appoint a committee amongst themselves to consider all resignations tendered and recommend to the Board of Directors whether to accept them (which committee of the independent members shall act in lieu of the Corporate Governance Committee with respect to the resignations tendered in such circumstances).

(d)    If the incumbent director's resignation is not accepted by the Board of Directors, such director shall continue to serve until the next annual meeting and until such director's successor is elected and qualified or such director's earlier death resignation or removal. If the Board of Directors accepts a director's resignation pursuant to this Section 2, or if a nominee for director is not elected and the nominee is not an incumbent director, the Board of Directors may fill the resulting vacancy.

Section 3.    Annual Meetings.  The annual meeting of the Board of Directors shall be held, without other notice than this Bylaw, immediately after, and at the same place as, the annual meeting of stockholders.

Section 4.    <u>Regular Meetings and Special Meetings</u>.  Regular meetings, other than the annual meeting, of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by resolution of the Board of Directors and publicized among all directors.  Special meetings of the Board of Directors may be called by the Chairman of the Board, if any, or upon the written request of at least a majority of the directors then in office.

Section 5.    <u>Notice of Meetings</u>.  Notice of regular meetings of the Board of Directors need not be given except as otherwise required by law or these Bylaws.  Notice of each special meeting of the Board of Directors, and of each regular and annual meeting of the Board of Directors for which notice shall be required, shall be given by the Secretary as hereinafter provided in this Section 5 of this Article III, in which notice shall be stated the time and place of the meeting.  Notice of any special meeting, and of any regular or annual meeting for which notice is required, shall be given to each director at least (a) twenty-four (24) hours before the meeting if by telephone or by being personally delivered or sent by telex, telecopy, email or similar means or (b) five (5) days before the meeting if delivered by mail to the director's residence or usual place of business.  Such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage prepaid, or when transmitted if sent by telex, telecopy, email or similar means.  Notice of a meeting of the Board of Directors shall state the purpose or purposes thereof and no other business may come before the meeting except if the directors present and voting at the meeting constitute at least 66 2/3% of the persons who are then directors and entitled to vote on whatever business may come before the meeting, and such directors agree upon such matters to be discussed and/or transacted at such special meeting.  Any director may waive notice of any meeting by a writing signed by the director or by electronic transmission from the director entitled to the notice and filed with the minutes or corporate records.

Section 6.    <u>Waiver of Notice and Presumption of Assent</u>.  Any member of the Board of Directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the secretary of the Corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to any member who voted in favor of such action.

Section 7.    <u>Chairman of the Board, Quorum, Required Vote and Adjournment</u>.  Subject to Section 14 of this ARTICLE III, the Board of Directors may elect, by the affirmative vote of at least a majority of the directors then in office (in addition to any other vote required by applicable law), a Chairman of the Board. The Chairman of the Board may be an officer of the Corporation and shall be a director of the Corporation. Subject to the provisions of these Bylaws and the direction of the Board of Directors, he or she shall perform all duties and have all powers which are commonly incident to the position of Chairman of the Board or which are delegated to him or her by the Board of Directors, shall preside at all meetings of the stockholders and Board

of Directors at which he or she is present and shall have such powers and perform such duties as the Board of Directors may from time to time prescribe. If the Chairman of the Board is not present at a meeting of the stockholders or the Board of Directors, the Chief Executive Officer (if the Chief Executive Officer is a director and is not also the Chairman of the Board) shall preside at such meeting, and, if the Chief Executive Officer is not present at such meeting, a majority of the directors present at such meeting shall elect one of the directors present at the meeting to so preside. A majority of the directors then in office shall constitute a quorum for the transaction of business; provided, however, that if a majority of the directors then in office constitute less than one-third of the total number of directors, then one-third of the total number of directors shall constitute a quorum. Unless by express provision of an applicable law, the Certificate of Incorporation or these Bylaws a different vote is required, the affirmative vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. At any meeting of the Board of Directors, business shall be transacted in such order and manner as the Board of Directors may from time to time determine. If a quorum shall not be present at any meeting of the Board of Directors, a majority of the directors present thereat may, to the fullest extent permitted by law, adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 8.    <u>Committees</u>.  The Board of Directors (a) may, by resolution passed by a majority of the directors then in office (in addition to any other vote required by applicable law), designate one or more committees, consisting of one or more of the directors of the Corporation, including but not limited to a standing Audit and Finance Committee, Compensation and Benefits Committee and Corporate Governance Committee of the Board of Directors, and (b) shall, by resolution passed by a majority of the directors then in office (in addition to any other vote required by applicable law), designate all committees required by, and maintain such committees in compliance with, the rules and regulations of the Securities and Exchange Commission and of any exchange on which any securities of the Corporation are listed. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Each such committee, to the extent provided in the resolution creating it, shall have and may exercise all the powers and authority of the Board of Directors. Notwithstanding the foregoing, no Committee shall have the power to: (i) approve or adopt, or recommend to stockholders, any action or matter expressly required by the Delaware General Corporation Law to be submitted to stockholders for approval; (ii) change the number of directors constituting the entire Board of Directors; (iii) fill any vacancy on the Board of Directors or any Committee; or (iv) adopt, amend or repeal these Bylaws. Each such committee shall serve at the pleasure of the Board of Directors as may be determined from time to time by resolution adopted by the Board of Directors or as required by the rules and regulations of the Securities and Exchange Commission and of such exchange, if applicable. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors upon request.

Section 9.    <u>Committee Rules</u>.  Each committee of the Board of Directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the Board of Directors designating such committee or as otherwise provided herein or required by law or the Certificate of Incorporation. Notice of each meeting of a Committee shall be given (or waived) in the same manner as notice for a Board of Directors' meeting may be given (or waived). Unless otherwise provided in such a resolution, the

presence of at least a majority of the members of the committee shall be necessary to constitute a quorum. All matters shall be determined by a majority vote of the members present. Unless otherwise provided in such a resolution, in the event that a member and that member's alternate, if alternates are designated by the Board of Directors, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.

Section 10.    <u>Action by Written Consent</u>.  Unless otherwise restricted by the Certificate of Incorporation, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 11.    <u>Compensation</u>.  Unless otherwise restricted by the Certificate of Incorporation, the Board of Directors shall have the authority to fix the compensation, including fees and reimbursement of expenses, of directors for services to the Corporation in any capacity, including for attendance of meetings of the Board of Directors or participation on any committees. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 12.    <u>Reliance on Books and Records</u>.  A member of the Board of Directors, or a member of any committee designated by Board of Directors, shall, in the performance of such person's duties, be fully protected in relying in good faith upon records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board of Directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 13.    <u>Telephonic and Other Meetings</u>.  Unless restricted by the Certificate of Incorporation, any one or more members of the Board of Directors or any committee thereof may participate in a meeting of the Board of Directors or such committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation by such means shall constitute presence in person at a meeting.

Section 14.    <u>Board Composition; CEO and Chairman Position</u>.

(a)    Effective as of the SuperMedia Effective Time (as defined in the Agreement and Plan of Merger, dated as of [●], 2012, by and among Dex One Corporation ("<u>Dex</u>"), SuperMedia, Inc. ("<u>SuperMedia</u>") and the other parties thereto), Peter J. McDonald shall serve as Chief Executive Officer and Alan F. Schultz shall serve as Chairman of the Board

until removed or a successor is elected or appointed in accordance with these Bylaws; provided, that no such removal or successor election or appointment shall be made, other than in the case of the death or resignation of either such individual, prior to the Termination Date.

(b)     Effective as of the SuperMedia Effective Time, the Board of Directors of the Corporation shall consist of (i) five Continuing Dex Directors, including Mr. Schultz, (ii) five Continuing SuperMedia Directors, including Mr. McDonald, and (iii) one independent director (as such term is defined under the rules of the New York Stock Exchange and NASDAQ Stock Market). From and after the Effective Time until the Corporation's 2014 Annual Meeting of Stockholders (the "Termination Date"): (i) the number of directors that comprises the full Board of Directors shall be eleven; (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Corporate Governance Committee; and (iii) the Corporate Governance Committee shall be co-chaired by one Continuing Dex Director and one Continuing SuperMedia Director and composed of an equal number of Continuing Dex Directors and Continuing SuperMedia Directors until the Termination Date. Any deadlocks on the Corporate Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected by this Section 14 of ARTICLE III. If Mr. Schultz is unable to serve as Chairman at any time prior to the Termination Date, then the Continuing Dex Directors shall elect a new Chairman (the "Continuing Chairman"). For the purposes of this Section 14, the terms "Continuing Dex Director" and "Continuing SuperMedia Director" shall mean, respectively, the directors of the Dex and SuperMedia who were selected to be directors of the Corporation by Dex or SuperMedia, as the case may be, as of the SuperMedia Effective Time pursuant to Section 1.7(a) of the Merger Agreement.

(c)     In the event of any inconsistency between any provision of this Section 14 of this ARTICLE III and any other provision of these Bylaws or the Corporation's other constituent documents, the provisions of this Section 14 shall control.

ARTICLE IV
OFFICERS

Section 1.     Number.  The officers of the Corporation shall be elected by the Board of Directors and shall consist of a Chief Executive Officer, a President, one or more Vice Presidents, a Secretary, a Chief Financial Officer and such other officers and assistant officers as may be deemed necessary or desirable by the Board of Directors.  Any number of offices may be held by the same person. In its discretion, the Board of Directors may choose not to fill any office for any period as it may deem advisable.

Section 2.     Election and Term of Office.  The officers of the Corporation shall be elected annually by the Board of Directors at its first meeting held after each annual meeting of stockholders or as soon thereafter as is convenient.  Subject to the provisions of Section 14 of Article III, the Chairman of the Board, if any, shall be elected annually by the Board of Directors at the first meeting of the Board of Directors held after each annual meeting of stockholders or as soon thereafter as is convenient.  Vacancies may be filled or new offices created and filled by the Board of Directors.  Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3.    <u>Removal</u>.    Subject to the provisions of Section 14 of Article III, any officer or agent elected by the Board of Directors may be removed by the Board of Directors at its discretion, with or without cause, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

Section 4.    <u>Vacancies</u>.    Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise may be filled by the Board of Directors.

Section 5.    <u>Compensation</u>.    Compensation of all executive officers shall be approved by the Board of Directors, a duly authorized committee thereof or such officers as may be designated by resolution of the Board of Directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the Corporation.

Section 6.    <u>Chief Executive Officer</u>.    The Chief Executive Officer shall have the powers and perform the duties incident to that position.  The Chief Executive Officer shall, in the absence of the Chairman of the Board, or if a Chairman of the Board shall not have been elected, preside at each meeting of (a) the Board of Directors if the Chief Executive Officer is a director or (b) stockholders.  Subject to the powers of the Board of Directors and the Chairman of the Board, the Chief Executive Officer shall be in general and active charge of the entire business and affairs of the Corporation, and shall be its chief policy making officer.  The Chief Executive Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or provided in these Bylaws.  The Chief Executive Officer is authorized to execute bonds, mortgages and other contracts requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the Corporation.  Whenever the President is unable to serve, by reason of sickness, absence or otherwise, the Chief Executive Officer shall perform all the duties and responsibilities and exercise all the powers of the President.

Section 7.    <u>The President</u>.    The President of the Corporation shall, subject to the powers of the Board of Directors, the Chairman of the Board and the Chief Executive Officer, have general charge of the business, affairs and property of the Corporation, and control over its officers, agents and employees.  The President shall see that all orders and resolutions of the Board of Directors are carried into effect.  The President is authorized to execute bonds, mortgages and other contracts requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the Corporation.  The President shall have such other powers and perform such other duties as may be prescribed by the Chairman of the Board, the Chief Executive Officer, the Board of Directors or as may be provided in these Bylaws.  The President shall have the powers and perform the duties incident to that position.

Section 8.    <u>Vice Presidents</u>.    The Vice President, or if there shall be more than one, the Vice Presidents, in the order determined by the Board of Directors or the Chairman of the Board, shall, in the absence or disability of the President, act with all of the powers and be subject to all the restrictions of the President.  The Vice Presidents shall also perform such other duties and have such other powers as the Board of Directors, the Chairman of the Board, the

Chief Executive Officer, the President or these Bylaws may, from time to time, prescribe.  The Vice Presidents may also be designated as Executive Vice Presidents or Senior Vice Presidents, as the Board of Directors may from time to time prescribe.  A Vice President shall have the powers and perform the duties incident to that position.

Section 9.    The Secretary and Assistant Secretaries.  The Secretary shall attend all meetings of the Board of Directors (other than executive sessions thereof) and all meetings of the stockholders and record all the proceedings of the meetings in a book or books to be kept for that purpose or shall ensure that his or her designee attends each such meeting to act in such capacity.  Under the Board of Directors' supervision, the Secretary shall give, or cause to be given, all notices required to be given by these Bylaws or by law; shall have such powers and perform such duties as the Board of Directors, the Chairman of the Board, the Chief Executive Officer, the President or these Bylaws may, from time to time, prescribe; and shall have custody of the corporate seal of the Corporation.  The Secretary, or an Assistant Secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary.  The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature.  The Assistant Secretary, or if there be more than one, any of the assistant secretaries, shall in the absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors, the Chairman of the Board, the Chief Executive Officer, the President or the Secretary may, from time to time, prescribe.  The Secretary and any Assistant Secretary shall have the powers and perform the duties incident to those positions.

Section 10.    The Chief Financial Officer.  The Chief Financial Officer shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation as shall be necessary or desirable in accordance with applicable law or generally accepted accounting principles; shall deposit all monies and other valuable effects in the name and to the credit of the Corporation as may be ordered by the Chairman of the Board or the Board of Directors; shall receive, and give receipts for, moneys due and payable to the Corporation from any source whatsoever; shall cause the funds of the Corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the Board of Directors, at its regular meeting or when the Board of Directors so requires, an account of the Corporation; shall have such powers and perform such duties as the Board of Directors, the Chairman of the Board, the Chief Executive Officer, the President or these Bylaws may, from time to time, prescribe.  The Chief Financial Officer shall have the powers and perform the duties incident to that position.

Section 11.    Other Officers, Assistant Officers and Agents.  Officers, assistant officers and agents, if any, other than those whose duties are provided for in these Bylaws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors.

Section 12.    Delegation of Authority.  The Board of Directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

ARTICLE V
CERTIFICATES OF STOCK

Section 1.    Form.   The shares of stock of the Corporation shall be represented by certificates provided that the Board of Directors may provide by resolution that some or all of any or all classes or series of its stock shall be uncertificated shares.  If shares are represented by certificates, the certificates shall be in such form as required by applicable law and as determined by the Board of Directors.  Each certificate shall certify the number of shares owned by such holder in the Corporation and shall be signed by, or in the name of the Corporation by the Chairman of the Board, or the President or any Vice President and the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the Corporation designated by the Board of Directors.  Any or all signatures on the certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed, whose facsimile signature has been used on or who has duly affixed a facsimile signature or signatures to any such certificate or certificates shall cease to be such officer, transfer agent or registrar of the Corporation whether because of death, resignation or otherwise before such certificate or certificates have been issued by the Corporation, such certificate or certificates may nevertheless be issued as though the person or persons who signed such certificate or certificates, whose facsimile signature or signatures have been used thereon or who duly affixed a facsimile signature or signatures thereon had not ceased to be such officer, transfer agent or registrar of the Corporation.  All certificates for shares shall be consecutively numbered or otherwise identified.  The Board of Directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar or both in connection with the transfer of any class or series of securities of the Corporation.  The Corporation, or its designated transfer agent or other agent, shall keep a book or set of books to be known as the stock transfer books of the Corporation, containing the name of each holder of record, together with such holder's address and the number and class or series of shares held by such holder and the date of issue.  When shares are represented by certificates, the Corporation shall issue and deliver to each holder to whom such shares have been issued or transferred, certificates representing the shares owned by such holder, and shares of stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation or its designated transfer agent or other agent of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps.  In that event, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates and record the transaction on its books.  When shares are not represented by certificates, shares of stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, with such evidence of the authenticity of such transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps, and within a reasonable time after the issuance or transfer of such shares, the Corporation shall send the holder to whom such shares have been issued or transferred a written statement of the information required by applicable law.  Unless otherwise provided by applicable law, the Certificate of Incorporation, these Bylaws or any other instrument the rights and obligations of shareholders are identical, whether or not their shares are represented by certificates.

Section 2.     Lost Certificates.  The Corporation may issue or direct a new certificate or certificates or uncertificated shares to be issued in place of any certificate or certificates previously issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates or uncertificated shares, the Corporation may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his or her legal representative, to give the Corporation a bond in such sum as it may direct, sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

Section 3.     Registered Stockholders.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its records as the owner of shares of stock to receive dividends, to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner.  The Corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares of stock on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by the laws of Delaware.

Section 4.     Fixing a Record Date for Purposes Other Than Stockholder Meetings.  In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action (other than stockholder meetings which is expressly governed by Section 11 of ARTICLE II hereof), the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 5.     Regulations.  The issue, transfer, conversion and registration of certificates of stock shall be governed by such other regulations as the Board of Directors may establish.

ARTICLE VI
GENERAL PROVISIONS

Section 1.     Dividends.  Subject to the provisions of statutes and the Certificate of Incorporation, dividends upon the shares of capital stock of the Corporation may be declared by the Board of Directors, in accordance with applicable law.  Dividends may be paid in cash, in property or in shares of the capital stock, subject to the provisions of applicable law and the Certificate of Incorporation.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation or for such other purpose as the Board of Directors may think conducive to the interests of the Corporation.  The Board of Directors may modify or abolish any such reserves in the manner in which they were created.

Section 2.    Checks, Notes, Drafts, Etc.  All checks, notes, drafts or other orders for the payment of money of the Corporation shall be signed, endorsed or accepted in the name of the Corporation by such officer, officers, person or persons as from time to time may be designated by the Board of Directors or by an officer or officers authorized by the Board of Directors to make such designation.

Section 3.    Contracts.  In addition to the powers otherwise granted to officers pursuant to Article IV hereof, the Board of Directors may authorize any officer or officers, or any agent or agents, in the name and on behalf of the Corporation to enter into or execute and deliver any and all deeds, bonds, mortgages, contracts and other obligations or instruments, and such authority may be general or confined to specific instances.

Section 4.    Loans.    Subject to compliance with applicable law (including Section 13(k) of the Exchange Act), the Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiaries, including any officer or employee who is a director of the Corporation or its subsidiaries, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the Corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation.  Nothing in this section shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.

Section 5.    Fiscal Year.    The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors. In the absence of such resolution, the fiscal year of the Corporation shall be the calendar year beginning January 1 and ending December 31.

Section 6.    Corporate Seal.    The Board of Directors may provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the Corporation and the words "Corporate Seal, Delaware."  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.  Notwithstanding the foregoing, no seal shall be required by virtue of this Section 6 of this Article VI.

Section 7.    Voting Securities Owned By Corporation.  The Chairman of the Board, the Chief Executive Officer, the President or the Chief Financial Officer shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of stockholders of or with respect to any action of stockholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation, unless the Board of Directors specifically confers authority to vote or act with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer.  Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

Section 8.    Facsimile Signatures.  In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer

or officers of the Corporation may be used whenever and as authorized by the Board of Directors or a committee thereof.

Section 9.    Inspection of Books and Records.    The Board of Directors shall have power from time to time to determine to what extent and at what times and places and under what conditions and regulations the accounts and books of the Corporation, or any of them, shall be open to the inspection of the stockholders; and no stockholder shall have any right to inspect any account or book or document of the Corporation, except as conferred by the laws of the State of Delaware, unless and until authorized so to do by resolution of the Board of Directors.

Section 10.    Time Periods. In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded and the day of the event shall be included.

Section 11.    Section Headings.    Section headings in these Bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 12.    Inconsistent Provisions.    In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL or any other applicable law, the provision of these Bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

ARTICLE VII
INDEMNIFICATION

Section 1.    Right to Indemnification and Advancement.    Each person who was or is made a party or is threatened to be made a party to or is otherwise involved or threatened to be involved (including involvement, without limitation, as a witness) in any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as an employee or agent of the Corporation or as a director, officer, partner, member, trustee, administrator, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan (an "indemnitee"), shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto), against all expense, liability and loss (including attorneys' fees and related disbursements, judgments, fines, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, partner, member, trustee, administrator, employee or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided, however, that, except as provided in

this Section 1 of this Article VII with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation.  The right to indemnification conferred in this Section 1 of this Article VII shall be a contract right. In addition to the right to indemnification conferred herein, an indemnitee shall also have the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition (an "<u>advance of expenses</u>"); provided, however, that if and to the extent that the DGCL requires, an advance of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any capacity in which service was or is rendered by such indemnitee, including without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (an "<u>undertaking</u>"), by or on behalf of such indemnitee, to repay all amounts so advanced that such indemnitee is not entitled to be indemnified for such expenses under this Section 1 of this Article VII or otherwise.  The Corporation may also, by action of its Board of Directors, provide indemnification and advancement of expenses to employees and agents of the Corporation.

      Section 2.    <u>Procedure for Indemnification</u>.    Any indemnification of a director or officer of the Corporation or advance of expenses (including attorneys' fees, costs and charges) under this Section 2 of this Article VII shall be made promptly, and in any event within forty-five days after a written claim has been received by the Corporation (or, in the case of an advance of expenses, twenty days after a written request is received by the Corporation, provided that the director or officer has delivered the undertaking contemplated by Section 1 of this Article VII if required).  If a determination by the Corporation that the director or officer is entitled to indemnification or advancement of expenses pursuant to this Article VII is required, and the Corporation fails to respond within sixty days to a written request for indemnity or advancement of expenses, the Corporation shall be deemed to have approved the request.  If the Corporation denies a written request for indemnification or advance of expenses, in whole or in part, or if payment in full pursuant to such request is not made within forty-five days after a written claim has been received by the Corporation (or, in the case of an advance of expenses, twenty days after a written request is received by the Corporation, provided that the director or officer has delivered the undertaking contemplated by Section 1 of this Article VII if required), the right to indemnification or advances as granted by this Article VII shall be enforceable by the director or officer in any court of competent jurisdiction.  Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification or advancement of expenses, in whole or in part, in any such action shall also be indemnified by the Corporation to the fullest extent permitted by Delaware law.  It shall be a defense to any such action (other than an action brought to enforce a claim for the advance of expenses where the undertaking required pursuant to Section 1 of this Article VII, if any, has been tendered to the Corporation) that the claimant has not met the standards of conduct which make it permissible under the DGCL for the Corporation to indemnify the claimant for the amount claimed, but the burden of such defense shall be on the Corporation to the fullest extent permitted by law.  Neither the failure of the Corporation (including its Board of Directors, a committee thereof, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors, a committee thereof,

independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct. The procedure for indemnification of other employees and agents for whom indemnification and advancement of expenses is provided pursuant to Section 1 of this Article VII shall be the same procedure set forth in this Section 2 of this Article VII for directors or officers, unless otherwise set forth in the action of the Board of Directors providing indemnification and advancement of expenses for such employee or agent.

Section 3.    Insurance.  The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was or has agreed to become a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, partner, member, trustee, administrator, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise against any expense, liability or loss asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify such person against such expenses, liability or loss under the DGCL or otherwise.

Section 4.    Service for Subsidiaries.  Any person serving as a director, officer, partner, member, trustee, administrator, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, at least 50% of whose equity interests are owned by the Corporation (a "subsidiary" for this Article VII), shall be conclusively presumed to be serving in such capacity at the request of the Corporation.

Section 5.    Reliance.  Persons who after the date of the adoption of this provision become or remain directors or officers of the Corporation or who, while a director or officer of the Corporation, become or remain a director, officer, employee or agent of a subsidiary, shall be conclusively presumed to have relied on the rights to indemnity, advance of expenses and other rights contained in this Article VII in entering into or continuing such service.  The rights to indemnification and to the advance of expenses conferred in this Article VII shall apply to claims made against an indemnitee arising out of acts or omissions which occurred or occur both prior and subsequent to the adoption hereof.  Any amendment, alteration or repeal of this Article VII that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment or repeal.

Section 6.    Non-Exclusivity of Rights; Continuation of Rights to Indemnification. The rights to indemnification and to the advance of expenses conferred in this Article VII shall not be exclusive of any other right which any person may have or hereafter acquire under the Certificate of Incorporation or under any statute, bylaw, agreement, vote of stockholders or disinterested directors or otherwise.  All rights to indemnification under this Article VII shall be deemed to be a contract between the Corporation and each director or officer of the Corporation who serves or served in such capacity at any time while this Article VII is in effect.  Any repeal or modification of this Article VII or any repeal or modification of relevant provisions of the DGCL or any other applicable laws shall not in any way diminish any rights to indemnification and advancement of expenses of such director or officer or the obligations of the Corporation

arising hereunder with respect to any proceeding arising out of, or relating to, any actions, transactions or facts occurring prior to the final adoption of such repeal or modification.

Section 7.    Merger or Consolidation.  For purposes of this Article VII, references to the "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article VII with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

Section 8.    Savings Clause.  If this Article VII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify and advance expenses to each person entitled to indemnification under Section 1 of Article VII as to all expense, liability and loss (including attorneys' fees and related disbursements, judgments, fines, ERISA excise taxes and penalties, penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by such person and for which indemnification or advancement of expenses is available to such person pursuant to this Article VII to the fullest extent permitted by any applicable portion of this Article VII that shall not have been invalidated and to the fullest extent permitted by applicable law.

ARTICLE VIII
FORUM FOR ADJUDICATION OF DISPUTES

With respect to any action arising out of any act or omission occurring after the adoption of these Bylaws, unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law, the Certificate of Incorporate or these Bylaws, or (iv) any action asserting a claim governed by the internal affairs doctrine, in each case subject to the Court of Chancery of the State of Delaware having personal jurisdiction over the indispensable parties named as defendants therein and the Court of Chancery of the State of Delaware having subject matter jurisdiction over the claim in question. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article.

ARTICLE IX
AMENDMENTS

These Bylaws may be amended, altered, changed or repealed or new Bylaws adopted by a vote of a majority of the entire Board of Directors at any meeting, including any bylaw adopted by the stockholders, provided that the stockholders may from time to time specify particular

provisions of the Bylaws which shall not be amended by the Board of Directors. Notwithstanding the foregoing, Sections Section 2, Section 5, Section 7, Section 8, and Section 9 of Article III may be amended, altered, changed, or repealed only by a vote of at least 75% of the entire Board of Directors at any meeting.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT C TO THE MERGER AGREEMENT**

FORM OF SUPERMEDIA SURVIVING COMPANY CERTIFICATE OF INCORPORATION

[THIS PAGE INTENTIONALLY LEFT BLANK]

Exhibit C

CERTIFICATE OF INCORPORATION
OF
SUPERMEDIA INC.


ARTICLE ONE

The name of the corporation (hereinafter referred to as the "Corporation") is SuperMedia Inc.


ARTICLE TWO

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.  The name of its registered agent at such address is The Corporation Trust Company.


ARTICLE THREE


The purpose for which the Corporation is organized is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware or any applicable successor thereto, as the same may be amended or supplemented from time to time (the "DGCL").


ARTICLE FOUR


A.    Capital Stock.  The total number of shares of stock which the Corporation has authority to issue is 100 shares of common stock, with a par value of $0.01 per share.

[B.    Non-Voting Stock.  Notwithstanding anything herein to the contrary, the Corporation shall not be authorized to issue non-voting capital stock of any class, series or other designation to the extent prohibited by Section 1123(a)(6) of chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"); provided, however, that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as such Section 1123(a)(6) is in effect and applies to the Corporation and (iii) be deemed void or eliminated if required under applicable law.][1]

---

[1] Bracketed text to be included only if SuperMedia Inc. or Spruce Acquisition Sub, Inc. files for Chapter 11 bankruptcy and the SuperMedia Merger (as defined in the Amended and Restated Agreement and Plan of Merger, dated as of December 5, 2012, by and among Dex One Corporation, Newdex, Inc., Spruce Acquisition Sub, Inc. and SuperMedia Inc.) is consummated through such Chapter 11 bankruptcy.

## ARTICLE FIVE

The Corporation is to have perpetual existence.

## ARTICLE SIX

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation (the "Board of Directors") is expressly authorized to make, alter or repeal the Bylaws of the Corporation (the "Bylaws").

## ARTICLE SEVEN

Meetings of the stockholders of the Corporation may be held within or without the State of Delaware, as the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws. Election of directors need not be by written ballot unless the Bylaws so provide.

## ARTICLE EIGHT

A.    Limitation of Director's Liability.  The Corporation hereby eliminates, to the fullest extent permitted by law (as contemplated by Section 102(b)(7) of the DGCL), the personal liability of any person who serves as a director of the Corporation to the Corporation and/or its stockholders for monetary damages for breach of fiduciary duty as a director; *provided*, that this ARTICLE EIGHT shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for any acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit.  If the DGCL is hereafter amended to authorize further elimination or limitation of the liability of directors, then the liability of a director of the Corporation, in addition to the elimination or limitation on personal liability provided herein, shall be limited to the fullest extent permitted by the DGCL as so amended.  Any repeal or modification of this ARTICLE EIGHT shall be prospective only, and shall not adversely affect any elimination or limitation on the personal liability of a director of the Corporation existing at the time of such repeal or modification.

B.    Right to Indemnification.  The Corporation, to the fullest extent permitted or required by the DGCL or other applicable law, as the same exists or may hereafter be

amended (but, in the case of any such amendment, unless applicable law otherwise requires, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), shall indemnify and hold harmless any person who is or was made a party, or is threatened to be made a party, or who is or was involved in any manner (including, without limitation, as a witness), in any threatened, pending or completed investigation, claim, action, suit or proceeding, whether civil, criminal, administrative, or investigative (including, without limitation, any action, suit or proceeding by or in the right of the Corporation to procure a judgment in its favor) (collectively, a "Proceeding"), by reason of the fact that such person, or a person of whom he or she is or was the legal representative, is or was a director or officer of the Corporation, or who while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise (including service with respect to employee benefit plans maintained or sponsored by the Corporation) (collectively, an "Indemnitee"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent or in any other capacity while serving as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent, against all expenses, liabilities and losses (including, without limitation, attorneys' fees, costs, charges and related disbursements, judgments, fines, taxes, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended from time to time, penalties, and amounts paid or to be paid in settlement) (collectively, "Expenses") actually and reasonably incurred by the Indemnitee in connection with such Proceeding; *provided*, *however*, that, except as provided in this ARTICLE EIGHT with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify an Indemnitee in connection with a Proceeding (or part thereof) initiated by or on behalf of such Indemnitee only if the initiation of such Proceeding (or part thereof) was authorized by the Board of Directors. Each person who is or was serving as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent of a subsidiary of the Corporation shall be deemed to be serving, or have served, at the request of the Corporation.

C.    Presumptions and Effect of Certain Proceedings. An Indemnitee seeking indemnification shall be presumed to be entitled to indemnification upon submission of a written request, and thereafter the Corporation shall have the burden of proof to overcome that presumption in reaching a contrary determination. In any event, if the Corporation shall not have made a determination within thirty (30) days after receipt of a written request therefor, the Indemnitee seeking indemnification shall be deemed to be, and shall be, entitled to indemnification unless (i) the Indemnitee intentionally misrepresented or failed to disclose a material fact in the written request for indemnification or (ii) such indemnification is prohibited by the DGCL. The termination of any Proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnitee (a) did not act in good faith and in a manner which the Indemnitee reasonably believed to be in, or at least not opposed to, the best interests of the Corporation or (b) with respect to any criminal action or proceeding, had reasonable cause to believe that such conduct was unlawful. Furthermore, the knowledge or actions or failure to act of any other director, officer, employee or agent of the Corporation or other enterprise, as applicable, shall not be

imputed to the Indemnitee for purposes of determining the Indemnitee's entitlement to indemnification under this <u>ARTICLE EIGHT</u>.

> D. <u>Advancement of Expenses</u>. Expenses incurred by an Indemnitee in defending a Proceeding shall be paid by the Corporation in advance of the final disposition of such Proceeding and within 15 days of receipt by the secretary of the Corporation of (i) a written request therefor setting forth the basis for such indemnification and (ii) if required by law at the time such written request is made, an undertaking by or on behalf of the Indemnitee to repay such amount if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified by the Corporation as authorized in this Article VII. Such advances shall be made on an unsecured basis, shall be interest-free and shall be made without regard to the Indemnitee's ability to repay such amounts and without regard to the Indemnitee's ultimate entitlement to indemnification under this <u>ARTICLE EIGHT</u> or otherwise.

> E. <u>Remedies of the Indemnitee</u>.

> (i) If a determination is made that the Indemnitee is not entitled to indemnification or advancement of Expenses under this <u>ARTICLE EIGHT</u>: (a) the Indemnitee shall be entitled to seek an adjudication of entitlement to such indemnification or advancement of Expenses either, at the Indemnitee's sole option, (1) in an appropriate court of the State of Delaware or any other court of competent jurisdiction or (2) in an arbitration to be conducted by a single arbitrator pursuant to the rules of the American Arbitration Association; (b) any such judicial proceeding or arbitration shall be *de novo* and the Indemnitee shall not be prejudiced by reason of such adverse determination; and (c) in any such judicial proceeding or arbitration, the Corporation shall have the burden of proving by clear and convincing evidence that the Indemnitee is not entitled to indemnification or advancement of Expenses under this <u>ARTICLE EIGHT</u>.

> (ii) If a determination shall have been made or deemed to have been made that the Indemnitee is entitled to indemnification, the Corporation shall be obligated to pay the amounts constituting such indemnification within fifteen (15) days after such determination has been made or deemed to have been made and shall be conclusively bound by such determination unless (a) the Indemnitee intentionally misrepresented or failed to disclose a material fact in the written request for indemnification or (b) such indemnification is prohibited by the DGCL. In the event that (1) advancement of Expenses is not timely made pursuant to Section D of this <u>ARTICLE EIGHT</u> or (2) payment of indemnification is not made within fifteen (15) days after a determination of entitlement to indemnification has been made or deemed to have been made pursuant to this Article VII, the Indemnitee shall be entitled to seek judicial enforcement of the Corporation's obligation to pay the Indemnitee such advancement of Expenses and indemnification. It shall be a defense to any such action for judicial enforcement (other than an action brought to enforce a claim for Expenses incurred in defending any Proceeding in advance of its final disposition where the written request therefor and the required undertaking, if any is required, has been received by the secretary of the Corporation) that the Indemnitee has not met the standard of conduct set forth in the DGCL, but the burden of proving such defense, by clear and convincing evidence, will be on the Corporation. Neither the failure of the Corporation to have made a determination prior to the commencement of such action that indemnification of the

Indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation that the Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the Indemnitee has not met the applicable standard of conduct.

(iii)    The Corporation shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section E of <u>ARTICLE EIGHT</u> that the procedures and the presumptions of this <u>ARTICLE EIGHT</u> are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Corporation is bound by all the provisions of this <u>ARTICLE EIGHT</u>.

(iv)    The Corporation shall indemnify the Indemnitee against, and the Indemnitee shall be entitled to recover from the Corporation, any Expenses actually and reasonably incurred in connection with any judicial adjudication, judicial enforcement, or arbitration commenced pursuant to this Section E of <u>ARTICLE EIGHT</u> to enforce his or her rights under, or to recover damages for breach of, this <u>ARTICLE EIGHT</u>.

F.    <u>Definitions</u>.  For purposes of this <u>ARTICLE EIGHT</u>:

(i)    "<u>Corporation</u>" shall mean, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this <u>ARTICLE EIGHT</u> with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

(ii)    "<u>Disinterested Director</u>" shall mean a director of the Corporation who is not or was not a party to the Proceeding in respect of which indemnification is sought by the Indemnitee.

(iii)    Actions "in, or at least not opposed to, the best interests of the Corporation" shall include, without limitation, actions taken in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the participants and beneficiaries of an employee benefit plan.

G.    <u>Insurance</u>.  The Corporation shall purchase and maintain insurance on behalf of any person who is or was a director or officer of the Corporation, or who while a director or officer is or was serving at the request of the Corporation as a director, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise ("<u>D&O Insurance</u>"), against any liability asserted against the person and incurred by the person in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power or the obligation to indemnify such person against such

liability under the provisions of this <u>ARTICLE EIGHT</u>. Notwithstanding the foregoing, the Corporation shall have no obligation to obtain or maintain D&O Insurance if the Corporation determines in good faith that such insurance is not reasonably available, the premium costs for such insurance are materially disproportionate to the amount of coverage provided, the coverage provided by such insurance is limited by exclusions so as to provide a materially insufficient benefit, or such person is covered by substantially similar insurance maintained by a subsidiary of the Corporation or by another person pursuant to a contractual obligation owed to the Corporation.

H.      <u>Scope of ARTICLE EIGHT</u>. The rights conferred in this <u>ARTICLE EIGHT</u> shall not be exclusive of any other right that any person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation, any certificate of designations, the Bylaws, any agreement, vote of stockholders or Disinterested Directors, or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office or while employed by or acting as agent for the Corporation. The rights provided by or granted pursuant to this <u>ARTICLE EIGHT</u> shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director or officer and shall inure to the benefit of the heirs, executors and administrators of such person.

I.      <u>Reliance on Provisions</u>. Each person who shall act as a director or officer of the Corporation, or as the legal representative of such person, or who while a director or officer serves at the request of the Corporation as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, shall be deemed to be doing so in reliance upon rights of indemnification provided by this <u>ARTICLE EIGHT</u>. Any repeal or modification of the provisions of this <u>ARTICLE EIGHT</u> shall not adversely affect any right or benefit of any potential Indemnitee existing at the time of such repeal or modification.

J.      <u>Indemnification of Other Employees</u>. The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and rights to advancement by the Corporation of any Expenses actually and reasonably incurred in defending any Proceeding, to any employee or agent of the Corporation to the fullest extent of the provisions of this <u>ARTICLE EIGHT</u> with respect to the indemnification of and advancement of Expenses to directors and officers of the Corporation.

K.      <u>Severability</u>. If this <u>ARTICLE EIGHT</u> or any portion hereof shall be held to be invalid, illegal or unenforceable on any ground by any court of competent jurisdiction, then (i) the Corporation shall nevertheless indemnify each Indemnitee as to all Expenses actually and reasonably incurred or suffered by such person in connection with any Proceeding, including, without limitation, a grand jury proceeding, to the fullest extent permitted by (a) any applicable portion of this Article VII that shall not have been invalidated, (b) the DGCL or (c) any other applicable law; and (ii) to the fullest extent possible, the provisions of this <u>ARTICLE EIGHT</u> (including, without limitation, each portion of any paragraph of this <u>ARTICLE EIGHT</u> containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

L.    <u>Contract Rights</u>.    The provisions of this <u>ARTICLE EIGHT</u> shall be deemed to be a contract right between the Corporation and each person who is entitled to indemnification or advancement of Expenses pursuant to this <u>ARTICLE EIGHT</u> at any time while this <u>ARTICLE EIGHT</u> and the relevant provisions of the DGCL or other applicable law are in effect, and any repeal or modification of this <u>ARTICLE EIGHT</u> or any such law shall be prospective only, and shall not in any way diminish any rights to indemnification of such person or the obligations of the Corporation arising hereunder with respect to any Proceeding arising out of, or relating to, any actions, transactions or facts occurring prior to the final adoption of such modification or repeal.

### ARTICLE NINE

The Corporation expressly elects not to be governed by Section 203 of the DGCL.

### ARTICLE TEN

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware.  All rights, preferences and privileges of any nature conferred upon stockholders, directors, or any other persons or entities by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the right reserved in this <u>ARTICLE TEN</u>; *provided*, *however*, that any amendment, repeal or modification of <u>ARTICLE EIGHT</u> of this Certificate of Incorporation shall be prospective only, and shall not adversely affect any right, benefit or protection existing at the time of such amendment, repeal or modification.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT D TO THE MERGER AGREEMENT**

FORM OF SUPERMEDIA SURVIVING COMPANY BYLAWS

[THIS PAGE INTENTIONALLY LEFT BLANK]

# BY-LAWS

## OF

## SUPERMEDIA INC.

### A Delaware corporation

*Adopted as of _____, 2013*

## ARTICLE I
## OFFICES

Section 1.    Registered Office.  The registered office of SuperMedia Inc. (the "Corporation") in the State of Delaware shall be located at 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801.  The registered agent of the Corporation for service of process at such address is The Corporation Trust Company.  The registered office and/or agent of the Corporation may be changed from time to time by action of the Board of Directors of the Corporation (the "Board of Directors").

Section 2.    Other Offices.  The Corporation may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

Section 1.    Annual Meetings.  An annual meeting of the stockholders shall be held each year within one hundred twenty (120) days after the close of the immediately preceding fiscal year of the Corporation for the purpose of electing directors and conducting such other proper business as may come before the meeting.  The date, time and place of the annual meeting shall be determined by the President; provided that if the President does not act, the Board of Directors shall determine the date, time and place of such meeting. No annual meeting of stockholders need be held if not required by the Certificate of Incorporation of the Corporation (the "Certificate of Incorporation") or by the General Corporation Law of the State of Delaware, as in effect from time to time (the "DGCL").

Section 2.    Special Meetings.  Special meetings of stockholders may be called for any purpose and may be held at such time and place, within or without the State of Delaware, as shall be stated in a notice of meeting or in a duly executed waiver of notice thereof.  Except as otherwise provided in the Certificate of Incorporation, such meetings may be called at any time by the Board of Directors or the President and shall be called by the President upon the written request of holders of shares entitled to cast not less than a majority of the votes at the meeting.  Such written request shall state the purpose or purposes of the meeting and shall be delivered to the President.

Section 3.    Place of Meetings.  The Board of Directors may designate any place, either within or without the State of Delaware, as the place of meeting for any annual

meeting or for any special meeting called by the Board of Directors. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Corporation.

Section 4.    Notice.  Whenever stockholders are required or permitted to take action at a meeting, written or printed notice stating the place, date, time, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting. All such notices shall be delivered, either personally, by mail, by facsimile or by e-mail by or at the direction of the Board of Directors, the President or the Secretary, and if mailed, such notice shall be deemed to be delivered (i) upon confirmation of receipt if sent by facsimile, e-mail or personal delivery or (ii) three (3) days after being deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

Section 5.    Stockholders List.  The officer having charge of the stock ledger of the Corporation shall make, at least ten (10) days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at such meeting arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the annual meeting either at a place within the city where the meeting is to be held which place shall be specified in the notice of the meeting or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

Section 6.    Quorum.  The holders of at least a majority of the outstanding shares of capital stock entitled to vote, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders, except as otherwise provided by statute or by the Certificate of Incorporation.  If a quorum is not present, the holders of a majority of the shares present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place.  When a quorum is once present to commence a meeting of stockholders, it is not broken by the subsequent withdrawal of any stockholders or their proxies.

Section 7.    Adjourned Meetings.  When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 8.    Vote Required.  When a quorum is present, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law or of the Certificate of Incorporation, a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 9.    Voting Rights.  Except as otherwise provided by the DGCL or by the Certificate of Incorporation or any amendments thereto and subject to Section 3 of Article VI hereof, every stockholder shall at every meeting of the stockholders be entitled to one (1) vote in person or by proxy for each share of common stock entitled to vote on the subject matter and held (or deemed held) by such stockholder (it being understood that certain other classes or series of capital stock may, pursuant to the Certificate of Incorporation, be entitled to vote on an as-if converted to common stock basis).

Section 10.    Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for him or her by proxy, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally.  Any proxy is suspended when the person executing the proxy is present at a meeting of stockholders and elects to vote, except that when such proxy is coupled with an interest and the fact of the interest appears on the face of the proxy, the agent named in the proxy shall have all voting and other rights referred to in the proxy, notwithstanding the presence of the person executing the proxy.  At each meeting of the stockholders, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the Secretary or a person designated by the Secretary and no shares may be represented or voted under a proxy that has been found to be invalid or irregular.

Section 11.    Inspectors of Election.  In advance of any meeting of stockholders, the Board of Directors may appoint one or more inspectors, who need not be stockholders, to act at the meeting and to make a written report thereof.  The Board of Directors may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before discharging his or her duties, shall take and sign an oath to faithfully execute the duties of inspector with strict impartiality and according to the person's best ability.  The inspectors shall have the duties prescribed by law.

Section 12.    Action by Written Consent.  Unless otherwise provided in the Certificate of Incorporation, any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates

3

of signature of the stockholders who signed the consent or consents, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in the state of Delaware, or the Corporation's principal place of business, or an officer or agent of the Corporation having custody of the book or books in which proceedings of meetings of the stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested, or by facsimile or e-mail, with confirmation of receipt.  All consents properly delivered in accordance with this Section shall be deemed to be recorded when so delivered.  No written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered to the Corporation as required by this Section, written consents signed by the holders of a sufficient number of shares to take such corporate action are so recorded.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.  Any action taken pursuant to such written consent or consents of the stockholders shall have the same force and effect as if taken by the stockholders at a meeting thereof.

## ARTICLE III
## DIRECTORS

Section 1. General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 2. Number, Election and Term of Office. The Board of Directors shall consist of that number of directors as determined from time to time by the Board of Directors.  The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote in the election of directors. The directors shall be elected in this manner at the annual meeting of the stockholders, except as provided in Section 4 of this Article III.  Each director elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3. Removal and Resignation. The directors shall only be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.  Whenever the holders of any class or series are entitled to elect one or more directors by the provisions of the Certificate of Incorporation, the provisions of this Section shall apply, in respect to the removal without cause of a director or directors so elected, to the vote of the holders of the outstanding shares of that class or series and not to the vote of the outstanding shares as a whole.  Any director may resign at any time upon written notice to the Corporation.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

4

Section 4.    Vacancies.  Vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by the sole remaining director.  Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Section 5.    Annual Meetings.  The annual meeting of each newly elected Board of Directors shall be held without other notice than this Section immediately after, and at the same place as, the annual meeting of stockholders.

Section 6.    Other Meetings and Notice.  Regular meetings, other than the annual meeting, of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by resolution of the board. Special meetings of the Board of Directors may be called by or at the request of any director on at least seven (7) days' notice to each director, either personally, by telephone, by mail, or by facsimile or e-mail.

Section 7.    Quorum.  Each director shall be entitled to one (1) vote except as otherwise provided in the Certificate of Incorporation.  Directors then in office (and specifically excluding any vacancies) and holding a majority of the votes of all directors (or such greater number required by applicable law) shall constitute a quorum for the transaction of business. The vote of directors holding a majority of votes present at a meeting at which a quorum is present shall be the act of the Board of Directors.  If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 8.    Committees.  The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, each committee to consist of one or more of the directors of the Corporation, which to the extent provided in such resolution or these By-Laws shall have and may exercise the powers of the Board of Directors in the management and affairs of the Corporation except as otherwise limited by law.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors.  Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 9.    Committee Rules.  Each committee of the Board of Directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the Board of Directors designating such committee. Unless otherwise provided in such a resolution, the presence of at least a majority of the members of the committee shall be necessary to constitute a quorum.  In the event that a member and that member's alternate, if alternates are designated by the Board of Directors as provided in Section 8 of this Article III, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.

Section 10.    Communications Equipment.  Members of the Board of Directors or any committee thereof may participate in and act at any meeting of such board or committee through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting pursuant to this Section shall constitute presence in person at the meeting.

Section 11.    Waiver of Notice and Presumption of Consent.  Any member of the Board of Directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Such member shall be conclusively presumed to have consented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the Secretary immediately after the adjournment of the meeting. Such right to dissent shall not apply to any member who voted in favor of such action.

Section 12.    Action by Written Consent.  Unless otherwise restricted by the Certificate of Incorporation, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the board or committee.

Section 13.    Compensation.  The Board of Directors or a committee thereof shall have the authority to fix the amount of compensation of directors and any committee members.

## **ARTICLE IV**
## **OFFICERS**

Section 1.    Officers. The officers of the Corporation shall be elected by the Board of Directors.  Unless otherwise determined by the Board of Directors, the officers shall consist of at least a President and Secretary and may consist of a Chief Executive Officer, any number of Vice-Presidents, a Chief Financial Officer, any number of Assistant Secretaries and such other officers and assistant officers as may be deemed necessary or desirable by the Board of Directors.  Any number of offices may be held by the same person.  In its discretion, the Board of Directors may choose not to fill any office for any period as it may deem advisable.

Section 2.    Election and Term of Office.  The officers of the Corporation shall be elected annually by the Board of Directors at its first meeting held after each annual meeting of stockholders or as soon thereafter as conveniently may be.  Vacancies may be filled or new offices created and filled at any meeting of the Board of Directors. Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3.    Removal and Resignation.  Any officer or agent elected by the Board of Directors may be removed by the Board of Directors whenever in its judgment the best

interests of the Corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Any officer may resign at any time by giving written notice to the Corporation.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 4.    Vacancies.  Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the Board of Directors for the unexpired portion of the term by the Board of Directors then in office.

Section 5.    Compensation.  Compensation of all officers shall be fixed by the Board of Directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the Corporation.

Section 6.    The President.  The President shall (in the absence of a Chief Executive Officer) be the chief executive officer of the Corporation; shall preside at all meetings of the stockholders and Board of Directors at which he is present; subject to the powers of the Board of Directors, shall have general charge of the business, affairs and property of the Corporation, and control over its officers, agents and employees; and shall see that all orders and resolutions of the Board of Directors are carried into effect. The President shall execute bonds, mortgages and other contracts which the Board of Directors have authorized to be executed, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the Corporation. The President shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or as may be provided in these By-Laws.

Section 7.    Chief Financial Officer. The Chief Financial Officer of the Corporation shall, under the direction of the Chief Executive Officer (or, in the absence of a Chief Executive Officer, the President), be responsible for all financial and accounting matters and for the direction of the offices of Treasurer and Controller. The Chief Financial Officer shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the Chief Executive Officer, the President or the Board of Directors or as may be provided in these By-Laws.

Section 8.    Vice-Presidents.  The Vice-President, or if there shall be more than one, the Vice-Presidents in the order determined by the Board of Directors or by the President, shall, in the absence or disability of the President, act with all of the powers and be subject to all the restrictions of the President. The Vice-Presidents shall also perform such other duties and have such other powers as the Board of Directors, the Chief Executive Officer, the President or these By-Laws may, from time to time, prescribe.

Section 9.    The Secretary and Assistant Secretaries. The Secretary shall attend all meetings of the Board of Directors, all meetings of the committees thereof and all meetings of the stockholders and record all the proceedings of the meetings in a book or books to be kept for that purpose. Under the Chief Executive Officer's (or, in the absence of a Chief Executive Officer, the President's) supervision, the Secretary shall give, or cause to be given, all notices

required to be given by these By-Laws or by law; shall have such powers and perform such duties as the Board of Directors, the Chief Executive Officer, (or, in the absence of a Chief Executive Officer, the President), the President or these By-Laws may, from time to time, prescribe; and shall have custody of the corporate seal of the Corporation. The Secretary, or an Assistant Secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his or her signature. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board of Directors, shall, in the absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors, the Chief Executive Officer, the President or the Secretary may, from time to time, prescribe.

Section 10.    The Treasurer and Assistant Treasurer. The Treasurer shall, subject to the authority of the Chief Financial Officer, have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation; shall deposit all monies and other valuable effects in the name and to the credit of the Corporation as may be ordered by the Board of Directors; shall cause the funds of the Corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; shall render to the Chief Executive Officer, the President and the Board of Directors, at its regular meeting or when the Board of Directors so requires, an account of the Corporation; and shall have such powers and perform such duties as the Board of Directors, the Chief Executive Officer (or, in the absence of a Chief Executive Officer, the President), the President or these By-Laws may, from time to time, prescribe. If required by the Board of Directors, the Treasurer shall give the Corporation a bond (which shall be rendered every six (6) years) in such sums and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of Treasurer and for the restoration to the Corporation, in case of death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the possession or under the control of the Treasurer belonging to the Corporation. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors, shall in the absence or disability of the Chief Financial Officer or Treasurer, perform the duties and exercise the powers of the Treasurer. The Assistant Treasurers shall perform such other duties and have such other powers as the Board of Directors, the Chief Executive Officer, the President or Treasurer may, from time to time, prescribe.

Section 11.    Other Officers, Assistant Officers and Agents.  Officers, assistant officers and agents, if any, other than those whose duties are provided for in these By-Laws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors.

Section 12.    Absence or Disability of Officers.  In the case of the absence or disability of any officer of the Corporation and of any person hereby authorized to act in such officer's place during such officer's absence or disability, the Board of Directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

8

# ARTICLE V
# INDEMNIFICATION

Section 1.    Right to Indemnification.  The Corporation, to the fullest extent permitted or required by the DGCL or other applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, unless applicable law otherwise requires, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), shall indemnify and hold harmless any person who is or was made a party, or is threatened to be made a party, or who is or was involved in any manner (including, without limitation, as a witness), in any threatened, pending or completed investigation, claim, action, suit or proceeding, whether civil, criminal, administrative, or investigative (including, without limitation, any action, suit or proceeding by or in the right of the Corporation to procure a judgment in its favor) (collectively, a "Proceeding"), by reason of the fact that such person, or a person of whom he or she is or was the legal representative, is or was a director or officer of the Corporation, or who while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent of another Corporation or of a partnership, limited liability company, joint venture, trust or other enterprise (including service with respect to employee benefit plans maintained or sponsored by the Corporation) (collectively, an "Indemnitee"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent or in any other capacity while serving as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent, against all expenses, liabilities and losses (including, without limitation, attorneys' fees, costs, charges, and related disbursements, judgments, fines, taxes, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended from time to time, penalties and amounts paid or to be paid in settlement) (collectively, "Expenses") actually and reasonably incurred by the Indemnitee in connection with such Proceeding; provided, however, that, except as provided in this Article V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify an Indemnitee in connection with a Proceeding (or part thereof) initiated by or on behalf of such Indemnitee only if the initiation of such Proceeding (or part thereof) was authorized by the Board of Directors.  Each person who is or was serving as a director, officer, partner, principal, member, manager, fiduciary, employee, trustee or agent of a subsidiary of the Corporation shall be deemed to be serving, or have served, at the request of the Corporation.

Section 2.    Presumptions and Effect of Certain Proceedings.  An Indemnitee seeking indemnification shall be presumed to be entitled to indemnification upon submission of a written request, and thereafter the Corporation shall have the burden of proof to overcome that presumption in reaching a contrary determination.  In any event, if the Corporation shall not have made a determination within thirty (30) days after receipt of a written request therefor, the Indemnitee seeking indemnification shall be deemed to be, and shall be, entitled to indemnification unless (a) the Indemnitee intentionally misrepresented or failed to disclose a material fact in the written request for indemnification or (b) such indemnification is prohibited by the DGCL.  The termination of any Proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnitee (i) did not act in good faith and in a manner which the Indemnitee reasonably

9

believed to be in, or at least not opposed to, the best interests of the Corporation or (ii) with respect to any criminal action or proceeding, had reasonable cause to believe that such conduct was unlawful.  Furthermore, the knowledge or actions or failure to act of any other director, officer, employee or agent of the Corporation or other enterprise, as applicable, shall not be imputed to the Indemnitee for purposes of determining the Indemnitee's entitlement to indemnification under this <u>Article V</u>.

                Section 3.      <u>Advancement of Expenses</u>.  Expenses incurred by an Indemnitee in defending a Proceeding shall be paid by the Corporation in advance of the final disposition of such Proceeding and within fifteen (15) days of receipt by the Secretary of (a) a written request therefor setting forth the basis for such indemnification and (b) if required by law at the time such written request is made, an undertaking by or on behalf of the Indemnitee to repay such amount if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified by the Corporation as authorized in this <u>Article V</u>.  Such advances shall be made on an unsecured basis, shall be interest-free and shall be made without regard to the Indemnitee's ability to repay such amounts and without regard to the Indemnitee's ultimate entitlement to indemnification under this <u>Article V</u> or otherwise.

                Section 4.      <u>Remedies of the Indemnitee</u>.

                (a)      If a determination is made that the Indemnitee is not entitled to indemnification or advancement of Expenses under this <u>Article V</u>, (i) the Indemnitee shall be entitled to seek an adjudication of entitlement to such indemnification or advancement of Expenses either, at the Indemnitee's sole option, (A) in an appropriate court of the State of Delaware or any other court of competent jurisdiction or (B) in an arbitration to be conducted by a single arbitrator pursuant to the rules of the American Arbitration Association, (ii) any such judicial proceeding or arbitration shall be de novo and the Indemnitee shall not be prejudiced by reason of such adverse determination, and (iii) in any such judicial proceeding or arbitration, the Corporation shall have the burden of proving by clear and convincing evidence that the Indemnitee is not entitled to indemnification or advancement of Expenses under this <u>Article V</u>.

                (b)      If a determination shall have been made or deemed to have been made that the Indemnitee is entitled to indemnification, the Corporation shall be obligated to pay the amounts constituting such indemnification within fifteen (15) days after such determination has been made or deemed to have been made and shall be conclusively bound by such determination unless (i) the Indemnitee intentionally misrepresented or failed to disclose a material fact in the written request for indemnification or (ii) such indemnification is prohibited by the DGCL.  In the event that (A) advancement of Expenses is not timely made pursuant to <u>Section 3</u> of this <u>Article V</u> or (B) payment of indemnification is not made within fifteen (15) days after a determination of entitlement to indemnification has been made or deemed to have been made pursuant to this <u>Article V</u>, the Indemnitee shall be entitled to seek judicial enforcement of the Corporation's obligation to pay the Indemnitee such advancement of Expenses and indemnification.  It shall be a defense to any such action for judicial enforcement (other than an action brought to enforce a claim for Expenses incurred in defending any Proceeding in advance of its final disposition where the written request

10

therefor and the required undertaking, if any is required, has been received by the Secretary) that the Indemnitee has not met the standard of conduct set forth in the DGCL, but the burden of proving such defense, by clear and convincing evidence, will be on the Corporation.  Neither the failure of the Corporation to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation that the Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the Indemnitee has not met the applicable standard of conduct.

(c)     The Corporation shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 4 that the procedures and the presumptions of this Article V are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Corporation is bound by all the provisions of this Article V.

(d)     The Corporation shall indemnify the Indemnitee against, and the Indemnitee shall be entitled to recover from the Corporation, any Expenses actually and reasonably incurred in connection with any judicial adjudication, judicial enforcement or arbitration commenced pursuant to this Section 4 to enforce his or her rights under, or to recover damages for breach of, this Article V.

Section 5.     Definitions.  For purposes of this Article V:

(a)     "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article V with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

(b)     "Disinterested Director" means a director of the Corporation who is not or was not a party to the Proceeding in respect of which indemnification is sought by the Indemnitee.

(c)     Actions "in or at least not opposed to the best interests of the Corporation" shall include, without limitation, actions taken in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the participants and beneficiaries of an employee benefit plan.

Section 6.     Insurance.  The Corporation shall purchase and maintain insurance on behalf of any person who is or was a director or officer of the Corporation, or who while a director or officer is or was serving at the request of the Corporation as a director, officer,

employee, trustee or agent of another Corporation, partnership, joint venture, trust or other enterprise ("D&O Insurance"), against any liability asserted against the person and incurred by the person in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Article V.  Notwithstanding the foregoing, the Corporation shall have no obligation to obtain or maintain D&O Insurance if the Corporation determines in good faith that such insurance is not reasonably available, the premium costs for such insurance are materially disproportionate to the amount of coverage provided, the coverage provided by such insurance is limited by exclusions so as to provide a materially insufficient benefit, or such person is covered by substantially similar insurance maintained by a subsidiary of the Corporation or by another person pursuant to a contractual obligation owed to the Corporation.

     Section 7.  Service for Subsidiaries.  Any person serving as a director, officer, partner, member, trustee, administrator, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, at least 50% of whose equity interests are owned by the Corporation (a "subsidiary" for this Article V), shall be conclusively presumed to be serving in such capacity at the request of the Corporation.

     Section 8.  Reliance.  Persons who after the date of the adoption of this provision become or remain directors or officers of the Corporation or who, while a director or officer of the Corporation, become or remain a director, officer, employee or agent of a subsidiary, shall be conclusively presumed to have relied on the rights to indemnity, advance of expenses and other rights contained in this Article V in entering into or continuing such service. The rights to indemnification and to the advance of expenses conferred in this Article V shall apply to claims made against an indemnitee arising out of acts or omissions which occurred or occur both prior and subsequent to the adoption hereof.  Any amendment, alteration or repeal of this Article V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment or repeal.

     Section 9.  Non-Exclusivity of Rights; Continuation of Rights to Indemnification.  The rights to indemnification and to the advance of expenses conferred in this Article V shall not be exclusive of any other right which any person may have or hereafter acquire under the Certificate of Incorporation or under any statute, bylaw, agreement, vote of stockholders or Disinterested Directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office or while employed by or acting as agent for the Corporation.  The rights provided by or granted pursuant to this Article V shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director or officer and shall inure to the benefit of the heirs, executors and administrators of such person.  All rights to indemnification under this Article V shall be deemed to be a contract between the Corporation and each director or officer of the Corporation who serves or served in such capacity at any time while this Article V is in effect.  Any repeal or modification of this Article V or any repeal or modification of relevant provisions of the DGCL or any other applicable laws shall not in any way diminish any rights to indemnification and advancement of expenses of such director or officer or the obligations of the Corporation arising hereunder with

respect to any proceeding arising out of, or relating to, any actions, transactions or facts occurring prior to the final adoption of such repeal or modification.

Section 10.    Indemnification of Other Employees.  The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and rights to advancement by the Corporation of any Expenses actually and reasonably incurred in defending any Proceeding, to any employee or agent of the Corporation to the fullest extent of the provisions of this Article V with respect to the indemnification of and advancement of Expenses to directors and officers of the Corporation.

Section 11.    Severability.  If this Article V or any portion thereof shall be held to be invalid, illegal or unenforceable on any ground by any court of competent jurisdiction, then (a) the Corporation shall nevertheless indemnify each Indemnitee as to all Expenses actually and reasonably incurred or suffered by such person in connection with any Proceeding, including, without limitation, a grand jury proceeding, to the fullest extent permitted by (i) any applicable portion of this Article V that shall not have been invalidated, (ii) the DGCL or (iii) any other applicable law; and (b) to the fullest extent possible, the provisions of this Article V (including, without limitation, each portion of any paragraph of this Article V containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

## ARTICLE VI
## CERTIFICATES OF STOCK

Section 1.    Form.  Every holder of stock in the Corporation shall be entitled to have a certificate, signed by, or in the name of the Corporation by the Chief Executive Officer, President, Chief Financial Officer or a Vice-President and the Secretary or an Assistant Secretary of the Corporation, certifying the number of shares of a specific class or series owned by such holder in the Corporation. If such a certificate is countersigned (1) by a transfer agent or an assistant transfer agent other than the Corporation or its employee or (2) by a registrar, other than the Corporation or its employee, the signature of any such Chief Executive Officer, President, Chief Financial Officer, Vice-President, Secretary, or Assistant Secretary may be facsimiles. In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer or officers of the Corporation whether because of death, resignation or otherwise before such certificate or certificates have been delivered by the Corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the Corporation. All certificates for shares shall be consecutively numbered or otherwise identified. The name of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the books of the Corporation. Shares of stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps. In that event, it shall be the

duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates, and record the transaction on its books. The Board of Directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the Corporation.

Section 2.    Lost Certificates.    The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates previously issued by the Corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate or certificates, or his or her legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

Section 3.    Fixing a Record Date for Stockholder Meetings.    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the Board of Directors may fix a new record date for the adjourned meeting.

Section 4.    Fixing a Record Date for Action by Written Consent.    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by statute, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by facsimile or e-mail, with confirmation of receipt. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by statute, the record date for determining stockholders entitled to consent

14

to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 5.    Fixing a Record Date for Other Purposes.  In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 6.    Registered Stockholders.  Prior to the surrender to the Corporation of the certificate or certificates for a share or shares of stock with a request to record the transfer of such share or shares, the Corporation may treat the registered owner as the person entitled to receive dividends, to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner. The Corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

Section 7.    Subscriptions for Stock.  Unless otherwise provided for in the subscription agreement, subscriptions for shares shall be paid in full at such time, or in such installments and at such times, as shall be determined by the Board of Directors. Any call made by the Board of Directors for payment on subscriptions shall be uniform as to all shares of the same class or as to all shares of the same series. In case of default in the payment of any installment or call when such payment is due, the Corporation may proceed to collect the amount due in the same manner as any debt due the Corporation.

## ARTICLE VII
## GENERAL PROVISIONS

Section 1.    Dividends.  Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or any other purpose and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 2.    Checks, Drafts or Orders.  All checks, drafts, or other orders for the payment of money by or to the Corporation and all notes and other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers, agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the Board of Directors or a duly authorized committee thereof.

Section 3.    Contracts.  The Board of Directors may authorize any officer or officers, or any agent or agents, of the Corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

Section 4.    Loans.  The Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiary, including any officer or employee who is a director of the Corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the Corporation. The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation. Nothing in this section contained shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.

Section 5.    Fiscal Year.  The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 6.    Corporate Seal.  The Board of Directors may provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the Corporation and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

Section 7.    Voting Securities Owned By Corporation.  Voting securities in any other corporation or other entity (such as a limited liability company, limited partnership or trust) held by the Corporation shall be voted by the President, unless the Board of Directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer. Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

Section 8.    Inspection of Books and Records.  Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger, a list of its stockholders, and its other books and records, and to make copies or extracts therefrom. A proper purpose shall mean any purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the Corporation at its registered office in the State of Delaware or at its principal place of business.

Section 9.    Section Headings.  Section headings in these By-Laws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 10.    Inconsistent Provisions.  In the event that any provision of these By-Laws is or becomes inconsistent with any provision of the Certificate of Incorporation, the

16

DGCL or any other applicable law, the provision of these By-Laws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

## ARTICLE VIII
## AMENDMENTS

These By-Laws may be amended, altered, or repealed and new by-laws adopted at any meeting of the Board of Directors by a majority vote.  The fact that the power to adopt, amend, alter, or repeal these By-Laws has been conferred upon the Board of Directors shall not divest the stockholders of the same power.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT E TO THE MERGER AGREEMENT**

### KNOWLEDGE OF SUPERMEDIA

Peter J. McDonald
Samuel D. Jones
Cody Wilbanks

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT F TO THE MERGER AGREEMENT**

### KNOWLEDGE OF DEX

Alfred Mockett
Gregory Freiberg
Mark Hianik

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT G TO THE MERGER AGREEMENT**

DEX FINANCING AMENDMENTS

[THIS PAGE INTENTIONALLY LEFT BLANK]

R.H. DONNELLEY INC. CREDIT AGREEMENT
Summary of Amendments[1]

Dex One Corporation ("<u>Dex One</u>") and SuperMedia Inc. ("<u>SuperMedia</u>") have entered into a Merger Agreement, dated as of August 20, 2012 (the "<u>Merger Agreement</u>"), by and among Dex One, NewDex, Inc. ("<u>Newco</u>"), Spruce Acquisition Sub, Inc. ("<u>Merger Sub</u>") and SuperMedia, pursuant to which Dex One will be merged with Newco, with Newco as the surviving corporation (the "<u>Dex Merger</u>"), and SuperMedia will be merged with Merger Sub, with SuperMedia as the surviving corporation (the "<u>SuperMedia Merger</u>" and together with the Dex Merger, the "<u>Mergers</u>").   After giving effect to the Mergers, SuperMedia will become a direct wholly owned subsidiary of Newco and Newco will become the Ultimate Parent (as defined in the RHDI Credit Agreement referred to below).  Set forth below are the proposed amendments (the "<u>RHDI Amendments</u>") to the Credit Agreement, dated as of December 13, 2005, as amended and restated as of January 29, 2010 (as amended by the First Amendment thereto, dated as of March 9, 2012, and the RHDI Amendments, the "<u>R.H. Donnelley Credit Agreement</u>"), among Dex One, R.H. Donnelley Inc. (the "<u>Borrower</u>"), the lenders parties thereto and Deutsche Bank Trust Company Americas, as administrative agent, to be effected in connection with the consummation of the Mergers and the other transactions contemplated by the Merger Agreement.

| | |
|---|---|
| <u>Transactions</u>: | The Mergers and the other transactions contemplated by the Merger Agreement will be permitted by making the following amendments: |
| | • The definition of Change of Control will be amended to include an exception for the consummation of the Mergers; and |
| | • The Ultimate Parent Covenants will be amended to permit the Ultimate Parent to incur and discharge its obligations under the Merger Agreement and to acquire and own the Equity Interests of SuperMedia and its Subsidiaries (for the avoidance of doubt, the Liens securing the obligations under the SuperMedia Credit Agreement (as defined below) will be permitted). |
| <u>Maturity Date</u>: | The Maturity Date will be extended from October 24, 2014 to December 31, 2016 (Section 1.01). |
| <u>Discounted Voluntary Prepayments</u>: | The period during which Discounted Voluntary Prepayments are permitted will be extended from December 31, 2013 to December 31, 2016 (Section 2.16(a)). |
| <u>Shared Services Agreement and Tax</u> | The existing shared services agreement will be replaced with an |

---

[1] Capitalized terms used but not defined in this Term Sheet shall have the meaning assigned thereto in the RHDI Credit Agreement.

1

Sharing Agreement:        Amended and Restated Shared Services Agreement as set forth in the form attached hereto as Exhibit A.

It will be a condition precedent to the RHDI Amendments that:

- (i) The trademarks (which include, for clarity, logos, trade dress and similar designations of origin other than domain names and are collectively referred to herein as the "trademarks") owned by SuperMedia will be transferred (together with the associated goodwill) to and owned by a bankruptcy remote subsidiary of SuperMedia, (ii) the trademarks owned by each of the Borrower, Dex Media East, Inc. ("Dex East") and Dex Media West, Inc. ("Dex West" and, together with the Borrower and Dex East, the "Dex Entities") will be transferred (together with the associated goodwill) to and owned by bankruptcy remote subsidiaries of the Borrower, Dex East and Dex West, respectively, (iii) the trademarks owned by the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) will be transferred (together with the associated goodwill) to and owned by a bankruptcy remote subsidiary of such Person, respectively and (iv) in the case of each of (i), (ii) and (iii) above, each such bankruptcy remote subsidiary[2] (each, a "License Subsidiary") will grant a fully paid-up, royalty-free, perpetual, irrevocable, non-exclusive, worldwide, fully transferable and fully sublicensable license to use the trademarks it owns pursuant to (i), (ii) and (iii) above to the Ultimate Parent and each Subsidiary of the Ultimate Parent in connection with any current and future products and services of the Ultimate Parent and each such Subsidiary.  Despite the non-exclusive nature of such licenses, each License Subsidiary will covenant not to license or assign the trademarks it owns to any third party except to an affiliate of the Ultimate Parent or as otherwise permitted in the RHDI Credit Agreement. Each such license will expressly allow each licensee to retain its license after a change in control or divestiture of such entity and will also be subject to other mutually acceptable and reasonably satisfactory terms.

- Each of SuperMedia, the Dex Entities, the Service Company and each other Shared Collateral Loan Party will grant to the Ultimate Parent and each Subsidiary of the Ultimate Parent a fully paid-up, royalty-free, perpetual, irrevocable, non-exclusive, worldwide, fully transferable and fully

---

[2] Constituent documents of License Subsidiaries to be in form and substance satisfactory to the Administrative Agent.

sublicensable license (or sublicense, as applicable) under all intellectual property (other than trademarks and domain names) it owns (or licenses, to the extent sublicensing is permitted by the applicable contract without (i) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or obligations upon sublicensor or any loss of rights, (ii) loss of any rights, (iii) additional obligations and (iv) unless the sublicensee fully reimburses the sublicensor for any fees or other consideration required to obtain the right to grant such sublicense, any additional fees or other consideration) as of the closing of the Mergers, as well as future intellectual property (other than trademarks and domain names) it creates, invents or acquires after closing of the Mergers, for any purpose (including the right to modify and create derivative works of any software); provided that the agreements providing such licenses will (a) prohibit the licensor from granting exclusive licenses with respect to such intellectual property to any Person in any manner that narrows such non-exclusive licenses to the Ultimate Parent or to such Subsidiaries of the Ultimate Parent and (b) expressly allow each licensee to retain its license after a change in control or divestiture of such entity. Such licenses will also be subject to other mutually acceptable and reasonably satisfactory terms.

- SuperMedia, the Dex Entities, the Service Company and the other Shared Collateral Loan Parties other than the Ultimate Parent will deliver to each other current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of (i) all software source code and all documentation and training manuals relating thereto and (ii) certain other tangible or written embodiments of material technology, websites and databases (but for clarity, excluding any print directories or other publicly distributed print materials), in each case to the extent owned (or licensed, if such license grants the licensee (x) possession of same and the right to allow the foregoing entities (and any escrow agent, as applicable) to access same and (y) the right to sublicense such right of possession and access without (I) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or obligations upon sublicensor or any loss of rights, (II) loss of any rights, (III) additional obligations and (IV) unless the sublicensee fully reimburses the sublicensor for any fees or other consideration required to obtain a sublicense to such possession and access, any additional fees or other consideration) and currently used by SuperMedia, the Dex Entities, the Service Company or any of such Shared

3

Collateral Loan Parties, as applicable, in their respective businesses.  Each of such entities shall make an initial deposit of same and will be obligated to provide material updates on an ongoing basis.

The existing Tax Sharing Agreement will be amended as set forth in the form attached hereto as Exhibit B.

A new tax sharing agreement between SuperMedia entities and Dex entities as set forth in the form attached hereto as Exhibit C will be permitted.

- For the avoidance of doubt, under the tax sharing agreements attached hereto as Exhibits B and C, the Ultimate Parent will not receive compensation for the use of its tax attributes.

| | |
|---|---|
| Directory Consolidation Project: | The Borrower will be permitted to consolidate print directories in markets and/or with advertisers that adjoin/overlap with Dex East, Dex West and/or SuperMedia and their respective Subsidiaries, and to cross license intellectual property as needed in connection with the foregoing, all as described in greater detail on Schedule I hereto. In connection with the foregoing, the asset sale, lien and transactions with affiliates covenants will be amended to permit non-exclusive licenses of intellectual property and transfers of directories and/or titles in connection with the directory consolidation project to the extent specifically described on Schedule I hereto (Sections 6.02 and 6.05). |
| Interest Rate: | The "Applicable Rate" will be amended to 5.75% for ABR Loans and to 6.75% in the case of Eurodollar Loans. |
| Mandatory Amortization: | The amortization schedule will be amended such that the quarterly amortization payment is (i) $10,000,000 for each fiscal quarter in fiscal 2013 and fiscal 2014, (ii) $7,500,000 for each fiscal quarter in fiscal 2015 and (iii) $6,250,000 for each fiscal quarter in fiscal 2016 (Section 2.05(a)), with all remaining outstanding amounts due at maturity on December 31, 2016.  All such quarterly repayments will be made on the last day of each March, June, September, and December. If the effective date of the RHDI Amendments (the "Effective Date") occurs after March 31, 2013, the quarterly amortization payments immediately following the Effective Date will be reduced (in direct order) by an amount equal to the difference between the scheduled amortization payment due on March 31, 2013 (so long as such payment has been made) under the RHDI Credit Agreement prior to giving effect to the RHDI Amendments (the "Existing RHDI Credit Agreement") and the scheduled amortization payment due on March 31, 2013 described above. |

4

Excess Cash Flow Prepayment:    The Excess Cash Flow prepayment will be amended as follows (Section 2.06(d)):

- Excess Cash Flow will be calculated as of the end of each fiscal quarter ending after the Effective Date for the period starting on January 1, 2013 and ending on the last day of such quarter (with (i) the required prepayment as of the end of any such fiscal quarter to be calculated based on Excess Cash Flow for the applicable period net of any previously made required quarterly Excess Cash Flow prepayments and (ii) with the Borrower's Discounted Prepayment Portion of Excess Cash Flow (as defined below) and the Borrower's Discretionary Portion of Excess Cash Flow (as defined below) as of the end of such quarter to be calculated based on Excess Cash Flow for the applicable period net of any permitted uses of the Borrower's Discounted Prepayment Portion of Excess Cash Flow  and the Borrower's Discretionary Portion of Excess Cash Flow, as applicable, made in prior periods).  If the Effective Date occurs after the date on which the Excess Cash Flow prepayment would otherwise have been due under the RHDI Amendments in respect of the fiscal quarter ended March 31, 2013, then the quarterly Excess Cash Flow prepayment  for such fiscal quarter shall be due and payable on the Effective Date.

- The required prepayment percentage will be amended to 60%.

- 20% of quarterly Excess Cash Flow (the "Borrower's Discounted Prepayment Portion of Excess Cash Flow") will be required to be used to make a prepayment if not used to make Discounted Voluntary Prepayments as follows:

  o Borrower's Discounted Prepayment Portion of Excess Cash Flow will be available only for Discounted Voluntary Prepayments within 180 days after the delivery of financial statements for the applicable fiscal quarter (it being agreed that the availability of the Borrower's Discounted Prepayment Portion of Excess Cash Flow during such 180 day period, as well as the requirements in clauses (i) and (ii) in the next succeeding sentence, will not be reduced by any succeeding calculation of Excess Cash Flow).

  o If such amounts are not applied to effect Discounted Voluntary Prepayments during the applicable 180-day period, such amounts shall be used (i) to make additional optional prepayments at par at the end of the fiscal quarter during which such 180-day period

5

expires to be applied to scheduled payments as directed by the Borrower or (ii) at the Borrower's option, to make an advance Excess Cash Flow payment pursuant to Section 2.06(d)(iii) of the RHDI Credit Agreement.

- 20% of quarterly Excess Cash Flow (the "<u>Borrower's Discretionary Portion of Excess Cash Flow</u>") may be retained by the Borrower and utilized for purposes otherwise permitted under the Dex East Credit Agreement, including, but not limited to, at the Borrower's option and in the Borrower's sole discretion (i) to effect additional Discounted Voluntary Prepayments or (ii) for optional prepayments at par, to be applied to scheduled payments as directed by the Borrower.

- To the extent any Specified Charges (as defined below) are deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries for any period, such Specified Charges shall be added in the determination of Excess Cash Flow for such period.

- For the avoidance of doubt, any Excess Cash Flow payment due under the Existing RHDI Credit Agreement in respect of the fiscal year ended December 31, 2012, shall continue to be payable in accordance with the terms of the Existing RHDI Credit Agreement.

<u>Affirmative Covenants</u>:

The Borrower will continue to deliver the financial statements and other information required to be delivered under the Existing RHDI Credit Agreement, as well as financial statements with respect to Dex East, Dex West, and SuperMedia that are required to be delivered by Dex East, Dex West, and SuperMedia under their respective Credit Agreements (as defined below). In addition, the Borrower will deliver the following information on a quarterly basis (with reasonably descriptive detail):

- sales metric (which will serve as leading indicator of reported print and digital revenues), for the applicable period;

- print and digital revenue and a gross margin amount for each of such reported revenue amounts, for the applicable period; and

- statements of cash flow from operations (with a reconciliation of net income to operating cash flow from operations and financing activities (including capital expenditures)).

Concurrently with the delivery of the financial statements required pursuant to Sections 5.01(a) and 5.01(b) of the RHDI Credit Agreement, the Borrower will be required to deliver a schedule of Services Assets (as defined in the Shared Services

6

Agreement) contributed to the Service Company during the previous fiscal quarter with a reasonably detailed description of such Services Assets and the value thereof.

Conditions Precedent to
Effectiveness

Including, but not limited to, the following:

- the negotiation, execution and delivery of definitive documentation with respect to the RHDI Amendments, including an amendment to the Intercreditor Agreement (which will, among other things, revise the percentages in Section 3.4(b) thereof to reflect the Applicable Shares of the Companies (as defined below)), in all cases reasonably satisfactory to the Administrative Agent and the Lenders;

- each of the Dex East Credit Agreement, Dex West Credit Agreement and the Credit Agreement, dated as of December 31, 2009, (as amended by the First Amendment thereto, dated as of December 14, 2010, and the Second Amendment thereto, dated as of November 8, 2011, the "SuperMedia Credit Agreement" and, together with the Dex East Credit Agreement, the Dex West Credit Agreement and the RHDI Credit Agreement, the "Credit Agreements"), among SuperMedia, the lenders parties thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, shall concurrently be amended in a manner consistent with the term sheets attached hereto as Exhibit D;

- each of Dex East, Dex West, RHDI and SuperMedia (collectively, the "Companies" and each individually, a "Company") shall have entered into a subordinated guarantee (with respect to each Company, its "Subordinated Guarantee") pursuant to which each Company will guarantee the obligations of the other Companies under their respective Credit Agreements (and any refinancings thereof), which guarantee (a) will be subordinated to the obligations of the Company providing such guarantee in respect of its Credit Agreement (and any refinancings thereof) on terms to be mutually agreed (including an unlimited standstill period) and (b) will include sharing provisions pursuant to which the beneficiaries of such guarantees will share the benefits of such guarantees on a pari passu basis (in accordance with the percentages used to allocate costs under the Shared Services Agreement as of the Effective Date (i.e., 53% to SuperMedia and 47% to the Dex Entities (to be shared by the Dex Entities in accordance with their applicable percentages));

- the receipt by the Administrative Agent of executed consents to the RHDI Amendments from each Lender; and

- additional customary closing conditions, including delivery

7

of opinions of counsel, corporate resolutions, certificates and other documents as the Lenders shall reasonably require

Borrower's Portion of Excess Cash Flow Baskets and other Prepayment Matters:

- The definition of "Borrower's Portion of Excess Cash Flow" will be amended to (i) reduce the total percentage to 40% and (ii) reflect the Borrower's Discounted Repayment Portion of Excess Cash Flow and the Borrower's Discretionary Portion of Excess Cash Flow described above. In addition, the "Borrower's Portion of Excess Cash Flow" (which may be a negative amount) will be calculated in the manner described above under the heading "Excess Cash Flow Prepayment".

- The basket for Permitted Acquisitions financed with the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.04(f)).

- The basket for Specified Investments financed with the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.04(l)).

- The exception permitting Restricted Payments (a) with the Borrower's Portion of Excess Cash to effect Specified Investments or to pay interest on the Restructuring Notes and (b) in amounts based on the Ultimate Parent PIK Election Amount will be deleted (Section 6.08(a)(iii)).

- The basket for optional prepayments of other debt based on the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.08(b)(vi)).

- The definition of Designated Excess Cash Expenditures will be deleted.

- The carveout to the mandatory prepayment provision for proceeds of Ultimate Parent Asset Dispositions used to effect Specified Investments will be deleted (Section 2.06(c); Section 6.1 of Shared Guarantee and Collateral Agreement).

Financial Covenants:

- The Leverage Ratio covenant will be amended to require a ratio at the end of each fiscal quarter below not exceeding the ratio set forth below opposite such fiscal quarter (Section 6.14):

| Fiscal Quarter | Leverage Ratio |
|---|---|
| 1Q 2013 | 5.50x |
| 2Q 2013 | 5.50x |
| 3Q 2013 | 5.50x |
| 4Q 2013 | 5.50x |
| 1Q 2014 | 5.4625x |
| 2Q 2014 | 5.425x |
| 3Q 2014 | 5.3875x |
| 4Q 2014 | 5.35x |

8

| | |
|---|---|
| 1Q 2015 | 5.3125x |
| 2Q 2015 | 5.275x |
| 3Q 2015 | 5.2375x |
| 4Q 2015 | 5.20x |
| 1Q 2016 | 5.15x |
| 2Q 2016 | 5.10x |
| 3Q 2016 | 5.05x |
| 4Q 2016 | 5.0x |

- An interest coverage ratio covenant requiring a minimum ratio of 1.1 to 1.0 at the end of each fiscal quarter will be added.

Certain Other Negative Covenants:   The general unsecured indebtedness basket will be amended to prohibit indebtedness of the Borrower to any Affiliate (Section 6.01(a)(x)).

The general lien basket will be decreased from $15 million to $5 million (Section 6.02(a)(vii)).

The basket for loans and advances to employees of the Borrower will be increased from $1 million to $2.5 million (Section 6.04(k)).

The general Investments basket will be decreased from $25 million to $5 million (Section 6.04(o))  and will prohibit Investments in Affiliates that are not Subsidiaries of the Borrower (other than Investments resulting in a purchase of assets (i) by a Newco Senior Guarantor or the Service Company in connection with equivalent Investments by the other Companies and (ii) by the Borrower or a Subsidiary in BDC in connection with equivalent Investments by Dex East and Dex West).  In addition, the Borrower will be permitted to consummate up to $5 million in Permitted Acquisitions during the remaining term of the RHDI Credit Agreement (other than Permitted Acquisitions involving the purchase of assets from Affiliates that are not Subsidiaries of the Borrower.

The limitation on Asset Sales covenant (Section 6.05) will be amended to:

- delete the basket for Permitted Asset Swaps (Section 6.05(e));

- decrease the general basket for asset sales from $25 million to $20 million subject, after the first $2.5 million, to the mandatory prepayment provisions of Section 2.06(b), and to prohibit the use of the basket for transactions with Affiliates (Section 6.05(f)); and

- delete the additional $2.5 million general basket for asset sales (Section 6.05(j)).

The sale and leaseback basket will be decreased from $20 million to $15 million (Section 6.06).

The general basket for Restricted Payments (Section 6.08(a)(vii)) will be reduced to $2 million in any fiscal year with an aggregate cap of $5 million during the remaining term of the Dex East Credit Agreement, provided that:

- such funds will be used to fund corporate expenses permitted under the Dex East Credit Agreement;

- the Ultimate Parent will use proceeds of such Restricted Payments to make payments under this clause within 30 days of receipt;

- cash balances held by the Ultimate Parent will not exceed $5 million at any one time plus any amounts held pending use under Section 6.08(a)(v) to fund interest payments on Restructuring Notes; and

- no payments made under this clause will be used (i) to effect the repurchase, or the making of any payments in respect, of Restructuring Notes or Additional Notes or (ii) to make any payment to or investment in any Affiliate other than the Borrower or a Subsidiary of the Borrower (or any director, officer or employee of any such Affiliate).

The exception permitting Restricted Payments in amounts based on the Ultimate Parent PIK Election Amount will be deleted (Section 6.08(a)(iii)).

The basket limiting Restricted Payments to fund interest payments on Restructuring Notes (or any Additional Notes incurred to refinance the Restructuring Notes) will be amended to reflect the continuation of the Ultimate Parent PIK Election on the Restructuring Notes (Section 6.08(a)(v)(D)).

The limitation on amendment of material documents covenant will be amended to add the Subordinated Guarantee agreement and any license agreement or escrow agreement described above under the heading "Shared Services Agreement and Tax Sharing Agreement" to the agreements that shall not be amended if such amendment is adverse in any material respect to the interests of the Lenders (Section 6.13).

The basket for Capital Expenditures (Section 6.15) will be amended such that (a) the aggregate capital expenditures for the Borrower, Dex East, Dex West and SuperMedia (collectively, the "Companies", and each, individually, a "Company") will not exceed $57.5 million in fiscal year 2013 and $50.0 million in any fiscal year thereafter, with a 75% non-cumulative one-year carry-forward of the unused portion of permitted Capital Expenditures

10

in the applicable year (Capital Expenditures will first be applied to permitted amounts in such year before being applied to carried-forward amounts), provided that (a) Capital Expenditures of a Company shall either (i) relate to assets directly owned or acquired by such Company and shall be allocated to (and paid by) such Company or (ii) relate to the acquisition or development of Shared Assets and shall be allocated to (and paid by) the Companies in accordance with their applicable percentage used in the calculation of sharing of costs under the Shared Services Agreement at the time any such payment is made and (b) the aggregate capital expenditures of the Borrower shall not exceed $15 million in any fiscal year, with a 75% non-cumulative one-year carry-forward of the unused portion of permitted Capital Expenditures in the applicable year (Capital Expenditures will first be applied to permitted amounts in such year before being applied to carried-forward amounts).

The Ultimate Parent covenants will be modified to (a) prohibit the issuance of Additional Notes to finance Specified Investments or to make prepayments of indebtedness under the Credit Agreements and (b) in clause (g) thereof, require that the allocable net proceeds of the sale of any of Dex East, Dex West or SuperMedia be applied to mandatory prepayments of the Loans in accordance with the waterfall in the Intercreditor Agreement (as amended) (Section 6.17).

Events of Default:

The cross-default and judgment defaults will be amended to exclude the Loan Documents (as defined in the SuperMedia Credit Agreement) and SuperMedia and its Subsidiaries, as applicable (Article 7(g), (h) and (k)).

The following will be added as Events of Default:

- the commencement of enforcement actions under the Shared Guarantee and Collateral Agreement;

- the commencement of enforcement actions under the Shared Services Agreement or the occurrence of an event that permits the Service Company to terminate the Shared Services Agreement with respect to any Client Company (as defined therein), and such event continues unremedied for a period of three days;

- the failure of the Borrower to receive any payment under the Tax Sharing Agreements when due and such failure continues unremedied for a period of three days; and

- if any license agreement or escrow agreement described above under the heading "Shared Services Agreement and Tax Sharing Agreement" is terminated (other than upon the expiration of the term thereof), ceases to be effective or

11

ceases to be the legally valid, binding and enforceable obligation in any material respect of any party thereto.

Guarantee and Collateral Requirements:

SuperMedia and its Subsidiaries will be excluded from the requirements of Section 5.12 (the "Further Assurances" covenant).

- For the avoidance of doubt, none of SuperMedia's Subsidiaries' equity interests or assets shall be required to be pledged to the Lenders as Collateral for the Obligations.

The existing Shared Guarantee and Collateral Agreement will be amended such that (i) the Service Company will guarantee on a secured basis the obligations under the Credit Agreements (and any refinancings thereof) on a pari passu basis and (ii) in addition to its existing secured guarantees of the obligations under the Dex East Credit Agreement, the Dex West Credit Agreement and the RHDI Credit Agreement, the Ultimate Parent (and any additional Guarantors under the RHDI Credit Agreement after the Effective Date (other than the Service Company and the Borrower and its Subsidiaries)) will also guarantee the obligations under the SuperMedia Credit Agreement on an unsecured basis. Under the amended Shared Guarantee and Collateral Agreement, (i) the Service Company shall also grant liens in favor of each of the Companies to secure the performance of its obligations under the Shared Services Agreement and (ii) each Company will agree that its rights to pursue remedies and initiate enforcement actions against the Service Company shall be conditioned on a material breach by the Service Company of its obligations to such Company under the Shared Services Agreement.

Certain Definitions:

- The definition of "Allocable Net Proceeds" will be amended to reflect the Applicable Share for the Companies (Section 1.01).

- The definition of "Material Indebtedness" will be amended to exclude (i) the Borrower's Subordinated Guarantee and (ii) the Indebtedness of SuperMedia and its Subsidiaries (Section 1.01).

- The definition of "Total Indebtedness" will be amended to exclude the Borrower's Subordinated Guarantee (Section 1.01).

- The definition of "Newco" will be amended to exclude SuperMedia and its Subsidiaries (other than for purposes of the definition of Ultimate Parent Asset Disposition, which shall be amended to cover a sale of any of the Dex Entities, SuperMedia or the Service Company) (Section 1.01).

12

- The definitions of "Ultimate Parent Consolidated Net Income," "Ultimate Parent Consolidated EBITDA," "Ultimate Parent Leverage Ratio," "Ultimate Parent Total Indebtedness," "Ultimate Parent PIK Election Period" and "Ultimate Parent PIK Election Amount" will be deleted (Section 1.01).

- The definition of "Ultimate Parent Base Annual Cash Interest Amount" will be amended to reflect the Borrower's Applicable Share (Section 1.01).

- The definition of "Required Percentage" will be amended to 50% in the case of an Equity Issuance by the Ultimate Parent (Section 1.01).

- The definition of "Change of Control" will be amended to (i) reduce the threshold for a change of control at the Ultimate Parent in clause (e) thereof to 35% and (ii) clarify that such threshold is after giving effect to, and taking into consideration, the ownership of Ultimate Parent on a pro forma basis following the Mergers (Section 1.01).

- The definition of "Asset Disposition" will be amended to include dispositions described in Section 6.05(f) (Section 1.01).

- The definition of "Consolidated EBITDA" will be amended (i) to add back any non-cash impact of fresh start accounting principles in connection with any reorganization plan necessary to consummate the Mergers, (ii) to specify that the add-back in clause (a)(v)(A) thereof shall only be applicable in fiscal years 2015 and 2016 (and in any event subject to a cap in any fiscal year of up to $3.5 million and only in respect of severance costs paid in such fiscal years), and (iii) to amend clause (a)(vi) thereof to limit the add-backs pursuant thereto to the charges described on Schedule II hereto (the "Specified Charges") so long as (A) such charges are recorded during the period starting on October 1, 2012 and ending on December 31, 2013 and (B) the aggregate amount of charges added-back for all periods shall not exceed $14.7 million (it being understood that such charges may be added-back in any four quarter period which includes the quarter in which such charges are recorded) (Section 1.01).

- The definition of "Excess Cash Flow" will be amended to add back, to the extent deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries, the Specified Charges for such period (Section 1.01).

- The definition of "Equity Issuance" will be amended to

13

provide that proceeds of any Equity Issuance (other than proceeds that are received as a result of (i) a non cash exchange of Restructuring Notes or Additional Notes for equity or (ii) equity that is issued on a non-cash basis as consideration for a permitted transaction) will be used first to prepay the Loans prior to any refinancing of any Restructuring Notes or Additional Notes and prior to the funding of any Specified Investment.

- "<u>Shared Assets</u>" means any asset (including intellectual property rights) owned by the Service Company or any License Subsidiary (Section 1.01).

- "<u>Applicable Share</u>" means the percentage equivalent to the applicable percentage used in the calculation of sharing of costs under the Shared Services Agreement as of the Effective Date (Section 1.01).

<u>Schedule I</u>

Directory Consolidation Project Details

The objective of the directory consolidation project is to permit the Borrower to consolidate directories in markets for which the Borrower, Dex East, Dex West or SuperMedia is the exclusive publisher that is adjacent to a market in which any of Dex East, Dex West or SuperMedia also publishes. In these affected markets, there is overlap in both distribution and/or sales operations.  The consolidation of directories in these markets will increase advertiser satisfaction, improve the consumer experience, and provide increased efficiency and reduced costs for the Borrower.  The proposed consolidation project will only be effected after integration of the Dex entities and the SuperMedia entities is completed.

The Borrower has identified as of the date hereof certain directories in adjacent markets that are targets for combination, as set forth in Appendix A attached hereto.  In some cases, two or more directories would be discontinued, and a new directory covering the combined market would replace them.  In other cases, a directory would be discontinued and those advertisers would be transferred to one or more existing directories.  Upon completion of a consolidation, the Companies will calculate the contribution margin of the new directory or directories (which would include net sales, provision for bad debt, direct selling costs, print cost of sales and indirect overhead, with intercompany accounts settled in accordance with the Shared Services Agreement), with such contribution margin to be shared (in the manner as previously disclosed to the Administrative Agent) by the Companies participating in the consolidation based on the proportionate contribution margin of each of the directories included in the consolidation. Appendix A may be modified with the consent of the Agent to include additional directories identified after the date hereof.

**Appendix A**
**Target Directories**

| Impacted Directories | Current Copyright Ownership |
|---|---|
| Aitkin, MN | RHDI |
| Brainerd, MN | Dex Media East |
| Long Prairie, MN | RHDI |
| Little Falls, MN | Dex Media East |
| Alexandria, MN | RHDI |
| Glenwood, MN | Dex Media East |
| Morris, MN | Dex Media East |
| North Platte Valley, NE | RHDI |
| Alliance, NE | Dex Media East |
| Casper, WY | Dex Media West |
| Sidney, NE | Dex Media East |
| West Central NE (North Platte-McCook) | Dex Media East |
| Laughlin, NV | RHDI |
| Mohave County, AZ | Dex Media West |
| Benson, MN | RHDI |
| Cokato, MN | RHDI |
| Granite Falls, MN | RHDI |
| Glencoe, MN | RHDI |
| Litchfield-Montevideo-Willmar, MN | Dex Media East |
| Lower Yakima Valley, WA | RHDI |
| Yakima Valley, WA | Dex Media West |
| Tri-Cities, WA | Dex Media West |
| New Richland, MN | RHDI |
| Faribault/Northfield/Owatonna/Waseca, MN | Dex Media East |
| Hastings, MN | RHDI |
| SE St Paul, MN | Dex Media East |
| South Metro, MN | Dex Media East |
| Sheridan/Carlton, OR | RHDI |
| Salem, OR | Dex Media West |
| Poulsbo, WA | RHDI |
| Bainbridge Island, WA | Dex Media West |
| Kitsap County, WA | Dex Media West |
| Quilcene, WA | RHDI |
| Port Townsend, WA | Dex Media West |
| Port Angeles, WA | Dex Media West |
| Chaska, MN | RHDI |
| Western Suburban Area, MN | Dex Media East |
| Southwest Suburban Area, MN | Dex Media East |
| Northwest Metro (Brooklyn Park), MN | RHDI |
| Northwest Suburban Area, MN | Dex Media East |
| Western Suburban Area, MN | Dex Media East |

| Impacted Directories | Current Copyright Ownership |
|---|---|
| Lake City, MN | RHDI |
| Lewiston, MN | RHDI |
| Winona, MN | Dex Media East |
| Rochester, MN | Dex Media East |
| NW Missouri | RHDI |
| Shenandoah, IA | Dex Media East |
| Upper Rogue, OR | RHDI |
| Klamath Falls, OR | Dex Media West |
| Medford, OR | Dex Media West |
| Columbia Gorge, OR | RHDI |
| Central Oregon | Dex Media West |
| Central & North Oregon Coast | RHDI |
| Tillamook, OR | RHDI |
| Northern Oregon Coast (Astoria) | Dex Media West |
| N. Central Oregon Coast (Newport-Lincoln) | Dex Media West |

<u>Schedule II</u>

Restructuring Add-Backs

1. Out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with the Mergers, the RHDI Amendments (including, for the avoidance of doubt, costs, fees and expenses incurred in connection with the activities specified in the second, third and fourth bullet points under the heading "Shared Services Agreement and Tax Sharing Agreement" in the Term Sheet), and the transactions contemplated by the Support and Limited Waiver Agreement dated as of December 5, 2012 (the "<u>Support Agreement</u>"), including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Borrower's Chapter 11 Case (as defined in the Support Agreement).

2. Out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Agent and the steering committee Lenders and reimbursed by the Borrower (including without limitation, the fees and expenses of the Agent and the steering committee Lenders) incurred in connection with the RHDI Amendments (including, for the avoidance of doubt, costs, fees and expenses incurred in connection with the activities specified in the second, third, and fourth bullet points under the heading "Shared Services Agreement and Tax Sharing Agreement" in the Term Sheet) and the transactions contemplated by the Support Agreement, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Borrower's Chapter 11 Case (as defined in the Support Agreement).

DEX MEDIA WEST, INC. CREDIT AGREEMENT
Summary of Amendments[1]

Dex One Corporation ("Dex One") and SuperMedia Inc. ("SuperMedia") have entered into a Merger Agreement, dated as of August 20, 2012 (the "Merger Agreement"), by and among Dex One, NewDex, Inc. ("Newco"), Spruce Acquisition Sub, Inc. ("Merger Sub") and SuperMedia, pursuant to which Dex One will be merged with Newco, with Newco as the surviving corporation (the "Dex Merger"), and SuperMedia will be merged with Merger Sub, with SuperMedia as the surviving corporation (the "SuperMedia Merger" and together with the Dex Merger, the "Mergers").   After giving effect to the Mergers, SuperMedia will become a direct wholly owned subsidiary of Newco and Newco will become the Ultimate Parent (as defined in the Dex East Credit Agreement referred to below).  Set forth below are the proposed amendments (the "Dex West Amendments") to the Credit Agreement, dated as of June 6, 2008 , as amended and restated as of January 29, 2010 (as amended by the First Amendment thereto, dated as of March 9, 2012, and the Dex East Amendments, the "Dex West Credit Agreement"), among Dex One, Dex Media, Inc., Dex Media West, Inc. (the "Borrower"), the lenders parties thereto and JPMorgan Chase Bank, N.A., as administrative agent, to be effected in connection with the consummation of the Mergers and the other transactions contemplated by the Merger Agreement.

| | |
|---|---|
| Transactions: | The Mergers and the other transactions contemplated by the Merger Agreement will be permitted by making the following amendments:<br><br>• The definition of Change of Control will be amended to include an exception for the consummation of the Mergers; and<br><br>• The Ultimate Parent Covenants will be amended to permit the Ultimate Parent to incur and discharge its obligations under the Merger Agreement and to acquire and own the Equity Interests of SuperMedia and its Subsidiaries (for the avoidance of doubt, the Liens securing the obligations under the SuperMedia Credit Agreement (as defined below) will be permitted). |
| Maturity Date: | The Maturity Date will be extended from October 24, 2014 to December 31, 2016 (Section 1.01). |
| Discounted Voluntary Prepayments: | The period during which Discounted Voluntary Prepayments are permitted will be extended from December 31, 2013 to December 31, 2016 (Section 2.16(a)). |
| Shared Services Agreement and Tax Sharing Agreement: | The existing shared services agreement will be replaced with an Amended and Restated Shared Services Agreement as set forth in |

---

[1] Capitalized terms used but not defined in this Term Sheet shall have the meaning assigned thereto in the Dex West Credit Agreement.

the form attached hereto as <u>Exhibit A</u>.

It will be a condition precedent to the Dex West Amendments that:

- (i) The trademarks (which include, for clarity, logos, trade dress and similar designations of origin other than domain names and are collectively referred to herein as the "trademarks") owned by SuperMedia will be transferred (together with the associated goodwill) to and owned by a bankruptcy remote subsidiary of SuperMedia, (ii) the trademarks owned by each of the Borrower, Dex Media East, Inc. ("<u>Dex East</u>") and R.H. Donnelley Inc. ("<u>RHDI</u>" and, together with the Borrower and Dex East, the "<u>Dex Entities</u>") will be transferred (together with the associated goodwill) to and owned by bankruptcy remote subsidiaries of the Borrower, Dex West and RHDI, respectively, (iii) the trademarks owned by the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) will be transferred (together with the associated goodwill) to and owned by a bankruptcy remote subsidiary of such Person, respectively and (iv) in the case of each of (i), (ii) and (iii) above, each such bankruptcy remote subsidiary[2] (each, a "<u>License Subsidiary</u>") will grant a fully paid-up, royalty-free, perpetual, irrevocable, non-exclusive, worldwide, fully transferable and fully sublicensable license to use the trademarks it owns pursuant to (i), (ii) and (iii) above to the Ultimate Parent and each Subsidiary of the Ultimate Parent in connection with any current and future products and services of the Ultimate Parent and each such Subsidiary. Despite the non-exclusive nature of such licenses, each License Subsidiary will covenant not to license or assign the trademarks it owns to any third party except to an affiliate of the Ultimate Parent or as otherwise permitted in the Dex West Credit Agreement. Each such license will expressly allow each licensee to retain its license after a change in control or divestiture of such entity and will also be subject to other mutually acceptable and reasonably satisfactory terms.

- Each of SuperMedia, the Dex Entities, the Service Company and each other Shared Collateral Loan Party will grant to the Ultimate Parent and each Subsidiary of the Ultimate Parent a fully paid-up, royalty-free, perpetual, irrevocable, non-exclusive, worldwide, fully transferable and fully sublicensable license (or sublicense, as applicable) under all

---

[2] Constituent documents of License Subsidiaries to be in form and substance satisfactory to the Administrative Agent.

intellectual property (other than trademarks and domain names) it owns (or licenses, to the extent sublicensing is permitted by the applicable contract without (i) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or obligations upon sublicensor or any loss of rights, (ii) loss of any rights, (iii) additional obligations and (iv) unless the sublicensee fully reimburses the sublicensor for any fees or other consideration required to obtain the right to grant such sublicense, any additional fees or other consideration) as of the closing of the Mergers, as well as future intellectual property (other than trademarks and domain names) it creates, invents or acquires after closing of the Mergers, for any purpose (including the right to modify and create derivative works of any software); provided that the agreements providing such licenses will (a) prohibit the licensor from granting exclusive licenses with respect to such intellectual property to any Person in any manner that narrows such non-exclusive licenses to the Ultimate Parent or to such Subsidiaries of the Ultimate Parent and (b) expressly allow each licensee to retain its license after a change in control or divestiture of such entity. Such licenses will also be subject to other mutually acceptable and reasonably satisfactory terms.

- SuperMedia, the Dex Entities, the Service Company and the other Shared Collateral Loan Parties other than the Ultimate Parent will deliver to each other current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of (i) all software source code and all documentation and training manuals relating thereto and (ii) certain other tangible or written embodiments of material technology, websites and databases (but for clarity, excluding any print directories or other publicly distributed print materials), in each case to the extent owned (or licensed, if such license grants the licensee (x) possession of same and the right to allow the foregoing entities (and any escrow agent, as applicable) to access same and (y) the right to sublicense such right of possession and access without (I) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or obligations upon sublicensor or any loss of rights, (II) loss of any rights, (III) additional obligations and (IV) unless the sublicensee fully reimburses the sublicensor for any fees or other consideration required to obtain a sublicense to such possession and access, any additional fees or other consideration) and currently used by SuperMedia, the Dex Entities, the Service Company or any of such Shared Collateral Loan Parties, as applicable, in their respective

3

businesses.  Each of such entities shall make an initial deposit of same and will be obligated to provide material updates on an ongoing basis.

The existing Tax Sharing Agreement will be amended  as set forth in the form attached hereto as <u>Exhibit B</u>.

A new tax sharing agreement between SuperMedia entities and Dex entities as set forth in the form attached hereto as <u>Exhibit C</u> will be permitted.

- For the avoidance of doubt, under the tax sharing agreements attached hereto as Exhibits B and C, the Ultimate Parent will not receive compensation for the use of its tax attributes.

|  |  |
|---|---|
| <u>Directory Consolidation Project</u>: | The Borrower will be permitted to consolidate print directories in markets and/or with advertisers that adjoin/overlap with Dex East, RHDI and/or SuperMedia and their respective Subsidiaries, and to cross license intellectual property as needed in connection with the foregoing, all as described in greater detail on Schedule I hereto. In connection with the foregoing, the asset sale, lien and transactions with affiliates covenants will be amended to permit non-exclusive licenses of intellectual property and transfers of directories and/or titles in connection with the directory consolidation project to the extent specifically described on Schedule I hereto (Sections 6.02 and 6.05). |
| <u>Interest Rate</u>: | The "Applicable Rate" will be amended to 4.00% for ABR Loans and to 5.00% in the case of Eurodollar Loans. |
| <u>Mandatory Amortization</u>: | The amortization schedule will be amended such that the quarterly amortization payment is $11,250,000 for each fiscal quarter in fiscal 2013 through fiscal 2016 (Section 2.05(a)), with all remaining outstanding amounts due at maturity on December 31, 2016.  All such quarterly repayments will be made on the last day of each March, June, September, and December. If the effective date of the Dex West Amendments (the "<u>Effective Date</u>") occurs after March 31, 2013, the quarterly amortization payments immediately following the Effective Date will be increased (in direct order) by an amount equal to the difference between the scheduled amortization payment due on March 31, 2013 described above and the scheduled amortization payment due on March 31, 2013 (so long as such payment has been made) under the Dex West Credit Agreement prior to giving effect to the Dex East Amendments (the "<u>Existing Dex West Credit Agreement</u>"). |
| <u>Excess Cash Flow Prepayment</u>: | The Excess Cash Flow prepayment will be amended as follows (Section 2.06(d)): |

- Excess Cash Flow will be calculated as of the end of each fiscal quarter ending after the Effective Date for the period starting on January 1, 2013 and ending on the last day of such quarter (with (i) the required prepayment as of the end of any such fiscal quarter to be calculated based on Excess Cash Flow for the applicable period net of any previously made required quarterly Excess Cash Flow prepayments and (ii) with the Borrower's Discounted Prepayment Portion of Excess Cash Flow (as defined below) and the Borrower's Discretionary Portion of Excess Cash Flow (as defined below) as of the end of such quarter to be calculated based on Excess Cash Flow for the applicable period net of any permitted uses of the Borrower's Discounted Prepayment Portion of Excess Cash Flow  and the Borrower's Discretionary Portion of Excess Cash Flow, as applicable, made in prior periods).  If the Effective Date occurs after the date on which the Excess Cash Flow prepayment would otherwise have been due under the Dex West Amendments in respect of the fiscal quarter ended March 31, 2013, then the quarterly Excess Cash Flow prepayment  for such fiscal quarter shall be due and payable on the Effective Date.

- The required prepayment percentage will be amended to 50%.

- 30% of quarterly Excess Cash Flow (the "<u>Borrower's Discounted Prepayment Portion of Excess Cash Flow</u>") will be required to be used to make a prepayment if not used to make Discounted Voluntary Prepayments as follows:

  o Borrower's Discounted Prepayment Portion of Excess Cash Flow will be available only for Discounted Voluntary Prepayments within 180 days after the delivery of financial statements for the applicable fiscal quarter (it being agreed that the availability of the Borrower's Discounted Prepayment Portion of Excess Cash Flow during such 180 day period, as well as the requirements in clauses (i) and (ii) in the next succeeding sentence, will not be reduced by any succeeding calculation of Excess Cash Flow).

  o If such amounts are not applied to effect Discounted Voluntary Prepayments during the applicable 180-day period, such amounts shall be used (i) to make additional optional prepayments at par at the end of the fiscal quarter during which such 180-day period expires to be applied to scheduled payments as directed by the Borrower or (ii) at the Borrower's option, to make an advance Excess Cash Flow

5

payment pursuant to Section 2.06(d)(iii) of the Dex West Credit Agreement.

- 20% of quarterly Excess Cash Flow (the "Borrower's Discretionary Portion of Excess Cash Flow") may be retained by the Borrower and utilized for purposes otherwise permitted under the Dex East Credit Agreement, including, but not limited to, at the Borrower's option and in the Borrower's sole discretion (i) to effect additional Discounted Voluntary Prepayments or (ii) for optional prepayments at par, to be applied to scheduled payments as directed by the Borrower.

- To the extent any Specified Charges (as defined below) are deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries for any period, such Specified Charges shall be added in the determination of Excess Cash Flow for such period.

- For the avoidance of doubt, any Excess Cash Flow payment due under the Existing Dex West Credit Agreement in respect of the fiscal year ended December 31, 2012, shall continue to be payable in accordance with the terms of the Existing Dex West Credit Agreement.

| | |
|---|---|
| Affirmative Covenants: | The Borrower will continue to deliver the financial statements and other information required to be delivered under the Existing Dex West Credit Agreement, as well as financial statements with respect to Dex East, RHDI and SuperMedia that are required to be delivered by Dex East, RHDI and SuperMedia under their respective Credit Agreements (as defined below). In addition, the Borrower will deliver the following information on a quarterly basis (with reasonably descriptive detail): |

- sales metric (which will serve as leading indicator of reported print and digital revenues), for the applicable period;

- print and digital revenue and a gross margin amount for each of such reported revenue amounts, for the applicable period; and

- statements of cash flow from operations (with a reconciliation of net income to operating cash flow from operations and financing activities (including capital expenditures)).

Concurrently with the delivery of the financial statements required pursuant to Sections 5.01(a) and 5.01(b) of the Dex West Credit Agreement, the Borrower will be required to deliver a schedule of Services Assets (as defined in the Shared Services Agreement) contributed to the Service Company during the previous fiscal quarter with a reasonably detailed description of

such Services Assets and the value thereof.

Conditions Precedent to
Effectiveness

Including, but not limited to, the following:

- the negotiation, execution and delivery of definitive documentation with respect to the Dex West Amendments, including an amendment to the Intercreditor Agreement (which will, among other things, revise the percentages in Section 3.4(b) thereof to reflect the Applicable Shares of the Companies (as defined below)), in all cases reasonably satisfactory to the Administrative Agent and the Lenders;

- each of the Dex East Credit Agreement, RHDI Credit Agreement and the Credit Agreement, dated as of December 31, 2009, (as amended by the First Amendment thereto, dated as of December 14, 2010, and the Second Amendment thereto, dated as of November 8, 2011, the "SuperMedia Credit Agreement" and, together with the Dex East Credit Agreement, the Dex West Credit Agreement and the RHDI Credit Agreement, the "Credit Agreements"), among SuperMedia, the lenders parties thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, shall concurrently be amended in a manner consistent with the term sheets attached hereto as Exhibit D;

- each of Dex East, Dex West, RHDI and SuperMedia (collectively, the "Companies" and each individually, a "Company") shall have entered into a subordinated guarantee (with respect to each Company, its "Subordinated Guarantee") pursuant to which each Company will guarantee the obligations of the other Companies under their respective Credit Agreements (and any refinancings thereof), which guarantee (a) will be subordinated to the obligations of the Company providing such guarantee in respect of its Credit Agreement (and any refinancings thereof) on terms to be mutually agreed (including an unlimited standstill period) and (b) will include sharing provisions pursuant to which the beneficiaries of such guarantees will share the benefits of such guarantees on a pari passu basis (in accordance with the percentages used to allocate costs under the Shared Services Agreement as of the Effective Date (i.e., 53% to SuperMedia and 47% to the Dex Entities (to be shared by the Dex Entities in accordance with their applicable percentages));

- the receipt by the Administrative Agent of executed consents to the Dex West Amendments from each Lender; and

- additional customary closing conditions, including delivery of opinions of counsel, corporate resolutions, certificates and other documents as the Lenders shall reasonably require

Borrower's Portion of Excess Cash Flow Baskets and other Prepayment Matters:

- The definition of "Borrower's Portion of Excess Cash Flow" will be amended to (i) reduce the total percentage to 50% and (ii) reflect the Borrower's Discounted Repayment Portion of Excess Cash Flow and the Borrower's Discretionary Portion of Excess Cash Flow described above. In addition, the "Borrower's Portion of Excess Cash Flow" (which may be a negative amount) will be calculated in the manner described above under the heading "Excess Cash Flow Prepayment".

- The basket for Permitted Acquisitions financed with the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.04(f)).

- The basket for Specified Investments financed with the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.04(l)).

- The exception permitting Restricted Payments (a) with the Borrower's Portion of Excess Cash to effect Specified Investments or to pay interest on the Restructuring Notes and (b) in amounts based on the Ultimate Parent PIK Election Amount will be deleted (Section 6.08(a)(iv)).

- The basket for optional prepayments of other debt based on the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.08(b)(vi)).

- The definition of Designated Excess Cash Expenditures will be deleted.

- The carveout to the mandatory prepayment provision for proceeds of Ultimate Parent Asset Dispositions used to effect Specified Investments will be deleted (Section 2.06(c); Section 6.1 of Shared Guarantee and Collateral Agreement).

Financial Covenants:

- The Leverage Ratio covenant will be amended to require a ratio at the end of each fiscal quarter below not exceeding the ratio set forth below opposite such fiscal quarter (Section 6.14):

| Fiscal Quarter | Leverage Ratio |
| --- | --- |
| 1Q 2013 | 3.50x |
| 2Q 2013 | 3.50x |
| 3Q 2013 | 3.50x |
| 4Q 2013 | 3.50x |
| 1Q 2014 | 3.50x |
| 2Q 2014 | 3.42x |
| 3Q 2014 | 3.34x |
| 4Q 2014 | 3.25x |
| 1Q 2015 | 3.1875x |
| 2Q 2015 | 3.125x |

| 3Q 2015 | 3.0625x |
| 4Q 2015 | 3.00x |
| 1Q 2016 | 2.875x |
| 2Q 2016 | 2.75x |
| 3Q 2016 | 2.625x |
| 4Q 2016 | 2.5x |

- Senior Secured Leverage Ratio covenant and references thereto will be deleted (Section 6.15).

- An interest coverage ratio covenant requiring a minimum ratio of 2.0 to 1.0 at the end of each fiscal quarter will be added.

Certain Other Negative Covenants:

The general unsecured indebtedness basket will be amended to prohibit indebtedness of the Borrower to any Affiliate (Section 6.01(a)(ix)).

The general lien basket will be decreased from $15 million to $5 million (Section 6.02(a)(vii)).

The basket for loans and advances to employees of the Borrower will be decreased from $10 million to $2.5 million (Section 6.04(k)).

The general Investments basket will be decreased from $25 million to $5 million (Section 6.04(p)) and will prohibit Investments in Affiliates that are not Subsidiaries of the Borrower (other than Investments resulting in a purchase of assets (i) by a Newco Senior Guarantor or the Service Company in connection with equivalent Investments by the other Companies and (ii) by the Borrower or a Subsidiary in BDC in connection with equivalent Investments by Dex East and RHDI.  In addition, the Borrower will be permitted to consummate up to $5 million in Permitted Acquisitions during the remaining term of the Dex West Credit Agreement (other than Permitted Acquisitions involving the purchase of assets from Affiliates that are not Subsidiaries of the Borrower.

The basket for investments structured as intercompany loans to Dex East will be deleted (Section 6.04(o)).

The limitation on Asset Sales covenant (Section 6.05) will be amended to:

- delete the basket for Permitted Asset Swaps (Section 6.05(e));

- decrease the general basket for asset sales from $50 million to $20 million subject, after the first $2.5 million, to the mandatory prepayment provisions of Section 2.06(b), and to prohibit the use of the basket for

transactions with Affiliates (Section 6.05(f)); and

- delete the additional $2.5 million general basket for asset sales (Section 6.05(j)).

The sale and leaseback basket will be decreased from $20 million to $15 million (Section 6.06).

The general basket for Restricted Payments (Section 6.08(a)(viii)) will be reduced to $2 million in any fiscal year with an aggregate cap of $5 million during the remaining term of the Dex West Credit Agreement, provided that:

- such funds will be used to fund corporate expenses permitted under the Dex West Credit Agreement;

- the Ultimate Parent will use proceeds of such Restricted Payments to make payments under this clause within 30 days of receipt;

- cash balances held by the Ultimate Parent will not exceed $5 million at any one time plus any amounts held pending use under Section 6.08(a)(vi) to fund interest payments on Restructuring Notes; and

- no payments made under this clause will be used (i) to effect the repurchase, or the making of any payments in respect, of Restructuring Notes or Additional Notes or (ii) to make any payment to or investment in any Affiliate other than the Borrower or a Subsidiary of the Borrower (or any director, officer or employee of any such Affiliate).

The exception permitting Restricted Payments in amounts based on the Ultimate Parent PIK Election Amount will be deleted (Section 6.08(a)(iv)).

The basket limiting Restricted Payments to fund interest payments on Restructuring Notes (or any Additional Notes incurred to refinance the Restructuring Notes) will be amended to reflect the continuation of the Ultimate Parent PIK Election on the Restructuring Notes (Section 6.08(a)(vi)(D)).

The limitation on amendment of material documents covenant will be amended to add the Subordinated Guarantee agreement and any license agreement or escrow agreement described above under the heading "Shared Services Agreement and Tax Sharing Agreement" to the agreements that shall not be amended if such amendment is adverse in any material respect to the interests of the Lenders (Section 6.13).

The basket for Capital Expenditures (Section 6.15) will be amended such that (a) the aggregate capital expenditures for the Borrower, Dex East, RHDI and SuperMedia (collectively, the

"Companies", and each, individually, a "Company") will not exceed $57.5 million in fiscal year 2013 and $50.0 million in any fiscal year thereafter, with a 75% non-cumulative one-year carry-forward of the unused portion of permitted Capital Expenditures in the applicable year (Capital Expenditures will first be applied to permitted amounts in such year before being applied to carried-forward amounts), provided that (a) Capital Expenditures of a Company shall either (i) relate to assets directly owned or acquired by such Company and shall be allocated to (and paid by) such Company or (ii) relate to the acquisition or development of Shared Assets and shall be allocated to (and paid by) the Companies in accordance with their applicable percentage used in the calculation of sharing of costs under the Shared Services Agreement at the time any such payment is made and (b) the aggregate capital expenditures of the Borrower shall not exceed $12 million in fiscal 2013, $10 million in fiscal 2014 and $9 million in fiscal 2015 and 2016, in each case with a 75% non-cumulative one-year carry-forward of the unused portion of permitted Capital Expenditures in the applicable year (Capital Expenditures will first be applied to permitted amounts in such year before being applied to carried-forward amounts).

The Ultimate Parent covenants will be modified to (a) prohibit the issuance of Additional Notes to finance Specified Investments or to make prepayments of indebtedness under the Credit Agreements and (b) in clause (g) thereof, require that the allocable net proceeds of the sale of any of Dex East, RHDI or SuperMedia be applied to mandatory prepayments of the Loans in accordance with the waterfall in the Intercreditor Agreement (as amended) (Section 6.19).

| | |
|---|---|
| Events of Default: | The cross-default and judgment defaults will be amended to exclude the Loan Documents (as defined in the SuperMedia Credit Agreement) and SuperMedia and its Subsidiaries, as applicable (Article 7(g), (h) and (k)). |

The following will be added as Events of Default:

- the commencement of enforcement actions under the Shared Guarantee and Collateral Agreement;

- the commencement of enforcement actions under the Shared Services Agreement or the occurrence of an event that permits the Service Company to terminate the Shared Services Agreement with respect to any Client Company (as defined therein), and such event continues unremedied for a period of three days;

- the failure of the Borrower to receive any payment under the Tax Sharing Agreements when due and such failure continues

unremedied for a period of three days; and

- if any license agreement or escrow agreement described above under the heading "Shared Services Agreement and Tax Sharing Agreement" is terminated (other than upon the expiration of the term thereof), ceases to be effective or ceases to be the legally valid, binding and enforceable obligation in any material respect of any party thereto.

Guarantee and Collateral
Requirements:

SuperMedia and its Subsidiaries will be excluded from the requirements of Section 5.12 (the "Further Assurances" covenant).

- For the avoidance of doubt, none of SuperMedia's Subsidiaries' equity interests or assets shall be required to be pledged to the Lenders as Collateral for the Obligations.

The existing Shared Guarantee and Collateral Agreement will be amended such that (i) the Service Company will guarantee on a secured basis the obligations under the Credit Agreements (and any refinancings thereof) on a pari passu basis and (ii) in addition to its existing secured guarantees of the obligations under the Dex East Credit Agreement, the Dex West Credit Agreement and the RHDI Credit Agreement, the Ultimate Parent (and any additional Guarantors under the Dex West Credit Agreement after the Effective Date (other than the Service Company and the Borrower and its Subsidiaries)) will also guarantee the obligations under the SuperMedia Credit Agreement on an unsecured basis.  Under the amended Shared Guarantee and Collateral Agreement, (i) the Service Company shall also grant liens in favor of each of the Companies to secure the performance of its obligations under the Shared Services Agreement and (ii) each Company will agree that its rights to pursue remedies and initiate enforcement actions against the Service Company shall be conditioned on a material breach by the Service Company of its obligations to such Company under the Shared Services Agreement.

Certain Definitions:

- The definition of "Allocable Net Proceeds" will be amended to reflect the Applicable Share for the Companies (Section 1.01).

- The definition of "Material Indebtedness" will be amended to exclude (i) the Borrower's Subordinated Guarantee and (ii) the Indebtedness of SuperMedia and its Subsidiaries (Section 1.01).

- The definition of "Total Indebtedness" will be amended to exclude the Borrower's Subordinated Guarantee (Section

1.01).

- The definition of "Newco" will be amended to exclude SuperMedia and its Subsidiaries (other than for purposes of the definition of Ultimate Parent Asset Disposition, which shall be amended to cover a sale of any of the Dex Entities, SuperMedia or the Service Company) (Section 1.01).

- The definitions of "Ultimate Parent Consolidated Net Income," "Ultimate Parent Consolidated EBITDA," "Ultimate Parent Leverage Ratio," "Ultimate Parent Total Indebtedness," "Ultimate Parent PIK Election Period" and "Ultimate Parent PIK Election Amount" will be deleted (Section 1.01).

- The definition of "Ultimate Parent Base Annual Cash Interest Amount" will be amended to reflect the Borrower's Applicable Share (Section 1.01).

- The definition of "Required Percentage" will be amended to 50% in the case of an Equity Issuance by the Ultimate Parent (Section 1.01).

- The definition of "Change of Control" will be amended to (i) reduce the threshold for a change of control at the Ultimate Parent in clause (e) thereof to 35% and (ii) clarify that such threshold is after giving effect to, and taking into consideration, the ownership of Ultimate Parent on a pro forma basis following the Mergers (Section 1.01).

- The definition of "Asset Disposition" will be amended to include dispositions described in Section 6.05(f) (Section 1.01).

- The definition of "Consolidated EBITDA" will be amended (i) to add back any non-cash impact of fresh start accounting principles in connection with any reorganization plan necessary to consummate the Mergers, (ii) to specify that the add-back in clause (a)(v)(A) thereof shall only be applicable in fiscal years 2015 and 2016 (and in any event subject to a cap in any fiscal year of up to $3.5 million and only in respect of severance costs paid in such fiscal years), and (iii) to amend clause (a)(vi) thereof to limit the add-backs pursuant thereto to the charges described on Schedule II hereto (the "Specified Charges") so long as (A) such charges are recorded during the period starting on October 1, 2012 and ending on December 31, 2013 and (B) the aggregate amount of charges added-back for all periods shall not exceed $13.7 million (it being understood that such charges may be added-back in any four quarter period which includes the quarter in which such charges are recorded) (Section 1.01).

13

- The definition of "Excess Cash Flow" will be amended to add back, to the extent deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries, the Specified Charges for such period (Section 1.01).

- The definition of "Equity Issuance" will be amended to provide that proceeds of any Equity Issuance (other than proceeds that are received as a result of (i) a non cash exchange of Restructuring Notes or Additional Notes for equity or (ii) equity that is issued on a non-cash basis as consideration for a permitted transaction) will be used first to prepay the Loans prior to any refinancing of any Restructuring Notes or Additional Notes and prior to the funding of any Specified Investment.

- "Shared Assets" means any asset (including intellectual property rights) owned by the Service Company or any License Subsidiary (Section 1.01).

- "Applicable Share" means the percentage equivalent to the applicable percentage used in the calculation of sharing of costs under the Shared Services Agreement as of the Effective Date (Section 1.01).

<u>Schedule I</u>

Directory Consolidation Project Details

The objective of the directory consolidation project is to permit the Borrower to consolidate directories in markets for which the Borrower, RHDI, Dex East or SuperMedia is the exclusive publisher that is adjacent to a market in which any of RHDI, Dex East or SuperMedia also publishes.  In these affected markets, there is overlap in both distribution and/or sales operations.  The consolidation of directories in these markets will increase advertiser satisfaction, improve the consumer experience, and provide increased efficiency and reduced costs for the Borrower.  The proposed consolidation project will only be effected after integration of the Dex entities and the SuperMedia entities is completed.

The Borrower has identified as of the date hereof certain directories in adjacent markets that are targets for combination, as set forth in Appendix A attached hereto.  In some cases, two or more directories would be discontinued, and a new directory covering the combined market would replace them.  In other cases, a directory would be discontinued and those advertisers would be transferred to one or more existing directories.  Upon completion of a consolidation, the Companies will calculate the contribution margin of the new directory or directories (which would include net sales, provision for bad debt, direct selling costs, print cost of sales and indirect overhead, with intercompany accounts settled in accordance with the Shared Services Agreement), with such contribution margin to be shared (in the manner as previously disclosed to the Administrative Agent) by the Companies participating in the consolidation based on the proportionate contribution margin of each of the directories included in the consolidation. Appendix A may be modified with the consent of the Agent to include additional directories identified after the date hereof.

**Appendix A**
**Target Directories**

| Impacted Directories | Current Copyright Ownership |
|---|---|
| Aitkin, MN | RHDI |
| Brainerd, MN | Dex Media East |
| Long Prairie, MN | RHDI |
| Little Falls, MN | Dex Media East |
| Alexandria, MN | RHDI |
| Glenwood, MN | Dex Media East |
| Morris, MN | Dex Media East |
| North Platte Valley, NE | RHDI |
| Alliance, NE | Dex Media East |
| Casper, WY | Dex Media West |
| Sidney, NE | Dex Media East |
| West Central NE (North Platte-McCook) | Dex Media East |
| Laughlin, NV | RHDI |
| Mohave County, AZ | Dex Media West |
| Benson, MN | RHDI |
| Cokato, MN | RHDI |
| Granite Falls, MN | RHDI |
| Glencoe, MN | RHDI |
| Litchfield-Montevideo-Willmar, MN | Dex Media East |
| Lower Yakima Valley, WA | RHDI |
| Yakima Valley, WA | Dex Media West |
| Tri-Cities, WA | Dex Media West |
| New Richland, MN | RHDI |
| Faribault/Northfield/Owatonna/Waseca, MN | Dex Media East |
| Hastings, MN | RHDI |
| SE St Paul, MN | Dex Media East |
| South Metro, MN | Dex Media East |
| Sheridan/Carlton, OR | RHDI |
| Salem, OR | Dex Media West |
| Poulsbo, WA | RHDI |
| Bainbridge Island, WA | Dex Media West |
| Kitsap County, WA | Dex Media West |
| Quilcene, WA | RHDI |
| Port Townsend, WA | Dex Media West |
| Port Angeles, WA | Dex Media West |
| Chaska, MN | RHDI |
| Western Suburban Area, MN | Dex Media East |
| Southwest Suburban Area, MN | Dex Media East |
| Northwest Metro (Brooklyn Park), MN | RHDI |
| Northwest Suburban Area, MN | Dex Media East |
| Western Suburban Area, MN | Dex Media East |

| Impacted Directories | Current Copyright Ownership |
|---|---|
| Lake City, MN | RHDI |
| Lewiston, MN | RHDI |
| Winona, MN | Dex Media East |
| Rochester, MN | Dex Media East |
| NW Missouri | RHDI |
| Shenandoah, IA | Dex Media East |
| Upper Rogue, OR | RHDI |
| Klamath Falls, OR | Dex Media West |
| Medford, OR | Dex Media West |
| Columbia Gorge, OR | RHDI |
| Central Oregon | Dex Media West |
| Central & North Oregon Coast | RHDI |
| Tillamook, OR | RHDI |
| Northern Oregon Coast (Astoria) | Dex Media West |
| N. Central Oregon Coast (Newport-Lincoln) | Dex Media West |

<u>Schedule II</u>

Restructuring Add-Backs

1.  Out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with the Mergers, the Dex West Amendments (including, for the avoidance of doubt, costs, fees and expenses incurred in connection with the activities specified in the second, third and fourth bullet points under the heading "Shared Services Agreement and Tax Sharing Agreement" in the Term Sheet), and the transactions contemplated by the Support and Limited Waiver Agreement dated as of December 5, 2012 (the "<u>Support Agreement</u>"), including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Borrower's Chapter 11 Case (as defined in the Support Agreement).

2.  Out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Agent and the steering committee Lenders and reimbursed by the Borrower (including without limitation, the fees and expenses of the Agent and the steering committee Lenders) incurred in connection with the Dex West Amendments (including, for the avoidance of doubt, costs, fees and expenses incurred in connection with the activities specified in the second, third and fourth bullet points under the heading "Shared Services Agreement and Tax Sharing Agreement" in the Term Sheet) and the transactions contemplated by the Support Agreement, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Borrower's Chapter 11 Case (as defined in the Support Agreement).

## DEX MEDIA EAST, INC. CREDIT AGREEMENT
Summary of Amendments[1]

Dex One Corporation ("Dex One") and SuperMedia Inc. ("SuperMedia") have entered into a Merger Agreement, dated as of August 20, 2012 (the "Merger Agreement"), by and among Dex One, NewDex, Inc. ("Newco"), Spruce Acquisition Sub, Inc. ("Merger Sub") and SuperMedia, pursuant to which Dex One will be merged with Newco, with Newco as the surviving corporation (the "Dex Merger"), and SuperMedia will be merged with Merger Sub, with SuperMedia as the surviving corporation (the "SuperMedia Merger" and together with the Dex Merger, the "Mergers").   After giving effect to the Mergers, SuperMedia will become a direct wholly owned subsidiary of Newco and Newco will become the Ultimate Parent (as defined in the Dex East Credit Agreement referred to below).  Set forth below are the proposed amendments (the "Dex East Amendments") to the Credit Agreement, dated as of October 24, 2007, as amended and restated as of January 29, 2010 (as amended by the First Amendment thereto, dated as of March 9, 2012, and the Dex East Amendments, the "Dex East Credit Agreement"), among Dex One, Dex Media, Inc., Dex Media East, Inc. (the "Borrower"), the lenders parties thereto and JPMorgan Chase Bank, N.A., as administrative agent, to be effected in connection with the consummation of the Mergers and the other transactions contemplated by the Merger Agreement.

| | |
|---|---|
| Transactions: | The Mergers and the other transactions contemplated by the Merger Agreement will be permitted by making the following amendments: |
| | • The definition of Change of Control will be amended to include an exception for the consummation of the Mergers; and |
| | • The Ultimate Parent Covenants will be amended to permit the Ultimate Parent to incur and discharge its obligations under the Merger Agreement and to acquire and own the Equity Interests of SuperMedia and its Subsidiaries (for the avoidance of doubt, the Liens securing the obligations under the SuperMedia Credit Agreement (as defined below) will be permitted). |
| Maturity Date: | The Maturity Date will be extended from October 24, 2014 to December 31, 2016 (Section 1.01). |
| Discounted Voluntary Prepayments: | The period during which Discounted Voluntary Prepayments are permitted will be extended from December 31, 2013 to December 31, 2016 (Section 2.16(a)). |
| Shared Services Agreement and Tax Sharing Agreement: | The existing shared services agreement will be replaced with an Amended and Restated Shared Services Agreement as set forth in |

---

[1] Capitalized terms used but not defined in this Term Sheet shall have the meaning assigned thereto in the Dex East Credit Agreement.

the form attached hereto as <u>Exhibit A</u>.

It will be a condition precedent to the Dex East Amendments that:

- (i) The trademarks (which include, for clarity, logos, trade dress and similar designations of origin other than domain names and are collectively referred to herein as the "trademarks") owned by SuperMedia will be transferred (together with the associated goodwill) to and owned by a bankruptcy remote subsidiary of SuperMedia, (ii) the trademarks owned by each of the Borrower, Dex Media West, Inc. ("<u>Dex West</u>") and R.H. Donnelley Inc. ("<u>RHDI</u>" and, together with the Borrower and Dex West, the "<u>Dex Entities</u>") will be transferred (together with the associated goodwill) to and owned by bankruptcy remote subsidiaries of the Borrower, Dex West and RHDI, respectively, (iii) the trademarks owned by the Service Company and each other Shared Collateral Loan Party (other than the Ultimate Parent) will be transferred (together with the associated goodwill) to and owned by a bankruptcy remote subsidiary of such Person, respectively, and (iv) in the case of each of (i), (ii) and (iii) above, each such bankruptcy remote subsidiary[2] (each, a "<u>License Subsidiary</u>") will grant a fully paid-up, royalty-free, perpetual, irrevocable, non-exclusive, worldwide, fully transferable and fully sublicensable license to use the trademarks it owns pursuant to (i), (ii) and (iii) above to the Ultimate Parent and each Subsidiary of the Ultimate Parent in connection with any current and future products and services of the Ultimate Parent and each such Subsidiary.  Despite the non-exclusive nature of such licenses, each License Subsidiary will covenant not to license or assign the trademarks it owns to any third party except to an affiliate of the Ultimate Parent or as otherwise permitted in the Dex East Credit Agreement.  Each such license will expressly allow each licensee to retain its license after a change in control or divestiture of such entity and will also be subject to other mutually acceptable and reasonably satisfactory terms.

- Each of SuperMedia, the Dex Entities, the Service Company and each other Shared Collateral Loan Party will grant to the Ultimate Parent and each Subsidiary of the Ultimate Parent a fully paid-up, royalty-free, perpetual, irrevocable, non-exclusive, worldwide, fully transferable and fully sublicensable license (or sublicense, as applicable) under all intellectual property (other than trademarks and domain

---

[2] Constituent documents of License Subsidiaries to be in form and substance satisfactory to the Administrative Agent.

names) it owns (or licenses, to the extent sublicensing is permitted by the applicable contract without (i) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or obligations upon sublicensor or any loss of rights, (ii) loss of any rights, (iii) additional obligations and (iv) unless the sublicensee fully reimburses the sublicensor for any fees or other consideration required to obtain the right to grant such sublicense, any additional fees or other consideration) as of the closing of the Mergers, as well as future intellectual property (other than trademarks and domain names) it creates, invents or acquires after closing of the Mergers, for any purpose (including the right to modify and create derivative works of any software); provided that the agreements providing such licenses will (a) prohibit the licensor from granting exclusive licenses with respect to such intellectual property to any Person in any manner that narrows such non-exclusive licenses to the Ultimate Parent or to such Subsidiaries of the Ultimate Parent and (b) expressly allow each licensee to retain its license after a change in control or divestiture of such entity. Such licenses will also be subject to other mutually acceptable and reasonably satisfactory terms.

- SuperMedia, the Dex Entities, the Service Company and the other Shared Collateral Loan Parties other than the Ultimate Parent will deliver to each other current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of (i) all software source code and all documentation and training manuals relating thereto and (ii) certain other tangible or written embodiments of material technology, websites and databases (but for clarity, excluding any print directories or other publicly distributed print materials), in each case to the extent owned (or licensed, if such license grants the licensee (x) possession of same and the right to allow the foregoing entities (and any escrow agent, as applicable) to access same and (y) the right to sublicense such right of possession and access without (I) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or obligations upon sublicensor or any loss of rights, (II) loss of any rights, (III) additional obligations and (IV) unless the sublicensee fully reimburses the sublicensor for any fees or other consideration required to obtain a sublicense to such possession and access, any additional fees or other consideration) and currently used by SuperMedia, the Dex Entities, the Service Company or any of such Shared Collateral Loan Parties, as applicable, in their respective businesses. Each of such entities shall make an initial

3

deposit of same and will be obligated to provide material updates on an ongoing basis.

The existing Tax Sharing Agreement will be amended as set forth in the form attached hereto as <u>Exhibit B</u>.

A new tax sharing agreement between SuperMedia entities and Dex entities as set forth in the form attached hereto as <u>Exhibit C</u> will be permitted.

- For the avoidance of doubt, under the tax sharing agreements attached hereto as <u>Exhibits B</u> and <u>C</u>, the Ultimate Parent will not receive compensation for the use of its tax attributes.

| | |
|---|---|
| <u>Directory Consolidation Project</u>: | The Borrower will be permitted to consolidate print directories in markets and/or with advertisers that adjoin/overlap with Dex West, RHDI and/or SuperMedia and their respective Subsidiaries, and to cross license intellectual property as needed in connection with the foregoing, all as described in greater detail on Schedule I hereto. In connection with the foregoing, the asset sale, lien and transactions with affiliates covenants will be amended to permit non-exclusive licenses of intellectual property and transfers of directories and/or titles in connection with the directory consolidation project to the extent specifically described on Schedule I hereto (Sections 6.02 and 6.05). |
| <u>Interest Rate</u>: | • The "Applicable Rate" will be amended to 2.00% for ABR Loans and to 3.00% in the case of Eurodollar Loans.<br><br>• The definition of "LIBO Rate" will be amended to include a 3.00% floor. |
| <u>Mandatory Amortization</u>: | The amortization schedule will be amended such that the quarterly amortization payment is (i) $16,250,000 for each fiscal quarter in fiscal 2013, (ii) $13,750,000 for each fiscal quarter in fiscal 2014 and (iii) $11,250,000 for each fiscal quarter in fiscal 2015 and 2016 (Section 2.05(a)), with all remaining outstanding amounts due at maturity on December 31, 2016.  All such quarterly repayments will be made on the last day of each March, June, September, and December.  If the effective date of the Dex East Amendments (the "<u>Effective Date</u>") occurs after March 31, 2013, the quarterly amortization payments immediately following the Effective Date will be reduced (in direct order) by an amount equal to the difference between the scheduled amortization payment due on March 31, 2013 (so long as such payment has been made) under the Dex East Credit Agreement prior to giving effect to the Dex East Amendments (the "<u>Existing Dex East Credit Agreement</u>") and the scheduled amortization payment due on March 31, 2013 described above. |

4

Excess Cash Flow Prepayment:    The Excess Cash Flow prepayment will be amended as follows (Section 2.06(d)):

- Excess Cash Flow will be calculated as of the end of each fiscal quarter ending after the Effective Date for the period starting on January 1, 2013 and ending on the last day of such quarter (with (i) the required prepayment as of the end of any such fiscal quarter to be calculated based on Excess Cash Flow for the applicable period net of any previously made required quarterly Excess Cash Flow prepayments and (ii) with the Borrower's Discounted Prepayment Portion of Excess Cash Flow (as defined below) and the Borrower's Discretionary Portion of Excess Cash Flow (as defined below) as of the end of such quarter to be calculated based on Excess Cash Flow for the applicable period net of any permitted uses of the Borrower's Discounted Prepayment Portion of Excess Cash Flow  and the Borrower's Discretionary Portion of Excess Cash Flow, as applicable, made in prior periods).  If the Effective Date occurs after the date on which the Excess Cash Flow prepayment would otherwise have been due under the Dex East Amendments in respect of the fiscal quarter ended March 31, 2013, then the quarterly Excess Cash Flow prepayment  for such fiscal quarter shall be due and payable on the Effective Date.

- The required prepayment percentage will be amended to 70% for fiscal 2013 and 2014 and 60% for fiscal 2015 and 2016.

- 15% of quarterly Excess Cash Flow for fiscal 2013 and 2014 and 20% of quarterly Excess Cash Flow for 2015 and 2016 (the "Borrower's Discounted Prepayment Portion of Excess Cash Flow") will be required to be used to make a prepayment if not used to make Discounted Voluntary Prepayments as follows:

  o Borrower's Discounted Prepayment Portion of Excess Cash Flow will be available only for Discounted Voluntary Prepayments within 180 days after the delivery of financial statements for the applicable fiscal quarter (it being agreed that the availability of the Borrower's Discounted Prepayment Portion of Excess Cash Flow during such 180 day period, as well as the requirements in clauses (i) and (ii) in the next succeeding sentence, will not be reduced by any succeeding calculation of Excess Cash Flow).

  o If such amounts are not applied to effect Discounted Voluntary Prepayments during the applicable 180-day period, such amounts shall be used (i) to make

5

additional optional prepayments at par at the end of the fiscal quarter during which such 180-day period expires to be applied to scheduled payments as directed by the Borrower or (ii) at the Borrower's option, to make an advance Excess Cash Flow payment pursuant to Section 2.06(d)(iii) of the Dex East Credit Agreement.

- 15% of quarterly Excess Cash Flow for fiscal 2013 and 2014 and 20% of quarterly Excess Cash Flow for 2015 and 2016 (the "Borrower's Discretionary Portion of Excess Cash Flow") may be retained by the Borrower and utilized for purposes otherwise permitted under the Dex East Credit Agreement, including, but not limited to, at the Borrower's option and in the Borrower's sole discretion (i) to effect additional Discounted Voluntary Prepayments or (ii) for optional prepayments at par, to be applied to scheduled payments as directed by the Borrower.

- To the extent any Specified Charges (as defined below) are deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries for any period, such Specified Charges shall be added in the determination of Excess Cash Flow for such period.

- For the avoidance of doubt, any Excess Cash Flow payment due under the Existing Dex East Credit Agreement in respect of the fiscal year ended December 31, 2012, shall continue to be payable in accordance with the terms of the Existing Dex East Credit Agreement.

Affirmative Covenants:

The Borrower will continue to deliver the financial statements and other information required to be delivered under the Existing Dex East Credit Agreement, as well as financial statements with respect to Dex West, RHDI and SuperMedia that are required to be delivered by Dex West, RHDI and SuperMedia under their respective Credit Agreements (as defined below). In addition, the Borrower will deliver the following information on a quarterly basis (with reasonably descriptive detail):

- sales metric (which will serve as leading indicator of reported print and digital revenues), for the applicable period;

- print and digital revenue and a gross margin amount for each of such reported revenue amounts, for the applicable period; and

- statements of cash flow from operations (with a reconciliation of net income to operating cash flow from operations and financing activities (including capital expenditures)).

Concurrently with the delivery of the financial statements

required pursuant to Sections 5.01(a) and 5.01(b) of the Dex East Credit Agreement, the Borrower will be required to deliver a schedule of Services Assets (as defined in the Shared Services Agreement) contributed to the Service Company during the previous fiscal quarter with a reasonably detailed description of such Services Assets and the value thereof.

Conditions Precedent to Effectiveness

Including, but not limited to, the following:

- the negotiation, execution and delivery of definitive documentation with respect to the Dex East Amendments, including an amendment to the Intercreditor Agreement (which will, among other things, revise the percentages in Section 3.4(b) thereof to reflect the Applicable Shares of the Companies (as defined below)), in all cases reasonably satisfactory to the Administrative Agent and the Lenders;

- each of the Dex West Credit Agreement, RHDI Credit Agreement and the Credit Agreement, dated as of December 31, 2009, (as amended by the First Amendment thereto, dated as of December 14, 2010, and the Second Amendment thereto, dated as of November 8, 2011, the "SuperMedia Credit Agreement" and, together with the Dex East Credit Agreement, the Dex West Credit Agreement and the RHDI Credit Agreement, the "Credit Agreements"), among SuperMedia, the lenders parties thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, shall concurrently be amended in a manner consistent with the term sheets attached hereto as Exhibit D;

- each of Dex East, Dex West, RHDI and SuperMedia (collectively, the "Companies" and each individually, a "Company") shall have entered into a subordinated guarantee (with respect to each Company, its "Subordinated Guarantee") pursuant to which each Company will guarantee the obligations of the other Companies under their respective Credit Agreements (and any refinancings thereof), which guarantee (a) will be subordinated to the obligations of the Company providing such guarantee in respect of its Credit Agreement (and any refinancings thereof) on terms to be mutually agreed (including an unlimited standstill period) and (b) will include sharing provisions pursuant to which the beneficiaries of such guarantees will share the benefits of such guarantees on a pari passu basis (in accordance with the percentages used to allocate costs under the Shared Services Agreement as of the Effective Date (i.e., 53% to SuperMedia and 47% to the Dex Entities (to be shared by the Dex Entities in accordance with their applicable percentages));

- the receipt by the Administrative Agent of executed consents

7

to the Dex East Amendments from each Lender; and

- additional customary closing conditions, including delivery of opinions of counsel, corporate resolutions, certificates and other documents as the Lenders shall reasonably require

Borrower's Portion of Excess Cash Flow Baskets and other Prepayment Matters:

- The definition of "Borrower's Portion of Excess Cash Flow" will be amended to (i) reflect a total percentage of 30% for each fiscal quarter after the Effective Date in fiscal 2013 and 2014 and 40% for each fiscal quarter in fiscal 2015 and 2016 and (ii) reflect the Borrower's Discounted Repayment Portion of Excess Cash Flow and the Borrower's Discretionary Portion of Excess Cash Flow described above. In addition, the "Borrower's Portion of Excess Cash Flow" (which may be a negative amount) will be calculated in the manner described above under the heading "Excess Cash Flow Prepayment".

- The basket for Permitted Acquisitions financed with the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.04(f)).

- The basket for Specified Investments financed with the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.04(l)).

- The exception permitting Restricted Payments (a) with the Borrower's Portion of Excess Cash to effect Specified Investments or to pay interest on the Restructuring Notes and (b) in amounts based on the Ultimate Parent PIK Election Amount will be deleted (Section 6.08(a)(iv)).

- The basket for optional prepayments of other debt based on the Borrower's Portion of Excess Cash Flow will be deleted (Section 6.08(b)(vi)).

- The definition of Designated Excess Cash Expenditures will be deleted.

- The carveout to the mandatory prepayment provision for proceeds of Ultimate Parent Asset Dispositions used to effect Specified Investments will be deleted (Section 2.06(c); Section 6.1 of Shared Guarantee and Collateral Agreement ).

Financial Covenants:

- The Leverage Ratio covenant will be amended to require a ratio at the end of each fiscal quarter below not exceeding the ratio set forth below opposite such fiscal quarter (Section 6.14):

| Fiscal Quarter | Leverage Ratio |
|---|---|
| 1Q 2013 | 5.00x |
| 2Q 2013 | 5.00x |

|          |          |
|----------|----------|
| 3Q 2013  | 5.00x    |
| 4Q 2013  | 5.00x    |
| 1Q 2014  | 4.9375x  |
| 2Q 2014  | 4.875x   |
| 3Q 2014  | 4.8125x  |
| 4Q 2014  | 4.75x    |
| 1Q 2015  | 4.6875x  |
| 2Q 2015  | 4.625x   |
| 3Q 2015  | 4.5625x  |
| 4Q 2015  | 4.50x    |
| 1Q 2016  | 4.375x   |
| 2Q 2016  | 4.25x    |
| 3Q 2016  | 4.125x   |
| 4Q 2016  | 4.00x    |

- An interest coverage ratio covenant requiring a minimum ratio of 1.1 to 1.0 at the end of each fiscal quarter will be added.

<u>Certain Other Negative Covenants</u>:

The basket for additional indebtedness for borrowings from Dex West will be deleted (Section 6.01(a)(vii)).

The general unsecured indebtedness basket will be amended to prohibit indebtedness of the Borrower to any Affiliate (Section 6.01(a)(x)).

The general lien basket will be decreased from $15 million to $5 million (Section 6.02(a)(vii)).

The basket for loans and advances to employees of the Borrower will be decreased from $10 million to $2.5 million (Section 6.04(k)).

The general Investments basket will be decreased from $25 million to $5 million (Section 6.04(o)) and will prohibit Investments in Affiliates that are not Subsidiaries of the Borrower (other than Investments resulting in a purchase of assets (i) by a Newco Senior Guarantor or the Service Company in connection with equivalent Investments by the other Companies and (ii) by the Borrower or a Subsidiary in BDC in connection with equivalent Investments by Dex West and RHDI).  In addition, the Borrower will be permitted to consummate up to $5 million in Permitted Acquisitions during the remaining term of the Dex East Credit Agreement (other than Permitted Acquisitions involving the purchase of assets from Affiliates that are not Subsidiaries of the Borrower).

The limitation on Asset Sales covenant (Section 6.05) will be amended to:

- delete the basket for Permitted Asset Swaps (Section

6.05(e));

- decrease the general basket for asset sales from $50 million to $20 million subject, after the first $2.5 million, to the mandatory prepayment provisions of Section 2.06(b), and to prohibit the use of the basket for transactions with Affiliates (Section 6.05(f)); and

- delete the additional $2.5 million general basket for asset sales (Section 6.05(j)).

The sale and leaseback basket will be decreased from $20 million to $15 million (Section 6.06).

The general basket for Restricted Payments (Section 6.08(a)(viii)) will be reduced to $2 million in any fiscal year with an aggregate cap of $5 million during the remaining term of the Dex East Credit Agreement, provided that:

- such funds will be used to fund corporate expenses permitted under the Dex East Credit Agreement;

- the Ultimate Parent will use proceeds of such Restricted Payments to make payments under this clause within 30 days of receipt;

- cash balances held by the Ultimate Parent will not exceed $5 million at any one time plus any amounts held pending use under Section 6.08(a)(vi) to fund interest payments on Restructuring Notes; and

- no payments made under this clause will be used (i) to effect the repurchase, or the making of any payments in respect, of Restructuring Notes or Additional Notes or (ii) to make any payment to or investment in any Affiliate other than the Borrower or a Subsidiary of the Borrower (or any director, officer or employee of any such Affiliate).

The exception permitting Restricted Payments in amounts based on the Ultimate Parent PIK Election Amount will be deleted (Section 6.08(a)(iv)).

The basket limiting Restricted Payments to fund interest payments on Restructuring Notes (or any Additional Notes incurred to refinance the Restructuring Notes) will be amended to reflect the continuation of the Ultimate Parent PIK Election on the Restructuring Notes (Section 6.08(a)(vi)(D)).

The limitation on amendment of material documents covenant will be amended to add the Subordinated Guarantee agreement and any license agreement or escrow agreement described above under the heading "Shared Services Agreement and Tax Sharing Agreement" to the agreements that shall not be amended if such

10

amendment is adverse in any material respect to the interests of the Lenders (Section 6.13).

The basket for Capital Expenditures (Section 6.15) will be amended such that (a) the aggregate capital expenditures for the Borrower, Dex West, RHDI and SuperMedia (collectively, the "Companies", and each, individually, a "Company") will not exceed $57.5 million in fiscal year 2013 and $50.0 million in any fiscal year thereafter, with a 75% non-cumulative one-year carry-forward of the unused portion of permitted Capital Expenditures in the applicable year (Capital Expenditures will first be applied to permitted amounts in such year before being applied to carried-forward amounts), provided that (a) Capital Expenditures of a Company shall either (i) relate to assets directly owned or acquired by such Company and shall be allocated to (and paid by) such Company or (ii) relate to the acquisition or development of Shared Assets and shall be allocated to (and paid by) the Companies in accordance with their applicable percentage used in the calculation of sharing of costs under the Shared Services Agreement at the time any such payment is made and (b) the aggregate capital expenditures of the Borrower shall not exceed $10 million in fiscal 2013 and 2014 and $9 million in fiscal 2015 and 2016, in each case with a 75% non-cumulative one-year carry-forward of the unused portion of permitted Capital Expenditures in the applicable year (Capital Expenditures will first be applied to permitted amounts in such year before being applied to carried-forward amounts).

The Ultimate Parent covenants will be modified to (a) prohibit the issuance of Additional Notes to finance Specified Investments or to make prepayments of indebtedness under the Credit Agreements and (b) in clause (g) thereof, require that the allocable net proceeds of the sale of any of Dex West, RHDI or SuperMedia be applied to mandatory prepayments of the Loans in accordance with the waterfall in the Intercreditor Agreement (as amended) (Section 6.17).

Events of Default:

The cross-default and judgment defaults will be amended to exclude the Loan Documents (as defined in the SuperMedia Credit Agreement) and SuperMedia and its Subsidiaries, as applicable (Article 7(g), (h) and (k)).

The following will be added as Events of Default:

- the commencement of enforcement actions under the Shared Guarantee and Collateral Agreement;

- the commencement of enforcement actions under the Shared Services Agreement or the occurrence of an event that permits the Service Company to terminate the Shared

11

Services Agreement with respect to any Client Company (as defined therein), and such event continues unremedied for a period of three days;

- the failure of the Borrower to receive any payment under the Tax Sharing Agreements when due and such failure continues unremedied for a period of three days; and

- if any license agreement or escrow agreement described above under the heading "Shared Services Agreement and Tax Sharing Agreement" is terminated (other than upon the expiration of the term thereof), ceases to be effective or ceases to be the legally valid, binding and enforceable obligation in any material respect of any party thereto.

| | |
|---|---|
| Guarantee and Collateral Requirements: | SuperMedia and its Subsidiaries will be excluded from the requirements of Section 5.12 (the "Further Assurances" covenant). |

- For the avoidance of doubt, none of SuperMedia's Subsidiaries' equity interests or assets shall be required to be pledged to the Lenders as Collateral for the Obligations.

The existing Shared Guarantee and Collateral Agreement will be amended such that (i) the Service Company will guarantee on a secured basis the obligations under the Credit Agreements (and any refinancings thereof) on a pari passu basis and (ii) in addition to its existing secured guarantees of the obligations under the Dex East Credit Agreement, the Dex West Credit Agreement and the RHDI Credit Agreement, the Ultimate Parent (and any additional Guarantors under the Dex East Credit Agreement after the Effective Date (other than the Service Company and the Borrower and its Subsidiaries)) will also guarantee the obligations under the SuperMedia Credit Agreement on an unsecured basis. Under the amended Shared Guarantee and Collateral Agreement, (i) the Service Company shall also grant liens in favor of each of the Companies to secure the performance of its obligations under the Shared Services Agreement and (ii) each Company will agree that its rights to pursue remedies and initiate enforcement actions against the Service Company shall be conditioned on a material breach by the Service Company of its obligations to such Company under the Shared Services Agreement.

| | |
|---|---|
| Certain Definitions: | |

- The definition of "Allocable Net Proceeds" will be amended to reflect the Applicable Share for the Companies (Section 1.01).

- The definition of "Material Indebtedness" will be amended to exclude (i) the Borrower's Subordinated Guarantee and (ii)

the Indebtedness of SuperMedia and its Subsidiaries (Section 1.01).

- The definition of "Total Indebtedness" will be amended to exclude the Borrower's Subordinated Guarantee (Section 1.01).

- The definition of "Newco" will be amended to exclude SuperMedia and its Subsidiaries (other than for purposes of the definition of Ultimate Parent Asset Disposition, which shall be amended to cover a sale of any of the Dex Entities, SuperMedia or the Service Company) (Section 1.01).

- The definitions of "Ultimate Parent Consolidated Net Income," "Ultimate Parent Consolidated EBITDA," "Ultimate Parent Leverage Ratio," "Ultimate Parent Total Indebtedness," "Ultimate Parent PIK Election Period" and "Ultimate Parent PIK Election Amount" will be deleted (Section 1.01).

- The definition of "Ultimate Parent Base Annual Cash Interest Amount" will be amended to reflect the Borrower's Applicable Share (Section 1.01).

- The definition of "Required Percentage" will be amended to 50% in the case of an Equity Issuance by the Ultimate Parent (Section 1.01).

- The definition of "Change of Control" will be amended to (i) reduce the threshold for a change of control at the Ultimate Parent in clause (e) thereof to 35% and (ii) clarify that such threshold is after giving effect to, and taking into consideration, the ownership of Ultimate Parent on a pro forma basis following the Mergers (Section 1.01).

- The definition of "Asset Disposition" will be amended to include dispositions described in Section 6.05(f) (Section 1.01).

- The definition of "Consolidated EBITDA" will be amended (i) to add back any non-cash impact of fresh start accounting principles in connection with any reorganization plan necessary to consummate the Mergers, (ii) to specify that the add-back in clause (a)(v)(A) thereof shall only be applicable in fiscal years 2015 and 2016 (and in any event subject to a cap in any fiscal year of up to $3.5 million and only in respect of severance costs paid in such fiscal years), and (iii) to amend clause (a)(vi) thereof to limit the add-backs pursuant thereto to the charges described on Schedule II hereto (the "Specified Charges") so long as (A) such charges are recorded during the period starting on October 1, 2012 and ending on December 31, 2013 and (B) the aggregate amount

13

of charges added-back for all periods shall not exceed $11.7 million (it being understood that such charges may be added-back in any four quarter period which includes the quarter in which such charges are recorded) (Section 1.01).

- The definition of "Excess Cash Flow" will be amended to add back, to the extent deducted in the determination of net cash provided by operating activities of the Borrower and its Subsidiaries, the Specified Charges for such period (Section 1.01).

- The definition of "Equity Issuance" will be amended to provide that proceeds of any Equity Issuance (other than proceeds that are received as a result of (i) a non cash exchange of Restructuring Notes or Additional Notes for equity or (ii) equity that is issued on a non-cash basis as consideration for a permitted transaction) will be used first to prepay the Loans prior to any refinancing of any Restructuring Notes or Additional Notes and prior to the funding of any Specified Investment.

- "Shared Assets" means any asset (including intellectual property rights) owned by the Service Company or any License Subsidiary (Section 1.01).

- "Applicable Share" means the percentage equivalent to the applicable percentage used in the calculation of sharing of costs under the Shared Services Agreement as of the Effective Date (Section 1.01).

<u>Schedule I</u>

Directory Consolidation Project Details

       The objective of the directory consolidation project is to permit the Borrower to consolidate directories in markets for which the Borrower, RHDI, Dex West or SuperMedia is the exclusive publisher that is adjacent to a market in which any of RHDI, Dex West or SuperMedia also publishes.  In these affected markets, there is overlap in both distribution and/or sales operations.  The consolidation of directories in these markets will increase advertiser satisfaction, improve the consumer experience, and provide increased efficiency and reduced costs for the Borrower.  The proposed consolidation project will only be effected after integration of the Dex entities and the SuperMedia entities is completed.

       The Borrower has identified as of the date hereof certain directories in adjacent markets that are targets for combination, as set forth in Appendix A attached hereto.  In some cases, two or more directories would be discontinued, and a new directory covering the combined market would replace them.  In other cases, a directory would be discontinued and those advertisers would be transferred to one or more existing directories.  Upon completion of a consolidation, the Companies will calculate the contribution margin of the new directory or directories (which would include net sales, provision for bad debt, direct selling costs, print cost of sales and indirect overhead, with intercompany accounts settled in accordance with the Shared Services Agreement), with such contribution margin to be shared (in the manner as previously disclosed to the Administrative Agent) by the Companies participating in the consolidation based on the proportionate contribution margin of each of the directories included in the consolidation. Appendix A may be modified with the consent of the Agent to include additional directories identified after the date hereof.

**Appendix A**
**Target Directories**

| Impacted Directories | Current Copyright Ownership |
|---|---|
| Aitkin, MN | RHDI |
| Brainerd, MN | Dex Media East |
| Long Prairie, MN | RHDI |
| Little Falls, MN | Dex Media East |
| Alexandria, MN | RHDI |
| Glenwood, MN | Dex Media East |
| Morris, MN | Dex Media East |
| North Platte Valley, NE | RHDI |
| Alliance, NE | Dex Media East |
| Casper, WY | Dex Media West |
| Sidney, NE | Dex Media East |
| West Central NE (North Platte-McCook) | Dex Media East |
| Laughlin, NV | RHDI |
| Mohave County, AZ | Dex Media West |
| Benson, MN | RHDI |
| Cokato, MN | RHDI |
| Granite Falls, MN | RHDI |
| Glencoe, MN | RHDI |
| Litchfield-Montevideo-Willmar, MN | Dex Media East |
| Lower Yakima Valley, WA | RHDI |
| Yakima Valley, WA | Dex Media West |
| Tri-Cities, WA | Dex Media West |
| New Richland, MN | RHDI |
| Faribault/Northfield/Owatonna/Waseca, MN | Dex Media East |
| Hastings, MN | RHDI |
| SE St Paul, MN | Dex Media East |
| South Metro, MN | Dex Media East |
| Sheridan/Carlton, OR | RHDI |
| Salem, OR | Dex Media West |
| Poulsbo, WA | RHDI |
| Bainbridge Island, WA | Dex Media West |
| Kitsap County, WA | Dex Media West |
| Quilcene, WA | RHDI |
| Port Townsend, WA | Dex Media West |
| Port Angeles, WA | Dex Media West |
| Chaska, MN | RHDI |
| Western Suburban Area, MN | Dex Media East |
| Southwest Suburban Area, MN | Dex Media East |
| Northwest Metro (Brooklyn Park), MN | RHDI |
| Northwest Suburban Area, MN | Dex Media East |
| Western Suburban Area, MN | Dex Media East |

| Impacted Directories | Current Copyright Ownership |
|---|---|
| Lake City, MN | RHDI |
| Lewiston, MN | RHDI |
| Winona, MN | Dex Media East |
| Rochester, MN | Dex Media East |
| NW Missouri | RHDI |
| Shenandoah, IA | Dex Media East |
| Upper Rogue, OR | RHDI |
| Klamath Falls, OR | Dex Media West |
| Medford, OR | Dex Media West |
| Columbia Gorge, OR | RHDI |
| Central Oregon | Dex Media West |
| Central & North Oregon Coast | RHDI |
| Tillamook, OR | RHDI |
| Northern Oregon Coast (Astoria) | Dex Media West |
| N. Central Oregon Coast (Newport-Lincoln) | Dex Media West |

<u>Schedule II</u>

Restructuring Add-Backs

1.  Out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with the Mergers, the Dex East Amendments (including, for the avoidance of doubt, costs, fees and expenses incurred in connection with the activities specified in the second, third and fourth bullet points under the heading "Shared Services Agreement and Tax Sharing Agreement" in the Term Sheet), and the transactions contemplated by the Support and Limited Waiver Agreement dated as of December 5, 2012 (the "<u>Support Agreement</u>"), including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Borrower's Chapter 11 Case (as defined in the Support Agreement).

2.  Out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Agent and the steering committee Lenders and reimbursed by the Borrower (including without limitation, the fees and expenses of the Agent and the steering committee Lenders) incurred in connection with the Dex East Amendments (including, for the avoidance of doubt, costs, fees and expenses incurred in connection with the activities specified in the second, third and fourth bullet points under the heading "Shared Services Agreement and Tax Sharing Agreement" in the Term Sheet), and the transactions contemplated by the Support Agreement, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Borrower's Chapter 11 Case (as defined in the Support Agreement).

## **EXHIBIT H TO THE MERGER AGREEMENT**

SUPERMEDIA FINANCING AMENDMENTS

[THIS PAGE INTENTIONALLY LEFT BLANK]

SUPERMEDIA INC. CREDIT AGREEMENT
Summary of Amendments[1]

Dex One Corporation ("Dex One") and SuperMedia Inc. ("SuperMedia") have entered into a Merger Agreement, dated as of August 20, 2012 (the "Merger Agreement"), by and among Dex One, NewDex, Inc. ("Newco"), Spruce Acquisition Sub, Inc. ("Merger Sub") and SuperMedia, pursuant to which Dex One will be merged with Newco, with Newco as the surviving corporation (the "Dex Merger"), and SuperMedia will be merged with Merger Sub, with SuperMedia as the surviving corporation (the "SuperMedia Merger" and together with the Dex Merger, the "Mergers").   After giving effect to the Mergers, SuperMedia will become a direct wholly owned subsidiary of Newco.  Set forth below are the proposed amendments (the "SuperMedia Amendments") to the Credit Agreement, dated as of December 31, 2009, (as amended by the First Amendment thereto, dated as of December 14, 2010, the Second Amendment thereto, dated as of November 8, 2011, and the SuperMedia Amendments, the "SuperMedia Credit Agreement"), among SuperMedia Inc. (f/k/a Idearc Inc.) (the "Borrower"), the lenders parties thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, to be effected in connection with the consummation of the Mergers and the other transactions contemplated by the Merger Agreement.  The terms "Dex East Credit Agreement", "Dex West Credit Agreement" and "RHDI Credit Agreement" (collectively, the "Dex Credit Agreements" and together with the SuperMedia Credit Agreement, the "Credit Agreements") shall have the respective meanings assigned to such terms in the term sheets attached hereto as Exhibit C.

| | |
|---|---|
| Transactions: | The Mergers and the other transactions contemplated by the Merger Agreement will be permitted by making the following amendments: |

- The definition of "Change in Control" (Section 1.01) will be amended to:

  o include an exception for the consummation of the Mergers;

  o include a Change in Control in the event that any person or group acquires ownership of more than 35% of the outstanding equity interests in Newco (after giving effect to, and taking into consideration, the ownership of Newco on a pro forma basis following the Mergers);

  o include a Change in Control in the event that Newco or a wholly owned subsidiary thereof fails to own, directly or indirectly, 100% of the outstanding equity interests in SuperMedia free of Liens;

  o delete the safe harbor for Institutional Holders;[2] and

---

[1] Capitalized terms used but not defined in this Term Sheet shall have the meaning assigned thereto in the SuperMedia Credit Agreement.

1

      o  include a Change in Control, for so long as the Amended and Restated Shared Services Agreement (as defined below) is in existence, in the event that any person other than Newco owns any equity interests in Dex One Service, Inc. (the "<u>Service Company</u>").

- The fundamental change covenant will be amended to permit the Mergers (Section 6.03).

<u>Maturity Date</u>:

The Maturity Date will be extended from December 31, 2015 to December 31, 2016 (Section 1.01).

<u>Discounted Voluntary Prepayments</u>:

The period during which Voluntary Prepayments are permitted will be extended from December 31, 2013 to December 31, 2016 (Section 2.15(a)).

<u>Shared Services Agreement and Tax Sharing Agreement</u>:

Each of the following will be a condition precedent to the SuperMedia Amendments:

- SuperMedia will enter into an amended and restated shared services agreement between SuperMedia and certain of its subsidiaries and Newco and certain of its other subsidiaries in the form attached hereto as <u>Exhibit A</u> (the "<u>Amended and Restated Shared Services Agreement</u>") providing for sharing of synergy benefits by means of payments by and among Newco and all of its subsidiaries (including SuperMedia) in accordance with the terms set forth therein.  SuperMedia contributions will be funded into a separate account, subject to a deposit account control agreement in favor of the Administrative Agent as agent for the Lenders;

- SuperMedia will enter into a tax sharing agreement between SuperMedia and certain of its subsidiaries and Newco and certain of its other subsidiaries in the form attached hereto as <u>Exhibit B</u> (the "<u>Tax Sharing Agreement</u>") reflecting an allocation of income tax burden by and among Newco and all of its subsidiaries (including SuperMedia) in accordance with the terms set forth therein;

      o  For the avoidance of doubt, under the Tax Sharing Agreement, Newco will not receive compensation for the use of its tax attributes.

- (i) The trademarks (which include, for clarity, logos, trade dress and similar designations of origin other than domain names and are collectively referred to herein as the "trademarks") owned by SuperMedia will be transferred

---

[2] To be deleted if the post-transaction equity ownership of the Institutional Holders is below 35%.

(together with the associated goodwill) to and owned by a bankruptcy remote subsidiary of SuperMedia, (ii) the trademarks owned by each of Dex Media East, Inc. ("Dex East"), Dex Media West, Inc. ("Dex West") and R.H. Donnelley Inc. ("RHDI" and, together with Dex East and Dex West, the "Dex Entities") will be transferred (together with the associated goodwill) to and owned by bankruptcy remote subsidiaries of the Dex East, Dex West and RHDI, respectively, (iii) the trademarks owned by the Service Company and each other Shared Collateral Loan Party (as defined in the Dex Credit Agreements) (other than Newco) will be transferred (together with the associated goodwill) to and owned by a bankruptcy remote subsidiary of such Person, respectively, and (iv), in the case of each of (i), (ii) and (iii) above, each such bankruptcy remote subsidiary[3] (each, a "License Subsidiary") will grant a fully paid-up, royalty-free, perpetual, irrevocable, non-exclusive, worldwide, fully transferable and fully sublicensable license to use the trademarks it owns pursuant to (i), (ii) and (iii) above to Newco and each Subsidiary of Newco in connection with any current and future products and services of Newco and each such Subsidiary. Despite the non-exclusive nature of such licenses, each License Subsidiary will covenant not to license or assign the trademarks it owns to any third party except to an affiliate of Newco or as otherwise permitted in the SuperMedia Credit Agreement. Each such license will expressly allow each licensee to retain its license after a change in control or divestiture of such entity and will also be subject to other mutually acceptable and reasonably satisfactory terms.

- Each of SuperMedia, the Dex Entities, the Service Company and each other Shared Collateral Loan Party will grant to Newco and each Subsidiary of Newco a fully paid-up, royalty-free, perpetual, irrevocable, non-exclusive, worldwide, fully transferable and fully sublicensable license (or sublicense, as applicable) under all intellectual property (other than trademarks and domain names) it owns (or licenses, to the extent sublicensing is permitted by the applicable contract without (i) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or obligations upon sublicensor or any loss of rights, (ii) loss of any rights, (iii) additional obligations and (iv) unless the sublicensee fully reimburses the sublicensor for any fees or other consideration required to obtain the

---

[3] Constituent documents of License Subsidiaries to be in form and substance satisfactory to the Administrative Agent.

right to grant such sublicense, any additional fees or other consideration) as of the closing of the Mergers, as well as future intellectual property (other than trademarks and domain names) it creates, invents or acquires after closing of the Mergers, for any purpose (including the right to modify and create derivative works of any software); provided that the agreements providing such licenses will (a) prohibit the licensor from granting exclusive licenses with respect to such intellectual property to any Person in any manner that narrows such non-exclusive licenses to Newco or to such Subsidiaries of Newco and (b) expressly allow each licensee to retain its license after a change in control or divestiture of such entity.  Such licenses will also be subject to other mutually acceptable and reasonably satisfactory terms.

- SuperMedia, the Dex Entities, the Service Company and the other Shared Collateral Loan Parties (as defined in the Dex Credit Agreements) other than Newco will deliver to each other current or contingent (e.g., through an escrow arrangement reasonably satisfactory to the Administrative Agent) possession of (i) all software source code and all documentation and training manuals relating thereto and (ii) certain other tangible or written embodiments of material technology, websites and databases (but for clarity, excluding any print directories or other publicly distributed print materials), in each case to the extent owned (or licensed, if such license grants the licensee (x) possession of same and the right to allow the foregoing entities (and any escrow agent, as applicable) to access same and (y) the right to sublicense such right of possession and access without (I) the licensor's consent, unless consent can be obtained with no additional fees or other consideration or obligations upon sublicensor or any loss of rights, (II) loss of any rights, (III) additional obligations and (IV) unless the sublicensee fully reimburses the sublicensor for any fees or other consideration required to obtain a sublicense to such possession and access, any additional fees or other consideration) and currently used by SuperMedia, the Dex Entities, the Service Company or any of such Shared Collateral Loan Parties, as applicable, in their respective businesses.  Each of such entities shall make an initial deposit of same and will be obligated to provide material updates on an ongoing basis.

Directory Consolidation Project:    SuperMedia will be permitted to consolidate print directories in markets and/or with advertisers that adjoin/overlap with Dex East, Dex West and/or RHDI and their respective Subsidiaries, and to cross license intellectual property as needed in connection

with the foregoing, all as described in greater detail on Schedule I hereto. In connection with the foregoing, the asset sale, lien and transactions with affiliates covenants will be amended to permit non-exclusive licenses of intellectual property and transfers of directories and/or titles in connection with the directory consolidation project to the extent specifically described on Schedule I hereto (Sections 6.02, 6.05 and 6.09).

Interest Rate:

The "Applicable Margin" will be amended to 7.60% in the case of ABR Loans and to 8.60% in the case of Eurodollar Loans.

Excess Cash Flow ("Available Cash") Prepayment:

The quarterly Available Cash prepayment will be amended as follows (Section 2.06(c)):

- The required prepayment percentage will remain 67.5%.

- 12.5% of quarterly Available Cash (the "Borrower's Discounted Prepayment Portion of Available Cash") will be required to be used to make an Available Cash prepayment (if not used to make Voluntary Prepayments) as follows:

  o Borrower's Discounted Prepayment Portion of Available Cash will be available only for Voluntary Prepayments within 180 days after the delivery of financial statements for the applicable fiscal quarter (it being agreed that the availability of the Borrower's Discounted Prepayment Portion of Available Cash during such 180 day period, as well as the requirements in clauses (i) and (ii) in the next succeeding sentence, will not be reduced by any succeeding calculation of Available Cash).

  o If such amounts are not applied to effect Voluntary Prepayments during the applicable 180-day period, such amounts shall be used (i) to make additional optional prepayments at par at the end of the fiscal quarter during which such 180-day period expires or (ii) at the Borrower's option, to make Advance Prepayments.

20% of quarterly Available Cash (the "Borrower's Discretionary Portion of Available Cash") may be retained by the Borrower and utilized for purposes otherwise permitted under the SuperMedia Credit Agreement, including, but not limited to, at the Borrower's option and in the Borrower's sole discretion (i) to effect additional Voluntary Prepayments or (ii) for optional prepayments at par.

- The minimum Unrestricted Cash requirement for Voluntary Prepayments set forth in Section 2.15(a) shall be reduced from $50 million to $40 million.

5

- The minimum transaction size requirement for Voluntary Prepayments set forth in Section 2.15(b) shall be reduced from $10 million to $5 million. The total amount permitted for Voluntary Prepayments after the effective date of the SuperMedia Amendments (the "Effective Date") shall be calculated without regard to the total magnitude of Voluntary Prepayments effected prior to the Effective Date.

- To the extent any Specified Charges (as defined below) are added back in determining Consolidated Adjusted EBITDA for any period, such Specified Charges shall be added (without duplication) in the determination of Available Cash for such period.

Affirmative Covenants:

The delivery of financial statements covenant (Section 5.01) will be amended so that SuperMedia is required to deliver:

- the audited annual financial statements and the quarterly financial statements of Newco, as filed with the SEC, accompanied (on the same dates that the Newco financial statements are required to be delivered pursuant to the SuperMedia Credit Agreement) by:

    o stand-alone unaudited financial statements for SuperMedia and its subsidiaries in form substantially the same in all material respects as such financial statements of Newco;

    o a certificate of an officer certifying that such financial statements of SuperMedia fairly present in all material respects in accordance with GAAP the financial condition and results of operations of SuperMedia and its subsidiaries (except for income tax provisions, which would reflect an allocation to SuperMedia and its subsidiaries of Newco's income tax provisions, in accordance with the tax sharing agreement).

- the financial statements with respect to Dex East, Dex West and RHDI that are required to be delivered by Dex East, Dex West and RHDI under the Dex East Credit Agreement, the Dex West Credit Agreement, and the RHDI Credit Agreement, respectively.

In addition, the Borrower will deliver the following information on a quarterly basis (with reasonably descriptive detail):

- sales metric (which will serve as leading indicator of reported print and digital revenues), for the applicable period;

- print and digital revenue and a gross margin amount for each of such reported revenue amounts, for the applicable period;

6

and

- statements of cash flow from operations (with a reconciliation of net income to operating cash flow from operations and financing activities (including capital expenditures)).

Concurrently with the delivery of the financial statements required pursuant to Sections 5.01(a) and 5.01(b) of the SuperMedia Credit Agreement, the Borrower will be required to deliver a schedule of Services Assets (as defined in the Amended and Restated Shared Services Agreement) contributed to the Service Company during the previous fiscal quarter with a reasonably detailed description of such Services Assets and the value thereof.

| Conditions Precedent to Effectiveness: | Including, but not limited to, the following: |

Including, but not limited to, the following:

- the negotiation, execution and delivery of definitive documentation with respect to the SuperMedia Amendments, including an Intercreditor Agreement (as defined in the Dex Credit Agreements and as amended concurrently with the SuperMedia Amendments, which amendment will, among other things, revise the percentages in Section 3.4(b) thereof to reflect the Applicable Shares of the Companies (in each case as defined below)), in all cases reasonably satisfactory to the Administrative Agent and the Lenders;

- each of the Dex Credit Agreements shall concurrently be amended in a manner consistent with the term sheets attached hereto as Exhibit C;

- each of Dex East, Dex West, RHDI and SuperMedia (collectively, the "Companies" and each individually, a "Company") shall have entered into a subordinated guarantee (with respect to each Company, its "Subordinated Guarantee") pursuant to which each Company will guarantee the obligations of the other Companies under their respective Credit Agreements (and any refinancings thereof), which guarantee (a) will be subordinated to the obligations of the Company providing such guarantee in respect of its Credit Agreement (and any refinancings thereof) on terms to be mutually agreed (including an unlimited standstill period) and (b) will include sharing provisions pursuant to which the beneficiaries of such guarantees will share the benefits of such guarantees on a pari passu basis (in accordance with the percentages used to allocate costs under the Amended and Restated Shared Services Agreement as of the Effective Date (i.e., 53% to SuperMedia and 47% to the Dex Entities (to be shared by the Dex Entities in accordance with their applicable percentages));

7

- the receipt by the Administrative Agent of executed consents to the SuperMedia Amendments from each Lender; and

- additional customary closing conditions, including delivery of opinions of counsel, corporate resolutions, certificates and other documents as the Lenders shall reasonably require.

Financial Covenants:

- The Leverage Ratio covenant will be amended to require a ratio for net indebtedness (net of up to $50 million of unrestricted cash on hand) at the end of each fiscal quarter below not exceeding the ratio set forth below opposite such fiscal quarter (Section 6.13(a)):

| Fiscal Quarter | Leverage Ratio |
| --- | --- |
| 1Q 2013 | 4.75x |
| 2Q 2013 | 4.75x |
| 3Q 2013 | 4.75x |
| 4Q 2013 | 4.75x |
| 1Q 2014 | 4.6875x |
| 2Q 2014 | 4.625x |
| 3Q 2014 | 4.5625x |
| 4Q 2014 | 4.50x |
| 1Q 2015 | 4.50x |
| 2Q 2015 | 4.50x |
| 3Q 2015 | 4.50x |
| 4Q 2015 | 4.50x |
| 1Q 2016 | 4.4375x |
| 2Q 2016 | 4.375x |
| 3Q 2016 | 4.3125x |
| 4Q 2016 | 4.25x |

- The financial covenants (Section 6.13) will be amended so that the financial covenants are calculated for SuperMedia and its subsidiaries on a stand-alone basis as if, after closing of the Mergers, (1) SuperMedia were not a subsidiary of Newco and (2) the preparation of financial statements and other calculations (including without limitation the Leverage Ratio and the Consolidated Interest Coverage Ratio) in accordance with GAAP did not require or give effect to intercompany eliminations for transactions between SuperMedia and its subsidiaries on the one hand and Newco and its other subsidiaries on the other hand, and all transactions with Newco or its other subsidiaries were transactions with a person not affiliated with SuperMedia (provided that Section 6.09 will continue to apply and give effect to the affiliate status of Newco and its other subsidiaries).

Certain Other Negative Covenants:    The general unsecured indebtedness basket will be amended to

prohibit indebtedness of the Borrower and its Subsidiaries to any Affiliate (Section 6.01(a)(xxi).

The limitation on Investments covenant (Section 6.04) will be amended to:

- decrease the basket for Permitted Acquisitions to $20 million (with no additional capacity based on Available Retained Cash) during the remaining term of the SuperMedia Credit Agreement (other than Permitted Acquisitions involving the purchase of assets from Affiliates that are not Subsidiaries of the Borrower) (Section 6.04(f));

- decrease the general Investments basket from $30 million to $20 million and prohibit Investments in Affiliates that are not Subsidiaries of the Borrower (other than Investments resulting in a purchase of assets by a Newco Senior Guarantor (as defined in the Dex Credit Agreements) or the Service Company in connection with equivalent Investments by the other Companies) (Section 6.04(u)).

The general basket for asset sales (Section 6.05(l)) will be amended to prohibit use of the basket for transactions with Affiliates.

The Restricted Payments covenant (Section 6.08) will be amended to:

- decrease the basket for employee stock repurchases from $10 million per fiscal year (capped at $25 million during the term of the SuperMedia Credit Agreement) to $5 million per fiscal year.

- decrease the general basket for Restricted Payments (Section 6.08(v)) to $2 million in any fiscal year with an aggregate cap of $5 million during the remaining term of the SuperMedia Credit Agreement, provided that:

  o such funds will be used to fund corporate expenses permitted under the SuperMedia Credit Agreement;

  o Newco will use proceeds of such Restricted Payments to make payments under this clause within 30 days of receipt;

  o cash balances held by Newco will not exceed $5 million at any one time plus any amounts distributed to Newco by the Dex Entities pursuant to the Dex Credit Agreements and held pending use to fund interest payments on the

9

Restructuring Notes; and

○  no payments made under this clause will be used (i) to effect the repurchase, or the making of any payments in respect, of Restructuring Notes or Additional Notes (in each case as defined in the Dex Credit Agreements) or (ii) to make any payment to or investment in any Affiliate other than the Borrower or a Subsidiary of the Borrower (or any director, officer or employee of any such Affiliate).

The limitation on amendment of material documents covenant (Section 6.12) will be amended to add the Shared Services Agreement, Tax Sharing Agreements, Subordinated Guarantee agreement and any license agreement or escrow agreement described above under the heading "Shared Services Agreement and Tax Sharing Agreement" to the agreements that shall not be amended if such amendment is adverse in any material respect to the interests of the Lenders.

The basket for Capital Expenditures (Section 6.14) will be amended such that (a) the aggregate capital expenditures for Dex East, Dex West, RHDI and SuperMedia (collectively, the "Companies", and each, individually, a "Company") will not exceed $57.5 million in fiscal year 2013 and $50 million in any fiscal year thereafter, with a 75% non-cumulative one-year carry-forward of the unused portion of permitted Capital Expenditures in the applicable year (Capital Expenditures will first be applied to permitted amounts in such year before being applied to carried-forward amounts), provided that (a) Capital Expenditures of a Company shall either (i) relate to assets directly owned or acquired by such Company, and shall be allocated to (and paid by) such Company or (ii) relate to the acquisition or development of Shared Assets (as defined below) and shall be allocated to (and paid by) the Companies in accordance with their applicable percentage used in the calculation of sharing of costs under the Amended and Restated Shared Services Agreement at the time any such payment is made and (b) the aggregate capital expenditures of the Borrower shall not exceed $30 million in any fiscal year, with a 75% non-cumulative one-year carry-forward of the unused portion of permitted Capital Expenditures in the applicable year (Capital Expenditures will first be applied to permitted amounts in such year before being applied to carried-forward amounts).

The transactions with affiliates covenant (Section 6.09) will be amended to permit the transactions contemplated by the Amended and Restated Shared Services Agreement and the Tax

10

Sharing Agreement.

Covenants applicable to Newco and the Service Company limiting their activities will be added in substantially the same form as the covenants applicable to Newco and the Service Company limiting their activities in the Dex Credit Agreements (as amended concurrently with the SuperMedia Amendments), including a covenant with respect to Newco to require that the Allocable Net Proceeds of the sale of any of Dex East, Dex West or RHDI be applied to mandatory prepayments of the Loans in accordance with the waterfall in the Intercreditor Agreement (as defined in the Dex Credit Agreements and as amended concurrently with the SuperMedia Amendments).

Events of Default:

The following will be added as Events of Default:

- the occurrence of a bankruptcy event with respect to Newco or the Service Company;

- the commencement of enforcement actions under the Shared Guarantee and Collateral Agreement (as defined in the Dex Credit Agreements);

- the commencement of enforcement actions under the Amended and Restated Shared Services Agreement or the occurrence of an event that permits the Service Company to terminate the Amended and Restated Shared Services Agreement with respect to any Client Company (as defined therein), and such event continues unremedied for a period of three days; and

- the failure of the Borrower to receive any payment under the Tax Sharing Agreement when due and such failure continues unremedied for a period of three days; and

- if any license agreement or escrow agreement described above under the heading "Shared Services Agreement and Tax Sharing Agreement" is terminated (other than upon the expiration of the term thereof), ceases to be effective or ceases to be the legally valid, binding and enforceable obligation in any material respect of any party thereto.

Guarantee and Collateral Requirements:

The Shared Guarantee and Collateral Agreement (as defined in the Dex Credit Agreements) will be amended such that (i) the Service Company will guarantee on a secured basis the obligations under the Credit Agreements (and any refinancings thereof) on a pari passu basis, and (ii) in addition to its existing secured guarantees of the obligations under the Dex East Credit Agreement, the Dex West Credit Agreement and the RHDI Credit Agreement, Newco (and any additional Guarantors under the Dex

11

Credit Agreements after the Effective Date (other than the Service Company and the Dex Entities and the Subsidiaries of the Dex Entities)) will also guarantee the obligations of SuperMedia under the SuperMedia Credit Agreement on an unsecured basis. Under the amended Shared Guarantee and Collateral Agreement, (i) the Service Company shall also grant liens in favor of each of the Companies to secure the performance of its obligations under the Shared Services Agreement and (ii) each Company will agree that its rights to pursue remedies and initiate enforcement actions against the Service Company shall be conditioned on a material breach by the Service Company of its obligations to such Company under the Shared Services Agreement.

Certain Definitions:

- The definitions of "Available Cash", "Consolidated Net Income", "Pro Forma Compliance" and "Total Indebtedness" will be amended so that such terms are calculated for SuperMedia and its subsidiaries on a stand-alone basis as if, after closing of the Mergers, (1) SuperMedia were not a subsidiary of Newco and (2) the preparation of financial statements and other calculations (including without limitation the Leverage Ratio and the Consolidated Interest Coverage Ratio) in accordance with GAAP did not require or give effect to intercompany eliminations for transactions between SuperMedia and its subsidiaries on the one hand and Newco and its other subsidiaries on the other hand, and all transactions with Newco or its other subsidiaries were transactions with a person not affiliated with SuperMedia (provided that Section 6.09 will continue to apply and give effect to the affiliate status of Newco and its other subsidiaries) (Section 1.01).

- The definition of "Available Cash" will be amended to add back, to the extent deducted in the determination of Consolidated Adjusted EBITDA, the Specified Charges for such period (Section 1.01).

- The definition of "Consolidated Adjusted EBITDA" will be amended (i) to add back any non-cash impact of fresh start accounting principles in connection with any reorganization plan necessary to consummate the Mergers (ii) to amend clause (f) thereof to add back, to the extent deducted in determining Consolidated Net Income for the applicable period, restructuring charges relating to the transactions contemplated by the reorganization plan as described on Schedule II hereto (the "Specified Charges") so long as (A) such charges are recorded during the period starting on October 1, 2012 and ending on December 31, 2013 and (B) the aggregate amount of charges added-back for all periods shall not exceed $40 million (it being understood that such

12

charges may be added-back in any four quarter period which includes the quarter in which such charges are recorded), (iii) to specify that the add-back in clause (g)(i) thereof shall only be applicable in fiscal years 2015 and 2016 (and in any event subject to a cap in any fiscal year of up to $10 million and only in respect of severance costs paid in such fiscal years), and (iv) to delete clause (g)(ii) thereof (Section 1.01).

- The definition of "Material Indebtedness" will be amended to exclude the Borrower's Subordinated Guarantee (Section 1.01).

- The definition of "Total Indebtedness" will be amended to exclude the Borrower's Subordinated Guarantee (Section 1.01).

- A definition of "Allocable Net Proceeds" will be inserted to reflect the Applicable Share for the Companies (Section 1.01).

- "Shared Assets" means any asset (including intellectual property rights) owned by the Service Company or any License Subsidiary (Section 1.01).

- "Applicable Share" means the percentage equivalent to the applicable percentage used in the calculation of sharing of costs under the Amended and Restated Shared Services Agreement as of the Effective Date (Section 1.01).

<u>Schedule I</u>

Directory Consolidation Project Details

The objective of the directory consolidation project is to permit SuperMedia to consolidate directories in markets for which SuperMedia, Dex West, Dex East or RHDI is the exclusive publisher that is adjacent to a market in which any of SuperMedia, Dex West, Dex East or RHDI also publishes.  In these affected markets, there is overlap in both distribution and/or sales operations.  The consolidation of directories in these markets is expected to increase advertiser satisfaction, improve the consumer experience, and provide increased efficiency and reduced costs for SuperMedia.  The proposed consolidation project will only be effected after integration of the Dex entities and the SuperMedia entities is completed.

SuperMedia has identified as of the date hereof certain directories in adjacent markets that are targets for combination, as set forth in Appendix A attached hereto.  In some cases, two or more directories would be discontinued, and a new directory covering the combined market would replace them.  In other cases, a directory would be discontinued and those advertisers would be transferred to one or more existing directories.  Upon completion of a consolidation, the Companies will calculate the contribution margin of the new directory or directories (which would include net sales, provision for bad debt, direct selling costs, print cost of sales and indirect overhead, with intercompany accounts settled in accordance with the Shared Services Agreement), with such contribution margin to be shared (in the manner as previously disclosed to the Administrative Agent) by the Companies participating in the consolidation based on the proportionate contribution margin of each of the directories included in the consolidation. Appendix A may be modified with the consent of the Agent to include additional directories identified after the date hereof.

**Appendix A**
**Target Directories**

| Impacted Directories | Current Copyright Ownership |
|---|---|
| Aitkin, MN | RHDI |
| Brainerd, MN | Dex Media East |
| Long Prairie, MN | RHDI |
| Little Falls, MN | Dex Media East |
| Alexandria, MN | RHDI |
| Glenwood, MN | Dex Media East |
| Morris, MN | Dex Media East |
| North Platte Valley, NE | RHDI |
| Alliance, NE | Dex Media East |
| Casper, WY | Dex Media West |
| Sidney, NE | Dex Media East |
| West Central NE (North Platte-McCook) | Dex Media East |
| Laughlin, NV | RHDI |
| Mohave County, AZ | Dex Media West |
| Benson, MN | RHDI |
| Cokato, MN | RHDI |
| Granite Falls, MN | RHDI |
| Glencoe, MN | RHDI |
| Litchfield-Montevideo-Willmar, MN | Dex Media East |
| Lower Yakima Valley, WA | RHDI |
| Yakima Valley, WA | Dex Media West |
| Tri-Cities, WA | Dex Media West |
| New Richland, MN | RHDI |
| Faribault/Northfield/Owatonna/Waseca, MN | Dex Media East |
| Hastings, MN | RHDI |
| SE St Paul, MN | Dex Media East |
| South Metro, MN | Dex Media East |
| Sheridan/Carlton, OR | RHDI |
| Salem, OR | Dex Media West |
| Poulsbo, WA | RHDI |
| Bainbridge Island, WA | Dex Media West |
| Kitsap County, WA | Dex Media West |
| Quilcene, WA | RHDI |
| Port Townsend, WA | Dex Media West |
| Port Angeles, WA | Dex Media West |
| Chaska, MN | RHDI |
| Western Suburban Area, MN | Dex Media East |
| Southwest Suburban Area, MN | Dex Media East |
| Northwest Metro (Brooklyn Park), MN | RHDI |
| Northwest Suburban Area, MN | Dex Media East |
| Western Suburban Area, MN | Dex Media East |
| Lake City, MN | RHDI |
| Lewiston, MN | RHDI |
| Winona, MN | Dex Media East |
| Rochester, MN | Dex Media East |
| NW Missouri | RHDI |
| Shenandoah, IA | Dex Media East |
| Upper Rogue, OR | RHDI |
| Klamath Falls, OR | Dex Media West |
| Medford, OR | Dex Media West |

| Impacted Directories | Current Copyright Ownership |
|---|---|
| Columbia Gorge, OR | RHDI |
| Central Oregon | Dex Media West |
| Central & North Oregon Coast | RHDI |
| Tillamook, OR | RHDI |
| Northern Oregon Coast (Astoria) | Dex Media West |
| N. Central Oregon Coast (Newport-Lincoln) | Dex Media West |

Schedule II

Restructuring Add-Backs

1. Out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Borrower incurred in connection with the Mergers, the SuperMedia Amendments (including, for the avoidance of doubt, costs, fees and expenses incurred in connection with the activities specified in the second, third and fourth bullet points under the heading "Shared Services Agreement and Tax Sharing Agreement" in the Term Sheet) and the transactions contemplated by the Support and Limited Waiver Agreement dated as of December 5, 2012 (the "Support Agreement"), including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Borrower's Chapter 11 Case (as defined in the Support Agreement).

2. Out-of-pocket costs, fees and expenses for attorneys, auditors, accountants, consultants, and advisors retained by the Agent and the steering committee Lenders and reimbursed by the Borrower (including without limitation, the fees and expenses of the Agent and the steering committee Lenders) incurred in connection with the SuperMedia Amendments (including, for the avoidance of doubt, costs, fees and expenses, incurred in connection with the activities specified in the second, third and fourth bullet points under the heading "Shared Services Agreement and Tax Sharing Agreement" in the Term Sheet) and the transactions contemplated by the Support Agreement, including, incurred in connection with the events leading up to, and throughout, the ongoing administration of the Borrower's Chapter 11 Case (as defined in the Support Agreement).

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT I TO THE MERGER AGREEMENT**

FORM OF TAX SHARING AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

Exhibit I

## AMENDED AND RESTATED TAX SHARING AGREEMENT

THIS AMENDED AND RESTATED TAX SHARING AGREEMENT (the "Agreement") is made and entered into effective as of [                    ], by and between NEWDEX, INC. A DELAWARE CORPORATION ("NDI"), DEX ONE CORPORATION, a Delaware corporation ("DOC"), DEX MEDIA, INC., a Delaware corporation ("DMI"), DEX MEDIA EAST, INC., a Delaware corporation ("DME"), DEX MEDIA WEST, INC., a Delaware corporation ("DMW"), DEX ONE SERVICE, INC., a Delaware corporation ("DOS"), R.H. DONNELLEY CORPORATION, a Delaware corporation ("RHDC"), R.H. DONNELLEY INC., a Delaware corporation ("RHDI"),  R.H. DONNELLEY APIL, INC., a Delaware corporation ("APIL"), and BUSINESS.COM, INC., a Delaware corporation ("BDC"), (collectively, including any person who hereafter becomes a party to this Agreement, the "Parties" and, individually, a "Party").

## R E C I T A L S

WHEREAS, pursuant to the Amended and Restated Shared Services Agreement dated [                    ], the Parties have agreed to share certain services and assets (the "Shared Services Agreement");

WHEREAS, DOC is the common parent corporation of an affiliated group of corporations (the "DOC Consolidated Group") within the meaning of Section 1504(a) of the Internal Revenue Code of 1986, as amended (the "Code");

WHEREAS, each of the Parties is a member of the DOC Consolidated Group;

WHEREAS, SUPERMEDIA INC., a Delaware corporation ("SuperMedia") together with SUPERMEDIA SALES INC., a Delaware corporation, and SUPERMEDIA SERVICES INC., a Delaware corporation (collectively, the "SuperMedia Entities" and, individually, a "SuperMedia Entity") constitute an affiliated group of corporations within the meaning of Section 1504(a) of the Code (the "SuperMedia Group");

WHEREAS, pursuant to the Agreement and Plan of Merger dated as of [                    ], 2012 (the "Merger Agreement"), by and among NDI, DOC, SuperMedia, SUPERMEDIA ACQUISITION SUB, INC., a Delaware corporation and a direct, wholly owned subsidiary of DOC ("Merger Sub"), (i) DOC will merge with and into NDI, with NDI as the surviving entity (the "Dex Merger") and (ii) immediately following consummation of the Dex Merger, Merger Sub will merge with and into SuperMedia, with SuperMedia surviving the merger and becoming a wholly-owned subsidiary of NDI (the "SuperMedia Merger");

WHEREAS, NDI will be the successor to DOC as a result of the Dex Merger and NDI will be common parent corporation of the affiliated group of corporations that are members of the DOC Consolidated Group (the "NDI Consolidated Group");

WHEREAS, on the day following the Closing Date, each of the SuperMedia Entities will be a member of the NDI Consolidated Group;

WHEREAS, the NDI Consolidated Group has filed and intends to file consolidated federal income tax returns as permitted by Section 1501 of the Code;

WHEREAS, in certain state and local tax jurisdictions the Parties calculate income, franchise or similar tax liabilities on a consolidated, combined or unitary basis;

WHEREAS, DOS is the service agent of the NDI Consolidated Group;

WHEREAS, in furtherance of the Shared Services Agreement and the Merger Agreement, each Party desires on behalf of itself and its successors to set forth its rights and obligations with respect to taxes due for periods during and after the period in which such Party is a member of the NDI Consolidated Group;

NOW THEREFORE, the Parties hereto, intending to be legally bound and in consideration of the premises and the mutual covenants herein contained, agree as follows:

## ARTICLE I
## DEFINITIONS

References in this Agreement to provisions of the Code and Treasury Regulations shall include successor provisions to the Code and Treasury Regulations.  All other capitalized terms used herein shall have the meaning specified herein.

"Applicable Percentage" means (i) with respect to NDI, 0%, and (ii) with respect to any other Party, 50%.

"Code" has the meaning set forth in the recitals.

"COD Utilized Tax Assets" means, with respect to any taxable year and any Party, the sum of (i) the Party's Credit Attributes determined on a pro forma stand-alone basis and (ii) the product of (x) the Composite Rate, multiplied by (y) the Party's Loss Attributes determined on a pro forma stand-alone basis, but only to the extent such Party's Credit Attributes and Loss Attributes, if any, are used, or are reasonably expected to be used, in the Consolidated Return for such taxable year by reason of any cancellation of indebtedness income of any Party.

"Composite Rate" means, with respect to any taxable year, the sum of (i) the highest marginal federal income tax rate for such taxable year and (ii), as determined in good faith by NDI, the estimated tax rate of the Parties, in the aggregate, for Consolidated State Tax (net of any federal income tax benefit) with respect to such taxable year.

"Consolidated Return" means the NDI Consolidated Group's federal income tax consolidated return.

"Consolidated State Tax" means any state and local tax calculated on a consolidated, combined or unitary basis.

"Credit Attributes" means any credit that could reduce a tax, the sharing of which is addressed in Article III of this Agreement, including, but not limited to, a investment tax credit,

2

foreign tax credit, alternative minimum tax credit or any other credit that can be carried forward or carried back to reduce a tax.

"Deconsolidation" means any event pursuant to which a Party or SuperMedia Entity ceases to be includable in the NDI Consolidated Group.

"Dex Utilized Tax Assets" means, with respect to any taxable year and any Party, the amount equal to the sum of (i) the Party's Credit Attributes determined on a pro forma stand-alone basis, plus (ii) the product of (x) the Composite Rate, multiplied by (y) the Party's Loss Attributes determined on a pro forma stand-alone basis, but only to the extent such Party's Credit Attributes and Loss Attributes, if any, are used, or are reasonably expected to be used, in the Consolidated Return for such taxable year to reduce the federal income tax attributable to any Party, less (iii) the Party's COD Utilized Tax Assets for such taxable year.

"DOC Consolidated Group" has the meaning set forth in the recitals.

"NDI Consolidated Group" has the meaning set forth in the recitals, *provided that* for the avoidance of doubt the term shall be interpreted to take account of any corporations that may enter or exit the group from time to time."Event" has the meaning set forth in Section 4.4.

"Excess DOS Payment" means, with respect to any taxable year and any Party other than NDI (which shall not be entitled to any Excess DOS Payment), such Party's pro rata share (based on Separate Company Taxable Income but determined without reference to any cancellation of indebtedness income) of the amount equal to the sum of (x), the sum of (i) the total amount of Dex Utilized Tax Assets for all Parties for such taxable year, plus (ii) the total amount of Utilized SuperMedia Tax Assets for all Parties for such taxable year, less (y) the total amount of Separate Company Tax Receivables for all Parties for such taxable year, less (z) the total amount of SuperMedia Tax Payables for all Parties for such taxable year.

"Exempt COD Payment" means, with respect to any taxable year and any Party, such Party's pro rata share (based on such Party's cancellation of indebtedness income for such taxable year) of COD Utilized Tax Assets for all Parties for such taxable year.

"Final Determination" shall mean final resolution of liability for any Tax, which resolution may be for a specific issue or adjustment or for a Tax period (i) by a decision, judgment, decree or other order by any court of competent jurisdiction which has become final and not subject to further appeal, (ii) by a closing agreement entered into under Section 7121 of the Code or any other binding settlement agreement (whether or not with the Internal Revenue Service) entered into in connection with or in contemplation of an administrative or judicial proceeding, or (iii) by the completion of the highest level of administrative proceedings if a judicial contest is not or is no longer available.

"Loss Attributes" means any loss or deduction (other than a current item of loss or deduction) that could reduce a tax (other than the alternative minimum tax), the sharing of which is addressed in Article III of this Agreement, including, but not limited to, a Separate Company Taxable Loss, a net operating loss, net capital loss, charitable deduction or any other loss or deduction that can be carried forward or carried back to reduce a tax.

3

"Post-Deconsolidation Tax Period" means (i) any tax period beginning and ending after the date of the Deconsolidation and (ii) with respect to a tax period that begins before and ends after the date of Deconsolidation, such portion of the tax period that commences on the day immediately after the date of Deconsolidation.

"Pre-Deconsolidation Tax Period" means (i) any tax period beginning and ending before or on the date of Deconsolidation and (ii) with respect to a period that begins before and ends after the date of Deconsolidation, such portion of the tax period ending on and including the date of Deconsolidation.

"Proceeding" means any audit or other examination, protest, appeal or other administrative or judicial proceeding relating to a Party's liability for, or refunds or adjustments to, Taxes for any Tax period.

 "Separate Company Taxable Income" means, with respect to any taxable year and any Party, a Party's federal taxable income, if any, computed on a pro forma stand-alone basis, without regard to the Tax Attributes of such Party or any other Party.

"Separate Company Taxable Loss" means, with respect to any taxable year and any Party, a Party's federal taxable loss, if any, computed on a pro forma stand-alone basis, without regard to the Tax Attributes of such Party or any other Party.

 "Separate Company Tax Payable" means, with respect to any taxable year and any Party, the product of (x) the Composite Rate, multiplied by (y) the Party's Separate Company Taxable Income, if any, for such taxable year.

 "Separate Company Tax Receivable" means, with respect to any taxable year and any Party, the product of (x) the Applicable Percentage, multiplied by (y) the sum of such Party's Dex Utilized Tax Assets for such taxable year.

"Shared Services Agreement" has the meaning set forth in the recitals.

"SuperMedia Group" has the meaning ascribed to it in the recitals, *provided that* for the avoidance of doubt the term shall be interpreted to take account of any corporations that may enter or exit the group from time to time.

"SuperMedia Tax Payable" means, with respect to any taxable year and any Party, the product of (x) 50%, multiplied by (y) such Party's Utilized SuperMedia Tax Assets.

"SuperMedia Tax Receivable" means, with respect to any taxable year and any Party, the sum of (i) the product of (x) 0% with respect to NDI and 75% with respect to any other Party, multiplied by (y) such Party's SuperMedia Utilized Tax Assets for such taxable year, less (ii) such Party's SuperMedia Tax Payable.

"SuperMedia Utilized Tax Assets" means, with respect to any taxable year and any Party, the amount equal to the sum of (i) the Party's Credit Attributes determined on a pro forma stand-

4

alone basis, plus (ii) the product of (x) the Composite Rate, multiplied by (y) the Party's Loss Attributes determined on a pro forma stand-alone basis, but only to the extent such Party's Credit Attributes and Loss Attributes, if any, are (I) used, or are reasonably expected to be used, in the Consolidated Return for such taxable year to reduce the federal income tax attributable to any SuperMedia Entity or (II) reduced, or reasonably expected to be reduced, as a result of any cancellation of indebtedness income of any SuperMedia Entity that is excluded from U.S. federal taxable income in such taxable year pursuant to Section 108 of the Code.

"Utilized SuperMedia Tax Assets" means, with respect to any taxable year and any Party, the amount equal to the sum of (i) the aggregate Credit Attributes of the SuperMedia Entities, plus (ii) the product of (x) the Composite Rate, multiplied by (y) the aggregate Loss Attributes of the SuperMedia Entities, but only to the extent such Credit Attributes and Loss Attributes, if any, are used, or are reasonably expected to be used, by the Parent Consolidated Group in any Tax Return for such taxable year to reduce the federal income tax (excluding any federal income tax attributable to cancellation of indebtedness income) attributable to such Party.

"Tax" or "tax" means any United States federal, state or local income, franchise or similar tax.

"Tax Attributes" means any Loss Attribute and any Credit Attribute.

"Tax Item" means any item of income, gain, loss, deduction or credit, or other attribute that may have the effect of increasing or decreasing any tax, the sharing of which is addressed in Article III of this Agreement.

"Tax Return" means any Consolidated Return and any state or local income, franchise or similar tax return on which the activities of more than one Party are reported on a consolidated, combined or unitary basis.

## ARTICLE II
## TAX PREPARATION

2.1    NDI agrees to prepare and timely file, or to cause to have prepared and timely filed, the Tax Returns for any period with respect to which NDI remains the common parent corporation of the NDI Consolidated Group. NDI shall be responsible for determining the elections, methods of accounting, positions, conventions and other principles of taxation to be used and the manner in which any Tax Item shall be reported on the Tax Returns.

2.2    Each Party will provide each other with the cooperation and information reasonably requested by the other Parties in connection with tax planning, the preparation or filing of any Tax Return (or claim for refund), the determination and payment of estimated tax, the conduct of any Proceeding, or the calculation of any amount under this Agreement. Such cooperation and information includes: (i) promptly forwarding copies of appropriate notices and other communications (including, information document requests, revenue agent's reports and similar reports, notices of proposed adjustments and notices of deficiency) received from or sent to any taxing authority, (ii) providing copies of all relevant Tax Returns (including work papers and schedules), and documents relating to rulings or other determinations by taxing authorities, (iii) providing copies of records concerning the ownership and tax basis of property, (iv)

5

providing other relevant information which either Party may possess, including explanations of documents and information provided under this Agreement, as well as access to appropriate personnel, (v) the execution of any document that may be necessary or reasonably helpful in connection with the filing of a Tax Return (or claim for refund) or in connection with any Proceeding, including waivers, consents or powers of attorney, and (vi) the use of the Parties' reasonable efforts to obtain any documentation from a governmental authority or a third party that may be necessary or reasonably helpful in connection with any of the foregoing.

2.3    During any Pre-Deconsolidation Tax Period, NDI has the sole right to represent, in good faith, the interests of the Parties with respect to Tax Returns, and Proceedings with respect to Tax Returns, for any period for which Parent remains the common parent corporation of the NDI Consolidated Group.

## ARTICLE III
## TAX SHARING

3.1    As common parent for the NDI Consolidated Group, NDI shall cause and direct DOS to pay the consolidated federal income tax liability of the NDI Consolidated Group and the Consolidated State Tax liability of the Parties at such time and in such manner as such payments are required.

3.2    For each taxable year ending on or after the effective date hereof, for which a Party is included in a Tax Return, such Party shall pay to DOS an amount equal to such Party's Separate Company Tax Payable, if any, for such taxable year.

3.3    For each taxable year ending on or after the effective date hereof, for which a Party is included in a Tax Return (including for the avoidance of doubt, any year in which a Deconsolidation takes place), DOS shall pay to such Party, an amount equal to the sum of (A) such Party's Separate Company Tax Receivable, if any, for such taxable year, (B) such Party's Excess DOS Payment, if any, for such taxable year, (C) such Party's Exempt COD Payment and (D) such Party's SuperMedia Tax Receivable, if any, for such taxable year. For the avoidance of doubt, with respect to any taxable year, a Party may both (i) pay to DOS an amount equal to such Party's Separate Company Tax Payable and (ii) receive from DOS an amount equal to the sum of (A) such Party's Separate Company Tax Receivable, (B) such Party's Excess DOS Payment, (C) such Party's Exempt COD Payment and (D) such Party's SuperMedia Tax Receivable.

3.4    In the event the NDI Consolidated Group is liable for alternative minimum tax as defined in Section 55 of the Code, each Party shall pay its proportionate share of alternative minimum tax and shall be allocated an alternative minimum tax credit equal to such payment.

3.5    Any payments required to be made under this Article 3 by any Party for a taxable year shall promptly be paid to DOS at the time or times requested by NDI.

3.6    A final accounting of the amount of payments for any taxable year shall be made, and any necessary adjustment shall be paid, on or before October 31 of the year following such taxable year unless the extended due date of a Consolidated State Tax return is after October 31, in which case the final accounting will occur no later than 30 days following the filing of such return.

3.7     In the event of an adjustment or redetermination of any item with respect to the Consolidated Return or Consolidated State Tax as a result of a Final Determination, the filing of a tax refund claim or the filing of an amended Tax Return pursuant to which taxes are paid to a tax authority or a refund of taxes is received from a tax authority, NDI shall prepare, in accordance with the principles and procedures set forth in this Agreement, revised Tax Returns, as appropriate, to reflect the adjustment or redetermination as a result of such Final Determination, filing of a tax refund claim or filing of an amended Tax Return.  Following the preparation of such revised Tax Returns, the Parties' payment obligations under this Agreement shall be redetermined and the Parties shall make appropriate payments reflecting such redetermination.

## ARTICLE IV
## POST-DECONSOLIDATION

4.1     Each Party covenants that on or after a Deconsolidation it will not make or change any tax election, change any accounting method, amend any tax return or take any tax position on any tax return, take any other action, omit to take any action or enter into any transaction that results in any increased tax liability or reduction of any Tax Attribute of the NDI Consolidated Group or any member thereof in respect of any Pre-Deconsolidation Tax Period, without first obtaining the written consent of the other Parties.

4.2     In the event of a Deconsolidation, NDI may, at its option, elect, and the applicable Party shall join NDI in electing, to ratably allocate items (other than extraordinary items) of the applicable Party in accordance with relevant provisions of the Treasury Regulations Section 1.1502-76.

4.3     In the event of a Deconsolidation, during any Post-Deconsolidation Period, NDI shall promptly notify the applicable Party in writing upon receipt by any includable member of the NDI Consolidated Group of notice in writing of any Proceeding in respect of a Pre-Deconsolidation Period.  The applicable Party shall be entitled to participate in such Proceeding at its own expense; provided that the applicable Party shall, following its receipt of notice of such Proceeding from NDI, promptly notify NDI in writing of its intention to participate in such Proceeding. In the event that the applicable Party elects to participate in any such proceeding, NDI shall not settle or resolve any issue that could materially affect the applicable Party's liability for Taxes without the applicable Party's consent; such consent not to be unreasonably withheld conditioned or delayed.   NDI shall provide the applicable Party with copies of any correspondence received from the taxing authorities related to any such Proceedings controlled by NDI, as reasonably requested by the applicable Party.

4.4     NDI agrees to pay the applicable Party 100% the actual tax benefit received by the NDI Consolidated Group from the use in any Tax Period of a carryback of any Tax Attribute of the applicable Party from a Post-Deconsolidation Tax Period, determined and paid in accordance with the principles of Article III.   If, subsequent to the payment by NDI to the applicable Party of any such amount, there shall be (i) a Final Determination which results in a disallowance or a reduction of the Tax Attribute so carried back or (ii) a reduction in the amount of the benefit realized by the NDI Consolidated Group as a result of any other Tax Attribute that arises in a Post-Deconsolidation Tax Period, the applicable Party shall (net of any reasonable

7

out-of-pocket expenses) repay NDI within 90 days of such event described in (i) or (ii) of this paragraph (an "Event" or, collectively, the "Events") any amount which would not have been payable to the applicable Party pursuant to this Section 4.4 had the amount of the benefit been determined in light of the Events.

4.5     The applicable Party shall hold NDI harmless for any penalty or interest payable by any member of the NDI Consolidated Group, solely as a result of any Event.  Any such amount shall be paid by the applicable Party to NDI within 90 days of the payment by NDI or any member of the NDI Consolidated Group of any such interest or penalty.

4.6     NDI may designate DOS, as its service agent, as the payor of any payment required to be paid by NDI to an applicable Party pursuant to Section 4.4 or as the payee of any payment required to be paid by an applicable Party to NDI pursuant to Sections 4.4 or 4.5.

## ARTICLE V
## MISCELLANEOUS

5.1     This Agreement shall expire with respect to an applicable Party upon the date of the Deconsolidation with respect to all Post-Deconsolidation periods of such Party; provided, however, that all rights and obligations arising hereunder with respect to a Pre-Deconsolidation Tax Period shall survive until they are fully effectuated or performed; provided, further, that notwithstanding anything in this Agreement to the contrary, all rights and obligations arising hereunder with respect to a Post-Deconsolidation Tax Period shall remain in effect and its provisions shall survive for the full period of all applicable statutes of limitation (giving effect to any extension, waiver or mitigation thereof).

5.2     For any period with respect to which NDI remains the common parent corporation of the NDI Consolidated Group, NDI shall be responsible for determining the conventions and other principles for the implementation of this Agreement.

5.3     No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy by any Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.  No Party shall be deemed to have waived any rights hereunder unless such waiver shall be in writing and signed by such Party.  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into by each of the Parties.

5.4     In any action, litigation or proceeding between the Parties arising out of or in relation to this Agreement, the prevailing Party in such action shall be awarded, in addition to any damages, injunctions or other relief, and without regard to whether or not such matter be prosecuted to final judgment, such Party's reasonable costs and expenses, including but not limited to costs and reasonable attorneys' fees incurred in bringing such action, litigation or proceeding and/or enforcing any judgment or order granted therein.

5.5     This Agreement and the Shared Services Agreement contain the entire agreement between the Parties hereto, superseding any oral statements, representations, understanding or

agreements with respect to the terms or provisions of this Agreement and the Shared Services Agreement.

5.6     All notices, requests, demands, consents, instructions or other communications to any Party under this Agreement shall be in writing and mailed or delivered to each Party at the Party's address in the records of NDI.  All such notices and communications shall be effective (i) when sent by Federal Express or other overnight service of recognized standing, on the business day following the deposit with such service; (ii) three days after mailing when mailed, by registered or certified mail, first class postage prepaid and addressed as aforesaid through the United States Postal Service, and (iii) when delivered by hand, upon delivery.

5.7     The terms and provision of Section 19(c) of the Shared Services Agreement are hereby incorporated by reference.

5.8     This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors, and assigns.

5.9     If one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, no Party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The Parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

5.10    This Agreement may be executed in multiple counterparts (any one of which need not contain the signatures of more than one Party), each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

5.11    This Agreement, and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

5.12    This Agreement constitutes the entire agreement between the parties hereto with respect to the matters covered hereby and supersedes all prior agreements and understandings between the parties.

5.13    NDI shall use commercially reasonable efforts to cause any person who hereafter becomes a member of the NDI Consolidated Group to become a Party to this Agreement, and may amend this Agreement, without the consent of any other Party to reflect the addition of such a Party.  Except as provided in the preceding sentence, the terms of this Agreement shall not be waived, altered, modified, amended or supplemented except by written instrument signed by each Party.

5.14    The parties hereto shall treat any payments made pursuant to the terms of this Agreement as a tax-exempt transaction for all tax purposes, except to the extent required by applicable law.

9

5.15    If, due to any change in applicable law or regulation or the interpretation thereof by any court of law or other governing body having jurisdiction, subsequent to the date of the Agreement, performance of any provision of or any transaction contemplated by this Agreement shall become impracticable or impossible, the parties will use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by this Agreement.

K&E 24538595.1

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first above written.

DEX ONE CORPORATION

By: _____
Title: _____

DEX MEDIA, INC.

By: _____
Title: _____

DEX MEDIA EAST, INC.

By: _____
Title: _____

DEX MEDIA WEST, INC.

By: _____
Title: _____

DEX ONE SERVICE, INC.

By: _____
Title: _____

R.H. DONNELLEY CORPORATION

By: _____
Title: _____

R.H. DONNELLEY INC.

By:
Title:

R.H. DONNELLEY APIL, INC.

By: _____
Title: _____

BUSINESS.COM, INC.

By: _____
Title: _____

11

[THIS PAGE INTENTIONALLY LEFT BLANK]

**<u>EXHIBIT J TO THE MERGER AGREEMENT</u>**

<u>FORM OF SHARED SERVICES AGREEMENT</u>

[THIS PAGE INTENTIONALLY LEFT BLANK]

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (together with all Schedules hereto, this "Agreement") is made as of [_____], 2013 (the "Effective Date"), by and among Dex One Service, Inc., a Delaware corporation  (successor by conversion to Dex One Service LLC, a Delaware limited liability company (formerly known as RHD Service LLC)) ("Servicer"), Dex One Corporation, a Delaware corporation ("Dex One Corp"), R.H. Donnelley Inc., a Delaware corporation ("RHD Inc"), Dex Media Service LLC, a Delaware limited liability company ("Dex Service"), Dex Media, Inc., a Delaware corporation ("DMI"), Dex Media East, Inc., a Delaware corporation ("Dex East"), Dex Media West, Inc., a Delaware corporation ("Dex West"), Dex One Digital, Inc., a Delaware corporation (formerly known as Business.com, Inc.) ("Dex Digital"), Newdex, Inc., a Delaware corporation ("Newdex"), Spruce Acquisition Sub, Inc., a Delaware corporation ("Merger Sub"), R.H. Donnelley Corporation, a Delaware corporation ("RHD Corp," and together with Dex One Corp, RHD Inc, Dex Service, DMI, Dex East, Dex West, Dex Digital, Newdex and Merger Sub, the "Dex Client Companies"), SuperMedia Inc., a Delaware corporation ("SuperMedia Inc."), SuperMedia LLC, a Delaware limited liability company ("SuperMedia"), SuperMedia Sales Inc., a Delaware corporation ("SM Sales"), SuperMedia Services Inc., a Delaware corporation ("SM Services") and SuperMedia UK, Ltd. (formerly known as Idearc Inceptor Ltd), a private company limited by shares incorporated in England and Wales ("SM UK," and together with SuperMedia Inc., SuperMedia, SM Sales and SM Services, the "SM Client Companies").  The Dex Client Companies and the SM Client Companies comprise the Client Companies (the "Client Companies").

## RECITALS

**WHEREAS**, Servicer and the Dex Client Companies are parties to that certain Shared Services Agreement, dated as of January 29, 2010 and amended on May 17, 2010 and further amended on July 8, 2011 (as so amended, the "Original Agreement").

**WHEREAS**, pursuant to the Original Agreement, Servicer agreed to provide certain administrative and other services to the Dex Client Companies and the Dex Client Companies agreed to have certain administrative and other services provided to them by Servicer, upon the terms and subject to the conditions set forth in the Original Agreement;

**WHEREAS**, pursuant to the Original Agreement, Dex One Corp agreed to have Servicer pay certain costs associated with certain stewardship services provided by Dex One Corp for the benefit of Servicer and the other Dex Client Companies (for which Servicer would be reimbursed by the Dex Client Companies other than Dex One Corp), and Servicer agreed to make such payments, upon the terms and subject to the conditions set forth in the Original Agreement;

**WHEREAS**, to enable and assist Servicer in performing the services set forth in the Original Agreement, the Dex Client Companies agreed to contribute and/or distribute certain assets of the Dex Client Companies to Servicer from time to time;

**WHEREAS**, on the date hereof, Dex One Corp will merge with and into Newdex ("Surviving Dex One Corp") and Merger Sub will merge with and into SuperMedia Inc., thereby causing the SM Client Companies to become subsidiaries of Surviving Dex One Corp;

WHEREAS, Servicer, directly and through the Dex Client Companies, will provide and receive certain administrative and other services to and from the Client Companies, and Servicer will allocate certain costs among the Client Companies, upon the terms and subject to the conditions set forth herein;

WHEREAS, SuperMedia, directly and through the other SM Client Companies, will provide and receive certain administrative and other services to and from Servicer and the Client Companies until the administrative and certain other functions of the SM Client Companies and the Dex Client Companies are fully integrated, and SuperMedia's costs for providing such Services shall be allocated by Servicer among the Client Companies, upon the terms and subject to the conditions set forth herein;

WHEREAS, the parties hereto intend to integrate administrative and certain other functions of the SM Client Companies and the Dex Client Companies as promptly as practicable so that, upon completion of such integration, Servicer provides all the Services performed by and for the SM Client Companies (the "Integration");

WHEREAS, pursuant to Section 19(b) of the Original Agreement, Servicer and the Dex Client Companies desire to amend the Agreement to add the SM Client Companies as parties, upon the terms and subject to the conditions set forth herein and to restate the Original Agreement in its entirety.

NOW THEREFORE, in consideration of the mutual promises and agreements contained herein, the parties do mutually agree as follows:

1.      In this Agreement, the following terms have the meanings specified or referred to in this Section 1:

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Allocated Costs" has the meaning set forth in Section 3(a).

"Allocated Share" has the meaning set forth in Section 3(c).

"Applicable Law" means any foreign, federal, state or local law, statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Body or common law that apply to any party hereto, this Agreement or the activities contemplated hereby, as applicable.

"Applicable Tax Law" means any foreign, federal, state or local tax law, statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Body or common law that apply to any party hereto, this Agreement or the activities contemplated hereby, as applicable.

"Asset" means any real property, tangible personal property, intangible property, equity interests or contract rights, or any interest in any of the foregoing.

"Books" has the meaning set forth in Section 9.

"Charges" has the meaning set forth in Section 3.

"Client Companies" means, collectively, the Dex Client Companies and the SM Client Companies and Client Company means any one of the Client Companies.

"Client Company Employees" has the meaning set forth in Section 3(a).

"Client Company Material" means all data, information, materials, contracts, computer systems and networks and software and associated documentation owned, licensed or leased by a Client Company which Servicer is required to access or use in connection with providing any Service.

"Confidential Information" means all information and materials of a confidential or secret nature, including the terms of this Agreement and any trade secrets, financial data, technical and business information, sales data, information regarding advertising, distribution, marketing or strategic plans, product plans, customer information, business strategies, formulae, productivity or technological advances, product designs or   specifications, development schedules, computer programs or systems, designs, databases, inventions, techniques, procedures and research or research projects, that, in each case, the Recipient should reasonably recognize as being of a confidential nature.

"Credit Agreements" means, collectively, the Dex East Credit Agreement, the Dex West Credit Agreement, the RHDI Credit Agreement and the SuperMedia Loan Agreement.

"Dex Client Companies" has the meaning set forth in the preamble to this Agreement.

"Dex Digital" has the meaning set forth in the preamble to this Agreement.

"Dex East" has the meaning set forth in the preamble to this Agreement.

"Dex East Credit Agreement" means: (a) the Credit Agreement, dated as of October 24, 2007 (as amended and restated as of January 29, 2010, as further amended and restated as of the Effective Date, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Dex One Corp, DMI, Dex East, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent; and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different financial institutions) in whole or in part (under one or more agreements) the indebtedness and other obligations outstanding under the Dex East Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including adding or removing any person as a borrower, guarantor or other obligor thereunder).

"Dex One Corp" has the meaning set forth in the preamble to this Agreement.

"Dex Service" has the meaning set forth in the preamble to this Agreement.

"Dex West" has the meaning set forth in the preamble to this Agreement.

"Dex West Credit Agreement" means: (a) the Credit Agreement, dated as of July 6, 2008 (as amended and restated as of January 29, 2010, as further amended and restated as of the Effective Date, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Dex One Corp, DMI, Dex West, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent; and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different financial institutions) in whole or in part (under one or more agreements) the indebtedness and other obligations outstanding under the Dex West Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including adding or removing any person as a borrower, guarantor or other obligor thereunder).

"Direct Costs" has the meaning set forth in Section 3(a).

"Disclosing Party" has the meaning set forth in Section 14(a).

"DMI" has the meaning set forth in the preamble to this Agreement.

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Event of Default" means an "Event of Default" or any equivalent term as such term is defined in the RHDI Credit Agreement, the Dex East Credit Agreement, the Dex West Credit Agreement or the SuperMedia Loan Agreement.

"Funding Accounts" has the meaning set forth in Section 6.

"Governmental Body" means any United States federal, state or local, or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization, notified body, court, tribunal or judicial or arbitral body.

"Indemnified Parties" has the meaning set forth in Section 15.

"Integration" has the meaning set forth in the recitals.

"Merger Sub" has the meaning set forth in the preamble to this Agreement.

"Net Revenue" means, with respect to any Client Company for any period of determination, the applicable gross revenue of such Client Company for such period less sales allowances and customer adjustments of such Client Company for such period.

"New Service" has the meaning set forth in Section 2(a).

"New Stewardship Service" has the meaning set forth in Section 4.

"Newdex" has the meaning set forth in the preamble to this Agreement.

"Original Agreement" has the meaning set forth in the first recital to this Agreement.

"Permitted Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing or allowing for liquidation at the original par value at the option of the holder within one year from the date of acquisition thereof;

(b)    investments in commercial paper (other than commercial paper issued by Servicer, any Client Company or any of their affiliates) maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)    investments in certificates of deposit, banker's acceptances, time deposits or overnight bank deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000, and having a debt rating of "A-1" or better from S&P or "P-1" or better from Moody's;

(d)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)    money market funds that: (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940; (ii) are rated AAA by S&P and Aaa by Moody's; and (iii) have portfolio assets of at least $5,000,000,000.

"Primary Funding Account" has the meaning set forth in Section 6.

"Recipient" has the meaning set forth in Section 14(a).

"RHD Corp" has the meaning set forth in the preamble to this Agreement.

"RHD Inc." has the meaning set forth in the preamble to this Agreement.

"RHDI Credit Agreement" means: (a) the Third Amended and Restated Credit Agreement, dated as of January 29, 2010, as amended and restated as of the Effective Date (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Dex One Corp, RHD Inc, the lenders from time to time party thereto and Deutsche Bank Trust Company Americas, as Administrative Agent; and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different financial

institutions) in whole or in part (under one or more agreements) the indebtedness and other obligations outstanding under the RHDI Credit Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including adding or removing any person as a borrower, guarantor or other obligor thereunder).

"Servicer" has the meaning set forth in the preamble to this Agreement.

"Services" has the meaning set forth in Section 2(a).

"Services Assets" means the Assets listed on Schedule E and other Assets used primarily for the provision of Services.

"Shared Employees" has the meaning set forth in Section 3(a).

"SM Client Companies" has the meaning set forth in the preamble to this Agreement.

"SM Sales" has the meaning set forth in the preamble to this Agreement.

"SM Services" has the meaning set forth in the preamble to this Agreement.

"Stewardship Costs" has the meaning set forth in Section 4.

"Stewardship Services" has the meaning set forth in Section 4.

"SuperMedia" has the meaning set forth in the preamble to this Agreement.

"SuperMedia Loan Agreement" means: (a) the Loan Agreement, dated as of December 31, 2009 and amended December 14, 2010 and November 8, 2011, as amended and restated as of the Effective Date and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, among SuperMedia Inc., the lenders party thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent; and (b) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to refinance (whether by the same or different financial institutions) in whole or in part (under one or more agreements) the indebtedness and other obligations outstanding under the SuperMedia Loan Agreement referred to in clause (a) above or any other agreement or instrument referred to in this clause (b) (including adding or removing any person as a borrower, guarantor or other obligor thereunder).

"SuperMedia Inc." has the meaning set forth in the preamble to this Agreement.

"Surviving Dex One Corp" has the meaning set forth in the recitals to this Agreement.

2.    Services to be Provided.

(a)    Services. Subject to the terms and conditions set forth in this Agreement, Servicer and (until completion of the Integration) SuperMedia agree to provide to each Client Company the administrative and other services identified in Schedule A as to be

performed for such Client Company (collectively with any New Services, the "Services"), it being understood and agreed that, from and after December 31, 2014, SuperMedia shall only provide Services to SM Client Companies, except (subject to Section 10(c)) with respect to (x) Services involving assets, services or rights which require the consent of third parties to transfer such assets, services or rights to the Servicer or (y) Services involving assets, services or rights as to which SuperMedia (with the consent of the Servicer) determines that a transfer of such assets, services or rights to the Servicer will be economically disadvantageous to the Client Companies. SuperMedia agrees to provide Servicer (and, if requested by any Client Company, the Client Companies) within thirty (30) days after the end of each calendar month a written report regarding the Services provided by SuperMedia and the Direct Costs and Allocated Costs of such Services, which information shall indicate in reasonable detail that such Services have been attributed as Direct Costs and Allocated Costs in a manner consistent with Servicer's attribution of such Direct Costs and Allocated Costs under the Original Agreement. The parties hereto may, from time to time during the term of this Agreement, negotiate in good faith for services not otherwise specifically identified in Schedule A (each, a "New Service"), provided that SuperMedia shall only provide Services that Servicer is providing under this Agreement as of the Effective Date. Any agreement among the parties on the terms of any such New Service shall be deemed to be an amendment to this Agreement and thereafter such New Service shall be a "Service" for all purposes of this Agreement; provided that (x) such amendment is in accordance with the terms of the Credit Agreements and (y) an amended Schedule A is provided to the Administrative Agents under each of the Credit Agreements. At all times during the performance of the Services, employees of the provider of the Services or other persons performing Services hereunder (including any agents, temporary employees, independent third parties and consultants) shall not be deemed to be employees of the persons receiving the Services on account of such Services. Neither Servicer nor SuperMedia shall be required to perform any Services hereunder that conflict with or violate any Applicable Law or third-party rights.

(b)    Service Standard. Servicer and (until completion of the Integration) SuperMedia shall use the degree of skill, care and diligence in the performance of the Services that an experienced, qualified, prudent and reputable provider of similar services under a similar services agreement would use acting in like circumstances in accordance with applicable industry standards and all Applicable Laws, including all data protection and privacy laws. Servicer and (until completion of the Integration) SuperMedia shall act honestly and in good faith in providing the Services and shall provide the Services to the Client Companies on a non-discriminatory basis and without mark-up or profit by Servicer or SuperMedia; provided that the Charges and Stewardship Costs may be marked up or provide a profit for Servicer if required by any Applicable Tax Law.

(c)    Attorney-in-Fact.

(i)    Subject to Section 2(c)(ii), each Client Company hereby appoints Servicer as such Client Company's attorney-in-fact, with full authority in the place and stead of such Client Company and in the name of such Client Company or otherwise, from time to time in Servicer's discretion, but subject to the

direction of such Client Company, to take such actions on behalf of such Client Company as may be necessary or advisable for purposes of performing the Services.

(ii)    Anything in Section 2(c)(i) or elsewhere in this Agreement to the contrary notwithstanding, Servicer is not authorized to execute this Agreement on behalf of or as attorney-in-fact for any Client Company or to execute any amendment, modification or waiver to or under this Agreement or any other agreement to which Servicer is a party.

3.    Charges for Services.

(a)    Servicer Charges.  Each Client Company shall pay the following charges to Servicer (the "Charges") (for the avoidance of doubt, Charges shall not include any profit and shall reflect only the cost of providing the applicable Services):

(i)    Direct Costs. The Charges to each Client Company under this Agreement shall include all: (i) of Servicer's costs associated with performing a Service that can be directly attributed to such Service for such Client Company; (ii) of SuperMedia's costs associated with performing a Service that can be directly attributed to such Service for such Client Company (which, after completion of the Integration, shall be zero) (any such costs of SuperMedia shall be calculated in the same manner as comparable costs are calculated by Servicer) and (iii) costs otherwise directly attributable to an individual Client Company (collectively, "Direct Costs").  For the avoidance of doubt, the Direct Costs of a Client Company shall include the salary, benefits and severance costs of employees substantially all of the services provided by which are for the benefit of only such Client Company ("Client Company Employees"), including without limitation the employees providing sales and marketing services to such Client Company.

(ii)    Allocated Costs. The Charges to each Client Company under this Agreement shall include such Client Company's Allocated Share of all costs incurred by Servicer that are not Direct Costs, including costs related to Services that have joint benefit for two or more Client Companies and Servicer's overhead costs and costs paid by SuperMedia that have joint benefit for two or more Client Companies (which, after completion of the Integration, shall be zero) (collectively, "Allocated Costs"). For the avoidance of doubt, Allocated Costs shall include the salary, benefits and severance costs of employees (other than Client Company Employees) that provide services for the benefit of two or more Client Companies ("Shared Employees"). For the avoidance of doubt, Charges allocated to any Client Company as Direct Costs or Allocated Costs (including such Client Company's share of any capital expenditures or capital lease obligations incurred by Servicer) shall also be allocated to such Client Company for financial statement purposes.

(b)    <u>Charges to SM Client Companies</u>.  Notwithstanding the foregoing, unless otherwise agreed to by the parties, all Charges to an SM Client Company shall be deemed to be Charges to SuperMedia.

(c)    <u>Allocated Share</u>. Each Client Company's "<u>Allocated Share</u>" for purposes of this Agreement shall be determined as follows:

(i)    For each Service that directly benefits a Client Company, such Client Company's Allocated Share of the Allocated Costs for such Service shall be equal to such Client Company's annual Net Revenue for the preceding calendar year divided by the total applicable annual Net Revenue of all of the Client Companies receiving the benefits of such Service for the same period (rounded to the nearest one percent); provided that the sum of the Allocated Shares of all Client Companies receiving the benefit of any Service must equal 100%. The Client Companies' initial Allocated Shares for Services shall be as set forth on Schedule B. Effective as of January 1st of each calendar year during the term of this Agreement, and upon the addition or removal of any Client Company pursuant to <u>Section 18</u>, Servicer shall reset the Client Companies' respective Allocated Shares for each Service in accordance with this <u>Section 3(c)(i)</u>. Upon final determination of any such reallocation by Servicer, Servicer shall submit for review and approval by each Client Company a written statement of such reallocation and the assumptions and calculations underlying such reallocation set forth in reasonable detail. All changes to determinations of Direct Costs, Allocated Shares and Allocated Costs shall only apply on a prospective basis.

(ii)    Each Client Company's Allocated Share for purposes of <u>Sections 4</u> and <u>6</u> shall be equal to each Client Company's Allocated Share set forth in <u>Section 3(c)(i)</u> for a Service that benefits all of the Client Companies.

(iii)    (A) Not less than once every five years during the term of this Agreement (such period initially commencing on the date of the Original Agreement) and (B) upon any acquisition or divestiture by Surviving Dex One Corp or any of its direct or indirect subsidiaries of assets accounting (individually or in the aggregate with all other acquisitions or divestitures from the Effective Date) for at least 10% of the consolidated revenues or consolidated expenses of Surviving Dex One Corp and its subsidiaries (as reasonably determined by the board of directors of Surviving Dex One Corp acting in good faith), Servicer shall commission a nationally recognized accounting firm or financial institution to review the fairness of the shared Allocated Costs and the corresponding allocation methodology set forth in this <u>Section 3(c)</u>.

(d)    <u>Determination of Charges</u>. Servicer shall make all determinations and allocations of all Direct Costs to each Client Company and the determination of each Client Company's Allocated Share and the allocation of Allocated Costs to each Client Company on a fair, reasonable and equitable basis in conformity with the principles set forth herein and as may be required by Applicable Law. For the avoidance of doubt, Servicer's costs to be included in the Direct Costs and Allocated Costs shall include any

and all costs of Servicer in performing the Services and otherwise in operating its business, including costs for labor, material, third-party services, overhead, taxes, legal services and information technology; provided, however, that in no event shall costs included in Direct Costs, Allocated Costs or Stewardship Costs include the allocation of indebtedness for borrowed money or interest expense in respect thereof.

4.      Stewardship Services and Costs. Surviving Dex One Corp and (until completion of the Integration) SuperMedia provide certain services to Servicer and the other Client Companies that are not directly beneficial to Servicer or any individual Client Company, but which indirectly benefit all of Servicer and the other Client Companies, as further identified in Schedule C (collectively with any New Stewardship Services, the "Stewardship Services"). The parties hereto may, from time to time during the term of this Agreement, negotiate in good faith for services not otherwise specifically identified in Schedule C (each, a "New Stewardship Service"). Any agreement among the parties on the terms of any such New Stewardship Service shall be deemed to be an amendment to this Agreement and thereafter such New Stewardship Service shall be a "Stewardship Service" for all purposes of this Agreement; provided that (x) such amendment is in accordance with the terms of the Credit Agreements and (y) an amended Schedule C is provided to the Administrative Agents under each of the Credit Agreements. Surviving Dex One Corp and (until completion of the Integration) SuperMedia incur certain costs associated with the Stewardship Services (collectively, "Stewardship Costs"). Servicer shall, on behalf of Surviving Dex One Corp, pay all of the Stewardship Costs incurred by Surviving Dex One Corp. Until the first anniversary of the Effective Date, SuperMedia, pursuant to Section 5(b), shall receive a credit for Stewardship Costs that SuperMedia incurs, provided that SuperMedia agrees to provide Servicer (and, if requested by any Client Company, the Client Companies) with information regarding the Stewardship Services provided by SuperMedia, which information shall indicate in reasonable detail that such Stewardship Services are consistent with Dex One Corp's Stewardship Services provided under the Original Agreement. Each Client Company other than Surviving Dex One Corp shall pay Servicer an amount equal to such Client Company's Allocated Share of the Stewardship Costs.

5.      Payment.

(a)      Daily Cash Settlements. Each Client Company shall reimburse Servicer for such Client Company's associated Charges and Allocated Share of the Stewardship Costs, in each case, in accordance with Schedule D.

(b)      SuperMedia Credit for Provided Services.    Until completion of the Integration, Servicer shall credit SuperMedia for amounts paid for by SuperMedia for its costs associated with performing a Service that have been directly attributed to a Service for a Client Company, with a Service that has a joint benefit for two or more Client Companies or for Stewardship Costs incurred by SuperMedia.  Such credit shall be used in the monthly reconciliation described in Section 5(c).

(c)      Monthly Reconciliation. Within thirty (30) days after the end of each calendar month, Servicer (and, until completion of the Integration, SuperMedia) shall submit for review and approval by each Client Company a written statement of such Client Company's Charges and Allocated Share of the reimbursement of Stewardship

10

Costs (and, with respect to SuperMedia, SuperMedia's credit for the amount set forth in Section 5(b)) for such prior month. This monthly reconciliation statement shall include the following information for the relevant period: (i) Charges for Services as described in Section 3; (ii) daily cash settlement amounts as described in Section 5(a); (iii) Services that have not yet been paid in cash by Servicer (or, until completion of the Integration, SuperMedia); (iv) Stewardship Cost reimbursement amounts as described in Section 4; (v) credit given for costs paid by such Client Company pursuant to Section 5(b) (if applicable); and (vi) overpayment or underpayment amounts as defined in Section 5(d). Client Companies shall not reimburse Servicer or (until completion of the Integration) SuperMedia for Charges that have not resulted in actual cash disbursements until such time as the Charges have been paid by Servicer.  Solely with respect to SuperMedia, until completion of the Integration, the excess of SuperMedia's Charges and Allocated Share of the reimbursement of Stewardship Costs over SuperMedia's credit for the amount set forth in Section 5(b) shall be transferred from SuperMedia to Servicer (if such difference is positive) or from Servicer to SuperMedia (if such difference is negative) within thirty (30) days after the end of each calendar month.

(d)     Settlement of Monthly Reconciliation. Each Client Company may request a written report from Servicer (and, until completion of the Integration, SuperMedia) setting forth, in reasonable detail, the nature of the Services rendered and costs incurred and other relevant information to support the Charges and Stewardship Cost reimbursements (and, if applicable, credit given) included in the monthly reconciliation statement as described in Section 5(c). If the Charges and Stewardship Cost reimbursements for a Client Company (as adjusted for any credit given) in such written statement are lower than the actual Charges and Stewardship Cost reimbursements paid (as adjusted for any credit given) by such Client Company during such prior month, the amount of the difference shall be applied as a credit to the next day's settlements pursuant to Section 5(a) until fully consumed; provided, that to the extent such credit is not fully applied to Charges and Stewardship Cost reimbursements within three (3) Business Days (or after the occurrence and during the continuation of an Event of Default, one Business Day) of such written statement, Servicer shall reimburse such Client Company for the remaining amount of such credit in cash. If the Charges and Stewardship Cost reimbursements for a Client Company (as adjusted for any credit given) in such written statement are higher than the actual Charges and Stewardship Cost reimbursements paid (as adjusted for any credit given) by such Client Company during such prior month, the amount of the difference shall be paid no later than the next business day by such Client Company to Servicer. Notwithstanding the foregoing, if the amount of the overpayment or underpayment of any Client Company in any month is less than $100,000, no settlement payment or credit shall be made and the amount of such overpayment or underpayment will be rolled forward to be considered in the next month's reconciliation until such time as the cumulative amount of such overpayment or underpayment exceeds $100,000, at which time such difference shall be paid or credited as set forth above.

(e)     Annual Non-Cash Settlements. For each year during the term of this Agreement and no later than the earlier of (i) 10 days after the date that Surviving Dex One Corp is required to file a report on Form 10-K with the Securities and Exchange

Commission in compliance with the reporting requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, as amended (whether or not Surviving Dex One Corp is so subject to such reporting requirements), and (ii) 90 days after the end of each fiscal year of Surviving Dex One Corp, Servicer shall provide each Client Company with a written statement of all non-cash Charges and Stewardship Cost reimbursements for the previous calendar year for each Client Company. Settlement of such non-cash Charges and Stewardship Cost reimbursements shall be handled by the parties with non-cash dividends or similar distributions or contributions that do not involve the transfer of property.

6.      Funding Accounts. Servicer shall establish one or more funding accounts for making payment of the Client Companies' obligations on behalf of the Client Companies pursuant to the performance of the Services and Stewardship Services (each, a "Funding Account", and collectively, the "Funding Accounts").  The initial Funding Account established pursuant to this Section 6 prior to the Effective Date (the "Primary Funding Account") was initially pre-funded with $5 million.  After the Effective Date, Servicer may, in its reasonable discretion and with the consent of the SM Client Companies, cause the SM Client Companies to make an initial contribution to the Funding Accounts of $5 million.  Servicer may elect to fund any Funding Account with a portion of the funds then maintained in any other Funding Account; provided, that at no time shall the aggregate closing balance of all of the Funding Accounts, exclusive of additional funding amounts maintained in the Funding Accounts pursuant to the next succeeding sentence, exceed $10 million.  From time to time, if Servicer determines in its reasonable discretion that additional funding for any Funding Account is needed to continue to make payments of the Client Companies' obligations on behalf of the Client Companies pursuant to the performance of the Services and Stewardship Services, Servicer shall provide the Client Companies with written notice of the same setting forth such additional funding amount, and promptly after receipt of such notice each Client Company shall pay its Allocated Share of such additional funding amount to Servicer; provided, that Servicer shall not request any such additional funding by the Client Companies in an aggregate amount exceeding the aggregate amount of Charges and reimbursements of Stewardship Costs to be made by the Client Companies during the period of two (2) Business Days following such additional funding. Notwithstanding the foregoing, at no time shall the daily aggregate closing balance of all of the Funding Accounts exceed $25 million. Servicer shall be permitted to invest the funds in the Funding Accounts in Permitted Investments. Servicer shall have no liability to any Client Company for any losses associated with any Permitted Investment made by Servicer. Any proceeds from any Permitted Investment made with funds from the any Funding Account shall be quantified on a monthly basis and applied as a credit to each Client Company in the next day's settlements pursuant to Section 5(a), each such credit to be equal to each Client Company's Allocated Share of such proceeds at the date of determination.

7.      Contributions / Distributions of Services Assets. From time to time, a Client Company may, through one or more transactions, contribute and/or distribute certain Services Assets to Servicer. All such contributions and distributions of Services Assets shall be conducted pursuant to separate agreement(s) or transaction(s) between the parties; provided that after the date of the contribution or distribution of all of the applicable Services Assets set forth on Schedule E for a Client Company, such Client Company shall not make any contribution or distribution of any Services Asset that was thereafter acquired by such Client Company in

contemplation of such contribution or distribution. The parties intend that such contributions and distributions shall include the Services Assets listed on <u>Schedule E</u>. Concurrently with the delivery of the financial statements required under Sections 5.01(a) and 5.01(b) of the applicable Credit Agreement, Servicer shall provide to the administrative agent under such Credit Agreement a schedule of the Services Assets contributed to Servicer during the previous fiscal quarter with a reasonably detailed description of such Services Assets and the value thereof (as determined by Servicer in good faith); provided, that such schedule need only include intellectual property to the extent such intellectual property has been (i) issued, registered, applied for or (ii) is material and proprietary, as determined by Servicer in good faith (unless, with respect to this clause (ii), such disclosure could harm the value of such intellectual property, e.g., trade secrets). For the avoidance of doubt, nothing herein shall constitute a warranty from any Client Company with respect to such Services Assets or the contribution or distribution of such Services Assets to Servicer.

8.    <u>Reports</u>. Without limiting <u>Section 5(b)</u>, Servicer and (until completion of the Integration) SuperMedia shall provide each Client Company all reports reasonably requested by such Client Company and which Servicer or (until completion of the Integration) SuperMedia reasonably determines that it can provide. Servicer and (until completion of the Integration) SuperMedia will provide such reports with the frequencies agreed upon by the applicable parties.

9.    <u>Accounting Records and Documents</u>. Servicer and (until completion of the Integration) SuperMedia shall be responsible for maintaining full and accurate books, accounts and records ("<u>Books</u>") of all Services and Stewardship Servicers rendered pursuant to or associated with this Agreement and all Direct Costs, Allocated Costs and Stewardship Costs.

10.    <u>Additional Obligations of the Client Companies</u>.

(a)    <u>Instructions and Information</u>. Each Client Company acknowledges that some of the Services to be provided hereunder require instructions and information (including access to Client Company Materials) from such Client Company, which such Client Company shall provide to Servicer or (until completion of the Integration) SuperMedia in sufficient time for Servicer or (until completion of the Integration) SuperMedia to provide or procure such Services. Any failure by Servicer or (until completion of the Integration) SuperMedia to provide any Service due to any delay by any Client Company in providing such instructions or information shall not be considered a breach of Servicer's or (until completion of the Integration) SuperMedia's obligations herein, and Servicer or (until completion of the Integration) SuperMedia shall have the right to suspend the performance of any affected Service until such instruction or information is provided. Servicer and (until completion of the Integration) SuperMedia shall treat all such instructions and information as Confidential Information of the applicable Client Company.

(b)    <u>Client Company Materials</u>. Each Client Company retains all right, title and interest in and to its Client Company Material. Each Client Company hereby grants to Servicer and (until completion of the Integration) SuperMedia a worldwide, royalty-free, fully paid-up, non-exclusive, nontransferable license to access, use, display and make derivative works of its Client Company Material solely to the extent necessary to provide

the Services. This license: (i) shall be limited to the term of this Agreement (including any period pursuant to which Servicer or (until completion of the Integration) SuperMedia is providing transition assistance to such Client Company pursuant to Section 13(a); and (ii) with respect to any third-party owned Client Company Material, is granted solely to the extent permissible under the applicable third-party agreement. Servicer and (until completion of the Integration) SuperMedia shall have administrative responsibility for obtaining and maintaining all consents and licenses for Servicer's or (until completion of the Integration) SuperMedia's access and use of any Client Company Material that may be necessary for Servicer or (until completion of the Integration) SuperMedia in providing the Services, and each Client Company shall cooperate with Servicer and (until completion of the Integration) SuperMedia in obtaining and maintaining such consents and licenses and such Client Company shall pay all costs associated therewith with respect to its Client Company Material.

     (c)    <u>Integration</u>.  Each Client Company and the Servicers agrees to use its commercially reasonable efforts to complete the Integration as promptly as practicable. In connection with the Integration, each SM Client Company shall, when commercially reasonable, assign material vendor or other supply contracts to which it is a party to the Servicer to the extent permitted by the terms of such contracts, and each Client Company agrees that material vendor or other supply contracts that directly or indirectly benefit any Client Company entered into after the date hereof shall be entered into in the name of the Servicer.  For clarity, SuperMedia shall only provide Services until completion of the Integration.

     11.    <u>Term</u>. This Agreement shall be effective as of the Effective Date, and shall continue in full force and effect with respect to Servicer and all Client Companies until terminated with respect to any or all Client Companies in accordance with Section 12.

     12.    <u>Termination</u>.

     (a)    <u>Termination for Convenience</u>. Any Client Company may terminate this Agreement with respect to its rights and obligations hereunder for convenience by providing at least sixty (60) days' prior written notice to Servicer.

     (b)    <u>Termination upon Breach of Payment Obligation</u>. This Agreement may be terminated by Servicer as to any Client Company which fails to make any payment required to be made under Section 5 within 30 days of notice from Servicer of such failure to pay.

     13.    <u>Consequences of Termination</u>.

     (a)    <u>Transition Assistance</u>. Upon termination of this Agreement with respect to any Client Company, unless this Agreement is terminated with respect to such Client Company pursuant to Section 12(b) for non-payment, Servicer or (until completion of the Integration) SuperMedia shall, upon such Client Company's request, provide such Client Company with cooperation and assistance in transitioning the Services provided hereunder to a new service provider or continue to provide such Services for so long as

14

this agreement is in effect with respect to such Client Company. Servicer or (until completion of the Integration) SuperMedia shall provide the Services to such Client Company in substantially the same manner and at substantially the same level as such Services were provided by Servicer or SuperMedia consistent with its past practices and, to the extent applicable, with at least the same quality standards, service levels and response times as any such Services are performed by Servicer or SuperMedia for other Client Companies during the period when such transition assistance is being provided (the "Transition Period"); provided, that a failure to provide such Services at such level and quality as a result of a transfer of Client Company Employees under Section 13(c) shall not violate this Section 13(a). Notwithstanding the termination of this Agreement, during the applicable Transition Period, the applicable Client Company shall continue to pay (x) the Charges for such transition assistance, (y) the Charges for any other Services provided in accordance with Section 3 and (z) such Client Company's Allocated Share of any Stewardship Costs in accordance with Section 4.

(b)     Distribution of the Funding Account or Accounts. Promptly following the end of a Transition Period in connection with the termination of this Agreement with respect to any Client Company, Servicer shall pay to such Client Company such Client Company's Allocated Share of the funds available in the Funding Accounts as of the effective date of such termination that are in excess of the then-outstanding obligations that Servicer is required to pay from such funds.

(c)     Transfer of Client Company Employees.  Promptly following termination of this Agreement with respect to any Client Company, Servicer shall transfer to such Client Company such Client Company's Client Company Employees as well as any assets, services or rights substantially all of the use of which is to provide Services to such Client Company (it being understood and agreed that nothing herein shall obligate Servicer to transfer to such Client Company any Shared Employees or any assets, services or rights substantially all of the use of which is for the joint benefit of two or more Client Companies).  Servicer shall not be entitled to any consideration in connection with any such transfer (other than reimbursement of reasonable costs and expenses related thereto) and shall execute such documents and take such other actions as may be reasonably required in connection with such transfer.  Without limiting the provisions of and in accordance with Section 13(a), during the Transition Period and to the extent requested by such Client Company, Servicer shall continue to provide Services to such Client Company performed by Shared Employees consistent with this Agreement, the past practice of Servicer and such Shared Employees.

14.     Confidentiality.

(a)     General. The receiving party (the "Recipient") shall not disclose to any third party such Confidential Information of any other party (the "Disclosing Party") disclosed to the Recipient by the Disclosing Party in connection with the Disclosing Party's performance of this Agreement and shall not use such Confidential Information other than for purposes of the Recipient's performance under or exercise of its rights pursuant to this Agreement.

(b)    <u>Employees and Agents</u>. Each Recipient shall ensure that only its contractors, distributors, representatives, agents, officers and employees who have a need to have access to the Confidential Information of the Disclosing Party for purposes of such Recipient's performance under or exercise of its rights pursuant to this Agreement shall be permitted to have access to such Confidential Information. Each Recipient shall cause its contractors, distributors, officers, representatives, agents and employees who shall have access to the Confidential Information of the Disclosing Party not to disclose to any third party any such Confidential Information and not to use such Confidential Information other than for the purposes of such Recipient's performance under or exercise of its rights pursuant to this Agreement.

(c)    <u>Excluded Information</u>. The undertakings of non-disclosure and non-use in this <u>Section 14</u> shall not apply to information or material which the Recipient demonstrates:

(i)    is or becomes generally available to the public other than as a result of any act or omission on the part of the Recipient or any contractor, distributor, representative, agent, officer or employee of the Recipient;

(ii)    was available to the Recipient on a non-confidential basis prior to its disclosure by the Disclosing Party;

(iii)    becomes available to the Recipient from a Person other than the Disclosing Party who is not, to the Recipient's knowledge, subject to any legally binding obligation to keep such disclosed information confidential; or was independently developed by the Recipient without reference to the disclosed information.

(d)    <u>Compelled Disclosure</u>. If a Recipient is compelled by court decree, subpoena or other Applicable Law to disclose any of the Confidential Information of the Disclosing Party, it shall promptly notify the Disclosing Party in writing and use reasonable good faith efforts to: (i) disclose only the specific Confidential Information legally required to be disclosed and only to the extent required; and (ii) assist the Disclosing Party (if and to the extent requested by the Disclosing Party), at the Disclosing Party's expense, in obtaining a protective order or other appropriate assurances that the confidential nature of such Confidential Information shall be protected and preserved.

15.    <u>Indemnification</u>. Servicer (and, until completion of the Integration, SuperMedia) shall indemnify, defend and hold harmless each Client Company and its directors, officers and agents (collectively, the "<u>Indemnified Parties</u>") from and against any and all third-party claims, suits, actions, liabilities, fines, penalties, costs, losses, damages and expenses (including reasonable fees and expenses of attorneys and other reasonable costs of investigation and defense), whether incurred by or asserted against such Indemnified Parties arising out of or resulting from the intentional tort, reckless conduct, gross negligence or bad faith (including dishonest, fraudulent or criminal acts or omissions) on the part of Servicer (or SuperMedia, as applicable) in performing or failing to perform its obligations hereunder.

16.    <u>Limitation on Liability</u>. IN NO EVENT SHALL ANY PARTY HERETO BE LIABLE HEREUNDER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING LOST OR ANTICIPATED REVENUES OR PROFITS RELATING TO THE SAME) ARISING FROM ANY CLAIM RELATING TO THIS AGREEMENT OR THE PROVISION OR FAILURE TO PROVIDE ANY OF THE SERVICES TO BE PROVIDED HEREUNDER, WHETHER SUCH CLAIM IS BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE, EVEN IF SUCH PARTY IS ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF THE SAME. IN ADDITION, SERVICER SHALL HAVE NO LIABILITY TO ANY CLIENT COMPANY WITH RESPECT TO THE PERFORMANCE OF OR FAILURE TO PERFORM ANY STEWARDSHIP SERVICE.

17.    <u>Representations and Warranties; Disclaimer</u>.

(a)    <u>Servicer Warranties</u>. Servicer hereby represents and warrants to each Client Company that: (i) it is an entity validly existing and in good standing under the laws of its jurisdiction of incorporation or formation; and (ii) it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement.

(b)    <u>Client Companies Warranties</u>. Each Client Company hereby represents and warrants to Servicer that: (i) it is an entity validly existing and in good standing under the laws of its jurisdiction of incorporation or formation; and (ii) it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement.

(c)    <u>Disclaimer</u>. EXCEPT AS EXPRESSLY SPECIFIED IN THIS AGREEMENT, NO WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, ARE MADE OR CREATED AMONG THE PARTIES, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

18.    <u>Changes in Parties</u>. New direct or indirect subsidiaries of Surviving Dex One Corp, which come into existence after the Effective Date, may become additional Client Companies upon mutual agreement of the parties, including agreement of any initial payment to the Primary Funding Account to be made by such additional Client Companies, and shall thereafter constitute "<u>Client Companies</u>" for all purposes of this Agreement. In addition, any Client Company that no longer is a direct or indirect subsidiary of Surviving Dex One Corp shall no longer be considered a party to this Agreement, and thereafter neither Servicer nor (until completion of the Integration) SuperMedia shall have an obligation to provide Services to or on behalf of such former Client Company. For the avoidance of doubt, any agreement among the parties relating to the addition of a new Client Company shall constitute an amendment to this Agreement; provided that (x) such amendment is in accordance with the terms of the Credit Agreements and (y) notice of such new Client Company is provided to the Administrative Agents under each of the Credit Agreements.

19.    <u>Miscellaneous Provisions</u>.

17

(a)    Notices. Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by certified mail return receipt requested, by courier or express delivery service or by facsimile) to the address or facsimile number set forth beneath the name of such party below (or to such other address or facsimile number as such party shall have specified in a written notice given to the other parties hereto):

if to Servicer:

Dex One Service, Inc.
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to Dex One Corp:

Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to RHD Inc:

R.H. Donnelley Inc.
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to Dex Service:

Dex Media Service LLC
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to DMI:

Dex Media, Inc.
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to Dex East:

Dex Media East, Inc.
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to Dex West:

Dex Media West, Inc.
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to Dex Digital:

Dex One Digital, Inc.
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to Merger Sub:

Spruce Acquisition Sub, Inc.
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to Newdex:

19

Newdex, Inc.
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to RHD Corp:

R.H. Donnelley Corporation
c/o Dex One Corporation
1001 Winstead Drive
Cary, North Carolina 27513
Attention: General Counsel
Facsimile: (919) 297-1518

if to SuperMedia Inc.:

SuperMedia Inc.
c/o SuperMedia LLC
P.O. Box 619810
D/FW Airport, Texas 75261
Attention: General Counsel
Facsimile: (972) 453-6829

if to SuperMedia:

SuperMedia LLC
P.O. Box 619810
D/FW Airport, Texas 75261
Attention: General Counsel
Facsimile: (972) 453-6829

if to SM Sales:

SuperMedia Sales Inc.
c/o SuperMedia LLC
P.O. Box 619810
D/FW Airport, Texas 75261
Attention: General Counsel
Facsimile: (972) 453-6829

if to SM Services:

20

SuperMedia Services Inc.
c/o SuperMedia LLC
P.O. Box 619810
D/FW Airport, Texas 75261
Attention: General Counsel
Facsimile: (972) 453-6829

if to SM UK:

SuperMedia UK, Ltd.
c/o SuperMedia LLC
P.O. Box 619810
D/FW Airport, Texas 75261
Attention: General Counsel
Facsimile: (972) 453-6829

(b)      Amendment and Restatement; Entire Agreement; Amendment. This Agreement amends and restates the Original Agreement in its entirety. From and after the Effective Date, this Agreement shall supersede the Original Agreement in its entirety. Further, this Agreement shall constitute the entire agreement among the parties with respect to the rights and responsibilities set forth herein and supersedes all prior agreements and understandings, whether written or verbal, to the extent such agreements pertain to the rights and responsibilities set forth herein. This Agreement may be amended only in a writing executed by all parties; provided, that the consent of the administrative agents under each of the Credit Agreements (which may not be unreasonably withheld, conditioned or delayed) shall be required for any material amendment to this Agreement; provided, further, that Servicer and any Client Company may amend Schedule A with respect to the provision of a Service solely to such Client Company without the written consent of the other parties, so long as such amendment of Schedule A is in accordance with Section 2; and provided, further, that the addition of a new Client Company in accordance with Section 18 shall not require the consent of the administrative agents under each of the Credit Agreements.

(c)      Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of New York. Each of the parties agrees that all disputes, controversies or claims arising out of or relating to this Agreement, or the validity, interpretation, breach or termination of this Agreement, including claims seeking redress or asserting rights under any Applicable Law, shall be brought exclusively in the federal or state courts residing within the State of New York, and the appellate courts having jurisdiction with respect to appeals from such courts, and each of the parties irrevocably and unconditionally submits to personnel jurisdiction in such courts, and waives any objection to such venue or jurisdiction or to inconveniency of such courts.

21

(d)     <u>Subcontractors; Assignment</u>.

(i)     With the consent of the Client Companies, such consent not to be unreasonably withheld, Servicer (or, until completion of the Integration, SuperMedia) may hire or engage one or more subcontractors or other third parties to perform any or all of its obligations under this Agreement; provided, that Servicer (or SuperMedia, as applicable) remains ultimately responsible for all of its obligations hereunder; provided, further, that the terms of any such engagement or hiring of any Affiliate of the Servicer, SuperMedia, Surviving Dex One Corp or their respective Subsidiaries shall be on terms and conditions not less favorable, considered as a whole, to Servicer (or SuperMedia, as applicable) and the Client Companies than could be obtained on an arm's-length basis from unrelated third parties.

(ii)     Except as permitted by <u>Section 19(d)(i)</u>, no party hereto may assign or transfer, by operation of law or otherwise, this Agreement or any of its rights hereunder, and may not delegate any of its duties or obligations hereunder, in each case in whole or in part, without the prior written consent of, in the case of Servicer, all of the Client Companies, in the case of SuperMedia, all of the SM Client Companies, or in the case of any Client Company, Servicer. Any assignment or delegation made in violation of this <u>Section 19(d)(ii)</u> shall be void and of no effect. Subject to the foregoing, this Agreement shall be binding on the parties hereto and their permitted successors and assigns.

(e)     <u>Independent Contractor</u>. Except as set forth in <u>Section 2(c)</u>: (i) the relationship among the parties, as established by this Agreement, is solely that of independent contractors; (ii) no party may assume or create any obligation, representation, warranty or guarantee, express or implied, on behalf of any other party for any purpose whatsoever; and (iii) nothing in this Agreement shall be deemed to make any party the agent of another other party hereto. This Agreement does not create any partnership, joint venture or similar business relationship between the parties hereto.

(f)     <u>No Third-Party Beneficiaries</u>. Except as provided in <u>Section 2(a)</u>, <u>Section 4</u> and <u>Section 7</u> with respect to the rights of the administrative agents under the Credit Agreements to receive an amended Schedule A, Schedule C and schedule of contributed Services Assets as set forth in such sections, and except as provided in <u>Section 15</u> with respect to the Indemnified Parties, this Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

(g)     <u>Severability</u>. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under Applicable Law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the

remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

(h)     Force Majeure. Except for each Client Company's obligations to pay Charges and Stewardship Cost reimbursements herein, each party hereto shall be excused from any performance required hereunder if such performance is rendered impossible or unfeasible due to any catastrophe or other major event beyond its reasonable control, including: (i) war, riot, acts of terrorism and insurrection; (ii) Applicable Law; (iii) strikes, lockouts and other serious labor disputes; (iv) floods, fires, explosions and other natural disasters; (v) any delay of sources to supply materials and equipment; (vi) government priorities; and (vii) labor or transportation problems. When such events have abated, the parties' respective obligations hereunder shall resume.

(i)     Interpretation. For purposes of this Agreement: (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation;" (ii) the word "or" is not exclusive; and (iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (1) to Sections and Schedules mean the Sections of and the Schedules attached to this Agreement; (2) to a contract, instrument or other document means such contract, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and by this Agreement; and (3) to a statute means such statute as amended from time to time and includes any successor legislation thereto and regulations promulgated thereunder. The Schedules referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. Headings to Sections are inserted for convenience of reference only and shall not be deemed a part of or to affect the meaning or interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

(j)     Counterparts. This Agreement is legally binding when, but not until, each party has received from the others a counterpart of this Agreement signed by an authorized representative of such other parties. The parties' representatives may sign separate, identical counterparts of this Agreement; taken together, they constitute one agreement. A signed counterpart of this document may be delivered by any reasonable means, including facsimile or other electronic transmission.

* * * * *

**IN WITNESS WHEREOF**, the undersigned have executed and delivered this Agreement as of the Effective Date.

DEX ONE SERVICE, INC.

By:_____
Name: _____
Title: _____


DEX ONE CORPORATION

By:_____
Name: _____
Title: _____


R.H. DONNELLEY INC.

By:_____
Name: _____
Title: _____


DEX MEDIA SERVICE LLC

By:_____
Name: _____
Title: _____


DEX MEDIA, INC.

By:_____
Name: _____
Title: _____


DEX MEDIA EAST, INC.

By:_____
Name: _____
Title: _____

DEX MEDIA WEST, INC.

By:_____
Name: _____
Title: _____


DEX ONE DIGITAL, INC.

By:_____
Name: _____
Title: _____


NEWDEX, INC.

By:_____
Name: _____
Title: _____


R.H. DONNELLEY CORPORATION

By:_____
Name: _____
Title: _____


SPRUCE ACQUISITION SUB, INC.

By:_____
Name: _____
Title: _____


*Signature Page to the Amended and Restated Shared Services Agreement*

SUPERMEDIA INC.

By:_____
Name: _____
Title: _____


SUPERMEDIA LLC

By:_____
Name: _____
Title: _____


SUPERMEDIA SALES INC.

By:_____
Name: _____
Title: _____


SUPERMEDIA SERVICES INC.

By:_____
Name: _____
Title: _____


SUPERMEDIA UK, LTD

By:_____
Name: _____
Title: _____


*Signature Page to the Amended and Restated Shared Services Agreement*

# SCHEDULE A
## SERVICES

**I.      Dex Service, DMI, RHD Corp., SuperMedia Inc., SM Sales, SM Services, SM UK.**  Servicer will not provide any Services to Dex Service, DMI, RHD Corp., SuperMedia Inc., SM Sales, SM Services or SM UK.

**II.      Services Provided to RHD Inc, Dex East, Dex West and SuperMedia**. Servicer shall provide the following Services to each of RHD Inc, Dex East, Dex West and SuperMedia:

> 1.  General and Administration Services. The following general and administration services: (a) Executive; (b) Finance; (c) Human Resources; (d) Legal; (e) Information Technology; (f) Corporate Facilities; (g) Publishing; and (h) Communications.

> 2.  Operations Support Services. The following business operations support services: (a) Marketing and Advertising; (b) Print & Delivery Management; (c) Customer Service; (d) Billing; (e) Credit; (f) Collections (excluding, for the avoidance of doubt, actual receipt of receivables, which shall continue to be received by each Client Company individually); and (g) Operations Facilities.

> 3.  Sales Leadership and Effectiveness Services. The following sales leadership and effectiveness services: (a) Sales Leadership Team; (b) Sales Reporting; (c) Training; (d) Sales Office Support; (e) Sales Compensation Analysis; and (f) National Sales.

> 4.  Digital Operations Services. The following digital operations services: (a) Digital Information Technology; (b) Leadership team; (c) Non-Print Product Development; and (d) Digital Sales and expense reporting.

**III.      Services Provided to RHD Inc, Dex East, Dex West, Surviving Dex One Corp and SuperMedia**. Servicer shall provide the following Services to each of RHD Inc, Dex East, Dex West, Surviving Dex One Corp and SuperMedia:

> 1.  Tax Sharing Services. The tax sharing services described in the following Tax Sharing Agreements:

>> (i)      Amended and Restated Tax Sharing Agreement, dated ____, by and between Newdex, Inc., Dex One Corporation, Dex Media, Inc., Dex Media East, Inc., Dex Media West, Inc., Dex One Service, Inc., R.H. Donnelley Corporation, R.H. Donnelley Inc., R.H. Donnelley Apil, Inc., and Business.Com, Inc.

>> (ii)      SuperMedia-Dex Tax Sharing Agreement, dated _____, by and between Supermedia Inc., Supermedia Sales Inc., Supermedia Services Inc., Dex One Corporation, Newdex, Inc., and Dex One Service, Inc.

**III.    Services Provided by SuperMedia.**  Until the completion of the Integration, SuperMedia (i) shall provide to the SM Client Companies the same Services as set forth in Section II of this Schedule A and (ii) may provide Services to other Client Companies to the extent agreed to between SuperMedia and Servicer (and Servicer's obligation to provide such Services shall be deemed satisfied).

**SCHEDULE B**

**INITIAL ALLOCATED SHARES**

1.     Surviving Dex One Corp's, DMI's, Dex Service's, RHD Corp's, SuperMedia Inc.'s, SM Sales', SM Services' and SM UK's initial Allocated Share shall be 0% for all Services and other determinations.

2.     For Services that benefit RHD Inc, Dex East, Dex West and SuperMedia and the Stewardship Services, the initial Allocated Shares for the Allocated Costs shall be as follows:

| Client Company | Allocated Share |
|----------------|-----------------|
| RHD Inc | 19% |
| Dex East | 13% |
| Dex West | 15% |
| SuperMedia | 53% |

**SCHEDULE C**

**STEWARDSHIP SERVICES**

The following functions shall constitute Stewardship Services: (a) Directors and Officers Insurance; (b) Board of Directors Expenses; (c) Chief Executive Officer; (d) Chief Financial Officer; (e) Treasury Employees; (f) Merger and Acquisition Employees; (g) Allocated Portion of Surviving Dex One Corp Third-Party Audit Fees; (h) Legal; and (i) Investor Relations/Corporate Communications.

## SCHEDULE D

## DAILY CASH SETTLEMENTS

Servicer shall make daily cash settlements in connection with Servicer's payment of amounts on behalf of the Client Companies in connection with the Services and each Client Company's reimbursement of its Allocated Share of the Stewardship Costs as follows:

1.      Accounts Payable Checks. As accounts payable checks are presented for payment, funds will automatically move from the applicable Funding Account to the accounts payable disbursement account to cover such checks. The following day, Servicer will provide a funding report detailing the prior day's check disbursements for each Client Company, and will transfer such amounts from the appropriate Client Company other than Surviving Dex One Corp to the applicable Funding Account.

2.      Accounts Payable ACH Transactions. Each day Servicer may create files detailing accounts payable ACH transactions to be paid by Servicer in connection with the Services or Stewardship Services, as applicable. Servicer will provide a funding report detailing the ACH transactions for each Client Company, and Servicer will transfer the appropriate amount of funds from each Client Company other than Surviving Dex One Corp to the applicable Funding Account the same day that Servicer moves the amount of such funds from the applicable Funding Account to the accounts payable disbursement account to cover the payments set forth in such ACH files.

3.      Accounts Payable Wire Transfers. Each day Servicer may initiate accounts payable wire transfers to be paid by Servicer in connection with the Services or Stewardship Services, as applicable. Servicer will transfer the appropriate amount of funds from each Client Company other than Surviving Dex One Corp to the applicable Funding Account the same day that the wire transfer is debited from the applicable Funding Account to cover the payments made by wire transfer.

4.      Payroll Funding. Each day Servicer may create files detailing the total amount of payroll-related disbursements to be paid by Servicer in connection with the Services. Servicer will provide a funding report detailing the payroll-related disbursements for each Client Company, and Servicer will transfer the appropriate amount of funds from each Client Company other than Surviving Dex One Corp to the applicable Funding Account on the pay date or earlier if required by the financial institution that provides these banking services to Servicer.

Notwithstanding the foregoing, until completion of the Integration, Servicer shall not make daily cash settlements in accordance with this Schedule for SM Client Companies. Instead, settlement will occur with respect to the SM Client Companies on a monthly basis as described in Section 5(c) within thirty (30) days after the end of each calendar month.

**SCHEDULE E**

**CONTEMPLATED INITIAL CONTRIBUTED AND/OR DISTRIBUTED ASSETS**

RHD Inc., Dex East and Dex West intend to contribute or have contributed the following assets to Servicer:

| Asset Category | Asset Description |
|---|---|
| Developed Software | Internally developed or enhanced software applications, including, for example, Oracle (full suite of modules - e.g., human resources, accounts payable, payroll, procurement and general ledger), BIW Insight (marketing) and Prepsmart (sales management) |
| Buildings & Leasehold Improvements | Includes building renovations, cabling, bathroom fixtures, etc., for leased properties occupied by shared employees |
| Furniture and Fixtures | Includes cubicles, desks, chairs, file cabinets, etc., used by shared employees |
| Computer Equipment | Includes servers, desktops, laptops, etc., used by shared employees |
| Machinery and Equipment | Includes copiers, printers, scanners, NetJets lease, telephone equipment, etc., used by shared employees |
| Licensed Software | Purchased software licenses and applications, including, for example, Oracle eBusiness Suite, Hyperion (several reporting modules - e.g., strategic finance, financial management, Essbase and Smart View) |

## **EXHIBIT K TO THE MERGER AGREEMENT**

<u>FORM OF SUPERMEDIA PRE-PACK PLAN</u>

Substantially in the form attached hereto as Exhibit C to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT L TO THE MERGER AGREEMENT**

### FORM OF DEX PRE-PACK PLAN

Substantially in the form attached hereto as Exhibit A to the Disclosure Statement

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT F TO THE DISCLOSURE STATEMENT**

UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

[THIS PAGE INTENTIONALLY LEFT BLANK]

## UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

### The Merger

The Merger will be accounted for as a business combination using the acquisition method of accounting in accordance with Accounting Standards Codification ("ASC") Topic 805, *Business Combinations,* with Dex One identified as the accounting acquirer. Dex One is considered the acquiring entity for accounting purposes based on certain criteria including, but not limited to, the following: (1) upon the Effective Date, holders of Dex One Interests will hold approximately 60% of Newdex Common Stock as compared to 40% held by SuperMedia stockholders and (2) Dex One's current chairman of the board of directors will continue to serve as the chairman of the board of directors of Newdex.

### Basis of Presentation

We derived the following unaudited pro forma condensed combined balance sheet of Newdex from the Debtors' and SuperMedia's unaudited consolidated balance sheets as of September 30, 2012. The following unaudited pro forma condensed combined statements of operations of Newdex were derived from the Debtors' and SuperMedia's audited consolidated statements of operations for the year ended December 31, 2011, and unaudited consolidated statements of operations for the nine months ended September 30, 2012. The following unaudited pro forma condensed combined financial statements of Newdex are presented for illustrative purposes only and give effect to the Merger as if it had occurred on January 1, 2011, with respect to the unaudited pro forma condensed combined statements of operations and as of September 30, 2012, with respect to the unaudited pro forma condensed combined balance sheet. The following unaudited pro forma condensed combined financial statements do not consider any potential impact resulting from the Plan and the SuperMedia Plan. The historical consolidated financial statements of the Debtors and SuperMedia have been adjusted in the unaudited pro forma condensed combined financial statements to give effect to pro forma events that are (1) directly attributable to the Merger, (2) estimable and supportable, and (3) with respect to the statement of operations, expected to have a continuing impact on the combined results. In addition, the unaudited pro forma condensed combined financial statements include adjustments to conform SuperMedia's accounting policies with Dex One's accounting policies. The following unaudited pro forma condensed combined financial statements are not indicative of the financial results of the combined companies had the companies actually been combined at the beginning of each period presented, do not reflect the impact of possible business model changes or the costs of any integration activities or benefits that may result from the Merger and are not indicative of the results of operations in future periods or the future financial position of Newdex. The unaudited pro forma condensed combined financial statements also do not consider any potential impacts of current market conditions on revenues, expense efficiencies, asset dispositions, and share repurchases, among other factors. The unaudited pro forma condensed combined financial statements have been derived from and should be read in conjunction with the historical consolidated financial statements and related notes of the Debtors and SuperMedia, which are incorporated by reference in this Disclosure Statement, and the other information contained or incorporated by reference in this Disclosure Statement.

### Acquisition Method of Accounting

Under the acquisition method of accounting, consideration provided by Dex One to complete the Merger with SuperMedia will be allocated to assets and liabilities of SuperMedia based upon their estimated fair values as of the date of completion of the Merger. The excess purchase price over the estimated fair value of the net assets acquired, including identifiable intangible assets, will be allocated to goodwill. As of the date of these unaudited pro forma condensed combined financial statements, the detailed valuation studies necessary to arrive at the required estimates of fair value of SuperMedia's assets to be acquired and liabilities to be assumed and the related allocations of purchase price have not been finalized, nor have we identified all adjustments necessary to conform accounting policies. A final determination of the fair value of SuperMedia's assets and liabilities will be based on the actual net tangible and intangible assets and liabilities of SuperMedia that exist as of the Effective Date and, therefore, a final determination cannot be made prior to the Effective Date. In addition, the final value of the consideration to be provided by Dex One to complete the Merger will be determined based on information at the time of the Effective Date. Accordingly, the following pro forma purchase price adjustments and allocations are preliminary and are subject to further adjustments as additional information becomes available and as additional analyses are performed.

Final pro forma purchase price adjustments and allocations may differ materially from the preliminary pro forma purchase adjustments and allocations presented here.

**Preliminary Purchase Price Allocation**

The preliminary purchase price allocation used to prepare the unaudited pro forma condensed combined balance sheet as of September 30, 2012, is based upon a preliminary purchase price of approximately $30 million. In accordance with the Merger Agreement, the preliminary purchase price was based on the estimated fair value of Newdex Common Stock issued to SuperMedia stockholders comprised of (1) 15.7 million outstanding shares of SuperMedia common stock on November 9, 2012, which represents the latest practicable date prior to the creation of these unaudited pro forma condensed combined financial statements, (2) the exchange ratio of Newdex Common Stock for each SuperMedia share of 0.4386 and (3) a price per share of $4.40, which represents the closing price of Dex One common stock on November 9, 2012, of $0.88 adjusted for the 1-for-5 reverse stock split as specified in the Merger Agreement. The actual number of shares and fair value of Newdex Common Stock issued to SuperMedia stockholders and final purchase price will be determined as of the Effective Date based upon the terms and conditions of the Merger Agreement.

*[The remainder of this page is intentionally left blank.]*

**PRO FORMA CONDENSED COMBINED BALANCE SHEET**
**THE DEBTORS AND SUPERMEDIA**
**AS OF SEPTEMBER 30, 2012**

| (in millions) | The Debtors Historical | SuperMedia Historical | Adjustments | Newdex Total Pro Forma |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | $ 96 | $ 94 | $ (60)[(k)] | $ 130 |
| Net accounts receivable | 499 | 117 | 352[(1)(j)] | 968 |
| Deferred directory costs | 99 | 130 | (97)[(d)] | 132 |
| Prepaid expenses and other current assets | 114 | 11 | (72)[(f)] | 53 |
| Total current assets | 808 | 352 | 123 | 1,283 |
| Fixed assets and computer software, net | 117 | 58 | 27[(2)(j)] | 202 |
| Other non-current assets | 18 | 80 | 19[(e)(k)] | 117 |
| Intangible assets, net | 1,920 | 250 | 530[(2)(b)] | 2,700 |
| Goodwill | — | 704 | (496)[(g)] | 208 |
| Total Assets | $ 2,863 | $ 1,444 | $ 203 | $ 4,510 |
| **Liabilities and Shareholders' Equity (Deficit)** | | | | |
| **Current Liabilities** | | | | |
| Accounts payable and accrued liabilities | $ 92 | $ 116 | $ 18[(f)(j)] | $ 226 |
| Accrued interest | 22 | 1 | — | 23 |
| Deferred revenues | 506 | 68 | (65)[(1)(c)] | 509 |
| Short-term deferred income taxes, net | — | 7 | 48[(f)] | 55 |
| Current portion of long-term debt | 226 | 1 | 92[(3)] | 319 |
| Total current liabilities | 846 | 193 | 93 | 1,132 |
| Long-term debt | 1,779 | 1,474 | (573)[(3)(h)] | 2,680 |
| Deferred income taxes, net | 78 | 100 | 208[(f)] | 386 |
| Other non-current liabilities | 68 | 147 | (5)[(j)] | 210 |
| Total liabilities | 2,771 | 1,914 | (277) | 4,408 |
| **Shareholders' Equity (Deficit)** | | | | |
| Common stock | — | — | —[(a)(i)] | — |
| Additional paid-in capital | 1,464 | 213 | (179)[(a)(i)(l)] | 1,498 |
| Accumulated deficit | (1,345) | (789) | 765[(i)(k)(l)] | (1,369) |
| Accumulated other comprehensive income (loss) | (27) | 106 | (106)[(i)] | (27) |
| Total shareholders' equity (deficit) | 92 | (470) | 480 | 102 |
| Total Liabilities and Shareholders' Equity (Deficit) | $ 2,863 | $ 1,444 | $ 203 | $ 4,510 |

## Conforming Adjustments

The unaudited pro forma condensed combined balance sheet as of September 30, 2012 includes adjustments to (1) conform accounting policies of SuperMedia with Dex One's, the accounting acquirer, and (2) combine historical results of SuperMedia to conform with Dex One's presentation, as permitted and in accordance with Regulation S-X (17 CFR Part 210) of the SEC. The accounting policies of both companies are in accordance with US GAAP, however the companies have used different approaches for the balance sheet presentation of certain items. The following represents the adjustments to conform SuperMedia's accounting policies with the accounting policies of Dex One:

(1) SuperMedia's accounting policy is to recognize unbilled accounts receivable on a "net basis" as an offset to deferred revenue on its consolidated balance sheet for unbilled receivables that are directly associated with and offset by unearned deferred revenue, for which no cash payment has been received. Dex One's accounting policy is to recognize unbilled accounts receivable on a "gross basis" as a component of net accounts receivable on its consolidated balance sheet. In order to conform to Dex One's accounting policy, $370 million of SuperMedia's unbilled accounts receivable has been reclassified from deferred revenue to net accounts receivable on the unaudited pro forma condensed combined balance sheet as of September 30, 2012. See footnote (j) below for additional information.

(2)  SuperMedia's accounting policy is to recognize capitalized software as an intangible asset on its consolidated balance sheet. In order to conform to Dex One's accounting policy, we have reclassified capitalized software of $16 million from intangible assets to fixed assets and computer software, net, on the unaudited pro forma condensed combined balance sheet as of September 30, 2012. See footnote (j) below for additional information.

(3)  Dex One has an accounting policy of estimating mandatory debt repayments based on cash flow sweep requirements under the Credit Agreements over the following twelve months and classifying those obligations as current maturities.  SuperMedia's mandatory debt repayments are based on a percentage of each quarter's Available Cash, as defined in the SuperMedia Secured Credit Agreement, and accordingly are not known with certainty 12 months in advance.  SuperMedia's accounting policy is to only reflect in current maturities known repayments that are due and payable at each quarter end.  In order to conform to Dex One's accounting policy, an estimated $92 million of SuperMedia's long-term debt was reclassified to the current portion of long term debt from long-term debt on the unaudited pro forma condensed combined balance sheet as of September 30, 2012 to reflect our estimate of debt repayments over the following 12 months.

**Pro Forma Merger-Related Adjustments**

The unaudited pro forma condensed combined balance sheet as of September 30, 2012, also includes pro forma Merger-related adjustments. The Merger will be accounted for as a business combination using the acquisition method of accounting in accordance with ASC Topic 805, *Business Combinations*. Accordingly, the purchase price will be allocated to the tangible and intangible assets acquired and the liabilities assumed on the Effective Date. The preliminary allocation of the purchase price to the assets acquired and liabilities assumed is as follows:

| | |
|---|---:|
| Calculation of Allocable Purchase Price: | |
| Fair value of Newdex Common Stock issued to SuperMedia stockholders[a] | $    30 |
| Total allocable purchase price | $    30 |
| Estimated allocation of net purchase price adjustment: | |
| SuperMedia net tangible assets acquired (excluding intangible assets and outstanding debt) | $    51 |
| Directory services agreements[b] | 460 |
| Customer relationships[b] | 270 |
| Marketing-related intangibles[b] | 40 |
| Patented technologies[b] | 10 |
| SuperMedia outstanding debt at fair value as of November 9, 2012[h] | (994) |
| Other adjustments[j] | (13) |
| Fair value adjustments: | |
| Reverse pre-Merger deferred revenue[c] | 435 |
| Reverse pre-Merger deferred directory costs[d] | (97) |
| Deferred income tax adjustments, net[f] | (340) |
| Fair value of net liabilities acquired | (178) |
| Goodwill[g] | 208 |
| Total allocable purchase price | $    30 |

(a)  The Merger Agreement provides that each issued and outstanding share of SuperMedia common stock will be converted into the right to receive 0.4386 shares of Newdex Common Stock. As of November 9, 2012, 15.7 million shares of SuperMedia common stock were issued and outstanding, which will result in the issuance of 6.9 million shares of Newdex Common Stock valued at $4.40 per share, which represents the closing price of Dex One common stock on November 9, 2012 of $0.88 adjusted for the 1-for-5 reverse stock split as specified in the Merger Agreement. The calculation of the equity component of the allocable purchase price is as follows:

| *(in millions, except exchange ratio and price per share data)* | Dex One | SuperMedia | Newdex |
|---|---:|---:|---:|
| Shares of common stock issued and outstanding at November 9, 2012 | 50.9 | 15.7 | — |

| | | | |
|---|---|---|---|
| Exchange ratio | 0.20 | 0.4386 | — |
| Assumed shares of Newdex Common Stock issued | 10.2 | 6.9 | 17.1 |
| Price per share | $ 4.40 | $ 4.40 | $ 4.40 |
| Fair value of Newdex Common Stock issued | $ 45 | $ 30 | $ 75 |

The Newdex Common Stock issued to Dex One and SuperMedia stockholders will have a par value of $0.00 1 per share.

(b)   These adjustments represent the estimated fair value of SuperMedia's intangible assets in conjunction with our application of acquisition accounting and in conformity with Dex One's accounting policies and fair value estimation methodologies. The determination of the estimated fair value of all of SuperMedia's intangible assets resulted in a net increase in intangible assets of $546 million.

(c)   Dex One and SuperMedia recognize revenue with respect to print advertising under the deferral and amortization method whereby revenues are initially deferred when a directory is published, net of sales claims and allowances, and recognized ratably over the directory's life, which is typically 12 months.

Subsequent to the conforming adjustments for unbilled accounts receivable noted above, deferred revenue associated with the acquired SuperMedia directories on September 30, 2012, was $438 million, which included $435 million related to directories published prior to the Merger that, in the absence of acquisition accounting, would have been recognized over the twelve months following the Merger under the deferral and amortization method. Under acquisition accounting, the $435 million of deferred revenue has been reduced to zero in the accompanying unaudited pro forma condensed combined balance sheet as of September 30, 2012. The remaining deferred revenue of $3 million pertains to billings to customers in advance of the directories being published. Although the deferred revenue balance was substantially eliminated as a result of acquisition accounting, Newdex will retain all the rights associated with the collection of amounts due and contractual obligations under the advertising contracts executed prior to the Merger. As a result, the net accounts receivable balances relating to the SuperMedia directory business will become assets of Newdex.

(d)   Dex One and SuperMedia also recognize certain costs directly related to the sale and production of print advertising under the deferral and amortization method. The deferred directory costs associated with the acquired SuperMedia directories on September 30, 2012, were $130 million and included $97 million related to directories published prior to the Merger that, in the absence of acquisition accounting, would have been recognized over the twelve months following the Merger under the deferral and amortization method. Under acquisition accounting, the $97 million of deferred directory costs related to directories published prior to the Merger have been reduced to zero in the accompanying unaudited pro forma condensed combined balance sheet as of September 30, 2012. The remaining deferred directory costs of $33 million, which relate to paper inventory and costs associated with directories that are scheduled to publish subsequent to the Merger, will be assumed by Newdex and are reflected on the unaudited pro forma condensed combined balance sheet as of September 30, 2012.

(e)   Total estimated remaining financing costs associated with the amendments of the Debtors' and SuperMedia's Prepetition Credit Agreements will approximate $10 million for the Debtors and $9 million for SuperMedia and such costs will be deferred and amortized to interest expense over the maturities of the related loans under the Prepetition Credit Agreements.

(f)   These adjustments represent a preliminary assessment of SuperMedia's deferred income taxes that will be eliminated under acquisition accounting as well as deferred income taxes of Newdex upon the Effective Date. At the time of the creation of these pro forma condensed combined financial statements, the Debtors have not completed their assessment of their valuation allowance that will carryforward to Newdex upon the Effective Date. As of September 30, 2012, the Debtors' estimated valuation allowance totaled $117 million, which represents the amount subject to adjustment upon finalization of our assessment of the Newdex's deferred income taxes.

The amendments to the SuperMedia Secured Credit Agreement as noted in the Merger Agreement have resulted in a significant modification determination in accordance with Treasury Regulation Section 1.1001-3. As such, estimated deferred taxes of $180 million that would have been recognized as a result of acquisition accounting associated with adjusting SuperMedia's outstanding debt to fair value have not been recognized on the unaudited pro forma condensed combined balance sheet as of September 30, 2012. However, as a result of this determination, estimated accrued taxes of $12 million have been recognized on the unaudited pro forma condensed combined balance sheet as of September 30, 2012. If the Merger is unable to be completed out of court and must be accomplished through a chapter 11 bankruptcy, the estimated accrued taxes of $12 million included in the unaudited pro forma condensed combined balance sheet as of September 30, 2012 would not be recognized resulting in a reduction to goodwill.

(g)   Goodwill represents the excess purchase price over the estimated fair value of the net identifiable assets acquired. We have estimated goodwill of approximately $208 million assuming the Merger had occurred as of September 30, 2012. SuperMedia's pre-Merger goodwill was eliminated as a result of acquisition accounting.

(h)   As a result of acquisition accounting, SuperMedia's outstanding debt was adjusted to fair value of $994 million and a discount of $481 million was recognized. This discount will be amortized to interest expense over the remaining term of the loans under the SuperMedia Secured Credit Agreement.

(i)   These adjustments eliminate SuperMedia's historical equity, accumulated deficit, and accumulated other comprehensive income and establish equity of Newdex in conjunction with the Merger Agreement.

(j)   As a result of acquisition accounting, the carrying value of SuperMedia's capitalized software was adjusted by $11 million to an estimated fair value of $27 million.

In order to state unbilled accounts receivables at fair value, an estimated allowance for doubtful accounts of $18 million was established based on historical experience as an offset to unbilled accounts receivable, resulting in a net unbilled accounts receivable adjustment of $352 million on the unaudited pro forma condensed combined balance sheet as of September 30, 2012.

This adjustment includes estimated remaining SuperMedia Merger-related costs of $21 million that have been eliminated as part of SuperMedia's historical accumulated deficit. See footnote (k) below for additional information.

This adjustment includes an acceleration of unrecognized compensation cost associated with SuperMedia's long term incentive plan of $6 million due to change in control provisions.

In order to conform to Dex One's accounting policy pertaining to the measurement of assigning probabilities for uncertain state tax positions, we have reduced SuperMedia's liability for uncertain tax positions by $5 million.

(k)   This adjustment reflects total estimated remaining Merger-related costs of $60 million, which includes total estimated remaining financing costs of $19 million noted in (e) above, comprised of $10 million for the Debtors and $9 million for SuperMedia, and estimated remaining Merger-related costs of $41 million, comprised of $20 million for the Debtors and $21 million for SuperMedia, representing one-time investment banking, legal, and professional fees. As the Merger-related costs are a non-recurring expense to be recognized, these costs are not included in the unaudited pro forma condensed combined statements of operations.

(l)   This adjustment represents the acceleration of unrecognized compensation cost associated with SuperMedia's stock-based awards of $3 million, which has been eliminated as part of SuperMedia's historical equity and accumulated deficit, and the Debtors' stock-based awards of $4 million due to change in control provisions. This non-recurring cost is directly attributable to the Merger and not included in the unaudited pro forma condensed combined statements of operations.

### UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS
### THE DEBTORS AND SUPERMEDIA
### FOR THE YEAR ENDED DECEMBER 31, 2011

| (in millions, except per share data) | The Debtors Historical | SuperMedia Historical | Pro Forma Transaction Adjustments | Newdex Total Pro Forma |
|---|---|---|---|---|
| Net revenues ............................................................ | $ 1,481 | $ 1,642 | $ (669)[1] | $ 2,454 |
| Expenses: | | | | |
| Production and distribution expenses ........................ | 287 | 408 | (86)[1] | 609 |
| Selling and support expenses ..................................... | 427 | 435 | (75)[1] | 787 |
| General and administrative expenses ......................... | 144 | 220 | (26)[1] | 338 |
| Depreciation and amortization .................................. | 252 | 172 | (54)[2] | 370 |
| Impairment charges .................................................. | 801 | 1,003 | — | 1,804 |
| Total expenses ..................................................... | 1,911 | 2,238 | (241) | 3,908 |
| Operating loss ..................................................... | (430) | (596) | (428) | (1,454) |
| Gain on debt repurchases, net.................................... | — | 116 | | 116 |
| Gain on sale of assets, net ........................................ | 13 | — | — | 13 |
| Interest expense, net ................................................. | (227) | (227) | (130)[3] | (584) |
| Loss before reorganization items, net and income taxes | (644) | (707) | (558) | (1,909) |
| Reorganization items, net ......................................... | — | (2) | — | (2) |
| Loss before income taxes ...................................... | (644) | (709) | (558) | (1,911) |
| (Provision) benefit for income taxes ......................... | 125 | (62) | 223[4] | 286 |
| Net loss ................................................................. | $ (519) | $ (771) | $ (335) | $ (1,625) |
| Loss per share: | | | | |
| Basic ...................................................................... | $ (10.35) | $ (51.04) | [5] | $ (95.03) |
| Diluted .................................................................. | $ (10.35) | $ (51.04) | [5] | $ (95.03) |
| Shares used in computing loss per share: | | | | |
| Basic ...................................................................... | 50.1 | 15.1 | (48.1)[5] | 17.1 |
| Diluted .................................................................. | 50.1 | 15.1 | (48.1)[5] | 17.1 |

[*The remainder of this page is intentionally left blank.*]

**UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS**
**THE DEBTORS AND SUPERMEDIA**
**FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2012**

| (in millions, except per share data) | The Debtors Historical | | SuperMedia Historical | | Pro Forma Transaction Adjustments | | Newdex Total Pro Forma | |
|---|---|---|---|---|---|---|---|---|
| Net revenues | $ | 999 | $ | 1,042 | $ | —[1] | $ | 2,041 |
| Expenses: | | | | | | | | |
| Production and distribution expenses | | 215 | | 249 | | —[1] | | 464 |
| Selling and support expenses | | 270 | | 261 | | —[1] | | 531 |
| General and administrative expenses | | 94 | | 78 | | —[1] | | 172 |
| Depreciation and amortization | | 313 | | 119 | | (32)[2] | | 400 |
| Total expenses | | 892 | | 707 | | (32) | | 1,567 |
| Operating income | | 107 | | 335 | | 32 | | 474 |
| Gain on debt repurchases, net | | 140 | | 51 | | — | | 191 |
| Interest expense, net | | (152) | | (129) | | (100)[3] | | (381) |
| Income before reorganization items, net and income taxes | | 95 | | 257 | | (68) | | 284 |
| Reorganization items, net | | — | | (1) | | — | | (1) |
| Income before income taxes | | 95 | | 256 | | (68) | | 283 |
| (Provision) benefit for income taxes | | 3 | | (78) | | 27[4] | | (48) |
| Net income | $ | 98 | $ | 178 | $ | (41) | $ | 235 |
| Earnings per share: | | | | | | | | |
| Basic | $ | 1.94 | $ | 11.36 | | [5] | | $13.74 |
| Diluted | $ | 1.93 | $ | 11.36 | | [5] | | $13.74 |
| Shares used in computing earnings per share: | | | | | | | | |
| Basic | | 50.6 | | 15.3 | | (48.8)[5] | | 17.1 |
| Diluted | | 50.6 | | 15.3 | | (48.8)[5] | | 17.1 |

(1)  The adjustments to the unaudited pro forma condensed combined statement of operations for the year ended December 31, 2011, represent net revenue of $669 million and certain expenses of $187 million related to SuperMedia directories published prior to the Merger that, due to acquisition accounting, would not have been recognized during the year ended December 31, 2011, assuming the Merger had occurred on January 1, 2011. As revenue and certain costs directly related to the sale and production of print advertising are recognized over the life of the directory, which is typically twelve months, the unaudited pro forma condensed combined statement of operations for the nine months ended September 30, 2012, has not been adjusted.

(2)  These adjustments represent a revision of SuperMedia's intangible asset amortization expense and capitalized software expense for the year ended December 31, 2011, and nine months ended September 30, 2012, respectively, assuming the Merger had occurred on January 1, 2011, and to reflect the new fair value and estimated useful lives of its intangible assets as a result of acquisition accounting and conforming with Dex One's accounting policies and fair value estimation methodologies. The following table presents the estimated pro forma fair value and remaining useful lives of SuperMedia's intangible assets as well as the estimated pro forma intangible asset amortization expense for the year ended December 31, 2011, and nine months ended September 30, 2012, respectively.

| (in millions) | Fair Value Estimate | Life (Years) | Year Ended December 31, 2011 | Nine Months Ended September 30, 2012 |
|---|---|---|---|---|
| Directory service agreements | $460 | 10 | $46 | $35 |
| Client relationships | 270 | 10 | 27 | 20 |
| Marketing-related intangibles | 40 | 10 | 4 | 3 |
| Patented technologies | 10 | 3 | 3 | 2 |
| | $780 | | $80 | $60 |

(3) These adjustments represent estimated pro forma incremental interest expense for the year ended December 31, 2011, and nine months ended September 30, 2012, respectively, associated with (1) the amendments of the Debtors' and SuperMedia's interest rates on their Prepetition Credit Agreements as currently proposed, (2) amortization of deferred financing costs associated with the amendments of the Debtors' and SuperMedia's Prepetition Credit Agreements and (3) amortization of the fair value adjustment to the SuperMedia Secured Credit Agreement.

| (in millions) | Year Ended December 31, 2011 | Nine Months Ended September 30, 2012 |
|---|---|---|
| Incremental interest expense associated with the Debtors' and SuperMedia's interest rates amendments | $ 52 | $ 30 |
| Amortization of deferred financing costs associated with the Debtors' and SuperMedia's amendments | 4 | 2 |
| Amortization of the fair value adjustment to the SuperMedia Secured Credit Agreement | 74 | 68 |
| Total incremental interest expense | $130 | $100 |

A sensitivity analysis demonstrating the impact of a 12.5 basis point increase or decrease in assumed interest rates for the Debtors' and SuperMedia's Prepetition Credit Agreements would yield a difference to pro forma incremental interest expense of approximately $6 million and $4 million for the year ended December 31, 2011, and nine months ended September 30, 2012, respectively.

(4) These adjustments represent the income tax effect of the preceding pro forma adjustments using a statutory rate of 40%. At the time of the creation of these pro forma condensed combined financial statements, the Debtors have not completed their assessment of their tax attributes that will carryforward to the combined entity upon the Effective Date. Final determination of the remaining tax attributes could have a material impact on the combined company's effective tax rate subsequent to the Effective Date.

(5) The following table presents the calculation of the Debtors' and SuperMedia's historical basic and diluted earnings (loss) per share ("EPS") as well as pro forma basic and diluted EPS of Newdex for the year ended December 31, 2011, and the nine months ended September 30, 2012, respectively:

| (in millions, except per share data) | The Debtors Historical | | SuperMedia Historical | | Newdex Total Pro Forma | |
| | Year Ended December 31, 2011 | Nine Months Ended September 30, 2012 | Year Ended December 31, 2011 | Nine Months Ended September 30, 2012 | Year Ended December 31, 2011 | Nine Months Ended September 30, 2012 |
|---|---|---|---|---|---|---|
| **Basic EPS:** | | | | | | |
| Net income (loss) .................. | $    (519) | $    98 | $    (771) | $    178 | $  (1,625) | $    235 |
| Less: Allocation of income to participating unvested restricted stock .................... | — | — | — | (5) | — | — |
| Income (loss) available to common shareholders .......... | (519) | 98 | (771) | 173 | (1,625) | 235 |
| Weighted average common shares outstanding ......................... | 50.1 | 50.6 | 15.1 | 15.3 | 17.1 | 17.1 |
| Basic EPS ........................ | $  (10.35) | $   1.94 | $  (51.04) | $   11.36 | $  (95.03) | $   13.74 |
| **Diluted EPS:** | | | | | | |
| Net income (loss) .................. | $    (519) | $    98 | $    (771) | $    178 | $  (1,625) | $    235 |
| Less: Allocation of income to participating unvested restricted stock .................... | — | — | — | (5) | — | — |
| Income (loss) available to common shareholders .......... | (519) | 98 | (771) | 173 | (1,625) | 235 |
| Weighted average common shares outstanding ......................... | 50.1 | 50.6 | 15.1 | 15.3 | 17.1 | 17.1 |
| Dilutive effect of stock awards .................................. | — | 0.01 | — | — | — | — |
| Weighted average diluted shares outstanding ......................... | 50.1 | 50.6 | 15.1 | 15.3 | 17.1 | 17.1 |
| Diluted EPS ..................... | $  (10.35) | $   1.93 | $  (51.04) | $   11.36 | $  (95.03) | $   13.74 |

Due to the Debtors' and SuperMedia's reported net losses for the year ended December 31, 2011, the effect of all stock-based awards was anti-dilutive and therefore not included in the calculation of EPS.

Certain employees and certain non-management directors of SuperMedia were granted restricted stock awards, which entitles those participants to receive non-forfeitable dividends during the vesting period on a basis equivalent to the dividends paid to holders of SuperMedia's common stock. As such, these unvested restricted stock awards meet the definition of a participating security. Participating securities are defined as unvested share-based payment awards that contain non-forfeitable rights to dividends or dividend equivalents (whether paid or unpaid) and are included in the computation of EPS pursuant to the two-class method. At September 30, 2012, there were 0.4 million of such participating securities outstanding. Under the two-class method, all earnings, whether distributed or undistributed, are allocated to each class of common stock and participating securities based on their respective rights to receive dividends. However, the net loss from continuing operations for the year ended December 31, 2011, was not allocated to these participating securities, as these awards do not share in any loss generated by SuperMedia.

**EXHIBIT G TO THE DISCLOSURE STATEMENT**

SUPERMEDIA TAX SHARING AGREEMENT

[THIS PAGE INTENTIONALLY LEFT BLANK]

## [FORM OF SUPERMEDIA-DEX TAX SHARING AGREEMENT]

THIS [SUPERMEDIA-DEX] TAX SHARING AGREEMENT (the "Agreement") is made and entered on [                    ], by and between [SUPERMEDIA INC., a Delaware corporation ("SuperMedia") together with SUPERMEDIA SALES INC., a Delaware corporation, and SUPERMEDIA SERVICES INC., a Delaware corporation] (collectively, the "SuperMedia Entities" and, individually, a "SuperMedia Entity"), DEX ONE CORPORATION, a Delaware corporation ("DOC"), NEWDEX, INC. a Delaware corporation ("Parent"),and DEX ONE SERVICE, INC., a Delaware corporation ("DOS"), (the SuperMedia Entities, Parent, DOS and any person who hereafter becomes a party to this Agreement, collectively the "Parties" and, individually, a "Party").

## R E C I T A L S

WHEREAS, SuperMedia and its U.S. corporate subsidiaries constitute an affiliated group of corporations within the meaning of Section 1504(a) of the Code (the "SuperMedia Group");

WHEREAS, DOC, DEX MEDIA, INC., a Delaware corporation, DEX MEDIA EAST, INC., a Delaware corporation, DEX MEDIA WEST, INC., a Delaware corporation, R.H. DONNELLEY CORPORATION, a Delaware corporation, R.H. DONNELLEY INC., a Delaware corporation, R.H. DONNELLEY APIL, INC., a Delaware corporation, and BUSINESS.COM, INC., a Delaware corporation constitute an affiliated group of corporations within the meaning of Section 1504(a) of the Code (the "DOC Consolidated Group") (the members of the DOC Consolidated Group together with Parent, collectively, the "Dex Entities" and individually, a "Dex Entity");

WHEREAS, pursuant to the Agreement and Plan of Merger dated as of [                    ], 2012 (the "Merger Agreement"), by and among Parent, DOC, SuperMedia, SUPERMEDIA ACQUISITION SUB, INC., a Delaware corporation and a direct, wholly owned subsidiary of Parent ("Merger Sub"), (i) DOC will merge with and into Parent, with Parent as the surviving entity (the "Dex Merger") and (ii) immediately following consummation of the Dex Merger, Merger Sub will merge with and into SuperMedia, with SuperMedia surviving the merger and becoming a wholly-owned subsidiary of Parent (the "SuperMedia Merger");

WHEREAS, Parent will be the successor to DOC as a result of the Dex Merger and Parent will be common parent corporation of the affiliated group of corporations that are members of the DOC Consolidated Group (the "Parent Consolidated Group");

WHEREAS, on the day following the Closing Date, each of the SuperMedia Entities and each of the Dex Entities will be a member of the Parent Consolidated Group;

WHEREAS, the Parent Consolidated Group intends to file consolidated federal income tax returns as permitted by Section 1501 of the Code;

WHEREAS, in certain state and local tax jurisdictions the Parties may calculate income, franchise or similar tax liabilities on a consolidated, combined or unitary basis;

WHEREAS, DOS will be the service agent of the Parent Consolidated Group;

WHEREAS, in furtherance of the Merger Agreement, each SuperMedia Entity desires on behalf of itself and its successors to set forth its rights and obligations with respect to taxes due for periods during and after the period in which such SuperMedia Entity is a member of the Parent Consolidated Group;

NOW THEREFORE, the Parties hereto, intending to be legally bound and in consideration of the premises and the mutual covenants herein contained, agree as follows:

# ARTICLE I
## DEFINITIONS

References in this Agreement to provisions of the Code and Treasury Regulations shall include successor provisions to the Code and Treasury Regulations.  All other capitalized terms used herein shall have the meaning specified herein.

"AMT" means the tax described in Section 55(a) of the Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Composite Rate" means, with respect to any taxable year, the sum of (i) the highest marginal federal income tax rate for such taxable year and (ii), as determined in good faith by Parent, the estimated tax rate of the members of the Parent Consolidated Group, in the aggregate, for Consolidated State Tax (net of any federal income tax benefit) with respect to such taxable year.

"Consolidated Return" means the Parent Consolidated Group's federal income tax consolidated return.

"Consolidated State Tax" means, with respect to any taxable year (other than a Pre-Consolidation Tax Period), any state and local tax calculated on a consolidated, combined or unitary basis.

"Consolidation" means any event pursuant to which a Party begins to be includable in the Parent Consolidated Group.

"Credit Attribute" means any credit that is attributable to one member of the Parent Consolidated Group that may be used in accordance with Section 1502 of the Code and the Treasury regulations issued thereunder to offset Regular Taxes attributable to another member of the Parent Consolidated Group.

"Deconsolidation" means any event pursuant to which a SuperMedia Entity or Dex Entity ceases to be includable in the Parent Consolidated Group.

"Dex Tax Benefit" means 50% of the SuperMedia Utilized Tax Assets.

"Dex TSA" means, that certain tax sharing agreement by and among the Dex Entities entered into as of January 1, 2011, as modified by the amendments agreed to by the Dex Entities as of March 9, 2012, [attached hereto as Exhibit-A].

"Dex Utilized Tax Assets" means, with respect to any taxable year the amount equal to the sum of (i) the aggregate Credit Attributes of the Dex Entities, plus (ii) the product of (x) the Composite Rate, multiplied by (y) the aggregate Loss Attributes of the Dex Entities, but only to the extent such Credit Attributes and Loss Attributes, if any, are (I) used, or are reasonably expected to be used, by the Parent Consolidated Group in the Tax Returns for such taxable year to reduce Regular Tax attributable to any SuperMedia Entity or (II) reduced, or reasonably expected to be reduced, as a result of any cancellation of indebtedness income of a SuperMedia Entity that is excluded from U.S. federal taxable income in such taxable year pursuant to Section 108 of the Code.

"Event" has the meaning set forth in Section 4.4.

"Final Determination" shall mean final resolution of liability for any Tax, which resolution may be for a specific issue or adjustment or for a Tax period (i) by a decision, judgment, decree or other order by any court of competent jurisdiction which has become final and not subject to further appeal, (ii) by a closing agreement entered into under Section 7121 of the Code or any other binding settlement agreement (whether or not with the Internal Revenue Service) entered into in connection with or in contemplation of an administrative or judicial proceeding, or (iii) by the completion of the highest level of administrative proceedings if a judicial contest is not or is no longer available.

"Loss Attribute" means any loss or deduction recognized by one member of the Parent Consolidated Group that may be used in accordance with Section 1502 of the Code and the Treasury regulations issued thereunder to offset the Regular Taxable income of another member of the Parent Consolidated Group.  For the avoidance of doubt, such term shall include, but not be limited to, a net operating loss, net capital loss, charitable deduction or any other loss or deduction that can be carried forward or carried back to reduce a Regular Tax.

"Parent Consolidated Group" has the meaning set forth in the recitals.

"Post-Deconsolidation Tax Period" means (i) any tax period beginning and ending after the date of the Deconsolidation and (ii) with respect to a tax period that begins before and ends after the date of Deconsolidation, such portion of the tax period that commences on the day immediately after the date of Deconsolidation.

"Pre-Consolidation Tax Period" means any tax period beginning before or on the date of Consolidation.

"Pre-Deconsolidation Tax Period" means (i) any tax period beginning and ending before or on the date of Deconsolidation and (ii) with respect to a period that begins before and ends after the date of Deconsolidation, such portion of the tax period ending on and including the date of Deconsolidation.

"Proceeding" means any audit or other examination, protest, appeal or other administrative or judicial proceeding relating to a Party's liability for, or refunds or adjustments to, Taxes for any Tax period.

"Regular Tax" means any Tax imposed under Subtitle A or F of the Code; *provided that* the term does not include AMT or any adjustments related thereto.

"SuperMedia Group" has the meaning ascribed to it in the recitals, *provided that* for the avoidance of doubt the term shall be interpreted to take account of any corporations that may enter or exit the group from time to time.

"SuperMedia Rebate" means, with respect to any taxable year, an amount equal to the sum of the SuperMedia Tax Benefit and the Dex Tax Benefit.

"SuperMedia Taxable Income" means, with respect to any taxable year (other than a Pre-Consolidation Tax Period) the aggregate of each SuperMedia Entity's positive U.S. federal taxable income, if any, for Regular Tax purposes computed: (i) on a standalone basis, and (ii) without regard to any Tax Attributes constituting SuperMedia Utilized Tax Assets or the Tax Attributes of any Dex Entity; provided that any cancellation of indebtedness income of a SuperMedia Entity that is excluded from U.S. federal taxable income under Section 108 of the Code and that utilizes Dex Utilized Tax Assets shall be included in SuperMedia Taxable Income.

"SuperMedia Tax Benefit" means, with respect to any taxable year, 25% of the Dex Utilized Tax Assets.

"SuperMedia Tax Payable" means, with respect to any taxable year (other than a Pre-Consolidation Tax Period), the product of (x) the Composite Rate, multiplied by (y) the SuperMedia Taxable Income, if any, for such taxable year.

"SuperMedia Utilized Tax Assets" means, with respect to any taxable year, the amount equal to the sum of (i) the aggregate Credit Attributes of the SuperMedia Entities, plus (ii) the product of (x) the Composite Rate, multiplied by (y) the aggregate Loss Attributes of the SuperMedia Entities, but only to the extent such Credit Attributes and Loss Attributes, if any, are used, or are reasonably expected to be used, by the Parent Consolidated Group in any Tax Return for such taxable year to reduce the Regular Tax (excluding any Regular Tax attributable to cancellation of indebtedness income) attributable to any Dex Entity.

"Tax" or "tax" means any U.S. federal, state or local income, franchise or similar tax.

"Tax Attributes" means any Loss Attribute and any Credit Attribute.

"Tax Item" means any item of income, gain, loss, deduction or credit, or other attribute that may have the effect of increasing or decreasing any tax.

"Tax Return" means any Consolidated Return and any state or local income, franchise or similar tax return on which the activities of more than one Party are reported on a consolidated, combined or unitary basis (other than any tax return for a Pre-Consolidation Tax Period).

## ARTICLE II
## TAX PREPARATION

2.1     Parent agrees to prepare and timely file, or to cause to have prepared and timely filed, the Tax Returns for any period with respect to which Parent remains the common parent corporation of the Parent Consolidated Group. Parent shall be responsible for determining the elections, methods of accounting, positions, conventions and other principles of taxation to be used and the manner in which any Tax Item shall be reported on the Tax Returns.

2.2     For any tax period, each Party will provide each other Party with the cooperation and information reasonably requested in connection with tax planning, the preparation or filing of any Tax Return (or claim for refund), the determination and payment of estimated tax, the conduct of any Proceeding, or the calculation of any amount under this Agreement. Such cooperation and information includes, but is not limited to: (i) promptly forwarding copies of relevant notices and other communications (including, information document requests, revenue agent's reports and similar reports, notices of proposed adjustments and notices of deficiency) received by the Party from, or sent by the Party to, any taxing authority, (ii) providing copies of all relevant Tax Returns (including work papers and schedules), and documents relating to relevant rulings or other determinations by taxing authorities, (iii) providing copies of records concerning the ownership and tax basis of property beneficially owned by a Party, (iv) providing other relevant information which either Party may possess, including explanations of documents and information provided under this Agreement, as well as access to appropriate personnel, (v) the execution of any document that may be necessary or reasonably helpful in connection with the filing of a Tax Return (or claim for refund) or in connection with any Proceeding, including waivers, consents or powers of attorney, and (vi) the use of the Parties' reasonable efforts to obtain any documentation from a governmental authority or a third party that may be necessary or reasonably helpful in connection with any of the foregoing.

2.3     During any Pre-Deconsolidation Tax Period, Parent has the sole right to represent, in good faith, the interests of the SuperMedia Group with respect to Tax Returns, and Proceedings with respect to Tax Returns, for any period for which Parent remains the common parent corporation of the Parent Consolidated Group.

## ARTICLE III
## TAX SHARING

3.1     As common parent for the Parent Consolidated Group, Parent shall cause and direct DOS to pay the consolidated U.S. federal income tax liability of the Parent Consolidated Group and the Consolidated State Tax liability of the Parties at such time and in such manner as such payments are required.

3.2     For each taxable period ending on or after the date hereof, for which any SuperMedia Entity is included in a Tax Return, SuperMedia shall pay to DOS an amount equal to the SuperMedia Tax Payable, if any, for such taxable period.

3.3     For each taxable period ending on or after the date hereof, for which any SuperMedia Entity is included in a Tax Return (including for the avoidance of doubt, any period

in which a Deconsolidation takes place), DOS shall pay to SuperMedia an amount equal to the SuperMedia Rebate, if any, for such taxable period.

3.4    AMT

(a) For each taxable period ending on or after the date hereof, for which any SuperMedia Entity is included in a Tax Return (including for the avoidance of doubt, any period in which a Deconsolidation taxes place) and for which the Parent Consolidated Group has an AMT liability and the SuperMedia Group would have had AMT liability (calculated on a standalone basis without reference to any Tax Attributes other than Tax Attributes of SuperMedia Entities), SuperMedia shall pay to DOS an amount equal to the lesser of (i) the AMT liability of the Parent Consolidated Group, or (ii) such standalone AMT liability of the SuperMedia Group, and SuperMedia shall be entitled to the benefits of any corresponding AMT credits.

(b) Any AMT liabilities (and the corresponding credits) of the Parent Consolidated Group or its members, other than those described in Section 3.4(a), shall not be borne by any SuperMedia Entity but instead shall be the responsibility of the Dex Entities and shall be allocated among them in accordance with the Dex TSA.

3.5    Any payments, net of any SuperMedia Rebate, required to be made under this Article III by SuperMedia for a taxable year shall promptly be paid to DOS at the time or times requested by Parent.

3.6    A final accounting of the amount of payments for any taxable year shall be made, and any necessary adjustment shall be paid, on or before October 31 of the year following such taxable year unless the extended due date of a Consolidated State Tax return is after October 31, in which case the final accounting will occur no later than 30 days following the filing of such return.

3.7    In the event of an adjustment or redetermination of any item with respect to the Consolidated Return or Consolidated State Tax as a result of a Final Determination, the filing of a tax refund claim or the filing of an amended Tax Return pursuant to which taxes are paid to a tax authority or a refund of taxes is received from a tax authority, Parent shall prepare, in accordance with the principles and procedures set forth in this Agreement, revised Tax Returns, as appropriate, to reflect the adjustment or redetermination as a result of such Final Determination, filing of a tax refund claim or filing of an amended Tax Return.  Following the preparation of such revised Tax Returns, the Parties' payment obligations under this Agreement shall be redetermined and the Parties shall make appropriate payments reflecting such redetermination.

**ARTICLE IV**
**POST-DECONSOLIDATION**

4.1    Each Party covenants that on or after a Deconsolidation it will not make or change any tax election, change any accounting method, amend any tax return or take any tax position on any tax return, take any other action, omit to take any action or enter into any transaction that results in any increased tax liability or reduction of any Tax Attribute of the Parent Consolidated

Group or any member thereof in respect of any Pre-Deconsolidation Tax Period, without first obtaining the written consent of the other Parties.

4.2     In the event of a Deconsolidation, Parent may, at its option, elect, and the applicable Party shall join Parent in electing, to ratably allocate items (other than extraordinary items) of the applicable Party in accordance with relevant provisions of the Treasury Regulations Section 1.1502-76.

4.3     In the event of a Deconsolidation, during any Post-Deconsolidation Period, Parent shall promptly notify SuperMedia in writing upon receipt by any includable member of the Parent Consolidated Group of notice in writing of any Proceeding in respect of a Pre-Deconsolidation Period.  SuperMedia shall be entitled to participate in such Proceeding at its own expense; provided that SuperMedia shall, following its receipt of notice of such Proceeding from Parent, promptly notify Parent in writing of its intention to participate in such Proceeding. In the event that SuperMedia elects to participate in any such proceeding, Parent shall not settle or resolve any issue that could materially affect SuperMedia's liability for Taxes without SuperMedia's consent; such consent not to be unreasonably withheld conditioned or delayed. Parent shall provide SuperMedia with copies of any correspondence received from the taxing authorities related to any such Proceedings controlled by Parent, as reasonably requested by SuperMedia.

4.4     Parent agrees to pay SuperMedia 100% of the actual tax benefit received by the Parent Consolidated Group from the use in any Tax Period of a carryback of any Tax Attribute of SuperMedia from a Post-Deconsolidation Tax Period, determined and paid in accordance with the principles of Article III.  If, subsequent to the payment by Parent to SuperMedia of any such amount, there shall be (i) a Final Determination which results in a disallowance or a reduction of the Tax Attribute so carried back or (ii) a reduction in the amount of the benefit realized by the Parent Consolidated Group as a result of any other Tax Attribute that arises in a Post-Deconsolidation Tax Period, SuperMedia shall (net of any out-of-pocket costs) repay Parent within 90 days of such event described in (i) or (ii) of this paragraph (an "Event" or, collectively, the "Events") any amount which would not have been payable to SuperMedia pursuant to this Section 4.4 had the amount of the benefit been determined in light of the Events.

4.5     SuperMedia shall hold Parent harmless for any penalty or interest payable by any member of the Parent Consolidated Group, solely as a result of any Event.  Any such amount shall be paid by SuperMedia to Parent within 90 days of the payment by Parent or any member of the Parent Consolidated Group of any such interest or penalty.

4.6     Parent may designate DOS, as its service agent, as the payor of any payment required to be paid by Parent to SuperMedia pursuant to Section 4.4 or as the payee of any payment required to be paid by SuperMedia to Parent pursuant to Sections 4.4 or 4.5.

## ARTICLE V
## MISCELLANEOUS

5.1     This Agreement shall expire with respect to an applicable Party upon the date of the Deconsolidation with respect to all Post-Deconsolidation periods of such Party; provided,

however, that all rights and obligations arising hereunder with respect to a Pre-Deconsolidation Tax Period shall survive until they are fully effectuated or performed; provided, further, that notwithstanding anything in this Agreement to the contrary, all rights and obligations arising hereunder with respect to a Post-Deconsolidation Tax Period shall remain in effect and its provisions shall survive for the full period of all applicable statutes of limitation (giving effect to any extension, waiver or mitigation thereof).

5.2     For any period with respect to which Parent remains the common parent corporation of the Parent Consolidated Group, Parent shall be responsible for determining the conventions and other principles for the implementation of this Agreement.

5.3     No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy by any Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.  No Party shall be deemed to have waived any rights hereunder unless such waiver shall be in writing and signed by such Party.  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into by each of the Parties.

5.4     In any action, litigation or proceeding between the Parties arising out of or in relation to this Agreement, the prevailing Party in such action shall be awarded, in addition to any damages, injunctions or other relief, and without regard to whether or not such matter be prosecuted to final judgment, such Party's reasonable costs and expenses, including but not limited to costs and reasonable attorneys' fees incurred in bringing such action, litigation or proceeding and/or enforcing any judgment or order granted therein.

5.5     This Agreement contains the entire agreement between the Parties hereto, superseding any oral statements, representations, understanding or agreements with respect to the terms or provisions of this Agreement.

5.6     All notices, requests, demands, consents, instructions or other communications to any Party under this Agreement shall be in writing and mailed or delivered to each Party at the Party's address in the records of Parent.  All such notices and communications shall be effective (i) when sent by Federal Express or other overnight service of recognized standing, on the business day following the deposit with such service; (ii) three days after mailing when mailed, by registered or certified mail, first class postage prepaid and addressed as aforesaid through the United States Postal Service, and (iii) when delivered by hand, upon delivery.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors, and assigns.

5.7     If one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, no Party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The Parties shall endeavor in good-faith negotiations to

replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

5.8    This Agreement may be executed in multiple counterparts (any one of which need not contain the signatures of more than one Party), each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

5.9    This Agreement, and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

5.10    This Agreement constitutes the entire agreement between the parties hereto with respect to the matters covered hereby and supersedes all prior agreements and understandings between the parties.

5.11    The terms of this Agreement shall not be waived, altered, modified, amended or supplemented except by written instrument signed by each Party.

5.12    The parties hereto shall treat any payments made pursuant to the terms of this Agreement as a tax-exempt transaction for all tax purposes, except to the extent required by applicable law.

5.13    If, due to any change in applicable law or regulation or the interpretation thereof by any court of law or other governing body having jurisdiction, subsequent to the date of the Agreement, performance of any provision of or any transaction contemplated by this Agreement shall become impracticable or impossible, the parties will use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by this Agreement.

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first above written.

NEWDEX, INC.

By:    _____
Title:  _____

DEX ONE CORPORATION, INC.

By:    _____
Title:  _____

DEX ONE SERVICE, INC.

By:    _____
Title:  _____

SUPERMEDIA INC.

By:    _____
Title:  _____

SUPERMEDIA SALES INC.

By:    _____
Title:  _____

SUPERMEDIA SERVICE INC.

By:    _____
Title:  _____

**EXHIBIT H TO THE DISCLOSURE STATEMENT**

UNAUDITED LIQUIDATION ANALYSIS OF THE DEBTORS

[THIS PAGE INTENTIONALLY LEFT BLANK]

## UNAUDITED LIQUIDATION ANALYSIS OF THE DEBTORS

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the "Best Interests Test"), each holder of an impaired Claim or Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in chapter 7. The gross amount of Cash available for distribution to creditors would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the commencement of their chapter 7 cases. Such amount would then be reduced by the costs and expenses of the liquidation.

In order to determine whether the Best Interests Test has been satisfied, available Cash and the proceeds from the liquidation of the Debtors' assets would be applied to Secured Claims (to the extent of the value of the underlying collateral) and to satisfy Administrative Claims (including any incremental Administrative Claims that may result from the termination of the Debtors' businesses and the liquidation of their assets), Priority Tax Claims, and Other Priority Claims, all of which are senior in priority to Senior Subordinated Notes Claims and General Unsecured Claims. Any remaining Cash would be available for distribution to the holders of Senior Subordinated Notes Claims and General Unsecured Claims in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

This liquidation analysis (the "Liquidation Analysis") was prepared by the Debtors with assistance from their financial advisor and represents the Debtors' best estimate of the Cash proceeds, net of liquidation-related costs that would be available for distribution to the holders of Claims and Dex One Interests if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This Liquidation Analysis assumes that the Debtors' Chapter 11 Cases are converted into liquidation cases under chapter 7 in a "shut-the-door" liquidation that does not preserve the going concern value of the Debtors' Estates.

Unless otherwise stated, (i) the asset values used in this Liquidation Analysis reflect the unaudited book values of the Debtors' assets as of September 30, 2012 and (ii) the Debtors' liabilities are based on the Debtors' actual liabilities as of September 30, 2012.

**THE INFORMATION SET FORTH IN THIS LIQUIDATION ANALYSIS IS PRELIMINARY AND IS SUBJECT TO MODIFICATION AND SUPPLEMENTATION BY THE DEBTORS AT ANY TIME UP TO THE PLAN SUPPLEMENT FILING DATE.**

The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, after consultation with their financial advisor, are inherently subject to significant business, economic and competitive uncertainties and contingencies that are beyond the control of the Debtors and their management. Accordingly, there can be no assurance that the estimated values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo liquidation under chapter 7. In addition, any such liquidation would take place under future circumstances that cannot be predicted with certainty. Accordingly, although the analysis that follows is necessarily presented with numerical specificity, if the Debtors' Estates were in fact liquidated as described herein, the actual liquidation proceeds could vary significantly from the amounts set forth in this Liquidation Analysis. Such actual liquidation proceeds could be materially higher or lower than the amounts set forth herein, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated from a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis has been prepared solely for the purposes of estimating the asset proceeds available in hypothetical chapter 7 liquidation. Nothing contained in this Liquidation Analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis for purposes of the Best Interests Test. The Liquidation Analysis should be read in conjunction with the accompanying assumptions. The Liquidation Analysis has been prepared on a Debtor-by-Debtor basis. Accordingly, Claims against each of the Debtors have been identified and allocated by Class for purposes of the Liquidation

Analysis. The following Debtor is not included in the Liquidation Analysis because it has de minimis assets: RH Donnelley Corp.

Capitalized terms used but not defined in this Liquidation Analysis have the meaning assigned thereto in the Plan, a copy of which is attached to this Disclosure Statement as Exhibit A.

**General Assumptions**

Upon conversion of the Debtors' Chapter 11 Cases to chapter 7, a trustee (the "Chapter 7 Trustee") would be appointed to manage the Debtors' affairs and to conduct the liquidation of the Debtors' assets as an alternative to the continued operation of the Debtors' business on a going concern basis as proposed under the Plan. This Liquidation Analysis assumes that it would not be possible to sell the Debtors as a going concern in chapter 7 cases, which would precipitate a shutdown of the Debtors' operations. Accordingly, the Debtors have assumed that the Chapter 7 Trustee would be forced to sell the Debtors' assets in a traditional "bricks and mortar" liquidation, which would result in the loss of most, if not all, of the going concern value attributable to the Debtors' assets.

To maximize recoveries, the hypothetical liquidation is assumed to take place over a six to twelve month period (the "Wind-Down Period"), during which time all of the Debtors' major assets (which primarily consist of receivables) would be collected or sold and the Cash proceeds, net of liquidation-related costs, would be distributed to creditors. The Debtors have assumed that the collection of receivables, sale of assets, and wind-down of operations would be substantially completed during the Wind-Down Period. There can be no assurances that all assets of the Debtors would be completely liquidated during this time period. The Liquidation Analysis assumes that there would be no proceeds from the recoveries on any potential preference, fraudulent conveyance, or other Causes of Action. This Liquidation Analysis assumes that the Debtors would be forced to cease substantially all operations almost immediately upon conversion of their cases to chapter 7. The likely consequences of the conversion to chapter 7 include the following:

- The Debtors' workforce consists of specialized employees who are coveted by the Debtors' competitors. With the Debtors facing certain liquidation, those employees are likely to quickly leave the Debtors and find employment elsewhere. The loss of the Debtors' employees would make an orderly wind down significantly more difficult and would render the possibility of continuing operations in an effort to complete a going concern sale highly remote, if not impossible. The inability to retain employees for a transitional period would be exacerbated by concerns over the Debtors' ability to fund ongoing payroll obligations.

- Substantially all of the Debtors' revenues are derived from advertising sales. The Debtors' customers have the ability to quickly shift their purchases from the Debtors' publications and websites to the Debtors' competitors and/or other advertising mediums. It is highly unlikely that the Chapter 7 Trustee could maintain many, if any, of the Debtors' customers for any meaningful period of time upon the commencement of the Wind-Down Period.

- Net accounts receivables would be difficult to collect in full. The Debtors would, as a result, experience high levels of uncollectible accounts receivable.

- The majority of the Debtors' property, plant, and equipment ("PP&E") consists of depreciated computer equipment and internally and externally developed software. The Debtors lease substantially all of their office space. These assets have very limited value on the secondary market and it is unlikely that any meaningful value would be realized from the liquidation of such assets.

- Substantially all of the Debtors' assets are intangible and are in the form of directory service agreements, brand names, and trademarks. The value of these assets would be severely compromised in a liquidation scenario, although some value would likely be realized from the sale of the subscriber lists and from the sale of the Debtors' trademarks and URLs.

**Specific Assumptions**

### A. *Cash and Cash Equivalents*

The Liquidation Analysis assumes that the Debtors' actual Cash balance as of September 30, 2012, in the amount of approximately $96 million, would be 100% recoverable. The Liquidation Analysis assumes that operations during the Wind-Down Period would not generate additional Cash, except for the net proceeds realized by the Chapter 7 Trustee from the disposition of non-Cash assets.

### B. *Accounts Receivable*

The Liquidation Analysis assumes that the Chapter 7 Trustee would retain certain existing employees of the Debtors to handle an aggressive collection effort for the existing accounts receivable. Collections during a liquidation of the Debtors would likely be significantly compromised as customers may attempt to offset outstanding amounts owed to the Debtors against alleged damage and breach of contract Claims. Estimated proceeds from accounts receivable in a liquidation scenario are based on management's estimate of collectability. An estimated recovery percentage range of 30% to 40% was assumed. Intercompany accounts receivable are assumed to have no value for purposes of this Liquidation Analysis. This Liquidation Analysis assumes the Debtors would continue to bill for published but unamortized revenue. However, the Debtors' ability to collect such receivables is highly uncertain.

### C. *Deferred Directory Costs*

Deferred directory costs consist of deferred sales commissions and deferred print, paper, and initial distribution costs. Deferred directory costs would be amortized over the life of the directory in a going concern scenario. Deferred directory costs are assumed to have no value in liquidation.

### D. *Prepaid Expenses*

Prepaid expenses consist primarily of prepaid print and paper expenses, prepaid commissions, prepaid insurance expense, prepaid rent expense, and other miscellaneous prepaid expenses. Prepaid expenses are assumed to have no value in a liquidation scenario.

### E. *Other Current Assets*

Other current assets consist primarily of miscellaneous receivables, state franchise tax refunds receivables, and credit card receivables. Miscellaneous receivables are deemed to be 80 to 95% recoverable based on the fact that 97% of this balance represents tax refunds receivable and credit card receivables which are deemed to be recoverable. Credit card receivables represent a timing difference between the authorization of the credit card transaction and the receipt of monies from the credit card processor.

### F. *Deferred Tax Assets*

The deferred tax assets are assumed to have no value for purposes of this Liquidation Analysis.

### G. *Property, Plant and Equipment*

PP&E primarily consists of owned assets such as computer equipment and software, leasehold improvements, and furniture & fixtures. A majority of these assets are significantly depreciated and are unlikely to result in any meaningful liquidation value. There is no recoverability for leasehold improvements since such improvements will revert to the lessor upon discontinuation of the leases. An estimated recovery percentage has been applied by asset category. The likely proceeds from the sale of such assets are estimated at 10% - 35% of book value on a net basis.

3

### H.  Other Illiquid Assets

Investment in consolidated subsidiaries, and deferred financing costs are all assumed to have no value for purposes of this Liquidation Analysis.

### I.  Intangible Assets and Goodwill

Goodwill and other intangible assets are assumed to have 0% realizable value in liquidation.

### J.  Other Non-Current Assets

Other non-current assets include deferred financing costs, mark-to-market interest rate swaps, lease agreement receivables, long term deferred tax assets, various deposits, and restricted Cash. Other non-current assets are assumed to have no value for purposes of this Liquidation Analysis. Intercompany investments consist of parent company interest recognition and are assumed to have no value for purposes of this Liquidation Analysis.

## Chapter 7 Administrative Claims

### K.  Chapter 7 Trustee Fees

Chapter 7 Trustee fees are estimated based on historical experience in similar cases and are estimated to be 3% of the total Cash proceeds generated during the liquidation, net of Cash on hand.

### L.  Chapter 7 Professional Fees

Chapter 7 professional fees include legal and accounting fees expected to be incurred by the Chapter 7 Trustee during the Wind-Down Period and not already deducted from liquidation values. Monthly professional fees for legal, accounting, and other staff to assist the Estates and the Chapter 7 Trustee with the liquidation process are assumed to be 25% of the Chapter 7 Trustee's fees.

### M. Wind - Down Costs

Wind-down costs are associated with the retention of select general and administrative ("G&A") employees primarily in the collections, accounting, human resource, treasury, and legal departments. Management estimates these costs to range between 20% and 30% of annual G&A expense.

### N.  Priority Tax Claims

Priority Tax Claims include remaining 2012 state tax payments.

### O.  Secured Claims

For purposes of this Liquidation Analysis, the Secured Claims include the RHDI Secured Credit Facility Claims, the Dex West Secured Credit Facility Claims, and the Dex East Secured Credit Facility Claims.

### P.  Senior Subordinated Notes Claims and General Unsecured Claims

For purposes of this Liquidation Analysis, the unsecured Claims consist of the Senior Subordinated Notes Claims and the General Unsecured Claims (including remaining lease obligations) as estimated in the Disclosure Statement. The Liquidation Analysis does not attempt to estimate the potential additional General Unsecured Claims that would likely arise as a result of the termination of the Debtors' pension and benefit plans, the rejection of remaining Executory Contracts, and the failure of the Debtors to perform under Existing Contracts with their customers and vendors. Such additional Claims would likely result from a cessation of operations as contemplated herein and would likely be substantial in amount. Senior Subordinated Notes Claims and the General Unsecured

Claims are assumed to be paid on a pro rata basis from the net proceeds available, if any, after the payment in full of Secured Claims.

**Conclusion**

As set forth in this Liquidation Analysis, in a hypothetical chapter 7 liquidation, secured creditors' recoveries likely would range from approximately zero to approximately 18 percent of the face value of their respective Secured Claims, and unsecured creditors and holders of Interests likely would receive no recoveries. Under the Plan, all secured and unsecured creditors are projected to recover 100 percent of the face value of their respective Claims. Based on the significantly lower estimated recoveries for secured and unsecured creditors and holders of Interests under this hypothetical liquidation analysis, the Debtors, after consultation with their financial advisor, believe that the Plan satisfies the requirements of the Best Interests Test established by section 1129(a)(7) of the Bankruptcy Code.

*[The remainder of this page is intentionally left blank.]*

*($ in thousands)*

| RHDI | | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| | ***Gross Proceeds*** | | | | | |
| a. | Cash and Cash Equivalents: | $27,418 | 100.0% | 100.0% | $ 27,418 | $ 27,418 |
| b. | Net Accounts Receivable: | 215,572 | 30.0% | 40.0% | 64,672 | 86,229 |
| b. | I/C Receivables: | 0 | — | — | — | — |
| c. | Deferred directory costs: | 45,216 | — | — | — | — |
| d. | Prepaids: | 9,326 | — | — | — | — |
| e. | Other Current Assets: | 3,756 | 80.0% | 95.0% | 3,005 | 3,568 |
| f. | Deferred Tax: | 24,415 | — | — | — | — |
| g. | Fixed Assets and Computer Software, Net: | 30,894 | 10.0% | 35.0% | 3,089 | 10,813 |
| h. | Investment in subsidiaries: | 0 | — | — | — | — |
| i. | Intangible Assets, Net: | 640,708 | — | — | — | — |
| h. | Goodwill: | (0) | — | — | — | — |
| h. | Deferred Financing Costs: | 1,767 | — | — | — | — |
| f. | Deferred Tax Asset L/T: | 6,937 | — | — | — | — |
| j. | Other Non-Current Assets: | 346 | — | — | — | — |
| | **Gross Proceeds Available for Distribution** | **$1,006,355** | **9.8%** | **12.7%** | **$  98,184** | **$ 128,029** |
| | ***Chapter 7 Administrative Claims*** | | | | | |
| k. | Trustee Fees | | 100.0% | 100.0% | $ 2,123 | $ 3,018 |
| l. | Professional Fees | | 100.0% | 100.0% | 531 | 755 |
| m. | Wind Down Costs | | 100.0% | 100.0% | 7,978 | 11,966 |
| n. | Priority Tax Claims | | 100.0% | 100.0% | 431 | 431 |
| | **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | **$11,062** | **$ 16,170** |
| | **Net Proceeds Available for Distribution** | | | | **$87,122** | **$111,858** |
| o. | ***Secured Claims*** | | | | | |
| | RHDI Secured Credit Facility Claims | $ 783,558 | 11.1% | 14.3% | $87,122 | $111,858 |
| | **Total Secured Claims** | **$ 783,558** | **11.1%** | **14.3%** | **$87,122** | **$111,858** |
| | **Net Proceeds Available for Unsecured Claims** | | | | — | — |
| p. | ***Unsecured Claims*** | | | | | |
| | Senior Subordinated Notes Claims | $ 227,222 | — | — | — | — |
| | General Unsecured Claims | 28,873 | — | — | — | — |
| | **Total Unsecured Claims** | **$ 256,095** | **—** | **—** | **—** | **—** |
| | **Net Proceeds Available to Common Stockholders** | | | | — | — |

*($ in thousands)*

| | | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|---|
| **Dex East** | | | **Low** | **High** | **Low** | **High** |
| | ***Gross Proceeds*** | | | | | |
| a. | Cash and Cash Equivalents: | $ 24,135 | 100.0% | 100.0% | $24,135 | $24,135 |
| b. | Net Accounts Receivable: | 133,523 | 30.0% | 40.0% | 40,057 | 53,409 |
| b. | I/C Receivables: | — | | | | |
| c. | Deferred directory costs: | 25,389 | — | — | — | — |
| d. | Prepaids: | 3,250 | — | — | — | — |
| e. | Other Current Assets: | 2,390 | 80.0% | 95.0% | 1,912 | 2,271 |
| f. | Deferred Tax: | 9,008 | — | — | — | — |
| g. | Fixed Assets and Computer Software, Net: | 19,349 | 10.0% | 35.0% | 1,935 | 6,772 |
| h. | Investment in subsidiaries: | — | — | — | — | — |
| i. | Intangible Assets, Net: | 571,654 | — | — | — | — |
| h. | Goodwill: | (0) | — | — | — | — |
| h. | Deferred Financing Costs: | 1,012 | — | — | — | — |
| f. | Deferred Tax Asset L/T: | — | — | — | — | — |
| j. | Other Non-Current Assets: | 6,189 | — | — | — | — |
| | **Gross Proceeds Available for Distribution** | **$795,900** | **8.5%** | **10.9%** | **$68,039** | **$86,587** |
| | ***Chapter 7 Administrative Claims*** | | | | | |
| k. | Trustee Fees | | 100.0% | 100.0% | $ 1,317 | $ 1,874 |
| l. | Professional Fees | | 100.0% | 100.0% | 329 | 468 |
| m. | Wind Down Costs | | 100.0% | 100.0% | 6,289 | 9,434 |
| n. | Priority Tax Claims | | 100.0% | 100.0% | 291 | 291 |
| | **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | **$ 8,227** | **$12,067** |
| | **Net Proceeds Available for Distribution** | | | | **$59,812** | **$74,520** |
| o. | ***Secured Claims*** | | | | | |
| | Dex East Secured Credit Facility Claims | $514,625 | 11.6% | 14.5% | $59,812 | $74,520 |
| | **Total Secured Claims** | **$514,625** | **11.6%** | **14.5%** | **$59,812** | **$74,520** |
| | **Net Proceeds Available for Unsecured Claims** | | | | **—** | **—** |
| p. | ***Unsecured Claims*** | | | | | |
| | Senior Subordinated Notes Claims | — | — | — | — | — |
| | General Unsecured Claims | 23,989 | — | — | — | — |
| | **Total Unsecured Claims** | **$ 23,989** | **—** | **—** | **—** | **—** |
| | **Net Proceeds Available to Common Stockholders** | | | | **—** | **—** |

*($ in thousands)*

| | | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **Dex West** | | | | | | |
| | ***Gross Proceeds*** | | | | | |
| a. | Cash and Cash Equivalents: | $ 26,614 | 100.0% | 100.0% | $26,614 | $26,614 |
| b. | Net Accounts Receivable: | 148,090 | 30.0% | 40.0% | 44,427 | 59,236 |
| b. | I/C Receivables: | — | | | | |
| c. | Deferred directory costs: | 27,143 | — | — | — | — |
| d. | Prepaids: | 10,203 | — | — | — | — |
| e. | Other Current Assets: | 2,779 | 80.0% | 95.0% | 2,223 | 2,640 |
| f. | Deferred Tax: | 5,978 | — | — | — | — |
| g. | Fixed Assets and Computer Software, Net: | 24,997 | 10.0% | 35.0% | 2,500 | 8,749 |
| h. | Investment in subsidiaries: | — | — | — | — | — |
| i. | Intangible Assets, Net: | 707,651 | — | — | — | — |
| h. | Goodwill: | (0) | — | — | — | — |
| h. | Deferred Financing Costs: | 1,829 | — | — | — | — |
| f. | Deferred Tax Asset L/T: | — | — | — | — | — |
| j. | Other Non-Current Assets: | 5,007 | — | — | — | — |
| | **Gross Proceeds Available for Distribution** | **$960,291** | **7.9%** | **10.1%** | **$75,764** | **$97,239** |
| | ***Chapter 7 Administrative Claims*** | | | | | |
| k. | Trustee Fees | | 100.0% | 100.0% | $ 1,475 | $ 2,119 |
| l. | Professional Fees | | 100.0% | 100.0% | 369 | 530 |
| m. | Wind Down Costs | | 100.0% | 100.0% | 7,609 | 11,413 |
| n. | Priority Tax Claims | | 100.0% | 100.0% | 356 | 356 |
| | **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | **$ 9,807** | **$14,417** |
| | **Net Proceeds Available for Distribution** | | | | **$65,956** | **$82,822** |
| o. | ***Secured Claims*** | | | | | |
| | Dex West Secured Credit Facility Claims | $501,721 | 13.1% | 16.5% | $65,956 | $82,822 |
| | **Total Secured Claims** | **$501,721** | **13.1%** | **16.5%** | **$65,956** | **$82,822** |
| | **Net Proceeds Available for Unsecured Claims** | | | | **—** | **—** |
| p. | ***Unsecured Claims*** | | | | | |
| | Senior Subordinated Notes Claims | — | — | — | — | — |
| | General Unsecured Claims | 19,000 | — | — | — | — |
| | **Total Unsecured Claims** | **$ 19,000** | **—** | **—** | **—** | **—** |
| | **Net Proceeds Available to Common Stockholders** | | | | **—** | **—** |

*($ in thousands)*

| **RHDI APIL** | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| ***Gross Proceeds*** | | | | | |
| a. Cash and Cash Equivalents: | — | 100.0% | 100.0% | — | — |
| b. Net Accounts Receivable: | — | 30.0% | 40.0% | — | — |
| b. I/C Receivables: | — | — | — | — | — |
| c. Deferred directory costs: | — | — | — | — | — |
| d. Prepaids: | — | — | — | — | — |
| e. Other Current Assets: | — | 80.0% | 95.0% | — | — |
| f. Deferred Tax: | 13,853 | — | — | — | — |
| g. Fixed Assets and Computer Software, Net: | — | 10.0% | 35.0% | — | — |
| h. Investment in subsidiaries: | — | — | — | — | — |
| i. Intangible Assets, Net: | — | — | — | — | — |
| h. Goodwill: | — | — | — | — | — |
| h. Deferred Financing Costs: | — | — | — | — | — |
| f. Deferred Tax Asset L/T: | 53,779 | — | — | — | — |
| j. Other Non-Current Assets: | — | — | — | — | — |
| **Gross Proceeds Available for Distribution** | **$  67,632** | — | — | — | — |
| ***Chapter 7 Administrative Claims*** | | | | | |
| k. Trustee Fees | | 100.0% | 100.0% | — | — |
| l. Professional Fees | | 100.0% | 100.0% | — | — |
| m. Wind Down Costs | | 100.0% | 100.0% | — | — |
| n. Priority Tax Claims | | 100.0% | 100.0% | — | — |
| **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | — | — |
| **Net Proceeds Available for Distribution** | | | | — | — |
| o. ***Secured Claims*** | | | | | |
| RHDI Secured Credit Facility Claims | $ 783,558 | — | — | — | — |
| Dex East Secured Credit Facility Claims | 514,625 | — | — | — | — |
| Dex West Secured Credit Facility Claims | 501,721 | — | — | — | — |
| **Total Secured Claims** | **$1,799,904** | — | — | — | — |
| **Net Proceeds Available for Unsecured Claims** | | | | — | — |
| p. ***Unsecured Claims*** | | | | | |
| Senior Subordinated Notes Claims | — | — | — | — | — |
| General Unsecured Claims | — | — | — | — | — |
| **Total Unsecured Claims** | — | — | — | — | — |
| **Net Proceeds Available to Common Stockholders** | | | | — | — |

*($ in thousands)*

| Dex Media Inc | | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| | ***Gross Proceeds*** | | | | | |
| a. | Cash and Cash Equivalents: | $ 89 | 100.0% | 100.0% | $ 89 | $ 89 |
| b. | Net Accounts Receivable: | — | 30.0% | 40.0% | — | — |
| b. | I/C Receivables: | — | — | — | — | — |
| c. | Deferred directory costs: | — | — | — | — | — |
| d. | Prepaids: | — | — | — | — | — |
| e. | Other Current Assets: | — | 80.0% | 95.0% | — | — |
| f. | Deferred Tax: | — | — | — | — | — |
| g. | Fixed Assets and Computer Software, Net: | — | 10.0% | 35.0% | — | — |
| h. | Investment in subsidiaries: | 0 | — | — | — | — |
| i. | Intangible Assets, Net: | — | — | — | — | — |
| h. | Goodwill: | (0) | — | — | — | — |
| h. | Deferred Financing Costs: | — | — | — | — | — |
| f. | Deferred Tax Asset L/T: | (4) | — | — | — | — |
| j. | Other Non-Current Assets: | — | — | — | — | — |
| | **Gross Proceeds Available for Distribution** | $ 86 | 104.4% | 104.4% | $ 89 | $ 89 |
| | ***Chapter 7 Administrative Claims*** | | | | | |
| k. | Trustee Fees | | 100.0% | 100.0% | — | — |
| l. | Professional Fees | | 100.0% | 100.0% | — | — |
| m. | Wind Down Costs | | 100.0% | 100.0% | (0) | (0) |
| n. | Priority Tax Claims | | 100.0% | 100.0% | — | — |
| | **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | **($    0)** | **($    0)** |
| | **Net Proceeds Available for Distribution** | | | | **$ 89** | **$ 89** |
| o. | ***Secured Claims*** | | | | | |
| | RHDI Secured Credit Facility Claims | $ 783,558 | 0.0% | 0.0% | $ 39 | $ 39 |
| | Dex East Secured Credit Facility Claims | 514,625 | 0.0% | 0.0% | 26 | 26 |
| | Dex West Secured Credit Facility Claims | 501,721 | 0.0% | 0.0% | 25 | 25 |
| | **Total Secured Claims** | **$1,799,904** | **0.0%** | **0.0%** | **$ 89** | **$ 89** |
| | **Net Proceeds Available for Unsecured Claims** | | | | — | — |
| p. | ***Unsecured Claims*** | | | | | |
| | Senior Subordinated Notes Claims | — | — | — | — | — |
| | General Unsecured Claims | — | — | — | — | — |
| | **Total Unsecured Claims** | — | — | — | — | — |
| | **Net Proceeds Available to Common Stockholders** | | | | — | — |

10

*($ in thousands)*

| Dex Media Services | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| ***Gross Proceeds*** | | | | | |
| a. Cash and Cash Equivalents: | — | 100.0% | 100.0% | — | — |
| b. Net Accounts Receivable: | — | 30.0% | 40.0% | — | — |
| b. I/C Receivables: | — | — | — | — | — |
| c. Deferred directory costs: | — | — | — | — | — |
| d. Prepaids: | — | — | — | — | — |
| e. Other Current Assets: | 1 | 80.0% | 95.0% | 1 | 1 |
| f. Deferred Tax: | — | — | — | — | — |
| g. Fixed Assets and Computer Software, Net: | — | 10.0% | 35.0% | — | — |
| h. Investment in subsidiaries: | — | — | — | — | — |
| i. Intangible Assets, Net: | — | — | — | — | — |
| h. Goodwill: | — | — | — | — | — |
| h. Deferred Financing Costs: | — | — | — | — | — |
| f. Deferred Tax Asset L/T: | — | — | — | — | — |
| j. Other Non-Current Assets: | — | — | — | — | — |
| **Gross Proceeds Available for Distribution** | **$        1** | **80.0%** | **95.0%** | **$        1** | **$        1** |
| ***Chapter 7 Administrative Claims*** | | | | | |
| k. Trustee Fees | | 100.0% | 100.0% | $        0 | $        0 |
| l. Professional Fees | | 100.0% | 100.0% | 0 | 0 |
| m. Wind Down Costs | | 100.0% | 100.0% | 0 | 0 |
| n. Priority Tax Claims | | 100.0% | 100.0% | — | — |
| **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | **$        0** | **$        0** |
| **Net Proceeds Available for Distribution** | | | | **$        1** | **$        1** |
| o. ***Secured Claims*** | | | | | |
| RHDI Secured Credit Facility Claims | $    783,558 | 0.0% | 0.0% | $        0 | $        1 |
| Dex East Secured Credit Facility Claims | 514,625 | 0.0% | 0.0% | 0 | 0 |
| Dex West Secured Credit Facility Claims | 501,721 | 0.0% | 0.0% | 0 | 0 |
| **Total Secured Claims** | **$1,799,904** | **0.0%** | **0.0%** | **$        1** | **$        1** |
| **Net Proceeds Available for Unsecured Claims** | | | | **—** | |
| p. ***Unsecured Claims*** | | | | | |
| Senior Subordinated Notes Claims | — | — | — | — | — |
| General Unsecured Claims | 17,297 | — | — | — | — |
| **Total Unsecured Claims** | **$      17,297** | **—** | **—** | **—** | **—** |
| **Net Proceeds Available to Common Stockholders** | | | | **—** | **—** |

*($ in thousands)*

| **Dex One Digital** | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| ***Gross Proceeds*** | | | | | |
| a. Cash and Cash Equivalents: | $ 505 | 100.0% | 100.0% | $ 505 | $ 505 |
| b. Net Accounts Receivable: | 1,980 | 30.0% | 40.0% | 594 | 792 |
| b. I/C Receivables: | — | — | — | — | — |
| c. Deferred directory costs: | 853 | — | — | — | — |
| d. Prepaids: | 9 | — | — | — | — |
| e. Other Current Assets: | 40 | 80.0% | 95.0% | 32 | 38 |
| f. Deferred Tax: | — | — | — | — | — |
| g. Fixed Assets and Computer Software, Net: | — | 10.0% | 35.0% | — | — |
| h. Investment in subsidiaries: | — | — | — | — | — |
| i. Intangible Assets, Net: | — | — | — | — | — |
| h. Goodwill: | — | — | — | — | — |
| h. Deferred Financing Costs: | — | — | — | — | — |
| f. Deferred Tax Asset L/T: | 263 | — | — | — | — |
| j. Other Non-Current Assets: | 264 | — | — | — | — |
| **Gross Proceeds Available for Distribution** | $ 3,914 | 28.9% | 34.1% | $ 1,131 | $ 1,335 |
| ***Chapter 7 Administrative Claims*** | | | | | |
| k. Trustee Fees | | 100.0% | 100.0% | $ 19 | $ 25 |
| l. Professional Fees | | 100.0% | 100.0% | 5 | 6 |
| m. Wind Down Costs | | 100.0% | 100.0% | 28 | 42 |
| n. Priority Tax Claims | | 100.0% | 100.0% | — | — |
| **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | **$ 51** | **$73** |
| **Net Proceeds Available for Distribution** | | | | **$ 1,079** | **$ 1,262** |
| ***Secured Claims*** | | | | | |
| o. RHDI Secured Credit Facility Claims | $ 783,558 | 0.1% | 0.1% | $ 470 | $ 549 |
| Dex East Secured Credit Facility Claims | 514,625 | 0.1% | 0.1% | 309 | 361 |
| Dex West Secured Credit Facility Claims | 501,721 | 0.1% | 0.1% | 301 | 352 |
| **Total Secured Claims** | **$ 1,799,904** | **0.1%** | **0.1%** | **$ 1,079** | **$ 1,262** |
| **Net Proceeds Available for Unsecured Claims** | | | | **—** | |
| p. ***Unsecured Claims*** | | | | | |
| Senior Subordinated Notes Claims | — | | | — | — |
| General Unsecured Claims | 5 | — | — | — | — |
| **Total Unsecured Claims** | **$ 5** | **—** | **—** | **—** | **—** |
| **Net Proceeds Available to Common Stockholders** | | | | **—** | **—** |

*($ in thousands)*

| Dex One Shared Services | | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| | ***Gross Proceeds*** | | | | | |
| a. | Cash and Cash Equivalents: | $    5,995 | 100.0% | 100.0% | $  5,995 | $  5,995 |
| b. | Net Accounts Receivable: | — | 30.0% | 40.0% | — | — |
| b. | I/C Receivables: | — | — | — | — | — |
| c. | Deferred directory costs: | — | — | — | — | — |
| d. | Prepaids: | 9,692 | — | — | — | — |
| e. | Other Current Assets: | 409 | 80.0% | 95.0% | 327 | 388 |
| f. | Deferred Tax: | 17,817 | — | — | — | — |
| g. | Fixed Assets and Computer Software, Net: | 42,319 | 10.0% | 35.0% | 4,232 | 14,812 |
| h. | Investment in subsidiaries: | — | — | — | — | — |
| i. | Intangible Assets, Net: | — | — | — | — | — |
| h. | Goodwill: | — | — | — | — | — |
| h. | Deferred Financing Costs: | — | — | — | — | — |
| f. | Deferred Tax Asset L/T: | (60,976) | — | — | — | — |
| j. | Other Non-Current Assets: | 1,290 | — | — | — | — |
| | **Gross Proceeds Available for Distribution** | **$   16,546** | **63.8%** | **128.1%** | **$10,554** | **$21,195** |
| | ***Chapter 7 Administrative Claims*** | | | | | |
| k. | Trustee Fees | | 100.0% | 100.0% | $137 | $456 |
| l. | Professional Fees | | 100.0% | 100.0% | 34 | 114 |
| m. | Wind Down Costs | | 100.0% | 100.0% | 86 | 129 |
| n. | Priority Tax Claims | | 100.0% | 100.0% | — | — |
| | **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | **$257** | **$699** |
| | **Net Proceeds Available for Distribution** | | | | **$10,297** | **$20,496** |
| o. | ***Secured Claims*** | | | | | |
| | RHDI Secured Credit Facility Claims | $  783,558 | 0.6% | 1.1% | $  4,483 | $8,923 |
| | Dex East Secured Credit Facility Claims | 514,625 | 0.6% | 1.1% | 2,944 | 5,860 |
| | Dex West Secured Credit Facility Claims | 501,721 | 0.6% | 1.1% | 2,870 | 5,713 |
| | **Total Secured Claims** | **$ 1,799,904** | **0.6%** | **1.1%** | **$10,297** | **$20,496** |
| | **Net Proceeds Available for Unsecured Claims** | | | | **—** | **—** |
| p. | ***Unsecured Claims*** | | | | | |
| | Senior Subordinated Notes Claims | — | — | — | — | — |
| | General Unsecured Claims | 5,587 | — | — | — | — |
| | **Total Unsecured Claims** | **$    5,587** | **—** | **—** | **—** | **—** |
| | **Net Proceeds Available to Common Stockholders** | | | | **—** | **—** |

13

*($ in thousands)*

| Dex One | Book Value as of 9/30/2012 | Estimated Recovery (%) | | Estimated Liquidation ($) | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| ***Gross Proceeds*** | | | | | |
| a. Cash and Cash Equivalents: | $ 10,849 | 100.0% | 100.0% | $ 10,849 | $ 10,849 |
| b. Net Accounts Receivable: | — | 30.0% | 40.0% | — | — |
| b. I/C Receivables: | — | — | — | — | — |
| c. Deferred directory costs: | — | — | — | — | — |
| d. Prepaids: | 25 | — | — | — | — |
| e. Other Current Assets: | 852 | 80.0% | 95.0% | 682 | 809 |
| f. Deferred Tax: | 438 | — | — | — | — |
| g. Fixed Assets and Computer Software, Net: | — | 10.0% | 35.0% | — | — |
| h. Investment in subsidiaries: | 0 | — | — | — | — |
| i. Intangible Assets, Net: | — | — | — | — | — |
| h. Goodwill: | — | — | — | — | — |
| h. Deferred Financing Costs: | — | — | — | — | — |
| f. Deferred Tax Asset L/T: | — | — | — | — | — |
| j. Other Non-Current Assets: | — | — | — | — | — |
| **Gross Proceeds Available for Distribution** | **$ 12,164** | **94.8%** | **95.8%** | **$ 11,531** | **$ 11,659** |
| ***Chapter 7 Administrative Claims*** | | | | | |
| k. Trustee Fees | | 100.0% | 100.0% | $ 20 | $ 24 |
| l. Professional Fees | | 100.0% | 100.0% | 5 | 6 |
| m. Wind Down Costs | | 100.0% | 100.0% | 11 | 16 |
| n. Priority Tax Claims | | 100.0% | 100.0% | — | — |
| **Total Chapter 7 Administrative Claims** | | **100.0%** | **100.0%** | **$ 36** | **$ 46** |
| **Net Proceeds Available for Distribution** | | | | **$ 11,495** | **$ 11,612** |
| o. ***Secured Claims*** | | | | | |
| RHDI Secured Credit Facility Claims | $ 783,558 | 0.6% | 0.6% | $ 5,004 | $ 5,055 |
| Dex East Secured Credit Facility Claims | 514,625 | 0.6% | 0.6% | 3,286 | 3,330 |
| Dex West Secured Credit Facility Claims | 501,721 | 0.6% | 0.6% | 3,204 | 3,237 |
| **Total Secured Claims** | **$1,799,904** | **0.6%** | **0.6%** | **$ 11,495** | **$ 11,612** |
| **Net Proceeds Available for Unsecured Claims** | | | | **—** | **—** |
| p. ***Unsecured Claims*** | | | | | |
| Senior Subordinated Notes Claims | — | — | — | — | — |
| General Unsecured Claims | — | — | — | — | — |
| **Total Unsecured Claims** | **—** | **—** | **—** | **—** | **—** |
| **Net Proceeds Available to Common Stockholders** | | | | **—** | **—** |

14

**EXHIBIT I TO THE DISCLOSURE STATEMENT**

UNAUDITED VALUATION ANALYSIS OF NEWDEX

[THIS PAGE INTENTIONALLY LEFT BLANK]

**UNAUDITED VALUATION ANALYSIS OF NEWDEX**

**VALUATION ANALYSIS**

THIS VALUATION ANALYSIS IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OR THE SUPERMEDIA PLAN, IF FILED, TO MAKE AN INFORMED JUDGMENT ABOUT THE PLANS AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, NEWDEX, THE DEBTORS, OR SUPERMEDIA.

THE ESTIMATES CONTAINED IN THE IMPLIED REFERENCE RANGE VALUES INDICATED BY HOULIHAN LOKEY'S ANALYSES ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR PREDICTIVE OF FUTURE RESULTS OR VALUES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SUGGESTED BY THE ANALYSES. IN ADDITION, ANY ANALYSES RELATING TO THE VALUE OF ASSETS, BUSINESSES OR SECURITIES DO NOT PURPORT TO BE APPRAISALS OR TO REFLECT THE PRICES AT WHICH BUSINESSES OR SECURITIES ACTUALLY MAY BE SOLD, WHICH MAY DEPEND ON A VARIETY OF FACTORS, MANY OF WHICH ARE BEYOND THE CONTROL OF DEX ONE, SUPERMEDIA OR NEWDEX. MUCH OF THE INFORMATION USED IN, AND ACCORDINGLY THE RESULTS OF, HOULIHAN LOKEY'S ANALYSES ARE INHERENTLY SUBJECT TO SUBSTANTIAL UNCERTAINTY.

*Overview*

In connection with the solicitation of acceptances of the Plan and SuperMedia Plan, Houlihan Lokey performed a valuation analysis of Newdex assuming consummation of the transactions provided for in the Plan and SuperMedia Plan. Based upon, and subject to the review and analysis described herein, and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by Houlihan Lokey in preparing its valuation analysis, Houlihan Lokey's view, as of December 5, 2012, was that the estimated going concern enterprise value from operations of Newdex, as of December 31, 2012, would be in a range between approximately $2.59 billion and approximately $3.62 billion, with a midpoint of approximately $3.10 billion. This implied enterprise value estimate reflected the estimated value of the assets and business of Newdex as used as part of an integrated going concern.

In arriving at its conclusion regarding its valuation analysis, Houlihan Lokey, among other things:

- reviewed the following agreements and documents:

  - the final draft of the Merger Agreement;

  - a draft of the form of the Plan;

  - a draft of the form of the SuperMedia Plan;

  - a draft of the Amended and Restated Certificate of Incorporation of Newdex, Inc., including certain transfer restrictions intended to ensure preservation of the tax attributes currently anticipated to result from the Merger (the "Preservation of Tax Benefits Provision");

- reviewed certain publicly available business and financial information relating to the Debtors and SuperMedia that Houlihan Lokey deemed to be relevant;

- reviewed certain information relating to the historical, current and future operations, financial condition and prospects of the Debtors and SuperMedia made available to Houlihan Lokey by Dex One and SuperMedia,

including (a) financial projections prepared by the respective management of Dex One and SuperMedia relating to the Debtors and SuperMedia, respectively, for the Projection Period, (b) certain forecasts and estimates of potential cost savings, operating efficiencies and other synergies expected to result from the transactions contemplated by the Plan and SuperMedia Plan, together with certain forecasts and estimates of the costs associated with achieving such cost savings, operating efficiencies and other synergies, all as prepared by the respective management of Dex One and SuperMedia (the "Synergies"), (c) certain forecasts and estimates involving the outstanding amounts, and terms of, the aggregate debt of Newdex on a consolidated basis pro forma for the credit agreement amendment and restatement transactions contemplated by the Plan and SuperMedia Plan during the Projection Period, and (d) estimated amounts and usages of tax attributes, prepared by the managements of Dex One and SuperMedia, relating to Newdex, pro forma for the transactions contemplated by the Plan and SuperMedia Plan (the "Newdex Tax Attributes");

- spoke with certain members of the respective management of Dex One and SuperMedia, and with certain of their representatives and advisors, regarding (a) the respective businesses, operations, financial condition and prospects pro forma for the transactions contemplated by the Plan and SuperMedia Plan, including the transactions contemplated by the Merger Agreement, of the Debtors, SuperMedia and Newdex (b) the transactions contemplated by the Plan and SuperMedia Plan, including the transactions contemplated by the Merger Agreement and (c) related matters;

- conducted such other financial studies, analyses and inquiries and considered such other information and factors as Houlihan Lokey deemed appropriate.

Houlihan Lokey relied upon and assumed, without independent verification, the accuracy and completeness of all data, material and other information furnished, or otherwise made available, to Houlihan Lokey, discussed with or reviewed by Houlihan Lokey, or publicly available, and did not assume any responsibility with respect to such data, material and other information. In addition, the respective management of Dex One and SuperMedia advised Houlihan Lokey, and Houlihan Lokey assumed, that the financial projections reviewed by Houlihan Lokey were reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of such management as to the future financial results and condition of (1) the Debtors and SuperMedia, respectively, and (2) Newdex, and Houlihan Lokey expressed no opinion with respect to such projections or the assumptions on which they are based. Furthermore, upon the advice of management of Dex One and SuperMedia, Houlihan Lokey assumed that the estimated Synergies and Newdex Tax Attributes reviewed by Houlihan Lokey were reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of the respective management of Dex One and SuperMedia and that each of the Synergies and Newdex Tax Attributes will be realized in the amounts and the time periods indicated thereby and Houlihan Lokey expressed no opinion with respect to such Synergies or Newdex Tax Attributes or the assumptions on which they are based. Houlihan Lokey relied upon and assumed, without independent verification, that there was no change in the business, assets, liabilities, financial condition, results of operations, cash flows or prospects of the Debtors or SuperMedia since the respective dates of the most recent information, financial or otherwise, provided to Houlihan Lokey that would be material to Houlihan Lokey's analyses (other than as otherwise reflected in the financial projections), and that there was no information or any facts that would make any of the information reviewed by Houlihan Lokey incomplete or misleading.

Houlihan Lokey relied upon and assumed, without independent verification, that (a) the representations and warranties of all parties to the agreements identified above and all other related documents and instruments that are referred to therein were true and correct, (b) each party to all such agreements and such other related documents and instruments would fully and timely perform all of the covenants and agreements required to be performed by such party, (c) all conditions to the consummation of the transactions contemplated by the Plan and SuperMedia Plan, including the transactions contemplated by the Merger Agreement, would be satisfied without waiver thereof, and (d) the transactions contemplated by the Plan and SuperMedia Plan, including the transactions contemplated by the Merger Agreement, would be consummated in a timely manner in accordance with the terms described in all such agreements and such other related documents and instruments, without any amendments or modifications thereto that would be material to Houlihan Lokey's analyses. Houlihan Lokey relied upon and assumed, without

independent verification, that (a) the transactions contemplated by the Plan and SuperMedia Plan, including the transactions contemplated by the Merger Agreement, would be consummated in a manner that complies in all respects with all applicable federal and state statutes, rules and regulations, and (b) all governmental, regulatory, and other consents and approvals necessary for the consummation of the transactions contemplated by the Plan and SuperMedia Plan, including the transactions contemplated by the Merger Agreement, would be obtained and that no delay, limitations, restrictions or conditions would be imposed or amendments, modifications or waivers made that would result in the disposition of any assets of Newdex, or otherwise have an effect on Newdex, or any of the expected benefits of, the transactions contemplated by the Plan and SuperMedia Plan, including the transactions contemplated by the Merger Agreement, that would be material to its analyses. In addition, Houlihan Lokey relied upon and assumed, without independent verification, that the final forms of any draft documents identified above would not differ in any material respect from the drafts of said documents. Additionally, no opinion, counsel or interpretation was intended in matters that require legal, regulatory, accounting, insurance, tax or other similar professional advice. Houlihan Lokey assumed that such opinions, counsel or interpretations were or will be obtained from the appropriate professional sources. Houlihan Lokey relied, with the consent of the Dex One board of directors, on the assessments by Dex One, SuperMedia, and their respective advisors, as to all legal, regulatory, accounting, insurance and tax matters with respect to the Debtors, SuperMedia, Newdex and the Plan and the transactions it contemplates or otherwise.

Furthermore, in connection with its valuation analysis, Houlihan Lokey was not requested to make, and did not make, any physical inspection or independent appraisal or evaluation of any of the assets, properties or liabilities (fixed, contingent, derivative, off-balance-sheet or otherwise) of the Debtors, SuperMedia or any other party, nor was Houlihan Lokey provided with any such appraisal or evaluation. Houlihan Lokey did not estimate, and expressed no opinion regarding, the liquidation value of any entity or business. Houlihan Lokey did not undertake an independent analysis of any potential or actual litigation, regulatory action, possible unasserted claims or other contingent liabilities, to which any Debtor, SuperMedia or Newdex is or may be a party or is or may be subject, or of any governmental investigation of any possible unasserted claims or other contingent liabilities to which any Debtor, SuperMedia or Newdex is or may be a party or is or may be subject.

Houlihan Lokey's valuation analysis was necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to Houlihan Lokey as of, the date thereof. Houlihan Lokey did not undertake, and is under no obligation, to update, revise, reaffirm or withdraw its opinion, or otherwise comment on or consider events occurring or coming to its attention after the date thereof. Houlihan Lokey did not express any views as to what the value of Newdex Common Stock actually would be when issued pursuant to the Plan and SuperMedia Plan and the Merger Agreement or the price or range of prices at which Dex One common stock, SuperMedia common stock or Newdex Common Stock may be purchased or sold at any time, including, but not limited to, any potential impact on prices or values that may result from the effects of the Preservation of Tax Benefits Provision. Houlihan Lokey assumed that the Newdex Common Stock to be issued as part of the Plan and SuperMedia Plan would be listed on one of either the NYSE or one of the NASDAQ Markets.

In preparing its valuation analysis, Houlihan Lokey reviewed a variety of potential analytic techniques and analyses, including those described below. The summary of Houlihan Lokey's analyses is not a complete description of the analyses underlying Houlihan Lokey's valuation. Houlihan Lokey believes that its analyses and the following summary must be considered as a whole and that selecting portions of its analyses, methodologies and factors without considering all analyses, methodologies and factors or the narrative description of the analyses, could create a misleading or incomplete view of the processes underlying Houlihan Lokey's analyses and conclusion. Each analytic technique has inherent strengths and weaknesses, and the nature of the available information may further affect the value of particular techniques.

Houlihan Lokey's analyses involved judgments and assumptions with regard to industry performance, general business, economic, regulatory, market and financial conditions and other matters, many of which are beyond the control of the Debtors, SuperMedia or Newdex, such as the impact of competition on the business of the Debtors, SuperMedia or Newdex and on the industry generally, industry growth and the absence of any material change in the financial condition and prospects of the Debtors, SuperMedia or Newdex or the industry or in the markets generally. No company, transaction, or business used or considered in Houlihan Lokey's analyses for comparative purposes is identical to the Debtors, SuperMedia, or Newdex or the proposed mergers and an

evaluation of the results of those analyses is not entirely mathematical. Houlihan Lokey believes that mathematical derivations (such as determining average and median) of financial data are not by themselves meaningful and should be considered together with qualities, judgments and informed assumptions.

## VALUATION METHODOLOGY

The following is a summary of the material analyses and reviews performed by Houlihan Lokey to arrive at its range of estimated values for Newdex.

Unless the context indicates otherwise, financial information was as estimated as of December 31, 2012, except for estimated pension and OPEB liabilities, which were based on estimated amounts as of September 30, 2012 and October 31, 2012 for each of SuperMedia and the Debtors, respectively.

### Discounted Cash Flow Analysis

Houlihan Lokey estimated the implied enterprise value from operations reference range of Newdex by performing a discounted cash flow analysis of Newdex. The discounted cash flow analysis consisted of calculating the estimated net present value of the unlevered, after-tax free cash flows that Newdex is forecasted to generate from January 1, 2013, through December 31, 2016, based on internal estimates provided by Dex One and SuperMedia management , including Synergies, net of the estimated one-time costs to achieve such Synergies. Houlihan Lokey calculated terminal values for Newdex by applying a range of perpetuity growth rates of (1.0)% to 1.0% to Newdex's fiscal year 2016 estimated normalized unlevered free cash flow. The present values of the cash flows and terminal values were then calculated using discount rates ranging from 13.0% to 17.0%. The discounted cash flow analysis indicated an implied enterprise value from operations reference range of approximately $2.59 billion to $3.62 billion, with a midpoint of approximately $3.10 billion.

Houlihan Lokey then calculated the implied equity value reference range from operations of Newdex. This reference range was determined by adjusting the implied enterprise value from operations reference range resulting from the discounted cash flow analyses for Newdex described above so as to (a) subtract (1) estimated net debt as of December 31, 2012, (2) estimated pension and OPEB liabilities, and (3) estimated expenses arising from the transactions contemplated by the Plan and the SuperMedia Plan, including the transactions contemplated by the Merger Agreement, and (b) add the estimated present value as of December 31, 2012, of the Newdex Tax Attributes. The present value of the Newdex Tax Attributes were calculated using discount rates ranging from 20% to 25%. This analysis resulted in an implied equity value reference range for Newdex of approximately $(348.9) million to $721.8 million, with a midpoint of approximately $186.5 million.

### Selected Companies Analysis

Houlihan Lokey conducted a review of possible companies whose financial information could be meaningfully compared with that of Newdex. Houlihan Lokey did not perform a selected companies analysis, however, in light of the absence of any sufficiently similarly situated companies in the publishing and directory industries for which public information was available so as to be able to make any meaningful comparisons.

### Selected Transaction Analysis

Houlihan Lokey conducted a review of possible business combination transactions for which the financial information of the target companies could be meaningfully compared with that of Newdex. Houlihan Lokey did not perform a selected transactions analysis, however, in light of the absence of recent business combination transactions in the publishing and directory industries for which sufficient publicly available information was available so as to be able to make any meaningful comparisons.

*Other Matters*

Houlihan Lokey's valuation analysis was provided to the Dex One board of directors in connection with its preparation of the Plan. Houlihan Lokey's valuation analysis was not determinative of the views of the Dex One board of directors or management with respect to pursuing the Plan. The type and amount of value issuable in accordance with the Plan and SuperMedia Plan were determined through negotiation between the Debtors and SuperMedia, and through negotiations between the Debtors and SuperMedia on the one hand, and the consenting lenders under the senior credit facilities of the Debtors and SuperMedia on the other hand, and any decision to pursue the Plan or the SuperMedia Plan by filing chapter 11 cases will require approval of the Dex One board of directors and the SuperMedia board of directors, respectively.

Houlihan Lokey was engaged by Dex One to act as its financial advisor in connection with a possible business combination with SuperMedia, whether pursuant to applicable bankruptcy laws, or otherwise, including with respect to the financing amendments, and to provide financial advisory services, including an opinion to the Dex One board of directors regarding the fairness from a financial point of view of the exchange ratio provided for in the mergers. Previously, Houlihan Lokey had been engaged by Dex One to review strategic alternatives and to act as financial advisor to Dex One in connection with Dex One's acquisition of certain of its outstanding debt securities in 2012. Dex One engaged Houlihan Lokey based on Houlihan Lokey's experience and reputation. Houlihan Lokey is regularly engaged to provide advisory services in connection with mergers and acquisitions, financings, and financial restructurings. Pursuant to its engagement letters with Dex One, including in connection with the Plan and the mergers, Houlihan Lokey has received $5,036,000 for its services, including $1,500,000, which it received upon the delivery of a fairness opinion relating to the proposed mergers, regardless of the conclusion reached therein, and none of which was contingent upon the successful completion of any portion or aspect of the transactions contemplated by the Plan, including the transactions contemplated by the Merger Agreement. In addition, Houlihan Lokey will be entitled to an additional $6,400,000, payable upon consummation of the transactions contemplated by the Plan, including the mergers. Houlihan Lokey will also receive certain fees upon the successful completion of any the Debtors' financing amendments, which includes consummation of the transactions contemplated by the Plan, which is currently estimated to be approximately $7,201,000. Dex One has also agreed to reimburse Houlihan Lokey for certain expenses and to indemnify Houlihan Lokey, its affiliates and certain related parties against certain liabilities and expenses, including certain liabilities under the federal securities laws arising out of or relating to Houlihan Lokey's engagement.

In the ordinary course of business, certain of Houlihan Lokey's employees and affiliates, as well as investment funds in which they may have financial interests or with whom they may co-invest, may acquire, hold or sell, long or short positions, or trade, in debt, equity, and other securities and financial instruments (including loans and other obligations) of, or investments in, the Debtors, SuperMedia, or any other party that may be involved in any transactions contemplated by the Plan, including the Merger Agreement and their respective affiliates or any currency or commodity that may be involved in any transactions contemplated by the Plan, including the Merger Agreement.

Houlihan Lokey and certain of its affiliates have in the past provided and are currently providing investment banking, financial advisory and other financial services to Paulson & Co. Inc. ("Paulson"), which Houlihan Lokey understands owns, together with its affiliates, a significant interest in each of Dex One, SuperMedia, and Franklin Templeton Investments ("Franklin Templeton"), which Houlihan Lokey understands owns, together with its affiliates, a significant interest in Dex One, and/or one or more of their respective affiliates, for which Houlihan Lokey and such affiliates have received, and may receive, compensation, including, among other things, (a) providing valuation advisory services to Paulson, Franklin Templeton and/or one or more of their respective affiliates and (b) having acted as financial advisor to certain creditors of a predecessor company of Dex One in connection with a restructuring transaction which was completed in 2010. Houlihan Lokey and certain of its affiliates may provide investment banking, financial advisory and other financial services to Dex One, SuperMedia, Newdex, Paulson, Franklin Templeton, other participants in the transactions contemplated by the Plan and the Merger Agreement, and/or one or more of their respective affiliates in the future, for which Houlihan Lokey and such affiliates may receive compensation. In addition, Houlihan Lokey and certain of its affiliates and certain of their respective employees may have committed to invest in private equity or other investment funds managed or

advised by Paulson, Franklin Templeton, other participants in any transactions contemplated by the Plan, including the transactions contemplated by the Merger Agreement, and/or one or more of their respective affiliates, and in portfolio companies of such funds, and may have co-invested with Paulson, Franklin Templeton, other participants in the transactions contemplated by the Plan and the Merger Agreement, and/ or one or more of their respective affiliates, and may do so in the future. Furthermore, in connection with bankruptcies, restructurings, and similar matters, Houlihan Lokey and certain of its affiliates may have in the past acted, may currently be acting and may in the future act as financial advisor to debtors, creditors, equity holders, trustees and other interested parties (including, without limitation, formal and informal committees or groups of creditors) that may have included or represented and may include or represent, directly or indirectly, or may be or have been adverse to, Paulson, Franklin Templeton, other participants in any transactions contemplated by the Plan, including the transactions contemplated by the Merger Agreement, and/or one or more of their respective affiliates, for which advice and services Houlihan Lokey and such affiliates have received and may receive compensation.

**EXHIBIT J TO THE DISCLOSURE STATEMENT**

CORPORATE STRUCTURE CHARTS

[THIS PAGE INTENTIONALLY LEFT BLANK]

**Pre-Transaction Structure**



Dex One Stockholders

100%

$219.7 million
12% / 14% senior
subordinated notes → Dex One Corporation

$782.5 million
RHDI term loan

Newdex, Inc.
(to be renamed Dex
Media, Inc.)

R.H. Donnelley
Corporation

Dex One
Digital, Inc.

Dex Media, Inc. (to
be renamed Dex Media
Holdings, Inc.)

Dex One
Service, Inc.

R.H. Donnelley
Inc.

Spruce Acquisition
Sub, Inc.

$503.2 million
DexWest term loan → Dex Media
West, Inc.

Dex Media
East, Inc.

$540.9 million Dex
East term loan

R.H. Donnelley
APIL, Inc.

49%    2%    49%

Dex Media
Service LLC

SuperMedia Stockholders

100%

SuperMedia Inc. ← $1,442.0 million
SuperMedia term loan

SuperMedia LLC

SuperMedia
Services Inc.

SuperMedia
Sales Inc.

SuperMedia
UK, Ltd.*

* As currently contemplated, if SuperMedia files
for chapter 11 bankruptcy, SuperMedia UK, Ltd.
will not be a debtor in those cases.

**Post-Transaction Structure**



**EXHIBIT K TO THE DISCLOSURE STATEMENT**

NEWDEX CERTIFICATE OF INCORPORATION

[THIS PAGE INTENTIONALLY LEFT BLANK]

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**NEWDEX, INC.**

(originally incorporated on August 17, 2012, under the name Newdex, Inc.)

1. <u>Name</u>. The name of the corporation is Dex Media Inc. (the "<u>Corporation</u>").

2. <u>Registered Office and Agent</u>. The registered office of the Corporation in the State of Delaware is located at 1201 North Market Street, 18th Floor, Post Office Box 1347, in the City of Wilmington, County of New Castle (19801). The name of its registered agent at such address is Delaware Corporation Organizers, Inc.

3. <u>Nature of Business; Purpose</u>. The nature of the business or purpose to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (as amended, the "<u>DGCL</u>").

4. <u>Capital Stock</u>. The total number of shares of capital stock which the Corporation shall have authority to issue is Three Hundred Ten Million (310,000,000) shares, consisting of: (a) Three Hundred Million (300,000,000) shares of common stock, $.001 par value per share (the "<u>Common Stock</u>"); and (b) Ten Million (10,000,000) shares of preferred stock, $.001 par value per share (the "<u>Preferred Stock</u>"), issuable in one or more series as hereinafter provided.

A. <u>Common Stock</u>. Except as otherwise provided (i) by the DGCL, (ii) by <u>Article 4.B</u>, or (iii) by resolutions, if any, of the Board of Directors fixing the relative powers, preferences and rights and the qualifications, limitations or restrictions of any series of Preferred Stock, the entire voting power of the shares of the Corporation for the election of directors and for all other purposes shall be vested exclusively in the Common Stock. Each share of Common Stock shall have one vote upon all matters to be voted on by the holders of the Common Stock. Subject to the rights and preferences of any series of Preferred Stock (as fixed by resolutions, if any, of the Board of Directors), the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board of Directors from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions. Each share of Common Stock shall share equally, subject to the rights and preferences of any series of outstanding Preferred Stock (as fixed by resolutions, if any, of the Board of Directors), in all assets of the Corporation, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, or upon any distribution of the assets of the Corporation.

B. <u>Preferred Stock</u>. The Preferred Stock may be issued at any time and from time to time in one or more series. Subject to the provisions of this Amended and Restated Certificate of Incorporation, the Board of Directors is hereby expressly authorized to fix from time to time by resolution or resolutions, the designation of any series of Preferred Stock (which may be

distinguished by number, letter or title) and the number of shares of any series of Preferred Stock, and to determine the voting powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations and restrictions thereof, of any such series, including, without limitation, to provide that any such series may be: (i) subject to redemption (including any sinking or purchase fund) at such time or times and at such price or prices or rate or rates, and with such adjustments; (ii) entitled to receive dividends (which may be cumulative or non-cumulative) at such rates, on such conditions, at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or any other series of stock; (iii) entitled to such rights upon the dissolution of, or upon any distribution of the assets of, the Corporation; (iv) convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock, at such price or prices or at such rate or rates of conversion or exchange and any adjustments thereto; or (v) entitled to the benefit of conditions and restrictions upon the creation of indebtedness of the Corporation or any subsidiary of the Corporation, upon the issue of any additional stock (including additional shares of such series or of any other class or series) and upon the payment of dividends or the making of other distributions on, and the purchase, redemption or other acquisition by the Corporation or any subsidiary of the Corporation of any outstanding stock of the Corporation; all as may be stated in such resolution or resolutions. Further, within the limits and restrictions stated in any resolution or resolutions of the Board of Directors originally fixing the number of shares constituting any such series, the Board of Directors is authorized to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any such series subsequent to the issuance of shares of that series. Shares of any series of Preferred Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or otherwise acquired by the Corporation, or which, if convertible or exchangeable, have been converted into or exchanged for shares of stock of any other class or classes or series shall have the status of authorized and unissued shares of Preferred Stock and may be reissued as a part of the series of which they were originally a part or may be reclassified and reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors or as part of any other series of Preferred Stock, all subject to the conditions or restrictions on issuance set forth in the resolution or resolutions adopted by the Board of Directors providing for the issue of any series of Preferred Stock and to any filing required by law.

[C. <u>Non-Voting Stock</u>. Notwithstanding anything herein to the contrary, the Corporation shall not be authorized to issue non-voting capital stock of any class, series or other designation to the extent prohibited by Section 1123(a)(6) of chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"); provided, however, that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as such Section 1123(a)(6) is in effect and applies to the Corporation and (iii) be deemed void or eliminated if required under applicable law.][1]

---

[1] Bracketed text to be included only if Newdex files for Chapter 11 bankruptcy and the Dex Merger (as defined in the Amended and Restated Agreement and Plan of Merger, dated as of December 5, 2012, by and among Dex One Corporation, Newdex, Inc., Spruce Acquisition Sub, Inc. and SuperMedia Inc.) is consummated through such Chapter 11 bankruptcy.

5. <u>Board of Directors.</u>

A. <u>General</u>. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. Directors need not be stockholders of the Corporation or residents of the State of Delaware. Elections of directors need not be by ballot.

B. <u>Number</u>. Except as otherwise provided by resolutions, if any, of the Board of Directors fixing the relative powers, preferences and rights and the qualification, limitations or restrictions of any series of Preferred Stock, the number of directors constituting the Board of Directors shall be not less than 3 directors, the exact number of directors to be fixed by, or in the manner provided in, the Bylaws of the Corporation. In no case shall a decrease in the number of directors remove or shorten the term of any incumbent director.

C. <u>Committees</u>. The Board of Directors may, in the manner provided in the Bylaws of the Corporation, designate one or more committees which, to the extent provided in the Bylaws of the Corporation or any resolution of the Board of Directors, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Corporation to the full extent permitted by law, and may authorize the seal of the Corporation to be affixed to all papers which may require it. Such committee or committees shall have such name or names as may be stated in the Bylaws of the Corporation or as may be determined from time to time by resolution adopted by the Board of Directors.

D. <u>Bylaws</u>. Subject to any limitations that may be imposed by the stockholders, the Board of Directors shall have power to make, alter, amend or repeal any or all of the Bylaws of the Corporation in the manner and subject to the approval requirement set forth in the Bylaws.

6. <u>Preemptive Rights</u>. No holder of shares of stock of the Corporation of any class shall have any preemptive right or be entitled as a matter of right to subscribe for or purchase any part of any new or additional issue of stock or any securities of any kind whatsoever, whether now or hereafter authorized.

7. <u>Stockholder Action Without a Meeting</u>. Except as otherwise provided by resolutions, if any, of the Board of Directors fixing the relative powers, preferences and rights and the qualifications, limitations or restrictions of any series of Preferred Stock, no action may be taken by stockholders of the Corporation, except at an annual or special meeting of stockholders of the Corporation, and stockholder action by written consent is prohibited.

8. <u>Personal Liability</u>. No person who is or was a director of the Corporation shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted by the DGCL as the same exists or hereafter may be amended. If the DGCL is hereafter amended to authorize corporate action further limiting or eliminating the liability of directors, then the liability of a director to the Corporation or its stockholders shall be limited or eliminated to the fullest extent permitted by the DGCL, as so amended. Any repeal, amendment or modification of this <u>Article 8</u> by the stockholders of the Corporation or by

changes in law, or the adoption of any other provision of this Amended and Restated Certificate of Incorporation inconsistent with this <u>Article 8</u> will, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to further limit or eliminate the liability of directors) and shall not adversely affect (or eliminate or reduce) any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any event or act or omission of such director occurring prior to, such repeal, amendment or modification or adoption of such inconsistent provision with respect to events, acts or omissions occurring prior to such repeal, amendment or modification or adoption of such inconsistent provision, or if applicable, modification of law.

     9. <u>Right to Indemnification</u>.

     A. <u>Right to Indemnification of Directors and Officers</u>. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "<u>Indemnified Person</u>") who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "<u>Proceeding</u>"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, trustee, manager, employee or agent of another corporation or of a partnership, company, limited liability company, joint venture, trust, non-profit entity or other enterprise, including service with respect to any employee benefit plan, whether the basis of such Proceeding is alleged action in an official capacity as a director or officer or in any other capacity while serving, at the request of the Corporation, as a director, officer, employee or agent, against all liability and loss suffered (including judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) and expenses (including attorneys' fees) actually and reasonably incurred by such Indemnified Person in connection with such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in <u>Article 9.C</u>, the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

     B. <u>Prepayment of Expenses of Directors and Officers</u>. The Corporation shall pay or reimburse (on an unsecured basis) an Indemnified Person for the reasonable expenses (including attorneys' fees) actually incurred by such Indemnified Person in connection with any such Proceeding in advance of its final disposition or final judicial decision (hereinafter an "<u>advancement of expenses</u>"); <u>provided</u>, <u>however</u>, that, if and to the extent required by law, such payment or reimbursement of expenses in advance of the final disposition of or final judicial decision regarding the Proceeding shall be made only upon delivery to the Corporation of an undertaking (an "<u>undertaking</u>"), by or on behalf of such Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined at final disposition or by final judicial decision from which there is no further right to appeal (a "<u>Final Adjudication</u>") that such

Indemnified Person is not entitled to be indemnified for such expenses under this <u>Article 9</u> or otherwise.

C. <u>Claims</u>. If a claim for indemnification or advancement of expenses under this <u>Article 9</u> is not paid in full by the Corporation within 30 days after a written claim by the Indemnified Person has been received by the Corporation, the Indemnified Person may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnified Person shall be entitled to be paid also the expense of prosecuting or defending such suit. In any action brought by the Indemnified Person to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnified Person to enforce a right to an advancement of expenses) it shall be a defense that the Indemnified Person has not met any applicable standard for indemnification set forth in the DGCL. Further, in any action brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking by an Indemnified Person, the Corporation shall be entitled to recover such expenses upon a Final Adjudication that the Indemnified Person has not met any applicable standard for indemnification set forth in the DGCL. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the Indemnified Person has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) shall create a presumption that the Indemnified Person has not met the applicable standard of conduct or, in the case of such an action brought by the Indemnified Person, be a defense to such action. In any action brought by the Indemnified Person to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnified Person is not entitled to be indemnified, or to such advancement of expenses, under this <u>Article 9</u> or otherwise shall be on the Corporation.

D. <u>Contract Right; Non-Exclusivity of Rights</u>. The rights conferred by <u>Article 9.A</u> and <u>Article 9.B</u> shall be contract rights that shall fully vest at the time the Indemnified Person first assumes such Indemnified Person's position as a director or officer of the Corporation. The rights conferred on any person by this <u>Article 9</u> shall not be exclusive of any other rights which such person may have under the Corporation's certificate of incorporation prior to the effectiveness of this Amended and Restated Certificate of Incorporation or may have or hereafter acquire under any statute, provision of this Amended and Restated Certificate of Incorporation, the Bylaws of the Corporation, agreement, vote of stockholders or disinterested directors or otherwise.

E. <u>Insurance</u>. The Corporation may purchase and maintain insurance, at its expense, to protect itself and any director, officer, trustee, manager, employee or agent of the Corporation or another corporation, or of a partnership, company, limited liability company, joint venture, trust, non-profit entity or other enterprise (including any employee benefit plan) against any expense, liability or loss, whether or not the Corporation would have the power to indemnify

such person against such expense, liability or loss under applicable law, this <u>Article 9</u> or otherwise.

F. <u>Indemnification of and Advancement of Expenses of Employees and Agents</u>. The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this <u>Article 9</u> with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

G. <u>Limitations</u>. The Corporation shall not be liable under this <u>Article 9</u> to make any payment in connection with any claim made against the Indemnified Person (or pay or reimburse any expenses to any Indemnified Person) to the extent the Indemnified Person has otherwise actually received payment (under any insurance policy, other right of indemnity or agreement or otherwise) of the amounts otherwise indemnifiable or payable hereunder. The Corporation shall not be liable to indemnify any Indemnified Person under this <u>Article 9</u>: (a) for any amounts paid in settlement of any Proceeding effected without the Corporation's written consent, which consent shall not be unreasonably withheld or delayed, or (b) for any judicial award if the Corporation was not given a reasonably timely opportunity to participate, at its expense, in the defense of such action, but only to the extent that the failure to be given such reasonably timely opportunity actually and materially prejudiced the Corporation's ability to defend such action.

H. <u>Subrogation</u>. In the event of payment under this <u>Article 9</u>, the Corporation shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnified Person, who shall execute all papers required and shall do everything that may be reasonably necessary to secure such rights, including the execution of such documents reasonably necessary to enable the Corporation effectively to bring suit to enforce such rights.

I. <u>Amendment or Repeal; Successors</u>. No amendment, modification or repeal of the provisions of this <u>Article 9</u>, nor the adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this <u>Article 9</u>, nor to the fullest extent permitted by applicable law, any modification of law, shall adversely affect (or eliminate or reduce) any right or protection hereunder of any person in respect of any event, act or omission occurring prior to the time of such amendment, modification or repeal, or adoption of any inconsistent provision or, if applicable, modification of law (regardless of when any Proceeding (or part thereof) relating to such event, act or omission arises or is first threatened, commenced or completed). The rights conferred by this <u>Article 9</u> shall inure to the benefit of any Indemnified Person (and shall continue as to an Indemnified Person who has ceased to be a director or officer) and such person's legal representatives, executors, administrators, heirs, devises and legatees. For purposes of this Article, references to "the Corporation" shall include any constituent corporation absorbed in a merger with this Corporation which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article with respect to this Corporation as

such person would have with respect to such constituent corporation if its separate existence had continued.

10. <u>Amendment or Repeal of Articles 3, 5, 7, 8, 9, 10, or 12</u>. The amendment, alteration or repeal of <u>Articles 3</u>, <u>5</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, or <u>12</u> of this Amended and Restated Certificate of Incorporation shall require the affirmative vote of the holders of at least 66 2/3% of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class; all other amendments to this Amended and Restated Certificate of Incorporation shall require the affirmative vote of the holders of at least a majority of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

11. <u>Registered Holders</u>. The Corporation shall be entitled to treat the person in whose name any share of stock or any warrant, right or option is registered as the owner thereof for all purposes and shall not be bound to recognize any equitable or other claim to, or interest in, such share, warrant, right or option on the part of any other person, whether or not the Corporation shall have notice thereof, save as may be expressly provided otherwise by law.

12. <u>DGCL Section 203</u>. The Corporation hereby elects to be governed by Section 203 of the DGCL.

13. <u>Restrictions on Transfers of Shares</u>.

A. <u>Definitions</u>. As used in this Article 13, the following capitalized terms have the following meanings when used herein with initial capital letters (and any references to any portions of Treasury Regulation §§ 1.382-2T, 1.382-3 and 1.382-4 shall include any successor provisions):

(a) "<u>4.9-percent Transaction</u>" means any Transfer described in clause (a) or (b) of Article 13.B.

(b) "<u>4.9-percent Shareholder</u>" a Person with a Percentage Share Ownership of 4.9% or more.

(c) "<u>Agent</u>" has the meaning set forth in Article 13.E.

(d) "<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended from time to time, and the rulings issued thereunder.

(e) "<u>Common Shares</u>" means any interest in Common Stock of the Corporation.

(f) "<u>Corporation Security</u>" or "<u>Corporation Securities</u>" means (i) Common Shares, (ii) shares of preferred stock issued by the Corporation (other than preferred stock described in Section 1504(a)(4) of the Code), (iii) warrants, rights, or options (including options within the meaning of Treasury Regulation §§ 1.382-2T(h)(4)(v) and 1.382-4) to purchase Securities of the Corporation, and (iv) any Shares.

(g) "Effective Date" means the date of filing of this Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware.

(h) "Excess Securities" has the meaning given such term in Article 13.D.

(i) "Expiration Date" means the earlier of (i) the repeal of Section 382 of the Code or any successor statute if the Board of Directors determines that this Article 13 is no longer necessary for the preservation of Tax Benefits, (ii) the beginning of a taxable year of the Corporation to which the Board of Directors determines that no Tax Benefits may be carried forward, (iii) such date as the Board of Directors shall in good faith determine that it is in the best interests of the Corporation and its stockholders for the transfer limitations in this Article 13 to expire, or (iv) the date that is three years after the Effective Date.

(j) "Percentage Share Ownership" means the percentage Share Ownership interest of any Person for purposes of Section 382 of the Code as determined in accordance with the Treasury Regulation §§ 1.382-2T(g), (h), and (k) and 1.382-4 or any successor provision.  For the sole purpose of determining the Percentage Share Ownership of any entity (and not for the purpose of determining the Percentage Share Ownership of any other Person), Corporation Securities held by such entity shall not be treated as no longer owned by such entity pursuant to Treasury Regulation §1.382−2T(h)(2)(i)(A).

(k) "Person" means any individual, firm, corporation or other legal entity, including a group of persons treated as an entity pursuant to Treasury Regulation § 1.382-3(a)(1)(i); and includes any successor (by merger or otherwise) of such entity; provided, however, that the term Person shall not include a Public Group.

(l) "Prohibited Distributions" means any and all dividends or other distributions paid by the Corporation with respect to any Excess Securities received by a Purported Transferee.

(m) "Prohibited Transfer" means any Transfer or purported Transfer of Corporation Securities to the extent that such Transfer is prohibited and/or void under this Article 13.

(n) "Public Group" has the meaning set forth in Treasury Regulation § 1.382-2T(f)(13).

(o) "Purported Transferee" has the meaning set forth in Article 13.D.

(p) "Securities" and "Security" each has the meaning set forth in Article 13.G.

(q) "Share Ownership" means any direct or indirect ownership of Shares, including any ownership by virtue of application of constructive ownership rules, with such direct, indirect, and constructive ownership determined under the provisions of Section 382 of the Code and the regulations thereunder.

(r) "Shares" means any interest that would be treated as "stock" of the Corporation pursuant to Treasury Regulation § 1.382-2T(f)(18).

(s) "Tax Benefits" means the net operating loss carryforwards, capital loss carryforwards, general business credit carryforwards, alternative minimum tax credit carryforwards and foreign

tax credit carryforwards, as well as any loss or deduction attributable to a "net unrealized built-in loss" of the Corporation or any direct or indirect subsidiary thereof, within the meaning of Section 382 of the Code.

(t) "Transfer" means, any direct or indirect sale, transfer, assignment, conveyance, pledge or other disposition or other action taken by a Person, other than the Corporation, that alters the Percentage Share Ownership of any Person. A Transfer also shall include the creation or grant of an option (including an option within the meaning of Treasury Regulation §§ 1.382-2T(h)(4)(v) and 1.382-4). For the avoidance of doubt, a Transfer shall not include the creation or grant of an option by the Corporation, nor shall a Transfer include the issuance of Shares by the Corporation.

(u) "Transferee" means any Person to whom Corporation Securities are Transferred.

(v) "Treasury Regulations" means the regulations, including temporary regulations or any successor regulations promulgated under the Code, as amended from time to time.

B. Transfer And Ownership Restrictions. In order to preserve the Tax Benefits, from and after the Effective Date of this Article 13 any attempted Transfer of Corporation Securities prior to the Expiration Date and any attempted Transfer of Corporation Securities pursuant to an agreement entered into prior to the Expiration Date, subject to the exceptions set forth in Article 13.C, shall be prohibited and void ab initio to the extent that, as a result of such Transfer (or any series of related Transfers of which such Transfer is a part), either (a) any Person or Persons would become a 4.9-percent Shareholder or (b) the Percentage Share Ownership in the Corporation of any 4.9-percent Shareholder would be (i) increased or (ii) decreased.

C. Exceptions. The restrictions set forth in Article 13.B shall not apply to an attempted Transfer that is a 4.9-percent Transaction if the transferor or the Transferee obtains the written approval of the Board of Directors or a duly authorized committee thereof. The Board of Directors may grant such approval notwithstanding the effect of such approval on the Tax Benefits if it determines that the approval is in the best interests of the Corporation. The Board of Directors shall be deemed to have granted such approval to any such proposed Transfer if the Board of Directors does not notify the transferor in writing within 20 days of the Corporation receiving written notice of the proposed Transfer, that it has determined in good faith after consultation with its tax advisors that the proposed Transfer could reasonably be expected to jeopardize the realization of a material portion of the Tax Benefits. The Board of Directors, to the fullest extent permitted by law, may exercise the authority granted by this Article 13 through duly authorized officers or agents of the Corporation. Nothing in this Article 13.C shall be construed to limit or restrict the Board of Directors in the exercise of its fiduciary duties under applicable law.

D. Excess Securities.

(a) No employee or agent of the Corporation shall record any Prohibited Transfer, and the purported transferee of such a Prohibited Transfer (the "Purported Transferee") shall not be recognized as a stockholder of the Corporation for any purpose whatsoever in respect of the

Corporation Securities which are the subject of the Prohibited Transfer (the "Excess Securities"). Until the Excess Securities are acquired by another person in a Transfer that is not a Prohibited Transfer, the Purported Transferee shall not be entitled with respect to such Excess Securities to any rights of a stockholder of the Corporation, including, without limitation, the right to vote such Excess Securities and to receive dividends or distributions, whether liquidating or otherwise, in respect thereof, if any, and the Excess Securities shall be deemed to remain with the transferor unless and until the Excess Securities are transferred to the Agent pursuant to Article 13.E or until an approval is obtained under Article 13.C. After the Excess Securities have been acquired in a Transfer that is not a Prohibited Transfer, the Corporation Securities shall cease to be Excess Securities. For this purpose, any Transfer of Excess Securities not in accordance with the provisions of Article 13.D or Article 13.E shall also be a Prohibited Transfer.

(b) The Corporation may require as a condition to the registration of the Transfer of any Corporation Securities or the payment of any distribution on any Corporation Securities that the proposed Transferee or payee furnish to the Corporation all information reasonably requested by the Corporation with respect to its direct or indirect ownership interests in such Corporation Securities. The Corporation may make such arrangements or issue such instructions to its share transfer agent as may be determined by the Board of Directors to be necessary or advisable to implement this Article 13, including, without limitation, authorizing such transfer agent to require an affidavit from a Purported Transferee regarding such Person's actual and constructive ownership of shares and other evidence that a Transfer will not be prohibited by this Article 13 as a condition to registering any transfer.

E. <u>Transfer To Agent</u>. If the Board of Directors determines that a Transfer of Corporation Securities constitutes a Prohibited Transfer then, upon written demand by the Corporation sent to the Purported Transferee within 20 days of the date on which the Board of Directors determines that the attempted Transfer would result in Excess Securities, the Purported Transferee shall transfer or cause to be transferred any certificate or other evidence of ownership of the Excess Securities within the Purported Transferee's possession or control, together with any Prohibited Distributions, to an agent designated by the Board of Directors (the "<u>Agent</u>").

(a) In the case of a Prohibited Transfer described in Article 13.B(b)(i), the Agent shall thereupon sell to a buyer or buyers (which may include the Corporation) the Excess Securities transferred to it in one or more arm's-length transactions (on the public securities market on which such Excess Securities are traded, if possible, or otherwise privately); provided, however, that any such sale must not constitute a Prohibited Transfer and provided, further, that the Agent shall effect such sale or sales in an orderly fashion and shall not be required to effect any such sale within any specific time frame if, in the Agent's discretion, such sale or sales would disrupt the market for the Corporation Securities or otherwise would adversely affect the value of the Corporation Securities. If the Purported Transferee has resold the Excess Securities before receiving the Corporation's demand to surrender Excess Securities to the Agent, the Purported Transferee shall be deemed to have sold the Excess Securities for the Agent, and shall be required to transfer to the Agent any Prohibited Distributions and proceeds of such sale, except to the extent that the Corporation grants written permission to the Purported Transferee to retain a portion of such sales proceeds not exceeding the amount that the Purported Transferee would

have received from the Agent pursuant to Article 13.F if the Agent rather than the Purported Transferee had resold the Excess Securities.

(b) In the case of a Prohibited Transfer described in Article 13.B(b)(ii), the transferor of such Prohibited Transfer (the "Purported Transferor") shall also deliver to the Agent the sales proceeds from the Prohibited Transfer (in the form received, i.e., whether in cash or other property), and the Agent shall thereupon sell any non-cash consideration to a buyer or buyers in one or more arm's-length transactions (including over a national securities exchange, if possible). If the Purported Transferee is determinable (other than with respect to a transaction entered into through the facilities of a national securities exchange), the Agent shall, to the extent possible, return the Prohibited Distributions to the Purported Transferor, and shall reimburse the Purported Transferee from the sales proceeds received from the Purported Transferor (or the proceeds from the disposition of any non-cash consideration) for the cost of any Excess Securities returned in accordance with Article 13.F. If the Purported Transferee is not determinable, or to the extent the Excess Securities have been resold and thus cannot be returned to the Purported Transferor, the Agent shall use the proceeds to acquire on behalf of the Purported Transferor, in one or more arm's-length transactions (including over a national securities exchange on which the Corporation Securities may be traded, if possible), an equal amount of Corporation Securities in replacement of the Excess Securities sold; provided, however, that, to the extent the amount of proceeds is not sufficient to fund the purchase price of such Corporation Securities and the Agent's costs and expenses (as described in Article 13.F), the Purported Transferor shall promptly fund such amounts upon demand by the Agent.

F. <u>Application Of Proceeds And Prohibited Distributions</u>. The Agent shall apply any proceeds of a sale by it of Excess Securities and, if the Purported Transferee has previously resold the Excess Securities, any amounts received by it from a Purported Transferee, together, in either case, with any Prohibited Distributions, as follows: (a) first, such amounts shall be paid to the Agent to the extent necessary to cover its costs and expenses incurred in connection with its duties hereunder; (b) second, any remaining amounts shall be paid to the Purported Transferee, up to the amount paid by the Purported Transferee for the Excess Securities (or in the event the purported Transfer of the Excess Securities was, in whole or in part, a gift, inheritance or similar Prohibited Transfer without consideration, the fair market value, (1) calculated on the basis of the closing market price for the Corporation Securities on the day before the Prohibited Transfer or, (2) if the Corporation Securities are not listed or admitted to trading on any stock exchange but are traded in the over-the-counter market, calculated based upon the difference between the highest bid and lowest asked prices, as such prices are reported by the National Association of Securities Dealers through its NASDAQ system or any successor system on the day before the Prohibited Transfer or, if none, on the last preceding day for which such quotations exist, or (3) if the Corporation Securities are neither listed nor admitted to trading on any stock exchange nor traded in the over-the-counter market, then as determined in good faith by the Board of Directors, which amount shall be determined at the discretion of the Board of Directors); and (c) third, any remaining amounts shall be paid to one or more organizations qualifying under section 501(c)(3) of the Code (or any comparable successor provision) selected by the Board of Directors. The Purported Transferee of Excess Securities shall have no claim, cause of action or any other recourse whatsoever against any transferor of Excess Securities. The Purported Transferee's sole right with respect to such shares shall be limited to the amount payable to the Purported Transferee pursuant to this Article 13.F. In no event shall the proceeds

of any sale of Excess Securities pursuant to this Article 13.F inure to the benefit of the Corporation or the Agent, except to the extent used to cover costs and expenses incurred by the Agent in performing its duties hereunder.

G. <u>Modification Of Remedies For Certain Indirect Transfers</u>. In the event of any Transfer which does not involve a transfer of securities of the Corporation within the meaning of Delaware law ("Securities," and individually, a "Security") but which would cause a 4.9-percent Shareholder to violate a restriction on Transfers provided for in this Article 13, the application of Article 13.E and Article 13.F shall be modified as described in this Article 13.G.

(a) In such case where the Prohibited Transfer is described in Article 13.B(b)(i), no such 4.9-percent Shareholder shall be required to dispose of any interest that is not a Security, but such 4.9-percent Shareholder and/or any Person whose ownership of Securities is attributed to such 4.9-percent Shareholder shall be deemed to have disposed of and shall be required to dispose of sufficient Securities (which Securities shall be disposed of in the inverse order in which they were acquired) to cause such 4.9-percent Shareholder, following such disposition, not to be in violation of this Article 13. Such disposition shall be deemed to occur simultaneously with the Transfer giving rise to the application of this provision, and such number of Securities that are deemed to be disposed of shall be considered Excess Securities and shall be disposed of through the Agent as provided in Article 13.E and Article 13.F, except that the maximum aggregate amount payable either to such 4.9-percent Shareholder, or to such other Person that was the direct holder of such Excess Securities, in connection with such sale shall be the fair market value of such Excess Securities at the time of the purported Transfer. All expenses incurred by the Agent in disposing of such Excess Securities shall be paid out of any amounts due such 4.9-percent Shareholder or such other Person.

(b) In such case where the Prohibited Transfer is described in Article 13.B(b)(ii), no such 4.9-percent Shareholder shall be required to acquire any interest that is not a Security, but such 4.9-percent Shareholder and/or any Person whose ownership of Securities is attributed to such 4.9-percent Shareholder shall be deemed to have acquired and shall be required to acquire sufficient Securities (which Securities shall be acquired in the inverse order in which they were disposed of) to cause such 4.9-percent Shareholder, following such acquisition, not to be in violation of this Article 13. Such acquisition shall be deemed to occur simultaneously with the Transfer giving rise to the application of this provision, and such number of Securities that are deemed to be acquired shall be considered acquired through the Agent as provided in Article 13.E. All expenses incurred by the Agent in acquiring such Securities shall be paid out of any amounts due such 4.9-percent Shareholder or such other Person.

The purpose of this Article 13.G is to extend the restrictions in Article 13.B and Article 13.E to situations in which there is a 4.9-percent Transaction without a direct Transfer of Securities, and this Article 13.G, along with the other provisions of this Article 13, shall be interpreted to produce the same results, with differences as the context requires, as a direct Transfer of Corporation Securities.

H. <u>Legal Proceedings; Prompt Enforcement</u>. If the Purported Transferee fails to surrender the Excess Securities or the proceeds of a sale thereof or the Purported Transferor fails to surrender the sale proceeds from the Prohibited Transfer to the Agent within thirty days from

the date on which the Corporation makes a written demand pursuant to Article 13.E, then the Corporation shall promptly take all cost effective actions which it believes are appropriate to enforce the provisions hereof, including the institution of legal proceedings to compel the surrender. Nothing in this Article 13.H shall (i) be deemed inconsistent with any Transfer of the Excess Securities provided in this Article 13 being void ab initio, (ii) preclude the Corporation in its discretion from immediately bringing legal proceedings without a prior demand or (iii) cause any failure of the Corporation to act within the time periods set forth in Article 13.E to constitute a waiver or loss of any right of the Corporation under this Article 13. The Board of Directors may authorize such additional actions as it deems advisable to give effect to the provisions of this Article 13.

I. <u>Obligation To Provide Information</u>. As a condition to the registration of the Transfer of any Corporation Securities, any Person who is a beneficial, legal or record holder of Corporation Securities, and any proposed Transferee and any Person controlling, controlled by or under common control with the proposed Transferee, shall provide such information as the Corporation may reasonably request from time to time in order to determine compliance with this Article 13 or the status of the Tax Benefits of the Corporation and the Corporation shall keep such information confidential.

J. <u>Legends</u>. The Board of Directors shall require that any certificates issued by the Corporation evidencing ownership of Corporation Securities that are subject to the restrictions on transfer and ownership contained in this Article 13 bear the following legend:

"THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (THE "<u>CERTIFICATE OF INCORPORATION</u>"), OF THE CORPORATION CONTAINS RESTRICTIONS PROHIBITING THE TRANSFER (AS DEFINED IN THE CERTIFICATE OF INCORPORATION) OF STOCK OF THE CORPORATION (INCLUDING THE CREATION OR GRANT OF CERTAIN OPTIONS, RIGHTS AND WARRANTS) WITHOUT THE PRIOR AUTHORIZATION OF THE BOARD OF DIRECTORS OF THE CORPORATION (THE "<u>BOARD OF DIRECTORS</u>") IF SUCH TRANSFER AFFECTS THE PERCENTAGE OF STOCK OF THE CORPORATION (WITHIN THE MEANING OF SECTION 382 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") AND THE TREASURY REGULATIONS PROMULGATED THEREUNDER), THAT IS TREATED AS OWNED BY A 4.9 PERCENT SHAREHOLDER (AS DEFINED IN THE CERTIFICATE OF INCORPORATION). IF THE TRANSFER RESTRICTIONS ARE VIOLATED, THEN THE TRANSFER WILL BE VOID AB INITIO AND, AS APPLICABLE, EITHER (I) THE PURPORTED TRANSFEREE OF THE SHARES WILL BE REQUIRED TO TRANSFER EXCESS SECURITIES (AS DEFINED IN THE CERTIFICATE OF INCORPORATION) TO THE CORPORATION'S AGENT OR (II) THE PURPORTED TRANSFEROR OF THE SHARES WILL BE REQUIRED TO SURRENDER THE SALE PROCEEDS OF THE PROHIBITED TRANSFER TO THE CORPORATION'S AGENT AND THE CORPORATION'S AGENT SHALL USE SUCH PROCEEDS TO ACQUIRE ON BEHALF OF THE PURPORTED TRANSFEROR AN AMOUNT OF SHARES IN REPLACEMENT OF THE EXCESS SECURITIES (AS DEFINED IN THE CERTIFICATE OF INCORPORATION) SOLD BY THE PURPORTED TRANSFEROR. IN THE EVENT OF A TRANSFER WHICH DOES NOT INVOLVE SECURITIES OF THE CORPORATION WITHIN THE MEANING OF THE GENERAL CORPORATION LAW OF THE STATE OF

DELAWARE ("SECURITIES") BUT WHICH WOULD VIOLATE THE TRANSFER RESTRICTIONS, AS APPLICABLE, EITHER (A) THE PURPORTED TRANSFEREE (OR THE RECORD OWNER) OF THE SECURITIES WILL BE REQUIRED TO TRANSFER SUFFICIENT SECURITIES PURSUANT TO THE TERMS PROVIDED FOR IN THE CORPORATION'S CERTIFICATE OF INCORPORATION TO CAUSE THE 4.9 PERCENT SHAREHOLDER TO NO LONGER BE IN VIOLATION OF THE TRANSFER RESTRICTIONS OR (B) THE PURPORTED TRANSFEROR OF THE SECURITIES WILL BE REQUIRED TO ACQUIRE SUFFICIENT SECURITIES PURSUANT TO THE TERMS PROVIDED FOR IN THE CORPORATION'S CERTIFICATE OF INCORPORATION TO CAUSE THE 4.9 PERCENT SHAREHOLDER TO NO LONGER BE IN VIOLATION OF THE TRANSFER RESTRICTIONS. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO THE HOLDER OF RECORD OF THIS CERTIFICATE A COPY OF THE CERTIFICATE OF INCORPORATION, CONTAINING THE ABOVE-REFERENCED TRANSFER RESTRICTIONS, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS."

K. Authority Of Board Of Directors. The Board of Directors shall have the power to determine all matters necessary for assessing compliance with this Article 13, including, without limitation, (i) the identification of 4.9-percent Shareholders, (ii) whether a Transfer is a 4.9-percent Transaction or a Prohibited Transfer, (iii) the Percentage Share Ownership in the Corporation of any 4.9-percent Shareholder, (iv) whether an instrument constitutes a Corporation Security, and (v) the amount (or fair market value) due to a Purported Transferee pursuant to Article 13.F. In addition, the Board of Directors may, to the extent permitted by applicable law, from time to time and subject to the terms hereof and thereof, establish, modify, amend or rescind by-laws, regulations and procedures of the Corporation not inconsistent with the provisions of this Article 13 for purposes of determining whether any Transfer of Corporation Securities would jeopardize the Corporation's ability to preserve and use the Tax Benefits and for the orderly application, administration and implementation of this Article 13.

Notwithstanding anything herein to the contrary, in the event of a change in law making one or more of the following actions necessary or desirable, the Board of Directors may, by adopting a written resolution, (i) modify the ownership interest percentage in the Corporation or the Persons or groups covered by this Article 13, (ii) modify the definitions of any terms set forth in this Article 13 (other than the term "Expiration Date") or (iii) modify the terms of this Article 13 (other than the Expiration Date) as appropriate, in each case, in order to prevent an ownership change for purposes of Section 382 of the Code as a result of any changes in applicable Treasury Regulations or otherwise; provided, however, that the Board of Directors shall not cause there to be such modification unless it determines, by adopting a written resolution, that such action is reasonably necessary or advisable to preserve the Tax Benefits or that the continuation of these restrictions is no longer reasonably necessary for the preservation of the Tax Benefits. Stockholders of the Corporation shall be notified of such determination through a filing with the Securities and Exchange Commission or such other method of notice as the Secretary of the Corporation shall deem appropriate.

In the case of an ambiguity in the application of any of the provisions of this Article 13, including any definition used herein, the Board of Directors shall have the power to determine the application of such provisions with respect to any situation based on its reasonable belief,

understanding or knowledge of the circumstances. In the event this Article 13 requires an action by the Board of Directors but fails to provide specific guidance with respect to such action, the Board of Directors shall have the power to determine the action to be taken so long as such action is not contrary to the provisions of this Article 13. All such actions, calculations, interpretations and determinations which are done or made by the Board of Directors in good faith shall be conclusive and binding on the Corporation, the Agent, and all other parties for all other purposes of this Article 13. The Board of Directors may delegate all or any portion of its duties and powers under this Article 13 to a committee of the Board of Directors as it deems necessary or advisable and, to the fullest extent permitted by law, may exercise the authority granted by this Article 13 through duly authorized officers or agents of the Corporation. Nothing in this Article 13 shall be construed to limit or restrict the Board of Directors in the exercise of its fiduciary duties under applicable law.

L. <u>Reliance</u>. To the fullest extent permitted by law, the Corporation and the members of the Board of Directors shall be fully protected in relying in good faith upon the information, opinions, reports or statements of the chief executive officer, the chief financial officer, the chief accounting officer or the corporate controller of the Corporation and the Corporation's legal counsel, independent auditors, transfer agent, investment bankers or other employees and agents in making the determinations and findings contemplated by this Article 13. The members of the Board of Directors shall not be responsible for any good faith errors made in connection therewith. For purposes of determining the existence and identity of, and the amount of any Corporation Securities owned by any stockholder, the Corporation is entitled to rely on the existence and absence of filings of Schedule 13D or 13G under the Securities and Exchange Act of 1934, as amended (or similar filings), as of any date, subject to its actual knowledge of the ownership of Corporation Securities.

M. <u>Benefits Of This Article 13</u>. Nothing in this Article 13 shall be construed to give to any Person other than the Corporation or the Agent any legal or equitable right, remedy or claim under this Article 13. This Article 13 shall be for the sole and exclusive benefit of the Corporation and the Agent.

N. <u>Severability</u>. The purpose of this Article 13 is to facilitate the Corporation's ability to maintain or preserve its Tax Benefits. If any provision of this Article 13 or the application of any such provision to any Person or under any circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Article 13.

O. <u>Waiver</u>. With regard to any power, remedy or right provided herein or otherwise available to the Corporation or the Agent under this Article 13, (a) no waiver will be effective unless expressly contained in a writing signed by the waiving party; and (b) no alteration, modification or impairment will be implied by reason of any previous waiver, extension of time, delay or omission in exercise, or other indulgence.

**[Signature Page Follows]**

IN WITNESS WHEREOF, Newdex, Inc. has caused this Amended and Restated Certificate of Incorporation, which restates and integrates and further amends the provisions of its certificate of incorporation as currently in effect, and which has been duly adopted in accordance with Sections 228, 242 and 245 of the Delaware General Corporation Law, to be executed by its duly authorized officer on the date set forth below.

**NEWDEX, INC.**

By: _____

Name:

Title:

Date: _____